No. 25-1372

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
*Plaintiff-Appellant*,

v.

INTUITIVE SURGICAL, INC.,
*Defendant-Appellee*.

_____

United States District Court
for the Northern District of California
No. 21-cv-3496-AMO
Hon. Araceli Martinez-Olguín

_____

## APPELLANT'S OPENING BRIEF

_____

Richard T. McCaulley
MCCAULLEY LAW GROUP LLC
180 N. Wabash Avenue, Suite 601
Chicago, IL 60601
(312) 330-8105
richard@mcaulleylawgroup.com

Joshua V. Van Hoven
MCCAULLEY LAW GROUP LLC
3001 Bishop Dr., Suite 300
San Ramon, CA 94583
(925) 302-5941
josh@mcaulleylawgroup.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com

David J. Zimmer
Edwina Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Appellant Surgical Instrument Service Company, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ...........................................5

ISSUE PRESENTED ................................................................5

STATEMENT OF THE CASE...................................................6

    I.    Legal Background ........................................................6

        A.    The rule of reason ...........................................6

        B.    Market definition and market power ...........7

        C.    Tying and other anticompetitive conduct ................................10

        D.    Foremarkets and aftermarkets.................13

    II.    Factual Background........................................15

        A.    Intuitive centers its business plan, from the outset, on charging high prices for limited-use surgical instruments.......................15

        B.    Intuitive's robot succeeds. ......................17

        C.    Intuitive tightly controls the EndoWrist aftermarket...............20

        D.    SIS attempts to compete with Intuitive on EndoWrists...........21

        E.    Intuitive squashes SIS's success using its ties and exclusive-dealing arrangements. ...............22

    III.    Procedural History.............................................24

SUMMARY OF THE ARGUMENT ....................................26

STANDARD OF REVIEW ................................................29

i

ARGUMENT ........................................................................................30

I.    The District Court Should Have Treated This Case Like The Standard
      Tying Case It Is. .................................................................30

      A.    A century of precedent from this Court and the Supreme Court
            has settled the elements of a tying claim. .................................31

      B.    The same settled elements apply to foremarket/aftermarket ties.
            ...................................................................................33

II.   The District Court Erred By Also Requiring SIS To Prove The *Kodak*
      Factors. .................................................................................39

      A.    *Kodak* makes clear that it applies only if the defendant lacks
            foremarket power. ...................................................................40

      B.    This court's *Kodak*-related precedents are similarly limited to
            cases involving competitive upstream markets. ........................46

      C.    Other authorities have correctly held that the *Kodak* factors do
            not apply absent a competitive foremarket. .............................54

      D.    The district court's instruction was particularly inapposite in
            this total monopoly case. ..........................................................56

CONCLUSION .......................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
836 F.3d 1171 (9th Cir. 2016) ......................................................12

*Apex Hosiery Co. v. Leader,*
310 U.S. 469 (1940) ........................................................................6

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) .................................. 2, 11, 27, 31, 32

*Coronavirus Reporter v. Apple, Inc.,*
85 F.4th 948 (9th Cir. 2023) ........................................ 9, 49, 52, 53

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.,*
141 F.4th 1075 (9th Cir. 2025) ....................................................10

*Dr. Miles Med. Co. v. John D. Park & Sons Co.,*
220 U.S. 373 (1911) ........................................................................7

*Dreamstime.com, LLC v. Google LLC,*
54 F.4th 1130 (9th Cir. 2022) .................................................. 12, 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992) .................. 3, 4, 11, 14, 15, 28, 30, 33, 37, 40, 41, 43, 44

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ................. 3, 6, 7, 8, 9, 13, 15, 29, 48, 49, 50, 51

*FTC v. Deere & Co.,*
No. 25-CV-50017, 2025 WL 1638474 (N.D. Ill. June 9, 2025) ...... 29, 55, 56

*FTC v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020) ........................................................8

*Illinois Tool Works Inc. v. Indep. Ink, Inc.,*
547 U.S. 28 (2006) .................................................................. 8, 35

*International Business Machines Corp. v. United States,*
298 U.S. 131 (1936) .............................................................. 1, 33, 34

*International Salt Co. v. United States,*
332 U.S. 392 (1947) ................................................................ 34, 35

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984)................................................................ 8, 32

*Krechman v. Cnty. of Riverside*,
723 F.3d 1104 (9th Cir. 2013) .........................................30

*Lambrix v. Tesla, Inc.*,
737 F. Supp. 3d 822 (N.D. Cal. 2024)............................ 29, 54, 55

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)............................................................7

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) ............................................................ 6, 33

*Newcal Indus., Inc. v. Ikon Office*,
513 F.3d 1038 (9th Cir. 2008) .......................... 7, 46, 47, 48

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)............................................................8

*Omega Env'tl, Inc. v. Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) .........................................12

*Paladin Assocs., Inc. v. Montana Power Co.*,
328 F.3d 1145 (9th Cir. 2003) .........................................11

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) ............................................47

*Siegel v. Chicken Delight, Inc.*,
448 F.2d 43 (9th Cir. 1971) .............................................31

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)..........................................................13

*Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*,
728 F. Supp. 3d 1034 (N.D. Cal. 2024)...........................20

*Tanaka v. Univ. of S. Cal.*,
252 F.3d 1059 (9th Cir. 2001) ...........................................9

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
676 F.2d 1291 (9th Cir. 1982) .........................................12

*United Shoe Machinery Corp. v. United States*,
258 U.S. 451 (1922)...................................................... 35, 36

iv

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ........................................................................12

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ........................................................................10

*Wilkerson v. Wheeler*,
    772 F.3d 834 (9th Cir. 2014) ...........................................................29

**Statutes**

15 U.S.C. § 1 ...............................................................................................6

15 U.S.C. § 2 ...............................................................................................6

28 U.S.C. § 1291 .........................................................................................5

28 U.S.C. § 1331 .........................................................................................5

28 U.S.C. § 1337(a) .....................................................................................5

**Rules**

Fed. R. App. P. 4(a)(1)(A) ..........................................................................5

Fed. R. Civ. P. 54(b) ...................................................................................5

# INTRODUCTION

Almost 100 years ago, the Supreme Court found that IBM violated the antitrust laws when it required purchasers of its early computers to buy all the "cards" they needed to run the machines from IBM itself. *International Business Machines Corp. v. United States*, 298 U.S. 131, 135-36 (1936). This was a classic example of "tying," in which a company uses its market power in one market (the "tying" market) to unreasonably restrain trade in another market (the "tied" market). The antitrust principle is simple: A company with market power in one market should not be able to use that power to force consumers to make sub-optimal choices in another. *See, e.g.*, *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1212 n.4 (9th Cir. 1977).

Under these settled principles, this case should have been easy. Defendant Intuitive manufactures the da Vinci surgical robot, which it sells to hospitals. It has a near-total monopoly over minimally invasive soft-tissue (MIST) surgical robots, with a market share of 99 percent. Intuitive also manufactures and sells "EndoWrists"—the different attachments for the end of the robot arm that the da Vinci requires for every procedure it performs. Intuitive programs these EndoWrists to "self-destruct" after ten activations so that users will have to buy more of them. And it fiercely guards the profits generated by that inefficient self-

destruct mechanism by contractually forbidding da Vinci owners from avoiding the counter or buying EndoWrists from anyone else.

Sensing an opportunity, plaintiff SIS offered hospitals a service that would refresh their EndoWrists, enabling many more uses at a lower price. But once Intuitive got wind of this offering and started enforcing its ties and exclusive-dealing arrangements, SIS was quickly frozen out of the EndoWrist market. That harmed not only SIS but all the da Vinci owning hospitals, as they lost access to a more efficient and less wasteful product at a far more favorable price.

SIS thus sued Intuitive on tying, exclusive-dealing, and monopolization theories—accusing it of leveraging its monopoly in the "foremarket" for MIST surgical robots to preclude competition in the "aftermarket" for EndoWrists. That case was tried to a jury, but not to a verdict. The jury should have been asked to decide a few, simple questions that have long defined a tying claim in this Circuit: whether Intuitive (1) had power in the MIST robot market; (2) used it to force robot buyers to also buy all their EndoWrists from Intuitive; and (3) thereby unreasonably precluded SIS from competing in the downstream EndoWrist market. *See, e.g.*, *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008). The trial record shows that the answer to all three questions was clearly "yes."

Intuitive, however, sought to complicate matters by arguing that SIS should *also* have to prove what are known as the "*Kodak/Epic* factors," which emerge

2

from the Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), and were applied by this Court in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). Those cases considered whether a durable equipment manufacturer that *lacks* power in the equipment foremarket can nevertheless violate the antitrust laws by leveraging the power it holds over customers who have already been "locked in" to its particular brand. In *Kodak* itself, there was a competitive market in photocopiers, but the plaintiff alleged that Kodak controlled the market for Kodak-specific replacement parts, which it would only provide to customers who hired Kodak servicing technicians. That theory presented a different (and harder) antitrust case than *IBM* because, while Kodak controlled the replacement-part aftermarket, it *did not* control the foremarket in copiers. Thus, if a consumer understood and disliked Kodak's policies, it could simply choose a different copier brand upstream—an option that does not exist where, as here, there is no competition in the foremarket at all.

*Kodak* ultimately held that plaintiffs can *still* bring viable antitrust claims in that context, provided they prove some special factors that prevent the competition in the foremarket from disciplining aftermarket misbehavior. *See* 504 U.S. at 473-77. But, again, these factors were only necessary because Kodak concededly *lacked* market power in the upstream copier foremarket. And while some Justices disagreed with this expansion of potential antitrust liability, no one questioned

3

whether—if Kodak *had* power in the foremarket—it would have all the market power necessary for a conventional tying violation of the kind the Court had established in *IBM* and similar cases. *See* 504 U.S. at 479 n.29; *id.* at 499 (Scalia, J., dissenting, but agreeing on this point).

Accordingly, SIS did not try to prove the *Kodak/Epic* factors in this case because they were both unnecessary and impossible to logically apply. SIS's whole trial theory was that Intuitive was a near-total monopolist with *no competitors* in the MIST robot market. That meant that competition in the foremarket for surgical robots could not possibly discipline Intuitive's anticompetitive behavior in the EndoWrist market—not because that competition was ineffective to discipline aftermarket behavior under the *Kodak* factors, but because there wasn't any foremarket competition in the first place.

Having vacillated several times on the question—to the point of issuing conflicting decisions on the same day—the district court eventually sided with Intuitive and held that the jury would have to find the *Kodak/Epic* factors for SIS to prevail. Given its trial theory, SIS conceded that this required judgment against it as a matter of law while preserving its right to appeal the instructional error.

This Court should now reverse and remand for a new trial. Requiring SIS to prove the *Kodak/Epic* factors here conflicts with a century of precedent from the Supreme Court and this Court establishing the elements of a tying case in which

4

the plaintiff alleges that there is market power in the foremarket. It misreads *Kodak* and this Court's precedents applying it. And it conflicts with the opinions of the Federal Trade Commission and multiple other district courts, all concluding that the *Kodak* factors do not apply—or even make sense—unless the foremarket is competitive. This Court should thus correct the district court's outlier decision and allow a jury to decide SIS's claim.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337(a). It entered judgment as a matter of law on SIS's antitrust claims under Federal Rule of Civil Procedure 54(b) on January 30, 2025. 1-ER-2-3. SIS timely noticed this appeal on February 27, 2025. 6-ER-1313-1314; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

Whether a plaintiff must prove the *Kodak/Epic* factors when it alleges that a defendant *with market power in a durable equipment foremarket* tied access to that market to the purchase of the defendant's own brand of aftermarket inputs.

## STATEMENT OF THE CASE

### I.    Legal Background

#### A.    The rule of reason

The fundamental premise of the antitrust laws is that competition is good:  It lowers prices, increases quality, spurs innovation, and contributes to economic growth.  *See N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).  The Sherman Act thus broadly prohibits "[e]very contract, combination … or conspiracy[] in restraint of trade," 15 U.S.C. § 1, along with all "monopoliz[ation] or attempt[s] to monopolize … any part" of U.S. commerce, 15 U.S.C. § 2.  *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 500 (1940).

Broadly speaking, antitrust cases present two "general categories of liability standards."  *Epic*, 67 F.4th at 974.  Under the *per se* rule, some practices—like price fixing—are "conclusively presumed to be unreasonable and therefore illegal," "because of their pernicious effect on competition and lack of any redeeming virtue."  *N. Pac. Ry. Co.*, 356 U.S. at 5.  But the "antitrust liability standard applicable to most cases" is the "Rule of Reason," under which a plaintiff must show not only a restraint of trade, but also the "restraint's actual effect on competition."  *Epic*, 67 F.4th at 971, 974 (quotation marks omitted).  That requires a "multi-step, burden-shifting framework" that looks to the anticompetitive effects of the challenged conduct, any procompetitive rationales, and whether the

defendant could have achieved those benefits through less restrictive means. *Id.* at 974, 983-994.

Modern antitrust doctrine has leaned against *per se* rules. The Supreme Court has expressly abrogated some longstanding examples. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (overruling *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911)). And some rules that are still standing have long been questioned or cabined to existing fact patterns. *See, e.g.*, *Epic*, 67 F.4th at 997 (declining to extend *per se* anti-tying rule to certain software markets); *Moore*, 550 F.2d at 1213 (noting criticism of *per se* anti-tying rule). Given the uncertainty, many plaintiffs—like SIS here—choose to dispense with a *per se* case and proceed solely under the rule of reason, even if a *per se* proscription might technically apply. And this means they must prove not only the allegedly unlawful restraint, but its actual anticompetitive effects as well.

## B. Market definition and market power

Most antitrust cases, and particularly rule-of-reason theories, require courts to apply two closely related concepts: market definition and market power. *See, e.g.*, *Epic*, 67 F.4th at 974-975 & n.6. That is because, "[i]n order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). A firm with market power can "force a purchaser

7

to do something that he would not do in a competitive market," like accept supracompetitive prices or unreasonable conditions.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984), overruled on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Conversely, a firm without market power is generally unable to create the anticompetitive effects that a rule-of-reason case requires because consumers who dislike its high prices or onerous terms can just deal with its competitors instead.

Typically, the first step towards proving market power is to define a "relevant market."  A "relevant market" for antitrust purposes is "the area of effective competition" that covers the product at issue and all its reasonable substitutes.  *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018).  As this Court carefully explained in *Epic*, the technical test is to ask whether a "hypothetical monopolist" controlling the plaintiff's proposed market could profitably impose higher prices without losing too much market share to competing options.  If not, the proposed market is too narrow, and those competing choices must be included within the relevant market as well.  *See* 67 F.4th at 975.

Relevant markets are defined by reference to both geography (the "geographic market") and product (the "product market").  The geographic market is scoped by "where buyers can turn for alternative sources of supply."  *Tanaka v.*

8

*Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).  And the product market is made up of all "[p]roducts … that are 'reasonably interchangeable.'"  *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) (citation omitted).  For example, a McDonald's in Berkeley does not need to worry about its customers turning to a McDonald's in Honolulu (different geographic market) or a hardware store across the street (different product market).  But it might be in the same geographic and product market as a Chick-fil-A in Oakland.

The key concept in market definition is "cross-elasticity of demand"—*i.e.*, the extent to which a consumer will respond to a price increase for one firm's offering by switching to another's.  *Id.*  To give a (highly simplified) example, if the Oakland Chick-fil-A could double its prices without losing customers to the Berkeley McDonald's, that would indicate that consumers don't consider the two restaurants to be interchangeable and thus that they're in separate markets.  On the other hand, if a price increase *would* lead customers to switch to the Berkeley McDonald's, the plaintiff could not define a relevant market of "Oakland fast-food chicken restaurants" or the like.

Once a relevant market is properly defined, the question turns to whether the defendant has market power within it.  Market power can be proven directly, but it is also "generally inferred from the defendant's possession of a high market share and the existence of significant barriers to entry."  *Epic*, 67 F.4th at 983 (quotation

9

marks omitted); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1088 (9th Cir. 2025). In other words, if a firm occupies a large part of a relevant market, and it's hard for new competitors to enter, that company will generally have market power. Still, the ultimate question remains whether the defendant can impose unfavorable terms on its customers without losing too many to competitors.

As the foregoing demonstrates, the relevant market and market power inquiries go hand in hand: Both look to whether competitive pressures are sufficient to discipline a firm's efforts to impose unreasonable conditions on its counterparties. If not, the defendant has the power to harm competition within a relevant market and commit an antitrust violation. Conversely, if competition does discipline the defendant's behavior, the antitrust laws usually have no role to play.

### C.     Tying and other anticompetitive conduct

While market power is necessary to find an antitrust violation, there is nothing illegal about *having* market power or charging higher prices as a result. *See, e.g.*, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). Rather, what concerns the antitrust laws is using that power to exclude competitors or otherwise undermine the competition that will erode high prices and promote consumer welfare over time. *Id.* This case primarily concerns one such form of potentially anticompetitive conduct called "tying."

Tying occurs when a firm sells a product (the tying product) "only on the condition that the buyer also purchases a different (or tied) product." *Kodak*, 504 U.S. at 461. For example, a hospital that controls the market in certain specialized medical procedures might require insurers who want to access them to also contract for the hospital's primary care services. *Cascade Health Sols.*, 515 F.3d at 891-92. Tying thus enables a seller with "market power in one market to extend its market power to an entirely distinct market." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003).

Tying arrangements are not always illegal. At a minimum, a plaintiff alleging an anticompetitive tie must prove that a defendant: (1) "tied together the sale of two distinct products or services"; (2) had "enough market power in the tying product market to coerce its customers into purchasing the tied product"; and (3) "affect[ed] a not insubstantial volume of commerce in the tied product market." *Cascade Health Sols.*, 515 F.3d at 913 (quotation marks omitted). These elements rightly cabin tying liability to situations where the defendant forces a meaningful number of consumers to make sub-optimal choices in the tied market. And, as noted above, that is generally impossible for a defendant to do without market power in the tying market, because consumers can reject the tie by choosing a competitor's product in the tying market instead.

The related practice of exclusive dealing also can be anticompetitive in the presence of market power. It occurs when an "agreement between a vendor and a buyer … prevents the buyer from purchasing a given good from any other vendor, and forecloses competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016) (quotation marks omitted). The two practices often go together and reinforce each other; the tie requires a customer to buy from the defendant, while the exclusive-dealing condition prohibits buying from anyone else. In the absence of market power, however, there are some "well-recognized economic benefits to exclusive dealing arrangements." *Omega Env'tl, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997). Accordingly, such claims require proof of both market power and anticompetitive effects under the rule of reason. *See, e.g.*, *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 (9th Cir. 1982).

Both actual and attempted monopolization have similar requirements. "[M]onopoly power means the power to 'control prices and shape competition,'" *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)), and it is generally inferred from an even higher relevant-market share than is required for market power. But, as with market power, *having* a monopoly is not itself illegal. Instead, these claims require acquiring, maintaining, or attempting to acquire

12

monopoly power through anticompetitive conduct rather than competition on the merits. *See id.*; *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). And, once again, that will typically require showing that the defendant had enough power to impose anticompetitive conditions on counterparties without being disciplined by competition itself. *Dreamstime.com, LLC*, 54 F.4th at 1137.

### D.    Foremarkets and aftermarkets

SIS's allegations here involve tying together two particular types of markets called "foremarkets" and "aftermarkets." A "primary market" or "foremarket" involves a product one purchases for its own sake, while an "aftermarket" or "derivative market" is a market where demand for a good is largely contingent on a different product market upstream—often, "the prior purchase of a durable good." *See supra* pp.2-4; *Epic*, 67 F.4th at 976. For instance, there is a primary market for cars, and an aftermarket for compatible replacement parts like brake pads.

It is well settled that, just like a primary market, an aftermarket can be "the relevant market for antitrust purposes." *Epic*, 67 F.4th at 976. And it is similarly settled that tying together a foremarket and aftermarket can be illegal when the defendant has market power in the foremarket. *See supra* p.1 (discussing *IBM*).

The situation becomes more complicated, however, when the foremarket is characterized by effective interbrand competition rather than market power. That is what happened in *Kodak*, where Kodak concededly lacked market power in the

13

primary market for photocopiers. Despite that upstream competition, Kodak apparently (1) controlled the market for Kodak-specific replacement parts and (2) required customers to hire Kodak service technicians to get access to those parts. *Kodak*, 504 U.S. at 458. The plaintiff did not (and could not) use the foremarket in photocopiers as a "tying" market because that upstream equipment market was quite competitive. Instead, the plaintiff invoked the aftermarket for *Kodak parts* as the tying market, claiming that Kodak unreasonably tied access to that product market to the "tied" market of servicing Kodak copiers. *Id.* at 459.

Conflicting intuitions can arise in that scenario. On the one hand, the interbrand competition in the foremarket for photocopiers might rein in any anticompetitive conduct in the aftermarket for Kodak replacement parts. If, for instance, Kodak were to meaningfully increase replacement-part prices, it might lose sophisticated buyers in the upstream copier market, who will realize that other brands are offering a better overall "lifecycle price." Conversely, consumers who have already invested significantly in a foremarket product do seem to be trapped and at the mercy of a potentially unreasonable counterparty because they can no longer substitute some other brand's part or service in the aftermarket. Technically speaking, they are in a relevant market with only one seller if other brands' parts are not interchangeable with the ones they need.

Starting with *Kodak* itself, courts have resolved that tension by holding that, even where there is interbrand competition in the foremarket, plaintiffs can still *sometimes* use such a "single-brand aftermarket" as a tying market—but only if they identify some reason why the competition that exists in the foremarket fails to "discipline the aftermarket." *Kodak*, 504 U.S. at 486. That could happen if: (1) customers don't know enough about the total lifecycle cost (including aftermarket costs) to make an informed choice among different foremarket options, *id.* at 473-74; (2) that information is too difficult or costly to obtain, *id.* at 474-76; and/or (3) it is too expensive to switch to a different foremarket option upon learning of the aftermarket restrictions, *id.* at 476-77. These are known as the "*Kodak/Epic*" or "lock-in" factors. And as this Court has recently explained, to define a brand-specific aftermarket as a relevant antitrust market when a defendant faces effective interbrand competition upstream, a plaintiff must not only demonstrate the ordinary indicia of a relevant market, but also prove up the *Kodak* factors as well. *See Epic*, 67 F.4th at 976-77.

## II.    Factual Background

### A.    Intuitive centers its business plan, from the outset, on charging high prices for limited-use surgical instruments.

When Intuitive was founded in 1995, its business plan correctly forecasted how the company would make money: It would derive most of its revenue not from selling the robots themselves, but from "high margin 'resposable' instruments

15

which can be resterilized and reused only for the number of times allowed by the company." 6-ER-1249.

The plan explained that, at that point, there were only two available surgical modalities: open and laparoscopic. *See* 6-ER-1251-1253; 2-ER-197-198. Open surgery employs "large incisions in the body" that allow for "precise and natural instrument control." 6-ER-1251. But "large incisions cause major trauma and result in long and expensive recovery times." *Id.* Laparoscopic surgery, on the other hand, uses small incisions through which long, rigid instruments are inserted. 6-ER-1252; 2-ER-198-199. But the movements of laparoscopic instruments are "non-intuitive"; the instruments provide only "limited degrees of freedom" and "poor sensory feedback"; and laparoscopy allows for only "non-intuitive visualization." 6-ER-1252-1253 (capitalization altered). This made minimally invasive surgery instruments "significantly less flexible and less intuitive for the surgeon than using open surgical technique." 6-ER-1253.

Intuitive's plan was to create a "new approach" to surgery that would "combin[e] many of the natural motions of open surgery with the reduced trauma of [minimally invasive] surgery," giving "the surgeon the best of both worlds." 6-ER-1252-1253. Its products would "utilize a 3D visualization system" and include "control handles" that would "make [the surgeon] feel much more like he is performing open surgery." 6-ER-1253. They would "include a 'wrist'" that would

16

"track hand movements," and "allow the instruments to be maneuvered along additional 'degrees of freedom' that simply are unavailable or unusable with conventional" instruments. 6-ER-1254. The result, Intuitive projected, would make difficult procedures that were previously "performed only rarely" into routine operations, while enabling entirely new minimally invasive procedures that were impossible before. 6-ER-1253.

Intuitive envisioned "a business model based on recurring revenue rather than revenue from sale of capital equipment." 6-ER-1255. To achieve this, Intuitive would "electronically limit[]" the number of times the instruments that attached to its robot could be reused. *Id.* Importantly, this limitation was about ensuring revenue, not safety. Reuse of disposable medical products, Intuitive noted, could "result[] in very significant revenue loss for the manufacturer." 6-ER-1257. So "[t]he number of reuses w[ould] be controlled to reflect" the EndoWrists' "cost" and "the gross margin and price desired." 6-ER-1256.

## B. Intuitive's robot succeeds.

To Intuitive's credit, the da Vinci robot has become irreplaceable for modern hospitals. Today, according to Intuitive, MIST robot surgery "allows doctors to perform many types of complex procedures with more precision, flexibility and control." 6-ER-1219. "The surgeon is able to do surgery in a way that's different than the laparoscopic surgeries," 3-ER-467; MIST robot surgery provides "a much

17

better range of motion and dexterity of motion," 2-ER-199; and it enables "patients, who otherwise couldn't, to" "experience[] the benefits of minimally invasive surgery," 4-ER-665. Those benefits can include "better outcomes, fewer complications, [and] shorter recovery times … than either open surgery or traditional laparoscopy." 3-ER-467; *accord* 3-ER-462; 5-ER-913-915.

Intuitive has also dominated this market from the beginning. When its first commercial product (the da Vinci Standard, 3-ER-550) launched in 1998, 3-ER-577-578, it was the only MIST robot available in the United States, 4-ER-682. And while there have been a few minor competitors over the years, *see* 3-ER-582-585, the overwhelming majority of systems installed in the United States have been da Vincis, 3-ER-478. During the time at issue here, Intuitive's share of the U.S. market was over 99 percent. *Id.*; *see* 3-ER-519; 3-ER-584-585; 4-ER-856.

The da Vinci has three components: the surgeon console, patient cart, and vision cart. 4-ER-656-657. The surgeon sits at the surgeon console, which provides a binocular camera with 3D vision and ergonomic controls for the instruments. 4-ER-657. The vision cart holds a monitor, powers the da Vinci, and provides computing capabilities. 4-ER-658. The patient cart has arms to which the surgical instruments attach. *Id.* The da Vinci's surgical instruments—called EndoWrists—include wrist-like joints at the tips that mimic or exceed human range of motion, with even greater precision. 3-ER-343-344; 3-ER-544. A system

18

of cables, pulleys, and rods translates the surgeon's hand movements at the control console into delicate surgical actions inside the patient. 3-ER-384-386. There are dozens of types of EndoWrist instruments, 3-ER-368-369; 4-ER-672, including scissors, dissectors, and graspers, 4-ER-661. Intuitive designed the da Vinci to function only with EndoWrists that Intuitive itself produces. 4-ER-853.

As Intuitive hoped, robotic surgery has become an entirely distinct form of surgical intervention. The da Vinci's advantages make it the clear choice of modality for many surgeries, 2-ER-206-207, like those—including many cancer procedures—that cannot be done laparoscopically, 4-ER-666. Indeed, Intuitive has said that it does not "see [itself] in competition with laparoscopy." 6-ER-1223.

Meanwhile, the da Vinci's dominance has become entrenched. Surgeons now train on da Vinci robots in medical school. 2-ER-209; 2-ER-243; 3-ER-463. Hospitals without a da Vinci can thus struggle to recruit surgeons, 2-ER-224-225; *see* 3-ER-463-464; 4-ER-666, many of whom believe that robotic surgery is "the safest" and "best way to accomplish surgery," 2-ER-235; *see* 2-ER-225; 3-ER-463 ("most surgeons coming out of medical school prefer" doing surgery with a da Vinci robot). Hospitals without da Vincis can thus lose patients' business, too. 5-ER-916; *see* 3-ER-466.

19

### C.    Intuitive tightly controls the EndoWrist aftermarket.

True to its plan to "derive its revenues from … high margin 'resposable' instruments which can be resterilized and reused only for the number of times allowed by the company," 6-ER-1249, Intuitive put a use counter into every EndoWrist it sold, 3-ER-454.  For most instruments, that counter was set at ten.  4-ER-680.  The counter decreases with every activation, 3-ER-590, without regard to how long the EndoWrist is used, 3-ER-595; 4-ER-879, the purpose involved, 4-ER-882, or even whether it enters the patient's body, *see* 3-ER-588-590.  When the use counter hits zero, the EndoWrist essentially "self-destruct[s]," *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 728 F. Supp. 3d 1034, 1038 (N.D. Cal. 2024), becoming medical waste that the hospital must discard and pay Intuitive to replace.  *See* 3-ER-360.

Intuitive calibrated the counter to maximize profit rather than safety or efficiency.  Indeed, Intuitive's marketing department set the target number of uses, and Intuitive tested the EndoWrists to validate safety *only* up to that pre-set limit and no further.  3-ER-439-440; 4-ER-882; 4-ER-886; *see* 3-ER-446-448.  In other words, Intuitive did not know whether more uses would be safe and did not even bother to find out.  Meanwhile, a company called Rebotix independently tested a representative sample of EndoWrists and found that they performed perfectly through 29 uses, including 29 cycles of cleaning and sterilization.  6-ER-1210-

1211.  It further tested several EndoWrists through 50 uses, and again, "no indications of material degradation were observed."  6-ER-1212.  But by setting the counter at ten for most EndoWrists, Intuitive was able to make good on its replacement-part-driven revenue plan.  *See* 6-ER-1249.  In 2019, each EndoWrist cost about $2,700, 4-ER-638, generating a huge profit margin that Intuitive would not negotiate or discount, 3-ER-348; 3-ER-361.

Given this business model, Intuitive took steps to protect its stranglehold on EndoWrist production, service, and use.  Its contracts with da Vinci buyers forbade using the robot without an EndoWrist "made or approved by Intuitive."  6-ER-1276; 6-ER-1304.  The EndoWrists themselves were sold subject to a "limited license" that expired when the use counter hit zero.  6-ER-1278; 6-ER-1304.  Intuitive also had to approve any "repair, refurbishment, or reconditioning."  6-ER-1304.  And through more than 25 years in business, Intuitive had approved only two third parties (who had both sued Intuitive and obtained approvals via settlements) to service a single type of EndoWrist each.  4-ER-609; 3-ER-561-563.

### D.  SIS attempts to compete with Intuitive on EndoWrists.

Plaintiff Surgical Instrument Service Company (SIS) is a family-run surgical instrument repair company founded in 1971.  2-ER-257-258.  It repairs handheld surgical equipment in-house—everything from scissors and cameras to electrosurgical laparoscopic equipment.  2-ER-257; 2-ER-262; 2-ER-266; 2-ER-

21

271.  SIS rigorously tests every instrument it repairs before returning it to the customer, ensuring that it meets original specifications.  2-ER-267-268.

Greg Posdal, the president and CEO of SIS, had a longstanding business relationship with Rebotix's principals.  2-ER-281.  And given Rebotix's test results, *see supra* pp.20-21, SIS and Rebotix together recognized that Intuitive's business model created a major competitive opportunity.  2-ER-283-284.  Rebotix developed a way to essentially reset an EndoWrist's use counter, enabling the EndoWrist to be safely used ten more times than Intuitive allowed.  2-ER-284.  And their joint plan was that SIS would market this service through its existing hospital relationships, Rebotix would reset the counter, and SIS would otherwise service the instrument, ensuring its safety and performance.  2-ER-285-286.  The result would be a less wasteful option for hospitals to replenish their supply of EndoWrists at a cost 40% below Intuitive's monopoly price.  3-ER-348.

### E. Intuitive squashes SIS's success using its ties and exclusive-dealing arrangements.

Unsurprisingly, hospitals liked what SIS was selling, 3-ER-514, and starting in June 2019, SIS successfully serviced EndoWrists for six different hospitals for about six months, 6-ER-1195.  The refreshed EndoWrists performed exactly as expected, 5-ER-918-920 (hospital surgical director: "There was no difference").  There is no evidence that any SIS-serviced EndoWrist ever put any patient at risk.  *See* 4-ER-627; 4-ER-662; 4-ER-896.

22

Intuitive, however, was not happy. Its systems could tell when EndoWrists were used beyond the allotted limits, 3-ER-572-573; 4-ER-898-899, and having discovered that certain hospitals were doing so, it threatened to bring the hammer down. It wrote letters asserting that "[u]sing instruments beyond the programmed number of uses [was] a material breach" of Intuitive's purchase contract, 6-ER-1270; 6-ER-1273; *see* 4-ER-872; 6-ER-1227, and threatening to "no longer accept [the hospitals'] service calls" for those hospitals' da Vincis, 6-ER-1271; 6-ER-1274; *see* 5-ER-907. If a da Vinci could not be serviced, it could not be used; as one witness put it, "if Intuitive cuts it off, about the only thing it's good for is a paperweight." 3-ER-493-494; 2-ER-307; 5-ER-907-908. Intuitive's letters also cast doubt on the safety of SIS's service, 6-ER-1269; 6-ER-1272, even though Intuitive had never tested its own units beyond their arbitrary limit, 3-ER-439-440; 3-ER-446-448, let alone the carefully refreshed instruments SIS was providing, 4-ER-873-874.

Intuitive's enforcement campaign destroyed the demand for SIS's service. 3-ER-504; *see* 5-ER-944. Every client abandoned it after receiving Intuitive's letter. 3-ER-317-318. SIS thus exited the market, seeing "little point in going forward" in the face of Intuitive's anticompetitive tactics. 3-ER-318.

23

### III. Procedural History

SIS sued Intuitive in the Northern District of California on May 10, 2021, asserting Sherman Act claims based on tying, exclusive dealing, and actual and attempted monopolization. 5-ER-1188-1192. Intuitive counterclaimed, asserting various theories of unfair competition that are not at issue in this appeal. *See* 5-ER-955. These claims eventually went to trial in January 2025. *See* 5-ER-951-964.

Before trial, the parties submitted competing jury instructions. 5-ER-965-1160. Intuitive proposed instructing the jury that, to prevail, SIS would have to prove the *Kodak/Epic* factors, 5-ER-986-987, whereas SIS proposed omitting any such instruction from the relevant-market instruction, 5-ER-1018-1019; *see* Pl. SIS's Memo. of Law on SIS's Disputed Jury Instructions (D. Ct. Dkt. 274) at 18-19; Defendant's Memo. of Law in Support of Disputed Jury Instructions (D. Ct. Dkt. 275) at 4-5.

Over thirteen trial days, SIS presented evidence that there were two relevant markets: one for MIST robots (the foremarket), in which Intuitive had a 99% market share, and one for the "resposable" parts Intuitive called EndoWrists (the aftermarket), in which Intuitive's exclusionary practices gave it a 100% market share. SIS presented no evidence respecting the *Kodak/Epic* factors. Intuitive sought judgment as a matter of law on this (and other) grounds after SIS's case in

24

chief. 3-ER-524; 3-ER-530. The court denied that motion the next day. 3-ER-564-565.

As the end of trial approached, however, the district court began to waver on this question. First, it issued tentative jury instructions that included the disputed charge on the *Kodak/Epic* factors. 1-ER-18. Then, on the last day of trial, Intuitive renewed its motion for judgment as a matter of law, arguing, among other things, that SIS had not established the *Kodak/Epic* factors. 4-ER-701-702. SIS replied that the *Kodak/Epic* factors were inapplicable, and the district court denied Intuitive's motion. 4-ER-714. Nonetheless, after the parties argued their positions on the propriety of the *Kodak/Epic* instruction, 4-ER-716-727; 4-ER-779-786, the court ruled from the bench that the instruction *would* be given, 4-ER-727.

Later that same day, however, the court reversed itself again. 2-ER-104-105. This time, it recognized that "SIS does not contend that [Intuitive] lacks market power in the purported market of minimally-invasive soft tissue robots and that Intuitive's customers are 'locked-in' to an alleged single-brand aftermarket." 2-ER-104. "To the contrary, SIS asserts that Intuitive has market power in the purported market of minimally-invasive soft tissue robots." *Id.* Therefore, the court found "the proposed jury instruction requiring SIS to prove the *Epic v. Apple* factors unnecessary." *Id.* The Court then issued the "Final Jury Charge," omitting the *Kodak/Epic* instruction. 2-ER-20-103.

25

But that same evening, the district court reversed itself *again*. This time, it tentatively agreed with an objection Intuitive had subsequently filed on the *Kodak/Epic* question without even allowing SIS to file a response. 1-ER-16. Apparently still uncertain, however, the court invited further argument the next day. *Id.* When the parties renewed their arguments that morning, 4-ER-798-809, the court again ruled that the *Kodak/Epic* instruction would be given, concluding that, under this Court's decisions in *Epic* and *Coronavirus Reporter*, "a single-brand aftermarket is only available in cases where the plaintiff shows satisfaction of the four-part test in *Epic*." 1-ER-8-10.

Noting again that "[a]pplication of the four factors do[es]n't make any sense where there's no competition in the foremarket," 4-ER-818, SIS acknowledged the lack of evidence on the *Kodak/Epic* factors, 4-ER-814, and stipulated to judgment in Intuitive's favor on SIS's antitrust claims, *see* 4-ER-836-848. The court thus granted Intuitive's Rule 50(a) motion and entered judgment in Intuitive's favor on SIS's antitrust claims under Rule 54(b). 1-ER-14-15; 1-ER-2-3.

This appeal followed.

## SUMMARY OF THE ARGUMENT

I.     The district court should have treated this case like any other tying case in which a seller conditions access to a product in one market (the tying market) on buying a product in a second market (the tied market). *See Cascade*

26

*Health Sols.*, 515 F.3d at 912. One element plaintiffs must prove in such cases is that "the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product." *Id.* at 913. SIS did that here by proving Intuitive's near-total monopoly in the MIST robot market.

As the Supreme Court has expressly held, nothing changes where, as here, the tying and tied markets are foremarkets and aftermarkets. Indeed, the Supreme Court has repeatedly found tying violations where, as here, a seller with market power in the foremarket for a durable good conditions sale of that foremarket good on the buyer's purchase of the seller's aftermarket input. SIS's antitrust theory in this case was effectively a carbon copy of the theory the Supreme Court endorsed in cases like *IBM*. *Kodak* specifically blessed those decisions, further clarifying that when the defendant has market power in the foremarket, the plaintiff need only prove the traditional tying elements—and *not* the *Kodak* lock-in factors. The district court should thus have instructed the jury on the traditional tying elements and stopped there.

II. Instead, the district court erred by requiring that SIS *also* prove the *Kodak* lock-in factors. Those factors apply only where, unlike here, there is meaningful interbrand competition upstream.

The district court's decision conflicts with both *Kodak*'s legal reasoning and its economic logic. *Kodak* states repeatedly that it is only deciding "whether a

27

defendant's *lack of market power in the primary equipment market* precludes—as a matter of law—the possibility of market power in derivative aftermarkets." 504 U.S. at 455 (emphasis added); *see also, e.g., id.* at 456, 469. And *Kodak*'s reasoning depended on that lack of market power. *Kodak* concluded that interbrand competition in the foremarket cannot always discipline anticompetitive behavior in the aftermarket, and it set forth the *Kodak* factors to help identify when a single-brand aftermarket might therefore be appropriate despite meaningful interbrand foremarket competition. But asking the question those factors answer about downstream discipline makes no sense *when there is no competition in the foremarket in the first place*. Even Justice Scalia's *Kodak* dissent—which objected to what it perceived as the majority's overly expansive view of antitrust liability— agreed that "manufacturer ties of foremarket equipment to aftermarket derivatives" violate the antitrust laws when the manufacturer has "monopoly power in the equipment." *Id.* at 499 (Scalia, J., dissenting) (emphasis deleted). That is all SIS is saying here.

This Court's cases applying *Kodak* similarly depend on the presence of foremarket competition. Unlike here, the defendants in *Newcal*, *Epic*, and *Coronavirus Reporter* did *not* have a monopoly or even market power in the foremarket, and those cases make that a central point. In *Epic*, for instance, this Court held that Epic "bore the burden of rebutting the economic presumption that

consumers make a knowing choice to restrict their aftermarket options when they decide *in the initial (competitive) market* to enter a contract." 67 F.4th at 980-81 (cleaned up and emphasis added). And that makes sense because, absent an "initial (competitive) market" in which consumers can choose among brands, there is nothing to discipline aftermarket behavior and no reason for the plaintiff to prove that the lock-in factors interfere with that discipline.

Intuitive's reading of this Court's precedents conflicts not only with cases like *IBM*, but also with the opinions of the Federal Trade Commission and other district courts considering the same question under the same caselaw. Those opinions universally agree that the *Kodak/Epic* "factors only apply to cases in which defendants do not have market power in the foremarket." *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 840-41 (N.D. Cal. 2024); *see also FTC v. Deere & Co.*, No. 25-CV-50017, 2025 WL 1638474, at *3 (N.D. Ill. June 9, 2025). This Court should so hold, and reverse.

## STANDARD OF REVIEW

This Court "review[s] a district court's formulation of civil jury instructions for an abuse of discretion, but … consider[s] *de novo* whether the challenged instruction correctly states the law." *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014). This appeal presents a pure question of law concerning the elements of SIS's antitrust claims. Review is therefore *de novo*.

This Court's review of the district court's grant of a Rule 50(a) motion is also *de novo*. *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013). In that review, the Court "view[s] the evidence in the light most favorable to the nonmoving party … and draw[s] all reasonable inferences in that party's favor." *Id.* (citation omitted).

## ARGUMENT

## I. The District Court Should Have Treated This Case Like The Standard Tying Case It Is.

SIS's antitrust case amounts to a mine-run tying claim: It alleged that Intuitive used its power in the market for MIST robots (the tying market) to unreasonably restrain trade in the separate market for EndoWrists (the tied market). The elements of such a claim are settled, and courts have repeatedly applied those elements where, as here, the tying market is a foremarket for equipment and the tied market is a derivative market for that equipment's parts or inputs. Indeed, all nine Justices in *Kodak* agreed that, in the absence of any interbrand competition upstream, the law should "treat[] derivative aftermarkets as it has every other separate market" for antitrust tying purposes. 504 U.S. at 479 n.29; *accord id.* at 499 (Scalia, J., dissenting). The district court should have instructed the jury on these settled elements—and stopped there.

30

### A. A century of precedent from this Court and the Supreme Court has settled the elements of a tying claim.

Tying is one of the oldest and most settled theories in antitrust law. In a tying arrangement, "the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Cascade Health Sols.*, 515 F.3d at 912. When the seller has "market power in one product market," it can use a tying arrangement to "extend its market power to a distinct product market." *Id.* "The hallmark of a tie-in is that it denies competitors free access to the tied product market, not because the party imposing the arrangement has a superior product in that market, but because of the power or leverage exerted by the tying product." *Moore v. James H. Matthews & Co.*, 550 F.2d 1207, 1212 (9th Cir. 1977) (quoting *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 47 (9th Cir. 1971)).

As this Court has explained, "the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second." *Moore*, 550 F.2d at 1212 n.4 (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 512 (1969) (White, J., dissenting)).

31

The elements of a tying claim are well settled by the Supreme Court and this Court. As this Court explained in *Cascade Health*, a plaintiff asserting a tying claim "must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." 515 F.3d at 913 (citation omitted). As noted above, *supra* p.7, SIS also agreed that it had to prove that the tie was anticompetitive under the rule of reason—including rebutting Intuitive's argument that its tying arrangement was needed to protect patient safety.

The second element—market power in the tying market—is critical because it is what gives the defendant the power to force consumers into sub-optimal choices in the tied market. Recall that market power means the power to "force a purchaser to do something that he would not do in a competitive market." *Jefferson Par. Hosp. Dist. No. 2*, 466 U.S. at 14. Accordingly, absent power in the tying market, the company cannot generally coerce consumers to do something they do not want to do in the tied market: If consumers do not like the tying arrangement, they can just switch to a different product in the tying market.

"As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain

competition in sugar if its competitors were ready and able to sell flour by itself." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958). But if the company *does* have market power in the tying market, consumers cannot respond to an inefficient tying arrangement by switching products in the tying market. The company can therefore use that market power in the tying market to restrain competition in the tied market.

### B. The same settled elements apply to foremarket/aftermarket ties.

Nothing changes where, as here, the markets at issue are foremarkets and aftermarkets. As the Supreme Court has expressly held, antitrust law "treat[s] derivative aftermarkets as it has every other separate market" for tying purposes. *Kodak*, 504 U.S. at 479 n.29. And cases from the Supreme Court and this Court dating back more than a century apply the rule that, where the plaintiff can show market power in the foremarket, it can prove a tying claim by proving that the defendant tied the sale of the foremarket equipment to the aftermarket input and thereby affected a not insubstantial volume of commerce in the tied aftermarket— with or without the *Kodak/Epic* factors.

The Supreme Court's decision in *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936) (*IBM*), is a good example. IBM was the larger of two manufacturers of early computing devices, which performed their calculations using a specific type of data-recording card. *Id.* at 133. IBM's leases

33

for these machines gave it the option to immediately terminate if it found the lessee buying these cards from anyone else. *Id.* at 134. The Supreme Court held that this tying arrangement violated the antitrust laws. *Id.* at 135-36. IBM's 81% share of the two-player equipment foremarket gave it market power. *Id.* at 136. It conditioned its lease of the computing machine (the tying market/foremarket) on the purchase of its cards (the tied market/aftermarket). *Id.* at 135. And the tying arrangement impacted a "substantial" volume of commerce in the tied aftermarket for cards. *Id.* at 136.

The Court also held that IBM had not shown that the tie was necessary to ensure "the proper operation of the machines" because "others are capable of manufacturing cards suitable for use in appellant's machines." *Id.* at 138-39. As the Court explained, IBM "is not prevented from proclaiming the virtues of its own cards or warning against the danger of using, in its machines, cards which do not conform to the necessary specifications, or even from making its leases conditional upon the use of cards which conform to them." *Id.* at 139-40. But what IBM cannot do is impose "a condition whose substantial benefit to the lessor is the elimination of business competition and the creation of monopoly, rather than the protection of its good will." *Id.* at 140.

The Court's decision in *International Salt Co. v. United States* was similar. 332 U.S. 392, 394 (1947), abrogated on other grounds by *Illinois Tool Works Inc.*

34

*v. Independent Ink, Inc.*, 547 U.S. 28 (2006). International Salt leased two salt-related machines—one for dissolving salt into an industrial brine and the other for injecting salt into canned products—on the condition that its lessees purchase from International Salt all "salt and salt tablets consumed in the leased machines." *Id.* at 394. The Court held that the defendant had market power in the relevant foremarket both by virtue of its patents and the fact that it was "the country's largest producer [of salt] for industrial uses." *See id.* at 394-95. The Court also held that the volume of impacted business in the salt aftermarket "cannot be said to be insignificant or insubstantial." *Id.* at 396.

Again, the Court emphasized that the company's desire to "minimize maintenance burdens and to assure satisfactory operation" of the leased machines did not justify its tie. *Id.* at 397-98. As in *IBM*, the record showed that competitors were capable of "produc[ing] [inputs] equal to reasonable specifications for machine use." *Id.* at 398. Nonetheless, the defendant's tying arrangements left these competitors "shut out of the market by a provision that limits it, not in terms of quality, but in terms of a particular vendor. Rules for use of leased machinery must not be disguised restraints of free competition, though they may set reasonable standards." *Id.*

The same goes for *United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922). United controlled "more than 95 per cent" of the market for a

35

particular type of specialized shoe machinery (tying/foremarket). *Id.* at 455. And it conditioned its lease of that machinery on, among other things, a "supplies clause," which required that "the lessee shall purchase supplies [for operating the shoe machinery] exclusively from the lessor" (the tied/aftermarket). *Id.* at 456. Recognizing United's "dominating position in supplying shoe machinery of the classes involved," and the significant impact on the tied markets, the Supreme Court affirmed the district court's decision enjoining this (and other) tying arrangements, "entertain[ing] no doubt that such provisions as were enjoined" violated the antitrust laws given their obvious purpose of "lessen[ing] competition." *Id.* at 457-58.

This Court's subsequent decision in *Moore* reached a similar conclusion in the foremarket/aftermarket context. There, the defendant sought to "tie the purchase of a cemetery lot (tying) with the requirement that purchasers of markers buy the memorial from or through the cemetery" or "use the installation service of the cemetery (tied)." 550 F.2d at 1212. This Court applied the standard three-element test for tying claims in this foremarket/aftermarket context, holding that the defendant sought to tie its sale of the foremarket product (cemetery lot) to the aftermarket product/service (memorial/installation); that the defendant had market power in the market for cemetery lots; and that the tying arrangement impacted a "not insubstantial" volume of business in the tied aftermarkets. *Id.* at 1214-17.

36

Much like in *IBM* and *International Salt*, the defendant argued that its tying

arrangement was justified by a legitimate business purpose—here, to "retain

neatness and aesthetic appearance" in the cemetery. *Id.* at 1217. But, as in *IBM*

and *International Salt*, this Court rejected that argument because those interests

could be protected without a tying arrangement through "reasonable guidelines and

specifications." *Id.*

The Supreme Court's decision in *Kodak* confirms that these cases are

correct, and that they stand for the proposition that foremarket/aftermarket ties are

analyzed in the same way as any other tying claim. Citing *IBM*, *International Salt*,

and *United Shoe*, the Court wrote in *Kodak* that, "on the occasions when the Court

has considered tying in derivative aftermarkets by manufacturers, it has not

adopted any exception to the usual antitrust analysis, *treating derivative*

*aftermarkets as it has every other separate market*." 504 U.S. at 479 n.29

(emphasis added). And while Justice Scalia's dissent disagreed with the *Kodak*

majority's expansion of tying doctrine, *see infra* pp.43-45, he agreed with the

majority that the Court had already approved antitrust liability for "manufacturer

ties of foremarket equipment to aftermarket derivatives" so long as the

manufacturer had "monopoly power in the equipment." *See id.* at 499 (Scalia, J.,

dissenting) (citing majority opinion, along with *International Salt*, *IBM*, and

*United Shoe*) (emphasis omitted).

SIS's theory in this case was effectively the same as the plaintiffs' theories in *IBM*, *International Salt*, *United Shoe*, and *Moore*. SIS claimed that there are two relevant product markets: a MIST robot foremarket and an aftermarket for the EndoWrists they need to operate (just as the plaintiff in *IBM* alleged separate markets in computing machines and the cards that they relied on). 2-ER-39. SIS claimed that Intuitive had market power—indeed, a monopoly—in the upstream market (just as the plaintiff in *IBM* alleged that IBM had market power in the market for early computers). SIS claimed that Intuitive tied its sale of its da Vinci robot to hospitals' purchase of Intuitive's own EndoWrist instruments (just as the plaintiff in *IBM* alleged that IBM tied its equipment leases to buying IBM's cards). SIS claimed that Intuitive's tying arrangement impacted a substantial volume of commerce in the EndoWrist market (just as the plaintiff in *IBM* alleged that IBM's tying arrangement foreclosed a substantial volume of commerce in the market for cards). And SIS argued that Intuitive's purported safety concerns were a pretextual effort to suppress competition (just as the plaintiff in *IBM* alleged that IBM's concerns about card quality were pretextual).

That is *all* that SIS should have been required to prove—it is all that the Supreme Court and this Court have *ever* required for a tying claim in which the defendant has market power in the foremarket. Indeed, the district court's jury

38

instructions covered all of these elements and covered them correctly. 2-ER-45-55. It should have stopped there.

## II. The District Court Erred By Also Requiring SIS To Prove The *Kodak* Factors.

Rather than treat this as an ordinary tying case, however, the district court required SIS to prove the *Kodak/Epic* lock-in factors as an element of its case. At a high level, that makes no logical sense. The whole point of those factors was to offer an *alternative* theory of market power that a plaintiff can invoke *even if* there is vibrant interbrand competition in the foremarket (as there was in *Kodak* itself). SIS's theory here was the opposite: It sought to prove that Intuitive had an upstream monopoly and used it to unreasonably restrain competition in the downstream, derivative market. *Kodak*'s concerns about brand lock-in were thus irrelevant.

At a more granular level, the district court's decision is wrong for a host of reasons. It conflicts with the precedents discussed above, which treated foremarket/aftermarket tying cases involving market power in the foremarket just like any other tying case. It conflicts with both the legal reasoning and economic logic of *Kodak* itself. And it errs in purporting to find support in this Court's decisions applying *Kodak*. The district court's decision also conflicts with the decisions of other district courts and the position of the FTC, all of which have properly recognized that *Kodak* applies only when there is interbrand competition

39

upstream.  This Court should endorse those decisions and reverse the injection of an unnecessary element into SIS's antitrust claims.

### A. *Kodak* makes clear that it applies only if the defendant lacks foremarket power.

*Kodak* is clear that it only applies when there is interbrand competition in the upstream market for the durable, tying product.  Its very first paragraph says:  "The principal issue here is whether a defendant's *lack of market power in the primary equipment market* precludes—as a matter of law—the possibility of market power in derivative aftermarkets."  504 U.S. at 454-55 (emphasis added).  *Kodak*'s answer is "no" because there will be some circumstances where brands have power over locked-in customers *even though the foremarket is competitive*.  And it articulates the *Kodak/Epic* "lock-in" factors as the means of identifying those circumstances, which can matter only if lock-in is preventing a *competitive equipment foremarket* from disciplining a defendant's behavior downstream.

Parallel language comes up again and again:  The Court says it is rejecting a legal rule that "*equipment competition* precludes any finding of monopoly power in derivative markets," *id.* at 466 (citation omitted; emphasis added); it disagrees with Kodak's argument that "market power in the service and parts markets *absent power in the equipment market* 'simply makes no economic sense,'" *id.* at 467 (citation omitted; emphasis added); and it even refuses to consider the plaintiff's late-breaking argument that Kodak had market power in the equipment market

40

because the entire "premise" for the question on which the Court granted certiorari was that Kodak "*lack[ed] market power*" in the upstream equipment market, *id.* at 465 n.10 (citation omitted; emphasis added). All this makes it beyond clear that cases—like this one—where the equipment manufacturer *has* market power in the upstream equipment market simply are not *Kodak* cases.

The same is evident from *Kodak*'s logic. In rejecting Kodak's argument, the Court reasoned that real-world market conditions determine whether upstream competition will discipline anticompetitive behavior in aftermarkets in the way that economic theory predicts. The lock-in factors assess those real-world conditions. If aftermarket restrictions are known and consumers can assess total lifecycle costs when buying equipment, then they can punish unreasonable aftermarket restraints when they choose their equipment upstream. *See id.* at 473-74. Conversely, if that information is prohibitively difficult or expensive to acquire, consumers may end up stuck with aftermarket conditions they could never have anticipated when they bought their equipment. *See id.* at 473-76. That said, if switching costs are low, consumers might still change brands when they encounter supracompetitive pricing or undesirable restraints in the aftermarket. *See id.* at 476-77. But this logic all turns on the underlying assumption that the consumers *can choose between brands in the foremarket*. If (as here) the defendant has a monopoly in the foremarket, it does not matter how easily consumers could theoretically access choice in the

upstream market because—according to the very definition of market power—there aren't enough choices upstream to make a difference anyway.

Although we explain below that the *Kodak* factors are particularly confounding in a case, like this one, that involves a total monopoly, *see infra* pp. 56-57, it is useful here to pause on just one of those factors and see how nonsensical it is to employ it where there is market power in the upstream equipment market. Recall that *Kodak* looks to how easily consumers can assess the total lifecycle price of different equipment packages, on the theory that consumers armed with that information can effectively access competition by choosing the best-priced brand for them in the primary market. But if there is market power in that primary equipment market—if it is *not* competitive enough to prevent the defendant from imposing conditions that counterparties would reject in a competitive market—then all the most accurate lifecycle pricing evidence in the universe would not make one whit of difference. Having carefully unearthed and statistically modeled the total price of a da Vinci robot system and, with the advice of an army of learned deal lawyers and economists, found Intuitive's aftermarket prices and terms unreasonable, the hospital will remain unable to do anything about it if (as here) Intuitive has zero competitors. The hospital may be exceedingly well informed, but it has nowhere else to turn.

If all that leaves any doubts about whether *Kodak*'s factors are applicable to cases where the plaintiff alleges that the defendant has power in a foremarket for durable equipment, Justice Scalia's dissent in *Kodak* should silence them.  As he summarized it, the whole point of that dissent was that the prohibition against tying and other antitrust restrictions on alleged monopolists should not apply "to a seller's behavior in its single-brand aftermarkets, *when that seller is without power at the interbrand level*."  504 U.S. at 490 (emphasis added).

The dissenters' theory was that, whatever functional or "circumstantial power" an equipment brand might have over its own customers and parts in the aftermarkets for its own equipment, that alone should not count as "market power" because, while exploiting that control could "plainly work to the injury of certain consumers" who might be "locked in" to the brand, interbrand competition would limit the problem to "brief perturbation[s] in competitive conditions—not the sort of thing the antitrust laws do or should worry about."  *See id.* at 498 (emphasis and citation omitted).  In the dissenters' view, a brand's leverage over even fully locked-in consumers can cause only fleeting problems from an antitrust perspective because, if that brand were to exploit that power, interbrand competition would rapidly shrink its share in the overarching equipment market:  It "would be wholly unable to make further foremarket sales[,] and would find itself exploiting an ever-dwindling aftermarket."  *Id.* at 497.  The dissent thus viewed the

43

majority's alternative lock-in theory of market power as inconsistent with "the assumption on which we are bound to decide this case, viz., Kodak's *lack of any power whatsoever in the interbrand market*." *Id.* (emphasis added). This shows that all nine Justices agreed about the centrality and sufficiency of interbrand market power in the upstream equipment market, and the only controversy among them was whether the *Kodak* "lock-in" theory represented a proper alternative way to establish market power over a subset of vulnerable customers or instead a repudiation of the power of interbrand foremarket competition to protect aftermarket consumers from any long-term harm.

This all culminated in a paragraph that should put this case to bed. As Justice Scalia put it,

> [w]e have never before accepted the thesis the Court today embraces: that a seller's inherent control over the unique parts for its own brand amounts to "market power" of a character sufficient to permit invocation of the *per se* rule against tying. As the Court observes, … *we have applied the per se rule to manufacturer ties of foremarket equipment to aftermarket derivatives*—but only when the manufacturer's *monopoly power in the equipment*, coupled with the use of derivative sales as "counting devices" to measure the intensity of customer equipment usage, enabled the manufacturer to engage in price discrimination, and thereby more fully exploit its interbrand power. [Citation to *International Salt*, *IBM*, and *United Shoe*, discussed *supra* at pp. 33-36]. That sort of enduring opportunity to engage in price discrimination is unavailable to a manufacturer—like Kodak—that *lacks power at the interbrand level*.

*Id.* at 498-99 (emphases altered).

In this passage, *Kodak*'s dissenters—who are maximally skeptical of its lock-in analysis—are candidly acknowledging that, even without those factors, the Supreme Court *has* found an illegal tie in multiple cases where foremarket equipment was tied to aftermarket derivatives, so long as the plaintiff proved "monopoly power in the equipment." And that's because "monopoly power in the equipment" creates the "sort of enduring opportunity to engage in" anticompetitive behavior that "is unavailable to a manufacturer—like Kodak—that lacks power at the interbrand level." This is *exactly* SIS's point and the theory on which it presented its case.

Indeed, Justice Scalia here correctly categorizes all three of the Supreme Court's key equipment-to-aftermarket tying cases in a way that is precisely analogous to SIS's theory of this case. SIS sought to prove that Intuitive has "monopoly power in the equipment" (*i.e.*, a 99% share of all MIST robots) and ties access to that equipment to the purchase and use of *literal* "counting devices" (*i.e.*, use-limited EndoWrists), through which it better exploits its monopoly by using a form of price discrimination (*i.e.*, by collecting a monopoly rent from a hospital on every ten *uses* of the robot). That scheme would fall apart if Intuitive permitted others to sell EndoWrists or provide services that circumvent its arbitrarily self-destructing counters. And that's why Intuitive imposes the tie, requires exclusive

dealing, and monopolizes the aftermarket for its "resposable" parts by willfully

excluding potential entrants like SIS.

All SIS wanted was a correct set of instructions that told the jury that

proving those things would—without proof of the *Kodak* factors or any other

extraneous facts—establish an antitrust violation.  Instead, the district court

reversibly erred by injecting additional elements (in the form of the *Kodak* factors)

that SIS had to prove to prevail.

**B.    This court's *Kodak*-related precedents are similarly limited to cases involving competitive upstream markets.**

This Court's cases interpreting and elaborating on *Kodak* follow *Kodak*'s

straightforward logic and so likewise depend on the assumption that the defendant

*lacks* power in a foremarket where consumers can choose among different brands.

The district court thus erred by reading those cases to support Intuitive's position.

Take, for example, *Newcal Industries, Inc. v. Ikon Office Sol.*, 513 F.3d 1038

(9th Cir. 2008).  There, the plaintiff (Newcal) competed with the defendant

(IKON) in leasing copiers and providing service contracts.  *Id.* at 1043.  There was

both a primary market for new contracts and an aftermarket where the parties

competed to renew or poach existing clients.  *Id.* at 1044.  Newcal alleged that

IKON engaged in various deceptive and unfair practices to lock-in its own existing

clients and restrain competition in renewals.  *Id.* at 1043-44.  And in deciding that

the *Kodak* factors were relevant there, this Court emphasized that Newcal did "not

46

allege that IKON ha[d] restrained trade in the market for initial leases and service agreements, nor d[id] it allege that IKON *holds power in the primary market*." *Id.* at 1050 (emphasis added). Newcal thus needed to prove the *Kodak* factors to disconnect the competitive primary market from the downstream market where it wanted to establish IKON's market power.

The same is true even in *Newcal*'s analysis of other circuits' precedents. *Newcal* discusses at length the Third Circuit's decision in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), where Domino's Pizza franchisees sued Domino's for monopolizing the market for their restaurant inputs, *id.* at 436. The franchisees tried to premise this claim on Domino's having monopoly power over a market for "Domino's-approved inputs," arguing that this single-brand market made sense because franchisees were contractually prohibited from substituting unapproved "brands of dough, tomato sauce, and paper cups"— even though these products were otherwise interchangeable (and available from cheaper suppliers). *Newcal*, 513 F.3d at 1046. The Third Circuit rejected this move but, as this Court stressed, it "grounded its holding in the fact that *the primary market for franchise agreements [was] a competitive market*." *Id.* at 1046-47 (emphasis added). Accordingly, franchisees "chose to enter a Domino's franchise rather than, say, a Pizza Hut franchise," knowing "that Domino's would retain exclusive rights to provide them with ingredients." *Id.* at 1047. And this

meant "competition in the primary market for franchise agreements sufficed to discipline anticompetitive conduct in the aftermarket," *id.*—the exact thing that is impossible where, as here, there is no alleged upstream market that is competitive enough to give consumers any choices at all.

The same point shines through in this Court's recent *Epic* decision, which rejected Epic's effort to define a tying market that was limited to Apple's iOS brand for failure to adequately prove up the *Kodak* factors. *Epic* repeatedly emphasizes that that case involved a competitive upstream equipment market that could discipline Apple's behavior in its aftermarkets—namely, the one where Apple's iOS devices competed for customers with other manufacturers' Android-based phones and tablets. *See, e.g.*, 67 F.4th at 970, 973, 987 (all referring to the choice consumers have when they opt to "buy iOS devices" or "purchas[e] an iPhone"). This meant that, to use an Apple-specific, single-brand aftermarket to establish Apple's market power, Epic would have to meet the *Kodak* factors—it "bore the burden of 'rebutting the economic presumption that consumers make a knowing choice to restrict their aftermarket options when they decide *in the initial (competitive) market* to enter a contract.'" *Id.* at 980-81 (quoting *Newcal*, 67 F.4th at 980-81) (cleaned up and emphasis added).

Again, the entire point was that the *Kodak* lock-in factors were relevant precisely because there was a "competitive" upstream market that could discipline

Apple's downstream behavior; that would preclude a finding of market power for Apple unless Epic could show (through the lock-in factors) that the upstream competition could not provide the discipline that economic theory expects. And Epic lost because it "presented no evidence regarding whether consumers unknowingly lock themselves into Apple's [downstream] restrictions *when they buy iOS devices*." *Id.* at 970 (emphasis added). If consumers had no other effective choices for smartphones, none of this reasoning would make any sense. This Court's statement that the *Kodak* factors are necessary "to establish a single-brand aftermarket," *id.* at 977, thus clearly assumed that there *was* interbrand competition in the foremarket. Nothing in *Epic* even suggests—let alone holds—that proving those factors is necessary when the defendant has a monopoly in the equipment foremarket instead.

The district court below misread these precedents based on an apparent misunderstanding of the "foremarket" that mattered in *Epic* and another Apple-related case called *Coronavirus Reporter*, 85 F.4th 948. While the court's oral decision treated *Epic* and *Coronavirus Reporter* as controlling without explaining *why*, the court seemed to believe that Apple had a controlling share of the upstream markets on which those cases turned. That meant that the *Kodak* factors this Court applied in those cases had to be applied here, too, despite Intuitive's total monopoly share in the upstream MIST robot market. *See* 1-ER-8-10.

The district court's premise, however, was simply incorrect, and reflects serious confusion on at least one of two points, either: (1) which markets matter when assessing the applicability of the *Kodak* factors; or (2) Apple's actual share in those markets. As noted above, the foremarket that this Court was adverting to in *Epic* as a possible source of discipline for Apple's downstream behavior was (as typical) the durable equipment market, where Apple's iOS devices confront interbrand competition from other brands' Android-based hardware. *See supra* pp.48-49. Indeed, *Epic*'s very first paragraph says that Apple's status as an equipment maker was "of particular relevance [t]here." *Id.* at 966. And while the esoteric experience of relatively well-off Americans might suggest otherwise, the reality is that Apple does not have anything like market or monopoly power in the worldwide equipment market for phones and tablets. In fact, *Epic*'s very next paragraph flags that Apple has only "about a 15% market share in the global smartphone market." *Id.* at 966-67. *Epic* is thus a case involving healthy interbrand competition in the equipment foremarket; it cannot possibly require proof of the *Kodak*/*Epic* factors in a case, like this one, that involves an allegation of essentially total monopoly in the upstream equipment market.

Apple's briefing in *Epic* is illuminating in this regard. Here's what Apple told this Court about the problem with Epic's theory:

> What Apple *does* sell is *phones*, yet Epic never proposed a foremarket for that product. That is because Apple has a modest share (about

15%) in that highly competitive market and indisputably competes with Samsung and others worldwide on a host of interrelated features, including operating system, "battery life, durability, ease of use, cameras, and performance." 1-ER-48–49. By dismissing the competition for the product Apple *does* sell, Epic confirms that its operating system foremarket was gerrymandered for litigation purposes.

Apple Br. at 46, *Epic*, 67 F.4th 946 (No. 21-16695), ECF No. 80. This was the argument on which Apple prevailed: The Court ruled that proving the *Kodak* factors was necessary because the plaintiff was trying to finesse away this "highly competitive market"—not because the *Kodak* factors apply in every single case that involves a manufacturer tying its foremarket and aftermarket products. And that argument is irrelevant here because Intuitive does not "compete[] with" *anyone* in selling MIST robots.

The district court may have been confused because the tying market that the plaintiff *proposed* to define in *Epic* was different from the upstream equipment market on which this Court's holding actually turned. The market Epic hoped to define as the tying market was the market for "iOS app distribution," *Epic*, 67 F.4th at 970—probably because Apple's share in that market was (by definition) overwhelming. But *Kodak*'s applicability clearly cannot turn on the defendant's market share in whatever tying market the plaintiff seeks to define; it turns on whether there is vibrant interbrand competition *upstream* from that market that might discipline the defendant's market power downstream—in which case, the

plaintiff's theory of market power must fail unless the *Kodak* factors are met. Here, there was no market upstream from the durable equipment market for MIST robots that could possibly discipline Intuitive's behavior in any downstream market, and so *Epic*'s use of the *Kodak* lock-in factors simply does not apply.

*Coronavirus Reporter*—in which a disgruntled app maker complained about Apple blocking its apps from the App Store based on violations of Apple's policies (including collection of private health data), 85 F.4th at 953—provides even less support to the district court. Given that it involved Apple, the same conclusion would follow about the existence of interbrand competition in the "broader market for smartphones"—which, this Court noted, created a "corresponding ability to access apps outside of the Apple App Store." *Id.* at 956-57. And sure enough, just like in *Epic*, this Court's *Kodak* discussion in *Coronavirus Reporter* faulted the plaintiff for failing to "demonstrate that iOS end consumers lacked awareness that *buying an iPhone* constrains which apps would be available to them through the App Store." *Id.* at 956 (emphasis added). Thus, just like *Epic*, *Coronavirus Reporter* was a case where there *was* a competitive upstream equipment market, and so it could not possibly have held that the *Kodak* factors would also be necessary elements in a case where the upstream equipment foremarket was an uncompetitive monopoly.

Beyond that, it is also misguided to infer a broad and previously unknown rule about all aftermarket cases from *Coronavirus Reporter* given that this Court's principal holding there turned on the near-total unintelligibility of the plaintiff's complaint. This Court affirmed dismissal in *Coronavirus Reporter* largely because the complaint "alleged in scattergun fashion that there were at least *fifteen* 'relevant markets' pertinent to its antitrust claims but made no effort at all to define the markets or to distinguish them from one another." *Id.* at 956 (emphasis added). The faults of such a shoddy complaint are a very poor place to find binding, previously unknown, and highly consequential rules of the kind that Intuitive successfully foisted on the district court below.

Indeed, the district court's reading of *Epic* and *Coronavirus Reporter* would effectively overrule a century of binding Supreme Court precedent. That includes not only *IBM, United Shoe*, and *International Salt* (cases that every Justice reaffirmed in *Kodak*), but also *Kodak*'s own, very explicit holding that aftermarket cases should be treated just like other ordinary tying cases. *See supra* pp.30, 33, 37. Reading *Epic* to conflict with these Supreme Court cases is not just impermissible but illogical: *Epic* purported to apply *Kodak*, not distinguish it, and *Kodak* explicitly endorsed *IBM, United Shoe*, and *International Salt*. Thus, the only coherent way to read *Epic* and *Coronavirus Reporter* is that they are premised

(like *Kodak*) on the existence of interbrand competition in the foremarket and simply do not apply to an ordinary foremarket/aftermarket tying case like this one.

**C.    Other authorities have correctly held that the *Kodak* factors do not apply absent a competitive foremarket.**

The district court's decision was not just wrong but also an outlier.  Neither we nor Intuitive have found a single case explicitly reaching the same conclusion.  Conversely, other district courts confronting the identical question have recently and correctly read *Kodak* and *Epic* to restrict the lock-in factors to cases involving upstream markets with interbrand competition.

In *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024), for instance, plaintiffs sued Tesla for making it impossible for independent repair shops to repair their equipment, *id.* at 834-35, and Tesla argued that this theory required proving the *Kodak/Epic* factors, *id.* at 840.  The district court disagreed, however, correctly identifying the essential distinction between that case (and this case) and an actual *Kodak* case:

> Plaintiffs … argue that these factors only apply to cases in which defendants do not have market power in the foremarket. Plaintiffs claim that, because they allege that Defendant has market power in the EV market, and the *Epic Games* factors derive from concerns about a lack of market power in the foremarket, these factors do not apply. This Court agrees.

*Id.*  As the *Lambrix* court went on to explain, "[c]onsumers in a foremarket within which a company has market power have minimal ability to discipline the

company's conduct in aftermarkets, regardless of information costs, switching costs, and general awareness of restrictions." *Id.* at 841. This is the precise reading of *Kodak* and its progeny that SIS urges here.

Another prominent example comes from the Northern District of Illinois court overseeing the multi-district antitrust litigation against John Deere regarding its restraints on who can repair its equipment. *See FTC v. Deere & Co.*, No. 25-cv-50017, 2025 WL 1638474 (N.D. Ill. June 9, 2025). In that litigation, several government enforcers, including the FTC, argued that, if there is an allegation of market power in the upstream equipment market where interbrand competition occurs, the *Kodak* lock-in factors are simply not relevant—just as SIS argues here. As the FTC put it, "Plaintiffs need not plead the *Kodak* factors because Deere possesses market power in equipment foremarkets. … [I]f the defendant has market power in the foremarket, the central concern of *Kodak* drops away and, with it, the need to consider the *Kodak* factors." Pls' Mem. of Law in Opp. to Def's Mot. for J. on Pleadings at 7-8, *FTC v. Deere & Co.*, 2025 WL 1638474 (No. 25-cv-50017), 2025 WL 1658400. The district court agreed:

> Deere, like it did in its MDL motion, argues that the Governments fail
> to plead a *Kodak*-qualifying aftermarket. Dkt. 110 at 8–11. And again,
> the Court "questions" whether *Kodak* even applies in this situation.
> *Deere MDL*, 703 F. Supp. 3d at 896. "[T]he issue presented to the
> Supreme Court [in *Kodak*] was whether a defendant's lack of market
> power in the primary equipment market precludes—as a matter of
> law—the possibility of market power in derivative aftermarkets." *Id.*
> at 891. The Governments, however, allege that Deere is the "leading

55

manufacturer" and holds a "dominant" position in the tractor (i.e. fore) market. Dkt. 44 ¶ 3.

2025 WL 1638474, at *3.

### D. The district court's instruction was particularly inapposite in this total monopoly case.

While further discussion is perhaps overkill, it is worth noting that, ironically, applying the *Kodak* factors to this case was particularly impossible because of Intuitive's essentially total monopoly in the MIST robot market. As noted above, the *Kodak* factors examine why foremarket competition might fail to discipline unreasonable conduct in aftermarkets, and when a defendant has market power in the foremarket, there is not enough competition to provide such discipline anyway, making the factors irrelevant. But in the case of a total monopoly, these factors become even more obviously meaningless, and it would hopelessly confuse the jury to even try to apply them.

Consider them in turn:

**Information costs**: Even if perfect information on lifecycle costs and downstream restraints can be had for free, that information is still worth nothing without alternative choices in the foremarket. Intuitive could reduce information costs to zero by producing detailed, bespoke PowerPoints for every hospital buyer, projecting their unique lifecycle cost for a da Vinci robot at different EndoWrist price points. But what good would that do them? Hospitals could not use this

56

information to select a cheaper alternative (and thus discipline Intuitive's behavior) because there are literally no alternatives. Producing evidence on the cost to acquire utterly valueless information is sure to confuse the jury.

**Switching costs**: This factor is particularly absurd for a plaintiff to try to argue in a total-monopoly context. Switching costs only exist when there is another product to switch to. With Intuitive controlling 99% of the MIST robot market, hospitals would be unable "switch" at any price and could not access foremarket competition even if surgical robots were very cheap (which, surprise, they are not). In any event, it is not possible for a plaintiff like SIS to coherently present evidence on switching costs without any possible switch to price out.

**General knowledge of restrictions**: As noted above, *supra* p.42, knowing what lurks behind Door Number 1 cannot protect someone with no other doors to choose from. Intuitive could publish bold-faced, plain-language disclaimers vividly disclosing that EndoWrists will be available only from Intuitive, that Intuitive plans to brazenly charge supracompetitive prices for them, and that it will make them arbitrarily expire after ten uses in order to more fully restrict supply and extract monopoly rents from its customers. But, apart from rubbing salt into its customers' wounds, those candid disclosures would have no pro-competitive effect, because Intuitive's customers have nowhere to look for better terms.

\*　　　\*　　　\*

Ultimately, this case is easy as a matter of settled Supreme Court precedent and antitrust first principles.  Unlike in cases like *Kodak* or *Queen City Pizza*, there is no argument that SIS sought to finesse away upstream interbrand competition here through a carefully defined single-brand aftermarket.  Instead, SIS undertook to prove market power in the most straightforward way that antitrust law allows—by showing that Intuitive was a monopolist that wielded monopoly power over its customers because it faced essentially zero competing brands in the only relevant markets where interbrand competition could even plausibly occur.  When it comes to proving market power in an antitrust case, that is obviously enough.  And it can do nothing more than confuse the jury to ask it (unintelligible) questions about brand lock-in through the *Kodak/Epic* factors when the plaintiff's whole theory is that there are no other brands at all.

## CONCLUSION

The Court should reverse and remand for a new trial.

Date: July 23, 2025

Richard T. McCaulley
MCCAULLEY LAW GROUP LLC
180 N. Wabash Avenue, Suite 601
Chicago, IL 60601
(312) 330-8105
richard@mcaulleylawgroup.com

Joshua V. Van Hoven
MCCAULLEY LAW GROUP LLC
3001 Bishop Dr., Suite 300
San Ramon, CA 94583
(925) 302-5941
josh@mcaulleylawgroup.com

/s/ Eric F. Citron
Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com

David J. Zimmer
Edwina Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Appellant Surgical Instrument Service Company, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 25-1372

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Eric F. Citron    **Date** | 07/23/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1372

I am the attorney or self-represented party.

**This brief contains** | 13,403 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
 ☐ it is a joint brief submitted by separately represented parties.
 ☐ a party or parties are filing a single brief in response to multiple briefs.
 ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Eric F. Citron | **Date** | 07/23/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*