No. 25-1372

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL, INC.,
*Defendant-Appellee.*

---

United States District Court
for the Northern District of California
No. 21-cv-3496-AMO
Hon. Araceli Martinez-Olguín

---

## EXCERPTS OF RECORD – VOLUME III OF VI

---

Richard T. McCaulley
MCCAULLEY LAW GROUP LLC
180 N. Wabash Avenue, Suite 601
Chicago, IL 60601
(312) 330-8105
richard@mcaulleylawgroup.com

Joshua V. Van Hoven
MCCAULLEY LAW GROUP LLC
3001 Bishop Dr., Suite 300
San Ramon, CA 94583
(925) 302-5941
josh@mcaulleylawgroup.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com

David J. Zimmer
Edwina Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Appellant Surgical Instrument Service Company, Inc.*

**Volume 3**

**Pages 434 - 663**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

```
SURGICAL INSTRUMENT SERVICE    )
COMPANY, INC., et al.,         )
                               )
          Plaintiffs,          )
                               )
   VS.                         )   NO. C 21-03496-AMO
                               )
INTUITIVE SURGICAL, INC.,      )
                               )
          Defendant.           )
_____)
AND RELATED COUNTERCLAIMS.     )
_____)
```

San Francisco, California
Wednesday, January 8, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

MCCAULLEY LAW GROUP
180 N. Wabash Avenue - Suite 601
Chicago, Illinois 60601
BY:  **RICHARD McCAULLEY JR., ATTORNEY AT LAW**

HALEY GUILIANO LLP
111 Market Street - Suite 900
San Jose, California 95113
BY:  **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

```
 1    APPEARANCES:  (CONTINUED)

 2    For Defendant:
                                PAUL, WEISS, RIFKIND, WHARTON
 3                              & GARRISON LLP
                                2001 K Street NW
 4                              Washington, D.C. 20006
                      BY:   KENNETH A. GALLO, ATTORNEY AT LAW
 5                          PAUL BRACHMAN, ATTORNEY AT LAW

 6                              PAUL WEISS RIFKIND WHARTON
                                & GARRISON LLP
 7                              1285 Avenue of the Americas
                                New York, New York 10019
 8                    BY:   WILLIAM MICHAEL, ATTORNEY AT LAW

 9                              PAUL, WEISS, RIFKIND, WHARTON
                                & GARRISON LLP
10                              535 Mission Street - 24th Floor
                                San Francisco, California 94105
11                    BY:   JOSHUA HILL, JR., ATTORNEY AT LAW

12

13    Also Present:          Bobby Cox
                             Ryan Lee
14                           Greg Posdal
                             David Rosa
15

16

17

18

19

20

21

22

23

24

25
```

436

```
 1                          I N D E X

 2    Wednesday, January 8, 2025 - Volume 3

 3    PLAINTIFFS' WITNESSES                          PAGE   VOL.

 4    POSDAL, GREG (RECALLED)
      (PREVIOUSLY SWORN)                             457    3
 5    Direct Examination resumed by Mr. McCaulley    457    3
      Cross-Examination by Mr. Gallo                 485    3
 6    Redirect Examination by Mr. McCaulley          618    3
      Recross-Examination by Mr. Gallo               631    3
 7    Further Redirect Examination by Mr. McCaulley  638    3
      Further Recross-Examination by Mr. Gallo       639    3
 8
      INACAY, ANTONIO
 9    By Video Deposition (not reported)             643    3

10                        E X H I B I T S

11    TRIAL EXHIBITS                          IDEN   EVID   VOL.

12      136                                          558    3

13      147                                          464    3

14      279                                          472    3

15      463                                          474    3

16      560                                          659    3

17     1434                                          482    3

18     1438                                          483    3

19     1495                                          479    3

20     1503                                          484    3

21     1547                                          568    3

22     1548                                          495    3

23     1566                                          543    3

24

25
```

POSDAL - DIRECT / MCCAULLEY

```
1          THE COURT:  Seeing no hands, we'll go ahead and ask
2   Ms. Solorzano-Rodriguez to get them.
3          THE CLERK:  All rise for the jury.
4              (The jury enters the courtroom.)
5      (Proceedings were heard in the presence of the jury.)
6          THE COURT:  You may be seated.
7      Good morning.  Good morning.  Good morning.
8          I want to commend you-all for being here.  I
9   understand traffic might have been a bit of a bear this
10  morning.  So thank you, thank you all for getting here on time.
11         We're ready to resume day two.
12         Please.
13     (Greg Posdal steps forward to resume testifying.)
14         MR. VAN HOVEN:  Thank you.  Good morning, Your Honor.
15         THE COURT:  Good morning, Mr. McCaulley.
16     Good morning.  Yes, please.
17                     GREG POSDAL,
18  called as a witness for the Plaintiffs, having been previously
19  duly sworn, testified further as follows:
20             DIRECT EXAMINATION   (resumed)
21  BY MR. McCAULLEY:
22  Q.   Good morning, Mr. Posdal.
23  A.   Good morning.
24  Q.   We're going to start out --
25         THE COURT:  Mr. McCaulley, would you give me just one
```

POSDAL - DIRECT / MCCAULLEY

```
 1   moment?
 2                    (Pause in proceedings.)
 3        THE COURT:  So I'll just remind you you remain under
 4   oath.
 5        THE WITNESS:  Yes.
 6        THE COURT:  All right.  Sorry about that,
 7   Mr. McCaulley.  Please go ahead.
 8   BY MR. McCAULLEY:
 9   Q.   Mr. Posdal, during the relevant time period in 2019 and
10   2020, when you were offering the reset service for EndoWrists,
11   did you ever hear anything from Intuitive?
12   A.   We did not.
13   Q.   You heard a lot about authorization.  Do you have
14   experience in your industry with getting authorized by OEMs?
15   A.   Yes.  It never happens.
16   Q.   Do you have an opinion as to whether asking Intuitive for
17   authorization in this case would have resulted in
18   authorization?
19        MR. GALLO:  Objection, Your Honor.  Lack of
20   foundation.
21        THE COURT:  Overruled.
22        THE WITNESS:  Can I answer that, then?
23        THE COURT:  Yes, please do.
24        THE WITNESS:  Okay.  We do have an opinion on that.
25   Based on Intuitive's actions to that point, it seems like that
```

POSDAL - DIRECT / McCAULLEY

```
 1    would have been an exercise in futility.
 2            I think Mr. Gallo said yesterday their position was
 3    still that these instruments were dangerous after 10 uses.  So
 4    it made no sense there would be authorization for such.
 5    BY MR. McCAULLEY:
 6    Q.   Are you aware in your experience of -- and I asked a
 7    question before.  What's an OEM?
 8    A.   I'm sorry.  An OEM is an original equipment manufacturer,
 9    the people who make the equipment.
10    Q.   And you service OEM equipment routinely?
11    A.   For many, many original manufacturers, yes.
12            MR. McCAULLEY:  I want to go back; if I could have,
13    Bobby, Trial Exhibit 142 back up.
14    BY MR. McCAULLEY:
15    Q.   Mr. Posdal, are you able to read that from the screen?
16    A.   Not in the least.
17            MR. McCAULLEY:  Your Honor, may I approach the witness
18    and give him a printout copy that might be easier to read?
19            THE COURT:  Yes.
20                   (Counsel approaches witness.)
21            THE WITNESS:  I can see a cut-out now.  He made it
22    bigger.
23            Okay.  This is tiny too.
24    BY MR. McCAULLEY:
25    Q.   Are you able to read that one?
```

POSDAL - DIRECT / MCCAULLEY

1  A.   I can read it.

2  Q.   Can you remind the jury what's reflected on that page?

3  A.   This is a page that reflects all the EndoWrists that were

4  serviced through SIS to our customers.

5  Q.   Can you identify all the different customers that you had

6  for the EndoWrist service?

7  A.   Sure.  Alexian Brothers Medical Center, Legacy, Good

8  Samaritan Hospital, the Kaiser Hospital Fontana, Advocate Good

9  Samaritan, Marin Health.  I don't know if it's -- it's Marin,

10  right, not Marin.  Advocate South Suburban Hospital, Marin --

11  and Good Samaritan Hospital.  I think those -- I think I got

12  them all.

13  Q.   And are you able to tell, from that document, what the

14  approximate dates are that you were doing servicing for each of

15  those customers?

16  A.   Yes, I can.

17  Q.   Will you?

18  A.   Okay.  It looks like approximately July of 2019 through

19  December of 2019.

20  Q.   Can you identify the range for each of the customers that

21  you had?

22  A.   Sure.  Legacy, Alexian Brothers -- this is -- this was

23  before -- the first line is not part of this process.  That was

24  before we started the service.

25          Good Samaritan -- Legacy Good Samaritan Hospital was

POSDAL - DIRECT / MCCAULLEY

1    June and July of 2019.

2         Kaiser Fontana was August through September of 2019.

3         Advocate Good Samaritan -- again, let's see...  That

4    was outside this service.  It just indicates that we did --

5    someone sent something in, but we didn't do anything with it.

6         Marin is from October to December of 2019.

7         And South Suburban was October through November of

8    2019.

9    Q.   Did SIS, after those time frames, continue to try to

10   market this service?

11   A.   No, not after that period of time.

12   Q.   Did all of those customers stop doing business with the

13   EndoWrists repair service?

14   A.   Yes, they did.

15   Q.   At a certain point did SIS abandon its effort to try to

16   market this service?

17   A.   We did.

18   Q.   Why was that?

19   A.   Again, there was -- there was little point in going

20   forward.  All of these hospitals got letters from Intuitive and

21   were afraid to move forward with our service for fear that

22   their robotic service would be shut down.

23   Q.   How large is the executive team at SIS?

24   A.   It's pretty small.

25   Q.   Did you prepare a formal business plan for the launch of

POSDAL - DIRECT / MCCAULLEY

1  the EndoWrist reset service?

2  **A.**   We did not.

3  **Q.**   Why not?

4  **A.**   We're a small family business.  We've been in business for

5  50 years.  We've never really had a formal written business

6  plan.  Our team is small enough to sit down and talk about what

7  we're doing and how to move forward.

8  **Q.**   Despite the fact that you didn't have a formal business

9  plan, did you have a plan?

10 **A.**   We did.

11 **Q.**   What was the plan?

12 **A.**   Well, the plan was to pursue this service.  We knew

13 that -- the potential size of it; and in working with Rebotix,

14 we knew what was involved with providing this service.  It's

15 fairly straightforward and a huge opportunity for us to move

16 forward.

17 **Q.**   Did you have an estimate of what the size of the

18 opportunity was?

19 **A.**   I don't think we nailed it down specifically, but we knew

20 just kind of, you know, back-of-the-napkin stuff.  We looked at

21 one of our customers, Banner Hospital, and they were spending

22 tens of millions of dollars on EndoWrists at that point in

23 time, and that represented 30 hospitals.  So in the universe of

24 2300 acute care medical centers in the States, that opportunity

25 was likely larger than we could ever handle or want to handle,

POSDAL - DIRECT / McCAULLEY

1  but a huge opportunity for us.

2  Q.   You would be able to handle a portion of it; correct?

3  A.   Absolutely.

4  Q.   What was your capacity to handle increased demand for

5  EndoWrist reset?

6  A.   Well, I think -- right off the bat I think -- in terms of

7  revenue dollars?  Is that what you're looking for?

8  Q.   Just having the people and the resources.

9  A.   Oh.  We had people and resources to be able do that.  This

10  process is fairly simple and straightforward.  It involves

11  replacing a chip.  It's a very simple process.  We had plenty

12  of personnel, plenty of room in three of our facilities to do

13  so, and we knew the ability to add technicians who can do this

14  particular service was pretty simple and straightforward and

15  quick.

16  Q.   How many EndoWrists could a trained technician service,

17  approximately, in an hour?

18  A.   I think two to three per hour.

19  Q.   And that's based on what?

20  A.   That's based on discussions with Rebotix, Chris Gibson and

21  Rebotix, and watching the process in Florida.

22  Q.   I'd like to turn your attention to Exhibit --

23       MR. McCAULLEY:  Well, first of all, I intend to move

24  into evidence, Your Honor, Exhibit 147.  I believe there's no

25  objection as redacted.

POSDAL - DIRECT / MCCAULLEY

```
1            MR. GALLO:  No objection.  Thank you.

2            MR. McCAULLEY:  Your Honor, I move 147 into evidence.

3            THE COURT:  It's admitted.

4        (Trial Exhibit 147 received in evidence.)

5            THE COURT:  And I presume you want to publish it.

6            MR. McCAULLEY:  I'd like to publish it.

7            THE COURT:  Go ahead.

8            MR. McCAULLEY:  Bobby, can we turn to page 2 of that

9    exhibit?

10   BY MR. McCAULLEY:

11   Q.    Do you recognize Trial Exhibit 147, Mr. Posdal?

12   A.    I do.

13   Q.    What is that?

14   A.    It's the suggested retail price for the service of

15   resetting the EndoWrists for various items.

16   Q.    And then if we turn to page 3 of Exhibit 147, do you

17   recognize that document?

18   A.    I do.

19   Q.    And these are all part of the same document; correct?

20   A.    Yes.

21   Q.    And what does this portion refer to?

22   A.    Obviously this is the Rebotix summary of quality and

23   reliability measures that goes on for a number of pages.

24   Q.    And you're familiar with this document?

25   A.    Yes.
```

POSDAL - DIRECT / MCCAULLEY

1   Q.   You saw this document during the relevant time period?

2   A.   I did.

3   Q.   Approximately when was the first time you saw this

4   document?

5   A.   I've -- middle of 2019.  Shortly after I met Mr. Gibson at

6   the conference in Ohio.

7   Q.   What does this document represent, to your understanding?

8   A.   This is Rebotix's document of their -- of the testing that

9   they performed to ensure that this process would be safe for

10  another 10 uses and -- and the different tests that they

11  performed to make sure that that was so.

12  Q.   Why would you review this document in the course of

13  evaluating the Rebotix opportunity?

14  A.   Well, it's important to make sure that -- that the process

15  has been fully vetted and it's safe for the hospital.

16          Since our inception, quality has always been the

17  number one item on our list of things to do for your customers,

18  to, first and foremost -- to make sure that this it's safe,

19  that's it's been well thought through, and that we're

20  comfortable giving this service to our customers.

21  Q.   Did SIS perform any of its own testing?

22  A.   No.

23  Q.   Why not?

24  A.   We relied heavily on this -- this and other documents and

25  what we saw in person from Rebotix, along with our 10-year

POSDAL - DIRECT / MCCAULLEY

1  history with that company prior -- with a number of other

2  parts, materials, and services.

3  Q.  If you were going to carry out your own testing, would you

4  have done it in-house?

5  A.  In the absence of this?

6  Q.  If you -- yes, in the absence of this.

7  A.  We probably would have reached out to somebody like

8  Rebotix did to perform that specialized testing.

9  Q.  By the time you first offered the EndoWrist reset service,

10  were you comfortable that the process you were offering was

11  safe?

12  A.  Absolutely.

13        MR. McCAULLEY:  I'm going to turn to page 16 of

14  Exhibit 147, please, Bobby.

15  BY MR. McCAULLEY:

16  Q.  Mr. Posdal, again, you reviewed this document at the time

17  you were offering the service; correct?

18  A.  Yes.

19        MR. McCAULLEY:  If you highlight for us, Bobby, the

20  paragraph that starts "Additionally."

21        THE WITNESS:  Thank you.

22  BY MR. McCAULLEY:

23  Q.  Are you able to read that paragraph?

24  A.  Would you like me to read it?  I can read it.  Yes, I can

25  see it.

POSDAL - DIRECT / MCCAULLEY

1  Q.   Can you summarize it, what the conclusions were?

2  A.   This states that Rebotix performed testing that

3  mimicked -- that ensured that 10 uses were safe, and they did

4  it 3 times, up to 29.  So the first 9 on the original

5  manufacturer -- the original EndoWrist, and then they tested 2

6  more times, 10 additional uses each time -- I'm sorry.  I'll

7  slow down -- to -- to validate and verify that this process was

8  safe up to and through 29 uses.

9  Q.   Why did they start with nine uses, if you know?

10 A.   The nine uses was important because, as the original

11 EndoWrist was set, on its tenth use, it would wipe the

12 information out -- or it would either wipe it out or disable

13 it.  So once the EndoWrist was connected to the robot for the

14 10th time, the robot would be unable to read any information

15 from that device from that point forward.  So Rebotix needed it

16 on its ninth use so that all of that information was still

17 acceptable.

18          And it's not a lot of information.  It's a model

19 number.  It's a serial number.  And the model number kind of

20 tells the robot, "Hey, this is the instrument.  This is -- this

21 is how it's supposed to be used."  And then the identifying

22 serial number.  Those are the only two important pieces of

23 information on that, but it would be lost after the tenth use.

24 Q.   What was the conclusion of the testing that you relied on

25 with respect to whether there was degradation of the device

POSDAL - DIRECT / MCCAULLEY

1  after 29 uses?

2  **A.**   After 29 uses, the data shows that there was no

3  degradation in that piece of equipment.

4  **Q.**   And you were comfortable with that data?

5  **A.**   Absolutely.

6       **MR. McCAULLEY:**  Turn to page 17, Bobby.  And if you

7  could call out the second full paragraph on that page for

8  Mr. Posdal.

9  **BY MR. McCAULLEY:**

10 **Q.**   Are you able to read that?

11 **A.**   I am, yes.

12 **Q.**   What does that paragraph refer to?

13 **A.**   This refers to the fact that, beyond the 29 uses that they

14 tested to simulate surgical procedures, they did an additional

15 subset of instruments where they cleaned and sterilized to 50

16 cleaning and sterilization procedures.  And that was important.

17 As Mr. Gallo pointed out yesterday, that cleaning and

18 sterilization can degrade the instruments.  So they took it to

19 50 sterilizations and cleaning without any degradation of

20 materials.

21 **Q.**   I believe we'll see -- did you use Trial Exhibit 147, or a

22 version of it, in marketing your EndoWrist services?

23 **A.**   We did.  Shall I elaborate on that?

24 **Q.**   Yes.

25 **A.**   We -- in working with Rebotix, they provided us with all

POSDAL - DIRECT / MCCAULLEY

1   this marketing material and testing and gave us permission to

2   use all of the stuff that was included in that.

3   Q.   And I forget if we covered this yesterday.  Rebotix had a

4   patent on this process; correct?

5   A.   They did.

6   Q.   Did they give you permission to use the patent?

7   A.   They did.

8   Q.   Did they give you permission to use the fact that there

9   was a patent in your marketing efforts?

10  A.   Yes.

11  Q.   Who gave you that permission?

12  A.   Chris Gibson.

13          MR. McCAULLEY:  I'd like to turn to page 22.

14  BY MR. McCAULLEY:

15  Q.   Are you able to read that, Mr. Posdal?

16  A.   Sort of.

17          MR. McCAULLEY:  Your Honor, may I give my paper copy

18  to the witness?

19          THE COURT:  Go ahead.

20              (Counsel approaches witness.)

21          THE WITNESS:  Thanks.

22  BY MR. McCAULLEY:

23  Q.   Can you explain what that portion of the document is?

24  A.   This is Rebotix's flow chart for how to test, evaluate,

25  and reset the counter for this service process.

POSDAL - DIRECT / MCCAULLEY

1  Q.  Were you able to, in your visit to Rebotix, witness that

2  process?

3  A.  Most of it.  We didn't do scissor sharpening, but I think

4  they went through most, if not all, of the rest of the

5  functions on here.

6  Q.  Can you describe, using the flow chart, in general terms

7  what the process entailed?

8  A.  Sure.  In general, the process entails receiving the piece

9  of equipment, inspecting it, making sure that the use count

10  function is still available, that nine uses that we talked

11  about a second ago.

12       A general function, make sure that the wires are

13  intact, that they're working properly.

14       Electrosurgical testing to make sure that the

15  insulation that we talked about yesterday wasn't compromised.

16       Then installing the new chip, the Interceptor as they

17  call it.  Making sure the cables are adjusted, the tools are

18  aligned, special fixtures and jigs to make sure those were

19  aligned properly, that they didn't suffer any damage or

20  malfunction during the first nine uses.

21       And then an outgoing evaluation to ensure that all

22  those specifications were met.

23  Q.  And there's -- so there's an -- is there an inspection

24  done before anything is done to the EndoWrist?

25  A.  Yes.  To make sure that it's okay to proceed with this --

POSDAL - DIRECT / MCCAULLEY

1   with the chip reset.

2   Q.   And there's a reference on there, although you have my

3   copy, to an electrosurgical inspection?

4   A.   Right.

5   Q.   Can you describe that?

6   A.   That's the process that we talked about yesterday with a

7   hipot tester.  So a test is performed over the length of the

8   insulation to make sure there are no defects or cracks or

9   unseen holes where electricity could escape.  So it's tested

10  before.  If there's a hole in it, that process was abandoned

11  and the instrument was returned.

12       And then obviously on the outgoing evaluation, to make

13  sure again that there's no electrical leaks.

14  Q.   And would that be done for all instruments or just certain

15  instruments?

16  A.   Just the electrosurgical instruments.

17  Q.   The ones we talked about yesterday?

18  A.   Yes.

19  Q.   When you first offered the service, you indicated that

20  you'd be a distributor for Rebotix; correct?

21  A.   Yes.

22  Q.   What was the plan for transitioning that operation to SIS

23  facilities?

24  A.   We had talked to the Rebotix people, Chris Gibson mainly,

25  and they were going to help train our personnel on the process,

POSDAL - DIRECT / MCCAULLEY

```
 1   their detailed process, and we would bring that entire process
 2   in-house.
 3              The chip replacement was really the only part that was
 4   different from most of the other repairs that we perform on a
 5   daily basis.
 6         MR. McCAULLEY:  Your Honor, I'd like to offer
 7   Exhibit 279 into evidence.  I don't believe there's an
 8   objection as redacted.
 9         MR. GALLO:  No objection.
10         MR. McCAULLEY:  Your Honor, I move Exhibit --
11   Trial Exhibit 279 into evidence and request permission to
12   publish it to the jury.
13         THE COURT:  It's admitted and you can publish it.
14      (Trial Exhibit 279 received in evidence.)
15   BY MR. McCAULLEY:
16   Q.  Mr. Posdal, you testified that you saw this summary that
17   we just talked about; correct?
18   A.  Yes.
19   Q.  Did you also see any additional information about the
20   procedures and processes that Rebotix had gone through?
21   A.  Everything that was contained in that binder, the whole
22   process, all the pieces of information on repair and/or
23   testing, so the complete substance of what they had.
24   Q.  And can you remind us, from yesterday, what you're
25   referring to when you say "that binder"?
```

POSDAL - DIRECT / MCCAULLEY

1   A.   Oh, Mr. Gibson shared a big white three-ring binder with

2   us that had all the testing, all the repair processes, all the

3   proper tools, all the proper adhesives and solders and things

4   that you need to use to perform this service.

5   Q.   Did he give you a copy of it?

6   A.   We didn't have a full copy of it at that time, no.

7   Q.   Did you go through it with him when you made your visit?

8   A.   Yes.

9   Q.   How long did the review of that binder take?

10  A.   I couldn't tell you.  We went through in chunks:  Here's

11  the process.  The process is what we concentrated most on.  The

12  testing was the next thing.  And then I had that to bring back.

13  So I saw -- I had copies of the testing to bring back to the

14  office and keep.  So I was able to review that -- chunks of

15  that much later.

16  Q.   Were you comfortable, by the time you reviewed the binder

17  with Mr. Gibson, that the process that -- how would you

18  characterize the process that Rebotix went through to ensure

19  that their method was safe?

20  A.   I characterize it as thorough and thoughtful and complete.

21  Q.   Did you ask any questions to Mr. Gibson that he wasn't

22  able to answer?

23  A.   No.

24  Q.   Was Trial Exhibit 279 part of that binder that you

25  reviewed with Mr. Gibson?

474

POSDAL - DIRECT / McCAULLEY

 1   **A.**   Is that what we're looking at now?

 2   **Q.**   Yes.

 3   **A.**   Yes.

 4         **MR. McCAULLEY:**  I'd like to offer into evidence

 5   Exhibit 463 as redacted, and I believe there's no objection.

 6         **MR. GALLO:**  No objection.

 7         **MR. McCAULLEY:**  Your Honor, I move Trial Exhibit 463

 8   into evidence and request permission to publish it to the jury.

 9         **THE COURT:**  It's admitted and you can publish it.

10      (Trial Exhibit 463 received in evidence.)

11   **BY MR. McCAULLEY:**

12   **Q.**   Mr. Posdal, have you seen this document before?

13   **A.**   Just in preparing for the trial.

14   **Q.**   All right.  Turn to page 2 of that document.

15         **MR. McCAULLEY:**  Bobby, can you blow up the copyright?

16   **BY MR. McCAULLEY:**

17   **Q.**   Do you see when this document is copyrighted?

18   **A.**   Yes.  It says 2014.

19         **MR. McCAULLEY:**  Turn to page 11 of that document,

20   Bobby.  Blow up the 1.3.

21   **BY MR. McCAULLEY:**

22   **Q.**   Are you able to see that, Mr. Posdal?

23   **A.**   I can, yes.

24         **MR. McCAULLEY:**  Then it continues on, Bobby, at 112,

25   top of the page.

POSDAL - DIRECT / MCCAULLEY

```
 1              MR. GALLO:  May I impose an objection under lack of --
 2    for lack of foundation, personal knowledge?
 3              THE COURT:  The only question I see pending at this
 4    moment is, "Can you see that?"
 5              So can I hear the next question you have for him?
 6              But don't answer it yet, Mr. Posdal.
 7              Because the witness has stated he has seen this
 8    document before.  So what else do you want to ask him about
 9    this?
10    BY MR. McCAULLEY:
11    Q.   Are you familiar with the policy that's outlined in this
12    document?
13              MR. GALLO:  Objection, Your Honor.
14              THE COURT:  Rule?
15              MR. GALLO:  Foundation, 602 and personal knowledge.
16    The witness testified he saw it in preparing for the
17    litigation.
18              THE COURT:  Overruled.
19              Go ahead and answer, Mr. Posdal.
20              THE WITNESS:  Can you repeat the question?  Have I
21    seen it?
22              MR. McCAULLEY:  I think the -- may we have the last
23    question back, Ms. Court Reporter?
24         (Record read as follows:  "QUESTION:  Are you familiar
25         with the policy that's outlined in this document?")
```

POSDAL - DIRECT / McCAULLEY

```
 1              THE WITNESS:  Yes.
 2   BY MR. McCAULLEY:
 3   Q.    And what is the policy?
 4   A.    The policy generally is, once an EndoWrist is used 10
 5   times, the license and warranty expires and there's no more
 6   guarantee or warranty on that piece of equipment.
 7   Q.    And what's your understanding of the policy reflected as
 8   to repair, refurbish, and/or remodeling?
 9              MR. GALLO:  Same objection, Your Honor.
10              THE COURT:  Sustained.
11   BY MR. McCAULLEY:
12   Q.    You raised the warranty issue.  Did SIS warrant the
13   services that they provided for EndoWrists?
14   A.    We did, same as every other piece of equipment that we
15   repair or service.
16   Q.    And how would that have been tracked?
17   A.    By serial number.
18   Q.    You referred to this yesterday.  So EndoWrists have serial
19   numbers?
20   A.    Yes.
21   Q.    And have you maintained a record of documents -- of
22   instruments that you've worked on?
23   A.    Our system allows to record manufacturer, model number,
24   serial number, date of service, type of service, complaint, all
25   the relevant information as that instrument comes in, gets
```

POSDAL - DIRECT / MCCAULLEY

1  serviced and goes out.  And we can refer back to that

2  information at any time.

3          When any serialized number piece of equipment comes in

4  for repair, the first thing we do is reenter it into our system

5  and check history on that.  So we would know exactly when we

6  serviced a piece of equipment and what we did to it.

7  **Q.**   Is that information also shared with the hospital?

8  **A.**   Yes, it is.

9  **Q.**   So if there was an issue with a piece of equipment that

10  SIS had worked on, including EndoWrists, there would be a

11  record that SIS had worked on that equipment; is that correct?

12          **MR. GALLO:**  Objection.  Leading.  611(c).

13          **THE COURT:**  Sustained.

14  BY MR. McCAULLEY:

15  **Q.**   How do hospitals know if you've worked on an instrument?

16  **A.**   They have access to our system.  Any of our hospitals can

17  log into our system, track the serial number of any particular

18  item or any model number.  If they don't do it themselves, they

19  can ask any one of our representatives and we let them know.

20          As part of the quoting process, if they have any

21  interest, we bring that -- as I said earlier, bring that up as

22  soon as we get a piece of equipment back in and check the

23  relevant history.  If it seems like it's something that's had

24  the same issue, we address that with the customer immediately.

25  **Q.**   If there was a problem with a serviced instrument, would

POSDAL - DIRECT / MCCAULLEY

1    the hospital be able to track down that you serviced it?

2           MR. GALLO:  Objection.  Foundation.

3           THE COURT:  Sustained.

4           Rephrase it, Mr. McCaulley.

5           MR. McCAULLEY:  I'll move on.

6    BY MR. McCAULLEY:

7    Q.   You had a warranty in place that you stood behind all of

8    your work; correct?

9    A.   Correct.

10   Q.   That also applied to EndoWrists?

11   A.   Correct.

12   Q.   If there was a problem, would -- with the service that you

13   provided, SIS would stand behind it?

14          MR. GALLO:  611(c).  Leading.

15          THE COURT:  Sustained.

16          Rephrase it, Mr. McCaulley.

17   BY MR. McCAULLEY:

18   Q.   How would a warranty claim be handled in the case that SIS

19   improperly serviced an EndoWrist?

20   A.   SIS takes responsibility for that instrument after we

21   service -- whatever we do to that instrument, we then take

22   responsibility for.

23   Q.   And are there conditions under which your warranty becomes

24   invalid?

25   A.   Several.  I'm not sure they've ever been used; but if

POSDAL - DIRECT / MCCAULLEY

1  somebody alters our work, we can't warrant the work that's not

2  there anymore.  But that's about it really.

3  **Q.**  Once you service an EndoWrist, would Intuitive be

4  responsible for things that you did to the instrument?

5  **A.**  No.  Sorry.

6       **THE COURT:**  All right.  Mr. McCaulley, I think we've

7  moved past it.

8       **MR. McCAULLEY:**  Your Honor, I'd like to move in and

9  publish to the jury Trial Exhibit 1495.

10       **THE COURT:**  Any objections?

11       **MR. GALLO:**  I'm sorry, Your Honor.  No objection.

12       **MR. McCAULLEY:**  Your Honor, I move Trial Exhibit 1495

13  into evidence and request permission to publish it to the

14  witness and the jury.

15       **THE COURT:**  It's admitted and you may publish it.

16    (Trial Exhibit 1495 received in evidence.)

17       **MR. McCAULLEY:**  May I see the second page of that

18  document, Mr. Cox?

19  **BY MR. McCAULLEY:**

20  **Q.**  Mr. Posdal, are you able to make out this document?

21  **A.**  Yes.

22  **Q.**  Can you tell us what that is?

23  **A.**  It's a service agreement, a document between Surgical

24  Instrument Service Company and Rebotix repair for this service.

25  **Q.**  This agreement, was it ever executed?

POSDAL - DIRECT / MCCAULLEY

1    A.    It was not.

2    Q.    Why not?

3    A.    We were still negotiating the terms and the costs for the

4    parts.

5    Q.    And what happened to prevent you from signing it?

6    A.    We were still in the middle of this when -- when it became

7    apparent we weren't going to be able to move on with the

8    program.

9    Q.    For the reasons that you stated earlier?

10   A.    For the reasons I stated earlier.

11   Q.    Did you operate under some kind of understanding with

12   Rebotix while you negotiated this agreement?

13   A.    We operated under the general terms of the agreement as

14   they were stated in this -- from this paper.

15   Q.    Until such time as the project was abandoned?

16   A.    Yes.

17   Q.    Did you ever get any pushback from Rebotix on the

18   marketing materials that you used with this project?

19   A.    No.

20   Q.    I believe the testimony has already established that you

21   did not have the code or the means to solve the X and the Xi at

22   the time you first offered this service; correct?

23   A.    Correct.

24   Q.    What types of instruments were you servicing during the

25   time period?

POSDAL - DIRECT / MCCAULLEY

1  A.   Those would have been the Si series of instruments.

2  Q.   Did you do anything to start to solve the code on the X

3  and the Xi?

4  A.   We had discussions about how we would go about doing that.

5  Q.   Why didn't you start -- or did you start?

6  A.   We started the process of how we would go about doing

7  that; but to move forward, we would have needed money and time

8  to do that, and that was -- we were to use the money generated

9  by the Si service to fund the research into the Xi's.

10 Q.   Did you have any estimate of how long it would take you to

11 solve the encryption on the X and Xi?

12 A.   Not without certainty; but some of the discussions we had

13 basically indicated that all of these things can be solved.  I

14 don't know if we had an exact time frame.

15 Q.   I'd like to call your attention back to Exhibit 942.

16       MR. McCAULLEY:  Which was already moved into evidence

17 yesterday, Your Honor.  I'd like to publish it.

18       THE COURT:  Go ahead.

19       MR. McCAULLEY:  Mr. Cox, if you could highlight the

20 bullet points at the bottom of page 2.

21 BY MR. McCAULLEY:

22 Q.   Was this -- did you have any knowledge, as a company,

23 prior to seeing a copy of this letter, about the terms of

24 Intuitive's contracts with its customers?

25 A.   No, we did not.

POSDAL - DIRECT / McCAULLEY

1  Q.   Did you have an impression about these contract terms once

2  you learned about them?

3  A.   Once we learned them, yes.

4  Q.   What was your impression?

5  A.   That -- that these instruments are subject to a

6  limited-use license; after 10 uses, that license expires; and

7  that they're saying that no one -- a customer won't permit

8  anyone to modify, disassemble, repair, service, remanufacture,

9  whatever the words are that they used in there, to modify their

10  equipment.

11  Q.   To this day, have you seen the full version of that

12  contract?

13  A.   No.

14      MR. McCAULLEY:  I'd like to move into evidence

15  Exhibit 1434 as redacted.

16      THE COURT:  Any objection?

17      MR. GALLO:  No objection.

18      MR. McCAULLEY:  Your Honor, I move the admission of

19  Trial Exhibit 1434 and request permission to publish it to the

20  witness and the jury.

21      THE COURT:  It's admitted and you may publish it.

22      (Trial Exhibit 1434 received in evidence.)

23  BY MR. McCAULLEY:

24  Q.   Mr. Posdal, have you seen this document before?

25  A.   Yes.

POSDAL - DIRECT / MCCAULLEY

```
 1            MR. McCAULLEY:  Could we turn to the second page,
 2   Mr. Cox?
 3   BY MR. McCAULLEY:
 4   Q.   Can you briefly describe what this document is to the
 5   jury?
 6   A.   This is another Rebotix document that outlines that -- the
 7   measures they took to ascertain and mitigate risk management
 8   and safety.  I don't know.
 9   Q.   Was this part of the package that you reviewed?
10   A.   Yes.
11            MR. McCAULLEY:  Your Honor, I'd seek to move
12   Trial Exhibit 1438.
13            THE COURT:  Any objection?
14            MR. GALLO:  No objection.
15            MR. McCAULLEY:  Your Honor, I move the admission of
16   Trial Exhibit 1438 and request permission to publish to the
17   witness and the jury.
18            THE COURT:  It's admitted and you may publish it.
19       (Trial Exhibit 1438 received in evidence.)
20   BY MR. McCAULLEY:
21   Q.   One question for you, Mr. Posdal.  If you recognize this
22   document; and if so, what is it?
23   A.   Another risk management report from Rebotix.
24   Q.   Was this part of the package you reviewed?
25   A.   Yes.
```

POSDAL - DIRECT / McCAULLEY

1    Q.   Did you discuss it with Mr. Gibson?

2    A.   Yes.

3            MR. McCAULLEY:  Your Honor, request to move into

4    evidence Trial Exhibit 1503.

5            MR. GALLO:  No objection.

6            THE COURT:  It's admitted.

7        (Trial Exhibit 1503 received in evidence.)

8            MR. McCAULLEY:  Your Honor, it's admitted?  I ask --

9    request permission to publish it to Mr. Posdal and to the jury.

10           THE COURT:  Go ahead.

11   BY MR. McCAULLEY:

12   Q.   Mr. Posdal, what is this document?

13   A.   This document is a relabeling of all of the quality and

14   reliability measures that Rebotix published prior to some of

15   the stuff that we've already looked at.

16   Q.   This is the version of the document that you produced?

17   A.   Yes.

18   Q.   Did you have Rebotix's permission to do this?

19   A.   We did.

20   Q.   They were aware that you were using this in your

21   marketing?

22   A.   They were.

23   Q.   I just want to clarify one thing from yesterday.

24           You referred to reverse engineering.  Can you remind

25   the jury what that means?

POSDAL - CROSS / GALLO

1  A.   That means taking an existing item, completely

2  disassembling it, seeing what parts were used in there, what

3  materials are used in there, what specifications you can glean

4  from the existing device, and using that information to be able

5  to perform a repair on that piece of equipment.

6  Q.   Is that a common practice in your industry?

7  A.   It is.

8       MR. McCAULLEY:  Thank you, Your Honor.  I tender the

9  witness.

10       THE COURT:  Thank you, Mr. McCaulley.

11       Mr. Gallo, do you want to get started?  We've been

12  going -- we haven't been going too long.

13       MR. GALLO:  I'm happy to start, Your Honor.

14       THE COURT:  Okay.  Folks, I'm sort of planning for us

15  to take a break around 10:00 so that it's short, but that way

16  you just get a chance to stand up and move.  This is -- I'm

17  going to stand anyways just because.

18       Go ahead, Mr. Gallo.  You can move on as you're ready.

19                  (Pause in proceedings.)

20                  **CROSS-EXAMINATION**

21  BY MR. GALLO:

22  Q.   Good morning, Mr. Posdal.

23  A.   Good morning.

24  Q.   Do you feel like you have a pretty good memory?

25  A.   I guess.

POSDAL - CROSS / GALLO

1    providing had a patent.

2    **A.**    Okay.

3    **Q.**    It said SIS has a patent; right?

4    **A.**    Accepted.

5    **Q.**    I think I have something we can agree on here.  So you

6    agree that the da Vinci is a great product; right?

7    **A.**    Absolutely.

8    **Q.**    Yeah.  Yeah.

9         And you agree the EndoWrist makes movements that a

10   human wrist can't make?

11   **A.**    I do.

12   **Q.**    And you agree that it allows for precision control when

13   it's operating inside a human body?

14   **A.**    I do.

15   **Q.**    And it gives an extra level of dexterity?

16   **A.**    I agree.

17   **Q.**    And the robots accurately hold the instrument working tips

18   in a position without causing physical strain on a surgeon's

19   body?

20   **A.**    Yes.

21   **Q.**    And it allows a surgeon not to be limited by his or her

22   own physical dexterity?

23   **A.**    Yes.

24   **Q.**    It allows a surgeon to make even more precise microscopic

25   movements with surgical instruments?

POSDAL - CROSS / GALLO

1    **A.**   Yes.

2    **Q.**   And a number of clinical studies have shown that the robot

3    and the EndoWrist are more effective and safer than

4    laparoscopic surgery?

5    **A.**   I believe that.  I don't know if I've seen any writing or

6    documentation but, yes.

7    **Q.**   And results in decreased infection rates?

8    **A.**   I wouldn't know specifically, but I would agree.

9    **Q.**   It results in faster recovery?

10   **A.**   Yes.

11   **Q.**   Better patient outcomes?

12   **A.**   Yes.

13   **Q.**   Okay.

14         **MR. GALLO:**  Your Honor, if this is an acceptable

15   time -- I can go for five more minutes if you want.  I just was

16   at a little bit of a break, so --

17         **THE COURT:**  I look over at our friends in the box.

18   Five more minutes?

19         Yes, go ahead, Mr. Gallo.

20         **MR. GALLO:**  Okay.

21         **THE WITNESS:**  We continue with the fun stuff?

22   BY MR. GALLO:

23   **Q.**   You know, we're all having a blast.

24         I want to talk to you about what you did or did not do

25   to invest in the business of selling these EndoWrists.

Volume 4

Pages 664 - 848

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE          )
COMPANY, INC., et al.,               )
                                     )
          Plaintiffs,                )
                                     )
  VS.                                )    NO. C 21-03496-AMO
                                     )
INTUITIVE SURGICAL, INC.,            )
                                     )
          Defendant.                 )
_____)
AND RELATED COUNTERCLAIMS.           )
_____)

                          San Francisco, California
                          Thursday, January 9, 2025

                  __TRANSCRIPT OF PROCEEDINGS__

__APPEARANCES__:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
                BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
                    **ANTHONY E. DOWELL, ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
                BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant:
                            PAUL, WEISS, RIFKIND, WHARTON
 3                          & GARRISON LLP
                            2001 K Street NW
 4                          Washington, D.C. 20006
                      BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                         PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                          PAUL WEISS RIFKIND WHARTON
                            & GARRISON LLP
 7                          1285 Avenue of the Americas
                            New York, New York 10019
 8                    BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                           CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                            PAUL, WEISS, RIFKIND, WHARTON
10                          & GARRISON LLP
                            535 Mission Street - 24th Floor
11                          San Francisco, California 94105
                      BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Thursday, January 9, 2025 - Volume 4

| PLAINTIFFS' WITNESSES | PAGE | VOL. |
|---|---|---|
| **ROSA, DAVE** | | |
| By Video Deposition (not reported) | 684 | 4 |
| **VAVOSO, GLENN** | | |
| By Video Deposition (not reported) | 685 | 4 |
| **SARGENT, JEAN** | | |
| (SWORN) | 694 | 4 |
| Direct Examination by Mr. Van Hoven | 694 | 4 |
| Cross-Examination by Ms. Parker | 759 | 4 |
| Redirect Examination by Mr. Van Hoven | 817 | 4 |
| Recross-Examination by Ms. Parker | 824 | 4 |
| **JOHNSON, KEITH ROBERT** | | |
| (SWORN) | 827 | 4 |
| Direct Examination by Mr. McCaulley | 827 | 4 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 540R | | 704 | 4 |
| 869 | | 731 | 4 |
| 871 | | 785 | 4 |
| 1641 | | 813 | 4 |

SARGENT - DIRECT / VAN HOVEN

1  A.    Yes.   It's the function that that particular instrument

2  performs.

3  Q.    So do you understand each of those rows of that table to

4  be describing an EndoWrist that SIS had contracted with Vizient

5  to sell through that GPO?

6  A.    Yes.

7  Q.    And at the right column we see "Repair Price"?

8  A.    Yes.

9  Q.    What do you understand that to be describing?

10 A.    The repair price is 40 percent off of list price.  All

11 hospitals pay list price to Intuitive.

12 Q.    Okay.  So, yeah, let's unpack that for a second.

13       What do you mean by "list price to Intuitive"?

14 A.    So each vendor has their set pricing and every vendor has

15 a list price.  And so through negotiations, either through the

16 GPO or a local agreement, that pricing is then negotiated down

17 to something less than that that is agreed upon between both

18 parties.  Intuitive doesn't contract to provide discounted

19 pricing.

20 Q.    So it is a list price like a manufacturer's retail price

21 on a car?

22 A.    Suggested retail price, yes.

23 Q.    What were you saying about Intuitive's practices with

24 respect to the list price for EndoWrists?

25 A.    There's no discount.

SARGENT - DIRECT / VAN HOVEN

1  Q.   And how are you saying that this pricing compares to

2  Intuitive's list price?

3  A.   It's 40 percent discount.

4  Q.   As someone who's worked in supply chain for a hospital,

5  would that be meaningful to you?

6  A.   Oh, absolutely.

7  Q.   Why is that?

8  A.   The robotics program is very expensive.  The devices, the

9  EndoWrists are very expensive.  And in working with hospitals,

10  we're constantly looking for cost-savings opportunity, and we

11  start with where our highest spend is.  Because you're going to

12  give -- if you're spending a million dollars and you get

13  10 percent off, it's very different than $10 and 10 percent

14  off.

15          And hospitals' bottom lines, their profitability is

16  very minimal.  Hospitals range from plus or minus 3 percent.

17  So it's incumbent on the hospitals to look for cost savings

18  wherever they can.

19  Q.   With vendors other than Intuitive, does -- do hospitals,

20  whether via GPOs or local agreements, negotiate discounts on

21  instruments?

22  A.   Yes.

23  Q.   With vendors other than Intuitive, do --

24  A.   Yes.

25  Q.   I'm sorry.

SARGENT - DIRECT / VAN HOVEN

1          Do hospitals, whether through local agreements or a

2   GPO, do they have instruments and devices repaired?

3   **A.**    Yes.

4   **Q.**    And why do they do that?

5   **A.**    Because it's less expensive than buying new; and so,

6   again, it's a cost savings.

7   **Q.**    For example, we were talking about flexible endoscopes

8   before.  Do you remember that?

9   **A.**    Yes.

10  **Q.**    Flexible endoscopes get repaired?

11  **A.**    Yes.

12  **Q.**    Do they get repaired more than once?

13  **A.**    Yes.

14  **Q.**    How many times does something like a flexible endoscope

15  get repaired?

16  **A.**    Well, as I had mentioned, they're -- they're very delicate

17  and they get broken quite often.  So what ends up happening is

18  that the hospital will monitor how many times it's been sent

19  out for repair and how much those repair costs are and at what

20  point have they paid as much in repair as they have to purchase

21  a new one.

22  **Q.**    And how many repair cycles might a flexible endoscope go

23  through?

24  **A.**    Well, there are scopes that cost $20,000, but they cost

25  7,000 to repair.  So within three repairs, you could have

SARGENT - DIRECT / VAN HOVEN

1   bought a new one, but you've saved by having the repair instead

2   of buying a new one.

3   Q.   And so those will be done multiple times?

4   A.   Yes.

5   Q.   Even though their -- even though your technicians

6   determined there was a problem with an instrument; they put it

7   in the bin?

8   A.   Yes.

9   Q.   And it goes out and comes back?

10  A.   Yes.

11  Q.   And the hospitals -- are the hospitals comfortable with

12  using that flexible endoscope?

13  A.   Oh, absolutely.

14  Q.   I'd like to talk about a seemingly simple process of

15  putting something in a bin.

16  A.   Yes.

17  Q.   Does every -- every instrument that should go -- possibly

18  go to repair end up going to the ISO?

19  A.   Not a hundred percent, no.

20  Q.   Why is that?

21  A.   Normally it's human error because it's the human that has

22  to notice that it needs to be repaired and put it into that

23  repair bin.  So if somebody in decontam fails to notice that it

24  needs a repair or on the prep-and-pack side doesn't notice that

25  it needs to be repaired, it could go back into the cycle.  And

SARGENT - DIRECT / VAN HOVEN

1    it could be that in the operating room, if they have something

2    that would need to be repaired, they might determine that it

3    should be thrown away instead and not really understand the

4    process.

5    Q.   So sometimes instead of getting into the bin and getting

6    out -- the repair out, it ends up in, I don't know, garbage or

7    waste or --

8    A.   Medical waste.

9    Q.   -- medical waste?

10   A.   Yes.

11   Q.   Is that something that happens commonly within the SPD and

12   in that OR cycle?

13   A.   For the most part, it happens but not frequently, and a

14   lot of it is about time, how much time.  You know, if I've got

15   a case cart that all of a sudden I have 50 trays I need to get

16   processed and through and on to the next person, I may not have

17   the time to complete the diligence of the inspection.

18   Q.   And so -- and, I guess, if that doesn't happen, some

19   portion of those end up essentially in medical waste; is that

20   right?

21   A.   Yes.

22   Q.   Are people within the SPD trained to try to avoid creating

23   that medical waste?

24   A.   Absolutely.

25   Q.   What sort of training goes on?

SARGENT - DIRECT / VAN HOVEN

1  A.   So when a new program comes in or maybe a new employee

2  comes in, there's education about the new program and what

3  their role and responsibility is within that program and what

4  the expectations are.

5       So if you've got employees that have been there a long

6  time and you have a new program, you do the diligence.  And

7  that training happens 24/7, whenever the staff works.  If it's

8  24/7 -- SPD, the education happens 24/7 to make sure that

9  everybody gets the education.

10  Q.   I guess -- why does the hospital care about giving these

11  employees that training?

12  A.   So the front-line workers are -- the front-line staff are

13  very important to that patient care, that patient safety.  If

14  the staff in decontam don't do their job appropriately and a

15  device goes through to the prep-and-pack side and still has

16  blood or body fluids on it and if prep and pack for some reason

17  doesn't notice, that goes through the sterilizer but it's not

18  sterile, and then it can go into the next patient's body.

19  Q.   And when we're talking about that process of making sure

20  the something that needs repair gets into the right place --

21  A.   Yes.

22  Q.   -- in your experience, how often does -- is that mistake

23  made by the staff as a proportion of the number of instruments

24  that come through and are checked?

25  A.   I would say that more than 90 percent end up in the repair

SARGENT - DIRECT / VAN HOVEN

1   bin; but when you look at an overall average, it might be

2   75 percent.

3   Q.   How do you come to those numbers?

4   A.   Knowing the inner workings of the hospital and the sterile

5   processing and the OR and just understanding how that happens.

6   I realize that we're not a hundred -- we're not a hundred

7   percent.

8        As I mentioned, most of the time it's going to be

9   90 percent, but you're going to have some hospitals that don't

10  have that deep education where it might be less than that.

11  Q.   And there's also -- you know, we've sort of looked at it

12  as a black box, the ISO getting the bin, but what actually --

13  what actually happens?  Or do they typically have service

14  people, or how do they -- how do those get picked up?

15  A.   So the -- sometimes they'll have a courier that will pick

16  up.  Sometimes they'll have an actual instrument van that will

17  park on the hospital property; and the instruments, the repair

18  box, will go out to the van, and the trained repair staff will

19  repair it on-site and return it.

20       And whenever they don't have the proper equipment to

21  complete the repair, they will then send it to the

22  manufacturer -- the site where the repairs occur.

23  Q.   And is that -- is that a function that the hospital

24  expects the ISOs to perform?

25  A.   Yes.  That's why the hospital contracts with that ISO, to

SARGENT - DIRECT / VAN HOVEN

1   have them perform those functions.

2   Q.   That's part of what they do there, is to get the

3   instruments out of the hospital and back to their facility?

4   A.   Yes.

5   Q.   And you count on them to do that?

6   A.   Yes.  And as I mentioned earlier, sometimes, if it's a

7   smaller hospital, the hospital may ship it directly to the

8   repairs warehouse.

9   Q.   And when you were talking about there being possibly

10  some -- a difference in rate, 90 to 75, what are some of the

11  factors that would -- in your experience, would push it more to

12  90 likely in a hospital or push it closer to 75?

13          MS. PARKER:  Objection.  Scope, Your Honor.

14          THE COURT:  Mr. Van Hoven, can you direct me to the

15  paragraph in the expert report?

16                  (Pause in proceedings.)

17          MR. VAN HOVEN:  56, Your Honor.

18          THE COURT:  What say you, Ms. Parker, paragraph 56?

19          MS. PARKER:  I agree that that's the relevant

20  paragraph.  I don't believe it supports the question he asked

21  as to different factors that go into the 75 percent.

22          THE COURT:  Ms. Parker, could you hand the report to

23  my courtroom deputy, please.

24          MS. PARKER:  Give me one second, Your Honor.

25          THE COURT:  Oh, apologies.  I thought it was in your

SARGENT - DIRECT / VAN HOVEN

```
 1   hand.
 2              MS. PARKER:  No.  That's my marked up.
 3                   (Pause in proceedings.)
 4              THE COURT:  Sustained.
 5   BY MR. VAN HOVEN:
 6   Q.   Ms. Sargent, when you're considering collection -- the
 7   collection rate, does cost bear a factor into that?
 8   A.   Absolutely.
 9   Q.   How is that?
10   A.   As I mentioned earlier, the hospital's profit margins are
11   very minimal, and so a repair such as the EndoWrist would be a
12   great savings to the hospital.
13              There are other products that are also expensive, not
14   as expensive but expensive, that we're able to send out to be
15   repaired and we buy them back at 50 percent of the cost, and so
16   it's a cost savings.
17   Q.   But how would that influence collection rate?
18   A.   So because of the significant cost savings, the staff are
19   educated to perform their functions, to make sure that the
20   repairs end up going out for repair.  So the staff that has to
21   be educated is not only the sterile processing staff but also
22   the operating room staff so they understand what should happen
23   with that product that needs to be repaired.
24   Q.   Does ease of implementation impact collection rate?
25   A.   Absolutely.
```

SARGENT - DIRECT / VAN HOVEN

1  Q.   How is that?

2  A.   It needs to be convenient because in a hospital, everybody

3  is extremely busy, and so it needs to be easy for the staff to

4  implement and to maintain.

5          MR. VAN HOVEN:  Could we get -- I believe 540 has been

6  admitted.  I'm just seeking to publish it.

7                    (Pause in proceedings.)

8          THE COURT:  I saw it for a moment there.

9          MR. VAN HOVEN:  That's 540R.

10         THE COURT:  It seems recalcitrant, Mr. Van Hoven.

11 There's nothing there.

12 BY MR. VAN HOVEN:

13 Q.   Ms. Sargent, did you review a da Vinci Xi instrument and

14 accessory manual as part of your investigation in this matter?

15 A.   Yes.

16 Q.   And is that the sort of document that you would review

17 during your practice and supply chain or SPD?

18 A.   Yes.

19 Q.   And did you use that -- consider that document in forming

20 your opinions in this matter?

21 A.   Yes.

22         MR. VAN HOVEN:  Any objection to 540?

23         MS. PARKER:  You already admitted it.

24         MR. VAN HOVEN:  Oh.  I --

25         THE COURT:  You were going to publish it.  It just

SARGENT - DIRECT / VAN HOVEN

```
 1    isn't -- it's not coming up on the screen.
 2            MR. VAN HOVEN:  Oh, it's not coming up on the screen.
 3        Could you publish it, Bobby?
 4            THE COURT:  It came up for a moment.  Oh, and now we
 5    have the strobe effect again.
 6            MR. VAN HOVEN:  It does not want to display that
 7    document.
 8            THE COURT:  Recalcitrant, I tell you.
 9        Can I suggest that you move on to something else?
10            MR. VAN HOVEN:  Yeah.  I'll move on to something else.
11    BY MR. VAN HOVEN:
12    Q.   Are you familiar with the da Vinci system?
13    A.   Yes, I am.
14    Q.   What's -- generally, what's the basis for your experience
15    with the da Vinci system?
16    A.   The system was in use at University of Kentucky when I
17    worked there.  And at that time, when I arrived at UK, it was
18    2009, and the chief medical officer had decided that the only
19    time that the robot would be used would be for prostatectomies,
20    and that's due to the expense of using the robot.  So unless it
21    was a prostatectomy, it did not get used.
22            And when he left in 20 -- yeah, that would have been
23    '07 to '09.  When I left in '09, it was still not being used
24    for anything outside of a prostatectomy.
25    Q.   But you understand that da Vinci systems are used all
```

744

SARGENT - DIRECT / VAN HOVEN

1    around the country, though; right?

2    A.    Yes.

3    Q.    For quite a few procedures?

4    A.    Yes.

5    Q.    And do you have other experience with the da Vinci system

6    other than your work at the University of Kentucky?

7    A.    Yes.  When I at -- following UK, I was at University of

8    Southern California, USC Keck Medical School and Center, and at

9    that hospital I was also in charge of supply chain.  And the

10   hospital had one robot.  The physicians had been requesting a

11   second robot.  The hospital did not have funding for a second

12   robot.  The local sales representative spoke with one of the

13   physicians, and the physician said, "Well, just" --

14            MS. PARKER:  Objection, Your Honor.  Hearsay.

15            THE COURT:  Sustained.

16   BY MR. VAN HOVEN:

17   Q.    Ms. Sargent, please don't speak about something that other

18   people said to you out of court.  Just your own experience.

19   A.    Oh, okay.

20   Q.    I'll move on to another question.

21            But through your experience with SPD -- well, I guess,

22   what do you understand the da Vinci system to be versus

23   EndoWrist instruments?

24   A.    The EndoWrist instruments are used with the da Vinci

25   system.

SARGENT - DIRECT / VAN HOVEN

1  Q.   What's your understanding of how they're used with the

2  da Vinci system?

3  A.   The -- that's what the physicians manipulate to perform

4  the procedure.

5  Q.   Do you understand that EndoWrist instruments have a use

6  counter?

7  A.   Yes, they do.

8  Q.   What is your understanding of how that use counter

9  functions?

10  A.   The use counter monitors how many times the EndoWrist has

11  actually been used in a procedure.  If it's plugged into the

12  machine but not used, it doesn't count that as a use.  It's

13  only when it has been used.

14  Q.   And do you have an understanding of what happens after

15  it's been used a number of times?

16  A.   Yes.  It's -- after the number of uses, it stops working.

17  Q.   What do you mean "it stops working"?

18  A.   It no longer functions.

19  Q.   We talked a little bit more before about repair.  In your

20  experience, have you -- do EndoWrists go through that same type

21  of repairs as other instruments and devices that we described

22  earlier?

23  A.   Well, SIS started a program to complete that repair, and

24  SI -- Intuitive shut the program down.

25  Q.   And before that sort of program came into being, were you

SARGENT - CROSS / PARKER

1    A.    Okay.

2    Q.    Now, Ms. Sargent, you talked in your direct exam that in

3    your experience, Intuitive wouldn't negotiate on the price of

4    EndoWrists; right?

5    A.    Correct.

6    Q.    And you've not offered any opinions in this case regarding

7    whether Intuitive negotiates with hospitals over the price of

8    da Vinci robots; right?

9    A.    Correct.

10   Q.    And you've not offered any opinions in this case whether

11   Intuitive negotiates with hospitals on the pricing of the

12   ongoing services that they provide to hospitals to maintain the

13   robots, have you?

14   A.    I'm sorry, can you -- can you repeat that?

15   Q.    Sure.

16         You've not offered any opinions in this case regarding

17   whether or not Intuitive will negotiate with a hospital over

18   the cost of the ongoing services that they provide to hospitals

19   for the robots; right?

20   A.    I did state that they don't provide discounts.

21   Q.    You opined that they don't provide discounts on the

22   EndoWrists; correct?

23   A.    Correct.

24   Q.    I'm talking about the robots themselves.

25   A.    Okay.

SARGENT - CROSS / PARKER

1    Q.    You've not offered any opinions in this case over whether

2    or not they negotiate the price of the robot; correct?

3    A.    Correct.

4    Q.    And you've not offered any opinions in this case over

5    whether or not they negotiate the price of the servicing that

6    they provide to the robot; right?

7    A.    Correct.

8    Q.    Okay.  So you can't speak to what negotiations Intuitive

9    is willing to have at the time a hospital makes the investment

10   and purchases a da Vinci, can you?

11   A.    No.

12   Q.    Okay.  And -- but if Intuitive were negotiating about the

13   price of robots or the servicing of those robots, that would be

14   relevant to the total cost of the system to the hospital;

15   right?

16   A.    Correct.

17   Q.    Because hospitals look at the total pricing package when

18   they're deciding whether or not to make an investment in new

19   equipment; correct?

20   A.    Hospitals look at that differently.

21   Q.    All right.  Thank you.

22          Now, Ms. Sargent, you talked a lot about the Vizient

23   contract between SIS and Vizient; correct?

24   A.    Yes.

25   Q.    And the business relationship that they had set up;

**Volume 5**

**Pages 849 - 1059**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | )  **NO. C 21-03496-AMO** ) |
| INTUITIVE SURGICAL, INC., | ) ) |
| Defendant. | ) ) |
| AND RELATED COUNTERCLAIMS. | ) ) |

San Francisco, California
Friday, January 10, 2025

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:

        MCCAULLEY LAW GROUP
        180 N. Wabash Avenue - Suite 601
        Chicago, Illinois 60601
    BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
        **ANTHONY E. DOWELL, ATTORNEY AT LAW**

        HALEY GUILIANO LLP
        111 Market Street - Suite 900
        San Jose, California 95113
    BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
        Official Reporter, CSR No. 12219

850

```
 1    APPEARANCES:   (CONTINUED)

 2    For Defendant:
                               PAUL, WEISS, RIFKIND, WHARTON
 3                             & GARRISON LLP
                               2001 K Street NW
 4                             Washington, D.C. 20006
                        BY:   KENNETH A. GALLO, ATTORNEY AT LAW
 5                            PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                             PAUL WEISS RIFKIND WHARTON
                               & GARRISON LLP
 7                             1285 Avenue of the Americas
                               New York, New York 10019
 8                      BY:   WILLIAM MICHAEL, ATTORNEY AT LAW
                              CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                               PAUL, WEISS, RIFKIND, WHARTON
10                             & GARRISON LLP
                               535 Mission Street - 24th Floor
11                             San Francisco, California 94105
                        BY:   JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
      Also Present:          Bobby Cox
14                           Ryan Lee
                             Greg Posdal
15                           David Rosa

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2     Friday, January 10, 2025 - Volume 5

 3     PLAINTIFFS' WITNESSES                      PAGE   VOL.

 4     JOHNSON, KEITH (RECALLED)
       (PREVIOUSLY SWORN)                         885     5
 5     Direct Examination resumed by Mr. Johnson  885     5
       Cross-Examination by Mr. Gallo             933     5
 6     Redirect Examination by Mr. McCaulley     1025     5

 7                        E X H I B I T S

 8     TRIAL EXHIBITS                     IDEN  EVID   VOL.

 9      137R                                     990     5

10      139                                      992     5

11      232                                      975     5

12      232R                                     977     5

13      235                                      983     5

14      1514                                     998     5

15      1546                                     968     5

16      1557                                     989     5

17      1674                                     963     5

18

19

20

21

22

23

24

25
```

JOHNSON - DIRECT / McCAULLEY

```
1    the United States in hospitals.  Post -- post-COVID there
2    was -- to my knowledge, there was less than 80 still being
3    used.  So it was dramatically decreasing.
4    Q.   You now do work with Restore Robotics; correct?
5    A.   Yes.
6    Q.   Were you familiar with Restore Robotics in 2019?
7    A.   I learned about Restore Robotics towards the end of 2019.
8    Q.   What was your understanding of what Restore Robotics did?
9    A.   Restore Robotics -- let me step back.
10         When we met -- when it was brought to my attention,
11   the Rebotix program, and when Greg and I were at the facility
12   in Florida, doing the lab tour and learning about the
13   technology, I was told -- or in that meeting we were informed
14   that Restore Robotics was Rebotix's current sales arm or
15   distributor for their rechip program.
16   Q.   In this case Intuitive have said they cleared Restore to
17   service EndoWrists.  Are you familiar with that clearance?
18   A.   Yes.
19   Q.   Do you know how many EndoWrist models Intuitive has
20   cleared?
21        MR. GALLO:  Objection, Your Honor.  Lack of
22   foundation.
23        THE COURT:  Sustained.
24        MR. McCAULLEY:  I asked him if he knew.
25        THE COURT:  You can answer that one.  Just "yes" or
```

JOHNSON - DIRECT / McCAULLEY

1    "no," please.

2                THE WITNESS:  Yes.

3                THE COURT:  You may proceed.

4    BY MR. McCAULLEY:

5    Q.    How many Intuitive EndoWrist models has Rebotix -- Restore

6    been cleared to reset the use counter?

7                THE COURT:  Hold on.

8                MR. GALLO:  Objection, 602 and 803, 802.

9                THE COURT:  Overruled.

10               You can answer.

11               THE WITNESS:  Do you want to ask me again or do you

12   want me to -- I want to make sure I remember exactly what you

13   asked me.

14               MR. McCAULLEY:  Can we have the question read back for

15   the witness, please?

16          (Record read as follows:  "QUESTION:  How many

17          Intuitive EndoWrist models has Rebotix -- Restore been

18          cleared to reset the use counter?")

19               MR. GALLO:  Objection.  602.  Foundation.

20               THE COURT:  Sustained.  It's slightly different.  Your

21   second formulation is different than the first question you

22   asked, Mr. McCaulley.

23               MR. McCAULLEY:  Let me begin again.

24   BY MR. McCAULLEY:

25   Q.    Do you know how many Endo -- Intuitive EndoWrist models

JOHNSON - DIRECT / McCAULLEY

1   have been cleared for reset service?

2   **A.**   Yes.

3           **MR. GALLO:**  Objection.  Yeah, okay.  That's fine.  I'm

4   sorry.  I was afraid we were going to get more than "yes" or

5   "no."

6           **THE COURT:**  Go ahead, Mr. McCaulley.

7   **BY MR. McCAULLEY:**

8   **Q.**   How many Intuitive EndoWrist models have been cleared by

9   Intuitive --

10          **MR. GALLO:**  Objection.

11  **BY MR. McCAULLEY:**

12  **Q.**   -- for Restore?

13          **MR. GALLO:**  I'm sorry, Mr. McCaulley.  I didn't mean

14  to interrupt.

15          Objection.  602.  Lack of foundation for the

16  knowledge.

17          **THE COURT:**  Sustained.

18          Let me clean this up.  I think -- you've asked do you

19  know.  You've said, "Yes."  How many?  Because I think your

20  first question is:  Do you know how many?

21          **MR. McCAULLEY:**  Yes.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  So...

24  **BY MR. McCAULLEY:**

25  **Q.**   How many?

JOHNSON - DIRECT / McCAULLEY

| | |
|---|---|
| 1 | **A.** One. |
| 2 | **Q.** Wait. Okay. |
| 3 | **A.** Is that okay to answer? |
| 4 | **THE COURT:** Mr. McCaulley, go ahead. |
| 5 | **BY MR. McCAULLEY:** |
| 6 | **Q.** What model, if you know? |
| 7 | **A.** 420179. |
| 8 | **Q.** And I think you testified -- is that for an S or an X? |
| 9 | **A.** For S and Si. |
| 10 | **Q.** And refresh -- I know you told us yesterday; how many |
| 11 | models are there? |
| 12 | **A.** Between 30 and 35. |
| 13 | **Q.** And only one is approved by Intuitive for reset; correct? |
| 14 | **A.** Correct. |
| 15 | **Q.** Do you know how many models have been authorized by |
| 16 | Intuitive for reset for Rebotix? Just "yes" or "no." |
| 17 | **A.** You asked do I know? Ask me again. I'm sorry. I'm |
| 18 | sorry. |
| 19 | **Q.** Do you know how many Intuitive EndoWrist models have been |
| 20 | cleared for reset for Rebotix? |
| 21 | **A.** Yes. |
| 22 | **Q.** How many? |
| 23 | **A.** One. |
| 24 | **MR. GALLO:** 602. |
| 25 | **THE COURT:** Before you -- sustained. |

JOHNSON - DIRECT / McCAULLEY

```
1          Before you ask further questions of him, could you
2   please lay more foundation for his knowledge?
3          MR. McCAULLEY:  Sure.  Let me -- I'll move on,
4   Your Honor.
5          MR. GALLO:  Well, then, Your Honor, I move to strike
6   because there was never a foundation laid for the knowledge.
7          MR. McCAULLEY:  I'll stipulate, Your Honor, to
8   striking.  I just don't want to get into dangerous territory
9   where I don't know the answer.  I think Your Honor will
10  understand.
11         THE COURT:  Agreed.
12         We'll strike that testimony.  You'll get an
13  instruction from me later about those -- about disregarding
14  some of this testimony.  You'll -- you are going to disregard
15  it as not having been given.  I'll just clarify that for you a
16  little bit more later.
17         MR. McCAULLEY:  And it's just as to the last question;
18  correct, Your Honor?
19         THE COURT:  It's to -- it's the last -- it's the last
20  two because I think it's for both -- it's as we went down this
21  road, Mr. McCaulley.  The 602 objections are valid.
22         MR. McCAULLEY:  Fair, Your Honor.
23  BY MR. McCAULLEY:
24  Q.  As part of your efforts to promote the EndoWrist reset
25  service on behalf of SIS, you used Rebotix's information;
```

JOHNSON - DIRECT / McCAULLEY

1  correct?

2  A.   Correct.

3  Q.   Did you hide your relationship with Rebotix from anybody?

4  A.   No.

5  Q.   Did you disclose your relationship with Rebotix to any of

6  your customers?

7  A.   Yes.

8  Q.   Who did you disclose it to?

9  A.   Specifically?

10  Q.   Specifically.

11  A.   Perry Kirwan at Banner Health System, Brian Mirsberger at

12  Advocate Aurora, Jerry Hutchison at Portland, Ben Haygood at

13  Piedmont, and I do -- I believe I shared that information with

14  Brenda Paulsen as well, at Kaiser Permanente.

15  Q.   If someone asked you about it, would you tell them?

16  A.   Would I tell them that we were working with them?

17  Absolutely, a hundred percent.

18  Q.   Eventually you were planning to move it in-house; correct?

19  A.   Correct.

20  Q.   With respect to Vizient, if you made money under the

21  Vizient contract, would Rebotix also make money?

22  A.   Yes.

23  Q.   Was there any motivation, to your understanding, for them

24  to compete with you at Vizient?

25  A.   No.

Volume 6

Pages 1060 - 1213

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE )
COMPANY, INC., et al., )
)
        Plaintiffs, )
)
  VS. )  **NO. C 21-03496-AMO**
)
INTUITIVE SURGICAL, INC., )
)
        Defendant. )
_____)
AND RELATED COUNTERCLAIMS. )
_____)
                 San Francisco, California
                 Monday, January 13, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

           MCCAULLEY LAW GROUP
           180 N. Wabash Avenue - Suite 601
           Chicago, Illinois 60601
       BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
           **ANTHONY E. DOWELL, ATTORNEY AT LAW**

           HALEY GUILIANO LLP
           111 Market Street - Suite 900
           San Jose, California 95113
       BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

1061

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                             PAUL, WEISS, RIFKIND, WHARTON
 3                           & GARRISON LLP
                             2001 K Street NW
 4                           Washington, D.C. 20006
                      BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                         PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                           PAUL WEISS RIFKIND WHARTON
                             & GARRISON LLP
 7                           1285 Avenue of the Americas
                             New York, New York 10019
 8                    BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                           CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                             PAUL, WEISS, RIFKIND, WHARTON
10                           & GARRISON LLP
                             535 Mission Street - 24th Floor
11                           San Francisco, California 94105
                      BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:      Bobby Cox
14                      Ryan Lee
                        Greg Posdal
15                      David Rosa

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2    Monday, January 13, 2025 - Volume 6

 3    PLAINTIFFS' WITNESSES                        PAGE   VOL.

 4    JOHNSON, KEITH (RECALLED)
      (PREVIOUSLY SWORN)                           1090    6
 5    Redirect Examination by Mr. McCaulley        1090    6
      Cross-Examination by Mr. Gallo               1098    6
 6
      DE SANTIS, ROBERT
 7    By Videotape Deposition (not reported)       1113    6

 8    MCGROGAN, ANTHONY
      By Videotape Deposition (not reported)       1115    6
 9
      PARNELL, TOBY KIM
10    (SWORN)                                      1115    6
      Direct Examination by Mr. Van Hoven          1115    6
11    Cross-Examination by Ms. Parker              1188    6

12                        E X H I B I T S

13    TRIAL EXHIBITS                       IDEN   EVID   VOL.

14      281                                        1183    6

15      475                                        1127    6

16      572                                        1186    6

17      783R                                       1164    6

18

19

20

21

22

23

24

25
```

PARNELL - DIRECT / VAN HOVEN

1    MR. VAN HOVEN:  You will now hear deposition testimony

2  from Anthony McGrogan.  Mr. McGrogan was employed by Intuitive

3  Surgical and held the title of Vice President of Design

4  Engineering, Single Port Platforms at the time **of** his

5  deposition taken June 7, 2021.

6              (Video played but not reported.)

7        MR. VAN HOVEN:  SIS calls Dr. Kim Parnell.

8        THE COURT:  All right.  While they get him, let's go

9  ahead and stretch.

10      (T. Kim Parnell steps forward to be sworn.)

11        THE CLERK:  Please raise your right hand.

12              <u>**TOBY KIM PARNELL**</u>,

13  called as a witness for the Plaintiffs, having been duly sworn,

14  testified as follows:

15        THE WITNESS:  I do.

16        THE CLERK:  Please be seated and spell and state your

17  full name for the record.

18        THE WITNESS:  My full name is Toby Kim Parnell.

19  T-O-B-Y; middle name Kim, K-I-M; last name Parnell,

20  P-A-R-N-E-L-L.

21              <u>**DIRECT EXAMINATION**</u>

22  BY MR. VAN HOVEN:

23  Q.  Good morning, Dr. Parnell.

24  A.  Good morning.

25  Q.  Could you briefly introduce yourself to the jury?

PARNELL - DIRECT / VAN HOVEN

1  A.   Yes.  So as you heard, Toby Kim Parnell.  I'm a mechanical

2  engineer.  I have an undergraduate degree from Georgia Tech and

3  then Stanford; I went to Stanford for master's and Ph.D. in

4  mechanical engineering.  I'm a licensed professional mechanical

5  engineer.

6  Q.   And when did you get your Ph.D. from Stanford?

7  A.   1984.

8  Q.   And could you briefly summarize your work history since

9  you got your Ph.D.?

10  A.   Yes.

11      I spent some 13 years at Exponent, which is a large

12  engineering scientific consulting firm.  And then in 2000, I

13  left and started doing more medical device-type work and

14  started working as a consultant and worked for a number of

15  small companies, doing a variety of activities associated with

16  medical devices.

17  Q.   And what is Exponent?

18  A.   Exponent is a large engineering scientific consulting

19  firm.  They're headquartered in Menlo Park.

20  Q.   What sort of work did you do at Exponent?

21  A.   Exponent, being a consulting firm, you really do a number

22  of different types of work, depending on the project.  The

23  company was originally known as Failure Analysis Associates.  A

24  lot of the tasks -- a lot of the projects involved accident and

25  failure analysis types of activities, but also -- also other --

PARNELL - DIRECT / VAN HOVEN

1    other things in terms of looking at reliability and analysis of

2    devices and how they operate and how they perform.

3    Q.   Have you ever had any positions in academia?

4    A.   Yes, I have.  I taught one quarter at Stanford in

5    graduate -- graduate courses -- course in mechanical

6    engineering.  Also I spent two years at Santa Clara University,

7    on a full-time basis, teaching undergraduate mechanical

8    engineering courses.  And that really covered a variety of

9    things involving design, analysis, materials, and also some

10   more specialized courses, like finite element analysis.

11   Q.   And what is your current position or employer?

12   A.   I'm self-employed.  I'm a -- work through my company,

13   Parnell Engineering and Consulting.  So I'm a sole proprietor

14   and I do work through -- on that basis, then.

15   Q.   What sort of work do you do at Parnell Engineering and

16   Consulting?

17   A.   Work like this is one example.  Some of my projects are

18   litigation-related types of projects, may involve patents, may

19   involve other -- other types of issues such as that.

20        Over the years, some of that has also been medical

21   device-related, helping companies with design-related issues

22   and development-related issues for medical devices.

23   Q.   And I guess -- so the consulting firm does a mix of

24   litigation and engineer consulting work?

25   A.   Yes, that's correct; that's correct.

PARNELL - DIRECT / VAN HOVEN

1  Q.   And you've been retained by Surgical Instrument Service

2  Company in this case?

3  A.   Yes, I have been.

4  Q.   What is your compensation in this matter?

5  A.   $650 per hour.

6  Q.   And does that compensation in any way influence the

7  opinions that you're giving today and that you've given in this

8  matter?

9  A.   No, it does not.  My retention is to give honest and

10  unbiased opinions.  I don't have a stake in the case, in the

11  outcome of the case or anything like that.  So I'm just here to

12  provide my opinions.

13  Q.   And have you prepared any reports in this case?

14  A.   Yes, I have.

15  Q.   And in preparing those reports, did you review any

16  materials or documentation?

17  A.   Yes, I did.

18  Q.   What sort of materials and documentation did you -- did

19  you review in preparing your reports?

20  A.   Well, in a litigation matter like this, there's always a

21  great deal of documents and -- that are produced.  I reviewed

22  all the documents, reports, deposition transcripts and things

23  like that that I had access to.  It also included more detailed

24  procedures associated with the service procedure.

25  Q.   And did you review documents from Intuitive?

PARNELL - DIRECT / VAN HOVEN

1   A.   Yes, some -- some were Intuitive documents.

2   Q.   Do you have any idea about how many you looked at or...

3   A.   No.  I'm afraid -- it's -- it's a large number.  I

4   don't -- I don't know.  I don't have a count, though, I'm

5   afraid.

6   Q.   Did you review any Rebotix documents in preparing your

7   opinions in this matter?

8   A.   Yes, I did.

9   Q.   And how would you characterize the amount of documents

10  that you reviewed from Rebotix?

11  A.   The documents were -- were significant, certainly for --

12  from Rebotix, there were detailed documents associated with the

13  service procedures that they had developed.  There were also

14  other types of transcripts and things of that sort that were

15  associated, reports produced, so it covered a range.

16  Q.   I'd like to ask you about a couple engineering subjects.

17       One is failure analysis.  Do you have an understanding

18  what failure analysis is?

19  A.   Yes.

20  Q.   Could you describe that to the jury?

21  A.   Yes.  Failure analysis can come up in a number of

22  different circumstances.  One you can think of is maybe when a

23  product has some type of a -- of a break or a failure and no

24  longer performs its function.

25       And so you want to be able to understand the cause of that

PARNELL - DIRECT / VAN HOVEN

```
1   problem, whether it -- whether it be materials associated or
2   some sort of design issue or overstress or overload.  It's
3   really just getting a handle on the cause of the problem.
4   Q.   And another term I'd like you to describe, if you're
5   familiar with it, is reverse-engineering?
6   A.   Yes.
7   Q.   What is reverse-engineering?
8   A.   Reverse-engineering most often comes into play when you
9   have a -- a product or a component and you're trying to
10  understand more about how that product performs, maybe even to
11  try to develop specifications, performance specifications for
12  that product.  So you're -- you're evaluating how it operates
13  and maybe making measurements, things to decide, okay, the --
14  the degree of movement, the geometric specifications, things
15  like that.
16  Q.   Is reverse-engineering fairly common in the engineering
17  field?
18  A.   Yes.  It often comes about.  You know, you may be handed
19  or exposed to a product and not really have access to the
20  manufacturer's specifications, and so you're trying to develop
21  some insight on that product through the reverse-engineering
22  process.
23  Q.   So you understand this matter relates to something called
24  EndoWrists; right?
25  A.   Yes.
```

PARNELL - DIRECT / VAN HOVEN

1   Q.   And have you had a chance to review documentation or other

2   information about the function and operation of EndoWrists?

3   A.   Yes, I have.

4   Q.   Could you generally describe that to the jury?

5   A.   Documentation includes quite a variety of different

6   things.  There's a lot of documentation that was produced from

7   Intuitive Surgical, covering various aspects through their own

8   development and testing cycle, for example.

9        A lot of information related to evaluation of their

10  instruments, information associated with instruments that were

11  returned and analyzed in some cases, you know, where Intuitive

12  did failure analysis on some of these instruments and -- to

13  understand the cause of a particular issue.

14       So it -- it covered quite a number of different things.

15  There's a lot of documentation produced in a case like this.

16  Q.   Did any documentation from Rebotix inform your

17  understanding of how EndoWrists operate?

18  A.   Yes.  It did.

19  Q.   Did you have an opportunity to see EndoWrists in person,

20  live?

21  A.   Yes, I have, on several different occasions.

22  Q.   What, to your understanding, of when the EndoWrist design

23  was initially developed?

24  A.   Time frame, I think roughly in the early 2000s, maybe even

25  a little bit into the late 1990s.  But early 2000s is when it

PARNELL - DIRECT / VAN HOVEN

1  was being developed as a -- and released as a commercial

2  product.

3  Q.   And do you understand that there are two generations of

4  EndoWrists that are at issue in this matter?

5  A.   Yes.

6  Q.   And could you explain your understanding to the jury?

7  A.   Well, the earlier generation of -- of EndoWrists had the

8  designation of basically S and S subscript i. So S/Si is a

9  designation you often see.  And then next generation of devices

10  had designation of X and X subscript i.  So that X/Xi

11  designation you see on later generations of devices.

12  Q.   And I'd like to talk a little bit about the structure and

13  function of the EndoWrists, if that makes sense.

14  A.   Sure.

15  Q.   And I guess, I'd like -- do you understand that the

16  EndoWrists have something that's generally called a proximal

17  end and a distal end?

18  A.   Yes.

19  Q.   Could you explain what that means in the context of an

20  EndoWrist?

21  A.   Yes.  So in -- in an EndoWrist, the proximal end is the

22  end of the device that actually mounts to the da Vinci robot,

23  so that's the mounting end.

24      And the distal end, typically, medical devices, it means

25  the other part.  It may be the part that interacts with a

PARNELL - DIRECT / VAN HOVEN

1 patient, then.  So in the EndoWrist, the distal end is the end

2 that has the tool or the operating component of the wrist

3 that's being driven during a surgical procedure.  So that's the

4 part that would be in -- in a patient during a -- a surgery of

5 this type, then.  That's the part that would be in the patient

6 to do a certain operation, then.

7 Q.  And is there some sort of drive system connecting between

8 that proximal end and that distal end?

9 A.  Yes.  The input drive comes back at the proximal end.

10 That's, again, where we talked about the connection to the

11 robot.

12     And there are basically four drive components that mount

13 there.  And -- and that -- that drive input is transmitted to

14 the distal end of the device.

15 Q.  And focusing back at the proximal end that couples to the

16 robot, how is force delivered to turn those disks to make them

17 operate?

18 A.  It's through motors that are controlled.  And they receive

19 input -- they're controlled by the surgeon still, you know.

20 Surgeon's got a console and the surgeon is providing the

21 commands or the -- the input to make the -- move those

22 components, then.  And there's basically 4 degrees of freedom

23 back there that he has to operate.

24 Q.  And where is that -- where are those four motors located?

25 A.  The motors themselves are on the arms of the

PARNELL - DIRECT / VAN HOVEN

1  Intuitive Surgical da Vinci robot.

2  **Q.**   Are there any motors or other drive components inside the

3  EndoWrist itself?

4  **A.**   Not -- not at the distal end, if that's what you're

5  asking.

6  **Q.**   I guess I'm asking are there any motors within the

7  EndoWrist at all.

8  **A.**   No, no, there's not.

9  **Q.**   Are there any active electronics within the EndoWrist that

10 control its operation?

11 **A.**   In terms of electronics, the only thing back there is

12 associated with usage counter.  That's the only real

13 electronics that's there.  Maybe I should qualify that a little

14 bit.

15     There is also connection for some instruments are, termed

16 broadly, like, electrosurgical instruments.  They'll have an

17 electrical input to -- let's say, to cauterize tissue, or to do

18 some operation of that sort.

19 **Q.**   But those electrosurgical input -- connections, do those

20 affect the drive system of the EndoWrist?

21 **A.**   No.

22 **Q.**   Going back to the drive system, could you provide --

23 discuss the -- what physically connects the motion at the robot

24 arm to movement at the distal end?

25 **A.**   Yes.  It's -- it's a cable-type system, and it's really a

PARNELL - DIRECT / VAN HOVEN

1   system that has a short piece of tungsten cable, braided

2   tungsten cable at -- both back at the proximal end, connecting

3   to the robot, and then also at the distal end.

4        In between that, the -- those short pieces of cable,

5   flexible cable are clipped to stainless steel rods, basically

6   fairly rigid rods that transmit the motion, then, down the

7   shaft of the EndoWrist to the cable at the other end.

8   Q.   And so within that, I guess -- what do you mean when

9   you're talking about the rods within the shaft of the

10  EndoWrist?  What are you talking about there?

11  A.   Just talking about how the cable input connects to a rod.

12  That rod is down the shaft of the EndoWrist.  And then there is

13  another short piece of flexible cable at the other end.  So

14  think of it as each end has a short piece of cable, and there's

15  a rod in between those two short pieces of cable, then.

16  Q.   What's your understanding of the material of the rod that

17  passes down the long shaft of the EndoWrist?

18  A.   Yeah, the rods are stainless steel.

19  Q.   What's your understanding of -- I guess the strength of

20  that material?

21  A.   It's significant and it's a solid-type material.  It's not

22  undergoing any bending or flexure.  It's really just a kind of

23  a -- a longitudinal push/pull-type loading on it.

24  Q.   And in connection with the -- the cables that we were

25  talking about, how do those connect to the rods?

PARNELL - DIRECT / VAN HOVEN

1  A.   They are crimped to the rods so that there's a strong

2  connection between the cable and the rod just through a crimp

3  process.

4  Q.   And are there any pulleys or anything involved in the

5  drive motion with the cables?

6  A.   Yes, definitely.  The cables, the flexible cables, are

7  routed through pulleys.  There's some pulleys at each end

8  really, back at the proximal end to carry from that input motor

9  drive to the cable and to the rod.  And then down at the distal

10 end, where you have the working end of the instrument, there

11 are pulleys that the cables route around at that end also.

12 That's how you get the degrees of freedom, the amount of

13 movement associated with the working end, the distal end of the

14 EndoWrist.

15 Q.   And you talked earlier about two generations of -- of

16 EndoWrists.  Do you have -- have you a general understanding of

17 the differences between those generations as to their general

18 function and structure?

19 A.   Yes.  General understanding, yes.

20 Q.   Could you explain that to the jury, please?

21 A.   One aspect is maybe the most visible, just if you held up

22 an EndoWrist from the S/Si, earlier generation, and the X/Xi,

23 is how it mounts to the arm of the da Vinci robot.

24      The S/Si is basically kind of a -- an in-line type of

25 mount, with the shaft to transmit down to the end.

PARNELL - DIRECT / VAN HOVEN

1    The X/Xi mounted -- went through, basically, a 90-degree

2  angle to mount to the robot and then to transmit down the

3  shaft.

4    The working end of the instruments, largely the same.  I

5  mean, there were some design changes that were made during this

6  time, but largely the same, though, when you look at them.

7         MR. VAN HOVEN:  I understand no objection to TX475?

8         MS. PARKER:  No objection.

9         MR. VAN HOVEN:  Could we, Your Honor, move 475 into

10 evidence and publish to the jury?

11        THE COURT:  You may.  It's admitted and you may

12 publish it.

13   (Trial Exhibit 475 received in evidence.)

14 BY MR. VAN HOVEN:

15 Q.   Dr. Parnell, can you see that document, or would you like

16 it zoomed in on maybe the top couple of paragraphs initially?

17 A.   Yes, that helps.  Do you want me to read the top two

18 paragraphs?

19 Q.   Just are you familiar with this document?

20 A.   Yes, I am.

21 Q.   Do you have an understanding of what this document was

22 intended for?

23 A.   Yes.  It's talking about some of the life testing being

24 performed on the Xi range of instruments and similarity with

25 the Si's.

PARNELL - DIRECT / VAN HOVEN

1   **Q.**  And if we can move down to the bottom paragraph of that

2   page.

3   **A.**  Yes.  So this last paragraph on the page is talking about

4   similarities between the S and the Si.  The instruments are

5   similar in many regards, the materials used in the distal

6   portion of the S/Si 8-millimeter are identical to those used in

7   the equivalent versions of the Xi 8-millimeter instruments.

8        **MR. VAN HOVEN:**  Could we move to the top of page two?

9   **Q.**  Take a look at that and let me know when you're ready to

10  talk about it.

11  **A.**  (Witness examines document.)

12     Yes.

13  **Q.**  This is using some of those terms we had, like proximal;

14  but it also gets into input, output, gear ratios and band

15  radii.  Do you mind explaining to us, in a little more layman's

16  terms, what this is talking about?

17  **A.**  So this is talking about -- well, one that's mentioned is

18  that back at the back end, where you attach to the robot, that

19  there's that change in the angle of the mount.  But it's

20  talking about the things that are similar and that are

21  basically designed to be identical.

22     So cable paths through the wrists of the instrument, so

23  this is how the cable runs through the pulleys and down at the

24  distal end of the shaft and to the cable attachment points on

25  the various joint output pulleys for the yaw, grip, and pitch.

PARNELL - DIRECT / VAN HOVEN

1　　These are associated with the 4 degrees of freedom that are

2　　down at the distal end, are designed to be identical.

3　　　　　　　**MR. VAN HOVEN:**  Could we move to the next two

4　　paragraphs and heading?

5　　**Q.**　And again, sort of same question, could you take a look at

6　　that and kind of try to put that into a little more layman's

7　　terms for us?

8　　**A.**　(Witness examines document.)

9　　　　Okay.

10　　**Q.**　Please, go ahead.

11　　**A.**　So this is talking about some more specifics associated

12　　with cable -- cable tension, for example, and how that's

13　　generated in the instrument by applying torque to those input

14　　drive -- drive pulleys where the cable is clamped.  So this is

15　　back again up at the proximal end and where it's connected to

16　　the robot.  And it's talking about things that are intended to

17　　be similar, to have the same kind of sizes, the same diameter

18　　of the clamping pulley so that the system torque limits -- the

19　　torque being the kind of rotary force, if you will.  You can

20　　think of as inch pounds.  It's a force and a length, is what

21　　you do to get a torque.  The applied system torque limits can

22　　be directly compared.

23　　　　Range of motion between S/Si and X/Xi is designed to be

24　　identical.

25　　　　So these -- these two paragraphs are -- are basically

PARNELL - DIRECT / VAN HOVEN

1    trying to indicate the things that are basically the same

2    between the two generations of devices.

3           MR. VAN HOVEN:  And could we go to the bottom of

4    page 5, last paragraph.

5    Q.   Is it fair to say that, based on this information, and

6    other information in this document, Intuitive reaches the

7    conclusion that they don't have to repeat testing between Xi

8    and Si instruments because they're --

9           MS. PARKER:  Objection.  Leading.

10          THE COURT:  Sustained.

11   BY MR. VAN HOVEN:

12   Q.   Would you mind describing what this paragraph is

13   explaining to the jury?

14   A.   Yes.  It's basically a justification for why testing that

15   is performed on the Xi, the newer generation of instruments, is

16   adequate or sufficient to cover the S/Si.  And so they were

17   basically going to provide some justification for how to apply,

18   let's say, conclusions.  This talks specifically about

19   reprocessing appendices, so these are associated with cleaning

20   and sterilization steps, why it applies to the Si family of

21   instruments also.

22   Q.   Based on your -- your own review of documents and other

23   information about Si and Xi instruments, do you agree with

24   Intuitive's statements about the similarities between those

25   instruments that we've discussed?

PARNELL - DIRECT / VAN HOVEN

 1    A.    I think so.  You know, there's definitely significant

 2    similarities there.  There's some documents that showed

 3    differences in, shall we say, numbers of devices that came back

 4    through their RMA process.  I may talk about that later.

 5         But, yeah, I certainly agree that there's significant

 6    similarities in commonality between the two families of

 7    devices.

 8    Q.    And do you have an understanding of when Si was introduced

 9    versus Xi?

10    A.    I believe the S/Si was in, roughly, 2010 time frame, maybe

11    a little before or after that.

12         And I think the X/Xi around -- just going from memory, I

13    think around the 2015 or so time frame, a little after that.

14              MR. VAN HOVEN:  We can pull that down.

15    BY MR. VAN HOVEN:

16    Q.    One of the things that you've been asked to look at is

17    failure of EndoWrists; is that right, Dr. Parnell?

18    A.    Yes.

19    Q.    Are you familiar with failure mode?

20              THE COURT:  Brief recess?

21         Can I ask you whether -- Mr. Van Hoven, how much longer do

22    you --

23              MR. VAN HOVEN:  I was just starting a whole other line

24    here.  But, yeah.

25              THE COURT:  We're going to give you a brief recess

PARNELL - DIRECT / VAN HOVEN

```
 1   now.  I thought we would break around 11:45 for lunch.  Maybe
 2   we can take a brief break now and break closer to noon for
 3   lunch.  All right.  Let's do that.
 4       All rise for the jury, please.
 5                   (The jury leaves the courtroom.)
 6       (Proceedings were heard out of the presence of the jury.)
 7            THE COURT:  You may be seated.  I wanted to chat with
 8   you-all about the depositions we were talking about this
 9   morning.  My sense is we should excuse the witness for that.
10            MR. VAN HOVEN:  What's that?
11            THE COURT:  I wanted to talk with you-all about the
12   deposition we were chatting about this morning, and my sense is
13   we should excuse the witness for that.
14            MR. VAN HOVEN:  Dr. Parnell, if you could step down
15   and head outside.
16            THE WITNESS:  Sorry.
17            THE COURT:  It's all right.  We'll have you back in
18   here shortly.
19                   (Witness steps down.)
20            THE COURT:  Mr. Brachman, do you want to go ahead; and
21   I think we have on your record, at this point, your objections
22   to the Duque designations, but is there anything you want to
23   add?  I appreciate your clarifying them for me a little bit
24   more as well as Mr. Van Hoven explaining what C1 and C2 and C3
25   are.
```

 1          MR. BRACHMAN:  Nothing further, Your Honor, beyond

 2    what we noted earlier about playing the testimony with the

 3    30(b)(1).

 4          THE COURT:  All right.  So with the understanding

 5    provided this morning, I went back and looked again at the

 6    portions of the deposition that were designated.  I'm going to

 7    sustain the objection to page 25, line 11, through page 26,

 8    line 2, because the witness is saying he's speculating.

 9          And then with regard to the other designations, here are

10    the parts -- I'm going to sustain the objection to portions of

11    that because, even though it isn't a document, I still think

12    that without Mr. Van Hoven's explanation, I wouldn't -- it

13    wouldn't have made any sense to me.  And I imagine that's going

14    to be true for the jury as well.  So let me tell you which

15    portion of Mr. Duque's designations are in.

16          So I find that -- page 49, line 1, through page 50,

17    line 8, as well as page 51, line 6 through 21.  But the rest, I

18    sustain the objection on 403 grounds because I think it would

19    just be too confusing for the jury.

20          So let me -- I wanted to get you those.  If anyone else

21    needs to take a minute, take it, and then I'll bring the jury

22    back in.

23          And as I said, I'm hoping, Mr. Van Hoven, now we'll go a

24    little closer to noon, so, where you can, look for a place to

25    break there.

PARNELL - DIRECT / VAN HOVEN

1  Anything else before I run away for a few minutes?

2      MR. BRACHMAN:  Just to be sure I have it, the second

3  range that is in?

4      THE COURT:  Page 51, line 6 through line 21.

5      MR. BRACHMAN:  Thank you very much.

6      MR. VAN HOVEN:  And the other one was 49/1, through

7  50/8?

8      THE COURT:  Correct.

9      I'm so sorry.  One last thing before I go.  Did we -- we

10  won't do it right now, but do we need to talk about exhibits

11  for Mr. Lamb still?  I think we do.

12      MR. GALLO:  Mr. Michael will --

13      THE COURT:  It's okay.  Does it -- take a break.

14  We'll come back.  Thank you.

15              (Recess taken at 11:25 a.m.)

16          (Proceedings resumed at 11:30 a.m.)

17      THE CLERK:  All rise.  Court is back in session.

18          (The jury enters the courtroom.)

19      (Proceedings were heard in the presence of the jury.)

20      THE COURT:  You may be seated.

21  BY MR. VAN HOVEN:

22  Q.  Dr. Parnell, have you heard the term "failure modes"?

23  A.  Yes.

24  Q.  Can you explain to the jury what failure modes means in

25  the context of mechanical engineering?

PARNELL - DIRECT / VAN HOVEN

1  A.    In general, it means to more specifically understand

2  what's causing a specific failure or issue.  So it's kind of

3  getting down more to the details of what the underlying cause

4  is.  You know, is there -- is there -- are the loads too high?

5  Was it, you know, an upset-type condition, meaning something

6  that is unusual, is outside of the usually operating realm or a

7  material issue?  It's really just getting more specifically to

8  the type of issue.

9  Q.    And did you perform any analysis of failure modes in the

10  context of EndoWrists?

11  A.    Well, you know, through both documents and -- and

12  EndoWrists that I had access to through this project, I saw a

13  number of different types of failures or issues at different

14  times.  You know, certain ones would have certain specific

15  types of issues and it might be different.  But there's kind of

16  a collection of things that are most frequently associated.

17  Q.    Let's talk first about the types of failures that you

18  understood to occur with EndoWrists.  Could you describe some

19  of those to us?

20  A.    Sure.

21      So some of them are things like -- just where there's a

22  type of a function that's not working any longer.  For example,

23  some of the EndoWrists have -- are basically scissors type of

24  devices that are intended to cut tissue, for example, and they

25  may not be cutting any longer.  They've gotten either dulled or

PARNELL - DIRECT / VAN HOVEN

1  they've gotten damaged through some operation, and they're just

2  not performing their function any longer.

3      There's other ones, of course, devices that are used to

4  grasp or hold tissue and maneuver it that can be no longer

5  performing their operation.

6      And then, you know, other types of issues, also, that come

7  up.

8  Q.  And within the EndoWrists, what are some of the components

9  that may fail to have those results?

10 A.  Well, okay.  For the ones -- like I mentioned, scissors or

11 grasping, that can mean damage or alignment that's needed.

12     There can be issues with the cables elongating or some --

13 some issues with cables so that the device is not -- is not

14 carefully transmitting the input motion to the distal end.

15 They don't respond together in kind of a one-to-one fashion.

16     There could be others that involve more significant damage

17 to a cable.  There could be a cable that's frayed or actually

18 gotten broken or damaged from another instrument.  So there's a

19 number of different types of things that come up.

20 Q.  And stepping now to the sort of things that cause failures

21 in EndoWrists, did you investigate that issue?

22 A.  Yes, largely through looking at -- looking at documents,

23 looking at investigations that were done as part of EndoWrists

24 that were returned.  There's some of these through what they

25 call an RMA process, Return Material Authorization process.

PARNELL - DIRECT / VAN HOVEN

1  And in some cases, those devices are investigated more

2  carefully to see what had happened or what issue is associated

3  with that particular return.

4  Q.   And what's your understanding as to how -- the way that an

5  EndoWrist is used in surgery relates to its potential failure

6  or failure modes?

7  A.   Well, certainly things specific to the given use.  These

8  things can have a factor.  How long it's used in a particular

9  operation could be a factor.

10      How many movements that it undergoes, how many movements

11 of each degree of freedom is involved.

12      The loads associated with it, you know, is it -- is it

13 something that requires a significant load or significant force

14 to carry out; you know, all of these are the types of things

15 that can contribute to a given issue.

16 Q.   Is it fair to characterize that as the kind of the

17 severity of the use in an actual surgery?

18 A.   Yes, yeah, it could be associated with that.

19 Q.   And did you do any investigation into, I guess, variance

20 between that severity in different surgical procedures?

21 A.   I'm not sure -- I mean, to the extent that there are

22 certainly differences.  Some surgeries can require significant

23 amounts of time, significantly more amounts of time of one

24 thing versus another.

25      The number of movements or operations that take place

PARNELL - DIRECT / VAN HOVEN

1  and -- by a person, I mean, actuations that take place in a

2  given surgery can be different and can be significantly

3  different in some cases.

4  Q.   And when you're talking about the severity of usage within

5  a surgery, is the -- how does the torque that is applied by the

6  robot arm to the EndoWrist disks -- how does that translate to

7  severity of usage within a surgery?

8  A.   It really means that the more torque that's required to

9  carry out a given step, it -- it's a -- it's a factor.  I mean,

10 the more -- this is the loading kind of component that we

11 talked about in terms of some type of a failure, analysis of a

12 failure, so the torque is associated with load: how high is the

13 load that's being applied, and how much is necessary to perform

14 a specific function or step?

15 Q.   So if you had available to you the torque at each of the

16 four motors that correspond to the input disks of the

17 EndoWrist, what would that tell you about the severity of a use

18 during surgery?

19 A.   It would give you kind of a log, kind of a black box type

20 of analysis of the spectrum of steps that it went through, and

21 how high the loads were associated with each individual step.

22 So it would be really something of a detailed recording of the

23 full-load spectrum that was applied in a given procedure.

24 Q.   And is that something you would then look at if you're

25 trying to assess the severity of a procedure?

PARNELL - DIRECT / VAN HOVEN

1  **A.**  Yeah.  That would be something you might look at to better

2  understand what took place, what was required in a given

3  procedure.  And maybe even to identify if there's something

4  that's unusual in that procedure, something that led to high

5  loads being applied.

6  **Q.**  Do you have an understanding as to whether Intuitive has

7  all that data available to it?

8  **A.**  I did see Intuitive testimony from Grant Duque, for one,

9  that that type of information is sometimes used in analysis of

10  a specific failure, that they go back in and look in more

11  detail associated with that.  Not done each time, but it

12  indicated that there is quite detailed information that can be

13  obtained and can be examined to look at and better understand a

14  particular failure.

15  **Q.**  Do you have an understanding if that information is used

16  in any way with the use counter of the EndoWrist instruments?

17  **A.**  No.  It doesn't come in to the use counter at all.  The

18  use counter is strictly that.  It's just a use, being mounted

19  to the robot and going through some kind of motion.

20      You know, an analogy might be kind of like starting your

21  car.  A use is just that, it's just a use.  Nothing about

22  details of the procedure or how long it -- analogy to the car,

23  how far you've driven, how long the trip is, no information

24  beyond just that we've got a use.

25  **Q.**  I'd like to move to your experience with Rebotix a little

PARNELL - DIRECT / VAN HOVEN

```
 1   bit.
 2           MR. VAN HOVEN:  Counsel, no objections to
 3   demonstratives?
 4           MS. PARKER:  As long as they're the ones I've got, no
 5   objections.
 6           MR. VAN HOVEN:  Could we just bring up for now just
 7   the first slide?
 8   BY MR. VAN HOVEN:
 9   Q.   Dr. Parnell, I understand that you've looked at Rebotix
10   documentation.  Did you do anything else to inform your
11   opinions on the Rebotix process?
12   A.   Yes.  I also had an opportunity to make a site visit to
13   Rebotix, and so to be able to see steps of their procedures
14   that they had developed, to see that firsthand, talk to Rebotix
15   staff, get questions answered and things like that.  So,
16   you know, it's really kind of that -- that firsthand look at
17   things that were involved in their process, in their service
18   process.
19   Q.   Did you review documents while you were there?
20   A.   Yes.  I did.
21   Q.   And you also reviewed more documents as part of preparing
22   your report?
23   A.   Yes.  Yeah, definitely, a lot of things in more detail
24   after -- after the visit and, you know, that led to some
25   additional follow-ups with staff there.
```

PARNELL - DIRECT / VAN HOVEN

1  Q.   I guess, are you able to kind of categorize the different

2  types of documents that you reviewed both at Rebotix and

3  outside of it regarding their process?

4  A.   I guess I would characterize them really as detailed

5  process or procedure types of documents, things that outlined

6  the steps in their process and what is done.

7       Also, information that they developed through

8  reverse-engineering, certain specifications for a given type of

9  Intuitive EndoWrist and more details associated with each one.

10 Q.   Where is the Rebotix facility?

11 A.   It's in Florida.  I believe St. Petersburg, I believe.

12 Q.   And about how long were you present at the facility?

13 A.   I had a one-day site visit.

14 Q.   And did you have anybody -- a guide while you were there?

15 A.   Yes.  My primary contact during the site visit was

16 Mr. Fiegel of Rebotix.  He's the Director of Operations for

17 Rebotix.

18 Q.   And what was your understanding of what Greg Fiegel's role

19 was at Rebotix?

20 A.   Well, it was Director of Operations.  He has kind of

21 overall responsibility for process and development of

22 procedures and how they're carried out by staff during a

23 service process.

24 Q.   And what sort of building was the -- Rebotix in?  Was it

25 kind of a light industrial warehouse?

PARNELL - DIRECT / VAN HOVEN

```
 1              MS. PARKER:  Objection, leading.
 2              THE COURT:  Sustained.
 3              THE WITNESS:  Yes, I would call it kind of a --
 4    BY MR. VAN HOVEN:
 5    Q.   Dr. Parnell, the judge sustained the objection, so I have
 6    to ask a better question.
 7    A.   All right.
 8    Q.   I guess what kind of building was it when you visited?
 9    A.   It's basically an office/laboratory type of environment.
10    So there are offices; but there's also lab spaces, benches,
11    equipment, things like that that are available there.  So it --
12    kind of a typical sort of environment for a company that's
13    going to be involved with medical devices, medical types of
14    procedures.
15              MR. VAN HOVEN:  Bobby, if we could go to Slide 23.
16    BY MR. VAN HOVEN:
17    Q.   Before we jump into discussion of the Rebotix processes,
18    I'd like to take a look at this slide quickly.
19         What is this showing?
20    A.   It's showing several things.  It's showing several
21    different S/Si generation EndoWrists.  The covers are off.  So
22    back here at the right side in this photo, the cover is off so
23    that you see more of the -- the spools or pulleys where the
24    cables are attached.  That's back here at the right side, which
25    is the proximal end.
```

PARNELL - DIRECT / VAN HOVEN

1    Then -- yes.  So the -- highlighted back here at this end,

2  you're seeing that in a little more detail because there's a

3  cover that's removed from it to be able to show this.

4  Q.   And, I guess, this is a good time to understand the terms

5  "proximal" and "distal."  Could you point out where the distal

6  end is to us on one of these tools?

7  A.   So in this photo, the distal end, where the tool is, is

8  the left end, the left side in this photo.  And so you'll see

9  some of the instruments, like this, you can see that distal end

10  of the instrument here.

11  Q.   Going back to the slide, there's something above the four

12  instruments there.  What is that?

13  A.   That is a board that Rebotix developed, a little auxiliary

14  board, and you'll see it referred to sometimes as the

15  Interceptor chip.  It's, basically, one that contains a little

16  chip or semiconductor device that is associated with being able

17  to reset -- do a reset of the usage counter.  So this is what

18  facilitates that part of the process.

19  Q.   And there's also a long -- and elongated items below the

20  EndoWrists.  Could you explain what those are?

21  A.   Yes.  So on that EndoWrist that's at the bottom, at the --

22  right above this, this is the -- the distal tool and the rods

23  and cables associated being removed.  This is not a typical

24  step.  This is just to illustrate what -- what they're like.

25    So back at the right-hand end you see the cables that

PARNELL - DIRECT / VAN HOVEN

1 would be in that proximal end of the device that would wrap
2 around the input pulleys there. And they're still attached. A
3 similar length of flexible cable down at the left-hand side,
4 which is the distal end associated with carrying out the
5 operation.

6 So this is sometimes referred to as, like, wristed
7 movement, you know, that it allows for something that can
8 pitch, that can move like so; it can rotate, a resolution. And
9 then there's also a degree of freedom that's often referred to
10 as a yaw direction, so there are two of those. That's kind of
11 where you do the operation, then. Sometimes it's called yaw
12 and grip, then, but that's where you carry out operations like
13 that.

14 Q. So each of those assemblies is related to one of those
15 motions; is that right?

16 A. Yes. That -- that's right. Each one comes in with an
17 input from the da Vinci robot back at the proximal end of the
18 device, where it mounts to the robot. And there's an input,
19 basically, that involves a rotation of that device back at that
20 end, and that leads to the transfer of the motion.

21 MR. VAN HOVEN: Could we zoom in on the right side,
22 where there's a connection? Bottom right -- no, I'm sorry,
23 that same -- the assembly there, yup.

24 BY MR. VAN HOVEN:
25 Q. And could you explain what this is showing here?

PARNELL - DIRECT / VAN HOVEN

1  A.    Yes.  I mean, what you're seeing is the length of the

2  flexible cable that is back at the -- at the proximal end of

3  the device.  This is how much cable there is there to go

4  through a pulley and to go around the mounting or input drive

5  connections back there.

6       And then you'll see -- you'll see where it's attached or

7  crimped to the stainless steel rods.  That's where you start to

8  see the solid portion there that's more to the left side.  I

9  know it's not super clear, but you kind of get a sense of the

10  length of the flexible or cable portion versus the length of

11  the rods.

12  Q.   And in your investigation of this matter, when you hear

13  about cable breaks or cable tension, what component do you

14  understand that to be referring to?

15  A.   That's really referring to the flexible tungsten cables

16  that you see here, and most often associated with the distal

17  end, down at the working end of the device.  But that's always

18  referring to something with the cable portion itself, not the

19  rods, but the cable portion.

20  Q.   And if we could just briefly go over to the other/distal

21  end.

22       That's -- can you explain what you see there?

23  A.   Yeah.  So this is a particular type of tool, a particular

24  model here that's being shown.  And the length of flexible

25  cable, then, is coming from the rod and going through pulleys,

PARNELL - DIRECT / VAN HOVEN

1   some different pulleys here to allow that movement to take

2   place here at this end of the device.  So it's -- it's the

3   place where that rotary input from the motor gets trans--

4   transferred to some type of a specific movement, a pitch or --

5   or the grip and operation, yaw and grip-type operation, then.

6   That's where it occurs, is down here.

7   Q.   And when you hear about failure mode such as cable

8   breakage or cable tension in the context of your investigation,

9   what do you understand that to be referring to at the distal

10  end here?

11  A.   It's typically referring to somewhere in this area, where

12  the cable goes around a pulley or where it's exposed in some

13  way, so it's typically down here at this end.

14  Q.   What information have you seen in your investigation about

15  failure of the rods that connect between those two cable

16  portions at the ends?

17  A.   I don't think I've ever seen an occasion where it was

18  indicated that the rod was a problem, that the rod had failed

19  for some reason.  I don't think -- I don't recall ever seeing

20  that.

21  Q.   And if we could move up to the -- to the first instrument

22  from the bottom and zoom in on the housing.

23       As to the cables on the proximal end, where would those be

24  within this, what we see here?

25  A.   They are coming out of that -- that shaft that goes off to

PARNELL - DIRECT / VAN HOVEN

1  the left side and goes down to the distal end.  They're coming

2  off of that, typically route around a pulley of some sort, a

3  drive pulley of some sort, and then are attached to this input

4  drive mechanism up here.  So there's four of these inputs here.

5      And you -- you see it, maybe not so clearly in this, but

6  there are four of these locations where that cable is going to

7  terminate and be attached so that -- so that the rotary motion

8  here will transfer into motion down through the rod and to the

9  distal end of the tool.

10      **MR. VAN HOVEN:**  Could we go to Slide 12?

11  **Q.**   What is this showing, Dr. Parnell?

12  **A.**   This is showing a particular EndoWrist.  The housing cover

13  is removed and it's put into a fixture, a specific fixture that

14  clamps and holds it, positions it.  This -- this would be one

15  of the fixtures that is associated with adjustment of cable.

16  **Q.**   And we'll talk about the process a little bit later.  I

17  want to focus on just the EndoWrist itself and its -- kind of

18  its components.

19      **MR. VAN HOVEN:**  Could we go to Slide 11 and focus on

20  the left side image?

21  **Q.**   So those -- the cables that we were talking about that

22  connect from the end of the rods, can you explain how they

23  connect to the disks that turn and interface with the robot arm

24  motor?

25  **A.**   Yeah.  There's basically an attachment here that clamps

PARNELL - DIRECT / VAN HOVEN

1   the cable into that rotary portion that we talked about so that

2   the -- so that the input from the robot at the underside, where

3   it attaches to the robot, will rotate, this -- this portion

4   that you see here.  You're seeing two of them, the two that are

5   on the side closest.

6        And so it will turn that, which, in turn, moves the cable

7   then, moves it back and forth.  It can go clockwise and

8   counterclockwise.

9            MR. VAN HOVEN:  And could we zoom in even more on,

10  I guess, the silver-looking components that have the screws or

11  bolts on them?

12  Q.  And what are we seeing here with respect to the cables and

13  their attachment?

14  A.  You're seeing attachment and basically kind of a clamping

15  mechanism that's used to clamp the cable to this input drive

16  post.

17  Q.  And is this -- is this visible in this manner within the

18  Rebotix facility during their processes?

19  A.  Yes, with that cover of the -- of this end of the device

20  taken off, this is what you would see, yes.

21           MR. VAN HOVEN:  Your Honor, it's 11:59.  I'd be moving

22  on to something pretty much completely new here.

23           THE COURT:  Sounds like a good place to break.  Thank

24  you, Mr. Van Hoven.

25       Folks, let's I want to make sure that staff also get a

PARNELL - DIRECT / VAN HOVEN

```
 1  good break here.  So why don't we plan to get back in about 45
 2  minutes.  So we'll expect you back here at 12:45; all right?
 3       All rise for the jury.
 4                 (The jury leaves the courtroom.)
 5       (Proceedings were heard out of the presence of the jury.)
 6            THE COURT:  You may be seated.
 7       Thank you.  We'll see you back after lunch.
 8            THE WITNESS:  Thank you.
 9            THE COURT:  Counsel, I mentioned the Lamb exhibits.
10  Apart from those, is there anything else that we need to take
11  up before we resume this afternoon?
12            MR. DOWELL:  Your Honor, I think Mr. Van Hoven has
13  about an hour left, and I suspect Ms. Parker will have some
14  questions.  We normally keep a witness in the wings, you know,
15  according to your rule.  Can we be excused from that today?
16  I'm assuming Ms. Parker will go at least half an hour, 45
17  minutes.
18            MS. PARKER:  It depends on what he's going to do and
19  how compliant he is.
20            MR. DOWELL:  And the only reason I ask is normally
21  Mr. McCaulley should be here --
22            THE COURT:  Let me stop.  Let me stop you.  That
23  should be fine for today.  Why don't we -- I'm making sure -- I
24  just want to get you the Lamb exhibits so that you have them
25  when you're ready for him.
```

PARNELL - DIRECT / VAN HOVEN

```
 1        I may have left those back there, so why don't we all come
 2   back a little closer to -- I gave them until a quarter to 1.
 3   Why don't we come back at 12:35 and we'll take care of those
 4   then.  I don't think we'll need very long.
 5        Tell me if you think otherwise, Mr. Michael.
 6             MR. MICHAEL:  No.  That's fine, Your Honor.  I just
 7   was to going to give the Court one citation.  We were talking
 8   about earlier -- Your Honor had a question about ISO
 9   certification in one of the exhibits.  And I found the
10   reference.  It's TX595.  At page 10 of 28, there is a slide
11   titled Regulatory Oversight of Facilities.  ISO certification
12   is the standard.
13        And what that whole discussion is about is comparing the
14   role of the FDA to ISO with respect to these particular
15   products.  And we think that would be unduly prejudicial to get
16   into and to just present one part of -- the ISO part, without
17   our ability to put that in context and explain what it means
18   and why, frankly, in this case, we think Deutsche Bank was
19   wrong about which regulatory framework applies.
20             THE COURT:  Understood.  Thank you, Mr. Michael.
21   All right.  I'll see you-all back here.
22                  (Recess taken at 12:03 p.m.)
23   AFTERNOON SESSION                            12:36 p.m
24             THE CLERK:  All right.  This Court is back in session.
25             THE COURT:  You may be seated.
```

PARNELL - DIRECT / VAN HOVEN

1     So, counsel, I have in front of me the objections that you

2  sent for the various exhibits for Dr. Lamb.

3     You went back and looked at the one we discussed a moment

4  ago, Mr. Michael.  And I, of course, left that note back in

5  chambers, but if you could -- it's page 10 of 28 of

6  Trial Exhibit --

7         **MR. MICHAEL:**  -- 595.

8         **THE COURT:**  Thank you.  I agree with you that that

9  should be redacted.  My sense is that I probably still need to

10  do slightly more granular review of some of the other -- of

11  some of the other objections that are lodged with regard to the

12  exhibit for Dr. Lamb, not just on that basis, but others as

13  well.

14     So for now, does -- I will apologize now, but I --

15  actually, I'm not prepared to give those to you-all at this

16  point.

17     Can I ask you-all:  Has there been -- I think this is -- I

18  have in front of me what was e-mailed Sunday morning.  Let me

19  ask if there's been any movement since then between you-all.

20     Mr. Van Hoven?

21         **MR. VAN HOVEN:**  And I see an e-mail from Sunday,

22  1:56 p.m. from Intuitive counsel.  So there may be a -- red

23  line some stuff, to remove some things.

24         **THE COURT:**  In which case, would you go ahead and

25  forward that to my courtroom deputy, assuming it's proper to

PARNELL - DIRECT / VAN HOVEN

```
 1   forward the version you have right there?

 2          MR. VAN HOVEN:  Yes.

 3          THE COURT:  And I'll pick it up from there and try to

 4   still have some something for you-all, if not this afternoon,

 5   first thing tomorrow morning.

 6          MR. MICHAEL:  And just so Your Honor knows, that red

 7   line does strike through some exhibits that SIS had told us

 8   they would not be using for Dr. Lamb, so it does resolve those.

 9   You'll still see, I believe, the objections for scope, which we

10   went through this morning, so that's another change.

11          And the other thing I want to add on the Deutsche Bank

12   exhibits, as Your Honor is looking at those, TX587 and 595, we

13   did the various redaction objections.  Just to be clear, we're

14   just objecting to those exhibits coming into evidence at all

15   through Dr. Lamb and being published to the jury through

16   Dr. Lamb.

17          THE COURT:  I remember the Deutsche Bank, was that --

18   we've discussed the Deutsche Bank report previously.  I'm

19   trying to remember -- was that in through the motions in

20   limine?

21          MR. MICHAEL:  Yes, Your Honor.  It was motion in

22   limine number 2.  And Your Honor denied the motion, said that

23   if SIS can lay a proper foundation for the documents, they may

24   be admissible for the limited purpose of showing Intuitive's

25   perception or awareness of the alleged threat posed by
```

PARNELL - DIRECT / VAN HOVEN

1  unauthorized third parties.

2      And then Your Honor addressed experts relying on those

3  documents.  But to be clear, that's not what we're challenging

4  here.  We're not -- this isn't about reliability or anything

5  like that.  You know, Dr. Lamb's ability to rely on the

6  document in forming his opinion, obviously Your Honor has ruled

7  on that in the context of the *Daubert* motion.  This is whether

8  they could be admitted through this witness and published to

9  the jury, which we think would be improper.

10      MR. DOWELL:  And, Your Honor, briefly on that point,

11  we would be seeking to admit it under Rule 703 for both

12  Dr. Lamb and Mr. Bero, our damages expert; they rely on those

13  documents heavily.  And under Rule 703, if the probative value

14  in helping the jury evaluate the expert's opinion outweighs the

15  prejudice, then it -- those are directly admissible under 703.

16      Now, of course they're prejudicial.  They say throughout,

17  you know, talk about the monopoly Intuitive has and market

18  share and all that.  But these -- these documents directly are

19  the -- they are the foundation of our two key experts'

20  opinions, and it would help the jury evaluate those opinions.

21      THE COURT:  Thank you for that, counsel.

22      Go ahead, Mr. Michael.

23      MR. MICHAEL:  If I could just respond to that,

24  Your Honor, briefly.  I think Mr. Dowell highlighted exactly

25  what we're concerned about.  Dr. Lamb is going to be here

PARNELL - DIRECT / VAN HOVEN

1 testifying as an economic expert to his specialized knowledge
2 about the subjects of market definition, monopoly power, and
3 other things. And what I'm concerned about is that if these
4 reports come into evidence through him and are published to the
5 jury, what he's essentially going to be doing is just reading
6 what Deutsche Bank had to say about those very same subjects,
7 which doesn't help the jury at all. It just lends the patina
8 of an expert to what are otherwise hearsay documents and to the
9 perception of a layperson at Deutsche Bank as to these
10 subjects.

11 So Dr. Lamb can give his opinion on those subjects, and I
12 assume he will. He can talk about what he did as the basis for
13 that opinion. That doesn't mean that he should serve as a
14 conduit for hearsay. And that's exactly what cases that we
15 talked about in our briefing on the motion in limine address,
16 like the *Malletier v. Dooney Bourke* case.

17 **THE COURT:** Thank you. Counsel.

18 My sense is you got a clearer answer, that yes, you'll be
19 allowed to rest for the day without resting -- or you'll be
20 allowed to stop for the day without resting after we finish --
21 I can't retain anything in my mind today.

22 **MR. MICHAEL:** Dr. Parnell.

23 **THE COURT:** Thank you so much. I'm like I knew his
24 name an hour ago.

25 After we finish with Dr. Parnell.

PARNELL - DIRECT / VAN HOVEN

1      **MR. MICHAEL:**  Thank you very much, Your Honor.

2      **THE COURT:**  Of course.

3      Anything else before we bring them in?

4      All right.  Thank you-all for preparing me with my

5  homework.  We'll see if they're ready.  They may still have a

6  whole minute on the clock before we start, so we'll be back

7  shortly.

8      **MR. MICHAEL:**  Thank you, Your Honor.

9                  (Pause in proceedings.)

10                 (Proceedings resumed at 12:48 p.m.)

11     **THE CLERK:**  This court in now in session.  All rise

12 for the jury.

13                 (The jury enters the courtroom.)

14     (Proceedings were heard in the presence of the jury.)

15     **THE COURT:**  You may be seated.

16     **MR. VAN HOVEN:**  Could we bring that back up, the

17 demonstratives?  And go to Slide 3.

18 **BY MR. VAN HOVEN:**

19 **Q.**   Dr. Parnell, you could see, on that first bullet point, it

20 discusses reviewed Rebotix documentation and independent

21 certifications underlying Rebotix SIS service procedure?

22 **A.**   Yes.

23 **Q.**   What activities did you undertake related to that bullet

24 point?

25 **A.**   That's really associated with all of the procedures that

PARNELL - DIRECT / VAN HOVEN

1  were developed to provide kind of the roadmap through the

2  service procedure, so specifications that were developed,

3  procedures, steps that were spelled out to carry out the

4  service procedure.

5      And then there were also some independent certifications

6  that were performed outside of Rebotix's quality review types

7  of certifications.

8  Q.   And there's a bullet point:  Personally inspected Rebotix

9  facility on August 10, 2021.  What are you referring -- what's

10 being referred to there?

11 A.   That's the visit to the Rebotix facility in Florida that

12 we were talking about.  We talked about some of the aspects of

13 it earlier.  And that's the date that I was present there.

14 Q.   Did you take new pictures while you were there?

15 A.   Yes, I did.

16 Q.   And based on that documentation and your visit, what does

17 bullet point three mean to you?

18 A.   Well, through what I saw firsthand, talking to Rebotix

19 staff, like Mr. Fiegel, and then going through Rebotix's

20 service procedures, you know, I was able to conclude that they

21 had a process that was thorough and I felt it was a reliable

22 process for performing the service.

23 Q.   Let's go to Slide 4.  And this is fairly dense but can you

24 generally describe what this is?

25 A.   Yeah.  This is a wall chart that was at the Rebotix

PARNELL - DIRECT / VAN HOVEN

```
1    facility; and it's associated with cleaning processes of the
2    devices, both on the initial or incoming side and then on the
3    outgoing side, after the service procedure is carried out with
4    the final cleaning and lubrication steps -- are before a device
5    would be shipped out.
6    Q.   And what's your understanding of who would refer to a
7    document like this?
8    A.   A technician that's preparing to do service procedure, for
9    example, would -- would take a given device, each given device,
10   each EndoWrist, would go through these cleaning steps and --
11   before starting.
12   Q.   And let's go to Slide 7.  Is this an image that you took
13   on your visit to Rebotix?
14   A.   Yes, it is.
15   Q.   What is that showing?
16   A.   So, really, first step after -- after cleaning, each
17   device undergoes a very careful visual inspection.
18   Magnification is used, looking at the device, trying to
19   identify if there's any sort of damage or issue that the --
20   that would screen the device out so that it wouldn't be a
21   candidate to go through the service procedure then.
22        And so this is one particular device that had damage to
23   the cables, so that's what you see here.  This is down at the
24   distal end.  There is an area where you can see damage.  One
25   cable is actually broken, one that's got a frayed area, then.
```

PARNELL - DIRECT / VAN HOVEN

1   So this would be an EndoWrist that would not be a

2   candidate for going through the repair procedure because,

3   you know, parts like this are not -- are not replaced.  The

4   service procedure has a number of steps after the inspection;

5   but they are adjustment types of steps, cable adjustment,

6   scissors sharpening, if need be, so things that are identified

7   are performed, but there are not components that are being

8   replaced.

9   Q.   And from what you saw at Rebotix, who is performing this

10  sort of visual inspection?

11  A.   This would typically be done by a staff member, possibly a

12  technician.  I mean, when I was there, Greg Fiegel was showing

13  me the process steps; but it would more typically be done by a

14  trained technician, to go through these steps.

15  Q.   And do they have tools available to them to perform a

16  visual inspection?

17  A.   Yes.  Visual --

18          MS. PARKER:  Vague.

19          THE WITNESS:  I'm sorry.

20          THE COURT:  Sustained.  Ask a different question.

21  Wait for the question.

22  BY MR. VAN HOVEN:

23  Q.   Do they have anything available to them to facilitate this

24  visual inspection?

25  A.   Yes, they do.  Things like optical microscopes to allow

PARNELL - DIRECT / VAN HOVEN

```
1   for looking at -- at areas in detail to be able to more clearly

2   see detail on items like this.

3        So this is a photo with magnification.

4   Q.   Are you aware of any other reference that may be available

5   to someone performing this visual inspection under the Rebotix

6   procedure?

7   A.   I'm not quite sure what you mean there.

8   Q.   Anything that -- anything that's available for the

9   technician to reference?

10  A.   Well, the procedural documents that I mentioned are

11  available.  The procedural documents provide essentially kind

12  of a roadmap or a guide through the series of steps.  And each

13  one references particular steps and operations to perform.

14           MR. VAN HOVEN:  Let's go to Slide 10, please.

15  BY MR. VAN HOVEN:

16  Q.   What is this machine that we see here, Dr. Parnell?

17  A.   Yeah.  This is a piece of test equipment.  So some of the

18  EndoWrists are referred to as electrosurgical types of

19  instruments.  So they provide electrical signal to the end of

20  the instrument.  And you'll see terms like "monopolar" or

21  "bipolar" depending on the type of action that's performed.

22       And so, this piece of equipment is called -- associated

23  with a hipot test.  This is to assess and confirm the

24  insulation, that insulation is intact on the device.

25       And so this -- when you connect or set up this instrument
```

PARNELL - DIRECT / VAN HOVEN

1  to perform the tests on the electrosurgical instruments, you

2  come away with either a pass or a fail.  And you see up here on

3  the screen, in the upper part, this one is pass.  So this is

4  indicating that insulation of the device is intact and not

5  screened out.

6      If there was a problem here, this would be another factor

7  that could screen out a device that would not make it a

8  candidate for service.

9          **MR. VAN HOVEN:**  Slide 11, please.

10 BY MR. VAN HOVEN:

11 **Q.**  Dr. Parnell, what are we looking at here?

12 **A.**  Here you're looking at an EndoWrist that's mounted in a

13 fixture.  So there's some fixtures that are utilized for

14 different parts of the process, and this is associated with the

15 cable adjustment and tensioning process.

16     Another photo that I took in August 2021, when I was

17 there, this fixture basically mounts the EndoWrist and allows

18 the tool end, the distal end, to be held in a neutral position

19 to facilitate the cable process.

20 **Q.**  Could you elaborate a little bit on that?  What do you

21 mean held in a neutral position?

22 **A.**  It's -- it's at the end of the -- the tool.  It's -- its

23 position.

24     You know, no -- no roll, no rotation.  The components are

25 closed, no pitch.  So it's basically in kind of the zero

PARNELL - DIRECT / VAN HOVEN

1 position, the no -- no movement position, then, to provide the

2 reference.

3 **Q.** And how does that facilitate cable adjustment and

4 tensioning?

5 **A.** Well, it's to get the device into that, you know, neutral

6 position to facilitate the process from there. So it's -- like

7 I said, it's a reference position.

8 **Q.** As we --

9      **MR. VAN HOVEN:** Can we go to Slide 13?

10 **Q.** And this is showing, a little closer, what's on the

11 proximal housing side. And, you know, looking at this, could

12 you describe to the jury what's involved in tensioning the

13 cables, where that happens?

14 **A.** Yeah. So it happens back at this end, at the proximal end

15 of the device. Those fastening screws are loosened and the

16 cable can be adjusted from that point. And there -- like I

17 said, there's a procedure to follow to carry that out. But

18 back here is where it happens on each of the four drive.

19 **Q.** In addition to the cable tensioning process, are there

20 other operations that may be performed on an EndoWrist

21 instrument in the Rebotix repair process?

22 **A.** Yes, there are.

23 **Q.** What are some of those?

24 **A.** Well, for example, I mentioned that in the inspection, you

25 might determine that there was a problem with instruments that

PARNELL - DIRECT / VAN HOVEN

1   are designed to grasp tissue, for example, and that those

2   operating components need to be able to meet properly so that

3   they can grasp tissue.  Sometimes there's -- there's some

4   damage there that maybe can be -- can be rectified during the

5   service process by straightening the tool to allow the ends to

6   come together again.

7        Another one would be scissors that are not sharp or -- so

8   they're not cutting properly, or maybe haven't -- have a nick

9   on the blade, something like that, something that's causing

10  either an alignment or an issue with performing their cutting

11  operation.

12       So things like that are part of steps that are -- would be

13  taken during service procedure to rectify.

14  **Q.**   And after the various repair steps are performed, is there

15  anything else; do they do anything else in the Rebotix

16  procedure?

17  **A.**   After -- after repair steps are performed, then there's an

18  evaluation of each of those.  Now is -- now is the device

19  functioning appropriately as expected?  Are you getting this

20  direct one-to-one motion at the distal end from the inputs?

21       There's also a step that's associated with kind of a

22  validation on cable tension.  It's called checking the free end

23  torque.  So there's a table for each instrument and each one of

24  these degrees of freedom that provides a torque range, a load

25  range that the instrument should have after adjustment of the

PARNELL - DIRECT / VAN HOVEN

1  cables.  And, you know, between visual inspection of the

2  movement and this free end torque, this is effectively

3  confirmation that you've adjusted into the proper range and --

4  **Q.**  And, Dr. Parnell, you talked about that being performed

5  for the degrees of freedom.  Could you maybe explain that a

6  little more in layman terms, what you mean by the degrees of

7  freedom?

8  **A.**  Basically, each one of these input wheels, input tabs,

9  that mount to the robot are controlling a particular degree of

10  freedom down at the distal end, down at the wrist end.

11      And as I mentioned, effectively, there's four.  There's

12  pitch, there's roll at the end, and then there are the two yaw

13  degrees of freedom, or sometimes it's referred to as yaw and

14  grip.  But they're basically a thing that will actuate to bring

15  together to grasp tissue or to cut or something like that.

16  That's the part that carries out that step.  And the other is

17  essentially more -- more positioning, I would say.

18      But each one of those is controlled by an input, by a

19  motor on the robot and is carried, through rotation, back here

20  at this end.

21  **Q.**  And so each of those is tested in that process after

22  tensioning; is that right?

23  **A.**  Yes, that's right.

24          **MR. VAN HOVEN:**  Counsel, any objections to 783R?

25          **MS. PARKER:**  No objection to 783R.

PARNELL - DIRECT / VAN HOVEN

```
 1              MR. VAN HOVEN:  Can we bring up 783R, Bobby?

 2              THE COURT:  Move for admission, please, Mr. Van Hoven?

 3              MR. VAN HOVEN:  I apologize.  Move to admit 783R and

 4    publish to the jury.

 5              THE COURT:  It's admitted and may be published.

 6         (Trial Exhibit 783R received in evidence.)

 7              MR. VAN HOVEN:  And maybe zoom in on the top third of

 8    the document or so.

 9              MS. PARKER:  I'm sorry, counsel.  I don't believe this

10    is 783R, based on the exhibit sticker on the cover.

11              MR. VAN HOVEN:  Okay.  That's what I have.  I'd hold

12    off on that.  I'll send that to the tech.

13    BY MR. VAN HOVEN:

14    Q.   Dr. Parnell, we talked about the process, the repair

15    process you saw at Rebotix, but did you do any investigation

16    into how that process was created?

17    A.   Yes, I did.

18    Q.   And can you briefly describe the materials you consulted

19    in doing that investigation?

20    A.   Well, both -- beyond discussions with Rebotix personnel

21    like Greg Fiegel during my visit, beyond that, then, is looking

22    at documents that were created to define each of the process

23    steps and ones that were defined to basically describe the

24    specifications, like how -- how far the tool should open and

25    close, things like that, things that put movement and
```

PARNELL - DIRECT / VAN HOVEN

1  dimensional type of specifications on each of the different

2  EndoWrists.

3  Q.   And to your understanding, what is that process called of

4  creating those kind of documents?

5  A.   So this is along the lines of what we talked about as

6  reverse-engineering.  So you've got -- you've got a component

7  and you are carrying out tests and measurements to define

8  specifications associated with it, to be able to extract or

9  develop dimensions and movements and things like that that are

10 correct for that particular product, then.

11        MR. VAN HOVEN:  And I believe it's admitted but can we

12 republish 783R?

13        THE COURT:  You may.

14        MR. VAN HOVEN:  We'll continue until that pops up.

15 BY MR. VAN HOVEN:

16 Q.   Do you have any understanding of any testing that Rebotix

17 may have performed on the instruments or on its process?

18 A.   I'm not sure.  Are you referring to certification steps,

19 that kind of thing, or something else?

20 Q.   Actually, I'm referring to instruments that were repaired

21 using their process, any testing they did after the instruments

22 went through the process.

23 A.   Yeah.  So -- so after -- after it goes through the

24 process, then there are tests basically to evaluate that

25 function.

PARNELL - DIRECT / VAN HOVEN

1  Now, am I -- is the instrument providing the movement that

2  is -- is specified for that device?  As I mentioned also, the

3  steps involving checking free end torque, that they're within

4  the specified range of each degree of freedom, both in

5  clockwise and counterclockwise movements.

6  So each of the things that are evaluated on the incoming

7  side are also evaluated before it would go out.  And if there

8  was still -- if there was something that is not in the

9  specified range, then it might go through the service process

10 steps again to take -- to rectify that.

11 **Q.**   And we have the elusive 783R up on the screen.

12 **MR. VAN HOVEN:**  If we could look at the top, about,

13 third of this document.

14 **BY MR. VAN HOVEN:**

15 **Q.**   Could you take a look and explain to the jury what type of

16 document this is?

17 **A.**   So this is a product specification associated with a

18 particular type of EndoWrist.  Up there in the title, you see

19 it's the EndoWrist reference 420205, so that's a model number.

20 Each one of these different EndoWrists has a model number and

21 then the name of this particular one is a fenestrated bipolar

22 forceps.  So this is one that does have an electro function

23 like we were talking about before.  This is bipolar.

24 **Q.**   And is it your understanding that there would be similar

25 documents for other types of EndoWrists?

PARNELL - DIRECT / VAN HOVEN

1    **A.**    Yes.  Similar ones that reference process steps in the

2    service procedure.  This is kind of a step by step through for

3    a particular device type.

4              **MR. VAN HOVEN:**  And can we go to page 6?  And

5    highlight section 5.4 and 5.41.

6    **BY MR. VAN HOVEN:**

7    **Q.**   Dr. Parnell, can you take a look at this and explain to

8    the jury what that's describing to you at least?

9    **A.**    Yeah.  So this is basically just saying that the

10   documentation is going to be in their standard Rebotix format.

11   Risk management process is associated with a particular risk

12   management procedure that they have in place and there's an

13   SOP-1006.  So that's a document reference and that's a

14   reference to the risk management procedure.

15   **Q.**   And if you -- we'll hit just little snippets here.  We

16   don't want to go through the whole thing.

17             **MR. VAN HOVEN:**  But can we look at, also on page 6,

18   under Number 6.

19   **Q.**   Could you read that and provide your understanding to the

20   jury?

21   **A.**    Yeah.  So this section starts out on physical

22   characteristics, physical characteristics recovered, remaining

23   uses.

24        So it just states kind of the criteria for the use counter

25   in order to go through the service procedure; that in order for

PARNELL - DIRECT / VAN HOVEN

1   it to be a candidate for the service procedure, it needs to

2   have at least one original remaining use on the use counter.

3       It can't be a zero.  If it's zero, it's totally expired

4   and could not be reset or serviced in that way.

5       So an original expired device, 10 uses, cannot be updated.

6   So that's what it's stating.  So you need to have one.

7       Typically they specify that the desirable is to have one

8   use remaining, then.

9           **MR. VAN HOVEN:**  And could we go to the bottom of

10  page 8?  This is under Section 7, Performance Characteristics,

11  that final, that final part.

12  **Q.**  And, again, we don't want to go through the whole thing,

13  but this is an example.  Would you explain to the jury what

14  this is describing as far as performance characteristics?

15  **A.**  Yeah.  So this is talking about movements associated with

16  a life test cycle, so a testing cycle that they have performed

17  as kind of a step to qualify their service procedure from a

18  testing point of view.

19      And so what are the steps that take place then?  That goes

20  through each of the types of movements associated to the

21  maximum movement in each direction.  And so there will be a --

22  like, for example, first one is pitch up to maximum host system

23  position.  And there will be a -- effectively, a dimension

24  associated with that in terms of what will be happening at the

25  tool end for each one.

PARNELL - DIRECT / VAN HOVEN

1    And as I said, this was part of a -- kind of the life test

2  type of specification, so they used chicken breast as the

3  tissue surrogate to be able to go through their testing

4  procedure here.

5  **Q.**  And I'm sorry, what do you mean when you're talking about

6  a Rebotix life test?

7  **A.**  Rebotix did life testing after developing their -- their

8  process, their procedure.

9    And so they identified specific instrument types.  The

10  objective is to identify kind of worst-case instrument in each

11  category, whether it's one with scissors, whether it's one with

12  an electro -- a capability like this one, the bipolar device.

13    And they went through a series of test steps basically as

14  a way to qualify a device after it's gone through the service

15  procedure.

16    **MR. VAN HOVEN:**  Can we go to Slide 17, at the bottom

17  paragraph, and image -- I'm sorry, of 783R.  We're still on

18  783R, the bottom paragraph and image.

19  **BY MR. VAN HOVEN:**

20  **Q.**  Can you take a look at that, Dr. Parnell, and explain to

21  the jury what we're seeing in this Rebotix document?

22  **A.**  Yes.  So it talked about the four different degrees of

23  freedom that are here.  These are the mounting tabs that mount

24  to the -- to the robot.  Each of these disks is a place that

25  has a motor to drive it, to be able to turn it, in clockwise or

PARNELL - DIRECT / VAN HOVEN

1  counterclockwise direction.  These are each of the 4 degrees of

2  freedom, then.  So upper left is yaw, here yaw one, yaw two.

3  Below, yaw grip, you'll see referred to sometimes.  And then

4  third one in the upper right is a pitch and then a rotation,

5  turning rotation of the shaft of the device.

6      And this portion of the document is starting out to talk

7  about what I referred to a little bit earlier as part of the

8  test after this service procedure.

9      So each of these degrees of freedom has a no-load torque.

10  No load at the tool end, but how much torque is required to

11  turn it in both directions.  And this is part of the evaluation

12  that cable tension is in the right range, then.  So there's a

13  range on the torque level that's measured here.

14      Let's see.  Yeah.  I think that described it.  The

15  figures, for reference, of specific degrees freedom and then

16  each of these, there would be a series of these steps that will

17  define this level, this no-load torque for each degree of

18  freedom.  There's a table that this document comes from where

19  all the different types of devices and the different degrees of

20  freedom each have a range associated on that table.

21      One other thing to point out here is that there is a

22  difference in the no-load torque associated with clockwise

23  versus counterclockwise.  Just something to note.

24          MR. VAN HOVEN:  Is there no objection to SIS095115?

25          MS. PARKER:  Do we have an exhibit number?

PARNELL - DIRECT / VAN HOVEN

```
 1              MR. VAN HOVEN:  Yeah, TX0136.

 2              MS. PARKER:  136R is already admitted, so no objection

 3    there.

 4              MR. VAN HOVEN:  Could we bring up 136R, please.

 5    BY MR. VAN HOVEN:

 6    Q.   Dr. Parnell, are you -- do you have some knowledge of the

 7    relationship between Rebotix and SIS?

 8    A.   Yes.  There was a -- a business relationship between the

 9    companies over long term.

10    Q.   And did you have any discussions with anyone in SIS --

11    with SIS in preparing your report?

12    A.   Yes.  During the time of this engagement, I did have

13    discussion with Mr. Posdal.

14    Q.   And did you review some SIS documents in preparing your

15    report?

16    A.   Yes, I did.

17              MR. VAN HOVEN:  Could we go to page 5 of

18    Trial Exhibit 136R?

19    Q.   And, Dr. Parnell, have you seen a document like this,

20    where Surgical Instrument Service Company is providing

21    information about its EndoWrist repairs?

22    A.   Yes, I have.

23              MR. VAN HOVEN:  And could we go to page 8 of that

24    document?

25    Q.   And this is from the SIS document, but do you have an
```

PARNELL - DIRECT / VAN HOVEN

1    understanding of what this is depicting?

2    **A.**    Yes.   This is, basically, kind of a high-level flow chart

3    to guide through the process, the service process steps, then

4    showing what those process steps entail, what kind of things

5    are done.   Some things that are -- can be specific to a certain

6    type of device.   You'll see there's one associated with the

7    electrosurgical testing like we talked about before.

8        So it's really kind of a -- kind of a flow chart to -- to

9    provide some guidance through the overall process.

10   **Q.**   And if you know, how does this correspond to the Rebotix

11   process that you've reviewed in person and via documentation?

12   **A.**    Yeah.   So Rebotix has a similar type of flow chart that

13   maybe this -- more detailed, it refers to specific process

14   documents.   This is more of a high-level -- more of a

15   high-level flow chart, or roadmap, I would say.

16       So there's not -- there's not reference to specific

17   process documents, but there's the description in the name of

18   the steps.   And so that's where the reference would come in.

19   **Q.**   So does this appear to be similar to -- depicting a

20   process that is similar to the Rebotix process that you've seen

21   and looked at?

22           **MS. PARKER:**  Objection.   Leading.

23           **THE COURT:**  Sustained.

24   BY MR. VAN HOVEN:

25   **Q.**   How does -- how does this document, the steps here,

PARNELL - DIRECT / VAN HOVEN

1  compare to what you saw in both documentation and your

2  in-person visit at Rebotix?

3  **A.**   This, again, is a high-level step or roadmap through that.

4  And so the basic steps or blocks are similar.  They'll -- they

5  would have a correspondence to Rebotix's process steps.

6          MR. VAN HOVEN:  Could we move back to the

7  demonstratives, to Slide 17?

8  **BY MR. VAN HOVEN:**

9  **Q.**   I'd like to change gears here and talk a little bit about

10  Intuitive's interactions with the Rebotix process; okay?

11  **A.**   All right.

12  **Q.**   So the title of the slide is "Intuitive Did Not Test

13  Serviced EndoWrists."

14          What's your understanding of that?

15  **A.**   That Intuitive did not test EndoWrists like they had gone

16  through the Rebotix process steps, the service process steps.

17  **Q.**   And so the first sub bullet point there is:  Did not

18  conduct its own testing on the feasibility of servicing

19  EndoWrists.

20          What is meant there?

21  **A.**   That Intuitive did not conduct testing on these types of

22  serviced EndoWrists or didn't do it on their own, didn't do

23  testing, you know, extensive testing like life testing or

24  things like that on devices from Rebotix, that had gone through

25  the Rebotix process.

1174

PARNELL - DIRECT / VAN HOVEN

1   Q.   And you also noted that the -- didn't test EndoWrists

2   serviced by Rebotix or other ISOs.  What did you mean by that?

3   A.   Similar to that there was not detailed testing done on

4   these devices.  There were some devices that had been inspected

5   through our RMA type of returns, but there wasn't a test or

6   evaluation type of a program that was undertaken on these

7   devices.

8   Q.   What do you mean there were devices that were looked at

9   through RMA concerns at Intuitive?

10  A.   These would be -- you know, these RMAs are the big

11  collection of devices that were returned to Intuitive.  So,

12  you know, they're mostly Intuitive devices without any Rebotix

13  service, but some were flagged as being devices that were

14  serviced by a third party like Rebotix.  And so -- and that's

15  all I meant, that some of these devices are examined, there's

16  comments that are provided from that RMA examination.

17  Q.   How do you consider that different than performing

18  testing?  How do you consider the RMA evaluation different from

19  performing testing, if at all?

20  A.   I mean, there you're basically looking at a given device

21  and it's returned for some reason.  You know, typically, you

22  wouldn't be able to continue to run operations with that device

23  to evaluate it.  Typically, it's got -- there's some sort of

24  issue that's -- that's occurred, something -- there's misuse,

25  there's damage.  There's something that caused it to be

PARNELL - DIRECT / VAN HOVEN

1    returned through the RMA process.

2    **Q.**    And then there's a final point about, "Did not determine

3    whether EndoWrists returned through the RMA process experienced

4    failure caused by the Rebotix service procedure."

5        What do you mean by that?

6    **A.**    As I said, so devices are examined and, through that

7    examination, you can -- or Intuitive could determine if it was

8    a device that had been serviced, meaning gone through this

9    service procedure, had the use counter reset, then through that

10   process.

11       And so we're -- we're just talking here about -- yeah,

12   really some of the specific process -- specific devices in that

13   RMA.  Some don't have any kind of note associated with a

14   service procedure.  And so particularly, we're looking at some

15   specific RMAs associated with that that did not have any

16   indication of even whether it was a serviced device and that

17   the service process led to -- what was the cause of an issue

18   with the device.

19   **Q.**    And how was that RMA data presented?

20   **A.**    It will be presented different ways.  You may see -- you

21   may see counts or summaries of -- for different EndoWrist

22   types, how many came back through RMAs.  But there's a -- a

23   very detailed spreadsheet associated with RMAs over a period of

24   time.  And those typically got a more detailed inspection and

25   review to assess what the particular issue was and to make a

PARNELL - DIRECT / VAN HOVEN

1  comment on what caused that issue or what was believed to cause

2  the issue.

3      And it might be something like -- one comment that I

4  looked at was associated with, you know, this is most commonly

5  caused by misuse and excessive force at the distal end.

6      So there could be different types of comments based on

7  what was examined and what the RMA tech was determining from

8  the inspection.

9  Q.   And have you looked at any of those entries for any

10 specific EndoWrist RMAs?

11 A.   Yes, I did.

12 Q.   What was the source of the information for that look-up

13 exercise?

14 A.   One that I was asked to look at was associated with a set

15 of four RMAs that were on the opening Intuitive slides, that

16 were flagged through that on an opening slide.

17 Q.   And what did you discover through that investigation?

18 A.   The specific four that were called out there, there were

19 some things that I think were important to look at.  One was,

20 on those four, there was no injury or death associated with the

21 particular device, with that particular EndoWrist.

22      But the other part that was interesting was in the very

23 detailed inspection and observation notes -- was that there was

24 nothing actually to indicate there that it was a Rebotix

25 service process.  There was no note on having the chip added

PARNELL - DIRECT / VAN HOVEN

```
 1   for reset as you see in some other places.
 2        But the really -- one really interesting point was the
 3   observation was made by the inspector that the type of damage
 4   that was observed on these four, he said, was most typically
 5   caused by misuse of the device, that it was caused by having
 6   excessive force applied at this distal end of the device.
 7        So it was a -- it was characterized by Intuitive
 8   inspection as being a misuse type of issue.
 9             MR. VAN HOVEN:  Could we go to Slide 14?
10             THE COURT:  Mr. Van Hoven, are you nearing --
11             MR. VAN HOVEN:  I'm starting something new, so...
12             THE COURT:  Let's take five minutes and come back.
13        All rise for the jury.
14                  (The jury leaves the courtroom.)
15      (Proceedings were heard out of the presence of the jury.)
16             THE COURT:  Take five.
17                  (Recess taken at 1:35 p.m.)
18                  (Proceedings resumed at 1:41 p.m.)
19             THE CLERK:  This court is back in session.  All rise
20   for the jury.
21                  (The jury enters the courtroom.)
22      (Proceedings were heard in the presence of the jury.)
23             THE COURT:  You may be seated.
24             MR. VAN HOVEN:  Could we go back to Slide 14 of the
25   demonstratives.
```

PARNELL - DIRECT / VAN HOVEN

1  BY MR. VAN HOVEN:

2  Q.   Dr. Parnell, is it your opinion that the use counter

3  provides no useful information on the condition of the

4  instrument --

5            MS. PARKER:  Objection, leading.

6            THE COURT:  Sustained.

7  BY MR. VAN HOVEN:

8  Q.   What is the -- what are you referring to in the title of

9  that slide?

10  A.   Basically, kind of an overview conclusion, that there is

11  no really useful information that comes from the use counter,

12  nothing on condition of the instrument.

13  Q.   And you have a few sub bullet points.  What are you

14  referring to with the first bullet point?

15  A.   That the use counter only measures how many times an

16  EndoWrist was used for a surgical operation, nothing about the

17  time or complexity or any of the details associated with it.

18        I sometimes think of an analogy as being that the use

19  counter is kind of similar to your car.  If you looked at how

20  many times your car was started, but you didn't look at all at

21  whether you're driving cross country or whether you're driving

22  locally, it's kind of the same here.  There's nothing about the

23  conditions of use or the length of use or anything beyond just

24  that it was used.

25  Q.   And, Dr. Parnell, what are you referring to in the second

PARNELL - DIRECT / VAN HOVEN

```
 1   sub bullet point there?
 2   A.    Another thing that is not done -- is not provided from the
 3   use counter is any mishandling or misuse is not recorded or
 4   taken account of in the use counter.  So if there's some type
 5   of physical damage that takes place, then that's not included
 6   in the use counter.
 7   Q.    And those first two bullet points, how do those relate to
 8   the actual failure modes of the instruments that you have
 9   observed?
10   A.    Generally, the use counter doesn't really tell you
11   anything about the -- the failure mode, if there was one or
12   anything like that.  It would just give you a count as to when
13   it occurred if it was -- if it occurred during a specific use.
14       But there's no other info that it gives you related to the
15   particular application, the particular procedure that it went
16   through.
17   Q.    What is being referred to in that third bullet point,
18   Dr. Parnell?  Could you explain that to the jury?
19   A.    So from Intuitive documents that I reviewed and testimony,
20   staff testimony that I reviewed, it was stated that -- how did
21   we come to the 10-use limit?  And it was stated in there that
22   it came as a goal or a target from marketing department that
23   we're going to use a 10-use limit.
24       But then it was -- engineering was asked to validate, to
25   test if EndoWrists could indeed perform reliably up to 10 uses.
```

PARNELL - DIRECT / VAN HOVEN

```
 1   But it's a -- it's a target and then a validation of that
 2   target, not can it go for more uses than 10.  They tested with
 3   the goal or the objective to validate that 10 was an acceptable
 4   limit, that it could perform reliably up to 10.
 5   Q.   And are you aware, and I -- you note 10 there.  Are you
 6   aware of some Intuitive instruments having different use limit
 7   numbers?
 8   A.   Yes.
 9   Q.   Explain that to the jury, please.
10   A.   There -- the -- the majority of the Si instruments started
11   out with having 10.  There's some -- there's some particular
12   instrument types that had different numbers, but most fell
13   under this 10-use limit type of setup and were validated with
14   that limit in mind.
15   Q.   And -- and there were other instruments that had different
16   limits, is that right, at some point?
17            MS. PARKER:  Objection, leading.
18            THE COURT:  Sustained.  Ask it differently, please,
19   Mr. Van Hoven.
20   BY MR. VAN HOVEN:
21   Q.   And you -- I believe you mentioned that there were some
22   instruments that had different than a 10-use limit.  Do you
23   have any understanding as to those circumstances and what that
24   involved?
25   A.   I don't know if -- if there was an extended use program
```

PARNELL - DIRECT / VAN HOVEN

| | |
|---|---|
| 1 | that was undertaken on the Xi instruments a few years ago.  So |
| 2 | after EndoWrists had been in use for long period -- for a |
| 3 | number of years, for a long period of time, then there was an |
| 4 | extended use program that was undertaken to explore some higher |
| 5 | number of uses, if it was feasible for some of the devices. |
| 6 | **Q.**   The final bullet point there says:  It does not track |
| 7 | condition of the instrument. |
| 8 |     What are you referring to there? |
| 9 | **A.**   The types of things that I talked about, it doesn't |
| 10 | indicate if there is damage or the condition of the |
| 11 | instrument -- actually, even if it's still functional, for that |
| 12 | matter.  It's really just that the proximal end of the device |
| 13 | with the chip can be mounted to the robot, but it might not be |
| 14 | operational.  That has to be determined by inspection.  The use |
| 15 | counter doesn't tell you that type of thing. |
| 16 |         **MR. VAN HOVEN:**  Slide 15. |
| 17 | **BY MR. VAN HOVEN:** |
| 18 | **Q.**   And could you look at this slide and, generally, explain |
| 19 | to the jury what's been conveyed here? |
| 20 | **A.**   Yeah.  So this slide is just detailing some of the -- some |
| 21 | of the types of things that we talked about that is not |
| 22 | information that's a part of the use counter.  So it just |
| 23 | breaks it down a little bit more, like time of use; there's no |
| 24 | information on time of use.  Or there's no information on |
| 25 | specific movements and how many there were in a given use. |

                                       1182

PARNELL - DIRECT / VAN HOVEN

1    Or the types of procedures that it was utilized in, or the
2    forces involved, you know, in terms of the torque or movement
3    or any types of things like that.
4        And no information if there was a malfunction of some sort
5    or if an instrument was misused or abused in some way.
6        None of those things are part of the use counter.  The use
7    counter is a very simple thing in terms of what is counted
8    there.
9    Q.  To your knowledge, does Intuitive have available to it
10   information from which it could determine some of this
11   information?
12   A.  Yes.  I did see testimony that in some cases, in terms of
13   investigation of a return, that there's some fairly detailed
14   logs that are explored, but they're not part of the use
15   counter.  That's information that comes through a different
16   mechanism; and that does include more -- more -- you might
17   consider kind of a detailed log of operations that were taking
18   place and torques that were involved during those operations as
19   kind of, really, a log of the action for that particular
20   activity, for that particular use then, but as separate from
21   the use counter.  It's not a part of the use counter.
22       MR. VAN HOVEN:  Is there any objection to
23   Trial Exhibit 281?
24       MS. PARKER:  No objection.
25       MR. VAN HOVEN:  We move to admit Trial Exhibit 281.

PARNELL - DIRECT / VAN HOVEN

```
 1              THE COURT:  It's admitted.
 2         (Trial Exhibit 281 received in evidence.)
 3              MR. VAN HOVEN:  May we publish it to the jury?
 4              THE COURT:  You may.
 5              MR. VAN HOVEN:  If we could zoom in on the top of the
 6    slide.
 7    BY MR. VAN HOVEN:
 8    Q.   Dr. Parnell, is this a document that you have seen before?
 9    A.   Yes.  It is a document I've seen before.  Title is "RMA
10    Analysis for Possible Life Extension," and this part of the
11    study was done in the 2017 to 2018 time frame.
12    Q.   Could you remind us again what RMA stands for?
13    A.   Return material authorization.  It's basically a return of
14    an EndoWrist that's -- had some sort of issue that the customer
15    has identified and so it's returned back to Intuitive.
16              MR. VAN HOVEN:  Page 4, please.
17    Q.   I guess, generally, do you have an understanding of what
18    this slide is depicting?
19    A.   Yes.  There are six specific types of EndoWrists that
20    their number of RMAs, number of returns, are being counted
21    here.  So each one of these curves pertains to a particular
22    EndoWrist.  And that number over on the right side, that links
23    to the model or the specification, and, you know, will have a
24    certain designation as to what that particular EndoWrist is.
25    That's what each of these curves then represents, the number of
```

PARNELL - DIRECT / VAN HOVEN

1  returns for each number of lives that have been used, so it
2  starts at zero, goes one -- goes through 10.
3      So this is -- that's what's on the X, or the horizontal
4  axis, is how many lives are used.  And the Y value is how many
5  RMA returns there were with one use, used, for example, and
6  then two, and then three, et cetera.
7  **Q.**  From reviewing this slide, do you have any opinions as to
8  what's represented by the patterns of the data in this RMA
9  slide?
10 **A.**  Yes.  There's some observations that are interesting.  On
11 the one that's the upper curve that has the greatest number of
12 RMAs returned, one thing that's interesting is that after about
13 two to three uses, that the number returned is fairly, fairly
14 constant.  It's not increasing significantly from there out,
15 that it sort of -- sort of reaches a steady state value, if you
16 will, where the number returned stays fairly flat fairly
17 straight from there on.
18     The next one down, kind of a similar observation.  The
19 ones at the lower part, there's fewer RMAs, you know.  It's a
20 little harder to see from the curves themselves; but when you
21 look to the data, a similar thing is taking place.  It kind of
22 flattens out and doesn't increase with number -- with the
23 number of uses to any significant degree.
24         **MR. VAN HOVEN:**  Slide 6, please.
25 \\\

PARNELL - DIRECT / VAN HOVEN

1  BY MR. VAN HOVEN:

2  Q.    Could you describe what we're seeing on this slide?

3  A.    Yes.  So this is taking the data that went into the plot

4  that we just looked at and combining the data point in a little

5  bit different way.

6       So each one of these symbols on its curve is basically the

7  sum of the failures that have occurred prior to that, the sum

8  of the RMAs that have occurred prior to that.

9       And to me, what this shows is that if there was -- if

10 there was significant increase with the number of lives used on

11 the use counter, you'd start to see this curve kind of really

12 tail up then.

13      But each one of these curves becomes quite linear so that

14 there's not a significant increase with number of lives used as

15 you plot the data in this fashion.

16           MR. VAN HOVEN:  We're almost done, Your Honor.  Can we

17 have one minute, please.

18           THE COURT:  You can have it.

19                  (Conferring.)

20           MR. VAN HOVEN:  Is there any objection to

21 Trial Exhibit 572?

22           MS. PARKER:  No objection.

23           MR. VAN HOVEN:  Move to admit Trial Exhibit 572.

24           THE COURT:  It can be admitted.

25           MR. VAN HOVEN:  And publish it to the jury.

PARNELL - DIRECT / VAN HOVEN

1    **THE COURT:** By all means.

2        (Trial Exhibit 572 received in evidence.)

3        **MR. VAN HOVEN:** And maybe get the top third in the

4    blowup. A little further, down through Purpose. There we go.

5    **BY MR. VAN HOVEN:**

6    **Q.** Dr. Parnell, do you have an understanding of what this

7    document is?

8    **A.** Yes. This is a report on some early life testing that was

9    done. This would have been on Si -- a particular Si type of

10   instrument. And this indicates it was done in September to

11   October 2009.

12   **Q.** Do you have an understanding as to how Intuitive performs

13   this life testing generally on EndoWrist instruments?

14   **A.** Yes, I do.

15   **Q.** What is this -- could you explain that to the jury?

16   **A.** They have a life test protocol called out, so it's

17   sometimes referred to as simulated surgical use. So it's done

18   with kind of a recipe or specification for number of movements

19   and activities that are going to take place in each degree of

20   freedom to represent a particular use. So it's got a recipe

21   that is followed for that. And in between each use, there is a

22   cleaning -- or sometimes called reprocessing -- step that takes

23   place then.

24   **Q.** Could we go then -- and are you aware with -- of how that

25   testing is carried out with respect to the rated lives of the

PARNELL - DIRECT / VAN HOVEN

1    instrument?

2    **A.**    Yes.  As I mentioned before, tests here at this stage were

3    done to -- with the intent to validate a set number of lives.

4         So these are not going to be tested to failure, but

5    they're tested to a life count that will statistically say,

6    okay, that we can reliably obtain 10 lives from it.  I believe

7    the number -- when you get to these, you'll see that they were

8    typically tested to 13 lives.  And it's a set of instruments,

9    you know, a set of, like, six instruments or something like

10   that that's done for each one.  So they're not tested to

11   identify failure or failure mechanism.  They're tested with the

12   objective being to validate a specified 10-use life limit.

13            **MR. VAN HOVEN:**  Page 2, the two paragraphs above

14   Number 7.

15   **BY MR. VAN HOVEN:**

16   **Q.**    And, Dr. Parnell, could you take a look at that and

17   explain to the jury what that represents as to what you were

18   just discussing as far as testing?

19   **A.**    Yes.  So the top paragraph here is describing things that

20   would be identified as a failure.  This is the failure criteria

21   that is being applied.  You know, if we saw a broken cable or a

22   fractured component or a seized mechanism, those would be

23   failures.  And that would indicate, you know, a stopping at

24   that point.  You can't -- you can't continue the test of the

25   device if that occurs.

PARNELL - CROSS / PARKER

```
 1        But then in the second paragraph, it indicates the results
 2   here.  All six of these instruments achieved 13 lives per the
 3   protocol.  And these instruments passed all the life testing
 4   specs and requirements associated with that, with 13.
 5        13 was so that, statistically, for the testing of six
 6   instruments, that you could say, with a high level of
 7   confidence and reliability, that, with this number of lives
 8   tested, that we can reliably confirm that a 10-life limit is
 9   acceptable.
10   Q.   And if you wanted to see if a limit different than 10 was
11   acceptable, or higher than 10, what would someone do?
12   A.   You would test further.  You would test for more number of
13   lives in -- you might test until you identify some failures.
14        Here you're not -- not testing far enough to identify any
15   failures under this protocol.
16             MR. VAN HOVEN:  Pass the witness.
17             THE COURT:  Thank you, Mr. Van Hoven.
18             MS. PARKER:  Permission to approach the witness?
19             THE COURT:  Granted.
20                  (Counsel approaches witness.)
21             THE COURT:  Proceed when ready, Ms. Parker.
22                       CROSS-EXAMINATION
23   BY MS. PARKER:
24   Q.   Good afternoon, Dr. Parnell.
25   A.   Hello.
```

**Volume 7**

**Pages 1214 - 1399**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE      )
COMPANY, INC., et al.,           )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   **NO. C 21-03496-AMO**
                                 )
INTUITIVE SURGICAL, INC.,        )
                                 )
          Defendant.             )
_____  )
AND RELATED COUNTERCLAIMS.       )
_____  )
                           San Francisco, California
                           Tuesday, January 14, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
                BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
                    **ANTHONY E. DOWELL, ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
                BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

1215

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                           PAUL, WEISS, RIFKIND, WHARTON
 3                         & GARRISON LLP
                           2001 K Street NW
 4                         Washington, D.C. 20006
                     BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                         PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                         PAUL WEISS RIFKIND WHARTON
                           & GARRISON LLP
 7                         1285 Avenue of the Americas
                           New York, New York 10019
 8                   BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                           CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                           PAUL, WEISS, RIFKIND, WHARTON
10                         & GARRISON LLP
                           535 Mission Street - 24th Floor
11                         San Francisco, California 94105
                     BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

1216

# I N D E X

Tuesday, January 14, 2025 - Volume 7

**PLAINTIFFS' WITNESSES**                                          **PAGE**   **VOL.**

**PARNELL, TOBY KIM (RECALLED)**
(PREVIOUSLY SWORN)                                                  1232      7
Cross-Examination resumed by Ms. Parker                            1232      7
Redirect Examination by Mr. Van Hoven                             1264      7

**DUQUE, GRANT**
By Videotape Deposition (not reported)                            1267      7

**LAMB, RUSSELL**
(SWORN)                                                             1270      7
Direct Examination by Mr. McCaulley                               1271      7
Cross-Examination by Mr. Michael                                  1336      7

# E X H I B I T S

**TRIAL EXHIBITS**                                    **IDEN**   **EVID**   **VOL.**

  464                                                            1279      7

  471                                                            1278      7

  489                                                            1284      7

  493                                                            1301      7

  507R                                                           1328      7

  509                                                            1287      7

  512                                                            1296      7

  524R                                                           1364      7

  818                                                            1254      7

PARNELL - CROSS / PARKER

1    A.    I think because that was the typical mode of -- of

2    business with customers and with EndoWrists that, you know,

3    gave them some sort of problem.  I think they typically would

4    return it through the RMA process.  Maybe not always, but they

5    often did.

6    Q.    And it was still Intuitive's reputation on the line when

7    that EndoWrist stopped working for that customer, right?  The

8    customer turned to Intuitive?

9    A.    Well, again, just that they did return it through that

10   process.

11   Q.    Thank you, sir.

12       I want to talk just a little bit, sir, about some opinions

13   that you gave yesterday about the use counter on Intuitive

14   EndoWrists.  Do you recall that?

15   A.    Yes.

16   Q.    And you gave some testimony that the use counter fails to

17   account for actual usage or wear and tear on the devices;

18   right?

19   A.    Yes, that's correct.  I tried to explain both what the use

20   counter does and also tried to explain some of the things that

21   are not reflected in the use counter.

22   Q.    And you've gone so far, in your expert reports in this

23   case, to say that the use counter is meaningless as an

24   indicator of safe operation; right?

25   A.    Yes, because it -- if a -- again, what it does represent

1249

PARNELL - CROSS / PARKER

1   and then more -- more importantly, what it doesn't represent --

2   that there's a lot that's just not accounted for through the

3   use counter.

4   **Q.**   Sir, we can agree that the components of the da Vinci

5   and the EndoWrists can wear out over time; correct?

6   **A.**   I'm sorry.  Could you repeat that?

7   **Q.**   Sure.

8        We can agree that the components of the EndoWrist can wear

9   out over time; right?

10  **A.**   Potentially based on the type of use, potentially based on

11  a lot of different factors, certainly.

12  **Q.**   And one of the criticisms that you've raised about the use

13  limits is that testing and evidence from Intuitive shows that

14  EndoWrists frequently performed basically the same at the end

15  of their 10th use as they did on their first use; right?

16  **A.**   There is data that indicates that to be the case.

17  **Q.**   And what you mean by that is the person who has the 10th

18  surgery using a particular EndoWrist gets the same performance

19  from that EndoWrist as the person who had the first surgery

20  with it; right?

21  **A.**   Yes.  That is -- that is potentially true.  A lot depends

22  on what has gone on before on the specific uses and what's

23  occurred in there.  But, you know, what I was citing was

24  information related to, like, numbers of returns as a function

25  of life, and that was showing that there was a fairly constant

PARNELL - CROSS / PARKER

1  number associated with that.

2  Q.   And just to be clear, sir, if you're the person receiving

3  the 10th surgery with an EndoWrist, you want to get the same

4  performance as the person who had the first surgery; right?

5  A.   Sure, I think that's correct.

6  Q.   That's the goal of the product; correct?

7  A.   Yes.

8  Q.   Now, yesterday you told the jury about a lot of things

9  that Intuitive could have considered in setting the life of its

10 EndoWrists other than the number of times they were used;

11 right?

12 A.   If you're talking about some of my criticisms of the use

13 counter, yes, there were several things that I pointed out

14 there that are not reflected in the use counter, but that are

15 important in terms of potential status, potential condition of

16 a given EndoWrist.

17 Q.   And you understand, sir, that Intuitive's EndoWrists

18 contained a use counter from the first day they were ever sold;

19 correct?

20 A.   Yes.  I've seen an indication to that effect, that that

21 was a specification that was a part of the EndoWrist.

22 Q.   And even though you told the jury all sorts of other data

23 that could be considered, you've not offered any opinions in

24 this case regarding what sorts of redesigns or product

25 modifications would be required to develop an EndoWrist that

PARNELL - CROSS / PARKER

1  actually considers any of those factors, have you?

2  A.   I've not endeavored to create or provide a recipe or an

3  approach for modifying or changing the use counter.

4      But just to try to point out that there is -- is certainly

5  relevant information that can be used to that effect.

6  Q.   Well, as part of its development of a process to reset the

7  use counter on EndoWrists, Rebotix didn't change the way that

8  use was tracked by an EndoWrist, did it?

9  A.   That's also correct.  They, basically, incorporated the

10  same sort of a count to do it the same way.

11  Q.   So Rebotix didn't take into consideration, when it was

12  resetting the EndoWrists, set it to -- excuse me.  Strike that.

13      Rebotix didn't reprogram the EndoWrists to expire after a

14  certain number of movements, did it?

15  A.   No, they did not.  They, basically, set it so that there

16  would be the same sort of initial number of uses available and

17  that they would decrement in the same way.  It was intended to

18  mimic what was done by Intuitive.

19  Q.   Correct.  And in mimicking what was done by Intuitive,

20  Rebotix didn't even change the number of uses, did it?  If a

21  device was sold with 10 uses, Rebotix reset it to 10 uses;

22  correct?

23  A.   Yes, that's also correct.

24  Q.   It wasn't selling its customers an EndoWrist with 25 uses,

25  was it?

PROCEEDINGS

 1  further?

 2          MR. VAN HOVEN:  Yeah.  The objection was sustained.

 3  We have nothing further at this point.

 4          THE COURT:  All right.  I will endeavor to make

 5  sure -- this is what I'm afraid of.  And I thank you-all for

 6  rolling with me, but I want to make sure that we actually get

 7  the objections and any further comments on the record before I

 8  rule.

 9      So we'll -- I will do better with that.

10      All right.  Folks, absent that, let's go ahead and bring

11  the jury in -- do you want to call him, or do you mind if we

12  put him on the stand now?

13          MR. McCAULLEY:  We can put him on the stand.

14          THE COURT:  Let's put him on the stand now before we

15  bring the jurors in.

16      (Russell Lamb steps forward to be sworn.)

17          THE COURT:  All rise for the jury.

18              (The jury enters the courtroom.)

19      (Proceedings were heard in the presence of the jury.)

20          THE COURT:  You may be seated.

21          THE CLERK:  Please raise your right hand.

22                      <u>RUSSELL LAMB</u>,

23  called as a witness for the Plaintiffs, having been duly sworn,

24  testified as follows:

25          THE WITNESS:  I do.

LAMB - DIRECT / MCCAULLEY

```
 1            THE CLERK:  Please be seated.
 2       And state and spell your full name and spell it for the
 3   record.
 4            THE WITNESS:  Russell Lamb, R-U-S-S-E-L-L, L-A-M-B.
 5                      DIRECT EXAMINATION
 6   BY MR. McCAULLEY:
 7   Q.   Good morning, Dr. Lamb.  You seem to be the only person in
 8   our crew who's avoided the virus.  We appreciate you being
 9   here.
10       Can you introduce yourself to the jury this morning?
11   A.   I'm Russell Lamb.  I'm an economist.  I've studied
12   economics my entire adult life.
13       I am the co-founder and president of an economic
14   consulting firm in Washington, D.C., where most of my work is
15   related to litigation like this.
16   Q.   Can you tell the jury a little bit about where you grew
17   up?
18   A.   I'm from East Tennessee, small town, farming community
19   where I have a farm today and raise some beef cattle.
20   Q.   That's not your primary occupation; correct?
21   A.   That is not, sadly.
22   Q.   Could you describe your educational background for the
23   jury?
24   A.   Well, I earned an undergraduate degree from the University
25   of Tennessee in Knoxville in 1987.  I graduated at the top of
```

LAMB - DIRECT / MCCAULLEY

```
 1    my class, summa cum laude, Phi Beta Kappa.
 2        I then went on and studied economics for another seven
 3    years at the graduate level.  I earned a master's degree from
 4    the University of Maryland and a Ph.D. from the University of
 5    Pennsylvania, all in economics.
 6    Q.   Have you had any teaching experience?
 7    A.   I have.  I have taught, at various points in my career, as
 8    an adjunct faculty member, starting in graduate school,
 9    University of Pennsylvania.
10        As a side note, Elon Musk was one of my students at the
11    University of Pennsylvania.
12        I then, as part of my professional activities, have taught
13    at George Washington University, the University of Tennessee in
14    Knoxville and Georgetown, including courses in law and
15    economics, managerial economics.
16    Q.   Can you tell us, what's the name of your consulting firm?
17    A.   Monument Economics Group.
18    Q.   And remind me again where they're -- where you're located?
19    A.   Our headquarters are in Washington, D.C.  We also have an
20    office in Philadelphia.
21    Q.   And just describe for the jury, generally, the types of
22    work that your consulting firm does?
23    A.   Most of Monument Economics Group's work is focused on
24    supporting expert witness testimony like this.  Most of that is
25    my expert work.  And most of it is in the area that I'm here to
```

LAMB - DIRECT / MCCAULLEY

1  talk about today, antitrust.  We do some other work related to

2  allegations of consumer fraud or some commercial litigation.

3      But most of our work is about antitrust economics and

4  allegations of anti-competitive conduct and the economic

5  analysis of those issues.

6  **Q.**  And you're here to testify on behalf of SIS in this case

7  today; is that correct?

8  **A.**  That's correct.

9  **Q.**  Can you provide the jury with a summary of your opinions

10 in this case?

11 **A.**  I've reached a number of opinions.  First, I have

12 determined that there are two relevant antitrust product

13 markets at issue here.

14     There's a market for MIST -- that's minimally invasive

15 soft tissue -- surgical robots.  Secondly, there is a separate

16 market for the repair and replacement of EndoWrist instruments.

17     The instruments, the EndoWrist instruments at issue here,

18 are the little things that go onto that piece of equipment over

19 there, the MIST surgical robot, to do things like cutting and

20 holding and grasping and so forth.

21     So I've determined there were two separate antitrust

22 product markets.  I've determined that Intuitive has market

23 power in both of those markets, in the market for MIST surgical

24 robots and separately in the market for the repair and

25 replacement of EndoWrist instruments.

LAMB - DIRECT / MCCAULLEY

1    I've determined that Intuitive maintained its market power

2    in the market for EndoWrist instruments by leveraging its

3    market power in the market for MIST surgical robots in a way

4    that was, for an economist, anticompetitive; and the result of

5    that was harm to competition as that is understood in antitrust

6    economics.

7        And I'm going to talk about that later more, I'm sure.

8    Q.   Okay.  Taking that piece by piece, you testified that

9    there was a relevant antitrust market for MIST robots; correct?

10   A.   Correct.

11   Q.   Can you explain to the jury the basis for that opinion?

12   A.   Well, let me start by explaining what a relevant market

13   is, as we use that term.  It's a very specialized term in

14   economics.

15       An economist, in studying allegations of anticompetitive

16   behavior, needs to start with an understanding of the products

17   at issue.  And we do that through this concept of relevant

18   market.

19       There are two dimensions to a relevant market.  There's a

20   geographic dimension and a product dimension.  For both of the

21   markets that I've defined here, the geographic market is the

22   United States.

23       The product market in the first market is a market for

24   MIST surgical robots.  Now, what I'm trying to do, in analyzing

25   that question of what is the relevant antitrust market, is to

LAMB - DIRECT / MCCAULLEY

```
 1   find the smallest group of products such that if a firm
 2   controlled all of those products, and dominated that market,
 3   they could raise the price in that market above the competitive
 4   level.  They could artificially exploit that market power and
 5   raise the price above the competitive level.  That's the
 6   process by which economists define a relevant antitrust market.
 7        And another way of thinking about that is, in order to do
 8   that, I'm trying to find all of the products that are close
 9   economic substitutes for each other.  That is, all of the
10   products that can be, in a marketplace, competitive so that
11   movements in the price of one determine demand for the price of
12   the other.  Okay?
13        That analysis of the set of close economic substitutes
14   that forms the relevant antitrust market typically looks for
15   two key factors.  In order to constitute a relevant antitrust
16   market, the products -- the market has to comprise everything
17   that is a close economic substitute.
18        So I'm looking for what is in that market and what's not
19   in the market.
20        Here, I determined that MIST surgical robots, of the type
21   manufactured by da Vinci, are part of that market --
22   manufactured by Intuitive, the da Vinci robot -- are part of
23   that market.  There are others that are in that market, such as
24   the Flex robot that is made by Medtronics or Medrobotics, and
25   the Senhance robot, very small competitors.
```

LAMB - DIRECT / MCCAULLEY

1    But what is not in that market are the laparoscopic

2  instrument -- laparoscopic towers that are used in laparoscopic

3  surgery.  And the reason that only the MIST surgical robots are

4  there is because there's no substitute for a MIST surgical

5  robot if you're conducting MIST robotic surgery.

6    It's not very surprising.  The MIST robot goes into the

7  performance of MIST robotic surgeries.  And MIST robotic

8  surgeries are distinctive from laparoscopic surgeries.

9    They have certain advantages to the patient.  There are

10 quicker recovery times; there are fewer complications.  They're

11 generally viewed as having some advantages to patients over,

12 particularly, laparoscopic surgery, but also open surgeries.

13 Okay?

14    So MIST surgeries, that is, MIST robotic surgeries, have

15 no close economic substitutes.  Laparoscopic surgery is not a

16 substitute.  Open surgery is not a substitute.

17    Therefore, there's -- there's a separate set of surgeries

18 and you have to have the MIST surgical robot to perform those

19 surgeries.  And every MIST robotic surgery needs a MIST

20 surgical robot.

21    You can't do the robotic surgery with a laparoscopic

22 tower.  It's not the same thing.

23 Q.  Did you examine whether -- let me ask a better question.

24    Are you familiar with the concept of price discipline?

25 A.  I am.

LAMB - DIRECT / MCCAULLEY

1    Q.    What does that term mean?

2    A.    Well, one product can discipline the pricing of another

3    product if -- when you attempt to raise the price of the second

4    product, say, 5 or 10 percent, the purchasers of that product

5    then go from buying your higher-priced product to buying the

6    other product that is disciplining its price.

7         So, for example, in this market, if raising the price of

8    a -- of the MIST surgical robot, which is a couple of million

9    dollars, the da Vinci robots are a couple of million dollars,

10   if, when the firm attempted to raise the price of the robot,

11   say, 5 or 10 percent, the purchasers of the robot said, "Whoa.

12   I'm not going to pay another $200,000.  I'll just go buy

13   another laparoscopic tower."

14        If that were the case, they would be economic substitutes.

15   That's not the case.  And I talk about -- in my report in this

16   matter, I talk about the fact that hospitals testified if the

17   price of a MIST surgical robot were to go up, we'd still have

18   to buy the MIST surgical robot.  Why?  Because MIST surgeries

19   have these advantages.  But also, there are other reasons the

20   hospitals say we have got to have the MIST surgical robot.

21        It's important to the hospital in two dimensions of its

22   competitive strategies.  The first is, hospitals are recruiting

23   surgeons.  Surgeons are trained in medical school on how to do

24   surgery on a da Vinci robot.  Most -- my understanding is

25   that most surgeons coming out of medical school prefer that.

LAMB - DIRECT / MCCAULLEY

```
 1   And I talk about evidence with respect to that in my report.
 2        And so the hospital, in its strategies to recruit
 3   surgeons, needs to be able to offer the MIST surgical robot,
 4   which is the da Vinci robot in most -- almost all cases.
 5   Q.   Did you -- I'm sorry to interrupt.  Did you review
 6   documents to that regard from Intuitive's files?
 7   A.   I believe I did, yes.
 8        MR. McCAULLEY:  Your Honor, I'd move the admission of
 9   Trial Exhibit 471, which I understand doesn't have any
10   objection.
11        MR. MICHAEL:  No objection.
12        THE COURT:  It's admitted.  And would you like to
13   publish it?
14        MR. McCAULLEY:  I'd like to publish it.  Thank you,
15   Your Honor.
16      (Trial Exhibit 471 received in evidence.)
17        MR. McCAULLEY:  Bobby, if you can pull up 471 and
18   potentially highlight the section from the report.
19        THE WITNESS:  Your Honor, I can't read this.
20        THE COURT:  I understand that it will likely be pieces
21   of it will be shown to you so that you can.
22      Neither can I.
23        THE WITNESS:  Okay.  Thank you.
24   BY MR. McCAULLEY:
25   Q.   Can you see the --
```

LAMB - DIRECT / MCCAULLEY

1          MR. McCAULLEY:  Bobby, can we have the second bullet,

2    I think, on the first page?

3          THE WITNESS:  Yes.  So this is an Intuitive e-mail

4    that goes exactly to the point that I was just making.

5    Intuitive -- the document here says that one of the reasons

6    hospitals buy the da Vinci robot is -- is, quote, attracts

7    surgeons to hospitals, close quote.  So that's the point that

8    I'm making, Intuitive understands it.  It's pretty

9    non-controversial.

10         Now, there's another -- well --

11         MR. McCAULLEY:  Your Honor, I move the admission of

12   Trial Exhibit 464, which I believe doesn't have an objection,

13   and I would seek to publish it to the jury.

14         MR. MICHAEL:  No objection.

15         THE COURT:  It's admitted and you may publish it.

16      (Trial Exhibit 464 received in evidence.)

17         MR. McCAULLEY:  And, Bobby, can you highlight the

18   portion that starts Statements.

19   BY MR. McCAULLEY:

20   Q.   Are you able to see what's on the screen now, Dr. Lamb?

21   A.   I am.

22   Q.   Do you recall reviewing this document as part of preparing

23   for your testimony?

24   A.   I have.

25   Q.   And how did that document impact your opinion?

LAMB - DIRECT / MCCAULLEY

1  A.   I'm -- this is referring to the strategic advantages.  I

2  think there's another part of this document that talks about

3  the importance in -- that I discuss in my report about the

4  ability of hospitals to recruit patients which have private

5  commercial insurance.  And that's important to hospitals.

6      I don't want go into too many details, but hospitals have

7  a hard time making money.  And if you've got a patient with

8  commercial insurance, it's easier to make money on that

9  procedure.  So there's -- part of this document talks about

10  the da Vinci robot helps you recruit patients to come to the

11  hospital with commercial insurance.  I don't know if we can

12  find that to highlight for the jury.

13  Q.   I thought we had it up, but we can put it back up.

14  A.   All right.  Here we are.  This is it.  This quote from the

15  document refers to, quote, hospitals are looking to diversify

16  their payor mix and then, quote, retain more commercially

17  privately insured patients.

18      So the hospitals have a demand for the da Vinci surgical

19  robot, or MIST surgical robots, to be able to offer those

20  surgeries in order to attract those patients that can afford to

21  be charged more because they have insurance.

22  Q.   Why is that important to a hospital?

23  A.   Make money.  I mean, the hospitals are trying to -- to

24  cover costs and turn a profit.

25  Q.   As part of your analysis of the relevant market, did you

LAMB - DIRECT / MCCAULLEY

1  factor in how Intuitive viewed itself with respect to

2  competition from laparoscopic surgeries?

3  **A.**   I did.  And I looked at Intuitive documents that referred

4  to its position as a monopoly.  They understood that they

5  really didn't have significant competition in the market for

6  MIST surgical robots.

7  **Q.**   Did you consider the features of robotic surgery in

8  reaching your opinion about the relevant market?

9  **A.**   I did.  As I mentioned earlier, it's established, well

10  established, that robotic surgeries have better outcomes, fewer

11  complications, shorter recovery times and so forth, than either

12  open surgery or traditional laparoscopy.

13  **Q.**   Did you consider the abilities of the MIST robots?

14  **A.**   I did in the sense that they're able to allow the surgeon

15  to perform surgery in a way that's more, I would say, facile

16  because the robot has a greater range of motion and the ability

17  to move its arm in a different way.  The surgeon is able to do

18  surgery in a way that's different than the laparoscopic

19  surgeries.

20  **Q.**   Did you also consider other types of surgical robots?

21  **A.**   I did.  There are certain robots, non-MIST surgical robots

22  is how I refer to them.  For example, there are robots that

23  perform certain kinds of cardiac surgery, robots that do

24  orthopedic surgery.  Those robots are not in the same relevant

25  market as the MIST surgical robots.  They do different things.

LAMB - DIRECT / MCCAULLEY

```
 1        Let me just sort of introduce a concept.  This might be
 2   useful.  In thinking about a relevant market, I'm looking for
 3   economic substitutes.  That is, goods that -- where the price
 4   of one good drives demand for the other.
 5        But in order to be economic substitutes, products have to
 6   be functional substitutes.  So these non-MIST robots that I'm
 7   talking about are not functional substitutes for MIST robots,
 8   so, therefore, they can't be in the same relevant market as the
 9   MIST surgical robots.
10   Q.   So let me make sure I understood.
11        If they're not functional substitutes, can they be
12   economic substitutes?
13   A.   No.  That's -- you can't be an economic substitute for a
14   good if you're not a functional substitute.
15   Q.   I believe you gave us a summary of your opinion.  You
16   talked about a second relevant market to your analysis; is that
17   right?
18   A.   Yes, that's right.  I've also determined there's a second
19   market for the repair and replacement of EndoWrist instruments.
20   Now, again, in defining that relevant market, I'm looking at
21   what are the goods that are close substitutes, economic
22   substitutes.
23        So I've first looked to see if there are functional
24   substitutes for EndoWrist instruments and performing MIST -- in
25   performing robotic surgeries with the da Vinci robot.
```

LAMB - DIRECT / MCCAULLEY

1    And there are not.  You can't use instruments from these

2  non-MIST robots on the da Vinci surgical robotic.  You also

3  can't use the instruments that are used in laparoscopic surgery

4  with a MIST surgical robot.

5    So if you're performing robotic surgery using a da Vinci

6  robot, you have to have the EndoWrist instruments that are

7  useful and designed to be used on the da Vinci surgical

8  robot.  And that's by design.  In other words, in manufacturing

9  the robot, Intuitive designed the instruments so that the

10  EndoWrist instruments are the instruments that use -- are

11  useful with the da Vinci robot.

12  Q.   And did you review any evidence that that was an

13  intentional design choice?

14  A.   Yes.  I cite evidence in my report with respect to that.

15  Q.   As part of viewing the evidence of this market, did you

16  review any analyst reports?

17  A.   I'm sorry.  I didn't -- I missed a word there, counsel.

18  Would you ask that again?

19  Q.   Sure.  As part of preparing your opinion on this subject,

20  did you review some analyst reports?

21  A.   I did.  I reviewed a lot of analyst reports.

22  Q.   Are analyst reports like this something that you typically

23  use in doing these analyses?

24  A.   I've often used -- these are investment analysts, people

25  that work for big investment banks like J.P. Morgan.  You might

LAMB - DIRECT / MCCAULLEY

1   have seen those people around town these past few days.  And I

2   do that -- I use analyst reports for a couple of reasons.  The

3   first is, you know, investment analysts are not employees of

4   the firms they're studying, and they've got an independent

5   interest in understanding what's going on.

6       And I found them, over many years, to provide useful

7   information about the products and the marketplace and so

8   forth.  So I found them to be reliable and useful.  And many of

9   my colleagues, as economics experts, use them as well, I can

10  say.

11  **Q.**   And in this case, did you use such analyst reports to

12  reach your conclusions?

13  **A.**   I did.

14  **Q.**   Okay.

15       **MR. McCAULLEY:**  Your Honor, I would seek to admit

16  Trial Exhibit 489, which I believe has no objection.  Move it

17  into evidence and seek to publish it to the jury.

18       **MR. MICHAEL:**  No objection to 489.

19       **THE COURT:**  It's admitted and may be published.

20       (Trial Exhibit 489 received in evidence.)

21       **MR. McCAULLEY:**  Thank you, Your Honor.

22       Bobby, can you put up the section of 489.

23  BY MR. McCAULLEY:

24  **Q.**   And, Dr. Lamb, before your testimony, did you work to call

25  out highlights from some of these documents that are referred

LAMB - DIRECT / MCCAULLEY

1   to in your report?

2   **A.**   Yes.

3   **Q.**   I put a section of 489 up there that Bobby's highlighted

4   for us.

5        Can you tell us how that impacts your opinion on the

6   separate market for EndoWrist replacement?

7   **A.**   Yes.

8        What I was testifying a moment ago is that the

9   instruments, the EndoWrist instruments, have to -- they're a

10  necessity in performing surgery, robot surgery with the

11  da Vinci robots.  So they certainly have to be in that market.

12       And then I was asking myself, are there -- besides going

13  out and buying a new EndoWrist instrument, what else would be

14  in the same market with the replaced instruments?

15       And, of course, the plaintiff here, SIS, repairs or

16  refurbishes or renews EndoWrist instruments.  And, of course,

17  I'm trying to understand whether they're in the same market or

18  not.  And I determined they are.  This is one piece of evidence

19  that I've relied on.  This is an analyst report -- I beg your

20  pardon.  This is an e-mail.  I can't see the document in front

21  of me that I'm looking at.  Apologies.

22       And here, I believe, this is Intuitive that -- Intuitive

23  e-mail, they're calling out that one of the hospitals that has

24  a da Vinci robot, a da Vinci robot that Intuitive is

25  servicing and sold to them and so forth, is using the plaintiff

LAMB - DIRECT / MCCAULLEY

```
 1   here, SIS, to, as the e-mail says, remanufacture the
 2   instruments, that is, the EndoWrist instruments.  So that's why
 3   the relevant antitrust market here is the replacement or repair
 4   of EndoWrist instruments.
 5            MR. McCAULLEY:  And, Bobby, if you can pull up the
 6   second part of that document, just to avoid backtracking later
 7   on in your testimony, Dr. Lamb.
 8   BY MR. McCAULLEY:
 9   Q.   Did you also review this part of Exhibit 489?
10   A.   I cite this in my report and it's one of the pieces of
11   evidence I would talk about in looking at pricing behavior and
12   harm to competition.  And this -- this e-mail from the
13   Intuitive people is saying that -- I got -- quote, I got a look
14   at the pricing structure, which appears to be a 40 to
15   50 percent discount.
16        That is, the prices charged to repair the EndoWrist
17   instruments is 40 to 50 percent off the price of buying a new
18   one.
19        And that is important to me in studying the question of
20   whether the conduct here resulted in harm to competition or
21   not.
22   Q.   As part of your opinion, did you consider how hospitals
23   viewed this service?
24   A.   I did.  And hospitals were eager for the service because
25   they wanted to enjoy this 40 to 50 percent price advantage.
```

LAMB - DIRECT / MCCAULLEY

1    Again, hospitals are worrying about the bottom line, and

2  if they can get usable EndoWrist instruments 40 to 50 percent

3  cheaper than having to go back to Intuitive and buy them, they

4  want to do that.  And I talked about that.

5  **Q.**  I think you fixed my error.

6    **MR. McCAULLEY:**  But, Bobby, can we see the top of

7  Exhibit 489, see the "to" and "from" lines?

8  **Q.**  And my question to you, Dr. Lamb, is just to confirm that

9  this is an internal Intuitive document that you reviewed as

10  part of your materials.

11  **A.**  Right.  I did -- you can tell that by the signature line

12  is @intusurg.com, and the recipients are all at the same

13  domain.

14    **MR. McCAULLEY:**  And, Your Honor, I move the admission

15  of Exhibit 509, which I believe is not objected to, and seek

16  permission to publish it.

17    **MR. MICHAEL:**  No objection.

18    **THE COURT:**  It's admitted.  And would you like to

19  publish it?

20    **MR. McCAULLEY:**  Yes.

21    (Trial Exhibit 509 received in evidence.)

22    **MR. McCAULLEY:**  And, Mr. Cox, can you highlight the

23  top of the document so the witness can identify it?

24    **THE WITNESS:**  The top of the document is -- there we

25  are.

LAMB - DIRECT / McCAULLEY

```
 1  BY MR. McCAULLEY:
 2  Q.   So --
 3  A.   So this is -- again, this is an internal Intuitive e-mail
 4  that the author of the e-mail is @intusurg.com and the
 5  recipients are as well.
 6          MR. McCAULLEY:  And then, Bobby, if you can highlight
 7  the first sentence there.
 8  BY MR. McCAULLEY:
 9  Q.   Is this a document that you considered in reaching your
10  opinions about the second market?
11  A.   Is this the relevant part of the document?  I feel like
12  there might be something right below --
13  Q.   I think, in your report, you refer to -- let me begin
14  again.
15      Are you thinking there's another part of this document
16  that you'd like to see?
17  A.   I thought there was a part down below here, but what
18  this -- what this is -- yeah, maybe down here.
19      (Witness examines document.)
20      This is going to the conduct issue, not to the market
21  definition.  But this is an Intuitive document where they're
22  talking about the repair as a competitive issue with respect to
23  the replacement of the EndoWrist instruments.
24  Q.   Did you also consider Intuitive's own efforts to refurbish
25  EndoWrists as part of your analysis of this market?
```

LAMB - DIRECT / MCCAULLEY

**A.** I did. And one of the reasons that I determined that this relevant market should include both new parts and refurbished parts is Intuitive, itself, thought about and considered providing these refurbished parts to the marketplace in order to get ahead of the competitive threat of firms like the plaintiff here, SIS, in refurbishing the instruments.

Intuitive had a project called the -- effort they called Project Dragon, and Project Dragon was studying this idea that Intuitive would go to the hospitals, pick up the EndoWrist instruments, refurbish them, remanufacture them, and then bring them back to the hospitals at a lower price.

They -- Intuitive considered that. I don't think they ever implemented that for their own strategic reasons, but that indicates to me that the refurbishment of the EndoWrist instruments is part of the same market as the replacement of the EndoWrist instruments.

**Q.** Did you consider whether there were functional substitutes for repair and replacement of EndoWrist surgical instruments as part of this analysis?

**A.** I did. There are no functional substitutes for the EndoWrist instruments. You can't use the instruments from laparoscopic surgery. You can't use the instruments from non-MIST surgery. They're not functional substitutes for the EndoWrist -- the repair or replacement of the EndoWrist instruments.

LAMB - DIRECT / MCCAULLEY

1  Q.   If not functional substitutes, are there economic

2  substitutes available?

3  A.   If you're not a functional substitute, you can't be an

4  economic substitute, by definition.  So there are no economic

5  substitutes for repair or replacement of the EndoWrist

6  instruments.

7  Q.   Or -- did you analyze, as part of your work in this case,

8  whether or not there are distinct markets for EndoWrists as

9  compared to the market for MIST surgical robots itself?

10 A.   I did.  And those are separate markets.  And let me

11 explain why that is.

12      I've talked about this notion of economic substitutes

13 already.  In order to be in the same market, two goods have to

14 be economically substitutable for each other.

15      But robots and instruments are not substitutes, one for

16 the other; they're complements.  You use a robot and some

17 instruments.  They are the opposite, in essence, of substitutes

18 to an economist.

19      And there are other reasons why these markets are

20 distinct.  That's a very important one.  But the other reason

21 is that they really -- the sale and purchase of robots is a

22 very different transaction than the sale and purchase of -- of

23 either EndoWrist instruments or the repair of EndoWrist

24 instruments.

25      In other words, you buy a robot once, costs a couple of

LAMB - DIRECT / MCCAULLEY

1   millions bucks, very expensive.  You buy instruments over time,

2   as you use your MIST robot or your da Vinci robot, to do

3   whatever you're using it to do.  So you're going to buy

4   different sets of instruments based on whether -- what kinds of

5   procedures you're using that robot for and how many of those

6   procedures you're doing.

7        In other words, the robots and the instruments aren't used

8   in fixed proportions to each other.  Every hospital is going to

9   have its own profile for the demand they have for instruments.

10  And that's very separate from buying the robot itself.

11  **Q.**   So, again, can you summarize what your opinion is with

12  respect to those two markets?

13  **A.**   So they're two separate markets, relevant antitrust

14  markets, one for the MIST surgical robot, and that is mostly da

15  Vinci robots.  I'm going to talk about that in a moment, I

16  think.

17       And one for -- a separate market for the repair and

18  replacement of the EndoWrist instruments that are used on the

19  da Vinci robot to perform robotic surgery.

20  **Q.**   Did you consider whether Intuitive possessed monopoly

21  power in the MIST surgical robot market?

22  **A.**   I did.  And let me start by explaining monopoly power,

23  market power.  And I -- as an economist, we use these terms

24  somewhat interchangeably, monopoly power, market power, and

25  sometimes I may even slip and say pricing power.

LAMB - DIRECT / MCCAULLEY

1      And, basically, monopoly power is the power over price.

2   That is, if a firm possesses monopoly power -- power, or if a

3   group of firms acting collectively possesses monopoly power,

4   they possess the ability to price a product above the cost of

5   producing the product, the marginal cost of producing the

6   product.

7      So there are really three separate analyses that feed into

8   my conclusion that Intuitive possessed market power in the

9   market for MIST surgical robots.  The first is, Intuitive

10  dominated that market.  You've heard me talk earlier about

11  these two other robot -- MIST surgical robots, the Flex robot

12  and the Senhance.

13     Those robots together had -- at the time I was preparing

14  my report and according to the best information I could find --

15  they had a couple of dozen, a few dozen robots that were

16  installed and being used in the U.S.

17     Intuitive had an installed base of da Vinci robots being

18  used in the U.S. of over 5,000.  So Intuitive had over

19  99 percent of the MIST surgical robots that were being used to

20  perform surgery in the United States.  They dominated,

21  therefore, the market for MIST surgical robots.

22     That allowed Intuitive to then enjoy pricing power.  They

23  could set the price of the robot well above the competitive

24  price that would have prevailed.

25     How do I know that?

LAMB - DIRECT / MCCAULLEY

1    Well, I look at the relationship between the price that

2    they were able to sell the robot for and the cost of producing

3    the robot, and that's what we call margin.  And Intuitive

4    enjoyed tremendous margins on the da Vinci robots they sold.

5    The analysis that I've seen indicated that they were

6    enjoying contribution margins of 60 percent.  To an economist,

7    that kind of margin is very high.

8    And so the fact that Intuitive was able to enjoy these

9    very, very high margins is indicative of their dominance of the

10    market.  But there's another fact that economists have to

11    consider in analyzing market power.

12    Those very high prices that Intuitive was enjoying for the

13    robots would normally attract new competition in the

14    marketplace.  Just think about a firm that's able to sell a car

15    at a very, very high price and they're making enormous profits

16    on it.  And other firms look at that and say, "I want some of

17    that profit.  I want to go and grab that profit."  Well, how do

18    you keep that from happening?

19    There have to be barriers to entry.  So in the market for

20    MIST surgical robots, there are significant barriers to entry.

21    The first, and one that I've already alluded to, is this

22    enormous install base of da Vinci robots, over 5,000 da Vinci

23    robots, and that's relevant for a couple of reasons.

24    The first is that all the surgeons that are using that

25    da Vinci robot are trained on the da Vinci robot.  They've

LAMB - DIRECT / MCCAULLEY

1    spent months studying it in graduate school maybe.  They've

2    been doing it and they have perfected their skills on the

3    da Vinci robot.  Anybody else that comes into the market has to

4    essentially retrain those surgeons.  And surgeons don't like to

5    be retrained.

6        That's time that they can't make money on.

7        So the enormous base of da Vinci robots is one barrier to

8    entry in itself.  Very hard for a firm to come in and break

9    through that.  And you know that because these two competitor

10   robots haven't been able to do very much -- very much with it.

11   I beg your pardon.

12       And there are other reasons that it's hard for new firms

13   to enter the market for MIST surgical robots.  One is patents.

14   Intuitive has a vast array of patents, thousands of patents

15   that govern the technology on the da Vinci robot.

16       Nothing illegal about a patent.  That's not something

17   that's challenged as part of any complaint that I'm aware of

18   here.

19       The patents protect the -- the intellectual capital of the

20   firm.  But they also represent, while they're valid patents, a

21   barrier to other firms coming into the market to compete.

22       So there's patent protection that is a barrier to entry.

23   In other words, it's very difficult for firms to come in and

24   compete as a new competitor in order to earn those profits.

25       Those -- those three things taken together, market

LAMB - DIRECT / MCCAULLEY

```
 1  dominance, 99 and a half percent of the market was the da Vinci
 2  robot; the possession or the existence of these barriers that
 3  keep other firms from coming in; and then the third piece of
 4  evidence that there's market power there is pricing that is way
 5  above the cost of producing the product.
 6  Q.   And to help the jury understand, from an economist's
 7  standpoint, is there anything wrong, in and of itself, with a
 8  monopoly?
 9  A.   No.  Nothing about the monopoly power that Intuitive
10  enjoys in the market for robots, MIST surgical robots to be
11  exact, nothing about that market power is challenged by the
12  plaintiff in this litigation.  And to an economist, there's
13  nothing about it that seems untoward, that is wrong, at all.
14       It's because they were the innovator.  They came into the
15  market early.  They developed a product and they protected
16  their intellectual property with patents.  And they've gone out
17  and gotten this enormous market presence legally.  There's
18  no -- I'm not reaching a legal opinion, but there's no
19  allegation that that market power was gained illegally.
20  Q.   In your experience in doing this kind of work, is
21  99.5 percent market share extraordinarily high?
22  A.   Enormous.  I can't think of another analysis of a relevant
23  market where I've seen such an enormous market share by a
24  single firm.  And it's because of these very high barriers to
25  entry.  Other people want to enter the market.  It's just very
```

LAMB - DIRECT / McCAULLEY

```
 1   difficult to do.
 2            MR. McCAULLEY:  Your Honor, I seek to introduce
 3   Trial Exhibit 512, which I -- I believe there's no objection to
 4   and seek to publish it to the jury.
 5            MR. MICHAEL:  No objection.
 6            THE COURT:  It's admitted and may be published.
 7        (Trial Exhibit 512 received in evidence.)
 8            MR. McCAULLEY:  Thank you, Your Honor.
 9        And just, Mr. Cox, if you can show Dr. Lamb the top part
10   of that document.
11   BY MR. McCAULLEY:
12   Q.   Do you have an understanding -- let me begin again.
13        Is this one of the documents you reviewed in your
14   analysis?
15   A.   I believe it is, yes.  And this is an Intuitive document.
16   Again, you can tell by the -- what's called the -- the domain
17   name, that is the part after the "at" sign.  These are all
18   folks that are at Intuitive.
19   Q.   Did you -- what did you consider this document for?
20   A.   Well, I need to see the --
21            MR. McCAULLEY:  Mr. Cox, can you pull up the portion
22   these referred to in the report?
23   BY MR. McCAULLEY:
24   Q.   Do you see the portion that's highlighted?
25   A.   Right.  The -- this is -- this is a document that is
```

LAMB - DIRECT / MCCAULLEY

1    talking about the potential competition for robots and

2    they're -- I believe this is talking about robots.

3        The -- they're noting here that, quote, we are -- sorry.

4    Quote, many are very happy to have competition because they

5    hate that we are a monopoly, close quote.

6    Q.   So did you consider, as part of your analysis, this

7    question how Intuitive viewed itself?

8    A.   Yes.  Intuitive viewed itself as having monopoly power.

9    They're a monopolist.

10   Q.   And I believe you testified -- I just want to make sure --

11   about the margins that Intuitive was able to maintain on its

12   robot?

13   A.   I did.  I mentioned earlier I've seen contribution margins

14   of 60 to 65 percent on sales of robots.  Just for reference, as

15   an economist, that number is very, very high.

16   Q.   You talked about two markets.  I believe you talked

17   earlier about MIST surgical robots, and then you talked about

18   EndoWrist instruments as a separate market; correct?

19   A.   Yes.

20   Q.   Did you evaluate whether Intuitive had market power in the

21   EndoWrist repair and replacement market?

22   A.   I did.  And I determined that Intuitive also enjoyed

23   market power in the market for the repair and replacement of

24   EndoWrist instruments.  And they were, in essence, a monopolist

25   in that market as well.  I'll stop there.

LAMB - DIRECT / MCCAULLEY

1  Q.  Did you evaluate the margins -- similar to what you just

2  talked about with respect to the robot, did you evaluate the

3  margins of EndoWrist products?

4  A.  I did.  Again, thinking about how to understand whether a

5  firm has monopoly power in a market, I look at three things:

6  The share of the market they control.  And the market for the

7  repair and replacement of EndoWrist instruments, Intuitive

8  controlled essentially a hundred percent of that market with

9  all but the de minimis exceptions from firms like the plaintiff

10  here -- were able to do some repair before they were shut out

11  of the market.

12      They -- in addition to that, there were strong barriers to

13  entry to keep firms like the plaintiff out.  That's the subject

14  of the -- of the litigation that we're here to talk about.

15      And then what's the pricing look like in the market?

16      To an economist, when you're evaluating this question of

17  monopoly power and market power, I like to think of the best

18  evidence that a firm has market power is when the firm goes out

19  and uses its market power.

20      What does that mean?  It uses its market power to price

21  its product in a way to maximize profits above the cost of

22  production.  That's what firms are seeking to do.  If they've

23  got the ability to exploit market power in pricing, they're

24  going to try to do that.

25      So there's strong evidence that Intuitive has monopoly

LAMB - DIRECT / MCCAULLEY

1  power.  In fact, it's essentially a pure monopolist in the

2  market for EndoWrist repair and replacement.

3  **Q.**  And did you consider how Intuitive maintained monopoly

4  power in the EndoWrist repair/replacement market?

5  **A.**  I did, and there's the crux of the problem.  I've talked

6  about market power in the market for the MIST surgical robots;

7  and I testified there's nothing about that market power, to an

8  economist, that is anything other than the reward for

9  innovation and creativity and bringing the product to bear to

10  the market earlier and protecting that intellectual property.

11  But in the market for EndoWrist repair and replacement, the

12  market power that is maintained now and that market arises for

13  different reasons.

14      It arises because Intuitive was able to foreclose the

15  effect of competitors like the plaintiff here, and others, who

16  sought to come into the EndoWrist repair and replacement market

17  and capture some of that market away from Intuitive.

18      How did Intuitive maintain that market power?

19      It used its market power in the market for robots as a

20  lever to maintain and preserve its monopoly in the market for

21  EndoWrist instrument repair/replacement.  And that leverage of

22  market power in one market to maintain market power in another

23  market, sometimes economists call that tying, T-Y-I-N-G, tying

24  the two markets together.  That leverage is the heart of the

25  alleged misconduct that plaintiffs allege in this case.

LAMB - DIRECT / MCCAULLEY

1  Q.  And just maybe as a foundational matter, from an

2  economist's standpoint, what is anticompetitive conduct,

3  generally?

4  A.  Well, anticompetitive conduct is conduct that harms the

5  market and causes the market -- to an economist, the

6  terminology an economist would use would not be to not be

7  efficient.  And in particular, what that means is it's conduct

8  that causes price to be higher or price to be out of whack, if

9  you will, to use a technical term.

10     Price is not working the way it's supposed to work to

11  guide the -- the market to the efficient allocation of

12  resources.

13     So there's two, sort of, different concepts of harm that

14  are here, and I want to make sure I distinguish them.

15     Anticompetitive conduct is about harm to competition.  It

16  may also result in harm to competitors, like the plaintiff.

17     But to an economist, in thinking about what is

18  anticompetitive, it's conduct that harms competition.  It may

19  also harm competitors in the process.

20  Q.  Did Intuitive's -- in your research, did Intuitive's

21  contracts with the hospitals play a role in its conduct here?

22  A.  Absolutely.  They're the very crux of the conduct.  This

23  is the -- sometimes the -- use the shorthand the SLSA, it's the

24  Sales Licensing Service Agreement.  I think I got all those in

25  the right order.  The Sales Licensing Service Agreement that

LAMB - DIRECT / MCCAULLEY

1  Intuitive used in selling and providing the da Vinci robot to

2  the hospitals and surgery centers in question contained certain

3  clauses which Intuitive used to maintain monopoly power in the

4  market for the repair and replacement of EndoWrist instruments.

5         MR. McCAULLEY:  Okay.  Your Honor, and I apologize.  I

6  have inconsistent notes between two pages.  I seek to admit

7  Trial Exhibit 493, but I don't know if -- I don't believe it's

8  already in evidence, but I'd seek to move it into evidence and

9  publish it the jury.

10        MR. MICHAEL:  No objection to 493.

11        THE COURT:  We'll admit it.  Before we publish to the

12 jury, let me ask, we've been going about an hour.

13     Let me ask the jurors very quickly:  Do you-all want to

14 take a short break and then try and go for one more hour before

15 taking the lunch break?  Or go a little bit longer now, maybe

16 another 20 minutes, and take a early lunch break?

17     I see three to four heads nodding for -- okay.  Let me ask

18 you-all to at least stand up and stretch for a hot minute, if

19 you would like to.

20     And that exhibit is admitted and may be published to the

21 jury, and we'll pick it up in a moment.

22        MR. McCAULLEY:  Thanks.

23     (Trial Exhibit 493 received in evidence.)

24                 (Pause in proceedings.)

25        THE COURT:  Please proceed, Mr. McCaulley.

LAMB - DIRECT / MCCAULLEY

1       **MR. McCAULLEY:**  Mr. Cox, can we please have

2  Exhibit 493, Section 8?

3  **BY MR. McCAULLEY:**

4  **Q.**  I believe we have the portion of the document that you

5  were referring to.

6       Can you explain to the jury how that's relevant to your

7  opinion?

8  **A.**  Well, this is the -- this is the one place in the SLSA

9  where there are restrictions that ultimately were enforced,

10  which limit how hospitals who have the da Vinci robot can

11  replace or refurbish or repair instruments when they are deemed

12  no longer usable under Intuitive's guidelines.

13       I should explain.  I don't know if this has ever been made

14  clear to the jury or not.  But the instruments in question here

15  come with an electronic counter.  And when you plug that

16  instrument into the robot -- I'm just speaking as a layperson.

17  I'm not an engineer, obviously.  But when you plug your

18  instrument into the robot, that counter ticks up.  And so most

19  of the instruments had a maximum number of uses of 10.

20       And after 10 uses, this is discussed here in this quote

21  that is highlighted for you.  You -- so it says, right in

22  the -- almost the bottom line there is the -- quote, the

23  license expires once an instrument or accessory is used up to

24  its maximum number of uses, close quote.

25       So that -- that counter is what governs when an instrument

1303

LAMB - DIRECT / MCCAULLEY

1  is used up, doesn't have anything to do with the condition of

2  the instrument or any technological condition.  It's this

3  counter is ticking up.  And if you get to 10 -- it's mostly 10,

4  historically, and then it was increased later, then the

5  instrument is used up.

6       All right.  So once that instrument is used up, you've got

7  to take it out.  It won't work anymore.  The robot won't do

8  surgery with it.  It's technological.  It's not up to your

9  judgment.  My understanding is it's technologically not usable.

10 You have to take that instrument, it's a pair of scissors, it's

11 a pincher, whatever it is, and that goes on the trash heap.

12 And you've either got to replace that instrument or you can

13 take the trash heap -- it's a bad way of saying it, but you can

14 take the set of discarded instruments and you can renew them.

15      And there's a process for doing that that the engineers

16 have talked about.  I think it's beyond my scope of my

17 expertise.

18      And so what this section of this paragraph 8 that we're

19 looking at, Section 8 is describing -- is what this agreement,

20 this SLSA, says about how you can use or replace or refurbish

21 the instruments.

22      And it says (as read):

23           "Other than the terms that are set forth above,"

24      in the first part of it, you get a new instrument

25      from Intuitive and you put it in and you use it, it

LAMB - DIRECT / MCCAULLEY

1    says, "anything else you do is prohibited."  And in

2    particular, it's important, the words are important

3    here.  It says (as read):

4         "Any other use is prohibited, whether before or

5    after the treatment or accessory license expiration,

6    including repair, refurbishment or reconditioning not

7    approved by Intuitive."

8    Okay.  So that is the part of the SLSA that Intuitive

9    enforced against hospitals to keep them from seeking out and

10   using this dramatically cheaper alternative to replacement.  In

11   other words, the hospitals want to go out and -- some hospitals

12   want to go out and refurbish their instruments; they save 40 to

13   50 percent over the cost of replacing the instruments.  And

14   Intuitive says in its SLSA, "You can't do that," and then it

15   enforces that.

16       And that's the conduct, to an economist, that is

17   anticompetitive.

18   Q.   Did you consider whether the agreements that we looked at

19   here -- let me ask a foundational question.  I'm sorry.

20       Was it your understanding that these terms were in every

21   Intuitive agreement that it had with a hospital?

22   A.   Yes.  My understanding is that these terms have been in

23   every agreement.  I didn't review all 5,000 agreements, but

24   that's my understanding.

25   Q.   Did you consider whether these SLSA agreements constituted

LAMB - DIRECT / MCCAULLEY

```
 1   a significant barrier to entry for competitors in that market?
 2   A.   Absolutely.  The enforcement of this part of the agreement
 3   meant that firms like SIS couldn't participate in the market.
 4   They couldn't offer their lower-cost alternative or substitute
 5   for new replaced instruments; and hospitals who had been
 6   interested in that and sought out that option simply didn't --
 7   didn't use them.
 8   Q.   Did you have an understanding as to whether or not there
 9   was demand for these repaired EndoWrists?
10   A.   Absolutely.  I've seen evidence that hospitals wanted to
11   use that repair service to lower cost.
12           MR. MICHAEL:  Hearsay, Your Honor.
13           THE COURT:  Sustained.  Ask a different question,
14   Mr. McCaulley.
15   BY MR. McCAULLEY:
16   Q.   We'll come back to it.
17       Did you consider any internal Intuitive information about
18   possible competition in the replacement/repaired EndoWrist
19   aftermarket?
20   A.   I did.  I've seen Intuitive documents that talk about this
21   competitive threat.
22   Q.   And we looked at one of those earlier; correct?
23   A.   I believe so, yes.
24   Q.   How did Intuitive react to learning about third-party
25   servicing of EndoWrists or resetting of EndoWrists?
```

LAMB - DIRECT / MCCAULLEY

```
 1   A.    Well, when Intuitive heard that a hospital was using a
 2   company like SIS to refurbish the EndoWrist instruments -- by
 3   the way, the same thing that Intuitive was thinking about doing
 4   with Project Dragon -- that Intuitive had a protocol for
 5   stopping it.  And they went through a series of steps.
 6           MR. McCAULLEY:  Your Honor, Exhibit 560R is already in
 7   evidence.  I seek permission to publish it.
 8           THE COURT:  By all means.
 9           THE CLERK:  Counsel, did you say 560?
10           MR. McCAULLEY:  560R.
11           THE CLERK:  I don't have that as admitted.
12           MR. McCAULLEY:  I think it was admitted in connection
13   with the Inacay deposition, at the end.
14       And --
15           THE COURT:  I think I have a note that indicates that
16   as well.
17       Mr. Michael, do you agree?
18           MR. MICHAEL:  I do, Your Honor.
19           THE COURT:  All right.  Go ahead and publish it.
20           MR. McCAULLEY:  Sorry about that.
21           THE COURT:  Not at all.
22   BY MR. McCAULLEY:
23   Q.  We've got on the screen, Dr. Lamb, Trial Exhibit 560R.
24   Have you seen that document before?
25   A.    I have, yes.
```

LAMB - DIRECT / McCAULLEY

1  Q.   What's your understanding of the significance of this

2  document?

3  A.   Well, I believe this is where they lay out the strategy

4  for dealing with repair.  I have to be able to flip through the

5  document again and see what else is in there, but I think this

6  is where that's discussed.

7         MR. McCAULLEY:  Mr. Cox, can we have the slide we

8  looked at yesterday?

9         THE WITNESS:  Page 40 maybe -- no, four.  Right.

10         MR. McCAULLEY:  And if you can show Dr. Lamb what page

11  of the exhibit that is, Mr. Cox.

12         THE WITNESS:  Yeah.  It's page 4, yeah.

13  BY MR. McCAULLEY:

14  Q.   Page 4 of TX560R?

15  A.   Yeah.  So this is -- this is a slide that Intuitive

16  prepared and presented internally for how to deal with

17  hospitals that are trying to use repair services rather than

18  replacing the EndoWrist instruments.  And what's in the bubbles

19  across the top there is a series of steps.

20       And the key, in my mind, is the last one, terminate

21  agreement, which is the key lever that Intuitive has at its

22  disposal through the SLSA, is the ability to make the robots

23  in -- a term that sometimes is used, to paperweight them.  I

24  like the term.  What it means is the robot is a piece of metal

25  and technology.  And if Intuitive cuts it off, about the only

LAMB - DIRECT / MCCAULLEY

1   thing it's good for is a paperweight, a very big paperweight

2   maybe, but a paperweight.

3       And Intuitive, in fact, has that capacity, not only for

4   one robot.  If a hospital has 10, 20, they could paperweight

5   them all.  And, in fact, there are examples I discuss in my

6   expert report, one or two of them, where Intuitive found out

7   that a hospital was using a repair service, SIS, I believe, in

8   both examples.  Maybe Rebotix in one.  And they disabled

9   robots.

10      Now, the robots cost a couple of million dollars.  So,

11  obviously, for a hospital to have a $2 million piece of

12  equipment that's become useless is significant.  And I think in

13  at least one of those instances -- I talk about this in the

14  report.  In at least one of those instances, the hospital very

15  quickly -- let me say, came to hill -- down South, where I'm

16  from.  But it came back to Intuitive and said, "Okay, we'll

17  back off and we won't repair any instruments.  We'll replace

18  them all and let you sell us new ones."

19      And just for sake of clarity, that conduct, that is,

20  taking your market power over here for robots and tying or

21  leveraging that market power into another market, separate

22  market, for instruments, is, to an economist, anticompetitive.

23  It artificially impedes competition in that separate market

24  through the use of the SLSA.

25  Q.   And how -- just to compound on that point, how is the --

LAMB - DIRECT / MCCAULLEY

1  why is it important that Intuitive has market power in the

2  robot market?

3  **A.**   Well, that's -- that's the lever.  That's the source of

4  its power in the EndoWrist repair and replacement market.

5  They're the only game in town in the robot market.

6      I like to think of this analogy.  Suppose you are going to

7  go buy a new car and you went to look at a Ford and liked the

8  car in the dealership.  And the Ford dealer says:  One

9  condition here.  If you buy our car, you have to replace the

10  tires every 5,000 miles and you've got to buy the tires from

11  us.

12      You would say:  Fly a kite.  I'm going to get a Toyota or

13  a Chevy or some other car.

14      And you can do that because there are a lot of firms that

15  supply cars.  But here, if you want to buy a robot and the guy

16  that sells 99.5 percent of the robots that you can buy says,

17  "You buy our robots, you're going to replace the instruments

18  every 10 uses," you might not like that, but you've no choice

19  because they have got market power in that market for robots.

20          **MR. McCAULLEY:**  If you scroll down to the next

21  section, Mr. Cox, in this document, the section that deals with

22  Legacy Good Samaritan.

23      Is this it?

24      Okay.  Yeah.

25  **Q.**   Did you review this portion of the Trial Exhibit 560R,

LAMB - DIRECT / MCCAULLEY

1    Dr. Lamb?

2    **A.**    I can't see anything yet.

3        Now I can.  Okay.  So this lays out what happened at

4    Legacy Good Samaritan Hospital.  There was an instance for the

5    first remanufactured -- this is the left side of the document,

6    right in the middle.  Maybe we can highlight that one for the

7    jury.  Right there, where you are.  Yeah.

8        There we go.  So on July 15, there was the first

9    instrument use of a remanufactured instrument.

10       Right below that it's talking about a later date,

11   August 28.  They have identified a trend.  In other words, just

12   for the sake of clarity, Intuitive has the ability to monitor

13   here these instruments that are going to the very

14   technologically sophisticated robots.

15       So if we can look at the full document, the full page,

16   again, rather, and highlight the box for me.

17       Okay.

18       So they identify the first instance July 15, and the last

19   occurrence had -- happened on October 10.  In the intervening

20   period, they've identified the trend.  They, quote, reached out

21   to the CEO of this hospital on September 3.  And if you look

22   at -- at the bullets across the top, they have educated the

23   account.  They've sent the letter and then Terminate Agreement.

24       My recollection is -- I'd have to go back to the report,

25   but my recollection is that after Intuitive terminated the

LAMB - DIRECT / McCAULLEY

1   agreement, Good Samaritan came back and said, let's talk.  We

2   need to use this robot and we won't use any more repaired

3   EndoWrist instruments, which is what the intended conduct by

4   Intuitive was intended to do, I believe.

5   **Q.**   In connection with testifying about this, you talked about

6   a letter.  Have you seen one of the letters that are referred

7   to in this document?

8   **A.**   I have.

9          MR. McCAULLEY:  Your Honor, seek to publish Trial

10  Exhibit 943R, which is already in evidence.

11         MR. MICHAEL:  Mr. McCaulley, did you mean 942R?

12         MR. McCAULLEY:  I meant what I said, but I might have

13  made a mistake.

14         MR. MICHAEL:  943R is not in evidence, Your Honor.

15  I believe 942R is.

16         THE CLERK:  I have 943 admitted January 7.

17         MR. MICHAEL:  My confusion is that 943R was not on

18  Mr. McCaulley's list to use with this witness but 942R was and

19  we had a discussion about that.

20         MR. McCAULLEY:  Your Honor, I might not have the right

21  document teed up.  We're about at the time that you indicated

22  we might break out for lunch.  Can I straighten out the

23  document issue and continue after lunch?

24         THE COURT:  That's a great idea.

25      So, folks, let's do this.  We're going to break now.  I'm

LAMB - DIRECT / MCCAULLEY

```
1          THE COURT:  You may be seated.

2      Folks, I see all the jackets and I did try and turn this

3  up a couple of degrees, so here's hoping.

4      With that, Mr. McCaulley, you're welcome to continue.

5              DIRECT EXAMINATION  (resumed)

6  BY MR. McCAULLEY:

7  Q.  Dr. Lamb, before we broke for lunch, you were testifying

8  about the -- I believe -- I don't want to put words in your

9  mouth -- the enforcement strategy of Intuitive upon learning of

10 third-party repair services.  Do you recall that?

11 A.  Yes.

12 Q.  All right.  Can you summarize for us what that strategy

13 was?

14 A.  Well, we had an exhibit that was very helpful that laid

15 out a series of steps when the -- when Intuitive discovered

16 that a hospital or surgery center used a refurbished EndoWrist

17 part rather than a new one, they began to monitor.  They looked

18 at -- for trend.  They then sent a letter, but ultimately they

19 terminated, at least in some instances.  And the effect of that

20 was chilling on the market for EndoWrist instrument repair and

21 replacement.

22 Q.  You referred to a letter.

23         MR. McCAULLEY:  Can we have Trial Exhibit 942R that's

24 already been admitted into evidence published to the jury,

25 please.
```

LAMB - DIRECT / McCAULLEY

```
 1              THE COURT:  It is up.
 2  BY MR. McCAULLEY:
 3  Q.   Do you recognize what's in front of you on the screen?
 4  A.   I believe this is a letter -- it's hard to read it, so you
 5  might highlight the top of it.
 6  Q.   I'm sorry.  What did you say?
 7  A.   Highlight the top part of it.  That was -- yeah.
 8       So this appears to be a letter to the Chief Medical
 9  Officer, the Chief Executive Officer and the Chief Operations
10  Officer at Marin General Hospital.  I believe we looked at that
11  example before lunch.
12  Q.   And is this the letter you're referring to in your
13  testimony?
14  A.   That's correct, yes.
15  Q.   What's your understanding of the purpose of this letter?
16  A.   Well, it's a warning letter.  I mean, I might think of it
17  as a cease and desist letter to say stop using these
18  refurbished instruments.
19              MR. McCAULLEY:  And, Mr. Cox, if you could put up the
20  section from page 2, highlight those bullets.
21  Q.   Are you able to read that?
22  A.   I am.
23  Q.   Okay.  Is this part of the letter that you referred to and
24  relied on in your report in this matter?
25  A.   It is.  Yes.  It's citing some of the material we looked
```

LAMB - DIRECT / MCCAULLEY

1   at earlier.  You see in the first bullet, at the end of that

2   bullet in the brackets, it's referencing the 2007 agreement and

3   then a 2013 agreement.  That 2013 agreement at Section 8, I

4   think that is the same Section 8 that we were looking at

5   together this morning.

6   Q.   What's your understanding of the nature of the statements

7   that are made in this letter and how did it affect your

8   opinion?

9   A.   Well, this -- being laid out here is a recitation of these

10  classes from the SLSA in the form of both education, but

11  perhaps a better word is warning, that the SLS agreement being

12  violated -- that Intuitive can suspend it.  And it's reminding

13  them of that agreement, this language in front of us.

14  Q.   Did you study, as part of the assignment in this case, the

15  effect that these letters had on the market?

16  A.   Well, I did and I talked about testimony -- I believe it

17  was testimony from the CEO of the plaintiff here with respect

18  to what this did to their ability to sell their refurbishment

19  and repair services.  Hospitals canceled their orders for those

20  services because they're concerned about this.

21  Q.   Okay.

22       MR. McCAULLEY:  Can we have Exhibit 507R.  I would

23  move that into evidence, Your Honor; I believe it's un-objected

24  to.

25       MR. MICHAEL:  No objection.

LAMB - DIRECT / MCCAULLEY

1    THE COURT:  It's admitted.  And would you like to

2    publish it?

3        MR. McCAULLEY:  I'd like to publish it.  Thank you,

4    Your Honor.

5        (Trial Exhibit 507R received in evidence.)

6        MR. McCAULLEY:  If you could highlight that section

7    from the first part of that document -- first of all, can you

8    show, Mr. Cox, the top portion to Dr. Lamb?

9        THE WITNESS:  This is an Intuitive e-mail from one

10   Intuitive employee to others.

11   BY MR. McCAULLEY:

12   Q.  Was it part of the documentation that you reviewed in this

13   case?

14   A.  I believe it was.

15       MR. McCAULLEY:  Mr. Cox, can you bring up the

16   substantive portion of the document?

17   BY MR. McCAULLEY:

18   Q.  Did this document inform your opinion about how Intuitive

19   viewed the success of its campaign?

20   A.  I'm just -- I just want to find words here.

21       Well, the key word at the bottom of that first paragraph

22   is:  To great success.

23       The campaign was designed to enforce on hospitals a

24   compliance with the clauses in the SLSA that precluded the

25   refurbishment that was provided by firms like SIS, the

LAMB - DIRECT / MCCAULLEY

```
1   plaintiff here.
2        And this Intuitive employee is saying that this is a -- he
3   says above they have, quote, an updated process and it has met
4   with, quote, great success.
5   Q.   What's your understanding of the process that's referred
6   to there?
7   A.   I believe that's the process we've been talking about for
8   educating, warning, and getting hospitals to not use
9   refurbishment and repair of the EndoWrist instruments here.
10  Q.   Did you consider information about how hospitals reacted
11  to this enforcement?
12  A.   I did.  I discussed some of that in my report.
13  Q.   And what was the reaction?
14       MR. MICHAEL:  Objection.  Hearsay, Your Honor.
15       THE COURT:  Sustained.
16  BY MR. McCAULLEY:
17  Q.   Did you study about how hospitals reacted?
18  A.   Yes.  If you have my report, I might look at, refresh my
19  memory with the report, but there's a discussion, in my report,
20  of that evidence.
21  Q.   Would looking at your report refresh your recollection?
22  A.   Yes.
23       MR. McCAULLEY:  Your Honor, may I provide the witness
24  with a copy of his report?
25       THE COURT:  You may.
```

LAMB - DIRECT / MCCAULLEY

```
 1          MR. MICHAEL:  Your Honor, I object because there's not
 2   a question pending to which the witness has said he can't
 3   answer.
 4          THE COURT:  I have a question pending.  I have --
 5   well, the question -- the last question that I have, you asked,
 6   Mr. McCaulley, was:  Did you study how hospitals reacted?  And
 7   then, I think, the witness asked for the report.
 8       So is there something in particular that you wanted him to
 9   answer with regard to that?
10          MR. McCAULLEY:  Yeah.  Well, let me ask another
11   foundational question to see if he still needs the report.
12   Q.  How did hospitals react to Intuitive's enforcement
13   threats, based on your study of the evidence?
14          MR. MICHAEL:  Objection, hearsay.
15          THE COURT:  Hold on.  There's an objection pending, so
16   you have to wait for me to --
17          THE WITNESS:  Sorry.
18          THE COURT:  You have to wait for me to -- yeah.
19       Dr. Lamb, can you answer that question without referring
20   specifically to what was said to you?
21          THE WITNESS:  That's why I wanted to look at my
22   report, Your Honor, because I saw it -- some discussion in
23   there; and I believe it's deposition testimony, but I have
24   to -- I'd have to look at my report.  It's a hundred pages and
25   I just can't remember every detail of it as I sit here.
```

LAMB - DIRECT / MCCAULLEY

```
 1         THE COURT:  Mr. McCaulley, could you ask your question
 2   again?  I want to -- I'm trying to get what you're trying to
 3   get from him.
 4         MR. McCAULLEY:  Let me ask a different question.
 5   BY MR. McCAULLEY:
 6   Q.   What happened to the market for EndoWrist repair as a
 7   result of Intuitive's enforcement campaign, based on your
 8   study?
 9   A.   Well, I have to be a little careful and correct you,
10   counselor, because you refer to market for EndoWrist repair,
11   but the market is the market for repair and replacement.  The
12   repair part of that market went away, is my understanding, and
13   I believe I've got some deposition testimony with respect to
14   that that I cite in my report.
15         But the -- the gist of how I use the document we were
16   looking at earlier and other evidence about that is that the
17   conduct had a chilling effect on the marketplace because the
18   customer base that has bought a da Vinci robot, and is
19   operating under the SLSA, has an economic decision that they're
20   confronted with.
21         They can save some money on the refurbishment of EndoWrist
22   instruments, but it's at the threat of rendering all their
23   da Vinci robots useless.  And that -- as a matter of
24   economics, that is a powerful threat to the hospital or the
25   purchaser of the da Vinci robots.
```

LAMB - DIRECT / MCCAULLEY

1  Q.  Did you consider, as part of your analysis, whether

2  Intuitive's anticompetitive conduct caused harm to competition

3  in the EndoWrist repair and replacement market?

4  A.  I did and I concluded that its conduct did cause harm to

5  competition.  But let me explain, just to be sure it's clear

6  for the jury, what economists mean by harm to competition.

7      I talked about this earlier.  I won't go through

8  everything.  But the fundamental notion is that if something,

9  some action causes the prices in the marketplace to be

10 distorted -- now, in this case, the analysis is that the

11 conduct caused the prices in the EndoWrist repair and

12 replacement market to be higher because, rather than using the

13 cheaper alternative of refurbishing those EndoWrist

14 instruments, hospitals and surgery centers that own da Vinci

15 robots were forced to replace them.

16     But if conduct causes prices to be distorted from what

17 would otherwise occur, that is harm to competition.  It --

18 it's -- the way I'd like to think of it is harm to the market.

19 It keeps the market from doing the job that economists focus on

20 the market to do.

21     That's the market's job, to an economist, is to use these

22 prices as a way to tell people how much and what to produce.

23     All right?

24     Here, if hospitals were able to purchase lower-cost

25 refurbishment services for EndoWrist instruments, they would --

LAMB - DIRECT / MCCAULLEY

1    at least some hospitals, and for at least some instruments,

2    would take advantage of those lower-cost refurbishment services

3    rather than buying more expensive replacement parts.  And that

4    price information is what the market is supposed to convey and

5    it can't because of the conduct.

6         And that's the essence of harm to competition here, is

7    that the conduct keeps the market from working the way the

8    market is supposed to.  And let me be clear.  I'm not offering

9    any legal opinions.  This is an opinion about economics.

10        Whether the conduct is a violation of antitrust laws is up

11   to the trier of fact, not me.  I'm not here to have an opinion

12   about that.  But as an economist, my opinion is that because

13   it -- the conduct thwarts the operation of the price mechanism,

14   it results in harm to competition and is anticompetitive.

15   **Q.**   And what's the significance of your conclusion that

16   Intuitive's conduct resulted in harm to competition?

17   **A.**   Well, that's a key aspect of a claim under antitrust laws,

18   is for conduct to violate the antitrust laws, it has to result

19   in harm to competition.  This is not a legal opinion.  This is

20   based on my understanding of doing this all the time, every

21   day.  So that -- so there are two -- I talked about this

22   already today, but there are two separate issues here.

23        The plaintiff here is worried about its damages and

24   injury; of course, I don't any opinions about that.  My

25   opinions are -- although it, you know, it wasn't able to set

LAMB - DIRECT / MCCAULLEY

1   its product, and that's something I discussed.  But my opinion

2   about harm to competition isn't about harm to the plaintiff

3   it's about the harm to the market, and the effect of the

4   challenged or alleged misconduct here, and thwarting the way

5   the market is supposed to work.

6   Q.   Would that result in harm to the public?

7   A.   Yes.  That's -- the notion, the very notion of that is --

8   is that if you harmed the operation of the market, that is

9   reflected in harm to some part of the market participants.  And

10  maybe the seller's conduct hurts the buyers or vice versa, but

11  it's harm to some members of the public.

12  Q.   Thank you.

13       MR. McCAULLEY:  Thank you.  Nothing further.

14       THE COURT:  Thank you, Mr. McCaulley.

15       MR. McCAULLEY:  Your Honor, may I request a brief

16  sidebar, with apologies.

17       THE COURT:  Certainly.

18       Let's take a minute.  Stretch if you'd like.  We won't be

19  long.

20       (A sidebar discussion was held at the bench as follows:)

21       MR. McCAULLEY:  I just explained --

22       THE COURT:  I'm just making sure.  Are you ready?

23       MR. McCAULLEY:  I just explained to Mr. Michael, the

24  witness is diabetic.  And I would just ask the Court -- I don't

25  want to interrupt Mr. Michael.  If his energy level seems to be

Volume 8

Pages 1400 - 1590

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

| | | |
|---|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | NO. C 21-03496-AMO |
| INTUITIVE SURGICAL, INC., | ) ) | |
| Defendant. | ) ) | |
| AND RELATED COUNTERCLAIMS. | ) ) | |

San Francisco, California
Wednesday, January 15, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        MCCAULLEY LAW GROUP
        180 N. Wabash Avenue - Suite 601
        Chicago, Illinois 60601
    BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
        **ANTHONY E. DOWELL, ATTORNEY AT LAW**

        HALEY GUILIANO LLP
        111 Market Street - Suite 900
        San Jose, California 95113
    BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
           Official Reporter, CSR No. 12219

1401

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                             PAUL, WEISS, RIFKIND, WHARTON
 3                           & GARRISON LLP
                             2001 K Street NW
 4                           Washington, D.C. 20006
                         BY: KENNETH A. GALLO, ATTORNEY AT LAW
 5                           PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                           PAUL WEISS RIFKIND WHARTON
                             & GARRISON LLP
 7                           1285 Avenue of the Americas
                             New York, New York 10019
 8                       BY: WILLIAM MICHAEL, ATTORNEY AT LAW
                             CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                             PAUL, WEISS, RIFKIND, WHARTON
10                           & GARRISON LLP
                             535 Mission Street - 24th Floor
11                           San Francisco, California 94105
                         BY: JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2    Wednesday, January 15, 2025 - Volume 8

 3    PLAINTIFFS' WITNESSES                      PAGE   VOL.

 4    LAMB, RUSSELL (RECALLED)
      (PREVIOUSLY SWORN)                         1426    8
 5    Cross-Examination (Resumed) by Mr. Michael 1426    8
      Redirect Examination by Mr. McCaulley      1459    8
 6    Recross-Examination by Mr. Michael         1463    8

 7    BERO, RICHARD
      (SWORN)                                    1468    8
 8    Direct Examination by Mr. Dowell           1468    8
      Cross-Examination by Mr. Michael           1524    8

 9                        E X H I B I T S

10    TRIAL EXHIBITS                    IDEN   EVID   VOL.

11     614R                                    1504    8

12     769                                     1487    8

13     1309 (under seal)                       1405    8

14     1497                                    1546    8

15

16

17

18

19

20

21

22

23

24

25
```

LAMB - CROSS / MICHAEL

```
 1   thermostat.
 2          This morning we'll continue again -- we'll pick up
 3   again with Dr. Lamb.
 4          Come on forward.
 5      (Dr. Lamb steps forward to resume the stand.)
 6                    RUSSELL LAMB,
 7   called as a witness for the Plaintiffs, having been previously
 8   duly sworn, testified further as follows:
 9          THE WITNESS:  Good morning.
10          THE COURT:  Good morning.  And, Mr. Michael --
11          You may be seated, of course.
12          And, Mr. Michael, proceed when you're ready.
13          MR. MICHAEL:  Thank you, Your Honor.
14                 CROSS-EXAMINATION (Resumed)
15   BY MR. MICHAEL:
16   Q.   Good morning, Dr. Lamb.  Welcome back.
17   A.   Good morning.
18   Q.   Dr. Lamb, did you discuss your testimony with anyone since
19   leaving court yesterday?
20   A.   No.
21   Q.   You gave an opinion on your direct examination concerning
22   harm to competition; is that correct?
23   A.   Yes.
24   Q.   And I believe your opinion was that there has been harm to
25   competition in this case because at least some hospitals would
```

LAMB - CROSS / MICHAEL

1  have paid lower prices for EndoWrists absent Intuitive's

2  alleged anticompetitive conduct than they paid in the actual

3  world; is that correct?

4  **A.**   I would say for EndoWrist repair and replacement, because

5  the alternative would have been the repair, yes.

6  **Q.**   Okay.  And that's part of what I wanted to clarify.

7        When you say that some hospitals would pay lower

8  prices for EndoWrist repair and replacement, what you mean is

9  that there are some hospitals that would have been willing to

10 accept modified EndoWrists from a third party at a lower price

11 than what Intuitive charges for new EndoWrists; is that

12 correct?

13 **A.**   I want to be very careful, Counselor, because you changed,

14 in a material way, my testimony here.  And I want to make sure

15 it's clear in the record here.  I said at least some hospitals.

16       I wasn't asked to, nor was it necessary for me to,

17 reach an opinion that all or essentially all hospitals -- the

18 vast majority of hospitals would have taken advantage of the

19 repair or refurbishment of EndoWrists, nor am I offering an

20 opinion about whether all or nearly all hospitals paid less,

21 because the price of new EndoWrists, EndoWrist replacement, in

22 the market for EndoWrist repair and replacement, would have

23 gone down.

24       In other words, that's a separate analysis, not part

25 of the analysis necessary in reaching the opinions and

LAMB - CROSS / MICHAEL

1    conclusions I've reached.  But the qualifier to my testimony

2    that says, quote, at least some hospitals is really important.

3            So my opinion is that at least some, perhaps all, of

4    them would have decided not to buy the new ones and had bought

5    refurbished ones.  Some of them might have bought brand-new

6    ones at a price that was 5, 10, 20, 40 percent lower.  I didn't

7    have to analyze that in reaching the opinion that there was

8    harm to competition.  But at least some hospitals would have

9    bought the repaired EndoWrists, as indicated by the record that

10   I've talked about in my report of actual interest in the

11   repaired EndoWrists.

12   **Q.**   I appreciate that clarification.

13           So it's that at least some hospitals, which you don't

14   quantify, but those are hospitals that you say would have

15   received a lower price because they were going to buy modified

16   EndoWrists from a third party rather than new EndoWrists from

17   Intuitive; is that correct?

18   **A.**   That would -- I'd be careful, because the misconduct here

19   applies to the ability to refurbish EndoWrists.  And that can

20   happen -- by a hospital simply refurbishes its own EndoWrists.

21   I think that's actually a common way, a hospital hiring someone

22   to refurbish its own EndoWrist instruments and not buying an

23   instrument that might have been owned by someone else that was

24   refurbished.  That's slightly different than what your question

25   posited.

LAMB - CROSS / MICHAEL

1    But my opinion is, as evidenced by the record, and I
2    talk about in the report, the actual interest and Intuitive's
3    acknowledgement in its own documents that hospitals were
4    interested in this, and Intuitive's acknowledgement of the
5    importance of that market through Project Dragon.  There was an
6    interest and a demand for the refurbished EndoWrist instruments
7    at a lower price.  And at least some hospitals would have
8    bought those lower-priced EndoWrist instruments.
9    **Q.**  And the only hospitals that you're aware of that did buy
10   used or modified EndoWrists from SIS in the real world either
11   got them for free or paid prices that SIS has said were on the
12   order of 40 to 50 percent lower than Intuitive's prices; is
13   that correct?
14   **A.**  I think that's correct, yes.
15   **Q.**  You are not aware of any hospital that has said it would
16   have been willing to pay the same amount of money for a
17   modified EndoWrist from SIS or another third party as it was
18   willing to pay for a new EndoWrist from Intuitive, are you?
19   **A.**  I wouldn't expect to see that statement anywhere.  I don't
20   recall having seen it.  I wouldn't expect to either.
21   **Q.**  Okay.  Now, you mentioned Project Dragon and I wanted to
22   ask you about that as well.
23   You said yesterday, I believe, that what Intuitive was
24   thinking of doing with Project Dragon was the same thing as
25   what SIS was proposing to do.  Do you recall that testimony?

LAMB - CROSS / MICHAEL

1  **A.**    Sounds right.  I accept your representation that those are

2  the words I used.

3  **Q.**    Just so no one is confused, what Intuitive was evaluating

4  doing with EndoWrists under Project Dragon was actually a

5  completely different process than what SIS or Rebotix were

6  proposing to do.  Isn't that true, sir?

7  **A.**    You'd have to clarify what you mean by "completely

8  different" as distinguished from my statement that they were

9  the same, Counselor.

10      I don't think that we're necessarily in disagreement.

11 Because when I talk about "the same," I mean they're taking

12 instruments whose number of uses has been met under the

13 Intuitive guidelines or contract, and they're examining those

14 instruments and making repairs to them, replacing some pieces

15 of them perhaps, and then resetting the counter.

16      So the -- to me, the reason I say the same is

17 either -- in either case, you're starting with instruments that

18 Intuitive has restricted the use of through the SLSA, and

19 you're taking those instruments and putting them back into use.

20      Now, how you get them back into use may be different.

21 I would expect that Intuitive has access to technology that it

22 would use that might be different from what Rebotix would use

23 or SIS would be able to offer the marketplace.

24      But what I mean by "the same," just to be clear, is in

25 both cases, you're starting with instruments that have been

LAMB - CROSS / MICHAEL

1    used a number of times to their -- met their maximum use.  You

2    take those instruments out.  You just, say, put them in this

3    black box and mix them around and you come out with something

4    that you can use again, that's deemed usable.

5           And my analysis of Project Dragon is that Intuitive

6    deemed those refurbished instruments to be usable enough that

7    they were going to sell them back to people.

8    Q.   The black box is what I wanted to ask you about.  And I

9    think you put your finger on one of the ways in which those

10   processes were not the same.

11          Intuitive was going to replace cables on EndoWrists

12   whereas Rebotix and SIS were not going to replace any cables.

13   Isn't that true?

14   A.   I don't recall.  The -- let me be very careful here,

15   because I'm not an engineering expert.

16          So I don't recall seeing that; but if I did recall

17   seeing it, as an economist, it wouldn't necessarily mean

18   anything to me.  One reason not to replace cables is because

19   they don't need to be replaced -- is the example I used

20   yesterday, I think, in testimony about a new Ford and the

21   requirement to replace your tires every 5,000 miles, one of the

22   problems with that -- right? -- is you don't need to replace

23   your tires every 5,000 miles.

24   Q.   So you're not offering an opinion that cables on

25   EndoWrists do or don't need to be replaced after any certain

LAMB - CROSS / MICHAEL

1    number of uses, are you?

2    **A.**    I'm not offering that opinion.  I'm offering the opinion

3    that it's -- at the end of the day, what matters is whether

4    it's an instrument that's deemed usable.  Whether it -- that

5    particular instrument -- and I would think that the wear and

6    tear on instruments would be different based on how many -- on

7    the nature of the surgeries they have been used in.

8           If you do a six-hour procedure with a robot, you

9    probably put more wear and tear on those little pulls and

10   scissors than you do if you do a one-hour surgery.

11   **Q.**    That's not a subject you have any expertise on, is it,

12   Dr. Lamb?

13   **A.**    No.  It's logic.

14   **Q.**    Just logic, that's what you would apply to determine what

15   the wear and tear on cables in this very precise surgical

16   instrument is that's used on surgeries in people's bodies?

17   **A.**    I -- I think -- maybe we're misunderstanding each other,

18   so let me be -- you know, try to clear up your confusion.

19          If you use something six times as long as -- in one

20   place as you do in another, you put six times as much use on

21   it; right?

22          I mean, that, to me, is a statement about arithmetic,

23   which I've been doing for some 50-some years.  I don't have a

24   problem saying that.  That's all I'm saying.  I'm not offering

25   an opinion about safety or an engineering opinion.  I'm just

LAMB - CROSS / MICHAEL

1   saying, I think -- and I think it's fair to say that in

2   refurbishing and repairing EndoWrists instruments, you'd be

3   starting with an individual instrument that might need

4   different things.

5   Q.   You're not an engineer; correct?

6   A.   That's correct.

7   Q.   You're not a doctor; right?

8   A.   Well, I'm a doctor with a Ph.D. in economics, so, yeah,

9   I'm that kind of doctor.

10  Q.   You've never performed surgery?

11  A.   No, but I've had some, I'm sorry to say.

12  Q.   And you're not expressing an opinion on the safety of

13  EndoWrist instruments, anything having to do with the safety of

14  EndoWrist instruments; correct?

15  A.   I've testified that; that's correct, sir.

16  Q.   Now, whether there were other companies in the same

17  business offering the same or similar kind of contract terms to

18  what Intuitive offered in this case is not something you

19  considered in forming your opinions; is that correct?

20  A.   I'm not clear on what business you're talking about.  If

21  you're talking about the robotic surgery robot business or

22  the --

23  Q.   Let's start there, with the robotic surgery business.  Did

24  you consider whether other companies in that business offered

25  the same or similar kinds of contract terms to the ones that

LAMB - CROSS / MICHAEL

1  SIS is challenging in this case?

2  **A.**  I'm trying to understand your question.  So I'm sorry,

3  bear with me here.

4         You're talking about other surgical robots that are

5  not da Vinci surgical robots?

6  **Q.**  That's correct, sir.

7  **A.**  And about terms -- when you say "terms," you mean as in

8  the SLSA?

9  **Q.**  Yes.

10  **A.**  I haven't analyzed those terms.  It wasn't necessary to do

11  that.

12  **Q.**  Okay.  In your opinion, that does not have any bearing on

13  whether Intuitive's contracts had any harmful effect on

14  competition in the relevant market; is that correct?

15  **A.**  That's correct; it does not.

16  **Q.**  And that would be true even if those other companies lack

17  the power to exclude competition in the relevant market?

18  **A.**  Well, in this particular -- the question you asked was a

19  hypothetical.  But in this particular market, Intuitive

20  controls 99.5 percent of this market.  So the other firms that

21  are offering surgical robots in this market really are

22  irrelevant to the impact of Intuitive's conduct because of

23  Intuitive's market dominance, which is extreme.

24  **Q.**  Do you know who CMR is?

25  **A.**  I don't recall the acronym as I sit here.

**Volume 10**

**Pages 1697 - 1769**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

```
SURGICAL INSTRUMENT SERVICE     )
COMPANY, INC., et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   NO. C 21-03496-AMO
                                )
INTUITIVE SURGICAL, INC.,       )
                                )
          Defendant.            )
_____)
AND RELATED COUNTERCLAIMS.      )
_____)
```

San Francisco, California
Tuesday, January 21, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        MCCAULLEY LAW GROUP
        180 N. Wabash Avenue - Suite 601
        Chicago, Illinois 60601
    BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
        **ANTHONY E. DOWELL, ATTORNEY AT LAW**

        HALEY GUILIANO LLP
        111 Market Street - Suite 900
        San Jose, California 95113
    BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
         Official Reporter, CSR No. 12219

1698

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
 3                            & GARRISON LLP
                              2001 K Street NW
 4                            Washington, D.C. 20006
                         BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                            PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
 7                            1285 Avenue of the Americas
                              New York, New York 10019
 8                       BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                              CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                         BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

Tuesday, January 21, 2025 - Volume 10

| | **PAGE** | **VOL.** |
|---|---|---|
| Plaintiff Rests | 1740 | 10 |

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **JONES, DANIEL**<br>By Videotape Deposition (not reported) | 1720 | 10 |
| **MORALES, COLIN**<br>By Videotape Deposition (not reported) | 1721 | 10 |
| **BAIR, RONALD**<br>By Videotape Deposition (not reported) | 1721 | 10 |
| **MAY, KEVIN**<br>By Videotape Deposition (not reported) | 1722 | 10 |
| **MAY, KEVIN**<br>By Videotape Deposition SEALED (not reported) | 1724 | 10 |
| **HARRICH, EDWARD**<br>By Videotape Deposition (not reported) | 1729 | 10 |
| **PARKER, CLIFTON**<br>By Videotape Deposition (not reported) | 1729 | 10 |
| **PARKER, CLIFTON**<br>By SEALEAD Videotape Deposition (not reported) | 1730 | 10 |
| **HAMILTON, STANLEY**<br>By Videotape Deposition (not reported) | 1734 | 10 |
| **PAPIT, GLENN**<br>By Videotape Deposition (not reported) | 1734 | 10 |
| **CHRISTENSEN, GIBSON**<br>By Videotape Deposition (not reported) | 1740 | 10 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **ROSA, DAVID**<br>(SWORN) | 1751 | 10 |
| Direct Examination by Mr. Michael | 1752 | 10 |

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 606 | | 1721 | 10 |
| 614R | | 1721 | 10 |
| 769 | | 1740 | 10 |
| 1644.008 | | 1760 | 10 |
| 1644.009 | | 1765 | 10 |
| 1644.010 | | 1767 | 10 |
| 1691 | | 1740 | 10 |
| 1698 | | 1734 | 10 |

## E X H I B I T S

| COURT EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 1726 | 10 |

PROCEEDINGS

```
 1   those similar admonitions.  We'll come back for you at about

 2   five past.  All rise for the jury.

 3                    (The jury leaves the courtroom.)

 4      (Proceedings were heard out of the presence of the jury.)

 5            THE COURT:  You may be seated.

 6      Mr. Gallo, the floor is yours.

 7            MR. GALLO:  Thank you, Your Honor, I appreciate the

 8   opportunity to be heard.

 9            Intuitive moves, under Rule 50, for judgment as a matter

10   of law.  SIS has failed to carry its burden on several

11   independent case-dispositive ways.  I'm going to, as discussed,

12   argue two ways briefly.  I will identify several other ways but

13   not argue them and hold that to a future date if it's

14   appropriate.

15            Obviously the Court is aware of the legal standard, that

16   where a party's had an opportunity to be heard and has not

17   presented the jury with legally sufficient basis to find for

18   that party, the Court can enter judgment as a matter of law.

19            The two grounds that I wish to identify today are that,

20   first, SIS has failed to meet its burden to establish that

21   Intuitive forced hospitals, coerced hospitals that wished to

22   purchase a da Vinci to also purchase EndoWrist repair and

23   replacement from Intuitive.  This is the central claim that is

24   in all four counts that are remaining in the plaintiffs'

25   complaint.
```

**PROCEEDINGS**

1     Their entire case is based on the premise that the

2  Intuitive contracts require hospitals to purchase EndoWrists

3  from Intuitive, not from third parties.

4     But as the Court has seen, that is not what the contracts

5  say.  The contracts, it is undisputed, say that third parties

6  may be approved to sell EndoWrists.  That's at

7  Trial Exhibit 1566, trial transcript 545 and 630 to '32.  Third

8  parties may be approved to sell EndoWrists.

9     The applicable law says that where contracts contain a

10 third-party authorization clause, it does not constitute tying

11 or exclusive dealing unless the possibility of obtaining

12 approval or authorization is a sham or a charade, is the way

13 cases put it.  It does not amount to a tie, where there is an

14 opportunity to obtain approval or authorization as a bona fide

15 opportunity.

16     The cases that support that proposition are the *Top Rank*

17 case -- I can give you the more detailed citations, if that's

18 helpful, but they'll be in the piece of paper that's about to

19 be filed.  The *Top Rank* case out of the Central District of

20 California; *Photovest* out of the Seventh Circuit; *Mozart versus*

21 *Mercedes-Benz* out of the Northern District of California; and

22 *U.S. versus Mercedes-Benz,* also out of this court.

23     Importantly, where a defendant, quote, never refused a

24 request to approve a supplier, a third-party authorization

25 clause is not a sham and there is not a tie.  That's the

PROCEEDINGS

1   *Betaseed* case out of the Ninth Circuit.

2       Where we have never refused to approve, there cannot be a

3   sham and cannot be a tying arrangement.

4       Where a contract contains a third-party authorization

5   clause, the burden is on the plaintiff to prove that it is a

6   sham or a charade.

7       SIS has failed to carry this burden.  It has not shown a

8   single instance of a third-party requesting approval or

9   authorization and Intuitive refusing.  There's nothing in the

10  record.

11      It's undisputed that Intuitive has approved third parties.

12  It's undisputed that it approved Restore.  It's undisputed that

13  it approved Rebotix, at trial transcript 523.

14      SIS' senior executive, Mr. Posdal, said he assumed SIS

15  would have been approved if it had asked.  That's at page 624

16  of the trial transcript.

17      Mr. Posdal admitted that he knew that the contracts did

18  not prohibit all third parties, but he never tried to even get

19  a copy of the contract to look at what the approval mechanism

20  was.  That's at page 549.

21      SIS knew that Intuitive invited Rebotix to submit clinical

22  evidence of safety, but yet it's admitted neither Rebotix nor

23  SIS ever contacted Intuitive to seek approval.  The Photo Vest

24  case rejects a tying claim under the same facts, where a

25  plaintiff knows it's available and never even tries.

**PROCEEDINGS**

1    This issue came up in jury instruction briefing to

2   the Court, and the primary argument that SIS made is that the

3   cases we are relying on are limited to a franchisee/franchisor

4   relationship.

5        That is wrong.

6        The *Top Rank* case is not a franchisor case.  There's

7   nothing case called *Pullos*, which is -- will be cited in our

8   papers which I can give you the pin cite for which also is not

9   a franchise case.

10       The only reason it comes up in franchise cases a lot is

11  because franchisees often complain that their franchisors

12  require them to buy from an approved seller.  So McDonald's

13  says, "Franchisee, you have to buy your burgers from X."

14       So it tends to come up in the franchisee context but it's

15  not limited, as a matter of legal doctrine or case law.  As I

16  said, there's cases out of the franchisee/franchisor

17  relationship.

18       The point is, the central thesis of tying is forcing or

19  coercion, forcing the hospital, in this case, to purchase the

20  EndoWrist from us if it wants to buy a da Vinci.  And if

21  there's no forcing, if there's not coercion, if it can be sold

22  by a third party, then tying and exclusive dealing cannot be

23  established as a matter of law.  And we respectfully submit

24  that on these facts, it cannot be established.

25       Now, I want to emphasize this.  All four counts of the

**PROCEEDINGS**

```
 1   complaint that are remaining are tying and exclusive dealing
 2   under Section 1 of the Sherman Act and monopoly and --
 3   monopolization and attempted monopolization under Section 2 of
 4   the Sherman Act.  But they all turn -- the anticompetitive
 5   conduct is the same for all four.
 6        And the so the failure to establish the tying claim also
 7   dooms an exclusive dealing claim.  That's the Dream Big Media
 8   case out of this court, that where the conduct is tying, and
 9   that means that we are the exclusive person they deal with if
10   the tying were proved, then both the tying claim and the
11   exclusive dealing claim fall.
12        And the same thing is true between Section 1 and Section
13   2, where the conduct is the same.  If the Section 2 claim from
14   monopolization depends on an allegation of tying, then once the
15   tying is disproved, the Section 2 claim falls along with it.
16        So all four of their remaining counts would fall.  And we
17   believing, under Rule 50, judgment should be entered on all
18   four claims.
19        That's ground one.
20        The second ground is that judgment should be entered on
21   all liability and damage claims for the period after November
22   of 2022.  SIS seeks to impose liability and damages through
23   2026 on a theory that it was permanently excluded when it left
24   the market in, roughly, late 2019 or late 2020 -- or early
25   2020, and it seeks damages all the way through 2026.
```

PROCEEDINGS

1    But Mr. Posdal, on the witness stand, admitted that

2  Intuitive did nothing to harm his business after November of

3  2022.  We asked him specifically.  He could not identify

4  anything that Intuitive did after that date.

5    So SIS provided no basis for establishing liability after

6  2022 or quantifying damages after 2022.  Let me be clear.  It

7  doesn't rely just on what Mr. Posdal said.

8    Mr. Posdal also said he could have invested in the

9  business after '22 -- 2022 on direct examination.  He admitted

10 he could, had the resources but did not.  Maybe more

11 importantly, their economic expert, Dr. Lamb, admitted that he

12 did no analysis, zero analysis, of the market after 2022.  He

13 said he had no opinion -- no opinion as to whether there was

14 anticompetitive conduct in the market after November of 2022.

15    He said he did not do any analysis of the market

16 conditions or structure after November of 2022.

17    So a plaintiff can only recover damages after it exits the

18 market if it can prove that the defendant's conduct continued

19 to harm the market's competitive structure.  So in this case,

20 SIS, in order to get damages, would have to prove that the

21 conduct that preceded November of 2022 continued to harm the

22 market structure in 2023, in 2024, in 2025.

23    Their expert economist expressly disclaimed offering any

24 opinions about that.  There's just nothing there.  SIS offered

25 no evidence about that.  And, of course, the Court knows that

**PROCEEDINGS**

1  two parties, Restore and Rebotix, were approved under the

2  contract clause after 2022.

3      Absent this evidence, Your Honor, respectfully, not only

4  can the jury not find liability, but there would be no way for

5  a jury to make a just and reasonable estimate of damages.  It

6  would be pure speculation and guesswork by the jury.

7      So, Your Honor, those are the two grounds that I said I

8  would address and try to do it in a reasonably quick way.  I

9  would like, for the record, if nothing else, to say that we do

10  have other grounds, and we're reserving all rights to a fuller

11  briefing and citation at a later date, as it seems

12  appropriate and necessary.

13      The other grounds is we believe SIS has failed to

14  establish a relevant market limited to minimally invasive

15  surgical robots.  We believe they failed to establish a

16  single-branded after-market for the repair of EndoWrists

17  because it failed to establish the factors required by the *Epic*

18  *Games versus Apple* decision in the Ninth Circuit.

19      Going back to the first one about limited to surgical

20  robots, the reason we think they've failed to establish that is

21  the record is now replete with evidence, plaintiffs' own

22  witnesses, buyers, hospitals saying they considered open and

23  laparoscopic surgery as a substitute for robotic surgery.

24      The gentleman who was just on videotape from Pullman said

25  if we couldn't use the robot, we could use laparoscopic.  Their

PROCEEDINGS

1  expert, Jean Sargent, earlier in the case testified that at the

2  University of Kentucky, they didn't use the robot and, instead,

3  they used laparoscopic surgery.  That's all evidence of

4  substitution, which undercuts their market definition; and

5  their expert, when he stood up, it was -- he gave the

6  conclusion that it was limited to robots.  But he didn't

7  address the reasonable substitution between them.

8       Third point, and I'll be wrapping up very quickly, SIS

9  failed to establish that the EndoWrist use limits are

10  anticompetitive or caused injury.  And by that, I mean, failed

11  to establish that it causes prices to go up, failed to

12  establish that the use limits reduced output, failed to

13  establish that the use limits harmed product quality, failed to

14  establish that they harmed patient safety.

15      So none of the indicia of anticompetitive conduct are

16  present.  They also failed to establish any anticompetitive

17  effect in the tied market, that is, the so-called market for

18  EndoWrist repair and replacement, for all of the same reasons.

19      Last, for the record, we also move on all of the grounds

20  that were in our summary judgment motion that the Court denied

21  and, as I mentioned, reserve the right to raise these issues at

22  the conclusion of our case as well.

23      I appreciate the Court's time.  Thank you.

24          THE COURT:  Well, Mr. Gallo, before you leave, am I

25  still to expect a brief from you-all on file today?

PROCEEDINGS

```
 1          MR. GALLO:  As a matter of fact, I suspect it's been
 2   filed as I've been speaking.
 3          THE COURT:  I suspect the same.  Thank you.
 4          MR. GALLO:  Thank you.
 5          THE COURT:  Mr. McCaulley?
 6          MR. McCAULLEY:  Yes, just very briefly, Your Honor.
 7   Obviously, I'm hearing this for the first time.
 8      We would refer Your Honor to the Mercedes-Benz case,
 9   517 F. Supp. 1369 at 1383 from this district.
10      We think that the record, viewed in the light most
11   favorable to plaintiff, establishes that any approval or
12   authorization methodology is illusory.  There were -- there was
13   nobody approved in the relevant time frame.  There were no
14   standards that were established.  The fact that the SLSA, which
15   is in evidence, makes a passing reference to authorization
16   doesn't establish that there was an authorization process in
17   place.
18      With respect to the second ground, Your Honor, we think
19   the overwhelming evidence is Intuitive's conduct did not
20   change.  The method for approval, as Your Honor has already
21   said, was not, that they touted and they talked to the jury
22   about, was not for what SIS was doing.  It was Intuitive
23   interposing the FDA -- requiring FDA approval whereas
24   Your Honor has already ruled the FDA did not require approval
25   for this service.
```

**PROCEEDINGS**

1       After the so-called statement in March of 2023, Mr. Rosa

2   submitted a declaration that said it still considered what SIS

3   was doing, the repair of EndoWrists, to be illegal and improper

4   and unauthorized.

5       So we think that the evidence in this case overwhelmingly

6   establishes that there was no real path to approval for what

7   SIS was doing.

8       The approval of one single S model, which is now phased

9   out, doesn't establish anything.  It, in fact, reinforces

10  Intuitive's anticompetitive behavior.

11      The evidence also establishes, Your Honor, that as of

12  2020, Intuitive's conduct had shut down the market for the SIS

13  repair business.  And you heard testimony just today from other

14  companies.  They all viewed it the same.  Nothing about

15  Intuitive's conduct changed.  Nothing -- the double-down from

16  Mr. Rosa in his declaration after the announcement in 2023

17  establishes that Intuitive's attitude and Intuitive's actions

18  did not change and would not have changed over the relevant

19  time period.  And SIS is entitled to damages for that entire

20  period.

21      Thank you, Your Honor.

22          **THE COURT:**  Thank you, Counsel.

23      As I indicated, I'm going to plan to take it under

24  submission for now.  I want to go ahead and proceed with

25  defendant's case.  Do you all want, like, a two-minute break

PROCEEDINGS

```
 1   before we bring the jury back in?
 2           MR. McCAULLEY:  I could use two minutes, Your Honor.
 3           THE COURT:  Let's do that.  But, truly, it will be
 4   just that.  All right.  We'll be back with the jury in just a
 5   moment.
 6                   (Recess taken at 2:01 p.m.)
 7                 (Proceedings resumed at 2:05 p.m.)
 8           THE CLERK:  Court is back in session.  All rise for
 9   the jury.
10                 (The jury enters the courtroom.)
11       (Proceedings were heard in the presence of the jury.)
12           THE COURT:  You may be seated.  We'll wait a moment.
13       Mr. Michael, you may begin defendant's case.
14           MR. MICHAEL:  Thank you, Your Honor.  Defendant
15   Intuitive Surgical calls, as its first witness, Mr. David Rosa.
16       (David Rosa steps forward to be sworn.)
17           THE CLERK:  Please raise your right hand.
18                          DAVID ROSA,
19   called as a witness for the Defendant, having been duly sworn,
20   testified as follows:
21           THE WITNESS:  I do.
22           THE CLERK:  Thank you.  Please spell and state your
23   full name for the record.
24           THE WITNESS:  Sure.  It's D-A-V-I-D, R-O-S-A, David
25   Rosa.
```

ROSA - DIRECT / MICHAEL

1      <u>DIRECT EXAMINATION</u>

2   BY MR. MICHAEL:

3   Q.   Good afternoon, Mr. Rosa.

4   A.   Good afternoon.

5   Q.   Could you please introduce yourself to the jury?

6   A.   Sure.  My name is Dave Rosa.  I'm currently the President

7   of Intuitive.

8   Q.   How long have you worked for Intuitive Surgical?

9   A.   I would say in March, it will be 29 years.

10  Q.   When you joined Intuitive, how many employees were there

11  at the company besides yourself?

12  A.   I guess I was the ninth employee, so eight others.

13  Q.   And what was your position when you joined Intuitive?

14  A.   I started as a mechanical design engineer.

15  Q.   Do you have any degrees in mechanical engineering?

16  A.   I do.  I have a bachelor's from Cal Poly San Luis Obispo

17  and a master's from Stanford.

18  Q.   Before joining Intuitive, did you have any prior

19  experience working in the medical device industry?

20  A.   My previous company was medical device company called

21  Acuson that made diagnostic or ultrasound equipment.

22  Q.   And so have you worked for Intuitive continuously for the

23  past 28 or 29 years, going back to 1996?

24  A.   I have.

25  Q.   Before becoming president of Intuitive Surgical, did you

ROSA - DIRECT / MICHAEL

1  hold a variety of other roles within the company?

2  A.   I did.

3  Q.   Starting in 2015, were you the Chief Commercial Officer of

4  Intuitive?

5  A.   Yes, I was.

6  Q.   And did that involve leading the sales and marketing

7  departments of Intuitive?

8  A.   Correct.

9  Q.   And have you also had responsibility, over the years, for

10  engineering as well as quality and clinical affairs within

11  Intuitive?

12  A.   Yep, yes.

13  Q.   When you joined Intuitive in 1996, did the company have

14  any sales?

15  A.   It did not.

16  Q.   Did Intuitive have any profits at that time?

17  A.   It did not.

18  Q.   Why did you decide to join this start-up company with no

19  sales and no profit?

20  A.   Maybe for two reasons, I guess.

21      From my previous company, there were a group of engineers

22  that had decided to join the company and they were -- they were

23  outstanding engineers.  And so I thought that it would be a

24  good idea to continue to work with them.  And so that was one

25  piece.

ROSA - DIRECT / MICHAEL

1  And then the other one was, I'd always been fascinated

2  with surgery; and so the idea of being able to use advanced

3  megatronics and combined with surgery, I thought sounded pretty

4  fun, interesting.

5  **Q.**  Today, do you consider Intuitive to be a successful

6  company?

7  **A.**  I do.

8  **Q.**  And is Intuitive a profitable company?

9  **A.**  It is.

10 **Q.**  How long did it take before Intuitive started to generate

11 any profits?

12 **A.**  Let's see.  My recollection is our first profitable

13 quarter was in 2003.

14 **Q.**  So about seven years after you joined the company?

15 **A.**  Yes, about seven years.

16 **Q.**  Based on your experience over the past 28, almost

17 29 years, how did Intuitive become a successful company?

18 **A.**  It was a long journey, but I think what it really is about

19 is showing that a device like da Vinci can produce better

20 outcomes for patients while just ensuring a track record of

21 safety and then doing it with -- with economics that work for

22 the customer, for our hospitals, and for Intuitive.

23 **Q.**  In 1996, when you joined the company, did you view

24 Intuitive's success as assured or guaranteed?

25 **A.**  I did not.

ROSA - DIRECT / MICHAEL

Q.    Why not?

A.    Well, we were trying to invent a system that hadn't really been done before.  And so to try to bring some capabilities to surgery that weren't in use at the time, I think was just bringing brand-new inventions, brand-new technology into an operating room, and then that that technology could then lead to better outcomes, I think that was all the hypothesis of the company.  None of that was proven.

Q.    What was Intuitive's first founding principle as a company?

A.    So we had a set of founding principles.  The very first one says:  Patients first always.  And there's -- we have several.  A description under this one talks about our role, our role in healthcare as being a sacred trust.

Q.    And why is patients first always your first founding principle?

A.    You know, at the end of the day, that's what all of this is about, is that the company, the products, our services, everything we do is meant to help care teams ultimately provide what we hope is a better outcome and better experience for the patient.

Q.    In your experience, what, if any, relationship is there between putting patients first always and Intuitive's commercial success?

A.    We have a -- at Intuitive, we've always had this very

ROSA - DIRECT / MICHAEL

1  intentional order, kind of the way we think about bringing

2  value to healthcare.  And it starts with patients and then it

3  moves down to surgeons and hospitals and payers and employees

4  and shareholders.  And it's a very intentional order.  And it

5  follows, if we do the right thing for patients, then -- excuse

6  me -- then value will be built and delivered for the subsequent

7  teams, people.

8  Q.    In 1996, when you joined Intuitive, did a product called

9  the da Vinci exist?

10 A.    It did not.

11 Q.    Did EndoWrists exist?

12 A.    They did not.

13 Q.    When you joined the company, you said that there were

14 eight other employees; is that right?  You were number nine?

15 A.    I was number nine, yep.

16 Q.    How many of the nine employees, including yourself, were

17 engineers?

18 A.    So one of the founders was a medical person, but I --

19 I believe the other -- the balance were engineers.

20 Q.    So eight of the nine?

21 A.    Yes.

22 Q.    Did you have a sales team at that time?

23       I'm sorry.  Did you have a sales team at that time?

24 A.    We did not.

25 Q.    Did you have a marketing team?

ROSA - DIRECT / MICHAEL

1  A.    No.

2  Q.    How closely or not closely did you personally work with

3  the other engineers at Intuitive in those early days?

4  A.    Very closely.  We spent a lot of time together.

5  Q.    Was the engineering work that you were doing easy or

6  difficult, in your view, in your experience?

7  A.    Collectively, it was quite difficult.

8  Q.    And what made it so difficult?

9  A.    Again, we were engineering something that really hadn't

10  been done before in surgery.  And so there are engineering

11  challenges, in and of themselves, but working in surgery with

12  patients and kind of this foundation of safety, understanding

13  sterilization, just the miniaturization that we were trying to

14  undertake, putting all of that together, make it extremely

15  challenging.

16  Q.    Mr. Rosa, have you prepared some demonstrative slides to

17  help illustrate the development of the da Vinci system in

18  your testimony to the jury today?

19  A.    I have.

20  Q.    If you could look in the front of your binder, there

21  should be a tab labeled Demonstratives and if you could just

22  tell me if those are the slides that you just referenced.

23  A.    They are.

24  Q.    And will using these slides, do you believe, help you to

25  explain to the jury the nature of Intuitive's products and how

ROSA - DIRECT / MICHAEL

1    they're designed and sold?

2    **A.**    I do.

3            **MR. MICHAEL:**    Your Honor, I would request permission

4    to publish Mr. Rosa's demonstrative to the jury.  I believe

5    there's no objection.

6            **MR. McCAULLEY:**    No objection.

7            **MR. MICHAEL:**    So, Mr. Lee, if you could bring up

8    Slide 1.

9    **BY MR. MICHAEL:**

10   **Q.**    Mr. Rosa, let me ask you:  What is being depicted here on

11   the screen, if you can see it?

12   **A.**    I can.

13          So the top left slide is the very first building.  Our

14   first office happens to be on the top floor of this building,

15   about 4,000 square feet.  There was no elevator in this

16   building.  I remember that very clearly.

17          The other three slides show some of the early employees

18   that were with the company.

19   **Q.**    And where was that first office that you started out

20   located?

21   **A.**    That first office is about 30 miles south of here, in

22   Palo Alto.

23   **Q.**    You said that the other photos show some of the early

24   employees.  Are any of those people still with Intuitive?

25   **A.**    They are.  So the gentleman who's on the bottom left

ROSA - DIRECT / MICHAEL

```
 1  picture, on the left, is Gary Guthart, our current CEO.  And
 2  then the gentleman in the striped shirt, sort of on the upper
 3  right picture, is an engineer who is consulting with the
 4  company.
 5  Q.   After you joined Intuitive in 1996, did the company
 6  develop something that was called the Lenny prototype?
 7  A.   We did.
 8       MR. MICHAEL:  Mr. Lee, could you go to the next slide?
 9  I see you're there already.
10  Q.   So what was the Lenny prototype?
11  A.   This was the very first system, if you will, that we
12  developed that had some of the core capabilities that we were
13  asked to engineer.  And so this was starting with some
14  technology that we had licensed from a company called SRI.  And
15  we had a few things that came from them.  And then we added
16  some capability to it, trying to bring about the vision of the
17  founders.
18  Q.   You mentioned SRI, does that stand for Stanford Research
19  Institute?
20  A.   It does.
21  Q.   Now, did the Lenny include a wristed surgical instrument?
22  A.   It did.
23  Q.   Can you identify that in the photos that are on the
24  screen?
25  A.   Sure.  So on the top left picture, this is what we would
```

ROSA - DIRECT / MICHAEL

```
 1   call our instrument arm, that whole device.  Then there's some
 2   cylindrical tubes.  Going from the upper left to the lower
 3   right, you can see it there.  And that is the instrument that
 4   is integrated into the arm.
 5   Q.   Did you personally see and use that prototype instrument
 6   in a lab in or around 1996?
 7   A.   I did.
 8   Q.   And does that prototype instrument still exist?
 9   A.   It does.
10   Q.   Do you have it here in the courtroom with you to show the
11   jury?
12   A.   I do.
13        MR. MICHAEL:  Your Honor, at this point I would ask --
14   we're going to offer into evidence TX1644.008.  And if it's
15   admitted, I would ask Mr. Rosa to come off the stand and show
16   it to the jury.
17        THE COURT:  Any objection?
18        MR. McCAULLEY:  No objection.
19        THE COURT:  It's admitted and as soon as it comes
20   over -- there you are.
21        (Trial Exhibit 1644.008 received in evidence.)
22        MR. MICHAEL:  Here it comes.
23   BY MR. MICHAEL:
24   Q.   So, Mr. Rosa, if you could identify TX1644.008 for us,
25   first of all, and tell us what this is?
```

3-ER-543

ROSA - DIRECT / MICHAEL

1    **A.**   Sure, so this is the Lenny arm that is depicted in that

2    one picture, and is really the very first prototype that was

3    developed at Intuitive in 1996 that really has some of the

4    foundational capability that exists even today on the systems

5    that we're selling.

6    **Q.**   Now, you referred to these instruments as "wristed."  Can

7    you explain what that means?

8    **A.**   I can do my best.

9         And so if you think about your own arm and your wrist, the

10   instrument that's inserted inside of this arm actually has a

11   flexible portion on the very tip here that mimics somewhat the

12   moments of your own wrist, and so it can go up and down and

13   left and right, and kind of grip like your fingers can.  And so

14   that motion that -- what we call a wrist, that is actually

15   inside the body is what we would refer to as wristed motion.

16   **Q.**   You said that when you first got to Intuitive, the

17   EndoWrist did not exist.  Did a wristed instrument of any kind

18   exist at the company at that time?

19   **A.**   No to my knowledge.

20        So if -- in 1996, most minimally invasive surgery was --

21   laparoscopy, as it's known, was performed with rigid

22   instruments, so these are instruments that don't have a wrist.

23   You go into the body and able to grip and rotate, move in and

24   out, move left and right, move up and down but aren't able to

25   articulate.

ROSA - DIRECT / MICHAEL

1    Q.   So where did this Lenny prototype wristed instrument that

2    we're looking at come from?

3    A.   So this was what was envisioned by the founders was adding

4    this articulation to instruments, but there was nothing that

5    existed at the time.  And so at the beginning stages of the

6    company, we had considered multiple architectures of wrists --

7    you can make wrists several different ways -- and eventually

8    ended on one that is today's EndoWrist.  And so it was just

9    a -- it was a development process in the early days.

10   Q.   Was the wristed instrument developed separately from the

11   rest of your da Vinci system or were they designed together?

12   A.   They were designed together.  So you can see it in this

13   prototype where the arm, so the -- the mechanism, the larger

14   mechanism that you see here, is the mechanism that controls

15   kind of the bigger, the out -- what we call the outer motions

16   of the instrument.  And then the wrist, the articulated section

17   here, is controlled by the motors that you see at the top here.

18   And those have to work in concert because, as the surgeon is

19   working with the instrument forces and torques and -- and the

20   characteristics of the instrument and the arm work together.

21   Q.   Now, how was the initial instrument that was designed and

22   used with the Lenny, that we're looking at here, similar to or

23   different from the EndoWrists that you developed and designed

24   later?

25   A.   So, it may be -- on the similarity side, they both have a

ROSA - DIRECT / MICHAEL

1  wrist.  We had tried and wanted to design that, from day one of

2  the company.  And so the one on the Lenny arm that's embedded

3  into the arm has a wrist that is similar to what the EndoWrist

4  is today.  The other similarities, it has a shaft on it like

5  the EndoWrist, albeit this was several millimeters larger in

6  diameter.  The motion of the arm and the way this arm works,

7  the mechanism of it, is similar, again, to the arms that we

8  have on the da Vinci today.

9      One primary difference for this one is this instrument is

10  sort of built into the arm.  It's a very -- we can't change it

11  out during surgery.  It has to be disassembled and reassembled

12  if we wanted to get a different kind of instrument onto the

13  arm.  And so, again, this -- this arm was meant just to have

14  sort of core capability that we were trying to engineer into

15  the system.

16  Q.  You mentioned the diameter being larger.  Can you show us

17  what part of the instrument you're talking about when you say

18  that?

19  A.  Sure.  So it is -- this shaft here is the instrument on

20  this arm.  That's the part that goes into, in this case, the

21  abdomen of the body.  And so, typically, when you hear surgeons

22  or care team professionals talking about instrument sizes,

23  they're referring to the diameter of the instrument.

24      And so this one, for instance, is probably on the -- about

25  11 millimeters.  You'll hear 8 millimeters quite a bit in

ROSA - DIRECT / MICHAEL

1  reference to our instrument.  Some instruments are

2  5 millimeters.

3  **Q.**   And you said that this instrument was not really

4  detachable.  Was it important to Intuitive to be able to design

5  an instrument that would be detachable from the arm?

6  **A.**   For sure.  It's critical to have the ability to

7  interchange instruments throughout the case.  Surgeons need all

8  different kinds of capabilities: suturing, cutting, dissecting,

9  grasping, whatever it may be as they perform the case.  So

10  instruments are interchanged throughout the case.

11  **Q.**   I think I may have neglected to ask you earlier why this

12  is called the Lenny.

13  **A.**   So we -- engineers love to name projects.  And so what we

14  had wanted to do at Intuitive was, whatever design it was going

15  to be that we were going to commercialize, we wanted to call

16  that da Vinci.  We really thought da Vinci was an extraordinary

17  inventor and human being, so we thought it would be a good name

18  for our final project, our final program.

19      So we just backed up from there and called the previous

20  versions of it something to do with da Vinci.  So in this case

21  it's Lenny.  You'll see our next one is called Mona for Mona

22  Lisa.

23  **Q.**   And do you have with you today a physical version of the

24  next iteration, the Mona instrument?

25  **A.**   Yes.  So --

ROSA - DIRECT / MICHAEL

```
 1              MR. MICHAEL:  Before you hold that up, at this point,

 2    Your Honor, I would offer into evidence TX1644.009, the Mona

 3    instrument.

 4              MR. McCAULLEY:  No objection.

 5              THE COURT:  It's admitted.

 6         (Trial Exhibit 1644.009 received in evidence.)

 7    BY MR. MICHAEL:

 8    Q.   So, Mr. Rosa, if you could point out and show to the jury

 9    the Mona instrument, TX1644.009, for the record?

10    A.   Sure.  So once we sort of understood the fundamental

11    capability of this arm and what we were trying to do, we had an

12    idea what we wanted to with the next version, which we called

13    Mona.  And one of the primary changes was to have an

14    interchangeable instrument now.  So instead of it being

15    integrated into the arm like you see here, we developed,

16    you know, kind of a very early version of the EndoWrist that

17    had some of the -- kind of the core characteristics, I would

18    say, to be able to attach to the arm and detach from the arm

19    during surgery.  It was able to be sterilized.  We were able to

20    have a couple of different instrument tips for surgery.

21    Q.   You mentioned, earlier in your testimony, the term

22    miniaturization; is that right?

23    A.   Yes.

24    Q.   Can you explain how you got from this Lenny instrument to

25    the smaller Mona instrument that you're holding in your hand?
```

ROSA - DIRECT / MICHAEL

1  A.   Sure.  So this instrument maybe is 11 millimeters or so.

2  This one was downsized a bit to about 10 millimeters, and then

3  downsized again as we go forward in generations.  And it --

4  it's one of the most critical aspects of the instrument design,

5  is the smaller you make the diameter, the better it is for the

6  patient, but makes it much more difficult to engineer cables

7  and pulleys and other parts of the instrument to be reliable

8  and robust.

9  Q.   And can you show the jury, on the Mona instrument, how the

10  wrist mechanism would work and where it's controlled from?

11  A.   Sure.  So for this instrument, it's going to look somewhat

12  similar to the one on the Lenny arm, but there's an

13  articulation section here at the end.  Again, a little bit like

14  your own wrist, where it can move up and down, left and right.

15  And in this case, there's no grip.  It only has a single

16  finger.  But it has, typically, four degrees of freedom.

17  That's what we call a degree of freedom, is up and down, left

18  and right, and two grippers typically.

19      Those are controlled by -- these disks, these little metal

20  disks up on top of the instrument, again, very similar to an

21  EndoWrist today.  So each one of these disks, if you will -- we

22  called them oak leaves in the day -- are controlled by a motor

23  on the arm.  And so as the surgeon moves the controller when

24  they're sitting down at the console through a series of

25  algorithms and other things, it moves each one these disks

ROSA - DIRECT / MICHAEL

```
 1  which, in turn, move the wrist inside the body.
 2  Q.   What was the next development after the Mona?
 3  A.   Let's see.  What was the next one?  I think we go, then,
 4  to our first commercial system.
 5  Q.   Was that called the da Vinci Standard?
 6  A.   It was.
 7  Q.   And do you have an example to show the jury what those
 8  first commercial instruments used with the da Vinci Standard
 9  looked like?
10  A.   I do.
11         MR. MICHAEL:  And, Your Honor, I would offer into
12  evidence TX1644.010.
13         MR. McCAULLEY:  No objection.
14         THE COURT:  It's admitted.
15     (Trial Exhibit 1644.010 received in evidence.)
16  BY MR. MICHAEL:
17  Q.   So, Mr. Rosa, if you would hold up that next exhibit,
18  TX1644.010, for the record, and identify that for the jury,
19  please.
20  A.   Sure.  So this is, again -- now, the next generation of
21  one of the EndoWrists instruments and it substantially will
22  have some of the same characteristics we just described, with a
23  wrist on the end that is more or less the same architecture
24  that you see on those other two instruments.
25         We've refined the back of this instrument to better engage
```

ROSA - DIRECT / MICHAEL

1   with the arm to be more easily removed and inserted during

2   surgery.  And then we've reduced now the diameter of the

3   instrument from about 10 millimeters on the Mona prototype to

4   about now 8 millimeters for the da Vinci Standard instrument.

5   **Q.**  And as you reduced the diameter from the Lenny to the Mona

6   to the da Vinci Standard instrument, or the first EndoWrist,

7   what was happening to the design of the components inside the

8   instrument?

9   **A.**  So during -- as we're moving along here, we have to

10  continue -- we're continuously working and redesigning

11  components of the instrument to better -- to have the

12  reliability, the robustness, and the performance, the

13  capabilities that we believed were needed in surgery to

14  effectively perform the task that the surgeon required.

15      And so what we'll be redesigning, the back-end pulleys and

16  cables, the front-end pulleys and cables in order to ensure

17  their performance as we continue to downsize the instrument.

18      **THE COURT:**  Mr. Michael, I'm going to pause you there

19  because we're at the 2:30 mark.

20      **MR. MICHAEL:**  Sure.

21      **THE COURT:**  So, members of the jury, I'm going to send

22  you on your way for the day with the friendly reminders to

23  please not discuss the case amongst yourself or with friends or

24  familiar or anyone in any way.

25      Mr. Rosa, let me go ahead and ask you to go ahead and have

PROCEEDINGS

1  a seat over there.

2      Please don't do any research.  Please don't look for any

3  information about this case, since you'll get everything you

4  need here.

5      We will see you -- we'll start up tomorrow again at 8:30,

6  please, as you've been doing.  Thank you-all for being so

7  punctual in the mornings.

8      We'll see you-all tomorrow morning.

9      All rise for the jury.

10                  (The jury leaves the courtroom.)

11    (Proceedings were heard out of the presence of the jury.)

12      THE COURT:  You may be seated.  Folks, I know that

13  we'll have -- thank you for the binders.  I know we'll have

14  some exhibits to talk about tomorrow with regard to -- well,

15  we'll do them as Mr. Rosa is testifying.  I did also see

16  deposition designations from you-all already submitted.  Is

17  there anything else that you-all wanted to discuss before we

18  end for the day?

19      I see you-all shaking your heads.

20          MR. GALLO:  Nothing, Your Honor.  That's it.

21          MR. McCAULLEY:  Nothing, Your Honor.

22          THE COURT:  All right.  With that, counsel, I'll see

23  you tomorrow morning.  Thank you.

24                  (Proceedings adjourned at 2:32 p.m.)

25                       ---o0o---

Volume 11

Pages 1770 - 1984

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. C 21-03496 AMO ) |
| INTUITIVE SURGICAL, INC., | ) San Francisco, California ) Wednesday |
| Defendant. | ) January 22, 2025 |
| -----------------------------------) | ) 8:00 a.m. |
| AND RELATED COUNTERCLAIMS. | ) |
| _____ | ) |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**         MCCAULLEY LAW GROUP
                   180 N. Wabash Avenue
                   Suite 601
                   Chicago, Illinois 60601
              BY:  **RICHARD McCAULLEY JR., ESQ.**


                   HALEY GUILIANO LLP
                   111 Market Street
                   Suite 900
                   San Jose, California 95113
              BY:  **JOSHUA V. VAN HOVEN, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
          Official Reporter - US District Court
          Computerized Transcription By Eclipse

1771

**APPEARANCES**:  (CONTINUED)

**For Defendant:**

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
2001 K Street NW
Washington, D.C. 20006
BY:  **KENNETH A. GALLO, ESQ.**
     **PAUL D. BRACHMAN, ESQ.**


PAUL WEISS RIFKIND WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
BY:  **WILLIAM MICHAEL, ESQ.**


PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
535 Mission Street
24th Floor
San Francisco, California 94105
BY:  **JOSHUA HILL, JR., ESQ.**


**Also Present:**           **Bobby Cox**
                            **Ryan Lee**
                            **Greg Posdal**


- - -

1772

## I N D E X

Wednesday, January 22, 2025 - Volume 11

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **ROSA, DAVID** | | |
| (PREVIOUSLY SWORN) | 1793 | 11 |
| Direct Examination Resumed by Mr. Michael | 1793 | 11 |
| Cross-Examination by Mr. McCaulley | 1937 | 11 |

- - -

## E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| TX-602-R | | 1813 | 11 |
| TX-616-R | | 1843 | 11 |
| TX-1314 | | 1918 | 11 |
| TX-1323 | | 1917 | 11 |
| TX-1325 | | 1921 | 11 |
| TX-1389 | | 1906 | 11 |
| TX-1394 | | 1929 | 11 |
| TX-1585-R | | 1872 | 11 |
| TX-1632.022-R | | 1902 | 11 |
| 1633.003-R | | 1832 | 11 |
| TX-1634.323 | | 1839 | 11 |
| TX-1642 | | 1869 | 11 |

— — —

1773

PROCEEDINGS

```
 1  Wednesday - January 22, 2025                        8:01 a.m.

 2                    P R O C E E D I N G S

 3                        ---o0o---

 4       THE CLERK:  Recalling Civil Matter 21-3496, Surgical

 5  Instrument Service Company Incorporated v. Intuitive Surgical

 6  Incorporated.

 7       Counsel, please state your appearances for the record,

 8  starting with the plaintiff.

 9       MR. McCAULLEY:  Good morning.  Richard McCaulley on

10  behalf of plaintiff, SIS.  Along with me is Joshua Van Hoven

11  and Greg Posdal.

12       THE COURT:  Good morning.

13       MR. GALLO:  Good morning, Your Honor. Ken Gallo for

14  Intuitive, along with Bill Michael, Josh Hill, and Dave Rosa.

15       THE COURT:  Good morning.

16       So, folks, I know we have a full agenda this morning, and

17  I want to start by taking care of logistics for the testimony

18  getting put on today.  And then I understand plaintiffs would

19  like to be heard further with regard to the Rule 50 motion made

20  yesterday.

21       But let's -- if we can start, please, with just the pieces

22  that we need to for today.  So I know that there's the video

23  deposition and an objection to some of the testimony to

24  discuss.

25       So can we start there?
```

1774

PROCEEDINGS

```
 1              MR. GALLO:  Just for clarity, Your Honor, obviously if
 2    the Court wants to hear -- this deposition is not going to go
 3    until Thursday or Friday.  So we can do it now.  Obviously,
 4    that's your call, but just so you know.
 5              THE COURT:  I appreciate that.  Let's go ahead and do
 6    it now because it's short, sweet and I have it in front of me.
 7    I will lose my notes on it by Thursday.
 8         But thank you, Mr. Gallo.
 9              MR. VAN HOVEN:  Joshua Van Hoven for plaintiff SIS.
10              THE COURT:  Before you start, Mr. Van Hoven, let me
11    note for you all, we do -- the court reporter that has been
12    with us is out sick.  So I want to remind you all to please
13    make sure to speak slowly and everything into the microphone
14    because Ruth got used to you all.  She knows who you are.  But
15    you're back sort of at square one with folks -- with -- Debbie
16    doesn't know who you are.  So just be prepared to need to
17    start -- you have been with me ten days, but not with Debbie.
18    So, all right.
19         Mr. Van Hoven, go ahead.
20              MR. VAN HOVEN:  Yes.  So we're talking about the John
21    Francis deposition, and specifically the designations between
22    18 -- Page 18, Line 8 and Page 18, Line 17.  These are,
23    essentially, Mr. Francis repeating hearsay from third parties
24    about which he does not really remember the content of the
25    hearsay even.
```

1775

PROCEEDINGS

 1      So our objections are on 602 and hearsay basis.

 2          THE COURT:  Go ahead.

 3          MR. BRACHMAN:  Good morning, Your Honor.  Paul

 4  Brachman for Intuitive.

 5      Our response to the objection is, we think this testimony

 6  is combined with some of the testimony that was allowed in

 7  yesterday where, indeed, the witness does say he talked to

 8  other individuals who provided him with information, but then

 9  provided him with a basis to respond to the question.

10          THE COURT:  While I agree with you that the 802

11  objection is one I would likely overrule, I'll sustain the 602

12  objection because the -- because Mr. Francis specifically says,

13  "I don't know and I can't speak to that."

14      So I'll sustain the 602 objection to that portion of the

15  deposition.

16          MR. McCAULLEY:  And I believe that's all for the

17  designations, Your Honor.

18          THE COURT:  All right.  Let me ask you all to

19  Mr. Gallo's point -- and you all let me know if this is a

20  question better posed to Mr. Gallo.  I know Mr. Rosa will be

21  taking the stand today.

22      What else are we doing today?

23          MR. GALLO:  After Mr. Rosa will be our -- an expert

24  surgeon Dr. Meng will testify.

25      And then after Dr. Meng, we have the Chief Medical Officer

**PROCEEDINGS**

```
 1   of Intuitive, Dr. Myriam Curet, which will be today, tomorrow
 2   morning, depending on how things go.
 3        And then we have Grant Duque, Intuitive employee on
 4   testing issues mostly.
 5        And then Dr. Howe, who talks about the testing done by
 6   Rebotix.
 7        A very short deposition or two, no more than 30 minutes.
 8        And then our economist, Dr. Smith.
 9        And we'll rest.
10        And, Your Honor, I was going to wait till later in the day
11   to see how things go, but since I'm standing, I'll say it seems
12   entirely possible that we could rest on Friday.  Of course, I
13   don't know how long the cross examinations are, but I just
14   wanted to alert the Court to that for your own scheduling
15   purposes.
16        THE COURT:  Thank you, Mr. Gallo.  That is
17   tremendously helpful, because I was going to talk -- I had
18   planned to speak with you all today about -- well, I appreciate
19   that, Mr. Gallo.  I have some things on my agenda that may be
20   implicated by what you're sharing in terms of your schedule.
21        I'm sorry.  Mr. Gallo, may I ask you one other question.
22   Is Dr. Meng -- who is using the robot?
23        MR. GALLO:  Dr. Myriam Curet, who is our Chief Medical
24   Officer, will be after Dr. Meng.
25        THE COURT:  All right.  Are you all -- at some point
```

PROCEEDINGS

```
 1   we talked about taking a break so it can get moved to over
 2   there.
 3            MR. GALLO:  Let me ask Mr. Hill.  It's not an easy
 4   thing to move.
 5            MR. HILL:  Yes, Your Honor.  Depending on the timing,
 6   we'll need a break to move this.  I anticipate that Dr. Curet
 7   will testify tomorrow, not today.
 8       So I spoke to your deputy this morning about potentially
 9   setting it up after court today so it's ready to go in the
10   morning.  That is our sort of expectation as of now, but we'll
11   see how the timing goes today with the witnesses.
12            THE COURT:  Just keep it somewhere in front of mind
13   and let me know.  As you all saw yesterday, we will let the
14   jury take a break where they need to do things; but if we can
15   do it overnight, that would be ideal.
16            MR. GALLO:  Okay.  Thank you.
17            THE COURT:  Let's pick up plaintiffs' request to be
18   heard on defendant's Rule 50 motion.
19            MR. McCAULLEY:  Thank you, Your Honor.  Richard
20   McCaulley on behalf of plaintiff SIS.
21       Your Honor, during the rebuttal that I provided yesterday,
22   I referred to a declaration of -- you know, Your Honor, as a
23   point of order, since Mr. Rosa is under oath and some of this
24   will touch on cross-examination, may I ask that he be excused
25   for the preliminaries?
```

PROCEEDINGS

```
 1              THE COURT:  Any objections?

 2              MR. GALLO:  No objection.

 3              THE COURT:  All right.  We'll see you shortly,

 4    Mr. Rosa.  Thank you.

 5          (Mr. Rosa exits the courtroom.)

 6              MR. McCAULLEY:  And for the record, Your Honor, I

 7    refer to a declaration, and I wanted to identify that for the

 8    record.  It's Docket Number 137-2 from this case, and I have a

 9    copy for the Court, if you would like me to hand it up.

10              THE COURT:  You're welcome to.

11          (Whereupon document was tendered to the Court.)

12              MR. McCAULLEY:  Your Honor, I point out what I was

13    referring to yesterday -- and it raises some other issues about

14    the record in this case -- was Paragraph 46, which is at the

15    end of that declaration from Mr. Rosa.  And it says:  This

16    statement -- with reference to the FDA statement that Intuitive

17    posted on its website in March of 2023.

18          [As read]:

19              "This statement accurately reflects Intuitive's

20          current policy towards the activities of EndoWrist

21          manufacturers.  To be clear, Intuitive views tampering

22          with an EndoWrist to reset its use counter through any

23          means not cleared by FDA as unlawful and potentially

24          dangerous."

25          As Your Honor is aware, and at the heart of many of the
```

PROCEEDINGS

1    Court's rulings that we have wrangled about during the course

2    of this trial, the Court ruled that the service that SIS and

3    Rebotix were offering in 2019 and 2020 did not require FDA

4    approval.

5         And my client is not in a business -- SIS is not in a

6    business that requires FDA approval.  They don't get FDA

7    approval.  It's expensive, and it's completely unnecessary in

8    light of the Court's ruling that the FDA has never taken action

9    to shut down either Rebotix or SIS.

10        And I think, Your Honor, the notion that's been injected

11   into this trial, the only people in the courtroom that don't

12   know that Restore and Rebotix got their authorization at the

13   point of a bayonet and settlement of litigation are the jury.

14   Everyone else knows it.  The witnesses knows it.  My client

15   knows it.

16        And I think, Your Honor, that a curative instruction is in

17   order.  Rebotix and Restore both got their authorization before

18   the statement that was put on the website, which now Mr. Rosa

19   characterizes as company policy -- current policy could be

20   revoked.

21        I think that the jury is entitled to know, and that the

22   record demands to know, for fairness and to avoid prejudice to

23   SIS, that to the extent that Restore or Rebotix received any

24   authorization or permission to offer a product, that it came as

25   a result of settlement of litigation and, in fact, litigation

1780

**PROCEEDINGS**

1  that has been characterized by Intuitive in this case as

2  legally and factually identical to this case.

3      And so I would ask that the Court entertain entering a

4  curative instruction that indicates that to the extent the jury

5  has heard about approval or authorization, that that came as a

6  result of settlement of litigation.

7      And, Your Honor, it raises another point.  I've got -- I

8  could use some guidance from the Court, and I could perhaps

9  display it here.  But during his deposition, which took place

10  in, I believe, March of 2023 or May of 2023, so I would like

11  permission to use it to cross-examine this witness.

12      And specifically on Page 152 and 153 Mr. Rosa was asked:

13      "QUESTION:  What was Intuitive's policy in this regard

14      before this statement came -- comes out in and around

15      early March of 2023?  What was Intuitive's policy

16      about shutting down or whether people could get

17      authorized?"

18      And the answer was:

19      "ANSWER:  You know, when I think about it, our

20      conversations, I don't know that we had a clear sort

21      of an agreed-to policy within the company.  So I'm

22      actually not sure if I could have said, 'Here is our

23      policy for our cleared instruments.'"

24      So to the extent that I asked that, first of all, I assume

25  that the witness has been instructed that he can't talk about

**PROCEEDINGS**

1    won't come for awhile, so you'll have a chance to look at it.

2        The important piece of this procedure that Judge Chhabria

3    lays out so well is the following:  Nothing gets read to the

4    jury.  You have Mr. Rosa testify.  You show me what you want to

5    read to them that you think is inconsistent.  I'll let you know

6    if I agree that it's inconsistent, and then maybe let you read

7    it to the jury.  There will be no reading him his deposition at

8    any point.

9        And now that I'm giving these to you, we're not doing this

10    ever again, despite my having allowed it up until now from the

11    rest of you.  We're not doing it anymore.  You have to convince

12    me going forward that the testimony on the stand is actually

13    inconsistent with what's in the deposition before you start

14    reading to a witness from their deposition.  I will get that to

15    you all.

16        All right.  Last piece -- so there's your guidance

17    about -- there's your guidance about how you want to question

18    Mr. Rosa.  If he testifies in a way that is inconsistent with

19    something that he said at his deposition, you show it to me.

20    We'll see whether or not you get to read that to the jury to

21    show that he's giving inconsistent testimony today.

22        You will not question him about the FDA because, again,

23    that's not part of what we're doing here beyond the cure for

24    the error made earlier in this trial.

25        Finally, with regard to defendant's Rule 50 motion, I

**PROCEEDINGS**

1  perhaps should have spared all of you this by starting here

2  this morning, which is that having viewed the evidence

3  presented so far, and without making credibility determinations

4  or weighing the evidence, I find that there is substantial

5  evidence to support a finding by reasonable jurors in

6  plaintiffs' favor.  So Intuitive's Rule 50 motion is denied.

7  That's the end of the Rule 50 motion.

8      All right.  Before we get the jury and before we start,

9  let me flag just a handful of things for you.  I want to remind

10 you that we learned yesterday from Juror Number 2 that she has

11 a funeral in her family coming up on January 30.

12     My proposal to you all that I asked you to discuss is

13 whether we just prepare for her -- well, we may not get there.

14 We may not -- from what I'm hearing from Mr. Gallo, we may not

15 need to do this.

16     But on the chance that the jury isn't already deliberating

17 by that point, I want to suggest to you all whether you want to

18 prepare something for Juror Number 2 the way we did for Juror

19 Number 5.  We can keep revisiting.  I just want to keep that in

20 the back of your minds as we go.

21     The other note I had for you all -- well, I'll save that

22 for later, because I do want to get the jury in here on time.

23 You already let me know about the robot.

24     I want to talk with you all really quickly about Mr. Rosa

25 testifying -- actually, any of defendant's witnesses who might

ROSA - DIRECT / MICHAEL

1    A.    No.

2    Q.    You heard testimony in this case that SIS started offering

3    EndoWrist resets around 2019; is that correct?

4    A.    That is correct.

5    Q.    So that's roughly 20 years after Intuitive put in place

6    the use limits on EndoWrists?

7    A.    Roughly, yes.

8    Q.    And roughly 20 years after Intuitive sold the first

9    EndoWrists with a use counter on it?

10   A.    Correct.

11   Q.    By 2019 or 2020 did you have any general understanding of

12   what unauthorized third parties, like SIS and Rebotix, were

13   proposing to do to modify EndoWrists?

14   A.    I did have a general understanding.

15   Q.    What did you generally understand them to be proposing to

16   do?

17   A.    So what I -- what I generally understood was that they

18   were going to remove the back of the instrument, this cover,

19   and insert a new PCB, new circuit board, that would bypass the

20   use counter of the instrument.

21        They would do maybe some other adjustments to the

22   instrument, close it back up and sell it with an extended

23   number of lives.

24   Q.    There has been some discussion in the trial so far about

25   something called Project Dragon.  Do you know what that was

ROSA - DIRECT / MICHAEL

1  generally?

2  **A.**   I do generally, yes.

3  **Q.**   Was -- did that involve the -- consideration by Intuitive

4  about a process to refurbish EndoWrists?

5  **A.**   It was.  It was our project name inside the company for

6  our refurbishment program.

7  **Q.**   Was the refurbishing of EndoWrists that Intuitive was

8  considering doing with Project Dragon the same or different

9  from what you understood the unauthorized third parties to be

10  doing in 2019 or 2020?

11  **A.**   It was actually quite different.

12  **Q.**   How was it different, in your understanding?

13  **A.**   So for Project Dragon, the -- the idea was that we would

14  take a -- an expired instrument, not one with one or more lives

15  remaining.  We would bring it back to Intuitive and we would

16  have to handle it appropriately, clean and sterilize it.

17       But, importantly, we would disassemble the instrument into

18  its core components, discard the components that we believe

19  were wearing items or may have some other performance

20  challenges.  So things like the mechanical cables, electrical

21  cables, tips, or endofactors of the instrument.  There is a

22  seal inside the instrument.  Things like that that would be

23  discarded.

24       And then we would look to retain and put back through our

25  process certain other parts of the instrument that we believe

ROSA - DIRECT / MICHAEL

```
 1   would be non-wearing items.  For example, maybe the chassis,
 2   the plastic chassis of the instrument.
 3   Q.   And how was that process different from what you
 4   understood the unauthorized third parties to be doing at that
 5   time?
 6   A.   So as I understand that process, it's taking the exact
 7   same instrument, if you will, that has one or more lives
 8   remaining and not replacing any of the wearing components that
 9   I just described; not replacing cables, not replacing the seal,
10   but performing some -- perhaps some adjustments to that, and
11   then adding in the circuit assembly into the back of the
12   instrument to bypass the circuit board that's in there and
13   adding in extended lives to it.
14   Q.   Ultimately did Intuitive decide to pursue Project Dragon,
15   to your knowledge?
16   A.   Ultimately we did not pursue it.
17   Q.   And was that decision made in or around 2020?
18   A.   To the best of my knowledge, it's about -- you know, it's
19   in the first half of 2020.
20   Q.   And was the refurbishment program that Intuitive was
21   considering at that time, was that about X and Xi EndoWrists?
22   A.   That -- the refurbishment program that we're talking about
23   there is about X and Xi.
24   Q.   So what is your understanding as to why Intuitive decided
25   not to pursue a refurbishment program for X and Xi instruments
```

ROSA - DIRECT / MICHAEL

1   in or around 2020?

2   **A.**   What we were trying to do when investigating that program

3   was ultimately pass on a price discount, and to lower the price

4   to our customers.  And so one way in which to do that would be

5   to say:  Can we refurbish instruments, lower the cost of

6   manufacturing, and pass some of that on to our customers?

7        Ultimately, we decided on a different approach that has

8   been mentioned here called the Extended Use Program that

9   provided substantially the same lowering of price, the same

10  price discount to customers as Project Dragon was contemplated

11  to deliver.

12  **Q.**   Why was Intuitive looking to launch a program that would

13  pass on price discounts to its customers around that time?

14  **A.**   So if you look at the history of Intuitive, at the

15  beginning of the company and through its first decade or more,

16  the adoption that surgeons were undertaking of the system had

17  mostly to do with taking what would have been an open

18  surgery -- so where large incisions are made -- and converting

19  that to a minimally invasive approach.  And that, you can

20  imagine, would have lots of benefits for the patient that were

21  described yesterday.

22        As the company progresses and the adoption of robotics

23  continues, more and more now surgeons are starting to use

24  robotics where laparoscopy used to be sort of the -- the

25  dominant modality of providing surgery for that patient.  And

ROSA - DIRECT / MICHAEL

1    so there that is a minimally invasive operation.

2         And so the difference between a laparoscopic case and a

3    robotic case is not as obvious as going from an open surgery to

4    a robotic case.

5         So when that happened, what we wanted to do was be more

6    price competitive, if you will, with what was happening in

7    laparoscopy.

8         And so the Extended Use Program, Project Dragon, were

9    contemplated to lower -- to help lower the cost of the

10   instruments that were used in the laparoscopic -- or in the

11   robotic cases that were then starting to compete with existing

12   laparoscopic cases.

13   **Q.**   And ultimately why did you consider the Extended Use

14   Program to be a superior way to achieve that goal or those

15   goals as compared to Project Dragon?

16   **A.**   So Project Dragon had with it, really, a lot of new

17   processes for Intuitive:  Hiring teams to collect instruments,

18   bringing back contaminated instruments, reprocessing,

19   disassembly as compared to -- if you were to look at the

20   Extended Use Program, what that was about was engineering

21   changes on the instrument that, taken together, allowed us to

22   extend the use.

23        So it was a much more certain program that fit into the

24   way in which our business was running, the infrastructure of

25   Intuitive.  And so that when looking at the two of those, it

ROSA - DIRECT / MICHAEL

1  became clear that the Extended Use Program was the best way to

2  pass on a price change to our customers.

3  **Q.**   By how much did you extend the uses on the certain X and

4  Xi instruments that were part of the Extended Use Program in

5  2020?

6  **A.**   So for the Extended Use Programs, the additional lives

7  ranged from two to eight.  So it went from now there was a

8  group of instruments still a 10, 12, 14, up to 18.

9  **Q.**   And just generally, in your understanding, what was it

10 that determined those numbers?

11 **A.**   So, again, it goes back to the engineering and the design

12 of the instrument itself.  So we had made a number of changes

13 over the years to help increase the reliability of those

14 instruments.  A lot goes how it's used in a case.

15     A needle driver has very high forces and a lot of

16 articulation that puts stress on the instrument as compared to,

17 say, a grasper that may not have nearly as much stress put on

18 it.

19     And then it's life testing that supports the design.  It

20 supports the intended use and ultimately results in the life

21 that it's indicated for.

22 **Q.**   Does the fact that you were able to add between two and

23 eight uses to some of the EndoWrists in 2020 indicate to you

24 that the use limits you had set previously that were arbitrary

25 or wrong?

ROSA - DIRECT / MICHAEL

1    A.    No.  If you look at what happened for the Extended Use

2    Program, where, again, we had over the years made a number of

3    design changes really intended to help the reliability, you can

4    see that the number of uses that were added, at the very

5    highest number, was eight more uses.  And so it didn't -- you

6    know, it's in the ballpark of what the existing limits were at

7    ten.

8         And then there's also a set of data that we get back what

9    we call RMA data.  So as we get instruments back from the

10   field, those are these Return Material Authorization.  You've

11   heard about that.  Customers send something back to us because

12   they are not working as expected.  Then that's another set of

13   data that helps us understand how the instruments are

14   performing in the field and whether or not they are meeting

15   their intended life.  And so two of those things sort of

16   support the limits that existed.

17   Q.    When Intuitive learned that a customer was using an

18   unauthorized third party to modify and reset the use counter on

19   an EndoWrist, did Intuitive, to your knowledge, have a process

20   for responding to or addressing that?

21   A.    We -- yes, we did have a process.

22   Q.    And can you describe your understanding of that process?

23   A.    Sure.  So the -- the first part of that really is becoming

24   aware that that was happening.  And we're able to do that

25   because we can see the instruments that are being used on a

1859

ROSA - DIRECT / MICHAEL

1  system and whether or not a particular serial number is being

2  used beyond its intended life.

3       So we can become aware -- that's one way in which we can

4  become aware.

5       Then after that was to interact with a -- with a hospital

6  to let those who are responsible for the robotic program as a

7  whole, make sure that they understood they were using

8  unauthorized instruments with the system and there could be

9  potential implications for that use.

10       And then if they continued to use unauthorized instruments

11  after that interaction and conversation back and forth, as a

12  last resort we could say that we're going to discontinue

13  service.

14  Q.   Did part of the interaction you would have with some of

15  your customers involve sending letters?

16  A.   Yes.

17  Q.   In this case, SIS has referred to those as "threat

18  letters."  Was Intuitive trying to threaten its customers when

19  you sent them those letters?

20  A.   No.  Really, what -- what those letters were intended to

21  do are two things:  Make sure that everyone who should know in

22  the hospital does know that unauthorized instruments are being

23  used.  And those that should know could be risk management and

24  clinical folks and supply chain and perhaps executives, just to

25  make sure everybody is on the same page.

ROSA - DIRECT / MICHAEL

1    And then the other part of that is to ensure that they

2  understand that they are, indeed, in violation of the terms of

3  the agreement that was signed between the two parties.

4  **Q.**   Did Intuitive send those kinds of letters to all of its

5  hospital customers?

6  **A.**   No.

7  **Q.**   Did you send them to most of your hospital customers?

8  **A.**   No.

9  **Q.**   To your knowledge, was it a large or a small percentage of

10  customers that received letters like the ones you described?

11  **A.**   It's a small percentage.

12  **Q.**   Let me ask you to turn to Tab 4 in your binder.

13    And for the record, it's a document marked TX-942-R, which

14  is in evidence.

15    (Witness complied.)

16  **Q.**   Mr. Rosa, do you recognize TX-942-R as an example of the

17  kind of letter that you just described?

18  **A.**   I do.

19    **MR. MICHAEL:**  Your Honor, if I may have permission to

20  publish TX-942-R to the jury?

21    **THE COURT:**  It's already admitted you said,

22  Mr. Michael; is that right?

23    **MR. MICHAEL:**  Yes.

24    **THE COURT:**  Okay.

25    **MR. MICHAEL:**  Thank you.

1937

ROSA - CROSS / MCCAULLEY

```
 1   A.    I do.

 2           MR. MICHAEL:  Mr. Lee, can you go back to slide 15,

 3   please.

 4       (Document displayed.)

 5   BY MR. MICHAEL:

 6   Q.    In 1996 when you were designing and building the Lenny

 7   prototype, was SIS doing anything to contribute that work?

 8   A.    They were not.

 9   Q.    Did SIS do anything to assist Intuitive in the development

10   of any of the subsequent da Vinci systems?

11   A.    They have not.

12   Q.    Did Intuitive invest $5 billion in research and

13   development over 25 years because of competition from SIS or

14   other unauthorized third parties?

15   A.    No.

16   Q.    And in your experience, has SIS contributed anything at

17   all to Intuitive's investments and innovations over the years?

18   A.    They have not.

19   Q.    Thank you, Mr. Rosa.  That's all the questions I have at

20   this time.

21           THE COURT:  Thank you, Mr. Michael.

22                      CROSS-EXAMINATION

23   BY MR. McCAULLEY:

24   Q.    Good afternoon, Mr. Rosa.

25   A.    Good afternoon.
```

ROSA - CROSS / MCCAULLEY

1   Q.   If I call you Dr. Rosa, take my apologies.  Just take the

2   compliment.

3   A.   I will.

4   Q.   I had a Dr. Rosa in college.

5        Hopefully, we can start with some non-controversial

6   things.  I'm sure we won't be able to agree on everything.

7        Starting with that slide that you just looked at, and you

8   started working on the Lenny in 1996; correct?

9   A.   Correct.

10  Q.   And at that time, there were no minimally invasive soft

11  tissue robots; correct?

12  A.   In 1996 there was not another soft tissue robot.

13  Q.   Is that a terminology that we can agree on, "soft tissue

14  robot"?  You'll know what I'm talking about?

15  A.   I do.

16  Q.   Okay.  And you were asked some questions in the latter

17  portions of your direct exam by Mr. Michael about some market

18  share information; correct?

19  A.   Correct.

20  Q.   And if you -- I want to talk about the evolution of

21  competition in the soft tissue robot market, if you will.

22       Have you heard it referred to internally at Intuitive as a

23  "robotic revolution"?  Do you know what that refers to?

24  A.   No, I haven't heard that.

25  Q.   Dr. Curet has never used that term with you?

ROSA - CROSS / MCCAULLEY

```
 1   A.    Not to my recollection.

 2   Q.    So in 1996, when you started in on the Lenny, there were

 3   basically two types of surgery, do you agree, open and

 4   minimally invasive laparoscopic?

 5   A.    I agree.

 6   Q.    And the design of the -- the evolution of the Intuitive

 7   products that you talked about at length in your testimony were

 8   made to perform surgeries; correct?

 9   A.    Correct.

10   Q.    They were made to take market share from those other

11   modalities of surgery; correct?

12   A.    So they were meant to compete with those, and provided

13   they produced better outcomes, then we would hope to convert

14   those operations, yes.

15   Q.    When you started, you'll agree that you had to take market

16   share from the other methods of surgery that were then

17   available; right?

18   A.    So the other two that existed on the market would have --

19   those surgeries would have to be converted to robotic surgery

20   for -- for our business to be successful, yes.

21   Q.    And in 2000 -- let me begin again.

22         In 1998, you introduced the da Vinci Standard; correct?

23   A.    In 1998, that's correct.

24   Q.    And at that time, there were no other soft tissue robots

25   available in the United States commercially; correct?
```

ROSA - CROSS / MCCAULLEY

```
 1   A.   I -- so there is another system that becomes available
 2   called "Zeus" from Computer Motion.  I just don't remember --
 3   it's in this time frame roughly that it becomes available, I
 4   just don't remember when.
 5   Q.   Do you recall approximately how many of the da Vinci
 6   Standards sold in the 1998/1999 time frame?
 7   A.   So -- in the U.S.?
 8   Q.   Yes.
 9   A.   I don't remember.  Let's see.  I know in 1998 for sure it
10   was sold into Europe.  In 1999, I don't recall.
11   Q.   Do you recall how many Standards, approximately, you sold
12   in the United States while that product was available?
13   A.   I don't.  I would be speculating on the order of a couple
14   of hundred.
15   Q.   And how many Zeus computer robots were sold in the United
16   States, if you know?
17   A.   I don't know.
18   Q.   Did you, Intuitive, have a greater market share than Zeus?
19   A.   We did.
20   Q.   Was it considerably greater?
21   A.   So we sold more robots than Computer Motion did, to my
22   recollection.  I don't remember the numbers to say if it was
23   considerably greater or not.
24   Q.   Is Zeus still available today?
25   A.   No, it is not on the market.
```

ROSA - CROSS / MCCAULLEY

1  Q.   And I believe you said this.  Who was the company that

2  produced the Zeus?

3  A.   It was called Computer Motion.

4  Q.   Does Computer Motion have any commercially available

5  surgical robots today?

6  A.   Computer Motion does -- it doesn't exist.

7  Q.   Did it have any other surgical robots, other than the

8  Zeus?

9  A.   It had one -- again, it depends on your definition.  But

10  it did have a system that would hold an endoscope for

11  laparoscopic surgery that was controlled by a surgeon's --

12  through voice commands primarily.

13  Q.   Did Intuitive -- well, let me begin again.

14       How long was that system available for?

15  A.   That system being?

16  Q.   The one you just referred to from Computer Motion.

17  A.   The endoscope controller was known as Aesop for a number

18  of years.  I don't remember exactly.

19  Q.   You introduced the S in around 2006?

20  A.   Correct.

21  Q.   And the S had EndoWrists associated with it; correct?

22  A.   Yes.

23  Q.   And you sold EndoWrists along with the S; correct?

24  A.   They were -- they could be purchased together at the

25  initial acquisition of a robot or acquired over time.

ROSA - CROSS / MCCAULLEY

1   Q.   And primarily they were acquired over time; correct?

2   A.   Provided the system was used by the customer, then it

3   would make sense that they would be more acquired over time.

4   Q.   You anticipated my next question.  It depended how many

5   surgeries were done with the robot as to how many EndoWrists

6   were bought; correct?

7   A.   That is generally true.

8   Q.   And so there wasn't a fixed relationship between the

9   number of robots sold and the number of EndoWrists sold;

10  correct?

11  A.   No, there is not a fixed relationship.

12  Q.   It depends on usage once a hospital buys the -- buys the

13  robot; correct?

14  A.   Mostly, I would say.  It also just depends on stocking

15  orders and inventory and those sorts of things.  So there's a

16  couple of other variables that would determine how many

17  instruments were purchased.

18  Q.   My only point is, you sell a robot.  You don't know how

19  many EndoWrists you're going to sell with respect to -- over

20  the life of that robot; correct?

21  A.   We can estimate it based upon the business plan that's put

22  together with a customer, but we won't know for sure.

23  Q.   Okay.  And in the time frame 2006 when the da Vinci S was

24  introduced, were there any other soft tissue robots available

25  in the market at that time?

ROSA - CROSS / MCCAULLEY

1   **A.**   The Zeus installations that we had talked about may have

2   still been in the market being supported, but I don't believe

3   they were being sold at the time.

4   **Q.**   And then the da Vinci Si in 2009, when you introduced

5   that, were there any other soft tissue robots being used in

6   surgeries in the United States at that time?

7   **A.**   To the best of my recollection -- in 2009, let's see.  I

8   don't believe so.  I think some came a little bit later.

9   **Q.**   Okay.  So as of 2009, is it fair to say -- I understand

10  you disagree with the definition of the market, but is it fair

11  to say that you -- that Intuitive had 100 percent of the soft

12  tissue robot market for commercially available devices in the

13  United States?

14          **MR. MICHAEL:**  Objection to form.

15          **THE COURT:**  Did you understand the question?

16          **THE WITNESS:**  I understand it.  I just don't agree

17  with the way it's being asked.

18          **THE COURT:**  If you understand it, could you please

19  answer it.

20      Overruled.

21          **THE WITNESS:**  Sure.

22      I apologize.  Could you re-answer -- or re-question?

23  **BY MR. McCAULLEY:**

24  **Q.**   I'm happy to answer.  We can take care of that.  I'll try

25  to ask it in bits.

ROSA - CROSS / MCCAULLEY

```
 1          You didn't have any competitors in the soft tissue
 2    surgical robot market in 2009; correct?
 3                MR. MICHAEL:  Same objection, Your Honor.
 4                THE COURT:  Can you answer that?
 5                THE WITNESS:  Again, I will do my best to frame an
 6    answer to that.
 7    A.    So --
 8                THE COURT:  To be clear, the objection is overruled.
 9          Answer what you can, Mr. Rosa.
10    A.    We had -- if you look at the market at the time, as we
11    talked about for surgery, open, laparoscopic, and robotic,
12    da Vinci was the system being used for robotic surgery at the
13    time.
14    BY MR. McCAULLEY:
15    Q.    Okay.  I don't think we're disagreeing.  I think we're
16    arguing over semantics.  So let me see if I can break it down
17    into simpler questions.
18          If someone wanted to do -- and made the choice to do a
19    robotic surgery in 2009, that would have been done on a
20    da Vinci in the United States; right?
21    A.    That is true.
22    Q.    And did that remain true for some period of time after
23    2009?
24    A.    I -- I would say -- I would generally agree with that,
25    yes.
```

**ROSA - CROSS / MCCAULLEY**

1  Q.   For how long was that true?

2  A.   This is where it's hard for me to know the timeline.  So

3  there will be another system that comes on the market -- I just

4  don't know when -- where customers can now use that system

5  instead of a da Vinci.

6  Q.   What system are you referring to?

7  A.   This one is by a company that was called TransEnterix,

8  changed its name to something called Asensus.  And I believe

9  the system was called Senhance.

10 Q.   So if we -- can we just agree, in your testimony we'll

11 talk about that as the Senhance system?

12 A.   Sure.

13 Q.   Was the Senhance system available by 2022?

14 A.   I'm -- the times are very hard for me.  It feels like --

15 it seems to me that was on the market at that time.

16 Q.   Okay.  And then I -- and I believe the jury has heard

17 this.

18       Excuse me.  I'm going to take a moment.

19       (Brief pause.)

20 Q.   Apologies.  If at some point you can't understand me,

21 please back me up.

22       So the Senhance system was the -- after Zeus was off

23 market, Senhance was the first commercially variable soft

24 tissue robot for surgery in the United States after the

25 da Vinci products; correct?

ROSA - CROSS / MCCAULLEY

1    A.    I believe that to be true.  There's another system, but

2    I -- and I don't remember the order.  But I believe the

3    Senhance system was the next one.

4    Q.    Okay.  And you referred to another system.  What was that?

5    A.    I believe that's the Flex system from Medrobotics.

6    Q.    And the Flex system, is that still commercially available

7    today in the United States?

8    A.    To the best of my knowledge, it is not.

9    Q.    Do you recall the time period when it was available?

10   A.    Hmm, I don't.  It -- prior to certainly several years ago,

11   but I don't know the time period exactly.

12   Q.    How about Senhance?  Do you recall if that's still

13   available?

14   A.    I believe it is still available.

15   Q.    Okay.

16        THE COURT:  Mr. McCaulley, may I offer you a cough

17   drop?

18        MR. McCAULLEY:  That would be very much appreciated.

19        (Brief pause.)

20        MR. McCAULLEY:  I apologize to everyone.  I think it's

21   no mystery that I have been battling.

22   BY MR. McCAULLEY:

23   Q.    I'm just trying to get at, at some point there were three

24   soft tissue robots that were commercially available in the

25   United States; correct?

ROSA - CROSS / MCCAULLEY

1  A.   Yes.  I think it was da Vinci, Senhance, and Flex, if you

2  will.

3  Q.   And it's fair to say that da Vinci had a much larger

4  installed base than either of the other two; correct?

5  A.   I would agree.

6  Q.   And I know you disagree with Dr. Lamb's characterization

7  in the market.  But when Mr. Michael asked you questions about

8  99.5 percent share, you understand that to mean with respect to

9  da Vinci as opposed to Senhance and Flex; correct?

10  A.   Yes.  So if you added up all the installations of robots

11  that were there, there was some percentage that was da Vinci

12  that would have in that range, I assume.  I didn't do the

13  calculation.

14  Q.   I'm not trying to be exact.  But somewhere over

15  95 percent.  We can probably agree on that; right?

16  A.   I -- again, I just don't know the numbers.  And so it's

17  hard for me -- I like precision with numbers, so it's just hard

18  for me to agree to that without knowing.

19  Q.   Okay.  Could you agree to 90 percent?

20  A.   Again, I -- I just don't know how to do that, because I

21  don't know the number of installations off the top of my head

22  in the time period for those robots relative to da Vinci.

23  Q.   Okay.  Fair enough.

24      But if Dr. Lamb calculated that based on numbers of units

25  and he had numbers, you would trust his number on that;

1948

ROSA - CROSS / McCAULLEY

```
 1   correct?
 2   A.   I'd like to see the calculations to make sure I do.  I
 3   don't -- I don't have any reason to believe that he didn't do a
 4   calculation appropriately.  But I'd like to -- it would be
 5   great to see it.
 6   Q.   We'll see if we can get that.
 7        But you'll agree that da Vinci had a dominant market
 8   share, correct, without knowing the numbers?
 9             MR. MICHAEL:  Object to the form.
10             THE COURT:  Mr. Rosa, do you understand the question?
11             THE WITNESS:  Again, I do understand the question and
12   believe I can answer it.
13             THE COURT:  Overruled.
14        Please do.
15   A.   So what you said before is, we had more installations than
16   Senhance and Flex, and I agree with that.
17   BY MR. McCAULLEY:
18   Q.   And do you agree with the fact that you had significantly
19   larger share than the two of them combined?  "You" being
20   Intuitive.
21   A.   So, again, if you add up all the installations that were
22   in the U.S. at the time, we had significantly more
23   installations than the other two systems.
24   Q.   You believe Intuitive had about 5,000 installations in the
25   U.S.?
```

ROSA - CROSS / MCCAULLEY

```
 1   A.   Can I ask what time period?

 2   Q.   Approximately 2019.

 3   A.   That sounds high to me.

 4   Q.   Combined S and Si -- or S and X, both models?

 5   A.   I am not sure.  That still sounds high to me.

 6   Q.   What number sounds right to you?

 7   A.   More -- I would say -- gosh, this is so hard to know.

 8   Several thousand, for sure.

 9   Q.   And Flex and Senhance had less than 100; is that fair?

10   A.   Again, I don't -- I just don't know the data.

11   Q.   When you -- when Intuitive started out its surgical robot

12   program, you had to sell robots to hospitals; correct?

13   A.   When we start -- when -- make sure I understand your

14   question.  When a customer started a robotic surgery program,

15   we had to sell a robot?

16   Q.   Yes.

17   A.   Yes.

18   Q.   And you -- your customers -- I think this is an important

19   point.  Your customers are hospitals; correct?

20   A.   Our customers are generally hospitals or perhaps a surgery

21   center.  But, yes, hospitals broadly.

22   Q.   Is there any difference between a hospital and a surgery

23   center that you can explain to the jury?

24   A.   Generally, it's the acuity of the procedures that they are

25   performing.  A hospital might perform higher acuity and more
```

ROSA - CROSS / MCCAULLEY

1  look over two decades or -- and more, I don't know what the

2  number is.

3  Q.  But you'll agree with me it's a big number.  It's over

4  100,000 certainly; correct?

5  A.  You're going to -- let's see.  I'd have to do some math,

6  actually.  I really don't know.  I'd have to do math to see.

7  Q.  I would hate to make you do math.

8      I want to ask a little bit about the use counter and then

9  we'll come back to these reset use counters.  A use counter

10  doesn't tell the end user anything about how the device was

11  used in a surgery.

12      You'll agree with that; right?

13  A.  It tells them the number of times that it's been used in

14  surgery.

15  Q.  Right.  So just want to make sure we're on the same page.

16  It's used in a surgery -- let me ask a foundational question.

17      What causes the use counter to decrement, to go down by

18  one?

19  A.  So that -- I think that algorithm has slightly shifted

20  over time.  The core of it is that the instrument has to be

21  used in the case, and then there has to be kind of an end of a

22  procedure recorded by the system in order for it to decrement

23  the use.  And it -- it's just difficult to understand, but the

24  essence of it is that it is used in a procedure.

25  Q.  So used in a procedure, does that mean just attached to

ROSA - CROSS / MCCAULLEY

```
 1   one of the robot arms?  Or would it have to be manipulated?
 2   A.   So just being attached to a robot arm isn't enough to
 3   decrement the counter, to the best of my knowledge.  Again,
 4   this algorithm has shifted over time, and I -- I don't remember
 5   exactly what -- when it happened.
 6        To the best of my knowledge, you have to put it on, use
 7   the instrument, record an end of procedure, and that's when the
 8   decrement would happen.
 9   Q.   So does "use the instrument" mean it has to be inserted
10   into the patient necessarily?
11   A.   It has to be -- use -- the way I'm saying is, it's
12   inserted into the patient and then we use a term called
13   "following."  But it has to actually be manipulated by the
14   surgeon and the instrument actually used, if you will, be moved
15   around in the case.
16   Q.   So if it's just attached to the robot, then the use
17   counter won't decrement?
18   A.   To the best of my knowledge, no, it will not.
19   Q.   We won't hold you to it.  Just trying to get a general
20   understanding.
21        So when the surgeon puts her hands into the console and
22   puts the instrument into the patient, you'll agree at least by
23   that point, as long as the procedure ends, goes to end of use,
24   that would be a use that would decrement the use counter;
25   correct?
```

ROSA - CROSS / MCCAULLEY

1    **A.**    Yeah.  Maybe just a slight tweak.  Just because -- so

2    the -- the -- the way it works is the instrument gets attached

3    to the system.  The patient's side assistant or the surgeon at

4    the table side will insert it into the body.  Then the surgeon

5    takes control at the surgeon console and starts to manipulate

6    the instrument.  And that's when it goes into, quote,

7    following, if we will.  And that would be using the instrument

8    in this case.

9    **Q.**    Okay.  So the instrument is put into following mode and

10   the surgeon manipulates that instrument.  Then we get to an end

11   of procedure, that would count as a use; correct?

12   **A.**    To the very best of my knowledge, that would be kind of

13   generally the sequence that would happen.

14   **Q.**    I guarantee you know better than me.

15       So what does that tell the next user of that EndoWrist

16   about how aggressively that device was used in the surgery?

17   **A.**    So that -- how it was used in the surgery prior, the use

18   counter itself doesn't tell the next user anything about that.

19   **Q.**    So the way that you designed the EndoWrist and the

20   software that goes with it, you do track information about how

21   it was used in the surgery; correct?

22   **A.**    We -- let's see if I can answer your question.

23       So there are some information available about how the

24   system is used in surgery.  Not every variable on the system is

25   tracked on every procedure.  Only certain aspects, and we call

ROSA - CROSS / MCCAULLEY

```
 1   them kind of state changes.  So when buttons are pushed, when
 2   it goes into following, those kinds of events we have on every
 3   procedure.
 4       Other types of variables on the system we don't have on
 5   every procedure.  So it really depends what you're talking
 6   about.
 7   Q.   You have the capability to track a large amount of
 8   information about what happens to your procedure, do you not?
 9   A.   And I think it depends on your definition of "large."  We
10   can track all sorts of aspects of the system.  And, again, that
11   are kind of "state events" that we call them.  And then there
12   is all sorts of other information on the system that we could
13   track, but it -- it's in very specialized cases when we're
14   working with hospitals and research and things like that.
15   Q.   So I'm going to refer to your letter.  One of the concerns
16   that Intuitive raised with some of the hospitals that were
17   using Rebotix information was unintuitive motion; correct?
18   A.   Just to make sure we're looking -- I don't know which --
19   the letter that you're referring to.
20   Q.   Sure, Tab 4.  Trial Exhibit 942.
21   A.   Okay.  I'm there.
22   Q.   If you look at the first -- the four bullet points that
23   are on the first page of the list.  I'm not really using it in
24   the context of letter, just for these concepts.  "Unintuitive
25   motion," you understand what that means; correct?
```

ROSA - CROSS / MCCAULLEY

```
 1   A.   I do.
 2   Q.   What does that mean?
 3   A.   So the way the system works -- and I wish you had seen
 4   this already -- there are the surgeon controllers, where the
 5   surgeon puts their hand on the -- on the controller in the
 6   console.  They are able to move their hand around in all
 7   different directions and positions.
 8        On the patient side cart inside the patient, the
 9   instrument needs to correspond.  That's our intention.  We're
10   designing it to correspond very precisely to the movement of
11   the surgeon.  That's where our name Intuitive comes from.  So
12   whatever the surgeon does with his or her hand, the instrument
13   follows it very faithfully.
14        And it can be then -- if the instrument is getting, quote,
15   unintuitive, then what the surgeon is doing at the console is
16   not being, kind of, replicated, if you will, by the instrument
17   in the patient.
18   Q.   Okay.  You were here, you heard Dr. Mahal's testimony;
19   correct?
20   A.   I did.
21   Q.   A long time ago?
22   A.   Indeed.
23   Q.   And Dr. Mahal indicated that he sometimes will manipulate
24   the EndoWrist before inserting it into the patient to check for
25   unintuitive motion.
```

ROSA - CROSS / MCCAULLEY

```
 1        Did you remember that?
 2   A.   For unintuitive motion, I don't understand how you would
 3   ever check for that actually without it being connected to the
 4   system.
 5   Q.   Connected to the system, a surgeon can manipulate the
 6   EndoWrist before the surgery to see if it's behaving the way
 7   that he or she expects it to; right?
 8   A.   I -- well, let's see.  When you say "before the surgery,"
 9   so I've never been in a case where the surgeon -- before the
10   system is brought to the patient and inserted into the body --
11   that they have connected instruments and manipulated it in
12   space.  I've never seen that before.
13   Q.   So it's -- but it can be done when the instruments are
14   inside the patient; correct?
15   A.   It can.  So incisions would have to be made into the
16   patient.  The system, what we call docked, would have to be
17   installed in the patient, instruments and the camera inserted,
18   everything brought in to the view of the surgeon and then
19   manipulated.
20   Q.   And unintuitive motion is one of the patient safety
21   concerns that you refer to in Trial Exhibit 942; correct?  You,
22   Intuitive?
23   A.   Yes.
24   Q.   And that's something that's just sensed by the surgeon;
25   correct?
```

ROSA - CROSS / MCCAULLEY

1  **A.**  Let's see if I understand again.  So if -- unintuitive

2  motion would be evident to the surgeon, if you will, yes.

3  **Q.**  And that happens, in your experience, on EndoWrists that

4  have been used less than ten times; correct?

5  **A.**  I have seen unintuitive motion on EndoWrists that have

6  been used under ten times.

7  **Q.**  And the use counter, in and of itself, doesn't tell you

8  anything about unintuitive motion; correct?

9  **A.**  That's correct.  The use counter doesn't tell the user or

10  the system anything about unintuitive motion.

11  **Q.**  So an EndoWrist that's been used less than ten times, use

12  counter has been decremented, for example, three times, that

13  EndoWrist could still encounter unintuitive motion; correct?

14  **A.**  That is correct.

15  **Q.**  And the surgeon would then replace that EndoWrist and

16  proceed with a different one; correct?

17  **A.**  I -- I would hope that would be one scenario of

18  unintuitive motion; that if -- if the surgeon so chose, they

19  could pull the instrument out and insert another one.  That is

20  a possibility.

21  **Q.**  And is that the most likely possibility?

22  **A.**  You know, I guess it depends on when and where it

23  happened.  It would be the one that I would hope for.  On the

24  likelihood side, it's hard for me to judge likelihood.  It

25  would be more about what was happening at the surgery at the

1978

**ROSA - CROSS / MCCAULLEY**

```
 1   time something happened, did it impact the operation at all?
 2   If not, take it in -- you know, pull it out and put a new one
 3   in.
 4        If it was at a point of the operation where it was
 5   impacting the patient for some reason, then it could affect a
 6   different outcome.  It may be all the way up to perhaps a
 7   conversion.
 8   Q.   You understand -- well, let me begin again.
 9        The use counter doesn't tell you how long the instrument
10   was used in the surgery; correct?
11   A.   Directly it does not tell the surgeon anything or the care
12   team about how long it was used, that is correct.
13   Q.   It doesn't tell you how aggressively it was used in a
14   procedure; correct?
15   A.   It won't -- it doesn't have any information about how
16   rigorously it was used.
17   Q.   And is it possible for Intuitive to track the amount of
18   torque that was applied to the business end of the EndoWrist?
19   A.   Let's see.  We can -- we can track the torque on the
20   motors, that I don't -- we can't sense the torque, if you will,
21   at the business end, per se.
22   Q.   But the torque on the motors would give you some
23   indication about how aggressively an EndoWrist was used in a
24   surgery; right?
25   A.   It would be one variable that could be used to understand
```

**ROSA - CROSS / MCCAULLEY**

1  how an EndoWrist was used.

2  **Q.**   It certainly would tell you more about how the EndoWrist

3  was used in a particular surgery than just the use counter;

4  right?

5  **A.**   It -- it would have -- definitely have the potential to do

6  so.

7  **Q.**   And insufficient grip force, if I look at Exhibit 942, is

8  another potential patient safety issue; correct?

9  **A.**   That is correct.

10  **Q.**   And that's an indication of how -- whether the grips on

11  the distal patient facing portion of the EndoWrist, how -- let

12  me begin again.  That was terrible.

13      Insufficient grip force refers to the force applied on

14  gripping mechanisms at the end of the EndoWrist; correct?

15  **A.**   It actually -- you know, I guess you could infer that.  It

16  really is about is it doing the job it was intended to do?  So

17  is it holding a needle?  Is it gripping, grasping tissue

18  appropriately, those sorts of surgical tasks.

19  **Q.**   And you'll agree with me that the use counter doesn't

20  provide the surgeon any information about the sufficiency of

21  the grip force of the EndoWrist?

22  **A.**   No.  It tells the system what kind of torque to apply and

23  how to control the instrument.  But in and of itself it doesn't

24  tell the surgeon anything.

25  **Q.**   The use counter tells it how much force to apply?

ROSA - CROSS / MCCAULLEY

1   **A.**   Only because it has the model number in it, and the system

2   needs to know what -- what is on the system, which kind of

3   instrument is on the system to apply correct algorithms.

4   **Q.**   So the use counter also identifies to the robot what

5   instrument the scrub tech has attached to the robot arms; is

6   that correct?

7   **A.**   It has information to tell what kind of instrument it is,

8   and then the robot knows what to do with it.

9   **Q.**   But the use counter doesn't provide any information about

10  what the grip force is that's actually being applied by the

11  instrument; correct?

12  **A.**   I just want to make sure I'm answering it correctly.

13        So the use counter, that chip, that electronic -- the

14  electronics has in it information about what that instrument

15  is.  That information tells the system how to control that

16  instrument.

17        One of those parameters affects how hard the -- and the

18  grip force of the instrument.  But it doesn't tell the surgeon

19  how -- anything about the grip force, if you will, directly.

20  **Q.**   Okay.  And as far as you know, the focusing on the Rebotix

21  instruments that you got back from the RMA process, the --

22  instruments that have had the use counter reset, it still was

23  able to identify what type of instrument it was to the robot;

24  is that correct?

25  **A.**   To the best of my knowledge, that's correct.

ROSA - CROSS / MCCAULLEY

```
 1   Q.   Forgive me if I've already asked:  Do you know how many
 2   EndoWrists with the use counter reset Intuitive possessed in
 3   2017?
 4   A.   I don't.
 5   Q.   Do you know that you continued to collect them -- "you"
 6   being Intuitive -- through 2020?
 7   A.   Via the RMA process?
 8   Q.   Yes.
 9   A.   I -- I think I remember seeing -- and I don't remember if
10   it was every year -- but that a number had come in over
11   subsequent years post 2017.
12   Q.   Okay.  And you testified earlier today under questioning
13   from Mr. Michael that Rebotix and Restore each qualified for
14   approval under Intuitive's policy; correct?
15   A.   That is correct.
16   Q.   And how many instruments was Rebotix qualified for?
17   A.   Rebotix has qualified for one.
18   Q.   And when you say "one," what do you mean?
19   A.   Let's see.  I mean, a single type of instrument.
20   Q.   And by "single type of instrument" -- well, what type of
21   instrument, to your understanding, had they qualified for?
22   A.   I believe it's two different ones.  One of them is the
23   monoport curved shears, to the best of my knowledge.  The other
24   one I don't remember.
25   Q.   So that's two for Rebotix?
```

ROSA - CROSS / MCCAULLEY

```
1    A.   I'm sorry.  I misspoke.  Rebotix has qualified for one.  I

2    apologize.  I was referring to Restore.  You asked me about

3    Rebotix.

4         It's one instrument, and I -- I believe the Rebotix one is

5    the monoport curved shears.  But I can't remember that for

6    sure.

7    Q.   And is that for -- what model of EndoWrist is that for?

8    A.   Can you say that one more time, please.

9    Q.   What model of EndoWrist is that for?

10   A.   Model of EndoWrist?

11   Q.   Let me ask a better question.  Was that for an S or an X?

12   A.   That, I believe, was for the S and Si version.

13   Q.   So it's -- and how many S or Si EndoWrists does

14   Intuitive -- well, let me ask a better question.

15        In 2019 and 2020, how many models of S and Si EndoWrists

16   were there?

17   A.   I don't know an exact number, but I would say above 30.

18   Q.   More than 30.  And the S -- I should have asked this

19   earlier.  The S and Si were discontinued by da Vinci -- by

20   Intuitive; correct?

21             MR. MICHAEL:  Objection, time period.

22             MR. McCAULLEY:  Let me ask a more precise question.

23   BY MR. McCAULLEY:

24   Q.   Were the S and Si da Vinci robots discontinued in 2018?

25   A.   They were not.
```

ROSA - CROSS / MCCAULLEY

```
 1   Q.   Were they discontinued in 2019?

 2   A.   They were not.

 3   Q.   Were they discontinued before 2022?

 4   A.   We are in a phase-out, and it's -- you know, there are

 5   last-time buys and all sorts of things, and I just don't know

 6   the exact timing.

 7           MR. McCAULLEY:  Your Honor, I'm at a logical breaking

 8   point.  Can I yield my five minutes and start again in the

 9   morning?

10           THE COURT:  You can, Mr. McCaulley.

11       Members of the jury, we're going to call it quits for the

12   day.  I will provide this friendly reminder to please not

13   communicate with anyone in any way about this case and not to

14   let anyone communicate with you about the merits or anything to

15   do with this case.

16       This, of course, includes discussing it in person, in

17   writing, by phone or any sort of electronic means.  This

18   applies to communicating with anyone, including your fellow

19   jurors, family members, friends, coworkers.

20       And a reminder -- my last reminder to you today is that

21   because you'll receive all the evidence and legal instruction

22   you can properly consider here -- please do not read, watch, or

23   listen to anything, any news or media accounts or commentary

24   about the case or anything to do with it and not engage in any

25   independent research of your own.
```

1984

**PROCEEDINGS**

```
 1        We will see you-all bright and early tomorrow morning.
 2   Thank you.
 3        All rise for the jury.
 4        (Jury exits the courtroom at 2:27 p.m.)
 5        THE COURT:  You may be seated.
 6        Mr. Rosa, you're welcome to step down.
 7        (Witness steps down.)
 8        THE COURT:  Counsel, I don't have anything to take up
 9   with you at this moment.  Is there anything you want to raise
10   with me?
11        MR. McCAULLEY:  No.
12        MR. GALLO:  No, we have nothing, Your Honor.
13        THE COURT:  Wonderful.  Good evening.  We'll see
14   you-all in the morning.
15        With a note that I do have -- you-all are doing a good job
16   getting out of here in a timely way.  I have 3:00 o'clock
17   settings -- no.  They are on Zoom.  Never mind.  I don't need
18   to kick you out.
19        Good evening.
20        (Whereupon at 2:28 p.m. further proceedings were
21         adjourned until Thursday, January 23, 2025 at
22         8:00 a.m.)
23
24
25
```