No. 25-1372

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
*Plaintiff-Appellant*,

v.

INTUITIVE SURGICAL, INC.,
*Defendant-Appellee.*

_____

United States District Court
for the Northern District of California
No. 21-cv-3496-AMO
Hon. Araceli Martinez-Olguín

_____

EXCERPTS OF RECORD – VOLUME V OF VI

_____

Richard T. McCaulley
MCCAULLEY LAW GROUP LLC
180 N. Wabash Avenue, Suite 601
Chicago, IL 60601
(312) 330-8105
richard@mcaulleylawgroup.com

Joshua V. Van Hoven
MCCAULLEY LAW GROUP LLC
3001 Bishop Dr., Suite 300
San Ramon, CA 94583
(925) 302-5941
josh@mcaulleylawgroup.com

Eric F. Citron
Kathleen Foley
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW, Suite 300
Washington, D.C. 20006
(202) 796-4540
ecitron@zimmercitronclarke.com

David J. Zimmer
Edwina Clarke
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Appellant Surgical Instrument Service Company, Inc.*

# Bair PA DC PR MERGED

Designation List Report

 **Bair, Ron**                                   **2021-05-24**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**COURT EXHIBIT 13**

Case No. ___3:21-cv-03496-AMO___
Date Entered_____
By_____
Deputy Clerk

**ID: V1M**

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 6:01 - 7:14 | **Bair, Ron 2021-05-24** | 00:02:18 | **V1M.1** |

6:01   Q.   Could you please state your full name for

6:02         the record.

6:03   A.   Sure. My full legal name is Ronald Lee

6:04         Bair, Jr.

6:05   Q.   And I understand you work for Intuitive

6:06         Surgical. Is that right?

6:07   A.   That is correct.

6:08   Q.   What is your position at Intuitive?

6:09   A.   I am the senior director of services

6:10         innovation and product management.

6:11   Q.   Can you explain to me a little bit what

6:12         that role entails.

6:13   A.    Sure. So the purview includes product

6:14         management, which is the definition and deployment

6:15         of service and service lines as a product to support

6:16         Intuitive's products and their customers. And it

6:17         also includes our services business system team and

6:18         our services analytics team.

6:19   Q.   When you say services business and services

6:20         analytics team, what do you mean by that?

6:21   A.   Services business systems. So IT-oriented

6:22         systems. For example, for order management, our

6:23         configuration management, field service order

6:24         management, et cetera, the back-end IT operations

6:25         side of that. And then also the analytics side of

7:01         it, drawing business intelligence from the data

7:02         captured by our business systems.

7:03   Q.   What sorts of business intelligence do you

7:04         draw from analytics captured by business systems?

7:05   A.   It ranges widely from economic factors,

7:06         such as cost to serve and support our customers, as

7:07         well as ensuring that we meet our service-level

7:08         agreements as it relates to time to respond, time to

7:09         resolve service orders, the efficiency and

7:10         effectiveness of our teams, et cetera.

7:11   Q.   Are you personally involved with -- when

7:12         you say 'customers,' some of Intuitive's customers

7:13         are hospitals; is that right?

7:14   A.   That is correct.

## V1M - Bair PA DC PR MERGED

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 7:15 - 7:17 | Bair, Ron 2021-05-24 | 00:00:10 | V1M.14 |

| | | |
|---|---|---|
| 7:15 | Q. | Are you personally involved in capturing |
| 7:16 | | analytics and data from hospitals? |
| 7:17 | A. | I am not personally involved. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 50:17 - 50:19 | Bair, Ron 2021-05-24 | 00:00:06 | V1M.2 |

| | | |
|---|---|---|
| 50:17 | Q. | Was it your understanding that refurbished |
| 50:18 | | instruments could offer equivalent performance to |
| 50:19 | | new instruments? |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 50:21 - 51:05 | Bair, Ron 2021-05-24 | 00:00:31 | V1M.3 |

| | | |
|---|---|---|
| 50:21 | | THE WITNESS: Following certain robust |
| 50:22 | | remanufacturing or refurbishment techniques, |
| 50:23 | | including the replacement of components, we did deem |
| 50:24 | | that it was likely feasible, although we did not |
| 50:25 | | undertake a full validation and verification of |
| 51:01 | | refurbished or remanufactured instruments. |
| 51:02 | | BY MR. ERWIG: |
| 51:03 | Q. | You certainly didn't conclude that |
| 51:04 | | refurbishment was not possible; right? |
| 51:05 | A. | That is correct. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 54:08 - 54:25 | Bair, Ron 2021-05-24 | 00:01:06 | V1M.15 |

| | | |
|---|---|---|
| 54:08 | Q. | What does it mean to have a product margin |
| 54:09 | | of 89 percent? |
| 54:10 | A. | The math is on the screen. But it is the |
| 54:11 | | revenue per instrument minus the cost to -- the |
| 54:12 | | direct costs to manufacture that instrument. |
| 54:13 | Q. | So that's 89 for -- withdrawn. |
| 54:14 | | For this particular instrument, the Xi MCS, |
| 54:15 | | that's an almost 90 percent profit on the sale of |
| 54:16 | | each instrument; right? |
| 54:17 | A. | The product margin does not translate to |
| 54:18 | | profit. |
| 54:19 | Q. | Well, the -- what's the cost for a new Xi |
| 54:20 | | MCS? |
| 54:21 | A. | The cost is multifaceted and includes the |
| 54:22 | | research and development associated with the |
| 54:23 | | instrument, the direct and indirect costs, the |
| 54:24 | | selling cost, the overhead, et cetera. So I don't |
| 54:25 | | know that I could speak to all of those elements. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 56:12 - 57:07 | Bair, Ron 2021-05-24 | 00:01:09 | V1M.16 |

5-ER-904

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 56:12 | Q. And Intuitive -- so Intuitive's cost | | **V1M.16** |
| | 56:13 | according to this spreadsheet with the direct | | |
| | 56:14 | materials, the direct labor, and other costs of | | |
| | 56:15 | goods sold is about $360 for a new Xi MCS; right? | | |
| | 56:16 | A. The direct costs as it relates to | | |
| | 56:17 | contribution margin but excluding, as I mentioned | | |
| | 56:18 | before, any sort of development, all the additional | | |
| | 56:19 | overhead associated with it, the selling costs for | | |
| | 56:20 | commissions, et cetera. | | |
| | 56:21 | Q. Well, there's also a column labeled 'Other | | |
| | 56:22 | Costs of Goods Sold'; right? | | |
| | 56:23 | A. Agreed, but all of other costs are not | | |
| | 56:24 | included in other costs of goods sold. | | |
| | 56:25 | Q. Can you tell just by looking at this single | | |
| | 57:01 | column? | | |
| | 57:02 | A. Yes, I can. | | |
| | 57:03 | Q. How? | | |
| | 57:04 | A. Because that number is -- if it were to | | |
| | 57:05 | incorporate all of the ancillary costs associated | | |
| | 57:06 | with developing, manufacturing, and selling the | | |
| | 57:07 | instrument, they would far exceed that $107 number. | | |
| 57:08 - 57:25 | **Bair, Ron 2021-05-24** | | 00:00:56 | **V1M.25** |
| | 57:08 | Q. Well, when Intuitive is calculating the | | |
| | 57:09 | financial analysis for a potential refurbishment | | |
| | 57:10 | program, the way that it's comparing a new | | |
| | 57:11 | instrument to an instrument that's remanufactured, | | |
| | 57:12 | the green housing instrument, is by comparing the | | |
| | 57:13 | direct costs and the list price; right? | | |
| | 57:14 | A. As it relates to individual decisions | | |
| | 57:15 | associated with individual products, we look at the | | |
| | 57:16 | margin associated uniquely with those products. | | |
| | 57:17 | That's the CM, or contribution margin, in the | | |
| | 57:18 | absence of all of the additional overhead costs and | | |
| | 57:19 | the other costs that I described. | | |
| | 57:20 | Q. Here, the direct costs are 300 -- around | | |
| | 57:21 | $360; right? | | |
| | 57:22 | A. That is correct. | | |
| | 57:23 | Q. The list price for a new Xi MCS, that's | | |
| | 57:24 | $3,200; right? | | |
| | 57:25 | A. That is correct. | | |

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 67:12 - 68:17 | **Bair, Ron 2021-05-24** | 00:01:45 | **V1M.4** |

| | | |
|---|---|---|
| 67:12 | Q. | Sir, you understand that lower-priced |
| 67:13 | | EndoWrists would be very attractive to hospitals |
| 67:14 | | that are using da Vinci surgical robots; right? |
| 67:15 | A. | I don't know that I can speak on behalf of |
| 67:16 | | the procurement organizations for hospitals, but I |
| 67:17 | | do know that part of our objective was to achieve a |
| 67:18 | | lower cost profile so that we could pass -- then |
| 67:19 | | pass that lower cost profile on to our customers. |
| 67:20 | Q. | And the point at which the study was at had |
| 67:21 | | confirmed the title of refurbished EndoWrists; |
| 67:22 | | right? |
| 67:23 | A. | I would not say that it confirmed the |
| 67:24 | | feasibility. It confirmed that we didn't initially |
| 67:25 | | through our high-level, very small-scale |
| 68:01 | | investigation, we explored or found that it wasn't |
| 68:02 | | impossible is what we concluded from that. But as |
| 68:03 | | referred to and mentioned in the financial analysis, |
| 68:04 | | as I noted, that there was a range of example |
| 68:05 | | material harvesting from instruments, and as such at |
| 68:06 | | that time we had not established what exactly it |
| 68:07 | | would take to render the instrument clinically safe |
| 68:08 | | and equivalent or better than new. |
| 68:09 | Q. | And Intuitive didn't continue with that |
| 68:10 | | process of bringing refurbished EndoWrists to |
| 68:11 | | market; right? |
| 68:12 | A. | We did not continue at that time, that is |
| 68:13 | | correct. |
| 68:14 | Q. | And at any time since; right? If a |
| 68:15 | | hospital wants to buy a refurbished instrument from |
| 68:16 | | Intuitive today, they can't do that; right? |
| 68:17 | A. | Not that I am aware of. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 69:16 - 69:21 | **Bair, Ron 2021-05-24** | 00:00:13 | **V1M.5** |

| | | |
|---|---|---|
| 69:16 | | BY MR. ERWIG: |
| 69:17 | Q. | Just one question. Hospitals can't buy |
| 69:18 | | refurbished EndoWrists from Intuitive; true? |
| 69:19 | A. | A hospital -- that is true -- cannot buy |
| 69:20 | | refurbished EndoWrist instrument from Intuitive, to |
| 69:21 | | my understanding. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 134:07 - 134:17 | **Bair, Ron 2021-05-24** | 00:00:19 | **V1M.17** |

5-ER-906

## V1M - Bair PA DC PR MERGED

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 134:07 | Q. Well, sir, we talked about earlier that | | **V1M.17** |
| | 134:08 | there's a series of steps that Intuitive takes when | | |
| | 134:09 | it finds out that a hospital is using reprogrammed | | |
| | 134:10 | EndoWrists; right? | | |
| | 134:11 | A. That is correct. | | |
| | 134:12 | Q. One of the things that Intuitive does is it | | |
| | 134:13 | might have a conversation with the hospital; right? | | |
| | 134:14 | A. That is correct. | | |
| | 134:15 | Q. The next thing it might do is send a | | |
| | 134:16 | letter; right? | | |
| | 134:17 | A. That is correct. | | |
| 134:18 - 134:22 | **Bair, Ron 2021-05-24** | | 00:00:14 | **V1M.6** |
| | 134:18 | Q. And then, ultimately, Intuitive will stop | | |
| | 134:19 | servicing the da Vinci robot for the hospital; | | |
| | 134:20 | right? | | |
| | 134:21 | A. If they do not stop using those devices on | | |
| | 134:22 | the da Vinci, that is correct. | | |
| 134:23 - 135:04 | **Bair, Ron 2021-05-24** | | 00:00:29 | **V1M.18** |
| | 134:23 | I do not know that we are aware of when | | |
| | 134:24 | they may, for example, provide instruments to a | | |
| | 134:25 | third party for repair. So if that repair isn't | | |
| | 135:01 | something that we become aware of or that registers | | |
| | 135:02 | on a system, that's the limitation to which I think | | |
| | 135:03 | we have visibility to. And that, I don't know that | | |
| | 135:04 | we could practically control. | | |
| 135:20 - 137:01 | **Bair, Ron 2021-05-24** | | 00:01:25 | **V1M.7** |
| | 135:20 | Q. Well, the hospital has to spend money to | | |
| | 135:21 | buy a da Vinci robot; right? | | |
| | 135:22 | A. A hospital traditionally does have to spend | | |
| | 135:23 | money to buy a robot, yes. | | |
| | 135:24 | Q. It likely has to train surgeons how to use | | |
| | 135:25 | that robot; right? | | |
| | 136:01 | A. That is correct. | | |
| | 136:02 | Q. So if Intuitive doesn't service that robot | | |
| | 136:03 | and the robot fails, it means the hospital can no | | |
| | 136:04 | longer do surgeries with that robot; right? | | |
| | 136:05 | A. That is correct. | | |
| | 136:06 | Q. So if Intuitive hears that a hospital is | | |
| | 136:07 | using reprogrammed instrumentation on a da Vinci | | |
| | 136:08 | robot, ultimately, Intuitive will not service that | | |

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 136:09    da Vinci robot; right? | | |
| | 136:10   A.  Following the steps that we discussed, we | | |
| | 136:11    may end up declining to service the robot. That is | | |
| | 136:12    correct. | | |
| | 136:13   Q.  And, ultimately, when hospitals have | | |
| | 136:14    continued to use these EndoWrists that have been | | |
| | 136:15    reprogrammed by a third party, Intuitive has, in | | |
| | 136:16    fact, terminated sales agreements and refused to | | |
| | 136:17    service da Vinci robots; right? | | |
| | 136:18   A.  That is correct. | | |
| | 136:19   Q.  And so it's certainly not true that there's | | |
| | 136:20    no consequence to a hospital that wants to use | | |
| | 136:21    reprogrammed EndoWrists on its da Vinci robots; | | |
| | 136:22    right? | | |
| | 136:23   A.  That is correct. | | |
| | 136:24   Q.  In fact, Intuitive aggressively enforces | | |
| | 136:25    its sales contracts to ensure that hospitals don't | | |
| | 137:01    engage in that type of activity; right? | | |
| 137:03 - 137:16 | **Bair, Ron 2021-05-24** | 00:00:34 | **V1M.8** |
| | 137:03    THE WITNESS:  I would say that we | | |
| | 137:04    aggressively pursue the terms of our agreement with | | |
| | 137:05    our customers. That is correct. | | |
| | 137:06    BY MR. ERWIG: | | |
| | 137:07   Q.  That agreement that's the sales and | | |
| | 137:08    licensing agreement, it's a contract with a | | |
| | 137:09    customer; right? | | |
| | 137:10   A.  That is correct. | | |
| | 137:11   Q.  And Intuitive enforces the terms of that | | |
| | 137:12    contract to stop the customer from using | | |
| | 137:13    reprogrammed EndoWrists; right? | | |
| | 137:14   A.  Among other things that we, yeah, pursue | | |
| | 137:15    contract enforcement for, which may include | | |
| | 137:16    nonpayment or other recourse as needed. | | |
| 144:17 - 145:01 | **Bair, Ron 2021-05-24** | 00:00:43 | **V1M.9** |
| | 144:17   Q.  Now, has Intuitive ever performed any | | |
| | 144:18    specific testing that would indicate that an | | |
| | 144:19    EndoWrist that has been safely repaired or | | |
| | 144:20    refurbished can operate well beyond its use counter? | | |
| | 144:21   A.  We went over that, I think, close to the | | |
| | 144:22    beginning of this as it related to our exploration | | |

### V1M - Bair PA DC PR MERGED

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 144:23 | of the viability of refurbishment. | | |
| | 144:24 | Meaning, yes, we have explored if | | |
| | 144:25 | refurbishing -- what we deem to be refurbishment or | | |
| | 145:01 | remanufacturing is safe and economically viable. | | |
| 145:02 - 145:04 | **Bair, Ron 2021-05-24** | | 00:00:07 | **V1M.19** |
| | 145:02  Q. | The conclusion was that it would likely be | | |
| | 145:03 | safe but would probably not be economically viable | | |
| | 145:04 | for Intuitive at the time; is that right? | | |
| 145:07 - 145:11 | **Bair, Ron 2021-05-24** | | 00:00:15 | **V1M.20** |
| | 145:07 | THE WITNESS:  The conclusion was not | | |
| | 145:08 | necessarily that it would likely be safe, but not -- | | |
| | 145:09 | we did not conclude that it was impossible to render | | |
| | 145:10 | the instrument after being appropriately | | |
| | 145:11 | remanufactured. | | |
| 145:13 - 145:22 | **Bair, Ron 2021-05-24** | | 00:00:33 | **V1M.10** |
| | 145:13  Q. | But you concluded that it was not | | |
| | 145:14 | economically viable for Intuitive at the time; | | |
| | 145:15 | right? | | |
| | 145:16  A. | The decision as it related to economic | | |
| | 145:17 | viability wasn't something that I was engaged in | | |
| | 145:18 | making. I did the analysis. And the decision as to | | |
| | 145:19 | whether to pursue it or not was made based on, I | | |
| | 145:20 | would say, multiple factors, one of which I would | | |
| | 145:21 | anticipate is the economic impact of it, which is | | |
| | 145:22 | why I was engaged to provide that analysis. | | |
| 145:23 - 146:03 | **Bair, Ron 2021-05-24** | | 00:00:14 | **V1M.21** |
| | 145:23  Q. | And, sir, you certainly understand that | | |
| | 145:24 | it's more profitable for Intuitive to continue | | |
| | 145:25 | selling its customers new EndoWrists than it is to | | |
| | 146:01 | refurbish and sell refurbished EndoWrists to | | |
| | 146:02 | customers; right? | | |
| | 146:03  A. | I do not understand that. | | |
| 146:06 - 146:19 | **Bair, Ron 2021-05-24** | | 00:00:41 | **V1M.11** |
| | 146:06 | Is it your understanding that the | | |
| | 146:07 | refurbishment program would, in fact, be more | | |
| | 146:08 | profitable to Intuitive than selling new | | |
| | 146:09 | instruments? | | |
| | 146:10  A. | That is not my understanding either. We | | |
| | 146:11 | did some financial modeling based on potential price | | |

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 146:12    points, but the market, the price elasticity, the | | |
| | 146:13    demand elasticity, all of those things remained | | |
| | 146:14    unproven from my perspective as it relates to what | | |
| | 146:15    the projected economic viability is. | | |
| | 146:16   Q.   Well, certainly based on your modeling, you | | |
| | 146:17    concluded that it was more profitable for Intuitive | | |
| | 146:18    to continue to sell new EndoWrists than it would be | | |
| | 146:19    to offer a refurbished instrument program. True? | | |
| 146:21 - 147:16 | **Bair, Ron 2021-05-24** | 00:01:03 | **V1M.12** |
| | 146:21    THE WITNESS:  Based on the way that we held | | |
| | 146:22    standards and our assumptions in the modeling, for | | |
| | 146:23    example, that we would potentially position it at | | |
| | 146:24    roughly a thousand dollars less per instrument, then | | |
| | 146:25    it was modestly or slightly less profitable from a | | |
| | 147:01    contribution margin standpoint only. | | |
| | 147:02    And that is referring back to the direct | | |
| | 147:03    materials, the direct labor, the other cost of goods | | |
| | 147:04    sold, and the revenue on each of those instruments, | | |
| | 147:05    which does not include the development costs, the | | |
| | 147:06    fixed overhead costs -- which we explored in the | | |
| | 147:07    previous model on the Cowbird old and new tabs -- | | |
| | 147:08    the commission costs, additional selling generally, | | |
| | 147:09    administrative costs, et cetera. So that is a | | |
| | 147:10    multifaceted question that's challenging to provide | | |
| | 147:11    a succinct response to. | | |
| | 147:12    BY MR. ERWIG: | | |
| | 147:13   Q.   Well, sir, let's make it simpler and look | | |
| | 147:14    at what's happened in the real world. | | |
| | 147:15    Since 2017 Intuitive hasn't offered a | | |
| | 147:16    refurbished instrument program; right? | | |
| 147:18 - 147:18 | **Bair, Ron 2021-05-24** | 00:00:02 | **V1M.13** |
| | 147:18    THE WITNESS: That is correct. | | |
| 147:20 - 147:22 | **Bair, Ron 2021-05-24** | 00:00:06 | **V1M.22** |
| | 147:20   Q.   Now, if that program had been wildly | | |
| | 147:21    profitable for Intuitive, you would expect that | | |
| | 147:22    Intuitive would have brought that to market; right? | | |
| 147:24 - 147:25 | **Bair, Ron 2021-05-24** | 00:00:05 | **V1M.23** |
| | 147:24    THE WITNESS:  I don't know that that would | | |
| | 147:25    be the case. As I mentioned, the decision, as it | | |

5-ER-910

**V1M - Bair PA DC PR MERGED**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 148:01 - 148:02 | **Bair, Ron 2021-05-24** | 00:00:06 | **V1M.24** |
| | 148:01  relates to the portfolio of products that we would | | |
| | 148:02  intentionally develop and | | |
| 148:03 - 148:08 | **Bair, Ron 2021-05-24** | 00:00:20 | **V1M.26** |
| | 148:03  deploy, is well beyond the profitability | | |
| | 148:04  implications of those products. The greatest | | |
| | 148:05  intention is in furtherance of our mission. And for | | |
| | 148:06  that reason there are variable price and margin | | |
| | 148:07  points associated with the products in our | | |
| | 148:08  portfolio. | | |

5-ER-911

# Harrich PA DA PC DC DR Merged

## Designation List Report

**Harrich, Edward W**                                    **2021-05-24**

 Documents linked to video: TX1688



**ID: V1M**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**COURT EXHIBIT 15**

Case No.   3:21-cv-03496-AMO
Date Entered
By
Deputy Clerk

5-ER-912

## V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 16:24 - 17:02 | **Harrich, Edward W 2021-05-24** | 00:00:12 | **V1M.3** |

| | |
|---|---|
| 16:24 | Q. The experience of Pullman Regional Hospital, |
| 16:25 | do da Vinci surgeries have certain advantages over |
| 17:01 | traditional nonrobotic or laparoscopic surgeries? |
| 17:02 | A. Yes. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 17:03 - 17:06 | **Harrich, Edward W 2021-05-24** | 00:00:22 | **V1M.1** |
| 🔗 TX1688.1.1 | | | |

| | |
|---|---|
| 17:03 | MR. LYON: I'm going to mark as Exhibit 1 the |
| 17:04 | document that says on its top 'da Vinci Surgical |
| 17:05 | Robots.' It is a printout from the Pullman Regional |
| 17:06 | website. It is in the folder that I am adding as |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 17:07 - 17:09 | **Harrich, Edward W 2021-05-24** | 00:00:05 | **V1M.86** |

| | |
|---|---|
| 17:07 | 'Pullman Regional Hospital Website Printout.' |
| 17:08 | (Plaintiff's Exhibit 1 was marked for |
| 17:09 | identification.) |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 17:25 - 18:15 | **Harrich, Edward W 2021-05-24** | 00:00:54 | **V1M.2** |

| | |
|---|---|
| 17:25 | Q. Mr. Harrich, do you recognize Exhibit 1, the |
| 18:01 | document entitled 'da Vinci Surgical Robots'? |
| 18:02 | A. I do. |
| 18:03 | Q. What is it? |
| 18:04 | A. It's the hospital's -- it's part of an |
| 18:05 | advertisement. When we got the da Vinci robot, that |
| 18:06 | was an ad we ran. And then for TV, we used that |
| 18:07 | picture, something like that, on a billboard, on the |
| 18:08 | hospital's website. |
| 18:09 | Q. Sir, if you look at the second sentence of |
| 🔗 TX1688.1.2   18:10 | Exhibit 1, it states, 'When compared to traditional or |
| 18:11 | laparoscopic surgery, patients report less pain, less |
| 18:12 | scarring, a shorter hospital stay, and a quicker |
| 18:13 | return to their daily activities.' |
| 18:14 | Do you see that? |
| 18:15 | A. I do. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 18:17 - 18:22 | **Harrich, Edward W 2021-05-24** | 00:00:14 | **V1M.4** |

| | |
|---|---|
| 18:17 | Does Pullman Hospital agree that when |
| 18:18 | compared to traditional or laparoscopic surgery, |
| 18:19 | patients report less pain, less scarring, a shorter |
| 18:20 | hospital stay, and a quicker return to their daily |
| 18:21 | activities? |
| 18:22 | A. Yes, we stand by that. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 19:06 - 19:08 | **Harrich, Edward W 2021-05-24** | 00:00:10 | **V1M.5** |

5-ER-913

### V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 19:06  Q.  Is less pain a benefit of the da Vinci | | **V1M.5** |
| | 19:07      surgical system and robotic systems over traditional | | |
| | 19:08      nonrobotic surgeries? | | |
| 19:10 - 19:15 | Harrich, Edward W 2021-05-24 | 00:00:17 | **V1M.6** |
| | 19:10      THE WITNESS:  Yes. It makes a significant | | |
| | 19:11      difference for our patients, less pain. | | |
| | 19:12      BY MR. LYON: | | |
| | 19:13  Q.  Is less blood loss an advantage of the | | |
| | 19:14      da Vinci robotic-assisted surgical system over | | |
| | 19:15      nonrobotic surgeries? | | |
| 19:17 - 19:22 | Harrich, Edward W 2021-05-24 | 00:00:15 | **V1M.7** |
| | 19:17      THE WITNESS: Yes. The less blood loss is an | | |
| | 19:18      advantage to our patients. | | |
| | 19:19      BY MR. LYON: | | |
| | 19:20  Q.  Is less scarring an advantage of using the | | |
| | 19:21      da Vinci robotic-assisted surgical system over | | |
| | 19:22      nonrobotic surgeries? | | |
| 19:24 - 20:04 | Harrich, Edward W 2021-05-24 | 00:00:16 | **V1M.8** |
| | 19:24      THE WITNESS: Yes, it is an advantage to our | | |
| | 19:25      patients to have less. | | |
| | 20:01      BY MR. LYON: | | |
| | 20:02  Q.  Is shorter hospital stays an advantage of | | |
| | 20:03      using the da Vinci robotic-assisted surgical system | | |
| | 20:04      over using nonrobotic surgeries? | | |
| 20:06 - 20:19 | Harrich, Edward W 2021-05-24 | 00:00:35 | **V1M.9** |
| | 20:06      THE WITNESS:  It's definitely an advantage to | | |
| | 20:07      our patients. For the hospital, we won't have the | | |
| | 20:08      patients staying as long as if they didn't have a | | |
| | 20:09      robot, so they get out a little quicker. So there | | |
| | 20:10      might be some financial issues tied to that. | | |
| | 20:11      BY MR. LYON: | | |
| | 20:12  Q.  The patients get out of the hospital a little | | |
| | 20:13      quicker if they have a robotic surgery than if they | | |
| | 20:14      don't have a robotic surgery? | | |
| | 20:15  A.  That would be correct. | | |
| | 20:16  Q.  Is shorter recovery and faster return to | | |
| | 20:17      normal activities an advantage of using a da Vinci | | |
| | 20:18      robotic-assisted surgical system over nonrobotic | | |
| | 20:19      surgery? | | |

5-ER-914

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 20:21 - 21:01 | Harrich, Edward W 2021-05-24 | 00:00:14 | **V1M.10** |

20:21     THE WITNESS: Yes, that is -- it's definitely
20:22     an advantage.
20:23     BY MR. LYON:
20:24   Q.  Does the equipment used to perform a robotic
20:25     surgery cost more than the equipment used to perform
21:01     the same surgery without the benefit of a robot?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 21:03 - 21:12 | Harrich, Edward W 2021-05-24 | 00:00:35 | **V1M.11** |

21:03     THE WITNESS: So I guess it is a little bit
21:04     vague on that question. To delve down a little
21:05     deeper, you have the up-front cost of the da Vinci
21:06     robot and then you have a yearly preventive
21:07     maintenance contract.
21:08     But case per case, the prices are fairly
21:09     equivalent. It's a little bit more expensive to use
21:10     the robot per case for instrumentation and
21:11     disposables, but we make up for it with the increased
⊠ Clear    21:12     volumes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 21:14 - 21:22 | Harrich, Edward W 2021-05-24 | 00:00:29 | **V1M.12** |

21:14   Q.  What do you mean by the 'increased volumes'?
21:15   A.  So to make up the difference of the fund --
21:16     the additional expenses to use the robot, we'll do
21:17     more surgical cases because patients will come to
21:18     Pullman Regional because like, say, we're doing a
21:19     hysterectomy, and they want it to be done robotically.
21:20   Q.  For a given surgery, is it more expensive to
21:21     use the robot than to not use the robot and perform a
21:22     traditional surgery?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 22:01 - 22:13 | Harrich, Edward W 2021-05-24 | 00:00:34 | **V1M.13** |

22:01     You know, I would have to say -- and I'm
22:02     going to go off of older numbers, because I haven't
22:03     looked at it in probably the last three years to see
22:04     what our expenses were -- are now versus using the
22:05     robot versus not using it. But going back prior to
22:06     three years ago, yes, it was more expensive to use the
22:07     robot.
22:08     BY MR. LYON:
22:09   Q.  Are the instruments and equipment used during
22:10     a surgical -- withdrawn.
22:11     Are the instruments and equipment used during

5-ER-915

### V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 22:12    a surgery with the robot more expensive than the | | |
| | 22:13    instruments used for the nonrobotic surgery? | | |
| 22:15 - 22:23 | **Harrich, Edward W 2021-05-24** | 00:00:29 | **V1M.14** |
| | 22:15    THE WITNESS:  Yes, they're more expensive. | | |
| | 22:16    BY MR. LYON: | | |
| | 22:17  Q.  You stated earlier that you make up some of | | |
| | 22:18    the -- withdrawn. | | |
| | 22:19    You stated that you make up for some of the | | |
| | 22:20    greater expenses of surgical -- robotic surgeries | | |
| | 22:21    because additional people come to Pullman Regional | | |
| | 22:22    because you have a robot; is that right? | | |
| | 22:23  A.  That's correct. | | |
| 22:24 - 23:02 | **Harrich, Edward W 2021-05-24** | 00:00:14 | **V1M.15** |
| | 22:24  Q.  Is the fact that Pullman Regional has a | | |
| | 22:25    surgical robot a draw for business at Pullman Regional | | |
| | 23:01    Hospital? | | |
| | 23:02  A.  Yes, absolutely. | | |
| 23:03 - 23:04 | **Harrich, Edward W 2021-05-24** | 00:00:09 | **V1M.16** |
| | 23:03  Q.  If Pullman Regional did not have a da Vinci | | |
| | 23:04    surgical robot, would it lose patients or customers? | | |
| 23:07 - 23:07 | **Harrich, Edward W 2021-05-24** | 00:00:03 | **V1M.17** |
| | 23:07    THE WITNESS:  Yes, we would lose customers. | | |
| 23:09 - 23:11 | **Harrich, Edward W 2021-05-24** | 00:00:07 | **V1M.18** |
| | 23:09  Q.  Does a patient pay more for a da Vinci | | |
| | 23:10    robotic surgery than an analogous surgery performed | | |
| | 23:11    without a surgical robot? | | |
| 23:13 - 23:19 | **Harrich, Edward W 2021-05-24** | 00:00:18 | **V1M.19** |
| | 23:13    THE WITNESS: No. My understanding of that | | |
| | 23:14    is our insurance is only going to pay what the | | |
| | 23:15    insurance is going to pay. So if they're doing a | | |
| | 23:16    hysterectomy and the insurance company is going to pay | | |
| | 23:17    $14,000, they don't care which form we do the | | |
| | 23:18    procedure; that's just what the insurance company is | | |
| | 23:19    going to pay. | | |
| 26:09 - 26:12 | **Harrich, Edward W 2021-05-24** | 00:00:07 | **V1M.20** |
| | 26:09  Q.  Would your hospital ever repair or service a | | |
| | 26:10    product if the repair service can make the product | | |
| | 26:11    unsafe? | | |

Court Ex. No. 15, Pg. 5 of 23

## V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 26:12    A.  No. | | |
| 30:04 - 30:07 | **Harrich, Edward W 2021-05-24** | **00:00:11** | **V1M.21** |
| | 30:04    Q.  Do the maximum use restrictions that | | |
| | 30:05        Intuitive imposes on EndoWrists force your hospital to | | |
| | 30:06        purchase more EndoWrists than it would otherwise | | |
| | 30:07        purchase? | | |
| 30:09 - 30:16 | **Harrich, Edward W 2021-05-24** | **00:00:25** | **V1M.22** |
| | 30:09        THE WITNESS:  Well, soon as -- as soon as we | | |
| | 30:10        hit our ten lives or whatever the limit number is on | | |
| | 30:11        that instrument, we will have to purchase new ones and | | |
| | 30:12        we can't use them any further. | | |
| | 30:13        BY MR. LYON: | | |
| | 30:14    Q.  Does the maximum use restriction that | | |
| | 30:15        Intuitive imposes force you to buy additional | | |
| | 30:16        EndoWrists that you otherwise wouldn't purchase? | | |
| 30:18 - 30:18 | **Harrich, Edward W 2021-05-24** | **00:00:01** | **V1M.23** |
| | 30:18        THE WITNESS: Yes. | | |
| 35:09 - 36:04 | **Harrich, Edward W 2021-05-24** | **00:00:53** | **V1M.24** |
| | 35:09    Q.  You stated that you believed EndoWrists had | | |
| | 35:10        additional lives on them before you had to dispose of | | |
| | 35:11        them when they reached their maximum use restrictions; | | |
| | 35:12        is that right? | | |
| | 35:13    A.  That's correct. | | |
| | 35:14    Q.  Why did you believe that EndoWrists had | | |
| | 35:15        additional lives on them? | | |
| | 35:16    A.  Well, on the end of the tenth life, it wasn't | | |
| | 35:17        working any different than it had been on the first | | |
| | 35:18        life. There was no complaints by the physicians. If | | |
| | 35:19        there were any, we'd take the instrument out of | | |
| | 35:20        service or send it back in to Intuitive for repair if | | |
| | 35:21        it still had lives left on it. | | |
| | 35:22        So if it's a grasper, it's a grasper. Is it | | |
| | 35:23        grabbing the tissue like you think it should? As the | | |
| | 35:24        physician says, it's feeling that tactile touch. You | | |
| | 35:25        can't actually feel the touch, but on a console. | | |
| | 36:01        But it's grabbing the tissue. They're liking | | |
| | 36:02        what they're seeing. They're liking what they're | | |
| | 36:03        feeling. So the instrument can still continue to be | | |
| | 36:04        used. | | |

5-ER-917

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 36:09 - 36:20 | Harrich, Edward W 2021-05-24 | 00:00:31 | V1M.25 |

| | | |
|---|---|---|
| 36:09 | Q. | Is your hospital aware of any other companies |
| 36:10 | | other than Rebotix Repair that repairs and services |
| 36:11 | | EndoWrists? |
| 36:12 | A. | I'm not aware of anybody else. |
| 36:13 | Q. | Is your hospital aware of any companies other |
| 36:14 | | than Rebotix Repair that can reset the usage counter |
| 36:15 | | on EndoWrists beyond the limit imposed by Intuitive? |
| 36:16 | A. | I'm not aware of anybody else. |
| 36:17 | Q. | Would your hospital have agreed to use |
| 36:18 | | EndoWrists repaired by Rebotix if the repaired |
| 36:19 | | EndoWrists were unsafe? |
| 36:20 | A. | No, never. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 36:23 - 38:13 | Harrich, Edward W 2021-05-24 | 00:02:15 | V1M.26 |

| | | |
|---|---|---|
| 36:23 | Q. | Did you do any testing or trials of |
| 36:24 | | Rebotix-repaired EndoWrists? |
| 36:25 | A. | We did. |
| 37:01 | Q. | What did you do to test or try out |
| 37:02 | | Rebotix-repaired EndoWrists? |
| 37:03 | A. | We had three or four samples that we were |
| 37:04 | | given by Rebotix, and informed the physician that it |
| 37:05 | | was a reprocessed robotic instrument for the cases, |
| 37:06 | | made everybody in the room aware that it was a |
| 37:07 | | reprocessed instrument, and gave it a whirl. |
| 37:08 | | There were no complaints. Everybody said |
| 37:09 | | they worked just fine. There was no difference than |
| 37:10 | | the non-reprocessed instruments. So we did -- we made |
| 37:11 | | some purchases. And then when we made our first |
| 37:12 | | purchases -- you had to get down to one life left |
| 37:13 | | before you could send them in. So once we got some |
| 37:14 | | instruments and we were able to send them in, got them |
| 37:15 | | back from Rebotix. |
| 37:16 | | Myself and my assistant director, Steve |
| 37:17 | | Cromer, the only two that knew that those were the |
| 37:18 | | reprocessed instruments that came back in, we used |
| 37:19 | | them in a case. I asked the first assist, the |
| 37:20 | | surgeon, and the scrub tech in the room if there were |
| 37:21 | | any issues, complications, or problems about the |
| 37:22 | | instruments, and there were no issues. They -- |
| 37:23 | | actually, one of them on one of the cases says the |

**Court Ex. No. 15, Pg. 7 of 23**

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 37:24 | scissors seemed extremely sharp. | | |
| | 37:25 | So we didn't have any issues and we were | | |
| | 38:01 | going to continue to proceed forward using them. | | |
| | 38:02 | Q. There is a lot there. I'm going to try to -- | | |
| | 38:03 | A. Yes. | | |
| | 38:04 | Q. -- break down and unpackage that as well. | | |
| | 38:05 | When you tested out the EndoWrists, was it | | |
| | 38:06 | during an actual surgery with a patient? | | |
| | 38:07 | A. Yes. | | |
| | 38:08 | Q. In the -- withdrawn. | | |
| | 38:09 | Were the surgeons who used the | | |
| | 38:10 | Rebotix-repaired EndoWrists able to discern any | | |
| | 38:11 | difference between those EndoWrists and EndoWrists | | |
| | 38:12 | that had not been repaired or serviced by Rebotix? | | |
| | 38:13 | A. No. | | |
| **38:16 - 38:19** | **Harrich, Edward W 2021-05-24** | | **00:00:15** | **V1M.27** |
| | 38:16 | Q. Were the first assists able to discern any | | |
| | 38:17 | differences between the Rebotix-repaired EndoWrists | | |
| | 38:18 | and the EndoWrists that had not been repaired or | | |
| | 38:19 | serviced by Rebotix? | | |
| **38:21 - 39:01** | **Harrich, Edward W 2021-05-24** | | **00:00:15** | **V1M.28** |
| | 38:21 | THE WITNESS: No. | | |
| | 38:22 | BY MR. LYON: | | |
| | 38:23 | Q. Were the scrub assists able to discern any | | |
| | 38:24 | difference between the Rebotix-repaired EndoWrists and | | |
| | 38:25 | EndoWrists that had not been repaired or serviced by | | |
| | 39:01 | Rebotix? | | |
| **39:03 - 39:07** | **Harrich, Edward W 2021-05-24** | | **00:00:16** | **V1M.29** |
| | 39:03 | THE WITNESS: No. | | |
| | 39:04 | BY MR. LYON: | | |
| | 39:05 | Q. Other than the first assists, the surgeons, | | |
| | 39:06 | and the scrub assists, did anyone else test or | | |
| | 39:07 | perceive the Rebotix-repaired EndoWrists in use? | | |
| **39:09 - 39:09** | **Harrich, Edward W 2021-05-24** | | **00:00:01** | **V1M.30** |
| | 39:09 | THE WITNESS: No. | | |
| **40:02 - 40:08** | **Harrich, Edward W 2021-05-24** | | **00:00:25** | **V1M.31** |
| | 40:02 | Did you personally interview the surgeons and | | |
| | 40:03 | the technicians who were involved in the trial of the | | |
| | 40:04 | Rebotix-repaired EndoWrists? | | |

5-ER-919

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 40:05   A.  Yes. | | |
| | 40:06   Q.  What did you learn from those interviews? | | |
| | 40:07   A.   That the instruments still worked just like | | |
| | 40:08        the nonrepaired ones. There was no difference. | | |
| 42:06 - 42:17 | **Harrich, Edward W 2021-05-24** | 00:00:24 | **V1M.32** |
| | 42:06   Q.  Has your hospital ever rejected an EndoWrist | | |
| | 42:07        because the surgeon perceived it to have dull or | | |
| | 42:08        damaged scissor plates? | | |
| | 42:09   A.  Yes. | | |
| | 42:10   Q.  Has your hospital ever rejected an EndoWrist | | |
| | 42:11        because a surgeon perceived it to have unintuitive | | |
| | 42:12        motion? | | |
| | 42:13   A.  Yes. | | |
| | 42:14   Q.  Has your hospital ever rejected an EndoWrist | | |
| | 42:15        because a surgeon perceived it to have insufficient | | |
| | 42:16        grip force? | | |
| | 42:17   A.  Yes. | | |
| 43:05 - 43:23 | **Harrich, Edward W 2021-05-24** | 00:00:51 | **V1M.33** |
| | 43:05   Q.  Did your hospital or your surgeons ever | | |
| | 43:06        reject a Rebotix-repaired EndoWrist because of | | |
| | 43:07        perceived unintuitive motion? | | |
| | 43:08   A.  No. | | |
| | 43:09   Q.  Did your hospital or surgeons ever reject a | | |
| | 43:10        Rebotix-repaired EndoWrist because of perceived dull | | |
| | 43:11        or damaged scissor blades? | | |
| | 43:12   A.  No. | | |
| | 43:13   Q.  Did your hospital or your surgeons ever | | |
| | 43:14        reject a Rebotix-repaired EndoWrist because of | | |
| | 43:15        insufficient grip force? | | |
| | 43:16   A.  No. | | |
| | 43:17   Q.  Did your hospital or surgeons ever reject a | | |
| | 43:18        Rebotix-repaired EndoWrist for any reason? | | |
| | 43:19   A.  No. | | |
| | 43:20   Q.  In the instances where one of Intuitive's | | |
| | 43:21        EndoWrists did not perform properly, for example, | | |
| | 43:22        unintuitive motion, insufficient grip force, or dull | | |
| | 43:23        blades, was the patient's safety put at risk? | | |
| 43:25 - 44:14 | **Harrich, Edward W 2021-05-24** | 00:00:48 | **V1M.34** |
| | 43:25        THE WITNESS:  No. We -- when we're | | |
| | 44:01        experiencing problems like that -- I think only once | | |

**Court Ex. No. 15, Pg. 9 of 23**

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 44:02 | we've had it where actually the teeth on a grasper | | |
| | 44:03 | were locked on some tissue. But prior to that, other | | |
| | 44:04 | than that one incident, no. If the instrument is not | | |
| | 44:05 | operating as it is supposed to, it's taken out and | | |
| | 44:06 | it's replaced. | | |
| | 44:07 | BY MR. LYON: | | |
| | 44:08 | Q.  When an EndoWrist is not performing properly, | | |
| | 44:09 | for example -- withdrawn. | | |
| | 44:10 | If an EndoWrist is not performing properly, | | |
| | 44:11 | for example, it's showing unintuitive motion, | | |
| | 44:12 | insufficient grip force, or dull blades, is it your | | |
| | 44:13 | hospital's practice to simply replace that EndoWrist? | | |
| | 44:14 | A.  Yes. | | |
| 59:25 - 60:01 | **Harrich, Edward W 2021-05-24** | | 00:00:07 | **V1M.35** |
| | 59:25 | Q.  How many EndoWrists did your hospital have | | |
| | 60:01 | serviced by Rebotix? | | |
| 60:02 - 60:07 | **Harrich, Edward W 2021-05-24** | | 00:00:27 | **V1M.36** |
| | 60:02 | A.  At least four. It might be six, but I | | |
| | 60:03 | believe it was four. | | |
| | 60:04 | Q.  How many surgeries were performed at your | | |
| | 60:05 | hospital using EndoWrists repaired by Rebotix? | | |
| | 60:06 | A.  I would say less than ten. I don't know that | | |
| | 60:07 | exact number, but less than ten. | | |
| 60:10 - 60:12 | **Harrich, Edward W 2021-05-24** | | 00:00:08 | **V1M.37** |
| | 60:10 | Q.  Is there anything that prevents your hospital | | |
| | 60:11 | from using Rebotix Repair services other than | | |
| | 60:12 | Intuitive? | | |
| 60:14 - 60:14 | **Harrich, Edward W 2021-05-24** | | 00:00:01 | **V1M.38** |
| | 60:14 | THE WITNESS: No. | | |
| 60:18 - 60:22 | **Harrich, Edward W 2021-05-24** | | 00:00:15 | **V1M.39** |
| | 60:18 | If your hospital were permitted to use | | |
| | 60:19 | Rebotix's repair services, is there any reason why you | | |
| | 60:20 | wouldn't use Rebotix's repair services on all the | | |
| | 60:21 | EndoWrists that they are capable of providing the | | |
| | 60:22 | service for? | | |
| 60:24 - 60:24 | **Harrich, Edward W 2021-05-24** | | 00:00:02 | **V1M.40** |
| | 60:24 | THE WITNESS:  We would use the Rebotix. | | |
| 60:25 - 61:04 | **Harrich, Edward W 2021-05-24** | | 00:00:13 | **V1M.41** |

## V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 60:25 | (Reporter clarification.) | | **V1M.41** |
| | 61:01 | BY MR. LYON: | | |
| | 61:02 Q. | For example, there is no reason your hospital | | |
| | 61:03 | would only use Rebotix for a subset of EndoWrist types | | |
| | 61:04 | or for limited volumes of EndoWrists; is that right? | | |
| 61:07 - 61:20 | **Harrich, Edward W 2021-05-24** | | 00:00:48 | **V1M.42** |
| | 61:07 Q. | I'm sorry? | | |
| | 61:08 A. | We would use the Rebotix for the extended | | |
| | 61:09 | life of the EndoWrist. | | |
| | 61:10 Q. | Is there any reason other than Intuitive's | | |
| | 61:11 | prohibition on you doing so that you wouldn't use | | |
| | 61:12 | Rebotix's repair services on all of your EndoWrists? | | |
| | 61:13 A. | All of them that are certified to be | | |
| | 61:14 | reprocessed would be. | | |
| | 61:15 Q. | What do you mean? | | |
| | 61:16 A. | Providing that you have to -- you can't use | | |
| | 61:17 | the last use, there has to -- you can use nine lives. | | |
| | 61:18 | And so a couple times we used them on the tenth. And | | |
| | 61:19 | so the robot -- so that arm was disposed of | | |
| | 61:20 | afterwards. So it would be a staff error. | | |
| 61:22 - 62:05 | **Harrich, Edward W 2021-05-24** | | 00:00:27 | **V1M.43** |
| | 61:22 | Is one additional use required in order for | | |
| | 61:23 | Rebotix to perform the repair and reset the usage | | |
| | 61:24 | counter? | | |
| | 61:25 A. | That's what I was informed and understood. | | |
| | 62:01 Q. | In those instances where you used all of the | | |
| | 62:02 | lives and were unable to use Rebotix's services, was | | |
| | 62:03 | that an error? | | |
| | 62:04 A. | Once we started, yeah. Once we were trying | | |
| | 62:05 | to save them. So, yes, that would be an error. | | |
| 62:06 - 62:10 | **Harrich, Edward W 2021-05-24** | | 00:00:14 | **V1M.44** |
| | 62:06 Q. | If it weren't for Intuitive's contractual | | |
| | 62:07 | limitations, would your hospital use Rebotix's | | |
| | 62:08 | services to the full extent that Rebotix was willing | | |
| | 62:09 | to provide them? | | |
| | 62:10 A. | Yes. | | |
| 62:14 - 62:15 | **Harrich, Edward W 2021-05-24** | | 00:00:08 | **V1M.45** |
| | 62:14 Q. | Do your surgeons have any preference for or | | |
| | 62:15 | against using Rebotix-repaired EndoWrists? | | |

Court Ex. No. 15, Pg. 11 of 23

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 62:19 - 62:21 | Harrich, Edward W 2021-05-24 | 00:00:07 | **V1M.46** |

| | |
|---|---|
| 62:19 | THE WITNESS: They didn't have any concerns |
| 62:20 | at the time. We didn't get to go long enough to get a |
| 62:21 | full run of it, full trial. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 63:07 - 63:10 | Harrich, Edward W 2021-05-24 | 00:00:09 | **V1M.49** |

| | | |
|---|---|---|
| 63:07 | Q. | Are you aware of any preference from insurers |
| 63:08 | | or third-party payors for or against using repaired |
| 63:09 | | EndoWrists? |
| 63:10 | A. | No. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 63:11 - 63:19 | Harrich, Edward W 2021-05-24 | 00:00:32 | **V1M.50** |

| | | |
|---|---|---|
| 63:11 | Q. | Does the amount of money your hospital |
| 63:12 | | receives for a surgical procedure depend on whether a |
| 63:13 | | repaired EndoWrist is used? |
| 63:14 | A. | No, there is -- no. |
| 63:15 | Q. | Does reducing the costs of EndoWrists by |
| 63:16 | | using the Rebotix Repair service improve the |
| 63:17 | | hospital's profitability associated with procedures |
| 63:18 | | that used the da Vinci system? |
| 63:19 | A. | Yes. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 69:08 - 69:16 | Harrich, Edward W 2021-05-24 | 00:00:27 | **V1M.51** |

| | | |
|---|---|---|
| 69:08 | Q. | Why did your hospital stop using Rebotix |
| 69:09 | | Repair services? |
| 69:10 | A. | Well, we were informed that our preventive |
| 69:11 | | maintenance contract, that we were in violation of it. |
| 69:12 | | And so we read through the contract, saw that it did |
| 69:13 | | say that if we used an outside vendor for |
| 69:14 | | instrumentation, that the preventive maintenance |
| 69:15 | | contract could and, after talking with Intuitive, |
| 69:16 | | would be potentially canceled, so we quit using them. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 76:22 - 77:03 | Harrich, Edward W 2021-05-24 | 00:00:28 | **V1M.52** |

| | | |
|---|---|---|
| 76:22 | Q. | When you said you did not want to get in the |
| 76:23 | | bad graces of Intuitive, why not? |
| 76:24 | A. | Because the Intuitive robot, if they stop |
| 76:25 | | maintaining it, I would have no one to go to that |
| 77:01 | | could come in and maintain our robot. If my robot is |
| 77:02 | | down, I've got seven unhappy surgeons. I put the |
| 77:03 | | hospital in a bad situation. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 77:13 - 77:16 | Harrich, Edward W 2021-05-24 | 00:00:09 | **V1M.53** |

| | | |
|---|---|---|
| 77:13 | Q. | If Intuitive would not perform preventive |

5-ER-923

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 77:14    maintenance on your robot, does your robot have any | | |
| | 77:15    use at all? | | |
| | 77:16   A. It would have -- | | |
| 77:18 - 77:24 | **Harrich, Edward W 2021-05-24** | 00:00:16 | **V1M.54** |
| | 77:18    THE WITNESS: It would have no use at all. | | |
| | 77:19    BY MR. LYON: | | |
| | 77:20   Q. If Intuitive refused to provide maintenance | | |
| | 77:21    on your da Vinci robot, could the da Vinci robot be | | |
| | 77:22    used for any surgeries? | | |
| | 77:23   A. No. If we couldn't have the preventive | | |
| | 77:24    maintenance, we'd stop using it. | | |
| 82:02 - 82:08 | **Harrich, Edward W 2021-05-24** | 00:00:22 | **V1M.55** |
| | 82:02   Q. Upon -- withdrawn. | | |
| | 82:03    Upon receiving the letter from Intuitive | | |
| | 82:04    about the violation of your contract and the statement | | |
| | 82:05    that it would no longer provide maintenance services, | | |
| | 82:06    did your hospital immediately decide to terminate its | | |
| | 82:07    relationship with Rebotix Repair? | | |
| | 82:08   A. Yes. | | |
| 88:17 - 88:19 | **Harrich, Edward W 2021-05-24** | 00:00:12 | **V1M.56** |
| | 88:17    What price differential would your hospital | | |
| | 88:18    require in order to have Rebotix repair its EndoWrists | | |
| | 88:19    rather than purchasing a new EndoWrist from Intuitive? | | |
| 88:21 - 89:01 | **Harrich, Edward W 2021-05-24** | 00:00:15 | **V1M.57** |
| | 88:21    THE WITNESS: The number we were talking at | | |
| | 88:22    the time is we were shooting for 40 percent. We sure | | |
| | 88:23    would have liked it to have been 50 or 60 percent. | | |
| | 88:24    And those were some conversations we were having when | | |
| | 88:25    we were still in the trial stages, but that's the | | |
| | 89:01    number we would have liked to settle on. | | |
| 108:03 - 108:06 | **Harrich, Edward W 2021-05-24** | 00:00:12 | **V1M.61** |
| | 108:03  Q. So have you personally had conversations with | | |
| | 108:04    physicians who work at Pullman about the merits of | | |
| | 108:05    Pullman purchasing another da Vinci system? | | |
| | 108:06  A. Absolutely. | | |
| 109:01 - 109:14 | **Harrich, Edward W 2021-05-24** | 00:00:49 | **V1M.62** |
| | 109:01  Q. And what have the physicians who work at | | |
| | 109:02    Pullman told you about whether Pullman should acquire | | |
| | 109:03    a new da Vinci system? | | |

5-ER-924

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 109:04  A.  Oh, absolutely. Our docs love the Intuitive | | |
| | 109:05     robot. I mean, it's a strong part -- it's ingrained | | |
| | 109:06     into their practice. They like what it does. They | | |
| | 109:07     like what they can do with it. They like the patient | | |
| | 109:08     referrals that they get from it. So, yeah, it's a | | |
| | 109:09     strong part of our culture. | | |
| | 109:10  Q.  Have you spoken to any physician at Pullman | | |
| | 109:11     who was less enthusiastic about the prospect of | | |
| | 109:12     Pullman acquiring another da Vinci system? | | |
| | 109:13  A.  No. That was not the case when we bought the | | |
| | 109:14     first one. | | |
| 109:15 - 114:18 | **Harrich, Edward W 2021-05-24** | 00:06:58 | **V1M.63** |
| | 109:15  Q.  Back when you bought the first da Vinci in | | |
| | 109:16     2011, was the process for getting that purchase | | |
| | 109:17     approved the same as the process that you just | | |
| | 109:18     described for me for what you have to go through to | | |
| | 109:19     potentially complete a purchase of a da Vinci Xi? | | |
| | 109:20  A.  Well, it would be the same, everything except | | |
| | 109:21     for I don't believe we had a foundation at the time. | | |
| | 109:22     And the Si was the third-generation robot. | | |
| | 109:23     I'd been following them from generation 1 to 2. I | | |
| | 109:24     don't remember what the terminology was at the time, | | |
| | 109:25     but it was their third robot. It was their platform | | |
| | 110:01     robot. | | |
| | 110:02     And from my research and study, I found it to | | |
| | 110:03     be extremely beneficial to patients, contrary to what | | |
| | 110:04     we were hearing as it was just an advertising scheme, | | |
| | 110:05     that people were buying them, it was for cardiac and | | |
| | 110:06     it didn't work. | | |
| | 110:07     We had doctors that were adamantly opposed to | | |
| | 110:08     us purchasing the Intuitive robot. They said that | | |
| | 110:09     they were -- University of Washington, a robot just | | |
| | 110:10     sat in a corner. It was a big scheme. | | |
| | 110:11     And, basically, we -- I only had one doctor | | |
| | 110:12     that wanted the robot. That was Dr. John Keizur. The | | |
| | 110:13     rest of the surgeons were fairly opposed to it or | | |
| | 110:14     extremely opposed to it until we brought it in and let | | |
| | 110:15     them get their hands on it, and we had some | | |
| | 110:16     conversions right there and then. | | |
| | 110:17     We had one doc that said, 'I'll give you five | | |

5-ER-925

**Court Ex. No. 15, Pg. 14 of 23**

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

110:18  minutes.' An hour later, he was saying, 'We've got to

110:19  talk tomorrow. That thing is fantastic.'

110:20  Three months into it, he said, 'You changed

110:21  my practice.' He says, 'Remember when I said if I can

110:22  do it vaginally, I'll do it vaginally. If I can do it

110:23  open, I'll do it open. And I may use your robot.' He

110:24  says, 'I was 100 percent wrong.' He says, 'I think

110:25  100 percent of the hysterectomies should be done on a

111:01  robot.'

111:02  So those conversations then and the

111:03  conversations now are completely different.

111:04  Q.  So back then, were you -- back in 2011, were

111:05  you personally involved in making any presentation to

111:06  the board to get the approval for Pullman's purchase

111:07  of the Xi?

111:08  A.  I may or may not have made a presentation to

111:09  the board. I can't tell you that for sure. But I can

111:10  tell you I gave a presentation to our administrative

111:11  team, which is about 25 members probably at the time,

111:12  pretty much on a regular basis, because they did hear

111:13  from a lot of the doctors, which there was a lot of

111:14  opposition. They thought we were spending a lot of

111:15  money for something that was just going to sit in the

111:16  corner and collect dust.

111:17  And, you know, for us being a small hospital,

111:18  that was a huge financial commitment. And I really,

111:19  truly feel if it would have been a bomb, I might have

111:20  been looking for a new job. So that's how big of a

111:21  risk it was.

111:22  Q.  So what gave you the confidence to take that

111:23  kind of risk in 2011 in the face of what it seems like

111:24  you described was some fairly robust physician

111:25  opposition?

112:01  A.  Precision technology, the camera, the 3D with

112:02  ten times magnification with the fluoro capabilities,

112:03  decrease in our blood loss because we can now see

112:04  where the vessels are.

112:05  Endometriosis lesions, we did our own

112:06  self-study internally using the Stryker camera, which

112:07  I think we had the 1288s that had just come out. They

112:08  were the hottest hotrod camera on the market at the

5-ER-926

**Court Ex. No. 15, Pg. 15 of 23**

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

112:09    time. And you take that side by side with the

112:10    Intuitive 1080p 3D camera, and we told all the

112:11    patients --

112:12    (Reporter clarification.)

112:13  A.  Okay. If you take the 1080 Stryker camera

112:14    and you put it in and you mark all the endometriosis

112:15    lesions, we would tell the patients, 'We got all your

112:16    lesions,' and we are mistakenly false on that.

112:17    And the Intuitive robot proved it to us with

112:18    the 3D ten times magnification. We put them side by

112:19    side. We'd mark all of them with the Stryker and then

112:20    once we put the Intuitive camera in, we would double

112:21    the amount of lesions that we in the past had left

112:22    behind. So now we, with confidence, can say, 'Man, we

112:23    did. We get all your endometriosis lesions.'

112:24    And the patients, when they would go back to

112:25    the doctors' follow-up, that pain that they'd had was

113:01    gone, as where that was only 50/50 probably, you know,

113:02    just throwing a rough number out there, when we used

113:03    the Stryker camera.

113:04    The articulation of the wrist. A morcellator

113:05    was being used to -- basically, it's like a garbage

113:06    disposal for the uterus, and that is not a good

113:07    practice. If you have cancer in the uterus and you

113:08    use a morcellator, you have a potential of spreading

113:09    cancerous tissue all around the lower abdomen. Those

113:10    are no longer in practice.

113:11    By using the robot, we have wrist -- the

113:12    articulating wrist, the visualization, and you can go

113:13    in and out -- take out the uterus without having to

113:14    open the abdomen.

113:15    Anything with the robot -- the further you go

113:16    in the body, the more difficult with laparoscopic

113:17    instruments it is to use. With the robot, that's not

113:18    the case. The further you go in, you still have the

113:19    same amount of control. You don't have any wiggling.

113:20    The surgeon can actually have a palsy and have their

113:21    hand shake on the console, but on the robot it's

113:22    perfectly still on the tip.

113:23    If you take a laparoscopic instrument, it

113:24    doesn't matter if you've had coffee or not that day,

Court Ex. No. 15, Pg. 16 of 23

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 113:25    you hold that instrument still at this end, it is | | |
| | 114:01    going to be wiggling up and down. So it's precision | | |
| | 114:02    control, nerve sparing. That's why it's critical in | | |
| | 114:03    prostate cases. | | |
| | 114:04    So these were some of the things that I was | | |
| | 114:05    studying, that I was researching. I understood why | | |
| | 114:06    our urologists wanted it and why we needed to bring | | |
| | 114:07    that in to Pullman. Because there is two things men | | |
| | 114:08    don't want: They don't want to be impotent and they | | |
| | 114:09    don't want to be incontinent. And you decrease | | |
| | 114:10    that -- those two things happening to them if you use | | |
| | 114:11    a robot versus doing an open prostate case. | | |
| | 114:12    So many, many benefits. Many, many. We can | | |
| | 114:13    get into blood loss, we can get into -- do you want to | | |
| | 114:14    hear that stuff? | | |
| | 114:15  Q.  Well, I'll ask -- well, there is a lot to | | |
| | 114:16    unpack in your last answer. | | |
| | 114:17  A.  There is a lot to this. I can do an | | |
| | 114:18    eight-hour presentation on the robot. | | |
| 114:25 - 115:05 | **Harrich, Edward W 2021-05-24** | 00:00:23 | **V1M.64** |
| | 114:25    But I will ask: Is it Pullman's | | |
| | 115:01    understanding that the advantages of robotic-assisted | | |
| | 115:02    surgery increase relative to laparoscopic surgery for | | |
| | 115:03    procedures that require the surgeon to go deeper into | | |
| | 115:04    the body? | | |
| | 115:05  A.  Yes. | | |
| 115:07 - 115:07 | **Harrich, Edward W 2021-05-24** | 00:00:01 | **V1M.65** |
| | 115:07    BY MR. MENITOVE: | | |
| 115:08 - 115:20 | **Harrich, Edward W 2021-05-24** | 00:00:44 | **V1M.66** |
| | 115:08  Q.  So for procedures that don't require a | | |
| | 115:09    surgeon to go quite as deep into the body, is there | | |
| | 115:10    less of an advantage to using robotic-assisted | | |
| | 115:11    surgery? | | |
| | 115:12  A.  Yes. So if you're talking -- like you can do | | |
| | 115:13    a total -- a joint, a scope of a knee or a shoulder, | | |
| | 115:14    you're only going in, you know, an inch. But you go | | |
| | 115:15    into an abdomen, how big is your patient? You're | | |
| | 115:16    doing a lower cholecystectomy, you're trying to get | | |
| | 115:17    all the way down to the rectum. If you do it | | |
| | 115:18    laparoscopic, you go open and closed and you can | | |

Court Ex. No. 15, Pg. 17 of 23

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 115:19    rotate. With the robot, you can bury down, you know, | | |
| | 115:20    16, 18 inches and still have a full functioning wrist. | | |
| 127:02 - 127:15 | **Harrich, Edward W 2021-05-24** | 00:00:46 | **V1M.67** |
| | 127:02  Q.  And have you done any analysis since to see | | |
| | 127:03       whether, I think as you put it, you made your money | | |
| | 127:04       back on the da Vinci Si? | | |
| | 127:05  A.   Well, we made our money back -- when I talked | | |
| | 127:06       about the endometriosis lesions, when we talked about | | |
| | 127:07       removing the bowel cancer in the lower | | |
| | 127:08       cholecystectomies, we made it back right then and | | |
| | 127:09       there. | | |
| | 127:10       Pullman Regional is not everything is about | | |
| | 127:11       making money. We make the money to try to keep us | | |
| | 127:12       afloat, but it's patient satisfaction, doing the right | | |
| | 127:13       thing for our customers and our physicians. So that's | | |
| | 127:14       not the underlying -- underlying reason why we're | | |
| | 127:15       doing it. | | |
| 134:05 - 134:13 | **Harrich, Edward W 2021-05-24** | 00:00:27 | **V1M.68** |
| | 134:05  Q.  So I just want to get a sense, I think, of | | |
| | 134:06       where those da Vinci surgeries fit within the various | | |
| | 134:07       types of surgeries that are performed, you know, | | |
| | 134:08       throughout the hospital. | | |
| | 134:09       It sounds to me like you referenced three | | |
| | 134:10       categories of surgeries that are performed using the | | |
| | 134:11       da Vinci: Urologic, general, and hysterectomy; is | | |
| | 134:12       that right? | | |
| | 134:13  A.  That's correct. | | |
| 139:08 - 140:17 | **Harrich, Edward W 2021-05-24** | 00:01:56 | **V1M.69** |
| | 139:08  Q.  Interesting. So for the three categories of | | |
| | 139:09       surgery we're talking about where the da Vinci is | | |
| | 139:10       used, are the surgeons at Pullman also using other | | |
| | 139:11       techniques like laparoscopic surgery or open surgery | | |
| | 139:12       to perform those procedures? | | |
| | 139:13  A.  Yes. So if you take the hysterectomies that | | |
| | 139:14       we've talked about a lot, sometimes the uterus is too, | | |
| | 139:15       too big. You can't get it out laparoscopically and | | |
| | 139:16       you can't morcellate them anymore because of the | | |
| | 139:17       potential of spreading cancer. So they may have to go | | |
| | 139:18       open or may have to go vaginal to get it out. So | | |
| | 139:19       that's a physician's call when they -- | | |

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 139:20 Q. Okay. So some of the advantages and | | |
| | 139:21    disadvantages might vary depending on the specific | | |
| | 139:22    procedure. Is that fair? | | |
| | 139:23 A. Yes. | | |
| | 139:24 Q.  And some of the advantages or disadvantages | | |
| | 139:25    of da Vinci surgery might vary based on the skill of | | |
| | 140:01    the surgeon who is performing the surgery. Is that | | |
| | 140:02    fair? | | |
| | 140:03 A. Yeah, I can say that there is -- there can be | | |
| | 140:04    a factor for that. | | |
| | 140:05 Q. And some of the advantages or disadvantages | | |
| | 140:06    of the da Vinci surgery might vary just on | | |
| | 140:07    characteristics of the patient. Is that fair? | | |
| | 140:08 A. That's fair. | | |
| | 140:09 Q. Sir, I think you mentioned earlier -- | | |
| | 140:10    Mr. Lyon was asking you questions about what would | | |
| | 140:11    happen if Pullman lost access to a da Vinci, and I | | |
| | 140:12    think you mentioned -- was it a Dr. Visger? Is that | | |
| | 140:13    one of the physicians? | | |
| | 140:14 A. Okay. Dr. Visger is a general surgeon. | | |
| | 140:15 Q. And I think you said Dr. Visger would then | | |
| | 140:16    perform more laparoscopic surgeries; is that right? | | |
| | 140:17 A. He would. | | |
| **145:10 - 145:14** | **Harrich, Edward W 2021-05-24** | **00:00:17** | **V1M.70** |
| | 145:10 Q. And at the time that Pullman acquired its Si | | |
| | 145:11    system in 2011, did Pullman understand that it needed | | |
| | 145:12    to purchase EndoWrist instruments in order to operate | | |
| | 145:13    its da Vinci system? | | |
| | 145:14 A. Yes, absolutely. | | |
| **145:15 - 146:04** | **Harrich, Edward W 2021-05-24** | **00:00:42** | **V1M.71** |
| | 145:15 Q. And did Pullman also understand at that time | | |
| | 145:16    that Intuitive was the only company manufacturing and | | |
| | 145:17    selling EndoWrist instruments? | | |
| | 145:18 A. Yes. | | |
| | 145:19 Q. And that was true in 2011 and it's remained | | |
| | 145:20    true to this day; correct? | | |
| | 145:21 A.  Correct. I mean, I guess you can buy them on | | |
| | 145:22    the secondhand market, if that's what you're asking. | | |
| | 145:23    You can get them from some secondhand vendors or eBay | | |
| | 145:24    or... | | |

5-ER-930

Court Ex. No. 15, Pg. 19 of 23

**V1M - Harrich PA DA PC DC DR Merged**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 145:25 Q. And as far as you know, though, all those<br>146:01 secondhand EndoWrist instruments, as you referred to<br>146:02 them, were originally manufactured by Intuitive;<br>146:03 right?<br>146:04 A. Correct. | | |
| 146:05 - 146:14 | **Harrich, Edward W 2021-05-24** | 00:00:31 | **V1M.72** |
| | 146:05 Q. And when Pullman acquired its da Vinci system<br>146:06 in 2011, did it also understand that Intuitive only<br>146:07 allowed its EndoWrist instruments to be used a certain<br>146:08 maximum number of times?<br>146:09 A. Correct.<br>146:10 Q. And Pullman was aware that Intuitive used the<br>146:11 usage counter to prevent the EndoWrist instruments<br>146:12 from being used more than that maximum number of<br>146:13 times; right?<br>146:14 A. Correct. | | |
| 146:15 - 146:20 | **Harrich, Edward W 2021-05-24** | 00:00:17 | **V1M.73** |
| | 146:15 Q. And Pullman also knew that its contract with<br>146:16 Intuitive prohibited Pullman from trying to use the<br>146:17 EndoWrist instruments more than that maximum number of<br>146:18 times; right?<br>146:19 A. No. That's -- I can't say that for sure. I<br>146:20 don't recall. | | |
| 147:10 - 147:14 | **Harrich, Edward W 2021-05-24** | 00:00:15 | **V1M.74** |
| | 147:10 When Pullman acquired its da Vinci system in<br>147:11 2011, did Pullman also understand that it would need<br>147:12 to obtain service and repairs, including preventative<br>147:13 maintenance, for its da Vinci system?<br>147:14 A. Yes. | | |
| 148:06 - 148:11 | **Harrich, Edward W 2021-05-24** | 00:00:17 | **V1M.75** |
| | 148:06 Q. Throughout the time that Pullman's owned the<br>148:07 da Vinci system, is Pullman aware of Intuitive ever<br>148:08 raising prices for EndoWrist instruments?<br>148:09 A. I don't -- I think the prices have been<br>148:10 fairly set. I don't recall hearing that they've gone<br>148:11 up. | | |
| 162:17 - 162:24 | **Harrich, Edward W 2021-05-24** | 00:00:32 | **V1M.76** |
| | 162:17 Q. So do you recall Rebotix ever telling you<br>162:18 that it was restoring EndoWrist instruments back to | | |

5-ER-931

## V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 162:19      Intuitive's performance or safety specifications? | | |
| | 162:20  A.  I don't recall the exact specifics of that. | | |
| | 162:21  Q.  And if Rebotix had made any representations | | |
| | 162:22      to you along those lines, would that have been | | |
| | 162:23      important to Pullman in deciding whether to use | | |
| | 162:24      Rebotix's services? | | |
| 163:01 - 163:02 | Harrich, Edward W 2021-05-24 | 00:00:03 | V1M.77 |
| | 163:01      THE WITNESS: That would have been a factor | | |
| | 163:02      in the conversation. | | |
| 163:04 - 163:07 | Harrich, Edward W 2021-05-24 | 00:00:17 | V1M.78 |
| | 163:04  Q.  If Rebotix had told you that they couldn't | | |
| | 163:05      return EndoWrist instruments back to the original | | |
| | 163:06      performance or safety specifications, would Pullman | | |
| | 163:07      have contracted with Rebotix? | | |
| 163:09 - 163:12 | Harrich, Edward W 2021-05-24 | 00:00:09 | V1M.79 |
| | 163:09      THE WITNESS:  Yeah, I can't remember the | | |
| | 163:10      specifics of a conversation, but that would have been | | |
| | 163:11      a factor that would have played in. If the instrument | | |
| | 163:12      wasn't safe, it's not safe if it wasn't inspected. | | |
| 165:12 - 165:20 | Harrich, Edward W 2021-05-24 | 00:00:24 | V1M.80 |
| | 165:12  Q.  And do you remember anyone at Pullman | | |
| | 165:13      expressing any hesitation or reluctance to use | | |
| | 165:14      Rebotix's services? | | |
| | 165:15  A.  No. I just recall the staff thought it was a | | |
| | 165:16      good idea. We -- you know, we didn't understand why | | |
| | 165:17      they were end of life. They were still perfectly | | |
| | 165:18      functioning. You know, everything seemed fine. We've | | |
| | 165:19      been doing this for ten years. And so I had good | | |
| | 165:20      staff buy-in. | | |
| 168:10 - 168:14 | Harrich, Edward W 2021-05-24 | 00:00:16 | V1M.81 |
| | 168:10  Q.  Okay. And were the patients who were | | |
| | 168:11      operated on informed that they were being operated on | | |
| | 168:12      using the instruments that had been serviced by | | |
| | 168:13      Rebotix? | | |
| | 168:14  A.  No. | | |
| 168:15 - 168:18 | Harrich, Edward W 2021-05-24 | 00:00:21 | V1M.82 |
| | 168:15  Q.  Okay. And were the patients that were | | |
| | 168:16      operated on informed that they were being operated on | | |
| | 168:17      with instruments used, you know, more times than the | | |

5-ER-932

Court Ex. No. 15, Pg. 21 of 23

## V1M - Harrich PA DA PC DC DR Merged

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 168:18     number of uses approved by Intuitive? | | |
| 168:20 - 168:20 | **Harrich, Edward W 2021-05-24** | 00:00:01 | **V1M.83** |
| | 168:20     THE WITNESS: No. | | |
| 168:22 - 168:25 | **Harrich, Edward W 2021-05-24** | 00:00:20 | **V1M.84** |
| | 168:22 Q.  So, in other words, did anyone at Pullman | | |
| | 168:23     tell the patients that Intuitive had only approved the | | |
| | 168:24     instruments for a certain number of uses, but Pullman | | |
| | 168:25     had engaged someone to circumvent that usage limit? | | |
| 169:02 - 169:21 | **Harrich, Edward W 2021-05-24** | 00:00:57 | **V1M.85** |
| | 169:02     THE WITNESS:  No. We didn't have those | | |
| | 169:03     conversations. You'd have that. There is no -- | | |
| | 169:04     multiple vendors. It's a standard in the industry to | | |
| | 169:05     reuse trocars to ports and instruments going through | | |
| | 169:06     secondhand vendors, having them, you know, relooked | | |
| | 169:07     at, cleaned up, ports, baffles, diaphragms changed and | | |
| | 169:08     being used. | | |
| | 169:09     And there is no way you could ever go and | | |
| | 169:10     tell all your patients, 'You may be getting a | | |
| | 169:11     brand-new one or you may be getting a new, reused, | | |
| | 169:12     refurbished one.' How would you know? How would I | | |
| | 169:13     know? | | |
| | 169:14     Even so, if you bring the robotic instrument | | |
| | 169:15     back in after it's got ten uses or the first use. | | |
| | 169:16     It's an instrument. It's a tool. It doesn't matter | | |
| | 169:17     to us if it's its first life or its tenth life. | | |
| | 169:18     I mean, would I go in and say, 'Hey, this is | | |
| | 169:19     the third use on the grasper, the seventh use on the | | |
| | 169:20     scissors, and the fourth one on the retractor'? Why | | |
| | 169:21     would we do that? | | |

5-ER-933

Court Ex. No. 15, Pg. 22 of 23

(34 of 293), Page 34 of 293 Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 34 of 293
Case 3:21-cv-03496-AMO Document 466-15 Filed 02/07/25 Page 23 of 23

**V1M - Harrich PA DA PC DC DR Merged**

Documents linked to video:
TX1688

**Court Ex. No. 15, Pg. 23 of 23**

# Gibson, Chris 06-22-2021

Designation List Report

 Gibson, Chris                               2025-01-12

Documents linked to video:
TX769
TX1691



ID: V1A



**Court Ex. No. 20, Pg. 1 of 16**

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 6:05 - 6:09 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.1** |
| | 6:05      CHRIS GIBSON, | | |
| | 6:06      having been first duly sworn, was examined, and | | |
| | 6:07      testified as follows: | | |
| | 6:08      THE WITNESS:  I swear. | | |
| | 6:09      DIRECT EXAMINATION | | |
| 6:10 - 6:12 | **Gibson, Chris 2025-01-12** | 00:00:04 | **V1A.2** |
| | 6:10      BY MS. LENT: | | |
| | 6:11  Q.  Good morning, Mr. Gibson. | | |
| | 6:12  A.  Good morning. | | |
| 16:03 - 16:14 | **Gibson, Chris 2025-01-12** | 00:00:35 | **V1A.3** |
| | 16:03      Let's talk a little bit about your | | |
| | 16:04      background. | | |
| | 16:05      Did you go to college? | | |
| | 16:06  A.  Yes. | | |
| | 16:07  Q.  What college did you attend? | | |
| | 16:08  A.  I attended Tallahassee Community College and | | |
| | 16:09      Florida State University. | | |
| | 16:10  Q.  Did you achieve any degrees from either of | | |
| | 16:11      those schools? | | |
| | 16:12  A.  Yes. AA from Tallahassee Community College | | |
| | 16:13      and a bachelor's in both finance and real estate at | | |
| | 16:14      Florida State. | | |
| 16:22 - 16:24 | **Gibson, Chris 2025-01-12** | 00:00:11 | **V1A.4** |
| | 16:22  Q.  Do you have any professional certifications? | | |
| | 16:23  A.  I do hold a real estate license and an | | |
| | 16:24      insurance sales license. | | |
| 16:25 - 17:16 | **Gibson, Chris 2025-01-12** | 00:01:16 | **V1A.5** |
| | 16:25  Q.  What did you do in terms of work after | | |
| | 17:01      graduating from Florida State University? | | |
| | 17:02  A.  I worked at a bank doing retail banking. | | |
| | 17:03  Q.  And when did you hold that position? | | |
| | 17:04  A.  2006. Right after school. | | |
| | 17:05  Q.  For how long? | | |
| | 17:06  A.  Until 2009. | | |
| | 17:07  Q.  What was your next job after that? | | |
| | 17:08  A.  I worked at Benjamin Biomedical. | | |
| | 17:09  Q.  When did you begin working at Benjamin | | |
| | 17:10      Biomedical? | | |

**Court Ex. No. 20, Pg. 2 of 16**

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 17:11   A.   January of 2009. | | |
| | 17:12   Q.   What position were you hired for Benjamin | | |
| | 17:13        Biomedical? | | |
| | 17:14   A.   So I -- I ran the customer service | | |
| | 17:15        department, and I handle all the purchasing for the | | |
| | 17:16        company. | | |
| 20:05 - 20:19 | **Gibson, Chris 2025-01-12** | 00:00:53 | **V1A.8** |
| | 20:05   Q.   Okay. Would Benjamin Biomedical sharpen any | | |
| | 20:06        devices for its customers? | | |
| | 20:07   A.   Yes, we have performed those repairs before. | | |
| | 20:08   Q.   And on what instruments does Benjamin | | |
| | 20:09        Biomedical perform sharpening repairs? | | |
| | 20:10   A.   We no longer provide those repairs. At one | | |
| | 20:11        time we did. But we no longer repair -- no longer | | |
| | 20:12        provide those types of repairs. | | |
| | 20:13   Q.   Okay. But there was a time when you did -- | | |
| | 20:14        when Benjamin Biomedical did provide sharpening-type | | |
| | 20:15        repairs, correct? | | |
| | 20:16   A.   There was a time, yes. | | |
| | 20:17   Q.   And what were the instruments on which | | |
| | 20:18        Benjamin Biomedical provided those sharpening repairs? | | |
| | 20:19   A.   Stainless steel laparoscopic instruments. | | |
| 21:16 - 22:03 | **Gibson, Chris 2025-01-12** | 00:00:43 | **V1A.9** |
| | 21:16   Q.   Can you name some of the customers that you | | |
| | 21:17        worked with regarding repairs of laparoscopic | | |
| | 21:18        instruments for Benjamin Biomedical? | | |
| | 21:19   A.   No. The -- the business was not there, the | | |
| | 21:20        volume, because you have to understand, in this repair | | |
| | 21:21        market, there's a lot of other companies that do that | | |
| | 21:22        work. They have big vans that they drive around to | | |
| | 21:23        customers, and they do instrument sharpening. And so | | |
| | 21:24        they already had the contracts. So we really didn't | | |
| | 21:25        have any customers, and that's why we stopped doing the | | |
| | 22:01        work. | | |
| | 22:02   Q.   Other than sharpening, what other repairs was | | |
| | 22:03        Benjamin Biomedical doing of laparoscopic instruments? | | |
| 22:04 - 22:04 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.10** |
| | 22:04   A.   None that I'm aware of. | | |
| 22:05 - 22:08 | **Gibson, Chris 2025-01-12** | 00:00:15 | **V1A.11** |

Court Ex. No. 20, Pg. 3 of 16

## V1A - Gibson, Chris 06-22-2021

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 22:05  Q.  Did Benjamin -- does Benjamin Biomedical | | **V1A.11** |
| | 22:06       refinish or resurface instruments? | | |
| | 22:07  A.  No. | | |
| | 22:08  Q.  Has it ever done that sort of work? | | |
| 22:10 - 22:10 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.12** |
| | 22:10       THE WITNESS:  Not that I'm aware of. | | |
| 22:12 - 22:15 | **Gibson, Chris 2025-01-12** | 00:00:12 | **V1A.13** |
| | 22:12  Q.  Does Benjamin Biomedical sterilize | | |
| | 22:13       instruments? | | |
| | 22:14  A.  No. | | |
| | 22:15  Q.  Has it in the past sterilized instruments? | | |
| 22:17 - 22:17 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.14** |
| | 22:17       THE WITNESS:  No. | | |
| 26:05 - 26:15 | **Gibson, Chris 2025-01-12** | 00:00:49 | **V1A.15** |
| | 26:05  Q.  So since 2011, Benjamin Biomedical has had | | |
| | 26:06       approximately 25 employees; is that right? | | |
| | 26:07  A.  I believe so, yes. | | |
| | 26:08  Q.  Okay. Do any of those employees, those 25 | | |
| | 26:09       employees of Benjamin Biomedical, work for Rebotix | | |
| | 26:10       Repairs also? | | |
| | 26:11  A.  Yes. | | |
| | 26:12  Q.  What employees are those by name, please? | | |
| | 26:13  A.  That would be myself, Chris Gibson. That | | |
| | 26:14       would be Joe Morrison. That would be Greg Fiegel. And | | |
| | 26:15       that would be Glenn Papit. | | |
| 26:16 - 26:16 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.16** |
| | 26:16  Q.  Any others? | | |
| 26:17 - 26:17 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.17** |
| | 26:17  A.  No. I believe that is it. | | |
| 34:20 - 34:25 | **Gibson, Chris 2025-01-12** | 00:00:29 | **V1A.18** |
| | 34:20  Q.  At some point during your employment at | | |
| | 34:21       Benjamin Biomedical, were you involved in something | | |
| | 34:22       called the 'Interceptor' that is used in connection with | | |
| | 34:23       EndoWrist devices? | | |
| | 34:24  A.  I am familiar with the term 'Interceptor' | | |
| | 34:25       through Rebotix LLC, Rebotix Panama, and Rebotix Repair. | | |
| 35:05 - 35:05 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.19** |
| | 35:05  Q.  What is the purpose of the Interceptor? | | |

Court Ex. No. 20, Pg. 4 of 16

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 35:07 - 35:09 | **Gibson, Chris 2025-01-12** | 00:00:07 | **V1A.20** |
| | 35:07  THE WITNESS:  It is part of the repair | | |
| | 35:08  process where we will bring the EndoWrist | | |
| | 35:09  instrument back to original specifications. | | |
| 35:11 - 35:11 | **Gibson, Chris 2025-01-12** | 00:00:03 | **V1A.21** |
| | 35:11  Q.  What does the Interceptor do? | | |
| 35:13 - 35:13 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.22** |
| | 35:13  THE WITNESS:  I don't know. | | |
| 35:14 - 35:14 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.23** |
| | 35:14  BY MS. LENT: | | |
| 35:15 - 35:25 | **Gibson, Chris 2025-01-12** | 00:00:30 | **V1A.24** |
| | 35:15  Q.  Does it sharpen an instrument? | | |
| | 35:16  A.  I don't believe so. | | |
| | 35:17  Q.  No. | | |
| | 35:18  Does it tighten a cable? | | |
| | 35:19  A.  No. | | |
| | 35:20  Q.  Is it used to sterilize an instrument? | | |
| | 35:21  A.  No. As I said before, we don't sterilize. | | |
| | 35:22  Q.  Right. | | |
| | 35:23  You told me that Benjamin Biomedical doesn't | | |
| | 35:24  sterilize, right? | | |
| | 35:25  A.  Correct. Neither does Rebotix Repair. | | |
| 36:11 - 36:13 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.26** |
| | 36:11  BY MS. LENT: | | |
| | 36:12  Q.  Well, you -- part of your job is to sell the | | |
| | 36:13  services of Rebotix Repairs, correct? | | |
| 36:14 - 36:23 | **Gibson, Chris 2025-01-12** | 00:00:33 | **V1A.27** |
| | 36:14  A.  That is correct. | | |
| | 36:15  Q.  And you -- you don't describe to customers | | |
| | 36:16  what repairs are provided? | | |
| | 36:17  A.  No. We do. | | |
| | 36:18  Q.  You do? | | |
| | 36:19  A.  Yes. | | |
| | 36:20  Q.  Do you tell customers that part of the repair | | |
| | 36:21  process could involve resetting the usage counter on the | | |
| | 36:22  EndoWrist? | | |
| | 36:23  A.  Yes. | | |
| 37:21 - 37:24 | **Gibson, Chris 2025-01-12** | 00:00:15 | **V1A.29** |

5 / 16

**Court Ex. No. 20, Pg. 5 of 16**

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 37:21   Q. My question is, is it your testimony that you | | **V1A.29** |
| | 37:22   have no idea whether the Interceptor is the technology | | |
| | 37:23   that is utilized in order to reset the usage counter on | | |
| | 37:24   EndoWrist instruments? | | |
| 38:01 - 38:02 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.30** |
| | 38:01   THE WITNESS: No, I -- I have heard that | | |
| | 38:02   before. | | |
| 38:04 - 38:04 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.31** |
| | 38:04   Q. Okay. Tell me what you've heard about that. | | |
| 38:06 - 38:08 | **Gibson, Chris 2025-01-12** | 00:00:06 | **V1A.32** |
| | 38:06   THE WITNESS: I have heard that the | | |
| | 38:07   Interceptor is a part of the repair process that | | |
| | 38:08   allows us to do the reset. | | |
| 38:10 - 38:12 | **Gibson, Chris 2025-01-12** | 00:00:06 | **V1A.33** |
| | 38:10   Q. And that's the extent of your knowledge about | | |
| | 38:11   the Interceptor? | | |
| | 38:12   A. Yes. | | |
| 38:19 - 38:23 | **Gibson, Chris 2025-01-12** | 00:00:20 | **V1A.34** |
| | 38:19   Q. Did you begin working in Rebotix LLC back in | | |
| | 38:20   2014 or whenever it was formed? | | |
| | 38:21   A. Yes. | | |
| | 38:22   Q. What was your role? | | |
| | 38:23   A. Purchasing of the tools or parts. | | |
| 38:24 - 38:25 | **Gibson, Chris 2025-01-12** | 00:00:03 | **V1A.35** |
| | 38:24   Q. What kinds of tools were you involved in | | |
| | 38:25   purchasing? | | |
| 39:01 - 39:02 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.36** |
| | 39:01   A. I don't recall, but I would say any tool. | | |
| | 39:02   Screwdrivers. I don't -- I don't recall. | | |
| 39:03 - 39:07 | **Gibson, Chris 2025-01-12** | 00:00:16 | **V1A.37** |
| | 39:03   Q. Well, tools to do what? What were the tools | | |
| | 39:04   to be used for that you were involved in purchasing for | | |
| | 39:05   Rebotix LLC? | | |
| | 39:06   A. Probably the disassembly of EndoWrists so | | |
| | 39:07   that we could understand them better. | | |
| 39:08 - 39:23 | **Gibson, Chris 2025-01-12** | 00:01:05 | **V1A.38** |
| | 39:08   Q. Were they -- were the tools that you were | | |

Court Ex. No. 20, Pg. 6 of 16

V1A - Gibson, Chris 06-22-2021

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 39:09 involved in purchasing to be used for anything other | | |
| | 39:10 than the disassembly of EndoWrists? | | |
| | 39:11 A. I don't believe so. | | |
| | 39:12 Q. What parts were you involved in purchasing | | |
| | 39:13 for Rebotix? | | |
| | 39:14 A. Well, when the Interceptor was finally | | |
| | 39:15 complete and we had a product, I was involved with | | |
| | 39:16 purchasing the Interceptor. | | |
| | 39:17 Q. Who did you purchase the Interceptor from? | | |
| | 39:18 A. I want to say we purchased it through a | | |
| | 39:19 vendor of ours called QCMS. | | |
| | 39:20 Q. QCMS, is that what you said? | | |
| | 39:21 A. Yes. I believe it stands for Quality | | |
| | 39:22 Contract Manufacturing Services [sic]. | | |
| | 39:23 Q. Did QCMS develop the Interceptor for Rebotix? | | |
| 39:25 - 39:25 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.39** |
| | 39:25 THE WITNESS: No. | | |
| 40:11 - 40:15 | **Gibson, Chris 2025-01-12** | 00:00:16 | **V1A.40** |
| | 40:11 Q. Oh. Well, do you know who developed the | | |
| | 40:12 Interceptor? | | |
| | 40:13 A. I believe G5 Engineering. | | |
| | 40:14 Q. Why were you purchasing the Interceptor from | | |
| | 40:15 QCMS and not G5? | | |
| 40:16 - 40:17 | **Gibson, Chris 2025-01-12** | 00:00:10 | **V1A.41** |
| | 40:16 A. G5 Engineering is a engineering consulting | | |
| | 40:17 firm. QCMS is a circuit board manufacturer. | | |
| 40:18 - 40:23 | **Gibson, Chris 2025-01-12** | 00:00:27 | **V1A.42** |
| | 40:18 Q. Do you know who G5 Engineering developed the | | |
| | 40:19 Interceptor for? | | |
| | 40:20 A. I believe it would have been Rebotix LLC. | | |
| | 40:21 Q. Did you work with G5 Engineering regarding | | |
| | 40:22 the development of the Interceptor? | | |
| | 40:23 A. Yes. | | |
| 41:16 - 41:18 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.44** |
| | 41:16 Q. Your best estimate is that Rebotix LLC paid | | |
| | 41:17 G5 Engineering about $500,000 to develop the | | |
| | 41:18 Interceptor; is that right? | | |
| 41:19 - 41:19 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.45** |
| | 41:19 A. That is correct. | | |

7 / 16

Court Ex. No. 20, Pg. 7 of 16

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID | |
|---|---|---|---|---|
| 58:13 - 59:04 | **Gibson, Chris 2025-01-12** | 00:01:12 | **V1A.46** | |

58:13   Q.  Did Rebotix or Benjamin Biomedical have

58:14       access to the original specifications for any EndoWrist?

58:15   A.  We developed our own original specifications.

58:16       We did not have published manufactured specifications.

58:17   Q.  So when you say 'original specifications,'

58:18       you don't mean the manufacturer's specifications; is

58:19       that right?

58:20   A.  No. I'm saying original specifications.

58:21   Q.  What does that mean if not published

58:22       manufacturer's specifications?

58:23   A.  Well, the way I understand it is, when we do

58:24       the reverse engineering on any device that we're going

58:25       to service, we get a brand-new -- multiple brand-new

59:01       instruments/devices. And we perform specs and spec

59:02       testing on those devices so that we know what the

59:03       original specs are when they're brand-new in the box.

59:04       And that's how we develop our original specifications.

| 62:22 - 62:23 | **Gibson, Chris 2025-01-12** | 00:00:11 | **V1A.47** | |

62:22   Q.  How many times on any particular instrument

62:23       is Rebotix able to perform the reset function?

| 62:25 - 63:06 | **Gibson, Chris 2025-01-12** | 00:00:22 | **V1A.48** | |

62:25       THE WITNESS: Rebotix Repair can offer

63:01       unlimited resets on an EndoWrist. The problem is

63:02       with the tool end. There are times where the

63:03       cables are cut or the tool end's completely ripped

63:04       off for something that might have happened during a

63:05       procedure. And then that is not a candidate for a

63:06       reset at that point.

| 63:08 - 63:09 | **Gibson, Chris 2025-01-12** | 00:00:07 | **V1A.49** | |

63:08   Q.  What is your basis for saying that Rebotix

63:09       Repairs can offer unlimited resets?

| 63:10 - 63:11 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.50** | |

63:10   A.  Because the way I understand it, that the

63:11       software, the usage count can be reset unlimited times.

| 63:12 - 63:15 | **Gibson, Chris 2025-01-12** | 00:00:32 | **V1A.52** | |

63:12   Q.  Did Rebotix Repair or any of the related

63:13       entities, like Rebotix or Benjamin Biomedical, perform

63:14       any testing to determine how many number of times an

Court Ex. No. 20, Pg. 8 of 16

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 63:15    EndoWrist usage counter can be reset safely? | | |
| 63:17 - 63:17 | **Gibson, Chris 2025-01-12** | 00:00:01 | **V1A.53** |
| | 63:17    THE WITNESS:  Yes. | | |
| 65:24 - 66:10 | **Gibson, Chris 2025-01-12** | 00:00:48 | **V1A.55** |
| | 65:24    Q.  Do you know whether any customer sent the | | |
| | 65:25        same EndoWrist to Rebotix Repairs more than once to have | | |
| | 66:01        the usage counter reset? | | |
| | 66:02    A.  Yes. I know that that happened, but I don't | | |
| | 66:03        know who the customer was. | | |
| | 66:04    Q.  How frequently did that happen? | | |
| | 66:05    A.  I believe quite frequently. | | |
| | 66:06    Q.  And can you define what you mean by 'quite | | |
| | 66:07        frequently'? | | |
| | 66:08    A.  I would think that every customer that we had | | |
| | 66:09        that was utilizing our service was sending us | | |
| | 66:10        instruments that had been repaired more than once by us. | | |
| 66:11 - 66:12 | **Gibson, Chris 2025-01-12** | 00:00:03 | **V1A.56** |
| | 66:11    Q.  What is that based on? What is that | | |
| | 66:12        understanding based on? | | |
| 66:13 - 66:13 | **Gibson, Chris 2025-01-12** | 00:00:02 | **V1A.57** |
| | 66:13    A.  Transaction data with customers. | | |
| 67:15 - 67:20 | **Gibson, Chris 2025-01-12** | 00:00:22 | **V1A.58** |
| | 67:15    Q.  Now, I think that you said earlier that you | | |
| | 67:16        thought Rebotix Panama was established in 2017; is that | | |
| | 67:17        right? | | |
| | 67:18    A.  If my memory serves me right, I would say | | |
| | 67:19        yes, probably 2017, 2018. | | |
| | 67:20    Q.  Why was Rebotix Panama formed? | | |
| 67:23 - 68:01 | **Gibson, Chris 2025-01-12** | 00:00:14 | **V1A.59** |
| | 67:23        THE WITNESS:  I believe that was a decision | | |
| | 67:24        based on business models and -- in the decision to | | |
| | 67:25        move to Panama and try to market into the | | |
| | 68:01        international markets base. | | |
| 68:11 - 68:12 | **Gibson, Chris 2025-01-12** | 00:00:04 | **V1A.61** |
| | 68:11    Q.  What was the repair process of Rebotix | | |
| | 68:12        Panama? | | |
| 69:06 - 69:11 | **Gibson, Chris 2025-01-12** | 00:00:16 | **V1A.62** |
| | 69:06        The repair process of Rebotix Panama is the | | |

**9 / 16**

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 69:07 | same as Rebotix Repair. Customers would ship us | | |
| | 69:08 | EndoWrists that needed to be repaired and reset, and we | | |
| | 69:09 | would repair and reset them if they were a good | | |
| | 69:10 | candidate for that process, and then we would ship them | | |
| | 69:11 | back their EndoWrist. | | |
| 70:06 - 70:11 | **Gibson, Chris 2025-01-12** | 00:00:22 | **V1A.63** |
| | 70:06 Q. Did Rebotix Panama actually perform the | | |
| | 70:07 repairs on the EndoWrists? | | |
| | 70:08 A. Yes. | | |
| | 70:09 Q. Did Rebotix Panama install the Interceptor | | |
| | 70:10 chip in EndoWrists? | | |
| | 70:11 A. Yes. That is my understanding. | | |
| 132:17 - 132:18 | **Gibson, Chris 2025-01-12** | 00:00:07 | **V1A.64** |
| | 132:17 Q. And what is the volume of business Rebotix | | |
| | 132:18 Repairs is doing -- has been doing since March of 2020? | | |
| 132:19 - 132:24 | **Gibson, Chris 2025-01-12** | 00:00:20 | **V1A.65** |
| | 132:19 A. The volume of business is minimal. We have | | |
| | 132:20 been completely shut down in the marketplace by | | |
| | 132:21 Intuitive with them threatening our customers. And our | | |
| | 132:22 customers are upset, but they have to have service on | | |
| | 132:23 their robots, so they always go back to Intuitive. And | | |
| | 132:24 they're unhappy about it. | | |
| 140:21 - 140:22 | **Gibson, Chris 2025-01-12** | 00:00:05 | **V1A.100** |
| | 140:21 MR. MCMILLAN: Tab 35, for the record, has | | |
| 🔗 TX1691.1 | 140:22 been introduced as Gibson Exhibit 11. | | |
| 140:25 - 141:01 | **Gibson, Chris 2025-01-12** | 00:00:06 | **V1A.101** |
| 🔗 TX1691.1.1 | 140:25 Q. And this is an e-mail from Chris G to Jeff | | |
| | 141:01 Dulaney on February 4, 2019. | | |
| 141:07 - 141:19 | **Gibson, Chris 2025-01-12** | 00:00:58 | **V1A.102** |
| | 141:07 Q. Do you recognize this e-mail exchange? | | |
| | 141:08 A. Yes. | | |
| | 141:09 Q. Who's Jeff Dulaney? | | |
| | 141:10 A. Looks like he works for contracts with | | |
| | 141:11 Premier. | | |
| | 141:12 Q. And why were you sending him a list of | | |
| 🔗 TX1691.1.2 | 141:13 authorized distributors? | | |
| | 141:14 A. I believe they wanted to know who would be | | |
| | 141:15 the distributors that would be inside of their hospital | | |
| | 141:16 systems offering the repair service because they knew | | |

10 / 16

### V1A - Gibson, Chris 06-22-2021

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 141:17    that Rebotix Repair could not be in every hospital | | |
| | 141:18    system. So we teamed with our distributors, who would | | |
| | 141:19    go and have the contacts and be the boots on the ground. | | |
| 141:20 - 141:21 | **Gibson, Chris 2025-01-12** | 00:00:06 | **V1A.103** |
| 🔗 TX1691.6 | 141:20  Q.  Can you look at the attachment to this, which | | |
| 🔗 TX1691.6.2 | 141:21    says it's 'Exhibit_C_Authorized_Distributors.' | | |
| 141:22 - 141:24 | **Gibson, Chris 2025-01-12** | 00:00:11 | **V1A.104** |
| | 141:22  A.  Yes. | | |
| | 141:23   Q.   Okay.  Are these all of Rebotix Repair's | | |
| | 141:24    authorized distributors as of February 2019? | | |
| 141:25 - 142:02 | **Gibson, Chris 2025-01-12** | 00:00:11 | **V1A.105** |
| | 141:25  A.  That was all that we put on the Premier | | |
| | 142:01   contract. But, no, that would not be all. | | |
| | 142:02  Q. How many more were there? | | |
| 142:04 - 142:09 | **Gibson, Chris 2025-01-12** | 00:00:15 | **V1A.106** |
| | 142:04    THE WITNESS: We discussed this service | | |
| | 142:05    process and the fact that we could offer it with -- | | |
| | 142:06    I don't know. Like I had said before, if we have | | |
| | 142:07    180 or 150 distributors in the United States, we | | |
| | 142:08    probably spoke to a hundred of them about this | | |
| ⊠ Clear | 142:09    process. | | |
| 143:13 - 143:20 | **Gibson, Chris 2025-01-12** | 00:00:38 | **V1A.74** |
| | 143:13  Q.  I said how -- how did the relationship with | | |
| | 143:14    Restore Robotics come about? | | |
| | 143:15  A.  I believe Glenn met a representative from | | |
| | 143:16    Restore Robotics at a trade show, and then they started | | |
| | 143:17    e-mailing back and forth and talking on the phone. | | |
| | 143:18  Q.  What was the nature of the business | | |
| | 143:19    relationship between Rebotix Repairs and Restore Rebotix | | |
| | 143:20    initially? | | |
| 143:22 - 143:24 | **Gibson, Chris 2025-01-12** | 00:00:09 | **V1A.75** |
| | 143:22    THE WITNESS: Initially, Restore Robotics was | | |
| | 143:23    going to just be a distributor of the service | | |
| | 143:24    process for Rebotix Repair. | | |
| 144:01 - 144:17 | **Gibson, Chris 2025-01-12** | 00:01:02 | **V1A.76** |
| | 144:01  Q.  And by that, what do you mean by 'just be a | | |
| | 144:02    distributor'? | | |
| | 144:03  A.  That they would get EndoWrist instruments | | |

11 / 16

**Court Ex. No. 20, Pg. 11 of 16**

### V1A - Gibson, Chris 06-22-2021

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 144:04    from hospitals. They would send them to us for repair | | |
| | 144:05    and reset. And we would send them back to Restore, and | | |
| | 144:06    they would deliver them to the hospital. | | |
| | 144:07  Q.  Okay. And you said that initially, that was | | |
| | 144:08    the nature of the relationship. | | |
| | 144:09    Did that change at some point? | | |
| | 144:10  A.  Yes. | | |
| | 144:11  Q.  In what way? | | |
| | 144:12  A.  Eventually, we set them up as a authorized | | |
| | 144:13    service center. They had a facility in California, and | | |
| | 144:14    Greg went out there and trained them. And after | | |
| | 144:15    training, they started purchasing Interceptor boards | | |
| | 144:16    from us so that they could do the repair process along | | |
| | 144:17    with the counter reset. | | |
| **144:18 - 145:05** | **Gibson, Chris 2025-01-12** | **00:00:50** | **V1A.77** |
| | 144:18  Q.  Are you aware of any agreements that Rebotix | | |
| | 144:19    entered into with Restore? | | |
| | 144:20  A.  Yes. | | |
| | 144:21  Q.  What agreement are you aware of? | | |
| | 144:22  A.  I believe we had an agreement where they | | |
| | 144:23    would be an authorized service center and that they | | |
| | 144:24    would buy Interceptor boards from us. | | |
| | 144:25  Q.  Did the agreement grant Restore any kind of | | |
| | 145:01    exclusivity? | | |
| | 145:02  A.  I don't recall that. | | |
| | 145:03  Q.  You don't recall that it did or you just | | |
| | 145:04    don't recall? | | |
| | 145:05  A.  Don't recall that it did. | | |
| **145:12 - 145:17** | **Gibson, Chris 2025-01-12** | **00:00:24** | **V1A.78** |
| | 145:12  Q.  Did Rebotix do any business with Restore | | |
| | 145:13    after the relationship as an authorized service center | | |
| | 145:14    ended? | | |
| | 145:15  A.  No. I don't recall. I don't think so. | | |
| | 145:16  Q.  Did Rebotix' relationship with Restore break | | |
| | 145:17    down at some point? | | |
| **145:19 - 146:01** | **Gibson, Chris 2025-01-12** | **00:00:24** | **V1A.79** |
| | 145:19    THE WITNESS:  Yes. | | |
| | 145:20    BY MS. LENT: | | |
| | 145:21  Q.  When was that? | | |
| | 145:22  A.  Again, I don't know the timeline, but about | | |

**12 / 16**

**Court Ex. No. 20, Pg. 12 of 16**

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 145:23 six months into our agreement with them, we found that<br>145:24 they were not doing the volume that we would like. And<br>145:25 so at that time, the relationship started to<br>146:01 deteriorate. | | |
| 146:02 - 146:07 | **Gibson, Chris 2025-01-12**<br>146:02 Q. What about the relationship started to<br>146:03 deteriorate at that time?<br>146:04 A. The fact that they weren't purchasing as many<br>146:05 Interceptor boards as we would like, which meant they<br>146:06 were not doing the repair service for as many EndoWrists<br>146:07 and as many customers as we would have liked. | 00:00:23 | **V1A.80** |
| 146:08 - 146:10 | **Gibson, Chris 2025-01-12**<br>146:08 Q. And that caused Rebotix Repairs to terminate<br>146:09 the relationship with Restore?<br>146:10 A. Correct. | 00:00:09 | **V1A.81** |
| 157:21 - 157:25 | **Gibson, Chris 2025-01-12**<br>157:21 Q. Are you familiar with a company called<br>157:22 Surgical Instrument Service, or SIS?<br>157:23 A. Yes.<br>157:24 Q. Did Rebotix Repairs use SIS as a distributor?<br>157:25 A. Yes. | 00:00:18 | **V1A.82** |
| 158:01 - 158:09 | **Gibson, Chris 2025-01-12**<br>158:01 Q. Can you describe the business relationship<br>158:02 between Rebotix Repairs an SIS?<br>158:03 A. Yes. SIS has been a longtime customer of<br>158:04 Benjamin Biomedical. And as I discussed before, that we<br>158:05 utilized our distributor base of Benjamin Biomedical to<br>158:06 offer the repair service that Rebotix Repairs was<br>158:07 offering, and so we engaged SIS to begin selling the<br>158:08 Rebotix Repair repair process and service to their<br>158:09 customers, which are the end-user hospitals. | 00:00:42 | **V1A.83** |
| 162:19 - 163:03 | **Gibson, Chris 2025-01-12**<br>162:19 Q. In exchange for providing SIS with the<br>162:20 technology to reset the usage counter on EndoWrists, was<br>162:21 Si -- sorry -- was Rebotix Repairs requiring any minimum<br>162:22 payment from SIS?<br>162:23 A. I would have to look at the agreement, but<br>162:24 typically yes, we did -- yes, I can see right here. The<br>162:25 initial quantity was they had to buy, looks like, 50 | 00:00:40 | **V1A.96** |

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 163:01    Interceptor boards from us. | | |
| | 163:02  Q.  And where are you looking at for that? | | |
| | 163:03  A.  Under 'Scope of Work.' | | |
| 163:04 - 163:07 | **Gibson, Chris 2025-01-12** | 00:00:12 | **V1A.97** |
| | 163:04  Q.  So that was for the initial setup, that this | | |
| | 163:05       draft agreement would require SIS to purchase 50 | | |
| | 163:06       components; is that right? | | |
| | 163:07  A.  Correct. That's the way I'm reading it. | | |
| 163:08 - 163:11 | **Gibson, Chris 2025-01-12** | 00:00:17 | **V1A.98** |
| | 163:08  Q.  And each Interceptor component price, | | |
| | 163:09       according to section three of the agreement, would be | | |
| | 163:10       not to exceed $800; is that right? | | |
| | 163:11  A.  Correct. | | |
| 163:21 - 164:01 | **Gibson, Chris 2025-01-12** | 00:00:15 | **V1A.99** |
| | 163:21  Q.  And, again, your understanding is that a | | |
| | 163:22       service center agreement was never executed with SIS, | | |
| | 163:23       correct? | | |
| | 163:24  A.  Correct. | | |
| | 163:25       MS. LENT:  Let's introduce tab 52 as the next | | |
| | 164:01       exhibit. | | |
| 164:07 - 164:12 | **Gibson, Chris 2025-01-12** | 00:00:20 | **V1A.107** |
| 🔗 TX769.1 | 164:07  Q.  Exhibit 14 is an e-mail from Chris G to Glenn | | |
| 🔗 TX769.1.1 | 164:08       P on January 24, 2020. The subject is 'REB Memorandum | | |
| | 164:09       of Understanding.' | | |
| | 164:10       Can you take a look at this document and let | | |
| | 164:11       me know if you recognize it? | | |
| | 164:12  A.  Sure. Just give me a second. | | |
| 164:13 - 164:20 | **Gibson, Chris 2025-01-12** | 00:00:26 | **V1A.108** |
| | 164:13       Okay. Yes. | | |
| | 164:14  Q.  Do you recognize this document? | | |
| | 164:15  A.  Yes. I've seen it before. | | |
| | 164:16  Q.  And what is it? | | |
| 🔗 TX769.2.2 | 164:17  A.  It's a memorandum of understanding that | | |
| | 164:18       SIS -- I believe they wrote this and sent it to us and | | |
| | 164:19       wanted us to agree to these terms, which we never did | | |
| | 164:20       and never would. | | |
| 165:05 - 165:10 | **Gibson, Chris 2025-01-12** | 00:00:26 | **V1A.109** |
| | 165:05  Q.  And why do you say that Rebotix Repairs never | | |
| | 165:06       would agree to these terms? | | |

Court Ex. No. 20, Pg. 14 of 16

**V1A - Gibson, Chris 06-22-2021**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| ⧉ TX769.2.3 | 165:07  A.  Well, when I look at the pricing, that's not | | |
| | 165:08      something that we would ever agree to -- where they say | | |
| ⧉ TX769.2.4 | 165:09      for the first 100, it's $200, and then 350, and then | | |
| | 165:10      450, based on steps of how many they do. | | |
| 165:11 - 166:05 | **Gibson, Chris 2025-01-12** | 00:01:05 | **V1A.110** |
| | 165:11  Q.  So let's look at that. This is number two in | | |
| | 165:12      that memorandum of understanding. The first bullet | | |
| ⧉ TX769.2.5 | 165:13      says, 'For the first 100 (combination | | |
| | 165:14      Interceptors/repairs) the discount from current pricing | | |
| | 165:15      per Interceptor or repair shall be $200.' | | |
| | 165:16      Do you see that? | | |
| | 165:17  A.  Yes. | | |
| | 165:18  Q.  So does that mean it's -- they're charging | | |
| | 165:19      $200 or it's $200 off of some other price? | | |
| | 165:20  A.  The way I understand that is if they were | | |
| | 165:21      buying boards at no more than $800, and then for the | | |
| | 165:22      first 100, they want a volume discount of $200 off each | | |
| | 165:23      $800 board. So they would be paying 600. And then as | | |
| | 165:24      you go forward in the next bullet point, the next 200 | | |
| | 165:25      would be 350 off. And then the next 300, it would be | | |
| | 166:01      450 off that $800 pricing. | | |
| | 166:02  Q.  So -- so they were asking for more than a -- | | |
| | 166:03      a 50 percent discount if they purchased over 300 boards; | | |
| | 166:04      is that right? | | |
| | 166:05  A.  Correct. | | |
| 166:06 - 166:14 | **Gibson, Chris 2025-01-12** | 00:00:28 | **V1A.111** |
| | 166:06  Q.  So let's look a little bit farther up the | | |
| | 166:07      page on the memorandum. It's the fourth whereas clause. | | |
| ⧉ TX769.2.6 | 166:08      It says, 'Whereas, SIS intends to invest substantial | | |
| | 166:09      resources in developing markets for the Interceptors | | |
| | 166:10      that include the patented technology.' | | |
| | 166:11      Do you see that? | | |
| | 166:12  A.  Yes. | | |
| | 166:13  Q.  Are you aware of SIS investing substantial | | |
| | 166:14      resources in that way? | | |
| 166:16 - 166:20 | **Gibson, Chris 2025-01-12** | 00:00:12 | **V1A.112** |
| | 166:16      THE WITNESS:  No. | | |
| | 166:17      BY MS. LENT: | | |
| | 166:18  Q.  Does SIS have the right to use the | | |
| | 166:19      Interceptor technology today? | | |

15 / 16

**Court Ex. No. 20, Pg. 15 of 16**

### V1A - Gibson, Chris 06-22-2021

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 166:20  A.  No. | | |
| 166:21 - 167:06 | **Gibson, Chris 2025-01-12** | 00:00:46 | **V1A.113** |
| 🔗 TX769.2.7 | 166:21  Q.  Look at paragraph three at the bottom of the | | |
| 🔗 TX769.2.8 | 166:22       page. 'Once SIS has purchased a combination of 300 | | |
| | 166:23       Interceptors for repairs, Rebotix will grant a license | | |
| | 166:24       to SIS to make, use, sell, and offer for sale, systems | | |
| | 166:25       that embody or practice any Intellectual Property owned | | |
| | 167:01       or controlled by Rebotix (or any successor in interest | | |
| | 167:02       to Rebotix).' | | |
| | 167:03       Do you see that? | | |
| | 167:04  A.  Yes. | | |
| | 167:05  Q.  Is that something that Rebotix Repairs was | | |
| | 167:06       interested in -- in doing? | | |
| 167:08 - 167:19 | **Gibson, Chris 2025-01-12** | 00:00:36 | **V1A.114** |
| | 167:08       THE WITNESS:  Absolutely not. | | |
| | 167:09       BY MS. LENT: | | |
| | 167:10  Q.  Why not? | | |
| | 167:11  A.  I don't fully understand what that paragraph | | |
| | 167:12       says, but we would never license our intellectual | | |
| | 167:13       property to anyone unless it was a company like a | | |
| | 167:14       Stryker or STERIS who was coming and possibly buying the | | |
| | 167:15       entire company and all of its IP and anything that we've | | |
| | 167:16       ever done. | | |
| | 167:17       But just to license it to a company that has | | |
| | 167:18       done 300 repairs, Rebotix would not agree to -- Rebotix | | |
| 🗶 Clear | 167:19       Repair would not agree to that. | | |

Documents linked to video:

TX769

TX1691



16 / 16

**Court Ex. No. 20, Pg. 16 of 16**

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

*Attorneys for Defendant and Counter-Claimant,*
*Intuitive Surgical, Inc.*

**MCCAULLEY LAW GROUP LLC**
Joshua V. Van Hoven, (CSB No. 261815)
E-Mail: josh@mccaulleylawgroup.com
3001Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

Richard T. McCaulley (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant*
*Surgical Instrument Service Company, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br> *Plaintiff/Counter-Defendant,* <br><br> v. <br><br> INTUITIVE SURGICAL, INC., <br><br> *Defendant/Counter-Claimant* | Case No. 3:21-cv-03496-AMO <br><br> **AMENDED JOINT PROPOSED FINAL PRETRIAL ORDER**   AS MODIFIED <br><br><br> The Honorable Araceli Martínez-Olguín |

Pursuant to the Court's Schedule and Pretrial Order of June 11, 2024, Dkt. 235, and subsequent request that Plaintiff Surgical Instrument Service Company, Inc. ("SIS") and Defendant Intuitive Surgical, Inc. ("Intuitive") (collectively, "Parties") amend their proposed pretrial order to comport with the Court's directives at the November 25, 2025 Pretrial Conference, the Parties hereby submit the following Amended Joint Proposed Final Pretrial Order.

## A.    CLAIMS AND DEFENSES TO BE DECIDED

### 1.    SIS's Description of Its Claims[1]

SIS has offered repair services for medical devices for more than 50 years. In late 2019, SIS began to offer repair services that allowed its hospital clients to safely use Endowrist instruments beyond the limited number of uses set by Intuitive. When Intuitive discovered that its customers were using SIS's services, it immediately leveraged its anti-competitive agreements and monopoly power to crush this threat to its supra-competitive EndoWrist profitability. Intuitive's agreements with hospitals include numerous restrictive terms that allow Intuitive to render the da Vinci surgical robots effectively inoperable, and it threatened to (and did) exercise those terms against hospitals that used SIS's services. Despite the massive savings to hospitals and patients from SIS's EndoWrist program, SIS's customers and potential customers had no choice but to capitulate to Intuitive's threats.

Intuitive has used its monopoly power in the minimally invasive soft tissue ("MIST") surgical robot market, in the separate EndoWrist instrument replacement aftermarket, as well as in the servicing of its da Vinci MIST surgical robots, to engage in a variety of anticompetitive practices resulting in an unlawful restraint of trade. These exclusionary practices essentially prevent hospitals, health care systems, and GPO's from having access to competitors that offer to repair and refurbish EndoWrist instruments, including resetting the EndoWrist usage counter, which have been previously used.

Intuitive wields its monopoly power in the market for MIST surgical robots to coerce hospitals, health care systems, and GPO's to act in ways that have anticompetitive effects thus

---

[1] Intuitive does not agree with or endorse SIS's description of its claims in this Section.

1   harming competition. Such coercion is backed up by Intuitive's threats to withhold technical

2   support and servicing for the da Vinci surgical robots purchased by hospitals, health care

3   systems, and GPO's and to deny those customers access to additional and/or replacement

4   EndoWrist instruments.

5       An additional exclusionary tactic used by Intuitive was redesigning its EndoWrist

6   instruments for use with it X/Xi surgical robots to prevent third-party servicers from resetting the

7   use counter on those instruments. More particularly, Intuitive's engineering design changes

8   adopted RFID encryption for the use counter in the X/Xi EndoWrist instruments primarily to

9   block independent repair companies from resetting the use counters.

10      SIS contends that the practices briefly summarized above violate Sections 1 and 2 of the

11  Sherman Act. Intuitive denies these claims.

12              2.   Intuitive's Description of Its Claims and Defenses to SIS's Claims[2]

13      SIS has asserted four antitrust claims all based on the same alleged conduct by Intuitive.

14  SIS asserts claims under Section 1 of the Sherman Act for Tying (Dkt. 1, Count I, ¶¶ 111-113)

15  and Exclusive Dealing (*id.*, Count II, ¶¶ 114-116), and under Section 2 of the Sherman Act for

16  Monopolization (*id.*, Count III, ¶¶ 117-119) and Attempted Monopolization (*id.*, Count IV, ¶¶

17  120-121).  SIS also asserted a claim for Unfair Trade Practices—Violation of the Lanham Act

18  (*id.*, Count V, ¶¶ 122-126), but that claim was dismissed by the Court at summary judgment

19  (Dkt. 209 at 15, 19.)  SIS bears the burden of proving each and every element of its remaining

20  claims (Counts I-IV).  Intuitive contends that SIS will not be able to carry its burden as to any of

21  these claims for at least the following reasons:

22  1.      Intuitive did not engage in unlawful tying, exclusive dealing, or any other form of

23  anticompetitive conduct.  Intuitive's contracts restrict only the use of unauthorized third-party

24  products and services, and SIS chose not to seek authorization for its products and services.

25  Such contractual authorization requirements do not constitute tying or exclusive dealing

26  arrangements, do not foreclose competition, and do not violate the antitrust laws.

27

28

---

[2] SIS does not agree with or endorse Intuitive's description of its claims in this Section.

2.    The contractual provisions that SIS challenges were put in place for legitimate and procompetitive business reasons, at a time when Intuitive had no significant sales or share of any market, and those provisions remain procompetitive.  The procompetitive rationales include protecting patient safety, ensuring product quality, promoting innovation, and protecting Intuitive's reputation and brand.  SIS cannot prove the availability of any substantially less restrictive means of achieving Intuitive's legitimate business objectives.

3.    Intuitive did not coerce its customers to buy anything from Intuitive.  Customers choose its da Vinci surgical systems over other competing alternatives because Intuitive offers a superior combination of product quality, service and price.  Intuitive's customers are highly sophisticated buyers who understand the contract terms and costs associated with da Vinci systems, including EndoWrists, understand that EndoWrists are designed for a limited number of uses, and knowingly and expressly agree not to use EndoWrists that have been modified by any unauthorized third party when they make the choice to buy or lease a da Vinci system.

4.    Intuitive contracts have not harmed competition or excluded competitors.

5.    Intuitive lacks the power to force customers to accept its contractual terms.

6.    Contractual provisions that void warranties in the event the customer uses unauthorized third-party products or services are not anticompetitive as a matter of law.

7.    Intuitive does not have market power or monopoly power in any properly defined antitrust market.  The da Vinci surgical system competes against other products and methods of performing surgery, including open and laparoscopic surgery, and customers can elect to use those alternative products and surgical methods if they do not wish to accept Intuitive's products, prices or contract terms.

8.    There is no market limited to "EndoWrist repair and replacement."  SIS cannot establish the legal requirements for a single-brand market.

9.    SIS has not suffered any antitrust injury as a result of Intuitive's conduct.  SIS's claimed injuries are the result of other factors, including the competitive process itself and SIS's own choices about how to run its business.

10. SIS is not entitled to any antitrust damages. SIS cannot prove any non-speculative amount of lost profits. Nor can it separate out any losses caused by the alleged anticompetitive conduct from losses caused by other, lawful factors.

Intuitive asserts five counterclaims against SIS arising out of SIS's marketing, advertising and related activities. In its marketing materials and communications, SIS made numerous false and misleading statements, including but not limited to statements that misrepresent: (i) the nature, efficacy, and/or safety of the service SIS coordinates (*e.g.*, by referring to those services as mere "repairs" or similar terms); (ii) that "repaired" EndoWrists meet applicable quality and functional requirements; (iii) that devices "serviced" through SIS had been repaired to meet "original specifications" of EndoWrists and are safe to use; (iv) that SIS itself developed, has tested and conducts the "repairs," and/or has a patent for the "repair" process; (v) that use of the service will result in substantial cost savings; (vi) that use of the service does not carry any adverse financial, legal or other consequences (e.g., voiding Intuitive customers' warranties); (vii) that use limits built into EndoWrists are "arbitrary" or Intuitive otherwise is not trustworthy; and (viii) that SIS and/or the "repair" service is authorized, approved, or endorsed by Intuitive. SIS has also engaged in other deceptive and fraudulent conduct with the intent to confuse and deceive the public into using its service and purchasing modified EndoWrists.

Intuitive asserts that these acts by SIS constitute Unfair Competition and False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125 (Dkt. 75, Count One, ¶¶ 84-91); Unfair Competition under CA. Stat. § 17200 (*id.*, Count Two, ¶¶ 92-96); False Advertising under CA Stat. § 17500 (*id.*, Count Three, ¶¶ 97-100); and Unfair Competition under common law (*id.*, Count Four, ¶¶ 101-104). In addition, SIS undertook intentional acts to disrupt and/or induce Intuitive customers to breach their contractual relationships with Intuitive. Intuitive asserts that these acts constitute Tortious Interference with Contract (*id.*, Count Five, ¶¶ 105-109). Intuitive further asserts a defense to SIS's claims of unclean hands (*id.*, p. 39), based on SIS's misconduct. SIS denies Intuitive's counterclaims.

**B.    RELIEF REQUESTED**

1.    <u>SIS's Statement of Relief Requested</u>

SIS seeks monetary damages that it claims are sufficient to compensate it for Intuitive's violations of Section 1 and Section 2 of the Sherman Act.  SIS contends that such monetary damages will be comprised primarily of lost profits resulting from Intuitive's anti-competitive conduct.  SIS also seeks equitable relief from the Court in the form of an injunction precluding Intuitive from engaging in the conduct complained of in the complaint and any other anti-competitive conduct established at trial.  The exact contours of the injunctive relief are to be established after all of the evidence is heard at trial.

2.    <u>Intuitive's Statement of Relief Requested</u>

Intuitive seeks damages it asserts were caused by SIS's false and misleading statements and SIS's tortious interference with contract.  In addition to damages, Intuitive may also seek— as equitable relief, to be determined by the Court—disgorgement of profits and injunctive relief, including preventing SIS from making false and misleading statements or interfering with Intuitive's contracts with its customers.  Intuitive also seeks costs, expenses, reasonable attorneys' fees, and post-judgment interest on all sums awarded, in amounts to be determined by the Court.

**C.    STIPULATED FACTS**

1.    The relevant geographic market for the antitrust claims in this action is the United States.

2.    SIS filed suit against Intuitive on May 1, 2021.

3.    SIS began offering reset S/Si EndoWrists to its customer base in fall of 2019.

**D.    JOINT EXHIBIT LIST**

See Appendix D, attached.

The parties stipulate to the following relating to exhibits, including trial exhibits and demonstrative exhibits:

1.    ***Party-Produced Documents***.  The Parties agree that neither Party will lodge objections to exhibits produced from either Party's files in the N.D. Cal. Actions, or the "related

actions" as defined by SIS in its First Requests for Production, on the basis that they are not authentic or do not qualify as business records under Federal Rule of Evidence 803(6); provided, however, that each Party may lodge objections to specific documents as to which the Party has a good faith argument that the document is not authentic or does not qualify as a business record. No other objection shall be waived as a result of this stipulation, including any objection on the basis of hearsay-within-hearsay.

2. ***Third Party-Produced Documents***. The Parties agree that the third party-produced documents listed in Appendix A are authentic and constitute business records, as apparent on their face under Rules 803(6), 901(a). Each of the documents in Appendix A was produced from the files of a third party in response to subpoenas served in this litigation or the related actions, or otherwise appears on the third party's website. No other objection shall be waived as a result of this stipulation, including any objection on the basis of hearsay-within-hearsay.

3. ***Further Stipulations on Admissibility of Exhibits***. The Parties agree to work together to identify documents falling within the following categories, and to stipulate to the admissibility of such documents: (1) transactional and other data relied upon by the Parties' experts or by the Parties themselves in conducting their day-to-day business; and (2) contracts executed by a Party and produced by a Party.

4. ***Exchange of Exhibits for Direct Examination of Witnesses***. Pursuant to the Court's Schedule and Pretrial Order, Dkt. 235, at the close of each trial day, all counsel shall exchange a list of witnesses for the next two full court days and the exhibits that will be used during direct examination (other than for impeachment of an adverse witness). Within 24 hours of such notice, all other counsel shall provide any objections to such exhibits. The first notice shall be exchanged prior to the first day of trial. All such notices shall be provided in writing. This stipulation shall not apply to documents that prove necessary to refresh the witness's recollection.

5. ***Cross-Examination Exhibits***. The Parties agree that exhibits to be used on cross-examination shall not be exchanged in advance, provided, however, that any exhibit that a party

seeks to move into evidence (including on cross-examination) must be included on the joint Trial Exhibit List.  The Parties further agree that documents to be used solely for impeachment or to refresh a witness's recollection, and not moved into evidence, need not be exchanged in advance or included on the Trial Exhibit List.

6.      ***Exchange of Demonstrative Exhibits for Witness Examinations***.  Each Party will disclose the demonstrative exhibits (including slides) to be used in its direct examination of a witness called in its case-in-chief two days before the Party reasonably anticipates the witness will testify.  Pursuant to the Court's direction at the November 25, 2024 Pretrial Conference, the parties shall email demonstrative exhibits to Ms. Solorzano-Rodriguez one day in advance of the direct examination in which they are to be used.  The Party proffering the demonstrative shall note whether there are any objections to the demonstrative.  Demonstrative exhibits (including slides) that will not be moved into evidence do not need to be identified on the Parties' exhibit lists.

7.      ***Exchange of Demonstrative Exhibits for Opening Statements***.  Pursuant to the Court's direction at the November 25, 2024 Pretrial Conference, the Parties will exchange the demonstrative exhibits (including slides) to be used in opening statements two days before opening statements are to be given.  The parties shall email demonstrative exhibits to be used in opening statements to Ms. Solorzano-Rodriguez on January 5, 2025.  The Party proffering the demonstrative shall note whether there are any objections to the demonstrative.

8.      ***Exchange of Demonstrative Exhibits for Closing Statements***.  Pursuant to the Court's direction at the November 25, 2024 Pretrial Conference, the Parties will exchange demonstrative exhibits (including slides) to be used in closing statements two days before closing statements are to be given.  The Parties shall email demonstrative exhibits to be used in closing statements to Ms. Solorzano-Rodriguez one day prior to closing statements.  The Party proffering the demonstrative shall note whether there are any objections to the demonstrative.

9.      ***Summary Exhibits***.  The Parties agree that the Parties shall identify Rule 1006 summary exhibits by description on the Parties' exhibit lists, but agree to exchange the

summaries themselves no later than 14 days before the first day of trial, and exchange objections

to summary exhibits no later than 7 days before the first day of trial.

10.     ***Exchange of Real Evidence***. The Parties agree to identify real evidence by

description on the Parties' exhibit lists, and to make such evidence available for inspection and to

exchange objections based on such inspection at a later date to be agreed upon by the Parties but

no later than November 22.  For the avoidance of doubt, this does not include objects to be used

solely as demonstratives.

11.     ***Compliance with Evidentiary Stipulations and* in Limine *Rulings***.  The Parties

agree to identify specific edits or redactions to exhibits as required to comply with all

stipulations and Court orders governing the admissibility of evidence in advance of the use of

such exhibits at trial.  The Parties agree to disclose such edits or redactions to documents to be

used in the direct examination of witnesses according to the schedule for disclosing such exhibits

set forth in Paragraph D.4 to this Order.  Each Party shall be responsible for redacting or editing

exhibits to be used in cross examination as required to comply with evidentiary stipulations and

Court orders governing the admissibility of evidence, and may disclose such redactions to the

other Party prior to the use of such exhibits in cross examination.

12.     ***Unobjected-To Exhibits***.  The Parties agree that unobjected-to exhibits may be

moved into evidence without otherwise laying a foundation with a witness.  Only evidence that is

admitted and ~~presented~~ published to the jury ~~or used in the trial~~ will be part of the trial record and go with

the jury into the deliberation room.  The Parties shall not publish evidence to the jury unless and

until such material is admitted into evidence.

### E.     PARTIES' WITNESS LISTS

See Appendix E, attached.

The parties stipulate to the following relating to trial witnesses and deposition designations:

1.     ***Video depositions.***

a.     The Parties agree that for any witness whose video depositions will be

played for the jury, ***any*** testimony designated or counter-designated by any party

1    will be played to the jury in a continuous manner, i.e., all designations will be

2    played sequentially in the order the testimony was given in the deposition.

3        b.        Pursuant to the Schedule and Pretrial Order, Dkt. 235, the Parties shall, on

4    December 30, 2024, jointly file all designations of deposition testimony or other

5    discovery that a Party wishes to offer, as well as any counter-designations or

6    objections to the deposition testimony or discovery offered by any other party.  To

7    streamline the presentation of deposition testimony at trial and to avoid the

8    presentation of duplicative evidence, the Parties agree to the following procedure

9    for finalizing deposition designations during trial:

10            (i)        Each Party serves its final affirmative designations of deposition

11        testimony to be played in that Party's case-in-chief, and a report of the

12        runtime of the designations, by 8:00 p.m. no later than 4 days before the

13        Party offering the affirmatively designated testimony reasonably

14        anticipates that such testimony will be played at trial.

15            (ii)        Each Party serves its final objections to the opposing Party's final

16        affirmative deposition designations, as well as its counter designations and

17        a report of the runtime of each counter-designated segment, by 8:00 p.m.

18        no later than 2 days after receiving the opposing Party's final affirmative

19        deposition designations.

20            (iii)        Counsel for the proponent of deposition testimony is permitted to

21        introduce the testimony by reading the witness's name, employer(s),

22        title(s), and employment history before the deposition testimony is played

23        or read to the jury.  The proponent of such testimony will serve the

24        opposing Party with a copy of the introduction concurrent with the

25        proposed final deposition designations, and the opposing Party reserves all

26        rights to object to that introduction.

27        For the avoidance of doubt, the Parties' final affirmative designations, final objections,

28    and final counter-designations shall not include any designations, objections, and counter-

designations that were not listed in the Parties' December 30, 2024 joint filing, absent prior agreement by the Parties.

2.   **Trial Time**.  The Parties agree to divide the allotted trial time evenly.  Each Party's allotted trial hours shall be inclusive of opening statements, closing statements, direct and cross examination, and the reading/playing of that Party's deposition designations.

3.   **Exclusion of Witnesses**.  The Parties agree that fact witnesses shall be sequestered until their trial testimony is complete and the witness has been excused.  For the avoidance of doubt, this limitation does not apply to a Party's designated corporate representative, subject to Court approval, or to witnesses testifying in an expert capacity.

**F.   OTHER**

1.   **Motion Practice During Trial**.  Pursuant to the Court's direction at the Pretrial Conference, the Parties shall not file motions during trial without leave of the Court.  If an issue should arise, the Parties shall first raise the issue with opposing counsel and use their best efforts to resolve the issue without involving the Court.  In the event the Parties are unable to resolve an issue, the Parties shall raise the dispute with the Court outside the presence of the jury.  Any briefing requested by the Court shall be submitted no later than 5:00 p.m. on the day the issue is raised with the Court.

**IT IS SO ORDERED.**

Dated:  __December 27, 2024__



- 10 -

Dated:  December 24, 2024

By: /s/ *Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 11 -

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

Dated:  December 24, 2024              By: /s/ *Richard T. McCaulley*
                                           Richard T. McCaulley

Richard T. McCaulley (*pro hac vice*)
**MCCAULLEY LAW GROUP LLC**
E-Mail: 180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: (312) 330-8105
richard@mccaulleylawgroup.com

Joshua V. Van Hoven (CSB No. 262815)
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: (925) 302-5941
E-Mail: josh@mccaulleylawgroup.com

*Attorneys for Plaintiff Surgical Instrument*
*Service Company, Inc.*

- 12 -

1

**E-Filing Attestation**

2

3      I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this

4      document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

5      signatories identified above have concurred in this filing.

6

   Dated:  December 24, 2024              By:   */s/ Kenneth A. Gallo*
7                                                Kenneth A. Gallo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Kenneth A. Gallo (*pro hac vice*)
    Paul D. Brachman (*pro hac vice*)
2   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
3   2001 K Street, NW
    Washington, DC  20006-1047
4   Telephone:  (202) 223-7300
    Facsimile:  (202) 204-7420
5   Email: kgallo@paulweiss.com
    Email: pbrachman@paulweiss.com
6
7   *Attorneys for Defendant and Counter-Claimant*
    *Intuitive Surgical, Inc.*
8
9   **MCCAULLEY LAW GROUP LLC**
    Joshua V. Van Hoven, (CSB No. 261815)
10  E-Mail: josh@mccaulleylawgroup.com
    3001Bishop Dr., Suite 300
11  San Ramon, California 94583
    Telephone: 925.302.5941
12
13  Richard T. McCaulley (*pro hac vice*)
    E-Mail: richard@mccaulleylawgroup.com
14  180 N. Wabash Avenue, Suite 601
    Chicago, Illinois 60601
15  Telephone: 312.330.8105
16  *Attorneys for Plaintiff and Counter-Defendant*
    *Surgical Instrument Service Company, Inc.*
17
18  [Additional counsel listed on signature page]

19              **UNITED STATES DISTRICT COURT**

20            **NORTHERN DISTRICT OF CALIFORNIA**

21               **SAN FRANCISCO DIVISION**

22  SURGICAL INSTRUMENT SERVICE          Case No. 3:21-cv-03496-AMO
    COMPANY, INC.,
23                                        **PARTIES' JOINT PROPOSED**
                                          **JURY INSTRUCTIONS**
24            *Plaintiff / Counter-Defendant*,

25          v.
                                          The Honorable Araceli Martínez-Olguín
26  INTUITIVE SURGICAL, INC.,

27            *Defendant / Counter-Claimant*.

28

## PRELIMINARY, GENERAL, AND CONCLUDING INSTRUCTIONS

Preliminary, general, and concluding instructions from Ninth Circuit Model Jury Civil Case Instructions are referenced by citation to the numbers of the requested instructions in the current edition of the Ninth Circuit Model Jury Instructions (UPDATED JUNE 2024). "Other than citing the numbers, the parties shall not include preliminary, general, or concluding instructions in the packet." Doc 235, Section II.A.2.

1.3 Duty of Jury (Court Reads Instructions at the Beginning of Trial but Does Not Provide Written Copies)

1.4 Duty of Jury (Court Reads and Provides Written Instructions at End of Case)

1.6 Burden of Proof—Preponderance of the Evidence

1.9 What is Evidence

1.10 What is Not Evidence

1.11 Evidence for Limited Purpose

1.12 Direct and Circumstantial Evidence

1.13 Ruling on Objections

1.14 Credibility of Witnesses

1.15 Conduct of the Jury

1.16 Publicity During Trial

1.17 No Transcript Available to Jury

1.18 Taking Notes

1.19 Questions to Witnesses by Jurors During Trial (Option 1)

1.20 Bench Conferences and Recesses

1.21 Outline of Trial

2.0 Cautionary Instructions

2.2 Stipulations of Fact

2.3 Judicial Notice

2.4 Deposition in Lieu of Live Testimony

2.13 Expert Opinion

2.14 Charts and Summaries Not Received in Evidence

2.15 Charts and Summaries Received in Evidence

2.16  Evidence in Electronic Format

3.1 Duty to Deliberate

3.2 Consideration of Evidence—Conduct of the Jury

3.3 Communication with Court

3.4 Readback or Playback

3.5 Return of Verdict

3.9 Post-Discharge Instruction

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

5-ER-967

**SIS'S BRIEF STATEMENT REGARDING ORDER OF INSTRUCTIONS**

SIS has objected and continues to object to the order and manner of the presentation of the below Instructions as proposed by Intuitive, both for their presentation to jury and to the Court. Intuitive's order of presentation buries SIS instructions below numerous Intuitive instructions in a manner that SIS believes creates confusion for the jury and Court. For example, SIS's third proposed instruction is Instruction 13 below and there are substantial gaps between instructions that should logically be grouped together for each claim. Accordingly, to aid the Court and avoid further disputes between the parties, SIS submits the below cross reference of Intuitive's order of instructions to SIS's proposed order of instructions:

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 2 | 1 | Purpose of Antitrust Laws | ABA A-1 |
| 3 | 2 | SIS's Claims and the Antitrust Statutes | *See cited caselaw* |
| 13 | 3 | Definition of Tying | ABA E-84 |
| 14 | 4 | Rationale for Prohibition of Tying Arrangements | ABA E-85 |
| 15 | 5 | Tying – Per Se Violation | ABA E-86 |
| 17 | 6 | Presence of Two Products | ABA E-90 |
| 18 | 7 | Tying – Conditioned Sale | ABA-93 |
| 19 | 8 | Relevant Geographic Market | *See instruction – SIS proposes instruct not disputed* |
| 22 | 9 | Relevant Product Markets | ABA A-108 |
| 23 | 10 | Existence of Market Power With Respect to the Tying Product Offered | ABA E-94 |
| 24 | 11 | Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product | ABA E-97 |
| 25 | 12 | Interstate Commerce – Tying | *See instruction – SIS proposes instruct not disputed* |
| 26 | 13 | Unlawful Tying under Rule of Reason | ABA E-88 |
| 27 | 14 | Rule of Reason - Overview | ABA C-3 |
| 28 | 15 | Rule of Reason - Proof of Competitive Harm | ABC C-5 |
| 29 | 16 | Rule of Reason -- Evidence of Competitive Benefits | ABA C-6 |
| 30 | 17 | Rule of Reason -- Balancing the Competitive Effects | ABA C-9 |
| 32 | 18 | Elements of Exclusive Dealing | ABA D-71 |
| 34 | 19 | Exclusive Dealing – Agreements that Substantially Foreclose Competition | ABA D-73 |

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 37 | 20 | Exclusive Dealing – Relevant Market | ABA A-108 (by ref to prior instruction ) |
| 38 | 21 | Exclusive Dealing – Unreasonable Restraint of Trade | ABA C-3, C-5, C-6, C9 (by ref to prior instructions) |
| 39 | 22 | Exclusive Dealing – Market Power | ABA E-94 |
| 41 | 23 | Exclusive Dealing – Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 42 | 24 | Injury | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 44 | 25 | Monopoly and Attempted Monopolization Defined | Modern Federal Jury Instructions-Civil, Form 485a-80-22 |
| 45 | 26 | Elements of Monopolization | ABA A-102 |
| 46 | 27 | Relevant Geographic Market | *See instruction – SIS proposes instruct not disputed* |
| 47 | 28 | Relevant Product Market | ABA A-108 (by ref to prior instructions) |
| 48 | 29 | Monopoly Power Defined | ABA A-104 |
| 49 | 30 | Monopoly Power – Direct Evidence | ABA A-121 |
| 50 | 31 | Monopoly Power – Indirect Evidence | ABA A-115 |
| 51 | 32 | Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct | ABA A-123 |
| 52 | 33 | Design Changes | *See cited caselaw* |
| 53 | 34 | Monopolization - Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 54 | 35 | Attempt to Monopolize | ABA D-155 |
| 55 | 36 | Attempted Monopolization - Anticompetitive Conduct | ABA D-158 |
| 56 | 37 | Specific Intent to Achieve Monopoly Power | ABA D-160 |
| 57 | 38 | Dangerous Probability of Success | ABA D-164 |
| 58 | 39 | Attempted Monopolization - Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 59 | 40 | Injury – Monopolization and Attempted Monopolization | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 64 | 41 | Antitrust Damages -- Introduction and Purpose | ABA B-304 |
| 67 | 42 | Damages for Competitors--Preparedness to Enter Business | ABA B-321 |

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 68 | 43 | Basis for Calculating Damages | ABA B-3; Modern Federal Jury Instructions-Civil, Form 485a-79-26 |
| 69 | 44 | Damages for Competitors -- Lost Profits | ABA B-8; Modern Federal Jury Instructions-Civil, Form 485a-79-27 |
| 71 | 45 | Damages for Competitors -- Future Lost Profits | ABA B-9 |

**INTUITIVE'S RESPONSE TO**
**SIS'S BRIEF STATEMENT REGARDING ORDER OF INSTRUCTIONS**

SIS's objection to the order in which the proposed instructions are presented is entirely unfounded.  While the parties disagree about the substance of many of the instructions herein, each side's proposed instructions are arranged in what it believes to be the "logical sequence." Dkt. 235 at 2:10-11.  If the Court accepts Intuitive's versions of the disputed instructions, and rejects SIS's versions, then it merely needs to delete SIS's disputed instructions from this document; once the Court does so, the remaining instructions will be presented in the sequence proposed by Intuitive.  And the same is true if the Court accepts SIS's versions of the disputed instructions and deletes Intuitive's:  in that event, the remaining instructions will be presented in the sequence proposed by SIS.

The crux of SIS's objection to this reasonable ordering system seems to be that SIS wants all of its disputed instructions to be presented to the Court first in this document.  That is both inconsistent with this Court's Order, Dkt. 235, and would only create more, unnecessary work for the Court.  If SIS's proposed ordering were adopted and the Court were to accept Intuitive's versions of the disputed instructions, the Court would then be required to re-order Intuitive's instructions to fit them into their "logical place in the overall sequence."  Dkt. 235 at 2:13-14. By contrast, the ordering of this document, to which SIS objects, is far more efficient.  As noted, each party's instructions are already presented in the order they contend would be a logical sequence, if the other party's disputed instructions were to be removed.

## PRELIMINARY INSTRUCTIONS

**Disputed** Instruction No. 1 Re Statements Regarding FDA Clearance Offered by **Intuitive**

During the trial, you may hear or see statements by SIS or other third parties that their activities relating to EndoWrists did not constitute remanufacturing and did not require FDA clearance, and statements by Intuitive that such activities did constitute remanufacturing and did require FDA clearance. I instruct you that there is no claim in this case by SIS that Intuitive's statements in this regard were false or misleading, and no claim by Intuitive that SIS's statements in this regard were false or misleading.[1]

---

[1] Dkt. 204 at 11–13, 15.

**Disputed** Instruction No. 1 Re Statements Regarding FDA Clearance Offered by **SIS**

SIS does not believe that any instruction on FDA clearances should be given, since matters regarding FDA clearance by any party should not be permitted in this matter in view of the Court's Summary Judgment Order (Dkt. 204) and controlling caselaw.   To the extent that any such evidence is introduced, SIS proposes curative instructions be given during trial before such evidence or testimony will be presented to the jury, as further outlined in SIS's motions in limine.

1

2

## **CLOSING INSTRUCTIONS**

3

**I.     INTRODUCTORY ANTITRUST INSTRUCTIONS**

4

**<u>Disputed</u>** Instruction No. 2 Re Purpose of Antitrust Laws Offered by **SIS**[2]

5

   SIS brings this action against Intuitive under a federal antitrust law known as the

6

Sherman Act.  The purpose of the Sherman Act is to preserve free and unfettered competition in

7

the marketplace. The Sherman Act rests on the central premise that competition produces the

8

best allocation of our economic resources, the lowest prices, the highest quality, and the greatest

9

material progress.

10

11

*Source*:  AMERICAN BAR ASSOCIATION

12

Model Jury Instructions in Civil Antitrust Cases A-1, 2016 Edition

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[2] Model Jury Instructions in Civil Antitrust Cases, Chapter 1 – Sherman Act—General, Instruction 1:  Purpose (Am. Bar Ass'n Antitrust L. Section 2016).

**Disputed** Instruction No. 2 Re Purpose of Antitrust Laws Offered by **Intuitive**[3]

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

The Sherman Act was enacted for the protection of competition, not competitors.  SIS must therefore establish that Intuitive's acts caused injury not only to SIS itself but to competition as a whole in the alleged relevant market.[4]

---

[3] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 1:  Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[4] The underlined text has been added to the model instruction.  *See Leegin Creative Leather Prods.* v. *PSKS, Inc.*, 551 U.S. 877, 906 (2007) ("The purpose of the antitrust laws . . . is 'the protection of competition, not competitors.'" (citation omitted)); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" (citations omitted)).

1   **Disputed** Instruction No. 3 Re SIS's Claims and the Antitrust Statutes Offered by **SIS**

2   SIS claims that Intuitive has violated the Sherman Act, and more specifically, each of
3   Section 1 and Section 2 of the Sherman Act.

4   SIS also claims under Section 1 of the Sherman Act that Intuitive's agreements with its
5   hospital customers unreasonably restrained trade in the market for replacement and repaired
6   EndoWrist instruments through illegal tying of EndoWrist replacement and repair with Intuitive's
    da Vinci surgical robots.

7   SIS claims under Section 1 of the Sherman Act that Intuitive entered into agreements with
8   its hospital customers and engaged in other related conduct that unreasonably restrained trade in
9   the market for replacement and repaired EndoWrist instruments through exclusive dealing in that
10  market.

11  SIS further claims that Intuitive has unlawfully obtained monopoly power in the market
12  for replacement and repaired EndoWrist instruments in violation of Section 2 of the Sherman Act
    through a variety of anticompetitive acts.

13  SIS also claims that Intuitive has unlawfully attempted to obtain monopoly power and has
14  a dangerous probability of obtaining monopoly power in the market for replacement and repaired
15  EndoWrist instruments in violation of Section 2 of the Sherman Act through a variety of
16  anticompetitive acts.

17  Each of these is a separate claim that has distinct elements that SIS must prove.  Thus, you
18  may find that SIS has proved all, none, or only a subset of these claims.

19  Next, I will be instructing you on the elements required to prove each of these claims.

20  **Authorities:** *SumoText Corp. v. Zoove, Inc.,* Case No. 5:16-cv-01370, ECF No. 468, Instruction
21  21 (N.D. Cal. Mar. 4, 2020)*; In re National Football League's "Sunday Ticket" Antitrust*
22  *Litigation*, Case No. 2:15-ml-02668, ECF No. 1482, Instruction 14 (N.D. Cal. June 27, 2024).

23
24
25
26
27
28

**Disputed** Instruction No. 3 Re SIS's Claims and the Antitrust Statutes Offered by **Intuitive**[5]

[N/A]

Explanation for Intuitive's Position:  Intuitive objects to SIS's proposed instruction.  SIS's proposed Instruction No. 3 merely lists the claims that SIS has asserted.  Rather than list all of SIS's claims at the outset, Intuitive proposes that SIS's Section 1 claims be described before providing the elements for those claims, *see* Disputed Instruction No. 9, and that SIS's Section 2 claims be described before providing the elements for those claims, *see* Disputed Instruction No. 43.

If SIS's proposed Instruction No. 3 is given, it should include the following statement: "SIS bears the burden of proof on each of these claims.  Intuitive denies each claim."

---

[5] MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 1.5 (9th Cir. Jury Instructions Comm. 2017 ed.); Complaint (Dkt. 1) ¶¶ 112, 115, 118, 121; Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 85, 93, 99, 102, 106.

**Disputed** Instruction No. 4 Re Communications with FDA Offered by **Intuitive**[6]

You have heard evidence that Intuitive had certain communications with the FDA regarding the actions of third parties with respect to Intuitive's products. The Constitution ensures the right of everyone, whether acting alone or with others, to petition or appeal to government for political action, recognizing that when people do so they will naturally seek political action that favors them and also may be unfavorable to others. The appeal to government may be direct, such as a discussion or meeting with a government official or agency, or it may be indirect, such as a publicity or advertising campaign.

The law provides that the right to petition government for political action is an important right, and the genuine exercise of that right does not violate the antitrust laws. Efforts genuinely intended to influence public officials to take official action do not violate the antitrust laws, even if the purpose and effect of those efforts is to obtain official action that eliminates or reduces competition.

There is no claim in this case that Intuitive's petitioning of the FDA was unlawful, or that it was not a genuine attempt to influence public officials to take official action. Accordingly, you must not consider Intuitive's communications with the FDA as unlawful or anticompetitive conduct either on their own or in combination with other acts.

---

[6] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 7 – Miscellaneous A. Certain Defenses and Exemptions, Instruction 3: Noerr-Pennington—Lobbying (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

**__Disputed__ Instruction No. 4 Re Communications with FDA Offered by __SIS__**

SIS objects to Intuitive's proposed Instruction No. 4. There is no need to provide the jury with any instruction on the subject of communications with the FDA. Intuitive's right to contact the FDA is not a disputed fact issue in this case. Subject to SIS's motion in limine, any evidence involving communications with the FDA regarding third-party "remanufacturing" should be excluded from being part of the evidence presented to the jury.

**Disputed** Instruction No. 5 Re Right to Repair Offered by **Intuitive**[7]

You may have heard about so-called "right to repair" laws in California or elsewhere. There is no "right to repair" medical devices, and such laws have no application in this case.

---

[7] *See* Cal. Pub. Res. Code § 42488; Minn. Stat. § 325E.72; N.Y. Gen. Bus. Law § 399-nn.

**Disputed** Instruction No. 5 Re Right to Repair Offered by **SIS**

SIS objects to Intuitive's proposed Instruction No. 5. There is no need to provide the jury with any instruction on the subject of "right to repair." SIS does not intend to offer any evidence about the so-called right to repair under California or other law.  Further, Intuitive's proposed instruction is likely to mislead the jury, as the absolute statement "[t]here is no 'right to repair' medical devices" can be interpreted to mean that repair of medical devices is unlawful or otherwise improper.

**<u>Disputed</u> Instruction No. 6 Re Unilateral Refusal to Deal Offered by <u>Intuitive</u>**

Antitrust law imposes no obligation on a defendant to help its competitors.[8]  You should therefore not base any finding of an antitrust violation on the fact that Intuitive did not cooperate with SIS to facilitate the sale of modified EndoWrists.[9]

---

[8] See *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (citing, *inter alia*, *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457, (2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

[9] Jury Instructions at 26, *AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472.

1   **Disputed** <u>Instruction No. 6 Re Unilateral Refusal to Deal Offered by</u> **SIS**

2        SIS objects to Intuitive's proposed Instruction No. 6. There is no need to provide the jury

3  with any instruction on the subject of unilateral refusal to deal. SIS does not allege that Intuitive

4  engaged in a unilateral refusal to deal and this is not a disputed fact issue in this case.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **__Disputed__ Instruction No. 7 Re Relevant Product Markets Offered by __Intuitive__**[10]

2       For each of SIS's antitrust claims, SIS must prove by a preponderance of the evidence

3 that the relevant markets it alleges are valid antitrust markets.

4       Defining the relevant market is essential because you will be required to make a

5 judgment about whether Intuitive has __market power or__ monopoly power in a properly defined

6 economic market.[11]  To make this judgment, you must be able to determine what, if any,

7 economic forces restrain Intuitive's freedom to set prices for or to restrict the production level of

8 the products or services in question.

9       The most likely and most important restraining force will be actual and potential

10 competition from other firms and their products.  This includes all firms and products that act or

11 likely could act as restraints on Intuitive's power to set prices as it pleases because customers

12 could switch to them if Intuitive sets its own prices too high.  All the firms and products that

13 exert such restraining force are within what is called the relevant market.

14       There are two aspects you must consider in determining whether SIS has met its burden

15 to prove the relevant market by a preponderance of the evidence.  The first is the relevant

16 product market.  The second is the relevant geographic market.

17       The basic idea of a relevant product market is that the products within it are reasonable

18 substitutes for each other from the buyer's point of view; that is, the products compete with each

19 other.  In other words, the relevant product market includes the products that a consumer

20 believes are reasonably interchangeable or reasonable substitutes for each other.  This is a

21 practical test with reference to the actual behavior of buyers and marketing efforts of sellers.

22 Products need not be identical or precisely interchangeable as long as they are reasonable

23 substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage

24

25 _____

[10] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman

26 Act—Monopolization–General, Instruction 3:  Relevant Market—General (AM. BAR ASS'N

ANTITRUST L. SECTION 2016); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter

27 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product

Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

28 [11] The underlined text has been added to model instruction, as SIS's Section 1 claims only

require proof of market power, not monopoly power.  *See infra* Disputed Instruction Nos. 16, 32.

considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products or services are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products or services that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the products at issue. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the same product market.

In evaluating whether various products or services are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- customers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of SIS and Intuitive regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

1     In this case, SIS alleges there are two separate relevant product markets:  (1) an alleged

2  market for surgical robots used in minimally invasive soft tissue (or "MIST") surgery; and (2) an

3  alleged aftermarket for EndoWrist repair and replacement.

4     Intuitive disputes SIS's definition of the alleged relevant markets.

5     First, Intuitive contends that the relevant product market in which Intuitive's da Vinci

6  system competes includes all types (or "modalities") of surgery available to doctors to treat the

7  conditions that can be treated by the da Vinci.  In particular, Intuitive contends that its da Vinci

8  system competes not just with other MIST surgical robots, but with laparoscopic surgery and

9  open surgery as well.

10     Second, Intuitive contends that the alleged aftermarket for EndoWrist repair and

11  replacement is an improperly defined single-brand aftermarket—that is, a market that is

12  improperly limited to Intuitive's own brand of products.

13     To establish a valid single-brand aftermarket, SIS must prove each of the following four

14  factors by a preponderance of the evidence:

15     (1) the challenged aftermarket restrictions (which, here, are the alleged restrictions that

16  Intuitive places in its contracts on the use with the da Vinci system of unauthorized instruments

17  or instruments that have been modified by unauthorized third parties) are not generally known

18  when hospitals make their "foremarket" purchase of the da Vinci system;

19     (2) significant information costs prevent hospitals from forecasting life-cycle pricing

20  accurately at the time they purchase their da Vinci surgical systems;

21     (3) significant monetary or non-monetary switching costs exist; and

22     (4) general market-definition principles regarding cross-elasticity of demand, like those

23  on which I have instructed you, do not undermine SIS's proposed single-brand market.[12]

24     As I said earlier, the second aspect of the relevant market is the geographic scope of the

25  market.  SIS and Intuitive agree that the relevant geographic market is the United States.

26

27  _____

[12] The underlined text has been added to the model instruction.  *See Epic Games, Inc. v. Apple,*

28  *Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023); *Newcal Indus. Inc. v. Ikon Office Solutions,* 513 F.3d
   1038, 1046–51 (9th Cir. 2008).

1    If you find that SIS has failed to prove by a preponderance of the evidence either of the

2 two relevant markets it alleges based on the instructions I have given you, then you must find for

3 Intuitive on all of SIS's claims.[13]  If you find that SIS has proven the relevant markets it alleges,

4 then you should continue to evaluate the remainder of SIS's claims.[14]

---

[13] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

[14] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

1

**Disputed** Instruction No. 7 Re Relevant Product Markets Offered by **SIS**

2

3       SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4   argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5   submits that this instruction is largely repetitive and unnecessary in view of at least previously

6   proposed Instruction No. 22 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 8 Re Relevant Product Markets – Supply Substitutability Offered by **Intuitive**[15]

In deciding whether SIS has proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources, such as intellectual property, manufacturing facilities, or personnel to producing another product in response to an increase in the price of the other product. Such producers, to the extent that they exist, can increase supply and, therefore, drive prices back to competitive levels, defeating any effort by a would-be monopolist to charge significantly higher prices.

Take two shoe manufacturers, for example. The first manufacturer produces shoes for women, while the second manufacturer produces shoes for men. Generally speaking, men's and women's shoes are not reasonably interchangeable and, therefore, might be thought of as being in a separate product markets. However, it is possible that the men's shoe manufacturer could quickly shift its resources to start producing women's shoes if the women's shoe manufacturer raised its prices significantly and vice versa. Although women would not buy men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its production could prevent the other manufacturer from raising prices significantly. Thus, in this example, men's and women's shoes would be included in the same market.

If, in determining the products in the relevant product market you find that there are manufacturers that have the ability to alter their production to manufacture products that can be reasonably substituted with Intuitive's—even though they do not presently compete with Intuitive—you may consider whether the existence of these potential alternative suppliers constrain the prices that Intuitive charges for its products. However, if you find that there are no others who would switch production to products that would compete with Intuitive's, you may define the market solely on your evaluation of whether the existing allegedly competing products are reasonable substitutes for each other.

---

[15] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 5:  Relevant Product Market—Supply Substitutiability (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **Disputed** Instruction No. 8 Re Relevant Product Markets – Supply Substitutability Offered by
2    **SIS**

3          SIS objects to Intuitive's proposed instruction. The proposed instruction is overly
4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, Intuitive
5    has no competitors in the relevant antitrust markets capable of reacting in the manner posed by
6    the hypothetical in the instruction.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    SIS'S CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT

### A.    Sherman Act Section 1 Claims Generally

**Disputed** Instruction No. 9 Re Sherman Act Section 1 Offered by **Intuitive**[16]

SIS brings two claims against Intuitive under Section 1 of the Sherman Act.  Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade.  The first claim is for "tying," and the second claim is for "exclusive dealing."[17]

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade.

To establish a violation of Section 1 of the Sherman Act, SIS must prove the following:

1.    The existence of a contract, combination, or conspiracy between or among at least two separate entities;

2.    That the contract, combination, or conspiracy unreasonably restrains trade; and

3.    That the restraint caused plaintiff to suffer an injury to its business or property.

Both of SIS's claims under Section 1 of the Sherman Act are based on features of Intuitive's contracts with purchasers of da Vinci surgical robots.  While Intuitive does not contest the existence of such contracts, Intuitive denies that such contracts unreasonably restrained trade.

---

[16] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 2:  Sherman Act Section 1 (AM. BAR ASS'N ANTITRUST L. SECTION 2016) .  The model instruction has been modified to remove element that the challenged restraint must "affect[] interstate or foreign commerce," which is not contested.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for tying claim).

[17] Complaint (Dkt. 1) ¶¶ 112, 115.

1

**Disputed** Instruction No. 9 Re Sherman Act Section 1 Offered by **SIS**

2

3

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5

submits that this instruction is largely repetitive and unnecessary in view of at least previously

6

proposed Instruction No. 3 above presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 10 Re Rule of Reason Overview Offered by **Intuitive**[18]

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.  You must determine, therefore, whether the restraints challenged by SIS here—namely, the alleged restrictions that Intuitive places in its contracts on the use with the da Vinci system of unauthorized instruments or instruments that have been modified by unauthorized third parties—are unreasonable.  In making this determination, you must first determine whether SIS has proven that the challenged restraint has resulted in a substantial harm to competition in a relevant product and geographic market.  If you find that SIS has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether Intuitive has shown that the restraint produces countervailing competitive benefits.

---

[18] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3A:  Rule of Reason – Overview (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove final instruction that "The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit," as this balancing is not an element supported by Supreme Court precedent.  *See, e.g.*, *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 541–42(2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations omitted)); *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 96–100 (2021) (endorsing the *American Express* burden-shifting framework); *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 99192 (9th Cir. 2020) (adopting the *American Express* burden-shifting framework)).  The Court likewise adopted the three-step burden shifting framework of *American Express* in its opinion regarding the parties' cross-motions for summary judgment, and nowhere mentioned a fourth step requiring a balancing analysis.  *See* Dkt. 204 at 17.

**<u>Disputed</u> Instruction No. 10 Re Rule of Reason Overview Offered by <u>SIS</u>**

SIS objects to presenting this instruction before even presenting any of the underlying claims and their elements.  SIS has provided its proposed instruction "Rule of Reason – Overview" at Disputed Instruction 27.

**Disputed** Instruction No. 11 Re Rule of Reason Proof of Competitive Harm Offered by **Intuitive**[19]

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Furthermore, SIS must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is SIS's burden to prove the existence of a relevant market. I instructed you earlier on how to make this assessment. In this case, SIS alleges competitive harm only in one market: the alleged aftermarket for EndoWrist repair and replacement; SIS does not allege any competitive harm in the alleged market for surgical robots used in MIST surgery.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also have proven that the challenged restraints have a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[20] If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;

---

[19] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 Sherman Act—General, Instruction 3B: Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[20] The underlined text has been added to the model instruction. *See* Dkt. 204 at 17 ("It is not enough that 'conduct "has the effect of reducing consumers' choices or increasing prices to consumers."'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether the defendant possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.  An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors.  Other factors that you may consider in determining whether Intuitive has market power include  market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with defendant for sales), the entry and exit by other companies, and the number and size of actual competitors or potential competitors.  If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power.  If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

**Disputed** Instruction No. 11 Re Rule of Reason Proof of Competitive Harm Offered by **SIS**

SIS objects to presenting this instruction before even presenting any of the underlying claims and their elements. SIS has provided its proposed instruction "Rule of Reason – Overview" at Disputed Instruction 28.

**Disputed** Instruction No. 12 Re Rule of Reason Evidence of Competitive Benefits Offered by **Intuitive**[21]

  If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether next must determine whether the restraint also benefits competition in other ways.  If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the challenged restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the challenged restraints.

  Antitrust law does not require businesses like Intuitive to use the least restrictive means of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented by SIS must be a substantially—not marginally—less restrictive means for achieving the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the Intuitive's procompetitive purposes without significantly increased cost.[22]

---

[21] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[22] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted) (citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

**Disputed** Instruction No. 12 Re Rule of Reason Evidence of Competitive Benefits Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 29, and 30 *infra* presented by SIS.

- 35 -

1

**B.    SIS's Tying Claim**

2

**<u>Disputed</u>** Instruction No.13 Re Definition of Tying Offered by **SIS**

3

SIS claims that Intuitive engaged in an unlawful tying arrangement. A tying

4

arrangement is one in which the seller will sell one product (referred to as the tying product) only

5

on the condition that buyers also purchase a different product (referred to as the tied product) from

6

the seller, or at least agrees that he will not purchase the tied product from any other supplier. In

7

this case, SIS claims that the da Vinci surgical robot is the tying product and a repaired or

8

replacement EndoWrist instrument is the tied product.

9

**Authority:** The definition is taken from *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451,

10

461 (1992). It is intended to introduce the jury to the vocabulary of the tying cause of action. The

11

terms "product," "sell," and "purchase" are used in this instruction and the other tying arrangement

12

instructions for simplicity.

13

**Source**: AMERICAN BAR ASSOCIATION

14

Model Jury Instructions in Civil Antitrust Cases E-84, 2016 Edition

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Disputed</u>** Instruction No. 13 Re Definition of Tying Arrangements Offered by **Intuitive**[23]

SIS claims that Intuitive engaged in an unlawful tying arrangement. <u>Intuitive denies this</u> <u>claim</u>.

A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product) from the seller, or at least agrees that he will not purchase the tied product from any other supplier. In this case, SIS claims that the da Vinci surgical robot is the tying product and EndoWrist repair and replacement is the tied product.

---

[23] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 1: Definition (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The underlined text has been added to the model instruction.

**Disputed** Instruction No. 14 Re Rationale for Prohibition of Tying Arrangements Offered by **SIS**

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (the da Vinci surgical robot) to force buyers to purchase a tied product (EndoWrist repair or replacement) that buyers might have preferred to purchase elsewhere.

**Authorities:** The instruction is drawn from *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006); *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-85, 2016 Edition.

**Disputed** Instruction No. 14 Re Rationale for Prohibition of Tying Arrangements Offered by **Intuitive**[24]

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (here, the da Vinci surgical robot) to force buyers to purchase a tied product (here, EndoWrist repair or replacement) that buyers might have preferred to purchase elsewhere. However, the law also recognizes that tying arrangements may have legitimate justifications that benefit buyers.[25]

---

[24] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 2: Rationale for Prohibition of Tying Arrangements (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[25] The underlined text has been added to the model instruction. *See Ill. Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 35–36 (2006).

**Disputed** Instruction No. 15 Re Tying – Per Se Violation Offered by **SIS**

To prevail on a per se tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1) (i) minimally invasive surgical robots and (ii) replacement and repaired EndoWrists are separate and distinct products;

(2) Intuitive will sell its da Vinci minimally invasive surgical robots only on the condition that the buyer also purchase replacement and repaired EndoWrists from Intuitive, or that the buyer not purchase replacement and repaired EndoWrists from any other supplier;

(3) Intuitive has sufficient market power with respect to minimally invasive surgical robots to enable it to restrain competition as to replacement and repaired EndoWrists;

(4) the alleged tying arrangement has foreclosed a substantial volume of commerce as to replacement and repaired EndoWrists;

(5) Intuitive's conduct occurred in or affected interstate commerce; and

(6) SIS was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for SIS and against Intuitive on SIS's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

**Authorities:** The first four elements are derived from *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 14-19 (1984) and are expanded on in further instructions below.  *See also Blough v. Holland Realty, Inc,* 574 F.3d 1084, 1089 (9th Cir. 2009); *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912-13 (9th Cir. 2008)).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-86, 2016 Edition.

1    **Disputed** Instruction No. 15 Re Tying – Per Se Violation Offered by **Intuitive**

2            [N/A]

3    Explanation for Intuitive's Position:   Intuitive objects to SIS's proposed Instruction.  The Court's

4    summary judgment decision forecloses SIS's attempt to belatedly introduce a per se tying theory

5    now: "[T]he parties here do not appear to dispute the market at issue, ***nor does SIS assert that the***

6    ***alleged restraints here are per se unreasonable***.  Their arguments focus on whether the parties

7    can satisfy the respective burdens imposed by the rule of reason." Dkt. 204 at 17 (emphasis added).

8            Further, there is no basis to under controlling Supreme Court and Ninth Circuit law to find

9    that the conduct alleged here is per se illegal. The Ninth Circuit has applied the rule of reason to

10   its most recent tying cases and provided no clear guidance on when, if ever, a per se approach

11   would apply instead.  *See Epic Games, Inc.* v. *Apple, Inc.*, 515 F.3d 883, 997–98 (9th Cir. 2023);

12   *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178-80 (9th Cir. 2016); *Brantley* v.

13   *NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  Given that not all tying is per se illegal,

14   there would need to be some trigger to determine when to apply the per se rule, but there is none

15   here.  SIS seems to argue in its proposed instruction 13 that the trigger is market power in the tying

16   market, but that is a non-starter in light of the Supreme Court's *Independent Ink* decision, which

17   holds that "in all cases involving a tying arrangement, the plaintiff must prove that the defendant

18   has market power in the tying product."  *Ill. Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28,

     46 (2006) (emphasis added).  If market power in the tying market is required in all tying cases,

     that cannot be what distinguishes between per se and rule of reason cases.

19           Finally, the ABA model instructions make clear that no matter whether a per se or rule of

20   reason instruction is given for the tying claim, in either event the jury must find that the alleged

21   tying arrangement caused a substantial adverse effect on competition in the relevant market.  The

22   Ninth Circuit similarly has made clear that an anticompetitive effect in the tied market is necessary

23   for a tie to be illegal.  *See Blough* v. *Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009)

24   ("[T]here is no unlawful tying arrangement [if] there is no adverse effect on competition in the tied

25   product market.").    Given this requirement, labeling the claim per se is confusing, unnecessary,

     and incorrect.

26           Accordingly, Intuitive proposes that the jury be given the standard rule of reason

27   instructions from the ABA model instruction for SIS's tying claim.

28

**Disputed** Instruction No. 16 Re Elements of Unlawful Tying Offered by **Intuitive**[26]

To prevail on its tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

1. MIST surgical robots and EndoWrist repair and replacement are separate and distinct products;

2. Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrists from Intuitive, or that the buyer not purchase repaired or replacement EndoWrists from any other supplier;

3. Intuitive has sufficient market power with respect to MIST surgical robots to enable it to restrain competition as to EndoWrist repair and replacement;

4. the alleged tying arrangement has foreclosed a substantial volume of commerce as to EndoWrist repair and replacement;

5. the alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to EndoWrist repair and replacement; and

6. SIS was injured in its business or property because of the alleged tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for SIS and against Intuitive on SIS's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

---

[26] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 4: Elements – Unlawful Tying Under Rule of Reason (AM. BAR ASS'N ANTITRUST L. SECTION 2016). This instruction has been modified to remove elements that the conduct must have "occurred in or affected interstate commerce" and that the defendant "has a financial interest" in the tied product, which are not contested.

- 42 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 16 Re Elements of Unlawful Tying Offered by **SIS**

      SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 13, 15, 18, 23–26 presented by SIS.

**Disputed** Instruction No. 17 Re Presence of Two Products Offered by **SIS**

To determine whether the da Vinci minimally invasive surgical robot and repaired and replacement EndoWrist instruments are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough customers would want to purchase the da Vinci minimally invasive surgical robot alone and repaired or replacement EndoWrist instruments alone, then they are separate products. On the other hand, if there is very little demand for one of the products by itself, that is, without purchasing the other product at the same time, then the da Vinci minimally invasive surgical robot and repaired or replacement EndoWrist instruments are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Authorities:** The consumer demand approach is mandated by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19-22 (1984); *See also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S. Ct. 363, 66 L. Ed. 708, (1922).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-90, 2016 Edition.

<u>**Disputed** Instruction No. 17 Re Presence of Two Products Offered by **Intuitive**[27]</u>

<u>The first element of its tying claim that SIS must prove by a preponderance of the evidence is that the da Vinci surgical robot is a separate and distinct product from the repair and replacement of EndoWrists.</u>

To determine whether the da Vinci surgical robot and EndoWrist repair and replacement are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough customers would want to purchase the da Vinci surgical robot alone and EndoWrist repair or replacement alone, then they are separate products.  On the other hand, if there is very little demand for one of the products by itself, that is, without purchasing the other product at the same time, then the da Vinci surgical robot and EndoWrist repair and replacement are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

---

[27] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 5:  Presence of Two Products (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

**Disputed** Instruction No. 18 Re Tying – Conditioned Sale Offered by **SIS**

You may find that a tying arrangement exists between da Vinci surgical robots and replacement and repaired EndoWrists if Intuitive either refused to sell da Vinci surgical robots unless purchasers also agreed to buy replacement and repaired EndoWrists (or not to buy replacement and repaired EndoWrists from another supplier), or effectively coerced purchasers into buying replacement and repaired EndoWrists in addition to da Vinci surgical robots. To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force the hospital buyers into the purchase of replacement and repaired EndoWrists, which the hospital either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement and repaired EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied daVinci surgical robots to replacement and repaired EndoWrists.  However, there is no coercion if da Vinci surgical robots and replacement and repaired EndoWrists are offered separately for sale and separate purchase is economically feasible.

**Authorities:** *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003); *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1340-41 (Fed. Cir. 2006); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir. 1996).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-93, 2016 Edition.

**Disputed** Instruction No. 18 Re Re Proof of Conditioning Offered by **Intuitive**[28]

The second element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrists from Intuitive, or that the buyer not purchase repaired or replacement EndoWrists from any other supplier.

You may find that a tying arrangement exists between da Vinci surgical robots and EndoWrist repair and replacement if Intuitive either refused to sell da Vinci surgical robots unless purchasers also agreed not to buy EndoWrist repair or replacement from another supplier, or effectively coerced purchasers into buying replacement EndoWrists in addition to da Vinci surgical robots from Intuitive. To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force buyers into the purchase of replacement EndoWrists, which the buyers either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied da Vinci surgical robots to EndoWrist repair and replacement. However, there is no coercion if da Vinci surgical robots and EndoWrist repair and replacement are offered separately for sale and separate purchase is economically feasible.

---

[28] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 7: Proof of Conditioning (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The underlined text has been added to the model instruction.

1 | **<u>Disputed</u>** <u>Instruction No. 19 Re Relevant Geographic Market Offered by **SIS**</u>

2 |       SIS and Intuitive agree that the relevant geographic market is the United States of

3 | America.

**Disputed** Instruction No. 19 Re Relevant Geographic Market Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position:  Intuitive objects to SIS's proposed instruction.   Intuitive contends that this Instruction need not be given at all, and can instead be omitted, because Intuitive does not contest this element of SIS's tying claim.

**Disputed** Instruction No. 20 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Coercion Offered by **Intuitive**[29]

SIS challenges provisions of Intuitive's contracts with customers that restrict the use of unauthorized third-party products and services in connection with the da Vinci system as an unlawful tie. If the seller of a product or service contractually requires its customers to buy another product or service either from the seller or from third parties that seller authorizes, such a contractual provision is not a tying arrangement unless third parties cannot realistically obtain such authorization from the seller. SIS bears the burden of demonstrating that third parties could not realistically obtain authorization from Intuitive and hence that third-party authorization was illusory. If you find that SIS fails to meet this burden, then you must find that SIS has failed to meet its burden of proving coercion and, accordingly, you must find in favor of Intuitive on SIS's tying claim.

---

[29] *Mozart* v. *Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)); *see also Ford Motor Co.* v. *GMB Universal Joints (West), Inc.*, 1988 WL 82826, at *3 (9th Cir. 1988) (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517); *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause. The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract, but in the present case Photovest has failed to provide evidence of any conduct from which to infer the tie." (quotation marks and internal citation omitted)).

**Disputed** Instruction No. 20 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Coercion Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is inconsistent with the wording of the actual contractual provision that Intuitive seems to rely on here and does not cover the situation described by Intuitive.

**<u>Disputed</u> Instruction No. 21 Re Voiding a Warranty Is Not Coercion Offered by Intuitive**[30]

You have heard testimony that Intuitive's contracts with its hospital customers provide that Intuitive's warranties on its products are voided if the customer uses an unauthorized third-party product or service in connection with the da Vinci system. Contractual provisions such as these—which existed at the time the customer chose to purchase the product, and which provide that the manufacturer may not honor a warranty if the customer uses unauthorized service providers or unauthorized parts or accessories with the equipment—are not considered to be so coercive to create a tying arrangement. Thus, you may not consider as evidence of coercion any provision in Intuitive's contracts that would void a warranty if the customer uses an unauthorized third-party product or service.

---

[30] *Virginia Panel Corp.* v. *MAC Panel Co.*, 133 F.3d 860, 870 (Fed. Cir. 1997) ("Voiding a warranty on a product already sold, while possibly a breach of warranty, cannot be a tying arrangement because the purchaser is not deciding whether to buy a product."); *Marts* v. *Xerox, Inc.*, 77 F.3d 1109, (8th Cir. 1996) ("Although the warranty does condition its continuation on the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox copier. . . . An owner of a new Xerox copier could forego the benefits of the warranty, buy service from Xerox or an independent provider, and purchase cartridges from the vendor of its choice."); *General Motors* v. *Gibson Chem. & Oil Co.*, 786 F.2d 105, 110 (2d Cir. 1986) ("[T]he sale of a GM automobile is not conditioned on the purchase of Dexron II. GM simply recommends use of the fluid in its automatic transmissions and cautions that damage to transmissions caused by the use of other fluids may not be covered by the automobile warranty. This manufacturer's recommendation is not the degree of coercion necessary to a tying arrangement."); *DSM Desotech Inc.* v. *3D Sys. Corp.*, 2009 WL 174989 (N.D. Ill. Jan. 26, 2009) (allegations of enforcing a warranty provision "do not amount to a tie-in" because customers had already purchased their machines "at the time the alleged tie-in was executed"); *Fido's Fences* v. *Canine Fence Company*, 672 F. Supp. 2d 303, 312 (E.D.N.Y. 2009) (holding that "it is well settled that warranties that are not sold as a separate product do not result in consumer coercion if the warranty sets forth requirements").

**Disputed** Instruction No. 21 Re Voiding a Warranty Is Not Coercion Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

submits that this instruction is not applicable to the issues and agreements in this case.  SIS bases

its claims on many actions taken by Intuitive, which include coupling of the threats to void the

warranty and the warranty provisions of the contract with respect to the use of third-party

services with other conduct as a concerted course of action. Since SIS bases its antitrust claims

on many more factors, it would be improper to instruct the jury that it cannot find in SIS's favor

based solely on a warranty claim.

**Disputed** Instruction No. 22 Re Relevant Product Markets Offered by **SIS**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material--such as aluminum foil, cellophane, or even plastic containers--to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you may consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of SIS and Intuitive regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

For its tying claim, SIS contends that the relevant product market for the tying product is minimally invasive surgical robots and that the relevant product market for the tied product is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to

allege the proper relevant product markets.  If you find that SIS has proven relevant product markets, then you should continue to evaluate the remainder of SIS's tying claim. However, if you find that SIS has failed to prove such markets, then you must find in Intuitive's favor on this claim.

**Authorities:** *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 229 (2d Cir. 2006); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-34 (1973).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases A-108, 2016 Edition.

**Disputed** Instruction No. 22 Re Relevant Product Markets Offered by **Intuitive**

[N/A]


Explanation for Intuitive's Position:  Intuitive objects to SIS's proposed instruction.  Intuitive proposes that one instruction on relevant product markets be given at the outset of the antitrust instructions, rather than requiring that a relevant product market instruction be given with respect to each individual claim. *See* Disputed Instruction No. 7.

Furthermore, the instruction as presented by SIS is incomplete.  SIS does not propose giving the "Relevant Market – General" instruction that is provided in Chapter 3.A of the ABA model instructions, even though that model instruction provides critical context.  SIS's proposed instruction also provides no guidance to the jury on how to evaluate whether SIS has properly alleged a single-brand aftermarket for EndoWrist repair and replacement.  There are only narrow circumstances in which a single-brand aftermarket can be defined, and the four-factor test that SIS must satisfy in order to do so are set out in  the Ninth Circuit's recent decision in *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023).  The jury should be instructed on these elements.  As such, Intuitive objects to SIS's proposed relevant market instruction.

**Disputed** Instruction No. 23 Re Existence of Market Power With Respect to the Tying Product Offered by **SIS**

You may find that Intuitive has market power with respect to minimally invasive surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for minimally invasive surgical robots without losing an appreciable amount of its business or otherwise to force a purchaser of minimally invasive surgical robots to do something that the purchaser would not do in a more competitive market. SIS may prove power over price with respect to minimally invasive surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets. In the alternative, you may determine whether Intuitive has market power with respect to minimally invasive surgical robots by considering whether Intuitive has a high share of that market for minimally invasive surgical robots such that purchasers do not have alternative sources of minimally invasive surgical robots or a reasonably interchangeable substitute readily available. If Intuitive's market share of the market for minimally invasive surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for minimally invasive surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power. Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market and make a price increase unprofitable. If you find that purchasers of minimally invasive surgical robots do not have readily available alternative sources of supply and are forced as a practical matter to buy minimally invasive surgical robots, you may find that Intuitive has market power. You may also consider in your market power determination the presence of any unique features or costs associated with minimally invasive surgical robots that effectively prevent others from offering a comparable product

**Authorities:** *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 505 (1969); *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 n.7 (7th Cir. 1987). If market power is shown directly, there is no need to define a relevant market. This instruction is thus consistent with the showing necessary to prove market power with respect to other types of antitrust claims. See FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002); *United*

- 57 -

*States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *RE/MAX Int'l Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-27 (1984); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577 (11th Cir. 1991).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-94, 2016 Edition.

**Disputed** Instruction No. 23 Re Existence of Market Power With Respect to the Tying Product Offered by **Intuitive**[31]

    The third element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive has sufficient market power in the alleged market for MIST surgical robots to enable Intuitive to restrain competition as to the alleged aftermarket for EndoWrist repair and replacement.

    You may find that Intuitive has market power with respect to MIST surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for MIST surgical robots without losing an appreciable amount of its business, or otherwise has the power to force a purchaser of MIST surgical robots to do something that the purchaser would not do in a more competitive market.  The ability to charge higher prices for better products or services, however, is not market power.[32]

    SIS may prove power over price with respect to MIST surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets.

    In the alternative, you may determine whether Intuitive has market power with respect to MIST surgical robots by considering whether Intuitive has a high share of that market for MIST surgical robots such that purchasers do not have alternative sources of MISTsurgical robots or a reasonably interchangeable substitute readily available.  If Intuitive's market share of the market for MIST surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for MIST surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power  Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing

---

[31] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 8:  Existence of Market Power with Respect to the Tying Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

[32] The underlined text has been added to the model instruction.  *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    competitors to expand production, and the ease (or difficulty) with which new competitors can

2    enter the market and make a price increase unprofitable.  If you find that purchasers of MIST

3    surgical robots do not have readily available alternative sources of supply and are forced as a

4    practical matter to buy MIST surgical robots, you may find that Intuitive has market power.  You

5    may also consider in your market power determination the presence of any unique features or

6    costs associated with MIST surgical robots that effectively prevent others from offering a

7    comparable product.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulated Instruction No. 24 Re Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product

If you determine that da Vinci minimally invasive surgical robots and repaired or replacement EndoWrist instruments are separate products that have been tied to one another, and that Intuitive has market power for MIST surgical robots, then you must determine whether SIS has proven that Intuitive has foreclosed a substantial amount of interstate commerce with respect to EndoWrist repair and replacement.

In determining whether Intuitive has foreclosed a substantial amount of commerce with respect to repaired or replacement EndoWrist instruments, you should first consider the total dollar amount of Intuitive's sales of repaired and replacement EndoWrist instruments in interstate commerce achieved by the tying arrangement in absolute terms.

If the dollar amount of Intuitive's sales of repaired and replacement EndoWrist instruments was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to EndoWrist repair and replacement due to the tying arrangement. If there was not a substantial adverse effect on competition with respect to repaired or replacement EndoWrist instruments due to the tying arrangement, then you must find in favor of Intuitive on the tying claim.

There is no substantial foreclosure if only a small percentage of sales in the market for repaired or replacement EndoWrist instruments were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought EndoWrist repair or replacement at all in the absence of the tying arrangement.


**Source**:

*SIS Citation*: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases E-97, 2016 Edition


*Intuitive Citation*: MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 ¬ Section 1 of the Sherman Act—Tying Arrangements, Instruction 9:  Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1

**Disputed** Instruction No. 25 Re Interstate Commerce – Tying Offered by **SIS**

2

      The Sherman Act applies only to conduct that affects interstate or foreign commerce.

3

You are instructed that Intuitive's agreements affected interstate commerce.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 25 Re Interstate Commerce – Tying Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position:  Intuitive objects to this instruction.  Intuitive contends that this instruction should not be given because Intuitive does not contest this element of SIS's tying claim.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for tying claim).

**Disputed** Instruction No. 26 Re Elements -- Unlawful Tying under Rule of Reason Offered by **SIS**

Even if SIS has failed to prove that Intuitive has sufficient market power in the tying product of minimally invasive surgical robots as required for its per se tying claim, SIS may still prove a tying violation by proving all other elements of a per se violation as well as proving that the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition in the market for repaired and replacement EndoWrist instruments under the rule of reason.  I will provide you with instructions on the rule of reason below.

**Authorities:** *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 29-31 (1984); *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 46 (2006).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases E-88, 2016 Edition.

**Disputed** Instruction No. 26 Re Elements -- Unlawful Tying under Rule of Reason Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position:  Intuitive objects to this instruction.  For the reasons set forth above in connection with Disputed Instruction No. 15, Intuitive contends that a *per se* instruction should not be offered, and thus there is no need to provide a separate rule of reason instruction in connection with the tying claim.  Instead, Intuitive suggests that the general rule of reason instructions be given prior to instructing the jury on both of SIS's Section 1 claims, *see* Instruction Nos. 10–12, and that the instructions for SIS's tying claim be given under the rule of reason, *see* Instruction No. 16.

(130 of 293), Page 130 of 293
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 130 of 293
Case 3:21-cv-03496-AMO  Document 266  Filed 10/28/24  Page 66 of 196

**Disputed** Instruction No. 27 Re Rule of Reason - Overview Offered by **SIS**

In order to prove its exclusive dealing claim, SIS must show that Intuitive's agreements and conduct related to those agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market under the so-called rule of reason. In making the determination of whether a restraint on trade is unreasonable, you must first determine whether SIS has proven that the challenged restraints have resulted in a substantial harm to competition in a relevant market. If you find that SIS has proven that the challenged restraints result in a substantial harm to competition in a relevant market, then you must consider whether Intuitive has proven that the restraints produce countervailing competitive benefits and whether those procompetitive benefits could not be achieved through less restrictive alternatives.   If Intuitive makes that showing, then you must balance the competitive harm against the competitive benefit, with the challenged restraints illegal under Section 1 of the Sherman Act only if the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

**Authorities:** *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (citing State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *California Dental Ass'n v. FTC*, 224 F.3d 942, 947-54 (9th Cir. 2000), on remand from 524 U.S. 756 (1999); *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996).

**Source:** AMERICAN BAR ASSOCIATION
Model Jury Instructions in Civil Antitrust Cases C-3, 2016 Edition.

**<u>Disputed</u>** <u>Instruction No. 27 Re Rule of Reason Overview Offered by</u> **<u>Intuitive</u>**

      [N/A]

<u>Explanation for Intuitive's Position</u>:  Intuitive objects to this instruction.  For the reasons set forth above in connection with Disputed Instruction No. 15, Intuitive contends that a *per se* instruction should not be offered, and thus there is no need to provide a separate rule of reason instruction in connection with the tying claim.  Instead, Intuitive requests that the general rule of reason instructions be given prior to instructing the jury on both of SIS's Section 1 claims, *see* Disputed Instruction Nos. 10–12, and that the rule of reason instructions for SIS's tying claim be given, *see* Disputed Instruction No. 16.

**Disputed** Instruction No. 28 Re Rule of Reason - Proof of Competitive Harm Offered by **SIS**

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition. Furthermore, SIS must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is SIS's burden to prove the existence of a relevant market.  Here, the parties agree that the relevant geographic market is the United States of America.  I will provide you with instructions for determining a relevant product market.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also has proven that the challenged restraints have had a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced competitive harm, you may look at the following factors:

- the effect of the restraints on prices, output, product quality, and service;
- the purpose and nature of the restraint;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether Intuitive possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge

higher prices for better products or services, however, is not market power. An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Intuitive has market power include the existence of barriers to entry for potential competitors, as well as the absence of economic substitutes for Intuitive's da Vinci surgical robots and EndoWrist instruments. If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power. If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

**Authorities:** *NYNEX v. Discon, Inc.*, 525 U.S. 128, 139 (1998); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001); *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *NCAA v. Board of Regents*, 468 U.S. 81, 109 n.38 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-5, 2016 Edition.

**Disputed** Instruction No. 28 Re Substantial Harm to Competition Offered by **Intuitive**[33]

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, SIS must show that the harm to competition occurred in the alleged aftermarket for EndoWrist repair and replacement.  It is SIS's burden to prove the existence of a relevant market.  I instructed you earlier on how to make this assessment.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also have proven that the challenged restraints have a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[34]  If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether the defendant possesses market power (a concept on which I have previously instructed you).

---

[33] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove the paragraph that explains the concept of market power, which Intuitive proposes be given in Instruction No. 11.

[34] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("It is not enough that 'conduct has the effect of reducing consumers' choices or increasing prices to consumers.'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

**Disputed** Instruction No. 29 Re Rule of Reason -- Evidence of Competitive Benefits Offered by **SIS**

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether Intuitive has proven that the restraints also benefit competition in other ways. If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

**Authorities:** Benefits that are unrelated to competition should be irrelevant to the analysis. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462 (1986); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978); *Bhan v. NME Hosps., Inc*., 929 F.2d 1404, 1413 (9th Cir. 1991).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-8, 2016 Edition.

**Disputed** Instruction No. 29 Re Rule of Reason Evidence of Competitive Benefits Offered by **Intuitive**[35]

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether next must determine whether the restraint also benefits competition in other ways.  If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the challenged restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Antitrust law does not require businesses like Intuitive to use the least restrictive means of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented by SIS must be a substantially—not marginally—less restrictive means for achieving the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the Intuitive's procompetitive purposes without significantly increased cost.[36]

---

[35] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[36] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted) (citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

**Disputed** Instruction No. 30 Re Rule of Reason -- Balancing the Competitive Effects Offered by **SIS**

If you find that the challenged restraint resulted in procompetitive benefits in a relevant market that were not achievable through substantially less restrictive means, then you still must balance those procompetitive benefits against the anticompetitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. SIS bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

**Authorities:** *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Barry v. Blue Cross*, 805 F.2d 866, 872-73 (9th Cir. 1986).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-9, 2016 Edition.

**Disputed** Instruction No. 30 Re Rule of Reason -- Balancing the Competitive Effects Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction.  Although the ABA model instruction suggests a fourth step to the rule of reason analysis, in which the competitive benefit must be weighed against the competitive harm, the Supreme Court has not adopted such a framework; instead, the Supreme Court has endorsed only the standard three-part burden-shifting framework. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations omitted)); *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 96–100 (2021) (endorsing the *American Express* burden-shifting framework)). The Ninth Circuit has also adopted the three-part burden shifting framework of *Amex. See FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991–92 (9th Cir. 2020).  The Court in this case likewise adopted the three-step burden shifting framework of *American Express* in its opinion regarding the parties' cross-motions for summary judgment, and nowhere mentioned a fourth step requiring a balancing analysis.  *See* Dkt. 204 at 17.  Intuitive thus objects to providing this instruction.

**Disputed** Instruction No. 31 Re Business Justification Defense Offered by **Intuitive**[37]

Intuitive contends that the alleged tying arrangement is justified. If you find that SIS has proven all elements of a tying claim, then you should consider whether Intuitive has proven, by a preponderance of the evidence, a business justification for the tying arrangement. Intuitive has the burden of proof on this issue.

Intuitive contends that its contractual restrictions on the unauthorized modification of EndoWrists by third parties are justified by procompetitive patient safety as well as business reasons including, for example, that:  Intuitive's da Vinci system was designed to work with Intuitive's proprietary EndoWrist instruments; the use of EndoWrist instruments beyond the number of lives specified in their Instructions for Use and cleared by the FDA presents serious risks to health and safety of patients; Intuitive has no way to ensure the safety and effectiveness of unauthorized third-party products and services that have not been cleared by the FDA; by posing risks to patient health and safety, the use of unauthorized third-party products and services with the da Vinci surgical system also poses a risk to Intuitive's reputation in the marketplace and would expose Intuitive to additional costs and liability that Intuitive's contracts help to avoid; and allowing unauthorized third parties to modify Intuitive's EndoWrists would permit such third parties to "free ride" on Intuitive's goodwill and the substantial investments Intuitive has made in developing and creating the da Vinci surgical system.[38]

---

[37] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Tying Arrangements, Instruction 11:  Business Justification Defense (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[38] The model instruction has a placeholder for the defendant to provide its contentions as to its business justifications.  The underlined text has been inserted by Intuitive to provide those contentions, which are supported by ample case law.  *See, e.g.*, *Cont'l T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 55 n.23 (1977) (recognizing legitimate justifications arising from federal and state laws requiring "that manufacturers assume direct responsibility for the safety and quality of their products"); *Hobart-Mayfield, Inc.* v. *National Operating Commission on Standards for Athletic Equipment*, 48 F.4th 656, 669–70 (6th Cir. 2022) (because helmet manufacturer served a "market that places high regard on the safety and warranty of its products," it had a "legitimate business interest" in "desir[ing] to protect their reputations and sell safe products"); *HDC Medical Inc.* v. *Minntech Corporation*, 474 F.3d 543, 549–50  (8th Cir. 2007) (since manufacturer could not "predict how its machines would react" to competitors' solutions, it was right to "believe[] that it could not feasibly warrant the performance of the product").

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Intuitive.  In making this determination, you should consider whether the justification Intuitive offers is the real reason that it imposed the tying arrangement.  <u>A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits. This inquiry does not turn on an assessment of Intuitive's subjective intent, but instead whether Intuitive's policies and practices have an objective justification.</u>[39]

You must also consider whether Intuitive's claimed objective could reasonably have been realized through <u>substantially</u> less restrictive means.[40]  Even if some type of constraint is necessary to promote a legitimate business interest, Intuitive must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Intuitive's claimed objective could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Intuitive's objective were more or less expensive and more or less effective than the means chosen by Intuitive.

If you find that Intuitive could reasonably have achieved its legitimate business purpose by substantially less restrictive means, then you may find that there was no business justification

---

[39] The underlined text has been added to the model instruction.  *See Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983) (Breyer, J.) (observing that, though "[s]ome courts have written as if one might look to a firm's 'intent to harm' to separate 'good' from 'bad' [conduct]," this search for "improper intent" in reality "refer[s] to a set of objective economic conditions"); *see also United States* v. *Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]n considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of § 2, our focus is upon the effect of that conduct, not upon the intent behind it.").

[40] The underlined text has been added to the model instruction.  *See Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 100–101 (2021) ("In this suit, as in any, the district court had to determine whether the defendants' agreements harmed competition and whether any procompetitive benefits associated with their restraints could be achieved by '*substantially* less restrictive alternative' means." (emphasis added)); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 985–86, 990 (9th Cir. 2023) ("[T]his circuit's test—which the Supreme Court approved in *Alston*—requires a '*substantially* less restrictive' alternative." (emphasis in original; citation omitted)).

1  and find for SIS on the tying claim.  If you find that the alleged tying arrangement serves a

2  legitimate business purpose of Intuitive, and that there are not substantially less restrictive means

3  reasonably available to achieve that purpose, then you must find for Intuitive and against SIS on the

4  tying claim.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

<u>**Disputed** Instruction No. 31 Re Business Justification Defense Offered by **SIS**</u>

2

      SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

3

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

4

submits that this instruction is largely repetitive and unnecessary in view of at least previously

5

proposed Instruction Nos. 27, 29, and 30 above presented by SIS.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C. SIS's Exclusive Dealing Claim

**Disputed** Instruction No. 32 Re Elements of Exclusive Dealing Offered by **SIS**

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors or a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier. Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and hospitals that substantially forecloses the hospitals from purchasing replacement and repaired EndoWrist instruments from competing suppliers;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the market for replacement and repaired EndoWrist instruments;

(3) Intuitive had substantial market power in the market for replacement and repair of EndoWrist instruments;

(4) Intuitive's agreements with hospitals occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that the evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's exclusive dealing claim.

**Authorities**: Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329, 334 (1961); Standard Oil Co. v. United States, 337 U.S. 293, 306-07 (1949).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases D-71, 2016 Edition.

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

**Disputed** Instruction No. 32 Re Elements of Exclusive Dealing Offered by **Intuitive**[41]

SIS also claims that Intuitive engaged in unlawful exclusive dealing. Intuitive denies this claim.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and its customers that totally foreclose customers from purchasing EndoWrist repair or replacement from competing suppliers;

(2) the agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged aftermarket for EndoWrist repair and replacement;

(3) Intuitive had substantial market power in the alleged aftermarket for EndoWrist repair and replacement;

and

(4) SIS was injured in its business or property because of the agreements.

---

[41] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Vertical Restraints, Instruction 5: Elements of Exclusive Dealing (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The model instruction has been modified to remove instructions regarding there being "several forms" of exclusive dealing arrangements, because the particular alleged exclusive dealing arrangement has been defined by SIS and thus other examples of exclusive dealing arrangements are irrelevant in this case. It has also been modified to remove the element that the conduct must have "occurred in or affected interstate commerce," which is not contested. *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for tying claim).

1    If you find that the evidence is insufficient to prove any one or more of these elements,

2    then you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that

3    the evidence is sufficient to prove all four elements, then you must find for SIS and against

4    Intuitive on SIS's exclusive dealing claim.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 33 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Exclusive Dealing Offered by **Intuitive**[42]

SIS challenges provisions of Intuitive's contracts with customers that restrict the use of unauthorized third-party products and services in connection with the da Vinci system as unlawful exclusive dealing. If the seller of a product or service contractually requires its customers to buy another product or service either from the seller or from third parties that seller authorizes, such a contractual provision is not an exclusive dealing arrangement unless third parties cannot realistically obtain such authorization from the seller. SIS bears the burden of demonstrating that third parties could not realistically obtain authorization from Intuitive and hence that third-party authorization was illusory. If you find that SIS fails to meet this burden, then you must find in favor of Intuitive on SIS's tying claim.

---

[42] *See Mozart* v. *Mercedes-Benz*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)) (where the defendant asks customers only to work with "authorized" third parties, there is no forcing or coercion unless the option for third parties to become authorized is "illusory"); *see also Ford Motor* v. *GMB Universal Joints*, 1988 WL 82826, at *3 (9th Cir. 1988) ("[a]n approval mechanism must not be illusory") (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517); *Photovest* v. *Fotomat*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause. The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract, but in the present case Photovest has failed to provide evidence of any conduct from which to infer the tie." (quotation marks and internal citation omitted)).

1   **Disputed** Instruction No. 33 Re Restrictions on Unauthorized Third-Party Products and Services
2   Are Not Exclusive Dealing Offered by **SIS**

3       SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4   argumentative, misleading and creates a substantial risk of confusing the jury. The proposed

5   instruction is inapplicable to the language of the agreements at issue in this case or to the facts of

6   this case.  Further, SIS submits that this instruction is largely repetitive and unnecessary in view

7   of at least previously proposed Instruction Nos. 27, 32, 34, 37–41 presented by SIS.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 34 Re Exclusive Dealing – Agreements that Substantially Foreclose Competition Offered by **SIS**

In determining whether Intuitive's exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the aftermarket for EndoWrist repair and replacement, whether buyers of the aftermarket repaired or replacement EndoWrist instruments have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives to Intuitive's products or services, the reasons Intuitive and buyers entered into the exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

You also should consider whether the buyer is the final end user of the product. If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market.

In determining the extent to which Intuitive's exclusive dealing contracts foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclose less than 20% of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available.  Similarly, the shorter the duration of the contract, the less likely it is to harm competition.  The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

In determining if Intuitive's exclusive dealing contracts substantially harmed competition, you also should consider Intuitive's market power.  If Intuitive does not possess market power, then there cannot be substantial harm to competition from an exclusive dealing contract, and you must find for Intuitive on this claim.  If you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Intuitive might otherwise have.  If SIS cannot show that Intuitive had the power to force

buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive lacks market power.

Finally, you should consider whether the process in which Intuitive secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against Intuitive, this is also evidence that Intuitive does not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

**Authorities:** *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 n.3 (6th Cir. 1997); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1218-19 (W.D.N.C. 1989); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1478 (D. Kan. 1987); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056, 1058-61 (8th Cir. 2000); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 644 (C.D. Cal. 1976); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464 (1992); *3M Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases D-73, 2016 Edition.

(151 of 293), Page 151 of 293
Case 3:21-cv-03496-AMO Document 266 Filed 10/28/24 Page 87 of 196
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 151 of 293

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed** Instruction No. 34 Re Exclusive Dealing – Agreements that Substantially Foreclose Competition Offered by **Intuitive**

     [N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction.  The ABA model instruction regarding exclusive dealing arrangements combines multiple elements into one instruction.  For the sake of clarity to the jury, Intuitive proposes breaking it up into multiple instructions, each focused on a single element of the claim.  Intuitive has presented its proposed separate instructions in Instruction Nos. 35 and 36, and the final two paragraphs of instruction 38.

**Disputed** Instruction No. 35 Re Substantial Adverse Effect on Competition Offered by **Intuitive**[43]

In determining whether Intuitive's agreements with its customers had a substantially harmful effect on competition in the alleged aftermarket for EndoWrist repair and replacement, you should consider the nature and history of the use of exclusive dealing contracts in the industry, whether buyers of Intuitive's products have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives to Intuitive's products, the reasons Intuitive and its customers entered into the contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[44]

You also should consider whether the buyer is the final end user of the product.  If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market.  On the other hand, if the buyer is a distributor or reseller, and there are other alternatives for competing sellers to market their products to end users, then an exclusive dealing arrangement may not foreclose competitors' access to the market and, thus, not substantially harm competition.

You ultimately should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market.  Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

---

[43] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been split up into separate instructions, so as to separate the elements of substantial adverse effect on competition, substantial foreclosure, and substantial market power into three separate instructions, rather than taking the model instruction's approach of combining them all into a single instruction.

[44] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 (It is not enough that 'conduct has the effect of reducing consumers' choices or increasing prices to consumers.'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

**Disputed** Instruction No. 35 Re Substantial Adverse Effect on Competition Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 29, 30, and 34 above presented by SIS.

**<u>Disputed</u> Instruction No. 36 Re Substantial Foreclosure of Competition Offered by Intuitive[45]**

        In determining the extent to which Intuitive's exclusive dealing contracts foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclosed less than 30–40 percent of the market, this indicates that the harm from the foreclosure of competition was not substantial because there are alternatives available.[46] Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

---

[45] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been split up into separate instructions, so as to separate the elements of substantial adverse effect on competition, substantial foreclosure, and substantial market power into three separate instructions, rather than taking the model instruction's approach of combining them all into a single instruction.

[46] The model instruction has been modified to change the foreclosure threshold from "20 percent" to "30–40 percent," which is consistent with prevailing caselaw.  *See, e.g.*, *Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1162–65 (9th Cir. 1997) ("Although 38% [foreclosure] appears significant, . . . we conclude that it considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons." (citation and internal quotation marks omitted)); *Sterling Merchandising, Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("[I]n applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy."); *United States* v. *Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before an exclusive contract raises competitive concerns); *Union Carbide Corp.* v. *Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998) (foreclosure percentage in the 30 percent range is the point at which firms are "presumptively incapable of exercising market power"); ABA, 1 ANTITRUST LAW DEVELOPMENTS, ch. 1 § D.2 (Vertical Restraints on Interbrand Competition) at n.1432 & accompanying text ("Although foreclosure of 20 to 30 percent was a gray area before *Jefferson Parish* [*Hospital District No. 2* v. *Hyde*, 466 U.S. 2 (1984)], the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market share thresholds are a prerequisite to finding exclusive dealing unlawful--and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion.").

**Disputed** Instruction No. 36 Re Substantial Foreclosure of Competition Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 29, 30, and 34 above presented by SIS.

**Disputed** Instruction No. 37 Re Exclusive Dealing – Relevant Market Offered by **SIS**

I have previously instructed you on the standards for identifying a relevant market. For its exclusive dealing claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market. If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's exclusive dealing claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

1

**Disputed** Instruction No. 37 Re Relevant Market Offered by **Intuitive**

2

I have previously instructed you on the standards for identifying a relevant market.  For its

3

exclusive dealing claim, SIS contends that the relevant product market is EndoWrist repair and

4

replacement, while Intuitive contends that SIS has failed to allege the proper relevant product

5

market.  If you find that SIS has proven its proposed relevant product market, then you should

6

continue to evaluate the remainder of SIS's exclusive dealing claim. However, if you find that SIS

7

has failed to prove such a market, then you must find in Intuitive's favor on this claim.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 38 Re Exclusive Dealing – Unreasonable Restraint of Trade Offered by **SIS**

I have previously instructed you on the standards for evaluating whether accused conduct is an unreasonable restraint of trade under the rule of reason.  For purposes of SIS's exclusive dealing claims, you must evaluate whether Intuitive's agreements with hospitals amount to an unreasonable restraint of trade that resulted in a substantial adverse effect in the market for replacement and repaired EndoWrists under the rule of reason.

**Disputed** Instruction No. 38 Re Exclusive Dealing – Unreasonable Restraint of Trade Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction. SIS proposes a general instruction that the jury must determine whether Intuitive's contracts with hospitals constitute an "unreasonable restraint of trade," without any citation to authority for its instruction or any guidance to the jury about how to make that determination.

Intuitive proposes instead providing Disputed Instruction No. 40, which derives from the ABA model instruction, and which actually explains to the jury how to conduct the third step of the rule of reason burden shifting framework by considering the procompetitive benefits of the challenged restraints. The jury would only need to reach this instruction if it has already found there to be an exclusive dealing arrangement that results in substantial harm to competition, thereby following the appropriate three-step burden-shifting framework.

1    **Disputed** Instruction No. 39 Re Exclusive Dealing – Market Power Offered by **SIS**

2        I have previously instructed you on the standards for determining whether a party has

3    market power in a relevant market.  For purposes of SIS's exclusive dealing claim, it is SIS's

4    burden to demonstrate that Intuitive has market power in the market for replacement or repaired

5    EndoWrists.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 39 Re Market Power Offered by **Intuitive**[47]

To prevail on its exclusive dealing claim, SIS must prove by a preponderance of the evidence that Intuitive had substantial power in the alleged aftermarket for EndoWrist repair and replacement.  If Intuitive does not possess market power, then there cannot be substantial harm to competition from Intuitive's contracts, and you must find for Intuitive on this claim.

A firm that possesses market power generally can charge higher prices for the same goods or services that a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.  An important factor in determining whether Intuitive possesses market power is its market share, that is, its percentage of the products or services sold in the relevant market by all competitors.  Other factors that you may consider in determining whether Intuitive has market power include  market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with defendant for sales), the entry and exit by other companies, and the number and size of actual competitors or potential competitors.

If you decide that the buyers are sophisticated businesses themselves which had countervailing power in negotiating contracts, this may offset any market power Intuitive might otherwise have.  If SIS cannot show that Intuitive had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive lacks market power.

You should also consider whether the process in which defendant secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against defendant, this is also evidence that defendant does not have market power

---

[47] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (The model instruction has been split up into separate instructions, so as to separate the elements of substantial adverse effect on competition, substantial foreclosure, and substantial market power into three separate instructions, rather than taking the model instruction's approach of combining them all into a single instruction.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **Disputed** Instruction No. 40 Re Evidence of Competitive Benefits Offered by **Intuitive**[48]

2            If you find that SIS has proven that Intuitive's agreements with its customers constitute

3 exclusive dealing arrangements that resulted in substantial harm to competition in the alleged

4 aftermarket for EndoWrist repair and replacement, then you next must determine whether

5 Intuitive's agreements also benefit competition in other ways.  If you find that the exclusive

6 dealing arrangements do result in competitive benefits, then you also must consider whether

7 those restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same

8 benefits could have been readily achieved by other, reasonably available means that create

9 substantially less harm to competition, then they cannot be used to justify the restraint.

10            Antitrust law does not require businesses like Intuitive to use the least restrictive means

11 of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented

12 by SIS must be a substantially—not marginally—less restrictive means for achieving the same

13 procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's

14 conduct is indeed a form of competition on the merits because it involves, for example, greater

15 efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an

16 alternative means must be virtually as effective in serving the Intuitive's procompetitive

17 purposes without significantly increased cost.[49]

18

19

20    [48] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General,
Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST

21 L. SECTION 2016).

22    [49] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A
procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of

23 competition on the merits because it involves, for example, greater efficiency or enhanced
consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic*

24 *Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed
alternative means, courts must give wide berth to defendants' business judgments and must resist

25 the temptation to require that enterprises employ the least restrictive means of achieving their
legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court

26 approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted)
(citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an

27 alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive
purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty.*

28 *Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

**Disputed** Instruction No. 40 Re Evidence of Competitive Benefits Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 28, and 30 above presented by SIS.

**Disputed** Instruction No. 41 Re Exclusive Dealing - Interstate Commerce Offered by **SIS**

The Sherman Act applies only to conduct that affects interstate or foreign commerce. You are instructed that Intuitive's agreements affected interstate commerce.

1   __**Disputed**__ Instruction No. 41 Re Exclusive Dealing - Interstate Commerce Offered by **Intuitive**

2        [N/A]

3

4   Explanation for Intuitive's Position:  Intuitive objects to this instruction.  Intuitive contends that

5   this instruction should not be given because Intuitive does not contest this element of SIS's

6   exclusive dealing claim.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*,

7   No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element

    from list of elements for tying claim).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 42 Re Injury Offered by **SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions-Civil, Form 485a-79-23

Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**__Disputed__ Instruction No. 42 Re Injury Offered by __Intuitive__**

[NA]


__Explanation for Intuitive's Position__: Intuitive objects to this Instruction. This is the same instruction SIS proposes giving following its Section 2 claims. Intuitive suggests that all instructions regarding injury and damages be given after the instructions on the other elements of SIS's claims, rather than having the same injury claim be given multiple times. *See* Disputed Instruction Nos. 59–71.

**III.    SIS'S CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT**

**A.    Sherman Act Section 2 Claims Generally**

**Disputed** Instruction No. 43 Re Sherman Act Section 2 Claims Offered by **Intuitive**

SIS asserts that Intuitive violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the alleged aftermarket for EndoWrist repair and replacement.[50]  I will now instruct you on the elements of each of these claims.

---

[50] 15 U.S.C. § 2; Complaint (Dkt. 1) ¶¶ 118, 121.

1    **Disputed** Instruction No. 43 Re Sherman Act Section 2 Claims Offered by **SIS**

2

3           SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5    submits that this instruction is largely repetitive and unnecessary in view of at least previously

6    proposed Instruction Nos. 3 and 52 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 44 Re Monopoly and Attempted Monopolization Defined Offered by **SIS**

It is important for you to understand what a monopoly is. A firm has a monopoly when it has the power to dominate or control a market. More specifically, a firm has a monopoly when it has the power to control prices or to exclude competition in the relevant market.

The power to control prices is simply the power of a company to establish significantly higher prices for its goods than those charged by competitors for equivalent goods without suffering a substantial loss of business to competitors. Thus, if a company that has raised prices eventually has to lower its prices to the level charged by its competitors, it may not have a monopoly in the sense of the power to control prices.

The power to exclude competition means the power of a company to dominate a market by eliminating existing competition from the market or by preventing new competition from entering that market. In other words, the power to exclude competition is the power to place major barriers in the way of other companies trying to remain in or enter the particular area of trade and compete for customers. It may be shown by evidence of a company's reducing or restricting the share of the market held by competitors by means other than the normal process of competition.

To prove the charge of attempted monopolization, SIS does not have to show that the Intuitive achieved a monopoly. That is, SIS does not have to prove that Intuitive actually gained the power to control prices or exclude competition. Instead, SIS must show, by a preponderance of the evidence, that Intuitive purposefully attempted to gain such power.

**Source:** Modern Federal Jury Instructions-Civil

Copyright 2024, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**Disputed** Instruction No. 44 Re Monopoly and Attempted Monopolization Defined Offered by **Intuitive**

[NA]

Explanation for Intuitive's Position: Intuitive objects to this instruction.  SIS and Intuitive both propose later in these instructions giving ABA model instructions regarding the elements of SIS's monopolization and attempted monopolization claims—including instructions on the meaning of monopoly power, on which this instruction is focused.  *See infra* Disputed Instruction Nos. 45, 48, 54.  There is no need to give multiple instructions on these issues, and to potentially confuse the jury given the different articulation of the concepts between the ABA model instruction and this instruction from a different service.

**B.      SIS's Monopolization Claim**

<u>**Disputed**</u> Instruction No. 45 Re Elements of Monopolization Offered by **SIS**

SIS alleges that it was injured by Intuitive's unlawful monopolization of the market for replacement and repaired EndoWrists. To prevail on this claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1) the alleged market is a valid antitrust market;

(2) Intuitive possessed monopoly power in that market;

(3) Intuitive willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

(4) Intuitive's conduct occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property because of Intuitive's anticompetitive conduct.

If you find that SIS has failed to prove any of these elements, then you must find for Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

**Authorities**: See generally *Pacific Bell Tel. Co. v. linkLine Commc'ns.*, 555 U.S. 438 (2009); *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-102, 2016 Edition.

**Disputed** Instruction No. 45 Re Elements of Monopolization Offered by **Intuitive**[51]

SIS alleges that it was injured by Intuitive's unlawful monopolization of the alleged aftermarket for EndoWrist repair and replacement. To prevail on this claim, SIS must prove each of the following elements by a preponderance of the evidence:

       (1)    the alleged aftermarket for EndoWrist repair and replacement is a valid antitrust market;

       (2)    Intuitive possessed monopoly power in the alleged aftermarket for EndoWrist repair and replacement;

       (3)    Intuitive willfully acquired or maintained monopoly power in the alleged aftermarket for EndoWrist repair and replacement by engaging in anticompetitive conduct; and

       (4)    SIS was injured in its business or property because of Intuitive's anticompetitive conduct.

If you find that SIS has failed to prove any of these elements, then you must find for Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

---

[51] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 1: Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The model instruction has been modified to remove the element that the alleged anticompetitive conduct "occurred in or affected interstate commerce," which is not contested. *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

1   **<u>Disputed</u>** <u>Instruction No. 46 Re Relevant Geographic Market Offered by **SIS**</u>

2       SIS and Intuitive agree that the relevant geographic market is the United States of

3   America

5-ER-1074

(175 of 293), Page 175 of 293
Case 3:21-cv-03496-AMO   Document 266   Filed 10/28/24   Page 111 of 196
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 175 of 293

**Disputed** Instruction No. 46 Re Relevant Geographic Market Offered by **Intuitive**

    [NA]


Explanation for Intuitive's Position: Intuitive objects to this instruction.  Intuitive contends that this instruction should not be given because Intuitive does not dispute the geographic scope of the alleged relevant market.

**Disputed** Instruction No. 47 Re Monopolization – Relevant Product Market Offered by **SIS**

I have previously instructed you on the standards for identifying a relevant market. For its monopolization claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market. If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's monopolization claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Disputed</u>** Instruction No. 47 Re Monopolization – Relevant Product Market Offered by **Intuitive**

I have previously instructed you on the standards for identifying a relevant market.  For its monopolization claim, SIS contends that the relevant product market is EndoWrist repair and replacement, while Intuitive contends that SIS has failed to allege the proper relevant product market.  If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's monopolization claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

**Disputed** Instruction No. 48 Re Monopoly Power Defined Offered by **SIS**

To prove its monopolization claim, SIS must prove by a preponderance of the evidence that Intuitive has monopoly power in the EndoWrist repair and replacement aftermarket.

Monopoly power is the power to dominate or control a market, including the power to control prices, restrict output, and exclude competition in a relevant antitrust market.

However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether SIS has met its burden of proving monopoly power in the market for replacement and repaired EndoWrists. If you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389 (1956).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-104, 2016 Edition.

1  **Disputed** Instruction No. 48 Re Monopoly Power Defined Offered by **Intuitive**[52]

2          To prove its monopolization claim, SIS must prove by a preponderance of the evidence

3  that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and

4  replacement.

5          Monopoly power is the power to control prices, restrict output, and exclude competition

6  in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise

7  prices substantially above the competitive level for a significant period of time.  However,

8  possession of monopoly power, in and of itself, is not unlawful.  Monopoly power can be

9  lawfully acquired and maintained through growth or development as a consequence of a superior

10 product, business acumen, or historic accident.[53]

11

12         I will now provide further instructions about how you may determine whether SIS has

13 met its burden of proving monopoly power in the alleged aftermarket for EndoWrist repair and

14 replacement.  There are two ways for SIS to prove that Intuitive had monopoly power in a

15 relevant market.  SIS may prove monopoly power through direct evidence of restricted output

16 and supracompetitive prices, or through indirect evidence that Intuitive has a dominant market

17 share in the relevant antitrust market and consideration of other characteristics of the relevant

18 market.  I will explain these in turn.[54]

19

20

21

22

23 [52] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 Section 2 of the Sherman
   Act—Monopolization-General, Instruction 2:  Monopoly Power Defined (AM. BAR ASS'N

24 ANTITRUST L. SECTION 2016).
   [53] The underlined text has been added to the model instruction.  *See Epic Games* v. *Apple, Inc.*,

25 67 F.4th 946, 998 (9th Cir. 2023) ("A Section 2 monopolization claim 'has two elements: (1) the
   possession of monopoly power in the relevant market and (2) the willful acquisition or

26 maintenance of that power as distinguished from growth or development as a consequence of a

27 superior product, business acumen, or historic accident.'" (quoting *United States* v. *Grinnell*
   *Corp.*, 384 U.S. 563, 570–71 (1966)).

28 [54] The underlined text has been added to the model instruction to provide a roadmap to the jury.
   *See infra* Stipulated Jury Instruction No. 34; Stipulated Jury Instruction No. 35.

1 **Disputed** Instruction No. 49 Re Monopoly Power – Direct Evidence Offered by **SIS**

2 One way that SIS may prove monopoly power is through direct evidence that Intuitive has
3 the ability to raise or maintain the prices that it charges for goods or services in the replacement
4 and repaired EndoWrist market above competitive levels, can maintain those prices above a
5 competitive level for a significant period of time, and that Intuitive has the ability to exclude
competition.

6 SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices
7 that it charges for goods or services in the market for replacement and repaired EndoWrists above
8 competitive levels. SIS must prove that Intuitive has the power to do so by itself--that is, without
9 the assistance of, and despite competition from, any existing or potential competitors.

10 SIS must also prove that Intuitive has the power to maintain prices above a competitive
11 level for a significant period of time. If Intuitive attempted to maintain prices above competitive
12 levels, but would lose so much business to other competitors that the price increase would become
unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power.

13 Similarly, SIS must prove that Intuitive has the ability to exclude competition. For example,
14 if Intuitive attempted to maintain prices above competitive levels, but new competitors could enter
15 the market for replacement and repaired EndoWrists or existing competitors could expand their
16 sales and take so much business that the price increase would become unprofitable and would have
17 to be withdrawn, then Intuitive does not have monopoly power. The ability to earn high profit
18 margins or a high rate of return does not necessarily mean that Intuitive has monopoly power.
19 Other factors may enable a company without monopoly power to sell at higher prices or earn
20 higher profit margins than its competitors, such as superior products or services, low costs, or
21 superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit
22 margins than other companies for similar goods or services over a long period of time may be
23 evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial amount
24 of sales if it raised prices substantially, or that Intuitive's profit margins were low compared to its
competitors, or that Intuitive's margins go up and down or are steadily decreasing, might be
25 evidence that Intuitive does not have monopoly power.

26 **Authorities:** *United States v. Microsoft*, 253 F.3d 34, 56-57 (D.C. Cir. 2001)*; see also Am. Council*
27 *of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 323 F.3d 366, 369
28 n.3 (6th Cir. 2003)*.

1

2   **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases
    A-121, 2016 Edition.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **Disputed** Instruction No. 49 Re Monopoly Power – Direct Evidence Offered by **Intuitive**[55]

2       One way that SIS may prove monopoly power to control prices and exclude competition

3 is through direct evidence that Intuitive has the ability to raise or maintain the prices that it

4 charges for goods or services in the alleged aftermarket for EndoWrist repair and replacement

5 substantially above the competitive levels for a significant period of time.

6       SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices

7 that it charges for goods or services in the alleged aftermarket for EndoWrist repair and

8 replacement above competitive levels, and to restrict output in that market.[56] SIS must prove that

9 Intuitive has the power to do so by itself—that is, without the assistance of, and despite

10 competition from, any existing or potential competitors.

11       SIS must also prove that Intuitive has the power to maintain prices above a competitive

12 level and restrict output for a significant period of time. If Intuitive attempted to maintain prices

13 above competitive levels, but would lose so much business to other competitors that the price

14 increase would become unprofitable and would have to be withdrawn, then Intuitive does not

15 have monopoly power.

16

17

18 [55] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof

19 (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[56] The underlined text has been added to the model instruction.  *See, e.g.*, *Rebel Oil Co., Inc.* v.

20 *Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious

21 exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with

22 market power may inflict, and thus, of the actual exercise of market power." (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986))); *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475

23 (9th Cir. 1997) ("Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices."); *Theme Promotions, Inc.* v. *News Amer. Mktg. FSI*, 546 F.3d 991,

24 1001 (9th Cir. 2008) ("Evidence of restricted output and supracompetitive prices is direct evidence of market power . . ."); *Safeway Inc.* v. *Abbott Lab'ys*, 761 F. Supp. 2d 874, 887 (N.D.

25 Cal. 2011) ("To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output. . . .  Both are required to prove monopoly power directly."); *CoStar Grp.,*

26 *Inc.* v. *Com. Real Est. Exch. Inc.*, 2023 WL 2468742, at *5 (N.D. Cal. Feb. 23, 2023) ("[D]irect

27 evidence of the injurious exercise of market power . . . is evidence of restricted output and supracompetitive prices."); *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1031 (N.D. Cal.

28 2021) (lack of evidence of restricted output "fatal in demonstrating monopoly power").

1    Similarly, SIS must prove that Intuitive has the ability to exclude competition. For

2   example, if Intuitive attempted to maintain prices above competitive levels, but new competitors

3   could enter the market for EndoWrist repair and replacement or existing competitors could

4   expand their sales and take so much business that the price increase would become unprofitable

5   and would have to be withdrawn, then Intuitive does not have monopoly power.  The ability to

6   earn high profit margins or a high rate of return does not necessarily mean that Intuitive has

7   monopoly power.  Other factors may enable a company without monopoly power to sell at higher

8   prices or earn higher profit margins than its competitors, such as superior products or services,

9   low costs, or superior advertising or marketing.  In analyzing whether supracompetitive pricing

10  was present, you may also consider Intuitive's total fixed costs, including capital costs and

11  research and development.[57]  However, an ability to sell at higher prices or earn higher profit

12  margins than other companies for similar goods or services over a long period of time may be

13  evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial

14  amount of sales if it raised prices substantially, or that Intuitive's profit margins were low

15  compared to its competitors, or that Intuitive's margins go up and down or are steadily

16  decreasing, might be evidence that Intuitive does not have monopoly power.

17

18

19

20

_____

[57] The underlined text has been added to the model instruction.  *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof (AM. BAR ASS'N ANTITRUST L. SECTION 2016) ("expand or contract list as appropriate"); *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds light on material factors such as [defendant's] price relative to its total costs (marginal and fixed) . . . , monopoly power cannot be found as a matter of law."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power."); 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶516g (4th ed. 2014 & Supp. 2021) ("No matter how accurately measured, of course, a substantial excess of price over marginal cost does not necessarily bring excess returns on investment.  A firm generates excess profit only if price exceeds its average total cost, including its cost of capital.").

**<u>Disputed</u> Instruction No. 50 Re Monopoly Power – Indirect Evidence Offered by SIS**

Another way that SIS may prove monopoly power in the market for replacement and repaired EndoWrists is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the market for replacement and repaired EndoWrists, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the market for replacement and repaired EndoWrists. Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the market for replacement and repaired EndoWrists. The Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the market for replacement and repaired EndoWrists, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors. Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence demonstrates that Intuitive does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Intuitive has monopoly power.

*Market Share Trends*

The trend in Intuitive's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry into the market for replacement and repaired EndoWrists. Barriers to entry make it difficult for new competitors to enter the market

for replacement and repaired EndoWrists in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Intuitive does not have monopoly power, regardless of Intuitive's market share, because new competitors could enter easily if Intuitive attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Intuitive has monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the market for replacement and repaired EndoWrists may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Intuitive lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Intuitive has monopoly power.

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products. If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power. On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If, through direct or indirect evidence, you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *United States v. Microsoft Corp.*, 253 F.3d 34, 56-57 (D.C. Cir. 2001); *Syufy Enters. v. Am. Multicinema*, 793 F.2d 990, 995-96 (9th Cir. 1986); *Hunt-Wesson Foods v. Ragu Foods*, 627 F.2d 919, 924-25 (9th Cir. 1980); *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 496-97 (9th Cir. 1977); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *United States v. Grinnell*

*Corp.*, 384 U.S. 563, 571 (1966); *International Boxing Club v. United States*, 358 U.S. 242 (1959); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797-98 (1946).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-115, 2016 Edition.

**Disputed** Instruction No. 50 Re Monopoly Power – Indirect Evidence Offered by **Intuitive**[58]

Another way that SIS may prove monopoly power in the alleged aftermarket for EndoWrist repair and replacement is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the alleged aftermarket for EndoWrist repair and replacement, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the alleged aftermarket for EndoWrist repair and replacement. Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the alleged aftermarket for EndoWrist repair and replacement. Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the alleged aftermarket for  EndoWrist repair and replacement, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors. Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence demonstrates that

---

[58] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 7:  Existence of Monopoly Power – Indirect Proof (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    Intuitive does, in fact, have monopoly power despite having a market share below 50 percent,

2    you may conclude that Intuitive has monopoly power.

3    *Market Share Trends*

4    The trend in Intuitive's market share is something you may consider. An increasing

5    market share may strengthen an inference that a company has monopoly power, particularly

6    where that company has a high market share, while a decreasing share might show that a

7    company does not have monopoly power.

8    *Barriers to Entry*

9    You may also consider whether there are barriers to entry into the alleged aftermarket for

10   EndoWrist repair and replacement. Barriers to entry make it difficult for new competitors to

11   enter the market in a meaningful and timely way. Barriers to entry might include intellectual

12   property rights (such as patents or trade secrets), the large financial investment required to build

13   a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of

14   the companies already participating in the market (or the brand name recognition of their

15   products).

16   Evidence of low or no entry barriers may be evidence that Intuitive does not have

17   monopoly power, regardless of Intuitive's market share, because new competitors could enter

18   easily if Intuitive attempted to raise prices for a substantial period of time. By contrast, evidence

19   of high barriers to entry along with high market share may support an inference that Intuitive has

20   monopoly power.

21   *Entry and Exit by Other Companies*

22   The history of entry and exit in the alleged aftermarket for EndoWrist repair and

23   replacement may be helpful to consider. Entry of new competitors or expansion of existing

24   competitors may be evidence that Intuitive lacks monopoly power. On the other hand,

25   departures from the market, or the failure of firms to enter the market, particularly if prices and

26   profit margins are relatively high, may support an inference that Intuitive has monopoly power.

27

28

- 124 -

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products. If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power. On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If you find that SIS has not proved by a preponderance of the evidence, whether through direct evidence or indirect evidence, that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must find for Intuitive and against SIS on SIS's monopolization claim. If you find that SIS has proven by a preponderance of the evidence that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must consider the remaining elements of this claim.

**Disputed** Instruction No. 51 Re Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct Offered by **SIS**

The next element plaintiff must prove is that defendant willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the market for replacement and repaired EndoWrists. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals--or the achievement of these goals--unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Intuitive's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct

1   even if it has a negative effect on competitors.

2   Similarly, in the same example, suppose Firm B developed and patented a revolutionary

3   new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It

4   would not be unlawful for Firm B to achieve monopoly power in printers in this way. Firm B "built

5   a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is

    not anticompetitive conduct.

6   By contrast, in the same example, suppose that Firm C makes printers, but Firm C is the

7   world's only manufacturer of computers and that there are barriers to entry into the computer

8   market such that no other firm will be able to enter that market. Suppose also that Firm C altered

9   its computers in such a way that only Firm C's printers would work with its computers, and that

10  the alteration does not improve the design of Firm C's computers or provide any benefits to

    competition or consumers. The only effect of the alteration is to exclude competing printer makers

11  from the marketplace. It would be unlawful for Firm C to achieve monopoly power in the printer

12  market in this way.

13  As the example shows, the acts or practices that result in the acquisition or maintenance of

14  monopoly power must represent something more than the conduct of business that is part of the

15  normal competitive process or commercial success. They must represent conduct that has made it

16  very difficult or impossible for competitors to compete and that was taken for no legitimate

    business reason. You may not find that a company willfully acquired or maintained monopoly

17  power through anticompetitive means if it has acquired or maintained that power solely through

18  the exercise of superior foresight and skill; or because of natural advantages such as unique

19  geographic access to raw materials or markets; or because of economic or technological efficiency,

20  including efficiency resulting from scientific research; or by obtaining a lawful patent; or because

21  changes in cost or consumer preference have driven out all but one supplier.

22  If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully

23  acquired or maintained monopoly power in the EndoWrist aftermarket through anticompetitive

24  acts, then you must consider whether SIS has proved the remaining elements of this claim. If,

    however, you find that SIS did not prove this element by a preponderance of the evidence, then

25  you must find for Intuitive and against SIS on this claim.

26

27  **Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407-08 (2004);

28  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S 585, 105 S. Ct. 2847, 86 L. Ed. 2d

    467 (1985); *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed.

- 127 -

2d 854 (1978).*United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *In re IBM Peripheral EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 1005-08 (N.D. Cal. 1979) *aff'd sub nom. Transamerica Computer Co. v. IBM*, 698 F.2d 1377 (9th Cir. 1983).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-123, 2016 Edition.

**Disputed** Instruction No. 51 Re Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct Offered by **Intuitive**[59]

The next element SIS must prove is that Intuitive willfully acquired or maintained monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the alleged aftermarket for EndoWrist repair and replacement. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.  Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[60]  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

---

[59] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 9:  Willful Acquisition or Maintenance of Monopoly Power (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
[60] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 (quoting *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

1    In determining whether Intuitive's conduct was anticompetitive or whether it was

2    legitimate business conduct, you should determine whether the conduct is consistent with

3    competition on the merits, whether the conduct provides benefits to consumers, and whether the

4    conduct would make business sense apart from any effect it has on excluding competition or

5    harming competitors.

6    For example, suppose there are five firms that make printers for home computers and that

7    these printers comprised a relevant product market.  Suppose also that Firm A developed a more

8    efficient manufacturing process that allowed it to sell profitably at a lower price than its

9    competitors.  If Firm A grew its market share and achieved monopoly power by selling

10   profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in

11   this way.  Developing more efficient processes and developing the ability to sell profitably at

12   lower prices is competition on the merits and benefits consumers, and it therefore is not

13   anticompetitive conduct even if it has a negative effect on competitors.

14   Similarly, in the same example, suppose Firm B developed and patented a revolutionary

15   new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power.

16   It would not be unlawful for Firm B to achieve monopoly power in printers in this way. Firm B

17   "built a better mousetrap," which is competition on the merits and benefits consumers, and it

18   therefore is not anticompetitive conduct.

19   By contrast, in the same example, suppose that Firm C makes printers, but Firm C is the

20   world's only manufacturer of computers and that there are barriers to entry into the computer

21   market such that no other firm will be able to enter that market. Suppose also that Firm C altered

22   its computers in such a way that only Firm C's printers would work with its computers, and that

23   the alteration does not improve the design of Firm C's computers or provide any benefits to

24   competition or consumers.  The only effect of the alteration is to exclude competing printer

25   makers from the marketplace.  It would be unlawful for Firm C to achieve monopoly power in

26   the printer market in this way.

27   As the example shows, the acts or practices that result in the acquisition or maintenance

28   of monopoly power must represent something more than the conduct of business that is part of

- 130 -

(195 of 293), Page 195 of 293
Case 3:21-cv-03496-AMO   Document 266   Filed 10/28/24   Page 131 of 196
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 195 of 293

the normal competitive process or commercial success.  They must represent conduct that has
made it very difficult or impossible for competitors to compete and that was taken for no
legitimate business reason.  You may not find that a company willfully acquired or maintained
monopoly power through anticompetitive means if it has acquired or maintained that power
solely through the exercise of superior foresight and skill; or because of natural advantages such
as unique geographic access to raw materials or markets; or because of economic or
technological efficiency, including efficiency resulting from scientific research; or by obtaining a
lawful patent; or because changes in cost or consumer preference have driven out all but one
supplier.

     If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully
acquired or maintained monopoly power in the alleged aftermarket for EndoWrist repair and
replacement through anticompetitive acts, then you must consider whether SIS has proved the
remaining elements of this claim. If, however, you find that SIS did not prove this element by a
preponderance of the evidence, then you must find for Intuitive and against SIS on this claim.

**Disputed** Instruction No. 52 Re Design Changes Offered by **SIS**

Changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2. A design change that improves a product by providing a new benefit to consumers may violate Section 2 when accompanied by some associated anticompetitive conduct. A product redesign is anticompetitive, in violation of anti-monopolization provisions of Sherman Act, when it coerces consumers and impedes competition.

If the monopolist abuses or leverages its monopoly power in some other way when introducing the product, it may violate Section 2. A monopolist's discontinuation of its old technology may violate Section 2 if it effectively forces consumers to adopt its new technology. When a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act.

Insignificant design changes, combined with other coercive conduct, could establish antitrust liability under the rule of reason. A monopolist's product design decisions are not per se lawful.

Proof of unlawful actions associated with introduction of an "improved" product design constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market can establish a violation of Section 2 of the Sherman Act.

The claim that a product design change constitutes an unlawful means of maintaining a monopoly under Section 2 is bolstered when the defendant fails to provide a "procompetitive justification" for its conduct.

Additionally, evidence of the initial intent motivating the design change may be helpful to the extent that it shows that the product designer knew all along that the new design was no better than the old design, and thus introduced the design solely to eliminate competition.

SIS claims that Intuitive's abandonment of the S/Si wired design and subsequent adoption of a wireless design for the X/Xi the usage counter was not a design change that improved the EndoWrist usage counter, but constitutes and exclusionary restraint prohibited by the Sherman Act. SIS also claims that Intuitive fails to provide a procompetitive justification for its design change. SIS claims that the way the X/Xi usage counter was imposed on hospitals served no apparent competitive purpose. For example, SIS claims that Intuitive has taken steps to force

1   customers to switch from earlier generation S/Si systems, such as discontinuing sales of S/Si

2   EndoWrists and surgical robots, phasing out technical support for S/Si da Vinci systems, and

3   aggressively pricing to encourage the switch to Xi.

4        If you find that Intuitive's adoption of a wireless design for the X/Xi usage counter was

5   associated with Intuitive's abuse or leverage of its monopoly power in some other way when

6   introducing the X/Xi usage counter, then you must find that the design change constitutes an

7   exclusionary restraint prohibited by the Sherman Act and violates Section 2.

8

9   **Authorities:** *Alivecor, Inc. v. Apple, Inc.*, 2024 WL 591864, *12 (N.D. Cal. February 13, 2024);

10  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010); *Blue*

11  *Cross and Blue Shield of Vermont v. Teva...*, 2024 WL 323775. *25 (D. Vermont January 22, 2024);

12  *In re Suboxone (Buprenorphine Hydrochloride And Naloxone) Antitrust Litigation*, 622 F.Supp.3d

13  22 (E.D. Pa. 2022); *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* 383

14  F.Supp.3d 187 (S.D.N.Y. 2019); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2nd

15  Cir. 2015).

**Disputed** Instruction No. 52 Re Design Changes Offered by **Intuitive**

Intuitive had no duty to design or redesign its products in a way that made it easier for third parties to provide their services, and the antitrust laws allow Intuitive to introduce legitimate design changes in its products and phase out older models in favor of new models.[61] A design change that improves a product by providing a benefit to consumers does not violate the antitrust laws absent some other anticompetitive conduct.[62]  The antitrust laws necessarily tolerate product improvements, as such improvements serve the very purpose of the antitrust laws, which is to foster and ensure competition on the merits.[63]  An antitrust challenge to a product design change therefore must fail if the design change is an improvement, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product.[64]

SIS contends that Intuitive violated the antitrust laws by introducing new versions of its da Vinci systems, the X and Xi, that require use of X/Xi EndoWrists with wireless chip technology.  Intuitive contends that the switch from S/Si to X/Xi technology improved its

---

[61] *Cal. Comp. Prods., Inc.* v. *Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) ("IBM, assuming it was a monopolist, had the right to redesign its products to make them more attractive to buyers whether by reason of lower manufacturing cost and price or improved performance. It was under no duty to help CalComp or other peripheral equipment manufacturers survive or expand. IBM need not have provided its rivals with disk products to examine and copy, nor have constricted its product development so as to facilitate sales of rival products. The reasonableness of IBM's conduct in this regard did not present a jury issue.").

[62] *Allied Orthopedic Appliances, Inc.* v. *Tyco Health Care Grp. LP*, 592 F.3d 991, 998–1002 (9th Cir. 2010) ("If a monopolist's design change is an improvement, it is necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product.  To hold otherwise would be contrary to the very purpose of the antitrust laws, which is, after all, to foster and ensure competition on the merits." (citations omitted))

[63] *Allied Orthopedic*, 592 F.3d at 998–1002.

[64] *Allied Orthopedic*, 592 F.3d at 998–1002; *Foremost Pro Color, Inc.* v. *Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983) ("[P]roduct introduction must be alleged to involve some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market, rather than aggressive competition on the merits.").

1    products and provides numerous benefits to surgeons and patients.  If you find that Intuitive's

2    introduction of X and Xi systems was a product improvement, then you cannot consider that to

3    be unlawful or anticompetitive conduct.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1   **Disputed** Instruction No. 53 Re Monopolization - Interstate Commerce Offered by **SIS**

2          The Sherman Act applies only to conduct that affects interstate or foreign commerce.

3   You are instructed that Intuitive's agreements affected interstate commerce.

1    **<u>Disputed</u>** Instruction No. 53 Re Monopolization - Interstate Commerce Offered by **Intuitive**

2          [NA]

3

4    <u>Explanation for Intuitive's Position</u>: Intuitive objects to this Instruction.  Intuitive contends that

5    this instruction should not be given because Intuitive does not contest this element of SIS's

6    monopolization claim.  *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*,

7    No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element

     from list of elements for monopolization claim).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     SIS's Attempted Monopolization Claim**

**Disputed** Instruction No. 54 Attempt to Monopolize Offered by **SIS**

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the market for repaired and replacement EndoWrist instruments. To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1) Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2) Intuitive had a specific intent to achieve monopoly power in the market for replacement and repaired EndoWrists;

(3) there was a dangerous probability that Intuitive would sooner or later achieve its goal of monopoly power in the market for replacement and repaired EndoWrists;

(4) Intuitive's conduct occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property by Intuitive's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.

**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993); *Brooke Grp. v. Brown & Williamson Tobacco Co.*, 509 U.S. 209, 225 (1993); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181, 96 L. Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927); *Swift & Co. v. United States*, 196 U.S. 375, 25 S. Ct. 276, 49 L. Ed. 518 (1905); *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1004 (9th Cir. 1981); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 688 F.2d 1014, 1028 (9th Cir. 1981); *Blair Foods v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir. 1980).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-155, 2016 Edition.

<u>**Disputed**</u> Instruction No. 54 Re Attempted Monopolization – Elements Offered by **Intuitive**[65]

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the alleged aftermarket for EndoWrist repair and replacement. To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1) Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2) Intuitive had a specific intent to achieve monopoly power in the alleged aftermarket for EndoWrist repair and replacement;

(3) there was a dangerous probability that Intuitive would achieve its goal of monopoly power in the alleged aftermarket for EndoWrist repair and replacement; and

(4) SIS was injured in its business or property by Intuitive's anticompetitive conduct.
If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find that the evidence is sufficient to prove all four elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.

---

[65] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize, Instruction 1: Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The model instruction has been modified to remove the element that the alleged anticompetitive conduct "occurred in or affected interstate commerce," which is not contested. *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

**Disputed** Instruction No. 55 Re Attempted Monopolization - Anticompetitive Conduct Offered by **SIS**

It is not sufficient for SIS to prove that Intuitive intended to monopolize the market for replacement and repaired EndoWrists. SIS must also show that Intuitive engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Intuitive would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

I have already instructed you on the standards for determining whether Intuitive engaged in anticompetitive conduct in the context of the monopolization claims. You should apply those same instructions here in the context of determining whether Intuitive engaged in anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to monopolize the market for replacement and repaired EndoWrists.

**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th Cir. 1983); *Cal. Computer Prods. v. IBM*, 613 F.2d 727, 738 (9th Cir. 1979); *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, (3d Cir. 2010).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-158, 2016 Edition.

**Disputed** Instruction No. 55 Re Attempted Monopolization - Anticompetitive Conduct Offered by **Intuitive**[66]

It is not sufficient for SIS to prove that Intuitive intended to monopolize the alleged aftermarket for EndoWrist repair and replacement. SIS must also show that Intuitive engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Intuitive would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

I have already instructed you on the standards for determining whether Intuitive engaged in anticompetitive conduct in the context of SIS's monopolization claim. You should apply that same instruction here in the context of determining whether Intuitive engaged in anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to monopolize the alleged aftermarket for EndoWrist repair and replacement.

---

[66] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize, Instruction 2: Anticompetitive Conduct (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 56 Re Specific Intent to Achieve Monopoly Power Offered by **SIS**

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the market it is talking about—replacement and repaired EndoWrist instruments --is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market.

The court has already provided you with instructions on determining whether the replacement and repaired EndoWrist market is a relevant market.  If SIS proves that the replacement and repaired EndoWrist market is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the market for replacement and repaired EndoWrists.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize. There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the market for replacement and repaired EndoWrists. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. You must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did.  For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable consequence of Intuitive's conduct in the market for replacement and repaired EndoWrists was to give Intuitive control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer that Intuitive specifically intended to acquire monopoly power.

In this case, SIS argues that the conduct underlying the claim of attempt to monopolize also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on that SIS has proven Intuitive restrained trade in the EndoWrist repair and replacement market under the instructions you have received pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that Intuitive had the specific intent to achieve monopoly power.

If SIS proves both that the repaired and replacement EndoWrist aftermarket is a relevant

market and that Intuitive had a specific intent to monopolize that market, you must find that SIS has proven this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that SIS fails to prove either of these points, then you must find for Intuitive on SIS's attempted monopolization claim.

**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951); *William Ingliss & Sons Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981); *Vollrath v. Sammi Corp.*, 1989 WL 201632, at *7 (C.D. Cal. 1989) (*citing Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1192-93 (9th Cir. 1984), and cases cited therein).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-160, 2016 Edition.

**Disputed** Instruction No. 56 Re Specific Intent to Achieve Monopoly Power Offered by **Intuitive**[67]

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the aftermarket SIS is talking about—EndoWrist repair and replacement–is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market.

The court has already provided you with instructions on determining whether the alleged aftermarket for EndoWrist repair and replacement is a relevant market.  If SIS proves that the aftermarket for EndoWrist repair and replacement is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the aftermarket for EndoWrist repair and replacement.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize.  There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the aftermarket for EndoWrist repair and replacement. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. You must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did.  For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable consequence of Intuitive's conduct in the aftermarket for EndoWrist repair

---

[67] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize–Instruction 3:  Specific Intent (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  and replacement was to give Intuitive control over prices and to exclude or destroy competition,

2  and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer

3  that Intuitive specifically intended to acquire monopoly power.

4        In this case, SIS argues that the conduct underlying the claim of attempt to monopolize

5  also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you

6  find on that SIS has proven Intuitive restrained trade in the aftermarket for EndoWrist repair and

7  replacement under the instructions you have received pertaining to Section 1 of the Sherman Act,

8  then you may infer from such conduct that Intuitive had the specific intent to achieve monopoly

9  power.

Stipulated Instruction No. 57 Re Dangerous Probability of Success

If you find that Intuitive had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Intuitive would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already defined monopoly power for you in Instruction No. 48.  You should use that same instruction to evaluate this element of SIS's attempted monopolization claim.

In determining whether there was a dangerous probability that Intuitive would acquire the ability to control price in the market, you should consider such factors as:

- Intuitive's market share;
- the trend in Intuitive's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market;
- the likely effect of any anticompetitive conduct on Intuitive's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Intuitive would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Intuitive would ultimately acquire monopoly power.

**Source**:

*SIS Citation*: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-164, 2016 Edition

*Intuitive Citation*: MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 ¬ Section 2 of the Sherman Act—Attempt to Monopolize–Instruction 4:  Dangerous Probability of Success (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1

**Disputed** Instruction No. 58 Re Attempted Monopolization - Interstate Commerce Offered by SIS

2

3          The Sherman Act applies only to conduct that affects interstate or foreign commerce.

4     You are instructed that Intuitive's agreements affected interstate commerce.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 58 Re Attempted Monopolization - Interstate Commerce Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction. Intuitive contends that this instruction should not be given because Intuitive does not contest this element of SIS's attempted monopolization claim. *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

**Disputed** Instruction No. 59 Re Injury – Monopolization and Attempted Monopolization Offered by **SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions, form 485a-79-23 -Civil

Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

1  <u>**Disputed**</u> Instruction No. 59 Re Injury – Monopolization and Attempted Monopolization Offered

2  by **Intuitive**

3         [N/A]

4

5  <u>Explanation for Intuitive's Position</u>: Intuitive objects to this instruction.  This is the same

6  instruction SIS proposes giving following its Section 1 claims.  Intuitive suggests that all

7  instructions regarding injury and damages be given after the instructions on the other elements of

8  SIS's claims, rather than having the same injury claim be given multiple times.  *See* Disputed

   Instruction Nos. 59–71.

## IV.    ANTITRUST INJURY & DAMAGES

**Disputed** Instruction No. 60 Re Injury Offered by **Intuitive**[68]

If you find that SIS has met its burden on each of the other elements of any of its claims, as I have described them to you, then you must finally decide if SIS is entitled to recover damages from Intuitive.

SIS is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

(1) SIS was in fact injured as a result of Intuitive's alleged violation of the antitrust laws;

(2) Intuitive's alleged illegal conduct was a material cause of SIS's injury; and

(3) SIS's injury is an injury of the type that the antitrust laws were intended to prevent.

---

[68] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

**Disputed** Instruction No. 60 Re Injury Offered by **SIS**

SIS objects to presenting this instruction in the order proposed by Intuitive, and has provided its instructions on Injury at Disputed Instructions 42 and 59.

1  **Disputed** Instruction No. 61 Re Injury in Fact Offered by **Intuitive**[69]

2       The first element is sometimes referred to as "injury in fact" or "fact of damage."  For

3  SIS to establish that it is entitled to recover damages, it must prove that it was injured as a result

4  of Intuitive's alleged violation of the antitrust laws.  Proving the fact of damage does not require

5  SIS to prove the dollar value of its injury.  It requires only that SIS prove that it was in fact

6  injured by Intuitive's alleged antitrust violation.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

[69] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages

27  – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N
ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three

28  elements of injury and causation so that each receives its own instruction, rather than being
grouped together in one instruction.

1  **Disputed** Instruction No. 61 Re Injury in Fact Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4  argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5  submits that this instruction is largely repetitive and unnecessary in view of at least previously

6  proposed Instruction Nos. 3, 42, 59, 60, 67, 70, and 71 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 62 Re Causation Offered by **Intuitive**[70]

2         SIS must also offer evidence that establishes by a preponderance of the evidence that

3    Intuitive's alleged illegal conduct was a material cause of SIS's injury.  This means that SIS

4    must have proved that some damage occurred to it as a result of Intuitive's alleged antitrust

5    violation, and not some other cause.  SIS is not required to prove that Intuitive's alleged antitrust

6    violation was the sole cause of its injury; nor need SIS eliminate all other possible causes of

7    injury.  It is enough if SIS has proved that the alleged antitrust violation was a material cause of

8    its injury.  However, if you find that SIS's injuries were caused primarily by factors other than

9    the alleged antitrust violation, then the causation element is not satisfied.[71]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    _____

      [70] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages
26    – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N
      ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three
27    elements of injury and causation so that each receives its own instruction, rather than being
      grouped together in one instruction.
28    [71] The underlined text has been added to the model instruction.  *See Discover Fin. Servs.* v. *Visa
      U.S.A., Inc.*, 582 F. Supp. 2d 501, 504–05 (S.D.N.Y. 2008).

**Disputed** Instruction No. 62 Re Causation Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction No. 59 above presented by SIS.

**Disputed** Instruction No. 63 Re Antitrust Injury Offered by **Intuitive**[72]

Finally, SIS must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If SIS's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then SIS's injuries are antitrust injuries. On the other hand, if SIS's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then SIS's injuries are not antitrust injuries and SIS may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit SIS to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if SIS can establish that it was in fact injured by Intuitive's conduct, that Intuitive's conduct was a material cause of SIS's injury, and that Intuitive's injury was the type that the antitrust laws were intended to prevent, then SIS is entitled to recover damages for the injury to its business or property.

---

[72] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 4 Requirements, Instruction 1: Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016). The model instruction has been modified to split the three elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

1   **Disputed** Instruction No. 63 Re Antitrust Injury Offered by **SIS**

2

3          SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4   argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5   submits that this instruction is largely repetitive and unnecessary in view of at least previously

6   proposed Instruction No. 59 above presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulated Instruction No. 64 Re Antitrust Damages -- Introduction and Purpose

If you find that Intuitive violated the antitrust laws and that this violation caused injury to SIS, then you must determine the amount of damages, if any, SIS is entitled to recover.

The fact that I am giving you instructions concerning the issue of SIS's damages does not mean that I believe SIS should, or should not, prevail in this case. If you reach a verdict for Intuitive on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that SIS should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer-- what we sometimes refer to as punitive damages--or to deter particular conduct in the future. Furthermore, you are not permitted to award to SIS an amount for attorneys' fees or the costs of maintaining this lawsuit.

**Sources**:

*SIS* Citation: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases B-304, 2016 Edition.

*Intuitive Citation:* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 1:  Antitrust Damages – Introduction and Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1   **Disputed** Instruction No. 65 Re FDA Clearance Offered by **Intuitive**[73]

2        You have heard testimony in this case about FDA 510(k) clearance.  I will now instruct

3   you on the law that applies to this subject.  Medical devices are regulated under the Food, Drug,

4   and Cosmetic Act, which Congress enacted to protect consumers from harmful products.[74]  The

5   products at issue in this case are considered to be medical devices.[75]  The FDA has identified

6   these medical devices and the surgical instruments used with them as "computer-controlled

7   surgical instrument systems."[76]  All computer-controlled surgical instrument systems and the

8   instruments used with them, including those that are remanufactured, are required to be approved

9   or cleared by the FDA.[77]  The FDA considers a device to be remanufactured when it has been

10  subject to any act that results in a significant change to the device's performance, safety

11  specifications, or intended use, as compared to the device that was originally approved or cleared

12  by the FDA.[78]  If you conclude that the insertion of a memory chip into an EndoWrist to change

13  its usage limit is remanufacturing as defined by the FDA, you must find that SIS could not

14  lawfully perform that operation on an instrument to be used for human surgery unless it obtained

15  510(k) clearance from FDA to perform that action on that particular EndoWrist.

16

17

18  ───────────

[73] Intuitive proposes giving the same jury instruction that the Northern District of Florida court in

19  *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, indicated was the "essence of what [the court]
expected to instruct the jury on" had the case proceeded to trial.  *See* Pretrial Conf. Tr. at 93:22–

20  95:5, *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, No. 5:19-cv-00055 (N.D. Fla. Jan. 13,
2023), ECF No. 226. The *Restore Robotics* court indicated that although experts could not offer

21  opinions about whether 510(k) clearance is legally required, the jury would be asked to decide as
a factual matter whether Restore's activities constituted "remanufacturing."  *See id.*   Its decision

22  to give this instruction was entirely consistent with its summary judgment opinion, which this
Court approvingly cited in its own summary judgment opinion on this issue.  *See* Dkt. 204 at 12–

23  13 (citing *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, 2019 WL 8063988, at *2–3 (N.D.
Fla. Nov. 14, 2019)).  Intuitive respectfully submits that the jury should be similarly instructed

24  here.
[74] *Wyeth* v. *Levine*, 555 U.S. 555, 574 (2009); FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

25  [75] 21 C.F.R. § 876.1500 (product code NAY).
[76] 21 C.F.R. § 876.1500 (product code NAY).

26  [77] FDCA § 510(k), 21 U.S.C. § 360(k); FDCA § 301(p), 21 U.S.C. § 331(p); FDCA § 502(o), 21
U.S.C. § 352(o); 21 C.F.R. § 807.81.

27  [78] 21 C.F.R. § 820.3(w) ("Remanufacturer means any person who processes, conditions,

28  renovates, repackages, restores, or does any other act to a finished device that significantly
changes the finished device's performance or safety specifications, or intended use.").

**Disputed** Instruction No. 65 Re FDA Clearance Offered by **SIS**

SIS objects to this instruction as being completely contrary to the Court's ruling with respect to the FDA made in connection with the parties' summary judgment motions. The presentation of this instruction is indicative of Intuitive's apparent plan to present testimony, documentary evidence, and argument (1) related to the FDA's 510(k) regulatory framework and procedures for clearance of medical devices for commercial marketing, (2) the meaning, scope and application of the regulatory term "remanufacturing", (3) the contention that the FDA required usage limits for EndoWrists such that adherence to use limits are required to ensure patient safety, and (4) the meaning, scope, application and effect of Intuitive's statement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts. Doc. 243-1 pp. 1-2.[79]

All of such evidence is irrelevant under Fed. R. Evid. 401 in light of the narrowed counterclaims resulting from the Court's rulings on the parties' cross motions for summary judgment. Accordingly presenting this instruction to the jury would be misleading, confuse the issues and be a waste of trial time because it would amount to an end-run around the summary judgment rulings. Giving this instruction would effectively permit Intuitive to invite the jury to hold SIS liable for conduct which, under the Court's determinations regarding unresolved FDA issues, Intuitive has been foreclosed from challenging.

---

[79] The wording of Intuitive's March 2023 website statement is: "However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA." Dkt. 244-5 at ¶ 45, Dkt. 137-2 at ¶¶ 45-46.

1

<u>**Disputed**</u> Instruction No. 66 Re No Antitrust Injury for Illegal Business Offered by **Intuitive**[80]

2

3

The antitrust laws do not prevent injury stemming from the inability to sell illegal products.  Thus, in order to establish antitrust injury, SIS must prove by a preponderance of the evidence that its business was lawful.

4

5

6

If you conclude, under my prior instruction, that SIS has not proved it could lawfully insert a memory chip into an EndoWrist to change its usage limit without having obtained 510(k) clearance from the FDA to engage in remanufacturing, then you must find that SIS has not proved an antitrust injury, and accordingly must find for Intuitive on all of SIS's claims.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[80] Notwithstanding the Court's summary judgment rulings, *see* Dkt. 204 at 12–13, Intuitive respectfully submits that this instruction should be given consistent with prevailing law, and preserves all appellate rights with respect to it.  *See* 3A FED. JURY PRAC. & INSTR., Ch. 150: Introduction § 1.a (6th ed. 2012) ("A private antitrust plaintiff must show not only the violation of an antitrust statute and an injury, but that the injury was an antitrust injury, *i.e.* an 'injury of the type that antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" (quoting *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990))); *PharmacyChecker.com* v. *Nat'l Assoc. of Bds. of Pharmacy*, 2022 WL 347669, at *3 (S.D.N.Y. Feb. 4, 2022) ("Plaintiff bears the burden of proving that its business is legal."); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–65 (3d Cir. 2017) (Plaintiff "must point to evidence affirmatively showing" that it satisfied the legal requirements to engage in the business at issue); *In re Can. Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (antitrust claim dismissed where claimed injury was caused by FDA import restrictions and not defendants' conduct); *see also RSA Media* v. *AK Media Grp.*, 260 F.3d 10, 15 (1st Cir. 2001) (no antitrust injury where alleged injury stemmed from regulatory scheme that prevented plaintiff's construction of new billboards, rather than defendant's policy of tearing down billboards that were no longer being used).

<u>**Disputed**</u> Instruction No. 66 Re No Antitrust Injury for Illegal Business Offered by **SIS**

   SIS objects to this instruction as contrary to well-established law, for example, as detailed in the Court's summary judgment ruling (Dkt. 204).

(228 of 293), Page 228 of 293
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 228 of 293
Case 3:21-cv-03496-AMO   Document 266   Filed 10/28/24   Page 164 of 196

Stipulated Instruction No. 67 Re Damages for Competitors--Preparedness to Enter Business

SIS claims that it was harmed because Intuitive's alleged antitrust violation prevented it from entering a new line of business: repair of EndoWrist instruments. To recover damages, it is not necessary that SIS actually have entered into this new line of business if you find that Intuitive's alleged antitrust violation prevented SIS from entering into this new business line. SIS must prove, however, that it had an intention to enter into this new line of business and that it had taken concrete steps to prepare to do so.

In determining whether or not SIS has demonstrated the intention and preparedness to enter this new line of business, you may consider such elements as the following: the background and experience of the principals and employees of SIS; the ability of SIS to finance the new line of business and to purchase the necessary facilities and equipment; and concrete and discernible steps taken by SIS to enter into this new line of business. Ultimately, to award SIS damages related to its failure to enter this new business line, you must determine that had it not been for Intuitive's alleged antitrust violation, SIS would have entered that business of repairing EndoWrist instruments.

**Source**:

*SIS Citation:* AMERICAN BAR ASSOCIATION - Model Jury Instructions in Civil Antitrust Cases B-321, 2016 Edition.

*Intuitive Citation:* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 11: Damages for Competitors—Preparedness to Enter Business (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

**Disputed** Instruction No. 68 Re Basis for Calculating Damages Offered by **SIS**

It might be difficult for you to measure SIS's damages in this case. However, the fact that it might be difficult to determine the amount of SIS's damages should not affect SIS's recovery. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision.

This does not mean, however, that you may determine SIS's damages on the basis of mere speculation or guesswork. Rather you must look to the evidence presented to you and make a fair and reasonable estimate of SIS's damages based on that evidence.

The amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. SIS must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that SIS has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that SIS has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

**Authorities:** The Supreme Court has recognized that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); Accordingly, "a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983); *see, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (damages calculations "need not be exact" at the class certification stage, but must be consistent with plaintiff's theory of liability); Although there is a relaxed standard of proof as to the amount of damage, the Supreme Court has made clear that a damage award may not be based on "speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1350-51 (9th Cir. 1985) (no damages may be awarded where jury required to speculate).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases

B-3, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-26, Copyright 2023,

Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**Disputed** Instruction No. 68 Re Basis for Calculating Damages Offered by **Intuitive**[81]

You are permitted to make just and reasonable estimates in calculating SIS's damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. SIS must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that SIS has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that SIS has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages, or you may award nominal damages not to exceed one dollar.

---

[81] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 Causation and Damages Damages, Instruction 3: Basis for Calculating Damages (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1   **Disputed** Instruction No. 69 Re Causation and Disaggregation Offered by **Intuitive**[82]

2         If you find that Intuitive violated the antitrust laws and that SIS was injured by that

3   violation, SIS is entitled to recover for such injury that was the direct result or likely

4   consequence of the unlawful acts of Intuitive.  SIS bears the burden of showing that its injuries

5   were caused by Intuitive's antitrust violation, as opposed to any other factors.  If you find that

6   SIS's alleged injuries were caused in part by Intuitive's alleged antitrust violation and in part by

7   other factors, then you may award damages only for that portion of SIS's alleged injuries that

8   was caused by Intuitive's alleged antitrust violation.

9         SIS claims that it suffered injury because it lost sales and profits as a result of Intuitive's

10  alleged violations of the antitrust laws.  Intuitive claims that any profits or sales lost by SIS

11  occurred as a result of other factors that have nothing to do with the alleged antitrust violations.

12  These include <u>SIS's failure to seek and obtain clearance from the FDA or authorization from</u>

13  <u>Intuitive to sell modified EndoWrists; SIS's reliance on Rebotix to provide parts and services,</u>

14  <u>rather than developing its own processes; SIS's lack of preparedness to launch a business based</u>

15  <u>on "resetting" X/Xi EndoWrists, as opposed to S/Si EndoWrists; and preference by customers</u>

16  <u>for purchasing EndoWrists from the original manufacturer for patient safety, regulatory, and</u>

17  <u>liability concerns</u>.  SIS is not entitled to recover for lost profits that resulted solely from these or

18  other causes arising from the normal course of business activity.  The presence of these factors

19  does not mean SIS did not suffer antitrust injury, but SIS is not entitled to recovery for damages

20  caused by them.  SIS only may recover for damages caused by the alleged antitrust violations.

21        SIS bears the burden of proving damages by a preponderance of the evidence, including

22  apportioning damages between lawful and unlawful causes.  If you find that SIS has not

23  established a reasonable basis to apportion its alleged injuries between lawful and unlawful

24  causes, or that apportionment can only be accomplished through speculation or guesswork, then

25

26  _____

[82] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages
27  – Damages, Instruction 4:  Causation and Disaggregation (AM. BAR ASS'N ANTITRUST L.
    SECTION 2016).  The underlined text has been added, in accordance with model instruction's
28  directive to "list, as appropriate, defendant's examples of ways plaintiff could lose sales in the
    normal course of competitive business activity."

1   you may not award any damages at all.  If you find that the SIS was injured by Intuitive's alleged

2   antitrust violations, and there is a reasonable basis to apportion its alleged injuries between

3   lawful and unlawful causes, then you may award damages.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1   **Disputed** Instruction No. 69 Re Causation and Disaggregation Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4   argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5   submits that this instruction is a further attempt by Intuitive to inject into the case matters that are

6   not at issue, such as related to the FDA (see SIS's explanation above with respect to disputed

7   instruction 65 offered by Intuitive).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **<u>Disputed</u>** Instruction No. 70 Re Damages for Competitors -- Lost Profits Offered by **SIS**

2      SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged antitrust

3 violation. If you find that Intuitive committed an antitrust violation and that this violation caused

4 injury to SIS, you now must calculate the profits, if any, that SIS lost as a result of Intuitive's

5 antitrust violation.

6      Lost profits for which SIS can recover are the net profits SIS would have earned, both in

7 the past and in the future, had it not suffered injury as a result of the violation of the antitrust laws.

8 Thus your award of lost profits should be your reasonable estimate of the amounts SIS would have

9 earned in the past and in the future less the amount SIS actually earned and can be expected to

10 earn. I remind you that your award of damages must be fairly based on the evidence which has

11 been presented to you. You may not simply speculate as to the past or future profits SIS may have

12 lost.

13      The fact that SIS's business is new or not yet established does not prevent you from

14 determining its lost earnings. In making this determination, you may consider the risks of the

15 business world, the experience and performance of SIS's officers, the performance of SIS as it

16 conducted its business, the competition which SIS would have encountered in the area, and the

17 general market conditions of the area of business.

18 **Authorities:** *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 439 (5th Cir. 1985); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir. 1970); *Hobart Bros. Co. v. Malcolm T. Gilliand, Inc.*, 471 F.2d 894, 902-03 (5th Cir. 1973).

19 **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases B-8, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-27, Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

1    **Disputed** Instruction No. 70 Re Damages for Competitors -- Lost Profits Offered by **Intuitive**[83]

2            SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged

3    antitrust violation. If you find that Intuitive committed an antitrust violation and that this

4    violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result

5    of Intuitive's antitrust violation.  To calculate lost profits, you must calculate net profit: the

6    amount by which plaintiff's gross revenues would have exceeded all of the costs and expenses

7    that would have been necessary to produce those revenues.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[83] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Damages, Instruction 8:  Damages for Competitors – Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 71 Re Damages for Competitors -- Future Lost Profits Offered by **SIS**

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits for 2 years into the future. If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits. In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation. In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative. If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit. In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today--this is known as the time value of money. For example, if you had a choice to receive $ 1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year--you would then have something more than $ 1,000 in a year from now. Similarly, if you had a right to $ 1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year. This lower amount is known as an amount discounted to present value.

**Authorities:** *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 412 (1985); *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338-40 (1971); *Los Angeles Mem'l Coliseum Comm'n*

1 *v. NFL*, 791 F.2d 1356 (9th Cir. 1986).

2

3 **Source**: AMERICAN BAR ASSOCIATION

4 Model Jury Instructions in Civil Antitrust Cases B-9, 2016 Edition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 71 Re Damages for Competitors -- Future Lost Profits Offered by **Intuitive**[84]

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits into the future, through 2025.  If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits.  In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation.  In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative.  If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit.  In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to

---

[84] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 9:  Damages for Competitors – Future Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  receive $1,000 today or a year from now, you would be better off receiving the money today and

2  earning interest on it for a year—you would then have something more than $1,000 in a year

3  from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money

4  today, the person owing you the money a year from now could properly give you a lower

5  amount, reflecting the value that could be earned on that money over the next year.  This lower

6  amount is known as an amount discounted to present value.  <u>The rate of return to be applied in</u>

7  <u>determining present value should be the interest that can reasonably be expected from safe</u>

8  <u>investments that can be made by a person of ordinary prudence, who has ordinary financial</u>

9  <u>experience and skill.</u>[85]

---

[85] The underlined text, which comes from the Ninth Circuit model jury instructions, has been added to the model instruction, to explain what rate of return the jury should apply when discounting future lost profits to present value.  *See* MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 5.4 (9th Cir. Jury Instructions Comm. 2017 ed.).

1    **Disputed** Instruction No. 72 Re Mitigation of Damages Offered by **Intuitive**[86]

2        SIS may not recover damages for any portion of its injuries that it could have avoided

3    through the exercise of reasonable care and prudence.  SIS is not entitled to increase any

4    damages through inaction.  The law requires an injured party to take all reasonable steps it can to

5    avoid further injury and thereby reduce its loss.  If SIS failed to take reasonable steps available to

6    it, and the failure to take those steps resulted in greater harm to SIS than it would have suffered

7    had it taken those steps, then SIS may not recover any damages for that part of the injury it could

8    have avoided.

9        Intuitive has the burden of proof on this issue.  Intuitive must prove by a preponderance

10   of the evidence that SIS:

11           (1)   acted unreasonably in failing to take specific steps to minimize or limit its

12                 losses;

13           (2)   that the failure to take those specific steps resulted in its losses being

14                 greater than they would have been had it taken such steps; and

15           (3)   the amount by which SIS's loss would have been reduced had SIS taken

16                 those steps.

17       In determining whether SIS failed to take reasonable measures to limit its damages, you

18   must remember that the law does not require SIS to take every conceivable step that might

19   reduce its damages.  The evidence must show that SIS failed to take commercially reasonable

20   measures that were open to it.  Commercially reasonable measures mean those measures that a

21   prudent businessperson in SIS's position would likely have adopted, given the circumstances as

22   they appeared at that time.  SIS should be given wide latitude in deciding how to handle the

23   situation, so long as what SIS did was not unreasonable in light of the existing circumstances.

24

25

26

27

---

28   [86] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages
     – Damages, Instruction 14:  Mitigation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

(242 of 293), Page 242 of 293
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 242 of 293
Case 3:21-cv-03496-AMO   Document 266   Filed 10/28/24   Page 178 of 196

**Disputed** Instruction No. 72 Re Mitigation of Damages Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is unnecessary in view of the fact that mitigation is not at issue because Intuitive has not asserted SIS failed to mitigate its damages.

1

**INTUITIVE'S COUNTERCLAIMS**

2

<u>Stipulated Instruction No. 73 Re Intuitive's Counterclaims</u>

3

Now, I will instruct you on the law regarding Intuitive's counterclaims against SIS.

4

Intuitive brings a claim against SIS under the federal Lanham Act, 15 U.S.C. § 1125,

5

based on false advertising and unfair competition.[87]

6

Intuitive also brings two claims against SIS under California law: one for unfair

7

competition under California's common law, and one for intentional interference with

8

contractual relations under California's common law.[88]

9

I will discuss each of these claims in turn.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[87] Answer (Dkt. 75) p. 39, Counterclaims ¶ 85.
[88] Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 102, 106.

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

## A.    Intuitive's Lanham Act Claim

**Disputed** Instruction No. 74 Re Lanham Act – Elements of False Statement Claim Offered by **Intuitive**

Intuitive claims that SIS is liable for unfair competition and false advertising under the Lanham Act, 15 U.S.C. § 1125.   Specifically, Intuitive alleges that in its marketing materials and communications disseminated to potential and actual customers, SIS has made numerous false and misleading statements,  including but not limited to statements that misrepresent:  (i) the nature, efficacy, and/or safety of the service SIS coordinates; (ii) that "repaired" EndoWrists meet applicable quality and functional requirements; (iii) that devices "serviced" through SIS had been repaired to meet "original specifications" of EndoWrists and are safe to use; (iv) that SIS itself developed, has tested and conducts the "repairs;" (v) that use of the service will result in substantial cost savings; (vi) that use of the service does not carry any adverse financial, legal or other consequences (*e.g.*, voiding Intuitive customers' warranties); (vii) that use limits built into EndoWrists are "arbitrary" or Intuitive otherwise is not trustworthy; and (viii) that SIS and/or the "repair" service is authorized, approved, or endorsed by Intuitive.[89]  Intuitive further alleges that customer confusion as to the source or affiliation of the "repaired" instruments is exacerbated by SIS's communications that misinform customers that "a repaired EndoWrist® is not an alternative or replacement device," but rather "an original da Vinci® manufactured device that has been repaired to original specifications."[90]

To prevail on its claim for unfair competition and false advertising under the Lanham Act, Intuitive must prove by a preponderance of the evidence:

        1.      SIS's advertisements were false or misleading;

        2.      SIS's advertisements deceived, or had the capacity to deceive, customers;

        3.      The deception had a material effect on purchasing decisions, meaning that it was likely to influence customers' purchasing decisions;

        4.      The misrepresentation affected interstate commerce; and

---

[89] Answer (Dkt. 75) Counterclaims ¶ 85.
[90] Answer (Dkt. 75) Counterclaims ¶ 86.

5.      Intuitive has been injured as a result of the false advertising.[91]

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for SIS and against Intuitive on Intuitive's unfair competition and false advertising claim.  If you find that the evidence is sufficient to prove all of the elements, then you must find for Intuitive and against SIS on Intuitive's unfair competition and false advertising claim.

---

[91] *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.);  MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).

**Disputed** Instruction No. 74 Re Lanham Act – Elements of False Statement Claim Offered by **SIS**

Intuitive has claimed that SIS has engaged in unfair competition and false advertising in violation of federal law. To establish this claim, Intuitive has the burden of proving each of the following by a preponderance of the evidence:

1.  SIS used in commerce a false designation of origin, false description of fact, misleading description of fact, false representation of fact, or misleading representation of fact on or in connection with any services;

2.  The use of the false designation of origin or misleading description of fact is likely to cause confusion as to the origin of SIS's goods; the affiliation or association of SIS with Intuitive; or the approval by Intuitive of SIS's sale of services in markets that were not in fact authorized by Intuitive; and

3.  INTUITIVE was and is likely to be damaged by SIS's actions.

**Source/Authority**: 15 U.S.C. 1125(a)(1); 90 Am. Jur. Proof of Facts 3d 95 (Originally published in 2006); BIOTAB NUTRACEUTICALS, INC., v. BEAMONSTAR, LLC,  2011 WL 13006813 (C.D.Cal.)

5-ER-1146

1  Stipulated Instruction No. 75 Re False or Misleading

2          There are two ways in which SIS's advertisements may be false or misleading:  they may

3  be literally false, or they may be literally true but misleading.  If an advertisement is literally

4  false, then it is presumed to deceive, or to have the capacity to deceive, customers, and Intuitive

5  need not prove that deception.[92]  When evaluating whether an advertising statement is literally

6  false, the statement must be analyzed in its full context.[93]

7          If you find that Intuitive has proved that SIS made false or misleading statements, then

8  you must assess the other elements of Intuitive's false advertising claim.  If you find that

9  Intuitive has not proved that SIS made false or misleading statements, then you must find for SIS

10  on Intuitive's false advertising claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

[92] *Appliance Recycling Ctrs. of Am., Inc.* v. *JACO Environmental, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) (citing *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997)) (endorsing presumption of deception for literally false statements); *AECOM Energy & Constr., Inc.* v. *Morrison Knudsen Corp.*, 748 F. App'x 115, 119 (9th Cir. 2018) ("Because [the statements] are literally false, we need not consider the impact on the buying public.").
[93] *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

- 183 -

**Disputed** Instruction No. 76 Re Commercial Advertisement or Promotion Offered by **Intuitive**[94]

To constitute commercial advertising or promotion, a statement of fact must have been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or services.  While the statement need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the statement must have been disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry.

If you find that Intuitive has proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must assess the other elements of Intuitive's unfair competition and false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must find for SIS on Intuitive's unfair competition and false advertising claim.

---

[94] *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citing *Coastal Abstract Service, Inc.* v. *First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

**Disputed** Instruction No. 76 Re Commercial Advertisement or Promotion Offered by **SIS**

To constitute commercial advertising or promotion, a statement of fact must have been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or services. While the statement need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the statement must have been disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry. However, a handful of statements to customers does not trigger protection from the Lanham Act unless the potential purchasers in the market are relatively limited in number.

If you find that Intuitive has proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must assess the other elements of Intuitive's false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must find for SIS on Intuitive's false advertising claim.

*Walker & Zanger, Inc. v. Paragon Indus*., 465 F. Supp. 2d 956, 969 (N.D. Cal. 2006) --- A handful of statements to customers does not trigger protection from the Lanham Act unless "the potential purchasers in the market are relatively limited in number," *Coastal Abstract Serv, Inc v First Am Title Ins Co*, 173 F3d 725 (9th Cir 1999).

**Disputed** Instruction No. 77 Re Lanham Act Injury Offered by **Intuitive**

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's statement, either by a direct loss of sales or a lessening of the goodwill associated with its products.[95] This can be proved in a number of ways. For example, injury can be proved by showing that SIS having made false statements induced customers to switch their purchasing decisions, and purchase replacement or repaired EndoWrists from SIS instead of from Intuitive.[96] Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation.[97] Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.[98]

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's unfair competition and false advertising claim. If you find that Intuitive has not proved that SIS's false or misleading statements caused injury to Intuitive, then you must find for SIS on Intuitive's unfair competition and false advertising claim.

---

[95] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1136 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.); MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).

[96] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

[97] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

[98] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

**Disputed** Instruction No. 77 Re Lanham Act Injury Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction No. 72 above presented by SIS. Subject to the foregoing, SIS offers the following alternative instruction.

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's false or misleading statement, either by a direct loss of sales or a lessening of the goodwill associated with its products. A statement is misleading if it conveys a false impression and actually deceives consumers. This can be proved in a number of ways.  For example, injury can be proved by showing that SIS having made false statements that actually deceived or had the tendency to deceive a substantial segment of SIS's audience, induced customers to switch their purchasing decisions, and purchase replacement or repaired EndoWrists from SIS instead of from Intuitive. Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation.  Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements of fact about its repair service or about Intuitive's products caused injury to Intuitive, then you must find for SIS on Intuitive's false advertising claim.

**B.     Intuitive's Common Law Unfair Competition Claim**

**Disputed** Instruction No. 78 Re Common Law Unfair Competition Offered by **Intuitive**

Intuitive claims that SIS's conduct constitutes unfair competition under California's common law.  The essence of the tort of unfair competition is the inequitable pirating of the fruits of another's labor and then either "palming off" those fruits as one's own through deception, or simply gaming from them an unearned commercial benefit.[99]

To prevail on this claim, Intuitive must prove that:

1.    SIS subjectively and knowingly intended to confuse buyers of EndoWrists by passing off its products in such manner as to induce those customers to believe that SIS's repaired EndoWrists were identical to original EndoWrists sold by Intuitive;

2.    Customers for EndoWrists were likely to be confused, meaning they were misled into thinking that SIS's repaired EndoWrists were actually identical to original EndoWrists sold by Intuitive; and

3.    SIS thereby caused Intuitive a competitive injury, meaning that Intuitive must have suffered some actual economic harm to its business that was caused by SIS's deception of Intuitive's actual and potential customers.[100]

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's common law unfair competition claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's common law unfair competition claim.

---

[99] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2019 WL 8163813, at *5 (C.D. Cal. Nov. 26, 2019).
[100] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2020 WL 4578700, at *3 (C.D. Cal. Aug. 7, 2020); *Fisher* v. *Dees*, 794 F.2d 432, 440 (9th Cir. 1986); *TMC Aerospace, Inc.* v. *Elbit Sys. of Am. LLC*, 2016 WL 3475322, at *8 (C.D. Cal. Jan. 29, 2016).

**Disputed** Instruction No. 78 Re Common Law Unfair Competition Offered by **SIS**

Intuitive contends that SIS has engaged in unfair competition in violation of common law. If you find that SIS has engaged in federal unfair competition, you should also find that they have engaged in California statutory and common law unfair competition. If you find that SIS has not engaged in federal unfair competition, then you should find that they have not engaged in California statutory and common law unfair competition.

**Source/Authority**: Enesco Corp. v. Price/Costco, Inc., 146 F.3d 1083, 1084 n.1 (9th Cir. 1998); Cal. Bus. & Prof. Code § 17200; Ninth Circuit Manual of Model Jury Instructions: Civil § 15.5 (2024); Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994).

**C.  Intuitive's Tortious Interference with Contract Claim**

**Disputed** Instruction No. 79 Re Tortious Interference with Contract Offered by **Intuitive**[101]

Intuitive claims that SIS intentionally interfered with the  contracts between it and certain customers.  To establish this claim, Intuitive must prove all of the following:

(1)  That there was a contract between Intuitive and each of its customers at issue;

(2)  That SIS knew of such contracts;

(3)  That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

(4)  That SIS intended to disrupt the performance of the contracts between Intuitive and its customers, or knew that disruption of performance was certain or substantially certain to occur;

(5)  That Intuitive was harmed; and

(6)  That SIS's conduct was a substantial factor in causing Intuitive's harm.

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's tortious interference with contract claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's tortious interference with contract claim.

---

[101] Judicial Council of California Civil Jury Instructions 2201 – Intentional Interference with Contractual Relations – Essential Factual Elements (2024 ed.); *Pacific Gas & Electric Co. v. BearStearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

**Disputed** Instruction No. 79 Re Tortious Interference with Contract Offered by **SIS**

Intuitive claims that SIS intentionally interfered with the "Sales, License and Service Agreement" contracts between it and certain customers. To establish this claim, INTUITIVE must prove all of the following:

(1) That there was a contract between Intutiive and each of the specifically identified customers;

(2) That SIS knew of the contract between Intuitive and each of the specifically identified customers;

(3) That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

(4) That SIS intended to disrupt the performance of the contract between Intuitive and each of the specifically identified customers;

(5) That Intuitive was harmed; and

(6) That SIS's conduct was a substantial factor in causing Intuitive's harm.

**Source**: CACI 2202 (2024).

**D.    Intuitive's Damages**

**Disputed** Instruction No. 80 Re Lost Profit Damages on Intuitive Counterclaims Offered by **Intuitive**

If you decide for Intuitive on the question of liability on its counterclaims, then you should consider the amount of money to award to Intuitive as damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

Damages consist of the amount of money required to compensate Intuitive for the injury caused by SIS's conduct.[102]  Plaintiff must prove its damages by a preponderance of the evidence.[103]

For the claims of unfair competition, false advertising, or tortious interference with contracts, Intuitive asks to be awarded lost profit damages.  That is, Intuitive asks to be awarded the lost profits that it would have earned but for SIS's unfair competition, false advertising, or tortious interference with contracts.

To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses Intuitive would have had if SIS's conduct had not occurred.[104]  The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.[105]

---

[102] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).

[103] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).

[104] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.); *see also* FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.) ("You may consider the following types of damages: Plaintiff's lost profits on lost sales, which consists of the revenue Plaintiff would have earned but for Defendant's infringement, less the expenses Plaintiff would have sustained in earning those revenues.").

[105] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.).

**Disputed** Instruction No. 80 Re Lost Profit Damages on Intuitive Counterclaims Offered by **SIS**

To recover damages for lost profits, Intuitive must prove it is reasonably certain it would have earned profits but for SIS' conduct. To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses Intuitive would have had if SIS's conduct had not occurred. The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

CACI 3903N

| | |
|---|---|
| 1 | Dated: October 28, 2024 |
| 2 | |

Dated: October 28, 2024

By: */s/ Richard T. McCaulley*
    Richard T. McCaulley (*pro hac vice*)
**MCCAULLEY LAW GROUP LLC**
E-Mail: 180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: (312) 330-8105
richard@mccaulleylawgroup.com

JOSHUA V. VAN HOVEN (CSB No. 262815)
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: (925) 302-5941
E-Mail: josh@mccaulleylawgroup.com

*Attorneys for Plaintiff Surgical Instrument
Service Company, Inc.*

Dated: October 28, 2024

By: */s/ Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

- 194 -

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLING LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLING LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (pro hac vice)
**COVINGTON & BURLING LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
allen@allenruby.com
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690

*Attorneys for Defendant*
*Intuitive Surgical, Inc.*

- 195 -

1

**E-Filing Attestation**

2    I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this

3 document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

4 signatories identified above have concurred in this filing.

5

6    */s/ Kenneth A. Gallo____*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HALEY GUILIANO LLP**
JOSHUA V. VAN HOVEN (CSB No. 262815)
    E-Mail: joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL (CSB No. 234941)
    E-Mail: greg.lundell@hglaw.com
111 N Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY  (applying *pro hac vice*)
    E-Mail: richard.mccaulley@hglaw.com
116 W. Hubbard, Unit 20
Chicago, Illinois 60654
Telephone: 312.330.8105

Attorneys for Plaintiff
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br><br>                     Plaintiff,<br><br>        vs.<br><br>INTUITIVE SURGICAL, INC.,<br><br>                     Defendant. | Case No. _____<br><br>**1. SHERMAN ACT § 1 - TYING**<br><br>**2. SHERMAN ACT § 1 – EXCLUSIVE DEALING**<br><br>**3. SHERMAN ACT § 2 - MONOPOLY**<br><br>**4. SHERMAN ACT § 2 – ATTEMPTED MONOPOLY**<br><br>**5. VIOLATION OF LANHAM ACT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Surgical Instrument Service Company, Inc ("SIS") brings this Complaint against Defendant Intuitive Surgical, Inc. ("Intuitive") for antitrust violations of tying, exclusive dealing, monopolization, and attempted monopolization under the Sherman Act, and unfair competition under the Lanham Act.


Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

**INTRODUCTION**

1.      SIS has 50 years of experience servicing surgical instruments and equipment ranging from simple devices such as forceps and scalpels to complex electromechanical devices such as flexible video endoscopes, powered orthopedic devices, and surgical video systems.  SIS employs exhaustive inspection and repair procedures to ensure that previously used surgical instruments are only returned to the operating room in accordance with specifications.  SIS's services save health care providers and patients millions of dollars a year, reducing the per-surgery cost of procedures without compromising instrument operation or patient safety.  SIS is a trusted nationwide partner for hospitals, health care systems, and group purchasing organizations ("GPOs"), including in this District.

2.      Since the late 1990's, defendant Intuitive has been the leading provider of robotic surgery systems for minimally invasive soft tissue surgeries.  In contrast to operating directly on a patient, the surgeon using Intuitive's system remotely operates a multi-arm "da Vinci" surgical robot from a console that receives video of the surgical site and includes means for precisely controlling the movement and operation of surgical tools known as EndoWrists.  EndoWrists include traditional surgical tools such as forceps and scalpels and are attached to the robotic arms based on the type of surgery to be performed.  The robotic arms include motors that control cables within the EndoWrist in response to the surgeon's inputs, allowing precise multi-axis movement of the "wrist" of the surgical tool that is not possible in traditional surgeries.

3.      Intuitive has monopoly power in the relevant markets of surgical robots for minimally invasive surgeries, the instruments used in such surgeries, and the servicing of those surgical robots, with a 99%+ market share.  In the early 2000's, Intuitive's Form 10-K filings noted a use counter to limit the number of operations performed with EndoWrist instruments, and acknowledged its strategy to "sell the instrument for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure or per-hour basis."  As Intuitive has since gained and exercised monopoly power in the relevant markets, this strategy has become extremely profitable.  Although revenue from the da Vinci robots initially exceeded revenue from

H|G Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

instrument and accessory sales, by fiscal year 2013 Intuitive's revenues from instruments and accessories surpassed da Vinci robot revenue.  By fiscal year 2019 instrument and accessories revenue exceeded $2.4 billion, or more than a $1 billion more than sales of da Vinci systems.  Although Intuitive does not break out its gross profit for instruments alone, its gross profit on instruments and da Vinci systems is over 70%.

4.      In connection with the purchase or lease of da Vinci Surgical products, Intuitive requires customers to enter into a Terms and Conditions Agreement ("Sales Agreement") and a Use, License and Service Agreement ("ULSA").  In connection with the agreements required to purchase or lease an Intuitive robotic surgical system, Intuitive demands that customers further agree to a limited license for the use of EndoWrist instruments.  The limited license expires once an EndoWrist instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument.  Intuitive's ULSA prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrist instruments, whether before or after the limited use license has expired.  Further, if a customer has or attempts to have an EndoWrist instrument repaired, refurbished or reconditioned, Intuitive has threatened to terminate the entire Use, License and Service Agreement with the customer immediately upon written notice, and any warranties applicable to the da Vinci robotic surgical system will become void.  Intuitive has advised its customers that should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at a customer's site for a service call, that the da Vinci robotic surgical system has been used with EndoWrist instruments refurbished or modified by any unauthorized third party, Intuitive will no longer provide any service for the customer's entire robotic system.

5.      Plaintiff SIS has detailed procedures for servicing used EndoWrists to original specifications and returning them to service.  These procedures include disassembly of the EndoWrist, inspection of all components, adjustment of components as necessary, confirming all movements, and setting a counter to Intuitive's original counter value.  While these procedures are

HG Haley • Giuliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

1   extensive and return the EndoWrist to original performance specifications, the cost to the hospital

2   is a fraction of what Intuitive charges to buy a new EndoWrist.  In 2019 and 2020, SIS entered

3   into contracts and was in discussion for other contracts to provide EndoWrist repair services to

4   numerous hospitals, health care systems, and GPOs.  The cost savings were so substantial that one

5   of the nation's largest health care systems awarded SIS's EndoWrist repair program a prestigious

6   annual award for cost savings.  Revenues for SIS, and savings to hospitals and patients, were

7   anticipated to be in the tens if not hundreds of millions of dollars.

8        6.    When Intuitive discovered that its customers were using SIS's services, it

9   immediately leveraged its anti-competitive agreements and monopoly power to crush this threat

10  to its supra-competitive EndoWrist profitability.  Intuitive's agreements with hospitals include

11  numerous restrictive terms that allow Intuitive to render the da Vinci robots effectively inoperable,

12  and it threatened to exercise those terms against hospitals that used SIS's services.  Intuitive also

13  made misleading statements that use of refurbished EndoWrists would violate FDA requirements

14  and intellectual property rights.

15       7.    Despite the massive savings to hospitals and patients from SIS's EndoWrist

16  program, SIS's customers and potential customers had no choice but to capitulate to Intuitive's

17  threats.  Because of Intuitive's monopoly power in minimally invasive surgical robots, the

18  instruments for those robots, and the servicing of those robots, there are no realistic alternative

19  suppliers in those relevant markets.  Health care providers have made massive capital investments

20  in da Vinci robots, surgeons are specifically trained to perform surgery with those robots, and a

21  large number of patients choose da Vinci robotic surgeries despite a significantly higher out-of-

22  pocket cost.  To lose access to existing da Vinci robots would not only waste an expensive capital

23  investment, but would effectively foreclose hospitals and surgeons from performing certain types

24  of surgeries.

25       8.    Intuitive's anti-competitive conduct cannot be justified by any purported safety or

26  regulatory requirements.  All components of the EndoWrists are medical-grade materials that are

27  capable of many times more uses than permitted by Intuitive's unilaterally programmed counter.

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

- 4 -

COMPLAINT

5-ER-1164

1  SIS's services ensure that the inspected or repaired EndoWrists meet all original specifications,

2  and SIS sets the instrument counter to the original value provided by Intuitive.  In sum, the only

3  purpose of Intuitive's anti-competitive conduct is to maintain supra-competitive "per-procedure"

4  EndoWrist pricing.  By leveraging its monopoly power and anti-competitive agreements in this

5  manner, Intuitive has violated the Sherman Act's prohibitions on monopoly, attempted monopoly,

6  exclusive dealing and tying, and the Lanham Act's prohibition on unfair competition.

7       9.    Intuitive is the dominant supplier of robotic surgical systems for minimally invasive

8  soft tissue surgeries.  Intuitive essentially has no competition in this market.  Additionally, Intuitive

9  is the dominant supplier of instruments used with minimally invasive soft tissue robots and the

10  dominant supplier of servicing for the robots -- essentially having no competition in either of these

11  markets as well.

12       10.    Intuitive has used its monopoly power in the EndoWrist instrument replacement

13  aftermarket, as well as in the servicing of surgical robots, to engage in a variety of anticompetitive

14  practices.  These exclusionary practices essentially prevent hospitals, health care systems, and

15  GPO's from having access to competitors that offer to repair and refurbish EndoWrist instruments

16  which have been previously used.

17       11.    Intuitive wields its monopoly power in the market for robotic soft tissue surgery

18  systems to coerce hospitals, health care systems, and GPO's to act in ways that have

19  anticompetitive effects thus harming competition.  Such coercion is backed up by Intuitive's

20  threats to withhold technical support and servicing for the robotic surgery systems purchased by

21  hospitals, health care systems, and GPO's and to deny those customers access to additional and/or

22  replacement EndoWrist instruments.

23                        **PARTIES**

24       12.    Plaintiff Surgical Instrument Service Company, Inc. is an Illinois corporation with

25  a principal place of business at 151 N. Brandon Drive, Glendale Heights, Illinois.

26       13.    Defendant Intuitive Surgical, Inc. is a Delaware corporation with a principal place

27  of business at 1020 Kifer Road, Sunnyvale, California.

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1165

**JURISDICTION AND VENUE**

14.     Jurisdiction - This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15, 22, and 1121.  Defendant has been engaged in interstate commerce during all relevant times of the Complaint.

15.     Jurisdiction - This Court has personal jurisdiction over Defendant due to its business activities in this District, including Defendant being headquartered in this District.

16.     Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).  Intuitive is headquartered in this District and a substantial part of the events giving rise to all claims occurred in this District.

17.     Intradistrict Assignment – Pursuant to Civil L.R. 3-2(c), the present action is an antitrust action that is assigned on a district-wide basis.

**GENERAL ALLEGATIONS**

**I.      SIS'S SURGICAL INSTRUMENT REPAIR BUSINESS**

18.     Founded in 1971, SIS has been a leader in surgical instrument and equipment service and repair for 50 years.  During this time, SIS has safely and effectively serviced millions of surgical instruments for health care providers.  SIS's best-in-class team, equipment, and processes are trusted by hundreds of hospitals throughout the country, including hospitals in this District.  SIS does not merely inspect and repair surgical instruments, but also functions as an operational partner for its client hospitals, improving their operations and processes.

19.     SIS services a wide variety of instruments, ranging from relatively simple mechanical devices such as traditional standard and laparoscopic instruments to complex instruments such as electrical and pneumatic saws and drills, a wide range of optical and video endoscopes, and surgical video equipment.  Based on the FDA's Quality Systems Regulation (QSR) and current Good Manufacturing Practices (cGMP), SIS develops inspection and repair processes that ensure that any equipment returned to the hospital or surgical field will function properly.

HG Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

20.     Based on this extensive experience with a wide range of surgical instruments, SIS is intimately familiar with the capabilities and lifespan of medical grade materials and components such as stainless steel, composites, and tungsten used in such devices.  SIS technicians employ industry-leading procedures for inspection, alignment, sharpening, electrical insulation test, and additional necessary steps to return instruments to the field with confidence.  Instruments that are regularly serviced by SIS are capable of dozens, hundreds, or thousands of uses over their lifetime, depending on the type of equipment and materials.

21.     SIS's services, and those like it, are essential to the safe and cost-effective operation of hospitals throughout the country.  SIS's preventative maintenance and inspection services ensure that instruments used in medical procedures and surgeries are safe.  Its repair services substantially extend the life of surgical instruments, resulting in substantial savings for health care providers and patients.

## II.     INTUITIVE'S DA VINCI SURGICAL ROBOTS AND ENDOWRISTS

22.     For over 20 years, Intuitive has developed and sold the "da Vinci" line of minimally invasive surgical robot systems.  A previous generation of da Vinci surgical robots that is currently being phased out is called the "Si," while the most recent "Xi" version was launched in 2014.  Additional versions of these systems also exist under the X and SP monikers.  Collectively, there are over 3,500 da Vinci robotic surgery systems employed by United States hospitals and surgery centers, and over 5,500 worldwide.

23.     The da Vinci system generally includes a multi-arm surgical robot (left), surgeon's console (center), and a vision cart (right):

Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT




24.    A new da Vinci system, including the surgical robot vision cart, typically costs more than $2.0 million.  Although Intuitive has begun leasing the da Vinci system to some customers, the vast majority (> 85%) of active da Vinci systems are purchased by hospitals as capital equipment.

25.    The instruments used in the surgical procedure are attached to the arms of the surgical robot, and the surgical robot is positioned relative to the target surgical region of the patient.  All of the 80+ instruments used with da Vinci robots are supplied by Intuitive under its EndoWrist brand.  EndoWrist instruments are the only FDA-approved instruments for use with the da Vinci systems.

26.    In a typical procedure, a number of small incisions are made to provide the EndoWrist surgical instruments access to the target surgical region.  A camera provides high-definition 3D images to the surgeon at the surgeon's console and to other operating room personnel via a large screen of the vision cart.  The surgeon directs the surgery by manipulating controllers on the console, which allow for precision control of the robot arms and EndoWrist instruments. This allows the surgeon to specify movements on a scale that is at least an order of magnitude less than the surgeon's actual hand movements at the console.

27.    The surgical instruments located at the end of the EndoWrists, such as scalpels, clamps, forceps, scissors, and needle drivers, are substantially identical to similar instruments used

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

in traditional surgeries. In fact, Intuitive reported to the FDA that EndoWrists and traditional surgical instruments "are essentially identical… in terms of shape, size, function, and tissue effect," "are substantially equivalent in intended use and/or method of operation," and "demonstrate substantial equivalence ... in terms of safety and effectiveness." The FDA agreed and "determined the [EndoWrist] device" is "substantially equivalent" to the traditional devices, and thus granted EndoWrist 510(k) certifications based on these predicate devices. EndoWrist devices are constructed from traditional medical grade materials, such as stainless steel, composites, and tungsten cables.

28. An example of the working end of an EndoWrist Force Bipolar instrument is depicted in the image below:



29. Many of the EndoWrist instruments have a wide degree of motion at the working tip of the instrument, capable of rotation in multiple planes, and providing an extra level of dexterity that is not available in traditional surgical instruments. The movement at the instrument tip is controlled by tungsten cables located within the EndoWrist. These tungsten cables are actuated by internal pulleys of the EndoWrist that mechanically interface with motors within the robot arms of the da Vinci system. The motors within the robot arms in turn cause the movement of the instrument tip commanded by the surgeon by changing the position of the pulleys and tungsten cables. For the vast majority of EndoWrist instruments, these mechanical components provide for all controls of the instrument tip within the EndoWrist.

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

30.    EndoWrists also include an internal memory chip.  The internal chip does not control the movement of the EndoWrist instrument tip, but instead stores certain information about the particular EndoWrist, including a model number specific to the type of EndoWrist, a part ID specific to the particular EndoWrist, a chip ID for the chip itself, and a counter value for the particular EndoWrist.

31.    The counter counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time.  The chip also does not monitor the components of the EndoWrist for conditions that would be indicative of failure, such as the lack of response of the instrument tip to requested movement or a motor requiring excessive force to cause a desired movement of the tungsten cables.

32.    The da Vinci robot system queries the memory chip prior to performing any operations with the particular EndoWrist instrument.  After a certain number of uses, usually limited to ten, the EndoWrist instrument is rendered non-operational, based solely on the number of times it is attached to a da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist instrument.  Without the services of providers such as SIS, the hospital has no choice but to buy a brand-new replacement EndoWrist instrument from Intuitive at full price.

### III.    SIS'S ENDOWRIST REPAIR BUSINESS

33.    Services of the type performed by SIS are permitted by the FDA.  SIS has properly repaired millions of surgical devices and instruments over its 50 years in business as an independent services operator.   After service by SIS, the surgical device or instrument is returned to the customer for its original intended use.  Indications for use are not affected, and the surgical device or instrument is returned to its original safety and effectiveness.

34.    SIS has created a program for the inspection and repair of EndoWrist instruments. The SIS repair procedures include an initial disassembly and inspection, checking the mechanical operation and integrity of all mechanical components, an electrical integrity check to confirm that electrical insulation, cleaning, sharpening or alignment of the instrument tip, and a series of tests

Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1170

1    to confirm that all the movements of the instrument tip are within original specifications. SIS also

2    sets the counter to a value corresponding to the initial setting of a new EndoWrist instrument.

3          35.    These procedures are similar to procedures that SIS has performed for decades on

4    dozens of types of surgical instruments and medical devices of similar or greater complexity. The

5    materials of the EndoWrist instruments are the same medical grade materials that typically last

6    through hundreds of surgeries and autoclave cycles in other surgical instruments and in medical

7    devices. Particularly after completion of SIS's rigorous set of procedures, the EndoWrist

8    instruments are suitable for many more uses, and at least a number of uses equivalent to Intuitive's

9    originally specified usage limit. In fact, independent testing has shown that EndoWrist instruments

10    serviced by SIS are suitable for 50 or more uses. Nonetheless, SIS returns the counter value to the

11    original value specified by Intuitive.

12          36.    Throughout 2019 and 2020, SIS spoke with numerous hospitals, health care

13    systems, and GPOs regarding its EndoWrist repair and refurbishment offering. These health care

14    providers universally conveyed their frustration with Intuitive and its abusive business practices.

15    In sum, Intuitive's aggressive and ever-changing tactics for extracting an exorbitant per-surgery

16    fee for EndoWrists is financially damaging for hospitals and results in excessive costs for patients.

17          37.    Accordingly, SIS entered into service contracts with a number of health care

18    providers, including health care providers in this District and a nationwide GPO. Many of these

19    health care providers were existing SIS customers, such that the ramp up for performing

20    incremental services on EndoWrist instruments would be minimal. SIS was also in late-stage

21    negotiations with numerous additional health care providers, including a number of large health

22    care systems. These agreements and other likely customers would have been worth millions in

23    annual revenue to SIS.

24          38.    SIS has the experience, facilities, equipment, and personnel to perform inspection

25    and repair for EndoWrist instruments nationwide. Just based on its initial contracts, SIS was

26    prepared to service at least 1,500 EndoWrists a month. Based on potential agreements and SIS's

27

Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT



5-ER-1171

existing experience and capacity, SIS could have easily ramped up these services to service thousands of additional EndoWrist instruments a month.

39.     SIS charges approximately 30-45% less per EndoWrist than what a hospital would have to pay to buy a replacement EndoWrist from Intuitive.

40.     While this is a substantial revenue source for SIS, these revenues pale in comparison to the cost savings to hospitals by using SIS to service EndoWrist instruments rather than throwing away and purchasing new EndoWrist instruments from Intuitive.  The vast majority of Intuitive's $2.4 billion in annual instrument sales is for replacement EndoWrists, a large proportion or majority of which would not be needed under SIS's competitive offering.  Indeed, even at its inception the cost savings for SIS's EndoWrist repair program were so substantial that one of the health care systems awarded the program its prestigious annual award for health care cost savings.

41.     Unfortunately for health care providers and patients, Intuitive became aware of SIS's repair program and its relationships with certain health care providers.  Intuitive immediately embarked on a scorched-earth pressure campaign to put SIS out of the EndoWrist repair business.  And it worked.  Faced with coercive threats from the monopoly provider of robotic surgical systems to effectively disable their expensive surgical robots, all of the health care providers backed out of SIS's EndoWrist repair program.

42.     In just the last year, health care providers and patients have had to pay hundreds of millions of dollars for unnecessary replacement EndoWrist instruments based on Intuitive's anti-competitive conduct.  Intuitive's monopoly power and its anti-competitive use of that power are detailed in the following sections.

## IV.     INTUITIVE'S MONOPOLY POWER IN THE RELEVANT MARKETS

43.     There are three relevant markets for purposes of this action: (1) the worldwide and domestic market for surgical robots used in minimally invasive soft tissue surgery; (2) the worldwide and domestic market for repair and maintenance for surgical robots used in minimally

1   invasive soft tissue surgery; and (3) the worldwide and domestic market for replacement or repair

2   of instruments for use with surgical robots used in minimally invasive soft tissue surgery.

3         44.    Intuitive has monopoly power in (1) the worldwide and domestic market for

4   surgical robots used in minimally invasive soft tissue surgery, (2) the worldwide and domestic

5   market for repair and maintenance for surgical robots used in minimally invasive soft tissue

6   surgery, and (3) the worldwide and domestic market for replacement or repair of instruments for

7   use with surgical robots used in minimally invasive soft tissue surgery, such that Intuitive is able

8   to exclude virtually all competition and charge supra-competitive prices in those markets.  With

9   respect to the "repair" aspect of (3), Intuitive has leveraged its monopoly power in robots and

10  instruments, and service of those robots, to prevent any repair services from existing and

11  competing within the EndoWrist instrument aftermarket.

12        *(1) The Market for Surgical Robots Used in Minimally Invasive Soft Tissue Surgery*

13        45.    Intuitive's da Vinci surgical robots are primarily used in minimally invasive soft

14  tissue surgery.  Initially cleared by the FDA in 1999, the da Vinci robot was the only FDA-cleared

15  surgical robot until 2015.  As of 2015, Intuitive had over 3,500 active da Vinci surgical robots at

16  hospitals worldwide.

17        46.    **The market for minimally invasive soft tissue surgery using surgical robots is**

18  **distinct from minimally invasive procedures performed without surgical robots**, primarily

19  due to the advantages that robotic surgery provides and the public perception which comes with

20  those advantages.

21        47.    In a traditional laparoscopic surgery performed without a da Vinci robot, a number

22  of trocars are placed through the skin in the target area, and function as placeholders for the surgical

23  instruments or other devices subsequently used to perform the surgery.  The surgical instruments

24  and a 2-dimensional camera are then manipulated through a number of small incisions in the target

25  area of the patient, while being manipulated or held by the surgeon(s), nurse(s), surgical

26  assistant(s), and physical supports.  More complex laparoscopic surgeries typically require more

27  trocars.

- 13 -

COMPLAINT


5-ER-1173

48.     Like laparoscopic surgery, minimally invasive robotic surgeries are advantageous over traditional open surgeries, in that the surgery is performed through a number of small incisions rather than a large incision of open surgery, resulting in decreased infection rates, faster recovery, and better patient outcomes.  But da Vinci robot surgeries also have substantial advantages over laparoscopic surgeries. Rather than physically holding surgical instruments or attaching them to physical supports, the da Vinci robotic surgeries have precision robot arms that accurately hold instrument working tips in position without causing physical strain.  The surgeon is seated at an ergonomic console viewing a 3D image of the surgical region.  The surgeon is not limited by his or her own physical dexterity in manipulating surgical instruments, but can instead make large scale movements at the console that are translated to precision microscopic movements of surgical instruments.  Most of the EndoWrist surgical instruments have a precision-controlled full range of motion about multiple axes at the working end of the instrument, as compared to the limited range of motion and limited precision available with just the human wrist and fingers.  Based on the advantages of robotic surgery, some procedures such as prostatectomies are frequently performed by surgeons that exclusively operate using surgical robots.

49.     Intuitive, many hospitals, many doctors, and many patients believe that minimally invasive robotic surgeries are superior to laparoscopic surgeries.  For example, Intuitive advertises that da Vinci surgeries provide "improved outcomes" and "fewer complications" than non-robotic surgery options.  A number of clinical studies support the claim that minimally invasive robotic surgeries are more effective and safer than laparoscopic surgery.  There is a perception among many doctors and patients that minimally invasive robotic surgeries are safer and more effective than traditional laparoscopic surgeries.  Perceptions are such that Intuitive states that "100% of the top-ranked U.S. hospitals for cancer, urology, gynecology and gastroenterology diseases all use da Vinci surgical systems" and "100% of top-ranked U.S. hospitals own at least one da Vinci System."

50.     There is hardly any cross-elasticity of demand between minimally invasive robotic surgical procedures and laparoscopic procedures.  The estimated per-surgery cost of the robot,

- 14 -

1    instruments, equipment, and service for robotic surgery is over three times as much as the

2    comparable costs for laparoscopic surgery, at over $3,500 versus under $1000.  Most insurance

3    plans pay the same amount for minimally invasive robotic surgery and laparoscopic surgery, such

4    that patients pay much more out of pocket for minimally invasive robotic surgery and hospitals

5    have lower (and sometimes negative) margins on minimally invasive robotic surgery.  Despite the

6    substantial financial incentives for both patients and hospitals to prefer laparoscopic surgery, the

7    estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in

8    2017 for a compounded annual growth rate of 23%.  *Id.*  In sum, an increase in the cost of a

9    minimally invasive surgical robot, instruments, and service does not lead doctors or patients to

10   choose laparoscopic or traditional surgery equipment instead, nor would a change in the cost of

11   traditional or laparoscopic equipment affect the market for minimally invasive surgical robots,

12   instruments, and service.

13          51.    Indeed, many surgeons specialize in minimally invasive robotic surgeries to the

14   exclusion of laparoscopic surgery.  According to Intuitive's annual report for fiscal year 2019,

15   surgeons have performed approximately 1.2 million surgeries with da Vinci robots over the last 20

16   years.  Professional and trade associations such as the Society of Robotic Surgery and the Clinical

17   Robotic Surgery Association are focused on robotic surgery.

18          52.    Hospitals that do not have robots such as the da Vinci robots for minimally invasive

19   robotic surgeries are unable to recruit an entire cohort of surgeons and lose out on a large volume

20   of potential surgeries.  Because many surgeons perform almost exclusively robotic surgeries, many

21   doctors will go to extraordinary measures to gain access to da Vinci surgical robots, including

22   performing surgery from multiple hospitals and scheduling surgery in the middle of the evening to

23   gain access to a da Vinci robot.

24          53.    **The market for surgical robots used in minimally invasive soft tissue surgery**

25   **is distinct from the market(s) for other robotic surgeries**.  Intuitive is the owner of a large

26   portfolio of patents that have blocked competitors from entering into the surgical robot market for

27

- 15 -

HG Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1175

1    minimally invasive soft tissue surgery.  Intuitive also invests heavily to ensure that doctors and

2    medical students are trained to use, and ultimately become dependent on, the da Vinci system.

3        54.    Most non-Intuitive surgical robots target entirely different types of surgeries than

4    multi-incision minimally invasive soft tissue surgery.  Stryker's Mako surgical robots,

5    Smith+Nephew's Cori system, and Zimmer Biomet's Rosa platform are used for orthopedic

6    surgeries such as knee and joint replacements.  Siemen's Corindus surgical robots are used for

7    coronary and peripheral vascular procedures.  Medrobotics received FDA clearance for its Flex

8    robot for use in natural orifice surgeries.  Titan Medical surgical robots is seeking to release a

9    surgical robot limited to single-port surgery.  None of these robots compete with Intuitive's da

10   Vinci robots, or in the minimally invasive surgical robot market.

11       55.    The few companies that purport to sell robots for minimally invasive surgery have

12   virtually no sales.  Medical device company Asensus (formerly known as TransEnterix) received

13   FDA clearance for a minimally invasive surgical robot, the Senhance Surgical Robotic System, in

14   October 2017.  However, this robot does not perform numerous surgeries that can be performed

15   with a da Vinci robot, such as cardiothoracic surgery, urologic surgery, and a number of other

16   procedures.  In 2019, Asensus shipped 4 Senhance surgical robots worldwide, none of which were

17   in the United States.  In contrast, in 2019, Intuitive shipped 1,119 da Vinci surgical robots

18   worldwide, including 728 in the United States.  Other medical device companies, such as

19   Medtronic, have plans to enter the minimally invasive robot market, but they have no market share

20   as their products are in the development stage.

21       56.    Intuitive's long-time market dominance provides numerous advantages that prevent

22   competition in the market for minimally invasive surgical robots.  No other company that sells or

23   has plans to sell a surgical robot has a comparable patent portfolio to the dozens of patents that

24   cover Intuitive's da Vinci robots.  Nor do they have the installed base of thousands of robots at

25   hospitals in the United States and worldwide, or the thousands of surgeons who have undergone

26   extensive training specific to da Vinci robots and since performed hundreds of surgeries with da

27   Vinci robots.

HG Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1176

57. As confirmed by Intuitive's market dominance, it is extremely difficult for competitors to enter the robotic surgery market. FDA clearance takes five to ten years and costs tens or hundreds of millions of dollars from concept to FDA approval, and may require premarket approval, which is much more difficult than 510(k) premarket clearance. Similar regulatory hurdles exist in other jurisdictions, such as the European Union.

58. **Accordingly, Intuitive has a 99% market share in the worldwide and domestic markets for surgical robots used in minimally invasive soft tissue surgery.** Indeed, Intuitive's dominance in the robotic surgery market is so great that even if surgical robots used for entirely different procedures such as orthopedic surgery are considered, recent estimates of Intuitive's overall share of the robotic surgery market range for 77% - 80%.

59. The installed base of da Vinci robots and the prevalence of da Vinci-trained surgeons precludes new products from gaining market share in the market for minimally invasive surgical robots. Intuitive has an installed base of over 5,500 da Vinci robots worldwide. Switching to a different surgical robot system would be costly for hospitals, requiring them to purchase expensive new robots. A switch would meet substantial resistance from doctors, who would need to abandon the da Vinci surgical methods they have been performing for years (for some, their entire careers), and re-learn how to perform surgeries with different surgical robots. At a 99% market share, including "100% of top-ranked hospitals," the resistance to change does not only affect the few hospitals which do not have da Vinci robots. It affects an enormous portion of the available consumer base.

60. Intuitive's market power allows it to obtain supra-competitive margins on its product sales. Although Intuitive does not distinguish between robot and instrument sales for gross margin, its 2019 form 10-K demonstrates over 70% gross margin for robots and instruments. Intuitive's net margin is over 30% based on $1.38 billion in net income on $4.48 billion of total revenue. These margins are significantly higher than margins for typical medical device companies, surgical robotic companies, or other companies that make complex medical equipment.

H G Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1177

61.     In sum, Intuitive has monopoly power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery.  Intuitive is able to and does exclude competition and maintain prices for da Vinci robot systems at supra-competitive levels.

*(2) The Market for Service of Robots Used in Minimally Invasive Soft Tissue Surgery*

62.     Intuitive extends its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery to the market for repair and support services for their robots.

63.     Once a customer makes the purchase of a DaVinci robot, the only practical service option is service and repair services offered by Intuitive.

64.     Hospitals are dependent on these robot maintenance services for the continued operation of their essential da Vinci robots.  The services include "provid[ing] and install[ing]Software upgrades," "replac[ing] defective malfunctioning System parts," and "replac[ing] and install[ing] Software, Hardware, and mechanical parts for safety."  Each of these services can only be obtained from Intuitive.  And if these services are not provided—e.g., if a malfunctioning part is not replaced or the Software is not up to date—the da Vinci system will display a "NEEDS SERVICE" warning message on the display panel.  Doctors will not perform a surgery with a machine indicating that it "NEEDS SERVICE."  Nor will patients allow themselves to be operated upon by a machine that "NEEDS SERVICE."  Accordingly, when service is needed, the da Vinci robot is effectively rendered useless until service is provided by Intuitive.  Hospitals cannot afford to have useless da Vinci robots.  Da Vinci robots are large capital investments, and ongoing da Vinci surgeries are necessary to recoup that investment.  Functional da Vinci machines are also necessary to maintain the goodwill of the doctors and patients who have scheduled robotic surgeries.

65.     Intuitive leverages its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery, and the market for repair

- 18 -

Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

5-ER-1178

services for their robots, to pressure its customers to use supra-competitively priced replacement EndoWrist parts.

### (3) The Market for Replacement and Repair of Instruments for Use with Surgical Robots Used in Minimally Invasive Soft Tissue Surgery

66.     Although Intuitive maintains a significant patent portfolio in its surgical robots, any blocking patents for its EndoWrist instruments are long expired.  Intuitive maintains a "Patent Notice" web page for its products.  Virtually all of the patents covering core structure and operations for the "EndoWrist" and "Accessories" are expired.  The few patents that remain in force are related to specific instrument implementations and could not block a third party from selling competing instruments for use with Intuitive da Vinci robots.  Intuitive instead uses technical and contractual means to ensure that only Intuitive-supplied EndoWrists are used with da Vinci robots.

67.     One way Intuitive maintains EndoWrist exclusivity is by programing the da Vinci robots to require that any EndoWrist attached has an Intuitive serial number in order to operate. This tactic prevents third parties from manufacturing da Vinci compatible EndoWrists.  Intuitive's standard sales contract for da Vinci robots also prohibits customers from using the robot with any surgical instruments not made by or approved by Intuitive.  Customers are left with access to only one source for EndoWrists—Intuitive.

68.     Even if a third party were to successfully create an alternative EndoWrist, the alternative would have to get FDA approval before entering the market.  This, in combination with the other mentioned factors, prevents EndoWrist alternatives from becoming available.

69.     Instruments used for other types of surgical robots, such as orthopedic surgery robots, are not compatible with minimally invasive soft tissue surgery robots.  Because they are used in different types of surgeries and do not operate in as small of spaces, they employ different tools and do not include multi-axis end-tool movement control in the same manner as EndoWrists.

HG Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

- 19 -

COMPLAINT



(280 of 293), Page 280 of 293
Case: 25-1372, 07/23/2025, DktEntry: 29.6, Page 280 of 293
Case 3:21-cv-03496-VC   Document 1   Filed 05/10/21   Page 20 of 33

70.     Accordingly, Intuitive has a 99% market share for instruments used with minimally invasive soft tissue surgery robots, because 100% of instruments used with Intuitive da Vinci robots are sold by Intuitive.

71.     Intuitive's market power in instruments used with minimally invasive soft tissue surgery robots is demonstrated by its lucrative revenue and profits in its EndoWrist business.  By fiscal year 2019, instrument and accessories (primarily EndoWrists) revenue exceeded $2.4 billion, or more than a $1 billion more than sales of da Vinci systems.  Although Intuitive does not break out its gross profit for instruments alone, its gross profit on instruments and da Vinci systems is over 70%.  Indeed, the bulk of Intuitive's revenue and profit growth over the last decade has come from its sales of EndoWrist instruments, not robotic systems, as demonstrated from data from Intuitive's 10-Ks from 2001 to 2019, below:

| Year | 2001 | 2002 | 2004 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| Instruments ($M) | $5.0 | $10.1 | $18.8 | $37.5 | $67.8 | $111.7 | $191.6 | $293.0 |
| Systems ($M) | $44.2 | $56.3 | $61.8 | $78.8 | $124.6 | $205.9 | $324.4 | $455.3 |

| Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Instruments ($M) | $389.4 | $528.8 | $701.1 | $903.3 | $1,033 | $1,070 | $1,198 | $1,396 |
| Systems ($M) | $490.5 | $660.3 | $777.8 | $932.9 | $834.9 | $632.5 | $721.9 | $800.0 |

| Year | 2017 | 2018 | 2019 |
|---|---|---|
| Instruments ($M) | $1,637 | $1,962 | $2,408 |
| Systems ($M) | $928.4 | $1,127 | $1,346 |

72.     Indeed, while Intuitive's sales of robots were stagnant from 2012 – 2017, Intuitive's EndoWrist sales increased by over $730 million dollars during that time period.  As is described in the following paragraphs, the bulk of Intuitive's EndoWrist windfall revenue, and thus the bulk of its corporate revenue and profitability, is based on its anti-competitive conduct that requires

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

1    hospitals to purchase replacement EndoWrists rather than repairing EndoWrists that are capable

2    of many more uses at a significantly reduced price.

3         73.    The vast majority of Intuitive's EndoWrist revenue and profit, and thus its overall

4    revenue and profit, comes from *replacement* EndoWrists. The da Vinci robots are typically in

5    service for years, if not a decade or more, and EndoWrists provide a recurring revenue stream. In

6    the words of Intuitive's Form 10-Ks from the early 2000's, EndoWrist instruments include a

7    counter that allows it to "sell the instrument for a fixed number of uses or hours and effectively

8    price our EndoWrist instruments on a per-procedure or per-hour basis."

9         74.    Specifically, the EndoWrist chip includes a counter that counts the number of times

10    the EndoWrist is attached to a da Vinci robot arm. This is not an actual measure of usage such as

11    usage time, number of movements, or actuation time. The chip does not monitor the components

12    of the EndoWrist for conditions that would be indicative of failure, such as the lack of response of

13    the instrument tip to requested movement or a motor requiring excessive force to cause a desired

14    movement of the tungsten cables. The counter is set to a variety of values for different instruments

15    such as 10, 12, 15, 18, 30, and 100. For virtually all EndoWrists instruments, the counter is set to

16    the lower part of that range, and the vast majority of EndoWrist instruments have their counter set

17    at 10 attachments.

18         75.    Intuitive has unilaterally changed counter values for types of EndoWrist

19    instruments and its pricing for those instruments. Intuitive has also unilaterally changed the

20    instructions for use (IFU) for EndoWrist instruments to force early replacement, even if the counter

21    value has not expired. For example, Intuitive issued an IFU for EndoWrist instruments setting a

22    maximum number of autoclave cycles. Because of the way that da Vinci surgeries are prepped

23    and performed, EndoWrist instruments often have to undergo an autoclave cycle even if not

24    actually attached to a robot during surgery. The specified limit on autoclave cycles is extremely

25    low compared to comparable devices made of similar medical grade materials. These unilateral

26    changes substantially increase the per-surgery cost of EndoWrist instruments to hospitals, and

27    Intuitive's supra-competitive EndoWrist profits, without prior notice to hospitals. When hospitals

- 21 -

HG Haley • Guliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

5-ER-1181

1  make the substantial capital and contractual commitment to purchase a da Vinci robot, they are

2  unaware of these additional costs and lack information to predict Intuitive's unilateral changes.

3  76.    Intuitive does not provide hospitals any option for repair of the EndoWrist

4  instrument after the counter has expired.  Instead, once the counter has expired the hospital must

5  purchase a new EndoWrist at a cost ranging from $2,250 - $3,750, without regard to whether the

6  EndoWrist instrument was actually used in surgery or the extent of such use.

7  77.    At least SIS has attempted to enter the market for repair of instruments for use with

8  surgical robots used in minimally invasive soft tissue surgery, and specifically, for repair of

9  EndoWrists.  On information and belief, other companies similar to SIS have attempted to enter

10  this market.

11  78.    As described previously herein, SIS employs meticulous procedures to inspect, and

12  as necessary, repair EndoWrist instruments.  Once the EndoWrist is returned to original

13  specifications, SIS sets the counter to the same value originally programmed by Intuitive.  Based

14  on its 50 years of expertise in surgical equipment repair and the demonstrated safety and efficacy

15  of its EndoWrist repair process, SIS entered into contracts and was in negotiations for contracts

16  with hospitals, health care providers, and GPOs representing thousands of EndoWrists a year and

17  tens of millions in revenue, just in the first year.

18  79.    An EndoWrist serviced by SIS would cost only 55-70% of the cost of buying a

19  replacement EndoWrist from Intuitive, and would be equally safe for the same number of

20  subsequent uses.

21  80.    Although SIS's business was poised to grow substantially year-over-year, SIS's

22  expected sales of tens of millions of dollars in 2020 would still amount to less than 1% market

23  share for replacement and repair of EndoWrists.  SIS had obtained and was in the process of

24  repairing EndoWrists from some of these initial customers, when Intuitive embarked on a

25  scorched-earth campaign to put SIS out of the EndoWrist repair business.  SIS repaired Endo

26  Wrists that were successfully used in surgeries without any problems or incidents.

27

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

81.     In view of Intuitive's 99% market share for minimally invasive soft tissue surgery robots, 100% market share for the servicing and support of those robots, and the 100% market share of instruments used with Intuitive da Vinci robots, Intuitive has leveraged its monopoly power in all these markets and engaged in other anti-competitive acts to prevent repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery. Intuitive's wrongful acts are described in the following section.

## V.     INTUITIVE'S MONOPOLIST TACTICS AND ANTI-COMPETITIVE ACTS

82.     Intuitive has engaged in an anticompetitive course of conduct consisting of several primary anticompetitive practices. Intuitive has harmed competition through and by these practices.

83.     One of Intuitive's anticompetitive practices involves requiring its customers for the da Vinci robotic surgical system to agree to numerous restrictive terms that allow Intuitive to subsequently disable and effectively render the da Vinci robots inoperable at some later time (for example, by refusing to service the robots).

84.     A second anticompetitive practice involves unilaterally modifying the terms for EndoWrists once a hospital has invested in a da Vinci robot, such as unilateral changes in pricing, use limits, and restrictive instructions for use.

85.     A third anticompetitive practice employed by Intuitive involves refusing to provide hospitals, health care systems, and GPOs with an option to have their previously used EndoWrist instruments repaired after the internal counter has expired.

86.     A fourth anticompetitive practice used by Intuitive involves requiring customers who purchase its da Vinci robotic systems to agree that they will not permit the repair or refurbishment of any EndoWrist instruments by a third party. If a customer violates this prohibition, Intuitive has threatened to void the warranties on the da Vinci robotic system, completely terminate the agreement with that customer, refuse to provide further service and support for the robotic system, and even render the surgical robot inoperable.

H·G Haley·Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1183

87.     An effect of Intuitive's anticompetitive conduct is to generate and sustain unreasonably high, supra-competitive prices for aftermarket EndoWrist instruments.

88.     Intuitive's anticompetitive conduct effectively forecloses customers who have purchased da Vinci robotic surgery systems from having access to competitive sources of aftermarket EndoWrist instruments in violation of the Sherman Act Sections 1 and 2.

89.     Through Intuitive's coercive practices directed at da Vinci customers, it foreclosed rivals from supplying customers with aftermarket EndoWrist instruments through repair and refurbishment services.  In so doing, Intuitive maintains its monopoly power in the EndoWrist instrument aftermarket which it has used to sustain unreasonably high replacement rates and supra-competitive prices.

90.     Intuitive's practices have the practical effect of preventing a buyer of a da Vinci robotic system from using the products and services of a potential competitor in the EndoWrist instrument aftermarket. Intuitive's practices have prevented SIS's entry as a rival into the EndoWrist instrument aftermarket.

91.     On information and belief, Intuitive became aware that SIS was providing owners of da Vinci robots with repaired EndoWrist instruments in late 2019.

92.     Between late 2019 to early 2020, Intuitive sent letters to and had in-person conversations with SIS's customers or potential customers, knowing that they were under contract or in contractual negotiations for repaired EndoWrists.  As a result of the threats and misleading statements in those letters and conversations, all of SIS's EndoWrists customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating SIS's EndoWrist repair business.

93.     In letters to SIS customers and potential customers, Intuitive claimed that repairs might lead to "degraded performance," including "unintuitive motion," "insufficient grip force," "dull or damaged scissor blades," and "worn/damaged cables."  To the contrary, under SIS procedures all of these aspects of EndoWrist performance, and numerous others, are inspected in detail and repaired as necessary to meet Intuitive's original equipment specifications.

- 24 -

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

94.     Intuitive also alleged that "third party manufacturers or refurbishers may use non-validated or incompatible cleaning agents and/or disinfection/sterilization processes" or "may damage the instrument's internal mechanisms that interface with the robotic system and allow Intuitive to monitor the device."  To the contrary, with years of experience working with millions of diverse devices that require sterilization procedures, SIS processes do not employ "incompatible cleaning agents and/or disinfection/sterilization processes."  Nor would SIS return a device to the customer that was damaged or could not interface properly with Intuitive's robotic system.

95.     In sum, if Intuitive had only alleged that SIS's services might potentially cause these issues, SIS's customers and potential customers would have had no worry whatsoever doing EndoWrist business with SIS.  SIS has a sterling reputation of repairing surgical devices such as EndoWrists, and robust processes specific to the EndoWrists.

96.     Intuitive instead asserted numerous threats and misleading statements by letter and in private conversations to prevent SIS from performing its repair services, and to maintain its monopoly profits in EndoWrists.

97.     A first set of Intuitive's misleading statements made by letter relates to FDA clearances.  Couched in terms of "might prevent such products from performing" such that FDA and other regulations "may not apply," Intuitive states without any basis that "the hospital has no way to know whether the refurbished instrument meets the rigorous specifications" of Intuitive and the FDA.  Intuitive also states that "any modification to allow for use of a da Vinci product beyond its useful life exceeds the scope of the original clearance by expanding the FDA cleared indications for use" in violation in 21 U.S.C. § 351.

98.     The components of the EndoWrists are medical grade parts with a useful life of dozens if not hundreds of uses.  They will operate within specification, particularly when properly inspected and repaired as is performed by SIS.  Intuitive's allegation appears to be that use of EndoWrists beyond the counter limit is a violation of Intuitive's FDA clearances.  Based on FDA clearances that have been identified for EndoWrists to date, this assertion is incorrect.  At most,

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

1    Intuitive merely mentions in its FDA applications that its devices have usage limits.  Available

2    510(k) summaries are silent on usage limits, and have no prohibitions whatsoever on repair.

3        99.    A second misleading statement made by letter relates to unspecified "intellectual

4    property rights in the da Vinci systems and its instruments" that "Intuitive believes it has[.]"  SIS

5    merely repairs EndoWrists, which according to Intuitive's own Patent Notice webpage do not have

6    any relevant patent rights that would cover SIS's services.  Nor are there any other intellectual

7    property rights that SIS's services would call into question.

8        100.    Intuitive's letters also inform SIS customers of certain "terms of [the customer's

9    agreements with Intuitive] that you might wish to consider."  According to Intuitive, such terms

10   include prohibitions on "repair, refurbishment, or reconditioning" and another asserts that the

11   hospital's "license [for an EndoWrist] expires once an Instrument or Accessory is used up to its

12   maximum number of uses[.]"  Another term referenced by Intuitive states that the hospital will not

13   "permit any third party to, modify, disassemble, [or] reverse engineer . . . the System or Instrument

14   or Accessories."  Failure to comply with the latter term results in termination of the hospital's

15   "Agreement immediately upon written notice, and any warranties applicable to the system will

16   become void."

17       101.    Notably, the Agreement that Intuitive is referring to and the remedies it is

18   threatening are for the "System," *i.e.*, the surgical robot.  These terms constitute attempts by

19   Intuitive to constrain its customers with illegal exclusive dealing agreements, and constitute illegal

20   tying of EndoWrists and EndoWrist related services to the original purchase of the da Vinci robot.

21   These provisions are particularly egregious in view of Intuitive's market power in the market for

22   minimally invasive surgical robots.  The effectiveness of its exclusive dealing and tying

23   requirements are proven by Intuitive's market power in the market for replacement instruments

24   for minimally invasive surgical robots, and its ability to completely foreclose the market for repair

25   of such instruments.

26       102.    Intuitive's letters make its threats explicit—if the hospital uses repaired

27   instruments, Intuitive will render its surgical robot inoperable.  Not only will Intuitive seek

HG  Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

1  damages or indemnity from its customer, but if Intuitive discovers "Systems being used with

2  instruments by an unauthorized third party, Intuitive may no longer accept your service calls for

3  such Systems." Because Intuitive also refuses to allow any competition in the market for service

4  of its robots, and refuses to make error codes and other critical information available to third

5  parties, failure to provide such service will render a robot that originally cost well over a million

6  dollars inoperable. Many hospitals have multiple such robots that would thus be rendered

7  inoperable.

8       103. Intuitive's letter continues, stating that "[s]hould Intuitive or its personnel

9  determine, after having accepted a service call or a purchase order for a service call, such as after

10  an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been

11  used with instruments refurbished or modified by an unauthorized third party, Intuitive may not

12  provide service for such a System." Again, the threat is explicit—if the hospital uses refurbished

13  instruments, Intuitive will render its surgical robot inoperable.

14       104. In private conversations, Intuitive representatives have made this threat even more

15  explicit. In response to one hospital's use of third-party repair services, an Intuitive representative

16  stated that Intuitive would turn the surgical robot into a "paperweight."

17       105. These threats provide further evidence of Intuitive improperly leveraging its

18  monopoly power in the relevant markets to maintain its lucrative EndoWrist sales and margins,

19  and to prevent the development of a repair market at all costs.

20       106. Intuitive has also engaged in other anticompetitive conduct to protect and expand

21  its EndoWrist monopoly. As described herein, Intuitive unilaterally changes counter values and

22  pricing for EndoWrist instruments, and has unilaterally changed IFUs to require replacement of

23  EndoWrist instruments after an unreasonably low number of autoclave cycles.

24       107. For its most recent Xi generation of da Vinci robots and EndoWrist instruments,

25  Intuitive has made an inordinate investment in encryption and other countermeasures of the

26  internal EndoWrist chip. There is no technical or safety justification for these excessive efforts,

27  except to prevent third parties such as SIS from accessing the counter. Specifically, it would not

5-ER-1187

be possible to operate an EndoWrist instrument with a da Vinci robot if other values of the EndoWrist chip such as the EndoWrist serial number were modified. Intuitive's sole purpose is to prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits. Intuitive's anti-competitive conduct operates to the detriment of patients, hospitals, and SIS, by using unjustified technical measures to prevent an EndoWrist repair market from existing for the Xi EndoWrists.

108.    In order to protect its EndoWrist monopoly pricing, Intuitive has taken steps to force customers to switch from da Vinci robots (typically "S" and "Si" robots) for which EndoWrist repair is possible to Xi da Vinci robots for which EndoWrist repair is not currently possible. For example, Intuitive has announced that as of 2023 it intends to stop selling S and Si EndoWrist instruments, and to discontinue providing service and technical support for da Vinci S and Si robots. By withdrawing service and technical support, Intuitive is effectively rendering these robots inoperable.

109.    Intuitive has offered favorable terms and pricing to induce customers to move from S and Si da Vinci robots to Xi robots, knowing that it can recoup lost revenue many times over by preventing repair of Xi EndoWrist instruments.

110.    In sum, Intuitive has gone to extraordinary efforts to leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors. This costs hospitals and patients at least 30-45% per instrument (which savings would increase over time) or hundreds of millions of dollars a year in a $2.4 billion market, without any safety or technical justification.

### COUNT I – TYING

111.    SIS incorporates all of the above paragraphs as though fully set forth herein.

112.    Intuitive has dominant economic power in the worldwide and domestic markets for surgical robots for minimally invasive soft tissue surgery, for servicing, support and repair of those

HG Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT


5-ER-1188

robots, and with respect to instruments for use with such robots. Intuitive has used this economic power to coerce its customers into buying EndoWrists from Intuitive rather than allowing the option of repairing EndoWrists through experienced service organizations such as SIS. Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive instead of permitting the use of EndoWrists that customers previously purchased but later had repaired, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This tying arrangement has anticompetitive effects in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery, which involves a substantial amount of interstate commerce.

113. As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT II – EXCLUSIVE DEALING

114. SIS incorporates all of the above paragraphs as though fully set forth herein.

115. Intuitive has taken measures and entered into agreements with its customers that require the customers to replace their EndoWrist instruments on an exclusive basis with new Intuitive EndoWrists, thus foreclosing competition in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This exclusive dealing has anticompetitive effects in the worldwide and domestic markets for repair and replacement of these instruments, which involves a substantial amount of interstate commerce.

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

116. As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT III – MONOPOLIZATION

117. SIS incorporates all of the above paragraphs as though fully set forth herein.

118. Intuitive has willfully obtained and maintains monopoly power in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive maintains at least a 99% market share by excluding competitors. Intuitive's exclusionary tactics include tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to have EndoWrists repaired, and employing countermeasures to the Xi instrument usage counter to prevent any modification of the usage counter.

119. As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

## COUNT IV – ATTEMPTED MONOPOLIZATION

120. SIS incorporates all of the above paragraphs as though fully set forth herein.

H|G Haley · Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

5-ER-1190

121.     Intuitive has acted with the clear intent to obtain monopoly power in the worldwide and domestic markets for the repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has engaged in anticompetitive conduct including tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to have EndoWrists repaired, and employing countermeasures to the Xi instrument usage counter to prevent modification of the usage counter.  Intuitive has at least a 99% market share and has a high probability of successfully monopolizing the market.

70.     As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

**COUNT V- UNFAIR TRADE PRACTICES – VIOLATION OF LANHAM ACT**

122.     SIS incorporates all of the above paragraphs as though fully set forth herein.

123.     Intuitive, in connection with the sale of its EndoWrist instruments, asserted false or misleading descriptions of facts or representations in its correspondence with its and SIS's customers and such misrepresentations were likely to cause consumer confusion or inaccurately describe the nature, characteristics, or qualities of its and SIS's commercial activities in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

124.     Intuitive has at least misrepresented that SIS's services are contrary to FDA approvals of the EndoWrist products and are in violation of intellectual property rights.  Intuitive

HG Haley • Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT



5-ER-1191

sent such correspondence to multiple SIS customers and potential customers.  Intuitive made such statements knowingly, willfully, and/or recklessly that such statements were misleading.  These misleading statements affected the purchasing decisions of such customers.

125.    Intuitive's misrepresentations were made to SIS's customers, and upon information and belief, a significant number of Intuitive customers that have, or had, Intuitive Si robots.

126.    SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries flow from that which makes Intuitive's conduct unlawful under the Lanham Act.  SIS is entitled to all relief available for such misleading statements, including but not limited to injunctive relief, disgorgement of Intuitive's ill-gotten profits, recovery of SIS's damages, attorneys' fees, the costs of this action, and treble damages under the Lanham Act, 15 U.S.C. § 1117(a).

**Prayer for Relief**

SIS respectfully requests that the Court enter judgment in its favor and against Intuitive as follows:

(a) For damages in an amount to be determined at trial and trebled pursuant to 15 U.S.C. §§ 15(a) and 1117(a);

(b) For injunctive relief pursuant to 15 U.S.C. §§ 26 and 1116;

(c) For costs and attorney's fees incurred in this action pursuant to 15 U.S.C. §§ 15(a) and 1117(a);

(d) For such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff demands trial by jury for all claims.

Haley ● Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

5-ER-1192

Dated: May 10, 2021

**HALEY GUILIANO LLP**

By: */s/ Joshua Van Hoven*

JOSHUA V. VAN HOVEN
joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL
greg.lundell@hglaw.com
111 N. Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY  (applying *pro hac vice*)
richard.mccaulley@hglaw.com
116 W. Hubbard, Unit 20
Chicago, Illinois 60654
Telephone: 312.330.8105

*Attorneys for Plaintiff*
SURGICAL INSTRUMENT SERVICES
COMPANY, INC.

Haley ● Guiliano
111 N. Market St.
Suite 900
San Jose, CA 95113
United States of America

COMPLAINT

5-ER-1193