No. 25-1372

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SURGICAL INSTRUMENT SERVICE CO.

Plaintiff-Appellant,

v.

INTUITIVE SURGICAL, INC.,

Defendant-Appellee.

On Appeal from the United States District Court for the Northern
District of California
No. 3:21-cv-03496-AMO (Martinez-Olguín, J.)

**Brief of *Amicus Curiae* Open Markets Institute in Support of
Plaintiff-Appellant**

　　　　　　　　　　　　　　　　　SANDEEP VAHEESAN
　　　　　　　　　　　　　　　　　TARA PINCOCK
　　　　　　　　　　　　　　　　　OPEN MARKETS INSTITUTE
　　　　　　　　　　　　　　　　　655 15th St NW
　　　　　　　　　　　　　　　　　　Suite 310
　　　　　　　　　　　　　　　　　Washington, DC 20005

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, the Open Markets Institute states that it is a non-profit corporation and, as such, no entity has any ownership interest in it.

i

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ........................................... i

**TABLE OF CONTENTS** ............................................................................ ii

**TABLE OF AUTHORITIES** .................................................................... iii

**INTEREST OF THE *AMICUS CURIAE*** ................................................ 1

**ARGUMENT** ............................................................................................ 5

   I. A monopolist is held to a higher standard because it does not face competitive discipline on its conduct ....................................................... 5

   II. The district court's decision is inconsistent with controlling precedent and illogical as a matter of policy ........................................... 9

**CONCLUSION** ........................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ..6
*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717 (1988)....................8
*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435 (4th Cir. 2011) ................................................................................6
*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ................................................................................................ passim
Epic Games, Inc. v. Apple, Inc., 67 F.4th 946 (9th Cir. 2023) 4, 11, 12, 13
*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)................7
*Int'l Salt Co. v. United States*, 332 U.S. 392 (1947)................................7
*Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024).......... 13, 14
*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)....................................5
*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) 11, 12
*Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701 (7th Cir. 1977)..3, 6
*United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922) .............7
*United States v. Colgate & Co.*, 250 U.S. 300 (1919)...............................7
*United States v. Griffith*, 334 U.S. 100 (1948).....................................5, 9
*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)................6
*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)................6

**Other Authorities**

Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3 (2004)................5

# INTEREST OF THE *AMICUS CURIAE*[1]

The Open Markets Institute is a non-profit organization dedicated to promoting fair and competitive markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. The Open Markets Institute regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public.

# SUMMARY OF ARGUMENT

Intuitive has a 99% share in the market for robots used to perform minimally invasive soft-tissue surgery, such as hernia repairs and tumor resections. Given the monopolistic position of its da Vinci surgical robots, Intuitive has the power to dominate relevant markets in a way that non-monopolists do not. Intuitive can use its power to exclude competitors in both the market for surgical robots and the

---

[1] No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission. The parties consented to the filing of this brief.

1

aftermarkets for accessories, parts, and service for the robots. Indeed, Intuitive used its monopoly power in the market for surgical robots to exclude Surgical Instrument Service from servicing the EndoWrist accessories essential for performing surgical procedures. Through coercive methods, Intuitive deprived hospitals and other owners of da Vinci robots of a high-quality, affordable option for ensuring their robot systems remain in good working order.

　　　　In granting Intuitive's motion for judgment as a matter of law, the district court made a fundamental mistake. It erased a critical conceptual distinction in the law: The Sherman Act treats monopolistic and non-monopolistic corporations differently because monopolists have exceptional market power that they can abuse.

　　　　1.　　Unlike firms in unconcentrated and even oligopolistic markets, monopolists face little or no discipline from rivals. Because monopolists do not have rivals that can check their harmful behavior, they are held to a higher standard and face increased scrutiny by the courts. Courts have consistently held that some acts may violate Section 2 of the Sherman Act when performed by a monopolist, even when they "would be lawful in the absence of a monopoly." *Sargent-Welch Sci. Co.*

2

*v. Ventron Corp.*, 567 F.2d 701, 711 (7th Cir. 1977). Justice Scalia wrote that "[b]ehavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting).

A manufacturer with a monopoly in the foremarket for equipment can wield its power to gain control of aftermarkets for accessories, parts, and service. There is little or no rivalry in the upfront goods market to check the monopolist from unfairly marginalizing or excluding independent providers of parts and services to capture these lucrative aftermarkets. When a manufacturer, like Intuitive, has almost 100% of the relevant market, it will face no "deterrent effect of interbrand competition." *Id.* at 501.

2. The district court erred when it failed to recognize that Intuitive is a monopolist in the surgical robot foremarket. The court held that the plaintiff must establish the existence of information and switching costs under the Supreme Court's *Kodak* decision. The courts apply the *Kodak* factors only when there is competition in the

3

foremarket. The *Kodak* factors are not applicable when the defendant is a monopolist—as in this case—because there are no competitive threats to potentially rein in the defendant in aftermarkets.

*Epic Games, Inc. v. Apple, Inc.* is a good example of why this distinction matters. 67 F.4th 946 (9th Cir. 2023). While the case concerned aftermarkets on Apple mobile devices, the court emphasized that consumers had the ability to select between two platforms: iOS and Android. Consumers had options and so, in theory, could choose the available features that best fit their needs. Thus, Epic was required to show the existence of information and switching costs to break the link between the foremarket and aftermarkets.

In this case, there are no rivals to Intuitive in the market for surgical robots for minimally invasive soft-tissue procedures. There is only Intuitive. No amount of information would help customers make better choices regarding the inflated prices that they will have to pay for accessories, parts, and repair service. Moreover, switching costs are irrelevant because there are no other surgical robot manufacturers: To which company could customers switch? Thus, the district court erred

4

when it failed to recognize this reality and improperly applied the *Kodak* factors to this case.

## ARGUMENT

I. A monopolist is held to a higher standard because it does not face competitive discipline on its conduct

Monopolists face increased scrutiny because business rivalry does not check their harmful behavior. *See LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003) (en banc). Jurists are in broad agreement that with great power comes great responsibility. They have largely followed this sensible principle: "For the privilege of the license to charge monopoly profits, it is not too much to ask that dominant firms adhere to a higher code of responsibility." Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 81 (2004).

Monopoly power can be used to "foreclose competition, to gain a competitive advantage, or to destroy a competitor" in violation of the Sherman Act. *United States v. Griffith*, 334 U.S. 100, 107 (1948). It has long been understood that certain "acts which would be lawful in the absence of monopoly," may violate Section 2 of the Sherman Act if

5

performed by a monopolist "because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency." *Sargent-Welch Sci. Co. v. Ventron Corp.*, 567 F.2d 701, 711-12 (7th Cir. 1977). *See also Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274-75, 291 n.50 (2d Cir. 1979) (same); *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (same). Indeed, the premise of Section 2 is that monopolists wield special power that non-monopolists do not and so should have a specific antitrust law applicable only to them. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) (describing the overlapping and distinct applications of Section 1 and 2 of the Sherman Act).

Applying this principle, the D.C. Circuit wrote that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001). Justice Scalia expressed the same point when he wrote, "Behavior that might otherwise not be of concern to the antitrust laws—or that might

6

even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting). *See also United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (recognizing businesses' right under the Sherman Act to select their trading partners conditional on "the absence of any purpose to create or maintain a monopoly").

Monopolists' extraordinary power to control their market extends to aftermarkets. A monopolistic manufacturer of goods can use its power to unfairly marginalize and exclude independent providers of accessories, parts, and service. It can use its monopoly power as a competitive weapon to take over aftermarkets and capture these lucrative markets for itself. Indeed, the Supreme Court understood this when it ruled in a pair of decisions decades ago that monopolistic manufacturers could not use tying to extend their power into markets for complementary parts and equipment. *United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456, 465 (1922); *Int'l Salt Co. v. United States*, 332 U.S. 392, 396-97 (1947), abrogated on other grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

7

By contrast, when foremarkets include many firms, the rivalry between them, in principle, can discipline aftermarket conduct. In selecting a product to purchase, customers may consider the ease and affordability of maintenance and repair when making their selection. *Kodak*, 504 U.S. at 495 (Scalia, J., dissenting). Under these circumstances, firms may compete to provide replacement parts at a lower price or offer simpler repair options as part of the package they sell. In this scenario, firms that restricted the availability of parts and independent repair options would lose sales and market share in the foremarket. *Id.* at 502. *See also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 725 (1988) ("[S]o long as interbrand competition existed, that would provide a significant check on any attempt to exploit intrabrand market power.") (internal quotations omitted).

When a corporation has a monopoly in the foremarket, however, this theory of interbrand competition is wholly irrelevant. As in the case at hand, a monopolist that has nearly a 100% share of the relevant market faces no "deterrent effect of interbrand competition." *Kodak*, 504 U.S. at 501 (Scalia, J., dissenting). And because the monopolist faces no competitive check by rivals, it may monopolize aftermarkets to "more

8

fully exploit its interbrand power." *Id.* at 499. In other words, it can use its monopoly power as a competitive weapon to unfairly capture related but separate markets. *Griffith*, 334 U.S. at 107.

II. The district court's decision is inconsistent with controlling precedent and illogical as a matter of policy

The district court erred by ignoring the fact that a monopolist's extraordinary power changes the calculus on aftermarket conduct. In requiring that the plaintiff establish the existence of information and switching costs, as articulated by the Supreme Court in *Kodak*, the court demanded a showing that is only necessary when the foremarket has some degree of competition. The *Kodak* factors do not and should not apply when the defendant has monopoly power in the foremarket. This principle follows the judicial recognition that monopolists have an exceptional degree of market control and consequently a special status under the Sherman Act.

In *Kodak*, the Supreme Court recognized that rivalry in the foremarket does not necessarily discipline a manufacturer's aftermarket conduct. The Court cited two critical factors: information and lock-in costs. First, information on the life-cycle costs of a product may be

9

unavailable or difficult to compute. A consumer may be unable to determine and compare the costs of maintenance, parts, and repair of competing goods at the time of purchase. *Kodak*, 504 U.S. at 473-74. Second, switching products after a purchase may be difficult due to the associated costs. *Id.* at 476. Discovering that the manufacturer charges inflated costs on parts and repair may not be enough to justify purchasing a whole new product. For example, if a customer has already purchased Product A, she may rationally conclude that inflated costs on parts and service are preferable to spending even more money to purchase Product B.

The Supreme Court was clear these two factors applied only to competitive foremarkets. In the opening paragraph of his opinion for the majority, Justice Blackmun wrote, "The principal issue here is *whether a defendant's lack of market power in the primary equipment market* precludes—as a matter of law—the possibility of market power in derivative aftermarkets." *Id.* at 454-55 (emphasis added).

This Court, in interpreting *Kodak*, requires plaintiffs to establish the existence of information and switching costs when foremarkets are competitive. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048

10

(9th Cir. 2008). Plaintiffs confront a rebuttable presumption that competition in the foremarket reins in restraints of trade and monopolization in aftermarkets. *Id.* at 1050. If plaintiffs demonstrate the existence of information and switching impediments, they establish that customers could not reasonably anticipate that they would pay inflated prices for parts and repair when "they were shopping for equipment." *Id.* at 1048.

In *Epic Games, Inc. v. Apple, Inc.*, some foremarket competition existed in the market for mobile operating systems. 67 F.4th 946, 976-77 (9th Cir. 2023). Given the rivalry between iOS and Android, this Court emphasized the ability of consumers to select between the two mobile platforms and prioritize certain features:

> With Apple's restrictions in place, users are free to decide which kind of app-transaction platform to use. Users who value security and privacy can select (by purchasing an iPhone) Apple's closed platform and pay a marginally higher price for apps. Users who place a premium on low prices can (by purchasing an Android device) select one of the several open app-transaction platforms, which provide marginally less security and privacy. *Id.* at 987.

11

Under these circumstances, consumers, at least in theory, could choose the combination of features that they want. Accordingly, the Court held that plaintiffs must establish the existence of information and switching costs that sever a clear nexus between the foremarket and aftermarkets. *Id.* at 979-80.

Here, the district court disregarded the basic fact that Intuitive is a monopolist in the foremarket and so its aftermarket conduct is not subject to the *Kodak* factors. The court applied factors that are relevant only to cases involving competitive foremarkets. In interpreting and applying *Kodak*, this Court recognized that information and switching costs only matter when a customer has effective choice upfront: "[T]he Supreme Court found that market imperfections, including information and switching costs, prevented consumers from discovering, *as they were shopping for equipment*, that the Kodak brand would include a de facto commitment to consume only supracompetitively priced Kodak-brand service contracts." *Newcal*, 513 F.3d at 1048 (emphasis added).

Given that Intuitive is a monopolist, the district court imposed an improper burden on the plaintiffs. Unlike *Kodak* and *Epic Games*, which involved at least some degree of rivalry in the foremarket,

12

Intuitive has the power to dominate aftermarkets because it has a monopoly in the foremarket. The factual contrast between this case and *Epic Games* is stark: Intuitive has a 99% share in the relevant market, while Apple had only a 15% share in the global smartphone market. *Epic Games*, 67 F.4th at 966-67. In a fully monopolized market, like the one for surgical robots for minimally invasive soft-tissue procedures, the relevance of information and switching costs is reduced to nothing. *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 841 (N.D. Cal. 2024).

Applying *Kodak* to monopolistic foremarkets is illogical as a matter of policy. When a firm has almost 100% share of a market, customers are captive. Here, customers have no alternative to Intuitive's surgical robots. If Intuitive is Apple, there is no Android competing against it. Perfect information about the costs of accessories, parts, and service would *not* mitigate the risk of monopolistic exploitation in aftermarkets because customers have no alternative in the surgical robot market. Similarly, zero switching costs would make no difference because customers have no alternative to switch to. In the monopolized market for surgical robots, customers have "minimal ability to discipline the company's conduct in aftermarkets, regardless

13

of information costs, switching costs, and general awareness of restrictions." *Lambrix*, 737 F. Supp. 3d at 841.

Intuitive's possession of "monopoly power in the equipment" is all it needed to "more fully exploit its interbrand power" in the market for EndoWrists. *Kodak*, 504 U.S. at 499 (Scalia, J., dissenting). Accordingly, the district court erred by ruling that Intuitive's power to monopolize this aftermarket is dependent on the existence of information and switching costs.

## CONCLUSION

For the reasons stated above, the order granting Intuitive's motion for judgment as a matter of law should be reversed.

Dated: July 30, 2025

Respectfully submitted,

*s/* Sandeep Vaheesan
**Sandeep Vaheesan**
**Tara Pincock**
OPEN MARKETS INSTITUTE
655 15th Street, NW, Suite 310
Washington, DC 20005
vaheesan@openmarketsinstitute.org

14

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and accurate copy of the foregoing to be served to counsel of record for all parties via ACMS.

Dated: July 30, 2025

*s/* Sandeep Vaheesan
**Sandeep Vaheesan**
OPEN MARKETS INSTITUTE
655 15th Street, NW, Suite 310
Washington, DC 20005
vaheesan@openmarketsinstitute.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 25-1372**

I am the attorney or self-represented party.

**This brief contains 2,610 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   [ ] it is a joint brief submitted by separately represented parties.

   [ ] a party or parties are filing a single brief in response to multiple briefs.

   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** __s/ Sandeep Vaheesan_____**Date** July 30, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

16