No. 25-1372

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-3496 (Martínez-Olguín, A.)

## BRIEF FOR ANTITRUST LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT

JOSHUA P. DAVIS
MATTHEW SUMMERS
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*jdavis@bergermontague.com*
*msummers@bergermontague.com*

*Counsel for Amici Curiae*

July 30, 2025

# TABLE OF CONTENTS

**PAGE**

Table of Contents ............................................................................................. i

Table of Authorities ........................................................................................ ii

Interest of Amici Curiae ................................................................................. 1

Introduction and Summary of Argument ...................................................... 1

The Case Below ............................................................................................. 3

Argument ........................................................................................................ 5

    I.    The Foremarket-Monopoly Theory .......................................... 7

    II.    The Lock-In Theory ................................................................ 10

    III.    Why It Makes No Sense to Combine the Theories ............... 13

Appendix ...................................................................................................... 16

Certificate of Compliance ............................................................................ 17

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992) .................................................................. 6, 12, 14

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ........................................................ 10, 13

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ..................................................................................8

*Lambrix v. Tesla, Inc.*,
  737 F.Supp.3d 822 (N.D. Cal. 2024) ...................................................10

**OTHER AUTHORITIES**

Patrick Rey & Jean Tirole, *A Primer on Foreclosure*,
  3 Handbook of Industrial Organization ch. 33 (Armstrong &
  Porter, eds. 2007) ..................................................................................9

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
  Analysis of Antitrust Principles and Their Application* (2025) ... 5, 6, 9

Steven C. Salop, *The First Principles Approach to Antitrust,
  Kodak, and Antitrust at the Millennium*,
  68 Antitrust L.J. 187 (2000) ................................................................12

## INTEREST OF AMICI CURIAE

Amici are antitrust law professors who have published significant research, including numerous books and the leading treatise, on the antitrust laws. The authors have written this brief independently.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

In the proceedings below, the district court made a simple legal error, but one that, if left uncorrected and followed by other courts, will reduce liability for monopolists who use their monopoly power over one product to monopolize the aftermarket for that product. The error will introduce confusion into the legal treatment of a large group of important cases, many of them involving high-tech firms, that involve aftermarkets and other derivative markets.

The defendant Intuitive Surgical has a monopoly over surgical robots used in minimally invasive, soft-tissue surgery. It also manufactures and sells instruments, including the EndoWrist instruments, which are attached to the robot. The EndoWrist instruments are composed of surgical tools like scalpels and forceps. A counter installed on the EndoWrist keeps track of the number of times that it is attached to the robot, and the system shuts down when a certain number of uses is reached. While Intuitive argued below that the

---

[1] All parties have consented to the filing of this brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amici curiae or their counsel—has contributed money that was intended to fund preparing or submitting this brief.

1

shutdown system served a procompetitive purpose, this appeal does not involve that question.

Plaintiff Surgical Instrument Service Company ("SIS") sought to prove that defendant Intuitive Surgical used its monopoly over the surgical robots to monopolize the aftermarket for attachments. The district court denied Intuitive's motion to dismiss, finding that SIS had properly alleged that Intuitive had a monopoly over the surgical robots (the "foremarket") and had engaged in exclusionary conduct that suppressed competition in the aftermarket for attachments. The district court also denied Intuitive's motion for summary judgment on SIS's antitrust claims.

Subsequently, the parties disputed the jury instructions. Intuitive argued that SIS was required to prove the *Epic* factors—including, for example, the requirement that consumers in the foremarket are not aware of the aftermarket restrictions—in order to prevail on its antitrust claims. SIS argued that the *Epic* factors were irrelevant because SIS sought to prove that Intuitive had a monopoly over the relevant surgical robots foremarket, which means that consumers have no choice but to comply with the restrictions even if they know about them. The *Epic* factors needed to be satisfied only if Intuitive faced competition in the foremarket. The district court agreed with Intuitive and granted Intuitive's motion for judgment as a matter of law pursuant to Federal

Rule of Civil Procedure 50(a), noting that SIS had conceded that it lacked evidence sufficient to satisfy the *Epic* factors.

The district court erred. The *Epic* factors apply to claims of aftermarket monopolization only where the defendant lacks monopoly power in the foremarket, not where, as in this case, the defendant has a monopoly in the foremarket. The district court's view, if broadly accepted, would significantly cut back on antitrust liability where it is most needed.

## THE CASE BELOW

Intuitive Surgical manufactures surgical robots used in minimally invasive soft tissue surgery. It also manufactures instruments that are attached to the robots and used in the surgery, like the EndoWrist instruments. SIS repairs and maintains surgical instruments used with surgical robots, and it had developed the capacity to repair, maintain, and extend the life of EndoWrist instruments. Hospitals and other owners of Intuitive robots would benefit from being able to hire SIS to repair and adjust the instruments so that they can be used beyond the use limits imposed by Intuitive.

SIS alleges that Intuitive has a monopoly over surgical robots used in minimally invasive soft tissue surgery, and that Intuitive reduced competition in the instrument repair and replacement market by prohibiting owners of Intuitive surgical robots from hiring third parties like SIS to repair or refurbish their EndoWrist instruments and extend the instruments' useful lives. As a result, hospitals and other buyers of

3

Intuitive surgical robots must buy replacement EndoWrist instruments directly from Intuitive even when their existing instruments can still be used safely and effectively but for Intuitive's use limits. The reduction in competition in the instrument repair and replacement market has allegedly increased prices for instruments and reduced SIS's sales.

SIS's claims against Intuitive are based on a well-established concern that a monopolist in one market can profitably use its dominance of that market to suppress competition and obtain a monopoly in another market—usually an adjacent or derivative market that is related to the first or primary market. To prevail on a prima facie claim, the plaintiff must prove that the defendant has market power in the primary market and has used anticompetitive means (for example, tying) to obtain an advantage over competitors in the adjacent market. That is just what SIS has alleged and sought to prove in the case below—that Intuitive used its monopoly over the surgical robots to eliminate competitors in the instrument repair and replacement market so that buyers are forced to buy new instruments from Intuitive when their instruments reach the use limits prescribed by Intuitive or need repairs.

The district court below issued jury instructions that stated that in order to prevail, SIS must prove four factors associated with a separate theory of aftermarket liability known as the "lock-in theory." It then granted Intuitive's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), noting that SIS had conceded that

4

it lacked evidence sufficient to satisfy the four factors, known as *Epic* factors. Because the *Epic* factors are relevant only where the defendant does *not* have a monopoly in the primary market, the district court erred.

## ARGUMENT

Sections 1 and 2 of the Sherman Act forbid monopolists to exploit their market power in one market to stifle competition in another market. The reason is that consumers in the second market are harmed when competition is reduced or eliminated. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 652c, 1706 (2025). For example, a prima facie tying case consists of showing that the defendant has market power over one product (the "tying" product) and conditions sales of that product on customers' purchasing another product (the "tied" product) from it. Market or monopoly power in a primary market may similarly allow the defendant to impose exclusive dealing requirements, or otherwise obtain or maintain a monopoly, in a second market such as would support a Section 1 exclusive dealing claim or a Section 2 monopolization claim regarding the second market.

In many such cases, the first market (or "foremarket") consists of durable goods and the second market (the "aftermarket") consists of goods (such as parts or attachments) or services (such as repair) that are necessary to maintain, use, or derive maximum value from the foremarket good. "An aftermarket is a type of derivative market

5

consisting of consumable goods or replacement components that must be used for the proper functioning of some primary good." *Id.* ¶ 564b. Under Sections 1 and 2, a plaintiff can make a prima facie case by showing that the defendant has monopoly power over the foremarket goods and uses that market power in the foremarket to exclude competitors from the aftermarket. This theory is a straightforward application of traditional antitrust principles and is not treated in the case law as a distinctive source of antitrust liability, but Amici call it the "foremarket-monopoly theory" here to distinguish it clearly from the lock-in theory. The foremarket-monopoly theory was the basis of the plaintiff's claim below.

There is an alternative way for a plaintiff to prevail on a claim that a company has reduced competition in an aftermarket. This theory, unlike the first, is available where the defendant does *not* have a monopoly in the foremarket. According to the "lock-in theory," a defendant who faces competition in the foremarket may incur liability for excluding competitors in an aftermarket derived from demand for the defendant's foremarket product when consumers of the defendant's foremarket product had no reason to expect that such exclusion would take place, among other requirements. *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992).

The two theories are separate and independent ways of establishing liability. SIS chose to advance the first theory. However, the court ruled against SIS because SIS could not prove facts necessary to satisfy the

second theory. This was plainly an error. The Court of Appeals should reverse the trial court and eliminate the confusion reflected in the trial court's decision by explaining the different requirements of the two theories.

## I. THE FOREMARKET-MONOPOLY THEORY

The foremarket-monopoly theory is simply an application of the standard doctrinal framework underpinning tying, exclusive dealing, and monopolization cases. As noted above, tying consists of exploiting market power over a "tying" product to require purchasers to also purchase a "tied" product from the defendant, thereby reducing competition in the tied market. Similarly, a plaintiff makes out a prima facie section 2 case by showing that the defendant has obtained or maintained monopoly power in one market through "anticompetitive," "exclusionary," or "predatory" conduct enabled by its monopoly in another market. The foremarket-monopoly theory recognizes that market power over a foremarket product may give a defendant the ability to profitably suppress competition in a related aftermarket through tying, exclusive dealing, or other anticompetitive conduct affecting the aftermarket. Importantly, the defendant can exercise that power regardless of whether its customers are aware of the defendant's aftermarket behavior when they make their foremarket purchase—the defendant's power comes directly from its monopoly position in the foremarket, not from its

7

customers' ignorance or confusion. That's why there's no "lock-in" requirement associated with the foremarket-monopoly theory.

While antitrust law allows firms to obtain monopolies as a reward for innovation, it prohibits firms from using a monopoly in one market to suppress competition in a second market. To understand why, suppose that a firm has a monopoly over drug A, which it sells to hospitals. The firm also manufactures drug B in a competitive market where other firms also produce drug B. In monopolized market A, the firm can lawfully charge monopoly prices at the expense of consumers and reap monopoly profits. The law permits monopoly pricing of drug A as a reward for inventing drug A. In competitive market B, the firm cannot charge monopoly prices because if it were to raise the price, the hospitals would simply buy drug B from other sellers. To prevent that from happening, the firm tells the hospitals that if they want to buy drug A from it, they must also buy all their needs for drug B from it, rather than from competing sellers of drug B. If drug A is important enough to the hospitals, the hospitals will stop buying drug B from the firm's competitors in the drug B market. Instead, they will buy drug B from the firm in question. Now the firm has two monopolies rather than just one, and it can raise prices for drug B as well as maintain its monopoly price for drug A. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) (describing the elements of a tying claim). An academic consensus supports liability in such cases for this reason. *See*, e.g., Patrick Rey &

8

Jean Tirole, *A Primer on Foreclosure*, 3 Handbook of Industrial Organization ch. 33 (Armstrong & Porter, eds. 2007); Areeda & Hovenkamp, *supra*, ¶ 1704b2.

The effect of gaining control of a second or adjacent market is sometimes called "foreclosure" because firms that might otherwise sell drug B to the hospitals are foreclosed from doing so. The mechanism for foreclosing the market for drug B is tying in the example above, though other mechanisms—like exclusive dealing—can be used as well. Foreclosure is harmful because the firm that engages in foreclosure converts a competitive market into a monopoly, enabling it to raise prices in that market. To prevail on a tying claim against the firm, a plaintiff must prove that the firm had market power over drug A and that it used the tie to exclude competition for drug B. If the plaintiff cannot prove that the firm had market power over drug A, it will lose the case.

This example does not involve an aftermarket, but the principles are exactly the same. Now suppose that product A is a medical device, as in the case below, and that product B consists of parts, attachments, or service. If the defendant has a monopoly over the medical device, which it obtained through innovation, it is entitled to charge a monopoly price for that device. But the defendant is not permitted to use its monopoly over the foremarket medical device to suppress competition in the aftermarket. That would permit the defendant to charge higher prices in the aftermarket where it has not innovated, causing injury to consumers.

The Sherman Act thus gives the customers (as well as competitors in the aftermarket) a claim against the defendant for suppressing competition in the aftermarket.

A recent opinion in the Northern District of California illustrates these principles. In *Lambrix v. Tesla, Inc.*, 737 F.Supp.3d 822 (N.D. Cal. 2024), consumers sued Tesla for monopolizing the aftermarkets for replacement parts and repair services by requiring some of its suppliers to supply parts exclusively to Tesla and interfering with the ability of independent service providers to service Tesla automobiles. The plaintiffs alleged both a foremarket-monopoly theory and a lock-in theory. The court denied the motion to dismiss on the basis of both theories. The plaintiffs could proceed to trial on the foremarket-monopoly theory because they sufficiently alleged that Tesla had market power in the electric vehicles market and used the power to monopolize the parts and repair aftermarkets. While the court also held that the plaintiffs adequately alleged the lock-in theory, the foremarket-monopoly theory was sufficient on its own.

## II.  THE LOCK-IN THEORY

The lock-in theory is different from the foremarket-monopoly theory because the lock-in theory does not require the defendant to have a monopoly in the foremarket. The theory was recognized in the Supreme Court's *Kodak* case, and has been addressed in other cases such as *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023).

10

In *Kodak*, a group of companies that repair photocopiers sued Kodak for tying the sale of parts for Kodak-branded copiers to service of those copiers and monopolizing the aftermarket for service of those copiers. The plaintiffs argued that Kodak monopolized the service aftermarket by blocking sales of Kodak parts to the plaintiffs and in other ways interfering with the ability of the plaintiffs to service Kodak machines.

Kodak argued that even if it had a monopoly of the parts aftermarket, it did not have market power in that aftermarket and thus could not raise prices above the competitive level in either the parts or the service aftermarkets. The reason, Kodak argued, is that the buyers of copiers (in the foremarket) take into account downstream costs of maintenance and repair (in the aftermarkets). This is known as lifecycle pricing: the customers estimate the price of the Kodak copier over its entire lifecycle, thus summing the retail price at the time of purchase and the present value of the expected price of maintenance and repairs for the useful life of the copier. Kodak argued that, if it raised aftermarket prices, then the buyers would demand a discount in the foremarket so as to offset the additional expected downstream costs. Otherwise, they will buy copiers from Kodak's competitors rather than from Kodak. But because the foremarket is competitive, Kodak already sells copiers at the competitive price; if it reduces the price, it will lose money. Kodak thus argued it could not raise prices in the aftermarket without losing

11

customers in the foremarket. In short, Kodak argued, it is impossible for a firm that faces foremarket competition to monopolize the aftermarket.[2]

The Supreme Court rejected the argument. The Court explained that

> Kodak's claim that charging more for service and parts would be "a short-run game," . . . is based on the false dichotomy that there are only two prices that can be charged—a competitive price or a ruinous one. But there could easily be a middle, optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales. The fact that the equipment market imposes a restraint on prices in the aftermarkets by no means disproves the existence of power in those markets.

*Kodak*, 504 U.S. at 470–71. In certain conditions, Kodak can raise the aftermarket price without lowering the foremarket price by locking in foremarket customers who are unable to accurately estimate the lifecycle price. In *Epic*, the Ninth Circuit enumerated the factors that a plaintiff must prove to proceed under *Kodak*'s lock-in theory where the defendant lacks power in the foremarket: (1) consumers in the foremarket must not generally be aware of the aftermarket restrictions; (2) consumers cannot price the aftermarket restrictions accurately because of significant information costs; (3) the cost of switching to a different brand in the

---

[2] For a discussion of the lock-in theory in *Kodak*, see Steven C. Salop, *The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millennium*, 68 Antitrust L.J. 187 (2000).

12

foremarket is high; and (4) the aftermarket is itself a well-defined market. *Epic*, 67 F.4th at 977.

The lock-in theory says that a firm without a monopoly in the foremarket can achieve an aftermarket monopoly. The *Kodak* court said this was possible because consumers who are unaware of aftermarket restrictions and are unable to engage in lifecycle pricing will make purchases in the foremarket without being able to take account of the consequences of their choice. Kodak can then surprise them with a change of conduct—for example, as in Kodak itself, driving competitors from the aftermarket and then raising prices. The customer cannot simply switch to another brand of copier—perhaps because copiers are expensive or staff have been trained with Kodak machines or Kodak machines interoperate with other business equipment owned by the customer.

SIS did not assert the lock-in theory, but rather offered evidence of Intuitive's monopoly power in the surgical robot foremarket. Accordingly, it was not required to satisfy the lock-in conditions in order to prevail.

### III. WHY IT MAKES NO SENSE TO COMBINE THE THEORIES

The lower court appears to believe that the factors that must be satisfied for the lock-in theory must also be satisfied for the foremarket-monopoly theory. That is a mistake. If Kodak had had a monopoly over copiers, then plaintiffs would have prevailed under the foremarket-

13

monopoly theory, and would not have been required to satisfy the *Kodak*/*Epic* conditions for lock-in.[3] Imagine, for example, that customers could perfectly engage in lifecycle pricing, so that the lock-in theory does not apply. If Kodak had a foremarket monopoly over copiers, then the customers would know that Kodak could also obtain a monopoly over service by refusing to sell parts to the repair companies. Knowing this, the customers could in principle calculate the lifecycle price of the copier. But having done so, they would not be able to purchase a different copier brand with a lower lifecycle price because there is no other copier brand. In this scenario, Kodak's use of foremarket power to monopolize the aftermarket causes an antitrust injury to consumers because of the reduction of competition in the aftermarket, enabling Kodak to raise aftermarket prices. The consumers' capacity to engage in lifecycle pricing does not protect them from the antitrust injury.

By applying the lock-in conditions to the foremarket-monopoly theory, the district court has turned the lock-in theory on its head. The lock-in theory *expanded* antitrust liability by applying it to defendants without foremarket power who lock in their customers. That is why Justice Scalia, in his *Kodak* dissent, complained that the majority's opinion "threatens to release a torrent of litigation." *Kodak*, 504 U.S. at 489. By contrast, the district court in the present case *contracted*

---

[3] The Court explicitly recognized that Kodak did not have monopoly power in the foremarket. *Kodak*, 504 U.S. at 465 & n.10.

14

antitrust liability by immunizing defendants with foremarket power who exercise their monopoly power with means other than lock-in. The district court's mashup of lock-in and foremarket-monopoly violates settled antitrust principles and common sense. Neither the Supreme Court nor any court of appeals has ever taken this position.

Respectfully submitted,

By: */s/ Joshua P. Davis*
JOSHUA P. DAVIS
MATTHEW SUMMERS
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684 (*telephone*)
*jdavis@bergermontague.com*
*msummers@bergermontague.com*

*Counsel for Amici Curiae*

# APPENDIX

**Identities of *Amici Curiae***

Rebecca Allensworth, David Daniels Allen Distinguished Chair of Law, Vanderbilt University Law School

Darren Bush, Leonard B. Rosenberg Professor of Law, University of Houston Law Center

Harry First, Charles L. Denison Professor of Law Emeritus, New York University School of Law

Eleanor Fox, Walter J. Derenberg Professor of Trade Regulation Emerita, New York University School of Law

Erik Hovekamp, Professor of Law, Cornell Law School

Herbert Hovenkamp, James G. Dinan University Professor, University of Pennsylvania Carey Law School

Mark A. Lemley, William H. Neukom Professor of Law at Stanford Law School

John M. Newman, Herbert Herff Chair of Excellence (incoming), University of Memphis School of Law

Eric A. Posner, Kirkland & Ellis Distinguished Service Professor, University of Chicago Law School

Spencer Weber Waller, John Paul Stevens Chair in Competition Law, Loyola University Chicago School of Law

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s) 25-1372**

I am the attorney or self-represented party.

**This brief contains 3,450 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: July 30, 2025

*/s/ Joshua P. Davis*
JOSHUA P. DAVIS

*Counsel for Amici Curiae*