No. 25-1372

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
———————————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL, INC.,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-3496 (Martínez-Olguín, A.)

———————————

**BRIEF FOR THE AMERICAN ANTITRUST INSTITUTE AS
AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT**

———————————

KATHLEEN W. BRADISH
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 304-0195 (*telephone*)
*kbradish@antitrustinstitute.org*

*Counsel for Amicus Curiae*

July 30, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), the American Antitrust Institute states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

# TABLE OF CONTENTS

**PAGE**

Table of Contents...................................................................ii

Table of Authorities.............................................................iii

Interest of Amici Curiae.......................................................1

Summary of Argument..........................................................1

Argument ..............................................................................8

    I.    Regardless of Market, Protections Against Tying are about Consumer Choice ....................................................8

    II.   Policy Justifications for Limiting Aftermarket Liability Do Not Apply in Monopolized Foremarkets ................................15

    III.  The District Court's Approach Would Leave Vulnerable Consumers Doubly Exposed ................................20

Certificate of Compliance .......................................................25

# TABLE OF AUTHORITIES

P<small>AGE</small>(S)

## C<small>ASES</small>

*Eastman Kodak Co. v. Image Tech. Servs.,*
  504 U.S. 451 (1992) ................................................................ *passim*

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (9th Cir. 2023) ........................................... 6,11

*Forsyth v. Humana, Inc.,* 114 F. 3d. 1467
  (9th Cir. 1997) ................................................................ 13

*In the Matter of Sandoz Pharm. Corp.,*
  115 F.T.C. 625 (1992) ..................................................... 2

*Int'l Salt Co. v. United States,*
  32 U.S. 392 (1947) .......................................................... 3

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
  466 U.S. 2 (1984) .......................................................... 3,9

*Lambrix v. Tesla, Inc.,*
  737 F.Supp.3d 822 (N.D. Cal. 2024) ............................ 14,15

*Nat'l Soc'y of Profl. Eng'rs v. United States,*
  35 U.S. 679 (1978) ......................................................... 20

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
  513 F.3d 1038 (9th Cir. 2008) .................................. *passim*

*New York ex rel. Schneiderman v. Actavis,*
  787 F.3d 638 (2d Cir. 2015) ............................................ 23

*Northern Pac. Ry. Co. v. United States.,*
  356 U.S. 1 (1958)............................................................... 8

*United States v. Microsoft Corp.,*
  253 F.3d 54 (D.C. Cir. 2001) ............................................. 2

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997) .............................................. 13

iii

**OTHER AUTHORITIES**

Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*,
   63 Antitrust L.J. 483 (1995) ...................................................... *passim*

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2025) ........... 2

## INTEREST OF AMICUS CURIAE[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. See http://www.antitrustinstitute.org/.[2]

## SUMMARY OF ARGUMENT

Under the Sherman Act, monopolists, no matter the source of their monopoly power, may not use anticompetitive restrictions to

---

[1] All parties consent to the filing of this amicus brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

expand that power into other markets. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 652c, 1706 (2025). This is true whether the other market is blood-monitoring services, *In the Matter of Sandoz Pharm. Corp.,* 115 F.T.C. 625 (1992) (tying schizophrenia drug to related blood-monitoring services), internet browsers, *United States v. Microsoft Corp.,* 253 F.3d 54, 85 (D.C. Cir. 2001) (tying Windows to Internet Explorer web browser), or surgical parts and service. To allow such behavior would improperly reward the monopolist with share in a new market—share it has not earned. Customers, stripped of the power of choice, would lose out on the potential for new competition and innovation.

The district court here lost sight of that fundamental principle. It required Plaintiff to show the presence of "customer lock-in" factors that (1) exceed the requirements of Sherman Act tying cases and (2) are not justified by the factual context. If upheld, the district court's approach risks creating a loophole that gives the most thoroughgoing monopolists near carte blanche to expand the scope of their market control. To avoid this result, the district court's improper limitation on a well-established

form of antitrust liability should be overturned. The Court should hold that Plaintiff need not prove the so-called *Kodak/Epic* factors.

Anticompetitive tying occurs when a monopolist uses its power in the original monopoly market (the tying product) to foreclose competition in additional markets (the tied product(s)). Preventing this kind of conduct has been a long-standing priority of courts and policymakers. Section 3 of the Clayton Act was devoted to rooting out the practice in goods markets, and the practice has been found illegal under both Section 1 and Section 2 of the Sherman Act. For many years, tying practices were considered *per se* illegal, like price-fixing and bid-rigging. *See, e.g., Int'l Salt Co. v. United States,* 332 U.S. 392, 396 (1947). Courts presumed the practice was an antitrust violation because of its likely anticompetitive effects, regardless of its potential procompetitive benefits. Although in most recent tying cases, courts have adopted a rule of reason analysis balancing anticompetitive effects against procompetitive justifications, the *per se* standard has not been overruled. *See, e.g., Jefferson Par. Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9 (1984) ("It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an

unacceptable risk of stifling competition and therefore are unreasonable *per se*."). Even though courts have recognized some procompetitive justifications for certain tying arrangements, an inherent aversion still exists for practices that coerce buyers into purchases they would not otherwise make.

This case illustrates why that concern is warranted. Defendant Intuitive Surgical, Inc. has a highly successful business manufacturing and selling minimally invasive soft tissue surgical robots. Its market share in domestic and worldwide markets for such robots is alleged to be 99%—a near-total monopoly. It also manufactures attachments for these robots and provides service. In an effort to contain their ongoing costs, the hospitals who purchase Defendant's $2 million products have sought the services of Plaintiff Surgical Instrument Service Company to repair and refurbish certain robot attachment components, which would otherwise have to be replaced after only a handful of uses. Plaintiff alleges that its products save hospitals 30-40% on their costs. Defendant, however, allegedly blocked hospitals from capitalizing on these savings. Among other conduct, Defendant made threats to shut down its customers' robots if they bought service or refurbished

4

attachments from Plaintiff. Those practices meant, according to
Plaintiff, that customers must continue to purchase new replacement
attachments from Defendant despite safe options to re-use the
equipment at a lower cost. If customers refused to accept these terms,
their only practical option was forego offering minimally invasive soft
tissue surgeries. Consumers—hospitals and ultimately patients—paid
the price.

Despite Defendant's clear monopoly position, the district court
here required Plaintiff to go beyond the standard requirements for a
tying violation. It required Plaintiff to demonstrate the so-called
*Kodak/Epic* factors indicating customer "lock-in." This was error. As
Plaintiff's Opening Brief explains, those factors, derived from the
Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs.,*
504 U.S. 451 (1992), were not designed as a general rule for tying or any
other Section 2 violation. *See* Pl.'s Br. at 40-6. Rather, the *Kodak*
discussion of customer "lock-in" addressed antitrust liability in a
narrow framework: single product "aftermarkets" when there is no
market power in the primary or "fore" market. In the *Kodak* case itself,
the Court used lock-in factors to establish potential liability for tying in

the printer parts and service markets despite a competitive market for printers. Put differently, the *Kodak* factors are criteria for identifying tying harms outside of traditional market power analysis, not a substitute for it. This case, in contrast, falls firmly within standard market power frameworks.

This Circuit has consistently recognized the narrow scope for applying *Kodak's* lock-in analysis. In both *Newcal Indus., Inc. v. Ikon Off. Sol.,* 513 F.3d 1038 (9th Cir. 2008) and *Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946 (9th Cir. 2023), this Circuit's leading cases interpreting *Kodak,* the Court began by identifying a competitive foremarket. Only then were the *Kodak* factors applied to determine whether competition in that market could adequately constrain anticompetitive conduct in aftermarkets. In *Newcal,* for example, the Court reversed dismissal of a claim that the defendant illegally tied printer leases to parts and services. 513 F.3d at 1053. It concluded that even though buyers had other options for printer leases, lessee lock-in and the defendant's deceptive manipulation of the service terms meant that competition in the printer lease market did not effectively constrain anticompetitive tying. *Id.* at 1051. In other words, despite

buyers' options to choose a different lessor at the time of purchase, deception and manipulation prevented buyers from knowingly choosing the defendant's aftermarket restrictions on parts and service. In light of these additional showings, the Court found that *Kodak* required it to allow the plaintiff to continue to pursue an antitrust tying claim. *Id.* at 1052.

The district court here stakes out unprecedented new ground. It demands proof of the *Kodak/Epic* factors even when there is no competitive foremarket to discipline aftermarket restrictions. This misapplies precedent in a way that is inconsistent with its internal logic and with the underlying rationales for enforcing against tying violations—that is, preserving consumer choice. *See infra Section I.* It is no surprise then that the district court's approach does not match any of the usual policy rationales for limiting "aftermarket" liability. Adding additional proof requirements when customer choice is already constrained in the foremarket does nothing (1) to protect efficient business practices, (2) to encourage nimble contract remedies in the absence of market imperfections, or (3) to encourage upstream interbrand competition at the foremarket level. *See infra Section II.*

7

Indeed, to adopt the district court's approach would leave consumers already vulnerable to monopolistic conduct doubly exposed. *See infra Section III.* Consumers would be open to exploitation not just in the primary market, but in related markets as well, as monopolists seek to extract the maximum rents. Indeed, in some scenarios, moving anticompetitive restraints to the aftermarket could offer monopolists a way to avoid antitrust scrutiny altogether. This is the opposite of what *Kodak* aftermarket analysis intended.

## ARGUMENT

### I.  Regardless of the Market, Protections Against Tying Are About Consumer Choice

Preserving consumers' freedom of choice is at the heart of antitrust law's prohibition against anticompetitive tying. As the Supreme Court explained, illegal tying arrangements "fare harshly" under the antitrust laws because "buyers are forced to forego their free choice between competing products." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958). Most other monopolization violations reduce consumer options indirectly through their effect on competitors—for example, by denying rivals access to sufficient distribution or terminating a prior profitable course of dealing. But

tying works through direct and immediate effects on consumer decision-making. This can make it particularly effective and pernicious. *See Jefferson Parish,* 466 U.S. at 12 ("The vice of tying arrangements lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that he either did not want at all, or might have preferred to buy elsewhere on different terms.").

The focus on consumer choice is reflected in the elements of a tying violation. Along with anticompetitive effect, (1) consumer demand must exist for two distinct products or services, (2) consumers must be subject to the seller's market power in one market, and (3) consumers must be coerced into buying the product in the second market. *Id.* at 12-18. At bottom, these boil down to a central question: have consumers lost a competitive market choice because of the tie?

The question does not change because the tying violation involves aftermarkets. Indeed, this is the point of the *Kodak* decision and the cases that follow it. Its "lock-in" analysis, like all tying analyses, foregrounds consumer choice. The factors it identifies are buyer centric: (1) the consumers' awareness of the aftermarket restrictions at the time of purchase, (2) the consumers' sophistication and ability to engage in

9

lifecycle pricing, and (3) the consumers' ability to switch away from the primary or foremarket product. *See Kodak* at 473-7. Each asks whether the consumer makes a free and informed choice when purchasing a foremarket product with aftermarket restrictions. Where the consumer can make such a choice, the antitrust laws do not interfere. Where that choice is constrained, *Kodak* tells us, antitrust laws must step in to protect the consumer.

The district court decision here misses the distinction by ignoring a key fact: the alleged monopoly in the foremarket. Defendant is alleged to have a nearly 99% market share in minimally invasive soft tissue surgical robots. Monopoly, whether lawful or not, constrains consumer options, particularly when it is as extreme as this one. The *Kodak* factors do not translate to this context. It makes no sense to talk about the buyer's choice if the initial purchase was made in a market without viable competitive options. The buyer's ability to do lifecycle pricing does not matter if the buyer has no other comparisons. Similarly, it matters little if the aftermarket restrictions were put in place before or after the purchase, or if the consumer was informed of the aftermarket restrictions. The buyer's only option was to purchase on

10

the monopolist's terms or forego the primary product or service entirely. In short, where an aftermarket is an extension of a monopolist's power in the foremarket, the answer to whether a tie takes away customer choice is always "yes."[3]

This Circuit's application of *Kodak* has consistently recognized the front-line role of foremarket competition in ensuring customer choice in aftermarkets. For example, this Court's *Epic v. Apple* decision begins by framing the question presented in *Kodak* to exclude scenarios in which buyers' options in the foremarket are already limited. 67 F.4th at 976 (describing *Kodak* as addressing "whether a lack of market power in the foremarket […] categorically precludes a finding of market power in the aftermarket."). The Court thus makes clear that assessing market position in the foremarket is the non-negotiable precursor to any *Kodak* analysis. Using *Kodak* factors to measure customer freedom of choice when that choice is already constrained by conditions in the foremarket is redundant and indeed nonsensical.

---

[3] This is not to say that the tie is always an antitrust violation. A rule of reason analysis may still apply and justifications may exist. The important point is that where choice is constrained, only an appropriate antitrust analysis will protect the consumer.

This Circuit's other leading case on aftermarkets, *Newcal,* followed the same order of operations—assessing competition in the foremarket first and only then, if appropriate, seeking proof of *Kodak* lock-in factors. There, the *Kodak* lock-in factors were invoked to counter the "economic presumption" that buyers freely accept aftermarket restrictions when entering into a foremarket contract. *Newcal,* 513 F.3d at 1050. But, for the presumption to apply in the first place, the Court emphasized, the contractual commitment must be made in "an initial (competitive) market." *Id.* The negative implication is clear: without a competitive foremarket for the contract, the restrictions it contains cannot be a proxy for customer choice.

This Circuit makes the same observation more directly when it recognizes that an acceptance of aftermarket restrictions can only reflect customer choice when it is both knowing *and voluntary*, a distinction which requires a competitive foremarket. The *Newcal* court repeatedly makes specific note of this connection as a way to differentiate cases with aftermarket liability from those without. *Id.* at 1046-8.

It is, for example, the *Newcal* court's basis for distinguishing the Third Circuit decision in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir. 1997), restricting antitrust liability for a pizza franchise's aftermarket supply requirements. The *Newcal* court explains that the earlier decision was "grounded in in the fact that the primary market [… was] a competitive market." *Id.* at 1046. Indeed, it is "*because there was a competitive market* for substitutable written agreements" that the court can conclude that the Domino Pizza franchisees "must have made a conscious and voluntary choice" to accept restrictions on ingredient purchases (emphasis added). *Id.* at 1047. Competition in the foremarket allows the court to presume, absent additional *Kodak*-factor showings, that the franchise contracts in *Queen City* were entered into not simply with awareness of aftermarket restrictions but "knowingly and voluntarily." *Id.*

The *Newcal* court similarly distinguished this Circuit's prior decision in *Forsyth v. Humana, Inc.,* 114 F. 3d. 1467 (9th Cir. 1997), which denied liability for alleged monopolization by Humana and relevant hospitals over an "aftermarket" for those hospitals' Humana insureds. The *Newcal* court explained that the claim failed because

13

there the relevant hospitals that constituted the foremarket lacked "market power in the general market for all economically substitutable hospital care." *Newcal,* 513 F.3d at 1048. Instead, the only source of market power over Humana insureds was "a contract explicitly granting the hospitals that power." *Id.* In other words, where the defendant's power over its customers was willingly given there was no "market power" in the antitrust sense of the word.

The "relevant principle" the *Newcal* court extracts from these cases is instructive for this case as well. *Id.* at 1049. Aftermarket antitrust liability cannot rest on market power derived "*solely* from contractual rights that consumers *knowingly and voluntarily* gave to the defendant." *Id.* (emphasis added). But all the modifiers are important here: to rule out aftermarket liability, the initial buyer's choice must not just be informed but freely made, which is only possible with a competitive foremarket.

The recent decision in *Lambrix v. Tesla,* 737 F. Supp. 3d 822 (N.D. Cal. 2024), encapsulates this logic. The district court there distinguished between the plaintiffs' tying claim, which alleged market power in the EV foremarket, and the *Kodak*-style aftermarket cases

14

that require further proof of downstream market power. The court reasoned that where upstream market power means customers do not have freedom of choice in the foremarket, they necessarily "have minimal ability to discipline the company's conduct in aftermarkets, regardless of information costs, switching costs, and general awareness of restrictions." *Id.* at 841. This is the model the district court here should have followed.

## II.  Policy Justifications for Limiting Aftermarket Liability Do Not Apply in Monopolized Foremarkets

This Circuit's precedent shows that requiring proof of the *Kodak/Epic* factors in the context of monopolized foremarkets does not square with the logic of protecting consumer choice. Given that fact, it also should not fit with any of the policy concerns often advanced for limiting *Kodak*-style liability. It does not.

One such concern is that overly broad liability for *Kodak*-style monopolization may interfere with potentially efficient business practices, like life-cycle pricing or "metering." According to this theory, high prices in the aftermarket for more frequently replaced components may allow for lower prices in the foremarket. *See* Carl Shapiro, *Aftermarkets and Consumer Welfare*, 63 Antitrust L.J. 483, 493-4

(1995). This hypothetically allows for customers to spread costs over time and allows for price-discrimination between different types of users of the foremarket product. *Id.* Thus, to take an often-used example, a razor can be offered at a lower cost and razor blades at a higher one, meaning that light users will pay less overall than heavy users. *Id.*

In an environment in which there are competitive pressures on the overall costs of the "system," economists have observed that metering practices like this do not necessarily yield monopoly profits. According to this economic theory, the supracompetitive prices on aftermarket products may instead be "rebated" to the customer in the form of discounted, infracompetitive pricing on equipment. *Id.* at 493. While there may be fairness questions about which customers benefit and which lose out, such "systems competition" means that suppliers who sell their equipment in a competitive foremarket can "only earn competitive rates of return overall" for equipment and service. *Id.* at 494. The *Kodak* factors add value in this context because they help determine whether the factual situation is an exception to this presumption. In other words, the *Kodak* analysis identifies whether

there are informational problems that would prevent this systems competition from performing its check on the overall price.

Here, however, proof of the *Kodak/Epic* factors is irrelevant to this concern. As Professor Shapiro makes clear, this systems competition rationale hinges first on a "competitive" foremarket. *Id.* Without the competitive pressure in the original equipment market, there is no effective systems competition at all. The notion that supracompetitive pricing in the aftermarket will be balanced by infracompetitive pricing in the foremarket no longer holds. And the premise that there can be no monopoly profit-taking, only redistribution, falls apart. Looking for an exception under *Kodak* makes no sense when the initial basis for the presumption is not there.

A second reservation about *Kodak*-style aftermarket antitrust liability is rooted in a hesitancy to second-guess contractual freedom. The crux of this idea is that antitrust can be a "blunt instrument" and that, where possible, the potential for aftermarket opportunism is often best dealt with via flexible contract terms negotiated at the time of the foremarket purchase. *Id.* at 496. This is because "each manufacturer [in the foremarket] has an incentive to try to offer stronger commitments to

17

its customers than do other firms." *Id.* Warranties, guarantees and other service commitments, for example, may help address the potential for exploitation of customer lock-in after the initial product purchase. *Id.* at 488-89 (describing various contractual protections). In a healthy foremarket, the theory says, "competition should favor those manufacturers that can design more effective contracts or that have a greater reputation to put on the line." *Id.* at 496. As the *Kodak* analysis recognizes, this doesn't always work, and exceptions may be necessary for customers without the sophistication to negotiate for protections or without access to the transparency to rely on reputational constraints.

But here, again, the lynchpin of effective contractual and reputational constraints on aftermarket exploitation is competition. Without competition in the foremarket, a manufacturer like Intuitive faces no pressure from other firms to offer stronger commitments or to build a better reputation. It is fruitless to demand a plaintiff show customers are unsophisticated or transparency is lacking when the leverage those customers might otherwise exert does not exist in the first place.

Finally, critics of the expansion of *Kodak*-style liability sometimes point to a risk that overly broad aftermarket antitrust liability might compromise foremarket competition. If a manufacturer fears exposure to antitrust liability for a post-purchase change in aftermarket policies, they argue, it may sacrifice "flexibility in setting and implementing" those policies. *Id.* at 492. As a result, "competition [in the foremarket] may be stifled and buyers hurt." *Id.* Articulating this policy concern, Professor Shapiro explains that the calculus may weigh against antitrust intervention, provided that the harm from a "surprise" change in aftermarket restrictions is time-limited by the buyer's ability to switch to a different foremarket product. *Id.* The *Kodak* factors, which identify aftermarkets with particularly high switching costs, offer a way to isolate potential exceptions to this assumption.

But when the foremarket is monopolized, the calculus changes dramatically. First, there is no trade-off between protecting foremarket and aftermarket competition. Instead, there is simply no or virtually no foremarket competition to begin with. And encouraging aftermarket competition becomes even more important because it may be the consumer's best or only source of power. Indeed, with a monopoly as

19

total as Intuitive's position in MIST robots, the aftermarket may offer the only effective competition customers can rely on. Second, lack of foremarket competition means the harm from surprise changes to aftermarket restrictions likely will not be short-lived. Buyers without switching options offer no discipline to a monopolists' incentive to exploit customer lock-in. Asking for proof of high switching costs in this environment adds nothing to the assessment.

In short, the policy concerns offered to justify a strict application of the *Kodak* factors have no purchase in a situation like this one. Both the concerns and the factors themselves assume that customers have choices in the foremarket. When customers lack those choices, proof of *Kodak* factors serves no valid policy goal.

## III. The District Court's Approach Would Leave Vulnerable Consumers Doubly Exposed

Lack of choice strips consumers of their most powerful market tool. As the Supreme Court has observed, "the assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers." *Nat'l Soc'y of*

20

*Profl. Eng'rs,* 35 U.S. 679, 695 (1978). Because they lack such options, customers of entrenched monopolists are inherently vulnerable, regardless of whether the monopoly is legally obtained or not.

In this case, hospitals and the patients they care for are already vulnerable to potential anticompetitive conduct simply as a function of Defendant's extremely high market share in the foremarket for MIST surgical robots. This distinguishes the consumers here from those in *Kodak, Epic, Newcal* and other similar aftermarket cases. The primary product options available to customers in the *Kodak*-type aftermarket cases mean they entered into their foremarket "bargain" in a very different position than the customers here.

The application of the *Kodak/Epic* factors in those cases asks whether market imperfections block customers from using the power of choice in the foremarket to constrain anticompetitive conduct in aftermarkets. Even if reasonable people may disagree about how to apply the *Kodak/Epic* factors to determine whether a buyer's ability to choose in the foremarket gives it sufficient power in the aftermarket, it is uncontroversial that the factors cannot be used to manufacture a choice that never existed in the first place. Without that initial

21

opportunity for customer choice, the *Kodak/Epic* factors are at best unreliable indicators of aftermarket conditions and at worst red herrings.

As we have discussed above, it is nonsensical to insist, as the district court here does, that a defendant monopolizing a foremarket cannot be found guilty of anticompetitive conduct in an aftermarket unless a plaintiff can show the presence of additional *Kodak/Epic* factors. The *Kodak/Epic* factors are not designed for that purpose. But beyond that, the district court's requirement makes already exposed consumers vulnerable to additional kinds of anticompetitive conduct. At the extreme, it can leave those consumers with no antitrust protection at all. Indeed, a monopolist might exploit the limits on aftermarket liability to carve out immunity simply by moving anticompetitive constraints from the foremarket to the aftermarket.

A hypothetical version of this case illustrates the potential. If, Defendant, instead of relying on self-destructing attachments, had extended the scope of its monopoly by forcing its customers to switch to a new patented version of the MIST surgical robot at the end of the previous version's patent life, antitrust scrutiny would be likely. If

22

competition were excluded as a result of the forced switch, Defendant would likely have to show procompetitive justifications for the switch or face liability. Brand pharmaceutical manufacturers, for example, have been found to violate antitrust laws based on similar fact patterns. *See, e.g., New York ex rel. Schneiderman v. Actavis,* 787 F.3d 638 (2d Cir. 2015) (antitrust violation found when brand manufacturer pulled an unpatented product from the market before introducing a patented, but otherwise substantially similar product with little consumer benefit). But because Defendant instead forces its customers to buy aftermarket attachments at supracompetitive prices, even when unnecessary and even when it excludes alternative suppliers, the district court's rule would exempt such coercion from antitrust scrutiny altogether. This makes no logical sense, creates the same types of consumer harms, and only encourages gamesmanship that is inconsistent with the mandate of antitrust law to protect the healthy functioning of markets.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order requiring Plaintiff to satisfy the *Kodak/Epic* factors in order to pursue its tying claims.

Respectfully submitted,

/s/ *Kathleen W. Bradish*
KATHLEEN W. BRADISH
*COUNSEL OF RECORD*
AMERICAN ANTIRUST INSTITUTE
1025 Connecticut Avenue, NW
Washington, DC 20036
kbradish@antitrustinstitute.org
(202) 304-0195

.

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Counsel for all parties to the case are registered ACMS users and will be served by the appellate ACMS system.

s/ Kathleen W. Bradish

Dated: July 30, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated         .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                              **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*