No. 25-1372

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL, INC.,

*Defendant-Appellee*

———————————

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-3496 (Martínez-Olguín, A.)

———————————

## BRIEF FOR THE ASSOCIATION OF MEDICAL DEVICE REPROCESSORS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF-APPELLANT SURGICAL INSTRUMENT SERVICE COMPANY, INC.

———————————

JENNIFER GROSS
MICHAEL R. GOODMAN
OLSSON FRANK WEEDA TERMAN MATZ PC
2000 Pennsylvania Avenue NW, Suite 4003
Washington, DC 20006
202.789.1212
jgross@ofwlaw.com
mgoodman@ofwlaw.com

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS ..................................................................i

TABLE OF AUTHORITIES ..........................................................ii

CORPORATE DISCLOSURE STATEMENT.............................. 1

INTEREST OF AMICUS CURIAE.......................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT........................... 2

ARGUMENT ................................................................. 5

    I.    Medical Device Reprocessors Play A Vital Role In The
Healthcare System That Is Threatened By The
Decision Below ................................................... 5

        A.    Reprocessed SUDs Reduce Cost, Waste,
Greenhouse Gas Emissions, And Strengthen
The Supply Chain ................................................ 6

        B.    Reprocessed SUDs Undergo Even More
Rigorous FDA Review ...................................... 7

        C.    Reprocessed SUDs Fuel Hospital Savings And
Patient Care Investments .................................. 8

        D.    Reprocessing SUDs Circumvents A Volatile And
Fragile Healthcare Supply Chain ................................. 9

        E.    The Reduction Of Medical Waste Is Significant.......... 10

    II.    The District Court Applied The Wrong Legal
Standard And Required Unalleged Facts To
Establish Market Power ...................................... 12

CONCLUSION ................................................. 23

CERTIFICATE OF COMPLIANCE ..................................... 25

i

# TABLE OF AUTHORITIES

P<small>AGE</small>(S)

**Cases:**

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011.............................................................................6

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
  No. 23-55662, 2025 WL 1730270 (9th Cir. June 23, 2025)...........17, 18

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ...............................3, 4, 11, 13, 14, 15, 18

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)..........................3, 4, 12, 13, 14, 15, 18, 22

*Innovative Health, LLC v. Biosense Webster, Inc.*,
  No. 22-55413, 2024 WL 62948 (9th Cir. Jan. 5, 2024)........................11

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ........................................................15, 16, 17, 18, 24

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ...............................................................6

*Lambrix v. Tesla, Inc.*,
  737 F. Supp. 3d 822 (N.D. Cal. 2024) .................................................13

*Newcal Indus., Inc. v. Ikon Office Solutions*,
  513 F.3d 1038 (9th Cir. 2008) .............................................................13

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ...............................................................18

**Statutes & Other Authorities:**

Federal Rule of Appellate Procedure 26.1.................................................1

Intuitive's Rule 50(a) ........................................................................3

Terrence J. Loftus, *A Comparison of the Defect Rate Between Original Equipment Manufacturer and Reprocessed Single-Use Bi- Polar and Ultrasound Diathermy Devices*, 9 J. Med. Devices 4 (Dec. 2015)..........8

U.S. Government Accountability Office, GAO-08-147, *Reprocessed Single-Use Medical Devices: FDA Oversight Has Increased, and Available Information Does Not Indicate That Use Presents an Elevated Health Risk* (Jan. 2008) ........................................................8

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Association of Medical Device Reprocessors states that it does not have a parent corporation, nor does any publicly-held corporation own 10% or more of its stock.

Dated:  July 30, 2025

By:   /s/ Jennifer Gross
JENNIFER GROSS
OLSSON FRANK WEEDA TERMAN MATZ PC
2000 Pennsylvania Avenue, NW
Suite 4003
Washington, DC 20006
202.789.1212
jgross@ofwlaw.com

*Counsel for Amicus Curiae*

## INTEREST OF AMICUS CURIAE

The Association of Medical Device Reprocessors ("AMDR") is the global non-profit trade organization representing the interests of regulated firms that collect, clean, repair, disinfect and/or re-sterilize (among other steps) medical devices marketed by the original equipment manufacturer ("OEM") for "single use." The single use devices ("SUD") that AMDR members reprocess are diverse and include, without limitation, cardiovascular, general surgery, patient monitoring, compression therapy, and orthopedic medical devices.

AMDR members' reprocessed devices often compete with OEMs by providing hospitals with a safe and effective reprocessed option. These safe and effective alternatives to OEM devices boost patient access, strengthen the supply chain, cut medical waste and emissions, and significantly lower healthcare costs. A fair marketplace between medical device reprocessors and OEMs will provide the highest quality care to patients while helping to bring down the cost of medical care. The authors have written this amicus curiae brief independently.[1]

---

[1] All parties have consented to the filing of this amicus curiae brief. No counsel for a named party in this case has authored this amicus curiae

## INTRODUCTION AND SUMMARY OF ARGUMENT

After Plaintiff Surgical Instrument Service Company, Inc. ("SIS") and Defendant Intuitive Surgical, Inc. ("Intuitive") presented their case-in-chief—but before closing arguments—the Judge in the U.S. District Court for the Northern District of California erroneously granted Intuitive's Rule 50(a) motion, entering judgment in Intuitive's favor and dismissing SIS's antitrust claims. In granting judgment as a matter of law, the District Court relied primarily on *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), and *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), holding that SIS was required to show that Intuitive's customers were "locked in" to a purported single-brand aftermarket. But the locked-in standards from *Kodak* and *Epic Games* decisions are inapplicable to the facts alleged by SIS. The core of SIS's theory is that Intuitive leveraged its entrenched dominance in the surgical robotics foremarket to coerce hospitals into accepting restrictive aftermarket service terms. In contrast, both *Kodak* and *Epic Games*

_____

brief in whole or in part, and no party, party's counsel, or any other person—other than this amicus curiae or their counsel—has contributed money that was intended to fund preparing or submitting this amicus curiae brief.

involved claims of anticompetitive conduct in a single-brand aftermarket despite robust competition in the foremarket—making customer "lock-in" appropriate to prove market power.

In *Kodak*, the Supreme Court held that a firm lacking foremarket power could still violate antitrust laws through aftermarket restrictions, but only if buyers were unaware of the restrictions at the time of purchase and could not easily switch afterward—*i.e.*, if they were effectively locked in. *Eastman Kodak,* 504 U.S. at 472–78. Similarly, in *Epic Games*, the Ninth Circuit applied the *Kodak* lock-in standard to assess aftermarket power in the absence of foremarket dominance. The lock-in standard from these cases do not control here. SIS does not—and need not—rely on post-sale lock-in to establish market power. Instead, it alleges Intuitive already possessed near complete and total market power in the foremarket and used that market power to impose aftermarket restraints. The District Court's application of the lock-in standards from *Kodak* and *Epic Games* improperly elevated SIS's burden by imposing legal requirements that do not apply to SIS's foremarket-based allegations.

4

If this error is left uncorrected, there would be sweeping consequences for competition, hospital supply, and patient access, as dominant manufacturers shield themselves from antitrust scrutiny, restrict market access for reprocessors, and reduce the availability and affordability of critical medical devices to hospitals and patients.

AMDR therefore respectfully submits this brief, as a friend to the court, to ask that this Court reaffirm prior Supreme Court and Ninth Circuit precedent that evidence of foremarket monopolization is a recognized, independent method that can alone support a jury finding that Intuitive engaged in an unlawful tie. Only by correcting this legal error can the Court safeguard competition, hospital supply, and patient access to medical devices while also preserving longstanding judicial precedent.

## ARGUMENT

### I. Medical Device Reprocessors Play A Vital Role In The Healthcare System That Is Threatened By The Decision Below.

Reprocessed SUDs are an indispensable part of the American healthcare ecosystem. This Court has recognized that the central purpose of both state and federal antitrust laws is to preserve competition, which

5

is essential to the public interest. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 *citing Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000). Yet the District Court's decision undermines the public interest by giving OEMs—who already control the foremarket—unchecked power over the entire market, effectively shutting out reprocessors. Shutting out reprocessors would stifle competition and drastically limit choices and availability for hospitals, doctors, and patients.

### A. Reprocessed SUDs Reduce Cost, Waste, Greenhouse Gas Emissions, And Strengthen The Supply Chain.

Use of reprocessed devices has increased yearly as hospitals and surgical centers learn of their benefits.[2] In 2024, reprocessed devices were purchased by 8,689 hospitals and surgical centers in the U.S., including all "top hospitals" as listed by U.S. News & World Report, and are used in all 50 states and 74 U.S. military hospitals. By using regulated, reprocessed SUDs, these hospitals were able to reduce $CO_2$ greenhouse gas emissions by the equivalence of over 113 million pounds. Hospitals that reprocessed saved health systems a collective $398 million

---

[2] Internal year-over-year analysis of AMDR member data.

and diverted over 12 million pounds of medical waste.[3]

## B. Reprocessed SUDs Undergo Even More Rigorous FDA Review.

Prior to use, reprocessed SUDs are cleared by the Food and Drug Administration (FDA) to be as safe and effective as the OEM's original device and must be reprocessed pursuant to FDA regulations. In other words, each reprocessed device is subject to the same requirements as the device when new.[4] Indeed, SUD reprocessors are held to higher premarket requirements than OEMs, as reprocessors must submit additional validation and testing data not required of the original device manufacturer in order to prove the reprocessed device is substantially equivalent to the OEM device. AMDR member reprocessors test and inspect every reprocessed device, as opposed to original equipment which is typically batch tested. Because of the individual testing requirements

---

[3] AMDR 2024 Annual Member Data, "Reprocessing by the Numbers" infographic 3, U.S. only data, April 22, 2025.

[4] These FDA requirements include among others, registering and listing all devices, obtaining premarket clearance or approval, complying with the quality system regulation, submitting adverse event reports, device tracking, corrections and removals or recalls, labeling, and are subject to inspection and enforcement.

imposed on and followed by reprocessors, researchers believe reprocessed devices may be of higher quality—with fewer performance problems—than original equipment manufacturer devices.[5] In one study, virgin devices were "reported as defective 4.9 times more frequently" than their reprocessed counterpart devices.[6] Researchers believe that reprocessors are able to provide more reliable equipment by performing numerous additional inspections and weeding out "lemons"—equipment that does not work when it is used the first time.[7]

### C. Reprocessed SUDs Fuel Hospital Savings And Patient Care Investments.

The costs savings from reprocessed devices is akin to the difference between generic and brand-named drugs. Each year, hospitals and surgical centers recover hundreds of millions of dollars in savings from

---

[5] Terrence J. Loftus, *A Comparison of the Defect Rate Between Original Equipment Manufacturer and Reprocessed Single-Use Bi- Polar and Ultrasound Diathermy Devices*, 9 J. Med. Devices 4 (Dec. 2015); U.S. Government Accountability Office, GAO-08-147, *Reprocessed Single-Use Medical Devices: FDA Oversight Has Increased, and Available Information Does Not Indicate That Use Presents an Elevated Health Risk*, 21 (Jan. 2008).

[6] *Id.*

[7] *Id.*

8

reprocessed equipment that they then invest in patient care initiatives like hiring more medical professionals, expanding patient access to procedures, and adopting new technology.

If OEMs gain court-blessed control over the market, hospitals will lose opportunities to save and reinvest in the future. Reprocessed SUDs play a vital role in curbing spiraling healthcare costs, allowing hospitals to redirect savings to other priorities, and enhancing patient care by improving both access and quality.

### D. Reprocessing SUDs Circumvents A Volatile And Fragile Healthcare Supply Chain.

Reprocessing SUDs strengthens the healthcare supply chain and mitigates the risk of medical device shortages. There is no better example of this need than how the unimagined COVID-19 pandemic exposed the fragility of the United States' medical device supply chain. The public lockdowns, factory closures, and transportation bottlenecks—especially in major manufacturing hubs such as China—caused cascading delays, a scarcity in components, and medical device shortages worldwide. And the volatility in the supply chain continues after the pandemic. The supply chain will be forever shaken by wars and trade disputes, and the

related tariffs, export restrictions, and logistical delays that disrupt the international flow of medical devices and their components. Because the medical device industry relies heavily on global supply chains for components, manufacturing, and distribution, these disruptions can lead to critical shortages and inflated costs passed down to healthcare providers and patients.

FDA-cleared reprocessed devices, sourced from used devices already within the United States, fortify the medical device supply chain and effectively help shield healthcare systems from global disruptions— including trade conflicts, natural disasters, and geopolitical tensions. By drastically reducing dependence on foreign suppliers for components and new devices, reprocessing serves as a critical pillar of affordability, security, and reliability. On the other hand, allowing OEM manufacturers to limit competition from reprocessed devices cuts against the FDA's primary goal: ensuring sufficient access to the medical devices to satisfy patient need.

### E.  The Reduction Of Medical Waste Is Significant.

As noted, when hospitals and surgical centers choose reprocessed devices from AMDR members, substantial environmental benefit is

realized. Regulated medical waste can cost 5–10 times more to dispose of than regular solid waste. By using reprocessed devices, U.S. hospitals and surgical centers saved over $7.7 million.[8]

Every dollar saved by reprocessing represents revenue lost by OEMs. Since entering a regulated marketplace over 20 years ago, reprocessing companies have had to contend with anti-competitive practices of entrenched OEMs who endeavor to block reprocessors and restrict choices for hospitals and patients, as demonstrated in cases like *Innovative Health, LLC v. Biosense Webster, Inc.*, No. 22-55413, 2024 WL 62948, at *1 (9th Cir. Jan. 5, 2024). The antitrust laws stand to curb these abuses. *Id.*

Yet the District Court took the "lock-in" exception that was created in *Kodak* as an avenue for plaintiffs to bring antitrust claims in *single-brand aftermarket* cases and extended it well beyond its proper context. Doing so gives dominant players a blueprint to harm competition while avoiding consequences for their actions. That could curtail choices for hospitals and doctors and cause innumerable medical device reprocessors

---

[8] AMDR 2024 Annual Member Data, op.cit

11

to go out of business. These reprocessors would be unable to serve their customers or provide competitive constraints on monopolists.

If affirmed, the District Court's decision will slash hospital and patient access to essential FDA-regulated devices and hand dominant manufacturers a free pass to block competition. The decision allows OEMs to monopolize aftermarkets and shut out reprocessors, without any grounding in antitrust law and contrary to the FDA's mission to ensure hospital and patient access to safe and effective medical devices.

The Association of Medical Device Reprocessors seeks to provide this Court with the perspective of an industry at risk in view of a vulnerable public. We therefore submit this amicus curiae brief in support of SIS and urge this Court to recognize the grave threat the District Court's decision poses to competition, hospitals, and patients.

II.   **The District Court Applied The Wrong Legal Standard And Required Unalleged Facts To Establish Market Power.**

The District Court granted Intuitive's motion for judgment as a matter of law after SIS acknowledged that it could not present facts satisfying the four-factor test for proving market power laid out in *Epic*

*Games, Inc. v. Apple Inc.*, a framework designed specifically for cases involving a *competitive* foremarket and a single-brand aftermarket to assess whether customers were locked-in to an alleged single-brand aftermarket. However, the standard for assessing lock-in in a single-brand aftermarket with a competitive foremarket doesn't apply here, because the defendant already holds—or can present to a jury—evidence of supracompetitive power in the foremarket.

It has long been settled, as a matter of U.S. Supreme Court and Ninth Circuit precedent, that market power in the foremarket alone is sufficient to support a tying claim. Only where the foremarket is competitive is the question of lock-in relevant. This is particularly so where there is no allegation that the defendant has market power as a single-brand aftermarket. As the court in *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 841 (N.D. Cal. 2024), explained, relying on *Newcal Indus., Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008), and *Epic Games*, 67 F.4th at 976,the purpose of the *Epic Games's* "lock-in" standard is to assess whether competition in the foremarket is sufficient to discipline potentially anticompetitive conduct in the aftermarket. Where, as here, the foremarket is not competitive and the

defendant's conduct is alleged to involve unlawful tying, the additional burden of showing lock-in in the aftermarket is unnecessary. Because this case involves supracompetitive market power in the foremarket, and SIS met its burden to present evidence of that market power to the jury, the lock-in standards from *Kodak* and *Epic Games* do not settle the tying and monopoly allegations claims SIS brings against Intuitive. Indeed, they are not even relevant. The District Court's reliance on *Kodak* and *Epic Games* and imputation of the lock-in analysis is simply wrong, and unsupported by any applicable precedent. And the ripple effects of the District Court's decision will have a devastating impact on multiple industries.

The District Court, in accepting Intuitive's argument that SIS had to prove both foremarket power and aftermarket lock-in, improperly conflated the standards governing distinct theories of liability. This misapplication of law creates an insurmountable burden in a context where it did not apply. This faulty view could cripple the reprocess industry by making the lift heavier than ever before to keep the playing field fair.

The Supreme Court made clear in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 472–78 (1992), that customer lock-in can establish market power in a single-brand aftermarket—even when the manufacturer *lacks* power in the foremarket—if buyers are unaware of restrictions and cannot switch after purchase. But that doctrine has no relevance when, as SIS argued here, the defendant already possesses market power in the foremarket and uses that market power to force purchasers to accept aftermarket conditions they would otherwise reject.

The correct standard to apply in tying cases like this one, where the defendant dominates the foremarket, is set forth in *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)[9], not the lock-in portions of *Kodak* and *Epic Games*. *Jefferson Parish* involved an alleged tying arrangement in which hospital patients (or their physicians) were required to accept anesthesiology services (the tied product) exclusively

---

[9] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) remains controlling law for general tying under Section 1 of the Sherman Act. The presumption that patents confer market power—recited in Jefferson Parish—has been expressly overruled. The underlying antitrust principles from Jefferson Parish, unrelated to patents, remain intact and are still routinely applied in tying cases.

from a provider selected by the hospital as a condition of accessing the hospital's operating rooms (the tying product). *Jefferson Parish*, 466 U.S. at 5-8.

Tying arrangements are condemned by courts when a seller leverages market power to force purchasers into actions they wouldn't take in a competitive environment. *Id.* at 12-14. When "such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* While the Supreme Court ultimately held that the agreement did not violate the antitrust laws, it did so based on a *factual determination* that the plaintiff failed to demonstrate that the seller possessed sufficient market power in the foremarket to force customers to accept the tied product and the restrictive terms. *Id.* at 26-31.

SIS's allegations closely track the tying standards that the Supreme Court validated as anticompetitive in *Jefferson Parish*. The central antitrust concern—leveraging foremarket dominance to restrain competition and choice in an aftermarket—is the same. Established antitrust precedent holds that when plaintiffs demonstrate power and

coercion in the foremarket, anticompetitive harm in the aftermarket is actionable—even without proving the existence of a distinct single-brand aftermarket or customer lock-in. *See e.g. Id.* at 13-14 (explaining essentially that a tying arrangement can be unlawful when a seller with market power in the foremarket (tying product) coerces purchasers to buy a separate product, resulting in actual or potential foreclosure of competition in the tied product market).

Antitrust law recognizes several principal ways to prove market power—two being direct and/or indirect evidence. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, No. 23-55662, 2025 WL 1730270, at *6-9 (9th Cir. June 23, 2025) (collecting cases). Under the direct evidence approach, plaintiffs can present proof that the defendant actually succeeded in imposing supracompetitive prices or causing anticompetitive harm without losing market share. *See Id.* at 6. If Intuitive did, in fact, keep prices artificially high or restrained rivals while maintaining its position, that conduct itself establishes the requisite market power. *See Id.*

Alternatively, antitrust courts accept standard indirect evidence.

17

*Id.* at 6-9. This method requires plaintiffs to (1) define a relevant market, (2) demonstrate that the defendant controls a substantial share of that market, (3) show high barriers to entry, and (4) establish that existing competitors cannot readily expand or new entrants cannot easily overcome those barriers. *Id.* Where competitors cannot discipline or constrain the defendant's conduct, a court can infer that the defendant possesses the power to inflict anticompetitive harm. *See e.g. United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001) (*en banc*).

The key difference here is that, unlike the plaintiff in *Jefferson Parish*, SIS offers substantial expert evidence—and a detailed factual record—supporting Intuitive's supracompetitive position in the minimally invasive surgical robotics foremarket. That evidence addresses the precise evidentiary gap that defeated the tying claim in *Jefferson Parish*.

Separate and distinct from the lock-in analyses in *Kodak* and *Epic Games,* SIS's theory is a classic foremarket-into-aftermarket tying claim. It is actionable under longstanding antitrust precedent—so long as market power in the tying market is shown—which SIS has directly

18

alleged and supported with evidence. Yet the District Court improperly required SIS to prove both that Intuitive had market power in the foremarket—a fact supported by expert evidence showing a lack of meaningful competition—and also that customers were locked in post-purchase. That elevated, unnecessary burden directly conflicts with controlling precedent.

The rule of reason, which underlies Section 1 tying claims, prohibits antitrust liability absent proof of the ability to cause anticompetitive harm. If a defendant lacks such power, liability does not attach. But if a defendant can raise prices, exclude competition, or *distort consumer choice*—as Intuitive did by exploiting high barriers to entry, using restrictive agreements, and cutting off access to third-party service providers—then the law deems that conduct potentially anticompetitive. That is exactly the kind of power SIS alleged Intuitive possessed and abused in this case.

The facts in SIS's case demonstrate how Intuitive exploited the FDA regulatory process to entrench a dominant, supracompetitive position in the surgical robotics market, thereby coercing hospitals and

19

patients into exclusive reliance on Intuitive's aftermarket services. For the past quarter-century, Intuitive's da Vinci system has functioned as the de facto standard for minimally invasive soft tissue surgeries, owing to an absence of viable competitors. Intuitive systematically maintained this dominance by repeatedly submitting new 510(k) clearance applications that leveraged its own predicate da Vinci devices, effectively creating regulatory hurdles for would-be entrants. Given the technical complexity of surgical robots, any potential competitor attempting to develop a substantially similar device and obtain requisite FDA clearance through the 510(k) pathway faced a process so lengthy and burdensome that their device would be rendered commercially obsolete before reaching the market. As a result, genuine competitive entry was foreclosed, and the da Vinci system remained unrivaled.

With strong demand, steep regulatory hurdles, no meaningful competition, and widespread physician reliance on the da Vinci platform, hospitals had little choice but to adopt Intuitive's system. Intuitive then leveraged this market dominance to impose restrictive agreements, precluding hospitals from engaging third-party service providers such as SIS for repairs or refurbishment of da Vinci robots and accessories. The

20

practical consequence was that hospitals were compelled to repeatedly invest in expensive new da Vinci systems and accessories rather than preserving value through independent servicing options. By wielding its supracompetitive foremarket power, Intuitive compelled compliance with its anticompetitive aftermarket restrictions, insulating itself from competition and undermining choice and cost savings for healthcare providers.

While necessary, the FDA regulatory processes of obtaining premarket approval or clearance presents a natural barrier to entry. So, Hospitals and patients already suffer the consequences of having certain expensive and complicated medical devices with FDA-blessed supracompetitve foremarket market powers. But the District Court greenlit powerful medical device companies with supracompetitve foremarket market powers to foreclose competition in the aftermarket too, by forcing hospitals to "knowingly" sign away any possibility of refurbishing its very expensive devices.

Recasting SIS's claims to require proof of a valid single-brand aftermarket—specifically by demanding a demonstration of aftermarket

lock-in—imposes a burden that exceeds established legal standards for tying claims rooted in a foremarket monopoly. This approach not only misapplies the law but also undermines the very purpose of the antitrust statutes, which are designed to deter dominant firms from leveraging their foremarket power to restrict competition and inflate prices in the aftermarket. The Ninth Circuit's decision in *Epic Games* set out four criteria for assessing antitrust violations in the aftermarket; the one critical factor in dispute here is whether the challenged aftermarket restrictions are generally disclosed to buyers before they purchase the primary product.

SIS could not plausibly demonstrate that hospitals were unaware of the prohibition on using third-party service providers—nor should they have to. Due to the absence of meaningful competition in the market for soft-tissue robotic surgery systems, hospitals faced no real choice and were compelled to accept Intuitive's contractual terms precluding independent repair or refurbishment of the da Vinci system and its accessories. The District Court's failure to recognize this dynamic led it to mischaracterize the nature of SIS's claims.

If this Court upholds the District Court's framework that transforms SIS's allegations into a mere single-brand aftermarket issue—and then require proof that hospitals were *unknowingly* locked-in—this will embolden dominant medical device companies to use disclosure as a shield for otherwise anticompetitive conduct. Such a precedent will allow manufacturers with regulatory entrenchment or foremarket dominance to force desperate hospitals and physicians into restrictive contracts, foreclose third-party service options, and significantly drive-up costs, ultimately to the detriment of patients. Proof of contractual awareness should not provide a safe harbor for conduct that insulates foremarket monopolists from all antitrust accountability, nor legitimize practices that the law is meant to prevent.

## CONCLUSION

Under the applicable precedent of this Court and the United States Supreme Court, the "lock-in" analysis is applicable only where the foremarket is competitive, and not where, as here, the defendant has controlling market power in the foremarket. Here, the District Court's ruling rested on a fundamental misunderstanding of SIS's factual allegations. Because SIS's claims arise from foremarket dominance,

23

established precedent—including *Jefferson Parish* and its progeny—establish that SIS was not required to also prove customer lock-in in the aftermarket.

The District Court's approach, ungirded by precedent, risks immunizing exclusionary conduct that could gut an entire industry. AMDR therefore respectfully requests that the Court reverse and remand for further proceedings consistent with this well-settled legal framework.

Respectfully submitted,

Date July 30, 2025

By: */s/ Jennifer Gross*
JENNIFER GROSS
MICHAEL R. GOODMAN
OLSSON FRANK WEEDA TERMAN MATZ PC
2000 Pennsylvania Avenue NW,
Suite 4003
Washington, DC 20006
202.789.1212
jgross@ofwlaw.com
mgoodman@ofwlaw.com

*Counsel for Amicus Curiae*

24

## <u>CERTIFICATE OF COMPLIANCE</u>

**9th Cir. Case Number(s) 25-1372**

I am the attorney or self-represented party.

**This brief contains 4,248 words,** including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: July 30, 2025

By: */s/ Jennifer Gross*
JENNIFER GROSS
MICHAEL R. GOODMAN
Olsson Frank Weeda Terman Matz PC
2000 Pennsylvania Avenue NW,
Suite 4003
Washington, DC 20006
202.789.1212
jgross@ofwlaw.com
mgoodman@ofwlaw.com

*Counsel for Amicus Curiae*