No. 25-1372

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————————————————

SURGICAL INSTRUMENT SERVICE
COMPANY, INC.,
*Plaintiff-Appellant,*

v.

INTUITIVE SURGICAL, INC.,
*Defendant-Appellee.*

————————————————————

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-03496 (Hon. Araceli Martinez-Olguin)

————————————————————

**BRIEF OF THE FEDERAL TRADE COMMISSION
AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

————————————————————

*Of Counsel*:

GEOFFREY M. GREEN
JOSEPH R. BAKER
JOSEPH CONRAD
ALOK NARAHARI
FEDERAL TRADE COMMISSION
Washington, D.C. 20580

LUCAS CROSLOW
  *General Counsel*

H. THOMAS BYRON III
  *Deputy General Counsel*

MARIEL GOETZ
  *Attorney*
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2763
mgoetz@ftc.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................ii

INTRODUCTION ....................................................................................1

INTEREST OF AMICUS ...........................................................................2

STATEMENT............................................................................................4

ARGUMENT ............................................................................................9

THE DISTRICT COURT IMPROPERLY REQUIRED SIS TO PROVE *KODAK* FACTORS TO ESTABLISH A RELEVANT MARKET....................................11

    A.  Where A Defendant Has Market Power In A Foremarket, Proof Of *Kodak* Factors Is Not Required To Define A Relevant Aftermarket. ...............................................................14

    B.  The District Court Erred In Requiring SIS To Prove The *Kodak* Factors.................................................................22

CONCLUSION ......................................................................................24

i

# TABLE OF AUTHORITIES

## CASES

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 35 (3d Cir. 2016) ................................................................ 16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................. 11, 28

*Coronavirus Rep. v. Apple, Inc.*,
85 F.4th 948 (9th Cir. 2023) ............................................................. 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 45 (1992) ............................................................... passim

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ..................................................... passim

*FTC v. Deere & Co.*,
No. 25-cv-50017, 2025 U.S. Dist. LEXIS 109177 (N.D. Ill. June
9, 2025) ................................................................................. 25, 26

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ............................................................. 16

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 86 (N.D. Ill. 2023) ............................................ 25, 26

*Lambrix v. Tesla*,
737 F. Supp. 3d 822 (N.D. Cal. 2024) ......................................... 23, 24

*Newcal Indus. v. Ikon Off. Sol.*,
513 F.3d 1038 (9th Cir. 2008) .................................................. passim

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) ................................................................ 11, 29

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ........................................................................ 11

**STATUTES**

15 U.S.C. § 1 ...................................................................... 1, 2

15 U.S.C. § 2 ...................................................................... 1, 2

**OTHER AUTHORITIES**

Fed. R. App. P. 29 ................................................................ 4

John M. Yun, App Stores, Aftermarkets, & Antitrust, 53 Ariz. St. L. J. 1283 (2021) .............................................................. 15

*Nixing the Fix: An FTC Report to Congress on Repair Restrictions,* FTC (May 6, 2021) ............................................................. 3

## INTRODUCTION

In this antitrust case, plaintiff Surgical Instrument Service Company (SIS) alleges that Intuitive Surgical (Intuitive) holds a dominant position in the market for certain surgical robots (the "foremarket"), and engages in conduct that harms competition in the markets for replacement and repair of parts for its robots (the "aftermarkets"). SIS is an independent medical device repair company that wishes to offer less expensive replacement and repair of Intuitive surgical robot parts. But SIS alleges that Intuitive has blocked SIS from competing in these repair aftermarkets through a series of restrictive practices that SIS claims violate Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 & 2.

The district court made a critical legal error in its instruction about what SIS must prove to establish the relevant antitrust markets: with regard to the alleged aftermarkets, it required SIS to prove additional "lock-in" factors beyond traditional market definition principles. There is no need for such proof when the defendant has market power in the foremarket—as alleged here. The FTC submits this brief to explain why the district court's jury instruction was

improper and why it contravenes precedent from the Supreme Court and this Court, as well as basic antitrust economics. If not corrected, this doctrinal error could interfere with effective enforcement of the antitrust laws, making it more difficult to stop anticompetitive practices that harm important segments of the economy and raise health care costs.

## INTEREST OF AMICUS

The Federal Trade Commission (FTC) enforces the federal antitrust laws and has a strong interest in their correct application. The FTC has a particular interest in ensuring that courts properly analyze claims arising under the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, including the claims asserted in this case.

The FTC likewise has a strong interest in protecting consumers' freedom to repair products they own—often described as a "right to repair"—and seeks to protect against anticompetitive abuses of market power in parts and repair aftermarkets. The FTC has studied ways in which manufacturers limit consumers or independent repair shops from repairing products, the associated harms, and manufacturers' professed justifications; in 2021 the FTC issued a report summarizing its findings.

*See Nixing the Fix: An FTC Report to Congress on Repair Restrictions*, FTC (May 6, 2021). The FTC is committed to vigorously enforcing the law to combat repair restrictions that violate antitrust or consumer protection laws. For example, earlier this year, the FTC sued agricultural equipment manufacturer Deere & Company over its use of anticompetitive tactics that have driven up equipment repair costs for farmers and deprived them of the ability to make timely repairs to their equipment. *See, e.g.*, Compl., *FTC v. Deere & Co.*, No. 3:25-cv-50017 (N.D. Ill. Jan. 15, 2025). That litigation is ongoing.

The FTC also actively works to protect competition in healthcare markets, where costs have soared—and where far too often, anticompetitive practices result in higher prices, lower quality, less innovation, and fewer choices. *See, e.g.*, Compl., *FTC v. U.S. Anesthesia Partners, Inc.*, No. 4:34-cv-03560 (S.D. Tex. Sept. 21, 2023).

The FTC regularly files amicus briefs addressing the proper application of the Sherman Act. *See, e.g.*, Br. of FTC as Amicus Curiae, *Costar Grp., Inc. v. Comm. Real Estate Exch., Inc.*, No. 23-55662 (9th Cir. Jan. 26, 2024); Br. of FTC as Amicus Curiae, *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, No. 24-1936 (Fed.

Cir. Sept. 6, 2024); Br. of United States and FTC as Amici Curiae,

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, No. 22-427 (2nd Cir.

June 17, 2022); Br. of FTC as Amicus Curiae, *Applied Med. Res. Corp. v.*

*Medtronic, Inc.*, No. 8:23-cv-00268 (C.D. Cal. July 3, 2023).

The FTC files this brief in support of neither party, pursuant to

Federal Rule of Appellate Procedure 29(a)(2). The FTC takes no position

on the merits of the parties' claims.

## STATEMENT

1. SIS's Complaint alleges that Intuitive has been the leading

provider of robotic surgery systems for minimally invasive soft tissue

surgeries since the late 1990s.[1] 5-ER-1162 ¶ 2 (Compl.).[2] A surgeon

using Intuitive's system remotely operates a multi-arm "da Vinci" robot

from a console that displays video of the surgical site and enables the

surgeon to control surgical tools known as EndoWrists. *Id.* EndoWrists

are attachments to the robotic arms of the da Vinci robot, such as

forceps and scalpels. *Id.* The system allows precise multi-axis movement

---

[1] Facts referenced are based on the Complaint's allegations. The FTC
takes no position on whether evidence supports them.

[2] "ER" refers to Appellant's Excerpts of Record; "Dkt.," to district court
docket numbers; and "DE," to appeals court docket numbers, where
applicable.

of the "wrist" of the surgical tool that is not possible in traditional surgeries where a surgeon operates directly on a patient. *Id.* A new da Vinci system costs more than $2 million. 5-ER-1168 ¶ 24.

SIS alleges that Intuitive has a 99 percent market share in the worldwide and domestic markets for surgical robots used in minimally invasive soft tissue surgery. According to SIS, these sorts of robots are not interchangeable with robots for other types of surgeries, and they have become critical to modern hospitals—with nearly all top-ranked U.S. hospitals owning at least one da Vinci system. 5-ER-1173–78 ¶¶ 46–61.

2. SIS's antitrust claims center on Intuitive's practices regarding its EndoWrists. EndoWrists have an internal memory chip that counts the number of times the EndoWrist is attached to a da Vinci robot arm. 5-ER-1170 ¶¶ 30–32. Intuitive programs EndoWrists to become non-operational after a certain number of uses—typically ten—without regard to the actual physical condition or functionality of the EndoWrist. *Id.* ¶ 32. After the limit is reached, Intuitive requires the hospital to buy a brand-new replacement EndoWrist from Intuitive at full price. *Id.* Intuitive contractually prohibits da Vinci customers from

using unapproved third-party services to repair or replace EndoWrists. 5-ER-1163 ¶ 4.

SIS, an experienced medical device repair servicer, wishes to offer repair and refurbishment services for EndoWrists, and created a program for doing so. 5-ER-1170–72 ¶¶ 34–38. SIS charges 30 to 45 percent less per EndoWrist than what a hospital would have to pay to buy a replacement EndoWrist from Intuitive. 5-ER-1172 ¶ 39. SIS secured service contracts with a number of health care providers to perform these refurbishment services. 5-ER-1171–72 ¶¶ 36–38. However, once Intuitive became aware of SIS's program, it pressured these providers to back out of the program, threatening to disable a hospital's da Vinci robots. 5-ER-1172 ¶ 41.

SIS sued Intuitive, asserting violations of Sections 1 and 2 of the Sherman Act. SIS alleged that Intuitive's practices constituted unlawful tying (conditioning sales and servicing of da Vinci robots on customers buying replacement parts from Intuitive); exclusive dealing (requiring customers to replace EndoWrists with new EndoWrists sold by Intuitive, rather than allowing repair or replacement with refurbished EndoWrists); and monopolization (willfully obtaining and maintaining

6

monopoly power in the relevant markets for repair and replacement of surgical robot instruments). 5-ER-1188–91 ¶¶ 111–21.[3]

3. The district court held a 15-day jury trial. As pertinent here, the parties disputed the proper jury instructions regarding the proof required for SIS to establish that "replacement and repair of EndoWrist instruments" (the aftermarket) is a relevant antitrust market.

The parties generally agreed that the jury should be instructed that a relevant product market includes those products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. *See* Dkt. 274 at ECF pp. 16–18; Dkt. 275 at ECF p. 12; Dkt. 275-1 at ECF pp. 10–11.

Intuitive contended, however, that the court should require additional proof. Claiming that replacement and repair of EndoWrist instruments is a "single-brand aftermarket" of the type involved in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), Intuitive argued that SIS must prove the four factors outlined in *Epic*: (1) the challenged aftermarket restrictions are not generally known when consumers

---

[3] Intuitive also asserted counterclaims against SIS, which are not relevant here.

make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market. Dkt. 275 at ECF p. 12 (Disputed Instruction No. 7); *see also Epic*, 67 F.4th at 977. Those factors are derived from the Supreme Court's decision in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473–77 (1992).

SIS opposed the additional instruction requiring proof of these factors. *Kodak* and *Epic*, SIS explained, were premised on "'a lack of market power in the foremarket.'" 4-ER-716–18 (Jan. 27, 2025 charging conference transcript) (quoting *Kodak*, 504 U.S. at 455); Dkt. 274 at ECF pp. 18–19 ("The four Epic Games factors derive from concerns about a lack of market power in the foremarket."); *Epic*, 67 F.4th at 976–77. The purpose of evaluating those factors is to determine if competition present in the foremarket can in fact discipline anticompetitive behavior in the aftermarket. If so, the aftermarket may not be a relevant antitrust market.

SIS's case, by contrast, alleged that Intuitive had near-total control in the foremarket (99 percent share), meaning that there was effectively no competition in the foremarket. In that scenario, SIS explained, there is no need to assess the additional lock-in factors; foremarket competition cannot discipline the aftermarket if that competition simply does not exist. *See* Dkt. 274 at ECF pp. 18–19. Rather, ordinary market definition principles—already reflected in the jury instructions—determine whether the aftermarket is properly defined. *See id.*

After initially agreeing with SIS, 2-ER-104, the district court ultimately sided with Intuitive and ordered the additional instruction requiring proof of the specific factors. 1-ER-16. Conceding that it lacked such proof, SIS agreed to entry of judgment as a matter of law on its antitrust claims. 1-ER-14–15. This appeal followed.

## ARGUMENT

In many antitrust cases, a "threshold step" is identifying the relevant market in which the alleged anticompetitive conduct occurs. *Epic*, 67 F.4th at 974. Courts use the relevant market to assess the defendant's "'ability to lessen or destroy competition.'" *See Ohio v. Am.*

9

*Express Co.*, 585 U.S. 529, 543 (2018) (*quoting Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)). A relevant product market includes those products that are reasonably interchangeable for the same purposes—i.e., products that customers would switch to in the event of a price increase or quality decrease. *See, e.g.*, *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("Th[e] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.").

The district court departed from these principles by layering on additional proof requirements (the *Kodak* or *Epic* factors) that cannot be reconciled with fundamental principles of antitrust law in the circumstances of this case. This Court should correct that legal error and hold that, when considering an aftermarket as a relevant antitrust market, analysis of specific lock-in factors is not required where a defendant has market power in the foremarket.

10

**THE DISTRICT COURT IMPROPERLY REQUIRED SIS TO PROVE *KODAK* FACTORS TO ESTABLISH A RELEVANT MARKET.**

A relevant market can be an "aftermarket"—a market "where demand for a good or service is entirely dependent on the prior purchase of a durable good in a *foremarket*." *Epic*, 67 F.4th at 976 (discussing *Kodak*, 504 U.S. at 466–86). The term "aftermarket" often refers to goods or services related to a product that a consumer already owns, such as parts for or repairs to durable equipment. The term "foremarket" (or sometimes "primary market") refers to the market in which the consumer initially acquired that durable equipment—like the surgical robots in this case. *See Epic*, 67 F.4th at 976.

The federal antitrust laws have long protected competition in aftermarkets. *See Kodak*, 504 U.S. 451. In *Kodak*, the plaintiffs claimed that Kodak used its market power in an aftermarket for Kodak copier equipment parts to monopolize and restrain trade in an aftermarket for repair services for Kodak copier equipment. The foremarket—copier equipment—was deemed competitive. 504 U.S. at 465 & n.10. The antitrust claims required Kodak to have market or monopoly power in aftermarkets for replacement parts and service. *Id.* at 464, 480–82

11

(discussing Sherman Act claims for tying under § 1 and monopolization under § 2).

In response, Kodak argued that it could not "actually exercise the necessary market power for a Sherman Act violation" because once customers realized that their (aftermarket) service costs were increasing, Kodak would suffer a "loss in profits from lower equipment sales" in the *foremarket*. *Id.* at 465–66. These lost sales would make it unprofitable for Kodak to exercise aftermarket power. *Id.* Therefore, Kodak asked the Court to hold as a matter of law that "competition in the equipment market cannot coexist with market power in the aftermarkets." *Id.* at 471; *see also id.* at 470.

The Court rejected Kodak's argument, recognizing that a single-brand aftermarket may be a separate antitrust market where competition in the foremarket, though present, does not in fact discipline the exercise of market power in the aftermarket.[4] *Kodak*, 504

---

[4] While Kodak framed the issue as one of market power, the Court recognized that "[w]hether considered in the conceptual category of 'market definition' or 'market power,' the ultimate inquiry is the same—whether competition in the equipment market [the foremarket] will significantly restrain power in the service and parts markets [the aftermarket]." *Kodak*, 504 U.S. at 469 n.15.

U.S. at 477–78. *Kodak* defined single-brand aftermarkets based on traditional economic principles—looking to the "'commercial realities' faced by consumers,'" *id.* at 482—rather than adopting "[l]egal presumptions that rest on formalistic distinctions," *id.* at 466–67. The Court held that *even with a competitive foremarket*, market imperfections such as a change in policy, unavailability of information, or customer lock-in may support the existence of a single-brand aftermarket. *See id.* at 473–77, 486. In such cases—where the foremarket is competitive—a fact-bound analysis of market conditions is needed. But the premise of the analysis in *Kodak* is that there is effective competition in the foremarket. Otherwise, there would be no need to determine whether competition in that market could constrain aftermarket conduct.

The market imperfections that enable market power in the aftermarket despite a competitive foremarket have become known in this Court as "*Kodak* factors," and courts have considered them in numerous antitrust cases involving single-brand aftermarkets. *See, e.g.*, *Epic*, 67 F.4th at 976–80; *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1049 (9th Cir. 2008); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354,

398–404 (3d Cir. 2016); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423
F.3d 374, 384 (3d Cir. 2005). But they have no role to play when there is
no meaningful competition in the foremarket.

### A. Where A Defendant Has Market Power In A Foremarket, Proof Of *Kodak* Factors Is Not Required To Define A Relevant Aftermarket.

A court is not *always* required to assess the *Kodak* factors when
the relevant product market is an aftermarket that consists of a single
brand's products. Where a defendant has sufficient market power in the
foremarket, foremarket competition could not constrain aftermarket
practices regardless of whether the specific *Kodak* factors are satisfied.
In that instance, antitrust doctrine and precedent require only that the
plaintiff demonstrate a lack of reasonable substitutes in the
aftermarket.

1. The factual predicate underlying the *Kodak* analysis is a
competitive foremarket. If there is robust competition in the
foremarket, examining *Kodak* factors may well be required to ascertain
whether the defendant can profitably exercise market power in the
aftermarket—i.e., whether the aftermarket is a proper antitrust
market. *See Kodak*, 504 U.S. at 469–71. With a competitive foremarket,

14

economic theory suggests that customers may be able to discipline a defendant's aftermarket conduct by making choices in the foremarket. But whether competitive forces actually can have that effect in any given market can turn on the presence or absence of the *Kodak* factors.

That's not the case when meaningful competition is absent in the foremarket. When a company has market power in the foremarket, consumers lack the ability to use their foremarket purchase decisions to discipline the company's conduct in an aftermarket—regardless of factors such as information costs and switching costs. *See* John M. Yun, App Stores, Aftermarkets, & Antitrust, 53 Ariz. St. L. J. 1283, 1296 (2021) (recognizing that "when there is already market power in the primary market," consumers "have limited options—irrespective of the degree of lock-in"). Market power is the ability to "'force a purchaser to do something that he would not do in a competitive market.'" *Kodak*, 504 U.S. at 464 (*quoting Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984)). When a company has that power in the foremarket, the central predicate of *Kodak* drops away, and with it, the need to consider the *Kodak* factors.

2. This Court should hold that the *Kodak* factors are not required to establish an aftermarket as a relevant market where a defendant has market power in a foremarket. That outcome is consistent with the reasoning of *Kodak*, Ninth Circuit precedent, economic theory, and decisions from two district courts squarely addressing the question.

a. The two key Ninth Circuit decisions applying *Kodak* to antitrust aftermarkets both involved a lack of market power in the relevant foremarket. *See Epic*, 67 F.4th at 970 (proposed foremarket included Apple and Google); *Newcal*, 513 F.3d at 1049 (foremarket for copier equipment leases was "indisputably competitive"). Both cases support the FTC's position here.

i. **Epic.** In *Epic*, the Ninth Circuit affirmed the dismissal of Epic's antitrust claims against Apple, including because Epic failed to establish its proposed market. *Epic*, 67 F.4th at 978–81. Epic had expressly framed its market as a *Kodak*-style aftermarket, and accepted that the court would evaluate the *Kodak* factors in determining the relevant market. *See, e.g.*, Epic Opening Br. at ECF pp. 31, 70–71 (DE 41); Epic Reply Br. at ECF pp. 79–82 (DE 163) (arguing that "this is a

classic single-brand product aftermarket case" and that the *Kodak* factors show "persistent lock-in").

This Court held that in those circumstances—where the foremarket was understood to be competitive—Epic must show that, when purchasing the foremarket product, consumers lacked knowledge of the aftermarket restrictions at issue and that switching costs were significant (two *Kodak* factors). *Epic*, 67 F.4th at 976–79. The Court found that Epic failed to show, as a factual matter, a lack of consumer knowledge. *Id.* at 980 (stating that "the main thrust of Epic's market-definition argument" on appeal was that Epic "is entitled, as a factual matter, to a finding in favor of its proposed aftermarkets"). This "failure of proof" doomed its proposed market. *Id.*

*Epic* did not address whether *Kodak* applies in the same way in the situation alleged here—where the defendant has market power in the foremarket. Epic accepted the *Kodak* framework and did not dispute that the *Kodak* factors should apply. The salient question in this appeal thus was not presented—much less decided—in *Epic*. *Epic*'s recitation of the factors a plaintiff "must show" to "establish a single-brand aftermarket," *Epic*, 67 F.4th at 977, therefore must be understood in the

context of a competitive foremarket, *id.* at 978 (describing *Kodak* factors as applicable in the context of "competitive" foremarkets). Indeed, this Court in *Epic* purported to straightforwardly *apply Kodak*, not extend it to a new situation—i.e., where a defendant has market power in a foremarket. *See id.* at 976–77, 979.

    ii. ***Newcal.*** This Court's other key case applying *Kodak* likewise involved a "competitive" foremarket in which the defendant "ha[d] no significant market power." *Newcal*, 513 F.3d at 1049. The *Newcal* plaintiffs alleged Sherman Act violations in aftermarkets for upgrade copier equipment and copier repair services, with a foremarket for copier equipment leases. That foremarket was "indisputably competitive," *id.*; the plaintiffs did not allege that the defendant "holds power in the primary market," *id.* at 1050. Against that backdrop, the *Newcal* Court held that plaintiffs had plausibly alleged a single-brand aftermarket under *Kodak* and standard market definition principles. *Id.* at 1049–51.

    *Epic* and *Newcal* reinforce the conclusion that analysis of *Kodak* factors is appropriate in cases where a defendant *lacks* market power in the foremarket. Both emphasize that *Kodak* was premised on the

existence of competition in the foremarket. *See Epic*, 67 F.4th at 976–77; *Newcal*, 513 F.3d 1038. Moreover, both recognize that in *Kodak*, the Supreme Court "folded aftermarkets into the framework for assessing markets generally," which examines reasonable substitutability for the product at issue. *Epic*, 67 F.4th at 976; *see also Newcal*, 513 F.3d at 1045, 1051 (discussing standard market definition principles). And both embrace the idea that single-brand aftermarkets may be appropriate where foremarket competition will not discipline anticompetitive conduct in the aftermarket. *See Epic*, 67 F.4th at 976–77; *Newcal*, 513 F.3d at 1050 ("Competition in the initial market, therefore, does not necessarily suffice to discipline anticompetitive practices in the aftermarket."). This case simply presents another scenario where that disciplining effect necessarily is absent—making a single-brand aftermarket definition proper without the need for considering *Kodak* factors.[5]

---

[5] *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023), is consistent with the FTC's position. There, this Court affirmed dismissal of plaintiffs' Sherman Act claims for failure to allege a plausible relevant market, remarking that plaintiffs pleaded fifteen relevant markets in a "scattergun fashion." *Id.* at 954–57. The Court considered whether plaintiffs' allegations of downstream markets amounted to a

(Continued…)

b. In well-reasoned decisions, two district courts have concluded that evaluation of *Kodak* factors is unnecessary when (as here) a defendant has market power in the foremarket.

In *Lambrix v. Tesla*, 737 F. Supp. 3d 822 (N.D. Cal. 2024) ("*Tesla*"), plaintiffs alleged that electric vehicle manufacturer Tesla monopolized aftermarkets for Tesla repair parts and services. Plaintiffs further alleged that Tesla had market power (65 to 80 percent share) in the foremarket for electric vehicles. *Id.* at 841. After closely analyzing *Kodak*, *Epic*, and *Newcal*, the district court concluded that the *Kodak* factors "derive from concerns about a lack of market power in the foremarket," and thus "do not apply" when the defendant allegedly has market power in the foremarket—as Tesla did. *Tesla*, 737 F. Supp. 3d at 840. The court observed:

> From a practical perspective, the relevance of information costs, switching costs, and general knowledge of restrictions [*Kodak* factors] is reduced where a defendant has market power in the foremarket. . . . Consumers in a foremarket within which a company has market power have minimal ability to discipline the

single-brand aftermarket but held that plaintiffs had not demonstrated consumers' lack of awareness or significant switching costs. *Id.* at 956–57. In contrast to this case, however, there were no plausible allegations of market power in the foremarket, and the court of appeals never considered whether *Kodak* factors must be assessed in that scenario. *See id.* at 954–57.

> company's conduct in aftermarkets, regardless of information
> costs, switching costs, and general awareness of restrictions.

*Id.* at 841. The court found plaintiffs properly alleged relevant

aftermarkets without reference to the *Kodak* factors, and denied Tesla's

motion to dismiss.

The Northern District of Illinois reached a similar conclusion in a

pair of antitrust cases against agricultural equipment manufacturer

John Deere—including one case brought by the FTC and one multi-

district class action. In both, Deere was alleged to have market power in

the equipment foremarket. *See In re Deere & Co. Repair Serv. Antitrust

Litig.*, 703 F. Supp. 3d 862, 896 (N.D. Ill. 2023) ("*Deere MDL*") (citing

allegations of 55 to 63 percent market share); *FTC v. Deere & Co.*, No.

25-cv-50017, 2025 U.S. Dist. LEXIS 109177, at *8 (N.D. Ill. June 9,

2025) (citing allegations that Deere is the "leading manufacturer" and

holds a "dominant" position in the tractor foremarket). The district

court emphasized that the Supreme Court's *Kodak* decision was

premised on Kodak "*lack[ing]* market power in the primary equipment

market." *Deere MDL*, 703 F. Supp. 3d at 891, 896 ("Notably, in *Kodak*,

there was an absence of market power . . . ."), 897 ("In *Kodak*, it was

agreed Kodak had no market power in the primary market."); *FTC v.*

21

*Deere*, 2025 U.S. Dist. LEXIS 109177, at *8. The court thus

"'question[ed]' whether *Kodak* even applies in this situation," citing

*Tesla*. *FTC v. Deere*, 2025 U.S. Dist. LEXIS 109177, at *8–11 (noting

that the district court, in its prior decision in the MDL, had analyzed

*Kodak* "identically" to the *Tesla* court); *see also Deere MDL*, 703 F.

Supp. 3d at 896. In both cases, the court found that the complaints

sufficiently alleged aftermarkets, either because *Kodak* did not apply

since Deere was alleged to have market power in the foremarket, or, in

the alternative, because the *Kodak* factors were satisfied. *FTC v. Deere*,

2025 U.S. Dist. LEXIS 109177, at *9–11; *Deere MDL*, 703 F. Supp. 3d at

888–99.

The *Tesla* and *Deere* cases thus provide persuasive reasoning that

further supports the FTC's position.

## B. The District Court Erred In Requiring SIS To Prove The *Kodak* Factors.

The district court below misapprehended these legal principles

and wrongly required SIS to prove *Kodak*-style lock-in factors. This

Court should correct that legal error and hold that proof of such factors

is not necessary where, as alleged here, the defendant has market

power in the relevant foremarket.

SIS contended below that "Intuitive's da Vinci surgical robot does not have any real competitors in the primary market" and that Intuitive in fact controls more than 99 percent of that market. Dkt. 274 at ECF pp. 18–19. As a matter of economic logic and common sense, evaluating *Kodak* factors is pointless in such a scenario because those factors are designed to ascertain whether competition in the foremarket can constrain anticompetitive conduct in the aftermarket. *See Epic*, 67 F.4th at 976–77; *Newcal*, 513 F.3d at 1050. If there is no meaningful competition in the foremarket, as SIS alleged here, the very reason to undertake a *Kodak* analysis is absent. *Cf. Newcal*, 513 F.3d at 1050 (point of analyzing *Kodak* factors is to ascertain whether "[c]ompetition in the initial market" may not "discipline anticompetitive practices in the aftermarket"); *Epic*, 67 F.4th at 976–77 (same). Whether consumers are locked-in to the aftermarket because of switching costs, information barriers, or a change in policy—i.e., the *Kodak* factors—plainly does not matter if consumers have no alternatives in the foremarket anyway. An absence of competition in the foremarket "necessarily results in the inability to discipline competition in the aftermarket." Dkt. 274 at ECF p. 19.

Forgoing analysis of the *Kodak* factors here comports with the Supreme Court's repeated emphasis that courts deciding antitrust cases should avoid "formalistic distinctions" in favor of case-by-case assessment of "actual market realities." *Kodak*, 504 U.S. at 466–67; *see also Brown Shoe*, 370 U.S. at 336 (the definition of a relevant market must "'correspond to the commercial realities' of the industry"); *Am. Express Co.*, 585 U.S. at 542–44 (same). Where market realities reflect a lack of competition in the foremarket, the market definition inquiry appropriately focuses on conditions in the proposed aftermarket—i.e., "which products have a reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Epic*, 67 F.4th at 975 (cleaned up). The district court should have allowed the jury to undertake that assessment, unhindered by the erroneous instruction requiring additional proof.

## CONCLUSION

This Court should correct the district court's error and hold that SIS need not prove the *Kodak* factors where SIS alleged that Intuitive had monopoly power in the foremarket.

24

Respectfully submitted,

LUCAS CROSLOW
    *General Counsel*

H. THOMAS BYRON III
    *Deputy General Counsel*

August 6, 2025

*/s/ Mariel Goetz*
MARIEL GOETZ
    *Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W
Washington, D.C. 20580
mgoetz@ftc.gov
(202) 326-2763

Of Counsel:
GEOFFREY M. GREEN
JOSEPH R. BAKER
JOSEPH CONRAD
ALOK NARAHARI

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)  25-1372**

I am the attorney or self-represented party.

**This brief contains 4,686 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ Mariel Goetz*       **Date** August 6, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*