No. 25-1372

# In the United States Court of Appeals for the Ninth Circuit

———————————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

*v.*

INTUITIVE SURGICAL, INC.,
DEFENDANT-COUNTER-CLAIMANT-APPELLEE

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-3496)
(THE HONORABLE ARACELI MARTINEZ-OLGUIN, J.)*

———————————

## BRIEF OF APPELLEE

———————————

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019*

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA J. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

**CORPORATE DISCLOSURE STATEMENT**

Appellee Intuitive Surgical, Inc., has no parent corporation, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

Introduction ...................................................................................................1

Statement of jurisdiction ............................................................................4

Statement of the issues ...............................................................................5

Statement of the case ...................................................................................5

    A.    Factual background .........................................................5

    B.    Procedural history .........................................................14

        1.    Pretrial proceedings ...........................................14

        2.    Trial proceedings ................................................17

Summary of argument ...............................................................................21

Standard of review ......................................................................................23

Argument ......................................................................................................24

I.    The district court correctly granted judgment as a matter
of law to Intuitive because SIS failed to prove a single-brand
aftermarket ...........................................................................................24

    A.    The district court properly required SIS to satisfy the
*Epic Games* requirements for establishing a single-brand
aftermarket ......................................................................24

    B.    SIS's contrary arguments lack merit ............................30

        1.    Plaintiffs may not dispense with the *Epic Games*
requirements whenever the defendant has market
power in the foremarket .....................................31

        2.    SIS's and its amici's alternative standards lack merit .......42

        3.    In any event, SIS did not establish Intuitive's market
power for most of the relevant period ..................48

II.    Intuitive is also entitled to judgment as a matter of law
because SIS failed to establish that Intuitive's process for
approving third parties was illusory ................................................50

    A.    Third-party approval clauses are generally valid unless
the plaintiff proves they are illusory .............................51

Page

Table of contents—continued:

B.    SIS has not proven that Intuitive's third-party approval
      process was illusory ..........................................................54

Conclusion..............................................................................................62

# TABLE OF AUTHORITIES

## CASES

Page

*Abogados* v. *AT&T, Inc.*, 223 F.3d 932 (9th Cir. 2000) .......................................42

*Aerotec International, Inc.* v. *Honeywell International, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..............................................................54

*Aggrenox Antitrust Litigation, In re*,
199 F. Supp. 3d 662 (D. Conn. 2016) ...................................................39

*Betaseed, Inc.* v. *U & I Inc.*, 681 F.2d 1203 (9th Cir. 1982) ...................51, 53, 55

*Bohmker* v. *Oregon*, 903 F.3d 1029 (9th Cir. 2018) ............................................58

*Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) .....................35

*Cascade Health Solutions* v. *PeaceHealth*,
515 F.3d 883 (9th Cir. 2008) ................................................................52

*Coronavirus Reporter* v. *Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023).........*passim*

*CoStar Group, Inc.* v. *Commercial Real Estate Exchange, Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........................................................44, 54

*Cruz* v. *International Collection Corp.*, 673 F.3d 991 (9th Cir. 2012) .............43

*Dream Big Media Inc.* v. *Alphabet Inc.*,
Civ. No. 22-2314 (N.D. Cal. July 15, 2024)......................................53, 54

*Dreamstime.com, LLC* v. *Google LLC*, 54 F.4th 1130 (9th Cir. 2022) .............45

*Eastman Kodak Co.* v. *Image Technical Services, Inc.*,
504 U.S. 451 (1992).......................................................................*passim*

*Eastman* v. *Quest Diagnostics Inc.*, 724 Fed. Appx. 556 (9th Cir. 2018)........53

iv

Page

Cases—continued:

*Epic Games, Inc.* v. *Apple, Inc.*:

    Civ. No. 20-5640, 2020 WL 7779017 (N.D. Cal. 2020)....................................32

    559 F. Supp. 3d 898, 955 (N.D. Cal. 2021).........................................................33

    67 F.4th 946 (9th Cir. 2023) ...............................................................*passim*

*FTC* v. *Deere & Co.*, Civ. No. 25-50017,
    2025 WL 1638474 (N.D. Ill. June 9, 2025).........................................................41

*FTC* v. *Meta Platforms, Inc.*, 775 F. Supp. 3d 16 (D.D.C. 2024).......................46

*FTC* v. *Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020)..................................25, 27

*Google Play Store Antitrust Litigation, In re*,
    147 F.4th 917 (9th Cir. 2025) ...............................................................*passim*

*Green Country Food Marketing, Inc.* v. *Bottling Group, LLC*,
    371 F.3d 1275 (10th Cir. 2004).............................................................26, 36, 39

*Hardy* v. *City Optical Inc.*, 39 F.3d 765 (7th Cir. 1994)...................................39

*Illinois Tool Works, Inc.* v. *Independent Ink, Inc.*,
    547 U.S. 28 (2006)...............................................................................................36

*International Business Machines Corp.* v. *United States*,
    298 U.S. 131 (1936).............................................................................................37

*International Logistics Group, Ltd.* v. *Chrysler Corp.*,
    884 F.2d 904 (6th Cir. 1989).............................................................................26, 35

*International Salt Co.* v. *United States*, 332 U.S. 392 (1947)..........................37

*Jefferson Parish Hospital District No. 2* v. *Hyde*,
    466 U.S. 2 (1984)............................................................................................37, 46

*Kentucky Fried Chicken* v. *Diversified Packaging*,
    549 F.2d 368 (5th Cir. 1977)...........................................................................53, 55

Page

Cases—continued:

*Lambrix* v. *Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024) ...........................41

*Los Angeles Land Co.* v. *Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993)..............................................44

*Midwestern Waffles, Inc.* v. *Waffle House, Inc.*,
    734 F.2d 705 (11th Cir. 1984)......................................51, 58

*Moore* v. *James H. Mathews & Co.*, 550 F.2d 1207 (9th Cir. 1977) ...........37, 47

*Movie 1 & 2* v. *United Artists Communications, Inc.*,
    909 F.2d 1245 (9th Cir. 1990).......................................45

*Mozart Co.* v. *Mercedes-Benz of North America, Inc.*,
    593 F. Supp. 1506 (N.D. Cal. 1984) ..............................52, 53

*Mozart Co.* v. *Mercedes-Benz of North America, Inc.*,
    833 F.2d 1342 (9th Cir. 1987).......................................46

*Neumann* v. *Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986) .................49

*Newcal Industries, Inc.* v. *Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008).................................*passim*

*Ohio* v. *American Express Co.*, 585 U.S. 529 (2018)....................................24, 25

*PhantomALERT* v. *Apple, Inc.*, 762 F. Supp. 3d 8 (D.D.C. 2025),
    *appeal filed*, No. 25-7017 (D.C. Cir.) ........................................26, 27

*Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704 (7th Cir. 1979).............*passim*

*PSI Repair Services, Inc.* v. *Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997).....................................35, 36

*PSKS, Inc.* v. *Leegin Creative Leather Products, Inc.*,
    615 F.3d 412 (5th Cir. 2010)........................................26

*Puget Soundkeeper Alliance* v. *Port of Tacoma*,
    104 F.4th 95 (9th Cir. 2024) ........................................23

Page

Cases—continued:

*Pullos* v. *Alliance Laundry System, LLC*, Civ. No. 07-169,
2009 WL 10708625 (D. Nev. July 29, 2009),
*aff'd*, 424 Fed. Appx. 663 (9th Cir. 2011)................................51, 53, 60

*Reilly* v. *Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022) ............................26

*Sports Racing Services, Inc.* v. *Sports Car Club of America*,
131 F.3d 874 (10th Cir. 1997)...............................................52, 55

*Top Rank, Inc.* v. *Haymon*, Civ. No. 15-4961,
2015 WL 9948936 (C.D. Cal. 2015)........................................51, 52

*UA Local 343 United Association of Journeymen & Apprentices
of Plumbing & Pipefitting Industries* v. *Nor-Cal Plumbing,
Inc.*, 48 F.3d 1465 (9th Cir. 1994) ........................................58, 59

*United Shoe Machinery Corp.* v. *United States*,
258 U.S. 451 (1922)...........................................................37

*United States* v. *Aluminum Co. of America*,
148 F.2d 416 (2d Cir. 1945) .................................................46

*United States* v. *Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995).....................46

*Y.Y.G.M. SA* v. *Redbubble, Inc.*, 75 F.4th 995 (9th Cir. 2023) ..........................23

## STATUTES AND RULE

Lanham Act, 15 U.S.C. §§ 1051-1141n ................................................15

Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-7....................................21, 24, 30

15 U.S.C. § 1 ...............................................................15, 30

15 U.S.C. § 2 ...........................................................15, 30, 45

28 U.S.C. § 1291 ...............................................................5

28 U.S.C. § 1331 ...............................................................4

Page

Statute and rule—continued:

28 U.S.C. § 1337 ................................................................4

Fed. R. Civ. P. 54(b) ......................................................4, 20

## OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law:
An Analysis of Antitrust Principles and Their
Application* (2024) .............................................52, 53, 57

Louis Kaplow, *The Accuracy of Traditional Market Power
Analysis and a Direct Adjustment Alternative*,
95 Harv. L. Rev. 1817, (1982) ....................................39

Carl Shapiro, *Aftermarkets and Consumer Welfare: Making
Sense of* Kodak, 63 Antitrust L.J. 483 (1995) ..............27

## INTRODUCTION

Although Surgical Instrument Service tries to cast this appeal as an ordinary tying case, it is anything but. A typical tying case involves markets with multiple brands of products, and it concerns restrictions on the use of any third-party products or services. In this case, by contrast, SIS tried to prove that Intuitive Surgical harmed competition in an alleged aftermarket limited to a *single* brand of Intuitive's own products—a rare and disfavored type of claim that may proceed only where a plaintiff proves certain requirements showing that customers are unknowingly "locked into" the alleged aftermarket. And SIS claimed that Intuitive's contracts with its customers harmed competition even though the undisputed evidence showed that the contracts allow the use of products and services from any authorized third party. The district court correctly granted judgment as a matter of law to Intuitive, and its judgment should be affirmed.

Intuitive is the creator of the da Vinci, the first robot-assisted surgical system cleared by the Food and Drug Administration. Key to the da Vinci's performance are Intuitive's proprietary EndoWrist instruments—surgical tools that attach to the da Vinci's robotic arms. Given the complexity of that integrated robotic system and the potentially fatal risks involved, Intuitive has always taken steps to ensure the da Vinci's safety and efficacy. For that reason, from the very beginning of its business, Intuitive has included a provision

(1)

in its sales contracts that permits customers to use the da Vinci only with instruments made or "approved" by Intuitive. The undisputed evidence showed that Intuitive has granted approval to multiple third parties.

More than twenty years later, SIS began offering a "service" that consisted of hacking into EndoWrist computer chips to increase the number of times the instrument could be reused beyond what had been validated by Intuitive or cleared by FDA. SIS would then sell the modified instruments back to hospitals with Intuitive's brand name still on them. Notably, the third-party supplier that performed this service for SIS had previously failed to obtain FDA clearance for those modifications, and although Intuitive asked for clinical proof of their safety and efficacy, neither SIS nor its third-party supplier ever provided such proof.

Within months, SIS abandoned that operation and pivoted to suing Intuitive on the theory that Intuitive had unlawfully restricted competition in its own brand—namely, an alleged single-brand aftermarket limited to "repaired and replaced" EndoWrists. After a three-week jury trial, the district court ruled that it would instruct the jury verbatim on the requirements from *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946 (2023), where this Court held that a plaintiff "must" satisfy certain conditions "to establish a single-brand aftermarket," including that the alleged aftermarket restrictions are not generally known and that consumers cannot engage in accurate lifecycle pricing. *Id.* at

2

982. After the close of evidence, but before closing arguments, SIS conceded that it had no evidence to satisfy the *Epic Games* requirements and asked the district court to grant judgment as a matter of law in favor of Intuitive.

On appeal, SIS argues that the district court improperly granted judgment as a matter of law because SIS did not need to satisfy the requirements from *Epic Games* to prove a single-brand aftermarket. That argument fails for the reasons given by the district court, as well as for an additional reason that provides a straightforward and independent ground for affirmance.

*First*, the district court correctly required SIS to satisfy the *Epic Games* requirements in order to prove a single-brand aftermarket. SIS argues that those requirements categorically do not apply whenever a defendant has market power in the foremarket. But that argument conflicts with this Court's precedents, and it ignores the bedrock principle that single-brand markets are rare and disfavored because the antitrust laws are not concerned with "market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Newcal Industries, Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1048 (9th Cir. 2008) (emphasis omitted). The *Epic Games* requirements appropriately limit single-brand aftermarkets to those rare circumstances in which there are reasons to think that a company's natural control over its own brand may impose the type of harm that the antitrust

laws were enacted to address. SIS's proposed rule, by contrast, risks punishing ordinary and procompetitive commercial behavior by painting almost any successful company as a monopolist in a market limited to that company's brand of product.

*Second*, Intuitive is entitled to judgment as a matter of law on the independent basis that it has not engaged in tying or exclusive dealing at all. That is because Intuitive's contracts do not require customers to purchase instruments or accessories *exclusively* from Intuitive. Instead, the contracts allow customers to use any "approved" third-party supplier. To prevail on its claims, SIS therefore had to prove that Intuitive's process for approving third parties was illusory. SIS failed to do so, and indeed, it is undisputed that SIS never even tried to seek Intuitive's approval. Accordingly, if the Court does not affirm based on SIS's failure to prove a single-brand aftermarket, it should affirm based on this alternative and straightforward ground to spare the parties and the district court from the need to redo a lengthy trial.

For both of those reasons, SIS's claims fail as matter of law. The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1337. The district court entered a partial final judgment under Federal Rule of Civil Procedure 54(b) on January 30, 2025. 1-ER-2–3. SIS filed a timely notice of

4

appeal on February 27, 2025.  6-ER-1313–23.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly granted judgment as a matter of law in favor of Intuitive on SIS's claims because SIS failed to prove a single-brand aftermarket.

2.    Whether Intuitive is entitled to judgment as a matter of law on SIS's claims on the alternative ground that SIS failed to prove that Intuitive's third-party approval process was illusory.

## STATEMENT OF THE CASE

### A.    Factual Background

1.    Intuitive Surgical is the creator of the da Vinci, a robot-assisted surgical system that combines the minimally invasive nature of laparoscopic surgery with the intuitive motions of traditional open surgical techniques.  4-SER-897–98.  Patients who undergo surgery using the da Vinci often experience less bleeding and pain, shorter hospital stays, quicker recovery times, and less scarring when compared with patients who receive the same procedures using open or laparoscopic surgical techniques.  5-ER-913–15, 3-SER-656–71, 5-SER-1222–23.

The da Vinci system allows a surgeon to see inside a patient's body and perform surgery without the need to make large incisions.  4-ER-656–59, 4-

5

SER-897–99.  The surgeon sits at a console viewing a three-dimensional, high-definition image of what is happening inside the patient's body.  4-ER-657, 4-SER-897.  Hand controls mounted on the console allow the surgeon to cut, grasp, suture, and cauterize tissue using surgical tools inserted into the body through tiny incisions.  4-SER-897–98.  The da Vinci instantaneously translates the surgeon's hand movements to multiple robotic arms attached to a cart next to the operating table.  *Id.*  EndoWrists are instruments developed by Intuitive that attach to the robotic arms and mimic the human wrist.  4-SER-898–99.  During a single operation, a surgeon may use different EndoWrists, each precisely designed to perform a specific surgical task.  *Id.*



4-SER-945.

Since the creation of the da Vinci in 1995, Intuitive has invested billions of dollars into developing the overall system, including EndoWrists. 3-ER-543–51, 3-ER-570–72, 3-ER-575, 5-SER-1094–1105, 5-SER-1135, 5-SER-1163–64. At the outset, Intuitive understood that it needed to compete with other surgical modalities on a cost-per-procedure basis. 6-ER-1249, 6-ER-1257. Many laparoscopic instruments are suitable only for a single use, but Intuitive's devices are more complex and expensive and thus would need to be usable more than once to make the da Vinci system, including its EndoWrist instruments, competitive with other surgical modalities. *Id.*; 2-ER-251–52, 5-SER-1106–07, 5-SER-1188. Intuitive thus conceived of instruments that would be "resposable" (a combination of reusable and disposable), which were designed for more uses than competitor devices. 6-ER-1247–68. During the initial design phase, however, Intuitive realized that it would have to defy commonly accepted engineering principles to create a wristed instrument small enough, strong enough, dexterous enough, and precise enough to perform minimally invasive surgery. 5-SER-1101–04. Because of the physical limits of cables and pulleys miniscule enough to fit in a device only millimeters wide, Intuitive's engineers struggled at first to create a wristed instrument that would survive even one or two uses, but they eventually developed one that

7

could be re-sterilized and used up to ten times without sacrificing performance or patient safety. 5-SER-1104–05, 5-SER-1192–94, 5-SER-1203–04.

The da Vinci does not perform new procedures; it simply accomplishes existing surgical procedures using different instrumentation. 5-SER-1186–87. Accordingly, Intuitive has always competed with open and laparoscopic surgical modalities, including based on price. 6-ER-1247–68, 3-SER-492, 3-SER-509, 3-SER-661, 4-SER-854–55, 4-SER-905, 5-SER-1222–23. When deciding whether to purchase a da Vinci, hospitals analyze not only the cost of the system itself but also the future costs of servicing and purchasing EndoWrists. 3-SER-567, 3-SER-607, 3-SER-661, 4-SER-943, 5-SER-1152–58. Over the years, Intuitive has successfully reduced the price of its devices to make them more competitive with laparoscopic and open surgical alternatives. 5-SER-1159–62, 5-SER-1210–12. But as of 2018, open and laparoscopic surgeries still accounted for 79% of all surgical procedures for which the da Vinci could have been used. 4-SER-716, 5-SER-1142–45. In other words, even for procedures where use of the da Vinci was an option clinically, da Vinci accounted for only a small share (21%) of surgeries, and other competing alternatives were used with far greater frequency (nearly 80% of the time).

Patient safety has always been Intuitive's foremost priority, and it is at the core of Intuitive's business model. If an Intuitive device fails and causes harm to a patient, Intuitive risks losing the trust of patients, surgeons, and

8

hospitals.  4-SER-869–70, 5-SER-1113.  To protect patient safety, Intuitive includes in its customer agreements a provision that instructs customers to use only instruments and services that have been made or "approved" by Intuitive. 6-ER-1304, 5-SER-1116–17, 5-SER-1122–24.  Intuitive's agreements have included similar terms from the earliest days of its business, long before it achieved commercial success.  6-ER-1286, 5-SER-1115–21.  When those terms were introduced in its agreements, Intuitive was struggling to gain acceptance in the market for its innovative system because of the dominance of open and laparoscopic surgical modalities.   4-SER-835, 4-SER-845, 5-SER-1136–41. Consistent with the intent behind those terms, Intuitive has approved dozens of devices manufactured by third parties for use with the da Vinci after reviewing and conducting safety and compatibility testing to ensure their performance.  3-SER-548–56, 5-SER-1126–30.

Given the serious safety risks inherent in surgical devices, the Food and Drug Administration (FDA) actively and heavily regulates those devices.[1]  Before Intuitive began marketing the da Vinci and EndoWrists to customers in

---

[1] As discussed below, the district court granted SIS's motion to exclude evidence relating to FDA and its regulatory processes from trial.  *See* pp. 15-16. The court nonetheless permitted the jury to hear limited evidence about FDA's role as a remedial measure after SIS violated the very evidentiary ruling it had sought from the court.  *See* 5-SER-1053–54.  The district court's ruling on the motion to exclude was erroneous, and Intuitive would ask the court to revisit it (and other issues) in the event of a retrial.  But this Court

the United States, it submitted extensive testing data to FDA to establish the system's safety and reliability for its intended use in comparison to existing and competing surgical devices such as laparoscopic tools. 1-SER-39–41. Intuitive's submission included a pre-specified use limit on its EndoWrist instruments. *Id.* Based on that data, FDA granted Intuitive clearance to market the da Vinci and each type of EndoWrist with a limited number of uses. 1-SER-39–40, 1-SER-66–70, 5-SER-1054. When Intuitive later sought to extend the maximum number of uses for EndoWrists, FDA rejected Intuitive's initial approach of increasing the number of uses based on its internal testing without FDA review, instead requiring Intuitive to submit its data to FDA and seek additional clearances. 1-SER-40, 1-SER-72–106.

2.    Surgical Instrument Service (SIS) is a company that repairs surgical instruments—for example, by sharpening their blades or cleaning them—and that sought to create a business based on hacking into EndoWrists. 2-ER-258–59. In 2019, SIS contracted with another company, Rebotix, that had figured out how to bypass the safety features of an EndoWrist so that the instrument could be used beyond its authorized number of uses. 2-ER-280–81, 5-SER-1029–30. Specifically, Rebotix would break open the EndoWrist

---

need not address that ruling to affirm the decision below. In this brief, Intuitive discusses FDA-related evidence solely to provide background context and as relevant to respond to arguments raised by SIS on appeal. *See* pp. 60-61, *infra*. Intuitive does not use any evidence outside the trial record in defending the district court's grant of judgment as a matter of law.

where the cables, electrical wiring, circuit board, and other machinery are housed, and replace the original circuit board with one of its own. 5-SER-1006, 5-SER-1074–76, 5-SER-1205–09. Those modifications permitted each EndoWrist to be used twice as many times as the number validated by Intuitive and cleared by FDA. 1-SER-38, 1-SER-61, 5-SER-1006; *see* 5-SER-1054. Among other concerns, Rebotix's modifications posed significant safety risks by generating particulate matter or debris that could disrupt the functioning of the device or fall into the patient and by introducing electrical connections that could shock patients and users. 2-ER-232, 5-SER-1031–33, 5-SER-1196–1202, 5-SER-1205–06, 5-SER-1207–09. SIS's own surgeon expert admitted at trial that he had never actually used those modified instruments and described some of the risks associated with them as "terrifying." 2-ER-227–28, 2-ER-232.

FDA had previously declined to grant Rebotix clearance to market modified EndoWrists when Rebotix sought it in 2014. 5-SER-1054. In 2015, FDA issued a deficiency letter to Rebotix listing 51 ways in which its application for clearance to modify EndoWrists failed to comply with FDA standards and highlighting serious failures in Rebotix's efforts to demonstrate that its processes were safe. *See* 1-SER-44, 1-SER-77. Rebotix never cured these deficiencies, and it lacked FDA clearance during the entire period of its relationship with SIS. 5-SER-1054.

11

Rebotix similarly failed to respond to Intuitive's requests for safety and efficacy data. In 2017—before SIS began working with Rebotix—Intuitive learned that an EndoWrist modified by Rebotix without authorization had malfunctioned during surgery. 4-SER-921. Intuitive promptly contacted Rebotix to request clinical proof that its modified EndoWrists could be used safely and effectively more than the designed and FDA-cleared number of uses, and it followed up a month later with the same request. 4-SER-921, 4-SER-929. Rebotix did not respond. 5-SER-1177–78, 5-SER-1180–81. In 2019, Intuitive again contacted Rebotix with the same concerns and for a third time requested evidence of the safety and efficacy of the modified EndoWrists or confirmation that they had been cleared by FDA. 1-SER-38, 1-SER-64, 4-SER-751. Rebotix again did not respond. 5-SER-1132-33. Neither Rebotix nor SIS ever provided any evidence to Intuitive regarding the safety or efficacy of the modified instruments. *See* 4-SER-950, 5-SER-975, 5-SER-980, 5-SER-1184.

After disregarding concerns raised by FDA and Intuitive regarding the safety of the modified EndoWrists, Rebotix and SIS nevertheless began selling the devices to hospitals. The EndoWrists still had Intuitive's brand name on them; they were still in the original housing; and they did not identify SIS's role in modifying them. 5-SER-1061–62. Some hospitals began using this ser-

12

vice based on the mistaken impression that Rebotix had received FDA clearance. 1-SER-49–50, 1-SER-124. SIS in turn disseminated Rebotix's marketing materials, rebranding them as its own and obscuring Rebotix's role in the arrangement. 6-ER-1196–218, 3-SER-447, 5-SER-1023. SIS represented to potential customers that *it* performed the modification process on the EndoWrists; that *it* had conducted safety monitoring of the process; and that *it* had a patent for the process. *See, e.g.*, 3-SER-456–57, 3-SER-459, 3-SER-464, 4-SER-757, 4-SER-792–93.

None of those representations was true. In reality, Rebotix was the entity that developed, patented, and performed the modifications. 5-SER-967–68, 5-SER-1037. SIS performed no testing of its own to determine whether modified EndoWrists were safe or effective for additional uses, 5-SER-975, and never had access to Rebotix's full testing file, 4-SER-950, 5-SER-980. SIS told customers that its modified EndoWrists had been tested to ensure that they were equivalent to the original manufacturer's specifications when SIS had taken no steps to verify whether that was true. 5-SER-1057, 5-SER-1059.

Within months, SIS abandoned the business of selling modified EndoWrists and instead began developing its litigation strategy. 5-SER-960, 5-SER-989, 5-SER-1038–39. Although Intuitive has approved "dozens" of third-party services and products for use with the da Vinci, 5-SER-1130, and al-

13

though SIS was aware of that policy and practice, 5-SER-1019, SIS never contacted Intuitive to seek authorization to sell modified EndoWrists, 5-SER-960, 5-SER-989. During the time it worked with SIS, Rebotix also never sought authorization from Intuitive. And neither SIS nor Rebotix had FDA clearance during that time. 1-SER-45–46, 1-SER-111, 5-SER-1054.

Later, Rebotix and another third party (not SIS) obtained FDA clearance for modified EndoWrists. 3-ER-562, 1-SER-47–49, 1-SER-112. Intuitive approved those devices for use with da Vinci systems, and it confirmed through a public announcement to customers that they are free to purchase any FDA-cleared third-party instrument under their contracts. 1-SER-47–49, 1-SER-117, 5-SER-989, 5-SER-1016, 5-SER-1019. Although SIS never sought approval from Intuitive (or FDA), its chief executive officer assumed it would have been able to obtain approval just like the other third parties did. 5-SER-1041. The undisputed evidence at trial showed that Intuitive never "rejected any application for approval by any third party for any other model of EndoWrist." 5-SER-1184–85; *see* 5-SER-1133.

### B. Procedural History

#### 1. *Pretrial Proceedings*

a. On May 10, 2021, SIS filed its complaint in the United States District Court for the Northern District of California, alleging that Intuitive had

engaged in tying, exclusive dealing, monopolization, and attempted monopoli-
zation in violation of Sections 1 and 2 of the Sherman Act.  5-ER-1161–93.  SIS
claimed that Intuitive had improperly placed limits on the use of EndoWrists,
prohibiting customers from using unauthorized instruments with the da Vinci
system.  5-ER-1170, 5-ER-1183.  In its complaint, SIS identified a foremarket
of "robotic surgical systems for minimally invasive soft tissue surgeries" and
an aftermarket of "EndoWrist instrument replacement."  5-ER-1165.  Intui-
tive later filed counterclaims alleging that SIS had made false and misleading
statements to customers in violation of the Lanham Act and California law.  2-
SER-427–31.  The district court denied a motion to dismiss as to most of the
claims, 2-SER-433, and subsequently denied cross-motions for summary judg-
ment in significant part, 2-SER-347.

In the lead-up to trial, the district court granted—over Intuitive's objec-
tion—SIS's motions in limine seeking to exclude all evidence related to FDA's
clearance process.  *See* 2-SER-211–12; *see also* 1-SER-192–93, 1-SER-169–70.
The court reasoned that FDA's clearance process does not involve "an inquiry
into the safety of the new product" and thus "any probative value of the evi-
dence  .  .  .  is greatly outweighed by the danger of, among other things, con-
fusing the issues, misleading the jury, and wasting time."  2-SER-211–12 (in-
ternal quotation marks and citations omitted).  The court subsequently made
clear that all "references to [FDA]" or its "regulatory scheme"—which appear

15

throughout Intuitive's documents given FDA's central regulatory role—were to be redacted in the trial evidence. 2-SER-208.

b.     Before trial, the parties submitted proposed jury instructions. Intuitive asked for an instruction on the requirements for proving a single-brand aftermarket under *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023)—including proof that the aftermarket restrictions are not generally known at the time of the foremarket purchase and that consumers cannot engage in accurate lifecycle pricing—in light of SIS's proposed "aftermarket for EndoWrist repair and replacement." 5-ER-986.[2] SIS opposed the instruction, arguing that it did not need to prove the requirements for a single-brand aftermarket because Intuitive allegedly had "significant market power in the foremarket." 2-SER-252. Intuitive responded that, under Ninth Circuit precedent, a plaintiff must satisfy the *Epic Games* requirements to establish a single-brand aftermarket even if the defendant has market power in the foremarket. 2-SER-239. The district court did not resolve the parties' dispute before trial, but SIS was on notice that giving Intuitive's proposed instruction was one possible outcome.

---

[2] For the reasons explained above, *see* pp. 10-11, Intuitive does not agree that SIS's hacking into EndoWrist instruments to reset their use counters involves "repair," but because SIS purported to define the market in those terms, Intuitive uses that phrase as relevant to the arguments in this appeal.

### 2.  *Trial Proceedings*

a.  The parties proceeded to trial in January 2025.  Over the course of the three-week jury trial, Intuitive presented evidence that, since the introduction of da Vinci, Intuitive has competed with open and laparoscopic surgical modalities on price and quality. 3-SER-652, 5-SER-1222–23, 5-SER-1225. The evidence showed that customers switch between open, laparoscopic, and da Vinci surgical modalities depending on a variety of factors, including price. 5-ER-929–30, 5-SER-1048–49.  All of the surgical procedures that can be performed with the da Vinci can also be performed by other surgical methods, including open and laparoscopic surgery, 2-ER-235, 5-SER-1186–87, 5-SER-1220—and, as discussed above, they are most often performed by such other methods, 4-SER-716–17; *see* p. 8.  That remains true even at hospitals that have already purchased one or more da Vinci systems.  4-SER-716–17, 5-SER-1221–22.  When making the initial decision to purchase a da Vinci system, Intuitive's customers—hospitals—are aware of the terms of their agreements, including those that SIS challenges in this case, and calculate the overall lifecycle price of the da Vinci system and EndoWrists.  5-ER-930–31, 3-SER-567, 3-SER-607, 3-SER-661, 4-SER-943, 5-SER-1152.

The undisputed evidence further showed that Intuitive has approved "dozens" of third-party devices to be used with the da Vinci system, 5-SER-1130, and that Intuitive approved both Rebotix and another third party, Restore Robotics, to sell modified EndoWrists years after SIS abandoned the

EndoWrist business, 5-SER-1019, 5-SER-1079. Based on those approvals, SIS's chief executive officer testified in response to a question from his own counsel that he "could make the assumption" that "SIS would similarly be authorized," 5-SER-1041, but he acknowledged that SIS had never sought such authorization, 5-SER-960. SIS offered no evidence that Intuitive had ever denied authorization to a third party, and the evidence was uniformly to the contrary. *See, e.g.*, 5-SER-1133, 5-SER-1184–85.

Although Intuitive began selling the da Vinci system in 1999, SIS offered no evidence as to whether Intuitive had market power in any market before 2019 (the year SIS began and ended its business endeavor). 5-SER-1080–83. SIS's expert admitted he did not analyze the time period before 2019; did not know whether the alleged market for EndoWrist replacement and repair even existed at that time; and did not know whether Intuitive possessed power in such a market. 5-SER-1081–86.

b.    At the close of SIS's case, Intuitive moved for judgment as a matter of law on SIS's claims. 3-ER-524–31, 1-SER-130. Intuitive primarily argued that its customer contracts allowed third parties to seek approval to sell modified EndoWrists and that SIS had not established that the possibility of obtaining such approval was "illusory." 3-ER-524–25. Accordingly, SIS had not met its burden of showing that Intuitive "forced hospitals" to buy EndoWrist repair and replacement services from Intuitive. 3-ER-524. Intuitive

also raised additional grounds for judgment in its favor, including SIS's failure to establish a single-brand aftermarket under *Epic Games*. 3-ER-530–31. The district court denied the motion, reasoning (without elaboration) that there was "substantial evidence to support a finding by reasonable jurors in [SIS's] favor." 3-ER-565.

After the close of evidence, Intuitive renewed its motion for judgment as a matter of law on the foregoing grounds and others. 4-ER-701–06. The district court again denied the motion (as well as SIS's motion related to Intuitive's counterclaims), reiterating that there was "substantial evidence to support a finding by reasonable jurors on each of [the] claims." 4-ER-714.

c.    Around the same time, the district court further considered Intuitive's proposed jury instruction on single-brand aftermarkets. SIS never proposed an alternative jury instruction but simply insisted that the jury should not be instructed on the issue at all. *See, e.g.*, 4-ER-798–805. After some back-and-forth, the court issued an order, on the eve of closing argument, stating its intent to include the instruction but inviting further argument from the parties. 1-ER-16. The next morning, the district court reaffirmed its decision to include the single-brand aftermarket instruction. 4-ER-809–12. The court reasoned that it was bound by this Court's precedents in *Epic Games* and

*Coronavirus Reporter* v. *Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023), which "directly" state that "a single-brand aftermarket is only available" where the plaintiff satisfies the *Epic Games* requirements. 4-ER-810.

At that point, SIS conceded that it could not prevail before the jury because it had "no evidence" to satisfy those requirements, even though it had known that they were a live issue in the case. 4-ER-813. SIS refused to have the jury resolve the outstanding issues and sought an immediate appeal to this Court. 4-ER-813–18. The parties ultimately agreed that Intuitive would renew its motion for judgment as a matter of law on the ground that SIS had failed to satisfy the *Epic Games* requirements, as well as on the grounds raised in its earlier motions. 1-ER-12. Once again, SIS conceded that there was "no evidence in the record upon which a reasonable jury" could find that it had satisfied the *Epic Games* requirements, 1-ER-12, and the district court accordingly granted judgment as a matter of law in Intuitive's favor on all of SIS's claims, 1-ER-14. The court also affirmed its earlier rulings denying Intuitive's motion for judgment as a matter of law on the "other grounds presented on the record." *Id.* The district court then entered a partial final judgment under Federal Rule of Civil Procedure 54(b) and stayed further proceedings on Intuitive's counterclaims pending the resolution of this appeal. 1-ER-15.

## SUMMARY OF ARGUMENT

I.    The district court correctly granted judgment as a matter of law to Intuitive because SIS failed to prove its alleged single-brand aftermarket. It is well settled that single-brand markets are rare and highly disfavored. That is because such narrowly defined markets risk making every company a monopolist in its own brand and threaten to turn ordinary contract provisions into Sherman Act violations punishable by treble damages. In *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451 (1992), the Supreme Court recognized a limited exception to the general rule against single-brand markets. But as this Court made clear in *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946 (2023), that exception is available only where a plaintiff satisfies certain requirements to show that consumers have become unknowingly and involuntarily "locked into" the aftermarket. And as SIS itself concedes, it cannot satisfy those requirements here.

SIS argues that a plaintiff seeking to establish a single-brand aftermarket may dispense with the *Epic Games* requirements whenever it shows that the defendant has market power in the foremarket. But that argument conflicts with this Court's precedents, including *Epic Games* itself, which have required proof of consumer lock-in even where the defendant was claimed to have market power in the foremarket. SIS's argument also rests on the mistaken premise that consumers lack any alternatives and cannot make voluntary decisions whenever a company has market power, and it risks making

21

single-brand markets commonplace in antitrust litigation. Tellingly, many of SIS's own amici focus on alternative tests based on monopoly power that equally lack merit (and that SIS never requested below). And even assuming that a plaintiff may somehow ignore the *Epic Games* requirements when the defendant has market or monopoly power in the foremarket, Intuitive would still be entitled to judgment as a matter of law. That is because SIS did not offer any proof that Intuitive had market power before 2019, including when it first introduced the challenged contract terms or when many customers agreed to those terms.

II. In the alternative, this Court should affirm on the straightforward ground that Intuitive's contracts did not require its customers to purchase modified EndoWrists exclusively from Intuitive, either on their face or in practice. Courts have long recognized that a seller may require its customers to make certain purchases only from "approved" third parties without running afoul of the antitrust laws as long as the possibility of approval is not illusory. And under that rule, Intuitive is entitled to judgment as a matter of law because the undisputed evidence after a full trial established that Intuitive's contracts did allow customers to purchase modified EndoWrists from approved third parties and SIS failed to offer any evidence that Intuitive's approval process was illusory. Indeed, the record shows that Intuitive approved numerous devices for use with the da Vinci and that SIS failed ever to seek Intuitive's

22

approval. Accordingly, if the Court does not affirm based on SIS's failure to prove a single-brand aftermarket, it should affirm on this alternative ground that can be readily resolved based on the undisputed trial record and that would spare the parties and the district court from the need to redo a lengthy trial.

## STANDARD OF REVIEW

This Court reviews a district court's decision on a motion for judgment as a matter of law de novo. *See, e.g.*, *Y.Y.G.M. SA* v. *Redbubble, Inc.*, 75 F.4th 995, 1000 (2023). Although the Court reviews de novo "whether a jury instruction accurately states the law, whether an instruction should be given in the first place depends on the theories and evidence presented at trial, which is mostly a factual inquiry" that the Court generally reviews for "abuse of discretion." *In re Google Play Store Antitrust Litigation*, 147 F.4th 917, 942 (2025) (internal quotation marks and citation omitted). The Court may affirm on any ground supported by the record. *See, e.g.*, *Puget Soundkeeper Alliance* v. *Port of Tacoma*, 104 F.4th 95, 103 (2024).

# ARGUMENT

## I.    THE DISTRICT COURT CORRECTLY GRANTED JUDGMENT AS A MATTER OF LAW TO INTUITIVE BECAUSE SIS FAILED TO PROVE A SINGLE-BRAND AFTERMARKET

The district court correctly granted judgment as a matter of law in favor of Intuitive based on SIS's failure to establish its proposed single-brand aftermarket for repaired and replaced EndoWrists, which underlay all its antitrust claims.  At trial, SIS conceded that it had not presented evidence to satisfy the requirements for proving a single-brand aftermarket as set forth in this Court's decision in *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946 (2023).  SIS instead argued that the *Epic Games* requirements are inapplicable whenever the defendant has market power in the foremarket.  But no appellate court has adopted that view, and SIS's argument conflicts with this Court's precedents, as well as broader principles of antitrust law and economics.  SIS's contrary arguments lack merit, and the district court should be affirmed.

### A.    The District Court Properly Required SIS To Satisfy The *Epic Games* Requirements For Establishing A Single-Brand Aftermarket

1.    Because the Sherman Act prohibits only "unreasonable restraints" on trade, courts must "distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Ohio* v. *American Express Co.*, 585 U.S. 529, 541 (2018) (citation and alteration omitted).  Except

24

for a small category of restraints that are considered "per se" unlawful, courts apply the "rule of reason"—a "fact-specific assessment of market power and market structure"—to "assess the restraint's actual effect on competition." *Id.* (internal quotation marks, citation, italics, and alterations omitted). SIS has expressly disclaimed any per se theory in this case and has made clear that it is proceeding only under the rule of reason. *See* Br. 7, 32. The vast majority of rule-of-reason claims fail at the first step of that framework, where "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Epic Games*, 67 F.4th at 983, 993 & n.19 (citation omitted).

A "threshold step" in most rule-of-reason cases is to define the relevant market. *Epic Games*, 67 F.4th at 974 & n.6 (citation omitted). Without a properly defined market, which is plaintiff's burden to establish, courts "cannot properly apply the rule of reason" because "there is no way to measure the defendant's ability to lessen or destroy competition." *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (internal quotation marks, citations, and alteration omitted). To define a relevant market, a court considers "which products have a reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Epic Games*, 67 F.4th at 975 (internal quotation marks and citation omitted). That analysis can involve empirical evidence and an assessment of various "practical indicia." *Id.* at 975-976 (citation omitted).

2.    In this case, the only market in which SIS alleged Intuitive harmed competition was a supposed single-brand aftermarket for repaired and replaced EndoWrists.  A single-brand market is one defined around "a single brand of the product at issue," *Newcal Industries, Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1048 (9th Cir. 2008), while an aftermarket is one in which "demand for [the] good is entirely dependent on the prior purchase of a durable good in [the] foremarket," *In re Google Play Store Antitrust Litigation*, 147 F.4th 917, 942 (9th Cir. 2025).  Not all aftermarkets are limited to a single brand.  *See id.* at 942-943.

As courts have explained time and again, single-brand markets are highly "disfavored" and cognizable only in "rare circumstances."  *Green Country Food Marketing, Inc.* v. *Bottling Group, LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004); *PhantomALERT* v. *Apple, Inc.*, 762 F. Supp. 3d 8, 19 (D.D.C. 2025) (citation omitted), *appeal filed*, No. 25-7017 (D.C. Cir.); *see also, e.g.*, *PSKS, Inc.* v. *Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 418 (5th Cir. 2010); *Reilly* v. *Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022).  That is for good reason:  a contrary rule would risk making every manufacturer a "monopolist" of its own brand and short-circuit the ordinary constraints on establishing an antitrust violation.  *See, e.g.*, *International Logistics Group, Ltd.* v. *Chrysler Corp.*, 884 F.2d 904, 908 (6th Cir. 1989); pp. 35-36, *infra*.

26

As a corollary, this Court has held that an antitrust market may not be one "whose boundaries depend[] entirely on a written contract." *Newcal*, 513 F.3d at 1047. A plaintiff is prohibited from "resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant," because such "contractually . . . created market power" is not the type of power that the antitrust laws were meant to address. *Id.* at 1048-1049. After all, the antitrust laws are a "poor instrument to try to correct for the fact that contracts are imperfect," Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of* Kodak, 63 Antitrust L.J. 483, 496 (1995), and they are "not well suited to govern contract disputes between private parties," *Qualcomm*, 969 F.3d at 997 (citation omitted).

3.    Although single-brand markets are rare and disfavored, they are not categorically forbidden. In *Eastman Kodak Co.* v. *Image Technical Services, Inc.*, 504 U.S. 451 (1992)—the "seminal example" of a single-brand aftermarket—the Supreme Court recognized a "limited exception" to the general rule against such markets. *Google Play Store*, 147 F.4th at 942; *PhantomALERT*, 762 F. Supp. 3d at 19. As this Court subsequently recognized, however, that limited exception will not apply unless "consumer[s] [are] 'locked in' with a single brand" due to particular circumstances. *Google Play Store*, 147 F.4th at 942 (quoting *Epic Games*, 67 F.4th at 976).

The antitrust theory in *Kodak* involved three markets: the alleged tying market consisted of replacement parts for Kodak-branded photocopier or micrographic equipment, in which Kodak had market power; the alleged tied market was the market for services for that equipment; and there was a competitive foremarket that consisted of copier equipment. 504 U.S. at 464-466. The *Kodak* plaintiffs sought to prove the existence of a market consisting only of customers that had purchased Kodak-branded photocopier or micrographic equipment and that needed replacement parts and services for that equipment. *Id.* at 455-456. The plaintiffs alleged that Kodak used its monopoly over Kodak parts to "strengthen its monopoly share of the Kodak service market." *Id.* at 464, 483. In response, Kodak argued that competition in the foremarket for copier equipment "necessarily preclude[d]" it from exercising market power in the aftermarkets. *Id.* at 465, 469.

In rejecting Kodak's "legal presumption[]," the Supreme Court emphasized that the plaintiffs presented evidence that purchasers of Kodak-branded copier equipment were unaware at the time of their purchases that Kodak would sell replacement parts only on the condition that the machines were serviced by Kodak. *See* 504 U.S. at 473-478. That fact, in turn, prevented customers from engaging in "lifecycle pricing," which is the practice of making purchasing decisions based on the "total cost of the 'package'" of goods. *Id.* at

473. And because the cost of copier equipment was prohibitive, the Court reasoned that, once consumers became aware of Kodak's policies, they were already "locked in" to paying supracompetitive prices for servicing. *See id*. at 475-476. On those facts, the Supreme Court concluded that the plaintiffs could proceed with their claims based on alleged markets for Kodak-branded replacement parts and servicing.

Since then, this Court has made clear that a plaintiff seeking to establish a single-brand aftermarket "must" show the same "lock-in" factors as in *Kodak*. *Google Play Store*, 147 F.4th at 942 & n.9 (citation omitted). The leading case on that issue from this Court is *Epic Games*, which clarified the relevant requirements for proving a single-brand aftermarket:

> [T]o establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are "not generally known" when consumers make their foremarket purchase; (2) "significant" information costs prevent accurate life-cycle pricing; (3) "significant" monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.

67 F.4th at 977. In *Epic Games* itself, the Court rejected a proposed single-brand aftermarket because of the plaintiff's failure to satisfy those requirements, and the Court has continued to emphasize their importance in subsequent cases. *Id*. at 980-981; *see, e.g.*, *Google Play Store*, 147 F.4th at 942 & n.9; *Coronavirus Reporter* v. *Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023).

29

4.    The district court correctly applied those requirements here and concluded that SIS had failed to establish a market for "replacement and repaired EndoWrist instruments." 2-ER-39. SIS does not dispute that this market is a single-brand aftermarket—a market defined around a single brand (the EndoWrist) and flowing entirely from the purchase of a foremarket good (the da Vinci). Accordingly, SIS needed to demonstrate consumer lock-in by presenting sufficient evidence of each of the requirements from *Epic Games*. *See* 67 F.4th at 977. But as SIS has expressly conceded, and as the record confirms, SIS presented no evidence to satisfy those requirements. *See* Br. 24, 26; 1-ER-12, 4-ER-813, 4-ER-818; p. 17-20, *supra*. Because SIS at no point during the three-week trial offered an alternative market definition, the district court correctly determined that SIS could not "prove a necessary element of each of its claims under Sections 1 and 2 of the Sherman Act," 1-ER-14, and its judgment should be affirmed.

## B.    SIS's Contrary Arguments Lack Merit

SIS challenges the district court's ruling on the ground that a plaintiff seeking to establish a single-brand aftermarket need not satisfy the requirements from *Epic Games* whenever the defendant has market power in the foremarket. But that argument squarely conflicts with this Court's precedents—including *Epic Games* itself—which have required a plaintiff to establish consumer "lock in" even where it claims that the defendant had market

power in the foremarket. It also ignores longstanding antitrust principles, real-world economics, and the facts of this case. Indeed, many of SIS's own amici focus on alternative tests based on monopoly power that likewise lack merit (and that SIS did not preserve below). And even assuming that a plaintiff may be excused from satisfying the *Epic Games* requirements where the defendant has market power in the foremarket, SIS's claims would still fail because it offered no evidence of Intuitive's market power in the foremarket for almost the entire period of time in which Intuitive has sold the da Vinci.

### 1. *Plaintiffs May Not Dispense With The* Epic Games *Requirements Whenever The Defendant Has Market Power In The Foremarket*

a. This Court's precedents foreclose SIS's argument that a plaintiff can dispense with the requirements from *Epic Games* whenever the defendant has market power in the foremarket.

Notably, *Epic Games* itself was a case in which the plaintiff claimed that the defendant had market power in the foremarket, and this Court still rejected the plaintiff's single-brand aftermarket for the failure to prove consumer lock-in. *See* 67 F.4th at 977-981. There, the plaintiff proposed "two single-brand markets": the "aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from a foremarket for smartphone operating systems." *Id.* at 970 (emphasis omitted). The Court's opinion described the

relevant foremarket as having two competitors—Apple's iOS and Google's Android—and it acknowledged that a consumer's only choice if it did not want to pay the "higher price for apps" on the Apple App Store was to "purchas[e] an Android device." *Id.* at 970, 987. The district court likewise explained that "Epic argues that Apple has market power in the market for mobile operating systems, and that this market power in turn supports Apple's market power in aftermarkets for app distribution and in-app payment processing on iOS." *Epic Games, Inc.* v. *Apple Inc.*, Civ. No. 20-5640, 2020 WL 7779017, at *3 (N.D. Cal. 2020) (internal quotation marks omitted); *see, e.g.*, Pltf.'s Proposed Findings of Fact and Conclusions of Law at 55, *Epic Games*, *supra* (Civ. No. 20-5640), Dkt. 407. Yet despite those claims of market power in the foremarket, this Court still required the plaintiff to show consumer lock-in.

This Court took the same approach in *Coronavirus Reporter*. There, the plaintiffs alleged in relevant part a single-brand aftermarket—the Apple App Store—that flowed from a foremarket of smartphones sold in the United States. *See* 85 F.4th at 896; SIS Br. 25, *Coronavirus Reporter*, *supra* (No. 22-15166), Dkt. 17. Apple was alleged to have substantial market share—between 60% to 80%—in that foremarket. *See* First Amend. Compl. ¶¶ 16, 18, *Coronavirus Reporter* v. *Apple Inc.*, 2021 WL 5936910 (Civ. No. 21-5567), Dkt. 41. But again, this Court affirmed dismissal at the pleading stage because the plaintiffs "did not allege the prerequisites for a single-brand market," having

32

failed to demonstrate that "iOS end consumers lacked awareness that buying an iPhone constrains which apps would be available to them through the App Store." 85 F.4th at 956.

The district court agreed that both *Epic Games* and *Coronavirus Reporter* required a showing of the lock-in requirements notwithstanding that the plaintiffs claimed market power in the foremarket. 1-ER-8–9. On appeal, however, SIS argues that the district court "misread" those cases "based on an apparent misunderstanding of the 'foremarket' that mattered." Br. 49.

SIS contends that the relevant foremarket in *Epic Games* was not what the plaintiff actually claimed—mobile operating systems—but rather the "global smartphone market," in which Apple had "about a 15% market share" that was "upstream" of other markets. Br. 50-51 (citation omitted). But that is belied by the Court's actual decision, in which the only foremarket discussed by the Court was for operating systems. *See Epic Games*, 67 F.4th at 970, 978; *id.* at 1005 (Thomas, J., concurring in part and dissenting in part). For example, the Court overturned the district court's conclusion that "smartphone operating systems" cannot be a foremarket because they are "not licensed or sold to anyone"—a holding that would be pointless if operating systems were not the relevant foremarket. *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 955 (N.D. Cal. 2021); *see Epic Games*, 67 F.4th at 978-979. Likewise, when

33

it conducted its lock-in analysis, the Court looked to consumers in the fore-market of operating systems (the "iOS platform"), rather than SIS's proposed upstream foremarket of smartphones. *See Epic Games*, 67 F.4th at 980.

SIS similarly fails to distinguish *Coronavirus Reporter*. SIS takes the fact that, in *Epic Games*, the Court recognized that Apple has only 15% of the market for smartphones globally and suggests that "the same conclusion would follow about the existence of interbrand competition" in some "up-stream" foremarket in *Coronavirus Reporter*. Br. 52. But the relevant fore-market alleged in *Coronavirus Reporter* was limited to smartphones sold in the United States (rather than globally, as in *Epic Games*), and Apple was alleged to have a dominant market share in that domestic market. *See* p. 32, *supra*. In affirming the district court's dismissal based on the plaintiff's failure to satisfy the requirements from *Epic Games,* moreover, this Court analyzed the plaintiff's proposed foremarket, not some possible upstream market. *See Coronavirus Reporter*, 85 F.4th at 956. In short, as the district court correctly held, SIS's market-power rule squarely conflicts with this Court's precedents.

b.    SIS primarily argues that the district court should have treated this case as involving ordinary tying claims that do not require specific proof of consumer lock-in. *See* Br. 30-36. But in doing so, SIS conspicuously ignores that this case involves a *single-brand* aftermarket and the legions of cases say-ing that such markets are rare and highly disfavored.

As explained above, *see* pp. 26-27, single-brand markets are disfavored for a variety of reasons, including that they allow a plaintiff to short-circuit the standard requirements for an antitrust claim. Virtually every company could be said to have a monopoly over its own brand, so a plaintiff alleging a single-brand market can too readily prove harm to competition; the contractual restriction at issue creates the market itself. *See, e.g.*, *International Logistics Group*, 884 F.2d at 908; *cf. Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012). That risks transforming a wide variety of reasonable and procompetitive contractual restrictions into antitrust violations, and at a minimum it risks costly litigation under the rule-of-reason framework. But in *Newcal*, this Court explained that "market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant" is not a concern of the antitrust laws. 513 F.3d at 1048-1049. And in *Epic Games*, the Court appropriately recognized that single-brand markets are limited to those narrow circumstances in which there are reasons to think that a company's control over its own brand may impose the type of harm that the antitrust laws were enacted to address.

In addition, SIS's proposed market-power rule would drastically expand the availability of single-brand markets and corresponding antitrust liability for companies operating in the United States—a "result certainly not intended by *Kodak*." *PSI Repair Services, Inc.* v. *Honeywell, Inc.*, 104 F.3d 811, 820

(6th Cir. 1997). That is because a plaintiff pursuing a tying claim must always establish market power in the tying market, *see Illinois Tool Works, Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 46 (2006), so SIS's proposed exception would render the lock-in requirements inapplicable whenever the tying market is the same as the foremarket. Accordingly, although courts have long made clear that single-brand markets are available only in "rare circumstances," *Green Country Food Marketing*, 371 F.3d at 1283; p. 26, *supra*, SIS's proposed approach would allow them as a matter of course.

This case illustrates the problem with that approach. With the same policies in place from the beginning, Intuitive grew from a startup into a successful company by innovating, expanding output, and offering benefits to hospitals and patients. *See* pp. 5-9, *supra*. But now, SIS is trying to leverage a rare and disfavored market definition to attack that procompetitive conduct as a scheme by Intuitive to monopolize its own brand.

SIS cites century-old Supreme Court precedent for the proposition that "foremarket/aftermarket ties are analyzed in the same way as any other tying claim." Br. 37. But those cases did not analyze single-brand aftermarkets (or apply the rule of reason), so they shed little light on the dispute here. For example, the Court did not elaborate on market definition in *International Business Machines Corp.* v. *United States*, 298 U.S. 131 (1936), and it referenced a market for "tabulating cards" more generally, noting that IBM held

36

81% of that market. *Id.* at 135-136; *see also Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2, 16-17 (1984) (citing decision as involving "per se" condemnation). SIS's other cases likewise referenced broader markets, such as for "salt," *International Salt Co.* v. *United States*, 332 U.S. 392, 396, 400 (1947), "domestically manufactured bronze grave markers," and "interments in Lane County," *Moore* v. *James H. Mathews & Co.*, 550 F.2d 1207, 1211 (9th Cir. 1977), or did not clarify the scope of the relevant market, *see United Shoe Machinery Corp.* v. *United States*, 258 U.S. 451 (1922).

Those cases simply show that plaintiffs do not need to prove consumer lock-in when they do not bring claims based on a single-brand aftermarket. *See*, *e.g.*, *Google Play Store*, 147 F.4th at 942. And it is telling that SIS does not point to any examples of appellate courts endorsing single-brand aftermarkets except where the requirements from *Kodak* and *Epic Games* are satisfied. When a plaintiff does proceed on a single-brand aftermarket theory—as SIS chose to do in this case—they must satisfy those requirements, lest single-brand markets become the norm in antitrust litigation.

c.     Relying on the references in *Kodak* to a competitive foremarket, SIS argues that the decision "makes clear" that a plaintiff seeking to establish a single-brand aftermarket need only prove consumer lock-in "if the defendant lacks foremarket power." Br. 40-46. But the Court in *Kodak* never imposed

such a limitation. Those references are simply a result of the specific argument advanced by Kodak in that case: namely, that the competition in the foremarket necessarily disciplined the aftermarket. 504 U.S. at 465. In rejecting that categorical argument, the Court explained that "there is no immutable physical law—no 'basic economic reality'—insisting that competition in the equipment [fore]market cannot coexist with market power in the aftermarkets" given the possibility that consumers might be "locked in" to using Kodak's equipment. *Id.* at 471, 473-476. And although the dissent would have accepted that argument, *see id.* at 486 (opinion of Scalia, J.), neither the majority nor the dissent rejected the longstanding principle that single-brand markets are allowed only in rare circumstances or said that a plaintiff can define a single-brand aftermarket without reference to consumer lock-in requirements whenever the defendant has market power in the foremarket—as this Court's subsequent decisions in *Epic Games* and other cases confirm.

d.     Finally, SIS's arguments make little sense on their own terms. SIS contends that the requirements from *Epic Games* "turn[] on the underlying assumption that the consumers can choose between brands in the foremarket"; where the defendant has market power in the foremarket, "there aren't enough choices upstream to make a difference anyway." Br. 41-42.

Importantly, however, the fact that a defendant may have market power in the foremarket does *not* mean that consumers lack "enough" other choices

38

or that they cannot make "voluntar[y]" decisions. *See Newcal*, 513 F.3d at 1048-1049. Market power is simply "the ability for a defendant to profitably raise prices by restricting output," *Epic Games,* 67 F.4th at 983, and courts have recognized that a defendant may have market power to support a tying claim where it holds as little as 30% of the relevant market, *see, e.g.*, *Hardy* v. *City Optical Inc.*, 39 F.3d 765, 767 (7th Cir. 1994). It defies common sense to claim that consumers lack choice when competitors hold up to 70% of the market. Accordingly, it has long been recognized that a company can "have a meaningful degree of market power" yet still "face some competition." *In re Aggrenox Antitrust Litigation*, 199 F. Supp. 3d 662, 666 (D. Conn. 2016); *see, e.g.*, Louis Kaplow, *The Accuracy of Traditional Market Power Analysis and a Direct Adjustment Alternative*, 95 Harv. L. Rev. 1817, 1845-1846 (1982). Indeed, even a very high market share can reflect the consumers' exercise of choice toward a popular and desirable brand, rather than a lack of choice in the first place. *Cf. Green Country Food Market*, 371 F.3d at 1282. But under SIS's proposed rule, a plaintiff will be able to dispense with the lock-in factors even if the defendant faces competition from several other significant sellers, customers have alternative choices, and many or even most customers choose

to buy from a competitor other than the defendant. Put simply, market power is a poor proxy for measuring the lack of consumer choice.[3]

This is a case in point. Intuitive disputes that SIS's proposed fore-market—minimally invasive soft-tissue surgical robots—constitutes a separate market. But even if such a market did exist, the evidence shows substantial substitution with other forms of surgery for the same procedures. One of SIS's own witnesses explained that any surgery that can be done robotically "can also be [done] laparoscop[ically]" and that a da Vinci is not "essential." 2-ER-235. Another testified that surgeons had the option for any given surgery to "use a da Vinci, a laparoscopic procedure, or an open procedure"; that hospitals used alternative forms of surgery even when a da Vinci was an option; and that one consideration in choosing among these options was cost. 5-SER-1047–49. And other evidence confirmed that some hospitals do not have da Vincis and that Intuitive vigorously competes against forms of surgery other than robotic-assisted surgery. *See* 3-ER-477–78, 3-SER-652, 5-SER-1047, 5-SER-1222–23, 5-SER-1225.

---

[3] Likely for that reason, SIS repeatedly conflates the argument that Intuitive has "market power" with the argument that it has "monopoly" power. *See, e.g.*, Br. 41-42. As explained below, SIS did not advance a monopoly-power argument in the district court, and such an argument would lack merit in any event. *See* pp. 43-48.

Because a company that possesses market power will generally still face competition, there is no reason to believe that the foremarket can never discipline the aftermarket or that consumers will not be able to make a knowing and voluntary choice in the foremarket whenever the defendant has market power in the foremarket. It is only where the objective requirements from *Epic Games* are present that a court can know that consumers lack sufficient information or choice for the foremarket to discipline the aftermarket.

For similar reasons, SIS's reliance (Br. 54-56) on *Lambrix* v. *Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024), and *FTC* v. *Deere & Co.*, Civ. No. 25-50017, 2025 WL 1638474 (N.D. Ill. June 9, 2025), is misplaced. In *Lambrix*, the district court erroneously assumed that "[c]onsumers in a foremarket within which a company has market power have minimal ability to discipline the company's conduct in aftermarkets," and thus it believed that "the relevance of information costs, switching costs, and general knowledge of restrictions is reduced." 737 F. Supp. 3d at 841. And in *Deere*, the district court's holding ultimately turned on its finding that the Federal Trade Commission had adequately pleaded the *Epic Games* factors. 2025 WL 1638474, at *3.[4] Although SIS tries to frame the district court's decision in this case as an "outlier" (Br. 54), that is incorrect for the reasons explained above (as SIS itself

---

[4] Consistent with its litigation position in *Deere*, the FTC has filed an amicus brief in this case; its arguments lack merit for the reasons already discussed.

41

acknowledged at trial), 4-ER-803.  To the contrary, it is SIS's proposed market-power exception to *Epic Games* that lacks any basis in the decisions of the Supreme Court or any appellate court.

### 2.    *SIS's And Its Amici's Alternative Standards Lack Merit*

Recognizing the problems with the market-power rule advanced below, both SIS and its amici propose an array of alternative tests for when a plaintiff may dispense with the *Epic Games* requirements.  That SIS and its amici cannot themselves settle on the relevant test confirms the capriciousness of straying from the clear, objective, and administrable standard of *Epic Games*.  Even so, the alternative tests are both forfeited and unavailing.

a.    As noted above, pp. 33-34, SIS seeks to distinguish this Court's decisions in *Epic Games* and *Coronavirus Reporter* by arguing that proof of consumer lock-in is required only where there is "vibrant interbrand competition" in *any* upstream foremarket.  Br. 51.  That is so regardless of the foremarket actually alleged, because SIS does not dispute that Apple had market power in the alleged foremarkets in *Epic Games* and *Coronavirus Reporter*.  *See* Br. 49-52.  But SIS never proposed this any-competitive-upstream-foremarket theory below, so the argument is plainly forfeited.  *See Abogados* v. *AT&T, Inc.*, 223 F.3d 932, 937 (9th Cir. 2000).

Even if SIS had preserved this novel standard, it has many substantive and administrability problems.  Among other things, SIS does not explain how

42

the existence of competition in some further upstream market would help customers if the defendant has market power in a downstream foremarket; it does not address how far upstream one should look for a possible competitive market; it does not say whose burden it would be to show whether there is a competitive upstream market; and it fails to offer any reason to think that there is no such competitive upstream market here (beyond a conclusory assertion in its brief). *See* Br. 52. Those issues reflect the fundamental problem that SIS never litigated this case based on its newfound theory.

b.    SIS also suggests that the *Epic Games* requirements should not apply where a defendant has *monopoly* power (not just market power) in the foremarket. *See, e.g.*, Br. 42, 56-57. Notably, many of SIS's own amici focus on the argument that the *Epic Games* requirements apply "only where the defendant lacks monopoly power in the foremarket." Antitrust Law Professors Br. 3-4; *see, e.g.*, Open Markets Br. 7-9, 12-14. The monopoly-power argument was not preserved below and lacks merit in any event.

i.    As an initial matter, SIS forfeited any argument concerning a showing of monopoly power in the foremarket, because it did not raise such an argument below—let alone request a jury instruction on the issue. *See Cruz* v. *International Collection Corp.*, 673 F.3d 991, 998-999 (9th Cir. 2012). In the district court, SIS argued that the *Epic Games* requirements are "only applicable for establishing a single-brand aftermarket in cases where a defendant

does not have *market power* in the foremarket." 2-SER-273 (emphasis added); *see also* 4-ER-716–17, 4-ER-803–05. But SIS never argued for a *monopoly-power* exception to *Epic Games*, nor did it request a jury instruction concerning whether Intuitive had monopoly power in the foremarket as a threshold for all of its claims. *See* 5-ER-965–1157.

On appeal, SIS suggests that it could prove Intuitive's monopoly power because, if the jury had agreed with SIS's proposed foremarket, Intuitive would purportedly have had "a market share of 99 percent." SIS Br. 1, 45; *cf.* 4-ER-798–99. But that is not equivalent to a finding of monopoly power or sufficient to preserve the argument. For example, to establish monopoly power, SIS also would have needed the jury to find that "there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run." *CoStar Group, Inc.* v. *Commercial Real Estate Exchange, Inc.*, 150 F.4th 1056, 1070 (9th Cir. 2025) (citation and alteration omitted). Even 100% market share has been found insufficient to prove monopoly power. *See Los Angeles Land Co.* v. *Brunswick Corp.*, 6 F.3d 1422, 1425-1426 (9th Cir. 1993). Accordingly, SIS forfeited its monopoly-power theory by failing to raise it below (and to request corresponding jury instructions).

44

ii.     Even if adequately preserved, SIS's monopoly-power argument should be rejected because a defendant with monopoly power in a foremarket still faces competition restraining its conduct in the aftermarkets.

Courts routinely find monopoly power even where a defendant does not control the entire market. Generally, 65% market share can be sufficient, *see, e.g.*, *Dreamstime.com, LLC* v. *Google LLC*, 54 F.4th 1130, 1137 n.5 (9th Cir. 2022), and a market share as low as 45% "may support a finding of monopoly power, if accompanied by other relevant factors," *Movie 1 & 2* v. *United Artists Communications, Inc.*, 909 F.2d 1245, 1254 (9th Cir. 1990). Put simply, customers can have other meaningful choices even where the defendant has monopoly power within the meaning of Section 2. A finding of monopoly power, which measures a defendant's ability to charge supracompetitive prices in a market, is a poor proxy for identifying the types of cases where a defendant can lock consumers into a second market.

To avoid that reality, SIS and its amici try to fudge their monopoly-power rule by suggesting a yet more novel "near-total monopoly" standard. SIS Br. 1, 27, 56; AAI Br. 4; *see, e.g.*, Open Markets Br. 4, 9, 13; Antitrust Professors Br. 14; AMDR Br. 4. But neither SIS nor its amici elaborate on how to implement a "near-total monopoly" rule, which is unknown to antitrust law. Would the rule still apply if a defendant had only 95% or 90% market share? Do other market factors matter? SIS and its amici offer no answers in

45

asking this Court to depart from its clear, objective, and administrable standard in *Epic Games*. Nor do they provide any justification for forcing businesses into the intolerable position of having to adjust their business practices based only on a guess as to how a "near-total monopoly" standard would work.

In any event, even a company with 100% market share faces competitive constraints. As Judge Learned Hand explained, "substitutes are available for almost all commodities, and to raise the price enough is to evoke them." *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 425-426 (2d Cir. 1945). Put another way, "[a]t a high enough price, even poor substitutes look good to the consumer." *United States* v. *Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995); *see, e.g.*, *FTC* v. *Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 46 (D.D.C. 2024). So even assuming that SIS were correct that Intuitive is a near-total monopolist, the record would show that Intuitive has already priced itself into competition, given the robust substitution between da Vinci and other forms of surgery. *See* pp. 8, 17, 40, *supra*.

By failing to recognize that competition, SIS and its amici also ignore the well-recognized principle that a seller with monopoly power in a foremarket generally cannot leverage that power into a second monopoly profit in the aftermarket. *See, e.g.*, *Jefferson Parish*, 466 U.S. at 36 (O'Connor, J., concurring in the judgment); *Mozart Co.* v. *Mercedes-Benz of North America, Inc.*, 833 F.2d 1342, 1345 n.3 (9th Cir. 1987). That is because, "[i]f the price for

the tied item exceeds the price the purchaser otherwise would have to pay, absent the tying arrangement, the purchaser will tend to regard this difference not as an increase in the price of the tied item, but rather as an increase in the price of the tying product." *Moore*, 550 F.2d at 1213. And as just explained, if the foremarket price is already set at the monopoly level, consumers will substitute away from the product altogether. That principle holds unless consumers are unaware of the true price of the tied item: for example, because they are unable to conduct accurate lifecycle pricing upfront. Hence, it makes good economic sense to apply the *Epic Games* factors even when a plaintiff alleges monopoly power in the foremarket.

At bottom, SIS's argument turns on its repeated (and erroneous) assertions that Intuitive has "zero competitors" and that its customers have "nowhere to look for better terms." Br. 42, 57. But even assuming that Intuitive had market power in a properly defined foremarket (an issue SIS did not let this jury resolve), both economic theory and the record show that is incorrect: Intuitive's customers have, and often choose, alternative surgical methods. *See* pp. 8, 17, 40, *supra*. There is therefore no reason to assume that those customers are involuntarily "locked into" dealing with Intuitive such that it might be appropriate to define an aftermarket limited to Intuitive's own brand. Rather than indulging such an assumption—which would turn single-brand aftermarkets into common fare in antitrust cases—this Court's case law has

47

an established way to prove such lock-in: the requirements set out in *Epic Games*. Accordingly, the district court correctly entered judgment based on SIS's failure to prove a single-brand aftermarket.

### 3.    *In Any Event, SIS Did Not Establish Intuitive's Market Power For Most Of The Relevant Period*

Even if a plaintiff may be excused from proving the *Epic Games* requirements by establishing the defendant's market power (or monopoly power) in the foremarket, SIS would still have failed to prove a single-brand aftermarket. That is because it did not even attempt to establish that Intuitive had such power in the twenty-year period that hospitals were buying the da Vinci before SIS entered the alleged market in 2019. Under SIS's theory, the relevant question is whether a defendant had sufficient market power "at the time" that customers entered into the relevant contractual restriction or made the relevant foremarket purchase. *See Kodak*, 504 U.S. at 473-475; *Newcal*, 513 F.3d at 1047-1048. After all, if the defendant lacked market power at that time, there is no reason to think that its *later* acquisition of market power would affect the voluntary nature of the consumer's earlier choice. And companies can hardly be faulted for failing to predict their future acquisition of market power.

In this case, however, SIS's expert failed to conduct any analysis of whether Intuitive had market power before SIS began offering modified EndoWrists in 2019—a period in which Intuitive sold enough da Vincis that it

48

purportedly acquired a dominant share of SIS's alleged market. *See* 5-SER-1082–83. That failure of proof is notable given that Intuitive had begun selling the da Vinci system twenty years earlier and had essentially the same restrictions in its contracts with customers from the very beginning. *See* p. 9, *supra*. There is no reason to think that Intuitive leveraged its purported market power after 2019 to lock customers into the same contractual restrictions that customers freely entered into before 2019.

SIS also failed to provide any other evidence to infer that Intuitive had market power from the first day it began selling the da Vinci or that a relevant market for minimally invasive surgical robots even existed at the time. To the contrary, it "makes no sense to say that an entrant with a new technology has monopoly power by defining the market as those customers whom the entrant has so far managed to persuade." *Neumann* v. *Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C. Cir. 1986). And SIS failed to show when (if ever) Intuitive acquired market power over the ensuing years or whether the hospitals to which it sought to sell modified EndoWrists entered into their da Vinci contracts at a time when Intuitive had market power. In short, even if there is a market-power exception to *Epic Games*, no reasonable jury could have found that SIS sufficiently established Intuitive's market power such that it would be appropriate to apply that exception here.

*     *     *     *     *

49

This Court has repeatedly required plaintiffs to satisfy certain requirements to establish a single-brand aftermarket, and neither this Court nor any other appellate court has held that a showing of market power (or monopoly or near-total monopoly power) excuses a plaintiff from satisfying those requirements. SIS's novel position cannot be reconciled with this Court's precedent, and it conflicts with longstanding antitrust principles, disregards basic economic theory, and ignores the facts of this case. Still more, SIS has not even sufficiently established Intuitive's market power during the relevant time period. Because SIS did not prove the existence of a single-brand aftermarket, the district court's judgment should be affirmed.

## II. INTUITIVE IS ALSO ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE SIS FAILED TO ESTABLISH THAT INTUITIVE'S PROCESS FOR APPROVING THIRD PARTIES WAS ILLUSORY

This Court should also affirm the district court's judgment on the alternative ground that SIS failed to prove the existence of a tie at all. Intuitive's contracts did not require customers to purchase modified EndoWrists exclusively from Intuitive—either on their face or in practice—and thus did not constitute tying or exclusive dealing as a matter of law. As Intuitive demonstrated at trial, the contracts allowed customers to use any "approved" third-party products and services, and SIS failed to offer any evidence that Intuitive's process for approving third-party suppliers was illusory. *See* 1-ER-12, 3-ER-524–

28, 4-ER-702–03. To the contrary, the uncontroverted evidence showed that Intuitive approved multiple suppliers, and there was no evidence that it had ever refused approval in response to a request. That failure of proof provides a straightforward path for affirmance on all of SIS's antitrust claims.

Thus, if the Court does not affirm for the reasons discussed above, it should reach this alternative ground given that the district court has already addressed the issue on a fully developed trial record, and its ruling is subject to de novo review on appeal. Resolution of the issue would also spare the parties and the district court from the need to redo a lengthy trial on the antitrust claims.

### A.    Third-Party Approval Clauses Are Generally Valid Unless The Plaintiff Proves They Are Illusory

1.    Courts have long recognized that a seller may require its customers to make certain purchases from "approved" third parties without running afoul of the antitrust laws. *See, e.g.*, *Midwestern Waffles, Inc.* v. *Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir. 1984); *Betaseed, Inc.* v. *U & I Inc.*, 681 F.2d 1203, 1223-1224 (9th Cir. 1982); *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979); *Top Rank, Inc.* v. *Haymon*, Civ. No. 15-4961, 2015 WL 9948936, at *10 (C.D. Cal. 2015); *Pullos* v. *Alliance Laundry System, LLC*, Civ. No. 07-169, 2009 WL 10708625, at *13 (D. Nev. July 29, 2009), *aff'd*, 424 Fed. Appx. 663 (9th Cir. 2011). That is because such requirements generally do not implicate the central concern of tying arrangements: namely, that "a

seller with market power in one product market" will "extend its market power to a distinct product market." *Cascade Health Solutions* v. *PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). When "customers can buy the second product elsewhere," not just from the seller of the first product itself, such requirements pose "little danger" that the seller will "acquire power in the second market not based on customer preference for its product," especially where the seller does not have a financial interest in sales by the third parties. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1716e, at 212 (2024) (Areeda & Hovenkamp); *see also Sports Racing Services, Inc.* v. *Sports Car Club of America*, 131 F.3d 874, 888 (10th Cir. 1997) (collecting cases). Instead, third-party approval requirements can benefit both customers and society—for example, by ensuring quality control. *See* Areeda & Hovenkamp ¶ 1716e, at 212.

Accordingly, where a contract on its face provides for "the possibility of purchasing" from independent sources, courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively" as to constitute "de facto tying." *Photovest*, 606 F.2d at 722. To determine whether a third-party approval clause amounts to de facto tying, courts have asked whether the possibility of third-party approval was "illusory" or a "charade" because the seller would not approve third parties in practice. *Top Rank*, 2015 WL 9948936, at *10 (citation omitted); *Mozart*

*Co.* v. *Mercedes-Benz of North America, Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984); *see Photovest*, 606 F.2d at 722; Areeda & Hovenkamp ¶ 1716e2, at 214.

For example, this Court has held that a third-party approval requirement could qualify as an unlawful tying arrangement where the defendant had "never approved" a third-party supplier, even though it had "admitted" that a competitor product "was acceptable." *Betaseed*, 681 F.2d at 1224. By contrast, where the defendant "never refused a request to approve a supplier," courts have found third-party approval requirements to be valid. *Id.* (citing *Kentucky Fried Chicken* v. *Diversified Packaging*, 549 F.2d 368 (5th Cir. 1977)); *see, e.g.*, *Photovest*, 606 F.3d at 722; *Pullos*, 2009 WL 10708625, at *13. A plaintiff bears the burden of showing that the defendant applied the third-party approval clause so restrictively as to render it illusory. *See, e.g.*, *Photovest*, 606 F.3d at 722; *Pullos*, 2009 WL 10708625, at *13.

2.    Although courts have generally addressed the lawfulness of third-party approval requirements in the context of tying claims, the same principles apply to SIS's exclusive-dealing and monopolization claims, especially because all the claims rested on the same core legal theory and evidence. *See Eastman* v. *Quest Diagnostics Inc.*, 724 Fed. Appx. 556, 558 n.1 (9th Cir. 2018); *Dream Big Media Inc.* v. *Alphabet Inc.*, Civ. No. 22-2314, at *5 (N.D. Cal. July 15,

53

2024); *see also, e.g.*, 2-ER-50, 2-ER-57 (providing same jury instruction for tying and exclusive-dealing claims), 3-ER-485–86, 5-SER-954–55. On appeal, SIS itself acknowledges the close relationship between all its claims (Br. 12), and it argues that its entire case should be treated like a "a mine-run tying claim" (Br. 30). The logic of the tying case law also applies equally to exclusive-dealing claims, since a "prerequisite" to any exclusive-dealing claim "is an agreement to deal exclusively." *Aerotec International, Inc.* v. *Honeywell International, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016); *cf. Costar Group*, 150 F.4th at 1073 (analogizing de facto exclusive dealing to tying claims). In short, if Intuitive's contracts provided for the possibility of third parties offering modified EndoWrists and that possibility was not illusory, then all of SIS's antitrust claims fail.

### B. SIS Has Not Proven That Intuitive's Third-Party Approval Process Was Illusory

1.     Intuitive presented ample, uncontroverted evidence at trial that it had a meaningful process for approving third-party products and services for use with the da Vinci system and EndoWrists.

To begin with, consistent with its contractual language regarding approved third-party products, Intuitive has approved numerous third parties to provide products and services for the da Vinci system in general and has even approved third parties to provide modified EndoWrists in particular. Intuitive's president, David Rosa, testified without contradiction that Intuitive had

54

approved "dozens" of third-party accessories to be used with the da Vinci system. 5-SER-1130. SIS's chief executive officer, Greg Posdal, likewise testified that two independent service organizations—Rebotix and Restore—had been specifically approved to sell modified EndoWrists. 5-SER-989, 5-SER-1016, 5-SER-1019. And when asked by his own counsel whether he "believe[d,] based on the fact that Rebotix and Restore were authorized by Intuitive, that SIS would similarly be authorized," Mr. Posdal stated that he could "make that assumption." 5-SER-1041.

There was no evidence that Intuitive had a financial interest in the third parties that received its approval. *See Sports Racing Services*, 131 F.3d at 888. And "[o]f crucial importance," there was no evidence that Intuitive had ever "refused a request to approve" a third-party supplier. *Betaseed*, 681 F.2d at 1224 (quoting *Kentucky Fried Chicken*, 549 F.2d at 373). To the contrary, Mr. Rosa testified without contradiction that Intuitive had not "rejected any application for approval by a third party" through the period when SIS was attempting to sell modified EndoWrists, 5-SER-1133, and that Intuitive never "rejected any application for approval by any third party for any other model of EndoWrist," 5-SER-1184–85.

It is also undisputed that no third party even sought Intuitive's approval to provide modified EndoWrists until well after SIS ended its business efforts. *See* 5-SER-960, 5-SER-989, 5-SER-1130, 5-SER-1133. That was not because

55

third parties were unaware of the possibility of obtaining approval. SIS itself was aware that Intuitive's contracts did not prohibit all third-party services but only those by unauthorized third parties. 2-ER-305–09, 5-SER-1016–19. But Mr. Posdal admitted that SIS never contacted Intuitive to ask for approval to provide third-party services or otherwise sought to determine the process for obtaining such approval. *See* 5-SER-960, 5-SER-1015, 5-SER-1039–40, 5-SER-1078. That fact alone fundamentally undermines SIS's claims. *See Photovest*, 606 F.2d at 722.

What is more, the undisputed evidence shows that Intuitive affirmatively asked SIS's supplier Rebotix for evidence that its services would not affect the safety or efficacy of EndoWrists. Specifically, Intuitive repeatedly wrote to Rebotix requesting any "clinical proof that [its] service process returns the modified instruments to a 'production equivalent qualification' and/or that additional use does not affect the safety or performance of the instruments." 4-SER-751; *see* p. 12, *supra*. Neither Rebotix nor SIS ever provided Intuitive with such information. *See* 5-SER-1067–68, 5-SER-1072–73, 5-SER-1131, 5-SER-1133, 5-SER-1170–71, 5-SER-1178, 5-SER-1184. Far from showing that Intuitive flatly refused to approve third parties, Intuitive's letters demonstrate that Intuitive was willing to consider doing so upon a showing of the safety and efficacy of such services, but that Rebotix and SIS simply failed to follow up.

56

2.　　SIS has not disputed that Intuitive's contracts allowed for third-party products or services to be used with the da Vinci system or EndoWrists. *See, e.g.*, SIS Br. 21.　Nor has it challenged the legitimacy of third-party approval requirements as a general matter.　At trial, SIS argued only that there was an issue of fact as to whether Intuitive's approval process was "illusory," and the district court summarily denied Intuitive's motions for judgment as a matter of law based on a purported dispute of fact.　3-ER-532–33, 3-ER-565, 4-ER-706–07, 4-ER-714.　But there is no dispute of fact on that question.

SIS argued below that Intuitive had "no standards" for approving third parties and that "there was nobody approved" to provide modified EndoWrists during "the relevant time frame."　3-ER-532.　But SIS failed to offer any evidence that Intuitive lacked standards for approving third parties, especially in light of Intuitive's longstanding practice of approving third-party suppliers and its requests for evidence that the modified EndoWrists were safe and effective.　Nor does it matter that Intuitive did not specifically approve any third parties to provide modified EndoWrists before SIS abandoned its business, given that no parties even *asked* for approval.　*See Photovest*, 606 F.2d at 722; pp. 55-56, *supra*.　When "approvals are practicable in principle," a defendant can hardly "be faulted for the mere absence of numerous (or even any) such approvals," because "[c]ustomers or rivals may not have sought approvals[] or no rival product may be good enough."　Areeda & Hovenkamp ¶ 1716e2, at 214.

57

SIS also suggested that it never sought approval for its services because Intuitive took the position that its "instruments were dangerous after 10 uses[,] [s]o it made no sense there would be authorization for such." 3-ER-315–16. But that ignores the fact that SIS itself claimed to perform more general testing, evaluation, and modification of the EndoWrists. 3-ER-326–30. SIS presented no evidence that Intuitive ever took the position that such services were ineligible for approval, assuming that the third party had clinical proof to support their safety and efficacy; indeed, Intuitive specifically asked Rebotix for such proof. *See* 4-SER-751; p. 56, *supra*. In that respect, this case is a far cry from those in which a request for approval might have been "futile" because the plaintiff was "told that no other sources would be approved." *Midwestern Waffles*, 734 F.2d at 712.

Relatedly, in response to questions from his counsel, Mr. Posdal asserted that original equipment manufacturers "never" authorize third parties. 3-ER-315. But that "conclusory, self-serving" statement not only lacks "any supporting evidence," *Bohmker* v. *Oregon*, 903 F.3d 1029, 1044 (9th Cir. 2018) (citation omitted), but also is directly contradicted by the record in this case, including Mr. Posdal's own testimony that he could "make the assumption" that SIS "would similarly be authorized," 5-SER-1041; pp. 54-55, *supra*. Such unsupported and "internal[ly] inconsisten[t]" testimony is insufficient to create a genuine issue of fact. *UA Local 343 United Association of Journeymen*

58

& *Apprentices of Plumbing & Pipefitting Industries* v. *Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1473 (9th Cir. 1994).

SIS's liability expert, Dr. Russell Lamb, offered a different reason for why SIS and Rebotix never took up Intuitive's request to submit evidence that their modification services were safe and effective.  Dr. Lamb testified that he would not have expected third parties to submit such information because "Intuitive [is not] a regulatory body" and it is "not Intuitive's decision one way or the other." 5-SER-1090.  But courts have held that third-party approval requirements are generally permissible and that the relevant question is whether approval under those clauses is illusory.  *See* pp. 51-53, *supra*.  Regardless, the record shows that it is not unusual for medical device companies to include third-party approval requirements in their contracts; SIS itself includes such a provision.  *See* 4-SER-826; 4-SER-841; 5-SER-1011–12, 5-SER-1042–43, 5-SER-1213–17.  Neither Dr. Lamb nor any other SIS witness established that Intuitive would have wrongly withheld approval or otherwise done anything inconsistent with good-faith contractual approval.

Finally, SIS argued below that Intuitive's approval of Rebotix and Restore to provide EndoWrist repair and replacement services cannot serve as evidence that Intuitive had a meaningful approval process because those approvals occurred in the context of settlement negotiations and were limited to third parties that had FDA clearance to remanufacture EndoWrists.  3-ER-

561–62; *see* SIS Br. 21.[5] But that argument has the burden of proof backwards. It was not Intuitive's burden to prove that its process was not illusory (though Intuitive did just that); it was SIS's burden to establish that Intuitive's approval process was illusory. *See, e.g.*, *Photovest*, 606 F.3d at 722; *Pullos*, 2009 WL 10708625, at *13. As discussed, even if Intuitive had *never* authorized any third parties, that would not establish that Intuitive's approval process was illusory. *See* p. 57. SIS's objection is particularly misplaced given that it offered no evidence that Intuitive's approvals represented a change in policy, that its policy applied only to Restore and Rebotix, or that it would be inappropriate for Intuitive to use FDA clearance as a standard for approving third parties (especially where multiple third parties ultimately obtained such clearance). And the record shows that Intuitive communicated to third parties that it was willing to consider approving their services if they provided clinical evidence of safety and efficacy—an invitation that Rebotix and SIS simply failed to take up. *See* p. 56, *supra*.

If anything, SIS's argument underscores that, if SIS had not convinced the district court to issue an erroneous ruling excluding all evidence related to FDA and its clearance process, Intuitive would have had even *more* evidence

---

[5] On appeal, SIS fails to mention that the district court specifically excluded any evidence of prior litigation or settlements. *See* 2-SER-216–217, 5-SER-983–85. SIS did not challenge that ruling in its opening brief so has abandoned any challenge for purposes of this appeal.

demonstrating that it had a non-illusory process for approving third parties. Intuitive vigorously disagrees with that ruling, as noted above. *See* p. 9 n.1. But because SIS has failed to offer any evidence suggesting that Intuitive's approval process was illusory, the Court need not address that evidentiary error (or rely on any excluded FDA-related evidence), and it instead should simply affirm the district court's judgment based on the existing trial record.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA J. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.*
   *Washington, DC 20006*
   *(202) 223-7300*

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *1285 Avenue of the Americas*
   *New York, NY 10019*

OCTOBER 29, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1372

I am the attorney or self-represented party.

**This brief contains** | 13,998 | **words,** including | 7 | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   ☐ it is a joint brief submitted by separately represented parties.
   ☐ a party or parties are filing a single brief in response to multiple briefs.
   ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [        ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Kannon K. Shanmugam | **Date** | Oct 29, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**   | 25-1372 |

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | /s/ Kannon K. Shanmugam |   **Date** | Oct 29, 2025 |
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**                                                                 *New 12/01/2018*