No. 25-1372

# In the United States Court of Appeals for the Ninth Circuit

———————————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

*v.*

INTUITIVE SURGICAL, INC.,
DEFENDANT-COUNTER-CLAIMAINT-APPELLEE

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-3496)
(THE HONORABLE ARACELI MARTINEZ-OLGUIN, J.)*

———————————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 1 OF 5**

———————————

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
    *1285 Avenue of the Americas*
    *New York, NY 10019*

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA G. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
    *2001 K Street, N.W.*
    *Washington, DC 20006*
    *(202) 223-7300*
    *kshanmugam@paulweiss.com*

# Exhibit A

1  Kenneth A. Gallo (*pro hac vice*)
   Paul D. Brachman (*pro hac vice*)
2  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   2001 K Street, NW
3  Washington, DC  20006-1047
   Telephone:  (202) 223-7300
4  Facsimile:  (202) 223-7420
   Email: kgallo@paulweiss.com
5  Email: pbrachman@paulweiss.com

6  William B. Michael (*pro hac vice*)
   Crystal L. Parker (*pro hac vice*)
7  Daniel A. Crane (*pro hac vice*)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8  1285 Avenue of the Americas
   New York, NY 10019-6064
9  Telephone:  (212) 373-3000
   Facsimile:  (212) 757-3990
10 Email: wmichael@paulweiss.com
   Email: cparker@paulweiss.com
11 Email: dcrane@paulweiss.com

12 Joshua Hill Jr. (SBN 250842)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13 535 Mission Street, 24th Floor
   San Francisco, CA 94105
14 Telephone:  (628) 432-5100
   Facsimile:  (628) 232-3101
15 Email: jhill@paulweiss.com

16 *Attorneys for Defendant Intuitive Surgical, Inc.*

17 [Additional counsel listed on signature page]

18                    **UNITED STATES DISTRICT COURT**

19                 **NORTHERN DISTRICT OF CALIFORNIA**

20                    **SAN FRANCISCO DIVISION**

21
   SURGICAL INSTRUMENT SERVICE          Case No. 3:21-cv-03496-AMO
22 COMPANY, INC.,
                                        **DEFENDANT'S MOTION FOR**
23              *Plaintiff*,            **RECONSIDERATION OR, IN THE**
                                        **ALTERNATIVE, FOR CERTIFICATION**
24        v.                            **OF AN INTERLOCUTORY APPEAL**

25 INTUITIVE SURGICAL, INC.,
                                        Date:
26              *Defendant*.            Time:
                                        Courtroom:  10
27
28                                      The Honorable Araceli Martínez-Olguín

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ..................................................................................1

STATEMENT OF THE ISSUES TO BE DECIDED..........................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .....................................................2

PRELIMINARY STATEMENT .............................................................................................2

RELEVANT BACKGROUND ...............................................................................................6

LEGAL STANDARD................................................................................................................8

ARGUMENT ...............................................................................................................................9

I.      THE COURT SHOULD RECONSIDER ITS DECISION EXCLUDING
        ALL EVIDENCE RELATED TO THE 510(K) CLEARANCE PROCESS.....................9

        A.      FDA-related evidence is relevant. ...............................................................9

                1.      The relevance and probative value of the FDA-related
                        evidence does not depend on whether 510(k) clearance was
                        legally required. ..............................................................................12

                2.      The issues presented by SIS's motions *in limine* were not
                        presented or resolved at summary judgment. ............................14

                3.      FDA-related evidence is not irrelevant to safety in the
                        context of this antitrust case.........................................................15

        B.      FDA-related evidence is not substantially more prejudicial than
                probative. .........................................................................................................17

II.     THE COURT SHOULD RECONSIDER ITS DECISION PROHIBITING
        INTUITIVE FROM INTRODUCING EVIDENCE FROM AFTER
        NOVEMBER 2022. .......................................................................................................21

III.    TO AVOID A VERDICT TAINTED BY LEGAL ERROR AND
        UNCURABLE PREJUDICE TO INTUITIVE, THE COURT SHOULD
        VACATE ITS ORDER AND MAKE CLEAR THAT CERTAIN FDA-
        RELATED AND POST-2022 EVIDENCE IS ADMISSIBLE BEFORE
        OPENING STATEMENTS.............................................................................................23

IV.     IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THESE
        MATTERS FOR AN INTERLOCUTORY APPEAL UNDER 1292(B)
        AND STAY PROCEEDINGS PENDING APPEAL. ..................................................24

CONCLUSION ...........................................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*,

5
    592 F.3d 991 (9th Cir. 2010) ..................................................................19

6

*Am. Fed'n of Musicians of U.S. & Can.* v. *Paramount Pictures Corp.*,

    903 F.3d 968 (9th Cir. 2018) ..................................................................25

7

*In re Bard IVC Filters Prod. Liab. Litig.*,

8
    2018 WL 11445485 (D. Ariz. Jan. 29, 2018) ...........................................18, 19, 20

9

*Beeman* v. *Anthem Prescription Mgmt., Inc.*,

10
    2007 WL 8433884 (C.D. Cal. Aug. 2, 2007).............................................9, 25

11

*Betaseed, Inc.* v. *U & I Inc.*,

    681 F.2d 1203 (9th Cir. 1982) ..................................................................10

12

*Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*,

13
    2017 WL 10845178 (N.D. Ind. Dec. 21, 2017) ........................................21

14

*In re C. R. Bard, Inc.*,

15
    810 F.3d 913 (4th Cir. 2016) ..................................................................18

16

*Carter* v. *Johnson & Johnson*,

    2022 WL 4700549 (D. Nev. Sept. 29, 2022)...........................................18

17

*In re Cement Antitrust Litig.*,

18
    673 F.2d 1020 (9th Cir. 1981) ..................................................................9, 25

19

*In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*,

20
    2018 WL 6617375 (S.D. Ind. Dec. 18, 2018).........................................15, 18

21

*Epic Games, Inc.* v. *Apple, Inc.*,

    67 F.4th 946 (9th Cir. 2023) ..................................................................11

22

*Gamevice, Inc.* v. *Nintendo Co., Ltd.*,

23
    2023 WL 4032009 (N.D. Cal. June 14, 2023) ..........................................8

24

*Gray* v. *Golden Gate Nat. Recreational Area*,

25
    866 F.Supp.2d 1129 (N.D. Cal. 2011) ....................................................8

26

*Gustavson* v. *Mars, Inc.*,

    2014 WL 6986421 (N.D. Cal. Dec. 10, 2014).........................................25

27

*Helsinn Healthcare S.A.* v. *Teva Pharms. USA, Inc.*,

28
    855 F.3d 1356 (Fed. Cir. 2017).............................................................13

- ii -

*Huddleston* v. *United States*,
   485 U.S. 681 (1988) ............................................................................................................21

*ICTSI Oregon, Inc.* v. *Int'l Longshore & Warehouse Union*,
   2022 WL 16924139 (D. Or. Nov. 14, 2022) ....................................................................22

*Juliana* v. *United States*,
   949 F.3d 1125 (9th Cir. 2018) ............................................................................................9

*Kaiser* v. *Johnson & Johnson*,
   2018 WL 1358407 (N.D. Ind. Mar. 16, 2018) ................................................................18

*Kuang* v. *U.S. Dep't of Def.*,
   2019 WL 1597495 (N.D. Cal. Apr. 15, 2019) ..................................................................25

*Medtronic, Inc.* v. *Lohr*,
   518 U.S. 470 (1996) ............................................................................................................15

*Miranda* v. *U.S. Sec. Assocs., Inc.*,
   2019 WL 2929966 (N.D. Cal. July 8, 2019) ..............................................................16, 22

*Munoz* v. *PHH Mortg. Corp.*,
   2022 WL 138670 (E.D. Cal. Jan. 14, 2022) ....................................................................18

*Novartis Pharms. Corp.* v. *Johnson*,
   102 F.4th 452 (D.C. Cir. 2024) ........................................................................................13

*Otero* v. *Zeltiq Aesthetics, Inc.*,
   2018 WL 3012942 (C.D. Cal. June 11, 2018) ................................................................15

*Ottesen* v. *Hi-Tech Pharms., Inc.*,
   2024 WL 589089 (N.D. Cal. Feb. 13, 2024) ..................................................................25

*Palantir Techs. Inc.* v. *Abramowitz*,
   639 F. Supp. 3d 981 (N.D. Cal. 2022) ............................................................................12

*Photovest Corp.* v. *Fotomat Corp.*,
   606 F.2d 704 (7th Cir. 1979) ............................................................................................10

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   166 F. Supp. 3d 654 (E.D. La. 2016) ..............................................................................22

*Reese* v. *B.P. Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ........................................................................................9, 25

*Sherwin-Williams Co.* v. *JB Collision Servs., Inc.*,
   2015 WL 11237466 (S.D. Cal. Nov. 6, 2015) ............................................................17, 21

*Sidibe* v. *Sutter Health*,
   103 F.4th 675 (9th Cir. 2024) ..........................................................................................17

- iii -

*United States* v. *Holmes*,
   2021 WL 2044470 (N.D. Cal. May 22, 2021) ..........................................................9

*U.S.A.* v. *Jackson*,
   2016 WL 4059615 (C.D. Cal. July 25, 2016) .........................................................17

**Statutes and Rules**

21 U.S.C. § 360(k) ................................................................................... *passim*

28 U.S.C. §1292(b) ................................................................................. *passim*

21 C.F.R. § 807.3(o) ...............................................................................................15

21 C.F.R. § 807.92(a)(5) ........................................................................................15

21 C.F.R. § 807.92(b)(2) ........................................................................................15

21 C.F.R. § 807.93(a)(1) ........................................................................................15

Fed. R. Civ. Pro. 54(b) .............................................................................................1

Fed. R. Evid. 401 ......................................................................................2, 7, 9, 10

Fed. R. Evid. 402 ......................................................................................2, 7, 9, 21

Fed. R. Evid. 403 .................................................................................... *passim*

Civ. L. R. 7-9 ..........................................................................................................1, 8

Civ. L. R. 7-9(b)(3) .................................................................................................1, 2

**Other Authorities**

FDA, *Medical Device Safety and the 510(k) Clearance Process* (current as of
   Sept. 6, 2023), https://www.fda.gov/medical-devices/510k-
   clearances/medical-device-safety-and-510k-clearance-process .............................16

FDA, *Premarket Notification 510(k)* (current as of Aug. 22, 2024),
   https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-
   preparing-correct-submission/premarket-notification-510k .................................16

FDA, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket
   Notifications [510k]* (July 28, 2014), available at
   https://www.fda.gov/media/82395/download ......................................................16

- iv -

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on such date as may be directed by the Court, Defendant Intuitive Surgical, Inc. ("Intuitive") will and hereby does move the Court, pursuant to Civil Local Rule 7-9 and Federal Rule of Civil Procedure 54(b), to reconsider portions of the Court's December 11, 2024 Order Re Motions *In Limine* (Dkt. 330, the "Order"). Intuitive requests that the Court reconsider its rulings granting Plaintiff Surgical Instrument Service Company, Inc.'s ("SIS") motions *in limine* #1 and #5 and imposing additional conditions with respect to Intuitive's motion *in limine* #4. Intuitive respectfully submits that reconsideration is warranted under Civil Local Rule 7-9(b)(3), Rule 54(b), and/or the inherent authority of the Court to prevent clear error or manifest injustice. In the alternative, Intuitive requests that the Court certify its Order for interlocutory appeal pursuant to 28 U.S.C. §1292(b) and stay proceedings pending the resolution of the request for an interlocutory appeal and any appellate proceedings.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, and such arguments and authorities as may be presented at or before the hearing.

**STATEMENT OF THE ISSUES TO BE DECIDED**

1.     Whether the Court should reconsider the portion of its December 11, 2024 Order granting SIS's motions *in limine* #1 and #5 and excluding all evidence relating to the FDA's 510(k) clearance process.

2.     Whether the Court should reconsider the portion of its December 11, 2024 Order imposing additional conditions with respect to Intuitive's motion *in limine* #4 such that Intuitive is prohibited from introducing evidence relating to events after November 2022.

3.     If the Court denies leave to seek reconsideration or declines to reconsider the relevant portions of its December 11, 2024 Order, whether the Court should certify, pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal as to the following questions of law:  (i) whether the Court erred in excluding all evidence relating to the FDA 510(k) clearance process and (ii) whether

the Court erred in prohibiting Intuitive from introducing evidence relating to events after November 2022.

4.      Whether the Court should stay proceedings pending the resolution of Intuitive's request for an interlocutory appeal and any appellate proceedings.

### MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Intuitive respectfully requests that the Court reconsider the portions of its December 11, 2024 Order (Dkt. 330) granting SIS's motions *in limine* #1 and #5 and imposing additional conditions with respect to Intuitive's motion *in limine* #4. As this Court recognized, these motions raised "important" issues that will "significantly shape the presentation of evidence at trial." November 25, 2024, Hearing Tr. at 44:10–11, 106:22 ("Hearing"). Intuitive submits that the Court misapprehended the nature of the arguments and evidence at issue, and otherwise clearly erred, in excluding all evidence relating to the FDA's 510(k) clearance process and in prohibiting Intuitive from introducing evidence relating to events after November 2022. The Court should correct those errors now rather than conduct a lengthy trial based on an incomplete and misleading evidentiary record and wait for the Ninth Circuit to reverse (and order a retrial) on an appeal from a final judgment. In the alternative, Intuitive respectfully requests that the Court certify its rulings for an interlocutory appeal and stay proceedings pending appeal.

In its Order resolving the motions *in limine*, the Court committed two fundamental errors that warrant reconsideration under Civil Local Rule 7-9(b)(3). *First*, the Court misapprehended or failed to consider Intuitive's arguments and evidence and otherwise erred in broadly excluding all evidence related to the FDA's 510(k) clearance process on the grounds that such evidence is not relevant (under Federal Rules of Evidence 401 and 402) and is more prejudicial than probative (under Federal Rule of Evidence 403). The Court's ruling proceeded from the mistaken premise that evidence of FDA's 510(k) regulatory framework will be used as it might in a products liability case to prove that Intuitive's products are safe and SIS's services are unsafe. That is incorrect. While Intuitive maintains that the FDA's entire regulation of medical devices, including the 510(k) process, is concerned with safety—as numerous courts have found, FDA regulations demonstrate,

FDA has stated, and SIS's own FDA expert opined—Intuitive is not relying on evidence of the FDA's process or determinations to prove that any device is safe or unsafe. Rather, such evidence is relevant to many other issues in this case, including one that the Court identified as central—whether Intuitive engaged in anticompetitive conduct. And that is so because of what the Court agreed that the 510(k) clearance process *does* involve—namely, "inquiry into a new device's equivalence with an earlier-approved medical device." Dkt. 330, at 2.

Simply put, a key question for the jury is whether it was anticompetitive for Intuitive to adopt a contractual policy requiring surgical instruments and accessories "made or approved by Intuitive" and prohibiting unauthorized modifications as well as "repair, refurbishment or reconditioning not approved by Intuitive." To establish the reasonableness of that policy, Intuitive seeks to introduce evidence showing that it would approve third-party products and services, so long as they had been proven to be *equivalent to*—or, *as safe and effective as*—earlier-approved medical devices, including Intuitive's own original EndoWrists. Intuitive further seeks to introduce evidence showing that it offered to third parties two alternative routes of proving such equivalence—obtaining FDA clearance or submitting clinical proof to Intuitive. Yet SIS and its partner Rebotix did neither. The Court's blanket prohibition on FDA-related evidence, however, would prevent the jury from hearing and seeing key parts of that record, despite their relevance and clear probative value. There is no basis under the Federal Rules of Evidence to support such a ruling, and its effect will cause serious and irremediable prejudice to Intuitive at trial—tainting any verdict the jury might reach before opening statements even begin.

To demonstrate how integral FDA-related evidence is to this case, and how confusing to the jury and prejudicial to Intuitive it would be to exclude *all* such evidence, Intuitive is submitting with this motion a detailed proffer setting out the key evidence it proposes to introduce and describing the relevance of that evidence. *See* Decl. Of particular note, this includes evidence that SIS itself has identified as central to *its* case—such as Intuitive's letters to hospitals that used unauthorized third-party services. Those letters detail Intuitive's concerns about the use with Intuitive's systems of modified EndoWrists that have not been determined by the FDA (or by Intuitive) to be equivalent to Intuitive's original FDA-cleared EndoWrists, and the letters assert

1  Intuitive's belief that such unauthorized activities are both illegal and unsafe. SIS is going to talk

2  to the jury about those letters, which it labels as "threats," in opening statements and throughout

3  the trial. They are the centerpiece of SIS's case—conduct that SIS claims was a central cause of

4  its alleged injury and damages. But it would be enormously prejudicial for SIS to be allowed to

5  rely on those letters and ask the jury to base a verdict on them without the jury seeing and hearing

6  about what the letters *actually say*. And a significant part of what the letters say is that Intuitive

7  believes that the activities of unauthorized third parties who modify EndoWrists are in conflict

8  with FDA regulations, fail to meet the rigorous product specifications established by Intuitive and

9  cleared by the FDA, and have not been demonstrated to be safe *or equivalent* to Intuitive's FDA-

10 cleared products. *See, e.g.*, Decl. ¶ 5. SIS has not explained how exactly it intends to introduce

11 these letters without opening the door to all the same FDA issues its motion sought to exclude, but

12 it is certainly no solution to say that the letters can be presented to the jury with all references to

13 the FDA redacted out: how can the jury be asked to judge the reasonableness of Intuitive's conduct

14 with customers if it is permitted to hear only *part* of what Intuitive actually said to its customers,

15 or to hear only Intuitive's conclusion regarding the use of unauthorized third-party services without

16 also hearing the reasons Intuitive actually gave to support that conclusion?

17         As Intuitive will show herein and in the accompanying proffer, the same applies to other

18 key pieces of FDA-related evidence, which cannot be excluded from trial without effectively

19 denying Intuitive the right to defend against SIS's claims. It is telling that SIS itself has identified

20 as trial exhibits more than 200 documents that reference the FDA—roughly one third of the total

21 number of trial exhibits on SIS's list.

22         To be clear, Intuitive (while preserving its appellate rights with respect to the Court's

23 summary judgment rulings) will *not* argue to the jury that it should conclude that what SIS and

24 other unauthorized third parties were doing *actually was illegal* under the Food, Drug, and

25 Cosmetic Act ("FDCA"). Intuitive respectfully suggests that any doubt about that issue can be put

26 to rest by the Court instructing the jury (again, subject to Intuitive preserving this issue for appeal)

27 that to date the FDA has not reached a final determination as to whether 510(k) clearance is

28 required for EndoWrist modification services of the kind that SIS offered and that the jury may

1  not base its verdict on a determination as to whether SIS was or was not legally required to obtain

2  510(k) clearance.  Such an instruction will avoid any "mini-trial" on FDA-related legal issues.

3        But regardless of any legal requirement, Intuitive's beliefs about the significance of FDA

4  clearance are indisputably a key part of the rationale behind its actions and must be considered in

5  determining whether such actions violated the antitrust laws.  The jury may ultimately decide that

6  such actions were nevertheless anticompetitive, or that Intuitive's stated beliefs were a pretext

7  (though Intuitive does not believe that such a finding would be supported by the evidence).  But

8  there is no basis to *preclude* the jury from even hearing about such beliefs—especially where this

9  Court has made (and will make) no determination as to the legality of SIS's conduct, *one way or*

10  *the other*, under the FDCA.  Any other result would be tantamount to this Court making "a

11  dispositive ruling on a claim" in favor of SIS, despite the fact that a motion *in limine* "is not the

12  proper vehicle for seeking" such a ruling.  Dkt. 330, at 1 (citation omitted).

13        Nor is the strong relevance and probative value of this evidence outweighed by any

14  prejudicial effect.  In holding otherwise, the Court relied on cases involving products-liability

15  claims in which parties attempted to use the fact of 510(k) clearance to establish that a product was

16  safe and not defective.  But in doing so, the Court again misapprehended what Intuitive intends to

17  argue at trial.  Here, Intuitive does *not* seek to present FDA-related evidence to prove as a matter

18  of fact that the original EndoWrists were safe or that modified EndoWrists were unsafe products.

19  Dkt. 330, at 3.  Instead, Intuitive seeks to present such evidence to establish (among other things)

20  that it acted reasonably in using 510(k) clearance as a proxy for ensuring that modified products

21  were *as safe as the originals* and that, in refusing to obtain such clearance—while nevertheless

22  telling customers that it was restoring EndoWrists to Intuitive's original FDA-cleared

23  specifications—SIS was not excluded from competition but instead simply chose not to compete.

24  There is no reason to think that introducing FDA-related evidence for these and related purposes

25  will confuse the jury or result in a "mini-trial" on the regulatory scheme.  And there is certainly no

26  reason to think that *all* FDA-related evidence must be excluded to avoid such issues.  On the

27  contrary, it will be immensely confusing and misleading for the jury to exclude all FDA-related

28  evidence given that such evidence is inextricably intertwined with other key evidence in this case.

*Second*, the Court also misapprehended Intuitive's arguments and evidence and otherwise clearly erred in prohibiting Intuitive from introducing evidence relating to events after November 2022—in particular, the fact that in March 2023 Intuitive *did* approve under its contracts a third party who obtained FDA clearance. That fact is public and has been known to SIS for almost two years at this point. By ruling that Intuitive is barred from introducing post-2022 evidence, the Court effectively made another dispositive ruling in SIS's favor on an issue that is hotly contested. Specifically, SIS urged the Court to exclude post-2022 evidence as irrelevant because SIS claims that it had already been excluded from the market and foreclosed from competing by Intuitive before 2022. Intuitive vehemently disputes that claim. By granting SIS the evidentiary ruling it requested, the Court has essentially decided that SIS was in fact excluded after 2022, and has taken away from the jury the ability to make that factual determination for itself. Additionally, the Court has set up a record on which it may appear to the jury (whether SIS argues this or not) that Intuitive *never* actually authorized a third party that modifies EndoWrists, even though that is flatly untrue. Again, SIS is free to argue to the jury that Intuitive's actions were reasonable or unreasonable, procompetitive or anticompetitive, genuine or pretextual. The point is that the jury's determinations on those issue will be meaningless and prejudicial if it is not allowed to hear evidence concerning what Intuitive actually did and why.

Finally, and in the alternative, Intuitive respectfully requests that the Court certify its Order for an interlocutory appeal under 28 U.S.C. § 1292(b) and that it stay all proceedings pending resolution of that request and any appellate proceedings. As discussed herein, the Court's rulings, if not modified, will create significant and unavoidable problems with the presentation of evidence at trial, starting with opening statements on day one. Intuitive therefore respectfully requests that the Court address these issues now, either by reconsideration or by allowing its rulings to be considered by the Ninth Circuit.

## **RELEVANT BACKGROUND**

On October 28, 2024, the parties filed three motions *in limine* as relevant to this proceeding. SIS filed two essentially repetitive motions (motions *in limine* #1 and #5) to exclude all evidence relating to the FDA 510(k) clearance process on the grounds that such evidence was not relevant

1   under Federal Rules of Evidence 401 and 402 and substantially more prejudicial than probative

2   under Federal Rule of Evidence 403.  Pl.'s motion *in limine* ("MIL") 1, Dkt. 298, at 6–7; Pl.'s MIL

3   5, Dkt. 300, at 5–6.  In particular, SIS argued that the evidence was irrelevant because 510(k)

4   clearance does not shed meaningful light on the safety of products and because this Court had

5   previously held that the parties could not litigate whether SIS's services required FDA clearance.

6   *See* Pl.'s MIL 1, Dkt. 298, at 6; Pl.'s MIL 5, Dkt. 300, at 5.  Relying on products-liability cases,

7   SIS also argued that the evidence was substantially more prejudicial than probative because it

8   would likely confuse the jury about the significance of 510(k) clearance and would waste time.

9   *See* Pl.'s MIL 1, Dkt. 298, at 6–7; Pl.'s MIL 5, Dkt. 300, at 5–6.  Intuitive filed a motion (motion

10  *in limine* #4) to prevent SIS from introducing evidence from after November 2022, other than the

11  limited information that SIS provided in response to the Court's prior discovery order, on the

12  ground that SIS should be estopped from doing so after opposing discovery on this issue.  Def.'s

13  MIL 4, Dkt. 294, at 4–5.

14        On November 7, 2024, the parties filed oppositions to the respective motions.  In response

15  to SIS's motions *in limine* #1 and #5, Intuitive explained that 510(k) clearance, although not

16  dispositive of safety, was at least relevant to safety and that evidence related to the clearance

17  process was relevant for numerous reasons apart from whether it established a product's safety or

18  whether SIS's services were legally required to be cleared by the FDA.  *See* Def.'s Opp. to MIL

19  1, Dkt. 298, at 1–6; Def.'s Opp. to MIL 5, Dkt. 300, at 1–6.  Intuitive also argued that the products-

20  liability cases cited by SIS were inapposite and that FDA-related evidence did not satisfy the high

21  bar for exclusion under Rule 403.  For its part, SIS did not oppose Intuitive's motion *in limine* #4

22  but requested that the Court also prohibit *Intuitive* from introducing evidence from after November

23  2022.  *See* Pl.'s Opp. to MIL 4, Dkt. 294, at 1–2.  SIS did not provide any support or legal authority

24  for this request, relying instead on a bare and unexplained invocation of "fairness."  *Id*. at 3.

25        On December 11, 2024, the Court granted all three motions and adopted SIS's request with

26  respect to Intuitive's motion *in limine* #4.  Dkt. 330.  As for evidence relating to the FDA's 510(k)

27  clearance process, the Court reasoned that the evidence should be excluded because 510(k)

28  clearance does not involve "an inquiry into the safety of the new product" and because "any

1    probative value of the evidence . . . is greatly outweighed by the danger of, among other things,

2    confusing the issues, misleading the jury, and wasting time." Dkt. 330, at 2–3 (internal quotation

3    marks and citations omitted). The Court also reasoned that Intuitive was seeking "to relitigate the

4    role the regulatory framework played in SIS's market participation," an issue that the Court stated

5    it had "already resolved at summary judgment." *Id*. at 5–6. The Court believed that Intuitive was

6    attempting "to enforce the FDCA through this case" by establishing that "SIS failed to obtain

7    510(k) clearance as if it was required." *Id*. at 6. As for evidence relating to events after November

8    2022, the Court stated that Intuitive had not established that "factual events taking place since the

9    close of fact discovery should bear on either liability or damages calculations in antitrust cases."

10   *Id*. at 8. In a footnote, the Court also noted that it would be "inequitable" to allow Intuitive to

11   introduce such evidence if SIS was not allowed to do so. *Id*. at 5 n.2.

12   Intuitive's proffer submitted herewith identifies the key FDA-related and post-2022

13   evidence that Intuitive would seek to introduce at trial if not excluded by the Court's rulings.

## **LEGAL STANDARD**

15   District courts have discretion to reconsider their own orders. *Gray* v. *Golden Gate Nat.*

16   *Recreational Area*, 866 F.Supp.2d 1129, 1132 (N.D. Cal. 2011) (citation omitted). Under Civil

17   Local Rule 7-9, parties can move for reconsideration by receiving leave from the court and

18   showing at least one of three factors: (1) "[t]hat at the time of the motion for leave, a material

19   difference in fact or law exists from that which was presented to the Court before entry of the

20   interlocutory order for which reconsideration is sought"; (2) "[t]he emergence of new material

21   facts or a change of law occurring after the time of such order"; or (3) "[a] manifest failure by the

22   Court to consider material facts or dispositive legal arguments which were presented to the Court

23   before such interlocutory order." Civ. L.R. 7-9(b); *see Gamevice, Inc.* v. *Nintendo Co., Ltd.*, 2023

24   WL 4032009, at *1 (N.D. Cal. June 14, 2023). Beyond those factors, district courts have "inherent

25   authority" to reconsider prior orders so as to "prevent clear error or prevent manifest injustice."

26   *Gray*, 866 F. Supp. 2d at 1132. And particularly relevant here, this Court has recognized that *in*

27   *limine* "rulings are not binding on the trial judge, and the judge may always change [their] mind

28   during the course of a trial." Dkt. 330, at 1 (citation and alteration omitted).

"An interlocutory appeal under 28 U.S.C. § 1292(b) is authorized when a district court order involves a controlling question of law as to which there is substantial ground for difference of opinion and where an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Juliana* v. *United States*, 949 F.3d 1125, 1126 (9th Cir. 2018) (cleaned up) (citation omitted). "[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981) (citation omitted), *aff'd sub nom. Arizona* v. *Ash Grove Cement Co.*, 459 U.S. 1190 (1983). "A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution[.]" *Reese* v. *B.P. Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). The party seeking an interlocutory appeal need not show that it will "have a final, dispositive effect on the litigation" but only that it "may materially advance the litigation." *Id.* It suffices that the interlocutory appeal "may avoid protracted and expensive (but ultimately unnecessary) litigation and the burdens on the litigants and court system[.]" *Beeman* v. *Anthem Prescription Mgmt., Inc.*, 2007 WL 8433884, at *2 (C.D. Cal. Aug. 2, 2007).

## **ARGUMENT**

## I.    THE COURT SHOULD RECONSIDER ITS DECISION EXCLUDING ALL EVIDENCE RELATED TO THE 510(K) CLEARANCE PROCESS.

In its motions *in limine* #1 and #5, SIS moved to exclude *all* evidence related to the FDA 510(k) clearance process both on the ground that it was not relevant under Federal Rules of Evidence 401 and 402 and on the ground that it was substantially more prejudicial than probative under Federal Rule of Evidence 403. *See* Pl.'s MIL 1, Dkt. 298, at 6–7; Pl.'s MIL 5, Dkt. 300, at 5–6. In granting those motions, the Court appeared to invoke both grounds asserted by SIS. *See* Dkt. 330, at 2–6. The Court should reconsider its ruling.

### A.    FDA-related evidence is relevant.

The Federal Rules of Evidence set a "low bar for relevance," *United States* v. *Holmes*, 2021 WL 2044470, at *7 (N.D. Cal. May 22, 2021), requiring merely that the evidence have "any tendency to make a fact more or less probable than it would be without the evidence" and that the

1   fact be "of consequence in determining the action," Fed. R. Evid. 401. Evidence related to the

2   FDA's 510(k) clearance process is highly relevant to numerous issues at the heart of this case as

3   set forth both below and in the attached proffer. *See* Decl. That has been true since the beginning

4   of this litigation as demonstrated by the numerous references in SIS's own complaint to the FDA's

5   clearance process and oversight of the products at issue. *See, e.g.*, Dkt. 1 ¶¶ 19, 25, 27, 33, 45,

6   54–55, 57, 68. Indeed, the Court itself recognized that "510(k) clearance is clearly relevant in the

7   context of this case and how it has been litigated so far." Dkt. 330, at 3. But in issuing a blanket

8   order excluding all this evidence, the Court misapprehended *how* the evidence was relevant.

9        *First*, FDA-related evidence is relevant to whether SIS can establish its tying and

10  exclusive-dealing claims in the first place because it shows that Intuitive has approved—and will

11  approve—any third parties that secure FDA clearance or otherwise demonstrate through clinical

12  evidence that their modified EndoWrists meet the specifications of and are as safe and effective as

13  Intuitive's original EndoWrists. *See* Decl. ¶¶ 28, 32–33.[1] Intuitive should not be precluded from

14  offering this evidence to argue that SIS was not excluded from the market and instead simply chose

15  not to seek contractual authorization to be a third-party provider following the criteria specified by

16  Intuitive. *See Betaseed, Inc.* v. *U & I Inc.*, 681 F.2d 1203, 1224 (9th Cir. 1982); *Photovest Corp.*

17  v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979); *see also* Def.'s Trial Br., Dkt. 279-1, at 6–9.

18

19

20  [1] Intuitive does not understand the Court's Order as generally precluding it from introducing
    evidence that Intuitive would *also* approve third parties that provided clinical evidence *to Intuitive*

21  that their services are safe and effective, regardless of whether the party obtained FDA clearance.
    *See* Def.'s Trial Br., Dkt. 279-1, at 6 n.6; *see also* Dkt. 330, at 3, 5 (noting that Intuitive may

22  introduce evidence about safety separate from the 510(k) clearance process). For example, both
    SIS and Intuitive have included on the exhibit list certain "cease and desist" letters to third parties

23  (including Rebotix and Restore) in which Intuitive specifically requested that the third parties

24  provide evidence *either* that they had obtained 510(k) clearance *or* that they were in possession of
    other clinical proof that their service "returns the modified instruments to a 'production equivalent

25  qualification' and/or that additional use does not affect the safety or performance of the
    instruments." Decl. ¶¶ 4, 6. The third parties never responded to these letters by providing any

26  such clinical proof in order to seek Intuitive's contractual authorization. For the reasons discussed

27  in the main text, the Court should allow the admission of the *entire* letters. But, at a minimum,
    there is no basis in the Court's Order to exclude the letters in their entirety and in particular their

28  references to the approval mechanisms separate and apart from the 510(k) clearance process, and
    Intuitive does not understand the Court's Order as requiring such exclusion.

- 10 -

1    *Second*, FDA-related evidence is relevant to whether Intuitive had legitimate business

2    reasons for its contractual policies regarding unauthorized products and services under the rule-of-

3    reason framework.  For instance, the evidence supports the argument that Intuitive required third

4    parties to secure FDA clearance or provide other clinical evidence of equivalence—that the

5    modified EndoWrists exhibited the same safety and effectiveness as Intuitive's EndoWrists—to

6    help ensure the reliability and safety of its products (and, as corollaries, to protect its reputation

7    and brand), procompetitive justifications that this Court recognized in its summary judgment

8    decision.  *See* Dkt. 204, at 18; *see also* Decl. ¶¶ 4, 6, 28, 33; Def.'s Trial Br., Dkt. 279-1, at 9–10.

9    The evidence also supports the argument that the failure of SIS and other unauthorized third parties

10   to obtain FDA clearance at least raised reasonable doubts from Intuitive's perspective about

11   whether the modified EndoWrists were substantially equivalent to the originals.  *See* Decl. ¶¶ 4–7.

12   And the evidence shows that at least some hospitals viewed FDA clearance as a proxy for safety—

13   or otherwise placed value on FDA clearance such that they required or preferred to use only FDA-

14   cleared medical devices in surgery—and therefore that Intuitive's policies were responsive to

15   consumer demand.  *See* Decl. ¶¶ 34–45; *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 987 (9th

16   Cir. 2023) (noting that goal of "tapping into consumer demand" was a "plainly procompetitive

17   rationale[]").

18       *Third*, FDA-related evidence is relevant to whether SIS can establish causation and

19   damages for its antitrust claims.  For instance, evidence that FDA clearance was a significant factor

20   in shaping the demand of at least some hospitals for modified EndoWrists, and that at least some

21   hospitals that bought modified EndoWrists from Rebotix or Restore wrongly believed that those

22   products *had* been cleared by the FDA, is relevant to the question of whether an alternative cause

23   (lack of FDA clearance) impacted SIS's ability to compete.  *See* Decl. ¶¶ 34–46; *see also* Hearing

24   at 36:9–11 (the Court noting concern about "Intuitive's ability to argue that customers cared about

25   the clearance and, thus, SIS's failure to obtain it impacts antitrust causation and damages").

26   Likewise, evidence that SIS did not seek approval from Intuitive—by obtaining FDA clearance or

27   otherwise—is also relevant to SIS's alleged damages.  *See* Decl. ¶¶ 24–27.

28

*Fourth*, FDA-related evidence is relevant to the credibility of SIS's witnesses. For instance, SIS's executives testified that Rebotix had applied for FDA clearance but did not know whether Rebotix had been granted clearance even though they repeatedly told customers that the device had been proven to be safe, effective, and equivalent in specifications to Intuitive's original, FDA-cleared EndoWrists. *See* Decl. ¶¶ 14, 24–27. Intuitive is entitled to cross-examine those witnesses on issues that go to their credibility. *See, e.g.*, *Palantir Techs. Inc.* v. *Abramowitz*, 639 F. Supp. 3d 981, 986–87 (N.D. Cal. 2022).

*Fifth*, FDA-related evidence is relevant to Intuitive's counterclaims that SIS lied or misled customers when it represented that its modified EndoWrists were equivalent in specifications to the originals. The FDA's deficiency letter to Rebotix in 2015, however, pointed out specifically that Rebotix had failed to prove such equivalence and that it did "not seem possible" to prove such equivalence based on the kinds of information and testing that Rebotix had identified. Decl. ¶ 15. Such evidence—along with evidence that SIS did not disclose to customers that the modified EndoWrists it was offering had failed to gain FDA clearance—is relevant to proving that SIS's statements to customers were false and misleading. *See* Decl. ¶ 14.

The Court excluded *all* of this highly probative evidence on grounds that are not supported by law or the record.

### 1. The relevance and probative value of the FDA-related evidence does not depend on whether 510(k) clearance was legally required.

The Court reasoned that Intuitive was seeking "to relitigate the role the regulatory framework played in SIS's market participation" and "to enforce the FDCA" by showing that "SIS failed to obtain 510(k) clearance as if it was required." Dkt. 330, at 5–6 & n.1. Respectfully, the Court was mistaken. For instance, evidence that Intuitive offered a non-illusory approval process (which it not only made available to third parties but *actually applied* to approve at least one third party that met its criteria), that its policies with regard to approval and the use of unauthorized third-party products and services with Intuitive systems were reasonable, and that SIS unreasonably failed to seek approval from Intuitive or to seek FDA clearance is all relevant to this case regardless of whether SIS's services legally *required* clearance from the FDA or whether

SIS violated the FDCA. After all, private companies may take reasonable measures to ensure the safety and efficacy of their products even if those measures are not technically required by law. *Cf. Novartis Pharms. Corp.* v. *Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024) (noting that regulatory "silence implies that [companies] may impose distribution conditions by contract, not that they are prohibited from doing so").[2]   And that is particularly so when the company has good reasons to think that those measures *are* legally required, as Intuitive did here. That would be true even if it turned out that Intuitive was wrong about the application of FDA regulations to SIS's services—though here, the FDA has never reached that conclusion, and the Court expressly declined to reach that conclusion at summary judgment. Dkt. 204, at 12–13.

Likewise, evidence that the FDA identified substantial deficiencies in Rebotix's application for clearance of its modified EndoWrists is relevant to the reasonableness of Intuitive's decision not to treat those modified EndoWrists as authorized under its contracts, as well as to whether SIS misrepresented that its products were equivalent to the original EndoWrists. Decl. ¶¶ 14–23. Again, the relevance of such evidence does not turn on whether Rebotix was required to seek FDA clearance in the first place. For starters, the fact that Rebotix *chose* to seek FDA clearance (as other third parties have done) is relevant on its own to establishing the *competitive* significance of such clearance in this marketplace. Specifically, it tends to reflect that hospital customers prefer (if not require) the use of products and services that are cleared by the FDA, and tends to undercut SIS's claim that there would be significant customer demand for an EndoWrist modification service *not* cleared by the FDA. As another third-party witness put it, FDA clearance, from a marketing perspective, is like the "Good Housekeeping seal of approval." Decl. ¶ 42.

In addition, the FDA's reasons for rejecting Rebotix's application highlight why it was so reasonable for Intuitive to consider FDA clearance as part of its authorization policy (and so

---

[2] Even assuming that Intuitive has no standing to enforce the FDCA, that does not preclude Intuitive from asking third parties to obtain FDA approval as one path to obtaining Intuitive's *contractual* authorization. Private parties frequently reference FDA approval as a *contractual* condition to the sale of products regulated by the FDA. *See*, *e.g.*, *Helsinn Healthcare S.A.* v. *Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1362 (Fed. Cir. 2017). To our knowledge, no court has ever suggested that contractual provisions regarding FDA approval amount to inappropriate enforcement of the FDCA by private parties.

- 13 -

misleading for SIS to represent that its modified EndoWrists were equivalent in specifications to the originals). In particular, the FDA found that Rebotix had failed to demonstrate that it had any sound or reliable basis for claiming that its EndoWrist modification process returned Intuitive's products to their original or "OEM-equivalent specifications." Decl. ¶ 19. It is not difficult to understand why, in these circumstances, Intuitive would have concerns about an unauthorized third party performing modifications to a product that *Intuitive* invented and bears *Intuitive's* brand name. The unauthorized third party—here, Rebotix or SIS—would be reselling that modified product back to *Intuitive's* customers for use with *Intuitive's* surgical systems, even though it had failed to demonstrate to the FDA, or to Intuitive, that its modified product was *at least equivalent to the one Intuitive had manufactured*. In short, such evidence tends to validate Intuitive's policies as a reasonable precaution against the possibility that unauthorized third parties would free ride on Intuitive's brand name, reputation for quality, and goodwill, by offering an inferior (albeit cheaper) version of Intuitive's own product—all while potentially putting the safety of patients at risk. At a minimum, the jury should be allowed to take this evidence into account in determining whether Intuitive acted reasonably with respect to SIS as a reseller of Rebotix's unauthorized product.

## 2. The issues presented by SIS's motions *in limine* were not presented or resolved at summary judgment.

The Court also misapprehended Intuitive's arguments and evidence in stating that it had "already resolved" these issues "at summary judgment." Dkt. 330, at 5. In its summary judgment decision, the Court held that neither party could raise claims or arguments insofar as they would entail deciding "whether Section 510(k) clearance was required" because that "would constitute private enforcement of the FDCA." Dkt. 204, at 15. But as just explained, Intuitive is *not* seeking to introduce FDA-related evidence to show that 510(k) clearance "was required" or to enforce a violation of the FDCA. Nor is there any basis or authority for expanding the Court's narrow summary judgment decision into a blanket rule of evidentiary exclusion. Indeed, on the same day as its summary judgment decision, the Court concluded that one of SIS's experts could testify about "FDA's practices and procedures as well as how such practices and procedures influence the parties' arguments regarding the Section 510(k) regulatory frame" because such evidence "will

1    aid the fact finder." Dkt. 203, at 20–21.  The parties have been preparing this case for trial on that

2    basis, and that conclusion would make no sense if the Court had already decided that all evidence

3    about the FDA clearance process was wholly irrelevant to this case.

4         In any event, as noted above, Intuitive is willing to eliminate any remaining doubt about

5    whether it is trying to revisit the Court's summary judgment rulings or argue to the jury that FDA

6    clearance was legally required by agreeing (subject to preservation of all appellate rights) to a jury

7    instruction that states, tracking the language of the Court's summary judgment decision, that FDA

8    has taken no final position on whether 510(k) clearance is required for SIS's EndoWrist services

9    and that the jury may not base its verdict on a determination as to whether SIS was or was not

10   legally required to obtain 510(k) clearance.  Dkt. 204, at 12–13.

11            **3.    FDA-related evidence is not irrelevant to safety in the context of this
                      antitrust case.**

12

13        In addition, the Court appears to have believed that evidence relating to the 510(k)

14   clearance process should be excluded because it is irrelevant to safety. Dkt. 330, at 2–3, 5–6.  As

15   an initial matter, although the 510(k) clearance process may not definitively resolve whether a

16   product is safe, that is far different from saying that the process is *irrelevant* to product safety.

17   Both courts and the FDA itself have recognized that the 510(k) process sheds light on the safety

18   and effectiveness of a product.  *See, e.g.*, *Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 493 (1996) (noting

19   that although the "510(k) process is *focused* on equivalence, not safety," "the FDA may well

20   examine § 510(k) applications . . . with a concern for the safety and effectiveness of the device"

21   (citation omitted; emphasis altered)); *In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. &*

22   *Prod. Liab. Litig.*, 2018 WL 6617375, at *1 (S.D. Ind. Dec. 18, 2018); *Otero* v. *Zeltiq Aesthetics,*

23   *Inc.*, 2018 WL 3012942, at *3 (C.D. Cal. June 11, 2018); 21 C.F.R. § 807.3(o) (defining a "510(k)

24   summary" as "the safety and effectiveness information contained in a premarket notification

25   submission upon which a determination of substantial equivalence can be based"); *id.*

26   §§ 807.92(a)(5), (b)(2), 807.93(a)(1) (requiring 510(k) submissions to include certain evidence of

27

28

safety and effectiveness); Decl. ¶¶ 48–52.[3]  And SIS's *own witnesses*, including SIS's *FDA expert*, have recognized the same point.  *See* Decl. ¶¶ 43–45.  This Court has previously declined "to step into the FDA's shoes" with respect to the regulatory clearance process.  Dkt 204, at 13.  But in excluding all FDA-related evidence, the Court did exactly that, determining—as a matter of law and contrary to the views of the FDA—that 510(k) clearance says nothing about safety.

The Court's ruling was particularly erroneous in this case where the issue is not whether the modified EndoWrists are "safe" in some abstract sense but rather whether Intuitive could conclude that they were not *as safe* as the original EndoWrists—that is, equivalently safe.  Even on the Court's own understanding of the 510(k) clearance process, FDA-related evidence is relevant to that issue.  *See* Dkt. 330, at 2 (noting that the "510(k) clearance involves an inquiry into a new device's equivalence with an earlier-approved medical device").  This includes, for example, the FDA's deficiency letter to Rebotix discussed above, which is relevant, among other reasons, precisely for what it has to say about Rebotix's failure to establish that its process for modifying EndoWrists restores them to "OEM-equivalent specifications"—and which is contrary to the claims that SIS made to customers on this very subject of equivalence to Intuitive's specifications.  Decl. ¶¶ 14, 19.  Of course, SIS is entitled to dispute at trial the extent to which the 510(k) clearance process is relevant to its claims and to argue that Intuitive did not require such clearance based on legitimate safety or quality concerns.  But it would be error for the Court to resolve those disputed issues in a pretrial evidentiary ruling.  *See, e.g.*, *Miranda* v. *U.S. Sec.*

---

[3] FDA, *Premarket Notification 510(k)* (current as of Aug. 22, 2024), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k ("A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device"); FDA, *Medical Device Safety and the 510(k) Clearance Process* (current as of Sept. 6, 2023), https://www.fda.gov/medical-devices/510k-clearances/medical-device-safety-and-510k-clearance-process ("Regardless of the type of regulatory pathway – PMA, De Novo, or 510(k) – the principles of safety and effectiveness underlie the FDA's review of all medical devices. . . . The information provided in a 510(k) submission is necessary for the FDA to determine substantial equivalence and to assure the safety and effectiveness of medical devices."); FDA, *The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510k]* 6 (July 28, 2014), available at https://www.fda.gov/media/82395/download ("the principles of safety and effectiveness underlie the substantial equivalence determination in every 510(k) review").

1    *Assocs., Inc.*, 2019 WL 2929966, at *5 (N.D. Cal. July 8, 2019) (noting that "courts must be careful

2    not to use [motions *in limine*] to resolve factual disputes or to weigh evidence" (citation omitted)).

3    Moreover, even assuming that the 510(k) clearance process does not shed any light on a

4    product's safety, FDA-related evidence would still be relevant to numerous issues in the case, such

5    as whether Intuitive had a non-illusory approval process, whether Intuitive and hospitals

6    reasonably (but mistakenly) viewed the clearance process as a proxy for safety, and whether SIS's

7    own executives viewed the clearance process as relevant to safety but failed to determine whether

8    Rebotix had FDA clearance and failed to seek clearance themselves.  Those issues are relevant

9    regardless of whether the clearance process is *actually* a reasonable proxy for safety.

10   In excluding all FDA-related evidence, the Court effectively issued dispositive rulings that,

11   as a matter of law, Intuitive lacked a non-illusory approval process based on 510(k) clearance and

12   that Intuitive had no legitimate basis for using 510(k) clearance as a proxy for ensuring that

13   modified products were as safe and effective as the originals.  Such rulings are not only legally

14   erroneous but procedurally improper.  As the Court itself recognized, a motion *in limine* "is not

15   the proper vehicle for seeking a dispositive ruling on a claim, particularly after the deadline for

16   filing such motions has passed." Dkt. 330, at 1 (citation omitted).

17   For all those reasons, FDA-related evidence is not merely relevant but central to this case.

18   At a minimum, the Court should reconsider its decision to issue a "blanket ruling" excluding all

19   such evidence.  *Sherwin-Williams Co.* v. *JB Collision Servs., Inc.*, 2015 WL 11237466, at *5 (S.D.

20   Cal. Nov. 6, 2015); *see also U.S.A.* v. *Jackson*, 2016 WL 4059615, at *2 (C.D. Cal. July 25, 2016)

21   ("motions *in limine* should rarely seek to exclude broad categories of evidence, as the court is

22   almost always better situated to rule on evidentiary issues in their factual context during trial").

23   **B.    FDA-related evidence is not substantially more prejudicial than probative.**

24   Federal Rule of Evidence 403 sets a "high bar" for excluding evidence as more prejudicial

25   than probative: "a court may exclude relevant evidence only if its probative value is *substantially*

26   outweighed by one or more of the articulated dangers or considerations." *Sidibe* v. *Sutter Health*,

27   103 F.4th 675, 691 (9th Cir. 2024).  As the Ninth Circuit has explained, courts should be "cautious

28   and sparing" when excluding evidence on this ground "because its major function is limited to

- 17 -

1    excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its

2    prejudicial effect." *Id*. (internal quotation marks and citation omitted).  The objecting party thus

3    bears a "significant burden because exclusion under Rule 403 is an extraordinary remedy." *Munoz*

4    v. *PHH Mortg. Corp.*, 2022 WL 138670, at *2 (E.D. Cal. Jan. 14, 2022) (internal quotation marks

5    and citation omitted).  The Court's misunderstanding of why FDA-related evidence is so highly

6    probative in this case resulted in its erroneous conclusion that the evidence is substantially more

7    prejudicial than probative.

8         Citing cases involving products-liability claims, the Court primarily expressed concern that

9    FDA-related evidence would risk "confusing the jury" by leading it "to erroneously conclude that

10   regulatory compliance proved safety." Dkt. 330, at 3 (quoting *In re C. R. Bard, Inc.*, 810 F.3d

11   913, 922 (4th Cir. 2016)); *Carter* v. *Johnson & Johnson*, 2022 WL 4700549, at *2 (D. Nev. Sept.

12   29, 2022); *Kaiser* v. *Johnson & Johnson*, 2018 WL 1358407, at *4 (N.D. Ind. Mar. 16, 2018),

13   *aff'd,* 947 F.3d 996 (7th Cir. 2020).  In some products-liability cases, courts have excluded

14   evidence relating to the 510(k) clearance process where a party sought to use such evidence to

15   establish that a product was safe and not defective. *See In re C. R. Bard, Inc.*, 810 F.3d at 920;

16   *Kaiser*, 2018 WL 1358407, at *1; *Carter*, 2022 WL 4700549, at *2.[4]  But contrary to the Court's

17   assertion, Intuitive does *not* seek to present evidence of the 510(k) clearance process to prove as a

18   matter of fact that SIS's modified EndoWrists are unsafe. *See* Dkt. 330, at 3.  Instead, as explained

19   above, Intuitive seeks to present such evidence to establish (among other things) that it acted

20   reasonably under the antitrust laws in requiring evidence of 510(k) clearance from third parties in

21   the absence of other clinical evidence of safety and effectiveness; that SIS was not excluded from

22   competition as a result of the alleged anticompetitive conduct; and that SIS made false and

23   misleading statements that its modified EndoWrists were equivalent to Intuitive's original

24   EndoWrists in specifications and quality. *See* pp. 10–12, *supra*.  Unlike in the products-liability

25

26   ───────────────

27   [4] Even in the products-liability context, courts have divided over whether evidence regarding the
     510(k) clearance process is substantially more prejudicial than probative, with many holding it is
28   not. *See, e.g.*, *In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2018
     WL 6617375, at *1–2 (S.D. Ind. Dec. 18, 2018) (collecting cases); *In re Bard IVC Filters Prod.
     Liab. Litig.*, 2018 WL 11445485, at *3–4 (D. Ariz. Jan. 29, 2018).

1    cases, that evidence is highly probative *regardless* of whether the 510(k) process says anything

2    about safety.  The evidence is not "ancillary to the gravamen of the claims at issue." Dkt. 330, at

3    4.  Instead, it goes to the heart of "whether Intuitive engaged in anticompetitive conduct," as well

4    as other elements of the parties' claims.  Dkt. 330, at 4.

5          Indeed, the Court's ruling is particularly erroneous because excluding all evidence

6    regarding the 510(k) process will itself "confus[e] the jury" because "[m]any of the relevant events

7    in this case occurred in the context of FDA 510(k) review, and much of the evidence is best

8    understood in that context." *In re Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 11445485, at *4

9    (D. Ariz. Jan. 29, 2018).  For instance, Intuitive understands that SIS plans to introduce cease-and-

10   desist letters to show that Intuitive excluded it from the market, but those very same letters discuss

11   the 510(k) clearance process at length, including the fact that Intuitive will approve third-party

12   services that have received FDA clearance.  *See* Decl. ¶¶ 4–6.  There is no way to introduce

13   redacted versions of that and other evidence without creating "a misleading, incomplete, and

14   confusing picture for the jury." *Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 11445485, at *4.

15         Likewise SIS has argued and will argue that the ten-use limit on EndoWrists is "arbitrary."

16   Decl. ¶ 8.  Yet it is undisputed that the FDA only cleared EndoWrists for a limited number of uses

17   (initially ten for most EndoWrist instruments).  Decl. ¶¶ 8–11.  Furthermore, when Intuitive

18   proposed to extend the use limits on newer-generation EndoWrists, the FDA required Intuitive to

19   apply for a new 510(k) clearance.  Decl. ¶ 12.  SIS is free to, and clearly intends to, debate the

20   validity of the EndoWrist use limits and to try to prove that EndoWrists can safely be used more

21   times than the FDA cleared them to be used.  But it is indisputable that the use limits are part of

22   the FDA-cleared labeling for the EndoWrist product.  And that is a clearly relevant fact of which

23   the jury should be informed.  It would be prejudicial and confusing for the jury to remain in the

24   dark about that fact and not to be informed of it.

25         As yet another example, SIS attacks the enhanced encryption that Intuitive added to its

26   X/Xi EndoWrists as being anticompetitive and not a genuine product improvement under *Allied*

27   *Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010).  But

28   Intuitive adopted that enhanced encryption technology in response to specific feedback it had

1   received from the FDA.  In connection with seeking FDA clearance for its Xi da Vinci system, the

2   FDA specifically required Intuitive to provide information to "address the safety and efficacy

3   concerns involving the wireless technology" included in that system, and in particular to address

4   concerns related to "data security."  Decl. ¶¶ 50, 52.  Intuitive reported to FDA in 2013 that the

5   mitigation measures it undertook to address "critical" cybersecurity risks included encrypting the

6   data on the RFID chip itself as well as the wireless communications between the chip and the da

7   Vinci. Decl. ¶¶ 50–51.  To the extent the Court's order prevents Intuitive from offering this FDA-

8   related evidence, it would prohibit Intuitive witnesses from explaining the reasons for the

9   encryption, forcing them to testify incompletely and therefore not fully truthfully, and further

10   prejudicing Intuitive at trial.

11       The Court also expressed concerns that evidence about the 510(k) clearance process would

12   "wast[e] time" and result in a "mini-trial."  Dkt. 330, at 3–4 (internal quotation marks and citation

13   omitted).  But this Court has ordered time limits for the trial and made clear that it will not extend

14   the time for trial.  *See* Hearing at 5:13–19, 8:8–9.  Those "time limits will avoid any risk of

15   unnecessary or time-consuming mini-trials," and the Court should have "confiden[ce] that counsel

16   for each side will be able to adequately and efficiently try this case in the time allotted by the

17   Court." *Bard IVC Filters Prod. Liab. Litig.*, 2018 WL 11445485, at *4.  That is particularly true

18   in light of the jury instructions proposed by Intuitive above.  *See id.*; pp. 15, *supra*.

19       Finally and more generally, the Court failed to explain how *every* piece of evidence related

20   to the 510(k) process would result in extended and confusing proceedings about the clearance

21   process.  For instance, that Intuitive had a policy of approving third parties who obtained FDA

22   clearance and that Intuitive in fact approved a third party who obtained FDA clearance is relevant

23   to whether Intuitive had a non-illusory approval process regardless of the regulatory details of the

24   clearance process.  And even assuming that this evidence would require some "contextualizing"

25   for the jury, the Court never explained how that basic context would automatically lead to a

26   "sideshow likely to distract and confuse the jury."  Dkt. 330, at 4–5.

27       For all those reasons, the FDA-related evidence in this case is not substantially more

28   prejudicial than probative.  At a minimum, the Court should decline to issue a "blanket ruling" on

1    the issue and should consider the particular evidence in context at trial. *Sherwin-Williams*, 2015

2    WL 11237466, at \*5; *see also Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, 2017 WL

3    10845178, at \*7 (N.D. Ind. Dec. 21, 2017) (declining to resolve whether FDA-related evidence

4    was more prejudicial than probative because such a determination would be "premature").

5    **II.    THE COURT SHOULD RECONSIDER ITS DECISION PROHIBITING**
     **INTUITIVE FROM INTRODUCING EVIDENCE FROM AFTER NOVEMBER**

6    **2022.**

7           In its Order on Intuitive's motion, the Court granted SIS's request to prohibit *Intuitive* from

8    introducing any evidence from after November 2022 outside of the limited information that SIS

9    provided in response to the Court's prior discovery order. In doing so, the Court did not explain

10   the basis for excluding such evidence, other than noting that Intuitive had not shown that "factual

11   events taking place since the close of fact discovery should bear on either liability or damages

12   calculations in antitrust cases." Dkt. 330, at 8. Earlier in its decision, the Court also noted that it

13   would exclude evidence that Intuitive had publicly announced that it will approve any third parties

14   that secure FDA clearance because, in the Court's view, admitting such evidence would be

15   "inequitable" in light of the Court's ruling prohibiting SIS from admitting evidence from after

16   November 2022. *Id*. at 5 n.2. In issuing this decision, the Court again misapprehended the

17   relevance of this evidence and otherwise clearly erred.

18          Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible" unless the

19   U.S. Constitution, a federal statute, the Federal Rules of Evidence, or other rule provide otherwise.

20   In other words, Rule 402 states the "broad principle" that relevant evidence should be admitted

21   unless its admission would be contrary to one of those identified legal authorities. *Huddleston* v.

22   *United States*, 485 U.S. 681, 687 (1988). Here, the Court did not (and could not) say that evidence

23   from after November 2022 was wholly *irrelevant* to this case. As explained above, evidence that

24   Intuitive had approved and would approve third parties is highly relevant to whether SIS can

25   establish its tying and exclusive dealing claims in the first place, because it shows that Intuitive's

26   approval process was anything but illusory. *See, e.g.*, pp. 10, 16-17, 20, *supra*. Likewise, evidence

27

28

from after November 2022 is highly relevant to the question of whether SIS could have competed but chose not to—an issue relevant to liability and damages. *See* Decl. ¶¶ 27, 28–33, 46.

At the Hearing, the Court suggested that evidence from after November 2022 may be irrelevant because damages should be calculated in the "but-for world." Hearing at 66:4–7. Even assuming that such evidence is not relevant to the question of damages, it would still be highly relevant to Intuitive's liability because it would show that Intuitive *had* approved a third party that modifies EndoWrists after the party obtained FDA clearance and thus had a non-illusory clearance process. Under the Court's Order, however, it may appear to the jury (whether SIS argues this or not) that Intuitive had never authorized a third party even though that is simply not true.

Moreover, real-world evidence from after November 2022 *is* relevant to determining damages in the but-for world. As one court in this circuit has explained, a "jury must be able to consider what actually occurred in the real world when evaluating the 'but-for world' and determining what would have happened if [the defendant] had not engaged in [the relevant unlawful] activities." *ICTSI Oregon, Inc.* v. *Int'l Longshore & Warehouse Union*, 2022 WL 16924139, at *9 (D. Or. Nov. 14, 2022). That is because the "but-for world" "requires consideration of actual real world conditions during the entire damages period, with the only fantastical element being that the unlawful conduct did not occur." *Id.*; *see, e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 678 (E.D. La. 2016). Here, the real world conditions include the fact that if SIS had sought and obtained FDA clearance or provided other clinical evidence of safety and effectiveness, then Intuitive would have approved it to modify EndoWrists. In addition, although SIS claims that it was driven out of business, Intuitive disputes that point and will offer evidence that SIS *chose* to stop competing in furtherance of this litigation. Decl. ¶ 24–27. The Court has not explained how this and other evidence from after November 2022 is irrelevant to the calculation of damages in the but-for world and it certainly cannot resolve these factual disputes in a pretrial evidentiary ruling. *See Miranda*, 2019 WL 2929966, at *5.

Nor has the Court identified any other legal basis for prohibiting Intuitive from introducing evidence from after November 2022. At most, the Court asserted that it would be "inequitable" to prevent SIS from introducing such evidence while allowing Intuitive to do so. Dkt. 330, at 5 n.2.

- 22 -

But the Federal Rules of Evidence do not contain any provision allowing courts to exclude evidence based on freestanding notions of fairness. And there is nothing inequitable in estopping SIS—and only SIS—from introducing such evidence based on its prior choice to block further discovery in this case. Indeed, it is the Court's Order that creates a fundamental inequity (and legal error) by allowing SIS to seek $170 million in damages up through 2026, while prohibiting Intuitive from obtaining discovery and presenting evidence from that time period.

### III. TO AVOID A VERDICT TAINTED BY LEGAL ERROR AND UNCURABLE PREJUDICE TO INTUITIVE, THE COURT SHOULD VACATE ITS ORDER AND MAKE CLEAR THAT CERTAIN FDA-RELATED AND POST-2022 EVIDENCE IS ADMISSIBLE BEFORE OPENING STATEMENTS.

For all the reasons set out above, if the Court's order is left in place it will infect the trial with clear legal error and cause prejudice to Intuitive that cannot be undone before a verdict is rendered. Intuitive respectfully suggests that the Court can mitigate this result, and the near certainty of reversal by the Ninth Circuit, by taking certain concrete steps before the trial begins.[5]

First, the Court should vacate its blanket order with respect to FDA-related evidence. There is simply no basis to exclude all such evidence in advance of trial, and as discussed, doing so will cause confusion and prejudice from the very start of the case—for example, the first time that SIS mentions Intuitive's "threat" letters to customers without mentioning that those letters were in large part concerned with issues relating to FDA clearance.

Second, the Court should adopt a preliminary jury instruction along the lines Intuitive has proposed above, to clarify the purposes for which FDA-related evidence is and is not being offered and to avoid any possible confusion regarding whether the jury will be asked to determine whether FDA clearance was or was not required by law.

Third, while Intuitive believes that all of the evidence set out in its proffer is relevant and should ultimately be admitted at trial for the reasons set forth, the Court need not make a blanket ruling of admissibility right now, just as the Court should not adhere to its blanket ruling of inadmissibility. So that the basic parameters of the trial are clear, however, and so that the parties

---

[5] Intuitive respectfully disagrees with all aspects of the Court's adverse evidentiary rulings and preserves its rights to challenge those rulings on appeal. But for purposes of this motion, Intuitive has focused on the most critical errors in the Court's rulings.

can plan their opening statements accordingly, the Court should determine that the parties are not precluded from referencing at least the following kinds of evidence covered by its current rulings:

- Evidence that Intuitive's products, including EndoWrists, were cleared by the FDA for certain kinds of surgical procedures. Decl. ¶¶ 8–13.

- Evidence that the use limits for EndoWrists, along with testing supporting those use limits, were submitted to the FDA and reviewed as part of the FDA's clearance process. Decl. ¶¶ 8–13.

- Evidence that Rebotix applied for FDA clearance to modify EndoWrists, and received a deficiency letter from the FDA, after which Rebotix withdrew its application for clearance. Decl. ¶¶ 14–23.

- Evidence that SIS never applied for FDA clearance, and evidence regarding SIS's knowledge or lack thereof of the Rebotix deficiency letter. Decl. ¶¶ 24–27.

- Evidence that Intuitive expressed its concerns about the use and sale of modified EndoWrists by unauthorized third parties that lacked FDA clearance in letters to customers and to the third parties themselves. Decl. ¶¶ 4–7.

- Evidence that another third party, Iconocare, applied for and was granted FDA clearance for a particular modified EndoWrist. Decl. ¶¶ 28–32.

- Evidence that Intuitive made an announcement in March 2023 that its customers were free to purchase FDA-cleared modified EndoWrists without consequence under Intuitive's contracts. Decl. ¶ 33.

## IV. IN THE ALTERNATIVE, THE COURT SHOULD CERTIFY THESE MATTERS FOR AN INTERLOCUTORY APPEAL UNDER 1292(B) AND STAY PROCEEDINGS PENDING APPEAL.

If the Court denies reconsideration, and declines to allow the kinds of evidence outlined above, Intuitive respectfully submits that the Court should certify its Order for interlocutory appeal because each of the requirements for certification under 28 U.S.C. § 1292(b) is met. *First*, the Order involves "controlling question[s] of law" because the Court's legal errors in analyzing the relevance and potential prejudice of the evidence at issue will "materially affect the outcome of

1    the litigation in the district court." *In re Cement*, 673 F.2d at 1026; *see also Am. Fed'n of Musicians*

2    *of U.S. & Can.* v. *Paramount Pictures Corp.*, 903 F.3d 968, 975 (9th Cir. 2018) ("exclusion was

3    legal error and therefore an abuse of discretion").  Those errors are on the face of the parties'

4    briefing and record, and the Ninth Circuit will not need to delve into the record to resolve them.

5    *Second*, for the reasons explained above, the Court clearly erred in excluding the evidence at issue,

6    but at the very least, there is a "substantial ground for difference of opinion" because "reasonable

7    jurists might disagree on [their] resolution."  *Reese*, 643 F.3d at 688.  *Finally*, an interlocutory

8    appeal will "materially advance the ultimate termination of the litigation" by preventing this case

9    from proceeding to trial on the basis of clearly erroneous evidentiary rulings, and thus avoiding

10   the need for a re-trial after appeal.  *See Beeman*, 2007 WL 8433884, at *2.

11         Intuitive also requests that the Court stay all proceedings pending the resolution of its

12   request for an interlocutory appeal and any appellate proceedings because the balance of hardships

13   and the orderly course of justice favor a stay.  *See, e.g.*, *Kuang* v. *U.S. Dep't of Def.*, 2019 WL

14   1597495, at *2–4 (N.D. Cal. Apr. 15, 2019).  No party will be significantly prejudiced by a stay,

15   and both the parties and this Court will benefit from staying the lengthy forthcoming trial

16   proceedings pending further guidance from the Ninth Circuit on these "important" issues that will

17   "significantly shape the presentation of evidence at trial."  Hearing at 44:10–11, 106:22; *see also*

18   *Ottesen* v. *Hi-Tech Pharms., Inc.*, 2024 WL 589089, at *4 (N.D. Cal. Feb. 13, 2024); *Gustavson*

19   v. *Mars, Inc.*, 2014 WL 6986421, at *3 (N.D. Cal. Dec. 10, 2014).  For the same reasons, the

20   orderly course of justice favors a stay because the interlocutory appeal may "significantly reshape

21   the merits" of the case.  *Kuang*, 2019 WL 1597495, at *6.  Simply put, there is no reason to conduct

22   an entire trial while critical evidentiary rulings remain in doubt.

23                                   **<u>CONCLUSION</u>**

24         For the foregoing reasons, Intuitive respectfully requests that the Court reconsider its

25   rulings granting SIS's motions *in limine* #1 and #5 and imposing additional conditions with respect

26   to Intuitive's motion *in limine* #4.  In the alternative, Intuitive respectfully requests that the Court

27   certify these rulings for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and stay

28   proceedings pending appeal.

Dated:  December 16, 2024

By: /s/ *Kenneth A. Gallo*

Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone:  (650) 632-4700
Facsimile:  (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)

- 26 -

Motion for Reconsideration, or Interlocutory Appeal
3:21-cv-03496-AMO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COVINGTON & BURLINGTON LLP**
One City Center, 850 Tenth Street NW
Washington, DC 20001-4956
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone:  (408) 477-9690
Email:  allen@allenruby.com

Attorneys for *Defendant
Intuitive Surgical, Inc.*

- 27 -

Motion for Reconsideration, or Interlocutory Appeal
3:21-cv-03496-AMO

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br>                    *Plaintiff*,<br>        v.<br><br>INTUITIVE SURGICAL, INC.,<br>                    *Defendant*. | Case No. 3:21-cv-03496-AMO<br><br>**DECLARATION OF KENNETH A. GALLO IN SUPPORT OF DEFENDANT'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR CERTIFICATION OF AN INTERLOCUTORY APPEAL**<br><br>The Honorable Araceli Martínez-Olguín |

I, KENNETH A. GALLO, declare as follows:

1.      I am an attorney licensed to practice in New York and the District of Columbia, and am admitted *pro hac vice* to practice before this Court.  I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter.  I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently hereto.

2.      I submit this declaration in support of Defendant's Motion for Reconsideration or, in the Alternative, for Certification of an Interlocutory Appeal, to identify the key FDA-related and post-2022 evidence that Intuitive would seek to introduce at trial if not excluded by the Court's rulings, and to describe the relevance of that evidence.  Excluding the evidence described herein would cause severe prejudice to Intuitive.

3.      Below, I provide a non-exclusive description of exhibits and testimony that Intuitive would expect to offer at trial should the Court grant its Motion for Reconsideration.[1]

**A.      SIS's Case Relies on Letters in Which Intuitive Expressed Its Concerns About EndoWrists Modified by Unauthorized Third Parties that Lacked FDA Clearance.**

4.      SIS has made clear that it intends to rely on certain letters that Intuitive sent to customers expressing Intuitive's concerns about the risks that unauthorized modified EndoWrists posted to patient safety as evidence of Intuitive's alleged anticompetitive conduct.  SIS references these letters to hospitals in its complaint, and has made clear that it intends to argue that such letters were the cause of customers declining to do business with SIS.  *See, e.g.*, Dkt. 1 ¶ 92 ("Between late 2019 to early 2020, Intuitive sent letters to and had in-person conversations with SIS's customers or potential customers, knowing that they were under contract or in contractual negotiations for repaired EndoWrists.  As a result of the threats and misleading statements in those letters and conversations, all of SIS's EndoWrists customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating SIS's EndoWrist repair business.").

---

[1]     Intuitive reserves the right to offer other testimony (either through depositions or from live witnesses) or exhibits included on the Trial Exhibit List that are not explicitly discussed in this declaration.

- 1 -

1    Intuitive sent similar letters to third parties who were marketing unauthorized EndoWrists, and to

2    the FDA. Significant to Intuitive's concerns in all of these letters was the fact that these

3    unauthorized third parties had not proven—to the FDA or to Intuitive—that their products and

4    services were equivalent in terms of safety, efficacy, performance, and reliability to Intuitive's

5    original EndoWrists. This evidence is relevant to demonstrating that Intuitive's contractual

6    policies regarding the use of unauthorized products and services with its system were reasonable

7    and not anticompetitive, and also that it was reasonable and not anticompetitive for Intuitive to

8    apply those policies with regard to the unauthorized instruments offered by Rebotix and SIS. In

9    addition, this evidence is relevant to demonstrating that Intuitive's contracts do not require the

10    exclusive use of Intuitive products and services, but rather permit the use of authorized or approved

11    third-party products and services, and that this authorization or approval term is not illusory.

12    Specifically, the evidence shows that Intuitive was willing to consider authorization of third parties

13    that provided proof of FDA clearance or other clinical proof demonstrating that their modified

14    EndoWrists were equivalent in specifications to original EndoWrists. I describe below examples

15    of such evidence.

16         5.    Attached hereto as Exhibit 1 is a true and correct copy of a document identified on

17    the Trial Exhibit List as TX0556 (Intuitive-00373885 - Intuitive-00373887), a letter from Intuitive

18    Surgical to Marin General Hospital dated November 26, 2019. The letter states that Intuitive

19    discourages the use of unauthorized products and services that modify Intuitive products so they

20    can be used to perform surgeries beyond the pre-programmed number of uses, explaining that each

21    product is "evaluated by the [FDA] and/or other international regulatory agencies to assess the

22    safety and effectiveness of [the] device over its intended life," that the FDA's 510(k) process helps

23    "to protect the public health by ensuring that medical devices are shown to be either safe and

24    effective or substantially equivalent to other devices," that "Intuitive products are designed and

25    tested to achieve a targeted level of safety, precision, and dexterity over the programmed number

26    of instrument uses," and that a "reduc[tion of] these levels of safety, precision and dexterity" may

27    result from "continued use beyond the instrument's determined useful life." Ex. 1 (TX0556), at

28

- 2 -

1  -885 through -886.  This letter is a representative example of letters that Intuitive sent to several

2  customers regarding the use of unauthorized modified EndoWrists and that both parties have

3  included on the Trial Exhibit List.

4       6.  Attached hereto as Exhibit 2 is a true and correct copy of a document identified on

5  the Trial Exhibit List as TX1441 and TX1635.018 (REBOTIX145274 - REBOTIX145279), an

6  April 16, 2019, cease and desist letter from Intuitive to Rebotix, sent shortly before SIS began

7  distributing Rebotix's modified EndoWrists.  The letter details concerns about Rebotix's

8  unauthorized marketing of modified EndoWrists, and explains the basis of those concerns.  The

9  letter demands that Rebotix stop modifying EndoWrists unless Rebotix could show that it or its

10  "service centers" (which include third parties such as SIS) *either* "[a] received FDA clearance for

11  the modifications to the EndoWrist instruments described herein *or* [b] possess clinical proof that

12  your service process returns the modified instruments to a 'production equivalent qualification'

13  and/or that additional use does not affect the safety or performance of the instruments."  Ex. 2

14  (TX1441), at -279 (emphasis added).  Attached hereto as Exhibits 3 through 8  are true and correct

15  copies of documents identified on the Trial Exhibit List as TX1635.002 (REBOTIX140044 -

16  REBOTIX140053), TX1635.003 (REBOTIX140654 - REBOTIX140662), TX1635.008

17  (REBOTIX144751 - REBOTIX144756), TX1635.009 (Restore-00086086 - Restore-00086092),

18  TX1635.012 (Intuitive-00478439 - Intuitive-00478444), and TX1635.014 (Restore-00025577 -

19  Restore-00025584) respectively, which are similar letters that Intuitive sent to other unauthorized

20  third parties.

21       7.  Attached hereto as Exhibit 9 is a true and correct copy of a document identified on

22  the Trial Exhibit List as TX0259 (Intuitive-00552744 - Intuitive-00552759), a January 30, 2020,

23  Intuitive email attaching a letter that it sent to the FDA on January 29, 2020.  The email expresses

24  Intuitive's concerns about "risk to patients" arising from EndoWrists that third parties have

25  modified to work beyond the number of uses for which those instruments have been validated by

26  Intuitive and previously cleared by the FDA.  Ex. 9 (TX0259), at -745.

27

28

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

**B.    Intuitive's EndoWrists Were Cleared by the FDA as Limited Use Instruments.**

8.    Intuitive's concerns about the use of unauthorized and non-FDA-cleared instruments with its system were informed by its own history of FDA clearance. If not excluded, Intuitive would seek to present evidence to the jury in the form of documents and witness testimony showing that Intuitive was required to obtain, and did obtain, clearance from the FDA before it could begin marketing its da Vinci surgical system and EndoWrist instruments to customers in the United States; that the process of obtaining FDA clearance was long and costly, and involved submitting thousands of pages of reports detailing Intuitive's testing of its products; that the FDA initially cleared EndoWrists as limited-use instruments; and that the FDA required Intuitive to obtain a new Section 510(k) clearance when Intuitive sought to extend the use limit for certain newer-generation EndoWrist instruments. This evidence, key examples of which are detailed below, is relevant in that it tends to prove several facts that are disputed by the parties. For example, this evidence tends to show that the EndoWrist use limit is not "arbitrary," contrary to what SIS told its customers, Ex. 43, TX1551 (SIS094574 - SIS094595), at -584, but rather was the product of extensive testing and was cleared following regulatory review. This evidence also tends to show that Intuitive acted reasonably, and did not engage in anticompetitive conduct, when it told its customers that Intuitive's contracts did not permit the use of unauthorized modified EndoWrists that had not been cleared by the FDA and had not been proven to be equivalent in their specifications to Intuitive's original FDA-cleared EndoWrists.

9.    Attached as Exhibits 10 through 17 are true and correct copies of documents identified on the Trial Exhibit List as TX1637.001 (Intuitive-00692611 - Intuitive-00692642), TX1637.002 (Intuitive-00692643 - Intuitive-00692821), TX1637.003 (Intuitive-00692822 - Intuitive-00692911), TX1637.004 (Intuitive-00692912 - Intuitive-00693153), TX1637.005 (Intuitive-00693154 - Intuitive-00693534), TX1637.006 (Intuitive-00693535 - Intuitive-00694042), TX1637.007 (Intuitive-00694043 - Intuitive-00694521), and TX1637.008 (Intuitive-00694522 - Intuitive-00694606). These exhibits are Volumes 1 through 8 of Intuitive's November 26, 1999, Premarket Application, titled "System 510k's/K990144 Premarket Application," seeking FDA clearance for additional instruments to be used with Intuitive's Endoscopic

- 4 -

1    Instrument Control System, including scissors, scalpels, forceps, clip applier, electrocautery and

2    accessories, pick-ups and needle drivers/holder.   These Exhibits document the information

3    Intuitive provided to the FDA before it was allowed to begin marketing these EndoWrist

4    instruments to customers in the United States.  For example, these Exhibits show that Intuitive told

5    the FDA that EndoWrist instruments were "re-usable (for a limited number of uses)" and

6    "programmed for a limited number of uses to ensure reliability and consistent performance[.]"  Ex.

7    11 (TX1637.002), at -662.  These Exhibits also show that Intuitive submitted extensive testing

8    data to the FDA validating the use limit on EndoWrist instruments.  Ex. 16 (TX1637.007), at -251

9    through -301.  In addition, these Exhibits show that certain EndoWrist instruments initially failed

10   use-limit testing and had to be improved and re-tested/re-validated.  Ex. 16 (TX1637.007), at -251

11   through -254, -260 through -272.

12        10.    Attached hereto as Exhibit 18 is a true and correct copy of a document identified

13   on the Trial Exhibit List as TX1377 (Intuitive-00691203 - Intuitive-00691207), which consists of

14   a January 15, 1999, submission from Intuitive to the FDA titled "510(k) SUMMARY – Intuitive

15   Surgical, Inc.[,]" and the FDA's July 11, 2000, clearance letter.  Intuitive's submission describes

16   its EndoWrists as "'Resposable' (limited reuse) Endoscopic Instruments."  Ex. 18 (TX1377), at -

17   204.   The FDA's letter notes that it has determined Intuitive's EndoWrists are "substantially

18   equivalent (for the indications for use stated in the enclosure) to legally marketed predicate

19   devices."  Ex. 18 (TX1377), at -205.  This Exhibit shows that, following review of Intuitive's

20   submission, including the testing data described in Paragraph 9 above, the FDA granted Intuitive

21   clearance to market EndoWrist instruments with a use limit.

22        11.    Attached hereto as Exhibit 19 is a true and correct copy of a document identified

23   on the Trial Exhibit List as TX0563 (Intuitive-00481167 - Intuitive-00481175), a January 4, 2002,

24   letter from Intuitive to the FDA regarding "510(k) Premarket Notification (K013416) Intuitive

25   Surgical® Endo Wrist™ Endoscopic Instruments Your Fax dated December 12, 2001."  The

26   Exhibit shows that the FDA asked Intuitive about how the use limit for the EndoWrist was

27   determined and asked Intuitive to provide data to support the claim that the EndoWrist is

28

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1    programmed with a use limit to "ensure reliability and consistent performance." Ex. 19 (TX0563),

2    at -168. The Exhibit shows that Intuitive responded with data, *see* Ex. 19 (TX0563), at -170

3    through -172, including referring the FDA to data submitted in Ex. 16 (TX1637.007), as described

4    above in Paragraph 9.

5    12. Attached hereto as Exhibit 20 is a true and correct copy of a document identified

6    on the Trial Exhibit List as TX1408 (Intuitive-02054178 - Intuitive-02054182), a February 25,

7    2022, email between the FDA and Intuitive attaching the FDA's letter notifying Intuitive that the

8    FDA has identified deficiencies with Intuitive's submission for 8mm EndoWrist instruments with

9    extended lives. Among other deficiencies, FDA cited issues with the cleaning validation testing

10   that Intuitive had submitted to support 510(k) clearance of its devices for extended use. *See* Ex.

11   20 (TX1408), at -180 ("You provided *Justification, Cleaning Efficacy for 18 Clinical Uses, da*

12   *Vinci X/Xi 8mm Instruments* in Appendix B of your submission to justify relying on existing

13   cleaning validation testing conducted with the predicate device (K170645) and not conducting new

14   cleaning validation to support the extended uses of the da Vinci X/Xi 8 mm instruments. With

15   your justification, you conducted testing on two device types used in reliability testing to

16   demonstrate that two design features, distal seal and flush tube, maintain flow rate specifications

17   over the extended simulated surgical use and reprocessing cycles. Although these features may

18   mitigate ingress of soil and facilitate removal of soil, testing of these features is not adequate to

19   demonstrate that the instruments can still be effectively cleaned following additional uses and

20   reprocessing cycles."). Intuitive subsequently addressed these deficiencies in follow-up

21   submissions to the FDA.

22   13. Attached hereto as Exhibit 21 is a true and correct copy of a document identified

23   on the Trial Exhibit List as TX0729 (Intuitive-02067560 - Intuitive-02067568), an August 15,

24   2022, email between the FDA and Intuitive attaching the FDA's August 15, 2022, letter notifying

25   Intuitive that the FDA has determined that Intuitive's 8mm EndoWrist instruments with extended

26   lives have been determined to be substantially equivalent to Intuitive's predicate devices. This

27   Exhibit shows that, after Intuitive submitted performance test data to the FDA, the FDA concluded

28

1    that these EndoWrist instruments with an increased number of lives were "substantially equivalent

2    (for the indications for use stated in the enclosure) to legally marketed predicate devices"—*i.e.*,

3    EndoWrist instrument with a lower number of lives.  Ex. 21 (TX0729), at -561, -566 through -568.

**C.     Rebotix Applied for FDA Clearance to Modify EndoWrists and Received a Deficiency Letter, After which Rebotix Withdrew Its Application.**

6    14.    In its marketing materials, SIS told customers that modified EndoWrists with reset

7    use counters were equivalent to Intuitive EndoWrists, or had been restored to the equivalent of

8    Intuitive's original specifications.   But the FDA did not determine that Rebotix's modified

9    EndoWrists, which SIS marketed to customers, were equivalent to original EndoWrists.  As further

10    detailed below, to the contrary, after Rebotix applied to the FDA for 510(k) clearance and a

11    determination of equivalence, the FDA issued a deficiency letter in 2015 detailing 51 separate

12    reasons why Rebotix had failed to satisfy the requirements for 510(k) clearance.  Instead of

13    addressing those deficiencies, Rebotix withdrew its application and continued to market its

14    modified EndoWrists without FDA clearance.  SIS thereafter became a distributor of Rebotix's

15    modified EndoWrists, and made statements to customers about their equivalence with Intuitive's

16    originals, which Intuitive will argue are false and misleading.  I describe below examples of the

17    evidence Intuitive would anticipate offering regarding Rebotix's application for 510(k) clearance

18    and subsequent communications with the FDA.  Evidence that Rebotix chose to seek FDA

19    clearance is relevant to establishing the competitive significance of such clearance and tends to

20    reflect that hospital customers prefer (if not require) the use of products and services cleared by

21    the FDA.  This evidence also tends to show that it was reasonable and not anticompetitive for

22    Intuitive to adopt contractual limitations regarding the use of unauthorized products and services,

23    including those offered by Rebotix and SIS, with its system.  Further, this evidence tends to show

24    that SIS's modified EndoWrists were not equivalent to Intuitive's original EndoWrists, and that

25    SIS's contrary statements to customers were therefore false.

26    15.    Attached hereto as Exhibit 22 is a true and correct copy of a document identified

27    on the Trial Exhibit List as TX1424 (REBOTIX074144 - REBOTIX074148), a May 10, 2013,

28    email with attached notes between AJW Technology Consultants, Inc. and Benjamin Biomedical,

- 7 -

the parent company of Rebotix.  In the email, an AJW representative states that, "AJW . . . will support Benjamin Biomedical and a new entity in developing the following documentation: . . . Design History File [with the intent to have the data support a potential 510(k) submission]."  Ex. 22 (TX1424), at -144 (brackets in original).  The attached notes state, under the heading "REGULATORY CLASSIFICATION": "Serviced Wrists will be considered 'remanufactured' devices for FDA purposes because the serviced Wrists will have a useful life beyond that established by the OEM.  As a result this project will require FDA registration, 510 (k) submission, and full compliance with 820 quality system requirements including Design controls."  Ex. 22 (TX1424), at -146.

16.    Attached hereto as Exhibit 23 is a true and correct copy of a document identified on the Trial Exhibit List as TX1437 (REBOTIX128997 - REBOTIX129042), a December 19, 2014, letter from the FDA "[a]cknowledg[ing]" receipt of Rebotix's submission titled "Traditional 510(k) Notification Re-manufactured EndoWrists."  Ex. 22 (TX1437), at -997, -999. The FDA's letter states:  "We will notify you when the processing of your 510(k) has been completed or if any additional information is required.  YOU MAY NOT PLACE THIS DEVICE INTO COMMERCIAL DISTRIBUTION UNTIL YOU RECEIVE A LETTER FROM FDA ALLOWING YOU TO DO SO."  Ex. 23 (TX1437), at -997 (capitalization in original).

17.    Attached hereto as Exhibit 24 is a true and correct copy of a document identified on the Trial Exhibit List as TX1425 (REBOTIX077545 - REBOTIX077548), an April 9, 2015, email from AJW Consultants to Benjamin Biomedical attaching an April 9, 2015, letter from the FDA.  The FDA's letter states:  "We will notify you when the processing of your 510(k) has been completed or if any additional information is required.  YOU MAY NOT PLACE THIS DEVICE INTO COMMERCIAL DISTRIBUTION UNTIL YOU RECEIVE A LETTER FROM FDA ALLOWING YOU TO DO SO."  Ex. 24 (TX1425), at -547 (capitalization in original).

18.    Attached hereto as Exhibit 25 is a true and correct copy of a document identified on the Trial Exhibit List as TX1428 (REBOTIX081742 - REBOTIX081746), which are Rebotix, LLC "Management Review Meeting" minutes dated May 4, 2015.  These meeting minutes state:

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1   "For financial and business considerations, Rebotix will not initiate production or ship

2   remanufactured Endowrists until receiving marketing clearance from FDA. The 510 k application

3   is currently under review." Ex. 25 (TX1428), at -742.

4          19.     Attached hereto as Exhibit 26 is a true and correct copy of a document identified

5   on the Trial Exhibit List as TX1453 (REBOTIX171030 - REBOTIX171058), a June 23, 2015,

6   email from the FDA to Rebotix, attaching a letter of the same date, in which letter the FDA

7   identifies 51 deficiencies in Rebotix's application for FDA clearance of modified

8   EndoWrists. Among other things, the FDA specifically called out Rebotix's statement that "OEM-

9   equivalent specifications have been derived from published OEM product information, in-house

10  'reverse engineering' activities, and the relevant requirements of applicable consensus standards."

11  Ex. 26 (TX1453), at -053. The FDA noted that "it does not seem possible to identify exact device

12  specifications using these methods," and called on Rebotix to "perform side-by-side comparative

13  testing with the subject device and the matching OEM device model, and use a statistical

14  comparison between the two devices to demonstrate substantial equivalence." Ex. 26 (TX1453),

15  at -053. The FDA also directed Rebotix to "address the risk mitigation measures you have in place

16  for addressing the issues in each recall" the FDA had previously issued with respect to EndoWrists,

17  and "any methods by which recalled devices are identified and rejected as unacceptable candidates

18  for remanufacture." Ex. 26 (TX1453), at -033.

19         20.     Attached hereto as Exhibit 27 is a true and correct copy of a document identified

20  on the Trial Exhibit List as TX0775 (REBOTIX077729 - REBOTIX077734), a July 9, 2015, email

21  from the FDA to Rebotix, in which the FDA responds to questions from Rebotix about the FDA's

22  deficiency letter and why the FDA required that Rebotix provide certain information.

23         21.     Attached hereto as Exhibit 28 is a true and correct copy of a document identified

24  on the Trial Exhibit List as TX0824 (REBOTIX146948 - REBOTIX146955), a June 25, 2020,

25  email chain between Rebotix and the FDA where Rebotix responds to questions the FDA has

26  raised, including: "Are you providing service that may extend the lives of devices beyond the

27  original equipment manufacturer (OEM) stated limit. If yes, please provide information on how

28

- 9 -

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1  many additional uses you extend the lives of the devices and how you confirm it remains safe and

2  effective for its intended use (i.e. the performance and safety specifications are not significantly

3  changed from the original performance and safety specifications)." Ex. 28 (TX0824), at -950.

4        22.     Attached hereto as Exhibit 29 is a true and correct copy of a document identified

5  on the Trial Exhibit List as TX0268 (REBOTIX175417 - REBOTIX175418), a November 16,

6  2021, letter from the FDA to Rebotix stating, among other things, that "the da Vinci S EndoWrist

7  Instruments were cleared for a set number of uses.  By extending the number of uses, your activities

8  may be altering the intended use of the subject device.  We have conducted a review of our files

9  and are unable to identify an additional [FDA] clearance or approval supporting this intended use."

10  Ex. 29 (TX0268), at -417.

11        23.     Attached hereto as Exhibit 30 is a true and correct copy of a document identified

12  on the Trial Exhibit List as TX0570 (REBOTIX175839 - REBOTIX175843), a July 22, 2022,

13  email chain in which a representative of the FDA expresses concerns that "the activities of Rebotix

14  constitute remanufacturing and would require FDA review and clearance (e.g. 510(k) / de Novo).

15  We therefore request that Rebotix stop engaging in the current activities until an application is

16  reviewed and cleared/granted."  Ex. 30 (TX0570), at -840.

17        **D.    SIS Did Not Apply for FDA Clearance Itself and Its Witnesses Claim Not to
18            Have Known the Outcome of Rebotix's Application for FDA Clearance.**

19        24.     SIS did not obtain FDA clearance for the modified EndoWrists that it marketed to

20  customers; it relied on Rebotix's representation that FDA clearance was not required.  SIS's Greg

21  Posdal has testified that he was aware that Rebotix applied for FDA clearance but claims not to

22  know the outcome of Rebotix's application.  And SIS has admitted, in response to written

23  discovery, that it did not attempt, after 2022, to obtain FDA clearance for modified EndoWrists or

24  market any modified EndoWrist instruments (including FDA-cleared modified EndoWrists).  This

25  evidence is relevant to proving that the modified EndoWrists that SIS marketed to customers were

26  not equivalent to Intuitive's EndoWrists, contrary to what SIS told its customers.  This evidence

27  also is relevant to proving that SIS chose not to compete by obtaining FDA clearance or marketing

28  FDA-cleared modified EndoWrists, even after Intuitive announced on its website in 2023 that

- 10 -

1    customers were free to purchase any modified EndoWrist that had been cleared by the FDA,

2    without consequence under Intuitive's contracts. This evidence also bears on the credibility of

3    SIS's witnesses.

4         25.    Attached hereto as Exhibit 31 is a true and correct copy of excerpts from the Rule

5    30(b)(1) deposition transcript of Greg Posdal of SIS, taken in this matter on November 1, 2022.

6    Mr. Posdal testified that SIS never sought 510(k) clearance from the FDA for anything. Ex. 31 at

7    93:19–21. Mr. Posdal further testified that he "assume[d]" that he discussed the fact that Rebotix

8    had applied for FDA clearance, but did not know the outcome of Rebotix's Section 510(k)

9    clearance for its EndoWrist reset process, and did not know whether the FDA found deficiencies

10   in Rebotix's FDA application. Ex. 31 at 54:23–55:19.

11        26.    Attached hereto as Exhibit 32 is a true and correct copy of excerpts from the Rule

12   30(b)(6) deposition transcript of Greg Posdal of SIS, taken in this matter on November 1, 2022.

13   Mr. Posdal testified that SIS did not take any independent steps to ensure that the modified

14   EndoWrists that it marketed to customers complied with FDA requirements. Ex. 32 at 61:20–24.

15   Mr. Posdal also testified that SIS "relied on Rebotix" for the conclusion that modifying EndoWrist

16   instruments to reset the use counter does not require FDA clearance, and that SIS did not

17   independently consider that question. Ex. 32 at 45:19–46:15.

18        27.    Attached hereto as Exhibit 33 is a true and correct copy a document identified on

19   the Trial Exhibit List as TX1701, SIS's Responses to Intuitive's Second Set of Requests for

20   Admissions. SIS admitted that it "did not, after November 2022, whether alone or with a third

21   party, seek FDA clearance for any service, procedure, or technology for resetting or

22   reprogramming the use counter on any EndoWrist Instrument." Ex. 33 (TX1701) at 3–4. SIS

23   further admitted that it "did not, after November 2022 . . . sell, distribute, or market any EndoWrist

24   Instruments with reset and/or reprogrammed use counters, or any service for resetting or

25   reprogramming the use counter on EndoWrist Instruments." Ex. 33 (TX1701) at 5.

26        **E.    Iconocare Obtained FDA Clearance to Market a Modified EndoWrist, and
27              Intuitive Subsequently Announced that Customers Were Free to Purchase**

28

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO                                                    **SER-46**

**FDA-Cleared Modified EndoWrists Without Consequence Under Intuitive's Contracts.**

28.     In 2019, around the same time that SIS became a distributor of Rebotix's non-FDA-cleared, unauthorized modified EndoWrists, another third party (Restore, through its affiliate Iconocare) began working on an application to the FDA for 510(k) clearance to modify EndoWrists. Iconocare received 510(k) clearance to modify a particular EndoWrist instrument in September 2022, after the FDA had reviewed its application and determined the modified EndoWrist to be substantially equivalent to Intuitive's original EndoWrist. Iconocare was the first entity to obtain FDA clearance to modify EndoWrists. Thereafter, Intuitive announced on its website that customers were free to purchase any modified EndoWrist that had been cleared by the FDA, without consequence under Intuitive's contracts. This evidence is relevant to show that Intuitive's authorization or approval process for third-party products and services is not illusory. As discussed above, Intuitive previously had asked third parties for proof that their modified EndoWrists were cleared by the FDA or had been clinically proven to be equivalent to Intuitive's original EndoWrists. *See supra* Paragraph 6. Iconocare chose to have its products cleared by the FDA and Intuitive authorized customers to purchase those products under its contracts. This evidence tends to show that Intuitive's contracts were not exclusive dealing or tying arrangements, and that Intuitive had reasonable, pro-competitive justifications for requiring approval for third-party modified EndoWrists. This evidence also shows that third parties were able to obtain approval to market modified EndoWrists, and that SIS's failure to do so was the result of a choice by SIS.

29.     Attached hereto as Exhibit 34 is a true and correct copy of a document identified on the Trial Exhibit List as TX1300 (ACG000006 - ACG000007), an April 9, 2019, memorandum to Restore Robotics from Arkin Consulting Group titled "Discussions with FDA about EndoWrist counter." The document states: "The Endowrist is the issue because Restore Robotics wants to reset the counter which then changes the device original specifications. To get FDA to accept this, they will need to [l]earn what the DaVinci specs are for each device[:] a) Develop a robust protocol that would <u>prove</u> that the device can withstand uses greater than those specified by the

- 12 -

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO                                                    **SER-47**

1    manufacturer. b) Implement said protocol." Ex. 34 (TX1300), at -007 (emphasis in original).

2    Restore subsequently submitted an application for 510(k) clearance to the FDA through its

3    affiliate, Iconocare.

4          30.    Attached hereto as Exhibit 35 is a true and correct copy of a document identified

5    on the Trial Exhibit List as TX1305 (AHP002623 - AHP002624), a February 13, 2021, letter from

6    Iconocare to the FDA ████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ███████████████████████████.

12         31.    Attached hereto as Exhibit 36 is a true and correct copy of a document identified

13   on the Trial Exhibit List as TX0334 (AHP000526 - AHP000537), a March 30, 2021, email from

14   the FDA to Iconocare, ██████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ██████████████████████████████.

22         32.    Attached hereto as Exhibit 37 is a true and correct copy of a document identified

23   on the Trial Exhibit List as TX0216 (Restore-00099136 - Restore-00099139), an October 1, 2022,

24   email from Alliance Healthcare Partners to Restore, attaching a September 30, 2022, letter from

25   the FDA. The letter shows that the FDA reviewed Iconocare's Section 510(k) premarket

26   notification of intent to market remanufactured 8mm Monopolar Curved Scissors, and that the

27   FDA determined the remanufactured device is substantially equivalent to Intuitive's legally

28

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1    marketed predicate devices.  The FDA therefore cleared Iconocare to "market the device."  Ex. 37

2    (TX0216), at -137.

3         33.    Attached hereto as Exhibit 38 is a true and correct copy of a document identified

4    on the Trial Exhibit List as TX1660, titled "Da Vinci Surgical Instruments | Intuitive."  This is

5    Intuitive's March 2023 statement on its website concerning usage limits and remanufactured

6    EndoWrist instruments.  Among other statements, Intuitive states that "Intuitive will not void its

7    service contract with, cease doing business with, or consider it a breach of contract by a

8    customer . . . who chooses to purchase remanufactured instruments that have been remanufactured

9    by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by

10   the FDA."  Ex. 38 (TX1660) at 3.

11         **F.    Hospitals Care About FDA Clearance.**

12         34.    At the pretrial conference, the Court noted "hesitation" in granting SIS's motions

13   relating "to Intuitive's ability to argue that customers cared about the [FDA] clearance and, thus,

14   SIS' failure to obtain it impacts antitrust causation and damages."  November 25, 2024, Hr'g Tr.

15   at 36:8–11.  To try to prove antitrust causation and damages at trial, SIS has repeatedly made clear

16   that it will argue that hospitals' demand for its EndoWrist modification services was

17   "monumental."  Evidence that hospitals and surgeons cared about whether the surgical instruments

18   they used on patients were FDA-cleared tends to rebut SIS's arguments about the level of demand

19   for modified EndoWrists that had not been cleared by the FDA.  Similarly, evidence that hospitals

20   that actually bought or sampled modified EndoWrists from Restore and Rebotix because they

21   mistakenly believed that such products *had* been cleared by the FDA also tends to undercut SIS's

22   arguments about customer demand.  I describe below examples of such evidence.

23         35.    Attached hereto as Exhibit 39 is a true and correct copy of excerpts from pages

24   151–154 of the deposition transcript of Edward Harrich.  Mr. Harrich testified that Pullman

25   Regional Hospital received information, before it started using Rebotix's services, that Rebotix

26   had received "the 510(k) approval"—meaning, in Mr. Harrich's understanding, that "they're

27   approved to reprogram the EndoWrist."  Ex. 39 at 151:2–16.  Mr. Harrich further explained that

28

- 14 -

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

"[h]aving FDA backing to reprocess or reprogram those chips" in the EndoWrists was "an important factor" for Pullman, because "we like to stay with FDA approval on everything we're using and doing." Ex. 39 at 154:5–11.

36.    Attached hereto as Exhibit 40 is a true and correct copy of excerpts from pages 76–78 of the deposition transcript of Tyler McDonald.  In this testimony, Mr. McDonald explained that Conway Regional Health System did not know that Restore did not have 510(k) clearance prior to purchasing Restore's services to remanufacture EndoWrist instruments, but that he would have wanted to know that fact because 510(k) clearance is a "general marker of reputability."  Ex. 40 at 78:5–6.

37.    Attached hereto as Exhibit 41 is a true and correct copy of excerpts from page 132 of the deposition transcript of Stacey Donovan.  Ms. Donovan testified that she did not think that her hospital, EvergreenHealth, "would do business with an organization that I'm aware of that doesn't have a[n] FDA clearance, at least not knowingly." Ex. 41 at 132:9–11.

38.    Attached hereto as Exhibit 42 is a true and correct copy of excerpts from pages 54–55, 57–59, and 82 of the deposition transcript of Ricardo Estape.  Dr. Estape, who serves as director of the Hospital Corporation of America's Florida Institute for Gynecologic Oncology, stated his understanding that EndoWrists have a limited number of uses because when Intuitive "went for the FDA clearance, they went for whatever number that they thought they could maintain it working functionally well," and that "those were the numbers that they used, based on what FDA cleared them to use." Ex. 42 at 55:2–11. Dr. Estape further recalled that when a representative of Revanix Biomedical, another unauthorized third party, told him they could "wipe out the number of uses on an instrument that's FDA cleared for only ten uses," Ex. 42 at 57:20–21, he found that to be very "shady," because "it didn't seem like a very up-and-up program. . . . It surely didn't sound like the right thing to do," Ex. 42 at 58:2–13. Dr. Estape testified specifically that he is "not willing to do something that's not FDA approved because . . . anything that happens to the patient, they're going to come down on me for having used equipment that was not FDA approved at that time." Ex. 42 at 59:18–22.  He added that he would not "be amenable to using a third party to

- 15 -

1   reset the counters on an EndoWrist if it did not have 510(k) clearance from the FDA." Ex. 42 at

2   82:2–5.

3       39.    Attached hereto as Exhibit 43 is a true and correct copy of a document identified

4   on the Trial Exhibit List as TX1551 (SIS094574 - SIS094595), titled "Surgical Instrument Service

5   Co., Inc. da Vinci® EndoWrist® Repair FAQs." This document includes as the very first

6   "frequently asked" question by hospital customers: "Can you send me your certification / FDA

7   approval?" Ex. 43 (TX1551), at -578.

8       40.    Attached hereto as Exhibit 44 is a true and correct copy of a document identified

9   on the Trial Exhibit List as TX1464 (Restore-00010153 - Restore-00010156), a July 12, 2019,

10  email chain between Rick Ferreira of Iconocare and other individuals affiliated with Restore

11  Robotics titled "FW: Restore Robotics Follow Up." Ferreira comments on a piece of marketing

12  material that SIS had sent to a customer and suggests: "Let's draft a list of questions for this

13  potential customer to ask SIS. . . . Ask is the facility where these are repaired ISO certified and

14  FDA Registered . . . . Ask why there is not a 510(k) requirement for this repair since it is a 'limited-

15  use' reusable." Ex. 44 (TX1464), at -153. This document tends to show that Restore understood

16  that hospital customers would want to know about SIS's and Rebotix's 510(k) clearance status

17  before deciding whether to purchase their EndoWrist modification services.

18      41.    Attached hereto as Exhibit 45 is a true and correct copy of a document identified

19  on the Trial Exhibit List as TX1472 (Restore-00061148 - Restore-00061149), a June 27, 2018

20  email between Restore and Maximum Surgical Solutions, in which a representative of Maximum

21  Surgical Solutions writes to Restore: "I was asked specifically today if this was an FDA approved

22  program by Univ of Cincinnati. Univ of Cincinnati has two Si's in-house . . . . I explained that this

23  was a restore/repair program, and he said for our program to meet their risk management approval,

24  that he would need the certification or documentation to denote the process additional to the ISO

25  documentation we provide[.] I know you cautioned not to infer that this process was anything

26  FDA oriented so what could I provide him to try and take next steps? Do you have documentation

27

28

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1    on the true differences between reprocessing and restoration that could increase our credibility on

2    the process?"  Ex. 45 (TX1472), at -148.

3        42.    Attached hereto as Exhibit 46 is a true and correct copy of excerpts from pages 29–

4    32, 55–56, and 92–95 of the June 7, 2021 deposition of Rick Ferreira.  Mr. Ferreira, who worked

5    with Restore Robotics to submit a 510(k) application on behalf of Iconocare, testified that the "real

6    advantage" of 510(k) clearance was "the marketing piece of it," Ex. 46 at 30:23–24,  because

7    "when the FDA gives you a 510(k) clearance, it's telling the marketplace that they've looked at

8    the predicate device, the new device, and that your methodologies for cleaning, function testing

9    the device, and sterilizing it is equal to the predicate device," Ex. 46 at 31:11–16.  Mr. Ferreira

10   further testified that even though his opinion was that 510(k) clearance was not required in this

11   instance, "from a marketing standpoint to be able to say to the customer this device basically has

12   a Good Housekeeping seal of approval from FDA, that's why we pursued the 510(k)."  Ex. 46 at

13   95:4–7.

14       43.    Attached hereto as Exhibit 47 is a true and correct copy of excerpts from pages 96,

15   100, 223, and 228–229 of the deposition of Glenn Papit, of Rebotix.  Mr. Papit testified about

16   hospitals wanting to know if Rebotix's EndoWrist remanufacturing service was FDA-approved,

17   and "getting shut down" by hospitals who insisted that Rebotix needed 510(k) clearance.  Ex. 47

18   at 228:23.

19       44.    Attached hereto as Exhibit 48 is a true and correct copy of excerpts from pages 52–

20   53, 149–153, and 157 of the deposition of David Fabricant of Stryker.  Mr. Fabricant testified

21   about the fact that Stryker, which runs a major medical device reprocessing business, had

22   considered acquiring Rebotix's assets for modifying EndoWrist instruments.  Mr. Fabricant

23   testified that Stryker would not have offered EndoWrist modification services to hospital

24   customers without first obtaining FDA 510(k) clearance.  Mr. Fabricant further testified that

25   Rebotix's representatives informed Stryker that the FDA had "issued a deficiency letter," Ex. 48

26   at 149:24, and that Rebotix wanted to "leverage . . . Stryker's R&D for testing and regulatory for

27   FDA engagement," Ex. 48 at 150:14–15.  Mr. Fabricant testified that Rebotix was "roughly 30

28

- 17 -

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1  percent to Stryker's standard for being able to go back to the FDA with a response."  Ex. 48 at

2  150:12–13.

3       45.    Attached hereto as Exhibit 49 is a true and correct copy of a document identified

4  on the Trial Exhibit List as TX1439 (REBOTIX139042 - REBOTIX139045), a December 10,

5  2015, letter from Stryker to Rebotix.  In its letter to Rebotix, Stryker expressed interest in acquiring

6  Rebotix but included language concerning the importance of 510(k) clearance:  "Key determinants

7  of value include, but are not limited to: . . . (ii) the ability of the Company to transfer to Stryker

8  its . . . design history file . . . and records of correspondence with the FDA;  . . . (iv) the ability of

9  the Company to transfer to Stryker responsibility for all activities related to 510(k) clearance and

10  product commercialization . . . .  We propose to acquire the Product Line for a total potential

11  consideration of US $13.5 million, payable as follows: . . . a milestone payment of $0.5 million,

12  payable upon 510(k) clearance . . . .  Our ongoing due diligence review would include . . . FDA

13  and regulatory due diligence."  Ex. 49 (TX1439), at -042 through -043.

14       46.    Attached hereto as Exhibit 50 is a true and correct copy of the December 2, 2022,

15  report of SIS damages expert Richard F. Bero.  On page 4 of his report, in a section titled "Basic

16  damages assumptions," Mr. Bero describes two alternative damages scenarios he analyzed

17  regarding SIS's antitrust claims, and explained that in both of them, he assumed that "SIS would

18  not need FDA approval to make its repairs."  Ex. 50 at 5.  At trial, Intuitive will cross examine Mr.

19  Bero about this assumption, his failure to account for the impact of SIS's lack of FDA clearance

20  on hospital demand, and his failure to account for the competition that SIS might face from third

21  parties with FDA clearance in a "but-for" world.

22  **G.    SIS's Experts Admit that FDA 510(k) Clearance Is Relevant to Issues of Safety**
23  **and Efficacy in the Context of This Case.**

24       47.    SIS's own experts have admitted how evidence relating to the FDA's 510(k)

25  clearance process is relevant to issues of safety and efficacy in the context of this case.

26  Specifically, SIS's experts have explained how a 510(k) determination indicates whether a medical

27  device product has been proven to be "as safe and effective" as its predicate device, and have

28  opined that the FDA's clearance of Iconocare's modified EndoWrist demonstrates that particular

- 18 -

1    product to be as safe and effective as Intuitive's original EndoWrists. This evidence is relevant to

2    showing why Intuitive's policies concerning unauthorized third-party products and services are

3    reasonable and not anticompetitive. Specifically, such admissions tend to show that it was

4    reasonable for Intuitive to adopt a policy of not approving or authorizing the use with its systems

5    of third-party modified devices that had not been proven—either to the FDA or to Intuitive—to be

6    at least equivalent in safety and efficacy to Intuitive's original devices. Likewise, this evidence

7    tends to show why it was reasonable for Intuitive to distinguish for purposes of contractual

8    authorization between such unproven devices and ones, like Iconocare's, that had received FDA

9    clearance determining them to be equivalent in safety and efficacy to Intuitive's original

10    EndoWrists.

11    48.    Attached hereto as Exhibit 51 is a true and correct copy of the expert report of Philip

12    J. Phillips, SIS's FDA expert, dated December 2, 2022. The report states, at ¶ 20, that "[t]he

13    objective of FDA device regulation is to provide the American public with reasonable assurance

14    of the safety and effectiveness for all medical devices,", and, at ¶ 24, that "FDA regulation of

15    devices provides a 'reasonable assurance of safety and effectiveness.'" The report further states,

16    at ¶ 29: "The purpose of a 510(k) submission is to demonstrate that a medical device is

17    substantially equivalent ('SE') to a predicate device, which is basically a legally marketed class I

18    or class II device. A medical device is determined to be SE to a predicate device if: (1) it has the

19    same intended use as the predicate device; and (2) it has the same technological characteristics as

20    the predicate device; or (3) it has different technological characteristics which do not raise new

21    questions of safety and effectiveness and is shown to be 'as safe and effective' as the predicate

22    device." At ¶ 121, the report explains that "Iconocare Health provided performance data to FDA

23    that demonstrated that '. . . the reprocessed devices are as safe and effective as the predicate and

24    operate as originally intended.' Furthermore, the company convinced FDA that testing each

25    individual device before release establishes the '. . . appropriate function of its components prior

26    to packaging and labeling operations.'" Mr. Phillips goes on, in the same paragraph, to opine: "It

27

28

1   is not surprising that FDA determined the device to be SE as it is virtually identical to the predicate

2   devices in all respects and one would anticipate that they are as safe and effective."

3        49.    Attached hereto as Exhibit 52 is a true and correct copy of the December 2, 2022,

4   report of SIS economic expert Dr. Russell Lamb.  In ¶¶ 129–132 of his report, Dr. Lamb adopts

5   and relies upon Mr. Phillips' opinions regarding Iconocare's 510(k) clearance, and cites this as

6   evidence that "despite Intuitive's claims to the contrary, EndoWrist instruments repaired or

7   reprocessed by third parties such as SIS were equally as safe as the newly manufactured

8   replacement EndoWrist instruments hospitals were required to purchase directly from Intuitive"—

9   which he argues undercuts Intuitive's stated pro-competitive justification for its contracts.  Dr.

10   Lamb also references FDA clearance as the basis for other opinions in his report.  For example, at

11   ¶¶ 46–48, Dr. Lamb opines that non-minimally invasive soft tissue ("MIST") surgical robots are

12   not economic substitutes for MIST surgical robots, like the da Vinci, and in reaching this

13   conclusion notes that no other surgical robots have FDA clearance to perform all of the same

14   procedures as the da Vinci.  Likewise, at ¶ 64 of his report, Dr. Lamb opines that EndoWrist repair

15   and replacement is a relevant product market, relying on the fact that "no other manufacturers sell

16   FDA-approved surgical instruments for use with a da Vinci."

17       **H.**    **FDA-Related Evidence Is Relevant to Showing that Intuitive's Design Changes**

18              **to X/Xi EndoWrists Were Genuine Product Improvements and Not Anticompetitive.**

19        50.    SIS claims that Intuitive's incorporation of a wireless RFID chip with enhanced

20   encryption technology in its X/Xi EndoWrists was anticompetitive, and not a genuine product

21   improvement.  As part of rebutting that claim, Intuitive would expect to point to evidence that the

22   FDA specifically required Intuitive to provide information addressing safety and efficacy concerns

23   involving the wireless technology, including but not limited to concerns related to data security.  In

24   connection with seeking FDA clearance for its Xi da Vinci systems, which included the wireless

25   RFID chip, Intuitive submitted to FDA a risk assessment that identified potential cybersecurity

26   risks associated with the product, including risks related to the RFID chip, and mitigation measures

27   that Intuitive had put in place to address those risks.  Among the "critical" cybersecurity risks

28

- 20 -

1   identified by Intuitive was the potential for interference with data on the RFID chip (which

2   includes data related to use limits). Intuitive reported to FDA in 2013 that the mitigation measures

3   it undertook to address this "critical" risk included encrypting the data on the RFID chip itself as

4   well as the wireless communications between the chip and the da Vinci. This evidence tends to

5   show that Intuitive enhanced the encryption technology on X/Xi EndoWrists for legitimate

6   reasons, relating to safety and efficacy and to preventing data breaches.

7        51.    Attached hereto as Exhibit 53 is a true and correct copy of a document identified

8   on the Trial Exhibit List as TX0566 (Intuitive-00506505 – Intuitive-00506641), Intuitive's FDA

9   submission including the "Cybersecurity Risk Analysis" submitted to FDA. The document

10  specifically identifies "critical" risks associated with the "RFID reader" on the da Vinci and the

11  "RFID tag" on the EndoWrist instruments including that "[c]ompromise of the interface leads to

12  modification of instrument" resulting in it being "[p]ossible to use surgical instruments beyond

13  tested life." Ex. 53 (TX0566), at -542. Intuitive further reported to FDA the mitigation measures

14  it undertook to address these "critical" risks including that the wireless communications are

15  "encrypted" as is data on the RFID chip itself. Ex. 53 (TX0566), at -542.

16       52.    Attached hereto as Exhibit 54 is a true and correct copy of a document identified

17  on the Trial Exhibit List as TX1351 (Intuitive-00499468 - Intuitive-00499756), Intuitive's

18  February 19, 2014, response to FDA comments specifically requiring Intuitive to provide

19  additional information to "address the safety and effectiveness concerns involving the wireless

20  technology" including but not limited to concerns related to "data security." Ex. 54 (TX1351), at

21  -640. Intuitive's response addresses each of FDA's safety and effectiveness concerns with

22  wireless technology including those related to "data security" and provides information both on

23  how data security would be addressed on the RFID chip itself as well as in connection with the

24  wireless transmission of that data. Ex. 54 (TX1351), at -640 through -642.

25

26       I declare under the penalty of perjury under the laws of the United States that the foregoing

27  is true and correct.

28

- 21 -

Gallo Declaration in Support of Defendant's Motion for Reconsideration or Interlocutory Appeal
3:21-cv-03496-AMO

1

2    Dated:  December 16, 2024                    By: /s/ *Kenneth. A. Gallo*
                                                       Kenneth A. Gallo

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

Intuitive
1020 Kifer Road
Sunnyvale, CA 94086

T. 408 523 2100
F 408 523 1390

intuitive.com

April 16, 2019

**VIA CERTIFIED MAIL & E-mail**

David Mixner
Rebotix Repair LLC
6822 22nd Avenue North, Suite 283
St. Petersburg, FL 33710

**Subject: Tampering with and Reprogramming *da Vinci*® Surgical System Instruments**

Dear Mr. Mixner,

We write on behalf of Intuitive Surgical, Inc. ("Intuitive"), a company that develops and distributes advanced robotic-assisted surgical platforms for minimally-invasive surgery. Our core products include the *da Vinci*® Surgical System (the "System") as well as the *EndoWrist*® instruments that attach to the System.

It has come to our attention that Rebotix Repair LLC ("Rebotix"), either directly or indirectly through its "service centers", is engaging in the unauthorized manufacturing and marketing of a medical device without proper regulatory authorization from the U.S. Food and Drug Administration ("FDA" or the "agency"). We also have concerns that the devices potentially being distributed are not being manufactured, or re-manufactured as the case may be, under a recognized quality management system applicable to medical devices. In addition, we believe that Rebotix and its service center representatives engaged in behavior that violates applicable laws and may give rise to civil liability. We write to you on behalf of Intuitive to demand that Rebotix immediately cease and desist from any and all improper behavior with regard to the *EndoWrist*® instruments, including but not limited to your actions described below.

**INTUITIVE.**

CONFIDENTIAL
REBOTIX145274

**Regulatory Background**

In the United States, class II medical devices – including *da Vinci*® Systems and *EndoWrist* instruments – are subject to premarket notification clearance, compliance with the Quality System Regulation (QSR), among other regulations promulgated by the FDA to ensure the safety and effectiveness of each medical device over its intended life. With respect to class II devices and related accessories, only those with FDA 510(k) clearance may be placed in the U.S. market. Moreover, it is FDA policy that only one company can manufacture and market a product under a single 510(k) absent a contract manufacturing or private labelling agreement between the parties. Further, any change or modification to a cleared class II medical device that could significantly affect its safety or effectiveness voids the prior 510(k) clearance as to the modified device, rendering its use unlawful without a new clearance. This includes changes to the cleared indications for use.

FDA also imposes strict requirements regarding the design, development and manufacturing of medical devices. These good manufacturing practices are codified in the Quality System Regulation, 21 C.F.R. Part 820. The QSR requires that medical device manufacturers have a quality management system in place for the design, manufacture, packaging, labelling, storage, installation, and servicing of finished medical devices intended for commercial distribution in the United States. As a key part of compliance with these requirements, device manufacturers must verify and validate both their designs and their manufacturing processes to ensure that they can consistently meet required specifications and user needs, and that such specifications are appropriate to ensure device performance and patient safety. Utilizing these process controls, manufacturers must identify the useful life of their devices, as well as service and maintenance requirements to ensure their safe and effective use. All service and maintenance must be performed per a controlled process and bring products to their FDA cleared specifications. Any changes to these specifications require extensive verification and validation subject to a comprehensive set of quality management procedures. Such changes also may require additional clearance from the FDA.

CONFIDENTIAL
REBOTIX145275

Importantly, FDA also requires certain refurbishers and service providers to register their establishments with the agency. Specifically, any entity that processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use must register their establishment and list the devices being remanufactured at the subject facility.

## Factual Background

In accordance with its quality system, Intuitive engages in rigorous testing prior to submitting its medical devices for FDA clearance. Generally, and specifically with respect to the *EndoWrist®* instruments, that includes instrument reliability/projected life testing to confirm the maximum number of safe and effective clinical uses of a product prior to disposal. Those test results are often incorporated into the FDA 510(k) clearance application. With respect to many of the *EndoWrist®* instruments, Intuitive Surgical determined – and the FDA 510(k) clearance reflects – ten surgical procedures is the maximum number of safe and effective clinical uses prior to disposal. Accordingly, Intuitive placed a memory device inside such instruments that keeps track of the usage count and inhibits the instrument from functioning after ten uses.

We recently have become aware that you are offering Intuitive customers in the United States a service where "[y]our authorized service centers" will "inspect and recondition" *EndoWrist®* instruments to allow the *EndoWrist®* instruments to be used beyond their pre-programmed, cleared number of uses.

## Rebotix's Alleged Activities Violate U.S. Law

We have numerous concerns with the foregoing activities. First, it is unclear whether you or your service technicians have the requisite specifications by which to make the claim that the units are returned to their production equivalent qualification. Even assuming for argument that you have obtained these specifications, or Intuitive' s service manual, any modifications that reset or extend the number of uses of the device also violates FDA requirements. This change impacts the intended use of the device, exceeds the verified and validated testing used to support the FDA clearance, and thereby constitutes a major change to the device. This change could significantly affect the safety and effectiveness of the device and therefore requires clearance of a new 510(k). To our knowledge, FDA

CONFIDENTIAL

REBOTIX145276

has not granted Rebotix or its service centers 510(k) clearance to market or distribute modified *EndoWrist*® instruments in the United States for any indication for use. Thus, it appears that Rebotix and it service centers are manufacturing, marketing, and selling class II medical devices without FDA premarket clearance. As a result, it appears that these activities adulterate under 21 U.S.C. § 351(f)(1)(B) and/or misbrand under 21 U.S.C. § 352(o) the products you and your service centers are entering into commerce, because the law requires, and you and your service centers do not have, a 510(k) clearance showing that the "reconditioned" device is substantially equivalent to a legally marketed predicate device. Moreover, any claims that Rebotix and its service centers are able to market significantly modified versions of Intuitive's *EndoWrist*® instruments also violate FDA's longstanding policy that only one company can manufacture and market a medical device under a single 510(k) absent an agreement between the companies to do so.

Rebotix and its service centers also appear to be marketing these devices without accurate establishment registration and device listing with FDA. Due to the nature and extent of the modifications of the activities apparently being performed, Rebotix or one of its service centers is considered to be a "remanufacturer." FDA defines a remanufacturer as any entity that processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use. As a remanufacturer of medical devices, regardless of whether you hold a 510(k) or not, you are required to register your manufacturing establishment with FDA and to submit a device listing to the agency. 21 U.S.C. §360; 21 C.F.R. § 807.20. Your failure to do so misbrands the remanufactured devices placed into commerce by Rebotix and its service centers. 21 U.S.C. § 352(o).

As previously stated, it does not appear that Rebotix or any of its service centers has the requisite 510(k) clearance to support the remanufacturing, marketing and sale of its services as they may pertain to *EndoWrist*® instruments. Consequently, any such Intuitive products placed into commerce by Rebotix or its service centers are likely adulterated under 21 U.S.C. § 351(f)(1)(B) and/or misbranded under 21 U.S.C. § 352(o). The introduction or delivery for introduction into interstate commerce of adulterated and/or misbranded medical devices is a prohibited act under the Federal Food, Drug, and

CONFIDENTIAL

Cosmetic Act ("FDCA"), 21 U.S.C. § 331. Those who commit prohibited acts may be subject to injunctions, civil and criminal fines and penalties under 21 U.S.C. §§ 302 and 333. The illegal devices also are subject to seizure under 21 U.S.C. § 304.

Your apparent false and misleading marketing practices and activities also may violate other U.S. federal and state laws and could expose Rebotix and its service centers to significant financial liability. False advertising statements regarding the modified *EndoWrist®* instruments are likely to deceive a substantial segment of your audience with respect to material characteristics of the instruments. The deception caused by such statements – and the attendant potential risk to patient health and safety through the use of modified *EndoWrist®* instruments – threaten to injure or have already injured Intuitive's business and reputation. Such deceptive practices also cause likelihood of confusion or of misunderstanding as to the modified *EndoWrist®* instruments, including but not limited to FDA certification, affiliation with or approval by Intuitive, as well as key characteristics such as safety and effectiveness. You also are liable to the extent your activities interfere with our customers' warranties.

Lastly and most critically, Rebotix's modification of the *EndoWrist®* instruments impacts the intended use of the device, exceeds the verified and validated testing performed by Intuitive to support the FDA 510(k) clearance, and therefore raises serious questions about the safety and effectiveness of the clinical use of such modified instruments in surgical procedures. For this reason, you could face significant financial liability from both practitioners and their patients in connection with your untested, unapproved modification of the *EndoWrist®* instruments.

### Demand

Based on the foregoing apparent violations of U.S. law, Intuitive demands that Rebotix and its service centers (and affiliated entities) immediately cease and desist from:

    a. marketing and offering a servicing process in the course of which the use counter of *EndoWrist®* instruments' memory device is manipulated and/or replaced to permit more than ten uses; and

    b. manipulating and marketing or offering Intuitive's products without FDA clearance of the manipulated products.

CONFIDENTIAL

REBOTIX145278

Please confirm your compliance with these demands no later than April 30, 2019. If you allege that you or your service centers received FDA clearance for the modifications to the *EndoWrist®* instruments described herein or possess clinical proof that your service process returns the modified instruments to a "production equivalent qualification" and/or that additional use does not affect the safety or performance of the instruments, provide proof of the same no later than April 30, 2019.

We reserve all rights to take all appropriate action against you and to protect Intuitive's rights, products and reputation, including notifying the FDA of these activities for investigation and potential enforcement action against you and pursuing appropriate civil remedies.

Very truly yours,

Romain Denis
VP, EU and US Regulatory Affairs

Kara Andersen Reiter
SVP, General Counsel & CCO

cc:
R. Reid Haney (Registered Agent), 101 E. Kennedy Boulevard, Suite 3700, Tampa, FL 33602
Rebotix Repair LLC (Street Address), 539 Pasadena Avenue South, St. Petersburg, FL 33707
Benjamin Biomedical (Shared Street Address with Rebotix), 539 Pasadena Avenue South, St. Petersburg, FL 33707

CONFIDENTIAL

REBOTIX145279

**EXHIBIT 18**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

## 510(k) SUMMARY – Intuitive Surgical, Inc.

*K990144*

This summary of 510(k) safety and effectiveness information is submitted in accordance with the requirements of SMDA 1990 and 21 CFR 807.92.

**510(k) Number:  TBD**

**Applicant Information:**

| | |
|---|---|
| Date Prepared: | January 15, 1999 |
| Name: | Intuitive Surgical, Inc. |
| Address: | 1340 W. Middlefield Road |
| | Mountain View, California 94043 |
| Contact Person: | Michael A. Daniel |
| Phone Number: | (650) 237-7036 |
| Facsimile Number: | (650) 526-2060 |

**Device Information:**

| | |
|---|---|
| Classification: | Class I / II    Gynecologic Laparoscope and Accessories |
| | Electrocautery, Endoscope and Accessories |
| Trade Name: | Intuitive Surgical™ Instruments / Accessories: |
| | "Resposable" (limited reuse) Endoscopic Instruments |
| | including: Scissors, Scalpels, Forceps, Clip Applier, |
| | Electrocautery and accessories, Pick-ups and Needle |
| | Drivers / Holders for use with: |
| | The Intuitive Surgical™ Endoscopic Instrument Control System |
| Common Name: | Endoscopic Instruments and Accessories |
| Classification Name: | Endoscope and Accessories,        21 CFR 876.1500 |
| | Gynecologic laparoscope and Acces. 21 CFR 884.1720 |

**Predicate Devices:**

The Intuitive Surgical™ Endoscopic Instruments and Tools are substantially equivalent in intended use and/or method of operation to the following predicate devices:

1.    Various Class I Exempt and Class II endoscopic electrocautery surgical instruments including the Baxter Healthcare Endoscopic Instruments (K931340) and the Deknatel Snowden Pencer Diamond Touch™ Brand of Endoscopic Instruments (K960400).
2.    The Intuitive Surgical™ Endoscopic Instrument Control System and selected instruments (K975001).

003

*136*

SER-66

Attorneys' Eyes Only                                                          Intuitive-00691203

## 510(k) SUMMARY – Intuitive Surgical, Inc.  (Continued)

**Device Description:**

The working ends and elements of the Intuitive Surgical™ Endoscopic Instruments and Accessories are essentially identical in size and shape to the predicate devices referenced and represent standard embodiments of standard surgical tools modified for use with the Intuitive Surgical™ Endoscopic Instrument Control System.

**Intended Use:**

The Intuitive Surgical™ Endoscopic Instrument Control System is intended to assist in the accurate control of Intuitive Surgical™ Endoscopic Instruments including, rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, clip appliers, endoscopic retractors, stabilizers, electrocautery and accessories during laparoscopic surgical procedures.  It is intended to be used by professionals in operating room environments.

**Comparison to Predicate Device(s):**

The Intuitive Surgical™ Instruments are essentially identical in terms of shape, size, function and tissue effect to the standard Class I and II endoscopic instruments cited. Further, the Intuitive Surgical™ Instrument Control System with the additional endoscopic instruments is substantially equivalent to the cleared Intuitive Surgical™ Instrument Control System (K975001).

***In Vitro* Test Data:**

Design analysis and comparison as well as in vitro testing confirm that basic functional characteristics are substantially equivalent to the predicate devices cited.

**Clinical Study Data:**

An extensive prospectively randomized and concurrently controlled clinical study was performed to demonstrate substantial equivalence to the predicate devices cited in terms of safety and effectiveness.

**Summary:**

Based upon the product technical information, intended use, and performance information provided in the pre-market notification, the Intuitive Surgical Endoscopic Instrument Control System has been shown to be substantially equivalent to currently marketed predicate devices.

Intuitive™ and Intuitive Surgical™ is a registered trademark of Intuitive Surgical, Inc.

004

137

Attorneys' Eyes Only
Intuitive-00691204



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
9200 Corporate Boulevard
Rockville MD 20850

David Casal, Ph.D.                    JUL 11 2000
Vice President of Clinical, Regulatory
 and Quality Affairs
Intuitive Surgical, Inc.
1340 W. Middlefield Road
Mountain View, California 94043

Re: K990144
    Trade Name: Intuitive Surgical™ da Vinci Endoscopic Instrument Control System and
                Endoscopic Instruments
    Regulatory Class: II
    Product Code: NAY
    Dated: 18 November 1999
    Received: 29 November 1999

Dear Dr. Casal:

We have reviewed your Section 510(k) notification of intent to market the device referenced
above and we have determined the device is substantially equivalent (for the indications for use
stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce
prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that
have been reclassified in accordance with the provisions of the Federal Food, Drug, and
Cosmetic Act (Act). You may, therefore, market the device, subject to the general controls
provisions of the Act and the following limitation:

Any future design changes that affect the operating surgeons ability to personally and
immediately intervene in the surgical procedure being performed will be considered to have a
major impact on the device's intended use. Therefore, any design changes that remove the
operating surgeon from the immediate vicinity of the patient will require the submission of a
traditional or abbreviated 510(k) submission.

The general controls of the Act include requirements for annual registration, listing of devices,
good manufacturing practices, labeling, and prohibitions against misbranding and adulteration.

If your device is classified (see above) into either class II (Special Controls) or class III
(Premarket Approval), it may be subject to such additional controls. Existing major regulations
affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 895.
A substantially equivalent determination assumes compliance with the Current Good
Manufacturing Practice requirements, as set forth in the Quality System Regulation (QS) for

*l*

SER-68
Intuitive-00691205

Attorneys' Eyes Only

Page 2 - David Casal, Ph.D.

Medical Devices: General regulation (21 CFR Part 820) and that, through periodic QS inspections, the Food and Drug Administration (FDA) will verify such assumptions. Failure to comply with the GMP regulation may result in regulatory action. In addition, FDA may publish further announcements concerning your device in the Federal Register. Please note: this response to your premarket notification submission does not affect any obligation you might have under sections 531 through 542 of the Act for devices under the Electronic Product Radiation Control provisions, or other Federal laws or regulations.

This letter will allow you to begin marketing your device as described in your 510(k) premarket notification. The FDA finding of substantial equivalence of your device to a legally marketed predicate device results in a classification for your device and thus, permits your device to proceed to the market.

If you desire specific advice for your device on our labeling regulation (21 CFR Part 801 and additionally 809.10 for in vitro diagnostic devices), please contact the Office of Compliance at (301) 594-4659. Additionally, for questions on the promotion and advertising of your device, please contact the Office of Compliance at (301) 594-4639. Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21CFR 807.97). Other general information on your responsibilities under the Act may be obtained from the Division of Small Manufacturers Assistance at its toll-free number (800) 638-2041 or (301) 443-6597 or at its internet address "http://www.fda.gov/cdrh/dsma/dsmamain.html".

Sincerely yours,

Celia M. Witten, Ph.D., M.D.
Director
Division of General, Restorative
  and Neurological Devices
Office of Device Evaluation
Center for Devices and
  Radiological Health

Enclosure

Attorneys' Eyes Only

Intuitive-00691206

# INDICATIONS FOR USE STATEMENT

510(k) Number (if known): K990144

Device name:   Intuitive Surgical™ da Vinci™ Endoscopic Instrument Control System
and Endoscopic Instruments

Indications for Use:

The Intuitive Surgical™ Endoscopic Instrument Control System (hereinafter referred to
as the "da Vinci™ System") is intended to assist in the accurate control of Intuitive
Surgical™ endoscopic instruments including: rigid endoscopes, blunt and sharp
endoscopic dissectors, scissors, scalpels, forceps / pick-ups, needle holders, endoscopic
retractors, stabilizers, electrocautery and accessories during laparoscopic surgical
procedures such as cholecystectomy or Nissen fundoplication. It is intended for use by
trained physicians in an operating room environment.

Intuitive Surgical™ Endoscopic Instruments including scissors, scalpels, forceps/pick-
ups, needle holders, clip appliers, and electrocautery are intended for endoscopic
manipulation of tissue, including: grasping, cutting, blunt and sharp dissection,
approximation, ligation, electrocautery and suturing.

(Division Sign-Off)
Division of General Restorative Devices
510(k) Number____K 9 9 0 1 4 4

## PLEASE DO NOT WRITE BELOW THIS LINE
## CONTINUE ON ANOTHER PAGE IF NEEDED

Concurrence of CDRH, Office of Device Evaluation (ODE)

Prescription Use _____          OR          Over-the Counter Use_____

(per 21 CFR §801.109                          (Optional Format 1-2-96)

3

**SER-70**
Intuitive-00691207
Attorneys' Eyes Only

**EXHIBIT 20**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

| | |
|---|---|
| **From:** | Anthony Lee [ANTHONY.LEE1] [anthony.lee1@fda.hhs.gov] |
| **Sent:** | 2/25/2022 10:10:11 AM |
| **To:** | Kunal Gunjal [Kunal.Gunjal@intusurg.com] |
| **CC:** | Anthony Lee [ANTHONY.LEE1] [anthony.lee1@fda.hhs.gov] |
| **Subject:** | [EXTERNAL] K214095 is on Hold Pending Your Response |
| **Attachments:** | K214095.AdditionalInformation.AINN.pdf |

February 25, 2022

We have reviewed your submission. Please see attached.

If you have any questions, please contact the lead reviewer assigned to your submission, Anthony Lee.


*** This is a system-generated email notification ***

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL.
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report any suspicious emails using the "**Report Phish**" button. Click KB0014776 for more information on the "Report Phish" button and to learn more about differentiating phishing from spam and bulk email, please review KB0014940.

Highly Confidential-AEO                                                    Intuitive-02054178



K214095
Intuitive Surgical, Inc.
Trade/Device Name: da Vinci X/Xi (IS4200/IS4000) 8mm Reusable Instruments
Contact Name: Kunal Gunjal

This document is being communicated via e-mail as an attachment. The date on which FDA sent this e-mail is the official date of this correspondence.

We have reviewed your submission K214095 and have determined that additional information is required. Your file is being placed on hold pending a complete response to the attached deficiencies.

Please submit your response, referencing the submission number K214095 to:

> U.S. Food and Drug Administration
> Center for Devices and Radiological Health
> Document Control Center - WO66-G609
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

Please refer to the eCopy guidance at https://www.fda.gov/media/83522/download for current information on eCopy requirements.

Your response is due within 180 days from the date of this request, which is the hold date plus 180 days. If a complete response is not received in CDRH's Document Control Center by this date, we will consider this submission to be withdrawn, and we will delete it from our review system.

You may not market this device until you have received a letter from FDA allowing you to do so. If you market the device without FDA clearance, you will be in violation of the Federal Food, Drug, and Cosmetic Act.

If you would like a meeting or teleconference with the review team and management to discuss your planned approach for responding to the attached deficiencies, please submit your request for feedback as a Submission Issue Q-Submission (Q-Sub). Please note that a Submission Issue Q-Sub does not take the place of a formal response to this email notification. As noted above, FDA will consider this submission to be withdrawn if FDA does not receive, in a submission to the Document Control Center, a complete response to all of the attached deficiencies within 180 calendar days of the date of this request.

This request for additional information has undergone supervisory review to ensure that the deficiencies cited are least burdensome and relevant to the marketing decision. Please see the revised guidance "Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions" issued on September 29, 2017 (https://www.fda.gov/media/71735/download) for clarification regarding major and minor deficiencies.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

K214095 - Kunal Gunjal                                                                                    Page 2

MAJOR DEFICIENCY LIST

The Agency has identified major deficiencies that if not adequately resolved, may preclude a favorable decision on the marketing application.

<u>Reprocessing, Sterility and Shelf-Life</u>

1.  You provided *Justification, Cleaning Efficacy for 18 Clinical Uses, da Vinci X/Xi 8mm Instruments* in Appendix B of your submission to justify relying on existing cleaning validation testing conducted with the predicate device (K170645) and not conducting new cleaning validation to support the extended uses of the da Vinci X/Xi 8 mm instruments. With your justification, you conducted testing on two device types used in reliability testing to demonstrate that two design features, distal seal and flush tube, maintain flow rate specifications over the extended simulated surgical use and reprocessing cycles. Although these features may mitigate ingress of soil and facilitate removal of soil, testing of these features is not adequate to demonstrate that the instruments can still be effectively cleaned following additional uses and reprocessing cycles.

    - The da Vinci Xi instruments are delicate surgical instruments with complex internal structures that cannot be visually inspected for soil and present a significant challenge to reprocessing.
    - Increased usage and reprocessing itself may introduce damage to internal surfaces and cables that is not evident and may retain soil. The retention of soil by damaged surfaces and cables presents an increased challenge to the cleaning procedures.
    - Although you previously showed no significant soil accumulation after 9 uses of the test instruments, you have not evaluated the instruments for incremental build-up of soil beyond 9 uses and up to the specified limited number of uses for each instrument.

    An inadequately cleaned device may prevent successful subsequent sterilization and allow for cross-contamination leading to patient infection. Therefore, please provide the protocol and results of new cleaning validation testing (manual and automated) on each subject instrument (or justified worst case representative devices) after simulated surgical use and repeated reprocessing at the end of its proposed use life. In addition, please address the following regarding your test devices:
    a) Please evaluate the instruments for soil accumulation to the new specified use life, prior to final cleaning.
    b) Please provide a robust side-by-side comparison to justify use of specified worst case representative instruments for testing, if used.
    c) Please prepare/condition test instruments to end of use life using simulated surgical use  (or actual clinical use) procedures and repeated manual and/or automated cleaning processes, as directed in the proposed labeling.

    This information is needed to ensure that you have adequately addressed reprocessing and sterility considerations which may impact the safety and/or effectiveness of your device.

<u>EMC, Wireless, and Electrical, Mechanical and Thermal Safety</u>

2.  You state that no additional EMC or electrical safety testing was required, as the only change in this submission is the number of use lives.  Please note that electrical safety and EMC standards requires

Highly Confidential-AEO                                                    Intuitive-02054180

evaluation to the full number of use lives to ensure there is no loss of basic safety or essential performance. By increasing the number of use and reprocessing cycles, the overall structural integrity of the device may be impacted after extended use. Accordingly, new testing should be performed with representative instruments stressed to the maximum use life. Please provide the full set of EMC and electrical safety data to FDA-recognized consensus standards. For additional information, refer to FDA guidance document, "Premarket Notification (510(k)) Submissions for Electrosurgical Devices for General Surgery" (https://www.fda.gov/media/87995/download). This information is needed to ensure that the extended life instruments do not impact the EMC and electrical safety profiles of the subject device.

Performance Testing

3.  You have provided performance testing in Appendices C and D with your submission. With this data, you appear to have set arbitrary performance goals for reliability at confidence of either 85% at 85% or 90% at 90%, depending on the test case. It is unclear why this acceptance criteria is clinically sufficient in evaluating the safety and effectiveness of the extended use devices as compared to the predicate. In addition, you have not provided comparative data to demonstrate how the results are substantially equivalent to the instruments at the predicate use lives. Please provide additional justification and/or comparative reliability data for the instruments at the original use life. This information is needed to understand how your results can be deemed substantially equivalent to the previously cleared instruments.

4.  With your performance testing, you evaluate cautery in a binary manner (cautery success vs cautery failed). You have not performed any quantitative thermal effects testing to determine whether the thermal characteristics have changed after extended use of the subject device. Extended use and reprocessing of the subject device may introduce microscopic damage and fractures to the instrument which are not readily apparent in general testing. These changes may potentially impact the thermal operating characteristics of electrosurgical instruments. Accordingly, thermal spread evaluation is necessary to understand the safety and effectiveness profile of these instruments. Please provide additional thermal damage data of representative instruments to evaluate this possibility. For additional information, please refer to Section XI part E, of FDA guidance, "Premarket Notification (510(k)) Submissions for Electrosurgical Devices for General Surgery" (https://www.fda.gov/media/87995/download). This information is needed to ensure that the electrosurgical characteristics of the extended use instruments are substantially equivalent to the predicate.

FDA is offering a teleconference within 10 calendar days from the date on this letter to address any clarification questions you may have pertaining to the deficiencies. If you are interested in a teleconference, please provide (1) proposed dates and (2) a list of your clarification questions via email at least 48 hours before the teleconference to the lead reviewer assigned to your submission. We would like to emphasize that the purpose of the meeting is to address specific clarification questions. Please note that if the specific clarification questions are not received at least 48 hours before the teleconference, the review team might not be able to provide feedback. The teleconference is not intended for review of new information, test methods or data; these types of questions could be better addressed via a Submission Issue Q-Submission (Q-Sub). For additional information regarding Q-Subs, please refer to the Guidance for Industry and FDA Staff on

Highly Confidential-AEO

K214095 - Kunal Gunjal                                                          Page  4

Medical Devices: Requests for Feedback and Meetings for Medical Device Submissions at
https://www.fda.gov/media/114034/download.

**Least Burdensome (LB) Flag**
The LB flag is an approach to allow submitters the opportunity for the informal review by or on behalf of
Division management of an issue raised in an FDA request for additional information (i.e., a deficiency
letter). The goal of the LB flag is to quickly address FDA requests that submitters do not believe are least
burdensome or when submitters believe they are being held to a different standard than their legally
marketed predicate device. The LB flag is not intended to clarify deficiencies, is not an appeal under 21 CFR
10.75, and is not intended to provide a review of a proposed response to deficiencies.

If you would like to throw the LB flag, FDA has several criteria that should be met before you submit your
request:

- You should have tried to address your concern by discussing it with Division management before
  attempting to throw the LB flag. This discussion with Division management may take place as part of
  a teleconference (such as the voluntary teleconference held within 10 days following transmission of
  an Additional Information letter to clarify deficiencies), email, or a Q-Submission Submission Issue
  Request.
- Your flag should generally be limited to two topic areas. Topic areas are common premarket review
  deficiency categories that apply to many device types across multiple reviewing Divisions. Examples
  of topic areas include biocompatibility, sterility, reprocessing, software, electromagnetic
  compatibility, wireless, electrical safety, clinical, and non-clinical performance testing.
- If you would like to discuss issues pertaining to more than two topic areas, you should contact
  OPEQSubmissionSupport@fda.hhs.gov for more information.
- You should throw the LB flag within 60 calendar days of the date that FDA sent the deficiency letter.

Upon meeting the criteria, you should send a short email (e.g., 1-2 page) that includes: 1) a summary of the
deficiencies under disagreement, 2) a summary of relevant communications with Division management, and
3) a proposed path forward. The LB flag should be sent to the lead reviewer and their Assistant Director.
You should also copy OPEQSubmissionSupport@fda.hhs.gov on your LB flag email request. Within two
business days of your email, your request will be acknowledged by the reviewing Division. If you do not
meet the criteria for the LB flag, you will be notified in this acknowledgement email.

Your LB flag should contain sufficient information to determine whether the deficiency letter was not least
burdensome, or you are being held to a different standard than your predicate device. FDA may request a
phone call with you to discuss your concern further and intends to communicate feedback from Division
management on LB flags through email no later than 21 calendar days of their receipt. Please note that the
LB flag does not change the deadline for your response to the Document Control Center. If you have any
questions, please contact OPEQSubmissionSupport@fda.hhs.gov.

Highly Confidential-AEO                                                        Intuitive-02054182

**EXHIBIT 26**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

**Ryan Burke**

---

| | |
|---|---|
| **From:** | Mary Wen <mary.wen@fda.hhs.gov> |
| **Sent:** | Tuesday, June 23, 2015 4:32 PM |
| **To:** | Ryan Burke |
| **Cc:** | Mary Wen |
| **Subject:** | K143619/S002 is on Hold Pending Your Response |
| **Attachments:** | K143619.S002.Deficiencies.pdf |

June 23, 2015

We have reviewed your submission K143619/S002 and have determined that additional information is required. Your file is being placed on hold pending a complete response to the attached deficiencies.

Please submit your response, referencing the submission number K143619/S002 to:

U.S. Food and Drug Administration
Center for Devices and Radiological Health
Document Control Center - WO66-G609
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

Please refer to the eCopy guidance at
http://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM313794.pdf for current information on the number of copies and the format (paper versus eCopy) you must submit.

Your response is due within 180 days from the date of this request, which is December 20, 2015. If a complete response is not received in CDRH's Document Control Center within 180 days, we will consider this submission to be withdrawn, and we will delete it from our review system.

You may not market this device until you have received a letter from FDA allowing you to do so. If you market the device without FDA clearance, you will be in violation of the Federal Food, Drug, and Cosmetic Act.

If you would like a meeting or teleconference with the review team and management to discuss your planned approach for responding to the attached deficiencies, please submit your request for feedback as a Submission Issue Q-Submission (Q-Sub). Please note that a Submission Issue Q-Sub does not take the place of a formal response to this email notification. As noted above, FDA will consider this submission to be withdrawn if FDA does not receive, in a submission to the Document Control Center, a complete response to all of the attached deficiencies within 180 calendar days of the date of this request.

Should you have questions about this email, you may contact Mary Wen, the lead reviewer assigned to your submission.

*** This is a system-generated email notification ***

HIGHLY CONFIDENTIAL

SER-78
REBOTIX171058



**DEPARTMENT OF HEALTH & HUMAN SERVICES**      Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD 20993-0002

K143619/S002                                          June 23, 2015
Rebotix, LLC
Remanufactured EndoWrists

<u>Device Description</u>

1.  You state that the subject device is reusable (for 11 additional uses), is provided non-sterile to the user, and must be cleaned and sterilized before the first and each subsequent use. However, there is no description of any of the cables used with the electrosurgical devices. We note that page 24 of the Instructions for Use states, "The PK Instrument Cords are reusable for a maximum of twenty (20) reuse cycles. Therefore, it is not clear if any of the cords for the electrosurgical instruments are included in the submission and, if so, how they are remanufactured or reprocessed by Rebotix, how they will be supplied to the end user, and how they will be reprocessed by the end user. If the cords are included in the submission, please provide all details regarding the device description, remanufacturing process, validated reprocessing instructions for users, and validated number of use lives, or a method to assess the cord's end of life based on simulated use/reprocessing followed by performance testing.

<u>Remanufacturing</u>
The following deficiencies refer to the procedures you have identified to collect used devices from users, and modify those devices to accommodate additional uses (defined as "remanufacturing" for the purpose of this letter).

2.  Although the subject device is not a "single-use device" (defined as a device used only once and then discarded), it has many aspects in common with third party reprocessed single-use devices. Therefore, it is recommended that you review and provide the following items described in FDA's Guidance "Medical Device User Fee and Modernization Act of 2002, Validation Data in Premarket Notification Submissions (510(k)s) for Reprocessed Single-Use Medical Devices," (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm071434):

    a.  Cleaning Agent Characterization

    b.  Process and Equipment Characterization

        i.  Cleaning process tolerances have not been described, nor have quality control tests or equipment specifications. It is recommended that the tolerances for each cleaning process be provided in a tabular format that

Page <b>1</b> of 28

**HIGHLY CONFIDENTIAL**

lists the minimum, maximum, and nominal values for each relevant parameter.

   c.  Risk Analysis

   d.  Process Validation that includes Installation Qualification (IQ), Operational Qualification (OQ) and Performance Qualification

       i.  It does not appear that the cleaning processes described in the remanufacturing procedures have been validated.

      ii.  In addition, the IQ and OQ for the sterilization process have not been provided.

   e.  Routine Monitoring and Control

   f.  Assessment of Change

       i.  Procedures to track changes that occur with the original equipment manufacturer (OEM) device as well as OEM reprocessing changes should be implemented.  Please refer to Deficiencies 3b, 35a, 39, and 42b for more information.

3.  In Attachment D of Supplement 2, you provide the protocols for your remanufacturing procedures.  Please revise the protocols as described below and provide a copy with your response.

   a.  Protocol PR3034, Autoclave Sterilization, appears to include non-discrete temperatures and times (e.g., temperature ranges, minimum exposure times) for steam sterilization. Please revise the procedures under PR3034 to include discrete temperatures and times that match your sterilization validation activities. Please also see Deficiency 14h below for similar issues regarding non-discrete values in the reprocessing instructions.

   b.  Protocol PR3043, Incoming Evaluation, states that candidates for remanufacture are evaluated for acceptance.  Please address the following concerns regarding this protocol:

       i.  There is no explanation of how clinical soil on the received devices will be assessed and any related acceptance criteria. It is not clear if devices shipped from the health care facilities will be reprocessed before shipping or if they are shipped dirty.  Please clarify these issues and revise your Incoming Evaluation protocol to include inspection criteria related to soil. The incoming acceptance criteria should be based on the results from your cleaning and sterilization validation studies, which should demonstrate that clinically used devices with worst case soiling (as

HIGHLY CONFIDENTIAL

determined from a Native Soil Characterization Study) can be effectively cleaned and sterilized. Please see related Deficiencies 18 and 19 regarding the Native Soil Characterization Study for more information.

ii. It does not appear that you have methods in place to track OEM device and reprocessing changes. Please revise your Incoming Evaluation protocol to include acceptance criteria for OEM device changes and reprocessing changes that are acceptable or not acceptable. FDA expects that you collect and track information from the health care facilities and only accept devices that fit within the scheme of devices that were validated for remanufacturing; this information should also be stated in the labeling (please see related Deficiency 5 below). For example, if OEM devices that were reprocessed by cleaning, disinfection AND sterilization were not included in your verification and validation testing, then these devices should not be accepted for remanufacturing since it could affect the use life, safety, and effectiveness of the device. It is also expected that this tracking be an ongoing monitoring procedure that is in place.

iii. Please revise your Incoming Evaluation protocol to include a criterion for previously remanufactured devices, including an explanation for how these devices are identified and that they will not be forwarded to the next remanufacturing step.

c. Protocol PR3033, Disassembly and Salvage, states that the small bearing and large bearing should be re-lubricated if necessary. However, it is not clear what these components are and if they are patient-contacting (including indirect patient contact due to cleaning fluid contact and travel down the instrument). In addition, it is not clear what lubricant is applied and what tolerance ranges apply to the application of the lubricant. Finally, it is not clear if this lubricant was accounted for in the cleaning and sterilization validation studies. Step 6.12 of PR3033 states, "Place the EndoWrist in the ultrasonic bath; refer to PR3036 In-Process U/S Cleaning SOP." Review of PR3036 does not clarify what part of the device is subjected to the cleaning or why this cleaning is performed. Again, it is not clear if these procedures have been accounted for in the cleaning validation studies. Please revise your protocol to clarify these issues, and provide an explanation of whether these lubrication steps have been included in your cleaning and sterilization validation studies. If this lubrication step was not included in your cleaning and sterilization validation studies, please repeat the validation studies to demonstrate that the presence of lubricant does not affect the ability to effectively clean and sterilize the device.

d. Protocol PR3025, Scissors Sharpen and Refurbishment, states that TheraBand is inserted to remove burs from the cutting blades. However, it is not clear what TheraBand is. Please provide a comprehensive description of TheraBand, including its material composition.

    e.   Protocol PR3050, Final Test, includes visual inspection along with a series of functional tests.  However, it does not appear to include a final inspection for visible soil. Please revise the protocol to include a final visual inspection step before component reassembly to assess for any visible soil or other extraneous materials with defined acceptance criteria (e.g., "no visible soil", etc.).

4.   In Attachment C of Supplement 2, you provide a table describing the purpose, acceptance criteria, and product specifications for each procedure.  However, it does not appear that the cleaning processes have adequate tolerances established.  For example, the "Ultrasonic Cleaning & Flush" states a minimum power density of 48 watts/gallon, ultrasonic frequency of 38 kHz or greater, and solution temperature as close to 45°C. Please revise your remanufacturing procedures to have defined tolerance ranges with minimum, maximum, and nominal values for all applicable processes.  Also, many of the acceptance criteria listed in Attachment C state that the device must pass a visual inspection. However, it is not clear what the actual pass/fail criteria are for these tests. Please revise Attachment C to explain what the acceptance criteria are for each visual inspection performed.

5.   Although you have provided reprocessing instructions to the user, it does not appear that you have provided any instructions on how to ship the used OEM device to you, including whether the user should reprocess the device before shipping or send the device dirty.  We note that on page 42 of Module J it is stated, "…the end user is supposed to return equipment sterilized."  In addition, the labeling should state which devices are candidates for remanufacture.  For example, devices must have one use life remaining, and only devices subjected to a validated list of reprocessing methods should be returned for remanufacturing. Please revise your labeling to include instructions on preparing devices for shipment and which devices are candidates for remanufacture.

6.   Numerous recalls for the Intuitive Surgical da Vinci EndoWrists have been identified in the FDA Recalls database (available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm). Please examine all reports in the FDA Recalls database regarding the da Vinci EndoWrists, and provide a risk analysis to address the issues identified in these recalls. In your risk analysis, please address the risk mitigation measures you have in place for addressing the issues in each recall. Please provide a copy of your risk analysis in your response. In addition, please specifically address the following issues:

    a.   You provide a description of the remanufacturing process in Supplement 2, Attachment B. However, it is unclear if or how recalled devices are identified and rejected during the incoming evaluation phase of your remanufacturing process. Please clarify any methods by which recalled devices are identified and rejected as unacceptable candidates for remanufacture.

    b.   Numerous reports in the Recalls database (e.g., Z-0435-2015, Z-0439-2015, etc.) describe EndoWrist products that were recalled since "Deviations in reprocessing

HIGHLY CONFIDENTIAL

REBOTIX171033

steps from those stated in the reprocessing instructions can cause surface degradation of the housing and/or accelerate mechanical wear of the instrument." These recalls underscore the importance of tracking the reprocessing history of all incoming devices (i.e., tracking how these devices were reprocessed by the previous end user prior to re-manufacture). Please see Deficiency 3b for more information regarding this matter.

c. Several reports in the Recalls database (e.g., Z-1965-2014, Z-0258-2008, etc.) describe products that were recalled due to incorrect labeling (e.g., either on the device housing or in the User Manual). These recalls led to changes to the device labeling. Please describe any methods you have in place for tracking changes to the OEM labeling and incorporating these changes into the subject device labeling.

d. Several reports in the Recalls database (e.g., Z-0520-2014, Z1442-2013, etc.) describe products that were recalled due to potential for device failure (e.g., potential for jaw detachment or device cracks, etc.). These "potential failures" may not be evident in new devices; rather, the probability of these failures increases over the course of the device's lifetime as the number of uses increases. Please identify any methods you have in place for identifying and mitigating the risk of these potential device failures following remanufacture of your subject devices.

<u>Labeling</u>
The following deficiencies refer to the proposed labeling you have provided, and include general labeling concerns along with concerns regarding your proposed reprocessing instructions. Please refer to "Device Labeling" (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/ucm2005422.htm) for general labeling concerns, and the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for concerns regarding reprocessing information.

7. You provide the Instructions for Use (IFU) for the subject device through email on May 22, 2015. However, the Indications for Use in the subject IFU differs slightly from the Indications for Use in the 510(k) Summary and the Indications for Use Form. The following sentence is omitted from the Indications for Use in the subject IFU, but is present in the 510(k) Summary and Indications for Use Form:

"The Instrument is for use only with the Intuitive da Vinci S and da Vinci Si Systems (Endoscopic Instrument Control System)."

Please revise the Indications for Use so that it is identical across the labeling, 510(k) Summary, and Indications for Use Form and provide a copy of the revised documents in your response.

HIGHLY CONFIDENTIAL

8. Protocol PR3027, Housing Labeling, states that Rebotix branding will be laser engraved onto the housing of all remanufactured instruments. However, you have not provided any images of how the engraving will appear. Please provide images of all laser engravings that will be added to the device housing. Please also see related Deficiency 11c below.

9. In the cleared predicate IFU in K063220, the following contraindication is listed as a general contraindication for all EndoWrist devices:

> "This instrument may only be used on soft tissue. Do not use it on cartilage, bone or hard objects. Doing so may damage the instrument and make it impossible to remove it from the cannula."

However, in the subject IFU, this contraindication is only listed for the PK Dissecting Forceps. Please provide a rationale for why this contraindication is only listed for the PK Dissecting Forceps in the subject IFU and not the other device models. Alternatively, please revise the subject IFU so that this contraindication is listed for all EndoWrist devices. Please provide a copy of your revised labeling in your response.

10. The following warning was removed from the subject IFU with respect to the cleared predicate IFU in K063220:

> "Do not remove the cannula and [EndoWrist] instrument simultaneously as this may damage the surrounding tissues and the instrument."

Since this warning was present in the predicate IFU, please provide a rationale for why it was removed. Alternatively, please add this warning back to the subject IFU, and provide a copy of your revised labeling in your response.

11. You provide the IFU for the subject device through email on May 22, 2015. You state that the IFU was formatted to "…align with the content organization of the OEM IFU." However, the differences identified below were noted between your subject IFU and the OEM IFU. Please provide revised labeling to address these concerns.

   a. Unlike the OEM IFU, the subject IFU does not contain a Table of Contents. Due to the large quantity of information present in the subject IFU, we recommend you to include a Table of Contents in the subject IFU so that the end user can readily access important information.

   b. Page 13 of the OEM IFU contains safety and compatibility information regarding the EndoWrist ProGrasp Forceps. This information includes a list of devices that can be used safely with the ProGrasp Forceps. However, this information is not included in the subject IFU. Since the subject device includes Remanufactured ProGrasp Forceps, please add this information to the subject IFU so that the user can understand how to safely use the Remanufactured ProGrasp Forceps.

HIGHLY CONFIDENTIAL

REBOTIX171035

c. Page 4 of the subject IFU states, "The remanufactured EndoWrist instruments have a blue housing with the instrument description. They also have the da Vinci S logo prominently displayed on the housing." However, unlike the OEM IFU, a picture of the device housing is not provided in the subject IFU. Furthermore, in Attachment B of Supplement 2, you state, "'Remanufactured By,' the Rebotix Logo, and 'Not Affiliated with Original Manufacturer' are added to the Instrument housing." However, this information is not mentioned in the device housing description provided in the subject IFU. In order to help the user distinguish between remanufactured devices and OEM EndoWrist devices, please provide a picture and description of the Remanufactured device housing in the subject IFU.

d. Page 21 of the OEM IFU contains a list of electrosurgical units (ESUs) and energy activation cables that can be used with the subject device, along with the following associated notes regarding use of the EndoWrist instruments:

    i. "Note: Not all da Vinci and da Vinci S surgical systems are equipped with a bipolar connection and will not be compatible with the above bipolar energy activation cables. Contact your local Intuitive Surgical representative to confirm your system's configuration."

    ii. "Note: The da Vinci S and Si instruments have been evaluated for use only with the above ESU generators, and are compatible only with interconnecting cords and ESU generators that are in compliance with IEC 60601-2-2: 1998, IEC 60601-2-2: 2006, or IEC 60601-2-2: 2009."

However, this information is not included in the subject IFU. Please note that you provide instructions regarding specific ESUs (e.g., Covidien Force FX-C, ConMed 5000, etc.) in the subject IFU, and this information may appear out of context to the user since a list of compatible ESUs and cables is not provided. Since knowledge of compatible ESUs and cables is necessary for safe and proper use of the subject device, please provide a list of ESUs and energy activation cables that can be used with the subject device, along with their associated warnings.

e. Page 37 of the OEM IFU contains instructions and figures regarding proper installation of the Tip Cover Accessory on the Monopolar Curved Scissors. While the subject IFU contains most of these instructions, it omits the following instruction along with the corresponding figure illustrating this instruction:

"[The Tip Cover Accessory] is not properly installed beyond the orange surface and over the shaft. This causes a bulge on the shaft and may prevent it fitting through the cannula."

HIGHLY CONFIDENTIAL

REBOTIX171036

Since this information is essential to safe use of the Monopolar Curved Scissors, please add this instruction to the subject IFU, along with a corresponding figure illustrating this instruction.

   f. The following instructions regarding energy activation cables are present in the OEM Manual:

      i. "Note: Energy activation cables are non-sterile and do not require sterilization before use." (page 20 of OEM IFU)

      ii. Cleaning and Storage instructions regarding use of the energy activation cable (pages 31 – 32 of OEM IFU)

It appears you may have chosen to omit these instructions since energy activation cables do not appear to be part of the subject device. Nonetheless, proper handling of the activation cable is necessary for proper functioning of the subject device. As such, we recommend providing a statement in your IFU referring the user to the OEM IFU for instructions regarding the energy activation cables.

12. You provide the IFU for the subject device through email on May 22, 2015. This IFU contains the following sections:

Section 1.  General Information
Section 2.  Remanufactured EndoWrist Instruments
Section 3.  ESU Settings and Energy Activation Cables
Section 4.  Remanufactured Monopolar Curved Scissors
Section 5.  Remanufactured Permanent Cautery Instruments
Section 6.  Remanufactured Bipolar Instruments
Section 7.  Remanufactured PK Dissecting Forceps
Section 8.  Cleaning and Sterilization of Remanufactured EndoWrist Instruments

Several of these sections (e.g., Sections 2, 4, 5, 6, 7) include instructions for specific categories of devices. However, since a list of applicable device models is not provided for each section, it is not readily apparent which sections apply to each device model. For example, Section 6 provides instructions for the Remanufactured Bipolar Instruments, but a list of bipolar device models is not provided. Furthermore, it is unclear which sections of the IFU apply to non-energized device models, since the IFU does not include a specific section on remanufactured non-energized devices. It is also unclear if Section 2 only applies to non-energized devices, or if it applies to all EndoWrist models. Please provide a list of applicable device models for each section 2, 4, 5, 6, and 7, so that the user can clearly understand how to use each device model. Please provide a revised copy of your labeling in your response.

13. On pages 1 – 50 of Module D, you provide package labels for the subject device. The symbols utilized in these package labels are defined in the IFU, but not defined in the package labels. Please note that the FDA does not recognize any standalone symbols

HIGHLY CONFIDENTIAL

REBOTIX171037

except for the "Rx only" symbol. Therefore, please revise your package labels to include textual descriptions for these symbols, placing this description near each symbol as it appears in the labels. Please note that any definitions for symbols used on the package label should be present on the package label and not in the IFU. Please provide a copy of your revised labeling with your response.

For more information on the recognition of symbols in labeling, please see the proposed rule that was issued in the Federal Register on April 19, 2013. This proposed rule may be found online at http://www.gpo.gov/fdsys/pkg/FR-2013-04-19/html/2013-09175.htm.

14. In your email dated May 22, 2015, you provide an IFU for the subject device that includes reprocessing instructions for the end user.  In general, it appears that the instructions follow FDA's Guidance Document "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling" issued on March 17, 2015, with the following exceptions noted.  Please revise your reprocessing instructions as described below, and provide a clean and redlined (tracked changes) copy of the revised IFU with your response.

   a. Page 6 states, "Clean the instruments immediately after each use.  Do not allow debris to dry on or inside the instrument intraoperatively *before* instrument processing.  In order to keep the instrument from drying when soiled, keep the instrument in water or an enzymatic bath between the surgical procedure and instrument processing.  The instrument may also be flushed through the main flush port with sterile water during use to minimize buildup of internal deposits of bio-material."  However, it is not clear if these instructions have been validated, in terms of the number of use lives, based on performance or appearance of corrosion, etc.  It is recommended that you revise the instructions in accordance with your validation activities.  Please also revise the wording, "water" and "enzymatic bath," to clarify the quality of water and pH of cleaning agent that should be used.

   b. Page 24 states, "The PK Instrument Cords are reusable for a maximum of twenty (20) reuse cycles.  Mark the usage tracker on the cord label after each use."  If the PK Instrument Cords are not considered part of your submission, please revise the labeling to recommend that the user refer to the OEM labeling for these cables.  If they are part of your submission, additional reprocessing instructions should be provided for the PK instrument cord.  Please include reprocessing instructions for the end user and also provide a description and image of the usage tracker.  Finally, please explain if the tracking marks are able to be removed by reprocessing and whether any special instructions should be provided on what type of marker should be used to mark the usage tracker.

   c. Page 25 contains the following statements that are not adequate in relation to the manufacturer's responsibility to provide validated reprocessing instructions to the user.  Please note that validation of the reprocessing instructions is the responsibility of the device manufacturer and not the end user (see Section VII of

HIGHLY CONFIDENTIAL

REBOTIX171038

the above referenced Reprocessing Guidance). Therefore, please remove the following statements from your labeling:

    i.    "Cleaning, disinfection, and sterilization of reusable devices are the responsibility of the hospital or site performing the process."

    ii.    "These steps may need to be adjusted or repeated depending on soiling conditions or specific cleaning equipment used."

d.    Page 25 mentions "endoscopes" in the statement, "The process and parameters listed are recommendations for cleaning, disinfecting, and sterilizing the remanufactured EndoWrist instruments, accessories, and endoscopes and have been validated…" However, endoscopes are not included in your current submission. Therefore, please remove this reference to endoscopes from your IFU. In addition, your reprocessing instructions do not appear to include disinfection; therefore, please also remove the reference to "disinfecting" in the referenced statement.

e.    Page 25 states, "Examine the device before and after each use. If any abnormality is found, do not use the device." Please revise these instructions to include a description of an "abnormality."

f.    Page 25 states, "Note: If Electro Lube anti-charring solution for cautery instruments is improperly applied, those instruments may require additional scrubbing and high-pressure water spray." It is not clear what instructions this note applies to, since the use of Electro-Lube does not appear in the remainder of your reprocessing instructions. The referenced note also does not describe how to properly apply the lubricant or how the user can know the lubricant is "improperly applied." Furthermore, the Electro-Lube lubricant is not mentioned in the predicate reprocessing instructions. Finally, it is does not appear that the referenced note or the general use of Electro-Lube lubricant have been accounted for as part of your "worst case" reprocessing validation protocol design. Please also note that the lubricant manufacturer (Mectra Labs, Inc.) received a warning letter from the FDA on November 14, 2013 warning them that there is no approved pre-market approval application for the Electro-Lube product for the intended use with robotic instruments (http://www.fda.gov/iceci/enforcementactions/warningletters/2013/ucm375446.htm). For these reasons, it is recommended that you remove all references to Electro-Lube lubricant from your labeling.

g.    Page 25 states, "Note: Remanufactured EndoWrist instruments have not been validated for compatibility with the optional thermal disinfection cycle on the Medisafe SI PCF system." However, thermal disinfection does not appear to be a step in your reprocessing instructions, and the Medisafe SI PCF is not cleared for the intended use mentioned in your IFU. Therefore, please remove this note from your labeling.

HIGHLY CONFIDENTIAL

REBOTIX171039

h.  Your instructions include temperature ranges and minimum exposure times for your steam sterilization parameters, rather than discrete times and temperatures. For example, page 27 lists the pre-vacuum steam sterilization temperature as "270-272°F (132-134°C)" and lists a "Minimum exposure time for the U.S.: 4 min." Page 27 also includes the warning "Do not sterilize at temperatures over 285°F or 140°C." Please note that the Reprocessing Guidance states "FDA recommends that 'ranges' not be used for defining sterilization cycles (for example, 121°C-132°C and greater or lesser than 4 minutes exposure time), as this implies that all intermediate values have been validated, and that there are FDA-cleared accessories for all intermediate cycles." Please revise your sterilization instructions to include one discrete temperature and exposure time, in accordance with your validation activities. Please note that FDA recommends that steam sterilization cycle parameters be consistent with those listed in Appendix C of the Reprocessing Guidance and ANSI/AAMI ST79:2010 & A1:2010, "Comprehensive Guide to Steam Sterilization and Sterility Assurance in Health Care Facilities."

i.  Your instructions include multiple Flush and Rinse steps. Please revise the instructions to include the type/quality and temperature of rinse water to be used in these steps, in accordance with your validation activities. Please note that AAMI TIR34, "Water for the Reprocessing of Medical Devices," recommends that the final rinse water for devices that will contact sterile areas of the body, such as the subject device, use critical water. For "Step 6: Rinse" on page 27, please also revise your instructions to include the duration of rinse and, in particular, how long the user should "…rinse into the area where the instrument shaft enters the housing."

j.  "Step 1: Scrub" on page 26 states, "Repeat scrubbing as needed." It is recommended that you revise this statement to specify how the end user is to know that repeated scrubbing is necessary.

k.  "Step 8: Lubricate" on page 27 states, "Lubricate the tip and wrist mechanism with a pH-neutral, steam-permeable instrument lubricant per the manufacturer's instructions." Please revise these instructions to include the general type of lubricant the user should use, in accordance with your cleaning and sterilization validation studies (e.g., "water soluble lubricant"). Otherwise, please remove this instruction from the labeling if it has not been validated.

l.  It does not appear that your instructions include the number of reuse lives that are validated for each of the device models. FDA is aware that your devices include an Interceptor chip for tracking the number of device uses. However, it may be useful to the end user to include in your Reprocessing Instructions how many times the reusable devices can be reused and a description of the chip tracking mechanism.

HIGHLY CONFIDENTIAL

m. Your instructions list multiple accessories (e.g., syringe, soft nylon brush) that do not include adequate descriptions such as size/diameter and type of syringe (e.g., Luer). The instructions also list pressure specifications for flushing the flush ports with pressurized water (i.e., "minimum of 30 psi"), but it is not clear how the pressurized water should be introduced into the flush port (e.g., is a type of Luer fitting or other accessory to be used?). Furthermore, it is not clear if you provide these accessories with the device or if the user needs to purchase these supplies themselves. Please revise your instructions to include a complete description of all cleaning accessories and how the user is to obtain these items. Please also include comprehensive instructions on how the user should introduce the pressurized water into the flush ports. Including images of these steps and accessories may be helpful to the user.

Cleaning Validation

The following deficiencies refer to the cleaning validation activities that you have proposed as part of your remanufacturing process and that you are recommending to users in the reprocessing instructions. Please refer to the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for additional information.

15. In Attachments B and C of Module E, you provide your justification for the "worst case" device models chosen for cleaning validation (i.e., the Monopolar Curved Scissors, Permanent Cautery Spatula, Fenestrated Bipolar Forceps, PK Dissecting Forceps, Large Needle Driver, and ProGrasp Forceps). Your "worst case" analysis outlines a brief description of the tool end design, materials, surface area, and worst case conclusion based on "risk." It appears that the analysis included consideration of the design configuration, number of components, materials of construction, size and density, surface are and porosity, need for disassembly, surface finish or texture, cannulations or lumens, presence of mated surfaces, and ability to be sterilized in a routine cycle. However, your analysis is not sufficient to determine if your justification for the chosen "worst case" models is appropriate in terms of cleaning validation and difficulty of cleaning the device over other models. Please repeat the analysis by including parameters such as the following: instruments that would collect the highest amount of soil in the inner shaft and on the tip, hardest to reach areas to remove soil, smallest spaces between components, and lowest flushing efficiency (e.g., number of cables in the inner shaft, distance between the distal seal and the termination of the flush tube). If any new "worst case" models are identified due to the new analysis, please provide results from cleaning validation performed using these additional models.

16. You provided "Medisafe Cleaning Process Validation" test reports in Attachments E-4 and E-5 of the original submission for analysis of residual protein and total organic carbon (TOC), respectively. It appears that the Medisafe PCF system and the Medisafe 3 E-zyme Triple Enzyme Cleaner were used in the testing. However, it is not clear why

HIGHLY CONFIDENTIAL

these reports are provided since no automated washer-disinfector, including the Medisafe PCF system is mentioned in your reprocessing instructions. In addition, as noted in the related Deficiency 14g, the Medisafe is not cleared for this intended use. Please explain the purpose of these test reports provided in Attachments E-4 and E-5.

17. On page 7 of Module E, you state that you have utilized 48 test samples (8 of each of the worst case models) in your cleaning validation studies. However, from Table 2 in the cleaning validation test reports, it appears that 18 samples were used in the tests. From Table 2, it also does not appear that each worst case device model was used in each of the three test cycles. It further appears that the control device models did not match the test sample device models. Finally, it is not clear how many and what type of samples were used for the cleaning efficacy study versus the extraction/recovery efficiency study. Please note that FDA expects all worst case device models to be tested in all cleaning cycles and matched with the same model for all controls. In addition, FDA expects the following controls to be included in the study:

    a. Negative device controls should be unsoiled and undergo the same cleaning and extraction as the test devices; the amount of residual soil should be at or slightly above the negative control.

    b. Positive device controls should be soiled with a known amount of soil, but not cleaned, and residual soil extracted; the amount of residual soil should be equivalent to or slightly lower than the amount of soil placed. Soil recovery efficiencies should be calculated and used during the calculations.

    c. Negative sample control in which "extraction" is conducted with no device. This sample is used as a blank.

    d. Positive sample control in which a known amount of soil (at or slightly above the limit of quantitation) is added to an "extraction" with no device; this control addresses interference of the extraction fluid and extraction method with soil detection.

Please repeat your cleaning validation study with all worst case device models and using appropriate controls. Please also provide a statistical rationale for the sample size chosen in your cleaning validation studies.

18. Your cleaning validation protocol did not explain how the devices were selected for the study. Please revise your protocol to explain how the devices were selected for the study, including their clinical use, remanufacturing and reprocessing. FDA's expectation would be that the devices used in your study are clinically used devices that were found to have worst case native soiling based on your conduction of a Native soil Characterization Study (see below for more information on this suggested study). Please also explain how the clinically used devices were reprocessed, since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a

HIGHLY CONFIDENTIAL

significant effect on the validated use lives. Please repeat your cleaning validation study taking into account these issues, and provide detailed methods in your revised test report.

19. Your cleaning validation protocols state that "…the artificial test soil used to inoculate the devices mimicked worst case contaminants (blood and proteins that may come in contact with the devices and remain on the devices after clinical use)." The test devices were soiled using the artificial test soil in order to obtain an average minimum protein level of 115 $\mu g/cm^2$ and an average minimum TOC level of 39.1 $\mu g/cm^2$ over the soiled surface area of the devices. You further state that "…this protein level is based on study data which quantified worst case soil levels of medical instruments after patient use (Alfa et al., 1999)," and that the "…TOC level is based on a study which quantified worst case soil levels of medical instruments after patient use (Lappalainen, SK; Gomatam SV; and Hichins V. Residual total protein and total organic carbon levels on reprocessed gastrointenstinal (GI) biopsy forceps. J Biomed Mater Res B Appl Biomater 89B:172-176, 2009)."

Please perform a Native Soil Characterization Study to investigate the amount of soiling present on clinically used EndoWrist devices to determine that the soil constituents and amount of soil are indeed worst case compared to what would be expected clinically. The study should include a quantitative scale to evaluate native soil as well as images of all soiled surfaces (including internal components). It is recommended that only worst case natively soiled devices be used in your cleaning and sterilization validation studies, and that this information then be used to develop your incoming device acceptance criteria. If worst case natively soiled devices were not used in your cleaning and sterilization validation studies, please repeat the studies using worst case soiled devices. Please provide the completely study protocols and reports for the Native Soil Characterization Study and any repeated validation studies with your response.

20. In Figure 1 of your cleaning validation test reports, you provide an image of the device soiling locations. However, the image is not legible. The caption, which is legible, states that the tip of the device was dipped into soil to point A (which appears to be just above the wrist of the instrument) and actuated to the full range of motion. It further states that a lumen cleaning brush was dipped into soil and then threaded into the main flush ports as far as possible. From this limited description, the test soil does not appear to be applied to the devices in a "worst case" simulated use manner, since it did not include injection of artificial soil into inner lumens, handling with soiled and gloved hands, or inoculation of the outer shaft, which would be expected to be soiled by user handling. Please revise your test reports to provide clearer images of all soiling and a comprehensive description of soil inoculation. Please also repeat the cleaning validation with worst case soiling of the device. It may be necessary to extract different parts of the device separately (e.g., tip vs. inner lumen) and calculate the results separately, since the extraction methods may differ, and since including the surface areas of each device component may lead to lowering the calculated residual soil per surface area. For example, including the higher surface areas of the outer shaft that is easier to clean with the harder-to-clean areas may negatively impact the results. Please provide the complete protocol and test reports of any repeated testing with your response, including raw data generated.

HIGHLY CONFIDENTIAL

REBOTIX171043

21. Your cleaning validation protocols do not appear to include simulated use of the instruments. For the electrosurgical devices, this is especially important since the soil can be baked onto the device, making it harder to clean. Please repeat your cleaning validation studies using devices that were subjected to a series of simulated use and "worst case" reprocessing (i.e., minimum conditions) over the proposed number of use lives at the health care facility, as well as any additional remanufacturing/reprocessing performed at your facility. With your response, please provide a detailed protocol of the methods used for simulated use, along with complete test reports with raw data.

22. In Table 1 of your cleaning validation test reports, you provide the surface area of the device models used in your cleaning validation studies. However, it is not clear how these surface areas were calculated, and which part of the devices were included in the calculation. You state in the Discussion section of the test reports, "Due to large amounts of the Da Vinci Endowrist surface area not making patient contact, only the surface areas of the device that would come in contact with the soil were used in the calculations…[for residual soil]." However, it is not clear what is classified as the patient vs. non-patient contacting portions of the device. In addition, please note that certain non-patient contacting parts of the device may become soiled from user handling. It should also be noted that if the interior of the device is soiled (e.g., the lumen or flush ports), the internal surface area of that device component should be used in the calculations. Please provide a comprehensive description of the surface area calculation and determination of soiled areas. It may be helpful to provide images with your explanation.

23. Your cleaning validation protocols state that the inoculated test samples and positive controls were allowed to dry at room temperature for a minimum of two hours to simulate worst case conditions. Although this treatment appears to be worst case compared to that specified in the Reprocessing Instructions (which state to clean the device "immediately after procedure" and "keep the device in water or an enzymatic bath between the surgical procedure and reprocessing"), it is not clear how this timeframe would be considered "worst case" for the timeframe of soiled instruments being shipped from the health care facility to the Rebotix facility. Please clarify how this timeframe is considered "worst case" with respect to soiled instruments being shipped to the Rebotix facility. If applicable, please provide repeat cleaning validation to reflect a revised "worst case" timeframe with respect to soiled instruments being shipped to the Rebotix facility.

24. Your cleaning validation test reports state, "Worst case cleaning procedures and conditions were used throughout the validation. For example, cleaners and detergents were prepared according to the manufacturer's instructions using the lowest range of concentration recommended (minimum effective concentration). The least effective (lowest) cleaning temperatures, within recommendations, were used for the rinsing and cleaning steps." The cleaning procedures used in your cleaning validation study were compared to the proposed reprocessing instructions, as well as your remanufacturing procedures. However, key details are missing, such that we are unable to determine if "worst case" conditions were used in your validation studies over those specified in your reprocessing instructions and in your remanufacturing procedures. Please provide a

HIGHLY CONFIDENTIAL

REBOTIX171044

tabular comparison of the cleaning parameters used in their cleaning validation study versus those in the reprocessing instructions and remanufacturing procedures, in order to demonstrate that "worst case" parameters were used in your cleaning validation studies. The comparison should include all relevant cleaning parameters, such as water quality, water pressure, time, temperatures, concentrations, any repeated scrub/rinse steps, detergent type, lubricants, ultrasonic cleaning parameters, etc.

In addition, please provide an explanation of the worst case temperature conditions used for the cleaning agents used in your cleaning validation studies. For example, your protocol states that you used an enzymatic detergent solution of Steris Prolystica 2X Concentrate Enzymatic Cleaner prepared at the lowest recommended concentration of detergent (1/8 oz. per gallon) and temperature (cold water). However, you have not provided information to demonstrate that "cold water" is considered worst case for this cleaning agent nor have you defined "cold water." Please provide a definition of "cold water" along with your explanation of worst case temperature conditions for the cleaning agents used in your cleaning validation studies.

25. It does not appear that the cleaning methods used in your cleaning validation protocols included a lubrication step, which is recommended in your reprocessing instructions, and which appear as part of your remanufacturing procedures. However, it is noted that page 43 (Attachment E: Parts and Materials) of Module E, Sterilization, from your original submission lists "Steris Hinge Free Lubricant." Since there is no further explanation provided with Attachment E, it is not clear what the purpose of this lubricant is, or whether it was included in the cleaning validation studies. Attachment E also lists "Ruhof Surgistain Rust Remover" and many other unknown materials. Please provide a comprehensive explanation of each of these materials and a flow chart of how the device is treated or used with each. Finally, please repeat your cleaning validation studies to ensure that all treatments the device is subjected to during your remanufacturing procedures, or will be subjected to by end-user reprocessing, are accounted for in your studies.

26. From Section 3.0 "Equipment and Materials" of your test reports, it appears that the extraction fluid used in your cleaning validation studies was distilled water, but there is no description of the extraction container. The Agency is concerned that using water as an extraction medium would not adequately extract residual soil from the surface of a complicated device such as the subject device. For example, the tip and lumen contain multiple coiled wires that could trap soil and be difficult to extract. It is suggested that you consider using a surfactant, such as sodium dodecyl sulfate, as an extraction medium, provided that it does not interfere with your endpoint assays. It appears that you have used an exhaustive extraction method for calculating recovery efficiency; however, it is not clear if this method is adequate for this complicated device, especially if the soil is not easily removed by the extraction medium. It also does not appear that your extraction method allows for sampling of the internal structures of the device (e.g., inside the flush ports and tubes and internal lumen).

HIGHLY CONFIDENTIAL

Please repeat your cleaning validation studies using an extraction method that can adequately extract all complex internal structures that are exposed to soil. Please also perform an additional test to (1) validate your extraction methods by inoculating a known amount of soil in the hardest to reach areas of the device at a low volume/dilute amount below the endpoint acceptance criterion, (2) extract and quantify the soil, and (3) determine how much soil was able to be removed from the device. Finally, please revise all test reports to include a description of the extraction container, extraction temperature, and extraction volume (and device surface area to extraction volume ratio) used in your cleaning validation studies, as well as the raw results for the extraction/recovery efficiency study, including the number of extractions performed in the exhaustive recovery and calculation of the correction factors. It is recommended that the surface area to extraction volume ratios listed in ISO 10993-12:2012 be used in your studies or that you provide a rationale for other ratios used.

27. From the "Equipment and Materials" list in your cleaning validation test reports, it appears that the assay used to detect residual protein was the MicroBCA assay, and that the Hach Reagent Kit and "DRB reactor" were used to detect total organic carbon (TOC). However, you have not provided the assay methods, mechanism of action for detection, the limit of detection, limit of quantitation, or characterization of any interfering substances for either assay. Please revise your cleaning validation test protocols and reports to include this information.

28. In Step 5.15 of your cleaning validation protocol, you state that "…the test samples were visually inspected to ensure the complete removal of soil." However, it is not clear if visual inspection for visible soil was an explicit acceptance criterion for your studies, or what the results of visual inspection were for the test samples and positive and negative controls. Since the subject device has a complicated design that can make cleaning difficult, it is recommended that you use methods to visually inspect all soiled areas of the device, including internal surfaces. To assess whether any visible soil remains on the internal surfaces, it may be possible to use a borescope. It is also recommended to use microscopic visualization of debris on all areas where it is possible to do so. Please repeat your cleaning validation studies, as applicable, to generate this data, and revise all of your cleaning validation protocols and test reports to include your visual inspection acceptance criteria and results.

29. In your cleaning validation test reports, you provide tables to summarize the data for each cleaning cycle. However, no results are provided for several of the test cycles for each assay test method, with no explanation for this missing data. Please revise your test reports to include data for each cleaning cycle to demonstrate reproducibility, and please also explain whether any deviations or failures occurred in any of the cleaning validation testing. In addition, please revise your test reports to include both the corrected (based on % recovery efficiency and related correction factor) and uncorrected raw data from your cleaning validation studies.

30. In the discussion section of your TOC cleaning validation test reports, you provide the following note: "Due to the elevated TOC levels of the negative controls, a baseline

HIGHLY CONFIDENTIAL

TOC level was used by subtracting the negative control TOC values from the test sample and positive control TOC values.  This was done to assure that measurement of the effectiveness of the cleaning process was based only on the reductions in the TOC levels contributed by the test soil applied to the challenged devices and not from interfering substances such as residual detergent or leaching chemicals.  After applying the baseline TOC level, all test samples met the acceptance criteria."  However, the TOC results from your negative controls are not adequate; neither is the subtraction of these results from the test samples and positive control results.  The Agency considers this an inappropriate adjustment of the data and, therefore, it appears that the negative controls and test samples do not meet the acceptance criterion of $< 2.2 \ \mu g/cm^2$ for TOC.  It appears that the TOC endpoint assay used in your studies may not be appropriate, or there may be interfering substances present. Please revise your cleaning validation methods to obtain acceptable results that meet at least two quantitative acceptance criteria for residual soil.

Sterilization Validation
The following deficiencies refer to the sterilization activities that you have proposed as part of your remanufacturing process and that you are recommending to users in the reprocessing instructions.  Please refer to the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at
http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for additional information.

31. In Attachments B and C of Module E, you provide your justification for the "worst case" device models chosen for sterilization validation (i.e., the Monopolar Curved Scissors, Permanent Cautery Spatula, Fenestrated Bipolar Forceps, PK Dissecting Forceps, Large Needle Driver, and ProGrasp Forceps).  Your "worst case" analysis outlines a brief description of the tool end design, materials, surface area, and worst case conclusion based on "risk."  It appears that the analysis included consideration of the design configuration, number of components, materials of construction, size and density, surface are and porosity, need for disassembly, surface finish or texture, cannulations or lumens, presence of mated surfaces, and ability to be sterilized in a routine cycle. However, your analysis is not sufficient to determine if your justification for the chosen "worst case" models is appropriate in terms of sterilization validation and difficulty of sterilizing the device over other models.  Please repeat the analysis by including parameters such as the following: hard to reach spaces that do not allow for easy steam access, presence of any additional cables that provide crowding for most difficult to reach small spaces and most difficult air removal from the internal shaft, and interfaces of different materials that affect moisture elimination. If any new "worst case" models are identified due to the new analysis, please provide results from sterilization validation performed using these additional models.

32. You provided a sterilization efficacy report in Attachment E-6 of the original submission. However, the following items identified in the test report require additional information:

HIGHLY CONFIDENTIAL

REBOTIX171047

a. You state in Section 5.0, Validation of Spores, of the test report, "The D-value was no less than 1.0 minute and the population no less than $1.0 \times 10^6$." However, the biological indicator (BI) does not appear to comply with ISO 11138-3: 2006, "Sterilization of health care products – Biological indicators – Part 3: Biological indicators for moist heat sterilization processes." Clause 9.5 of the standard states, "Suspensions, inoculated carriers or biological indicators containing Geobacillus stearothermophilus spores shall have a $D_{121}$ value of $\geq 1.5$ minutes when tested according to the conditions given in Annex A." Please repeat the sterilization validation using an appropriate BI. In addition, please provide the actual results from the BI validation results since they are not provided in the test report.

b. It appears from your sterilization validation report that the devices were placed into pouches (i.e., "SPSmedical Self-Seal Pouches") and not a sterilization wrap, as recommended in the reprocessing instructions. Please either revise your reprocessing instructions to recommend that an FDA-cleared sterilization pouch be used (in accordance with your sterilization validation study), or provide results from sterilization validation using an FDA-cleared sterilization wrap.

c. Section 7.12 of the test report states that "positive and negative controls were set up"; however, there is no description of the test methods used for the various controls. Please revise the test report to include comprehensive methods for what the controls entailed and how the controls were handled.

d. You perform a "Negative Verification Test" using samples inoculated with $\leq 100$ spores of *Geobacillus stearothermophilus* and "incubated per USP." The test methods are not entirely clear, and it does not appear that the recommendations in USP <71> "Sterility Tests" were followed. USP <71> states to use a variety microbes that include aerobic bacteria (*Staphylococcus aureus, Bacillus subtilis, Pseudomonas aeruginosa*), anaerobic bacterium (*Clostridium sporogenes*), and fungi (*Candida albicans* and *Aspergillus brasiliensis* (*Aspergillus Niger*)). Please repeat the "Negative Verification Test" using the test methods outlined in USP <71>, and provide a complete description of your test methods in your test report.

e. Your test report does not state how the devices (test samples and controls) were treated prior to the sterilization validation study. Please revise your test report to include this information. Please ensure that all devices used in your sterilization validation studies included all steps in your remanufacturing procedures and all steps in your reprocessing instructions up to the sterilization instruction. For example, it is not evident that "Step 8: Lubricate" in your reprocessing instructions has been validated. Please repeat your sterilization validation, if necessary, to validate all steps in your reprocessing instructions. Please ensure that you have used proper controls in your study to account for the presence of lubricant and potential false negative results.

HIGHLY CONFIDENTIAL

f.  It does not appear that you have validated the drying time for the steam sterilization method recommended in your reprocessing instructions.  Please perform a sterilization validation study to validate the drying time by evaluating the dryness of the product by mass change and perceptible moisture, as described in ISO 17665-1:2006, "Sterilization of health care products—Moist heat—Part 1: Requirements for the development, validation, and routine control of a sterilization process for medical devices."

g.  It does not appear that you have provided the results from bioburden enumeration and resistance or a description of your routine bioburden monitoring with action/alert limits.  Please perform and provide results, including % recovery efficiency and recorded colony forming units per device, from a bioburden validation study in which the bioburden is enumerated on heavily soiled, clinically used devices after exposure to minimum cleaning parameters.  Please also develop methods and alert limits for routine bioburden monitoring, and provide a description of these methods and alert limits with your response.  Finally, please perform a bioburden resistance study using a fractional sterilization cycle to confirm that natural bioburden contained on the reprocessed device is less resistant that the biological indicators used in the sterilization validation and those used for routine cycle monitoring.  Please reference and cite applicable standards where appropriate (e.g., ISO 11737-1:2006 /(R)2011, "Sterilization of health care products—Microbiological methods—Part 1: Determination of the population of microorganisms on product").

Biocompatibility

The following deficiencies refer to the biocompatibility testing that you have conducted to validate your remanufacturing process.  Please refer to the Blue Book Memorandum #G95-1, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'" (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080735.htm ), for additional information.

33.  On page 2 of Module G, you state that the Remanufactured Fenestrated Bipolar Forceps and Remanufactured Monopolar Curved Scissors were selected as the two representative device models for Biocompatibility testing.  Through email on May 15, 2015, you state:

"Each device did not contain all patient-contacting materials, but full coverage of added or modified material for all models was achieved by testing both of them.  The table below outlines which materials are represented by each device tested.  It should be noted that the ceramic heat sink that is present on the hook of one device model (420183) and spatula of another (420184) is never modified (polished or otherwise) or replaced during the remanufacturing process.  As such, this component was judged not to pose any biocompatibility risk, as the stable ceramic material was clearly qualified as biocompatible as part of the OEM device, and is not later modified."

HIGHLY CONFIDENTIAL

However, we do not agree with your rationale that the ceramic heat sink does not pose any biocompatibility risk. Although you claim that the ceramic heat sink is "…never modified (polished or otherwise) or replaced during the remanufacturing process," the heat sink is reprocessed multiple times throughout the lifetime of the device. Due to the harsh nature of reprocessing agents, repeated reprocessing and use cycles may cause the ceramic to degrade or exhibit other adverse effects over the course of the device's lifetime. In addition, an aspect of the biocompatibility testing for a reusable device is to evaluate residual cleaning agents used during reprocessing.

Therefore, please perform testing on either the Remanufactured Permanent Cautery Hook (420183) or Remanufactured Permanent Cautery Spatula (420184) to demonstrate the biocompatibility of the ceramic heat sink. As noted in Deficiency 35 below, this testing should be performed at the end of the remanufactured device's use life (i.e., after being subjected to all remanufacturing procedures performed under worst case conditions, followed by worst case reprocessing for at least 11 cycles). In your response, please provide a complete description of the methods used to prepare the test samples prior to biocompatibility testing. Please also provide the full biocompatibility test reports for these devices, including a description of the test article, methods, pass/fail criteria, and results for each completed test.

34. The list of "Parts and Materials" on page 43 of Module E, Sterilization, lists "Steris Hinge Free Lubricant."  As also stated in Deficiency 25, there is no further explanation provided with Attachment E; therefore, it is not clear how this lubricant is used or if it is applied onto a patient-contacting portion of the subject device. Please clarify if this lubricant is used on any patient-contacting portions of the subject device, and clarify if this lubricant is present on the devices used in your biocompatibility testing.

Furthermore, it appears that the Steris Hinge Free lubricant contains dimethylol-5,5-dimethylhydantoin (DMDMH), an antimicrobial preservative agent that is a formaldehyde releaser. If this lubricant is used on your subject device, please provide an MSDS and toxicology information to demonstrate the safety of this antimicrobial-containing lubricant. FDA is concerned that the presence of this antimicrobial lubricant on a patient-contacting portion of the device may lead to transfer of the lubricant to the surgical site where it could be in contact with tissue for longer than the 24 hours used to establish your biocompatibility testing. In addition, the presence of DMDMH raises concerns about potential genotoxicity and carcinogenicity. Please individually assess each of the chemical components in the lubricant used on your device and provide a toxicological risk assessment in accordance with ISO 10993-17, "Biological evaluation of medical devices – Part 17: Methods for the establishment of allowable limits for leachable substances." Please provide a tolerable intake analysis based on: (1) published no observed adverse effect level, (2) lowest observed adverse effect, and (3) an adequate safety margin as specified in ISO 10993-17. This information is necessary to establish substantial equivalence, in terms of safety, to the predicate device.

HIGHLY CONFIDENTIAL

35. Through email on May 15, 2015, you describe the selection and preparation of the Remanufactured Bipolar Forceps and Remanufactured Monopolar Curved Scissors for Biocompatibility testing. You state:

> "Worst case devices chosen for biocompatibility testing were those devices that collectively contained all patient contacting materials that were added or modified by the remanufacturing process, and were exposed to all remanufacturing processes that would be relevant to any individual model."

> You further state, "Previously used, expired devices were chosen for the testing, meaning that the device had been reprocessed a minimum of 10 times by the end-user. The devices were then subjected to our remanufacturing process which includes 2 additional reprocessing cycles (scrub, flush, ultrasonically clean and autoclave) for a total of 12 reprocessing cycles."

However, sufficient descriptive information is not provided for FDA to fully understand how the devices were prepared prior to biocompatibility testing. Although you provide a rationale for selecting the types of devices used for biocompatibility testing, you do not describe the criteria by which the individual test samples were selected for the study. Please explain how the test samples were selected for the study, and address the following items in your response:

a. A description of the reprocessing of the test samples by the end user prior to biocompatibility testing is not provided. Please provide a description of the reprocessing steps used on the test samples by the previous end user. This information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number of use lives.

b. The remanufacturing procedures in Attachment B of Supplement 2 describe the use of multiple agents (e.g., TheraBand, lubricants, rust remover etc.) that may contact patient-contacting portions of the subject device. Please clarify if the test samples were subjected to ALL of the remanufacturing procedures in Attachment B of Supplement 2, including all of the remanufacturing agents described therein. In your response, it would be helpful to provide a list of agents used during the remanufacturing process that contact patient-contacting portions of the subject device, and to describe any assurances for removing residuals from these agents remaining on the device after remanufacture. Please additionally see Deficiency 34 regarding use of the Steris Hinge-Free lubricant on the subject device.

Finally, according to your email on May 15, 2015, it appears that subject devices were tested for biocompatibility immediately following the remanufacturing process. It appears that the devices were not subjected to biocompatibility testing at the end of their remanufactured use life (i.e., after 11 additional cycles of worst case reprocessing.) Please be advised that the devices should be tested for biocompatibility after being

HIGHLY CONFIDENTIAL

subjected to all of the remanufacturing procedures (following worst case tolerance parameters) in addition to worst case reprocessing for at least 11 cycles.

Therefore, in order to demonstrate that the subject device remains biocompatible throughout its entire use life, please perform biocompatibility testing on the remanufactured devices after at least 11 additional cycles of worst case reprocessing. In your response, please provide a complete description of the methods used to prepare the test samples prior to biocompatibility testing. Please also provide the full biocompatibility test reports for these devices, including description of the test article, methods, pass/fail criteria, and results for each completed test.

36. In Attachments G-9 and G-10 of Module G, you provide test reports for hemolysis testing on the Remanufactured Fenestrated Bipolar Forceps and Monopolar Curved Scissors. However, only extract testing was performed on these devices; direct contact testing was not performed. Please note that ASTM F756-08 states, "It is recommended that both tests (extract and direct contact) be performed unless the material application or contact time justifies the exclusion of one of the tests." Therefore, please perform direct contact testing on your subject devices, or provide a valid scientific rationale for why this testing is not needed.

37. In Module G, You provide biocompatibility test reports for the Remanufactured Fenestrated Bipolar Forceps and Monopolar Curved Scissors. However, the normal saline extracts for both devices were described as being pale red in color, turbid, and containing red flake particulates in the Irritation, Sensitization, and Acute Systemic Toxicity tests. Please provide evidence to demonstrate that the presence of color, turbidity, and particulates in the extracts are not indicative of problems with product manufacturing, and/or inappropriate extraction conditions that may invalidate the findings of the study. Information regarding the chemistry of the product may be helpful in your response.

<u>Electromagnetic Compatibility (EMC) and Electrical Safety</u>
The following deficiencies refer to the EMC and electrical safety testing that you have conducted to validate your remanufacturing process.

38. In Module I, EMC and Electrical Safety, it is stated that devices were cleaned and autoclaved a total of 11 times prior to testing, in accordance with the reprocessing instructions provided in Attachment F of Module I. Although the reprocessing instructions provided in Module I appear consistent with the reprocessing instructions provided to the user, it is not clear if worst case parameters were used to prepare the test samples (e.g., longest exposure times, highest chemical concentrations, and shortest rinse durations) in terms of the remanufacturing procedures, but also the simulation of reprocessing that the end user would perform. The instructions also do not include discrete temperatures and times for sterilization. Please repeat your EMC and electrical safety testing on end-of-life devices that were remanufactured and reprocessed under worst case conditions.

HIGHLY CONFIDENTIAL

39. Although you provide a rationale for selecting the types of devices used for electrical safety testing, your electrical safety testing protocol does not explain how the individual test samples were selected for the study. Please revise your protocol to explain how the test samples were selected for the study, including their clinical use and reprocessing by the end user. This is information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number use lives (which in part is determined by the electrical safety testing performed on end of use life devices). This information should also be used to help develop your incoming device inspection criteria.

<u>Performance Testing</u>
The following deficiencies refer to the general performance testing that you have conducted to validate your remanufacturing process.

40. In Attachment E of Supplement 2, you state, "OEM-equivalent specifications have been derived from published OEM product information, in-house 'reverse engineering' activities, and the relevant requirements of applicable consensus standards." Since it does not seem possible to identify exact device specifications using these methods, please perform side-by-side comparative testing with the subject device and the matching OEM device model, and use a statistical comparison between the two devices to evaluate substantial equivalence. Please provide a copy of the full side-by-side performance testing report with your response.

41. In Module J of your original submission, you state that simulated use exercises were performed on the devices, and that each "exercise" was performed 72 times per simulated use cycle. You further state that the number 72 was derived from a survey of current users of the da Vinci system, including urologic, gynecologic, and thoracic surgeons. 60 was determined to be the high end number of manipulations/activations for any given function and a 20% safety margin (i.e., 12) was added to ensure each function would be exercised significantly more than would be expected in the field. Please provide a copy of the survey protocol and report, including the methods and full results for FDA review.

42. In Module J of your original submission, you provide protocols for the simulated use and reprocessing cycles that were performed on the device prior to each performance test. You state that "…each use cycle consisted of ultrasonic cleaning and steam sterilization according to OEM parameters…"

   a. From review of the protocols, it does not appear that defined or worst case parameters were used for the device remanufacturing or reprocessing performed on the test samples. For example, the steam sterilization parameters are listed as a temperature range, minimum exposure time, and minimum pressure, rather than discrete values. The ultrasonic cleaner temperature is also listed as a range. It is not clear why "OEM parameters" were followed rather than your own "worst case" parameters. All process tolerances for your own remanufacturing and reprocessing procedures should be defined, and treatment of the test devices should be based on the worst case tolerances (not the OEM parameters). FDA

HIGHLY CONFIDENTIAL

recommends that worst case conditions in this case include longest exposure times, highest exposure temperatures, highest chemical concentrations, and shortest rinse durations; note that these worst case conditions are different than what would be expected for worst case conditions used for preparing test samples for cleaning validation studies. Please revise your protocol to have defined worst case parameters for the remanufacturing and reprocessing procedures, and provide results from a new study performed following this revised protocol.

b. Although you provide a rationale for selecting the types of devices used for performance testing, your performance testing protocol does not explain how the individual test samples were selected for the study. Please revise your protocol to explain how the test samples were selected for the study, including their clinical use and reprocessing by the end user. This is information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number use lives. This information should also be used to help develop your incoming device inspection criteria.

c. It is stated on page 42 of Module J that two deviations occurred during the performance testing following your protocol. Sterilization was performed by gravity displacement rather than pre-vacuum steam sterilization method, and the ultrasonic cleaner was maintained between 45-50°C.

    i. It is not entirely clear what deviation occurred regarding the ultrasonic cleaner (it is presumed that the temperature was maintained incorrectly, but it is not explicitly stated what the temperature was intended by the protocol). Please revise your protocol to provide a comprehensive description of the ultrasonic cleaner procedure and its effect on the results of the study, with the consideration that the conditions used in the study should be "worst case." If "worst case" conditions were not used, please repeat the study using all "worst case" conditions.

    ii. You justify the deviation that resulted in the use of a different sterilization method (i.e., gravity displacement rather than pre-vacuum steam sterilization) by stating that the device is not shipped sterile and the only need at Rebotix is for decontaminating units upon arrival. You also discuss the fact that less steam may penetrate the flush tube inside the shaft with the gravity displacement compared to pre-vacuum. Consequently, you repeated the flush tube testing with pre-vacuum steam sterilization; however, all other testing was performed after gravity displacement steam sterilization. You further state that this deviation "…is only an issue if Rebotix was claiming sterility after being subjected to the life testing." However, FDA does not agree with this conclusion. Please note that it is your responsibility to validate not only the remanufacturing and reprocessing performed at your facility, but also the reprocessing instructions provided to the end user. Part of this validation

HIGHLY CONFIDENTIAL

REBOTIX171054

includes validating the number of use lives stated in the labeling if the user is to follow the provided reprocessing instructions. Therefore, it does not appear that the number of use lives has been properly validated, since the steam sterilization method used in your protocols is not what is used in your own remanufacturing procedures or what is recommended in your labeling. Please repeat all use life testing using defined, worst case parameters for the sterilization method that will be used in your remanufacturing procedures and in your reprocessing instructions for users.

d. Section 9.10 of your performance test reports states, "On the 11th cycle step 4 of 9.8 will not utilize a Steam Autoclave cycle." However, there is no step 4 related to sterilization in Section 9.8 of the test reports, and it is not clear why the protocol will not include sterilization during that step. Please revise your reports to clearly explain the referenced statement.

43. In Module B, Device Description, you state that the remanufactured device shall harvest the original DS2505 memory device for use on the interceptor printed circuit board (PCB) assembly, Rebotix P/N PR1110-002. It is not clear if there are acceptance criteria to determine if the DS2050 memory device can be reused. Please describe your acceptance criteria for determining if the DS2050 memory device can be reused.

44. In Module J, Performance Data, Attachment J-1, the Monopolar Curved Scissors Cuts Test procedure describes cutting on chicken breast. However, in Supplement 2 Attachment C, PR3037 and PR3038, the Cutting Efficiency Test states that scissors are subjected to a cut test using TheraBand (simulated tissue) per DIN 58298. Please provide justification for this deviation from your SOP for the cutting performance tests. Please provide data to show that the use of chicken breast represents the worst case challenge for the Monopolar Curved Scissors. Furthermore, please provide a copy of the methods used in DIN 58298 so that we may fully understand your cutting protocol.

45. In Module J, Performance Data, Attachment J-1, Monopolar Curved Scissors Simulated Life testing appears to have been conducted without the use of the tip cover accessory. It is our understanding that in clinical practice, the Monopolar Curved Scissors must be used with the tip cover accessory. Please repeat the simulated life testing for the Monopolar Curved Scissors with a tip cover accessory in place, and provide the verification report.

46. In Module J, Performance Data, Attachment J-4, 13 Permanent Cautery Spatula (420184) and 5 Permanent Cautery Hook (420183) were used in simulated life testing. A total of 18 samples were tested to provide the level of statistical significance at 85% confidence of 90% reliability. However, this is a departure from the other simulated life testing, where a total of 22 samples were tested to provide the level of statistical significance at 90% confidence of 90% reliability. Please provide your justification for this departure (i.e., for using 18 samples instead of 22, and for accepting a lower level of statistical significance at 85%) for the Permanent Cautery Spatula and Permanent Cautery Hook.

HIGHLY CONFIDENTIAL

47. In Module J, Performance Data, Attachment J-7, Life Testing Worst Case Analysis, you describe your use of 3 criteria in guiding the selection of 6 representative models for Rebotix Life Testing. When we reviewed the number of malfunction reports in FDA's Medical Device Reporting (MDR) Database, the Mega Suturecut Needle Driver was among the top 5 EndoWrist Instruments with the greatest number of malfunctions. Furthermore, it appears that your current Life Testing does not include an evaluation of suturing performance. Therefore, we recommend that you perform additional simulated life testing using the Mega SutureCut Needle Driver (420309). Please include an evaluation of suturing performance as part of this testing, and provide the verification report for Simulated Life Testing for the Mega SutureCut Needle Driver in your response.

48. In Module J, Performance Data, it is not clear how the RF activations parameters of Power Setting and Duration for energized instruments were selected in the RF Activation (9.7) and Post Testing/Inspection (9.11) procedures. Please provide a rationale to demonstrate that these RF Activation parameters represent worst case conditions for the simulated uses.

49. In Module J, Performance Data, it is not clear if jaw alignments are checked for graspers, forceps, needle drivers, and scissors during Post Testing/Inspection (9.11). We believe jaw alignments are critical performance characteristics for these instruments and should be evaluated following simulated life testing to verify that the jaw mechanism can withstand all additional remanufacturing, reprocessing, and reuse cycles. Please address the following issues:

    a. Please incorporate a jaw alignment inspection step during Post Testing/Inspection (After 11 Simulated Uses) for graspers, forceps, needle drivers, and scissors.

    b. Please provide objective acceptance criteria for jaw alignment inspection. A subjective criterion, such as "The jaw must be correctly aligned" in SOP PR3024, is not adequate.

    c. Please repeat the simulated life testing for the Monopolar Curved Scissors, the Fenestrated Bipolar Forceps, and the Mega SutureCut Needle Driver, and provide the full verification reports in your response.

50. In Attachment J-9 of Module J, you perform shipping validation on the subject device in accordance with ISTA 6 FED EX, "FedEx Procedures for Testing Packaged Products weighing up to 150 lbs." You further state, "Since three samples are required, 3 different models will be tested; the Monopolar, Bipolar and PK models, all of which are energized."

However, ISTA 6 FED EX is not an FDA-recognized standard. Furthermore, a sample size of n = 3 devices does not appear to be statistically justifiable. Please perform packaging validation on a statistically justifiable number of samples. We recommend the use of FDA-recognized consensus standards for this validation testing. (A current list of these standards is available at

HIGHLY CONFIDENTIAL

http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm). We have found that the FDA-recognized standard, ASTM D4169-09, "Standard Practice for Performance Testing of Shipping Containers and Systems," includes distribution cycles that provide sufficient rigor for a variety of shipping and handling situations. In addition, we have accepted successful test data from packages subjected to Distribution Cycle 13 with testing at Assurance Level 1, as we believe this to be sufficiently rigorous.

51. You provide the IFU for the subject device through email on May 22, 2015. On page 3 of this IFU, Table 1-1 provides a list of environmental conditions for the subject device. This table specifies the temperature and humidity ranges for operating, storage, and transport of the subject device. However, testing to support the specified temperature and humidity ranges does not appear to be provided in the submission. Please provide a copy of the validation report to support the environmental conditions specified in the IFU. Alternatively, please remove this information from the subject IFU.

**HIGHLY CONFIDENTIAL**

**EXHIBIT 31**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   SURGICAL INSTRUMENT SERVICE      )
     COMPANY, INC.,                   )
 5                                    )
             Plaintiff,               )
 6                                    )
             vs.                      ) Case No.
 7                                    ) 3:21-CV-03496-VC
     INTUITIVE SURGICAL, INC.,        )
 8                                    )
             Defendant.               )
 9   _____ )
10
11
12         VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
13           DEPOSITION OF GREG POSDAL, 30(B)(1)
14
15                Tuesday, November 1, 2022
16         Remotely Testifying from Phoenix, Arizona
17
18
19
20
21
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 5541334-B
```

Page 1

```
 1    approved as part of that clearance?
 2        A.   It's my understanding that they approved
 3    of the process of resetting the chip and going
 4    through the testing and evaluation process.
 5        Q.   How many times did the FDA approve Restore   13:19:14
 6    or its affiliate to perform the reset?
 7             MR. SNYDER:  Objection to form.
 8             THE WITNESS:  I would have no way of
 9    knowing that.
10    BY MR. CHAPUT:                                        13:19:28
11        Q.   Do you know if there's a -- a limit on the
12    number of times that the reset can be performed
13    under that clearance?
14             MR. SNYDER:  Objection.
15             THE WITNESS:  At this time, I do not.        13:19:36
16    BY MR. CHAPUT:
17        Q.   Do you know if there's a limit on the
18    number of uses that can be added to the EndoWrist
19    under the 510(k) clearance?
20             MR. SNYDER:  Objection.                      13:19:48
21             THE WITNESS:  I do not.
22    BY MR. CHAPUT:
23        Q.   Are you aware that Rebotix applied for
24    510(k) clearance for its EndoWrist reset process
25    back in 2014?                                         13:20:06
```

Page 54

```
 1            MR. McCAULLEY:  Object to form.

 2            THE WITNESS:  I would assume that that was

 3    discussed.  I don't recall those discussions.

 4    BY MR. CHAPUT:

 5        Q.   Do you know the outcome of Rebotix's        13:20:18

 6    510(k) application for its EndoWrist reset process?

 7        A.   I do not.

 8        Q.   So you don't know whether the FDA found

 9    deficiencies in Rebotix's application?

10        A.   I -- I don't.  There were -- I think there  13:20:42

11    were conversations with Chris Gibson that he didn't

12    understand what the hold up was and why they weren't

13    approving it that they got a letter that wasn't an

14    official type letter from the FDA as a -- as a

15    rejection or approval.  It -- it seemed to be an      13:21:14

16    opinion.  It didn't follow the -- what he said was

17    the normal process for moving these through the

18    process.  I -- and -- and the exact specifications,

19    I don't know.

20        Q.   This -- this letter that you're referring   13:21:33

21    to that Chris Gibson said he received, when -- when

22    did that happen?

23        A.   I don't know.

24        Q.   Is that something that -- that happened

25    within the last year?                                13:21:46
```

Page 55

```
 1    if there are more processes, that they are not as

 2    strict as what you would be subject to without

 3    you -- without claiming a predicate device.

 4    BY MR. CHAPUT:

 5        Q.   What's the basis for your understanding of    14:29:08

 6    the meaning of "substantial equivalence" and these

 7    FDA regulatory devices?

 8        A.   I can't say --

 9             MR. SNYDER:  Objection.  Foundation.

10             THE WITNESS:  I can't say exactly where I     14:29:21

11    got that.  Just in the process of what we've

12    discussed and learned over the years of doing this.

13    BY MR. CHAPUT:

14        Q.   Discussed and learned over the years of --

15    of doing what exactly, what are you referring to?     14:29:31

16        A.   Of doing repairs.  In -- in general

17    discussion about medical devices, I don't know where

18    I would have learned that, but I -- I can't answer.

19        Q.   Has SIS ever sought 510(k) clearance from

20    FDA for anything?                                     14:29:52

21        A.   No, we have not.

22        Q.   I believe you testified earlier that from

23    your perspective, F -- FDA doesn't have any role

24    in -- in regulating SIS's business; is that right?

25             MR. SNYDER:  Objection.                      14:30:06
```

Page 93

**EXHIBIT 37**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

Message

| | |
|---|---|
| **From**: | Rick Ferreira [rferreira@alliancehcpartners.com] |
| **Sent**: | 10/1/2022 12:29:34 AM |
| **To**: | Clif Parker [cparker@restorerobotics.net]; kmay5485@gmail.com; Rafal Chudzik [rchudzik@alliancehcpartners.com] |
| **CC**: | Jeffrey L. Berhold [jeff@berhold.com] |
| **Subject**: | FW: [EXTERNAL]K210478/S002 Review Complete |
| **Attachments**: | K210478.Letter.SE.FINAL_Sent001.pdf; K210478.IFU.FINAL_Sent001.pdf |

Here is the official correspondence boys – frame this one for the walls!!!
Toughest one we have ever done 20 years!!
Rick

**From:** "Anthony Lee [ANTHONY.LEE1]" <anthony.lee1@fda.hhs.gov>
**Date:** Friday, September 30, 2022 at 1:34 PM
**To:** Rick Ferreira <rferreira@alliancehcpartners.com>
**Cc:** "Anthony Lee [ANTHONY.LEE1]" <anthony.lee1@fda.hhs.gov>
**Subject:** [EXTERNAL]K210478/S002 Review Complete

September 30, 2022

We have completed our review. Please refer to the attached letter for details.

If you have any questions, please contact the lead reviewer assigned to your submission, Anthony Lee.

*** This is a system-generated email notification ***

OUTSIDE COUNSEL ONLY



September 30, 2022

Iconocare Health
Rick Ferreira
President
7825 East Redfield Rd.
Suite 103
Scottsdale, Arizona 85260

Re:  K210478
Trade/Device Name:  8mm Monopolar Curved Scissors
Regulation Number:  21 CFR 876.1500
Regulation Name:  Endoscope And Accessories
Regulatory Class:  Class II
Product Code:  QSM, NAY
Dated:  March 29, 2022
Received:  March 31, 2022

Dear Rick Ferreira:

We have reviewed your Section 510(k) premarket notification of intent to market the device referenced above and have determined the device is substantially equivalent (for the indications for use stated in the enclosure) to legally marketed predicate devices marketed in interstate commerce prior to May 28, 1976, the enactment date of the Medical Device Amendments, or to devices that have been reclassified in accordance with the provisions of the Federal Food, Drug, and Cosmetic Act (Act) that do not require approval of a premarket approval application (PMA). You may, therefore, market the device, subject to the general controls provisions of the Act. Although this letter refers to your product as a device, please be aware that some cleared products may instead be combination products. The 510(k) Premarket Notification Database located at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm identifies combination product submissions. The general controls provisions of the Act include requirements for annual registration, listing of devices, good manufacturing practice, labeling, and prohibitions against misbranding and adulteration. Please note:  CDRH does not evaluate information related to contract liability warranties. We remind you, however, that device labeling must be truthful and not misleading.

If your device is classified (see above) into either class II (Special Controls) or class III (PMA), it may be subject to additional controls. Existing major regulations affecting your device can be found in the Code of Federal Regulations, Title 21, Parts 800 to 898. In addition, FDA may publish further announcements concerning your device in the Federal Register.

Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

OUTSIDE COUNSEL ONLY

Restore-00099137

K210478 - Rick Ferreira                                                                 Page   2

801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803) for
devices or postmarketing safety reporting (21 CFR 4, Subpart B) for combination products (see
https://www.fda.gov/combination-products/guidance-regulatory-information/postmarketing-safety-reporting-
combination-products); good manufacturing practice requirements as set forth in the quality systems (QS)
regulation (21 CFR Part 820) for devices or current good manufacturing practices (21 CFR 4, Subpart A) for
combination products; and, if applicable, the electronic product radiation control provisions (Sections 531-
542 of the Act); 21 CFR 1000-1050.

Also, please note the regulation entitled, "Misbranding by reference to premarket notification" (21 CFR Part
807.97). For questions regarding the reporting of adverse events under the MDR regulation (21 CFR Part
803), please go to https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-
mdr-how-report-medical-device-problems.

For comprehensive regulatory information about medical devices and radiation-emitting products, including
information about labeling regulations, please see Device Advice (https://www.fda.gov/medical-
devices/device-advice-comprehensive-regulatory-assistance) and CDRH Learn
(https://www.fda.gov/training-and-continuing-education/cdrh-learn). Additionally, you may contact the
Division of Industry and Consumer Education (DICE) to ask a question about a specific regulatory topic. See
the DICE website (https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-
assistance/contact-us-division-industry-and-consumer-education-dice) for more information or contact DICE
by email (DICE@fda.hhs.gov) or phone (1-800-638-2041 or 301-796-7100).

Sincerely,

Mark
Trumbore -S

Digitally signed by
Mark Trumbore -S
Date: 2022.09.30
16:32:31 -04'00'

Mark Trumbore
Assistant Director
DHT4A: Division of General Surgery Devices
OHT4: Office of Surgical
   and Infection Control Devices
Office of Product Evaluation and Quality
Center for Devices and Radiological Health

Enclosure

OUTSIDE COUNSEL ONLY

DEPARTMENT OF HEALTH AND HUMAN SERVICES
Food and Drug Administration

## Indications for Use

Form Approved: OMB No. 0910-0120
Expiration Date: 06/30/2023
*See PRA Statement below.*

Submission Number *(if known)*

K210478

Device Name

8mm Monopolar Curved Scissors (420179)

Indications for Use *(Describe)*

The EndoWrist 8mm Monopolar Curved Scissors instrument is used with the Intuitive Surgical IS3000 da Vinci Si Surgical System for cutting, cauterizing, coagulation, manipulating and blunt dissection of tissue.

The Endoscopic Instrument Control System is intended to assist in the accurate control of Intuitive Surgical Endoscopic Instruments including rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels, ultrasonic shears, forceps/pick-ups, needle holders, endoscopic retractors, stabilizers, electrocautery and accessories for endoscopic manipulation of tissue, including grasping, cutting, blunt and sharp dissection, approximation, ligation, electrocautery, suturing, and delivery and placement of microwave and cryogenic ablation probes and accessories, during urologic surgical procedures, general laparoscopic surgical procedures, gynecologic laparoscopic surgical procedures, transoral otolaryngology surgical procedures restricted to benign and malignant tumors classified as TI and T2, and for benign base of tongue resection procedures, general thoracoscopic surgical procedures, and thoracoscopically assisted cardiotomy procedures. The system can also be employed with adjunctive mediastinotomy to perform coronary anastomosis during cardiac revascularization. The system is indicated for adult and pediatric use (except for transoral otolaryngology surgical procedures). It is intended to be used by trained physicians in an operating room environment in accordance with the representative, specific procedures set forth in the Professional Instructions for Use.

The 8mm Monopolar Scissors of this submission are for use only with the Intuitive Si System (Endoscopic Instrument Control System).

Type of Use *(Select one or both, as applicable)*

☒ Prescription Use (Part 21 CFR 801 Subpart D)        ☐ Over-The-Counter Use (21 CFR 801 Subpart C)

**CONTINUE ON A SEPARATE PAGE IF NEEDED.**

This section applies only to requirements of the Paperwork Reduction Act of 1995.

**\*DO NOT SEND YOUR COMPLETED FORM TO THE PRA STAFF EMAIL ADDRESS BELOW.\***

The burden time for this collection of information is estimated to average 79 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden, to:

Department of Health and Human Services
Food and Drug Administration
Office of Chief Information Officer
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

OUTSIDE COUNSEL ONLY                                    Restore-00099139

**EXHIBIT 38**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

Da Vinci



# Da Vinci Instruments

Robotic instruments designed to enable precision beyond the limits of the human hand

Da Vinci

# Trusted dexterity

Choose Intuitive's multi-functional da Vinci instruments with EndoWrist technology when you want fully wristed dexterity with a minimally invasive approach. Inspired by the human hand—but with a greater range of motion—our graspers, needle drivers, clip appliers, and energy instruments help enable surgical precision. With a variety of modalities, our instruments can be used for a range of procedures. Your da Vinci system seamlessly adjusts hand-to-instrument ratios, and tremor reduction further enhances fingertip control.

## Instrument portfolio details

**I&A product catalog**

See our catalog of instruments and accessories with how to order.

Explore the catalog

**Product user manuals**

Download guides, instructions and documentation for your da Vinci surgical systems and instruments.

Find your manuals

## Discover our portfolio of precise, multi-functional surgical instruments for da Vinci X and da Vinci Xi systems

**Clip Appliers**

Choose among multiple clip sizes from TeleFlex Hem-o-lok and Horizon clips.

**Bipolar Instruments**

Control at the surgeon console for multi-functional dissection, grasping, retracting, and coagulation.

**Monopolar Instruments**

Control at the surgeon console for multi-functional dissection, coagulation and cutting.

**Suction and Irrigation**

A wristed suction irrigator that is controlled at the surgeon console.

**Needle Drivers**

A portfolio of needle drivers with wristed articulation enables suturing at multiple angles.

SER-119

(120 of 206), Page 120 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 120 of 206
Case 3:21-cv-03496-AMO    Document 452-39    Filed 01/24/25    Page 4 of 7

Da Vinci

# Statement on usage limits and use of remanufactured EndoWrist instruments

"Patients first" has always been core to our mission. Patient safety, product efficacy, and delivering improvements in clinical outcomes guide the design, testing and manufacture of our surgical systems, instruments and accessories.

With these objectives in mind, we have designed and rigorously tested and validated our EndoWrist instruments with usage and reprocessing limits intended to provide consistent product performance from the first use to the last.

We are aware that certain third parties have sought to offer products or services to healthcare providers that would modify some of our instruments to extend their use. It is our understanding that such modifications constitute remanufacturing under FDA regulations and require 510(k) clearance from FDA.

We recognize the role that third-party medical device servicers have come to play in the medical device ecosystem, and we support healthy, lawful competition in the marketplace. We also have a responsibility to protect patient safety and provide customers with proven, safe and effective tools and technologies. The remanufacturing of EndoWrists is performed by third parties that are not affiliated with Intuitive, and we are not privy to their testing protocols, verifications and validations, remanufacturing processes, or quality controls, among other things. Therefore, Intuitive will not bear responsibility for instruments that are remanufactured by a third party, or for harms or damages caused by the use of such instruments.

However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA.

As of March 1, 2023, Intuitive is not aware that FDA has granted 510(k) or equivalent clearance to any party to remanufacture any instruments for use with 4th generation da Vinci technology, including the da Vinci X, Xi and SP systems. Outside of the US, Intuitive is also not aware that any regulatory bodies have granted clearance to any party to remanufacture any instruments for da Vinci systems. For more information about 510(k) clearances granted by FDA, please refer to FDA's publicly available searchable database.

# Integrated da Vinci products

Explore our da Vinci portfolio that includes systems with advanced instruments and technologies that bring vision, energy and innovation to your OR.

Da Vinci




SYSTEMS                    SOFTWARE




STAPLING                   ENERGY



VISION

# Help with instruments when you need it

Running a successful robotics program requires more than technical support. Our experts
answer questions 24x7—even during surgery. And we can visit you to help with sterile
reprocessing training and techniques that maximize instrument life.

**SER-121**

Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 122 of 206
Case 3:21-cv-03496-AMO   Document 452-39   Filed 01/24/25   Page 6 of 7

Da Vinci

 **Disclosures and important safety information**

**Important safety information**

Serious complications may occur in any surgery, including surgery with a da Vinci system, up to and including death. Examples of serious or life-threatening complications, which may require prolonged and/or unexpected hospitalization and/or reoperation, include but are not limited to, one or more of the following: injury to tissues/organs, bleeding, infection, and internal scarring that can cause long-lasting dysfunction/pain.

Risks specific to minimally invasive surgery, including surgery with a da Vinci system, include but are not limited to, one or more of the following: temporary pain/nerve injury associated with positioning; a longer operative time, the need to convert to an open approach, or the need for additional or larger incision sites. Converting the procedure could result in a longer operative time, a longer time under anesthesia, and could lead to increased complications.

Contraindications applicable to the use of conventional endoscopic instruments also apply to the use of all da Vinci instruments.

For important safety information, including surgical risks and considerations, please also refer to www.intuitive.com/safety. For a product's intended use and/or indications for use, risks, full cautions, and warnings, please refer to the associated user manual(s).

Individual outcomes may depend on a number of factors—including but not limited to—patient characteristics, disease characteristics, and/or surgeon experience.

### Da Vinci Xi system precaution statement

The demonstration of safety and effectiveness for the representative specific procedures did not include evaluation of outcomes related to the treatment of cancer (overall survival, disease-free survival, local recurrence) or treatment of the patient's underlying disease/condition. Device usage in all surgical procedures should be guided by the clinical judgment of an adequately trained surgeon.

### Da Vinci instruments and accessories

It is the responsibility of the owner of the da Vinci surgical system to properly train and supervise its personnel to ensure that the instruments and accessories are properly cleaned, disinfected, and sterilized as required by the user's manual. Da Vinci products should not be used in a clinical setting unless the institution has verified that these products are properly processed in accordance with the da Vinci system user manual.

### Da Vinci Single-Site for the Xi system (complete indication)

The safety and effectiveness of the da Vinci Xi Single-Site system for use in the performance of general laparoscopic abdominal surgery or general gynecological surgery procedures have not been established. The da Vinci Single-Site instruments and accessories are only intended to be used for single incision laparoscopic cholecystectomy, benign hysterectomy, and salpingo-oophorectomy with the da Vinci Single-Site instruments and the da Vinci Xi surgical system (IS4000). There may be an increased risk of incision-site hernia with single-incision surgery. Patients who are not candidates for non-robotic minimally invasive surgery are also not candidates for robotic-assisted surgery with da Vinci systems, including surgery with da Vinci systems with Single-Site instruments.

Home  >  Da Vinci Surgical Systems  >  Da Vinci Instruments

Products & Services

Healthcare Professionals

Patients

Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 123 of 206

Case 3:21-cv-03496-AMO    Document 432-19    Filed 01/24/25    Page 7 of 7

INTUITIVE

Da Vinci

Privacy Policy

Terms of Use

Sitemap



Copyright © 2024 Intuitive Surgical. All Rights Reserved. Product and brand names/logos are trademarks or registered trademarks of Intuitive Surgical or their respective owner. See www.intuitive.com/trademarks.

PN 1041171 REV H 04/23

**EXHIBIT 39**

**to**

**Declaration of Kenneth A. Gallo in
Support of Defendant's Motion for
Reconsideration or, in the Alternative, for
Certification of an Interlocutory Appeal**

Page 1

```
1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                  TAMPA DIVISION

4    REBOTIX REPAIR LLC,          )
                                  )
5         Plaintiff,        )
                                  )
6         vs.                ) Case No.
                             ) 8:20-cv-02274
7    INTUITIVE SURGICAL, INC.,     )
                                  )
8         Defendant.        )
     _____)

9

10

11     VIDEO DEPOSITION OF PULLMAN REGIONAL HOSPITAL

12     BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

13              EDWARD W. HARRICH

14               MAY 24, 2021

15     CONDUCTED REMOTELY VIA VIDEOCONFERENCE

16

17

18

19

20

21

22

23   Reported by Cynthia J. Vega

24   RMR, RDR, CA CSR 6640, WA CSR 21001436, CCRR 95

25   Job No.  194419
```

(126 of 206), Page 126 of 206 Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 126 of 206
05/24/2021 Case 3:21-cv-03496-AMO Document 252-40 Filed 01/24/25 Page 3 of 6
Harrich, Edward W. (Rebotix)

Page 151

1    A.  Okay.

2    Q.  Did Pullman ever receive any marketing

3    materials related to Rebotix?

4    A.  Not that I recall.  You mean like a -- not

5    marketing outside the hospital, but like a pamphlet?

6    Q.  Any -- well, that's a great clarification.

7    You know, any form of information about Rebotix's

8    services in a -- you know, in a written medium.

9    A.  Yeah, I'm sure that we got -- I got some of

10   that from Jason -- not Jason -- the Boyette -- the guy

11   with Rebotix.  I'm sure I got all that stuff up front.

12   It had like the 510(k) approval.

13   Q.  And by "the 510(k) approval," what do you

14   mean by that?

15   A.  That they're approved to reprogram the

16   EndoWrist.

17   Q.  So was it your understanding before you

18   started using Rebotix's services that Rebotix had

19   obtained clearance from the FDA to perform services on

20   EndoWrist instruments?

21   MR. LYON:  Objection to form.

22   THE WITNESS:  Yes.

23   BY MR. MENITOVE:

24   Q.  And was it Mr. Boyette who told you that

25   Rebotix had obtained 510(k) clearance to perform

Page 152

1    service on EndoWrist instruments?

2          MR. LYON:  Objection to form.

3          THE WITNESS:  He would be the only one that I

4    can recall I would have talked to about that.  I can't

5    remember specifics of our conversation.

6    BY MR. MENITOVE:

7      Q.  Okay.  And was it your understanding that

8    Mr. Boyette was working on behalf of Rebotix?

9      A.  Correct.

10     Q.  Okay.  I've also seen in some of the

11   documents that Pullman produced references to other

12   companies that Mr. Boyette seems to be affiliated

13   with.  One of them, I think, is Stone Mountain.  Do

14   you know what that is?

15     A.  No.  But that's not uncommon for our reps to

16   be supporting multiple different products.  That's

17   just the standard and the practice.  They have

18   different service lines for multiple different kinds

19   of companies.  Might sell Band-Aids.  He might sell

20   sutures and instruments, you know.

21     Q.  Okay.  So do you have any understanding as to

22   what the relationship is between Stone Mountain and

23   Rebotix?

24     A.  I don't recall I've ever heard the name Stone

25   Mountain.

**SER-127**

Page 153

1      Q.   And what about McCaleb Medical, I think

2    that's in Mr. Boyette's email address.  Do you know

3    what McCaleb Medical is?

4      A.   I don't recall it.  I'm wondering if they

5    sell trays, instrument trays, but I don't recall.

6           MR. MENITOVE:  Okay.  If we can -- Griff, can

7    we mark as our exhibit -- or introduce as our

8    Exhibit 2 and share Tab 18?

9           MR. ALMY:  Sure.  Give me one moment.

10          MR. MENITOVE:  While you do that, I'll ask

11   another question.

12   BY MR. MENITOVE:

13     Q.   When Pullman was considering purchasing

14   services from Rebotix, was the fact that you'd heard

15   that Rebotix had 510 clearance from the FDA -- 510(k)

16   clearance -- I'm sorry -- from the FDA something that

17   was important to your analysis?

18          MR. LYON:  Objection.  Form.

19          THE WITNESS:  That would be -- that would be

20   part of the conversation.

21   BY MR. MENITOVE:

22     Q.   So if you had thought that Rebotix didn't

23   have 510(k) clearance to perform service on EndoWrist

24   instruments, is there any possibility that you still

25   would have allowed Rebotix to perform service on

Page 154

1    EndoWrist instruments used at Pullman?

2      A.  Having --

3        MR. LYON:  Objection to form.

4        THE WITNESS:  Sorry for not waiting.

5        Having the FDA backing to reprocess or

6    reprogram those chips is an important factor for us.

7    BY MR. MENITOVE:

8      Q.  And why was that an important factor for

9    Pullman?

10      A.  Well, we like to stay with FDA approval on

11    everything we're using and doing.

12        MR. ALMY:  Tab 18 should be available in the

13    shared folder and in the chat.

14    BY MR. MENITOVE:

15      Q.  Do you ever remember anyone from Rebotix

16    telling you that, you know, FDA clearance was

17    unnecessary for someone to perform repairs on

18    EndoWrist instruments?

19      A.  I don't recall that.

20      Q.  Okay.  So let's take a look at what we'll

21    mark as Exhibit 2, which is the document that should

22    be Bates-stamped Pullman-75 to 76.  The Bates numbers

23    are the little numbers in the bottom right corner.

24    And this is an email exchange from June 2019 between

25    yourself and James Boyette.

(130 of 206), Page 130 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 130 of 206
Case 3:21-cv-03496-AMO    Document 426    Filed 01/21/25    Page 1 of 14

1  Kenneth A. Gallo (*pro hac vice*)
   Paul D. Brachman (*pro hac vice*)
2  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   2001 K Street, NW
3  Washington, DC 20006-1047
   Telephone: (202) 223-7300
4  Facsimile: (202) 223-7420
   Email: kgallo@paulweiss.com
5  Email: pbrachman@paulweiss.com

6  William B. Michael (*pro hac vice*)
   Crystal L. Parker (*pro hac vice*)
7  Daniel A. Crane (*pro hac vice*)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8  1285 Avenue of the Americas
   New York, NY 10019-6064
9  Telephone: (212) 373-3000
   Facsimile: (212) 757-3990
10 Email: wmichael@paulweiss.com
   Email: cparker@paulweiss.com
11 Email: dcrane@paulweiss.com

12 Joshua Hill Jr. (SBN 250842)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13 535 Mission Street, 24th Floor
   San Francisco, CA 94105
14 Telephone: (628) 432-5100
   Facsimile: (628) 232-3101
15 Email: jhill@paulweiss.com

16 *Attorneys for Defendant Intuitive Surgical, Inc.*

17 [Additional counsel listed on signature page]

18                **UNITED STATES DISTRICT COURT**

19               **NORTHERN DISTRICT OF CALIFORNIA**

20                   **SAN FRANCISCO DIVISION**

21

22 SURGICAL INSTRUMENT SERVICE         | Case No. 3:21-cv-03496-AMO
   COMPANY, INC.,
23                                     | **DEFENDANT'S NOTICE OF MOTION
              *Plaintiff,*             | AND MOTION FOR JUDGMENT AS A
24        v.                           | MATTER OF LAW**

25 INTUITIVE SURGICAL, INC.,           | Date: January 21, 2025
                                       | Time: TBD
26            *Defendant.*             | Courtroom: 10

27                                     | The Honorable Araceli Martínez-Olguín

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to the Court's order on the record, *see* Dkt. 423, Defendant Intuitive Surgical, Inc. ("Intuitive") hereby moves the Court, pursuant to Federal Rule of Civil Procedure 50(a), for judgment as a matter of law on all claims brought by Plaintiff Surgical Instrument Service Company, Inc. ("SIS").

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, and such arguments and authorities as may be presented at or before the hearing.

## STATEMENT OF ISSUES TO BE DECIDED

Should the Court grant judgment as a matter of law in favor of Intuitive as to:

1.      All antitrust claims asserted by SIS, because SIS has failed to prove that that contractual authorization was illusory, and thus has failed to establish an unlawful tying arrangement?

2.      All of SIS's claims for damages after November 2022, because SIS neither proved Intuitive caused SIS any damages after November of 2022, nor provided any basis for quantifying damages after that date?

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

SIS has failed to meet its burden of proof in several independent case-dispositive ways, and Intuitive accordingly moves on a number of grounds for the grant of judgment as a matter of law pursuant to Rule 50.  However, for the sake of expediency during trial, this brief presents argument on two of the most straight-forward bases for granting immediate judgment, leaving argumentation on other grounds to a later date, if necessary.

SIS's entire case is built on the assumption that Intuitive's contracts prohibited hospitals from having EndoWrists serviced by a third party like SIS.  But that is not what the contracts actually say.  The contracts provide that third-party servicers must be authorized or approved by Intuitive, which is the same term that appears in SIS's own contracts.  Under applicable law, where

- 1 -

1 | a contract contains a third-party authorization clause, it does not violate the antitrust laws unless
2 | the possibility of obtaining such authorization is "illusory."

3      SIS failed entirely to prove that the possibility of obtaining authorization from Intuitive
4 | was illusory.  It failed to identify a single third party that sought authorization and was denied.  It
5 | admitted that Intuitive has in fact approved third parties and that it believed that Intuitive would
6 | have approved SIS too.  It conceded that SIS never sought approval from Intuitive, nor even made
7 | any contact with Intuitive to determine whether approval might be possible.  And it acknowledged
8 | that Intuitive specifically invited Rebotix to submit proof, in April 2019, that its processes were
9 | safe—an invitation that both Rebotix and SIS failed to take up.  Some years later, Intuitive *did*
10 | approve Restore and Rebotix to modify EndoWrists under its policy.  In light of this unequivocal
11 | evidence from SIS's own case, there is no basis for finding that authorization was illusory, and
12 | therefore Intuitive is entitled to judgment as a matter of law on all of SIS's antitrust claims.

13      Additionally, although SIS seeks damages up to 2026, its own CEO admitted that Intuitive
14 | did nothing after November 2022 to harm SIS's business, and it provided no evidence concerning
15 | SIS's business, market conditions, or anything else for the this period.  Accordingly, SIS failed to
16 | establish either causation of injury or a non-speculative method for awarding damages after 2022.
17 | Thus, assuming that the Court does not grant Intuitive judgment as a matter of law in full on SIS's
18 | claims, the Court should at a minimum enter judgment as a matter of law to the extent that SIS
19 | seeks damages after November 2022.

20      **LEGAL STANDARD**

21      Rule 50(a)(1) provides that "[i]f a party has been fully heard on an issue during a jury trial
22 | and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to
23 | find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant
24 | a motion for judgment as a matter of law against the party on a claim or defense that, under the
25 | controlling law, can be maintained or defeated only with a favorable finding on that issue."
26 | Judgment as a matter of law "is proper, even in an antitrust case, when there is no substantial
27 | evidence to support the claim." *Cal. Computer Prods., Inc.* v. *Int'l Bus. Machines Corp.*, 613 F.2d
28 | 727, 734 (9th Cir. 1979) (internal quotation marks omitted).  That standard requires the nonmoving

party to "'come forward with more than a scintilla of evidence,'" and "do more than rely on conclusory, self-serving, and speculative testimony." *United Nat'l Maint., Inc.* v. *San Diego Convention Ctr. Corp., Inc.*, 2012 WL 12845620, at *2 (S.D. Cal. Sept. 5, 2012) (quoting *Tripati* v. *McKay*, 211 Fed. Appx. 552, 553 (9th Cir. 2006)), *aff'd sub nom. United Nat'l Maint., Inc.* v. *San Diego Convention Ctr., Inc.*, 766 F.3d 1002 (9th Cir. 2014).

## ARGUMENT

**I.    SIS FAILED TO ESTABLISH THE FORCING ELEMENT OF A TYING CLAIM BECAUSE IT FAILED TO ESTABLISH THAT THE THIRD-PARTY AUTHORIZATION CLAUSES IN INTUITIVE'S CONTRACTS ARE ILLUSORY**

### A.    Where a Contract Requires Authorization for Third-Party Service, There Is No Tie Unless the Possibility of Obtaining Such Authorization is Illusory

SIS has failed to meet its burden of establishing that Intuitive forced hospitals that wished to purchase da Vinci robots to purchase EndoWrist repair or replacement from Intuitive as well. Under the applicable case law, where a supplier's "contractual language . . . at least provides for the possibility of purchasing" a secondary product from third-party sources, courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively as to constitute a de facto tying clause." *Top Rank, Inc.* v. *Haymon,* 2015 WL 9948936, at *10 (C.D. Cal. 2015) (citing *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979)).  A clause calling for a third-party to be "authorized" by the defendant in order to supply services does not amount to a tie, unless the possibility of "authorization" is "illusory" or a "charade" because the defendant will not actually authorize third parties in good faith.  *Top Rank,* 2015 WL 9948936, at *10 (third-party approval clauses do not amount to ties unless they are "manipulated" by defendant and amount to "a charade") (citations omitted); *Mozart Co.* v. *Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)) (there is no forcing or coercion unless the option for third parties to become authorized is "illusory"); *see also Ford Motor* v. *GMB Universal Joints*, 1988 WL 82826, at *3 (9th Cir. 1988) ("[a]n approval mechanism must not be illusory") (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517).

Case law establishes the circumstances in which a requirement that third parties be authorized can, and cannot, qualify as a potential antitrust violation. Where the defendant refuses to authorize any third party even though it *admits* that there are third parties that meet its quality standards, an authorization clause may be shown to be illusory. *Betaseed, Inc.* v. *U and I Inc.*, 681 F.2d 1203, 1223–24 (9th Cir. 1982). On the other hand, where the defendant "never refused a request to approve a supplier," a third-party authorization clause is not illusory and there is no tie. *Id.* (citing *Ky. Fried Chicken* v. *Diversified Packaging*, 549 F.2d 368 (5th Cir. 1977)); *see also Pullos* v. *All. Laundry Sys.*, 2009 WL 10708625, at *13 (N.D. Nev. 2009) (observing that Ninth Circuit precedent "recognize[s] the important distinction between a seller coercing buyers to purchase supplies from the seller itself as opposed to from approved sources" and rejecting tying claim where customers were permitted to purchase from third parties that met the defendant's specifications). Where the contract contains a third-party authorization clause, the plaintiff bears the burden of proving that the defendant in fact applied the clause so restrictively as to constitute a de facto tie. *See Photovest*, 606 F.3d at 722; *Pullos*, 2009 WL 10708625, at *13.

**B.     The Evidence Presented in SIS's Case Demonstrates that SIS Cannot Establish that the Possibility of Contractual Authorization Was Illusory**

The evidence presented at trial establishes that Intuitive's customer contracts require that EndoWrist repair and replacement be done by either Intuitive or a third party authorized by Intuitive.[1] SIS's own contracts similarly exclude warranty coverage when an EndoWrist has been altered, changed, or modified by someone not authorized by SIS. TX1566-R at 32; Tr. at 544:17–545:18, 630:11–14, 632:3–10.

Under the case law cited above, it was SIS's burden to show that the possibility of third parties obtaining contractual authorization was illusory because Intuitive refused to grant authorization to requesting parties in good faith. SIS failed entirely to meet this burden.

*First*, SIS did not show a ***single instance*** of a third party requesting contractual authorization and Intuitive refusing. *Betaseed*, 681 F.2d at 1224 ("Of crucial importance was the

---

[1] Dr. Lamb identified Section 8 of Intuitive's Sales, License, and Service Agreement (TX0493) as the anticompetitive provision SIS is challenging. Trial Transcript (hereafter "Tr.") at 1301:1–12. Section 8 prohibits "repair, refurbishment, or reconditioning ***not approved by Intuitive***."

1   fact that KFC had never refused a request to approve a supplier." (internal quotation marks

2   omitted)).

3       *Second*, the evidence unequivocally shows that Intuitive **has** approved third parties.  Mr.

4   Posdal testified that Restore and Rebotix have been approved under Intuitive's contractual policy.

5   Tr. at 523:3–10, 550:1–5, 553:2–12.  He further admitted that, based on the fact that Rebotix and

6   Restore were authorized by Intuitive, he could "make [the] assumption" that SIS would be

7   authorized too.  Tr. at 624:12–22.  There was no evidence that Intuitive made "unreasonable

8   imposition of conditions on the request" for approval or made any "unjustified withholding of final

9   approval."  *Smith* v. *Denny's Rests., Inc.*, 62 F.R.D. 459, 461 (N.D. Cal. 1974).

10      *Third*, SIS itself was aware that Intuitive's contracts did not flatly prohibit all third-party

11  servicing, but only servicing by unauthorized third parties.  Tr. at 550:10–551:9.  Despite being

12  aware of the possibility of authorization, Mr. Posdal admitted that SIS never even tried to obtain a

13  copy of Intuitive's contracts to determine their actual provisions.  Tr. at 549:5–13.  Mr. Posdal did,

14  however, testify that he saw copies of Intuitive letters to customers referencing the relevant

15  contract provisions, including the prohibition on "repair, refurbishment, or reconditioning" of an

16  instrument (including an EndoWrist) that is "not approved by Intuitive."   TX0942-R at 2;

17  TX0943-R at 2; Tr. at 413:19–417:1 (Mr. Posdal testifying to having seen TX0942-R and

18  TX0943-R).  Mr. Posdal further admitted that SIS never even contacted Intuitive to inquire about

19  authorization. Tr. at 488:2–5, 618:1–3; *see also* Tr. at 1344:8–12 (Dr. Lamb confirming that "SIS

20  never asked Intuitive to become authorized or approved to offer services relating to EndoWrist

21  instruments").  SIS's failure to take any action to seek authorization is fatal to its tying claims.  *See*

22  *Photovest*, 606 F.2d at 722 (rejecting tying claim because "it appears that Photovest never

23  submitted a processor to Fotomat for approval during this time period"); *see also* Phillip E. Areeda

24  & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*,

25  ¶ 1716e2 (2024) ("When approvals are practicable in principle, the defendant still cannot be faulted

26  for the mere absence of numerous (or even any) such approvals. Customers or rivals may not have

27  sought approvals, or no rival product may be good enough.").

28

*Finally*, the evidence established that Intuitive communicated to SIS's business partner, Rebotix Repair, that "if you allege that you or your service centers . . . possess clinical proof that your service process returns the modified instruments to a 'production equivalent qualification' and/or that additional use does not affect the safety or performance of the instruments," then such proof should be submitted to Intuitive for consideration.  TX1441-R at 6.  SIS presented no evidence that either Rebotix or SIS ever submitted such evidence to Intuitive.  *See* Tr. at 1206:8–1207:15, 1231:16–1232:11 (Dr. Parnell admitting that SIS did not present any evidence that Rebotix ever responded to Intuitive's letter or otherwise approached Intuitive about authorization); Tr. at 1364:22–1365:4 (Dr. Lamb admitting same as to SIS). Far from showing that Intuitive flatly rejected any third-party authorization, Intuitive's letter to Rebotix establishes that Intuitive was willing to consider authorization upon a showing of clinical proof of safety, but Rebotix and SIS never followed up.

Attempting to diffuse SIS's admitted failure to take any step to secure contractual authorization, Mr. Posdal asserted that SIS never sought Intuitive's authorization because Intuitive took the position that "its instruments were dangerous after 10 uses[,] [s]o it made no sense there would be authorization for such."  Tr at. 459:2–4.  That argument is a total red herring, because SIS was not proposing to just re-set use counters without (allegedly) repairing and evaluating the instruments.  Mr. Posdal testified that "Rebotix's flow chart for how to test, evaluate, and reset the counter for this service process" involved a comprehensive inspection, servicing, and repair of the EndoWrist: "[T]he process entails receiving the piece of equipment, inspecting it, making sure that the use count function is still available. . . . A general function, make sure that the wires are intact, that they're working properly. Electrosurgical testing to make sure that the insulation that we talked about yesterday wasn't compromised.  Then installing the new chip, the Interceptor as they call it.  Making sure the cables are adjusted, the tools are aligned, special fixtures and jigs to make sure those were aligned properly, that they didn't suffer any damage or malfunction during the first nine uses.  And then an outgoing evaluation to ensure that all those specifications were met."  Tr at 469:24–470:22.  If testing revealed any defects in the equipment such as a hole that might allow electricity to leak, "that process was abandoned and the instrument was returned."  Tr at 471:6–11.

SIS presented no evidence that Intuitive ever took the position that a comprehensive evaluation, servicing, and repair of the EndoWrist of this kind before resetting the use counter—which Mr. Posdal described as "thorough and thoughtful and complete," Tr. at 473:16–20—would be ineligible for contractual approval, assuming the third party had clinical proof to back up its claims. Further, as noted above, the evidence shows that Intuitive communicated to Rebotix that it **would** be willing to consider proof of safety, but Rebotix never followed up. The evidence also shows that Intuitive **in fact** approved third parties under its contract. *See* Tr. at 523:3–10, 550:1–5, 553:2–12.[2]

Dr. Lamb, SIS's liability expert, had a different excuse for why Rebotix and SIS never took up Intuitive's invitation to submit evidence that their processes were safe. Dr. Lamb testified that he would not have expected third parties to submit such information because "Intuitive isn't a regulatory body. It's not -- it's not Intuitive's decision one way or the other." Tr. at 1460:4–11. Dr. Lamb's feeble excuse is unavailing both as a matter of fact and of law. As a matter of fact, the record established that it is common practice for medical device manufacturers, including SIS itself, to include third-party authorization clauses in their contracts. *See* TX1566-R at 32; Tr. at 545:3–18, 632:3–10. SIS admitted that it was aware that Intuitive had such clauses in its contracts. Tr. at 550:10–551:9. Further, the case law cited above is clear that third-party authorization clauses are prima facie lawful and that the question is whether ***approval*** under those clauses is wrongly withheld. Neither Dr. Lamb nor any other SIS witness established that Intuitive wrongly withheld approval, abused it right to approve, or otherwise did anything inconsistent with good faith contractual approval.

SIS completely failed to establish that contractual authorization was illusory, and thus completely failed to establish an unlawful tying arrangement.[3]

---

[2] That evidence refutes Mr. Posdal's unsupported "opinion" that original equipment manufacturers ("OEMs") "never" authorize third parties. *See* Tr. at 458:13–15. In any event, his testimony is so "conclusory, self-serving, and speculative" as applied to Intuitive's third-party authorization clause that it could not support a jury verdict in SIS's favor. *United Nat'l Maint., Inc.*, 2012 WL 12845620, at *2.

[3] SIS has incorrectly asserted that Intuitive's authorities on contractual authorization are inapplicable because they involve franchises. Two in-Circuit decisions, *Top Rank*, 2015 WL 9948936, at *10, and *Pullos*, 2009 WL 10708625, at *13, dismissed claims based on authorized

**C.     SIS's Failure to Prove that the Possibility of Authorization Was Illusory Requires Judgment in Intuitive's Favor On All of SIS's Claims**

SIS asserts four antitrust counts.  Counts I and II are for tying and exclusive dealing under Section 1 of the Sherman Act, and Counts III and IV are for monopolization and attempted monopolization through tying and exclusive dealing under Section 2 of the Sherman Act.  Compl., Dkt. 1, ¶¶ 111–121.  SIS has litigated all four counts under the same theory and the same proof, *see* Tr. at 1299:20–1300:4 (Dr. Lamb describing Intuitive's hospital contracts as "the very crux of the conduct"), and thus all four counts rise or fall together.  *See Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S. 451, 482–83 (1992) (analyzing Section 2 tying claims under same evidence that supported Section 1 tying claims); *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 281 (3d Cir. 2012) (applying same framework to Section 1 and 2 exclusive dealing claims); *Dream Big Media Inc.* v. *Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024) (noting that where a tying and exclusive dealing claim rest on the same factual allegations, the failure of the tying claim dooms the exclusive dealing claim as well).  Accordingly, SIS's total failure of proof that Intuitive's contractual third-party authorization clauses were illusory is fatal to all of its antitrust claims.

Since the Court previously granted summary judgment in Intuitive's favor on SIS's fifth count arising under the Lanham Act, Dkt. 204 at 19, judgment in Intuitive's favor on all of the antitrust counts would dispose of all of SIS's claims against Intuitive.

---

third-party clauses and did not involve a franchise.  The principle that an approved source clause does not constitute a tie unless the possibility of approval is illusory is general and not limited to franchising cases.  Further, in *Betaseed* the Ninth Circuit remarked that franchisors are "entitled to insist upon reasonable standards" for third parties because a franchisor's name and trademark appears on the goods sold by franchisees. 681 F.2d at 1224–25.  Here, SIS proposed to break into EndoWrists, service them, and then put them back into circulation with Intuitive's name still on them and to be used as a component of Intuitive's da Vinci robots.  Intuitive has an obvious interest in ensuring "reasonable standards" for products that continue to bear its name.

1

## II.   SIS FAILED TO ESTABLISH ANY GROUND FOR AWARDING DAMAGES AFTER NOVEMBER 2022

2

3    Assuming that the Court does not enter judgment as a matter of law in full on all of SIS's

4  antitrust claims, the Court at a minimum should enter judgment as a matter of law on those claims

5  to the extent that they seek damages after November 2022.

6    SIS seeks damages up through 2026, on the theory that after SIS spent about six months

7  investigating starting an EndoWrist repair business in 2019, it was permanently excluded from the

8  market and can claim damages for next seven years.  Tr. at 1514:20–1515:7.  Of the $140.6 million

9  in damages it claims, $109 million are for the period after 2022.  Tr. at 1526:9–17.  SIS's damages

10 claim squares with neither the facts nor the law.  SIS neither proved Intuitive caused SIS any

11 damages after November of 2022, nor provided any basis for quantifying damages after that date.

12 *See Allied Orthopedic Appliances, Inc.* v. *Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 165 (C.D.

13 Cal. 2007).

14    *First*, SIS provided no evidence that Intuitive did anything to cause SIS injury after 2022,

15 and indeed conceded the opposite.  Mr. Posdal admitted that Intuitive did nothing that damaged

16 his business after November 2022: "Q. I have not heard you say that Intuitive did anything after

17 November of '22 to harm your business.  A. Correct."  Tr. at 615:19–21. Similarly, Dr. Lamb

18 admitted that he had done no analysis of the market since December 2022 and offered no opinion

19 that Intuitive engaged in anticompetitive conduct after December 2022.  Tr. at 1457:10–12,

20 1457:20–23.

21    While a plaintiff may continue to recover damages for a period after the defendant's

22 anticompetitive conduct ceases if it proves that defendant's conduct "harmed a market's

23 competitive structure," *Optronic Tech., Inc.*  v. *Ningbo Sunny Elec. Co.*, 20 F.4th 466, 488 (9th

24 Cir. 2021), SIS offered no proof that Intuitive harmed the market's structure.  Dr. Lamb admitted

25 that he did not analyze the market's structure after 2022.  Tr. at 1457:13–19.  Further, the evidence

26 showed that two other companies successfully entered the EndoWrist refurbishing business after

27 2022 with Intuitive's authorization.  Tr. at 523:3–10, 550:1–5, 553:9–12.  As noted previously,

28 Mr. Posdal testified that he assumed SIS also could have received Intuitive's authorization on the

- 9 -

1    same terms as Restore and Rebotix.  Tr. at 624:12–22.  Mr. Posdal also admitted that SIS could

2    have invested in the EndoWrist repair and replacement business after 2022, but chose not to do so.

3    Tr. at 585:12–586:4, 617:20–23. There was no evidence that Intuitive did anything to exclude SIS

4    from the market after 2022, no evidence that anything that Intuitive did prior to 2022 kept SIS out

5    of the market after 2022, no evidence that the market's structure was distorted so as to prevent SIS

6    from entering after 2022, and affirmative evidence that other companies successfully entered after

7    2022.  In short, there is no basis for holding that Intuitive did anything to harm SIS after 2022, and

8    therefore no basis for liability after 2022.

9         *Second*, SIS presented no evidence whatsoever about the state of its business or the market

10   more generally after 2022.  The jury therefore has no basis to determine whether SIS's claims of

11   post-2022 damages had any validity.   An antitrust plaintiff seeking damages must present

12   "sufficient evidence to permit a 'just and reasonable estimate of the damages,'" *Los Angeles Mem.*

13   *Coliseum Comm'n* v. *Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986), but as to the

14   post-2022 period, SIS provided no evidence whatsoever.  In other words, SIS improperly asks the

15   jury to award post-2022 damages based on mere "speculation or guesswork."  *Murphy Tugboat*

16   *Co.* v. *Crowley*, 658 F.2d 1256, 1263 (9th Cir. 1981) (internal quotation marks omitted).

17   Accordingly, even if SIS had proven a continuing antitrust violation after 2022 (which it did not),

18   it could not recover damages in the face of a complete lack of evidence after that date.

19                                        **<u>CONCLUSION</u>**

20        For the foregoing reasons, Intuitive respectfully requests that the Court enter judgment as

21   a matter of law in favor of Intuitive on all of SIS's claims, or, at a minimum, grant judgment in

22   favor of Intuitive on all of SIS's claims for damages after November of 2022.

23

24

25

26

27

28

Dated:  January 21, 2025

By: */s/ Kenneth A. Gallo*
     Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone:  (650) 632-4700
Facsimile:  (650) 632-4800
Email: kcahoy@cov.com

- 11 -

SER-141

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center, 850 Tenth Street NW
Washington, DC 20001-4956
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone:  (408) 477-9690
Email:  allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

- 12 -

1

**CERTIFICATE OF SERVICE**

2

On January 21, 2025, I caused a copy of Defendant's Notice of Motion and Motion For

3

Judgment As A Matter Of Law to be electronically filed via the Court's Electronic Case Filing

4

System, which pursuant to the Court's order of September 29, 2008, constitutes service in this

5

action on counsel of record for Surgical Instrument Service Company, Inc.

6

7

Dated: January 21, 2025                    By:  */s/ Kenneth A. Gallo*

Kenneth A. Gallo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(144 of 206), Page 144 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 144 of 206
Case 3:21-cv-03496-AMO    Document 406    Filed 01/08/25    Page 1 of 76

1  Kenneth A. Gallo (*pro hac vice*)
   Paul D. Brachman (*pro hac vice*)
2  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   2001 K Street, NW
3  Washington, DC  20006-1047
   Telephone:  (202) 223-7300
4  Facsimile:  (202) 223-7420
   Email: kgallo@paulweiss.com
5  Email: pbrachman@paulweiss.com

6  William B. Michael (*pro hac vice*)
   Crystal L. Parker (*pro hac vice*)
7  Daniel A. Crane (*pro hac vice*)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8  1285 Avenue of the Americas
   New York, NY 10019-6064
9  Telephone:  (212) 373-3000
   Facsimile:  (212) 757-3990
10 Email: wmichael@paulweiss.com
   Email: cparker@paulweiss.com
11 Email: dcrane@paulweiss.com

12 Joshua Hill Jr. (SBN 250842)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13 535 Mission Street, 24th Floor
   San Francisco, CA 94105
14 Telephone:  (628) 432-5100
   Facsimile:  (628) 232-3101
15 Email: jhill@paulweiss.com

16 *Attorneys for Defendant Intuitive Surgical, Inc.*

17 [Additional counsel listed on signature page]

18                **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20                  **SAN FRANCISCO DIVISION**

21

22 SURGICAL INSTRUMENT SERVICE          Case No. 3:21-cv-03496-AMO
   COMPANY, INC.,
23                                       **DEFENDANT'S NOTICE OF MOTION
              *Plaintiff*,               AND MOTION IN LIMINE NO. 4 TO
24      v.                               PRECLUDE PLAINTIFF FROM
                                         OFFERING EVIDENCE OR
25 INTUITIVE SURGICAL, INC.,             ARGUMENT CONCERNING POST-
                                         NOVEMBER 2022 EVENTS**
26            *Defendant*.
                                         Date:  November 25, 2024
27                                       Time:  11:00 a.m.
                                         Courtroom:  10
28

                                         The Honorable Araceli Martínez-Olguín

                                                          **SER-144**

(145 of 206), Page 145 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 145 of 206
Case 3:21-cv-03496-AMO    Document 406    Filed 01/08/25    Page 2 of 76

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 25, 2024 at 11:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Araceli Martínez-Olguín, District Judge in the United States District Court for the Northern District of California, at 450 Golden Gate Avenue, Courtroom 10, 19th Floor, San Francisco, CA 94102, Defendant Intuitive Surgical, Inc. ("Intuitive") will and hereby does move the Court for an order prohibiting Plaintiff Surgical Instrument Service Company's ("SIS") witnesses and lawyers from offering any evidence or argument about the post-November 10, 2022 time period, other than SIS's recently produced financial records and RFA responses.

The relief Intuitive seeks through this Motion is authorized by the Federal Rules of Civil Procedure, including but not limited to Rules 26 and 37, and by applicable case law.  This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the accompanying Declaration of Paul D. Brachman and attached exhibits, other filings in this matter, and the oral argument of counsel.

**PRELIMINARY STATEMENT**

1

2    When Intuitive sought to take discovery of facts and events occurring after November

3    2022, SIS objected on various grounds, including that discovery from that period is irrelevant. The

4    Court denied Intuitive's motion to compel such discovery, with two narrow exceptions, requiring

5    SIS to: (1) produce updated financial records, and (2) respond to a small number of Requests for

6    Admission ("RFAs"). *See* Minute Entry, Dkt. 261. SIS subsequently produced what was ordered

7    by the Court. Its updated financials show that SIS continues to operate a profitable business. Its

8    RFA responses admit that SIS took no steps to compete in the business of modifying (or what SIS

9    calls "repairing") EndoWrists after November 2022. Having successfully resisted all other

10   discovery as to this period, SIS's witnesses and lawyers should be precluded from offering any

11   evidence or argument about what happened during that period outside of the limited information

12   that SIS produced in response to the Court's order.

13   Any other result would contradict the most basic rules of disclosure under Federal Rule of

14   Civil Procedure 26 and principles of fairness. A party cannot refuse to produce discovery on a

15   matter by claiming it is irrelevant, and then surprise its opponent with undisclosed evidence on the

16   same matter at trial. And here the prejudice to Intuitive of a contrary result would be especially

17   severe. SIS is seeking more than ***half a billion dollars*** in damages, post-trebling, the majority of

18   which are "lost profits" SIS claims to have incurred ***after*** November 2022. Yet SIS objected to

19   discovery of any real-world facts or events that occurred during that period, and the Court sustained

20   its objection with limited exceptions as noted. As a result, there is currently no evidence in the

21   record to show that SIS was excluded from competing in any relevant market by any alleged

22   anticompetitive conduct of Intuitive during that period. All that is in the record are *admissions* by

23   SIS that it took no steps to compete after November 2022. Having successfully resisted all other

24   pre-trial discovery about the post-November 2022 time period, SIS should not now be allowed to

25   try to plug any gaps in its proof by offering evidence or argument as to that period at trial.

26   For these reasons, and as set forth below, Intuitive respectfully submits that the Court

27   should preclude SIS from offering any evidence or argument about the post-November 10, 2022

28   time period, other than SIS's recently produced financial records and RFA responses.

## RELEVANT BACKGROUND

Intuitive sought to take supplemental discovery from SIS and various third parties to update the record before trial regarding marketplace facts and events since November 10, 2022. *See* Def.'s Mot. for Limited Suppl. Disc., Dkt. 243-1. Intuitive pointed to several key events that undercut SIS's claim that it was excluded from competing in that time period, including Intuitive's March 2023 announcement clarifying that its customers were free to purchase any FDA-cleared reset EndoWrist as well as the entry and expansion of other third parties in the same market that SIS alleges was "foreclosed" to competitors. *See id.* at 3–7. SIS opposed Intuitive's requests. *See* Pl's Br. Opposing Intuitive's Mot. to Reopen Disc., Dkt. 246.

At the hearing on Intuitive's motion to compel this discovery, SIS argued that post-November 2022 facts and events are irrelevant to its claims. SIS's attorney argued, for example, that Intuitive's March 2023 announcement regarding FDA clearance is "irrelevant. It really doesn't add anything here." Ex. 1 at 15:17-18.[1] He argued as to SIS's financial condition post-2022, "I don't think it's really relevant, Your Honor, because what we're talking about here is what happened in the market in 2019 and 2020." *Id.* at 18:12–14. And as to SIS's efforts, or lack thereof, to compete for X/Xi EndoWrist business, he stated: "our position was, as taken by our experts, is if SIS had had the money to reprogram the X and the Xi in 2019-2020 from ongoing operations from S and Si, then it would have taken about a year to do it. And I think that's the only relevant inquiry here. It's not whether we would have had the money to do it in 2023 or 2024. ***That's not our case***." *Id.* at 18:16–22 (emphasis added).

While Intuitive maintains that evidence showing that SIS had the opportunity to compete after November 2022 and simply made a choice not to do so is highly relevant and demonstrates why SIS's liability and damages claims have no merit, the Court largely declined to compel discovery on these matters. The Court required SIS to produce certain "updated financial reports"

---

[1] All references to "Ex." refer to exhibits to the Declaration of Paul D. Brachman in Support of Intuitive's Motions in Limine No. 4 to Preclude Plaintiff from Offering Evidence or Argument Concerning Post-November 2022 Events.

1    and to respond to "limited requests for admissions." Min. Entry, Dkt. 261. The Court otherwise

2    denied Intuitive's motion. *See id.*

3         In its responses to the RFAs Intuitive propounded pursuant to the Court's order, SIS admits

4    that since November 2022, it has not sought FDA clearance for any service, procedure, or

5    technology for resetting or reprogramming the use counter on any EndoWrists; has not taken any

6    steps to sell, distribute, or market any EndoWrists with reset and/or reprogrammed use counters,

7    or any service for resetting or reprogramming the use counter on EndoWrists; and has not

8    developed any service, procedure, or technology for resetting or reprogramming the use counter

9    on X/Xi EndoWrists. Ex. 2 at 3–5. SIS's financial records show that it remains profitable and has

10   continued to grow its revenues since 2020, but do not reflect any revenues or costs related to SIS's

11   EndoWrist repair business (or attempts to enter that business). *See* Exs. 3, 4.

12        Nevertheless, SIS continues to assert it is entitled to enormous money damages for 2023,

13   2024, and beyond. SIS's damages expert, Richard Bero, opined as of the close of expert discovery

14   that SIS was entitled to between $63.5 million to $131.4 million in alleged "lost profits" from 2020

15   through 2025 as a result of allegedly anticompetitive conduct by Intuitive, with bulk of that amount

16   coming in the years 2023, 2024, and 2025. *See* Ex. 5 at Schedule 1. And just three days ago, on

17   October 25, 2024—the last business day before pre-trial filings were due in this matter—SIS

18   produced "updated schedules" for Bero's damages report that substantially ***increase*** the amount

19   of damages that SIS is seeking in ***each year*** starting with 2022, and extend SIS's claimed damages

20   through ***2026***. *See* Ex. 6 at Schedule 1. In total, Bero has increased his total lost profit damages

21   estimates by over ***$30 million***, to a range from $95.5 million to $169.2 million—for a total of more

22   than ***$500 million*** post-trebling. *See id.* SIS has provided no backup data or information

23   supporting these increased calculations.

24        Thus, to recap: SIS took the position that everything that has happened in the real-world

25   marketplace since November 2022 is irrelevant to its claims. SIS refused to engage in discovery

26   about the post-November 2022 period and obtained a Court order largely precluding Intuitive from

27   obtaining such discovery. SIS has admitted it has done nothing to compete in any alleged relevant

28   market since November 2022, despite having an ongoing and profitable business. And SIS

---

3

Defendant's Motion in Limine to Preclude SIS from Offering Post-November 2022 Evidence
3:21-cv-03496-AMO                                                           **SER-148**

1  contends not only that it is entitled to hundreds of millions of dollars in "lost profits" damages

2  because it supposedly was excluded from the marketplace after November 2022, but that the

3  amount of those damages has increased by more than $30 million since discovery closed.

4  ## **ARGUMENT**

5  SIS made a **choice** not to voluntarily produce and to oppose Intuitive's requests to take

6  discovery from SIS and anyone else regarding the post-November 2022 time period.  Intuitive

7  moved to compel such discovery and SIS objected, arguing in Court that anything that happened

8  during that period is **irrelevant** to its claims.  *See supra* at 2.  It follows as a matter of fundamental

9  fairness, as well as from the Federal Rules of Civil Procedure, that SIS therefore should be barred

10  from offering evidence or making arguments to the jury about facts and events from that time

11  period.[2]

12  In similar circumstances, courts have estopped parties from litigating issues on which they

13  successfully opposed discovery.  For example, in *Cox* v. *Continental Casualty Co.*, 703 F. App'x

14  491, 495 (9th Cir. 2017), the Ninth Circuit affirmed a district court's decision estopping the

15  defendant from raising a fraud defense that would have voided an insurance contract, when the

16  defendant had earlier refused to produce coverage-related documents on the grounds that they were

17  "immaterial."  Similarly, in *Walker* v. *Life Insurance Co. of the Southwest*, 2014 WL 12577139,

18  at *11–12 (C.D. Cal. Apr. 3, 2014), the court granted a motion in limine to prevent the defendant

19  from offering evidence about the import of three riders to an insurance policy, after the defendant

20

21  [2] Whether the basis for the Court's ruling was relevance, or whether the Court ruled based on

22  burden, cost, or the proximity to trial, does not change the outcome on this motion.  If SIS wanted to use evidence from the post-November 2022 time period, it could have and should have

23  supplemented its discovery responses at any time before now (as, for example, Intuitive did by voluntarily producing post-November 2022 sales data last May to SIS, *see* Ex. 7 at 26:4–10.)  *See*

24  Fed. R. Civ. P. 26(e)(1) ("A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or requests for admission—must supplement

25  or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete . . . or (B) as ordered by the court."); Fed. R. Civ.

26  P. 37(c)(1) ("If a party fails to provide information . . . as required by [Rue 26(e)], the party is not allowed to use that information . . . at trial, unless the failure was substantially justified or is

27  harmless.").  The fact remains, SIS made a decision not to allow discovery of the post-November 2022 time period, and it should now be barred from offering evidence or argument about that time

28  period.

4

had successfully opposed a motion to compel their production on relevance grounds.  The Court here similarly should find that SIS is precluded from presenting at trial any evidence regarding the post-November 2022 period, beyond the updated financial records and RFA responses it provided in response to this Court's recent order.  Any other result would be tantamount to allowing SIS to reverse its prior representations to this Court.

Moreover, this is not some academic issue in this case, or a matter that should await seeing what SIS does at trial.  SIS has already made clear that it intends to ask the jury for hundreds of millions of dollars in "lost profits" damages supposedly incurred after November 2022.  Yet, as a result of SIS's litigation decision to oppose discovery about the post-November 2022 time period, there is no evidence in the record that *Intuitive's* actions prevented SIS from being able to compete during that period.  SIS cannot now try to fix that failure of proof by having its witnesses testify, or its lawyers make arguments, about post-November 2022 facts and events—including arguments that SIS was foreclosed from competing during that time period.  To do so, after having successfully resisted the discovery Intuitive sought to take about that time period, would be extremely prejudicial and unfair to Intuitive.  Rather, the *only* evidence pertaining to that period that SIS should be allowed to reference at trial is what it admitted in its RFA responses and what its updated financial records show.

## CONCLUSION

For the foregoing reasons, the Court should preclude SIS from offering evidence or argument about the post-November 10, 2022 time period, other than SIS's recently produced financial records and RFA responses.

Defendant's Motion in Limine to Preclude SIS from Offering Post-November 2022 Evidence
3:21-cv-03496-AMO

Dated:  October 28, 2024

By: /s/ *Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:(212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP** 415
Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000 Facsimile:
(415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777) **COVIN
GTON & BURLINGTON LLP** 3000 El
Camino Real

Defendant's Motion in Limine to Preclude SIS from Offering Post-November 2022 Evidence
3:21-cv-03496-AMO                                                      **SER-151**

(152 of 206), Page 152 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 152 of 206
Case 3:21-cv-03496-AMO    Document 406    Filed 01/08/25    Page 9 of 76

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

*Attorneys for Defendant*
*Intuitive Surgical, Inc.*

7

Defendant's Motion in Limine to Preclude SIS from Offering Post-November 2022 Evidence
3:21-cv-03496-AMO

1

<u>**CERTIFICATE OF SERVICE**</u>

2
            On October 28, 2024, I caused a copy of Defendant's Notice of Motion and

3
Motion in Limine No. 4 to Preclude Plaintiff from Offering Evidence or Argument Concerning

4
Post-November 2022 Events to be electronically served via email on counsel of record for

5
Surgical Instrument Service Company, Inc.

6
 Dated:  October 28, 2024                By:  <u>*/s/ Kenneth A. Gallo*</u>

7
                                            Kenneth A. Gallo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(154 of 206), Page 154 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 154 of 206
Case 3:21-cv-03496-AMO    Document 406    Filed 01/08/25    Page 69 of 76

1   **MCCAULLEY LAW GROUP LLC**
    JOSHUA V. VAN HOVEN, (CSB No. 262815)
2   E-Mail: josh@mccaulleylawgroup.com
    3001 Bishop Dr., Suite 300
3   San Ramon, California 94583
    Telephone: 925.302.5941
4
    RICHARD T. MCCAULLEY (*pro hac vice*)
5   E-Mail: richard@mccaulleylawgroup.com
    180 N. Wabash Avenue, Suite 601
6   Chicago, Illinois 60601
    Telephone: 312.330.8105
7
    *Attorneys for Plaintiff and Counter-Defendant,*
8   SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9                   **UNITED STATES DISTRICT COURT**

10                 **NORTHERN DISTRICT OF CALIFORNIA**

11                    **SAN FRANCISCO DIVISION**

12
    SURGICAL INSTRUMENT SERVICE          Case No. 3:21-cv-03496-AMO
13  COMPANY, INC.
                                         Honorable Araceli Martínez-Olguín
14          *Plaintiff/Counter-Defendant,*

15          v.                           **PLAINTIFF SIS' OPPOSITION TO**
                                         **INTUITIVE'S MOTION IN LIMINE #4**
16  INTUITIVE SURGICAL, INC.,

17          *Defendant/Counterclaimant.*

18

19          In its Motion In Limine No. 4 ("Mtn No. 4"), Defendant, Intuitive Surgical, Inc. ("Intuitive")

20  seeks an order prohibiting Plaintiff, Surgical Instrument Service Company, Inc's ("SIS"), including

21  its witnesses and lawyers, from:

22          "offering any evidence or argument about the post-November 10, 2022 time period, other

23  than SIS's recently produced financial records and RFA responses." Mtn No. 4 at p. i.

24
                    **SIS DOES NOT OPPOSE THE RELIEF INTUITIVE SEEKS**
25                  **PROVIDED CERTAIN EXCLUSIONS ARE INCLUDED**
                    **TO MODIFY THE SCOPE OF THE PROHIBITION**
26

27          SIS does not oppose the relief sought by Intuitive provided the following exclusions and

28

                                         1

additions are included to modify the scope of the provision to make it more even-handed and fair:

(1)      the prohibition against offering any evidence or argument about what happened after November 2022 outside of the limited information that SIS produced in response to the Court's order should also be applied to Intuitive, along with its witnesses and lawyers;

(2)      SIS's damages expert's updated Schedules appended to his expert report based upon financial data produced by the parties after the close of discovery are not subject to the prohibition against offering any evidence or argument about what the "but for" world would look like after November 2022;

(3)      SIS's damages expert is not prohibited from testifying regarding SIS's lost profits in the "but-for" world corresponding to the period after November 2022 through 2026; and

(4)      information available after November 10, 2022 which is disclosed or covered in the parties' expert reports and which the parties' had a full opportunity to explore through the subsequent expert deposition process are not subject to the prohibition against offering any evidence or argument about what happened after November 2022.

### SIS'S RESPONSE TO INTUITIVE'S PRELIMINARY STATEMENT -- RELEVANT BACKGROUND AND ARGUMENT SECTIONS

Intuitive suggests that SIS has refused to produce discovery on a matter by claiming it is irrelevant, and then plans to surprise Intuitive with undisclosed evidence on the same matter at trial. Mtn No. 4 at p. 1. That is not at all accurate. Everything that SIS will present during its case-in-chief to the jury during trial is known to Intuitive. SIS's live witness testimony and testimony of witnesses by deposition has been disclosed to Intuitive. There are no surprises in the trial exhibits SIS has on the list provided to Intuitive. SIS's expert witnesses will be testifying to the opinions that were fully disclosed in their expert reports and which Intuitive explored extensively during the period for expert deposition discovery.

Intuitive adds the gratuitous, self-serving, and erroneous assertion that "there is currently

2

1   no evidence in the record to show that SIS was excluded from competing in any relevant market

2   by any alleged anticompetitive conduct of Intuitive during that period." Mtn No. 4 at pp. 1:20-22;

3   5:10-11. SIS disagrees. There is, however, no evidence in the record to show that Intuitive stopped,

4   modified or otherwise changed its anticompetitive conduct after that conduct crushed SIS's effort

5   to establish its refurbishment and repair service for EndoWrist instruments. Accordingly, the

6   anticompetitive effect of the barriers to entry that Intuitive's anticompetitive conduct created, which

7   shut down SIS business in 2019 and 2020 continued to exclude SIS from competing in the

8   EndoWrist repair and replacement aftermarket from that time to the present.

9   

10          In its "Relevant Background" section, Intuitive argues that its "March 2023 announcement

11  clarifying that its customers were free to purchase any FDA-cleared reset EndoWrist" undercuts

12  "SIS's claim that it was excluded from competing in that [post November 2022] time period." Mtn

13  No. 4 at p. 2:4-8. That is simply not true.

14          Additionally, it appears that Intuitive wants to play by different rules regarding what post

15  November 2022 evidence it wants to present to the jury. For example, Intuitive apparently intends

16  to present evidence and argument to the jury to show "that SIS had the opportunity to compete after

17  November 2022 and simply made a choice not to do so" in order to demonstrate "why SIS's liability

18  and damages claims have no merit". Mtn No. 4 at p. 2:21-24. Yet, Intuitive asks that this Court

19  require SIS to remain mute in the face of such evidence and refrain from telling the jury anything

20  about what the "but-for" world would look like in the period after November 2022 through 2026.

21  Specifically, Intuitive asks that SIS "be barred from offering evidence or making arguments to the

22  jury about facts and events from that [post November 2022' time period." Mtn No. 4 at p. 4:9-11.

23  Such a result would contradict the most basic principles of fairness. Accordingly, SIS requests that

24  the Court incorporate the above-recited additional provisions in any Order the Court enters

25  resolving this motion in limine.

26  

27  

28

Intuitive's "Argument" is essentially a rehash of the arguments it presented in its motion to reopen discovery. It is also based upon the fallacious allegation that SIS intends to use evidence from the post-November 2022 time period. Mtn No. 4 at p. 4 n.2. SIS has no such intention. SIS does however intend to present expert testimony from Mr. Bero about his various damages models that address the but-for world after November 2022 and form the basis for his lost profits damages calculations. It appears that Intuitive is attempting to use this motion as a vehicle to preclude SIS from presenting that testimony and related argument to the jury. As such, Intuitive's ploy is nothing more than a renewed attack on the admissibility of Mr. Bero's expert testimony which was rejected and put to rest by this Court's denial of Intuitive's Daubert motion.

Intuitive's postion that SIS cannot have "its witnesses testify, or its lawyers make arguments, about post-November 2022 facts and events—including arguments that SIS was foreclosed from competing during that [post November 2022] time period" is absurd and is in no way compelled by this Court's denial of Intuitive's motion to reopen discovery in this case. Simply put, it is undisputed that Intuitive's anti-competitive conduct crushed the repair market in which SIS operates in 2019 and 2020. Intuitive does not dispute that it has and would continue that conduct with respect to SIS's business to this day, even with its manufactured and self-serving March 2023 statement.

//

//

//

4

SIS OPPOSITION TO INTUITIVE MOTION IN LIMINE #4

1

2
**CONCLUSION**

3
For the foregoing reasons, SIS respectfully requests that in the interest of ensuring a fair

4
and level playing field for the trial, that the Court include the proposed additional terms and

5
exclusions with any Order entered granting Intuitive's Motion in Limine No. 4.

6

7

8
Dated: November 7, 2024          McCAULLEY LAW GROUP LLC
                                 By: */s/ Joshua Van Hoven*

9                                          JOSHUA V. VAN HOVEN

10                               E-Mail: josh@mccaulleylawgroup.com
                                 3001 Bishop Dr., Suite 300

11                               San Ramon, California 94583
                                 Telephone: 925.302.5941

12

13                               RICHARD T. MCCAULLEY (pro hac vice)
                                 E-Mail: richard@mccaulleylawgroup.com

14                               180 N. Wabash Avenue, Suite 601
                                 Chicago, Illinois 60601

15                               Telephone: 312.330.8105

16
                                 *Attorneys for* SURGICAL INSTRUMENT SERVICE COMPANY, INC.

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2
        I hereby certify that on November 7, 2024, I caused a copy of the foregoing

3
    **PLAINTIFF SIS's OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #4**, to be

4
    electronically to be served *via* electronic mail to counsel of record:

5

6
    **Crystal Lohmann Parker**

7
    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    1285 Avenue of the Americas

8
    New York, NY 10019
    212-373-3000

9
    Email: cparker@paulweiss.com

10
    **Joshua Hill , Jr.**
    Paul, Weiss, Rifkind, Wharton & Garrison LLP

11
    535 Mission Street, 24th Floor
    San Francisco, CA 94105

12
    (628) 432-5123
    Email: jhill@paulweiss.com

13

14
    **Kenneth A. Gallo**
    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    2001 K Street NW

15
    Washington, DC 20006-104 7
    202-223-7356

16
    Fax: 202-204-7356
    Email: kgallo@paulweiss.com

17

18
    **Paul David Brachman**
    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    2001 K St., NW

19
    Washington, DC 20006
    202-223-7440

20
    Email: pbrachman@paulweiss.com

21
    **William Michael**
    Paul, Weiss, Rifkind, Wharton and Garrison LLP

22
    1285 Avenue of the Americas
    New York, NY 10019

23
    212-373-3000
    Email: WMichael@paulweiss.com

24

25
    **Allen Ruby**
    Attorney at Law
    15559 Union Ave. #138

26
    Los Gatos, CA 95032
    408-4 77-9690

27
    Email: allen@allenruby.com

28

1

2

3  **Andrew David Lazerow**
   Covington & Burling LLP
4  One CityCenter
   850 Tenth Street, NW
5  Washington, DC 20001-4956
   202-662-5081
6  Email: alazerow@cov.com

7  **Kathryn Elizabeth Cahoy**
   Covington & Burling LLP
8  3000 El Camino Real
   5 Palo Alto Square, 10th Floor
9  Palo Alto, CA 94306
   650-632-4700
10 Email: kcahoy@cov.com

11 **Sonya Diane Winner**
   Covington & Burling LLP
12 Floor 54
   415 Mission Street
13 San Francisco, CA 94105-2533
   (415) 591-6000
14 Email: swinner@cov.com

15

16    Dated: <u>November 7, 2024</u>          By:  ___<u>/s/ Joshua Van Hoven</u>___
                                                    JOSHUA V. VAN HOVEN
17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories identified above have concurred in this filing.

Dated:  November 11, 2024

By: /s/ *Kenneth A. Gallo*
      Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com

*Attorney for Defendant*
*Intuitive Surgical, Inc.*

(162 of 206), Page 162 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 162 of 206
Case 3:21-cv-03496-AMO    Document 403    Filed 01/07/25    Page 1 of 547

1   **MCCAULLEY LAW GROUP LLC**
    JOSHUA V. VAN HOVEN (CSB No. 262815)
2   E-Mail: josh@mccaulleylawgroup.com
    3001 Bishop Dr., Suite 300
3   San Ramon, California 94583
    Telephone: 925.302.5941
4
    RICHARD T. MCCAULLEY (*pro hac vice*)
5   E-Mail: richard@mccaulleylawgroup.com
    180 N. Wabash Avenue, Suite 601
6   Chicago, Illinois 60601
    Telephone: 312.330.8105
7
    *Attorneys for Plaintiff and Counter-Defendant,*
8   SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9               **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11  | SURGICAL INSTRUMENT SERVICE | CASE NO. 3:21-CV-03496-AMO |
    COMPANY, INC.

12  |                            | Honorable Araceli Martínez-Olguín |
                *Plaintiff/Counter-Defendant,*

13  |                            | **PLAINTIFF SIS's MOTION IN** |
            v.                  | **LIMINE #5**

14
    INTUITIVE SURGICAL, INC.
15
                *Defendant/Counterclaimant.*
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2   **RELIEF REQUESTED** ..........................................................................................**1**

3   **FACTS** ........................................................................................................................**1**

4   **ARGUMENT** ...............................................................................................................**4**

5   Legal Standards - Motions in Limine ...............................................................4

    Admissibility of Relevant Evidence Under Federal Rules of Evidence 401, 402,
6   and 403 ..............................................................................................................4

7   Evidence Attempting to Prove that the FDA Required Usage Limits for
    EndoWrists, or that Adherence to Such Use Limits Are Required or Related to
8   Patient Safety Should Be Excluded Under Fed. R. Evid. 402 and 403 ...........5

9   Curative Instruction .........................................................................................6

    **CONCLUSION** ...........................................................................................................**6**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Federal Statutes**
21 U.S.C. § 360(k) ............................................................................................. 1
Food, Drug, and Cosmetic Act ........................................................................ 2
Lanham Act ........................................................................................................ 2

**Federal Rules**
Federal Rule of Evidence 401 ........................................................................... 4
Federal Rule of Evidence 402 ....................................................................... 4, 5
Federal Rule of Evidence 403 ........................................................................... 4

**Federal Regulations**
21 C.F.R. § 807.81(a) ........................................................................................ 1

**United States Supreme Court Cases**
*Luce v. United States*,
  469 U.S. 38 (1984) ....................................................................................... 4
*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ................................................................................. 1, 5

**Cases**
*Campbell v. Boston Sci. Corp.*,
  882 F.3d 70 (4th Cir. 2018) ......................................................................... 5
*Federal Trade Commission v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ....................................................................... 2
*Kaiser v. Johnson & Johnson*,
  947 F.3d 996 (7th Cir. 2020) ....................................................................... 5
*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) ..................................................................... 4
*United States v. Lewis*,
  493 F. Supp. 3d 858 (C.D. Cal. 2020) ........................................................ 4

*Altair Instruments, Inc. v. Telebrands Corp.*,
  2021 WL 5238787 (C.D. Cal. Feb. 18, 2021) ............................................. 4
*Carter v. Johnson & Johnson*,
  No. 2:20-cv-01232, 2022 U.S. Dist. LEXIS 178596, 2022 WL 4700549 (D. Nev. Sept. 29,
  2022) ............................................................................................................. 5
*Enberg v. Ethicon, Inc.*,
  No. 2:20-cv-02477, 2022 U.S. Dist. LEXIS 51601; 2022 WL 850762 (E.D. Cal. Mar. 21,
  2022) ............................................................................................................. 5
*United States v. Holmes*,
  2021 WL 2044470 (N.D. Cal. November 6, 2021) ...................................... 4

1    **RELIEF REQUESTED**

2    Plaintiff, Surgical Instrument Service Company, Inc. ("SIS") hereby moves in limine to

3    exclude all testimony[1], documentary evidence, and argument related to (1) the FDA's

4    regulatory framework and procedures for clearance of medical devices for commercial

5    marketing, (2) Intuitive's FDA 510(k) clearance of EndoWrists, (3) the contention that

6    Intuitive's FDA 510(k) clearance of EndoWrists requires adherence to Intuitive use limits; (4)

7    the contention that Intuitive's FDA 510(k) clearance of EndoWrists is evidence that those use

8    limits ensure or relate to patient safety; and (5) the contention that Intuitive's FDA 510(k)

9    clearance of EndoWrists is evidence of the actual number of times an EndoWrist can be used

10    from an engineering/failure perspective.

11    **FACTS**

12    This Court previously addressed the FDA's 510(k) process in adjudicating the parties'

13    cross-motions for summary judgment:

14    > Manufacturers or remanufacturers of Class II devices need only submit a

15    > "premarket notification" to the FDA in accordance with the less burdensome

16    > "510(k) process" rather than the more rigorous process of obtaining "premarket

17    > approval" from the FDA necessary for manufacturers of Class III devices.

18    > *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477-79 (1996) (contrasting the two

19    > procedures); *see also* 21 C.F.R. § 807.81(a). "Section 510(k)" refers to the section

20    > of the original MDA containing this provision, and it sets forth the procedure by

21    > which a medical device that is "substantially equivalent" to a device that is already

22    > on the market can be cleared for sale without undergoing the more rigorous pre-

23    > market review and approval process. *See* 21 U.S.C. § 360(k); *see also Medtronic*,

24    > 518 U.S. at 478-79.

25    Dkt. 204 at 4:28-5:9. The Court considered communications between the FDA and third parties

26    Restore, Rebotix, and Iconocare regarding their EndoWrist services (*id.* at 5:11-7:13),

27    _____

28    [1] For purposes of this motion, "testimony" includes lay person and expert testimony presented
at trial either live or through video recordings of deposition testimony.

1  ultimately acknowledging that the "FDA has expressly disclaimed concluding that a violation

2  exists, and it has taken no final position on the need for 510(k) clearance here." *Id.* at 12:22-

3  23. "The Court, as other before it, declines Intuitive's invitation to step into the FDA's shoes

4  and determine whether SIS's services require 510(k) clearance." *Id.* at 13:4-5. Accordingly,

5  the Court granted summary judgment in SIS's favor on Intuitive's Lanham Act claims and

6  unclean hands defenses related to FDA 510(k) clearance. *Id.* at 11:14-14:28; *see also* Dkt. 240,

7  Exhibit A, Order Clarifying the Scope of the Court's Summary Judgment Order.

8       Intuitive sought summary judgment on SIS's claims based on two arguments. The first

9  argument posited that SIS lacked antitrust injury because it lacked 510(k) clearance for its

10  services.  This was rejected for the same reasons that SIS's motion was granted: "[T]his Court

11  will not permit Intuitive to seek private enforcement of the FDCA, an issue upon which

12  Intuitive's argument against injury causation rests." Dkt. 204 at 16:23-24.

13       Intuitive's second argument was that SIS could not prevail on its antitrust claims based

14  on purportedly undisputed evidence of Intuitive's "procompetitive rationales" for its actions.

15  Dkt. 204 at 17:10-18. According to Intuitive, "it had a reasonable basis for concluding that

16  EndoWrist use limits were necessary, a conclusion affirmed by the FDA in its initial approval

17  of the instruments." *Id.* at 18:11-13. Relevant to this Motion, the Court held that "[t]o the extent

18  Intuitive argues that its anticompetitive behavior arose from a good-faith attempt to ensure . .

19  . compliance with FDA regulations, it has failed to provide a nonpretextual 'procompetitive

20  rationale.' *See* [*FTC*] *v. Qualcomm*[*, Inc.*], 969 F.3d [974,] 991 (9th Cir. 2020)." *Id.* at 18:17–

21  20.

22       Despite these rulings, Intuitive apparently still intends to inject issues of EndoWrist

23  510(k) approval, remanufacturing, and other FDA clearances into the upcoming trial. For

24  example, **in its exhibit list** Intuitive seeks to introduce at least thirty-three EndoWrist 510(k)

25  documents (Van Hoven Ex. 1 at DX1771.01-DX1771.33), at least eight pre-market approval

26  documents for the da Vinci surgical robot (*Id.* at DX1770.01-DX1771.08), numerous other

27  Intuitive FDA and 510(k) documents (*Id.* at DX1378, DX1410, DX1412, DX1424, DX1452),

28  as well as the same and similar communications between the FDA and Rebotix, Restore, or

1    Iconocare, that the Court considered during summary judgment. *E.g.*, *id.* at DX0256, DX0257,

2    DX0268, DX1305, DX1308, DX1473, DX1489, DX1516, DX1679.

3         In its **witness list**, three of ten "Intuitive Fact Witnesses" plan to testify about "regulatory

4    issues," "regulatory affairs," or "communications with regulators" and three third parties are

5    proposed to testify regarding "[c]ompetition in the alleged market for the repair and

6    replacement of EndoWrist instruments and regulatory issues." Van Hoven Ex. 2 at pp. 2-4.

7    **Intuitive's FDA expert,** Christy Foreman, intends to testify that "Intuitive's marketing and

8    sale of EndoWrist instruments with usage limits is consistent with FDA's regulatory

9    requirements" and that "Intuitive's cybersecurity measures are consistent with FDA

10   expectations for devices that are vulnerable to cybersecurity threats." Van Hoven Ex. 3 at p.8.

11   **Intuitive's engineering expert**, Dr. Robert D. Howe, intends to opine that "the risk

12   management and life data submitted to the FDA for the Iconocare Process is significantly more

13   robust than the risk management and life testing data Rebotix had access to in connection with

14   the Rebotix Process." Van Hoven Ex. 4 at p. 10, ¶ 35. Intuitive's intended use of these FDA

15   documents and witnesses at trial is clear from **its proposed jury instructions**. Specifically,

16   Intuitive apparently intends to use a stamp of FDA approval, or lack thereof, to short-circuit

17   legitimate proofs of other contested issues in this case:

18   • "The Food and Drug Administration (FDA) has granted clearance to Intuitive to market

19     and sell the da Vinci and EndoWrist instruments as safe and effective." Van Hoven Ex.

20     5 at p. 3.

21   • "Intuitive contends . . . the use of EndoWrist instruments beyond the number of lives . .

22     . cleared by the FDA presents serious risks to health and safety of patients; Intuitive has

23     no way to ensure the safety and effectiveness of unauthorized third-party products and

24     services that have not been cleared by the FDA[.]" *Id.* at p. 34.

25   • "All computer-controlled surgical instrument systems and the instruments used with

26     them, including those that are remanufactured, are required to be approved or cleared by

27     the FDA." *Id.* at p. 71.

28

1    **ARGUMENT**

2    <u>Legal Standards - Motions in Limine</u>

3    "A motion in limine is a procedural mechanism to limit in advance testimony or evidence

4    in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Motions in

5    limine are vehicles by which a court may exclude inadmissible or prejudicial evidence before

6    it is "actually offered." *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Motions in limine

7    "avoid the futile attempt of unringing the bell when jurors have seen or heard inadmissible

8    evidence, even when stricken from the record"; "streamline trials, by settling evidentiary

9    disputes in advance and by minimizing side-bar conferences and other disruptions at trial";

10   and "permit more thorough briefing and argument on evidentiary issues than would be likely

11   during trial." *Altair Instruments, Inc. v. Telebrands Corp.*, 2021 WL 5238787, at *1 (C.D. Cal.

12   Feb. 18, 2021) (cleaned up). "[M]otions in limine must identify the evidence at issue and state

13   with specificity why such evidence is inadmissible." *United States v. Lewis*, 493 F. Supp. 3d

14   858, 861 (C.D. Cal. 2020) (cleaned up) (citation omitted).

15   <u>Admissibility of Relevant Evidence Under Federal Rules of Evidence 401,</u>
16   <u>402, and 403</u>

17   Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible" unless

18   the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or "other rules

19   prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 402. Evidence is "relevant"

20   if: (1) "it has any tendency to make a fact more or less probable than it would be without the

21   evidence"; and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401.

22   "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Federal Rule of Evidence 403

23   permits a court to exclude relevant evidence "if its probative value is substantially outweighed

24   by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading

25   the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R.

26   Evid. 403. Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to

27   lure the factfinder into declaring guilt on a ground different from proof specific to the offense

28   charged.' " *United States v. Holmes*, 2021 WL 2044470 at *5 (N.D. Cal. November 6, 2021).

<u>Evidence Attempting to Prove that the FDA Required Usage Limits for
EndoWrists, or that Adherence to Such Use Limits Are Required or
Related to Patient Safety Should Be Excluded Under Fed. R. Evid. 402
and 403</u>

"[T]he 510(k) process is focused on equivalence, not safety." *Medtronic*, 518 U.S. at 493 (internal quotation omitted). Yet, as evidenced by Intuitive's jury instructions and proposed presentation to the jury discussed above, Intuitive's main purpose in presenting its own EndoWrist 510(k) approvals and related evidence is the improper purpose of demonstrating that its use limits are required for safety and that exceeding those limits is unsafe. Courts regularly reject medical device companies' attempts to short-circuit analyses of actual product safety data through presentation of FDA 510(k) approvals and related documents, recognizing that such approvals are of minimal relevance to product and patient safety. *See, e.g., Enberg v. Ethicon, Inc.*, No. 2:20-cv-02477, 2022 U.S. Dist. LEXIS 51601 at *22; 2022 WL 850762 (E.D. Cal. Mar. 21, 2022) ("[C]ourts have found (again and again) that 510(k) clearance does not amount to a safety regulation requiring device producers to meet any established design standards." (quotation omitted)); *Carter v. Johnson & Johnson*, No. 2:20-cv-01232, 2022 U.S. Dist. LEXIS 178596 at *7, 2022 WL 4700549 (D. Nev. Sept. 29, 2022) ("section 510(k) clearance 'does not amount to a safety regulation requiring device producers to meet any established design standards'").

Even if Intuitive now attempts to backtrack and create some other reason to bring these documents and testimony into evidence, the minimal probative value of this evidence is substantially outweighed by the risks of juror confusion and undue deference to a federal agency. *E.g.*, *Carter*, 2022 U.S. Dist. LEXIS 178596 at *7-8 ("many hours, and possibly days, of complex testimony about regulatory compliance . . . could lead jurors to erroneously conclude that regulatory compliance proved product safety"); *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1018 (7th Cir. 2020) ("It was reasonable to conclude that the probative value of this evidence was minimal at best and that admitting it would precipitate a confusing sideshow over the details of the § 510(k) process."); *Campbell v. Boston Sci. Corp.*, 882 F.3d 70, 77 (4th Cir. 2018) ("Admitting the evidence on these grounds would invite a battle of the experts

1    regarding the exact meaning of 510(k) approval in these circumstances, and would risk the

2    same jury confusion we feared in [a prior case.]").

3    <u>Curative Instruction</u>

4        There may be instances – for example, Intuitive's agreements with hospitals – in which

5    statements regarding 510(k) clearance or remanufacturing are included with other evidence

6    properly presented to the jury.  SIS respectfully requests a curative instruction as presented in

7    Van Hoven Exhibit 6 to address such instances.

8                                 **CONCLUSION**

9        For the foregoing reasons, Plaintiff SIS respectfully requests that the Court grant this

10   motion in limine #5, excluding Intuitive from presenting testimony, documentary evidence,

11   and argument documentary evidence, and argument related to (1) the FDA's regulatory

12   framework and procedures for clearance of medical devices for commercial marketing, (2)

13   Intuitive's FDA 510(k) clearance of EndoWrists, (3) the contention that Intuitive's FDA

14   510(k) clearance of EndoWrists requires adherence to Intuitive use limits; (4) the contention

15   that Intuitive's FDA 510(k) clearance of EndoWrists is evidence that those use limits ensure

16   or relate to patient safety; and (5) the contention that Intuitive's FDA 510(k) clearance of

17   EndoWrists is evidence of the actual number of times an EndoWrist can be used from an

18   engineering/failure perspective.

19   Dated: <u>October 28, 2024</u>              McCAULLEY LAW GROUP LLC
                                                 By:    <u>/s/ Joshua Van Hoven</u>
20                                                    JOSHUA V. VAN HOVEN

21                                               E-Mail: josh@mccaulleylawgroup.com
                                                 3001 Bishop Dr., Suite 300
22                                               San Ramon, California 94583
                                                 Telephone: 925.302.5941
23
                                                 RICHARD T. MCCAULLEY (*pro hac vice*)
24                                               E-Mail: richard@mccaulleylawgroup.com
                                                 180 N. Wabash Avenue, Suite 601
25                                               Chicago, Illinois 60601
                                                 Telephone: 312.330.8105
26
                                                 *Attorneys for Plaintiff and Counter-Defendant,*
27                                               SURGICAL INSTRUMENT SERVICE
                                                 COMPANY, INC.
28

**CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2024, I caused a copy of the foregoing

**PLAINTIFF SIS's MOTION IN LIMINE #5**, to be electronically to be served *via*

electronic mail to counsel of record:

**Crystal Lohmann Parker**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: cparker@paulweiss.com

**Joshua Hill , Jr.**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
(628) 432-5123
Email: jhill@paulweiss.com

**Kenneth A. Gallo**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street NW
Washington, DC 20006-104 7
202-223-7356
Fax: 202-204-7356
Email: kgallo@paulweiss.com

**Paul David Brachman**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K St., NW
Washington, DC 20006
202-223-7440
Email: pbrachman@paulweiss.com

**William Michael**
Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: WMichael@paulweiss.com

**Allen Ruby**
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
408-4 77-9690
Email: allen@allenruby.com

1   **Andrew David Lazerow**
    Covington & Burling LLP
2   One CityCenter
    850 Tenth Street, NW
3   Washington, DC 20001-4956
    202-662-5081
4   Email: alazerow@cov.com

5   **Kathryn Elizabeth Cahoy**
    Covington & Burling LLP
6   3000 El Camino Real
    5 Palo Alto Square, 10th Floor
7   Palo Alto, CA 94306
    650-632-4700
8   Email: kcahoy@cov.com

9   **Sonya Diane Winner**
    Covington & Burling LLP
10  Floor 54
    415 Mission Street
11  San Francisco, CA 94105-2533
    (415) 591-6000
12  Email: swinner@cov.com

13

14  Dated: <u>October 28, 2024</u>          By: <u>   /s/ Joshua Van Hoven   </u>
                                                  JOSHUA V. VAN HOVEN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

(173 of 206), Page 173 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 173 of 206
Case 3:21-cv-03496-AMO    Document 403    Filed 01/07/25    Page 413 of 547

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | Case No. 3:21-cv-03496-AMO |
| *Plaintiff*, | **DEFENDANT INTUITIVE SURGICAL INC.'S OPPOSITION TO PLAINTIFF SURGICAL INSTRUMENT SERVICE, INC.'S MOTION *IN LIMINE* #5** |
| v. | |
| INTUITIVE SURGICAL, INC., | Date:  November 25, 2024 |
| *Defendant*. | Time:  11:00 a.m. |
| | Courtroom:  10 |
| | The Honorable Araceli Martínez-Olguín |

1    SIS's motions *in limine* ("MILs") Nos. 1 and 5 effectively ask the Court to exclude any

2    mention of the FDA from the upcoming trial.[1]  SIS bases its arguments entirely on the Court's

3    order denying Intuitive's motion for summary judgment.  Mot. at 1–2.  As a result, all of the

4    reasons presented in Intuitive's opposition to MIL No. 1 apply equally to MIL No. 5.  The Court

5    should deny MIL No. 5 based on the arguments in Intuitive's opposition to MIL No. 1 (which is

6    incorporated here by reference) as well as for the additional reasons set forth herein.

7    **I.    EVIDENCE RELATING TO 510(K) CLEARANCES FOR ENDOWRISTS IS
      RELEVANT TO SIS'S ANTITRUST CLAIMS.**

8    The relevance arguments in Intuitive's opposition to SIS's MIL No. 1 apply equally to

9    evidence relating to 510(k) clearances for EndoWrists by Intuitive and Iconocare.  The facts of

10   those clearances, and SIS's lack of 510(k) clearance, are relevant to a number of disputed issues

11   on SIS's antitrust claims—including the competitive effects analysis required under the rule of

12   reason, causation, and damages.  *See* Opp. MIL No. 1 at 2–5.[2]  Nothing in SIS's one page of

13   argument about the evidence it challenges in MIL No. 5, Mot. at 5, changes that.

14   *First*, SIS's attack on ***all*** FDA-related evidence about usage limits, *id.*, is unavailing.  SIS

15   did not move for summary judgment on any aspect of its antitrust claims, and the Court did not

16   grant SIS summary judgment on whether Intuitive's usage limits and related policies have

17   procompetitive justifications.  Rather, the Court unequivocally left that issue for the jury:

18       Intuitive claims that its conduct related to the EndoWrist market has certain
19       benefits, including ensuring product reliability and minimizing risks to patients.

---

[1] SIS's two motions *in limine* totaling 13 pages on the topic of FDA-related evidence violated the Court's Pretrial Order permitting one motion of up to seven pages on "a single, separate topic." *See* Dkt. 235 at 3, § II.B.  The Court should deny MIL Nos. 1 and 5 on this ground alone.  *See* Fed. R. Civ. P. 16(f)(1)(C).

[2] FDA-related evidence is relevant to other issues.  For example, the FDA's policies regarding cybersecurity and data security are relevant to explain why Intuitive changed the encryption technology on X/Xi EndoWrists and thus is part of Intuitive's defense to the claim that this change in technology was itself anticompetitive.  *See* Dkt. 1 ¶ 107 (alleging that "Intuitive's sole purpose" in changing the encryption technology "is to prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits"); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) ("There is no violation of Section 2 unless plaintiff proves that some conduct of the monopolist associated with its introduction of a new and improved product design 'constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market.'" (citation omitted)).

> Although patient safety appears to be an important rationale for the manufacture of surgical robots, SIS argues that such justification amounts to mere pretext.  Indeed, SIS proffers conflicting evidence regarding the patient safety justifications for Intuitive's use limits.  The directly conflicting evidence regarding the potential benefits of Intuitive's conduct is best left for a jury to weigh.

Dkt. 204 at 18 (citations omitted).  Allowing SIS to challenge this Court's ruling now through a motion *in limine* would be improper and prejudice Intuitive.  *See, e.g.*, *Pavo Sols. LLC v. Kingston Tech. Co.*, 2020 WL 1049911, at *1 (C.D. Cal. Feb. 18, 2020) ("allowing a party to litigate matters" in a motion *in limine* "that have been or should have been resolved at an earlier stage not only allows those dissatisfied with the court's initial ruling a chance to relitigate, but also deprives their opponents of those crucial procedural protections that attach at summary judgment" (cleaned up)).

Second, SIS's reliance on product liability cases excluding evidence of 510(k) clearance under Rule 403, Mot. at 5, is entirely misplaced.  As an initial matter, those are all cases in which a party was contesting whether, or to what extent, a clearance determination by the FDA actually involved a determination of safety and effectiveness.  Here, that issue is not in dispute.  Everyone agrees that the FDA determined Intuitive's EndoWrists to be as safe and effective as the predicate devices identified.  If the FDA had not made that determination, SIS would have had **no** basis to tell customers that it could "extend the[] **safe and effective** life" of EndoWrists by resetting the use counter.  *See, e.g.*, Ex. 1 at -127 (emphasis added).[3]  Everyone also agrees that the FDA determined Iconocare's modified EndoWrist to be as safe and effective as Intuitive's EndoWrists.  Ex. 2 ¶¶ 120–21; Ex. 3 ¶¶ 129–30.  And it is undisputed that the FDA made **no** such determination of safety and effectiveness as to EndoWrists modified by Rebotix and re-sold by SIS.  The cases that SIS cites do not remotely support an argument that these facts—all of which SIS itself has put at issue, *see* Opp. to MIL No. 1 at 2–4—are not relevant or probative in the context of SIS's antitrust claims, or that it would be unfairly prejudicial for the jury to hear them.

SIS's reading of *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), Mot. at 5, misses the mark.  The Supreme Court acknowledged in that case that "the FDA may well examine § 510(k) applications . . . with a concern for the safety and effectiveness of the device," *Medtronic*, 518

---

[3] "Ex." refers to the exhibits to the Declaration of Andrew Lazerow in Support of Intuitive Surgical Inc.'s Opposition to SIS's Motion *in Limine* #5.

1   U.S. at 493, and has since clarified that "the FDA simultaneously maintains the exhaustive PMA

2   and the more limited § 510(k) processes *in order to ensure . . . that medical devices are reasonably*

3   *safe and effective*," *Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349–50 (2001) (emphasis

4   added).  And more recently, one court in this circuit explained that the Supreme Court in *Medtronic*

5   "did ***not*** find that [510(k) clearance] has no bearing on a device's safety and effectiveness." *Otero*

6   *v. Zeltiq Aesthetics, Inc.*, 2018 WL 3012942, at *3 (C.D. Cal. June 11, 2018) (emphasis added).

7   Thus, SIS "ignores the significance of the FDA's decision" to classify a device as Class II, which

8   indicates that "certain 'special controls' provide 'reasonable assurance of the safety and

9   effectiveness of the device.'"  *Id.* (citations omitted).  "It follows that" Intuitive's argument that

10  the FDA determined that its instruments are safe and effective "is not a claim that can only be

11  made if the procedure was FDA approved and not FDA Cleared."  *Id.* (cleaned up).

12          Further, in contrast to cases SIS cites, Mot. at 5, this is not a case where there are reasons

13  to doubt the rigor of a particular 510(k) or where the clearance itself has "several red flags" such

14  that it is not probative of actual safety.  *See, e.g.*, *Kaiser v. Johnson & Johnson*, 947 F.3d 996,

15  1018 (7th Cir. 2020).  Rather, the facts here demonstrate that safety and effectiveness was central

16  to the 510(k) process for EndoWrists.  For example, the FDA issued a deficiency letter to Rebotix

17  that identified over 50 deficiencies in its 510(k) submission for modified EndoWrists in 2015 (the

18  same instruments SIS offered to hospitals).  Ex. 4.  The FDA requested, among other items,

19  additional information "necessary to establish substantial equivalence, *in terms of safety*, to the

20  predicate device." *Id.* at 21 (emphasis added).  The FDA asked Rebotix to repeat its "*safety testing*

21  on end-of life devices," *id.* at 23 (emphasis added), and raised concerns about sterilization of

22  patient-contacting parts of the devices, *id.* at 3, 11, 14–15, 21–22.

23  ██████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████

25  ██████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████████████

28  ██████████████████████████████████████████████████████████

1

2

3        FDA's concern with safety and effectiveness around extending the number of uses of

4  EndoWrists also permeated other FDA communications that SIS seeks to exclude. Mot. at 1–2.

5  For example, when Rebotix engaged with the FDA in 2022 about the regulatory status of modified

6  EndoWrists, FDA's team lead focused on safety and effectiveness as the basis for FDA's view

7  "that the activities of Rebotix constitute remanufacturing and would require FDA review and

8  clearance (e.g. 510(k) / de Novo)," and for FDA's resulting request that "Rebotix stop engaging

9  in the current activities until an application is reviewed and cleared/granted":

> 10  ***The instruments in question no longer maintain the same safety and effectiveness profile as cleared with the original manufacturer's own submission***. During
> 11  premarket review, FDA reviews test data to the labeled number of reuse cycles. This includes, but is not limited to, items such as electrical safety, reprocessing,
> 12  software, and general performance testing. By extending the number of uses and modifying the instrument with a new chip, ***the prior information is no longer valid***
> 13  ***and requires additional review to the new labeled usage limit in order to establish***
> 14  ***safety and effectiveness***.

15  Ex. 7 at -727 (emphasis added).

16        *Third*, the product liability cases on which SIS relies, Mot. at 5, are also of no use here

17  because evidence of 510(k) clearance was tangential (at best) to the product liability issues in those

18  cases, whereas such evidence is centrally relevant to SIS's antitrust claims. *See Carter v. Johnson*

19  *& Johnson*, 2022 WL 4700549, at *1 (D. Nev. Sept. 29, 2022) (citing Mem. Op. & Order at 7,

20  *Carter v. Johnson & Johnson*, No. 2:20-cv-01232 (D. Nev. June 28, 2020), Dkt. 148-11 (finding

21  that opinions about the 510(k) regulatory framework were "not helpful to the jury in determining

22  the facts at issue in these cases")); *cf.* Dkt. 203 at 20 ("Phillips's knowledge and experience with

23  the regulatory framework, however, will 'help the trier of fact to understand the evidence or to

24  determine a fact in issue[.]'" (citation omitted)). Whether an injured patient plaintiff in a product

25  liability case could prove that the device was defective is a starkly different inquiry than whether,

26  for example, it was reasonable under the antitrust laws for Intuitive to require that third-party

27  products and services used with its systems be authorized—and to rely on 510(k) clearance as an

28  indicator of safety and effectiveness where a third party declined to present clinical evidence of

1    safety directly to Intuitive.  The issues here are about the competitive impact of 510(k) clearance,

2    not whether Intuitive's designs meet a reasonable design standard under state tort laws.  *See*

3    *Campbell v. Bos. Sci. Corp.*, 2016 WL 5796906, at * 15 (S.D.W. Va. Oct. 3, 2016) ("Jurors are

4    likely to believe that FDA enforcement relates to the validity of the plaintiffs' state law tort claims,

5    which it does not. . . . [A]lleged shortcomings in FDA procedures are not probative to a state law

6    products liability claim." (citation omitted)).

7         *Finally*, *Enborg v. Ethicon, Inc.*, 2022 WL 850762 (E.D. Cal. Mar. 22, 2022), on which

8    SIS relies, Mot. at 5, is inapposite.  Whether the 510(k) process requires device producers to "meet

9    any established design standards," *id.* at 5, is not the issue here.  Instead, the question is whether

10   the 510(k) process requires manufacturers to make a showing to the FDA sufficient to ensure the

11   safety and efficacy of its devices.  The answer to that question is unquestionably yes for the reasons

12   shown above.  SIS's own FDA expert acknowledges, for example: "The objective of FDA device

13   regulation is to provide the American public with reasonable assurance of the safety and

14   effectiveness for all medical devices[.]"  Ex. 2 ¶ 20; *see id.* ¶ 24 ("FDA regulation of devices

15   provides a 'reasonable assurance of safety and effectiveness.'").

16   **II.    FDA-RELATED EVIDENCE IS RELEVANT TO THE CREDIBILITY OF SIS'S
         WITNESSES.**

17

18        FDA-related evidence is also relevant to the jury's determination of the credibility of SIS's

19   witnesses.  *See, e.g.*, *Henderson v. George Washington Univ.*, 449 F.3d 127, 139 (D.C. Cir. 2006)

20   (Rule 403 did not justify exclusion of evidence that had probative value both as "affirmative

21   evidence" and "for purposes of impeachment, rebuttal, and rehabilitation.").  SIS's executives,

22   Greg Posdal and Keith Johnson, both testified that they knew that Rebotix had applied for FDA

23   clearance but did not know whether Rebotix had been granted clearance. Ex. 8 at 54:23–54:7; Ex.

24   9 at 65:10–16, 66:2–6.  Indeed, both of them claim to know nothing about the information in

25   Rebotix's application or the FDA's response in its extensive deficiency letter to Rebotix, even

26   though they repeatedly told customers the device had been proven safe.  *See* Ex. 9 at 66:7–23; Ex.

27   8 at 55:8–19; Ex. 10 at 49:23–50:1.  Intuitive is entitled to a thorough cross-examination of SIS's

28   trial witnesses, including on this topic that goes to their credibility.  *See, e.g.*, *Palantir Techs. Inc.*

1   *v. Abramowitz*, 639 F. Supp. 3d 981, 986–87 (N.D. Cal. 2022) (denying motion *in limine* to exclude

2   evidence that implicated the credibility of the plaintiff company's officer because the relevance of

3   the "critical" witness's credibility was not substantially outweighed by the Rule 403 dangers).

4   **III.    SIS CANNOT MEET THE HIGH BAR FOR EXCLUSION UNDER RULE 403.**

5           Rule 403 sets a "high bar" for exclusion, *Sidibe v. Sutter Health*, 103 F.4th 675, 691 (9th

6   Cir. 2024), which SIS cannot satisfy.  Excising all references to FDA clearance from the trial

7   would create a false and misleading evidentiary record and prejudice Intuitive.  *See Armor Corr.*

8   *Health Servs., Inc. v. Teal*, 2022 WL 18458135, at *5–6 (S.D. Fla. Jan. 7, 2022) (denying motion

9   *in limine* to exclude evidence that defendant "[wa]s entitled to present" where plaintiff did not

10  "demonstrate[] that this evidence is clearly inadmissible").  And SIS cannot show this is evidence

11  "of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial

12  effect."  *United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015) (citation omitted).

13          SIS argues that introduction of FDA clearance evidence would present a risk of "undue

14  deference to a federal agency," Mot. at 5, but it neither articulates any specific reasons establishing

15  such a risk nor shows that the risk substantially outweighs the probative value of the evidence.  *See*

16  *Munoz v. PHH Mortg. Corp.*, 2022 WL 138670, at *2 (E.D. Cal. Jan. 14, 2022) (denying motion

17  *in limine* because "the party invoking Rule 403 has to carry a 'significant burden'" and the moving

18  party failed to offer "specific reasons why the jury will be confused" (citation omitted)).   In

19  *Tenorio v. Pitzer*, the district court considered a motion to exclude an opinion letter from the DOJ

20  on the grounds that "the jury would give undue deference to the opinion of the DOJ and substitute

21  the DOJ's conclusions for its own judgment."  2019 WL 687853, at *10 (D.N.M. Feb. 19, 2019).

22  The court denied the motion, holding that the letter was "highly probative of the issues" and "its

23  probative value is not outweighed by the danger of prejudice, confusion of the issues, or misleading

24  the jury."  *Id.* at *12; *see also id.* ("Defendants' arguments concerning errors, conflicting

25  statements, and omissions in the report are issues ripe for cross examination and go to the weight

26  the jury should give the evidence . . .");  *Tijerina v. Alaska Airlines, Inc.*, 2024 WL 2097902, at *7

27  (S.D. Cal. May 9, 2024) (denying motion *in limine* to exclude EEOC records where the moving

28  party failed to show that the evidence "will likely confuse the jury, who will misunderstand the

EEOC's role and give the EEOC's work product undue deference"). SIS fails to explain how the risk of juror confusion (if any) would outweigh the probative value of evidence about FDA clearance in a case about medical devices and safety. Indeed, this is just another example of how SIS is trying to distort the record by hiding clearly relevant and probative evidence from the jury. In the real world, FDA clearance *is* recognized as a marker of quality and reliability by hospitals, and thus has an effect on demand for medical devices, as the record in this case establishes. *See* Opp. to MIL No. 1 at 5. That is part of what makes the evidence relevant—not unduly prejudicial.

Even so, Intuitive is not asking the jury to defer to the FDA; rather, the evidence will allow the jury to understand the history of the usage limits and contractual restrictions and Intuitive's intent in implementing them. "There is nothing unfair about admitting evidence of precisely that." *Sidibe*, 103 F.4th at 702; *see also id.* ("The history of a restraint and the reasons for adopting it are essential aspects of the rule of reason analysis . . ."). Additionally, the jury could consider the evidence that Rebotix used a reset process that the FDA found to be deficient and determine that SIS's inattentiveness to these deficiencies, and resulting inability to address customer concerns about safety, caused its injury, not Intuitive's conduct. *See* Opp. to MIL No. 1 at 5.

SIS relies on FDA regulations to show that its modified EndoWrists—which are not cleared by FDA and did not meet FDA standards for clearance—are safe. At the same time, SIS argues that Intuitive cannot present evidence that its devices—which *are* reviewed and cleared by FDA, in carrying out its charge to "ensure . . . that medical devices are reasonably safe and effective," *Buckman*, 531 U.S. at 349–50—have a reasonable assurance of safety. SIS cannot have it both ways. *See, e.g.*, *In re HHE Choices Health Plan, LLC*, 2019 WL 6112679, at *12 (Bankr. S.D.N.Y. Nov. 15, 2019) ("[Plaintiff] would like to tell a one-sided story in which he is free to tell the jury about the Defendants' negative dealings with regulators, but in which any other dealings with regulators and evidence of regulatory compliance are off-limits. That is not appropriate.").

## CONCLUSION

For the foregoing reasons and those in Intuitive's Opposition to MIL No. 1, the Court should deny SIS's MIL No. 5.

Dated:  November 7, 2024

By: */s/ Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 8 -

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

1

## **CERTIFICATE OF SERVICE**

2

     On November 7, 2024, I caused a copy of Intuitive's Opposition to SIS's Motion *In Limine*

3

No. 5 to be served via electronic e-mail on counsel of record for Surgical Instrument Service Company, Inc. pursuant to the Court's Schedule and Pretrial Order in this case, ECF No. 235.

4

  Dated:  November 7, 2024          By:  */s/ Kenneth A. Gallo*

5

                                          Kenneth A. Gallo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **MCCAULLEY LAW GROUP LLC**
    JOSHUA V. VAN HOVEN (CSB No. 262815)
2   E-Mail: josh@mccaulleylawgroup.com
    3001 Bishop Dr., Suite 300
3   San Ramon, California 94583
    Telephone: 925.302.5941
4
    RICHARD T. MCCAULLEY (*pro hac vice*)
5   E-Mail: richard@mccaulleylawgroup.com
    180 N. Wabash Avenue, Suite 601
6   Chicago, Illinois 60601
    Telephone: 312.330.8105
7
    *Attorneys for Plaintiff and Counter-Defendant,*
8   SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11   SURGICAL INSTRUMENT SERVICE          CASE NO. 3:21-CV-03496-AMO
     COMPANY, INC.
12                                         Honorable Araceli Martínez-Olguín
              *Plaintiff/Counter-Defendant,*
13                                         **PLAINTIFF SIS's MOTION IN**
         v.                                **LIMINE #1**
14
     INTUITIVE SURGICAL, INC.
15
              *Defendant/Counterclaimant.*
16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

**RELIEF REQUESTED** ........................................................................................... 1

**BACKGROUND** .................................................................................................... 1

**ARGUMENT** ........................................................................................................ 5

Legal Standards - Motions in Limine .................................................................. 5

Admissibility of Relevant Evidence Under Federal Rules of Evidence 401, 402, and 403 .............................................................................................................. 5

Evidence Regarding FDA's 510(k) Framework and the Regulatory Term "Remanufacturing," whether SIS or others' Activities Constitute Remanufacturing, and Intuitive's Website Statement About FDA-Cleared Remanufactured EndoWrists Should All be Excluded Under Fed. R. Evid. 402 and 403 .............................................................................................................. 6

Curative Instruction ........................................................................................... 7

## TABLE OF AUTHORITIES

**Federal Statutes**
Food, Drug, and Cosmetic Act ................................................................................. 2, 3
Lanham Act .................................................................................................................. 2

**Federal Rules**
Federal Rule of Evidence 401 ................................................................................. 1, 5
Federal Rule of Evidence 402 ................................................................................. 5, 6
Federal Rule of Evidence 403 .............................................................................. 1, 5, 6

**Federal Regulations**
21 C.F.R. § 807.81 ....................................................................................................... 3

**United States Supreme Court Cases**
*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)................................................................................................ 2
*Luce v. United States*,
  469 U.S. 38 (1984).................................................................................................. 5

**Federal Cases**
*Amarin Pharma, Inc. v. International Trade Commission*,
  923 F.3d 959 (Fed. Cir. 2019) ............................................................................... 2
*Campbell v. Boston Sci. Corp.*,
  882 F.3d 70 (4th Cir. 2018) ................................................................................... 7
*Kaiser v. Johnson & Johnson*,
  947 F.3d 996 (7th Cir. 2020) ................................................................................. 6
*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2010) ................................................................................. 2
*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) ............................................................................... 5
*United States v. Lewis*,
  493 F. Supp. 3d 858 (C.D. Cal. 2020) ................................................................... 5

*Altair Instruments, Inc. v. Telebrands Corp.*,
  2021 WL 5238787 (C.D. Cal. Feb. 18, 2021)........................................................ 5
*Carter v. Johnson & Johnson*,
  No. 2:20-cv-01232, 2022 U.S. Dist. LEXIS 178596, 2022 WL 4700549 (D. Nev. Sept. 29,
  2022) ....................................................................................................................... 6
*United States v. Holmes*,
  2021 WL 2044470 (N.D. Cal. November 6, 2021) ............................................... 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELIEF REQUESTED**

Plaintiff, Surgical Instrument Service Company, Inc. ("SIS") hereby moves in limine to exclude all testimony[1], documentary evidence, and argument related to (1) the FDA's 510(k) regulatory framework and procedures for clearance of medical devices for commercial marketing, (2) the meaning, scope and application of the regulatory term "remanufacturing", (4) whether SIS or other third parties' EndoWrist activities constitute "remanufacturing" or require 510(k) approval; and (4) the meaning, scope, application and effect of Intuitive's announcement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts.

This evidence is irrelevant under Fed. R. Evid. 401 in light of the narrowed counterclaims resulting from the Court's rulings on the parties' cross motions for summary judgment. Moreover, permitting admission of this evidence at trial would be unduly prejudicial, mislead the jury, confuse the issues and be a waste of trial time under Fed. R. Evid. 403. Admitting this evidence would effectively permit Intuitive to invite the jury to hold SIS liable for conduct which, under the Court's determinations regarding unresolved FDA issues, Intuitive has been foreclosed from challenging.

To the extent the Court grants Intuitive any leeway to present evidence or testimony mentioning the FDA, or that is used for other purposes and references, SIS requests that the Court direct Intuitive to provide notice at the beginning of the trial day that evidence or testimony related to the FDA will be presented to the jury. In response to such notice, SIS requests that the Court read the proposed cautionary instruction to the jury before any such evidence is presented. The proposed cautionary instruction accompanies this motion as Van Hoven Exh. 5.

**BACKGROUND**

Through the presentation of certain testimony and documentary exhibits at trial identified above, Intuitive essentially is asking the jury to determine whether SIS's aftermarket

---

[1] For purposes of this motion, "testimony" includes lay person and expert testimony presented at trial either live or through video recordings of deposition testimony.

-1-
SIS MOTION IN LIMINE #1

EndoWrist-related services required Section 510(k) clearance from the FDA. This conflicts with  the Court's ruling in the Order Re: Cross Motions for Summary Judgment (Dkt. 204 p. 10):

> "[T]his query is problematic because '[t]he FDCA [(Food, Drug, and Cosmetic Act)] leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions.' *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Indeed, a private action brought under the Lanham Act may not be pursued when it requires litigating an alleged underlying FDCA violation where the FDA has not itself concluded that a violation exists. *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (affirming grant of summary judgment for defendant on Lanham Act false advertising claim where FDA had not taken a position on defendant's laser's need for Section 510(k) clearance, and claim was based on defendant allegedly misrepresenting that its laser had received FDA clearance). * * * [C]ourts have consistently precluded private actions which require establishing a violation of the FDCA. *See, e.g., Amarin Pharma, Inc. v. International Trade Commission*, 923 F.3d 959, 968 (Fed. Cir. 2019) (citing *PhotoMedex*, 601 F.3d at 924, 928) (finding that Lanham Act claim could not stand where it was "based on proving violations of the FDCA and where the FDA has not taken the position that the articles at issue do, indeed, violate the FDCA.")."

In this case, the Court has considered communications between FDA and third parties Restore, Rebotix, and Iconocare regarding their EndoWrist services (*id.* at 5:11-7:13), ultimately acknowledging that "FDA has expressly disclaimed concluding that a violation exists, and it has taken no final position on the need for 510(k) clearance here." *Id.* at 12:22-23. "The Court, as others before it, declines Intuitive's invitation to step into the FDA's shoes and determine whether SIS's services require 510(k) clearance." *Id.* at 13:4-5. Accordingly, the Court granted summary judgment to SIS on Intuitive's Lanham Act claims and unclean

1    hands defenses related to FDA 510(k) clearance. *Id.* at 11:14-14:28; *see also* Dkt. 240, Exhibit

2    A, Order Clarifying the Scope of the Court's Summary Judgment Order.

3         In its cross motion for  summary judgment, Intuitive challenged SIS's antitrust claims on

4    a number of bases. Intuitive's first argument posited that SIS lacked antitrust injury because it

5    lacked 510(k) clearance for its services, and was rejected for the same reasons that SIS's

6    motion was granted, *i.e.*, "this Court will not permit Intuitive to seek private enforcement of

7    the FDCA, an issue upon which Intuitive's argument against injury causation rests." Dkt. 204

8    at 16:23-24.

9         Despite these definitive rulings relating to the FDA, Intuitive is asking the jury to

10   determine whether aftermarket EndoWrist services constitute "remanufacturing" under 21

11   C.F.R. § 807.81 by offering its services to consumers without first obtaining Section 510(k)

12   clearance. For example, **in its exhibit list** Intuitive seeks to introduce communications between

13   FDA and Rebotix, Restore, or Iconocare, the subject matter of which the Court fully considered

14   in its summary judgment ruling. *E.g.*, Van Hoven Ex. 1 at DX0256, DX0257, DX0268,

15   DX1305, DX1308, DX1473, DX1489, DX1516, DX1679. In its **witness list**, three of ten

16   "Intuitive Fact Witnesses" plan to testify about "regulatory issues," "regulatory affairs," or

17   "communications with regulators" and three third parties are proposed to testify regarding

18   "[c]ompetition in the alleged market for the repair and replacement of EndoWrist instruments

19   and regulatory issues." Van Hoven Ex. 2 at pp. 2-4. **Intuitive's FDA expert**, Christy Foreman,

20   further intends to opine that "efforts to remove or extend the usage limitation by companies

21   other than the original equipment manufacturer (OEM) constitute remanufacturing activities"

22   and that "[t]hird parties engaging in extending or resetting the lives of EndoWrist instruments

23   are remanufacturers under existing FDA regulation. Therefore, they were required to obtain

24   510(k) clearance. * * * The third parties' arguments that they are not remanufacturers are

25   incorrect." Van Hoven Ex. 2 at 6 ("Ms. Foreman will testify to matters disclosed in her expert

26   report served in this case"); Van Hoven Ex. 3 at pp. 6-7 (Foreman Report).

27        Intuitive's intended use of these FDA documents and witnesses at trial is clear from **its**

28

**proposed jury instructions** – *i.e.*, Intuitive intends to use lack of FDA approval to short-circuit legitimate proofs of other legitimately contested issues in this case:

- "Intuitive contends . . . the use of EndoWrist instruments beyond the number of lives . . . . cleared by the FDA presents serious risks to health and safety of patients; Intuitive has no way to ensure the safety and effectiveness of unauthorized third-party products and services that have not been cleared by the FDA[.]" *Id.* at p. 34.

- "All computer-controlled surgical instrument systems and the instruments used with them, including those that are remanufactured, are required to be approved or cleared by the FDA. The FDA considers a device to be remanufactured when it has been subject to any act that results in a significant change to the device's performance, safety specifications, or intended use, as compared to the device that was originally approved or cleared by the FDA. If you conclude that the insertion of a memory chip into an EndoWrist to change its usage limit is remanufacturing as defined by the FDA, you must find that SIS could not lawfully perform that operation on an instrument to be used for human surgery unless it obtained 510(k) clearance from FDA to perform that action on that particular EndoWrist." *Id.* at p. 71.

- "Intuitive claims that any profits or sales lost by SIS occurred as a result of other factors that have nothing to do with the alleged antitrust violations. These include SIS's failure to seek and obtain clearance from the FDA[.]" Id. at 74.

Intuitive also seeks to leverage its post-discovery, eve-of-summary judgment briefing announcement that it would not enforce its contracts against hospitals that use FDA-approved third-party instruments to bring demand for "FDA-approved" remanufactured EndoWrists[2] inappropriately into the case. See Dkt. 243-1 (seeking discovery as to "how hospitals behaved

---

[2] Intuitive's Executive Vice President and Chief Strategy and Growth Officer, David Rosa, submitted a declaration in this case where he offers testimony about Iconocare Health's FDA-clearance to market a remanufactured S/Si 8mm Monopolar Curved Scissor instrument reset one time with ten additional lives, as well as testimony about Intuitive's website statement. Dkt. 137-2 at ¶¶ 44-46. Intuitive has listed Mr. Rosa as a trial witness and SIS submits that it is reasonable to assume that Mr. Rosa may testify at trial about the subjects in his prior declaration in this case.

in the actual world after Intuitive announced that buying FDA-cleared remanufactured EndoWrists does not violate its contracts").

### **ARGUMENT**

Legal Standards - Motions in Limine

"A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Motions in limine are vehicles by which a court may exclude inadmissible or prejudicial evidence before it is "actually offered." *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Motions in limine "avoid the futile attempt of unringing the bell when jurors have seen or heard inadmissible evidence, even when stricken from the record"; "streamline trials, by settling evidentiary disputes in advance and by minimizing side-bar conferences and other disruptions at trial"; and "permit more thorough briefing and argument on evidentiary issues than would be likely during trial." *Altair Instruments, Inc. v. Telebrands Corp.*, 2021 WL 5238787, at *1 (C.D. Cal. Feb. 18, 2021) (cleaned up). "[M]otions in limine must identify the evidence at issue and state with specificity why such evidence is inadmissible." *United States v. Lewis*, 493 F. Supp. 3d 858, 861 (C.D. Cal. 2020) (cleaned up) (citation omitted).

Admissibility of Relevant Evidence Under Federal Rules of Evidence 401, 402, and 403

Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible" unless the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 402. Evidence is "relevant" if: (1) "it has any tendency to make a fact more or less probable than it would be without the evidence"; and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Federal Rule of Evidence 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R.

Evid. 403. Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.' *United States v. Holmes*, 2021 WL 2044470 at *5 (N.D. Cal. November 6, 2021).

Evidence Regarding FDA's 510(k) Framework and the Regulatory Term "Remanufacturing," whether SIS or others' Activities Constitute Remanufacturing, and Intuitive's Website Statement About FDA-Cleared Remanufactured EndoWrists Should All be Excluded Under Fed. R. Evid. 402 and 403

Testimony and documentary evidence related to the FDA's 510(k) regulatory framework and procedures to clear medical devices for commercial marketing, as well as the meaning, scope and application of the regulatory term "remanufacturing", do not constitute relevant evidence in this case. Nor does evidence about whether SIS or others' activities constituted "remanufacturing." This is also true regarding the meaning, scope, application and effect of Intuitive's statement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts.

The only potential relevance of this evidence – and indeed, the exact reasons Intuitive intends to present this evidence as confirmed by its jury instructions and FDA expert opinions – would be to prove that SIS or its technology partners failed to obtain a required 510(k) clearance. But the Court has already "decline[d] Intuitive's invitation to step into the FDA's shoes and determine whether SIS's services require 510(k) clearance." Dkt. 204 at 13:4-5. A lay jury should not step into the FDA's shoes either. Further, any other potential use of this evidence would invite a "confusing sideshow" and "battle of the experts" for evidence that is tangentially relevant at best. *Carter v. Johnson & Johnson*, No. 2:20-cv-01232, 2022 U.S. Dist. LEXIS 178596 at *7-8, 2022 WL 4700549 (D. Nev. Sept. 29, 2022) ("many hours, and possibly days, of complex testimony about regulatory compliance . . . could lead jurors to erroneously conclude that regulatory compliance proved product safety"); *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1018 (7th Cir. 2020) ("It was reasonable to conclude that the probative value of this evidence was minimal at best and that admitting it would precipitate a confusing sideshow over the details of the § 510(k) process."); *Campbell v. Boston Sci. Corp.*,

882 F.3d 70, 77 (4ᵗʰ Cir. 2018) ("Admitting the evidence on these grounds would invite a battle of the experts regarding the exact meaning of 510(k) approval in these circumstances, and would risk the same jury confusion we feared in [a prior case.]").

Curative Instruction

There may be instances – for example, Intuitive's agreements with hospitals – in which statements regarding 510(k) clearance or remanufacturing may be included with other properly presented evidence at trial.  In that case, SIS respectfully requests the Court read a curative instruction as presented in Van Hoven Exhibit 5 to avoid undue prejudice.

Dated: October 28, 2024

McCAULLEY LAW GROUP LLC
By:  /s/ Joshua Van Hoven
JOSHUA V. VAN HOVEN

E-Mail: josh@mccauleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccauleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE
COMPANY, INC.

1                    **CERTIFICATE OF SERVICE**

2          I hereby certify that on October 28, 2024, I caused a copy of the foregoing

3    **PLAINTIFF SIS's MOTION IN LIMINE #1,** to be electronically to be served *via*

4    electronic mail to counsel of record:

5

6    **Crystal Lohmann Parker**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
7    1285 Avenue of the Americas
     New York, NY 10019
8    212-373-3000
     Email: cparker@paulweiss.com
9
     **Joshua Hill , Jr.**
10   Paul, Weiss, Rifkind, Wharton & Garrison LLP
     535 Mission Street, 24th Floor
11   San Francisco, CA 94105
     (628) 432-5123
12   Email: jhill@paulweiss.com

13   **Kenneth A. Gallo**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
14   2001 K Street NW
     Washington, DC 20006-104 7
15   202-223-7356
     Fax: 202-204-7356
16   Email: kgallo@paulweiss.com

17   **Paul David Brachman**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
18   2001 K St., NW
     Washington, DC 20006
19   202-223-7440
     Email: pbrachman@paulweiss.com
20
     **William Michael**
21   Paul, Weiss, Rifkind, Wharton and Garrison LLP
     1285 Avenue of the Americas
22   New York, NY 10019
     212-373-3000
23   Email: WMichael@paulweiss.com

24   **Allen Ruby**
     Attorney at Law
25   15559 Union Ave. #138
     Los Gatos, CA 95032
26   408-4 77-9690
     Email: allen@allenruby.com
27

28

1    **Andrew David Lazerow**
     Covington & Burling LLP
2    One CityCenter
     850 Tenth Street, NW
3    Washington, DC 20001-4956
     202-662-5081
4    Email: alazerow@cov.com

5    **Kathryn Elizabeth Cahoy**
     Covington & Burling LLP
6    3000 El Camino Real
     5 Palo Alto Square, 10th Floor
7    Palo Alto, CA 94306
     650-632-4700
8    Email: kcahoy@cov.com

9    **Sonya Diane Winner**
     Covington & Burling LLP
10   Floor 54
     415 Mission Street
11   San Francisco, CA 94105-2533
     (415) 591-6000
12   Email: swinner@cov.com

13

14   Dated: <u>October 28, 2024</u>          By: ___<u>/s/ Joshua Van Hoven</u>___
                                                   JOSHUA V. VAN HOVEN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

(196 of 206), Page 196 of 206
Case: 25-1372, 10/29/2025, DktEntry: 67.2, Page 196 of 206
Case 3:21-cv-03496-AMO    Document 401    Filed 01/07/25    Page 263 of 392

1  Kenneth A. Gallo (*pro hac vice*)
   Paul D. Brachman (*pro hac vice*)
2  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   2001 K Street, NW
3  Washington, DC 20006-1047
   Telephone: (202) 223-7300
4  Facsimile: (202) 204-7420
   Email: kgallo@paulweiss.com
5  Email: pbrachman@paulweiss.com

6  William B. Michael (*pro hac vice*)
   Crystal L. Parker (*pro hac vice*)
7  Daniel A. Crane (*pro hac vice*)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8  1285 Avenue of the Americas
   New York, NY 10019-6064
9  Telephone: (212) 373-3000
   Facsimile: (212) 757-3990
10 Email: wmichael@paulweiss.com
   Email: cparker@paulweiss.com
11 Email: dcrane@paulweiss.com

12 Joshua Hill Jr. (SBN 250842)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13 535 Mission Street, 24th Floor
   San Francisco, CA 94105
14 Telephone: (628) 432-5100
   Facsimile: (628) 232-3101
15 Email: jhill@paulweiss.com

16 *Attorneys for Defendant Intuitive Surgical, Inc.*

17 [Additional counsel listed on signature page]

18                    **UNITED STATES DISTRICT COURT**

19                  **NORTHERN DISTRICT OF CALIFORNIA**

20                       **SAN FRANCISCO DIVISION**

21

22 SURGICAL INSTRUMENT SERVICE          Case No. 3:21-cv-03496-AMO
   COMPANY, INC.,
23                                       **DEFENDANT INTUITIVE SURGICAL**
                    *Plaintiff*,         **INC.'S OPPOSITION TO PLAINTIFF**
24        v.                             **SURGICAL INSTRUMENT SERVICE,**
                                         **INC.'S MOTION *IN LIMINE* #1**
25 INTUITIVE SURGICAL, INC.,
26                  *Defendant*.         Date: November 25, 2024
                                         Time: 11:00 a.m.
27                                       Courtroom: 10

28
                                         The Honorable Araceli Martínez-Olguín

1     FDA-related evidence goes to the heart of key factual disputes on SIS's antitrust claims.

2     SIS wrapped itself in the language of the FDA in its Complaint and its communications with

3     customers.  SIS told the marketplace that it could extend the "safe and effective life" of EndoWrists

4     by resetting the use counter.  *See, e.g.*, Ex. 1 at -127.[1]  SIS also told customers it could restore

5     EndoWrists to their "original specifications," without changing their "intended use, method of use,

6     functionality, or performance."  *Id.*; Dkt. 1 ¶¶ 5, 8, 33–34, 78–79.  SIS lay and expert witnesses

7     will testify that Intuitive harmed competition by excluding these modified EndoWrists that were

8     allegedly as "safe and effective" as original EndoWrists.  Two SIS experts rely on the FDA's

9     clearance of a ***different*** modified EndoWrist, made and sold by a ***different*** company, as evidence

10    that modified EndoWrists sold by SIS were safe.

11        The evidence that SIS is trying to keep from the jury undercuts this story.  The modified

12    EndoWrists that SIS marketed were "repaired" and tested exclusively by a third party, Rebotix.

13    But, when Rebotix applied for FDA clearance on its modified EndoWrists, the FDA rejected its

14    application, citing 51 deficiencies in its safety data.  SIS told its customers none of this.  SIS

15    marketing does not even mention Rebotix or its failed quest for FDA clearance.  Instead, SIS

16    falsely alleges in its Complaint, like it falsely told customers, that SIS itself safety-tested the

17    devices.  In reality, SIS did ***no*** testing to support its baseless safety claims.  Intuitive responded by

18    telling hospitals it was concerned about uncleared EndoWrists being used on patients, and

19    reminded hospitals that their warranty could be voided if they used unapproved, modified

20    instruments.  When a different company, Restore/Iconocare, obtained FDA clearance, Intuitive

21    responded differently.  It publicly announced that its contracts would not restrict hospitals from

22    buying FDA-cleared instruments.

23        These facts bear directly on whether Intuitive had legitimate reasons for not warrantying

24    or servicing devices that had been modified by unauthorized third parties, such as Rebotix, while

25    authorizing other products, like Iconocare's, that had been cleared by the FDA.  These facts also

26    bear directly on whether SIS marketed a safe and commercially viable product, or whether it misled

27

28    _____
[1] "Ex." refers to the exhibits attached to the Declaration of Andrew Lazerow in Support of Intuitive Surgical Inc.'s Opposition to SIS's Motion *in Limine* #1.

1  its customers.  With its motions *in limine* ("MILs") Nos. 1 and 5, SIS seeks to hide all of this

2  relevant and probative evidence from the jury.[2]

3          SIS bases its arguments entirely on the Court's summary judgment order that "narrowed"

4  the parties' Lanham Act claims.  Mot. at 1.  Nothing in that order compels or supports the relief

5  SIS seeks.  At summary judgment, the Court held that Intuitive could not proceed with its Lanham

6  Act claim to the extent it required proving that SIS violated the Food, Drugs & Cosmetics Act

7  ("FDCA").  Dkt. 204 at 13.  Intuitive will not offer any evidence for that purpose.  And the Court's

8  *Daubert* rulings confirm that FDA-related evidence is admissible at trial.  The Court excluded

9  ***legal*** opinions of ***SIS's*** FDA expert about whether SIS violated the FDCA.  Dkt. 203 at 20–21.

10 But the Court recognized that both parties' FDA experts should ***not*** be excluded in their entirety

11 because evidence about the "FDA's practices and procedures" would "aid the fact finder."  *Id.*

12 Nothing has changed.  FDA-related evidence will aid the jury in resolving the merits of SIS's

13 antitrust claims and should not be excluded.

14 **I.        FDA-RELATED EVIDENCE IS RELEVANT TO SIS'S ANTITRUST CLAIMS.**

15          **A.        FDA-Related Evidence Is Relevant To The Rule Of Reason Analysis.**

16          From the start of this case, SIS has claimed that Intuitive's contracts were anticompetitive,

17 and that Intuitive's patient safety justifications should be rejected, because SIS's modified

18 EndoWrists were safe and effective.  In its Complaint, SIS repeatedly invoked FDA lexicon by

19 alleging, e.g., that SIS "demonstrated [the] safety and efficacy of its EndoWrist repair process"

20 and that an "EndoWrist serviced by SIS . . . would be equally safe for the same number of

21 subsequent uses" as one manufactured by Intuitive.  Dkt. 1 ¶¶ 78–79.  SIS claimed its "services

22 ensure that the inspected or repaired EndoWrists meet all original specifications," *id.* ¶ 8, and

23 "[i]ndications for use are not affected, and the surgical device or instrument is returned to its

24 original safety and effectiveness."  *Id.* ¶ 33.  It even alleged that SIS "develops inspection and

---

[2] SIS's two motions *in limine* totaling 13 pages on the topic of FDA-related evidence violate the Court's Pretrial Order permitting one motion of up to seven pages on "a single, separate topic." *See* Dkt. 235 at 3, § II.B.  Indeed, SIS seeks to exclude the same evidence about the FDA's 510(k) "regulatory framework and procedures" in both motions.  MIL Nos. 1 and 5 at 1.  The Court should deny MIL Nos. 1 and 5 on this ground alone.  *See* Fed. R. Civ. P. 16(f)(1)(C).

1   repair processes" based on the FDA's Quality System Regulation.  *Id.* ¶ 19.  In effect, SIS has

2   claimed that its modified EndoWrists meet all the standards for safety and effectiveness that the

3   FDA applied in clearing Intuitive's original EndoWrists.  *See id.* ¶ 27.

4        What SIS now wants to do with this motion is to hide from the jury—just like it hid from

5   its customers—what SIS **did not do** and what the FDA **actually did** with respect to safety and

6   effectiveness.  It is undisputed that SIS had no process of its own for modifying or "repairing"

7   EndoWrists—it relied entirely on Rebotix.  Ex. 2 at 47:4–6, 47:18–23, 49:23–50:3.  SIS also

8   admitted that it did no safety testing of its own.  *Id.* at 22:24–24:1, 24:13–16.  Yet, SIS told

9   customers it had done extensive safety testing of EndoWrists to assure their reliability, safety, and

10  performance.  Ex. 1 at -125, -132, -135–38.  In reality, those claims came from Rebotix marketing

11  materials that SIS pawned off as its own.  Ex. 2 at 65:16–67:23.

12       SIS did not disclose these admitted facts to its customers.  Nor did SIS disclose that Rebotix

13  had previously applied to the FDA for 510(k) clearance, and that the FDA **rejected** that

14  application—identifying **51 separate deficiencies** that prevented a finding that Rebotix's modified

15  instruments were as safe and effective as the predicate devices and operate as originally intended.

16  Ex. 3.  FDA specifically asked Rebotix to repeat its "**safety testing** on end-of life devices."  *Id.* at

17  23 (emphasis added).  Rebotix did not address those deficiencies or honor that request; instead, it

18  abandoned its FDA application.  It then partnered up with SIS to offer modified EndoWrist to

19  customers, and SIS continued passing off Rebotix's safety claims to customers.

20       This evidence is relevant for reasons that have nothing to do with whether FDA clearance

21  was legally required.  It is purely factual.  SIS claimed its product was safe and effective and would

22  function as originally intended, even though Rebotix did not convince the FDA of those claims.

23  Those facts bear directly on whether SIS offered a safe and commercially viable product, and

24  whether Intuitive acted reasonably to protect the quality of its product and patient safety.  *See, e.g.*,

25  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983, 987–88 (9th Cir. 2023) (product quality relevant

26  to rule of reason analysis); *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *4 (N.D. Cal. Feb.

27  3, 2020) (denying motion *in limine* to exclude evidence of legitimate business justification).[3]

28

---

[3] This evidence also is relevant to Intuitive's counterclaims that have *not* been dismissed.

1      The opinions proffered by SIS's own experts confirm why this evidence is relevant.  In the

2   section of his report on "harm to competition," SIS's economist, Dr. Lamb, argued that Intuitive's

3   safety justification should be rejected because "reprocessed devices are as safe and effective as the

4   predicate devices and operate as originally intended."  Ex. 4 ¶ 130.  Dr. Lamb based his opinions

5   on those of another SIS expert, Philip Phillips, who concluded that modified EndoWrists were safe

6   because of "***the FDA's recent clearance of reprocessed EndoWrist instruments***"—*i.e.*, the

7   Iconocare product.  *Id.*  But SIS did not market Iconocare's FDA-cleared modified EndoWrist.

8   Ex. 5 at 5.  ████████████████████████████████████████████

9   ████████████████████  ███████████  Instead, SIS partnered with Rebotix—which, unlike

10  Iconocare, did ***not*** have FDA clearance, and which had its application rejected by the FDA.  SIS

11  cannot be permitted to mislead the jury into thinking that the FDA has cleared all modified

12  EndoWrists when the FDA ***rejected*** the modified EndoWrists sold by SIS.

13      Further, SIS's experts are correct that the FDA's decision to clear Iconocare/Restore's

14  modified EndoWrist in 2022 is highly relevant—they just draw the wrong conclusion from it.  In

15  the wake of the Iconocare FDA clearance, Intuitive clarified for its customers—via a public

16  announcement that SIS also seeks to keep out of evidence—that they were free, and authorized

17  under Intuitive's contracts, to buy FDA-cleared, remanufactured EndoWrists.  That was fully

18  consistent with Intuitive's position that its contracts are necessary to ensure product safety, as were

19  Intuitive's actions with respect to ***unauthorized*** third-party products that had ***not*** received FDA

20  clearance.  As Phillips writes (and Lamb echoes), "Iconocare Health provided performance data

21  to FDA that demonstrated that '. . . the reprocessed devices are as safe and effective as the predicate

22  and operate as originally intended.'"  Ex. 7 ¶ 121; Ex. 4 ¶ 130.  SIS, by contrast, ***did not***, and the

23  data that SIS's partner Rebotix submitted to the FDA was rejected as ***insufficient***.

24      It is obvious why SIS would try so hard to keep these facts from the jury—they destroy the

25  credibility of SIS's witnesses, along with the underpinnings of its antitrust case.  But that is why

26  this evidence is so relevant and probative.  SIS cannot claim that evidence relating to its own

27  allegations is irrelevant. *See, e.g.*, *S.S. ex rel. Stern v. Peloton Interactive, Inc.*, 2023 WL 7135265,

28

1    at *4 (S.D. Cal. Oct. 27, 2023) (testimony bearing on allegations in the complaint admissible).[4]

2    **B.    FDA-Related Evidence Is Relevant To Causation And Damages.**

3    Evidence about the impact of FDA clearance on hospitals' purchasing decisions is also

4    probative of causation and damages.  SIS must show that Intuitive's unlawful conduct was a

5    material cause of its injury.  *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986).

6    "The defendant's ability to present alternate causes is of paramount importance in allowing for an

7    adequate defense."  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069–70 (11th Cir.

8    2014).  The jury should hear that the lack of FDA clearance, rather than Intuitive's conduct,

9    impacted SIS's ability to compete.  In other words, regardless of whether FDA clearance was

10   legally required, at least some hospitals viewed FDA clearance as a proxy for safety.  For example,

11   some hospitals, including witnesses SIS intends to call, testified that they believed, wrongly, that

12   Rebotix had FDA clearance, and this was an important factor in their decision to purchase modified

13   EndoWrists.  *E.g.*, Ex. 8 at 151:17–22, 153:13–154:11, 157:19–158:9.

14   Consistent with that hospital testimony, Iconocare witnesses testified that even though ***they***

15   did not believe that FDA clearance was legally required, they chose to seek it anyway ***for***

16   ***marketing reasons***.  Ex. 9 at 47:18–22, 193:3–6, 195:7–10.  SIS, by contrast, chose not to seek the

17   FDA's "Good Housekeeping Seal of Approval" for ***its*** products, and Rebotix tried but failed to

18   achieve it.  The extent to which that ***choice*** suppressed demand for SIS's products in the real world,

19   and would have impacted its ability to compete with third parties like Iconocare in the "but-for"

20   world, is centrally relevant to SIS's ability to show causation of injury and damages.[5]

21

22   [4] SIS's Rule 403 argument that FDA-related evidence would create a "confusing sideshow," Mot.
     at 6–7, is wrong, and its reliance on products liability cases is misplaced.  Unlike those cases, there

23   is no debate here about the meaning of FDA clearance:  SIS and its experts ***agree*** that the FDA's
     clearance of Intuitive's products as well as the Iconocare/Restore product means that the FDA

24   determined those products to be as safe and effective as the relevant predicate devices.  The FDA
     made no such determination with respect to SIS and Rebotix.  SIS repeats the same arguments in

25   its MIL No. 5, and Intuitive addresses them in more detail in response to that motion.

26   [5] Evidence tending to show that Intuitive's contract provisions were responsive to consumer
     demand is also relevant to the competitive effects analysis.  *See Epic Games*, 67 F.4th at 987

27   (Apple's goal of "tapping into consumer demand" was a "plainly procompetitive rationale[].");
     *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (describing

28   "'*enhanced consumer appeal*'" as a procompetitive justification (emphasis added) (quoting
     *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001))).

## II. FDA EVIDENCE IS INDEPENDENTLY RELEVANT BECAUSE, CONSISTENT WITH THE *RESTORE* COURT, THE JURY SHOULD DECIDE AS A MATTER OF FACT WHETHER SIS WAS ENGAGED IN REMANUFACTURING.

For the reasons discussed above (and in response to SIS's MIL No. 5), the FDA evidence that SIS seeks to exclude is relevant and probative *regardless* of any legal question about whether SIS's activities required FDA clearance. That evidence, however, is also independently relevant because whether SIS's activities required FDA clearance is dispositive of the *factual* question of antitrust injury. There can be no antitrust injury if the regulatory scheme—not the alleged antitrust violator—caused the alleged injury. Dkt. 204 at 16. FDA regulations describe what remanufacturing of medical devices means and proscribe remanufacturing without 510(k) clearance. There is no dispute that neither SIS nor Rebotix had 510(k) clearance. The only question is whether their EndoWrist modifications constituted remanufacturing.

SIS complains that Intuitive proposed a jury instruction on the meaning of remanufacturing and impact of engaging in remanufacturing without 510(k) clearance. Mot. at 3–4. Intuitive proposed that instruction because it is consistent with the Court's reliance on the decisions in *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF (N.D. Fla.). *See* Dkt. 204 at 13 & n.8 (The Court "is in good company" with the *Restore* court on the issue of whether SIS's services require 510(k) clearance.); *see also Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2022 WL 1495005, at *3–4 (N.D. Fla. Apr. 11, 2022) (finding genuine dispute as to whether Restore's injury was caused by Intuitive's conduct or Restore's lack of FDA clearance); *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *3–4 (N.D. Fla. Feb. 7, 2022) (precluding FDA expert from offering legal conclusions on the scope or meaning of FDA regulations).

The *Restore* court viewed Restore's lack of 510(k) clearance as "the critical issue in this case." *See Restore*, 2022 WL 1495005, at *3. Even though it was of the view that FDA clearance is required, the *Restore* court, like this Court, declined to say that "in the first instance." Ex. 10 at 94:2–6. Instead, that court planned to let the jury "make a determination" as to whether Restore was engaged in remanufacturing: "The role of the Court is to determine the law regarding 510(k) clearance and instruct the jury what was required of Plaintiffs under the law, and the role of the

1   jury is to resolve any disputed questions of fact bearing on Plaintiffs' compliance (or not) with the

2   law with the aid of any pertinent expert testimony regarding the complex regulatory scheme."

3   *Restore*, 2022 WL 19408080, at *3. The *Restore* court thus planned to allow the parties to

4   introduce testimony about the FDA's practices and procedures and the significance of FDA

5   actions, to "help the jury understand the complex regulatory scheme and determine the facts

6   bearing on Plaintiffs' compliance therewith." *Id.*[6]

7        The *Restore* court explained that the jury would decide (i) whether the FDA has decided

8   that the third party activities constituted "remanufacturing"; or, in the alternative, (ii) whether the

9   activities constituted remanufacturing. *See* Ex. 10 at 90:5–10, 90:25–91:15, 94:7–17, 94:25–95:2.

10  The court expected to give a jury instruction—like the one Intuitive has proffered here, Dkt. 266

11  at 160—on the relevant regulations that the jury would apply to the evidence. Ex. 10 at 91:9–15

12  ("[W]e tell them what the law is in the remanufacturing context. We've got [the expert] and

13  whatever they're going to bring forward, lay witnesses or experts, to articulate what -- how the

14  process works and what their particular devices are and where they fit in, and the jury then will

15  ultimately have to make that determination[.]"); *see also id.* 94:11–14 ("[T]hat was the essence of

16  what I expected to instruct the jury on. There's a requirement. It depends on whether you're

17  remanufacturing or not."). Respectfully, this Court should do the same.

18                                    **CONCLUSION**

19       For the foregoing reasons, the Court should deny SIS's MIL No. 1.

20

21

22

23

---

[6] The *Restore* court did not view the FDCA as precluding this defense in federal antitrust cases.
Unlike the plaintiffs in *Buckman* and *PhotoMedex*, Intuitive did not bring suit seeking to enforce
the FDCA "for noncompliance with the medical device provisions." *See* Mot. at 2 (citing
*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001); *PhotoMedex, Inc.* v.
*Irwin*, 601 F.3d 919, 924 (9th Cir. 2010)). Nothing in the FDCA expressly prohibits a defendant
from arguing that the FDCA creates a regulatory bar to antitrust injury under the Sherman Act;
the two statutes "complement each other." *Cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S.
102, 115 (2014). Courts recognize that the FDCA does not relieve an antitrust plaintiff from
showing that its injury was not caused by a regulatory bar. *See, e.g.*, *In re Canadian Imp.
Antitrust Litig.*, 470 F.3d 785, 791–92 (8th Cir. 2006).

- 7 -

Dated:  November 7, 2024

By: */s/ Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 8 -

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

- 9 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

On November 7, 2024, I caused a copy of Intuitive's Opposition to SIS's Motion *In Limine* No. 1 to be served via electronic e-mail on counsel of record for Surgical Instrument Service Company, Inc. pursuant to the Court's Schedule and Pretrial Order in this case, ECF No. 235.

Dated:  November 7, 2024          By:  */s/ Kenneth A. Gallo*
                                              Kenneth A. Gallo