No. 25-1372

# In the United States Court of Appeals for the Ninth Circuit

———————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

*v.*

INTUITIVE SURGICAL, INC.,
DEFENDANT-COUNTER-CLAIMAINT-APPELLEE

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-3496)
(THE HONORABLE ARACELI MARTINEZ-OLGUIN, J.)*

———————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 2 OF 5**

———————

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *1285 Avenue of the Americas
   New York, NY 10019*

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA G. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
   *2001 K Street, N.W.
   Washington, DC 20006
   (202) 223-7300
   kshanmugam@paulweiss.com*

1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    SURGICAL INSTRUMENT SERVICE              Case No. 21-cv-03496-AMO
     COMPANY, INC., et al.,

8                    Plaintiffs,             **ORDER FOLLOWING CONFERENCE**

9          v.

10   INTUITIVE SURGICAL, INC.,

11                   Defendant.

12

13          On this day, the Court held a Zoom conference with the parties to discuss certain pretrial

14   arrangements. During the conference, the Court denied Defendant Intuitive Surgical, Inc.'s

15   motion for leave to file a motion for reconsideration or, in the alternative, for certification of an

16   interlocutory appeal. ECF 339. Intuitive requested further guidance regarding the scope of the

17   Court's Order re Motions in Limine, *see* ECF 330, the subject of its motion. The Court provides

18   the following general guidance related to the three exemplar exhibits regarding which Intuitive

19   sought clarity.

20          Exhibit 1 to the Gallo Declaration in support of the motion for reconsideration is a letter

21   Intuitive sent to Marin General Hospital dated November 26, 2019. *See* ECF 338-2 at 1.

22   Consistent with the Court's Order re Motions in Limine, that letter may be presented at trial with

23   redactions of references to the Food and Drug Administration ("FDA") and its regulatory process.

24          Exhibit 2 to the same Gallo Declaration is a letter Intuitive sent to Rebotix Repair LLC

25   dated April 16, 2019. *See* ECF 338-2 at 5. Consistent with the Court's Order re Motions in

26   Limine, that letter may also be presented at trial with redactions, though the redactions will likely

27   prove more extensive than those anticipated for Exhibit 1 due to pervasive references to the FDA

28   and its regulatory scheme.

United States District Court
Northern District of California

1       Exhibit 26 to the same Gallo Declaration is an email with a lengthy attachment sent by the

2  FDA dated June 23, 2015.  *See* ECF 338-4 at 59.  Consistent with the Court's Order re Motions in

3  Limine, this exhibit may not be presented at trial.

4

5       **IT IS SO ORDERED.**

6  Dated: December 17, 2024

7

8

9       **ARACELI MARTÍNEZ-OLGUÍN**
         **United States District Judge**

United States District Court
Northern District of California

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    SURGICAL INSTRUMENT SERVICE          Case No.  21-cv-03496-AMO
     COMPANY, INC., et al.,
8                                         **ORDER RE MOTIONS IN LIMINE**
                    Plaintiffs,
9                                         Re: Dkt. Nos. 290, 292, 293, 296, 296, 301,
             v.                           302, 303
10
     INTUITIVE SURGICAL, INC.,
11
                    Defendant.
12

13          The Court held a pretrial conference in this antitrust case on November 25, 2024.  The

14   Court heard argument on the parties' motions in limine at the conference.  Having carefully

15   considered the arguments advanced at the hearing, together with the parties' papers and the

16   relevant legal authority, the Court rules on the motions in limine as follows.

17   **I.      LEGAL STANDARD**

18          "A motion in limine is a procedural mechanism [that is used] to limit in advance" of trial

19   the scope of "testimony or evidence in a particular area" that will be permitted at trial.  *United*

20   *States v. Heller*, 551 F.3d 1108, 1111-12 (9th Cir. 2009).  Though not explicitly authorized by the

21   Federal Rules of Evidence (FRE), the practice of ruling in limine on evidentiary issues is based on

22   the "district court's inherent authority to manage the course of trials."  *Luce v. United States*, 469

23   U.S. 38, 41 n.4 (1984).  "[I]n limine rulings are not binding on the trial judge, and the judge may

24   always change [their] mind during the course of a trial."  *Ohler v. United States*, 529 U.S. 753,

25   758 n.3 (2000) (emphasis removed).  "A motion in limine is not the proper vehicle for seeking a

26   dispositive ruling on a claim, particularly after the deadline for filing such motions has passed."

27   *Hana Financial, Inc. v. Hana Bank*, 735 F.3d 1158, 1162 n.4 (9th Cir. 2013).

28

United States District Court
Northern District of California

**II.      SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S MOTIONS IN LIMINE**

Plaintiff Surgical Instrument Service Company, Inc. ("SIS") filed five motions in limine. The Court granted stipulations resolving SIS's motions in limine #2 and #3. *See* ECF 308, ECF 309.

At the conference, the Court denied SIS's motion in limine #4 subject to revival at trial if Defendant fails to lay a sufficient foundation for lay witness testimony.

The Court discusses SIS's remaining motions in limine, #1 and #5, together because the Court's reasoning regarding introduction of evidence of the Food and Drug Administration ("FDA") regulatory framework bears on each motion.  In its motion in limine #1, SIS moves to exclude all testimony, documentary evidence, and argument related to (1) the FDA's Section 510(k) regulatory framework and procedures for clearance of medical devices for commercial marketing, (2) the meaning, scope and application of the regulatory term "remanufacturing," (3) whether SIS or other third parties' EndoWrist activities constitute "remanufacturing" or require 510(k) approval; and (4) the meaning, scope, application and effect of Intuitive's announcement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts. In its motion in limine #5, SIS moves to exclude all testimony, documentary evidence, and argument related to (1) the FDA's regulatory framework and procedures for clearance of medical devices for commercial marketing [same as in #1] , (2) Intuitive's FDA 510(k) clearance of EndoWrists [similar to #1], (3) the contention that Intuitive's FDA 510(k) clearance of EndoWrists requires adherence to Intuitive use limits; (4) the contention that Intuitive's FDA 510(k) clearance of EndoWrists is evidence that those use limits ensure or relate to patient safety; and (5) the contention that Intuitive's FDA 510(k) clearance of EndoWrists is evidence of the actual number of times an EndoWrist can be used from an engineering/failure perspective.

Courts regularly exclude evidence regarding the FDA's 510(k) clearance process based on a pair of interlocking concerns.  First, Section 510(k) clearance involves an inquiry into a new device's equivalence with an earlier-approved medical device, not, as Intuitive contends here, an inquiry into the safety of the new product.  *See Meditronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996) (explaining, "the § 510(k) process is focused on *equivalence*, not safety" (emphasis in original)).

2

United States District Court
Northern District of California

1   Second, and because Section 510(k) clearance does not address issues of safety, any probable

2   value of the evidence related to the regulatory framework and a plaintiff's failure to obtain such

3   clearance is greatly outweighed "by the danger of, among other things, confusing the issues,

4   misleading the jury, and wasting time." *Kaiser v. Johnson & Johnson*, No. 2:17-CV-114-PPS,

5   2018 WL 1358407, at *4 (N.D. Ind. Mar. 16, 2018) (denying motion in limine to admit FDA

6   evidence and granting motion in limine to exclude FDA 510(k) evidence), aff'd, 947 F.3d 996 (7th

7   Cir. 2020).

8       Both concerns merit exclusion here. The same risk of confusing the jury applies here and

9   warrants exclusion of the regulatory evidence. Intuitive aims to present evidence of the Section

10  510(k) process to demonstrate a lack of safety for SIS serviced instruments, but Section 510(k)

11  simply is not oriented towards ensuring safety of medical devices. *See Meditronic*, 518 U.S. at

12  493. Although Section 510(k) clearance is clearly relevant in the context of this case and how it

13  has been litigated so far, the regulatory framework cannot be invoked to demonstrate deficient

14  product safety. The voluminous record arising from SIS's failure to obtain Section 510(k)

15  clearance presents a substantial risk of confusing matters for the jury because the complex record

16  related to regulatory compliance could lead jurors "to erroneously conclude that regulatory

17  compliance proved safety." *In re C. R. Bard, Inc.*, 81 F.3d 913, 922 (4th Cir. 2016); *see also id.* at

18  920 ("[T]he clear weight of persuasive and controlling authority favors a finding that the 510(k)

19  procedure is of little or no evidentiary value."). Intuitive can and should present evidence

20  concerning repaired EndoWrists's safety, including through other available evidence, such as any

21  testing data, engineering data, and appropriate expert testimony. Intuitive cannot, however, invite

22  the jury to conclude that SIS's failure to obtain 510(k) clearance demonstrates that SIS's services

23  were unsafe.

24      Intuitive contends that the cases cited by SIS are unhelpful here because they considered

25  510(k) clearance in the product liability context. *See* Intuitive Opp. to MIL #1 at 5 n.4. But the

26  reasoning underpinning 510(k) clearance exclusion in the products liability context applies equally

27  here. Indeed, Intuitive aims to proffer 510(k) clearance evidence for the same purpose discounted

28  in the product liability cases – as a proxy or indication of product safety. *Compare* Intuitive Opp.

3

1    to MIL #1 at 1-3 *with Carter v. Johnson & Johnson*, No. 220CV01232KJDVCF, 2022 WL

2    4700549, at *2 (D. Nev. Sept. 29, 2022) (finding that a "mini-trial" on Section 510(k) evidence

3    " 'could easily inflate the perceived importance of compliance and distract the jury from the

4    central question before it,' whether the defendants' product was unreasonably dangerous."

5    (citation omitted)).  And here, just as in the product liability context, evidence of the 510k

6    clearance regime is ancillary to the gravamen of the claims at issue.  *See id.*  There, the regulatory

7    scheme did not resolve the issue of whether the challenged products were poorly or unsafely

8    designed; here, the regulatory scheme does not resolve the issue of whether Intuitive engaged in

9    anticompetitive conduct.  And here, perhaps to an even greater extent than in the product liability

10   cases, evidence regarding the regulatory scheme and either side's compliance threatens to itself

11   create a "mini-trial" that would greatly distract the jury.  The Court accordingly **GRANTS** the

12   portions of SIS's motion in limine #1 to exclude all testimony, documentary evidence, and

13   argument related to (1) the FDA's Section 510(k) regulatory framework and procedures for

14   clearance of medical devices for commercial marketing, (2) the meaning, scope and application of

15   the regulatory term "remanufacturing," and (3) whether SIS or other third parties' EndoWrist

16   activities constitute "remanufacturing" or require 510(k) approval.

17          The fourth part of SIS's motion of limine #1 merits separate discussion as it relates to

18   Intuitive's announcement on its website that buying FDA-cleared remanufactured EndoWrists

19   does not violate its contracts.  *See* Rosa Decl. ¶ 45 (ECF 137-2) (quoting in part from Intuitive's

20   March 2023 website announcement, "Intuitive will not void its service contract with, cease doing

21   business with, or consider it a breach of contract by a customer in the United States who chooses

22   to purchase remanufactured instruments that have been remanufactured by a third party pursuant

23   to and in compliance with a 510(k) clearance or equivalent granted by the FDA.").  The

24   announcement cannot be presented to the jury without contextualizing its reference to 510(k)

25   clearance, which would require presenting additional evidence that would turn into a sideshow

26

27

28

likely to distract and confuse the jury.[1]  The Court therefore **GRANTS** SIS's motion in limine to exclude the exclude all testimony, documentary evidence, and argument related to the meaning, scope, application and effect of Intuitive's announcement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts.[2]

This same reasoning generally applies to SIS's motion in limine #5.  Accordingly, the Court **GRANTS** SIS's motion in limine #5 to exclude all testimony, documentary evidence, and argument related to (1) the FDA's regulatory framework and procedures for clearance of medical devices for commercial marketing [same as in #1], (2) Intuitive's FDA 510(k) clearance of EndoWrists [similar to #1], (3) the contention that Intuitive's FDA 510(k) clearance of EndoWrists requires adherence to Intuitive use limits; (4) the contention that Intuitive's FDA 510(k) clearance of EndoWrists is evidence that those use limits ensure or relate to patient safety; and (5) the contention that Intuitive's FDA 510(k) clearance of EndoWrists is evidence of the actual number of times an EndoWrist can be used from an engineering/failure perspective. Intuitive may not present evidence that the use counters/use limits were required pursuant to the FDA's regulatory approval, but Intuitive may present argument and evidence that the use counters/use limits constituted a safety feature that warranted protection.  Intuitive argues that it must still be permitted to advance the use limits and other safety concerns as part of its pro-competitive rationale.  Intuitive may do so, though not by validating those safety concerns through the 510(k) scheme because 510(k) clearance does not address product safety.

Through its oppositions to SIS's motions in limine #1 and #5, Intuitive aims to relitigate the role the regulatory framework played in SIS's market participation.  This issue was already

---

[1] The Court further finds that the announcement demonstrates an attempt to privately enforce the Food, Drug and Cosmetic Act ("FDCA"), which the Court earlier determined is prohibited as a matter of law.  *See* Order re Cross MSJs (ECF 204) at 12-14.  Intuitive may not rely on its announcement, an improper attempt to privately enforce the FDCA by requiring compliance with a regulatory scheme unenforced by the FDA, to excuse its business conduct.

[2] The Court additionally finds that admission of this website announcement, made in the period following the close of fact discovery and prior to summary judgment briefing in this case, would prove inequitable in light of the Court's grant of Intuitive's motion to exclude most fact evidence arising following the close of fact discovery in November 2022.  *See* discussion of Intuitive's motion in limine #4, below.

5

United States District Court
Northern District of California

1    resolved at summary judgment.  The Court denied Intuitive's motion, which asserted that SIS

2    could not establish antitrust causation because the regulatory framework interfered with SIS's

3    market participation rather than Intuitive's allegedly anticompetitive conduct.  *See* Order re Cross

4    MSJs (ECF 204) at 16 (discussing *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,

5    868 F.3d 132, 165-66 (3d Cir. 2017); *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F.

6    Supp. 2d 1156, 1170 (N.D. Cal. 2004)).  The Court stated that neither party could aim to enforce

7    the FDCA through this case.  *See* Order re Cross MSJs (ECF 204) at 12-14.  Yet Intuitive seems to

8    do exactly that – to establish that SIS failed to obtain 510(k) clearance as if it was required.

9         In sum, though Intuitive argues that SIS distorts the record by trying to avoid discussing

10    FDA clearance in a case about medical devices and safety, it is Intuitive that distorts the gravamen

11    of the case.  This antitrust case is about allegedly anticompetitive conduct.  And, again, Intuitive

12    mischaracterizes the import of 510(k) clearance, which the Supreme Court has recognized is not

13    concerned with safety.  For these reasons, among the others discussed above, the Court **GRANTS**

14    SIS's motions in limine #1 and #5.

15  **III.    INTUITIVE SURGICAL, INC.'S MOTIONS IN LIMINE**

16         Intuitive Surgical filed five motions in limine.  The Court granted a stipulation resolving

17    Intuitive's motion in limine #5.  *See* ECF 326.  The Court additionally granted a stipulated

18    briefing schedule regarding an evidentiary proffer related to Intuitive's motion in limine #1, and

19    the Court therefore does not reach that motion in this order.  The Court takes up the remaining

20    three motions.

21        **A.    Intuitive's Motion in Limine #2**

22         Intuitive moves for an order prohibiting: (1) SIS from either introducing into evidence or

23    referencing the Deutsche Bank analyst reports dated January 27, 2020 and February 20, 2020 (the

24    "Reports"); and (2) SIS's experts from incorporating the opinions of the Reports' authors as part

25    of those experts' own opinions.

26         Intuitive argues that the reports themselves constitute inadmissible hearsay, including

27    multiple layers of hearsay in their reference to unidentified "surgeons and supply chain

28    executives."  *See* Fed. R. Evid. 801, 802, 803.  Moreover, the reports constitute improper lay and

*United States District Court*
*Northern District of California*

6

expert testimony where they opine on, among other things, hospital demand for third-party repaired EndoWrists, the safety risk posed by those repairs, and whether FDA approval is required for such repairs. *See* Fed. R. Evid. 701 & 702. SIS opposes Intuitive's requested exclusion.

The Court **DENIES** Intuitive's motion to exclude the Reports because they may prove admissible for a non-hearsay purpose. Assuming proper foundation, SIS may proffer the Reports to show that Intuitive was aware of the competitive threat posed by third-party activities refurbishing EndoWrist instruments discussed in the Reports. The Court otherwise finds the hearsay exceptions identified by SIS inapplicable to the Reports, and no party may proffer the Reports for the truth of their contents. *See* Fed. R. Evid. 803(3), 803(6), 803(17).

To the second part of this motion, Intuitive improperly attacks SIS's experts' reliance on the Deutsche Bank reports because experts need not rely on admissible evidence in forming their opinions. The Court finds that this portion of Intuitive's motion simply amounts to a collateral attack on the Court's *Daubert* rulings on Lamb and Bero, and the Court declines to limit the experts' testimony in this way.

### B. Intuitive's Motion in Limine #3

Intuitive moves for an order: (1) prohibiting Plaintiff SIS from introducing evidence that Intuitive has been sued by other parties in other cases or referring to other litigations and settlements involving Intuitive, including the litigation and settlement in *Restore Robotics LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055 (N.D. Fla.), the litigation and settlement in *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274 (M.D. Fla.), the still-pending litigation in *Restore Robotics Repairs LLC v. Intuitive Surgical, Inc.*, No. 3:24-cv-00444 (N.D. Fla.), and the still-pending putative class action litigation against Intuitive in the matter of *In re: Da Vinci Surgical Robot Antitrust Litigation*, No. 3:21-cv-03825-AMO (N.D. Cal.); and (2) requiring the parties to redact any references to other litigation or settlements in any documents or deposition designations.

The Court **GRANTS** Intuitive's motion in limine #3 because Intuitive's litigation history will likely prove more prejudicial than probative. The prohibitions against introducing evidence

United States District Court
Northern District of California

7

or making reference to other litigations and settlements apply to both SIS and Intuitive with equal force.

### C.     Intuitive's Motion in Limine #4

Intuitive moves for an order prohibiting SIS from offering any evidence or argument about the time period following November 10, 2022 (the close of fact discovery in this case), other than SIS's recently produced financial records and responses to requests for admission.  Intuitive sought to take discovery of facts and events occurring after November 2022.  The Court denied Intuitive's motion to compel such discovery, with two narrow exceptions, requiring SIS to: (1) produce updated financial records, and (2) respond to a small number of Requests for Admission ("RFAs").  *See* Minute Entry, ECF 261.  Intuitive argues that permitting SIS to proffer evidence post-dating November 2022 outside of its limited supplemental production would violate both Federal Rule of Civil Procedure 26 and principles of fairness.

Intuitive repeatedly argues that it is prejudiced by not being able to present evidence of what happened in the real world since the close of fact discovery in November 2022 because the events of the post-November 2022 period serve to undercut SIS's damages calculations in the "but for" world.  The Court previously resolved this issue.  The limited authority presented by Intuitive does not establish that the factual events taking place since the close of fact discovery should bear on either liability or damages calculations in antitrust cases.  The Court permitted limited further discovery for the sole purpose of establishing that SIS did not compete in the market following the close of fact discovery.  Even with this backdrop, SIS responded to Intuitive's motion by stating its non-opposition to the limitation so long as the Court added four proposed conditions.  The Court accordingly **GRANTS** Intuitive's motion in limine #4 to prohibit SIS's witnesses and lawyers from offering any evidence or argument about the time period following November 10, 2022, other than SIS's recently produced financial records and RFA responses.  The Court imposes the following additional conditions:

(1) the prohibition against offering any evidence or argument about what happened after November 2022 outside of the limited information that SIS produced in response to the Court's order applies with equal force to Intuitive, along with its witnesses and lawyers;

8

1   (2) SIS's damages expert's updated Schedules appended to his expert report based upon

2   financial data produced by the parties after the close of discovery are not subject to the prohibition

3   against offering any evidence or argument about what the "but for" world would look like after

4   November 2022;

5   (3) SIS's damages expert is not prohibited from testifying regarding SIS's lost profits in

6   the "but-for" world corresponding to the period after November 2022 through 2026; and

7   (4) information available after November 10, 2022, which is disclosed or covered in the

8   parties' expert reports and which the parties had a full opportunity to explore through the

9   subsequent expert deposition process are not subject to the prohibition against offering any

10   evidence or argument about what happened after November 2022.

11   **IT IS SO ORDERED.**

12   Dated: December 11, 2024

13

14

15   **ARACELI MARTÍNEZ-OLGUÍN**
     **United States District Judge**

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

9

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br> *Plaintiff,* <br> v. <br><br> INTUITIVE SURGICAL, INC., <br><br> *Defendant.* | Case No. 3:21-cv-03496-AMO <br><br> **DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF DISPUTED JURY INSTRUCTIONS** <br><br> Pretrial Conference: <br> Date:  November 25, 2024 <br> Time:  11:00 a.m. <br> Courtroom:  10 <br><br><br> The Honorable Araceli Martínez-Olguín |

## **TABLE OF CONTENTS**

I.     The Court Should Overrule SIS's Conclusory Objections ...................................1

II.    The Court Should Use Intuitive's Articulation of the Relevant Markets ...........................1

III.   The Jury Should Be Given a Preliminary Instruction, Disputed Instruction No. 1, That Statements Regarding FDA Clearance Are Not False or Misleading..................................................................................................1

IV.    The Court Should Adopt Intuitive's Modifications to the Model in Disputed Instruction No. 2 ..................................................................................2

V.     The Court Should Reject Disputed Instruction No. 3 ........................................2

VI.    Disputed Instruction Nos. 4, 5, and 6 Dispel Jury Confusion About Whether Certain Protected Conduct Is Unlawful .............................................3

VII.   The Court Should Give Disputed Instruction Nos. 7 and 8 Regarding Relevant Markets at the Outset, and Reject Disputed Instruction No. 22 ..........................4

VIII.  Disputed Instruction No. 9 Is an Unobjectionable General Statement About Sherman Act Section 1 .........................................................................5

IX.    The Court Should Provide the Standard Rule of Reason Framework of Disputed Instruction Nos. 10, 11, and 12.......................................................6

X.     The Court Should Use Intuitive's Version of Disputed Instruction No. 13........................8

XI.    The Court Should Adopt Intuitive's Modifications to the Model in Disputed Instruction No. 14 ................................................................................8

XII.   Disputed Instruction Nos. 15, 26, and 27, Which Reflect SIS's Proposed "Per Se" Tying Instructions, Should be Rejected, and Instead Disputed Instruction No. 16 Should be Given ............................................................8

XIII.  The Court Should Use Intuitive's Modification to the Model in Disputed Instruction Nos. 17, 18, and 23 ....................................................................10

XIV.   Disputed Instruction Nos. 19. and 46 Regarding the Relevant Geographic Market, and Disputed Instruction Nos. 25, 41, 53, and 58 Regarding Interstate Commerce, Should Be Rejected .......................................................10

XV.    Disputed Instruction Nos. 20 and 33 Properly Set Out the Law on When Authorization Requirements Can and Cannot Constitute Tying or Exclusive Dealing ....................................................................................11

XVI.   The Court Should Instruct the Jury Through Disputed Instruction No. 21 That Voiding a Warranty Is Not Coercion.......................................................12

XVII.  The Court Should Give Intuitive's Version of Disputed Instruction No. 28 Regarding Harm to Competition......................................................................13

XVIII. The Court Should Give Intuitive's Version of Disputed Instruction No. 29 Regarding Procompetitive Rationales..........................................................13

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03496-AMO

XIX.    The Court Should Reject Disputed Instruction No. 30 ...................................... 14

XX.     The Jury Should Be Permitted to Evaluate the Business Justification
        Defense in Disputed Instruction No. 31 ............................................................. 14

XXI.    The Court Should Adopt Intuitive's Proposed Instruction No. 32
        Regarding Elements of Exclusive Dealing .......................................................... 15

XXII.   Disputed Instruction No. 34, Which Discusses Three Elements of
        Exclusive Dealing, Should be Rejected in Favor of Disputed Instruction
        Nos. 35, 36, and 39 ............................................................................................. 15

XXIII.  The Court Should Give Disputed Instruction No. 40 Regarding the Rule of
        Reason Analysis for SIS's Exclusive Dealing Claim, and Reject Disputed
        Instruction No. 38 ............................................................................................... 16

XXIV.   Disputed Instruction No. 43 Is an Unobjectionable Roadmap ........................... 17

XXV.    Disputed Instruction No. 44 Purporting to Define Monopoly and
        Attempted Monopolization Should Be Rejected ................................................. 17

XXVI.   Disputed Instruction No. 45 Regarding the Elements of Monopolization
        Should Omit Interstate Commerce ...................................................................... 17

XXVII.        The Court Should Adopt Intuitive's Disputed Instruction No. 48
        Regarding Monopoly Power ................................................................................ 18

XXVIII.       The Court Should Adopt Intuitive's Disputed Instruction No. 49
        On Direct Evidence of Monopoly Power ............................................................ 18

XXIX.   The Court Should Give Intuitive's Version of Disputed Instruction No. 28
        Regarding Harm to Competition .......................................................................... 19

XXX.    The Court Should Reject SIS's Disputed Instruction No. 52 Regarding
        Design Changes, and Adopt Intuitive's Version ................................................. 19

XXXI.   The Court Should Adopt Intuitive's Disputed Instruction No. 54
        Regarding Elements of Attempted Monopolization ............................................ 20

XXXII.        The Court Should Reject SIS's Injury Instructions in Disputed
        Instruction Nos. 42 and 59, and Should Instead Give Intuitive's Disputed
        Instruction Nos. 60, 61, 62, and 63 .................................................................... 20

XXXIII.       The Court Should Give Disputed Instruction Nos. 65 and 66
        Regarding Remanufacturing and FDA Clearance ............................................... 21

XXXIV.        The Court Should Follow the ABA Model Instruction in Disputed
        Instruction Nos. 68 and 70 Regarding Damages ................................................ 22

XXXV.         The Court Should Give Disputed Instruction No. 69 Regarding
        Causation and Disaggregation ............................................................................ 22

XXXVI.        The Court Should Adopt Intuitive's Version of Disputed
        Instruction No. 71 Regarding Future Lost Profits .............................................. 23

- ii -

XXXVII.     The Court Should Adopt Intuitive's Version of Disputed
Instruction No. 72 Regarding Mitigation of Damages .........................................23

XXXVIII.     The Court Should Use Intuitive's Version of Disputed Instruction
No. 74 on the Elements of Its Lanham Act Claim ...............................................23

XXXIX.     The Court Should Reject SIS's Addition to Disputed Instruction
No. 76 Regarding Commercial Promotions ..........................................................24

XL.     The Court Should Adopt Intuitive's Version of Disputed Instruction No.
77 Regarding Lanham Act Injury .........................................................................24

XLI.     The Court Should Use Intuitive's Version of Disputed Instruction No. 78
on the Elements of Unfair Competition ................................................................25

XLII.     The Court Should Use Intuitive's Version of Disputed Instruction No. 79
on Tortious Interference with Contract ................................................................25

XLIII.  The Court Should Give Intuitive's Version of Disputed Instruction No. 80
Regarding Damages on Its Counterclaims ...........................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Mot. Picture Arts & Scis.* v. *Creative House Promotions, Inc.*,
   944 F.2d 1446 (9th Cir. 1991) ...................................................................25

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ....................................................................9

*Allied Orthopedic Appliances Inc.* v. *Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ....................................................................20

*Ohio* v. *Am. Express Co.*,
   585 U.S. 529 (2018).....................................................................................6

*Barry Wright Corp.* v. *ITT Grinnell Corp.*,
   724 F.2d 227 (1st Cir. 1983) .....................................................................14

*Betaseed, Inc.* v. *U & I Inc.*,
   681 F.2d 1203 (9th Cir. 1982) ..................................................................11

*Bigelow* v. *RKO Radio Pictures*,
   327 U.S. 251 (1946)...................................................................................23

*Brantley* v. *NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ....................................................................9

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).....................................................................................2

*In re Can. Imp. Antitrust Litig.*,
   470 F.3d 785 (8th Cir. 2006) .....................................................................22

*City of Vernon* v. *S. Cal. Edison Co.*,
   955 F.2d 1361 (9th Cir. 1992) ..................................................................22

*Coronavirus Reporter* v. *Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) .......................................................................5

*CoStar Grp., Inc.* v. *Com. Real Est. Exch. Inc.*,
   2023 WL 2468742 (N.D. Cal. Feb. 23, 2023) ..........................................19

*Discover Fin. Servs.* v. *Visa U.S.A., Inc.*,
   582 F. Supp. 2d 501 (S.D.N.Y. 2008).......................................................21

*Dream Big Media Inc.* v. *Alphabet Inc.*,
   2024 WL 3416509 (N.D. Cal. July 15, 2024)...........................................11

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03496-AMO

**2-SER-223**

*United States* v. *Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995) ...............................................................................19

*Epic Games, Inc.* v. *Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) ...........................................................19

*Epic Games, Inc.* v. *Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ................................................................. *passim*

*Fido's Fences* v. *Canine Fence Co.*,
   672 F. Supp. 2d 303 (E.D.N.Y. 2009) ...........................................................12

*Ford Motor Co.* v. *GMB Universal Joints (West), Inc.*,
   1988 WL 82826 (9th Cir. 1988) .....................................................................11

*Forsyth* v. *Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) .......................................................................18

*Gonzalez* v. *Allstate Ins. Co.*,
   2005 WL 5891935 (C.D. Cal. Aug. 2, 2005)................................................24

*Ill. Tool Works Inc.* v. *Independent Ink, Inc.*,
   547 U.S. 28 (2006)................................................................................5, 8, 9

*Jefferson Parish Hospital District No. 2* v. *Hyde*,
   466 U.S. 2 (1984).........................................................................................16

*Marts* v. *Xerox, Inc.*,
   77 F.3d 1109 (8th Cir. 1996) .......................................................................12

*United States* v. *Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .......................................................................14

*United States* v. *Microsoft Corp.*,
   87 F. Supp. 2d 30 (D.D.C. 2000)..................................................................16

*Mozart Co.* v. *Mercedes-Benz of N. Am., Inc.*,
   833 F.2d 1342 (9th Cir. 1987) .....................................................................14

*Mozart Co.* v. *Mercedes-Benz of N. Am., Inc.*,
   593 F. Supp. 1506 (N.D. Cal. 1984) .............................................................11

*Nat'l Collegiate Athletic Ass'n* v. *Alston*,
   594 U.S. 69 (2021)...................................................................................7, 14

*Ne. Tel. Co.* v. *Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981)...........................................................................13

*Newcal Indus., Inc.* v. *Ikon Office Sol'n*,
   513 F.3d 1038 (9th Cir. 2008) ..................................................................4, 24

- v -

*Omega Env't, Inc.* v. *Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ................................................................16

*PharmacyChecker.com* v. *Nat'l Assoc. of Bds. of Pharmacy*,
   2022 WL 347669 (S.D.N.Y. Feb. 4, 2022)...........................................22

*Photovest Corp.* v. *Fotomat Corp.*,
   606 F.2d 704 (7th Cir. 1979) ................................................................11

*Pullos* v. *Alliance Laundry Sys., LLC*,
   2009 WL 10708625 (D. Nev. 2009) .....................................................11

*FTC* v. *Qualcomm, Inc.*,
   969 F.3d 974 (9th Cir. 2020) ..............................................................3, 7

*Rebel Oil Co., Inc.* v. *Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ................................................................18

*In re Remeron Direct Purchaser Antitrust Litig.*,
   367 F. Supp. 2d 675 (D.N.J. 2005) .......................................................19

*Safeway Inc.* v. *Abbott Lab'ys*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) .................................................18

*Southland Sod Farms* v. *Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) ..............................................................24

*Sterling Merchandising, Inc.* v. *Nestle, S.A.*,
   656 F.3d 112 (1st Cir. 2011)..................................................................16

*Theme Promotions, Inc.* v. *News Amer. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ................................................................18

*Union Carbide Corp.* v. *Montell N.V.*,
   27 F. Supp. 2d 414 (S.D.N.Y. 1998)....................................................16

*Va. Panel Corp.* v. *MAC Panel Co.*,
   133 F.3d 860 (Fed. Cir. 1997)...............................................................12

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)........................................................................17, 18

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017)..................................................................22

**Statutes**

Lanham Act, 15 U.S.C. § 1125 .................................................................23

**Other Authorities**

AM. BAR ASS'N, ANTITRUST LAW DEVELOPMENTS (8th ed. 2017)..................................................16

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2023)......................................19

California Civil Jury Instructions...........................................................................................25

Courtney Lindwall, *Fixing Your Electronics Just Got Easier in California and Minnesota*, Consumer Reports (July 1, 2024) ............................................................3

MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT (9th Cir. Jury Instructions Comm. 2017 ed.).............................................1, 23

MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES (AM. BAR ASS'N ANTITRUST L. SECTION 2016) ....................................................................5, 9, 10, 14

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03825-AMO

Pursuant to Section II.A.3 of the Court's Schedule and Pretrial Order, Dkt. 235, and for the reasons set forth below, Intuitive respectfully requests that the Court reject SIS's proposed versions of the disputed jury instructions, and adopt Intuitive's proposals. For ease of reference, Intuitive attaches hereto, as Exhibit A, a "clean" draft of its proposed jury instructions.

## I. THE COURT SHOULD OVERRULE SIS'S CONCLUSORY OBJECTIONS

SIS repeatedly objects in conclusory fashion to Intuitive's proposals to give instructions drawn directly from the ABA model, asserting they are "overly argumentative, misleading and create[] a substantial risk of confusing the jury." SIS does not explain how the ABA model instructions are "argumentative," "misleading," or "confusing." These instructions generally provide neutral presentations of the law, used by countless courts. The Ninth Circuit's model jury instructions, which do not include specific antitrust instructions, refer to the ABA model as a "helpful" source.[1] The Court should overrule all of SIS's boilerplate and baseless objections.

## II. THE COURT SHOULD USE INTUITIVE'S ARTICULATION OF THE RELEVANT MARKETS

There is a difference between the parties' articulations of the relevant markets throughout the jury instructions. SIS says the two relevant product markets are "minimally invasive surgical robots" and "repaired and replacement EndoWrists." This is inconsistent with SIS's economic expert, Dr. Russell L. Lamb, who alleges in his expert report that Intuitive has market power in two (and only two) markets: "MIST surgical robots" and "EndoWrist repair and replacement." Dkt. 230-4 at 17, 33. Intuitive proposes in these Instructions to refer to the alleged markets using the terminology actually put forward by SIS's economic expert. (In Disputed Instruction Nos. 37, 47, 50, 55, and 56, the articulations of the relevant markets are the only difference between the parties' proposals.)

## III. THE JURY SHOULD BE GIVEN A PRELIMINARY INSTRUCTION, DISPUTED INSTRUCTION NO. 1, THAT STATEMENTS REGARDING FDA CLEARANCE ARE NOT FALSE OR MISLEADING

In its summary judgment decision, the Court dismissed both SIS's and Intuitive's claims

---

[1] *See* Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 14 (2017 ed.).

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03496-AMO

and affirmative defenses to the extent based on the alleged falsity of statements about the legal necessity for SIS to obtain 510(k) clearance from the FDA.  *See* Dkt. 204 at 11–15; Dkt. 240.  However, the jury will inevitably hear and see such statements throughout the trial.  Among other things, such statements are contained within Intuitive's letters to customers that SIS claims are the cause of its lost sales.  Complaint, Dkt. 1 ¶ 92.  SIS witnesses also testified that Intuitive's statements about the FDA in particular "scared" customers into not doing business with SIS.  SIS nonetheless objects to the proposed instruction, stating that "matters regarding FDA clearance by any party should not be permitted in this matter"—ignoring its own allegations and claims.

There is a serious risk that the jury will be misled into believing that such statements were unlawful unless the jury is informed at the outset that the Court instructs them that such statements are not false and misleading and are thus not actionable conduct in this case.[2]  Indeed, SIS's objection seems to *agree* with this point, in suggesting that "curative instructions be given during trial before such evidence or testimony will be presented to the jury."  That is exactly the point of Intuitive's proposed Instruction No. 1, and confirms why it should be given.

## IV. THE COURT SHOULD ADOPT INTUITIVE'S MODIFICATIONS TO THE MODEL IN DISPUTED INSTRUCTION NO. 2

Intuitive and SIS both draw Disputed Instruction No. 2 from the ABA model instruction regarding the purpose of the antitrust laws.  To the model, Intuitive has added a sentence, drawn directly from Supreme Court case law, setting forth the maxim that the Sherman Act was "enacted for the protection of competition, not competitors."  *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citation and quotation marks omitted).  Intuitive has then added a second sentence explaining that, as a result of this established proposition, SIS must prove not just harm to itself, but harm to *competition*.  Intuitive respectfully requests that the Court adopt these modifications, which are necessary to conform with controlling Supreme Court law.

## V. THE COURT SHOULD REJECT DISPUTED INSTRUCTION NO. 3

In Disputed Instruction No. 3, SIS proposes providing a laundry list of all its antitrust

---

[2] Intuitive is also moving *in limine* to exclude evidence or argument that Intuitive's statements to its customers regarding the need for FDA clearance were false or misleading.

claims.  Instead, Intuitive proposes that SIS's Sherman Act Section 1 claims be summarized briefly before providing the elements of those claims, *see* Disputed Instruction No. 9, and that SIS's Sherman Act Section 2 claims be summarized before the elements of those claims, *see* Disputed Instruction No. 43.  If the Court does adopt SIS's proposal, then at a minimum it should include a statement that SIS bears the burden of proving each of its claims and Intuitive denies each claim.

## VI.  DISPUTED INSTRUCTION NOS. 4, 5, AND 6 DISPEL JURY CONFUSION ABOUT WHETHER CERTAIN PROTECTED CONDUCT IS UNLAWFUL

Intuitive has proposed three instructions intended to ensure the jury is not confused about the legality of certain conduct that will be discussed during the trial.

In Disputed Instruction No. 4, Intuitive proposes the jury be given an ABA model instruction that individuals and entities have a First Amendment right to petition the government, and thus Intuitive's communications with the FDA cannot be considered anticompetitive.  SIS objects on the ground that it is seeking to exclude all FDA communications via a motion in limine.  If the Court denies that motion (as Intuitive contends it should), then the jury should be given this instruction rather than risk that they erroneously believe Intuitive having raised concerns with the FDA about the safety of SIS's EndoWrist repair program was anticompetitive.

In Disputed Instruction No. 5, Intuitive proposes the jury be instructed that so-called "right to repair" laws have no applicability in this case.  Such laws—which relate to consumer electronics and appliances—have received extensive recent media coverage, especially in California.[3]  If not otherwise instructed, jurors may erroneously believe that such laws give a hospital a legal right to have its medical equipment, like EndoWrists, serviced by unauthorized third parties.

In Disputed Instruction No. 6, Intuitive proposes the jury be instructed that there is no obligation for a firm to help its competitors, a concept well-established in antitrust law that is subject only to a narrow exception when a monopolist terminates a profitable prior course of dealing for anticompetitive reasons.  See *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020).  Absent this instruction, jurors may erroneously believe that Intuitive had an obligation to

---

[3] *See, e.g.*, Courtney Lindwall, *Fixing Your Electronics Just Got Easier in California and Minnesota*, Consumer Reports (July 1, 2024), https://www.consumerreports.org/right-to-repair/new-state-laws-just-made-it-easier-to-repair-electronics-a5222930321/.

1  cooperate with SIS by allowing it to modify or "repair" EndoWrists.[4]

2  SIS objects to these instructions on the grounds that they are not (or, as to Disputed

3  Instruction No. 4, should not be) issues in the case, but those objections miss the point. Without

4  clarifying instructions, the jury may misunderstand the evidence or law.

5  **VII. THE COURT SHOULD GIVE DISPUTED INSTRUCTION NOS. 7 AND 8**
   **REGARDING RELEVANT MARKETS AT THE OUTSET, AND REJECT**
6  **DISPUTED INSTRUCTION NO. 22**

7  All of SIS's claims require proving a relevant market. *See Newcal Indus., Inc.* v. *Ikon*

8  *Office Sol'n*, 513 F.3d 1038, 1044 n.3 (9th Cir. 2008). As such, Intuitive proposes providing in

9  Instruction No. 7, at the outset of the antitrust instructions, a single instruction on relevant markets

10 drawn from the ABA model that the jury can apply to all claims, rather than repeatedly explaining

11 the relevant market analysis in the context of each of SIS's claims.

12 Intuitive proposes adding to the model specific instructions on one of SIS's two proposed

13 markets—the alleged aftermarket for EndoWrist repair and replacement. As the Ninth Circuit

14 recently held: "[T]o establish a single-brand aftermarket, a plaintiff must show: (1) the challenged

15 aftermarket restrictions are 'not generally known' when consumers make their foremarket

16 purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant'

17 monetary or non-monetary switching costs exist; and (4) general market-definition principles

18 regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic*

19 *Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). Intuitive's proposed instruction

20 faithfully reflects Ninth Circuit law by setting out these four factors that a "plaintiff must show."[5]

21 SIS, by contrast, proposes giving the instruction on relevant markets among the elements

22 of SIS's tying claim. *See* Disputed Instruction No. 22. This placement has the potential to confuse

23 the jury about applicability of the relevant market inquiry to SIS's other claims. Further, SIS's

24 proposed instruction is incomplete. SIS does not include the "General" instruction on relevant

25

26

27  [4] Other courts have given such an instruction, even when there is no unilateral refusal to deal claim
    in the case, to avoid this problem. *See, e.g.*, Jury Instructions at 26, *AngioDynamics, Inc.* v. *C.R.*
28  *Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472.

    [5] For a more fulsome discussion of this issue, see Section V.B of Defendant's Trial Brief.

- 4 -

markets from the ABA model, even though it provides critical context for the inquiry.[6] SIS's proposal also is silent on the *Epic* factors, and provides no guidance to the jury on how to evaluate whether SIS has properly alleged a single-brand aftermarket for EndoWrist repair and replacement.

SIS may argue that *Epic* does not apply because Intuitive allegedly has market power in the alleged foremarket for minimally invasive soft tissue ("MIST") surgery robots, but that is a heavily contested factual issue that the jury will be asked to determine. Further, Ninth Circuit case law shows that the *Epic* factors apply even if the defendant has monopoly power in the foremarket. *See, e.g.*, *Coronavirus Reporter* v. *Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023). SIS's approach also would be inconsistent with the fundamental principle that "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 46 (2006).

In addition to the ABA model instruction on relevant product markets, Intuitive proposes in Disputed Instruction No. 8 giving an ABA model instruction on the impact of "supply substitutability" on the relevant product market analysis—*i.e.*, the effect of other manufacturers being able to alter their production methods to enter the market in response to a price increase. SIS objects to this instruction on the ground that there are no such manufacturers who are capable of doing so in this case. SIS's objection assumes the answer to the disputed factual question that Intuitive proposes be submitted to the jury—that is, whether there are such firms.

## VIII. DISPUTED INSTRUCTION NO. 9 IS AN UNOBJECTIONABLE GENERAL STATEMENT ABOUT SHERMAN ACT SECTION 1

In Disputed Instruction No. 9, Intuitive proposes the standard ABA model instruction that explains what a plaintiff must prove to establish a violation of Section 1 of the Sherman Act. SIS asserts that the proposed instruction is repetitive of its proposed Instruction No. 3, but that proposal merely lists SIS's claims without explaining what SIS must prove to establish them, and should not be given to the jury for the reasons noted above. *See supra* Section V.

---

[6] *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 3: Relevant Market—General (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

### IX. THE COURT SHOULD PROVIDE THE STANDARD RULE OF REASON FRAMEWORK OF DISPUTED INSTRUCTION NOS. 10, 11, AND 12

In Disputed Instruction Nos. 10, 11, and 12, Intuitive proposes ABA model instructions regarding the rule of reason framework that applies to both of the claims (tying and exclusive dealing) that SIS asserts under Sherman Act Section 1. Because this framework applies to both claims, Intuitive proposes to instruct on it before addressing the specific elements of each claim.

SIS asserts these instructions should be omitted, and instead given in the context of SIS's tying claim. That objection suffers from two flaws. *First*, SIS proposes instructions on the elements of a per se tying claim, and that the rule of reason analysis should be provided only as an alternative if the jury finds that it has not met the per se standard; but for the reasons stated below in Section XII, SIS's proposed per se instructions should be rejected. *Second*, by giving the rule of reason instructions only in the context of the tying claim, the jury may mistakenly believe that they do not apply to SIS's exclusive dealing claim. To avoid such confusion, the rule of reason instructions should be given before the elements of either of the two Sherman Act Section 1 claims.

To the ABA model instructions, Intuitive has proposed a few modifications. SIS does not specifically object to any of them, and for the following reasons, the Court should adopt them.

In Disputed Instruction No. 10, which provides an overview of the rule of reason, Intuitive has removed the final sentence from the model, which provides: "The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit." While some courts have endorsed such balancing, it is not a part of the three-part rule of reason burden-shifting framework that has been adopted by the Supreme Court and Ninth Circuit. *See, e.g.*, *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 541–42 (2018) ("To determine whether a restraint violates the rule of reason . . . the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations

omitted)); *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 96–100 (2021) (endorsing the *American Express* framework); *Qualcomm Inc.*, 969 F.3d at 991–92 (adopting the *American Express* framework). This Court likewise adopted the *American Express* three-step burden shifting framework in its opinion on the parties' cross-motions for summary judgment. *See* Dkt. 204 at 17.

In Disputed Instruction No. 11, regarding proof of harm to competition, Intuitive has proposed adding a single sentence to the model, consisting of a direct quote from this Court's summary judgment decision: "It is not enough that 'conduct has the effect of reducing consumers' choices or increasing prices to consumers.'" Dkt. 204 at 17 (quoting *Qualcomm*, 969 F.3d at 993–94 (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))). This sentence provides helpful context on what constitutes harm to competition, and reflects the law already applied in this case and controlling law of the Ninth Circuit.

In Disputed Instruction No. 12, Intuitive has added a paragraph that explains the standards a plaintiff must meet to prove, at step three of the rule of reason framework, that the defendant's procompetitive rationales could have been achieved through substantially less restrictive means. This proposed insert directly quotes this Court's summary judgment opinion and controlling Ninth Circuit precedent. *See* Dkt. 204 at 17 ("A procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *Qualcomm*, 969 F.3d at 991)); *Epic Games*, 67 F.4th at 990 ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a *substantially* less restrictive alternative." (quotations omitted) (citing *Alston*, 594 U.S. at 100–01); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

## X. THE COURT SHOULD USE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 13

In Disputed Instruction No. 13, SIS and Intuitive both provide the ABA model instruction on the definition of tying, differing only in that Intuitive has indicated that it opposes the claim. The Court should adopt Intuitive's version.

## XI. THE COURT SHOULD ADOPT INTUITIVE'S MODIFICATIONS TO THE MODEL IN DISPUTED INSTRUCTION NO. 14

In Disputed Instruction No. 14, SIS and Intuitive both provide the ABA model instruction on the rationale for the prohibition of tying arrangements. To the model, Intuitive has added a sentence derived from the Supreme Court's discussion of the historical development of tying law in *Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 35–36 (2006), to explain that tying arrangements may have legitimate benefits for consumers. The Court should adopt this proposed modification, which accurately reflects Supreme Court precedent.

## XII. DISPUTED INSTRUCTION NOS. 15, 26, AND 27, WHICH REFLECT SIS'S PROPOSED "PER SE" TYING INSTRUCTIONS, SHOULD BE REJECTED, AND INSTEAD DISPUTED INSTRUCTION NO. 16 SHOULD BE GIVEN

SIS proposes that the jury be instructed as to a "per se" tying claim, *see* Disputed Instruction No. 15, and only be instructed as to tying under the rule of reason as an alternative if SIS fails to prove that Intuitive has "sufficient market power" in the alleged tying market for MIST surgical robots, *see* Disputed Instruction No. 26. This approach makes no sense.

*First*, SIS did not assert a "per se" claim. At summary judgment, the Court said: "[T]he parties here do not appear to dispute the market at issue, ***nor does SIS assert that the alleged restraints here are* per se *unreasonable***. Their arguments focus on whether the parties can satisfy the respective burdens imposed by the rule of reason." Dkt. 204 at 17 (emphasis added).

*Second*, any "per se" tying claim in this case is foreclosed by law. In *Epic*, the Ninth Circuit clarified that per se tying cases are limited to those where the tie is "'plainly anticompetitive' and 'lacking in any redeeming virtue' such that it can be 'conclusively presumed illegal.'" *Epic Games*, 67 F.4th at 997 (quoting *Broad. Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–8 (1979)) (alterations omitted).[7] The Court has already concluded there is "directly conflicting

---

[7] Other recent Ninth Circuit cases have similarly applied the rule of reason or more generally

1    evidence regarding the potential benefits of Intuitive's conduct" that is "best left for a jury to

2    weigh." Dkt. 204 at 18. This is not the rare situation where the alleged tie is "plainly

3    anticompetitive."

4        *Third*, SIS seems to argue that the difference between a per se and rule of reason case

5    derives from the defendant having "sufficient market power" in the tying market. *See* Disputed

6    Instruction No. 26. But that is at odds with *Epic*, and with the Supreme Court's *Illinois Tool Works*

7    decision, which holds that "in *all* cases involving a tying arrangement, the plaintiff must prove that

8    the defendant has market power in the tying product." 547 U.S. at 46 (emphasis added).

9        Moreover, giving both per se and rule of reason instructions would be confusing because

10    ultimately the jury must decide the same elements. The ABA model instructions for per se and

11    rule of reason tying are identical except that element 5 in the rule of reason instruction—"the tying

12    arrangement has unreasonably restrained trade in that it had a substantial adverse effect on

13    competition as to [the tied product]"—does not appear in the per se instruction.[8] But even in a per

14    se tying case, the ABA model explains that the plaintiff still must prove that the tying arrangement

15    had "a substantial adverse effect on competition with respect to" the tied product.[9] The parties

16    have stipulated to including that instruction here. *See* Stipulated Instruction No. 24.

17        In contrast to SIS's proposed per se tying instruction, Intuitive proposes in Instruction No.

18    16 that the jury be given the ABA model instruction regarding the elements of a tying claim under

19    the rule of reason. That is the claim that SIS has actually pleaded, and unlike SIS's proposed per

20    se tying instruction, presents all required elements in one place.

21        Finally, SIS proposes two additional instructions regarding the evaluation of SIS's tying

22    claim under the rule of reason in the event that SIS does not prove its tying claim under a "per se"

23

24    discussed the required elements of tying without using the per se label. *See Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178–80 (9th Cir. 2016); *Brantley*, 675 F.3d at 1197.

25    [8] *Compare* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 Section 1 of the

26    Sherman Act—Tying Arrangements, Instruction 4: Elements – Unlawful Tying Under Rule of Reason (AM. BAR ASS'N ANTITRUST L. SECTION 2016), *with id.* at Chapter 2 Section 1 of the

27    Sherman Act—Tying Arrangements, Instruction 3: Elements – Per Se Unlawful Tying.

28    [9] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 Section 1 of the Sherman Act—Tying Arrangements, Instruction 9: Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

theory. *See* Disputed Instruction Nos. 26, 27. If the Court rejects SIS's proposed "per se" tying Instruction No. 15 and provides Intuitive's proposed Instruction No. 16 on the rule of reason, there is no need to provide these additional rule of reason instructions regarding SIS's tying claim.[10]

## XIII. THE COURT SHOULD USE INTUITIVE'S MODIFICATION TO THE MODEL IN DISPUTED INSTRUCTION NOS. 17, 18, AND 23

In Disputed Instruction Nos. 17, 18, and 23, each of which elaborates on one of the elements of SIS's tying claim, Intuitive has added a roadmap paragraph to orient the jury as to which element is at issue in the instruction. Intuitive requests the Court adopt these roadmaps.

Additionally, in Disputed Instruction No. 23, which provides the ABA model instruction regarding market power in the tying market, Intuitive has added a sentence directly from the general ABA model instruction on proof of competitive harm: "The ability to charge higher prices for better products or services, however, is not market power."[11] Intuitive requests this modification be adopted because the quality of Intuitive's alleged tying product, the da Vinci, is a fundamental issue in this case and the instruction thus provides helpful context to the jury.

## XIV. DISPUTED INSTRUCTION NOS. 19. AND 46 REGARDING THE RELEVANT GEOGRAPHIC MARKET, AND DISPUTED INSTRUCTION NOS. 25, 41, 53, AND 58 REGARDING INTERSTATE COMMERCE, SHOULD BE REJECTED

In Disputed Instruction No. 19 and 46, SIS proposed to instruct that "SIS and Intuitive agree that the relevant geographic market is the United States of America." These instructions are redundant and unnecessary—the parties have stipulated to the geographic market, and the jury will be read that stipulation. The same goes for SIS's proposed instructions that Intuitive's conduct "occurred in or affected interstate commerce." In addition to listing that requirement as an element for each claim, *see* Disputed Instruction Nos. 15, 32, 45, 54, SIS proposes to state repeatedly that "Intuitive's agreements affected interstate commerce." *See* Disputed Instruction Nos. 25, 41, 53, and 58. Where, as here, this element is not contested, courts omit it.[12]

---

[10] Intuitive has proposed a substantially similar version of SIS's proposed Instruction No. 26 as its Instruction No. 10, which should be given for the reasons above. *See supra* Section IX.

[11] *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act— General, Instruction 3B: Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[12] *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element of monopolization

**XV.  DISPUTED INSTRUCTION NOS. 20 AND 33 PROPERLY SET OUT THE LAW ON WHEN AUTHORIZATION REQUIREMENTS CAN AND CANNOT CONSTITUTE TYING OR EXCLUSIVE DEALING**

Intuitive's contracts on their face prohibit customers only from using EndoWrists serviced or modified by *unauthorized* or unapproved third parties.  Where, as here, a supplier's "contractual language at least provides for the possibility of purchasing" a secondary product from third-party sources, courts are "reluctant to find a tying arrangement without some evidence that [the defendant] applied the contract language so restrictively as to constitute a de facto tying clause." *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979).  Such contracts do not amount to a tie unless the possibility of "authorization" is "illusory."  *Mozart Co.* v. *Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)); *see also Ford Motor Co.* v. *GMB Universal Joints (West), Inc.*, 1988 WL 82826, at *3 (9th Cir. 1988) (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517).[13]  It is the plaintiff's burden to prove that the defendant in fact applied a contractual third-party authorization clause so restrictively as to constitute a de facto tie.  *Photovest*, 606 F.3d at 722.

Intuitive's proposed Instruction No. 20 accurately reflects this case law.  Intuitive proposes the same instruction regarding SIS's exclusive dealing claim in Instruction No. 33:  that claim is based on the same contract provisions, and courts often consider tying and exclusive dealing claims arising from the same alleged conduct under the same analytical framework.  *See, e.g.*, *Dream Big Media Inc.* v. *Alphabet Inc.*, 2024 WL 3416509, at *5 (N.D. Cal. July 15, 2024).

SIS does not challenge Intuitive's articulation of the law, nor does it point to any contrary caselaw.  Instead, SIS asserts that these proposed instructions are "inconsistent with the wording

---

claim); *id.* at 43 (omitting interstate commerce element of tying claim); Jury Instructions at 15–16, *AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472 (omitting interstate commerce element of tying claim).

[13] Where the defendant "never refused a request to approve a supplier," a third-party authorization clause is not illusory and  there is no tie.  *Betaseed, Inc.* v. *U & I Inc.*, 681 F.2d 1203, 1224 (9th Cir. 1982); *see also Pullos* v. *Alliance Laundry Sys., LLC*, 2009 WL 10708625, at *13 (D. Nev. 2009) (rejecting tying claim where customers were permitted to purchase from third parties that met defendant's specifications).

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03496-AMO

of the actual contractual provision that Intuitive seems to rely on here." That is false; even SIS's complaint alleges that "Intuitive's ULSA prohibits customers from engaging any ***unauthorized*** third party to repair, refurbish, or recondition EndoWrist instruments . . . ." Dkt. 1 ¶ 4 (emphasis added). If what SIS means is that, according to SIS, the contracts worked differently in practice, then SIS is proposing to displace the role of the jury to determine, as a factual matter, whether Intuitive's contracts actually do allow for its hospital customers to obtain EndoWrist repair services from authorized third-party servicers. The Court should overrule the objection and give Intuitive's proposed Instruction Nos. 20 and 33, so the jury can decide the question, not SIS.

## XVI. THE COURT SHOULD INSTRUCT THE JURY THROUGH DISPUTED INSTRUCTION NO. 21 THAT VOIDING A WARRANTY IS NOT COERCION

Intuitive's contracts with its customers provide that warranties on its products may be voided if the customer uses an unauthorized third-party product or service. In Disputed Instruction No. 21, Intuitive proposes the jury be instructed that such contractual provisions are, as a matter of law, not so coercive as to create a tying arrangement. *See, e.g.*, *Va. Panel Corp.* v. *MAC Panel Co.*, 133 F.3d 860, 870 (Fed. Cir. 1997) ("[V]oiding a warranty on a product already sold, while possibly a breach of warranty, cannot be a tying arrangement because the purchaser is not deciding whether to buy a product."); *Marts* v. *Xerox, Inc.*, 77 F.3d 1109, (8th Cir. 1996) ("Although the warranty does condition its continuation on the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox copier. . . . An owner of a new Xerox copier could forego the benefits of the warranty, buy service from Xerox or an independent provider, and purchase cartridges from the vendor of its choice."); *Fido's Fences* v. *Canine Fence Co.*, 672 F. Supp. 2d 303, 312 (E.D.N.Y. 2009) ("[I]t is well settled that warranties that are not sold as a separate product do not result in consumer coercion if the warranty sets forth requirements.").

SIS's objection does not take issue with Intuitive's articulation of the law or cite any contrary law. Instead, SIS again proposes to usurp the role of the jury on a disputed factual question by asserting that the instruction simply "is not applicable to the issues and agreements in this case." But again, SIS's position is inconsistent with its own complaint, which alleges that if a customer violates the prohibitions on unauthorized third-party products and services, "Intuitive

---

1    has threatened to void the warranties on the da Vinci robotic system." Dkt. 1 ¶ 86.

2    While SIS also alleges other consequences associated with such contractual violations, that

3    does not change the fact that at least one of the supposed "threats" on which SIS bases its claim is

4    entirely lawful conduct.  The impact of such lawful conduct on customers' decisionmaking, in

5    contrast to any alleged unlawful conduct, is a factual issue for the jury to decide.  SIS's objection

6    that its claims are based on "many actions taken by Intuitive," and that "it would be improper to

7    instruct the jury that it cannot find in SIS's favor based solely on a warranty claim" thus has no

8    merit.  What would be "improper" would be allowing SIS to bootstrap its way into having the jury

9    consider conduct that, as a matter of law, *cannot* support a tying claim.[14]  The Court should reject

10   SIS's attempt to decide disputed issues of fact and introduce legal error.

## XVII. THE COURT SHOULD GIVE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 28 REGARDING HARM TO COMPETITION

12   Disputed Instruction No. 28 consists of an ABA model instruction regarding whether SIS

13   has proved, for its tying claim, a substantial harmful effect on competition.  The versions proposed

14   by Intuitive and by SIS differ in two respects.  *First*, as in Disputed Instruction No. 11, *see supra*

15   Section IX, Intuitive proposes adding a single, direct quote from the Court's summary judgment

16   decision.  *See* Dkt. 204 at 17 ("It is not enough that 'conduct has the effect of reducing consumers'

17   choices or increasing prices to consumers.'" (quoting *Qualcomm*, 969 F.3d at 993–94)).  *Second*,

18   because Intuitive has proposed that the Court provide an instruction on market power in Instruction

19   No. 11, Intuitive proposes removing the repetitive instruction on that issue in Instruction No. 28.

## XVIII. THE COURT SHOULD GIVE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 29 REGARDING PROCOMPETITIVE RATIONALES

22   In Disputed Instruction No. 29, both parties propose an ABA model instruction regarding

23   the second and third steps of the rule of reason analysis.  Intuitive has proposed the same

24   modifications it does for Disputed Instruction No. 12, discussed above in Section IX.

---

[14] *See, e.g.*, *Ne. Tel. Co.* v. *Am. Tel. & Tel. Co.*, 651 F.2d 76, 96 (2d Cir. 1981) ("[A] new trial is ordered to enable [plaintiff] to prove [a violation of the Sherman Act] without resort to evidence of conduct that we have found not to have been anticompetitive . . . .").

## XIX. THE COURT SHOULD REJECT DISPUTED INSTRUCTION NO. 30

Intuitive objects to SIS's proposed Disputed Instruction No. 30 because it includes a balancing test that the Supreme Court and Ninth Circuit have rejected. *See supra* Section IX.

## XX. THE JURY SHOULD BE PERMITTED TO EVALUATE THE BUSINESS JUSTIFICATION DEFENSE IN DISPUTED INSTRUCTION NO. 31

Intuitive contends that the contract provisions which SIS challenges as "tying" are justified for legitimate business purposes, including patient safety, protecting Intuitive's brand and reputation, and preventing free riding. Accordingly, in Disputed Instruction No. 31, Intuitive proposes giving the ABA model instruction on the business justification defense to tying. Other than filling in a placeholder for Intuitive's specific business justifications, Intuitive proposes only two modifications. One adds the word "substantially" before "less restrictive means," consistent with controlling Supreme Court and Ninth Circuit law. *See Epic Games*, 67 F.4th at 985–86, 990 ("[T]his circuit's test—which the Supreme Court approved in *Alston*[, 594 U.S. at 100]—requires a '*substantially* less restrictive' alternative." (emphasis in original)). The second is to add two sentences explaining that a legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, and how to make that determination without reference to the actor's subjective intent. *See Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983) (Breyer, J.); *see also United States* v. *Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001).

SIS objects that this instruction should not be given because it is "largely repetitive and unnecessary" in light of the other rule of reason instructions regarding SIS's tying claim. But the ABA model instruction explains clearly that the business justification defense applies only if the "plaintiff has proven all of the elements of a tying claim"—that is, if the plaintiff has proven its claim under the rule of reason.[15] In other words, the business justification defense *adds* to the rule of reason and applies even if SIS were to carry its burden under the rule of reason burden-shifting framework.[16] The Ninth Circuit has endorsed just such an approach. *See Mozart Co.* v. *Mercedes-*

---

[15] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 11: Business Justification Defense (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[16] Other courts have given the business justification defense instruction following rule of reason instructions on a tying claim. *See, e.g.*, Jury Instructions at 24–25, *AngioDynamics, Inc.* v. *C.R.*

- 14 -

*Benz of N. Am., Inc.*, 833 F.2d 1342, 1350 n.7 (9th Cir. 1987). SIS's objection should be overruled.

## XXI. THE COURT SHOULD ADOPT INTUITIVE'S PROPOSED INSTRUCTION NO. 32 REGARDING ELEMENTS OF EXCLUSIVE DEALING

Intuitive's and SIS's competing proposals for Instruction No. 32—which provides the elements for SIS's exclusive dealing claim based on the ABA model instruction—differ in only a few respects. *First*, for brevity, Intuitive's version of the instruction omits from the first paragraph several examples of types of exclusive dealing arrangements that no party suggests actually apply in this case. *Second*, in the first element of the claim, Intuitive follows the model instruction's language that SIS must prove that Intuitive's agreements with its customers "*totally* foreclose" purchases from other suppliers, whereas SIS modifies the language of the instruction—without providing any authority—to suggest it must prove only that these agreements "*substantially* foreclose[]" buying from other suppliers. *Third*, Intuitive proposes to omit the interstate commerce element, which it does not contest. *See supra* Section XIV.

## XXII. DISPUTED INSTRUCTION NO. 34, WHICH DISCUSSES THREE ELEMENTS OF EXCLUSIVE DEALING, SHOULD BE REJECTED IN FAVOR OF DISPUTED INSTRUCTION NOS. 35, 36, AND 39

In Disputed Instruction No. 34, SIS proposes to give an ABA model instruction, which the ABA titled "Exclusive Dealing – Additional Considerations." This single model instruction weaves together paragraphs that relate to three separate elements of an exclusive dealing claim: (1) a substantial adverse effect on competition, (2) a substantial foreclosure of competition, and (3) substantial market power. For analytical clarity, Intuitive proposes that the single instruction be split up, so that each of those elements is explained in its own instruction.

In Disputed Instruction No. 35, Intuitive proposes to provide the portions of the "Additional Considerations" instruction that relate to substantial adverse effect on competition. To the model, Intuitive has added, as in Disputed Instruction Nos. 11 and 28, *supra* Sections IX, XVII, a single, direct quote from the Court's summary judgment decision. *See* Dkt. 204 at 17 ("It is not enough that 'conduct has the effect of reducing consumers' choices or increasing prices to consumers.'" (quoting *Qualcomm*, 969 F.3d at 993–94)).

---

*Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472.

In Disputed Instruction No. 36, Intuitive proposes to provide the portions of the "Additional Considerations" instruction that relate to substantial foreclosure of competition. Intuitive proposes to change the minimum percentage of the market that must be foreclosed from "20 percent," which is in the model, to "30–40 percent," which more accurately reflects prevailing caselaw. *See, e.g.*, *Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1162–65 (9th Cir. 1997) ("Although 38% [foreclosure] appears significant, . . . we conclude that it considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons." (citation and internal quotation marks omitted)); *Sterling Merchandising, Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("[I]n applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy." (citation and quotation marks omitted)); *United States* v. *Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before an exclusive contract raises competitive concerns).[17]

Finally, in Disputed Instruction No. 39, Intuitive proposes to provide the portions of the "Additional Considerations" instruction that relate to market power. To provide context for these paragraphs—which are specific to the exclusive dealing context, and relate to the contracting process and sophistication of Intuitive's customers—Intuitive has inserted language on market power from the general rule of reason instruction in Intuitive's proposed Instruction No. 11.

## XXIII. THE COURT SHOULD GIVE DISPUTED INSTRUCTION NO. 40 REGARDING THE RULE OF REASON ANALYSIS FOR SIS'S EXCLUSIVE DEALING CLAIM, AND REJECT DISPUTED INSTRUCTION NO. 38

In Disputed Instruction No. 38, SIS proposes—without citation to authority or

---

[17] *See also Union Carbide Corp.* v. *Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998) (foreclosure percentage in the 30 percent range is the point at which firms are "presumptively incapable of exercising market power"); AM. BAR ASS'N, 1 ANTITRUST LAW DEVELOPMENTS 213–14 (8th ed. 2017) ("Although foreclosure of 20 to 30 percent was a gray area before [*Jefferson Parish Hospital District No. 2* v. *Hyde*, 466 U.S. 2 (1984)], the concurring opinion in *Jefferson Parish*, the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market share thresholds are a prerequisite to finding exclusive dealing unlawful—and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion.").

explanation—the jury be instructed to "evaluate whether Intuitive's agreements with hospitals amount to an unreasonable restraint of trade that resulted in a substantial adverse effect in the market for replacement and repaired EndoWrists under the rule of reason."  The Court should reject SIS's proposal as insufficient to actually instruct the jury on this issue.  Intuitive proposes in Disputed Instruction No. 40 to give the jury guidance to make this determination, via an ABA model instruction regarding the second and third steps of the rule of reason analysis (which Intuitive has also proposed at Instruction Nos. 12 and 29).  *See supra* Sections IX, XVIII.

## XXIV. DISPUTED INSTRUCTION NO. 43 IS AN UNOBJECTIONABLE ROADMAP

In Disputed Instruction No. 43, Intuitive merely proposes to provide a roadmap to the jury by stating that SIS has stated claims for monopolization and attempted monopolization under Section 2 of the Sherman Act.  SIS's objections that this completely neutral instruction is somehow "overly argumentative" or "repetitive" border on frivolous, and should be overruled.

## XXV.  DISPUTED INSTRUCTION NO. 44 PURPORTING TO DEFINE MONOPOLY AND ATTEMPTED MONOPOLIZATION SHOULD BE REJECTED

SIS proposes in its Disputed Instruction No. 44 to "[d]efine" monopolization and attempted monopolization.  But SIS's proposed instruction focuses on defining only monopoly power, and as such risks misleading the jury into believing that the mere possession of monopoly power is unlawful, which is contrary to law.  *See Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Further, both parties have proposed in Disputed Instruction No. 48 an instruction on "Monopoly Power Defined," which is drawn directly from the ABA model.  There is no reason to give the jury Instruction No. 44 in addition.

SIS's proposed Instruction No. 44 also notes that attempted monopolization claims require only an attempt to achieve a monopoly—not that the defendant actually succeed.  The jury will be instructed on this issue more completely in the instructions on SIS's attempted monopolization claim.  *See* Disputed Instruction Nos. 54, 57.  Instruction No. 44 is thus unnecessary.

## XXVI. DISPUTED INSTRUCTION NO. 45 REGARDING THE ELEMENTS OF MONOPOLIZATION SHOULD OMIT INTERSTATE COMMERCE

Intuitive's and SIS's competing proposals for Instruction No. 45—providing the elements for monopolization based on the ABA model instruction—differ only in that Intuitive proposes to

1    omit the interstate commerce element, which it does not contest. *See supra* Section XIV.

2    **XXVII.      THE COURT SHOULD ADOPT INTUITIVE'S DISPUTED
             INSTRUCTION NO. 48 REGARDING MONOPOLY POWER**

3
4            In Disputed Instruction No. 48, both Intuitive and SIS start from the ABA model instruction

5    on the definition of monopoly power. To that instruction, Intuitive proposes two modifications,

6    which it respectfully requests the Court adopt. *First*, Intuitive proposes to add a sentence that

7    directly quotes the Ninth Circuit's recent decision in *Epic*, explaining that the acquisition or

8    maintenance of monopoly power is not unlawful if it is comes from "growth or development as a

9    consequence of a superior product, business acumen, or historic accident." 67 F.4th at 998. This

10   is important to clarify, so the jury does not mistakenly believe that the mere possession of

11   monopoly power may violate the antitrust laws. *See Law Offices of Curtis V. Trinko*, 540 U.S. at

12   407. *Second*, Intuitive proposes to add a simple roadmap explaining that the jury will hear, in

13   Instruction Nos. 49 and 50, two ways of proving monopoly power (direct and indirect).

14   **XXVIII.      THE COURT SHOULD ADOPT INTUITIVE'S DISPUTED
              INSTRUCTION NO. 49 ON DIRECT EVIDENCE OF MONOPOLY POWER**

15           In Disputed Instruction No. 49, both Intuitive and SIS start from the ABA model instruction

16   on proving monopoly power through direct evidence. To that instruction, Intuitive proposes two

17   modifications. *First*, Intuitive proposes language to specify that proving monopoly power by

18   direct evidence requires proving *both* that the defendant has the ability to raise or maintain prices,

19   *and* to restrict output, as case law makes clear is required. *See, e.g.*, *Rebel Oil Co., Inc.* v. *Atl.*

20   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("If the plaintiff puts forth evidence of restricted

21   output and supracompetitive prices, that is direct proof of the injury to competition which a

22   competitor with market power may inflict, and thus, of the actual exercise of market power.");

23   *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) ("Direct proof of market power may

24   be shown by evidence of restricted output and supracompetitive prices."), *overruled on other*

25   *grounds*, *Lacey* v. *Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012); *Theme Promotions, Inc.* v. *News*

26   *Amer. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008) ("Evidence of restricted output and

27   supracompetitive prices is direct evidence of market power.").[18]

28

---

[18] *See also Safeway Inc.* v. *Abbott Lab'ys*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) ("To prove

- 18 -

1      *Second*, Intuitive proposes a sentence making clear that, when considering whether prices

2  are supracompetitive, the jury may consider Intuitive's "total fixed costs, including capital costs

3  and research and development." This is supported by the leading antitrust treatise and several

4  cases. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 516g (5th ed. 2023) ("No

5  matter how accurately measured, of course, a substantial excess of price over marginal cost does

6  not necessarily bring excess returns on investment. A firm generates excess profit only if price

7  exceeds its average total cost, including its cost of capital.").[19]

8  **XXIX. THE COURT SHOULD GIVE INTUITIVE'S VERSION OF DISPUTED
   INSTRUCTION NO. 28 REGARDING HARM TO COMPETITION**

9

10      Disputed Instruction No. 51 on willful acquisition/maintenance of monopoly power is

11  drawn from the ABA model. As in Disputed Instruction Nos. 11, 28, and 35, *supra* Sections IX,

12  XVII, XXII, Intuitive proposes adding a single, direct quote from the Court's summary judgment

13  decision. *See* Dkt. 204 at 17 ("It is not enough that 'conduct has the effect of reducing consumers'

14  choices or increasing prices to consumers.'" (quoting *Qualcomm*, 969 F.3d at 993–94)).

15  **XXX. THE COURT SHOULD REJECT SIS'S DISPUTED INSTRUCTION NO. 52
   REGARDING DESIGN CHANGES, AND ADOPT INTUITIVE'S VERSION**

16      SIS attacks as anticompetitive design changes that Intuitive made with its X/Xi model

17  EndoWrists. Generally, a design change is not an antitrust violation. "To count as unlawful

18  exclusionary conduct, a firm must not have had any 'procompetitive justification' for its design

19  change." Mot. to Dismiss Order, Dkt. 70 at 8 (quoting *Allied Orthopedic Appliances Inc.* v. *Tyco*

20  *Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010)). Once a firm establishes that its design

21

22  monopoly power directly, supracompetitive pricing must be accompanied by restricted output. . . .
23  Both are required to prove monopoly power directly."); *CoStar Grp., Inc.* v. *Com. Real Est. Exch.
   Inc.*, 2023 WL 2468742, at *5 (N.D. Cal. Feb. 23, 2023) ("[D]irect evidence of the injurious
24  exercise of market power . . . is evidence of restricted output and supracompetitive prices."
   (citation and quotation marks omitted)); *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1031
25  (N.D. Cal. 2021) (lack of evidence of restricted output "fatal in demonstrating monopoly power").
26  [19] *See also United States* v. *Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain
   deviations between marginal cost and price, such as those resulting from high fixed costs, are not
27  evidence of market power."); *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d
   675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds light on material factors such as
28  [defendant's] price relative to its total costs (marginal and fixed) . . . , monopoly power cannot be
   found as a matter of law.").

has a procompetitive reason, "[t]here is no room . . . for balancing the benefits or worth of a product improvement against its anticompetitive effects," and the design "*is necessarily tolerated by the antitrust laws*." *Allied Orthopedic*, 592 F.3d at 1000 (quotation marks omitted; emphasis added).

SIS's version of Instruction No. 52 contradicts Ninth Circuit law.  SIS argumentatively and misleadingly starts from the position that redesigning products can give rise to antitrust liability, and then goes on to provide five gratuitous and legally erroneous paragraphs purporting to describe ways that a design change can be anticompetitive.  Nowhere does SIS acknowledge that under *Allied Orthopedic*, the presumption is that a design change that improves a product *cannot* give rise to antitrust liability *unless* it is accompanied by some other, associated anticompetitive conduct.  Further, at the end of its proposed instruction SIS sets forth its own contentions as to why Intuitive's introduction of the X/Xi model EndoWrists were anticompetitive, without acknowledging any of Intuitive's proffered procompetitive justifications.

Intuitive's version of Instruction No. 52 accurately reflects controlling law under *Allied Orthopedic*, by starting with the proposition that improvement in product design is presumptively procompetitive, while acknowledging that this presumption can be overcome if other associated anticompetitive behavior is present.  Intuitive also proposes informing the jury about both its position on the procompetitive justifications for the X/Xi model EndoWrist, and SIS's contention that the introduction of this new technology violated the antitrust laws.

## XXXI. THE COURT SHOULD ADOPT INTUITIVE'S DISPUTED INSTRUCTION NO. 54 REGARDING ELEMENTS OF ATTEMPTED MONOPOLIZATION

Intuitive's and SIS's proposals for Instruction No. 54, elements of attempted monopolization, differ in that SIS suggests the third element state, "there was a dangerous probability that Intuitive would sooner or later achieve its goal of monopoly power . . . ."  The ABA model does not include "sooner or later," and SIS offers no justification for its addition.  Intuitive also proposes to omit the interstate commerce element. *See supra* Section XIV.

## XXXII. THE COURT SHOULD REJECT SIS'S INJURY INSTRUCTIONS IN DISPUTED INSTRUCTION NOS. 42 AND 59, AND SHOULD INSTEAD GIVE INTUITIVE'S DISPUTED INSTRUCTION NOS. 60, 61, 62, AND 63

At the conclusion of the instructions on both its Section 1 and Section 2 claims, SIS

- 20 -

proposes giving virtually identical versions of an instruction regarding whether SIS has proven that it suffered injury. *See* Disputed Instruction Nos. 42, 59. In addition to being duplicative, both instructions omit key elements from the ABA model instruction on injury. Because SIS's claims are all based on the same alleged conduct, Intuitive proposes one set of instructions on injury after instructing on the other elements of SIS's claims. Intuitive uses an instruction from the ABA model that explains the three elements of injury SIS must prove: injury in fact, causation, and antitrust injury. *See* Disputed Instruction No. 60. Intuitive then proposes breaking up the ABA model instruction into three separate instructions, one for each element. *See* Disputed Instruction Nos. 61, 62, and 63. Intuitive also proposes clarifying the ABA model instruction on causation by stating that if SIS's injuries were caused *primarily* by factors other than the alleged anticompetitive conduct, it has not proven causation. *See Discover Fin. Servs.* v. *Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 504–05 (S.D.N.Y. 2008). Intuitive requests that the Court reject SIS's proposed Instruction Nos. 42 and 59, and give Intuitive's proposed Instruction Nos. 60, 61, 62, and 63.

## XXXIII. THE COURT SHOULD GIVE DISPUTED INSTRUCTION NOS. 65 AND 66 REGARDING REMANUFACTURING AND FDA CLEARANCE

In Disputed Instruction No. 65, Intuitive proposes an instruction for the jury to determine, as a matter of fact, whether the insertion of a memory chip into an EndoWrist to change its usage limit is "remanufacturing." This is the same jury instruction that the court in *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, indicated was the "essence of what [it] expected to instruct the jury on" had that case proceeded to trial. *See* Pretrial Conf. Tr. at 93:22–95:5, No. 5:19-cv-00055 (N.D. Fla. Jan. 13, 2023), ECF No. 226. The *Restore* court indicated that although experts could not opine on whether 510(k) clearance is legally required, the jury would decide as a factual matter whether Restore's activities constituted "remanufacturing." *See id.* Its decision to give this instruction was consistent with its summary judgment opinion, which this Court approvingly cited in its own summary judgment opinion. *See* Dkt. 204 at 12–13 (citing *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, 2019 WL 8063988, at *2–3 (N.D. Fla. Nov. 14, 2019)).

In Disputed Instruction No. 66, Intuitive proposes to instruct the jury that if SIS could not lawfully insert a memory chip into an EndoWrist to change its usage limit without having obtained

510(k) clearance, then it cannot have suffered antitrust injury.[20]  Notwithstanding the Court's summary judgment rulings, *see* Dkt. 204 at 12–13, Intuitive respectfully submits that this instruction is consistent with prevailing law, and preserves all appellate rights with respect to it.

**XXXIV.  THE COURT SHOULD FOLLOW THE ABA MODEL INSTRUCTION IN DISPUTED INSTRUCTION NOS. 68 AND 70 REGARDING DAMAGES**

Intuitive's proposal for Instruction No. 68—which explains how the jury may calculate damages—follows the ABA model.  SIS's proposal combines instructions from multiple sources, without justification.  SIS's approach to Instruction No. 70 should be rejected for the same reason.

**XXXV.  THE COURT SHOULD GIVE DISPUTED INSTRUCTION NO. 69 REGARDING CAUSATION AND DISAGGREGATION**

In Disputed Instruction No. 69, Intuitive proposes the ABA model instruction informing the jury that an antitrust plaintiff must "disaggregate" its damages—meaning that it must "segregate the losses . . . caused by acts which were not antitrust violations from those that were." *City of Vernon* v. *S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992).  The model instruction also includes a placeholder to list "examples of ways plaintiff could lose sales in the normal course of competitive business activity," which Intuitive has done.  SIS claims this "instruction is a further attempt by Intuitive to inject into the case matters that are not at issue," by pointing to the fact that SIS's own failure to seek FDA clearance may have contributed to its business failures.  This ignores other factors identified in Intuitive's proposal that may have caused SIS's losses, such as SIS's reliance on Rebotix to provide parts and services, and customer preference for purchasing EndoWrists from Intuitive for safety and liability concerns.  Moreover, whether or not FDA clearance was a legal requirement for SIS's business, SIS could have chosen to seek and obtain that clearance, as Iconocare did.  If all or some of SIS's alleged losses are attributable to SIS's own *choice* not to pursue FDA clearance, those losses cannot be recovered as antitrust damages.

---

[20] *See, e.g.*, *PharmacyChecker.com* v. *Nat'l Assoc. of Bds. of Pharmacy*, 2022 WL 347669, at *3 (S.D.N.Y. Feb. 4, 2022) ("Plaintiff bears the burden of proving that its business is legal."); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–65 (3d Cir. 2017) (Plaintiff "must point to evidence affirmatively showing" it satisfied the legal requirements to engage in the business); *In re Can. Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (antitrust claim dismissed where injury was caused by FDA import restrictions and not defendants' conduct).

**XXXVI.** **THE COURT SHOULD ADOPT INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 71 REGARDING FUTURE LOST PROFITS**

Intuitive's and SIS's competing proposals for Instruction No. 71, regarding future lost profits, are both based on the ABA model, but differ in two respects. The Court should adopt Intuitive's version. *First*, SIS asserts that it is claiming entitlement to damages for lost profits stretching "2 years into the future." However, until October 25, 2024, SIS's damages expert, Richard Bero, had not disclosed any opinion about lost profit damages beyond the end of 2025. SIS has now provided an update to Bero's damages calculations that purports to show SIS's damages through 2026, but with no supporting documentation or evidence. The law is clear that the jury may not award damages based on "speculation or guesswork." *Bigelow* v. *RKO Radio Pictures*, 327 U.S. 251, 264 (1946). *Second*, while the ABA model instruction tells the jury that it should discount future damages to present value, it does not say what discount rate to use. Intuitive has added a sentence from the Ninth Circuit's model jury instructions, which provides this missing explanation.[21]

**XXXVII.** **THE COURT SHOULD ADOPT INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 72 REGARDING MITIGATION OF DAMAGES**

Intuitive proposes, in Instruction No. 72, to provide the ABA model instruction on a plaintiff's duty to mitigate its damages. SIS objects that "mitigation is not at issue because Intuitive has not asserted SIS failed to mitigate its damages." This ignores that SIS's own damages expert stated in his report: "Inherent within [his lost profits damages analysis] is the question of mitigation," and that his but-for world analysis is based on his "understand[ing that] SIS has mitigated its lost profits to the best of its ability." *See* Dkt. 229-45 at 42.

**XXXVIII.** **THE COURT SHOULD USE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 74 ON THE ELEMENTS OF ITS LANHAM ACT CLAIM**

In its first counterclaim, Intuitive alleges that SIS engaged in unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125. Because the Ninth Circuit does not have model jury instructions for such a claim, Intuitive has proposed in Instruction No. 74 one that

---

[21] *See* Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 5.4 (9th Cir. Jury Instructions Comm. 2017 ed.).

is based on model jury instructions from the Seventh, Eighth, and Eleventh Circuits, and that is consistent with Ninth Circuit case law. *See Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008). SIS proposes an instruction that parrots the text of the statute, without reference to case law distilling it into the elements of a claim. Intuitive requests that the Court give its version.

## XXXIX. THE COURT SHOULD REJECT SIS'S ADDITION TO DISPUTED INSTRUCTION NO. 76 REGARDING COMMERCIAL PROMOTIONS

Intuitive's and SIS's competing proposals for Instruction No. 76—which instructs the jury on what constitutes a "commercial advertisement or promotion"—differ in only one respect. To Intuitive's proposal, SIS has added a statement that "a handful of statements to customers does not trigger protection from the Lanham Act unless the potential purchasers in the market are relatively limited in number," citing *Coastal Abstract Serv., Inc.* v. *First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir 1999). That presents an unduly restrictive view of the law. Cases from within the Ninth Circuit make clear that "the inquiry focuses on the 'relevant industry' and whether the communication was sufficiently disseminated in that context," and that in the right context, "even a single promotional representation to an individual purchaser may be enough to trigger the protections of the [Lanham] Act." *Gonzalez* v. *Allstate Ins. Co.*, 2005 WL 5891935, at *7 (C.D. Cal. Aug. 2, 2005). The undisputed portions of Instruction No. 76 already explain that "informal types of promotion" may qualify, as long as they were "disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry." SIS's proposal focusing on the number of potential purchasers would unduly restrict the jury's inquiry.

## XL. THE COURT SHOULD ADOPT INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 77 REGARDING LANHAM ACT INJURY

Intuitive's proposed Instruction No. 77 regarding its injuries from its Lanham Act claim is based on model instructions from the Seventh, Eighth, and Eleventh Circuits, and is consistent with Ninth Circuit precedent, which Intuitive has supplemented by reference to Supreme Court case law explaining how a plaintiff can actually prove such injury. SIS objects that this instruction is "repetitive" in light of Instruction No. 72, which provides the elements of Intuitive's Lanham Act claim. But that mere listing of the elements provides no information for the jury about what

types of injury are cognizable.  Instruction No. 77 provides that necessary instruction to the jury.

SIS, in the alternative, proposes its own version of Instruction No. 77, that differs from Intuitive's version only in that it includes language regarding what makes a statement false or misleading.  That issue is already covered in the parties' Stipulated Instruction No. 75.

## XLI.   THE COURT SHOULD USE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 78 ON THE ELEMENTS OF UNFAIR COMPETITION

There are no model instructions for common law unfair competition, so  Intuitive's version of Instruction No. 78 derives them from case law.  SIS proposes an instruction that provides *no* elements, and suggests this claim should succeed or fail solely based on Intuitive's Lanham Act claim.  While the Ninth Circuit has explained that common law unfair competition is "substantially congruent" to a *trademark infringement* claim under the Lanham Act, *see e.g.*, *Acad. of Mot. Picture Arts & Scis.* v. *Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991), it has not said the same about the Lanham Act claim for unfair competition and false advertising at issue here.  Intuitive thus requests that the Court give its version of Instruction No. 79.

## XLII.  THE COURT SHOULD USE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 79 ON TORTIOUS INTERFERENCE WITH CONTRACT

While both SIS and Intuitive derive Disputed Instruction No. 79 on the elements of Intuitive's tortious interference with contract claim from the California Civil Jury Instructions, in the third element SIS omits language from the model, which allows for liability if Intuitive can prove that SIS "knew that disruption of performance [of the contract] was certain or substantially certain to occur."[22]  SIS offers no justification or authority for this omission.

## XLIII. THE COURT SHOULD GIVE INTUITIVE'S VERSION OF DISPUTED INSTRUCTION NO. 80 REGARDING DAMAGES ON ITS COUNTERCLAIMS

In Disputed Instruction No. 80, Intuitive proposes instructions on how to evaluate Intuitive's claimed damages.  To do so, it provides some context to explain, for example, that the damages sought are compensatory and Intuitive must prove its damages by a preponderance of the evidence.  SIS's version of Instruction No. 80 proposes to omit that helpful context.

---

[22] Judicial Council of California Civil Jury Instructions 2201 – Intentional Interference with Contractual Relations – Essential Factual Elements (2024 ed.).

Dated:  October 28, 2024

By: /s/ *Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 26 -

Defendant's Memorandum of Law in Support of Disputed Jury Instructions
3:21-cv-03496-AMO

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

*Attorneys for Defendant*
*Intuitive Surgical, Inc.*

**CERTIFICATE OF SERVICE**

On October 28, 2024, I caused a copy of Intuitive's Memorandum of Law in Support of Disputed Jury Instructions to be electronically filed via the Court's Electronic Case Filing System, which pursuant to the Court's order of September 29, 2008, constitutes service in this action on counsel of record for Surgical Instrument Service Company, Inc.

Dated:  October 28, 2024                    By:   */s/ Kenneth A. Gallo*
                                                    Kenneth A. Gallo

1  **MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN, (CSB No. 262815)
2  E-Mail: josh@mccaulleylawgroup.com
3001Bishop Dr., Suite 300
3  San Ramon, California 94583
Telephone: 925.302.5941
4
RICHARD T. MCCAULLEY (*pro hac vice*)
5  E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
6  Chicago, Illinois 60601
Telephone: 312.330.8105
7
*Attorneys for Plaintiff and Counter-Defendant,*
8  SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9  **UNITED STATES DISTRICT COURT**

10  **NORTHERN DISTRICT OF CALIFORNIA**

11  **SAN FRANCISCO DIVISION**

12

13  SURGICAL INSTRUMENT SERVICE  |  Case No. 3:21-cv-03496-AMO
COMPANY, INC.  |  Honorable Araceli Martínez-Olguín

14  *Plaintiff/Counter-Defendant,*  |  **PLAINTIFF SIS'S MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTIONS**

15  v.

16  INTUITIVE SURGICAL, INC.,

17  *Defendant/Counterclaimant.*

18

19  Pursuant to the Court's Schedule and Pretrial Order (Dkt. 235, p. 2 Section II.A.3), Plaintiff

20  Surgical Instrument Service Company, Inc. ("SIS") hereby submits this Memorandum of Law in

21  support of its proposed instructions that Defendant Intuitive Surgical, Inc. ("Intuitive") disputes.

22  This Memorandum of Law is organized by the Instruction Number assigned to in the Parties' Joint

23  Proposed Jury Instructions.

24  **SIS'S BRIEF STATEMENT REGARDING ORDER OF INSTRUCTIONS**

25  SIS has objected and continues to object to the order and manner of the presentation of the

26  below Instructions as proposed by Intuitive, both for their presentation to jury and to the Court.

27  Intuitive's order of presentation buries SIS instructions below numerous Intuitive instructions in a

28

manner that SIS believes creates confusion for the jury and the Court. For example, SIS's third proposed instruction is Instruction 13 below and there are substantial gaps between instructions that should logically be grouped together for each claim. Accordingly, to aid the Court and avoid further disputes between the parties, SIS submits the below cross reference of Intuitive's order of instructions to SIS's proposed order of instructions:

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 2 | 1 | Purpose of Antitrust Laws | ABA A-1 |
| 3 | 2 | SIS's Claims and the Antitrust Statutes | *See cited caselaw* |
| 13 | 3 | Definition of Tying | ABA E-84 |
| 14 | 4 | Rationale for Prohibition of Tying Arrangements | ABA E-85 |
| 15 | 5 | Tying – Per Se Violation | ABA E-86 |
| 17 | 6 | Presence of Two Products | ABA E-90 |
| 18 | 7 | Tying – Conditioned Sale | ABA-93 |
| 19 | 8 | Relevant Geographic Market | *See instruction – SIS proposes instruct not disputed* |
| 22 | 9 | Relevant Product Markets | ABA A-108 |
| 23 | 10 | Existence of Market Power With Respect to the Tying Product Offered | ABA E-94 |
| 24 | 11 | Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product | ABA E-97 |
| 25 | 12 | Interstate Commerce – Tying | *See instruction – SIS proposes instruction not disputed* |
| 26 | 13 | Unlawful Tying under Rule of Reason | ABA E-88 |
| 27 | 14 | Rule of Reason - Overview | ABA C-3 |
| 28 | 15 | Rule of Reason - Proof of Competitive Harm | ABC C-5 |
| 29 | 16 | Rule of Reason -- Evidence of Competitive Benefits | ABA C-6 |
| 30 | 17 | Rule of Reason -- Balancing the Competitive Effects | ABA C-9 |
| 32 | 18 | Elements of Exclusive Dealing | ABA D-71 |
| 34 | 19 | Exclusive Dealing – Agreements that Substantially Foreclose Competition | ABA D-73 |
| 37 | 20 | Exclusive Dealing – Relevant Market | ABA A-108 (by ref to prior instruction ) |
| 38 | 21 | Exclusive Dealing – Unreasonable Restraint of Trade | ABA C-3, C-5, C-6, C9 (by ref to prior instructions) |
| 39 | 22 | Exclusive Dealing – Market Power | ABA E-94 |
| 41 | 23 | Exclusive Dealing – Interstate Commerce | *See instruction – SIS proposes instruction not disputed* |
| 42 | 24 | Injury | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 44 | 25 | Monopoly and Attempted Monopolization Defined | Modern Federal Jury Instructions-Civil, |

2

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| | | | Form 485a-80-22 |
| 45 | 26 | Elements of Monopolization | ABA A-102 |
| 46 | 27 | Relevant Geographic Market | *See instruction – SIS proposes instruction not disputed* |
| 47 | 28 | Relevant Product Market | ABA A-108 (by ref to prior instructions) |
| 48 | 29 | Monopoly Power Defined | ABA A-104 |
| 49 | 30 | Monopoly Power – Direct Evidence | ABA A-121 |
| 50 | 31 | Monopoly Power – Indirect Evidence | ABA A-115 |
| 51 | 32 | Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct | ABA A-123 |
| 52 | 33 | Design Changes | *See cited caselaw* |
| 53 | 34 | Monopolization - Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 54 | 35 | Attempt to Monopolize | ABA D-155 |
| 55 | 36 | Attempted Monopolization - Anticompetitive Conduct | ABA D-158 |
| 56 | 37 | Specific Intent to Achieve Monopoly Power | ABA D-160 |
| 57 | 38 | Dangerous Probability of Success | ABA D-164 |
| 58 | 39 | Attempted Monopolization - Interstate Commerce | *See instruction – SIS proposes instruction not disputed* |
| 59 | 40 | Injury – Monopolization and Attempted Monopolization | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 64 | 41 | Antitrust Damages -- Introduction and Purpose | ABA B-304 |
| 67 | 42 | Damages for Competitors--Preparedness to Enter Business | ABA B-321 |
| 68 | 43 | Basis for Calculating Damages | ABA B-3; Modern Federal Jury Instructions-Civil, Form 485a-79-26 |
| 70 | 44 | Damages for Competitors -- Lost Profits | ABA B-8; Modern Federal Jury Instructions-Civil, Form 485a-79-27 |
| 71 | 45 | Damages for Competitors -- Future Lost Profits | ABA B-9 |

**Disputed** Instruction No. 2 Re Purpose of Antitrust Laws Offered by **SIS**

SIS brings this action against Intuitive under a federal antitrust law known as the Sherman Act.  The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

*Source*:  AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases A-1, 2016 Edition

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 2

The proposed instruction is identical to the ABA Model Jury Instruction stating the purpose of the antitrust laws with the exception of the additional / substitute language highlighted in yellow and used to adapt the model instruction to the facts of this particular case.  There is no reason to introduce a different, general concept about establishing that Intuitive's acts caused injury not only to SIS itself but to competition as a whole in the alleged relevant market.

**<u>Disputed</u>** Instruction No. 3 Re SIS's Claims and the Antitrust Statutes Offered by **SIS**

SIS claims that Intuitive has violated the Sherman Act, and more specifically, each of Section 1 and Section 2 of the Sherman Act.

SIS also claims under Section 1 of the Sherman Act that Intuitive's agreements with its hospital customers unreasonably restrained trade in the market for replacement and repaired EndoWrist instruments through illegal tying of EndoWrist replacement and repair with Intuitive's da Vinci surgical robots.

SIS claims under Section 1 of the Sherman Act that Intuitive entered into agreements with its hospital customers and engaged in other related conduct that unreasonably restrained trade in the market for replacement and repaired EndoWrist instruments through exclusive dealing in that market.

SIS further claims that Intuitive has unlawfully obtained monopoly power in the market for replacement and repaired EndoWrist instruments in violation of Section 2 of the Sherman Act through a variety of anticompetitive acts.

SIS also claims that Intuitive has unlawfully attempted to obtain monopoly power and has a dangerous probability of obtaining monopoly power in the market for replacement and repaired EndoWrist instruments in violation of Section 2 of the Sherman Act through a variety of anticompetitive acts.

Each of these is a separate claim that has distinct elements that SIS must prove. Thus, you may find that SIS has proved all, none, or only a subset of these claims.

Next, I will be instructing you on the elements required to prove each of these claims.

**Authorities:** *SumoText Corp. v. Zoove, Inc.*. Case No. 5:16-cv-01370, ECF No. 468, Instruction 21 (N.D. Cal. Mar. 4, 2020)*; In re National Football League's "Sunday Ticket" Antitrust Litigation*, Case No. 2:15-ml-02668, ECF No. 1482, Instruction 14 (N.D. Cal. June 27, 2024).

1    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 3

2            This proposed instruction accurately states SIS's antitrust claims against Intuitive. It does

3    not attempt to combine SIS's claims with Intuitive's counterclaims, it does not attempt to argue

4    disputed factual contentions, nor does it attempt to repeat the content of the Simplified Statement

5    of the Case. The instruction correctly points out that SIS's Sherman Section 1 claim for illegal

6    restraint of trade is based on both unlawful tying and exclusive dealing agreements. Additionally,

7    the proposed instruction correctly points out that SIS's Section 2 Sherman Act claim is based upon

8    both Intuitive's monopolization and attempted monopolization of the market for replacement and

9    repaired EndoWrist instruments through a variety of anticompetitive acts.

**Disputed** Instruction No. 13 Definition of Tying Offered by **SIS**

SIS claims that Intuitive engaged in an unlawful tying arrangement. A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product) from the seller, or at least agrees that he will not purchase the tied product from any other supplier. In this case, SIS claims that the da Vinci surgical robot is the tying product and a repaired or replacement EndoWrist instrument is the tied product.

**Authority:** The definition is taken from *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461 (1992). It is intended to introduce the jury to the vocabulary of the tying cause of action. The terms "product," "sell," and "purchase" are used in this instruction and the other tying arrangement instructions for simplicity.

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases E-84, 2016 Edition

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 13

The proposed instruction is identical to the ABA Model Jury Instruction defining a tying arrangement with the exception of the additional / substitute language highlighted in yellow. The highlighted language was used to adapt the model instruction to the facts of this particular case. There is no reason to state that Intuitive denies the claim since that is self-evident from the existence of this lawsuit.

**Disputed** Instruction No. 14 Re Rationale for Prohibition of Tying Arrangements Offered by **SIS**

Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (the da Vinci surgical robot) to force buyers to purchase a tied product (EndoWrist repair or replacement) that buyers might have preferred to purchase elsewhere.

**Authorities:** The instruction is drawn from *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006); *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-85, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 14

The proposed instruction is identical to the ABA Model Jury Instruction discussing the rationale for prohibition of tying arrangements with the exception of the additional / substitute language highlighted in yellow. The highlighted language was used to adapt the model instruction to the facts of this particular case. There is no reason to state that the law also recognizes that tying arrangements may have legitimate justifications that benefit buyers.

**Disputed** Instruction No. 15 Tying – Per Se Violation Offered by **SIS**

To prevail on a per se tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1) (i) minimally invasive surgical robots and (ii) replacement and repaired EndoWrists are separate and distinct products;

(2) Intuitive will sell its da Vinci minimally invasive surgical robots only on the condition that the buyer also purchase replacement and repaired EndoWrists from Intuitive, or that the buyer not purchase replacement and repaired EndoWrists from any other supplier;

(3) Intuitive has sufficient market power with respect to minimally invasive surgical robots to enable it to restrain competition as to replacement and repaired EndoWrists;

(4) the alleged tying arrangement has foreclosed a substantial volume of commerce as to replacement and repaired EndoWrists;

(5) defendant has a financial interest in the relevant market for [product B]

(5) Intuitive's conduct occurred in or affected interstate [or foreign] commerce; and

(6) SIS was injured in its business or property because of the tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for SIS and against Intuitive on SIS's tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

**Authorities:** The first four elements are derived from *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 14-19 (1984) and are expanded on in further instructions below. *See also Blough v. Holland Realty, Inc,* 574 F.3d 1084, 1089 (9th Cir. 2009); *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912-13 (9th Cir. 2008)).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-86, 2016 Edition.

9
SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 15

The proposed instruction is identical to the ABA Model Jury Instruction stating the elements for per se unlawful tying with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case. "When a seller has sufficient market power in the tying product or service so that the existence of coercion is probable and there is a substantial potential for impact on competition, a tying arrangement can be proscribed without looking at the actual market conditions." *Aerotex Int'l, Inc. v. Honeywell, Int'l, Inc.*, 4 F. Supp. 3d 1123, 1133 (D. Ariz. 2014). For a tying claim to be considered a per se violation, "a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2)that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).

Further, there is no reason to introduce a different, general concept that some tying arrangements may have legitimate justifications that benefit the buyers without tying this statement to the particular facts in this case. Further, to the extent that Intuitive wishes to pursue a "business justification" defense (*see* Instruction 31), such a defense (which is not universally accepted, *see commentary* to Model Jury Instructions in Civil Antitrust Cases E-99) is an affirmative defense that Intuitive has not pleaded and creates confusion with the rule of reason, where that framework is appropriate.

**Disputed** Instruction No. 17 Presence of Two Products Offered by **SIS**

To determine whether the da Vinci minimally invasive surgical robot and repaired and replacement EndoWrist instruments are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough customers would want to purchase the da Vinci minimally invasive surgical robot alone and repaired or replacement EndoWrist instruments alone [to induce sellers generally to provide [product A] alone and [product B] alone], then they are separate products. On the other hand, if there is very little demand for one of the products by itself, that is, without purchasing the other product at the same time, then the da Vinci minimally invasive surgical robot and repaired or replacement EndoWrist instruments are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Authorities:** The consumer demand approach is mandated by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19-22 (1984); *See also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S. Ct. 363, 66 L. Ed. 708, (1922).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-90, 2016 Edition.

1  SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 17

2    The proposed instruction is identical to the ABA Model Jury Instruction directed to

3  determining the presence of two products with the exception of the deleted bracketed text shown

4  in red font. The bracketed language was deleted to adapt the model instruction to the facts of this

5  particular case. Additional / substitute language is highlighted in yellow and is used to adapt the

6  model instruction to the facts of this particular case.  There is no reason to introduce the burden of

7  proof concept as part of this instruction.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 18: Tying – Conditioned Sale Offered by **SIS**

You may find that a tying arrangement exists between da Vinci surgical robots and replacement and repaired EndoWrists if Intuitive either refused to sell da Vinci surgical robots unless purchasers also agreed to buy replacement and repaired EndoWrists (or not to buy replacement and repaired EndoWrists from another supplier), or effectively coerced purchasers into buying replacement and repaired EndoWrists in addition to da Vinci surgical robots. To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force the hospital buyers into the purchase of replacement and repaired EndoWrists, which the hospital either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement and repaired EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied daVinci surgical robots to replacement and repaired EndoWrists. However, there is no coercion if da Vinci surgical robots and replacement and repaired EndoWrists are offered separately for sale and separate purchase is economically feasible *[and if those products are not bundled together illegally]*.

**Authorities:** *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003); *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1340-41 (Fed. Cir. 2006); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir. 1996).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-93, 2016 Edition.

<u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 18</u>

The proposed instruction is identical to the ABA Model Jury Instruction directed to proof of conditioning with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case.  There is no reason to introduce the notion of multiple elements for proving a tying claim as part of this instruction which is inherent in the jury being given multiple instructions with respect to SIS's tying claim.

**Disputed** Instruction No. 19: Relevant Geographic Market Offered by **SIS**

       SIS and Intuitive agree that the relevant geographic market is the United States of America.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 19

       SIS submits that this instruction be given to ensure the Jury understands that this aspect of SIS's antitrust claim with respect to tying is not disputed by Intuitive.

**Disputed** Instruction No. 22 Relevant Product Markets Offered by **SIS**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material--such as aluminum foil, cellophane, or even plastic containers--to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you may consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors. [*but you may conclude in this case that some other percentage is more applicable to the product at issue*]. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;

16

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

- the views of SIS and Intuitive regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

For its tying claim, SIS contends that the relevant product market for the tying product is minimally invasive surgical robots and that the relevant product market for the tied product is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product markets. If you find that SIS has proven relevant product markets, then you should continue to evaluate the remainder of SIS's tying claim. However, if you find that SIS has failed to prove such markets, then you must find in Intuitive's favor on this claim.

**Authorities:** *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 229 (2d Cir. 2006); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-34 (1973).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases A-108, 2016 Edition.

1   <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 22</u>

2       The proposed instruction is identical to the ABA Model Jury Instruction directed to proof

3 of a relevant product market with the exception of the deleted bracketed text shown in red font. The

4 bracketed language was deleted to adapt the model instruction to the facts of this particular case.

5 Additional / substitute language is highlighted in yellow and is used to adapt the model instruction

6 to the facts of this particular case. SIS submits that giving the jury instruction on relevant product

7 markets in the context of SIS's individual antitrust claims will ensure the jury considers each

8 element of proving that claim. Giving a single instruction on relevant product market at the outset

9 of the antitrust instructions, divorced from the context of the particular claims in this case, would

10 require the jury to refer back to separate instructions when deciding on a particular antitrust claim

11 in the case, such as SIS's tying claim against Intuitive.

12       Further, the "Relevant Market – General" instruction that is provided in Chapter 3.A of the

13 ABA Model Jury Instructions is unnecessary and does not provide any critical context. SIS's

14 proposed Instruction 22 gives sufficient guidance for the jury and there is no need to evaluate

15 whether SIS has properly alleged a single-brand aftermarket for EndoWrist repair and replacement

16 and the jury need not be instructed on the four-factor test for defining a single-brand aftermarket

17 where as contended here Intutiive has significant market power in the foremarket. *E.g.*, Lambrix

18 v. Tesla, Inc., No. 23-cv-01145-TLT, , 2024 WL 3403777, 2024 U.S. Dist. LEXIS 126335, at *20-

19 21 (N.D. Cal. June 17, 2024) ("Consumers in a foremarket within which a company has market

20 power have minimal ability to discipline the company's conduct in aftermarkets, regardless of

21 information costs, switching costs, and general awareness of restrictions."). Specifically, the test

22 for establishing a single brand aftermarket and customer "lock-in" is not applicable to this case

23 because Intuitive's da Vinci surgical robot does not have any real competitors in the primary market,

24 *i.e.,* the market for minimally invasive soft tissue ("MIST") surgical robots (the tying product)

25 which could offer customers a reasonable alternative to Intuitive's surgical robots. "[T]he law

26 permits an antitrust claimant to restrict the relevant market to a single brand of the product at

27 issue[.]" *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1048 (9th Cir. 2008). "More

28 specifically, the relevant market for antitrust purposes can be an aftermarket—where demand for a

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

**2-SER-272**

1    good is entirely dependent on the prior purchase of a durable good in a foremarket." *Epic Games,*

2    *Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023). Resort to the so-called "single-brand

3    aftermarket" analysis, with proof that consumers were "locked in", is triggered when the allegation

4    of anti-competitive conduct in the aftermarket is made against a party that does not possess market

5    power in the foremarket. *See Lambrix v Tesla, Inc*., 2024 WL 3403777, *6. The four Epic Games

6    factors derive from concerns about a lack of market power in the foremarket. Accordingly, they are

7    only applicable for establishing a single-brand aftermarket in cases where a defendant does not

8    have market power in the foremarket. Id. at *7-8.

9          In this case, Intuitive has substantial market power in the foremarket (MIST surgical robots).

10   In fact, Intuitive's market share of the foremarket is greater than 99 percent, making Intuitive a

11   monopolist in the market for MIST surgical robots. There is no dispute that customer demand for a

12   repaired or replacement EndoWrist instrument is entirely dependent on the customer's prior

13   purchase of the da Vinci surgical robot. Therefore, proving a "lock-in" affecting unknowing

14   customers is not applicable to this case because the absence of competition in the surgical robot

15   foremarket necessarily results in the inability to discipline competition in the aftermarket for

16   repaired and replacement EndoWrist instruments. In other words, a monopolist like Intuitive could

17   price its aftermarket EndoWrist products at a supracompetitive level without a substantial number

18   of customers substituting to other products. *See Epic Games* at 976-77. Accordingly, the aftermarket

19   in this case is limited to repaired and replacement EndoWrist instruments without first requiring

20   the establishment of a "single-brand aftermarket".

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 23 Existence of Market Power With Respect to the Tying Product Offered by **SIS**

You may find that Intuitive has market power with respect to minimally invasive surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for minimally invasive surgical robots without losing an appreciable amount of its business or otherwise to force a purchaser of minimally invasive surgical robots to do something that the purchaser would not do in a more competitive market. SIS may prove power over price with respect to minimally invasive surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets. In the alternative, you may determine whether Intuitive has market power with respect to minimally invasive surgical robots by considering whether Intuitive has a high share of that market for minimally invasive surgical robots such that purchasers do not have alternative sources of minimally invasive surgical robots or a reasonably interchangeable substitute readily available. If Intuitive's market share of the market for minimally invasive surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for minimally invasive surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power. Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market and make a price increase unprofitable. If you find that purchasers of minimally invasive surgical robots do not have readily available alternative sources of supply and are forced as a practical matter to buy minimally invasive surgical robots, you may find that Intuitive has market power. You may also consider in your market power determination the presence of any unique features or costs associated with minimally invasive surgical robots that effectively prevent others from offering a comparable product

**Authorities:** *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 505 (1969); *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 n.7 (7th Cir. 1987). If market power is

1  shown directly, there is no need to define a relevant market. This instruction is thus consistent with

2  the showing necessary to prove market power with respect to other types of antitrust claims. See

3  FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*,

4  501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co*., 315 F.3d 101, 107-08 (2d

5  Cir. 2002); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002); *United

6  States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *RE/MAX Int'l Inc. v. Realty One, Inc.*,

7  173 F.3d 995, 1018 (6th Cir. 1999); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-27

8  (1984); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577 (11th Cir. 1991).

9

10  **Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-

11  94, 2016 Edition.

12

13  SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 23

14

15  The proposed instruction is identical to the ABA Model Jury Instruction regarding the

16  existence of market power with respect to the tying product with the exception of the additional /

     substitute language highlighted in yellow used to adapt the model instruction to the facts of this

17  particular case.  There is no reason to introduce the notion of multiple elements for proving a tying

18  claim as part of this instruction which is inherent in the jury being given multiple instructions with

19  respect to SIS's tying claim.  Additionally, introducing the concept that the ability to charge higher

20  prices for better products or services out of context does not necessarily prove market power is

21  unnecessary since this concept is not relevant to the disputed issues in this case and may confuse

22  and/or mislead the jury.

23

24

25

26

27

28

**Disputed** Instruction No. 25 Interstate Commerce – Tying Offered by **SIS**

The Sherman Act applies only to conduct that affects interstate or foreign commerce. You are instructed that Intuitive's agreements affected interstate commerce.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 25

SIS submits that this instruction be given to ensure the Jury understands that this aspect of SIS's antitrust claim with respect to tying is not disputed by Intuitive.

1 | **Disputed** Instruction No. 26 Elements -- Unlawful Tying under Rule of Reason Offered by **SIS**

2 |   Even if SIS has failed to prove that Intuitive has sufficient market power in the tying product

3 | of minimally invasive surgical robots as required for its per se tying claim, SIS may still prove a

4 | tying violation by proving all other elements of a per se violation as well as proving that the

5 | arrangement has unreasonably restrained trade in that it had a substantial adverse effect on

6 | competition in the market for repaired and replacement EndoWrist instruments under the rule of

7 | reason.  I will provide you with instructions on the rule of reason below.

8 |

9 | **Authorities:** *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 29-31 (1984); *Ill. Tool Works*

10 | *Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006).

11 |

12 | **Source**: AMERICAN BAR ASSOCIATION

13 | Model Jury Instructions in Civil Antitrust Cases E-88, 2016 Edition.

14 |

15 |

16 |

17 | SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 26

18 |   SIS contends that under its claim of tying Intuitive's actions are unlawful if analyzed under

19 | either the per se or rule of reason approach. Therefore, the jury should be instructed that even if SIS

20 | has failed to prove its per se tying claim, SIS may still prove a tying violation by proving that

21 | Intuitive's tying arrangement has unreasonably restrained trade in that it had a substantial adverse

22 | effect on competition in the market for repaired and replacement EndoWrist instruments under the

23 | rule of reason.

24 |

25 |

26 |

27 |

28 |

**Disputed** Instruction No. 27 Rule of Reason - Overview Offered by **SIS**

In order to prove its exclusive dealing claim, SIS must show that Intuitive's agreements and conduct related to those agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market under the so-called rule of reason. In making the determination of whether a restraint on trade is unreasonable, you must first determine whether SIS has proven that the challenged restraints have resulted in a substantial harm to competition in a relevant market. If you find that SIS has proven that the challenged restraints result in a substantial harm to competition in a relevant market, then you must consider whether Intuitive has proven that the restraints produce countervailing competitive benefits and whether those procompetitive benefits could not be achieved through less restrictive alternatives. If Intuitive makes that showing, then you must balance the competitive harm against the competitive benefit, with the challenged restraints illegal under Section 1 of the Sherman Act only if the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

**Authorities:** *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (citing State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *California Dental Ass'n v. FTC*, 224 F.3d 942, 947-54 (9th Cir. 2000), on remand from 524 U.S. 756 (1999); *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996).

**Source:** AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-3, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 27

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found by the jury to be unreasonable. Therefore, the jury should be instructed that it must determine whether Intuitive's exclusive dealing arrangement challenged by SIS is unreasonable. Under the Rule of Reason, the jury weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *See Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977).

To determine whether a restraint violates the rule of reason, a three-step, burden-shifting framework applies. *Ohio v. Am. Express Co.,* 585 U.S. 529, 541 (2018). Under this framework, SIS has the initial burden to prove that Intuitive's exclusive dealing arrangement has a substantial anticompetitive effect that harms consumers in the repair and replacement EndoWrist market. See Id. (citations omitted) If the SIS carries its burden, then the burden shifts Intuitive to show a procompetitive rationale for the exclusive dealing arrangement. See Id. If Intuitive makes this showing, then the burden shifts back to SIS to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. See Id. The jury then balances the competitive harm against the competitive benefit. *See Eichorn v. AT&T Corp.,* 248 F.3d 131, 143 (3rd Cir. 2001). Intuitive's exclusive dealing arrangement is illegal under Section 1 of the Sherman Act only if the jury finds that the competitive harm substantially outweighs the competitive benefit.

**__Disputed__** Instruction No. 28 Rule of Reason - Proof of Competitive Harm Offered by **SIS**

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted [*or is likely to result*] in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition. Furthermore, SIS must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is SIS's burden to prove the existence of a relevant market. Here, the parties agree that the relevant geographic market is the United States of America. I will provide you with instructions for determining a relevant product market.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also has proven that the challenged restraints have had [*or is likely to have*] a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in [*or is not likely to result in*] higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced [*or is likely to produce*] competitive harm, you may look at the following factors:

- the effect of the restraints on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether Intuitive possesses market power.

26
SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Intuitive has market power include [*list factors relevant to the facts of the case, such as the existence of barriers to entry or potential competitors*] the existence of barriers to entry for potential competitors, as well as the absence of economic substitutes for Intuitive's da Vinci surgical robots and EndoWrist instruments. If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power. If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted [*or will result*] in a substantial harmful effect on competition in the market.

**Authorities:** *NYNEX v. Discon, Inc.*, 525 U.S. 128, 139 (1998); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001); *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *NCAA v. Board of Regents*, 468 U.S. 81, 109 n.38 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-5, 2016 Edition.

1   <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 28</u>

2       The proposed instruction is identical to the ABA Model Jury Instruction directed to proof

3 of competitive harm under the rule of reason with the exception of the deleted bracketed text shown

4 in red font. The bracketed language was deleted to adapt the model instruction to the facts of this

5 particular case. Additional / substitute language is highlighted in yellow and is used to adapt the

6 model instruction to the facts of this particular case. Stating merely that it is not enough that the

7 conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers is

8 misleading. Such a statement, standing alone, could misleadingly suggest to the jury that SIS cannot

9 prove a violation of the Sherman Act. SIS, however, can prove a violation of the Sherman Act by

10 showing that "diminished consumer choices and increased prices are the result of a less competitive

11 market due to either artificial restraints or predatory and exclusionary conduct." *Fed. Trade*

12 *Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).  Further, a plaintiff may prove that a

13 restraint has anticompetitive effect either "directly or indirectly." *Fed. Trade Comm'n v. Qualcomm*

14 *Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citation omitted). Direct evidence includes "'proof of actual

15 detrimental effects [on competition],' " "such as reduced output, increased prices, or decreased

16 quality in the relevant market". *Id.* Indirect evidence involves "proof of market power plus some

17 evidence that the challenged restraint harms competition." *Id.* Thus, according to established law,

18 direct evidence that Intuitive's conduct has the effect of reducing consumers' choices or increasing

19 prices to consumers is sufficient to prove SIS claim that Intuitive is violating the Sherman Act.

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 29 Rule of Reason -- Evidence of Competitive Benefits Offered by **SIS**

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether Intuitive has proven that the restraints also benefit competition in other ways. If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

**Authorities:** Benefits that are unrelated to competition should be irrelevant to the analysis. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462 (1986); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-8, 2016 Edition.

1   <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 29</u>

2       The proposed instruction is identical to the ABA Model Jury Instruction directed to evidence

3 of competitive benefits under the rule of reason with the exception of the additional / substitute

4 language highlighted in yellow used to adapt the model instruction to the facts of this particular

5 case. An instruction referring to "least restrictive means" is likely to confuse the jury because that

6 is not the pertinent inquiry. The standard used for analysis of alleged competitive benefits under

7 the rule of reason is whether reasonably available alternative means achieve the same

8 procompetitive benefits with substantially less harm to competition. A reasonably available

9 alternative can qualify as "substantially less restrictive" and meet the standard without having to be

10 the "least restrictive means". *E.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023).

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

**Disputed** Instruction No. 30 Rule of Reason -- Balancing the Competitive Effects Offered by **SIS**

If you find that the challenged restraint [was reasonably necessary to achieve competitive] resulted in procompetitive benefits in a relevant market that were not achievable through substantially less restrictive means, then you still must balance those procompetitive benefits against the anticompetitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. SIS bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

**Authorities:** *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Barry v. Blue Cross*, 805 F.2d 866, 872-73 (9th Cir. 1986).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-9, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 30

The proposed instruction is identical to the ABA Model Jury Instruction directed to balancing the competitive effects under the rule of reason with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case and to provide consistency in language used, *i.e.* procompetitive benefits versus anticompetitive harm. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case. The balancing step in the rule of reason analysis incorporated in the ABA Model Instructions is not inconsistent with and fully incorporates the framework endorsed by the United States Supreme Court and the Ninth Circuit. *E.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 993-994 (9th Cir. 2023); *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006). This final balancing step merely ensures that the jury will consider the overall impact of the challenged restraints in terms of whether the anticompetitive effect of Intuitive's conduct substantially outweighs any proven procompetitive benefits. Accordingly, this instruction should be given to the jury. *Epic Games*, 67 F.4th at 994 ("Therefore, where a plaintiff's case comes up short at step three, the district court must proceed to step four and balance the restriction's anticompetitive harms against its procompetitive benefits.").

**Disputed** Instruction No. 32 Elements of Exclusive Dealing Offered by **SIS**

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors or a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier *[or a pricing policy that creates a substantial disincentive to purchase from competitors]*. *[Some practices [minimum purchase requirements, inventory requirements, or sales quotas] may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.]* Exclusive dealing arrangements *[and partial exclusive dealing arrangements, whatever form they may take,]* are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing *[or partial exclusive dealing]* arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and hospitals that substantially forecloses the hospitals from purchasing replacement and repaired EndoWrist instruments from competing suppliers;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the market for replacement and repaired EndoWrist instruments;

(3) Intuitive had substantial market power in the market for replacement and repair of EndoWrist instruments;

(4) Intuitive's agreements with hospitals occurred in or affected interstate *[or foreign]* commerce; and

(5) SIS was injured in its business or property because of the agreement.

1

2          If you find that the evidence is insufficient to prove any one or more of these elements, then

3   you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that the

4   evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and

5   against Intuitive on SIS's exclusive dealing claim.

6

7   **Authorities**: Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329, 334 (1961); Standard Oil

8   Co. v. United States, 337 U.S. 293, 306-07 (1949).

9

10  **Source**: AMERICAN BAR ASSOCIATION

11  Model Jury Instructions in Civil Antitrust Cases D-71, 2016 Edition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 32

The proposed instruction is identical to the ABA Model Jury Instruction directed to the elements of exclusive dealing with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case. The law does not require SIS to prove that Intuitive's customers are <u>totally</u> foreclosed from purchasing EndoWrist repair or replacement from competing suppliers. SIS is only required to prove <u>substantial</u> foreclosure. Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its probable effect is to "foreclose competition in a substantial share of the line of commerce affected." *CollegeNet, Inc. v. Common Application, Inc.*, 355 F.Supp.3d 926, 951 (D. Ore. 2018) (citations omitted). Generally, this requires "a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Id.* See also Disputed Instruction No. 34 (SIS 19) below.

**Disputed** Instruction No. 34 Exclusive Dealing – Agreements that Substantially Foreclose Competition Offered by **SIS**

In determining whether Intuitive's exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the aftermarket for EndoWrist repair and replacement, whether buyers of the aftermarket repaired or replacement EndoWrist instruments have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives to Intuitive's products or services, the reasons Intuitive and buyers entered into the exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

You also should consider whether the buyer is the final end user of the product. If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market. [On the other hand, if the buyer is a distributor or reseller, and there are other alternatives for competing sellers to market their products to end users, then an exclusive dealing agreement may not foreclose competitors' access to the market and, thus, not substantially harm competition.]

In determining the extent to which Intuitive's exclusive dealing contracts foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclose less than 20% of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short

1  notice without cause and without significant penalty. In such a case, the stated length of the
2  exclusive contract is not the period in which it has a competitive effect.

3      In determining if Intuitive's exclusive dealing contracts substantially harmed competition,
4  you also should consider Intuitive's market power.  If Intuitive does not possess market power, then
5  there cannot be substantial harm to competition from an exclusive dealing contract, and you must
6  find for Intuitive on this claim.  If you decide that the buyers are sophisticated businesses
7  themselves which have countervailing power in negotiating contracts, this may offset any market
8  power Intuitive might otherwise have.  If SIS cannot show that Intuitive had the power to force
9  buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive
10 lacks market power.

11     Finally, you should consider whether the process in which Intuitive secured exclusive
12 contracts itself involved competition. If you determine that the buyers formally or informally put
13 their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for
14 the exclusive contracts against Intuitive, this is also evidence that Intuitive does not have market
15 power.

16     By considering all of these factors, you should determine whether the exclusive dealing
17 contracts adversely affected the price paid by buyers, output, or the quality of products offered in
18 the relevant market. Where a restraint does not adversely affect price, output, or product quality, it
19 is unlikely to substantially harm competition.

20

21 **Authorities:** *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 n.3 (6th Cir. 1997); *Sewell Plastics,*
22 *Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1218-19 (W.D.N.C. 1989); *Reazin v. Blue Cross & Blue*
23 *Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1478 (D. Kan. 1987); *Concord Boat Corp. v. Brunswick*
24 *Corp.*, 207 F.3d 1039, 1056, 1058-61 (8th Cir. 2000); *United States v. Baker Hughes Inc.*, 908 F.2d
25 981, 986 (D.C. Cir. 1990); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 644 (C.D. Cal.
26 1976); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984); *Eastman Kodak Co.*
27 *v. Image Tech. Servs.*, 504 U.S. 451, 464 (1992); *3M Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d
28 1138, 1144 (D. Minn. 1999).

1

2   **Source**: AMERICAN BAR ASSOCIATION

3   Model Jury Instructions in Civil Antitrust Cases D-73, 2016 Edition.

4

5   <u>SIS's ARGUMENT IN SUPPORT OF INSTRUCTION NO. 34</u>

6          The proposed instruction is identical to the ABA Model Jury Instruction directed to the

7   exclusive dealing and additional considerations with the exception of the deleted bracketed text

8   shown in red font. The bracketed language was deleted to adapt the model instruction to the facts

9   of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt

10  the model instruction to the facts of this particular case.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 37 Exclusive Dealing – Relevant Market Offered by **SIS**

I have previously instructed you on the standards for identifying a relevant market. For its exclusive dealing claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market. If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's exclusive dealing claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

SIS's ARGUMENT IN SUPPORT OF INSTRUCTION NO. 37

This instruction merely points out that SIS has the burden of proving the relevant market and that SIS alleges the relevant market is the same for both its claims of unlawful tying and unlawful exclusive dealing against Intuitive. That relevant market is the replacement and repair of EndoWrist instruments.

**<u>Disputed</u>** <u>Instruction No. 38 Exclusive Dealing – Unreasonable Restraint of Trade Offered by **SIS**</u>

I have previously instructed you on the standards for evaluating whether accused conduct is an unreasonable restraint of trade under the rule of reason.  For purposes of SIS's exclusive dealing claims, you must evaluate whether Intuitive's agreements with hospitals amount to an unreasonable restraint of trade that resulted in a substantial adverse effect in the market for replacement and repaired EndoWrists under the rule of reason.

<u>SIS's ARGUMENT IN SUPPORT OF INSTRUCTION NO. 38</u>

This instruction merely points out that with respect to SIS's exclusive dealing claim, the jury applies the same standards for evaluating whether accused conduct is an unreasonable restraint of trade under the rule of reason. And more particularly, the instruction directs the jury to evaluate whether Intuitive's agreements with hospitals resulted in as substantial adverse effect in the market place for replacement and repaired EndoWrists as part of determining whether the challenged exclusive dealing arrangement amounts to an unreasonable restraint of trade.

**Disputed** Instruction No. 39 Exclusive Dealing – Market Power Offered by **SIS**

I have previously instructed you on the standards for determining whether a party has market power in a relevant market. For purposes of SIS's exclusive dealing claim, it is SIS's burden to demonstrate that Intuitive has market power in the market for replacement or repaired EndoWrists.

SIS's ARGUMENT IN SUPPORT OF INSTRUCTION NO. 39

This instruction merely points out that SIS has the burden of proving that Intuitive has market power in the relevant market and what SIS alleges the relevant market is for its exclusive dealing claims against Intuitive, which is replacement and repair of EndoWrist instruments. SIS proffered instruction on market power is found in Disputed Instruction No. 23 (SIS Instruction 10), supra.

1    **Disputed** Instruction No. 41 Exclusive Dealing - Interstate Commerce Offered by **SIS**

2        The Sherman Act applies only to conduct that affects interstate or foreign commerce. You

3    are instructed that Intuitive's agreements affected interstate commerce.

4

5    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 41

6        SIS submits that this instruction be given to ensure the Jury understands that this aspect of

7    SIS's antitrust claim with respect to exclusive dealing is not disputed by Intuitive.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 42 Injury Offered by **SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions-Civil, Form 485a-79-23

Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 42

The proposed instruction is identical to the Modern Federal Jury Instructions-Civil, Form 485a-79-23 directed to injury with the exception of the additional / substitute language highlighted in yellow used to adapt the model instruction to the facts of this particular case.

**Disputed** Instruction No. 44 Monopoly and Attempted Monopolization Defined Offered by **SIS**

[As I have told you, the plaintiff must prove that the defendant had a specific intent or purpose to obtain a monopoly in the relevant market.] It is [therefore] important for you to understand what a monopoly is. A firm has a monopoly when it has the power to dominate or control a market. More specifically, a firm has a monopoly when it has the power to control prices or to exclude competition in the relevant market.

The power to control prices is simply the power of a company to establish significantly higher prices for its goods than those charged by competitors for equivalent goods without suffering a substantial loss of business to competitors. Thus, if a company that has raised prices eventually has to lower its prices to the level charged by its competitors, it may not have a monopoly in the sense of the power to control prices.

The power to exclude competition means the power of a company to dominate a market by eliminating existing competition from the market or by preventing new competition from entering that market. In other words, the power to exclude competition is the power to place major barriers in the way of other companies trying to remain in or enter the particular area of trade and compete for customers. It may be shown by evidence of a company's reducing or restricting the share of the market held by competitors by means other than the normal process of competition.

To prove the charge of attempted monopolization, SIS does not have to show that the Intuitive achieved a monopoly. That is, SIS does not have to prove that Intuitive actually gained the power to control prices or exclude competition. Instead, SIS must show, by a preponderance of the evidence, that Intuitive purposefully attempted to gain such power.

**Source:** Modern Federal Jury Instructions-Civil

Copyright 2024, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

1    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 44

2           The proposed instruction is identical to the Modern Federal Jury Instructions-Civil, Form

3    485a-80-22 directed to defining monopoly with the exception of the deleted bracketed text shown

4    in red font. The bracketed language was deleted to adapt the model instruction to the facts of this

5    particular case. Additional / substitute language is highlighted in yellow and is used to adapt the

6    model instruction to the facts of this particular case.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 45 Elements of Monopolization Offered by **SIS**

SIS alleges that it was injured by Intuitive's unlawful monopolization of the market for replacement and repaired EndoWrists. To prevail on this claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1) the alleged market is a valid antitrust market;

(2) Intuitive possessed monopoly power in that market;

(3) Intuitive willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

(4) Intuitive's conduct occurred in or affected interstate [*or foreign*] commerce; and

(5) SIS was injured in its business or property because of Intuitive's anticompetitive conduct.

If you find that SIS has failed to prove any of these elements, then you must find for Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

**Authorities**: See generally *Pacific Bell Tel. Co. v. linkLine Commc'ns.*, 555 U.S. 438 (2009); *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-102, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 45

The proposed instruction is identical to the ABA Model Jury Instruction directed to the elements of monopolization with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case.

**Disputed** Instruction No. 46 Relevant Geographic Market Offered by **SIS**

    SIS and Intuitive agree that the relevant geographic market is the United States of America.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 46

    SIS submits that this instruction be given to ensure the Jury understands that this aspect of SIS's antitrust claim with respect to tying is not disputed by Intuitive.

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

**Disputed** Instruction No. 47 Monopolization – Relevant Product Market Offered by **SIS**

I have previously instructed you on the standards for identifying a relevant market.  For its monopolization claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market.  If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's monopolization claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

SIS's ARGUMENT IN SUPPORT OF INSTRUCTION NO. 47

Instruction No. 22 (SIS's Instruction No. 9 - Disputed by Intuitive) provides the jury with guidance for identifying a relevant market. This instruction provides the jury with guidance that for its monopolization claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments. This instruction also informs the jury that whether SIS has proven its proposed relevant product market is a threshold issue that is required before any effort is made to evaluate the remainder of SIS's monopolization claim.

**Disputed** Instruction No. 48 Monopoly Power Defined by **SIS**

To prove its monopolization claim, SIS must prove by a preponderance of the evidence that Intuitive has monopoly power in the EndoWrist repair and replacement aftermarket.

Monopoly power is the power to dominate or control a market, including the power to control prices, restrict output, and exclude competition in a relevant antitrust market. [More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.]

However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether SIS has met its burden of proving monopoly power in the market for replacement and repaired EndoWrists. If you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389 (1956).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-104, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 48

The proposed instruction is identical to the ABA Model Jury Instruction directed to the definition of monopoly power for the purposes of determining a monopolization claim, with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case. Intuitive has not asserted in this case that its monopoly power in the repair and replacement EndoWrist aftermarket was lawfully acquired through growth or development as a consequence of a superior product, business acumen, or historic accident. Therefore, there is no need to instruct the jury as to this hypothetical circumstance.   Additionally, including in this instruction additional language directed at acquisition of monopoly power and how to prove the existence of monopoly power is likely to confuse the jury.  Jury instructions "must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1437 (9th Cir.1996).  The willful acquisition or maintenance of monopoly power, along with the elements required to prove possession of monopoly power are distinct from the definition and ought to be presented in a separate instructions as SIS proposes in Instruction Nos. 49, 50, and 51 (SIS Instructions No. 30, 31 and 32).

1    **Disputed** Instruction No. 49 Monopoly Power – Direct Evidence Offered by **SIS**

2    ~~[If you find that plaintiff has proven a relevant market, then you should determine whether~~

3    ~~defendant has monopoly power in that market. As I instructed you earlier, monopoly power is the~~

4    ~~power to control prices and exclude competition in a relevant antitrust market. More precisely, a~~

5    ~~firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive~~

6    ~~level for a significant period of time.]~~

7    One way that SIS may prove monopoly power is through direct evidence that Intuitive has

8    the ability to raise or maintain the prices that it charges for goods or services in the replacement

9    and repaired EndoWrist market above competitive levels ~~[Plaintiff must prove that defendant has~~

10   ~~the power to do so by itself—that is, without the assistance of, and despite competition from, any~~

11   ~~existing or potential competitors. Plaintiff must also prove that defendant has the power to]~~, can

12   maintain those prices above a competitive level for a significant period of time ~~[If defendant~~

13   ~~attempted to maintain prices above competitive levels, but would lose so much business to other~~

14   ~~competitors that the price increase would become unprofitable and would have to be withdrawn,~~

15   ~~then defendant does not have monopoly power. Similarly, plaintiff must prove that defendant]~~, and

16   that Intuitive has the ability to exclude competition.

17   SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices

18   that it charges for goods or services in the market for replacement and repaired EndoWrists above

19   competitive levels. SIS must prove that Intuitive has the power to do so by itself--that is, without

20   the assistance of, and despite competition from, any existing or potential competitors.

21   SIS must also prove that Intuitive has the power to maintain prices above a competitive

22   level for a significant period of time. If Intuitive attempted to maintain prices above competitive

23   levels, but would lose so much business to other competitors that the price increase would become

24   unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power.

25   Similarly, SIS must prove that Intuitive has the ability to exclude competition. For example,

26   if Intuitive attempted to maintain prices above competitive levels, but new competitors could enter

27   the market for replacement and repaired EndoWrists or existing competitors could expand their

28   sales and take so much business that the price increase would become unprofitable and would have

52

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

to be withdrawn, then Intuitive does not have monopoly power. The ability to earn high profit margins or a high rate of return does not necessarily mean that Intuitive has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing [expand or contract list as appropriate]. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial amount of sales if it raised prices substantially, or that Intuitive's profit margins were low compared to its competitors, or that Intuitive's margins go up and down or are steadily decreasing, might be evidence that Intuitive does not have monopoly power.

[If you find that defendant has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that defendant does not have monopoly power, then you must find for defendant and against plaintiff on this claim.]

**Authorities:** *United States v. Microsoft*, 253 F.3d 34, 56-57 (D.C. Cir. 2001); *see also Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 323 F.3d 366, 369 n.3 (6th Cir. 2003).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-121, 2016 Edition.

1    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 49

2         The proposed instruction is largely based on the ABA Model Jury Instruction directed to

3    establishing the existence of monopoly power with direct proof. The deleted bracketed text shown

4    in red font encompasses language that was moved to a different place in the instruction or was

5    deleted to adapt the model instruction to the facts of this particular case. Additional / substitute

6    language is highlighted in yellow and is used to adapt the model instruction to the facts of this

7    particular case.

8         This instruction is designed for a case in which plaintiff has introduced direct evidence of

9    monopoly power sufficient to create an issue for a jury, such as evidence of what prices would have

10   been in a competitive market and monopoly level prices and/or evidence that a defendant has

11   restricted output to monopoly levels. Because direct evidence of control over prices and the ability

12   to exclude competition may not be available, the use of indirect proof is the means most often used

13   by courts to assess the existence of monopoly power. In cases in which plaintiff relies on indirect

14   evidence of monopoly power, a different instruction should be provided.

1 **Disputed** Instruction No. 50 Monopoly Power – Indirect Evidence Offered by **SIS**

2 ~~[If you find that plaintiff has proven a relevant market, then you should determine whether~~
3 ~~defendant has monopoly power in that market. As I instructed you earlier, monopoly power is the~~
4 ~~power to control prices and exclude competition in a relevant antitrust market. Plaintiff has~~
5 ~~introduced evidence of the structure of the market to show that defendant has monopoly power. The~~
6 ~~evidence presented by the parties includes evidence of]~~ Another way that SIS may prove monopoly
7 power in the market for replacement and repaired EndoWrists is through indirect evidence of
8 monopoly power such as Intuitive's market share, ~~[include any of the following as appropriate:]~~
9 market share trends, barriers to entry, entry and exit by other companies, and the number and size
10 of other competitors.  If this evidence establishes that Intuitive has the power to control prices and
11 exclude competition in the market for replacement and repaired EndoWrists, then you may
12 conclude that Intuitive has monopoly power in the market.

13 *Market Share*

14 The first factor that you should consider is Intuitive's share of the market for replacement
15 and repaired EndoWrists. Based on the evidence that you have heard about Intuitive's market share,
16 you should determine Intuitive's market share as a percentage of total sales in the market for
17 replacement and repaired EndoWrists. ~~[or shipments, production, capacity, reserves, or other~~
18 ~~relevant measures of market share The]~~ Intuitive must have a significant share of the market in
19 order to possess monopoly power.

20 In evaluating whether the percentage of market share supports a finding of monopoly power,
21 you also should consider other aspects of the market for replacement and repaired EndoWrists,
22 ~~[include any of the following as appropriate:]~~ such as market share trends, the existence of barriers
23 to entry (that is, how difficult is it for other producers to enter the market and begin competing with
24 Intuitive for sales), the entry and exit by other companies, and the number and size of competitors.
25 Along with Intuitive's market share, these factors should inform you as to whether Intuitive has
26 monopoly power.  The higher the company's share, the higher the likelihood that a company has
27 monopoly power.

28

(104 of 239), Page 104 of 239
Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 104 of 239
Case 3:21-cv-03496-AMO   Document 274   Filed 10/28/24   Page 56 of 92

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence demonstrates that Intuitive does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Intuitive has monopoly power.

*Market Share Trends*

The trend in Intuitive's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry into the market for replacement and repaired EndoWrists. Barriers to entry make it difficult for new competitors to enter the market for replacement and repaired EndoWrists in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Intuitive does not have monopoly power, regardless of Intuitive's market share, because new competitors could enter easily if Intuitive attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Intuitive has monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the market for replacement and repaired EndoWrists may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Intuitive lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Intuitive has monopoly power.

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products. If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power. On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If, through direct or indirect evidence, you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *United States v. Microsoft Corp.*, 253 F.3d 34, 56-57 (D.C. Cir. 2001); *Syufy Enters. v. Am. Multicinema*, 793 F.2d 990, 995-96 (9th Cir. 1986); *Hunt-Wesson Foods v. Ragu Foods*, 627 F.2d 919, 924-25 (9th Cir. 1980); *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 496-97 (9th Cir. 1977); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *International Boxing Club v. United States*, 358 U.S. 242 (1959); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797-98 (1946).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-115, 2016 Edition.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 50

The proposed instruction is identical to the ABA Model Jury Instruction directed to proving the existence of monopoly power with indirect proof for the purposes of determining a monopolization claim, with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case.

This instruction is designed for cases in which plaintiff attempts to prove the existence of monopoly power through indirect evidence of defendant's ability to control prices and exclude competition. Because direct evidence of control over prices and the ability to exclude competition may not be available, the use of indirect proof is the means generally used by courts to assess the existence of monopoly power. Market power is essentially a question of fact. Neither a high market share nor a declining market share alone are dispositive of the monopoly power question. Instead, as this instruction provides, the jury should consider all facts relevant to Intuitive's ability to charge supracompetitive prices and/or exclude competition.

**Disputed** Instruction No. 51 Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct Offered by **SIS**

The next element plaintiff must prove is that defendant willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the market for replacement and repaired EndoWrists. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals--or the achievement of these goals-- unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Intuitive's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more

1    efficient manufacturing process that allowed it to sell profitably at a lower price than its

2    competitors. If Firm A grew its market share and achieved monopoly power by selling profitably

3    at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way.

4    Developing more efficient processes and developing the ability to sell profitably at lower prices is

5    competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct

6    even if it has a negative effect on competitors.

7        Similarly, in the same example, suppose Firm B developed and patented a revolutionary

8    new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It

9    would not be unlawful for Firm B to achieve monopoly power in printers in this way. Firm B "built

10   a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is

11   not anticompetitive conduct.

12       By contrast, in the same example, suppose [not only that Firm C makes printers, but also

13   that] Firm C makes printers, but Firm C is the world's only manufacturer of computers and that

14   there are barriers to entry into the computer market such that no other firm will be able to enter that

15   market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers

16   would work with its computers, and that the alteration does not improve the design of Firm C's

17   computers or provide any benefits to competition or consumers. The only effect of the alteration is

18   to exclude competing printer makers from the marketplace. It would be unlawful for Firm C to

19   achieve monopoly power in the printer market in this way.

20       As [these examples] the example shows, the acts or practices that result in the acquisition

21   or maintenance of monopoly power must represent something more than the conduct of business

22   that is part of the normal competitive process or commercial success. They must represent conduct

23   that has made it very difficult or impossible for competitors to compete and that was taken for no

24   legitimate business reason. You may not find that a company willfully acquired or maintained

25   monopoly power through anticompetitive means if it has acquired or maintained that power solely

26   through the exercise of superior foresight and skill; or because of natural advantages such as unique

27   geographic access to raw materials or markets; or because of economic or technological efficiency,

28   including efficiency resulting from scientific research; or by obtaining a lawful patent; or because

1  changes in cost or consumer preference have driven out all but one supplier [or because the market
2  is so limited that it is impossible to efficiently produce the product except by a plant large enough
3  to supply the whole demand].

4      If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully
5  acquired or maintained monopoly power in the EndoWrist aftermarket through anticompetitive
6  acts, then you must consider whether SIS has proved the remaining elements of this claim. If,
7  however, you find that SIS did not prove this element by a preponderance of the evidence, then you
8  must find for Intuitive and against SIS on this claim.

9

10  **Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407-08 (2004);
11  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S 585, 105 S. Ct. 2847, 86 L. Ed. 2d 467
12  (1985); *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854
13  (1978).*United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *In re IBM Peripheral EDP
14  Devices Antitrust Litig.*, 481 F. Supp. 965, 1005-08 (N.D. Cal. 1979) *aff'd sub nom. Transamerica
15  Computer Co. v. IBM*, 698 F.2d 1377 (9th Cir. 1983).

16

17  **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-
18  123, 2016 Edition.

19
20
21
22
23
24
25
26
27
28

1    <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 51</u>

2           The proposed instruction is identical to the ABA Model Jury Instruction directed to proving

3    willful acquisition or maintenance of monopoly power for the purposes of determining a

4    monopolization claim, with the exception of the deleted bracketed text shown in red font. The

5    bracketed language was deleted to adapt the model instruction to the facts of this particular case.

6    Additional / substitute language is highlighted in yellow and is used to adapt the model instruction

7    to the facts of this particular case.

8           It is not necessary to state that it is not enough that the conduct at issue has the effect of

9    reducing consumers' choices or increasing prices to consumers and doing so may be misleading.

10   Such a statement could misleadingly suggest to the jury that SIS cannot prove a violation of the

11   Sherman Act on these grounds.  SIS, however, can prove a violation of the Sherman Act by showing

12   that "diminished consumer choices and increased prices are the result of a less competitive market

13   due to either artificial restraints or predatory and exclusionary conduct." *Fed. Trade Comm'n v.*

14   *Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).  That is, a plaintiff may prove that a restraint

15   has anticompetitive effect either "directly or indirectly." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969

16   F.3d 974, 989 (9th Cir. 2020) (citation omitted). Direct evidence includes "'proof of actual

17   detrimental effects [on competition],'" "such as reduced output, increased prices, or decreased

18   quality in the relevant market". *Id.* Indirect evidence involves "proof of market power plus some

19   evidence that the challenged restraint harms competition." *Id.* Thus, according to established law,

20   direct evidence that Intuitive's conduct has the effect of reducing consumers' choices or increasing

21   prices to consumers is sufficient to prove SIS claim that Intuitive is violating the Sherman Act.

22

23

24

25

26

27

28

**Disputed** Instruction No. 52 Design Changes Offered by **SIS**

Changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2. A design change that improves a product by providing a new benefit to consumers may violate Section 2 when accompanied by some associated anticompetitive conduct. A product redesign is anticompetitive, in violation of anti-monopolization provisions of Sherman Act, when it coerces consumers and impedes competition.

If the monopolist abuses or leverages its monopoly power in some other way when introducing the product, it may violate Section 2. A monopolist's discontinuation of its old technology may violate Section 2 if it effectively forces consumers to adopt its new technology. When a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act.

Insignificant design changes, combined with other coercive conduct, could establish antitrust liability under the rule of reason. A monopolist's product design decisions are not per se lawful.

Proof of unlawful actions associated with introduction of an "improved" product design constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market can establish a violation of Section 2 of the Sherman Act.

The claim that a product design change constitutes an unlawful means of maintaining a monopoly under Section 2 is bolstered when the defendant fails to provide a "procompetitive justification" for its conduct.

Additionally, evidence of the initial intent motivating the design change may be helpful to the extent that it shows that the product designer knew all along that the new design was no better than the old design, and thus introduced the design solely to eliminate competition.

SIS claims that Intuitive's abandonment of the S/Si wired design and subsequent adoption of a wireless design for the X/Xi the usage counter was not a design change that improved the

1  EndoWrist usage counter, but constitutes and exclusionary restraint prohibited by the Sherman Act.

2  SIS also claims that Intuitive fails to provide a procompetitive justification for its design change.

3  SIS claims that the way the X/Xi usage counter was imposed on hospitals served no apparent

4  competitive purpose. For example, SIS claims that Intuitive has taken steps to force customers to

5  switch from earlier generation S/Si systems, such as discontinuing sales of S/Si EndoWrists and

6  surgical robots, phasing out technical support for S/Si da Vinci systems, and aggressively pricing

7  to encourage the switch to Xi.

8      If you find that Intuitive's adoption of a wireless design for the X/Xi usage counter was

9  associated with Intuitive's abuse or leverage of its monopoly power in some other way when

10  introducing the X/Xi usage counter, then you must find that the design change constitutes an

11  exclusionary restraint prohibited by the Sherman Act and violates Section 2.

12

13  **Authorities:** *Alivecor, Inc. v. Apple, Inc.*, 2024 WL 591864, *12 (N.D. Cal. February 13, 2024);

14  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010); *Blue*

15  *Cross and Blue Shield of Vermont v. Teva...*, 2024 WL 323775. *25 (D. Vermont January 22, 2024);

16  *In re Suboxone (Buprenorphine Hydrochloride And Naloxone) Antitrust Litigation*, 622 F.Supp.3d

17  22 (E.D. Pa. 2022); *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* 383

18  F.Supp.3d 187 (S.D.N.Y. 2019); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2nd

19  Cir. 2015).

20

21

22

23

24

25

26

27

28

1    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 52

2        "A monopolist's discontinuation of [an old product] may violate § 2 if it effectively forces

3    customers to adopt its new [product]." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp.*

4    *LP*, 592 F.3d 991, 994 (9th Cir. 2010). Under *Allied Orthopedic*, "a design change that improves a

5    product by providing a new benefit to consumers does not violate Section 2 absent some associated

6    anticompetitive conduct." *Id.* at 998-99. "If a monopolist's design change is an improvement, it is

7    'necessarily tolerated by the antitrust laws,' ... unless the monopolist abuses or leverages its

8    monopoly power in some other way when introducing the product." *Id.* at 1000 (quoting *Foremost*

9    *Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983)). Well-established case

10   law makes clear that product redesign is anticompetitive when it coerces consumers and impedes

11   competition. *New York ex rel. Schneiderman v Actavis PLC,* 787 F.3d 638, 652 (2nd. Cir. 2015).

12   "But under *Berkey Photo*, when a monopolist combines product withdrawal with some other

13   conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits,

14   and to impede competition, its actions are anticompetitive under the Sherman Act." *Id.* at 654; *see*

15   *also In re Keurig Green Mtn. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230

16   (E.D.N.Y. 2019) (recognizing that defendant's product design changes, combined with allegations

17   of exclusive dealing, tying agreements, and product disparagement, purportedly coerced customers

18   to purchase K-cups over comparable cups, rather than competing on the merits); *see also Off.*

19   *Cantonal Des Faillites de la République Et Du Canton de Genève v. Expedia, Inc.* NO. 23-cv-983-

20   BJR, 2024 U.S. Dist. LEXIS 18140 *19; 2024 WL 381181 (W.D. Wash 2024) (citing *Allied* and

21   explaining that "[w]hile the bid modifiers, on their own, may have been intended to serve some

22   legitimate purpose (e.g., increasing advertisers' cost-per-click), Defendant offers no legitimate

23   explanation for the allegedly haphazard (if not "inscrutable and deceitful," Pl.'s Opp. at 5) way in

24   which they were imposed on Amoma")

25   .

26

27

28

1

2      **Disputed** Instruction No. 53 Monopolization - Interstate Commerce Offered by **SIS**

3              The Sherman Act applies only to conduct that affects interstate or foreign commerce. You

4      are instructed that Intuitive's agreements affected interstate commerce.

5

6      SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 53

7              SIS submits that this instruction be given to ensure the Jury understands that this aspect of

8      SIS's antitrust claim with respect to monopolization and attempted monopolization is not disputed

9      by Intuitive.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 54 Attempt to Monopolize Offered by **SIS**

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the market for repaired and replacement EndoWrist instruments. To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1) Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2) Intuitive had a specific intent to achieve monopoly power in the market for replacement and repaired EndoWrists;

(3) there was a dangerous probability that Intuitive would sooner or later achieve its goal of monopoly power in the market for replacement and repaired EndoWrists;

(4) Intuitive's conduct occurred in or affected interstate [*or foreign*] commerce; and

(5) SIS was injured in its business or property by Intuitive's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.


**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993); *Brooke Grp. v. Brown & Williamson Tobacco Co.*, 509 U.S. 209, 225 (1993); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181, 96 L. Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Materials Co*., 273 U.S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927); *Swift & Co. v. United States*, 196 U.S. 375, 25 S. Ct. 276, 49 L. Ed. 518 (1905); *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1004 (9th Cir. 1981); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 688 F.2d 1014, 1028 (9th Cir. 1981); *Blair Foods v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir. 1980).

1   **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-

2   155, 2016 Edition.

3

4   <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 54</u>

5   The proposed instruction is identical to the ABA Model Jury Instruction directed to the

6   elements for proving attempt to monopolize, with the exception of the deleted bracketed text shown

7   in red font. The bracketed language was deleted to adapt the model instruction to the facts of this

8   particular case. Additional / substitute language is highlighted in yellow and is used to adapt the

9   model instruction to the facts of this particular case.

SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION
3:21-cv-03496-AMO

**Disputed** Instruction No. 55 Attempted Monopolization - Anticompetitive Conduct Offered by **SIS**

It is not sufficient for SIS to prove that Intuitive intended to monopolize the market for replacement and repaired EndoWrists. SIS must also show that Intuitive engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Intuitive would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

I have already instructed you on the standards for determining whether Intuitive engaged in anticompetitive conduct in the context of the monopolization claims. You should apply those same instructions here in the context of determining whether Intuitive engaged in anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to monopolize the market for replacement and repaired EndoWrists.

**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th Cir. 1983); *Cal. Computer Prods. v. IBM*, 613 F.2d 727, 738 (9th Cir. 1979); *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, (3d Cir. 2010).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-158, 2016 Edition.

1    SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 55

2        The proposed instruction is identical to the ABA Model Jury Instruction directed to

3    anticompetitive conduct, with the exception that additional / substitute language is highlighted in

4    yellow and is used to adapt the model instruction to the facts of this particular case.

5        The same conduct required to support a monopolization claim also is required to establish

6    attempted monopolization. Regardless of whether the alleged antitrust violation involves

7    anticompetitive agreements under § 1 or independent anticompetitive conduct under § 2, the

8    burden- shifting test under the rule of reason is essentially the same. *Fed. Trade Comm'n v.*

9    *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (citations omitted). Under § 1, "the plaintiff has

10   the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that

11   harms consumers in the relevant market." *Id.* (citations omitted).   Defendant, not plaintiff, bears

12   the burden of persuading the jury that a procompetitive or efficiency-enhancing justification exists

13   and justifies any anticompetitive harm that plaintiff has proven. *E.g., LePage's, Inc. v. 3M*, 324 F.3d

14   141, 164 (3d Cir. 2003) (en banc) ("Defendant bears the burden of persuad[ing] the jury that its

15   conduct was justified by any normal business purpose.") (alteration in original) (internal quotation

16   marks omitted). **"**If the plaintiff carries its burden, then the burden shifts to the defendant to show

17   a procompetitive rationale for the restraint." 969 F.3d at 991.

18

19

20

21

22

23

24

25

26

27

28

2-SER-324

**Disputed** Instruction No. 56 Specific Intent to Achieve Monopoly Power Offered by **SIS**

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the market it is talking about—replacement and repaired EndoWrist instruments --is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market. [The court will begin by instructing you on the relevant market, and the court will then discuss specific intent. If plaintiff proves both that the [describe market ] is a relevant market and that defendant had a specific intent to monopolize that market, you must find that plaintiff has proven this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that plaintiff fails to prove either of these points, then you must find for defendant on plaintiff's attempted monopolization claim.]

The court has already provided you with instructions on determining whether the replacement and repaired EndoWrist market is a relevant market. If [you find that] SIS [has proven a relevant market] proves that the replacement and repaired EndoWrist market is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the market for replacement and repaired EndoWrists.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize. There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the market for replacement and repaired EndoWrists. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. You must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did. For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable

1  consequence of Intuitive's conduct in the market for replacement and repaired EndoWrists was to

2  give Intuitive control over prices and to exclude or destroy competition, and that this was plainly

3  foreseeable by Intuitive, then you may (but are not required to) infer that Intuitive specifically

4  intended to acquire monopoly power.

5      In this case, SIS argues that the conduct underlying the claim of attempt to monopolize also

6  constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on

7  the basis of this conduct that SIS has proven [a substantial claim of restraint of trade] Intuitive

8  restrained trade in the EndoWrist repair and replacement market under the instructions you have

9  received pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that

10  Intuitive had the specific intent to achieve monopoly power.

11      If SIS proves both that the repaired and replacement EndoWrist aftermarket is a relevant

12  market and that Intuitive had a specific intent to monopolize that market, you must find that SIS

13  has proven this element of its attempted monopolization claim and you should consider the other

14  elements of the claim. If you find that SIS fails to prove either of these points, then you must find

15  for Intuitive on SIS's attempted monopolization claim.

16

17

18  **Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Eastman Kodak Co. v.*

19  *Image Tech. Servs.*, 504 U.S. 451 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472

20  U.S. 585 (1985); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951); *William Ingliss & Sons*

21  *Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981); *Vollrath v. Sammi Corp.*, 1989

22  WL 201632, at *7 (C.D. Cal. 1989) (*citing Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1192-93 (9th

23  Cir. 1984), and cases cited therein).

24

25  **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-

26  160, 2016 Edition.

27

28

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 56

The proposed instruction is largely based on the ABA Model Jury Instruction directed to establishing specific intent for the purpose of attempted monopolization. The deleted bracketed text shown in red font encompasses language that was moved to a different place in the instruction or was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language is highlighted in yellow and is used to adapt the model instruction to the facts of this particular case.

1   **<u>Disputed</u>** <u>Instruction No. 58 Attempted Monopolization - Interstate Commerce Offered by</u> **<u>SIS</u>**

2          The Sherman Act applies only to conduct that affects interstate or foreign commerce. You

3   are instructed that Intuitive's agreements affected interstate commerce.

4

5   <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 58</u>

6          SIS submits that this instruction be given to ensure the Jury understands that this aspect of

7   SIS's antitrust claim with respect to monopolization and attempted monopolization is not disputed

8   by Intuitive.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Disputed</u> Instruction No. 59 Injury – Monopolization and Attempted Monopolization Offered by SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions -Civil

Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

<u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 59</u>

The proposed instruction is identical to the Modern Federal Jury Instructions-Civil, Form 485a-79-23 directed to injury with the exception of the additional / substitute language highlighted in yellow used to adapt the model instruction to the facts of this particular case.

**Disputed** Instruction No. 68 Basis for Calculating Damages Offered by **SIS**

It might be difficult for you to measure SIS's damages in this case. However, the fact that it might be difficult to determine the amount of SIS's damages should not affect SIS's recovery. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision.

This does not mean, however, that you may determine SIS's damages on the basis of mere speculation or guesswork. Rather you must look to the evidence presented to you and make a fair and reasonable estimate of SIS's damages based on that evidence.

[You are permitted to make just and reasonable estimates in calculating plaintiff's damages. You are not required to calculate damages with mathematical certainty or precision. However,] The amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. SIS must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that SIS has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that SIS has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages [or you may award nominal damages, not to exceed one dollar].

**Authorities:** The Supreme Court has recognized that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); Accordingly, "a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983); *see, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (damages calculations "need not be exact" at the class certification stage, but must be consistent with plaintiff's theory of liability); Although there is a relaxed standard of proof

1   as to the amount of damage, the Supreme Court has made clear that a damage award may not be

2   based on "speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946);

3   *Farley Transp. Co. v. Santa Fe Trail Transp. Co*., 786 F.2d 1342, 1350-51 (9th Cir. 1985) (no

4   damages may be awarded where jury required to speculate).

5

6   **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases B-

7   3, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-26, Copyright 2023,

8   Matthew Bender & Company, Inc., a member of the LexisNexis Group.

9

10   SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 68

11         The proposed instruction is identical to the ABA Model Jury Instruction regarding the basis

12   for calculating damages with the exception of the deleted bracketed text shown in red font. The

13   bracketed language was deleted to adapt the model instruction to the facts of this particular case.

14   Additional / substitute language highlighted in yellow is used to adapt the model instruction to the

15   facts of this particular case.  The first and second paragraph of the proposed instruction is an

16   addition to the ABA Model Jury Instruction that is essentially identical to Instruction 79-26 of the

17   Modern Federal Jury Instructions - Civil (Copyright 2024, Matthew Bender & Company, Inc., a

18   member of the LexisNexis Group).

19

20

21

22

23

24

25

26

27

28

__Disputed__ Instruction No. 70 Damages for Competitors -- Lost Profits Offered by **SIS**

SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged antitrust violation. If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result of Intuitive's antitrust violation. [To calculate lost profits, you must calculate net profit: the amount by which plaintiff's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. You may calculate the net profit by the following measure: [ *The court should incorporate case - specific instructions addressing legitimate means of measuring lost profit, as appropriate based on the evidence, such as the before - after, yardstick, or market share measures.*]]

[One measure of the plaintiff's damages is the profits it has lost as a result of the defendant's unlawful activities.] Lost profits for which SIS can recover are the net profits SIS would have earned, both in the past and in the future, had it not suffered injury as a result of the violation of the antitrust laws. Thus your award of lost profits should be your reasonable estimate of the amounts SIS would have earned in the past and in the future less the amount SIS actually earned and can be expected to earn. I remind you that your award of damages must be fairly based on the evidence which has been presented to you. You may not simply speculate as to the past or future profits SIS may have lost.

The fact that SIS's business is new or not yet established does not prevent you from determining its lost earnings. In making this determination, you may consider the risks of the business world, the experience and performance of SIS's officers, the performance of SIS as it conducted its business, the competition which SIS would have encountered in the area, and the general market conditions of the area of business.

**Authorities:** *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 439 (5th Cir. 1985); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir. 1970); *Hobart Bros. Co. v. Malcolm T. Gilliand, Inc.*, 471 F.2d 894, 902-03 (5th Cir. 1973).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases B-8, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-27, Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 70

The proposed instruction is identical to the ABA Model Jury Instruction regarding the basis for calculating lost profit damages for competitors with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language highlighted in yellow is used to adapt the model instruction to the facts of this particular case. The second and third paragraph of the proposed instruction is an addition to the ABA Model Jury Instruction that is essentially identical to Instruction 79-27 of the Modern Federal Jury Instructions - Civil (Copyright 2024, Matthew Bender & Company, Inc., a member of the LexisNexis Group).

**_Disputed_ Instruction No. 71 Damages for Competitors -- Future Lost Profits Offered by SIS**

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits for 2 years into the future. If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits. In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation. In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance _[expand or contract as appropriate]_.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative. If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit. In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues. ~~[You may calculate net profit by using the following measures: [_The court should incorporate case--specific instructions addressing legitimate means of measuring future lost profit, as appropriate based on the evidence, such as the before--after, yardstick, or market share measures_]]~~.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today--this is known as the time value of money. For example, if you had a choice to receive $ 1,000 today or a year from now, you would be better off receiving the money today and earning interest

on it for a year--you would then have something more than $ 1,000 in a year from now. Similarly, if you had a right to $ 1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year. This lower amount is known as an amount discounted to present value.

**Authorities:** *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 412 (1985); *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338-40 (1971); *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir. 1986).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases B-9, 2016 Edition.


SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 71

The proposed instruction is identical to the ABA Model Jury Instruction regarding future lost profits damages for competitors with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language highlighted in yellow is used to adapt the model instruction to the facts of this particular case.

**Disputed** Instruction No. 74 Re Lanham Act – Elements of False Statement Claim Offered by **SIS**

Intuitive has claimed that SIS has engaged in unfair competition and false advertising in violation of federal law. To establish this claim, Intuitive has the burden of proving each of the following by a preponderance of the evidence:

1. SIS used in commerce a false designation of origin, false description of fact, misleading description of fact, false representation of fact, or misleading representation of fact on or in connection with any [goods or container for goods] services;

2. The use of the false designation of origin or misleading description of fact is likely to cause confusion as to the origin of SIS's goods; the affiliation or association of SIS with Intuitive; or the approval by Intuitive of SIS's sale of [goods] services in markets that were not in fact authorized by Intuitive; and

3. INTUITIVE was and is likely to be damaged by SIS's actions.

Source/Authority: 15 U.S.C. 1125(a)(1); 90 Am. Jur. Proof of Facts 3d 95 (Originally published in 2006); BIOTAB NUTRACEUTICALS, INC., v. BEAMONSTAR, LLC, 2011 WL 13006813 (C.D.Cal.)

SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 74

The proposed instruction is identical to the Jury Instruction given in *BIOTAB NUTRACEUTICALS, INC., v. BEAMONSTAR, LLC,* 2011 WL 13006813 (C.D. Cal. October 12, 2011) regarding unfair competition with the exception of the deleted bracketed text shown in red font. The bracketed language was deleted to adapt the model instruction to the facts of this particular case. Additional / substitute language highlighted in yellow is used to adapt the model instruction to the facts of this particular case.

**Disputed** Instruction No. 76 Re Commercial Advertisement or Promotion Offered by **SIS**

To constitute commercial advertising or promotion, a statement of fact must have been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or services. While the statement need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the statement must have been disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry. However, a handful of statements to customers does not trigger protection from the Lanham Act unless the potential purchasers in the market are relatively limited in number.

If you find that Intuitive has proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must assess the other elements of Intuitive's false advertising claim. If you find that Intuitive has not proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must find for SIS on Intuitive's false advertising claim.

*Walker & Zanger, Inc. v. Paragon Indus.*, 549 F.Supp.2d 1168, 1182 (N.D. Cal. 2007) --- A handful of statements to customers does not trigger protection from the Lanham Act unless "the potential purchasers in the market are relatively limited in number," *Coastal Abstract Serv, Inc v First Am Title Ins Co*, 173 F3d 725 (9th Cir 1999).

1  SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 76

2          Dissemination of the alleged false statements is a key, critical element of the cause of

3  action. Although the representations need not be made in a "classic advertising campaign," they

4  must be "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or

5  'promotion' within that industry." *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d

6  725, 735 (9th Cir.1999). A handful of statements to customers does not trigger protection from

7  the Lanham Act unless "the potential purchasers in the market are relatively limited in number."

8  *Id.* Further, if an advertisement is not false on its face, plaintiff must produce evidence, usually in

9  the form of market research or consumer surveys, showing exactly what message ordinary

10 consumers perceived. *See Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*,

11 960 F.2d 294 (2d Cir.1992); *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294,

12 297–98 (2d Cir.1992) (requiring plaintiff to demonstrate that "a statistically significant part of the

13 commercial audience holds the false belief allegedly communicated by the challenged

14 advertisement"); J T, McCarthy, McCarthy on Trademarks and Unfair Competition, § 27–

15 07[2][d] (4th ed. 1992).

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 77 Re Lanham Act Injury Offered by **SIS**

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's false or misleading statement, either by a direct loss of sales or a lessening of the goodwill associated with its products. A statement is misleading if it conveys a false impression and actually deceives consumers. This can be proved in a number of ways.  For example, injury can be proved by showing that SIS having made false statements that actually deceived or had the tendency to deceive a substantial segment of SIS's audience, induced customers to switch their purchasing decisions, and purchase replacement or repaired EndoWrists from SIS instead of from Intuitive. Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation.  Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's false advertising claim. If you find that Intuitive has not proved that SIS's false or misleading statements of fact about its repair service or about Intuitive's products caused injury to Intuitive, then you must find for SIS on Intuitive's false advertising claim.

1   SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 77

2       Proof of actual injury is necessary to obtain damages under the Lanham Act. *Appliance*

3   *Recycling Centers of Am., Inc. v. JACO Env't, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010). To prevail

4   on a false advertising claim under the Lanham Act, a plaintiff must prove proximate cause, i.e.,

5   injury "flowing directly from the deception wrought by the defendant's advertising." *Kurin, Inc. v.*

6   *Magnolia Medical Technologies, Inc.,* 473 F.Supp. 1117, (S.D. Cal. 2020)(citations omitted) This

7   "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*

8   *Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014). Unlike "actual cause or

9   cause in fact," proximate cause denotes a cause with "some direct relation between the injury

10  asserted and the injurious conduct alleged." *Paroline v. United States*, 572 U.S. 434, 445 (2014). It

11  must flow directly from the advertisements which are shown to be false. *See Lindy Pen Co., Inc. v.*

12  *Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993), abrogated on other grounds by *SunEarth, Inc.*

13  *v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (2016); *Harper House, Inc. v. Thomas Nelson, Inc.*,

14  889 F.2d 197, 210 (9th Cir. 1989), *William H. Morris Co. v. Group W, Inc.*, 67 F.3d 310 (9th Cir.

15  1995) (unpub. disp.).

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed** Instruction No. 78 Re Common Law Unfair Competition Offered by **SIS**

2         Intuitive contends that SIS has engaged in unfair competition in violation of common law.

3  If you find that SIS has engaged in federal unfair competition, you should also find that they have

4  engaged in California statutory and common law unfair competition.  If you find that SIS has not

5  engaged in federal unfair competition, then you should find that they have not engaged in California

6  statutory and common law unfair competition.

7

8  **Source/Authority**: Enesco Corp. v. Price/Costco, Inc., 146 F.3d 1083, 1084 n.1 (9th Cir. 1998);

9  Cal. Bus. & Prof. Code § 17200; Ninth Circuit Manual of Model Jury Instructions: Civil § 15.5

10 (2024); Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994).

11

12 SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 78

13         An action for unfair competition under Cal.Bus. & Prof.Code §§ 17200 et seq. is

14 "substantially congruent" to a trademark infringement claim under the Lanham Act. *International*

15 *Order of Job's Daughters*, 633 F.2d 912, 916 (9th Cir.1980). The Ninth Circuit has consistently

16 held that state common law claims of unfair competition and actions pursuant to California

17 Business and Professions Code § 17200 are "substantially congruent" to claims made under the

18 Lanham Act. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*,

19 944 F.2d 1446, 1457 (9th Cir.1991).

20

21

22

23

24

25

26

27

28

**SIS's MEMORANDUM OF LAW ON SIS'S DISPUTED JURY INSTRUCTION**
3:21-cv-03496-AMO

**Disputed** Instruction No. 79 Re Tortious Interference with Contract Offered by **SIS**

Intuitive claims that SIS intentionally interfered with [the contract between [him/her/nonbinary pronoun/it] and [name of third party]. the "Sales, License and Service Agreement" contracts between it and certain customers. To establish this claim, INTUITIVE must prove all of the following:

(1) That there was a contract between Intuitive and each of the specifically identified customers;

(2) That SIS knew of the contract between Intuitive and each of the specifically identified customers;

(3) That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

(4) That SIS intended to disrupt the performance of the contract between Intuitive and each of the specifically identified customers;

(5) That Intuitive was harmed; and

(6) That SIS's conduct was a substantial factor in causing Intuitive's harm.

**Source**: Judicial Council of California Civil Jury Instructions, CACI 2201 (2024).

1    <u>SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 80</u>

2        The Judicial Council of California is "the rule-making arm of the California court system."

3    *NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1067 (9th Cir. 2007). The

4    Council consists of the Chief Justice and one Associate Justice of the California Supreme Court, as

5    well as three judges from the California courts of appeal, ten judges from the California superior

6    courts, and various nonvoting members. CAL. CONST. ART. VI, § 6(a). The Council is empowered

7    by the California Constitution to "adopt rules for court administration, practice and procedure, and

8    perform other functions prescribed by statute," so long as those rules are not "inconsistent with

9    statute." Id. § 6(d); *In re Abbigail A.*, 1 Cal.5th 83, 204 Cal.Rptr.3d 760, 375 P.3d 879, 883–84

10   (2016); *Cunningham v. California*, 549 U.S. 270, 278 n.4 (2007).

11       Among the California Rules of Court adopted by the Council is Rule 2.1050, the Judicial

12   Council jury instructions. These model jury instructions "are the official instructions for use in

13   the state of California" and are intended to "accurately state the law in a way that is understandable

14   to the average juror." Cal. R. Ct. 2.1050(a). Thus, use of the model jury instructions "is strongly

15   encouraged," unless the trial court judge "finds that a different instruction would more accurately

16   state the law and be understood by jurors." Cal. R. Ct. 2.1050(f). "Accordingly, even though the

17   'articulation and interpretation of California law [ ] remains within the purview of the Legislature

18   and the courts of review,' Cal. R. Ct. 2.1050(b), the Ninth Circuit has generally treated the model

19   jury instructions as a helpful, albeit not dispositive, interpretive tool." *Sidibe v. Sutter Health*, 103

20   F.4th 675, 682 (9th Cir. 2024) (citations omitted).

21       The proposed instruction is identical to the Judicial Council of California Civil Jury

22   Instructions, CACI 2201 regarding the essential factual elements of Intentional Interference With

23   Contractual Relations with the exception of the deleted bracketed text shown in red font. The

24   bracketed language was deleted to adapt the model instruction to the facts of this particular case.

25   Additional / substitute language highlighted in yellow is used to adapt the model instruction to the

26   facts of this particular case.

27

28

**Disputed** Instruction No. 80 Re Lost Profit Damages on Intuitive Counterclaims Offered by **SIS**

To recover damages for lost profits, Intuitive must prove it is reasonably certain it would have earned profits but for SIS's conduct. To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses [[including the value of the [specify categories of evidence, such as labor/materials/rents/all expenses/interest of the capital employed]] Intuitive would have had if SIS's conduct had not occurred. The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

Judicial Council of California Civil Jury Instructions, CACI 3903N (2024).

1 | SIS'S ARGUMENT IN SUPPORT OF INSTRUCTION NO. 81

2 |     The Judicial Council of California is "the rule-making arm of the California court system."

3 | *NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1067 (9th Cir. 2007). The

4 | Council consists of the Chief Justice and one Associate Justice of the California Supreme Court, as

5 | well as three judges from the California courts of appeal, ten judges from the California superior

6 | courts, and various nonvoting members. CAL. CONST. ART. VI, § 6(a). The Council is empowered

7 | by the California Constitution to "adopt rules for court administration, practice and procedure, and

8 | perform other functions prescribed by statute," so long as those rules are not "inconsistent with

9 | statute." Id. § 6(d); *In re Abbigail A.*, 1 Cal.5th 83, 204 Cal.Rptr.3d 760, 375 P.3d 879, 883–84

10 | (2016); *Cunningham v. California*, 549 U.S. 270, 278 n.4 (2007).

11 |     Among the California Rules of Court adopted by the Council is Rule 2.1050, the Judicial

12 | Council jury instructions. These model jury instructions "are the official instructions for use in

13 | the state of California" and are intended to "accurately state the law in a way that is understandable

14 | to the average juror." Cal. R. Ct. 2.1050(a). Thus, use of the model jury instructions "is strongly

15 | encouraged," unless the trial court judge "finds that a different instruction would more accurately

16 | state the law and be understood by jurors." Cal. R. Ct. 2.1050(f). "Accordingly, even though the

17 | 'articulation and interpretation of California law [ ] remains within the purview of the Legislature

18 | and the courts of review,' Cal. R. Ct. 2.1050(b), the Ninth Circuit has generally treated the model

19 | jury instructions as a helpful, albeit not dispositive, interpretive tool." *Sidibe v. Sutter Health*, 103

20 | F.4th 675, 682 (9th Cir. 2024) (citations omitted).

21 |     The proposed instruction is identical to the Judicial Council of California Civil Jury

22 | Instructions, CACI 3903N regarding lost profits with the exception of the deleted bracketed text

23 | shown in red font. The bracketed language was deleted to adapt the model instruction to the facts

24 | of this particular case. Additional / substitute language highlighted in yellow is used to adapt the

25 | model instruction to the facts of this particular case.

26 |

27 |

28 |

**CONCLUSION**

Based on the foregoing arguments, Plaintiff SIS respectfully requests that the Court accept SIS's proposed jury instructions, which Intuitive has disputed, and disregard Intuitive's proposed alternative instructions where offered after disputing SIS's proposed jury instruction.  Further, SIS respectfully submits that the Jury Instructions should be given to the jury in the order / sequence proposed by SIS in the foregoing Table at the front of this document.


Dated: October 28, 2024               McCAULLEY LAW GROUP LLC
                                      By: /s/ Joshua Van Hoven
                                              JOSHUA V. VAN HOVEN

                                      E-Mail: josh@mccaulleylawgroup.com
                                      3001 Bishop Dr., Suite 300
                                      San Ramon, California 94583
                                      Telephone: 925.302.5941

                                      RICHARD T. MCCAULLEY (pro hac vice)
                                      E-Mail: richard@mccaulleylawgroup.com
                                      180 N. Wabash Avenue, Suite 601
                                      Chicago, Illinois 60601
                                      Telephone: 312.330.8105

                                      *Attorneys for* SURGICAL INSTRUMENT
                                      SERVICE COMPANY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | Case No.  21-cv-03496-AMO |
| **Plaintiffs,** | |
| v. | **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| INTUITIVE SURGICAL, INC., | Re: Dkt. Nos. 127, 137 |
| **Defendant.** | **FILED UNDER SEAL** |

This is an antitrust case related to surgical robots, their instruments, and whether the robot's manufacturer has engaged in anticompetitive conduct.  This is one of two related cases before the Court alleging anticompetitive conduct by Defendant Intuitive Surgical, Inc. ("Intuitive").[1]  The two cases involve similar antitrust claims – this case is brought by a competitor and the other case is brought by customers.  Before the Court are the cross-motions for summary judgment of Defendant Intuitive and Plaintiff Surgical Instruments Services, Inc. ("SIS"), which were heard before this Court on September 7, 2023.  Having read the papers filed by the parties and carefully considered the arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS in part and DENIES in part** both motions, for the following reasons.

---

[1] The related case is *In Re: Da Vinci Surgical Robot Antitrust Litigation*, N.D. Cal. Case No. 3:21-cv-03825-AMO.  The Court simultaneously enters its order on the pending cross-motions for summary judgment in that case.

United States District Court
Northern District of California

**BACKGROUND[2]**

**A.      Intuitive's and SIS's Business Models**

Intuitive manufactures sophisticated medical devices used to perform surgery.  The company designs, manufactures, and sells minimally invasive surgical robots known as da Vinci Surgical Systems ("da Vinci") along with accompanying surgical instruments, called EndoWrists. EndoWrists are surgical instruments attached to the da Vinci's mechanical arms, which are suspended above the patient.  Rosa Decl. ¶ 9.  EndoWrists include fine wire cables that thread through a complex pulley system, allowing the surgeon to move the surgical instruments easily inside the patient's body to desired angles with great precision, mimicking and even exceeding the range of motion of the human wrist.  Rosa Decl. ¶ 24.

Intuitive controls the frequency of EndoWrist instrument replacement via a built-in self-destruct mechanism it calls a "use counter."  Van Hoven ("JVH") Decl. Ex. 10 at ¶ 93; Rosa Decl. ¶¶ 36-37.  A simple memory chip within the EndoWrist instruments decrements every time the EndoWrist instrument is used in surgery, without regard to the actual time or rigor the EndoWrist is used in the surgery.  JVH Decl. Ex. 10 ¶¶ 103-107; Rosa Decl. ¶¶ 36-37.  When the use count (until recently, 10 uses in most instruments) reaches zero, the da Vinci system will no longer recognize the EndoWrist instrument, which must then be thrown away.  JVH Decl. Ex. 10 ¶ 105. The use limits were described in Intuitive's submissions to the United States Food and Drug Administration ("FDA") to obtain regulatory clearance of the EndoWrist, but the parties offer conflicting evidence as to whether the limits serve any legitimate medical or patient safety purpose.  *See, e.g.*, Rosa Decl. ¶¶ 22-35, 45; JVH Decl. Ex. 18 ¶¶ 22, 92-129.

Each purchaser or lessor of a da Vinci enters into a contract with Intuitive, typically a Sales, Licensing and Service Agreement ("SLSA") or corresponding lease agreement.  *See* Rosa Decl. ¶ 21.  Intuitive's contracts with its customers – hospitals and other surgery centers – prohibit (a) any repair or modification of EndoWrists, and (b) the use of EndoWrists beyond the maximum

---

[2] The Court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

United States District Court
Northern District of California

2-SER-348

1 number of uses mandated by Intuitive. *See, e.g.*, Cahoy Decl. Ex. 12 § 8. The contracts typically

2 prohibit customers from modifying, altering, or misusing the system and its components or

3 manipulating the software. *See, e.g.*, *id.* §§ 3.4, 4, 5.2. The agreements confirm that the da Vinci

4 system should be used only with approved EndoWrists and provide that use of a non-approved

5 instrument may give Intuitive the right to discontinue service. *Id.* Intuitive also disclaims

6 warranty obligations for claims arising from repairs, modifications, or other changes made by a

7 third party. *See, e.g.*, *id.* §§ 5.2(E), 10.1.

8  Da Vinci systems have evolved over time, and Intuitive has periodically introduced new

9 models, with support eventually being phased out for outdated models. The first da Vinci systems

10 were introduced commercially in the United States in 2000, after the FDA granted the da Vinci

11 system and the instruments used with it clearance as medical devices that can be marketed and

12 used on patients. Rosa Decl. ¶ 8. The "Si" da Vinci systems were introduced in 2009; Intuitive

13 ceased selling new Si systems in the United States in 2018 and is expecting to cease support for

14 those systems, including the sale of new S/Si EndoWrists, in 2024, ten years after introducing the

15 successor Xi model. Rosa Decl. ¶ 11; Cahoy Decl. Ex. 2 at 172:13-174:12. The models that are

16 primarily used today in the United States are the Xi, introduced in 2014, and the X, introduced in

17 2017. Rosa Decl. ¶ 11. By early 2019, medical technology companies such as Rebotix Repair

18 ("Rebotix")and Restore Robotics ("Restore") had made significant sales of repaired S/Si

19 EndoWrists to a number of hospitals and systems in the United States. JVH Decl., Ex. 8 at 74:19-

20 76:17. Those companies circumvented the S/Si use counter and performed an inspection and

21 repair process to ensure that the repaired instrument would operate in the same manner as an

22 Intuitive-provided device. JVH Decl. Ex. 10 ¶¶ 68-91. In significant part, Rebotix developed a

23 computer chip called the "Interceptor" that could be inserted inside the S/Si EndoWrists to

24 "intercept" the data in the EndoWrist's memory and fool the system into accepting a new use

25 count starting at zero. *See* Cahoy Decl. Ex. 14 at 6.

26  SIS provides servicing of surgical instruments ranging from stainless instruments to more

27 complex systems such as surgical video systems and flexible endoscopes. JVH Decl. Ex. 17 at 2;

28 Ex. 18 at 11:20-12:1. SIS became aware of Rebotix's repair procedure for the EndoWrist in

*United States District Court*
*Northern District of California*

3

spring of 2019, and over the ensuing months, SIS worked with Rebotix to understand the process and potentially bring it to SIS customers.  JVH Decl. Ex. 18 at 23:18-27:20; Ex. 20 at 23:9-24:16, 32:21-33:18.  SIS began offering reset S/Si EndoWrists to its customer base in fall of 2019.  JVH Decl. Ex. 20 at 109:9-18, 110:13-24, 116:1-9; Ex. 8 at 88:7-19.  SIS signed an agreement specific to EndoWrist repairs with Vizient, the country's largest group purchasing organization (GPO) representing thousands of hospitals and health care facilities.  JVH Decl. Ex. 19 at 52:5-53:8; Ex. 20 at 87:2-6; Ex. 18 at 77:14-78:20.  Hospital demand for the EndoWrist repair service was "monumental," with interest from several hospitals and hospital systems across the country.  JVH Decl. Ex. 20 at 44:7-45:22; Ex. 19 at 50:10-51:24.

Intuitive sent letters to virtually every hospital where it discovered use of repaired EndoWrists, including to SIS's customers, reminding them of the terms of the SLSAs and threatening to cut off those customers' access to ongoing support and service from Intuitive.  *See, e.g.*, JVH Decl. Ex. 8 at 79:18-81:15, 88:7-19, 92:17-94:7; Ex. 24; Ex. 25.  Faced with the shutdown of their robotic surgery programs, all SIS customers (and to SIS's knowledge, all EndoWrist repair customers) stopped using repaired EndoWrists.  JVH Decl. Ex. 18 at 39:21-40:5, 41:23-44:19; Ex. 19 at 55:12-56:7; Ex. 22 at 39:3-41:4.

**B.      FDA & Section 510(k) Clearance**

The da Vinci robot and EndoWrist instruments fit within a regulatory scheme that shapes the parties' arguments in the pending motions.  The Food, Drug and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"), 90 Stat. 539 (codified at 21 U.S.C. § 301 et seq.), requires that medical devices like the da Vinci and its components receive certain approvals from the United States Food and Drug Administration ("FDA").  "The MDA separates devices into three categories: Class I devices are those that present no unreasonable risk of illness or injury and therefore require only general manufacturing controls; Class II devices are those possessing a greater potential dangerousness and thus warranting more stringent controls; Class III devices present a potential unreasonable risk of illness or injury and therefore incur the FDA's strictest regulation." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344 (2001) (internal quotation marks and alteration omitted).  Manufacturers or remanufacturers of Class II

United States District Court
Northern District of California

4

1    devices need only submit a "premarket notification" to the FDA in accordance with the less

2    burdensome "510(k) process" rather than the more rigorous process of obtaining "premarket

3    approval" from the FDA necessary for manufacturers of Class III devices. *Medtronic, Inc. v.*

4    *Lohr*, 518 U.S. 470, 477-79 (1996) (contrasting the two procedures); *see also* 21 C.F.R.

5    § 807.81(a). "Section 510(k)" refers to the section of the original MDA containing this provision,

6    and it sets forth the procedure by which a medical device that is "substantially equivalent" to a

7    device that is already on the market can be cleared for sale without undergoing the more rigorous

8    pre-market review and approval process. *See* 21 U.S.C. § 360(k); *see also Medtronic*, 518 U.S. at

9    478-79.[3]

10        The parties disagree as to whether SIS's and other third parties' services require Section

11   510(k) clearance from the FDA, and the FDA's position on the matter is less than clear. Rebotix

12   first sought regulatory clearance of its procedure in December 2014. Cahoy Decl. Ex. 10 ¶ 103;

13   Ex. 21. FDA responded by identifying deficiencies in the application and warning Rebotix that it

14   could not place remanufactured instruments into commercial distribution unless and until it

15   received FDA clearance. Cahoy Decl. Ex. 23. Rather than addressing the deficiencies identified

16   by FDA, Rebotix withdrew its application. Cahoy Decl. Ex. 24.

17        Rebotix then implemented a new business model, beginning in 2018: hospitals retained

18   ownership of their used Si EndoWrists and hired Rebotix to modify the instruments. Cahoy Decl.

19   Ex. 20 at 210:9-21, 227:10-23. In furtherance of that model, Rebotix entered into a relationship

20   with Restore Robotics ("Restore"), for Restore to market the Rebotix process to hospitals, buy the

21   Interceptor chips from Rebotix, and modify the instruments. Cahoy Decl. Ex. 28. Rebotix

22   terminated the contract in late 2019. Cahoy Decl. Ex. 20 at 132:12-21. Rebotix also entered into

23

24

25   _____

26   [3] "Remanufacturer" is defined in the Federal Regulations as "any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use." 21 C.F.R. § 820.3(w). Because there is a dispute about whether SIS's treatment of the EndoWrists constitutes "repair" or "remanufacturing" and the term of art used has implications for the outcome of the case, the Court generally refers to the treatment as "service" to the extent possible in this order.

27

28

United States District Court
Northern District of California

5

**2-SER-351**

1    an arrangement with SIS under which SIS would market the Rebotix service to hospitals and

2    Rebotix would perform the modifications. *Id.* Ex. 29 at 19:2-8, 33:22-34:4.

3         Following an inquiry from a Rebotix distributor, FDA stated that Section 510(k) clearance

4    was required because "if the use-life counter is reset or extended past the number of available use

5    lives, then the device specifications are changed," which would constitute "remanufactur[ing]."

6    Cahoy Decl. Ex. 31 at -0335. That correspondence also stated that the message constituted "an

7    informal communication" that did "not necessarily represent the formal position of FDA, and [did]

8    not bind or otherwise obligate or commit the agency to the view expressed." *Id.* at -0335-36. In

9    February 2020, an FDA representative emailed Rebotix directly, stating that "a 510(k) is needed

10   before [Rebotix] continue[s] [its] operation." Cahoy Decl. Ex. 34 at -6955. Following further

11   communications with the agency, Restore informed the agency that it had elected to exit the

12   business. Cahoy Decl. Ex. 38 at -1249.

13        Restore then worked with a third party, Iconocare, to submit an application for FDA

14   clearance. Cahoy Decl. Ex. 39 at 204:16-205:17, 213:19-216:23. Iconocare hired contractors to

15   develop an alternative technology and then, in February 2021, submitted a 510(k) application for

16   that new process which differed from the Rebotix process in important respects. *Id.* Ex. 39 at

17   213:9-15; Ex. 75 ¶¶ 141-50. FDA conducted an extensive review process that required additional

18   testing and procedural adjustments by Iconocare, and on September 30, 2022, Iconocare received

19   clearance on its limited application. Cahoy Decl. Ex. 10 ¶ 136. In the course of granting this

20   clearance, FDA repeatedly described the modification to reset the use counter as

21   "remanufacturing," which required 510(k) clearance. Cahoy Decl. Ex. 10 ¶¶ 129, 136; Ex. 41 at -

22   0535; Ex. 42 (ECF 138-28) at -6093.

23        Separately, in Rebotix's communications with FDA regarding its activities, the company

24   received email correspondence from a Team Lead at the FDA stating as follows:

> As mentioned during our call, the Agency believes that the activities
> of Rebotix constitute remanufacturing and would require FDA
> review and clearance (e.g. 510(k) / de Novo). We therefore request
> that Rebotix stop engaging in the current activities until an
> application is reviewed and cleared/granted.

United States District Court
Northern District of California

6

> The instruments in question no longer maintain the same safety and effectiveness profile as cleared with the original manufacturer's own submission. During premarket review, FDA reviews test data to the labeled number of reuse cycles. This includes, but is not limited to, items such as electrical safety, reprocessing, software, and general performance testing. By extending the number of uses and modifying the instrument with a new chip, the prior information is no longer valid and requires additional review to the new labeled usage limit in order to establish safety and effectiveness. This is therefore different than returning the device to its original condition.

Cahoy Ex. 37 (email dated April 8, 2022).[4]  In response to this correspondence from FDA, Rebotix mentioned that it would appeal FDA's regulatory determination that the EndoWrist services constituted remanufacturing, to which the same Team Lead clarified that his message was not an "official regulatory evaluation." *Id.* (email dated July 22, 2022).  Rather, the correspondence represented informal comments following a "preliminary informal assessment" of limited materials and did "not represent the formal position of FDA" or any position that was appealable. *Id.*

## C.     Procedural History

### 1.     Earlier Lawsuits

In 2019, Restore Robotics, LLC, filed suit against Intuitive in the Northern District of Florida.  Restore alleged that Intuitive engaged in anti-competitive conduct, using its monopoly power in the surgical robot market to further monopolize EndoWrist repair and replacement markets.  That case was heavily litigated, including through cross-motions for summary judgment that resemble the motions filed in the instant case.  The court mostly denied summary judgment, noting that "the jury will have to resolve this 'battle of the experts.'"  *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19CV55-TKW-MJF, 2022 WL 1495005 (N.D. Fla. Apr. 11, 2022). The case settled less than two weeks before the trial date.

In 2020, Rebotix Repair, LLC, filed suit against Intuitive in the Middle District of Florida. Rebotix advanced similar claims that Intuitive engaged in anti-competitive conduct.  That case

---

[4] This correspondence was submitted under seal.  However, the Court provides this portion of the correspondence in its public order because it has already been made public in another case, *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538 (M.D. Fla. Aug. 10, 2022), discussed further below.

7

was also heavily litigated, including through cross-motions for summary judgment that resemble the motions filed in the instant case. The court more plainly denied summary judgment to both sides, noting that a jury would have to weigh the competing expert testimony and evidence about the allegedly anti-competitive conduct. *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538 (M.D. Fla. Aug. 10, 2022). The case settled a month after the order denying summary judgment issued, shortly prior to the final pretrial conference.

### 2. SIS's Lawsuit and Cross-Motions

SIS filed suit against Intuitive in this district on May 1, 2021. ECF 1. SIS brings Sherman Act and Lanham Act claims against Intuitive, claiming that SIS's business was harmed because Intuitive conditions the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive rather than permitting customers to use repaired EndoWrists. SIS claims that Intuitive's actions violate the antitrust laws. First, SIS asserts that the contractual constraints Intuitive places on its customers – which together prohibit customers from having their EndoWrist instruments refurbished by third parties – constitute a "restraint of trade" in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Second, SIS alleges that Intuitive violated Section 2 of the Sherman Act, 15 U.S.C. § 2, through a series of exclusionary tactics, including "tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots," sending cease and desist letters when customers attempted to have their EndoWrist instruments refurbished by third parties, and redesigning its instruments to prevent third-party services from resetting the use counter on its instruments. Finally, SIS brings an attempted monopolization claim under Section 2 based on this same conduct.

SIS also asserts that Intuitive violated the Lanham Act by making false and misleading statements to its customers. 15 U.S.C. § 1125. SIS raises two Lanham Act claims based on two sets of Intuitive's alleged statements: that SIS's services require FDA approval and that SIS's services violate Intuitive's intellectual property rights.

Judge Chhabria denied Intuitive's Motion to Dismiss (ECF 70), and Intuitive filed an answer to the complaint that included the affirmative defense of unclean hands (ECF 75). Intuitive's unclean hands defense alleges in part that "SIS's claims are barred, in whole or in part,

United States District Court
Northern District of California

8

1   by the doctrine of unclean hands because SIS has acted contrary to applicable FDA

2   regulations . . . ."  ECF 75 at 39 ("First Defense").  In addition, Intuitive alleges five counterclaims

3   against SIS, including of an unfair competition and false advertising claim under the Lanham Act

4   (Count 1) and its derivative claims for violation of California's Unfair Competition Law (Count

5   2), violation of California's False Advertising Law (Count 3), and common law unfair competition

6   (Count 4).[5]  The counterclaims, like the unclean hands defense, rely on allegations that "SIS has

7   made numerous false and misleading statements, including . . . that the 'repair' and/or resulting

8   instruments do not require clearance by the FDA[.]"  *Id.* at ¶¶ 85, 93, 99, 102.

9   　　　The instant motions were filed starting in March 2023.  In the first brief filed, SIS does not

10  move for summary judgment on its own claims; rather, it seeks summary judgment regarding

11  Intuitive's counter claims and single affirmative defense – both sides aver that the resolution of

12  whether FDA clearance is necessary for SIS's servicing of EndoWrists will resolve the motion.

13  SIS moves for partial summary judgment in its favor on Intuitive's affirmative defense of unclean

14  hands, as well as Intuitive's Lanham Act counterclaim and its three derivative state law

15  counterclaims.  Intuitive's cross-motion seeks summary judgment on the entirety of SIS's

16  complaint.

17  　　　　　　　　　　　　**LEGAL STANDARD**

18  　　　A party may move for summary judgment on a "claim or defense" or "part of . . . a claim

19  or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is no genuine

20  dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *Id.*

21  The party seeking summary judgment bears the initial burden of informing the court of the basis

22  for its motion, and of identifying those portions of the pleadings and discovery responses that

23  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

24  317, 323 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v.*

25

26

27  _____

    [5] Intuitive's fifth counterclaim alleges tortious interference with contract.  Because neither party
28  specifically seeks adjudication of that counterclaim through the briefing underlying this order, the
    Court does not address it.

United States District Court
Northern District of California

9

1    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there

2    is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

3         Where the moving party will have the burden of proof at trial, it must affirmatively

4    demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun*

5    *v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving

6    party will bear the burden of proof at trial, the moving party may carry its initial burden of

7    production by submitting admissible "evidence negating an essential element of the nonmoving

8    party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have

9    enough evidence of an essential element of its claim or defense to carry its ultimate burden of

10   persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105-

11   06 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25 (moving party can prevail merely by

12   pointing out to the district court that there is an absence of evidence to support the nonmoving

13   party's case).

14        When the moving party has carried its burden, the nonmoving party must respond with

15   specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P.

16   56(c), (e). The asserted disputed facts must be material – the existence of only "some alleged

17   factual dispute between the parties will not defeat an otherwise properly supported motion for

18   summary judgment." *Anderson*, 477 U.S. at 247-48.

19        When deciding a summary judgment motion, a court must view the evidence in the light

20   most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255;

21   *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, when a non-moving

22   party fails to produce evidence rebutting defendants' showing, then an order for summary

23   adjudication is proper. *Nissan Fire*, 210 F.3d at 1103 ("If the nonmoving party fails to produce

24   enough evidence to create a genuine issue of material fact, the moving party wins the motion for

25   summary judgment."). The court's function on a summary judgment motion is not to make

26   credibility determinations or weigh conflicting evidence with respect to a disputed material fact.

27   *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

28

United States District Court
Northern District of California

10

2-SER-356

(151 of 239), Page 151 of 289
Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 151 of 239
Case 3:21-cv-03496-AMO   Document 204 *SEALED*   Filed 03/31/24   Page 11 of 19

**DISCUSSION**

SIS seeks partial summary judgment as to Intuitive's four false advertising counterclaims as well as its affirmative defense of unclean hands.  SIS does not seek summary judgment as to the causes of action it presents in its own operative complaint.  Intuitive, on the other hand, seeks summary judgment in its favor as to all the causes of action in SIS's operative complaint.  The Court addresses the arguments presented in SIS's motion first.

**I.    SIS's MOTION FOR SUMMARY ADJUDICATION**

SIS argues that those of Intuitive's counterclaims and affirmative defenses that rely on establishing a violation of the FDCA should all be dismissed.  Intuitive's Lanham Act counterclaim and derivative state law claims are all premised on the alleged falsity of SIS's statements that "repaired" EndoWrist instruments do not require clearance by the FDA.  The Court first addresses Intuitive's false advertising counterclaims before turning to the affirmative defense of unclean hands.

**A.    Intuitive's False Advertising Counterclaims[6]**

Intuitive's unfair competition and false advertising claim under the Lanham Act (Count 1) and its derivative state law claims (Counts 2-4) all require Intuitive to establish that SIS made a false and misleading statement to its customers.  *See, e.g.*, *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(1)(B); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).  Intuitive alleges in part that "SIS has made numerous false and misleading statements, including . . . that the 'repair' and/or resulting instruments do not require clearance by the FDA."  ECF 75 ¶ 85.  SIS argues that its statements about not needing FDA clearance cannot be deemed false or misleading where FDA has not taken any enforcement action and has avoided defining whether SIS's services constitute remanufacturing, which would require Section 510(k) clearance.  Essentially, Intuitive asks the Court to determine whether SIS's aftermarket EndoWrist-related services required Section 510(k)

---

[6] The Court's analysis and conclusion in this section are substantially similar to the analysis and discussion in the Court's order in the related case, *In Re: Da Vinci Surgical Robot Antitrust Litigation*, N.D. Cal. Case No. 3:21-cv-03825-AMO, also entered today.

11

United States District Court
Northern District of California

(152 of 239), Page 152 of 289
Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 152 of 239
Case 3:21-cv-03496-AMO   Document 204 *SEALED*   Filed 03/31/24   Page 12 of 19

clearance from the FDA.  However, this query is problematic because "[t]he FDCA [(Food, Drug

and Cosmetic Act)] leaves no doubt that it is the Federal Government rather than private litigants

who are authorized to file suit for noncompliance with the medical device provisions." *Buckman*

*Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001).

Indeed, a private action brought under the Lanham Act may not be pursued when it

requires litigating an alleged underlying FDCA violation where the FDA has not itself concluded

that a violation exists.  *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (affirming

grant of summary judgment for defendant on Lanham Act false advertising claim where FDA had

not taken a position on defendant's laser's need for Section 510(k) clearance, and claim was based

on defendant allegedly misrepresenting that its laser had received FDA clearance).  To be sure, the

FDCA does not preclude all Lanham Act claims.  *See POM Wonderful LLC v. Coca-Cola Co.*,

573 U.S. 102, 120 (2014) (permitting a Lanham Act claim challenging FDA-regulated food label

as misleading).  However, courts have consistently precluded private actions which require

establishing a violation of the FDCA.[7]  *See, e.g., Amarin Pharma, Inc. v. International Trade*

*Commission*, 923 F.3d 959, 968 (Fed. Cir. 2019) (citing *PhotoMedex*, 601 F.3d at 924, 928)

(finding that Lanham Act claim could not stand where it was "based on proving violations of the

FDCA and where the FDA has not taken the position that the articles at issue do, indeed, violate

the FDCA.").

Intuitive's Lanham Act and derivative state law counterclaims ask the Court to determine

whether the aftermarket EndoWrist services constituted "remanufacturing" and whether SIS

violated 21 C.F.R. § 807.81 by offering its services to consumers without first obtaining Section

510(k) clearance.  However, the FDA has expressly disclaimed concluding that a violation exists,

and it has taken no final position on the need for 510(k) clearance here.  *See, e.g.*, Cahoy Decl. Ex.

---

[7] In his order denying Intuitive's motion to dismiss earlier in this case, Judge Chhabria concluded
that *POM Wonderful* had "effectively overruled" *PhotoMedex. Surgical Instrument Serv. Co., Inc.
v. Intuitive Surgical, Inc.*, 571 F. Supp. 3d 1133, 1142 (N.D. Cal. 2021).  However, that no longer
appears to be the case, as the Ninth Circuit has restated its continued fidelity to the principle that
the FDA maintains exclusive enforcement authority over the FDCA.  *Nexus Pharms., Inc. v. Cent.
Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) (citing *PhotoMedex*, 601
F.3d at 926-28).

12

37 (email from FDA Team Lead clarifying that his message was not an "official regulatory evaluation" and did "not represent the formal position of FDA"). Despite Intuitive's repeated entreaties for the Court to find that informal communications made FDA's position clear, that is not so.[8] The Court, as others before it, declines Intuitive's invitation to step into the FDA's shoes and determine whether SIS's services require 510(k) clearance. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538, at *5 (M.D. Fla. Aug. 10, 2022); *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF, 2019 WL 8063988, at *2-3 (N.D. Fla. Nov. 14, 2019) (finding this determination more properly within the exclusive purview of FDA). Because FDA has not determined whether 510(k) clearance is necessary for SIS's aftermarket EndoWrist services, Intuitive may not proceed with its claims premised on SIS's representations that Section 510(k) clearance was not necessary, as that requires litigating an alleged FDCA violation. Intuitive's counterclaims, all of which rely on regulatory interpretation left to the FDA in the first instance, thus fail as a matter of law.

Although presented as causes of action relying on different legal authority, Intuitive's Lanham Act counterclaim, along with its derivative state law claims, constitute an attempt to enforce the FDCA and its implementing regulations. Private parties have no such enforcement authority, and the counterclaims that rely on proving a violation of the FDCA cannot proceed. Therefore, the Court GRANTS SIS's motion for summary adjudication on Intuitive's false advertising counterclaims.

### B. Unclean Hands Defense

SIS also moves for summary judgment on Intuitive's unclean hands defense. The doctrine of unclean hands is a "maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). Unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173

---

[8] This Court is in good company concluding that these informal communications do not constitute a final FDA action. *See Restore Robotics*, 2019 WL 8063988, at *2-3; *Rebotix Repair*, 2022 WL 3272538, at *5.

(154 of 239), Page 154 of 289
Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 154 of 239
Case 3:21-cv-03496-AMO   Document 204 *SEALED*   Filed 03/31/24   Page 14 of 19

1   (9th Cir. 1989). The doctrine "requires a finding of inequitableness or bad faith." *Rent-A-Ctr.,*

2   *Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 602 (9th Cir. 1991). Further, it

3   "requires balancing the alleged wrongdoing of the plaintiff against that of the defendant."

4   *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015). Though the party

5   against whom unclean hands is enforced need not have acted unlawfully, the court may only apply

6   the doctrine where the party committed a "willful act concerning the cause of action which

7   rightfully can be said to transgress equitable standards of conduct." *Precision Instrument Mfg.*

8   *Co.*, 324 U.S. at 815.

9        SIS argues that the defense of unclean hands in the Lanham Act context requires a showing

10   that the other party's conduct was "inequitable" or "unconscionable," neither of which applies to

11   its conduct here. SIS contends that it cannot have "willfully" violated FDA regulations where the

12   FDA has not clarified what constitutes remanufacturing and has avoided deciding whether SIS's

13   EndoWrist services constitute remanufacturing. Intuitive counters that there is no ambiguity, that

14   FDA has consistently communicated that SIS's EndoWrist services constitute remanufacturing for

15   which Section 510(k) clearance is necessary.

16        The Court agrees with SIS. Given the conclusion reached in the section above, the Court

17   cannot find that SIS acted wrongfully by providing aftermarket EndoWrist services. The evidence

18   demonstrates that SIS acted with good faith in its EndoWrist services. Since the time it entered

19   the EndoWrist service market, SIS operated under a reasonable interpretation of the relevant

20   regulations and made its position clear: "The da Vinci® EndoWrist® is a 'multi-use' medical

21   device. Multi-use devices, such as endoscopic instruments, have always been eligible for repair."

22   JVH Decl. Ex. 21 at 6 (SIS095124). As explained by SIS at the time, "The FDA does not

23   regulate, nor certify, repairs. The FDA regulates third party reprocessing companies and single-

24   use devices only." *Id.* at 2 (SIS095120). Although Intuitive presents ample evidence that it

25   disagrees with SIS's interpretation of the relevant regulations in finding that its service constituted

26   repairs (*see, e.g.*, Cahoy Decl. 10 ¶ 176, Ex. 65 at 18), Intuitive does not provide any evidence

27   establishing that SIS acted with unclean hands. Therefore, the Court GRANTS SIS's motion for

28   summary adjudication on Intuitive's affirmative defense of unclean hands.

United States District Court
Northern District of California

(155 of 239), Page 155 of 239

Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 155 of 239
Case 3:21-cv-03496-AMO   Document 204 *SEALED*   Filed 03/31/24   Page 15 of 19

## II. INTUITIVE'S MOTION FOR SUMMARY JUDGMENT

Because the discussion in the preceding section informs the merits of SIS's Lanham Act claim against Intuitive, the Court considers Intuitive's motion for judgment on that claim next. The Court then turns to Intuitive's related arguments regarding SIS's alleged antitrust injury. The Court finally analyzes the merits of Intuitive's challenge to SIS's antitrust claims.

### A. SIS's Lanham Act Claim

SIS's Lanham Act Claim, similar to the Intuitive claim discussed above, is premised on the alleged falsity of statements regarding the necessity of Section 510(k) clearance for aftermarket EndoWrist services. SIS's Lanham Act claim rests on its assertion that Intuitive, in correspondence with SIS customers, "misrepresented that SIS's services are contrary to FDA approvals of the EndoWrist products." ECF 1 ¶¶ 123-24; *see also* Cahoy Decl. Exs. 82, 83. The Court found above that Intuitive's Lanham Act claim against SIS could not stand because it would require deciding whether Section 510(k) clearance was required, which would constitute private enforcement of the FDCA. The same reasoning applies to SIS's Lanham Act claim against Intuitive. The Court cannot resolve this issue as a matter of law, and the Court therefore dismisses SIS's Lanham Act claim against Intuitive.

### B. Antitrust Injury

Intuitive seeks summary adjudication on the issue of whether SIS suffered antitrust injury. SIS avers that it suffered antitrust injury by its exclusion from the market for EndoWrist repair and replacement – there was substantial demand for SIS's services until Intuitive threatened to shut down hospital robot programs, among other allegedly anticompetitive conduct. *See, e.g.*, JVH Decl. Ex. 20 44:7-45:22; Ex. 19 at 50:10-51:24 (describing hospital demand for the EndoWrist repair service as "monumental"). Intuitive argues here that the robot producer's conduct was not the reason that SIS was excluded from the EndoWrist repair and replacement market; rather, SIS was excluded from that market because applicable regulations required SIS to obtain agency clearance before offering such services. Said another way, Intuitive contends that it was SIS's failure to first obtain Section 510(k) clearance from the FDA that restrained SIS's aftermarket

2-SER-361

1    EndoWrist servicing business, and any conduct by Intuitive thus did not proximately cause

2    antitrust injury to SIS.

3           In the Ninth Circuit, a plaintiff must satisfy four requirements to show antitrust injury:

4    "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes

5    the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *City

6    of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (citation omitted).  Antitrust

7    injury cannot be proved where the claimed injury "is caused by a regulatory scheme rather than by

8    the defendant's actions, as it is "beyond fair dispute" that "a regulatory or legislative bar can break

9    the chain of causation in an antitrust case." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser

10   Class*, 868 F.3d 132, 165-66 (3d Cir. 2017).  For example, in *Modesto Irrigation Dist. v. Pac. Gas

11   & Elec. Co.*, 309 F. Supp. 2d 1156, 1170 (N.D. Cal. 2004), *aff'd sub nom. Modesto Irrigation

12   Dist. v. Pac. Gas & Elec. Co.*, 158 F. App'x 807 (9th Cir. 2005), the plaintiff, an irrigation district,

13   complained that Pacific Gas & Electric had interfered with its attempt to offer competing electric

14   service in Pittsburg, California.  The district court held that the plaintiff could not prove antitrust

15   injury because it "possessed neither the legal right, nor the necessary [regulatory agency]

16   permission to expand its services into Pittsburg." *Modesto Irrigation Dist.*, 309 F. Supp. 2d at

17   1170.  And "[b]ecause [the plaintiff's] conduct was unlawful by its own terms, PG&E's response

18   – however anti-competitive or seemingly monopolistic – could not inflict [a] cognizable antitrust

19   injury." *Id.*

20          Intuitive analogizes to *Modesto Irrigation District*, positing that SIS is barred from

21   providing aftermarket EndoWrist services without Section 510(k) clearance in the same way that

22   the plaintiff utility company faced a regulatory bar from offering its services in Pittsburg,

23   California.  However, as discussed above, this Court will not permit Intuitive to seek private

24   enforcement of the FDCA, an issue upon which Intuitive's argument against injury causation rests.

25   In contrast to *Modesto Irrigation District*, Plaintiff SIS has not clearly engaged in unlawful

26   conduct and accordingly may still seek to prove that Intuitive's anticompetitive conduct caused its

27   antitrust injury at trial.  Therefore, the Court DENIES Intuitive's motion for summary judgment

28   on this basis.

United States District Court
Northern District of California

### C.   Antitrust Claims

In addition to seeking judgment as a matter of law on antitrust injury, Intuitive asks the Court to grant it judgment on the merits of SIS's antitrust claims.  While a threshold step in any antitrust analysis is to accurately define the relevant market, which refers to "the area of effective competition," *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (citation omitted), the parties here do not appear to dispute the market at issue, nor does SIS assert that the alleged restraints here are *per se* unreasonable.  Their arguments focus on whether the parties can satisfy the respective burdens imposed by the rule of reason.  *See Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022).

The rule of reason calls on courts to conduct a fact-specific assessment of market power and structure to assess a restraint's actual effect on competition.  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).  Under the rule of reason's framework:

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market.  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint.  If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Am. Express*, 585 U.S. at 541 (citing 1 Kalinowski § 12.02[1]; P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017); *Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2nd Cir. 1993)).

Intuitive only challenges SIS on the second and third steps.  The Court considers the arguments presented in the parties' briefing regarding the second step of the rule of reason analysis and, in so doing, assumes without deciding that SIS can carry its initial burden of showing the anticompetitive effects of Intuitive's conduct for purposes of this discussion.

A procompetitive rationale is a "nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal."  *Qualcomm*, 969 F.3d at 991.  It is not enough that "conduct 'has the effect of reducing consumers' choices or increasing prices to consumers.'"  *Id.* at 990 (quoting *Brantley v.*

United States District Court
Northern District of California

17

*NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)).  For example, the Ninth Circuit affirmed a finding that Apple "offered non-pretextual, legally cognizable procompetitive rationales for its" anticompetitive conduct, including restrictions it imposed to promote user privacy and security.  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985, 987-89 (9th Cir. 2023), cert. denied, 144 S. Ct. 681 (2024), and cert. denied, 144 S. Ct. 682 (2024).

Intuitive argues that the antitrust laws do not penalize a defendant that had a "reasonable basis to conclude that its [challenged] actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority."  *Phonetele, Inc. v Amer. Tel. & Tel. Co.*, 664 F.2d 716, 737-38 (9th Cir. 1981); *see also In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 12 (1st Cir. 2020) (regulatory justification defense can defeat antitrust claim if defendant's decision was reasonable and made in good faith).  Intuitive asserts that it had a reasonable basis for concluding that EndoWrist use limits were necessary, a conclusion affirmed by the FDA in its initial approval of the instruments.  The same reasoning underlies Intuitive's efforts to ensure that the use limits were not circumvented, it contends, including letters sent to customers and the FDA, and thus that it had a reasonable basis to act, satisfying the second step.

Intuitive's argument regarding its "legitimate justifications" for anticompetitive conduct misstates what the rule of reason requires and thus short-circuits.  To the extent Intuitive argues that its anticompetitive behavior arose from a good-faith attempt to ensure patient safety and compliance with FDA regulations, it has failed to provide a nonpretextual "procompetitive rationale."  *See Qualcomm*, 969 F.3d at 991.  Intuitive claims that its conduct related to the EndoWrist market has certain benefits, including ensuring product reliability and minimizing risks to patients.  Rosa Decl. ¶¶ 28-33 (describing EndoWrist testing to mitigate instrument failure).  Although patient safety appears to be an important rationale for the manufacture of surgical robots, SIS argues that such justification amounts to mere pretext.  Indeed, SIS proffers conflicting evidence regarding the patient safety justifications for Intuitive's use limits.  *See* JVH Decl., Ex. 11 (Mahal Report) ¶¶ 20-21, 53-66; JVH Decl. Ex. 18 (Parnell Report) ¶¶ 22, 92-129 (contradicting safety justification for EndoWrist use counter).  The directly conflicting evidence regarding the potential benefits of Intuitive's conduct is best left for a jury to weigh.  *See Nat'l*

United States District Court
Northern District of California

1  *Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 97 (2021) (providing that the rule of reason

2  allows for a factfinder to holistically weigh "all of the circumstances of a case in deciding whether

3  a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.").

4  Accordingly, the Court finds that Intuitive is not entitled to summary adjudication on the issue of

5  its procompetitive rationale.

6      Because Intuitive fails to identify any nonpretextual procompetitive justifications, the

7  Court does not reach the issue of whether SIS can demonstrate the existence of less restrictive

8  alternatives.  Intuitive is not entitled to summary judgment on SIS's antitrust claims.

9  **CONCLUSION**

10      For the foregoing reasons, the Court **GRANTS in part and DENIES in part** SIS's

11  motion.  Intuitive's false advertising counterclaims, including Counts One through Four are

12  **DISMISSED**.  Additionally, the Court **GRANTS** SIS's motion for summary adjudication on

13  Intuitive's affirmative defense of unclean hands.  The Court **GRANTS in part and DENIES in**

14  **part** Intuitive's motion.  SIS's Lanham Act claim is **DISMISSED**.  SIS's antitrust claims will

15  proceed to trial.

16      The Court resolves Intuitive's several motions to exclude expert testimony as well as the

17  parties' several administrative motions to seal in separate orders.

18      This Order is filed under seal.  The parties shall meet and confer with each other and any

19  appropriate non-parties, and on or before April 26, 2024, submit a new proposed redacted version

20  of this Order that incorporates the Court's rulings on the administrative motions to seal.

21      **IT IS SO ORDERED.**

22  Dated: March 31, 2024

24  **ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

19

2-SER-365

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Telephone: (408) 477-9690

KAREN HOFFMAN LENT (*Pro Hac Vice*)
karen.lent@skadden.com
MICHAEL H. MENITOVE (*Pro Hac Vice*)
michael.menitove@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:  (212) 735-3000
Facsimile:   (212) 735-2040

MICHAEL S. BAILEY (*Pro Hac Vice*)
michael.bailey@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:  (202) 371-7000
Facsimile: (202) 393-5760

*Attorneys for Defendant*
INTUITIVE SURGICAL, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | ) ) ) | CASE NO.: 3:21-cv-03496-VC |
| Plaintiff, | ) ) ) | **DEFENDANT INTUITIVE SURGICAL, INC.'S ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIMS** |
| v. | ) | |
| INTUITIVE SURGICAL, INC., | ) ) | Courtroom: 4 – 17th Floor Judge: The Honorable Vince Chhabria |
| Defendant. | ) ) ) ) | Complaint Filed: May 10, 2021 |
| _____ | ) ) ) ) | |

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS          CASE NO.: 3:21-cv-03496-VC

**2-SER-366**

### DEFENDANT'S ANSWER
### AFFIRMATIVE DEFENSE AND COUNTERCLAIMS

### DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSE

Defendant Intuitive Surgical, Inc. ("Intuitive") hereby sets forth its Answer and

Affirmative Defense to the Complaint ("Complaint") filed by Plaintiff Surgical Instrument

Service Company, Inc. ("SIS").  Except as otherwise expressly set forth below, Intuitive denies

knowledge or information sufficient to form a belief as to the truth or falsity of each and every

allegation contained in the Complaint.  Any allegation, averment, contention or statement in the

Complaint not specifically and unequivocally admitted is denied, including any statement in a

heading.  Intuitive preserves all objections regarding the admissibility of any allegations or

statements made in the Complaint or in this Answer and Affirmative Defense.  Intuitive responds

to each of the paragraphs of the Complaint as follows:

### RESPONSE TO "INTRODUCTION"

**Paragraph 1**: SIS has 50 years of experience servicing surgical instruments and equipment ranging from simple devices such as forceps and scalpels to complex electromechanical devices such as flexible video endoscopes, powered orthopedic devices, and surgical video systems.  SIS employs exhaustive inspection and repair procedures to ensure that previously used surgical instruments are only returned to the operating room in accordance with specifications.  SIS's services save health care providers and patients millions of dollars a year, reducing the per-surgery cost of procedures without compromising instrument operation or patient safety.  SIS is a trusted nationwide partner for hospitals, health care systems, and group purchasing organizations ("GPOs"), including in this District

       1.      Intuitive denies the allegations in paragraph 1 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 2**: Since the late 1990's, defendant Intuitive has been the leading provider of robotic surgery systems for minimally invasive soft tissue surgeries.  In contrast to operating directly on a patient, the surgeon using Intuitive's system remotely operates a multi-arm "da Vinci" surgical robot from a console that receives video of the surgical site and includes means for precisely controlling the movement and operation of surgical tools known as EndoWrists.  EndoWrists include traditional surgical tools such as forceps and scalpels and are attached to the robotic arms based on the type of surgery to be performed.  The robotic arms include motors that control cables within the EndoWrist in response to the surgeon's inputs, allowing precise multi-axis movement of the "wrist" of the surgical tool that is not possible in traditional surgeries.

1

2.      Intuitive admits that it has been a provider of robotic-assisted surgical systems for minimally invasive soft tissue surgeries since the 1990s.  Intuitive admits that the surgeon using Intuitive's robotic-assisted surgical system, known as a da Vinci Surgical System ("da Vinci"), operates a multi-arm system from a console that receives video of the surgical site and includes means for precisely controlling the movement and operation of surgical tools, many of which incorporate EndoWrist technology.  Intuitive admits that surgical instruments that have EndoWrist technology are called "EndoWrists," some of which include forceps and scalpels and are attached to da Vinci robotic arms based on the type of surgery to be performed.  Intuitive admits that the robotic arms include motors that control cables within the EndoWrist in response to the surgeon's inputs, allowing precise multi-axis movement of the "wrist" of the surgical tool that is not possible in all types of surgeries based on the type of surgery to be performed. Intuitive otherwise denies the allegations in paragraph 2.

**Paragraph 3**: Intuitive has monopoly power in the relevant markets of surgical robots for minimally invasive surgeries, the instruments used in such surgeries, and the servicing of those surgical robots, with a 99%+ market share.  In the early 2000's, Intuitive's Form 10-K filings noted a use counter to limit the number of operations performed with EndoWrist instruments, and acknowledged its strategy to "sell the instrument for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure or per-hour basis."  As Intuitive has since gained and exercised monopoly power in the relevant markets, this strategy has become extremely profitable.  Although revenue from the da Vinci robots initially exceeded revenue from instrument and accessory sales, by fiscal year 2013 Intuitive's revenues from instruments and accessories surpassed da Vinci robot revenue.  **By** fiscal year 2019 instrument and accessories revenue exceeded $2.4 billion, or more than a $1 billion more than sales of da Vinci systems.  Although Intuitive does not break out its gross profit for instruments alone, its gross profit on instruments and da Vinci systems is over 70%.

3.      Intuitive admits that its 10-K for the year ended December 31, 2000 stated that Intuitive "can sell the instruments for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure basis or per-hour basis," but otherwise denies the allegations in the second sentence of paragraph 3.  Intuitive admits that revenue from sales of da Vincis initially exceeded revenue from instrument and accessory sales, and by fiscal year 2013,

2

Intuitive's revenues from instruments and accessories surpassed revenue from da Vinci sales, but otherwise denies the allegations in the fourth sentence of paragraph 3. Intuitive admits that in fiscal year 2019, instrument and accessories revenue exceeded $2.4 billion, and sales of da Vincis were more than $1 billion, but otherwise denies the allegations in the fifth sentence of paragraph 3. Intuitive admits that its gross profit on instruments and da Vincis is 70.2% of product revenue, but otherwise denies the allegations in the sixth sentence of paragraph 3. Intuitive denies the allegations in the first and third sentences of paragraph 3.

**Paragraph 4**: In connection with the purchase or lease of da Vinci Surgical products, Intuitive requires customers to enter into a Terms and Conditions Agreement ("Sales Agreement") and a Use, License and Service Agreement ("ULSA"). In connection with the agreements required to purchase or lease an Intuitive robotic Surgical System, Intuitive demands that customers further agree to a limited license for the use of EndoWrist instruments. The limited license expires once an EndoWrist instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument. Intuitive's ULSA prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrist instruments, whether before or after the limited use license has expired. Further, if a customer has or attempts to have an EndoWrist instrument repaired, refurbished or reconditioned, Intuitive has threatened to terminate the entire Use, License and Service Agreement with the customer immediately upon written notice, and any warranties applicable to the da Vinci robotic Surgical System will become void. Intuitive has advised its customers that should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at a customer's site for a service call, that the da Vinci robotic Surgical System has been used with EndoWrist instruments refurbished or modified by any unauthorized third party, Intuitive will no longer provide any service for the customer's entire robotic system.

4.      Intuitive admits that customers enter into a "Sales, License and Service Agreement" ("SLSA") with Intuitive when they purchase or lease a da Vinci and that through this agreement customers agree to a limited license for the use of EndoWrists, but otherwise denies the allegations in the first and second sentences of paragraph 4. Intuitive admits that the limited license to use an EndoWrist expires once the instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument, but otherwise denies the allegations in the third sentence of paragraph 4. Intuitive admits that the

3

SLSA prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrists at any time, but otherwise denies the allegations in the fourth sentence of paragraph 4. Intuitive admits that it has informed customers of their contractual obligations and safety concerns related to the use of unauthorized third parties to repair, refurbish or recondition EndoWrists, but otherwise denies the allegations in the fifth and sixth sentences of paragraph 4.

**Paragraph 5**: Plaintiff SIS has detailed procedures for servicing used EndoWrists to original specifications and returning them to service. These procedures include disassembly of the EndoWrist, inspection of all components, adjustment of components as necessary, confirming all movements, and setting a counter to Intuitive's original counter value. While these procedures are extensive and return the EndoWrist to original performance specifications, the cost to the hospital is a fraction of what Intuitive charges to buy a new EndoWrist. In 2019 and 2020, SIS entered into contracts and was in discussion for other contracts to provide EndoWrist repair services to numerous hospitals, health care systems, and GPOs. The cost savings were so substantial that one of the nation's largest health care systems awarded SIS's EndoWrist repair program a prestigious annual award for cost savings. Revenues for SIS, and savings to hospitals and patients, were anticipated to be in the tens if not hundreds of millions of dollars.

5.      Intuitive denies the allegations in the first, second, fourth, fifth and sixth sentences of paragraph 5 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein. Intuitive denies the allegations in the third sentence of paragraph 5.

**Paragraph 6**: When Intuitive discovered that its customers were using SIS's services, it immediately leveraged its anti-competitive agreements and monopoly power to crush this threat to its supra-competitive EndoWrist profitability. Intuitive's agreements with hospitals include numerous restrictive terms that allow Intuitive to render the da Vinci robots effectively inoperable, and it threatened to exercise those terms against hospitals that used SIS's services. Intuitive also made misleading statements that use of refurbished EndoWrists would violate FDA requirements and intellectual property rights.

6.      Intuitive denies the allegations in paragraph 6.

**Paragraph 7**: Despite the massive savings to hospitals and patients from SIS's EndoWrist program, SIS's customers and potential customers had no choice but to capitulate to Intuitive's threats. Because of Intuitive's monopoly power in minimally invasive surgical robots, the instruments for those robots, and the servicing of those robots, there are no realistic alternative suppliers in those relevant markets. Health care providers have made massive capital investments in da Vinci robots, surgeons are specifically trained to perform surgery with those

4

robots, and a large number of patients choose da Vinci robotic surgeries despite a significantly higher out-of-pocket cost. To lose access to existing da Vinci robots would not only waste an expensive capital investment, but would effectively foreclose hospitals and surgeons from performing certain types of surgeries.

7.      Intuitive denies the allegations in paragraph 7.

**Paragraph 8**: Intuitive's anti-competitive conduct cannot be justified by any purported safety or regulatory requirements. All components of the EndoWrists are medical-grade materials that are capable of many times more uses than permitted by Intuitive's unilaterally programmed counter. SIS's services ensure that the inspected or repaired EndoWrists meet all original specifications, and SIS sets the instrument counter to the original value provided by Intuitive. In sum, the only purpose of Intuitive's anti-competitive conduct is to maintain supra-competitive "per-procedure" EndoWrist pricing. By leveraging its monopoly power and anti-competitive agreements in this manner, Intuitive has violated the Sherman Act's prohibitions on monopoly, attempted monopoly, exclusive dealing and tying, and the Lanham Act's prohibition on unfair competition.

8.      Intuitive denies the allegations in third sentence of paragraph 8 because it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

therein. Intuitive denies the allegations in the first, second, fourth and fifth sentences of

paragraph 8.

**Paragraph 9**: Intuitive is the dominant supplier of robotic Surgical Systems for minimally invasive soft tissue surgeries. Intuitive essentially has no competition in this market. Additionally, Intuitive is the dominant supplier of instruments used with minimally invasive soft tissue robots and the dominant supplier of servicing for the robots — essentially having no competition in either of these markets as well.

9.      Intuitive denies the allegations in paragraph 9.

**Paragraph 10**: Intuitive has used its monopoly power in the EndoWrist instrument replacement aftermarket, as well as in the servicing of surgical robots, to engage in a variety of anticompetitive practices. These exclusionary practices essentially prevent hospitals, health care systems, and GPO's from having access to competitors that offer to repair and refurbish EndoWrist instruments which have been previously used.

10.     Intuitive denies the allegations in paragraph 10.

**Paragraph 11**: Intuitive wields its monopoly power in the market for robotic soft tissue surgery systems to coerce hospitals, health care systems, and GPO's to act in ways that have anticompetitive effects thus harming competition. Such coercion is backed up by Intuitive's threats to withhold technical support and servicing for the robotic surgery systems purchased by hospitals, health care systems, and GPO's and to deny those customers access to additional

and/or replacement EndoWrist instruments.

11.      Intuitive denies the allegations in paragraph 11.

## RESPONSE TO "PARTIES"

**Paragraph 12**: Plaintiff Surgical Instrument Service Company, Inc. is an Illinois corporation with a principal place of business at 151 N. Brandon Drive, Glendale Heights, Illinois.

12.      Intuitive denies the allegations in paragraph 12 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 13**: Defendant Intuitive Surgical, Inc. is a Delaware corporation with a principal place of business at 1020 Kifer Road, Sunnyvale, California.

13.      Intuitive admits that it is a Delaware corporation with its executive offices at 1020

Kifer Road, Sunnyvale, California, but otherwise denies the allegations in paragraph 13.

## RESPONSE TO "JURISDICTION AND VENUE"

**Paragraph 14**: Jurisdiction - This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15, 22, and 1121.  Defendant has been engaged in interstate commerce during all relevant times of the Complaint.

14.      Intuitive admits the allegations in paragraph 14.

**Paragraph 15**: Jurisdiction - This Court has personal jurisdiction over Defendant due to its business activities in this District, including Defendant being headquartered in this District.

15.      Intuitive admits the allegations in paragraph 15.

**Paragraph 16**: Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).  Intuitive is headquartered in this District and a substantial part of the events giving rise to all claims occurred in this District.

16.      Intuitive admits that venue is proper and that it transacts business in this district,

but otherwise denies the allegations in paragraph 16.

**Paragraph 17**: Intradistrict Assignment – Pursuant to Civil L.R. 3-2(c), the present action is an antitrust action that is assigned on a district-wide basis.

17.      Intuitive admits the allegations in paragraph 17.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

## RESPONSE TO "I. SIS'S SURGICAL INSTRUMENT REPAIR BUSINESS"

**Paragraph 18**: Founded in 1971, SIS has been a leader in surgical instrument and equipment service and repair for 50 years.  During this time, SIS has safely and effectively serviced millions of surgical instruments for health care providers.  SIS's best-in-class team, equipment, and processes are trusted by hundreds of hospitals throughout the country, including hospitals in this District.  SIS does not merely inspect and repair surgical instruments, but also functions as an operational partner for its client hospitals, improving their operations and processes.

18.     Intuitive denies the allegations in paragraph 18 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 19**: SIS services a wide variety of instruments, ranging from relatively simple mechanical devices such as traditional standard and laparoscopic instruments to complex instruments such as electrical and pneumatic saws and drills, a wide range of optical and video endoscopes, and surgical video equipment.  Based on the FDA's Quality Systems Regulation (QSR) and current Good Manufacturing Practices (cGMP), SIS develops inspection and repair processes that ensure that any equipment returned to the hospital or surgical field will function properly.

19.     Intuitive denies the allegations in paragraph 19 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 20**: Based on this extensive experience with a wide range of surgical instruments, SIS is intimately familiar with the capabilities and lifespan of medical grade materials and components such as stainless steel, composites, and tungsten used in such devices.  SIS technicians employ industry-leading procedures for inspection, alignment, sharpening, electrical insulation test, and additional necessary steps to return instruments to the field with confidence.  Instruments that are regularly serviced by SIS are capable of dozens, hundreds, or thousands of uses over their lifetime, depending on the type of equipment and materials.

20.     Intuitive denies the allegations in paragraph 20 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 21**: SIS's services, and those like it, are essential to the safe and cost-effective operation of hospitals throughout the country.  SIS's preventative maintenance and inspection services ensure that instruments used in medical procedures and surgeries are safe.  Its repair services substantially extend the life of surgical instruments, resulting in substantial savings for health care providers and patients.

21.     Intuitive denies the allegations in paragraph 21 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

7

## RESPONSE TO "II. INTUITIVE'S DA VINCI SURGICAL ROBOTS AND ENDOWRISTS"

**Paragraph 22**: For over 20 years, Intuitive has developed and sold the "da Vinci" line of minimally invasive surgical robot systems.  A previous generation of da Vinci surgical robots that is currently being phased out is called the "Si," while the most recent "Xi" version was launched in 2014.  Additional versions of these systems also exist under the X and SP monikers.  Collectively, there are over 3,500 da Vinci robotic surgery systems employed by United States hospitals and surgery centers, and over 5,500 worldwide.

22.     Intuitive admits that it has developed and sold da Vincis used in robotic-assisted surgery for over 20 years, but otherwise denies the allegations in the first sentence of paragraph 22.  Intuitive admits that it has developed and sold different generations of da Vincis, including the da Vinci Si, da Vinci Xi, da Vinci X and da Vinci SP, and is currently phasing out the da Vinci Si, but otherwise denies the allegations in the second and third sentences of paragraph 22.  Intuitive admits that at the end of 2020, Intuitive had an installed base of 5,989 da Vincis worldwide, including 3,720 in the United States, but otherwise denies the allegations in the fourth sentence of paragraph 22.

**Paragraph 23**: The da Vinci system generally includes a multi-arm surgical robot (left), surgeon's console (center), and a vision cart (right): [images]

23.     Intuitive admits that the images in paragraph 23 show a multi-arm surgical system (left), surgeon's console (center), and a vision cart (right), but otherwise denies the allegations in paragraph 23.

**Paragraph 24**: A new da Vinci system, including the surgical robot vision cart, typically costs more than $2.0 million.  Although Intuitive has begun leasing the da Vinci system to some customers, the vast majority (> 85%) of active da Vinci systems are purchased by hospitals as capital equipment.

24.     Intuitive admits that the da Vinci generally sells for between $500,000 and $2.5 million, depending upon the model, configuration and geography, but otherwise denies the allegations in the first sentence of paragraph 24.  Intuitive admits that during the year ended

8

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

December 31, 2020, Intuitive had a total of 901 da Vincis installed at customers under operating

lease or usage-based arrangements, accounting for approximately 15% of Intuitive's total

installed base worldwide, but otherwise denies the allegations in the second sentence of

paragraph 24.

**Paragraph 25**: The instruments used in the surgical procedure are attached to the arms of the
surgical robot, and the surgical robot is positioned relative to the target surgical region of the
patient.  All of the 80+ instruments used with da Vinci robots are supplied by Intuitive under its
EndoWrist brand.  EndoWrist instruments are the only FDA-approved instruments for use with
the da Vinci systems.

25.     Intuitive admits that surgical instruments are attached to the da Vinci and that it is

positioned relative to the target surgical region of the patient, but otherwise denies the allegations

in the first sentence of paragraph 25.  Intuitive admits that it sells more than 80 different

EndoWrists used with da Vincis that have received FDA clearance, but otherwise denies the

allegations in the second and third sentences of paragraph 25.

**Paragraph 26**: In a typical procedure, a number of small incisions are made to provide the
EndoWrist surgical instruments access to the target surgical region.  A camera provides high-
definition 3D images to the surgeon at the surgeon's console and to other operating room
personnel via a large screen of the vision cart.  The surgeon directs the surgery by manipulating
controllers on the console, which allow for precision control of the robot arms and EndoWrist
instruments.  This allows the surgeon to specify movements on a scale that is at least an order of
magnitude less than the surgeon's actual hand movements at the console.

26.     Intuitive admits that one form of robotic-assisted surgery uses several incisions

for the insertion of small tools, including a magnified, high-definition 3D video camera that

shows images to the surgeons and other operating room personnel via a large screen of the vision

cart, and that the surgeon may sit at the surgeon's console and use hand controls to manipulate

the instruments, which are attached to the system by robotic arms with joints, but otherwise

denies the allegations in the first, second and third sentences of paragraph 26.  Intuitive admits

that the movements of a surgeon using a da Vinci are scaled, but otherwise denies the allegations

9

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                         CASE NO.: 3:21-cv-03496-VC

in the fourth sentence of paragraph 26.

**Paragraph 27**: The surgical instruments located at the end of the EndoWrists, such as scalpels, clamps, forceps, scissors, and needle drivers, are substantially identical to similar instruments used in traditional surgeries. In fact, Intuitive reported to the FDA that EndoWrists and traditional surgical instruments "are essentially identical... in terms of shape, size, function, and tissue effect," "are substantially equivalent in intended use and/or method of operation," and "demonstrate substantial equivalence ... in terms of safety and effectiveness." The FDA agreed and "determined the [EndoWrist] device" is "substantially equivalent" to the traditional devices, and thus granted EndoWrist 510(k) certifications based on these predicate devices. EndoWrist devices are constructed from traditional medical grade materials, such as stainless steel, composites, and tungsten cables.

27.     Intuitive admits that it represented in its 510(k) filing for Endoscopic Intuitive

Instruments and Accessories filed on January 19, 1999 that: "[t]he Intuitive Surgical Instruments

are essentially identical in terms of shape, size, function and tissue effect to the standard Class I

and II endoscopic instruments cited"; "[t]he Intuitive Surgical Endoscopic Instruments and Tools

are substantially equivalent in intended use and/or method of operation" to certain predicate

devices; with respect to clinical study data, "[a]n extensive prospectively randomized and

concurrently controlled clinical study was performed to demonstrate substantial equivalence to

the predicate devices cited in terms of safety and effectiveness"; and Intuitive "determined the

device is substantially equivalent (for the indications for use stated in the enclosure) to devices

marketed in interstate commerce prior to May 28, 1976, the enactment of the Medical Device

Amendment, or to devices that have been reclassified in accordance with the provisions of the

Federal Food, Drug, and Cosmetic Act," but otherwise denies the allegations in the second and

third sentences of paragraph 27. Intuitive admits that EndoWrists are constructed using medical

grade materials, including stainless steel, composites and tungsten cables, but otherwise denies

the allegations in the fourth sentence of paragraph 27. Intuitive denies the allegations in the first

sentence of paragraph 27.

10

**Paragraph 28**: An example of the working end of an EndoWrist Force Bipolar instrument is depicted in the image below: [IMAGE]

28.     Intuitive admits that the image in paragraph 28 shows the working end of an

EndoWrist Force Bipolar instrument.

**Paragraph 29**: Many of the EndoWrist instruments have a wide degree of motion at the working tip of the instrument, capable of rotation in multiple planes, and providing an extra level of dexterity that is not available in traditional surgical instruments. The movement at the instrument tip is controlled by tungsten cables located within the EndoWrist. These tungsten cables are actuated by internal pulleys of the EndoWrist that mechanically interface with motors within the robot arms of the da Vinci system. The motors within the robot arms in turn cause the movement of the instrument tip commanded by the surgeon by changing the position of the pulleys and tungsten cables. For the vast majority of EndoWrist instruments, these mechanical components provide for all controls of the instrument tip within the EndoWrist.

29.     Intuitive admits that many of the EndoWrists have a wide degree of motion at the

working tip of the instrument, capable of rotation in multiple planes, but otherwise denies the

allegations in the first sentence of paragraph 29. Intuitive denies the allegations in the second,

third, fourth and fifth sentences of paragraph 29.

**Paragraph 30**: EndoWrists also include an internal memory chip. The internal chip does not control the movement of the EndoWrist instrument tip, but instead stores certain information about the particular EndoWrist, including a model number specific to the type of EndoWrist, a part ID specific to the particular EndoWrist, a chip ID for the chip itself, and a counter value for the particular EndoWrist.

30.     Intuitive admits it includes a programmed memory chip in each EndoWrist

instrument but otherwise denies the allegations in the first sentence of paragraph 30. Intuitive

admits the allegations in the second sentence of paragraph 30.

**Paragraph 31**: The counter counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time. The chip also does not monitor the components of the EndoWrist for conditions that would be indicative of failure, such as the lack of response of the instrument tip to requested movement or a motor requiring excessive force to cause a desired movement of the tungsten cables.

31.     Intuitive admits that it includes a programmed memory chip in each EndoWrist

instrument that, among other functions, counts the number of uses, but otherwise denies the

11

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

allegations in the first and second sentences of paragraph 31.

**Paragraph 32**: The da Vinci robot system queries the memory chip prior to performing any operations with the particular EndoWrist instrument.  After a certain number of uses, usually limited to ten, the EndoWrist instrument is rendered non-operational, based solely on the number of times it is attached to a da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist instrument.  Without the services of providers such as SIS, the hospital has no choice but to buy a brand-new replacement EndoWrist instrument from Intuitive at full price.

32.     Intuitive admits that the da Vinci queries the programmed memory chip in the particular EndoWrist instrument prior to performing any operations, but otherwise denies the allegations in the first sentence of paragraph 32.  Intuitive admits that it has conducted rigorous testing and identified a maximum use limit for EndoWrists and that the maximum use limit ensures that instruments perform safely and reliably, but otherwise denies the allegations in the second sentence of paragraph 32.  Intuitive denies the allegations in the third sentence of paragraph 32.

## RESPONSE TO "III. SIS'S ENDOWRIST REPAIR BUSINESS"

**Paragraph 33**: Services of the type performed by SIS are permitted by the FDA.  SIS has properly repaired millions of surgical devices and instruments over its 50 years in business as an independent services operator.  After service by SIS, the surgical device or instrument is returned to the customer for its original intended use.  Indications for use are not affected, and the surgical device or instrument is returned to its original safety and effectiveness.

33.     Intuitive denies the allegations in the first, third and fourth sentence of paragraph 33.  Intuitive denies the allegations in the second sentence of paragraph 33 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 34**: SIS has created a program for the inspection and repair of EndoWrist instruments.  The SIS repair procedures include an initial disassembly and inspection, checking the mechanical operation and integrity of all mechanical components, an electrical integrity check to confirm that electrical insulation, cleaning, sharpening or alignment of the instrument tip, and a series of tests to confirm that all the movements of the instrument tip are within original specifications.  SIS also sets the counter to a value corresponding to the initial setting of a new EndoWrist instrument.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

34.     Intuitive denies the allegations in paragraph 34 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 35**: These procedures are similar to procedures that SIS has performed for decades on dozens of types of surgical instruments and medical devices of similar or greater complexity. The materials of the EndoWrist instruments are the same medical grade materials that typically last through hundreds of surgeries and autoclave cycles in other surgical instruments and in medical devices.  Particularly after completion of SIS's rigorous set of procedures, the EndoWrist instruments are suitable for many more uses, and at least a number of uses equivalent to Intuitive's originally specified usage limit.  In fact, independent testing has shown that EndoWrist instruments serviced by SIS are suitable for 50 or more uses.  Nonetheless, SIS returns the counter value to the original value specified by Intuitive.

35.     Intuitive denies the allegations in the first, second, fourth and fifth sentences of paragraph 35 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the allegations in the third sentence of paragraph 35.

**Paragraph 36**: Throughout 2019 and 2020, SIS spoke with numerous hospitals, health care systems, and GPOs regarding its EndoWrist repair and refurbishment offering.  These health care providers universally conveyed their frustration with Intuitive and its abusive business practices. In sum, Intuitive's aggressive and ever-changing tactics for extracting an exorbitant per-surgery fee for EndoWrists is financially damaging for hospitals and results in excessive costs for patients.

36.     Intuitive denies the allegations in the first and second sentences of paragraph 36 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive denies the allegations in the third sentence of paragraph 36.

**Paragraph 37**: Accordingly, SIS entered into service contracts with a number of health care providers, including health care providers in this District and a nationwide GPO.  Many of these health care providers were existing SIS customers, such that the ramp up for performing incremental services on EndoWrist instruments would be minimal.  SIS was also in late-stage negotiations with numerous additional health care providers, including a number of large health care systems.  These agreements and other likely customers would have been worth millions in annual revenue to SIS.

37.     Intuitive denies the allegations in paragraph 37 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

13

**Paragraph 38**: SIS has the experience, facilities, equipment, and personnel to perform inspection and repair for EndoWrist instruments nationwide.  Just based on its initial contracts, SIS was prepared to service at least 1,500 EndoWrists a month.  Based on potential agreements and SIS's existing experience and capacity, SIS could have easily ramped up these services to service thousands of additional EndoWrist instruments a month.

38.    Intuitive denies the allegations in paragraph 38 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 39**: SIS charges approximately 30-45% less per EndoWrist than what a hospital would have to pay to buy a replacement EndoWrist from Intuitive.

39.    Intuitive denies the allegations in paragraph 39 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 40**: While this is a substantial revenue source for SIS, these revenues pale in comparison to the cost savings to hospitals by using SIS to service EndoWrist instruments rather than throwing away and purchasing new EndoWrist instruments from Intuitive.  The vast majority of Intuitive's $2.4 billion in annual instrument sales is for replacement EndoWrists, a large proportion or majority of which would not be needed under SIS's competitive offering.  Indeed, even at its inception the cost savings for SIS's EndoWrist repair program were so substantial that one of the health care systems awarded the program its prestigious annual award for health care cost savings.

40.    Intuitive denies the allegations in the first and second sentences of paragraph 40.

Intuitive denies the allegations in the third sentence of paragraph 40 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 41**: Unfortunately for health care providers and patients, Intuitive became aware of SIS's repair program and its relationships with certain health care providers.  Intuitive immediately embarked on a scorched-earth pressure campaign to put SIS out of the EndoWrist repair business. And it worked.  Faced with coercive threats from the monopoly provider of robotic Surgical Systems to effectively disable their expensive surgical robots, all of the health care providers backed out of SIS's EndoWrist repair program.

41.    Intuitive denies the allegations in paragraph 41.

**Paragraph 42**: In just the last year, health care providers and patients have had to pay hundreds of millions of dollars for unnecessary replacement EndoWrist instruments based on Intuitive's anti-competitive conduct.  Intuitive's monopoly power and its anti-competitive use of that power are detailed in the following sections.

14

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

42.     Intuitive denies the allegations in paragraph 42.

## RESPONSE TO "IV. INTUITIVE'S MONOPOLY POWER IN THE RELEVANT MARKETS"

**Paragraph 43**: There are three relevant markets for purposes of this action: (1) the worldwide and domestic market for surgical robots used in minimally invasive soft tissue surgery; (2) the worldwide and domestic market for repair and maintenance for surgical robots used in minimally invasive soft tissue surgery; and (3) the worldwide and domestic market for replacement or repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery.

43.     Intuitive denies the allegations in paragraph 43.

**Paragraph 44**: Intuitive has monopoly power in (1) the worldwide and domestic market for surgical robots used in minimally invasive soft tissue surgery, (2) the worldwide and domestic market for repair and maintenance for surgical robots used in minimally invasive soft tissue surgery, and (3) the worldwide and domestic market for replacement or repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery, such that Intuitive is able to exclude virtually all competition and charge supra-competitive prices in those markets. With respect to the "repair" aspect of (3), Intuitive has leveraged its monopoly power in robots and instruments, and service of those robots, to prevent any repair services from existing and competing within the EndoWrist instrument aftermarket.

44.     Intuitive denies the allegations in paragraph 44.

## RESPONSE TO "(1) THE MARKET FOR SURGICAL ROBOTS USED IN MINIMALLY INVASIVE SOFT TISSUE SURGERY"

**Paragraph 45**: Intuitive's da Vinci surgical robots are primarily used in minimally invasive soft tissue surgery. Initially cleared by the FDA in 1999, the da Vinci robot was the only FDA-cleared surgical robot until 2015. As of 2015, Intuitive had over 3,500 active da Vinci surgical robots at hospitals worldwide.

45.     Intuitive admits that the da Vinci was cleared by the FDA for general

laparoscopic surgery in 2000 and is primarily used in minimally invasive soft tissue surgery, but

otherwise denies the allegations in the first and second sentences of paragraph 45. Intuitive

admits that at the end of 2015, it had an installed base of 3,597 da Vincis worldwide, but

otherwise denies the allegations in the third sentence of paragraph 45.

**Paragraph 46**: The market for minimally invasive soft tissue surgery using surgical robots is distinct from minimally invasive procedures performed without surgical robots, primarily due to the advantages that robotic surgery provides and the public perception which comes with those

15

advantages.

46.  Intuitive denies the allegations in paragraph 46.

**Paragraph 47**: In a traditional laparoscopic surgery performed without a da Vinci robot, a number of trocars are placed through the skin in the target area, and function as placeholders for the surgical instruments or other devices subsequently used to perform the surgery.  The surgical instruments and a 2-dimensional camera are then manipulated through a number of small incisions in the target area of the patient, while being manipulated or held by the surgeon(s), nurse(s), surgical assistant(s), and physical supports.  More complex laparoscopic surgeries typically require more trocars.

47.  Intuitive denies the allegations in paragraph 47 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 48**: Like laparoscopic surgery, minimally invasive robotic surgeries are advantageous over traditional open surgeries, in that the surgery is performed through a number of small incisions rather than a large incision of open surgery, resulting in decreased infection rates, faster recovery, and better patient outcomes.  But da Vinci robot surgeries also have substantial advantages over laparoscopic surgeries.  Rather than physically holding surgical instruments or attaching them to physical supports, the da Vinci robotic surgeries have precision robot arms that accurately hold instrument working tips in position without causing physical strain.  The surgeon is seated at an ergonomic console viewing a 3D image of the surgical region.  The surgeon is not limited by his or her own physical dexterity in manipulating surgical instruments, but can instead make large scale movements at the console that are translated to precision microscopic movements of surgical instruments.  Most of the EndoWrist surgical instruments have a precision-controlled full range of motion about multiple axes at the working end of the instrument, as compared to the limited range of motion and limited precision available with just the human wrist and fingers.  Based on the advantages of robotic surgery, some procedures such as prostatectomies are frequently performed by surgeons that exclusively operate using surgical robots.

48.  Intuitive admits that minimally invasive robotic surgeries may offer decreased infection rates, faster recovery and better patient outcomes as opposed to open surgery or laparoscopic surgery for certain surgical procedures, but otherwise denies the allegations in the first sentence of paragraph 48 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that the da Vinci may provide surgeons using the system with enhanced visualization, dexterity, precision and ergonomics, that the da Vinci has more "arms" than a human, that EndoWrists can achieve a greater range of

16

motion than a human hand, that the movements of a surgeon using the da Vinci are scaled, filtered and translated to the system's instruments and that the da Vinci may reduce fatigue during surgical procedures, but otherwise denies the allegations in second, third, fourth, fifth, sixth and seventh sentences of paragraph 48 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 49**: Intuitive, many hospitals, many doctors, and many patients believe that minimally invasive robotic surgeries are superior to laparoscopic surgeries. For example, Intuitive advertises that da Vinci surgeries provide "improved outcomes" and "fewer complications" than non-robotic surgery options. A number of clinical studies support the claim that minimally invasive robotic surgeries are more effective and safer than laparoscopic surgery. There is a perception among many doctors and patients that minimally invasive robotic surgeries are safer and more effective than traditional laparoscopic surgeries. Perceptions are such that Intuitive states that "100% of the top-ranked U.S. hospitals for cancer, urology, gynecology and gastroenterology diseases all use da Vinci Surgical Systems" and "100% of top-ranked U.S. hospitals own at least one da Vinci System."

49. Intuitive denies the allegations in the first and fourth sentences of paragraph 49 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein. Intuitive admits that there is medical literature that supports the claim that minimally invasive robotic surgeries may offer improved outcomes and fewer complications than alternative healthcare options for certain procedures, but otherwise denies the allegations in the second and third sentences of paragraph 49. Intuitive admits that it has stated that "100% of the top-ranked U.S. hospitals for cancer, urology, gynecology and gastroenterology diseases all use da Vinci Surgical Systems" and "100% of top-ranked U.S. hospitals own at least one da Vinci System," but otherwise denies the allegations in the fifth sentence of paragraph 49.

**Paragraph 50**: There is hardly any cross-elasticity of demand between minimally invasive robotic surgical procedures and laparoscopic procedures. The estimated per-surgery cost of the robot, instruments, equipment, and service for robotic surgery is over three times as much as the comparable costs for laparoscopic surgery, at over $3,500 versus under $1000. Most insurance plans pay the same amount for minimally invasive robotic surgery and laparoscopic surgery, such that patients pay much more out of pocket for minimally invasive robotic surgery and hospitals have lower (and sometimes negative) margins on minimally invasive robotic surgery. Despite the

17

substantial financial incentives for both patients and hospitals to prefer laparoscopic surgery, the estimated procedure volume for robotic surgery increased from 136,000 in 2008 to 877,000 in 2017 for a compounded annual growth rate of 23%. *Id*. In sum, an increase in the cost of a minimally invasive surgical robot, instruments, and service does not lead doctors or patients to choose laparoscopic or traditional surgery equipment instead, nor would a change in the cost of traditional or laparoscopic equipment affect the market for minimally invasive surgical robots, instruments, and service.

50. Intuitive denies the allegations in the first and sixth sentences of paragraph 50.

Intuitive denies the allegations in the second, third, fourth and fifth sentences of paragraph 50

because it is without knowledge or information sufficient to form a belief as to the truth of the

allegations therein.

**Paragraph 51**: Indeed, many surgeons specialize in minimally invasive robotic surgeries to the exclusion of laparoscopic surgery. According to Intuitive's annual report for fiscal year 2019, surgeons have performed approximately 1.2 million surgeries with da Vinci robots over the last 20 years. Professional and trade associations such as the Society of Robotic Surgery and the Clinical Robotic Surgery Association are focused on robotic surgery.

51. Intuitive denies the allegations in the first and third sentences of paragraph 51

because it is without knowledge or information sufficient to form a belief as to the truth of the

allegations therein. Intuitive denies the allegations in the second sentence of paragraph 51.

**Paragraph 52**: Hospitals that do not have robots such as the da Vinci robots for minimally invasive robotic surgeries are unable to recruit an entire cohort of surgeons and lose out on a large volume of potential surgeries. Because many surgeons perform almost exclusively robotic surgeries, many doctors will go to extraordinary measures to gain access to da Vinci surgical robots, including performing surgery from multiple hospitals and scheduling surgery in the middle of the evening to gain access to a da Vinci robot.

52. Intuitive denies the allegations in paragraph 52 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 53**: The market for surgical robots used in minimally invasive soft tissue surgery is distinct from the market(s) for other robotic surgeries. Intuitive is the owner of a large portfolio of patents that have blocked competitors from entering into the surgical robot market for minimally invasive soft tissue surgery. Intuitive also invests heavily to ensure that doctors and medical students are trained to use, and ultimately become dependent on, the da Vinci system.

53. Intuitive denies the allegations in the first sentence of paragraph 53. Intuitive

18

admits that it owns many patents, but otherwise denies the allegations in the second sentence of

paragraph 53.  Intuitive admits that it offers technical training relating to the use of the da Vinci

to doctors and medical staff, but otherwise denies the allegations in the third sentence of

paragraph 53.

**Paragraph 54**: Most non-Intuitive surgical robots target entirely different types of surgeries than multi-incision minimally invasive soft tissue surgery.  Stryker's Mako surgical robots, Smith+Nephew's Cori system, and Zimmer Biomet's Rosa platform are used for orthopedic surgeries such as knee and joint replacements.  Siemen's Corindus surgical robots are used for coronary and peripheral vascular procedures.  Medrobotics received FDA clearance for its Flex robot for use in natural orifice surgeries.  Titan Medical surgical robots is seeking to release a surgical robot limited to single-port surgery.  None of these robots compete with Intuitive's da Vinci robots, or in the minimally invasive surgical robot market.

54.     Intuitive denies the allegations in the first, second, third, fourth and fifth sentences

of paragraph 54 because it is without knowledge or information sufficient to form a belief as to

the truth of the allegations therein.  Intuitive denies the allegations in the sixth sentence of

paragraph 54.

**Paragraph 55**: The few companies that purport to sell robots for minimally invasive surgery have virtually no sales.  Medical device company Asensus (formerly known as TransEnterix) received FDA clearance for a minimally invasive surgical robot, the Senhance Surgical Robotic System, in October 2017.  However, this robot does not perform numerous surgeries that can be performed with a da Vinci robot, such as cardiothoracic surgery, urologic surgery, and a number of other procedures.  In 2019, Asensus shipped 4 Senhance surgical robots worldwide, none of which were in the United States.  In contrast, in 2019, Intuitive shipped 1,119 da Vinci surgical robots worldwide, including 728 in the United States.  Other medical device companies, such as Medtronic, have plans to enter the minimally invasive robot market, but they have no market share as their products are in the development stage.

55.     Intuitive denies the allegations in the first, second, third, fourth and sixth

sentences of paragraph 55 because it is without knowledge or information sufficient to form a

belief as to the truth of the allegations therein.  Intuitive admits that it reported that it in 2019, it

shipped 1,119 da Vincis worldwide, including 728 in the United States, but otherwise denies the

allegations in the fifth sentence of paragraph 55.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

**Paragraph 56**: Intuitive's long-time market dominance provides numerous advantages that prevent competition in the market for minimally invasive surgical robots. No other company that sells or has plans to sell a surgical robot has a comparable patent portfolio to the dozens of patents that cover Intuitive's da Vinci robots. Nor do they have the installed base of thousands of robots at hospitals in the United States and worldwide, or the thousands of surgeons who have undergone extensive training specific to da Vinci robots and since performed hundreds of surgeries with da Vinci robots.

56.  Intuitive denies the allegations in the first sentence of paragraph 56. Intuitive denies the allegations in the second and third sentences of paragraph 56 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 57**: As confirmed by Intuitive's market dominance, it is extremely difficult for competitors to enter the robotic surgery market. FDA clearance takes five to ten years and costs tens or hundreds of millions of dollars from concept to FDA approval, and may require premarket approval, which is much more difficult than 510(k) premarket clearance. Similar regulatory hurdles exist in other jurisdictions, such as the European Union.

57.  Intuitive denies the allegations in the first sentence of paragraph 57. Intuitive denies the allegations in the second and third sentences of paragraph 57 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 58**: Accordingly, Intuitive has a 99% market share in the worldwide and domestic markets for surgical robots used in minimally invasive soft tissue surgery. Indeed, Intuitive's dominance in the robotic surgery market is so great that even if surgical robots used for entirely different procedures such as orthopedic surgery are considered, recent estimates of Intuitive's overall share of the robotic surgery market range for 77% - 80%.

58.  Intuitive denies the allegations in paragraph 58.

**Paragraph 59**: The installed base of da Vinci robots and the prevalence of da Vinci-trained surgeons precludes new products from gaining market share in the market for minimally invasive surgical robots. Intuitive has an installed base of over 5,500 da Vinci robots worldwide. Switching to a different surgical robot system would be costly for hospitals, requiring them to purchase expensive new robots. A switch would meet substantial resistance from doctors, who would need to abandon the da Vinci surgical methods they have been performing for years (for some, their entire careers), and re-learn how to perform surgeries with different surgical robots. At a 99% market share, including "100% of top-ranked hospitals," the resistance to change does not only affect the few hospitals which do not have da Vinci robots. It affects an enormous portion of the available consumer base.

59.  Intuitive denies the allegations in the first, fifth and sixth sentences of paragraph

20

59.  Intuitive admits that it has sold more than 5,500 da Vincis worldwide, but otherwise denies the allegations in second sentence of paragraph 59.  Intuitive denies the allegations in the third and fourth sentences of paragraph 59 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 60**: Intuitive's market power allows it to obtain supra-competitive margins on its product sales.  Although Intuitive does not distinguish between robot and instrument sales for gross margin, its 2019 form 10-K demonstrates over 70% gross margin for robots and instruments.  Intuitive's net margin is over 30% based on $1.38 billion in net income on $4.48 billion of total revenue.  These margins are significantly higher than margins for typical medical device companies, surgical robotic companies, or other companies that make complex medical equipment.

60.  Intuitive denies the allegations in the first sentence of paragraph 60.  Intuitive admits that for the year ended December 31, 2019, as noted in Intuitive's 10-K for that year, its product gross profit represented 70.2% of product revenue, and that its net margin was over 30% based on its total revenue of $4,478.5 million, and its net income attributable to Intuitive Surgical, Inc. of $1,381.8 million, but otherwise denies the allegations in the second and third sentences of paragraph 60.  Intuitive denies the allegations in the fourth sentence of paragraph 60 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 61**: In sum, Intuitive has monopoly power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery.  Intuitive is able to and does exclude competition and maintain prices for da Vinci robot systems at supra-competitive levels.

61.  Intuitive denies the allegations in paragraph 61.

### RESPONSE TO "(2) THE MARKET FOR SERVICE OF ROBOTS USED IN MINIMALLY INVASIVE SOFT TISSUE SURGERY"

**Paragraph 62**: Intuitive extends its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery to the market for repair and support services for their robots.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

62.     Intuitive denies the allegations in paragraph 62.

**Paragraph 63**: Once a customer makes the purchase of a DaVinci robot, the only practical service option is service and repair services offered by Intuitive.

63.     Intuitive admits that Intuitive performs preventative maintenance and repairs of da Vincis, but otherwise denies the allegations in paragraph 63.

**Paragraph 64**: Hospitals are dependent on these robot maintenance services for the continued operation of their essential da Vinci robots.  The services include "provid[ing] and install[ing]Software upgrades," "replac[ing] defective malfunctioning System parts," and "replac[ing] and install[ing] Software, Hardware, and mechanical parts for safety."  Each of these services can only be obtained from Intuitive.  And if these services are not provided—e.g., if a malfunctioning part is not replaced or the Software is not up to date—the da Vinci system will display a "NEEDS SERVICE" warning message on the display panel.  Doctors will not perform a surgery with a machine indicating that it "NEEDS SERVICE." Nor will patients allow themselves to be operated upon by a machine that "NEEDS SERVICE." Accordingly, when service is needed, the da Vinci robot is effectively rendered useless until service is provided by Intuitive.  Hospitals cannot afford to have useless da Vinci robots.  Da Vinci robots are large capital investments, and ongoing da Vinci surgeries are necessary to recoup that investment.  Functional da Vinci machines are also necessary to maintain the goodwill of the doctors and patients who have scheduled robotic surgeries.

64.     Intuitive admits that the da Vinci will display a "NEEDS SERVICE" message on

the display panel until needed services—including replacing a malfunctioning part or updating

software—are rendered, but otherwise denies the allegations in paragraph 64 because it is

without knowledge or information sufficient to form a belief as to the truth of the allegations

herein.

**Paragraph 65**: Intuitive leverages its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery, and the market for repair services for their robots, to pressure its customers to use supra-competitively priced replacement EndoWrist parts.

65.     Intuitive denies the allegations in paragraph 65.

### RESPONSE TO "(3) THE MARKET FOR REPLACEMENT AND REPAIR OF INSTRUMENTS FOR USE IN MINIMALLY INVASIVE SOFT TISSUE SURGERY"

**Paragraph 66**: Although Intuitive maintains a significant patent portfolio in its surgical robots, any blocking patents for its EndoWrist instruments are long expired.  Intuitive maintains a "Patent Notice" web page for its products.  Virtually all of the patents covering core structure

22

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS          CASE NO.: 3:21-cv-03496-VC

and operations for the "EndoWrist" and "Accessories" are expired.  The few patents that remain in force are related to specific instrument implementations and could not block a third party from selling competing instruments for use with Intuitive da Vinci robots.  Intuitive instead uses technical and contractual means to ensure that only Intuitive-supplied EndoWrists are used with da Vinci robots.

66.    Intuitive denies the allegations in the first, third and fourth sentences of paragraph 66 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that it has a "Patent Notice" web page, but otherwise denies the allegations in the second sentence of paragraph 66.  Intuitive denies the allegations in the fifth sentence of paragraph 66.

**Paragraph 67**: One way Intuitive maintains EndoWrist exclusivity is by programing the da Vinci robots to require that any EndoWrist attached has an Intuitive serial number in order to operate.  This tactic prevents third parties from manufacturing da Vinci compatible EndoWrists.  Intuitive's standard sales contract for da Vinci robots also prohibits customers from using the robot with any surgical instruments not made by or approved by Intuitive.  Customers are left with access to only one source for EndoWrists—Intuitive.

67.    Intuitive denies the allegations in the first sentence of paragraph 67.  Intuitive denies the second and fourth sentences because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.  Intuitive admits that the SLSA for the da Vinci requires customers to use surgical instruments made or approved by Intuitive, but otherwise denies the allegations in the third sentence of paragraph 67.

**Paragraph 68**: Even if a third party were to successfully create an alternative EndoWrist, the alternative would have to get FDA approval before entering the market.  This, in combination with the other mentioned factors, prevents EndoWrist alternatives from becoming available.

68.    Intuitive admits that an alternative to EndoWrists from Intuitive for use with the da Vinci would require FDA clearance, but otherwise denies the allegations in paragraph 68.

**Paragraph 69**: Instruments used for other types of surgical robots, such as orthopedic surgery robots, are not compatible with minimally invasive soft tissue surgery robots.  Because they are used in different types of surgeries and do not operate in as small of spaces, they employ different tools and do not include multi-axis end-tool movement control in the same manner as EndoWrists.

23

69.  Intuitive denies the allegations in paragraph 69 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 70**: Accordingly, Intuitive has a 99% market share for instruments used with minimally invasive soft tissue surgery robots, because 100% of instruments used with Intuitive da Vinci robots are sold by Intuitive.

70.  Intuitive denies the allegations in paragraph 70.

**Paragraph 71**: Intuitive's market power in instruments used with minimally invasive soft tissue surgery robots is demonstrated by its lucrative revenue and profits in its EndoWrist business. By fiscal year 2019, instrument and accessories (primarily EndoWrists) revenue exceeded $2.4 billion, or more than a $1 billion more than sales of da Vinci systems. Although Intuitive does not break out its gross profit for instruments alone, its gross profit on instruments and da Vinci systems is over 70%. Indeed, the bulk of Intuitive's revenue and profit growth over the last decade has come from its sales of EndoWrist instruments, not robotic systems, as demonstrated from data from Intuitive's 10-Ks from 2001 to 2019, below: [IMAGES]

71.  Intuitive denies the allegations in the first sentence of paragraph 71. Intuitive admits that for the year ended December 31, 2019, as noted in Intuitive's 10-K for that year, Intuitive reported $2,408.2 million in revenue for instruments and accessories and $1.346 billion from da Vincis, but otherwise denies the allegations in the second sentence of paragraph 71. Intuitive admits that for the year ended December 31, 2019, as noted in Intuitive's 10-K for that year, its product gross profit "increased 21% to $2.6 billion, representing 70.2% of product revenue," but otherwise denies the allegations in the third sentence of paragraph 71. Intuitive admits that over the last decade, more of its revenue and profit growth have come from sales of EndoWrists than da Vincis, but otherwise denies the allegations in the fourth sentence of paragraph 71.

**Paragraph 72**: Indeed, while Intuitive's sales of robots were stagnant from 2012 – 2017, Intuitive's EndoWrist sales increased by over $730 million dollars during that time period. As is described in the following paragraphs, the bulk of Intuitive's EndoWrist windfall revenue, and thus the bulk of its corporate revenue and profitability, is based on its anti-competitive conduct that requires hospitals to purchase replacement EndoWrists rather than repairing EndoWrists that are capable of many more uses at a significantly reduced price.

24

72.     Intuitive admits that its EndoWrist sales increased between 2012 and 2017 by over $730 million dollars, but otherwise denies the allegations in paragraph 72.

**Paragraph 73**: The vast majority of Intuitive's EndoWrist revenue and profit, and thus its overall revenue and profit, comes from replacement EndoWrists.  The da Vinci robots are typically in service for years, if not a decade or more, and EndoWrists provide a recurring revenue stream.  In the words of Intuitive's Form 10-Ks from the early 2000's, EndoWrist instruments include a counter that allows it to "sell the instrument for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure or per-hour basis."

73.     Intuitive admits that its 10-K for the year ended December 31, 2000 stated that Intuitive "can sell the instruments for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure basis or per-hour basis," and that EndoWrists provide a recurring revenue, but otherwise denies the allegations in paragraph 73.

**Paragraph 74**: Specifically, the EndoWrist chip includes a counter that counts the number of times the EndoWrist is attached to a da Vinci robot arm.  This is not an actual measure of usage such as usage time, number of movements, or actuation time.  The chip does not monitor the components of the EndoWrist for conditions that would be indicative of failure, such as the lack of response of the instrument tip to requested movement or a motor requiring excessive force to cause a desired movement of the tungsten cables.  The counter is set to a variety of values for different instruments such as 10, 12, 15, 18, 30, and 100.  For virtually all EndoWrists instruments, the counter is set to the lower part of that range, and the vast majority of EndoWrist instruments have their counter set at 10 attachments.

74.     Intuitive admits that it includes a programmed memory chip in each EndoWrist that, among other functions, counts the number of uses, but otherwise denies the allegations in the first sentence of paragraph 74.  Intuitive admits that it has conducted rigorous testing and identified a maximum use limit for EndoWrists, which varies based on instrument, and that the maximum use limit ensures that instruments perform safely and reliably.  Intuitive denies the remaining allegations in paragraph 74.

**Paragraph 75**: Intuitive has unilaterally changed counter values for types of EndoWrist instruments and its pricing for those instruments.  Intuitive has also unilaterally changed the instructions for use (IFU) for EndoWrist instruments to force early replacement, even if the counter value has not expired.  For example, Intuitive issued an IFU for EndoWrist instruments setting a

25

maximum number of autoclave cycles. Because of the way that da Vinci surgeries are prepped and performed, EndoWrist instruments often have to undergo an autoclave cycle even if not actually attached to a robot during surgery. The specified limit on autoclave cycles is extremely low compared to comparable devices made of similar medical grade materials. These unilateral changes substantially increase the per-surgery cost of EndoWrist instruments to hospitals, and Intuitive's supra-competitive EndoWrist profits, without prior notice to hospitals. When hospitals make the substantial capital and contractual commitment to purchase a da Vinci robot, they are unaware of these additional costs and lack information to predict Intuitive's unilateral changes.

75.     Intuitive admits that it has changed the use limits and prices of certain EndoWrists and the instructions for use, but otherwise denies the allegations in the first sentence of paragraph 75. Intuitive denies the allegations in the second, sixth and seventh sentences of paragraph 75. Intuitive admits that it has issued an IFU for EndoWrists setting a maximum number of autoclave cycles, as required by the FDA, but otherwise denies the allegations in the third sentence of paragraph 75. Intuitive denies the allegations in the fourth and fifth sentences of paragraph 75 because it is without knowledge or information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 76**: Intuitive does not provide hospitals any option for repair of the EndoWrist instrument after the counter has expired. Instead, once the counter has expired the hospital must purchase a new EndoWrist at a cost ranging from $2,250 - $3,750, without regard to whether the EndoWrist instrument was actually used in surgery or the extent of such use.

76.     Intuitive admits that it does not provide "repairs" of EndoWrists, but otherwise denies the allegations in paragraph 76.

**Paragraph 77**: At least SIS has attempted to enter the market for repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery, and specifically, for repair of EndoWrists. On information and belief, other companies similar to SIS have attempted to enter this market.

77.     Intuitive denies the allegations in paragraph 77.

**Paragraph 78**: As described previously herein, SIS employs meticulous procedures to inspect, and as necessary, repair EndoWrist instruments. Once the EndoWrist is returned to original specifications, SIS sets the counter to the same value originally programmed by Intuitive. Based on its 50 years of expertise in surgical equipment repair and the demonstrated safety and efficacy of its EndoWrist repair process, SIS entered into contracts and was in negotiations for contracts

26

with hospitals, health care providers, and GPOs representing thousands of EndoWrists a year and tens of millions in revenue, just in the first year.

78.    Intuitive denies the allegations in paragraph 78 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations therein.

**Paragraph 79**: An EndoWrist serviced by SIS would cost only 55-70% of the cost of buying a replacement EndoWrist from Intuitive, and would be equally safe for the same number of subsequent uses.

79.    Intuitive denies the allegations in paragraph 79.

**Paragraph 80**: Although SIS's business was poised to grow substantially year-over-year, SIS's expected sales of tens of millions of dollars in 2020 would still amount to less than 1% market share for replacement and repair of EndoWrists.  SIS had obtained and was in the process of repairing EndoWrists from some of these initial customers, when Intuitive embarked on a scorched-earth campaign to put SIS out of the EndoWrist repair business.  SIS repaired Endo Wrists that were successfully used in surgeries without any problems or incidents.

80.    Intuitive denies the allegations in the first and third sentences of paragraph 80

because it is without knowledge or information sufficient to form a belief as to the truth of the

allegations therein.  Intuitive denies the allegations in the second sentence of paragraph 80.

**Paragraph 81**: In view of Intuitive's 99% market share for minimally invasive soft tissue surgery robots, 100% market share for the servicing and support of those robots, and the 100% market share of instruments used with Intuitive da Vinci robots, Intuitive has leveraged its monopoly power in all these markets and engaged in other anti-competitive acts to prevent repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery. Intuitive's wrongful acts are described in the following section.

81.    Intuitive denies the allegations in paragraph 81.

<u>**RESPONSE TO "V. INTUITIVE'S MONOPOLIST TACTICS
AND ANTI-COMPETITIVE ACTS"**</u>

**Paragraph 82**: Intuitive has engaged in an anticompetitive course of conduct consisting of several primary anticompetitive practices.  Intuitive has harmed competition through and by these practices.

82.    Intuitive denies the allegations in paragraph 82.

**Paragraph 83**: One of Intuitive's anticompetitive practices involves requiring its customers for the da Vinci robotic surgical system to agree to numerous restrictive terms that allow Intuitive to

27

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

subsequently disable and effectively render the da Vinci robots inoperable at some later time (for example, by refusing to service the robots).

      83.     Intuitive denies the allegations in paragraph 83.

**Paragraph 84**: A second anticompetitive practice involves unilaterally modifying the terms for EndoWrists once a hospital has invested in a da Vinci robot, such as unilateral changes in pricing, use limits, and restrictive instructions for use.

      84.     Intuitive denies the allegations in paragraph 84.

**Paragraph 85**: A third anticompetitive practice employed by Intuitive involves refusing to provide hospitals, health care systems, and GPOs with an option to have their previously used EndoWrist instruments repaired after the internal counter has expired.

      85.     Intuitive denies the allegations in paragraph 85.

**Paragraph 86**: A fourth anticompetitive practice used by Intuitive involves requiring customers who purchase its da Vinci robotic systems to agree that they will not permit the repair or refurbishment of any EndoWrist instruments by a third party.  If a customer violates this prohibition, Intuitive has threatened to void the warranties on the da Vinci robotic system, completely terminate the agreement with that customer, refuse to provide further service and support for the robotic system, and even render the surgical robot inoperable.

      86.     Intuitive denies the allegations in the first sentence of paragraph 86.  Intuitive

admits that it contacted certain customers in response to the customers' use of third-party

remanufacturers and, among other things such as expressing safety concerns relating to the use

of adulterated instruments, reminded customers of contractual obligations under the SLSA, but

otherwise denies the allegations in the second sentence of paragraph 86.

**Paragraph 87**: An effect of Intuitive's anticompetitive conduct is to generate and sustain unreasonably high, supra-competitive prices for aftermarket EndoWrist instruments.

      87.     Intuitive denies the allegations in paragraph 87.

**Paragraph 88**: Intuitive's anticompetitive conduct effectively forecloses customers who have purchased da Vinci robotic surgery systems from having access to competitive sources of aftermarket EndoWrist instruments in violation of the Sherman Act Sections 1 and 2.

      88.     Intuitive denies the allegations in paragraph 88.

**Paragraph 89**: Through Intuitive's coercive practices directed at da Vinci customers, it

28

foreclosed rivals from supplying customers with aftermarket EndoWrist instruments through repair and refurbishment services.  In so doing, Intuitive maintains its monopoly power in the EndoWrist instrument aftermarket which it has used to sustain unreasonably high replacement rates and supra-competitive prices.

89.     Intuitive denies the allegations in paragraph 89.

**Paragraph 90**: Intuitive's practices have the practical effect of preventing a buyer of a da Vinci robotic system from using the products and services of a potential competitor in the EndoWrist instrument aftermarket.  Intuitive's practices have prevented SIS's entry as a rival into the EndoWrist instrument aftermarket.

90.     Intuitive denies the allegations in paragraph 90.

**Paragraph 91**: On information and belief, Intuitive became aware that SIS was providing owners of da Vinci robots with repaired EndoWrist instruments in late 2019.

91.     Intuitive denies the allegations in paragraph 91.

**Paragraph 92**: Between late 2019 to early 2020, Intuitive sent letters to and had in-person conversations with SIS's customers or potential customers, knowing that they were under contract or in contractual negotiations for repaired EndoWrists.  As a result of the threats and misleading statements in those letters and conversations, all of SIS's EndoWrists customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating SIS's EndoWrist repair business.

92.     Intuitive admits that it contacted certain customers in response to the customers' use of third-party remanufacturers, but otherwise denies the allegations in paragraph 92.

**Paragraph 93**: In letters to SIS customers and potential customers, Intuitive claimed that repairs might lead to "degraded performance," including "unintuitive motion," "insufficient grip force," "dull or damaged scissor blades," and "worn/damaged cables."  To the contrary, under SIS procedures all of these aspects of EndoWrist performance, and numerous others, are inspected in detail and repaired as necessary to meet Intuitive's original equipment specifications.

93.     Intuitive admits that it sent a letter to certain customers stating, inter alia,  that "[a]ll Intuitive Surgical products are rigorously tested, reviewed and cleared by regulatory authorities to achieve a targeted level of safety, precisions, and dexterity over all programmed instruments uses by the original manufacturer.  Gradual degradation occurs both from use in surgery as well as repeated cleaning and sterilization required between uses."  Intuitive admits

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

that the letter also stated that "[e]xamples of degraded performance may include but are not

limited to: [u]nintuitive motion (i.e., instruments do not track well with master manipulators;

[u]nexpected motions or stalls); [i]nsufficient grip force; dull or damaged scissor blades;

[w]orn/damaged cables," but otherwise denies the allegations in paragraph 93.

**Paragraph 94**: Intuitive also alleged that "third- party manufacturers or refurbishers may use non-validated or incompatible cleaning agents and/or disinfection/sterilization processes" or "may damage the instrument's internal mechanisms that interface with the robotic system and allow Intuitive to monitor the device." To the contrary, with years of experience working with millions of diverse devices that require sterilization procedures, SIS processes do not employ "incompatible cleaning agents and/or disinfection/sterilization processes." Nor would SIS return a device to the customer that was damaged or could not interface properly with Intuitive's robotic system.

94. Intuitive admits that it has sent letters to certain customers stating, inter alia, that

"[t]hird party remanufacturers or refurbishers might use non validated or incompatible cleaning

agents" and "third party remanufacturers or refurbishers may damage the instrument's internal

mechanisms that interface with the robotic system and allow Intuitive to monitor the device," but

otherwise denies the allegations in the first sentence of paragraph 94. Intuitive denies the

allegations in the second and third sentences of paragraph 94 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations.

**Paragraph 95**: In sum, if Intuitive had only alleged that SIS's services might potentially cause these issues, SIS's customers and potential customers would have had no worry whatsoever doing EndoWrist business with SIS. SIS has a sterling reputation of repairing surgical devices such as EndoWrists, and robust processes specific to the EndoWrists.

95. Intuitive denies the allegations in paragraph 95 because it is without knowledge or

information sufficient to form a belief as to the truth of the allegations.

**Paragraph 96**: Intuitive instead asserted numerous threats and misleading statements by letter and in private conversations to prevent SIS from performing its repair services, and to maintain its monopoly profits in EndoWrists.

96. Intuitive denies the allegations in paragraph 96.

**Paragraph 97**: A first set of Intuitive's misleading statements made by letter relates to FDA

30

clearances.  Couched in terms of "might prevent such products from performing" such that FDA and other regulations "may not apply," Intuitive states without any basis that "the hospital has no way to know whether the refurbished instrument meets the rigorous specifications" of Intuitive and the FDA. Intuitive also states that "any modification to allow for use of a da Vinci product beyond its useful life exceeds the scope of the original clearance by expanding the FDA cleared indications for use" in violation in 21 U.S.C. § 351.

97.     Intuitive admits that it has sent a letter to certain customers stating, inter alia,  that

"[r]efurbishing activities performed by an unauthorized third party violate the U.S. Federal Food,

Drug, and Cosmetic Act ('FDC Act') and the regulations promulgated and enforced thereunder

by the FDA when such activities do not bring products to established specifications or when such

activities change intended uses.  Deviation from these specifications might prevent such products

from performing properly, thereby subjecting patients to significant risk.  By using a third party

remanufacturer or refurbisher, the hospital has no way to know whether the refurbished

instrument meets the rigorous specifications as established by Intuitive Surgical and cleared by

the FDA or other regulators."  Intuitive admits that the letter states that "any modification to

allow for use of a da Vinci product beyond its useful life exceeds the scope of the original

clearance by expanding the FDA cleared indications for use.  Engaging in such activities without

first obtaining a new clearance to do so misbrands the product under 21 U.S.C. § 351."  Intuitive

otherwise denies the allegations in paragraph 97.

**Paragraph 98**: The components of the EndoWrists are medical grade parts with a useful life of dozens if not hundreds of uses.  They will operate within specification, particularly when properly inspected and repaired as is performed by SIS.  Intuitive's allegation appears to be that use of EndoWrists beyond the counter limit is a violation of Intuitive's FDA clearances.  Based on FDA clearances that have been identified for EndoWrists to date, this assertion is incorrect.  At most, Intuitive merely mentions in its FDA applications that its devices have usage limits.  Available 510(k) summaries are silent on usage limits, and have no prohibitions whatsoever on repair.

98.     Intuitive admits that it believes any modification to allow for use of a da Vinci

product beyond its useful life exceeds the scope of the original clearance by expanding the FDA

31

cleared indications for use, and that engaging in such activities without first obtaining a new

clearance to do so misbrands the product under 21 U.S.C. § 351, but otherwise denies the

allegations in paragraph 98.

**Paragraph 99**: A second misleading statement made by letter relates to unspecified "intellectual property rights in the da Vinci systems and its instruments" that "Intuitive believes it has[.]"  SIS merely repairs EndoWrists, which according to Intuitive's own Patent Notice webpage do not have any relevant patent rights that would cover SIS's services.  Nor are there any other intellectual property rights that SIS's services would call into question.

99.     Intuitive avers that no response to paragraph 99 is necessary in light of the Court's

November 23, 2021 Order dismissing SIS's claims arising out of the alleged statement described

in the paragraph.  (ECF No. 70, at 12.)  To the extent that any response is necessary, Intuitive

admits that it has sent a letter to certain customers stating that "Intuitive believes that it has

important intellectual property rights in the da Vinci system and its instruments," but otherwise

denies the allegations in paragraph 99.

**Paragraph 100**: Intuitive's letters also inform SIS customers of certain "terms of [the customer's agreements with Intuitive] that you might wish to consider."  According to Intuitive, such terms include prohibitions on "repair, refurbishment, or reconditioning" and another asserts that the hospital's "license [for an EndoWrist] expires once an Instrument or Accessory is used up to its maximum number of uses[.]"  Another term referenced by Intuitive states that the hospital will not "permit any third party to, modify, disassemble, [or] reverse engineer . . . the System or Instrument or Accessories."  Failure to comply with the latter term results in termination of the hospital's "Agreement immediately upon written notice, and any warranties applicable to the system will become void."

100.     Intuitive admits that it has sent letters to certain customers concerning their use of

unauthorized services on instruments that stated, inter alia, "here are terms of your SLSA that

you might wish to consider," but otherwise denies the allegations in the first sentence of

paragraph 100.  Intuitive admits that this letter quoted provisions of the SLSA that state that

"'Instruments and Accessories are subject to a limited license'" which prohibits "'repair,

refurbishment, or reconditioning not approved by Intuitive'" and "'expires once an Instrument or

32

Accessory is used up to its maximum number of uses specified in the Documentation

accompanying the Instrument or Accessory,'" but otherwise denies the allegations in the second

sentence of paragraph 100. Intuitive admits that this letter quoted another provision of the SLSA

in which customers agree not to "'permit any third party to, modify, disassemble, reverse

engineer, alter, or misuse the System or Instruments and Accessories'" and that if the customer

does not comply with that requirement, "'Intuitive may terminate this Agreement immediately

upon written notice, and any warranties applicable to the system will become void,'" but

otherwise denies the allegations in the third and fourth sentences of paragraph 100.

**Paragraph 101**: Notably, the Agreement that Intuitive is referring to and the remedies it is
threatening are for the "System," *i.e.*, the surgical robot. These terms constitute attempts by
Intuitive to constrain its customers with illegal exclusive dealing agreements, and constitute
illegal tying of EndoWrists and EndoWrist related services to the original purchase of the da
Vinci robot. These provisions are particularly egregious in view of Intuitive's market power in
the market for minimally invasive surgical robots. The effectiveness of its exclusive dealing and
tying requirements are proven by Intuitive's market power in the market for replacement
instruments for minimally invasive surgical robots, and its ability to completely foreclose the
market for repair of such instruments.

     101.     Intuitive denies the allegations in paragraph 101.

**Paragraph 102**: Intuitive's letters make its threats explicit—if the hospital uses repaired
instruments, Intuitive will render its surgical robot inoperable. Not only will Intuitive seek
damages or indemnity from its customer, but if Intuitive discovers "Systems being used with
instruments by an unauthorized third party, Intuitive may no longer accept your service calls for
such Systems." Because Intuitive also refuses to allow any competition in the market for
service of its robots, and refuses to make error codes and other critical information available to
third parties, failure to provide such service will render a robot that originally cost well over a
million dollars inoperable. Many hospitals have multiple such robots that would thus be
rendered inoperable.

     102.     Intuitive admits that it has sent a letter to certain customers stating, inter alia, that

with regard to "[s]ystems being used with instruments by an unauthorized third party, Intuitive

may no longer accept your service calls for such Systems," but otherwise denies the allegations

in paragraph 102.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS              CASE NO.: 3:21-cv-03496-VC

**Paragraph 103**: Intuitive's letter continues, stating that "[s]hould Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been used with instruments refurbished or modified by an unauthorized third party, Intuitive may not provide service for such a System."  Again, the threat is explicit—if the hospital uses refurbished instruments, Intuitive will render its surgical robot inoperable.

103.    Intuitive admits that it has sent letters to certain customers stating, inter alia, that

"[s]hould Intuitive or its personnel determine, after having accepted a service call or a purchase

order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a

service call, that the System has been used with instruments refurbished or modified by an

unauthorized third party, Intuitive may not provide service for such a System," but otherwise

denies the allegations in paragraph 103.

**Paragraph 104**: In private conversations, Intuitive representatives have made this threat even more explicit.  In response to one hospital's use of third-party repair services, an Intuitive representative stated that Intuitive would turn the surgical robot into a "paperweight."

104.    Intuitive denies the allegations in paragraph 104.

**Paragraph 105**: These threats provide further evidence of Intuitive improperly leveraging its monopoly power in the relevant markets to maintain its lucrative EndoWrist sales and margins, and to prevent the development of a repair market at all costs.

105.    Intuitive denies the allegations in paragraph 105.

**Paragraph 106**: Intuitive has also engaged in other anticompetitive conduct to protect and expand its EndoWrist monopoly.  As described herein, Intuitive unilaterally changes counter values and pricing for EndoWrist instruments, and has unilaterally changed IFUs to require replacement of EndoWrist instruments after an unreasonably low number of autoclave cycles.

106.    Intuitive denies the allegations in paragraph 106.

**Paragraph 107**: For its most recent Xi generation of da Vinci robots and EndoWrist instruments, Intuitive has made an inordinate investment in encryption and other countermeasures of the internal EndoWrist chip.  There is no technical or safety justification for these excessive efforts, except to prevent third parties such as SIS from accessing the counter.  Specifically, it would not be possible to operate an EndoWrist instrument with a da Vinci robot if other values of the EndoWrist chip such as the EndoWrist serial number were modified.  Intuitive's sole purpose is to prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits.  Intuitive's anti-competitive conduct operates to the

34

detriment of patients, hospitals, and SIS, by using unjustified technical measures to prevent an EndoWrist repair market from existing for the Xi EndoWrists.

107.    Intuitive denies the allegations in paragraph 107.

**Paragraph 108**: In order to protect its EndoWrist monopoly pricing, Intuitive has taken steps to force customers to switch from da Vinci robots (typically "S" and "Si" robots) for which EndoWrist repair is possible to Xi da Vinci robots for which EndoWrist repair is not currently possible.  For example, Intuitive has announced that as of 2023 it intends to stop selling S and Si EndoWrist instruments, and to discontinue providing service and technical support for da Vinci S and Si robots.  By withdrawing service and technical support, Intuitive is effectively rendering these robots inoperable.

108.    Intuitive admits that it is gradually phasing out S and Si instruments, as well as

service and technical support for da Vinci S and Si systems, but otherwise denies the allegations

in paragraph 108.

**Paragraph 109**: Intuitive has offered favorable terms and pricing to induce customers to move from S and Si da Vinci robots to Xi robots, knowing that it can recoup lost revenue many times over by preventing repair of Xi EndoWrist instruments.

109.    Intuitive denies the allegations in paragraph 109.

**Paragraph 110**: In sum, Intuitive has gone to extraordinary efforts to leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors.  This costs hospitals and patients at least 30-45% per instrument (which savings would increase over time) or hundreds of millions of dollars a year in a $2.4 billion market, without any safety or technical justification.

110.    Intuitive denies the allegations in paragraph 110.

## RESPONSE TO "COUNT I – TYING"

**Paragraph 111**: SIS incorporates all of the above paragraphs as though fully set forth herein.

111.    To the extent SIS re-alleges all of the paragraphs above, Intuitive reasserts its

answers to those paragraphs.

**Paragraph 112**: Intuitive has dominant economic power in the worldwide and domestic markets for surgical robots for minimally invasive soft tissue surgery, for servicing, support and repair of those robots, and with respect to instruments for use with such robots.  Intuitive has used this economic power to coerce its customers into buying EndoWrists from Intuitive rather than allowing

35

the option of repairing EndoWrists through experienced service organizations such as SIS.  Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive instead of permitting the use of EndoWrists that customers previously purchased but later had repaired, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This tying arrangement has anticompetitive effects in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery, which involves a substantial amount of interstate commerce.

112.     Intuitive denies the allegations in paragraph 112.

**Paragraph 113**: As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

113.     Intuitive denies the allegations in paragraph 113.

### RESPONSE TO "COUNT II – EXCLUSIVE DEALING"

**Paragraph 114**: SIS incorporates all of the above paragraphs as though fully set forth herein.

114.     To the extent SIS re-alleges all of the paragraphs above, Intuitive reasserts its

answers to those paragraphs.

**Paragraph 115**: Intuitive has taken measures and entered into agreements with its customers that require the customers to replace their EndoWrist instruments on an exclusive basis with new Intuitive EndoWrists, thus foreclosing competition in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This exclusive dealing has anticompetitive effects in the worldwide and domestic markets for repair and replacement of these instruments, which involves a substantial amount of interstate commerce.

115.     Intuitive denies the allegations in paragraph 115.

**Paragraph 116**: As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured, including through lost profits, lost customers, and damage to its reputation and goodwill. These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

116.     Intuitive denies the allegations in paragraph 116.

36

## RESPONSE TO "COUNT III – MONOPOLIZATION"

**Paragraph 117**: SIS incorporates all of the above paragraphs as though fully set forth herein.

117.    To the extent SIS re-alleges all of the paragraphs above, Intuitive reasserts its

answers to those paragraphs.

**Paragraph 118**: Intuitive has willfully obtained and maintains monopoly power in the worldwide and domestic markets for repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive maintains at least a 99% market share by excluding competitors.  Intuitive's exclusionary tactics include tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to have EndoWrists repaired, and employing countermeasures to the Xi instrument usage counter to prevent any modification of the usage counter.

118.    Intuitive denies the allegations in paragraph 118.

**Paragraph 119**: As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

119.    Intuitive denies the allegations in paragraph 119.

## RESPONSE TO "COUNT IV – ATTEMPTED MONOPOLIZATION"

**Paragraph 120**: SIS incorporates all of the above paragraphs as though fully set forth herein.

120.    To the extent SIS re-alleges all of the paragraphs above, Intuitive reasserts its

answers to those paragraphs.

**Paragraph 121**: Intuitive has acted with the clear intent to obtain monopoly power in the worldwide and domestic markets for the repair and replacement of instruments for surgical robots for minimally invasive soft tissue surgery in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Intuitive has engaged in anticompetitive conduct including tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrists repaired, sending cease and desist letters when customers attempt to have EndoWrists repaired, and employing countermeasures to the Xi instrument usage counter to prevent modification of the usage counter.  Intuitive has at least a 99% market share and has a high probability of successfully monopolizing the market.

121.    Intuitive denies the allegations in paragraph 121.

37

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

**[Misnumbered] Paragraph 70**: As a direct and proximate result of the foregoing conduct, Intuitive has forced customers to purchase unnecessary EndoWrists at supra-competitive prices, and SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries are antitrust injuries, because they flow from that which makes Intuitive's conduct unlawful under the Sherman Act.

70.     Intuitive denies the allegations in misnumbered paragraph 70.

### RESPONSE TO "COUNT V – UNFAIR TRADE PRACTICES – VIOLATION OF LANHAM ACT"

**Paragraph 122**: SIS incorporates all of the above paragraphs as though fully set forth herein.

122.    To the extent SIS re-alleges all of the paragraphs above, Intuitive reasserts its

answers to those paragraphs.

**Paragraph 123**: Intuitive, in connection with the sale of its EndoWrist instruments, asserted false or misleading descriptions of facts or representations in its correspondence with its and SIS's customers and such misrepresentations were likely to cause consumer confusion or inaccurately describe the nature, characteristics, or qualities of its and SIS's commercial activities in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

123.    Intuitive denies the allegations in paragraph 123.

**Paragraph 124**: Intuitive has at least misrepresented that SIS's services are contrary to FDA approvals of the EndoWrist products and are in violation of intellectual property rights.  Intuitive sent such correspondence to multiple SIS customers and potential customers.  Intuitive made such statements knowingly, willfully, and/or recklessly that such statements were misleading.  These misleading statements affected the purchasing decisions of such customers.

124.    Intuitive denies the allegations in paragraph 124, and further avers that SIS's

claims arising out of the alleged statement described therein have been dismissed by the Court.

(ECF No. 70, at 12.)

**Paragraph 125**: Intuitive's misrepresentations were made to SIS's customers, and upon information and belief, a significant number of Intuitive customers that have, or had, Intuitive Si robots.

125.    Intuitive denies the allegations in paragraph 125.

**Paragraph 126**: SIS has been injured in its business and property, including through lost profits, lost customers, and damage to its reputation and goodwill.  These injuries flow from that which

38

makes Intuitive's conduct unlawful under the Lanham Act.  SIS is entitled to all relief available for such misleading statements, including but not limited to injunctive relief, disgorgement of Intuitive's ill-gotten profits, recovery of SIS's damages, attorneys' fees, the costs of this action, and treble damages under the Lanham Act, 15 U.S.C. § 1117(a).

126.    Intuitive denies the allegations in paragraph 126.

## RESPONSE TO "PRAYER FOR RELIEF"

Responding to the unnumbered paragraph and each of its subparts under the heading "PRAYER FOR RELIEF," Intuitive denies that SIS is entitled to any damages, costs of suit, attorney's fees, injunctive relief or any other form of relief.

## RESPONSE TO "DEMAND FOR JURY"

Intuitive admits that SIS demands trial of all claims by jury to the extent authorized by law.

## PREAMBLE TO AFFIRMATIVE DEFENSE

Intuitive reserves the right to rely upon any of the following or additional defenses to claims asserted by SIS to the extent that such defenses are supported by information developed through discovery or evidence at trial and thus reserves the right to amend its Answer and Affirmative Defense.  By asserting the following affirmative defense, Intuitive does not allege or admit it has the burden of proof or the burden of persuasion with respect to any matter:

## FIRST DEFENSE

SIS's claims are barred, in whole or in part, by the doctrine of unclean hands because SIS has acted contrary to applicable FDA regulations and/or engaged in other misconduct, including tortious interference with Intuitive's contracts and business relationships.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

## DEFENDANT'S COUNTERCLAIMS

Intuitive Surgical, Inc. ("Intuitive"), by its undersigned counsel, counterclaims against Surgical Instrument Service Company, Inc. ("SIS"), and alleges, upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This lawsuit concerns SIS's misinformation campaign to deceive Intuitive customers into believing that the unauthorized modification and remanufacturing of Intuitive's EndoWrist surgical instruments ("EndoWrists") facilitated by SIS is safe, cost-effective, actually conducted by SIS and consistent with both EndoWrists' design specifications and FDA clearances.  In reality, the service marketed by SIS as EndoWrist "repair" is none of those things. To the contrary, the "repair" involves another party breaking into EndoWrists and inserting an unauthorized circuit board called the "Interceptor" to override the instruments' safe, prescribed and FDA-cleared use limits.  The resulting inferior and unlawful products—still bearing Intuitive's trademarks—carry significant risk not only to Intuitive customers but also to the patients on whom they are used to operate.

2.      The result of decades of investment and innovation, Intuitive offers surgical systems for use in conducting minimally invasive procedures, including the highly touted da Vinci Surgical System ("da Vinci") and its related instruments and accessories.  Intuitive's multi-functional instruments with EndoWrist technology feature wristed joints for natural dexterity, giving surgeons an expanded range of motion and increased precision.

3.      Consistent with industry standards and best practices, and as required by the FDA, Intuitive has conducted rigorous testing and identified maximum use limits for EndoWrists.  The maximum use limits, built into the EndoWrists, ensures that instruments perform safely and

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

reliably.  Once the limit is reached, the instrument will no longer be operational, requiring that it be replaced to avoid putting patients at risk.

4.        EndoWrists are cleared by the FDA to be marketed and sold pursuant to the premarket clearance process set forth in Section 510(k) of the Food, Drug, and Cosmetic Act. The 510(k) process required Intuitive to submit to the FDA extensive data and testing results validating the safety and dependability of EndoWrists within the prescribed use limits.  FDA cleared EndoWrists as limited use or "resposable" instruments with use limits, and any modification of EndoWrists by a third party to increase the use limits requires a new 510(k) clearance.  SIS did not seek—and the FDA did not provide—510(k) clearance for EndoWrists that are modified so that they could be used *beyond* the number of uses that had been validated as safe and reliable.

5.        In light of safety and reliability concerns, among others, customers agree in their contracts with Intuitive that (i) they will not use Intuitive instruments after the maximum use limit is reached, and (ii) unauthorized parties are prohibited from modifying or altering the instruments.

6.        Despite being well aware of the prohibitions in Intuitive's contracts, SIS has solicited Intuitive customers to retain it to "repair" EndoWrists and override their use counters. Unbeknownst to the customers, once retained, SIS sends instruments to a third party, Rebotix Repair LLC ("Rebotix"), that breaks into the EndoWrists and implants the unauthorized "Interceptor" circuit board.  This unauthorized process results in "manufactured" or "remanufactured" instruments that include new materials inconsistent with the instruments' design and functional requirements.  These added materials have never been tested or validated by Intuitive and, upon information and belief, have not been properly tested or validated by

41

Rebotix or SIS in accordance with regulatory requirements.  Rebotix then returns the adulterated

instruments back to SIS, which in turn sends them back to its customers for use in surgical

procedures.

7.      SIS does not inform Intuitive customers of the true nature of SIS's (and

Rebotix's) unauthorized operations, let alone the substantial medical, financial and legal risks

that customers face if they secure EndoWrist "repairs" through SIS.

8.      SIS's success thus depends on its ability to deceive Intuitive customers.  To that

end, marketing materials and communications disseminated by SIS are rife with false and

misleading statements, all as part of a coordinated effort to bolster and legitimize unlawful

EndoWrist remanufacturing operations.

9.      SIS's willfully deceptive marketing claims are of several stripes.  Many

specifically concern the nature of the offered service, deceiving customers into believing that

EndoWrist use limits can be extended in a way that is safe, effective and reliable and that

conforms to regulatory requirements.  For example:

    a.  SIS states that it is "repairing" EndoWrists and does not describe the actual,
      substantial modifications being made to the instruments.  *See, e.g.*, Ex. 1, Ex. 2, Ex. 3.
      Contrary to a mere "repair," the Interceptor process is not a tune-up or calibration, but
      rather ***changes*** EndoWrists in fundamental (and risky) ways.

    b.  SIS purports to offer a "complete evaluation, repair, and test" of EndoWrists, further
      conveying a false message that the instruments are broken or defective when they
      reach their use limit.  *See, e.g.*, Ex. 2.  But SIS knows that the use limits are a ***feature***,
      not a bug, of EndoWrists because they ensure proper and safe operation.

    c.  SIS claims that serviced EndoWrists will "meet the quality and functional
      requirements of a new device" (*see, e.g.*, Ex. 3), but SIS does not have access to
      Intuitive's design history and other internal files to identify the "quality and
      functional requirements" of new EndoWrists.

    d.  SIS similarly claims that a "repaired" EndoWrist "is an original da Vinci
      manufactured device that has been repaired to original specifications" (*see, e.g.,* Ex.
      1), but SIS does not know the instruments' "original specifications" and is aware that

42

overriding prescribed use limits would be inconsistent with any such specifications.

e.  SIS misrepresents Intuitive's justifications for use limits and Intuitive's testing and safety protocols, as well as the safety of SIS's service.

10.  The foregoing deceptive messages are compounded by SIS falsely representing to customers that *it* performs the "repairs" and has tested the reliability of the use-extended EndoWrists.  SIS thus leverages its brand and purported long history of experience servicing surgical instruments while obscuring the fact that EndoWrist "repair" is actually done by Rebotix.  *See, e.g.,* Ex. 2, Ex. 3.  In fact, SIS has never conducted a repair of an EndoWrist for a customer or conducted any testing of the "repaired" instruments.

11.  Based on the false premise that the service is merely a "repair" of EndoWrists, SIS also misinforms customers that "repaired" instruments do not require 510(k) premarket clearance by the FDA.  *See, e.g.,* Ex. 3.  Relatedly, SIS misinforms customers that the "repair" service does not change the intended use, method of use, functionality or performance of EndoWrists.  Both sets of representations are not true, and SIS made the statements either with knowledge of their falsity or, at minimum, without conducting any independent or meaningful investigation as to whether clearance was required.  SIS has further misinformed customers about the nature and scope of Intuitive's 510(k) clearance for EndoWrists, such as misinforming customers that the FDA only regulates single-use surgical instruments.

12.  Yet another category of SIS's false advertising is its touting and purported validation of cost savings for customers who use the "repair" service instead of purchasing new EndoWrists.  For example, SIS advertises that its service offers significant savings for customers.  Lacking a legitimate basis to make such claims, SIS fails to inform customers and/or affirmatively misrepresents the financial and legal consequences for customers that use the unauthorized services, such as the voiding of customers' warranties and jeopardizing of their

43

service contracts with Intuitive.

13.     SIS also has leveled false accusations against Intuitive, including a baseless and inflammatory charge that the use limitations built into EndoWrists are "arbitrary." *See, e.g.,* Ex. 2.  SIS knows, or should know, however, that the use limits are critical for patient safety, designed in compliance with FDA regulations, requirements and publications, consistent with applicable industry standards as well as EndoWrist labeling and amply supported and validated by scientific testing.

14.     SIS's communications similarly have falsely suggested that the "repair" service was authorized by, approved by or affiliated with Intuitive, including through misleading references to Intuitive trademarks and describing SIS as an "authorized" EndoWrist "service" company.

15.     SIS's deceptive practices are not strictly limited to its false advertising.  Despite being qualitatively different from and inferior to originally manufactured EndoWrists, "repaired" instruments with the unauthorized "Interceptor" still bear Intuitive's trademarks.  As such, surgeons and others encountering the "repaired" EndoWrists are led to believe that those instruments still are genuine Intuitive products.  That deception is furthered by SIS's communications stating that "[a] repaired EndoWrist® is not an alternative or replacement device," but rather "an original da Vinci® manufactured device that has been repaired to original specifications."  Ex. 1.

16.     All of the foregoing deceptive practices are part and parcel of SIS's false pitch that:  (i) it can and does "repair" EndoWrists in a manner that saves large sums of money without any downside or risk; (ii) such "repair" service is authorized by Intuitive and does not require FDA 510(k) clearance; and (iii) Intuitive's safety and other requirements need not be adhered to

44

or trusted.  The dangers of such an inaccurate campaign to customers and their patients are self-evident, and SIS bears liability for these reckless communications.

## PARTIES

17.     Intuitive is a Delaware corporation with its principal place of business at 1266 Kifer Road, Sunnyvale, California.  Among other services, Intuitive manufactures and sells surgical systems, along with related instruments and accessories, to hospitals and surgical centers world-wide.

18.     Surgical Instrument Service Company, Inc. is an Illinois corporation with a principal place of business at 151 N. Brandon Drive, Glendale Heights, Illinois.  SIS purports to offer repair and replacement services for Intuitive's EndoWrists, including but not limited to customers in California.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over Intuitive's federal claims under 28 U.S.C. § 1331 and § 1332.  The federal claims arise under the Lanham Act, 15 U.S.C. § 1125. This Court has supplemental subject matter jurisdiction over Intuitive's state-law claims under 28 U.S.C. § 1367(a).

20.     This Court has personal jurisdiction over SIS, and venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), as SIS has appeared in this action and initiated this action by filing claims against Intuitive in this District.

## GENERAL ALLEGATIONS

### I.     Intuitive's da Vinci Surgical Systems and EndoWrist Precision Instruments

21.     Intuitive designs, manufactures and markets da Vincis and related instruments and accessories, which have become widely known as an advanced generation of surgery.  Da Vincis

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                     CASE NO.: 3:21-cv-03496-VC

combine the benefits of minimally-invasive surgery for patients with the ease of use, precision and dexterity of open surgery for surgeons.

22.     A da Vinci consists of a surgeon's console, a patient-side cart and a high-performance vision system. Da Vinci technology translates a surgeon's natural hand movements, which are performed on instrument controls at the console, into corresponding micro-movements of instruments positioned inside the patient through small incisions or ports. The da Vinci provides operating surgeons with intuitive control, range of motion, fine tissue manipulation capability and three-dimensional, high-definition vision, while simultaneously allowing surgeons to work through small ports.

23.     Through its extensive efforts and investments in research and development, as well as through strategic alliances with other medical and technology companies, Intuitive has developed and commercialized four generational platforms of da Vinci and continues to innovate in order to help surgeons improve surgical outcomes.

24.     In addition to the primary surgical platforms, Intuitive develops, manufactures and sells compatible instruments and accessories customized for various surgical procedures, such as forceps, scissors, electrocautery tools and scalpels.

25.     Most of these instruments incorporate EndoWrist technology, which feature wristed joints for natural dexterity. Inspired by the human hand, EndoWrists enable surgeons to orient the instruments carefully relative to the tissue and suture with precision, just as they can in open surgery. EndoWrists' internal cables provide maximum responsiveness, allowing for rapid and precise suturing, dissection and tissue manipulation.

26.     Because of the innovations and benefits that they provide, da Vincis and EndoWrists have successfully enabled surgeons to perform a wide range of surgical procedures

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

across a variety of specialties. That success has made Intuitive's offerings a highly desirable, competitive alternative to other surgical modalities, such as open and laparoscopic surgery.

## II. Use Limits Ensure EndoWrists Meet The Highest Quality and Safety Standards and Are Compliant With Applicable State, Federal and International Requirements and Guidelines

27. Intuitive goes to great lengths to ensure that its various products are safe, effective and reliable. Through its dedicated engineers, Intuitive subjects its products to extensive testing to ensure its products are safe, reliable and efficacious.

28. Among other steps taken to ensure that EndoWrists meet exacting performance specifications, most are designed with a use life of a defined number of procedures. A programmed memory chip inside each such instrument performs several functions that help determine how the da Vinci and EndoWrists work together, including by not allowing instruments to be used for more than the prescribed and appropriate number of procedures.

29. The use limits for EndoWrists are determined through a rigorous process involving substantial scientific testing and analysis. For example, instruments are subject to testing protocols that: (i) expose them to mechanical and electrical stress representative of intended use, taking into account procedure variances; and (ii) put them through typical installation, cleaning and sterilization cycles to simulate real-life uses in the surgical field as nearly as possible. Analyzing the data from its various tests, Intuitive also applies complex statistical models to identify risks and confirm the number of times that each instrument can safely and reliably be used.

30. Intuitive's incorporation of use limits into EndoWrists and other products is important as a best practice, critical to regulatory compliance and consistent with 510(k) clearance for previous iterations of the EndoWrist.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

31.     Many of Intuitive's products and operations are subject to regulation in each of the countries and regions where Intuitive markets and sells products.  Intuitive therefore is careful to stay up to date on the requirements of a large and growing body of international standards, which govern the design, manufacture, sourcing, testing, certification, packaging, installation, use and disposal of Intuitive products.

32.     In the United States, for example, Intuitive submits many of its systems, instruments and accessories to the U.S. Food and Drug Administration ("FDA") for premarket clearance.

33.     Under the Federal Food, Drug, and Cosmetic Act, medical devices are classified into one of three classes—Class I, Class II or Class III—depending on the degree of risk associated with each medical device and the extent of control needed to provide a reasonable assurance of safety and effectiveness.  Intuitive's current products, including EndoWrists, are Class II medical devices, which are subject to general controls and typically require premarket demonstration of adherence to FDA performance standards or other special controls in order to obtain clearance.  Premarket review and clearance are accomplished through the 510(k) premarket notification process.

34.     Critically, through its regulations, requirements and publications, the FDA mandates that in order for 510(k) clearance to be issued, the EndoWrist's maximum use limits must be determined and disclosed.  Accordingly, when Intuitive builds use limits into EndoWrists, it is both adhering to best practices and taking the steps necessary to comply with federal (and other) requirements.  It is further complying with FDA's prior 510(k) clearances of EndoWrists as limited use devices with use limits built in.

35.     Even after a medical device like an EndoWrist receives initial 510(k) clearance

48

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                          CASE NO.: 3:21-cv-03496-VC

from the FDA, any *modification* to the device that could significantly affect its safety or effectiveness, or that would constitute a major change in its intended use, requires a *new* 510(k) clearance, or could even require a premarket application ("PMA") approval. *See* 21 C.F.R. § 807.81(a)(3). The FDA requires each manufacturer to make the determination of whether a modification requires a new 510(k) clearance or PMA in the first instance, but the FDA may review any such determination. If the FDA disagrees with a manufacturer's decision not to seek a new 510(k) clearance or PMA approval for a particular modification, the FDA may retroactively require the manufacturer to do so, and under certain circumstances may require the manufacturer to cease marketing and/or recall the modified device until clearance or approval is obtained.

36. The FDA recently stated to Intuitive that extending the number of lives on EndoWrists with use limits is inconsistent with the cleared labels and requires a separate 510(k) submission that includes "[b]ench validation data or scientific justification" in order "to demonstrate that the instruments maintain adequate performance (as defined in your existing instrument validation protocols) after the maximum number of uses and reprocessing cycles." Exs. 6, 7.

37. Any company that *manufactures* a non-exempt device, including a finished device component for sale to an end user, must obtain 510(k) clearance. *See* 21 U.S.C, §§ 321(h); 807.3(d)(3); 807.81(a)(2); 807.20(a), (a)(6).

38. Further, any company that *remanufactures* devices or instruments as that term is defined by the FDA must obtain 510(k) clearance. *See* 21 C.F.R. § 807.81(a)(3). Per FDA regulations, a "remanufacturer" is "any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

performance or safety specifications, or intended use." *See* 21 C.F.R. § 820.3(w).

## III. Intuitive's Commitment to Product Safety, Quality and Efficacy By Prohibiting Unauthorized Maintenance and Support Services

39.     Given the surgical uses for which Intuitive's products are designed, proper maintenance of those products is essential.  Intuitive customers therefore have access to an expansive infrastructure of specialists and engineers around the world who can offer a full complement of round-the-clock support and service for the da Vincis.  That infrastructure includes a network of field service engineers across the United States, Europe and Asia, as well as distributors and service providers around the globe with whom Intuitive maintains relationships.

40.     Intuitive ensures that any in-house technicians or authorized third-party technicians that are part of Intuitive's service and support teams have the specialized training and experience necessary to safely and reliably work on the highly technical da Vincis.  This training continues throughout the course of the technicians' careers servicing the da Vinci so that they are fully up-to-date on the technology.

41.     Maintenance or modification of Intuitive devices by unauthorized and/or unqualified individuals, however, could lead to adverse outcomes and carry additional risk to surgical patients and to Intuitive customers that Intuitive would be unable to mitigate.  For example: (i) non-validated reprocessing methods, and unknown handling and transit conditions have the potential to damage instruments; (ii) handling and product modification can impact traceability and monitoring of the device by Intuitive, including Intuitive's ability to update customers about important developments like recalls; and (iii) using unauthorized channels for acquisition or maintenance of products may violate a given hospital's or health care facility's internal policies and impact the validity of patient consents.

50

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

42.     For these reasons and others, Intuitive carefully restricts who is permitted to perform maintenance and support services on its products and prohibits unauthorized parties from doing so.

43.     In that regard, Intuitive customers enter into binding Sales, License, and Service Agreements ("SLSA") governing their acquisition and use of Intuitive devices.  In those Agreements, the customer unequivocally agrees that, *inter alia*, it "will not, **nor will Customer permit any third party to**, **modify**, disassemble, reverse engineer, **alter**, or misuse" the Da Vinci Surgical System or instruments (such as EndoWrist) and accessories.  SLSA § 3.4 (emphasis added).

44.     If a third party does modify, alter, or otherwise manipulate Intuitive devices, thus violating the above contractual provision, "any warranties applicable to the System will become void" and Intuitive may terminate the SLSA immediately upon written notice.  *Id.*  Relatedly, if a customer "has used the System with surgical instruments or accessories that are not Instruments or Accessories [i.e., those made or approved by Intuitive for use with the System]," then the system warranty "is void with respect to any claims."  SLSA §§ 2, 10.

45.     The SLSA also includes an express acknowledgment by Intuitive customers that they may not use instruments after they have exceeded the use limits, or if those instruments have been subject to any servicing or modification not authorized by Intuitive:

> Instruments and Accessories are subject to a limited license to use those instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System.  **Any other use is prohibited,** whether before or after the Instrument or Accessory's license expiration, ***including repair, refurbishment, or reconditioning not approved by Intuitive***.  ***This license expires once an instrument or Accessory is used up to its maximum number of uses*** specified in the Documentation accompanying the Instrument or Accessory.

SLSA § 8 (emphasis added); *see also id.* § 3.4 (requiring proper use of the da Vinci system

51

consistent with the attached documentation, including the user manual).

**IV.  SIS's Unauthorized Facilitation of Overriding EndoWrist Use Limits By A Third Party, Rebotix Repair LLC**

46.     SIS characterizes itself as a medical and surgical device servicing company that has been a "trusted partner for over 50 years."  *See* http://sis-usa.com/.  In its marketing, SIS asserts that "SIS technicians are among the most highly-skilled and experienced in the industry," with a "majority" that are "pioneers in improved repair techniques."  http://sis-usa.com/services/. Central to SIS's branding is not only its purported expertise—e.g., that it can "extend the useful life of your critical instruments"—but also the notion that it is trustworthy.  SIS states, for example, that it has "no competing agendas" and "we always speak honestly with our customers."  *Id.*

47.     SIS markets its services to customers throughout the United States, including customers in the State of California.

48.     SIS learned of a process by which another party, Rebotix Repair LLC ("Rebotix"), was manufacturing EndoWrists with finished device components (i.e., the Interceptor) and/or remanufacturing EndoWrists in order to override their use limits. Unconcerned with serious safety implications for surgical patients, or legal and financial consequences for Intuitive customers, Rebotix developed its "Interceptor" process to disable memory chips in EndoWrists.  That process involves breaking into the instruments, discarding original instrument circuit boards, soldering the Intuitive memory chips onto unauthorized circuit boards and installing those adulterated circuit boards back into the instruments.  In short, Rebotix inserts its own technology to override a fundamental feature of EndoWrists, significantly changing their intended use and their performance and safety specifications.

49.     Notwithstanding the fact that Rebotix's modifications of EndoWrists are

52

substantial, and that its activity renders Rebotix a "manufacturer" or "remanufacturer" within the context of applicable FDA regulations (*see supra* ¶¶ 35-38), Rebotix never received 510(k) clearance from the FDA for its operations or for the marketing and sale of EndoWrists with overridden use counters. Upon information and belief, SIS knew that Rebotix never received 510(k) clearance and was aware of Rebotix's prior communications with the FDA in which Rebotix failed to obtain any such clearance.

50. Indeed, Rebotix's failure to receive 510(k) clearance for its operations is directly contrary to the FDA's directive to Rebotix that the Interceptor "repair" process ***requires*** 510(k) clearance. For example, in a letter to Rebotix in 2018, the FDA indicated to Rebotix that its Interceptor process required 510(k) clearance. Specifically, the FDA stated, "for the reusable Endowrist Instruments, if the use-life counter is reset of extended past the number of available use lives, then the device specification are changed." Intuitive's Motion to Stay Exhibit, REBOTIX166917, (ECF No. 46-2). On this basis, the FDA indicated that Rebotix would be "subject to premarket notification (510(k)) requirements." *Id*.

51. Seeking to piggyback on Intuitive's success and expand its own business, SIS entered into a business relationship with Rebotix whereby SIS effectively functions as a distributor. Upon information and belief, SIS markets and sells EndoWrist "repairs" to hospitals and collects devices from the hospitals to deliver them to Rebotix, which then conducts the "repairs." SIS pays Rebotix a "distributor price" for each "repair" and charges SIS customers a higher retail price for the "repaired" device.

52. SIS entered into the relationship with Rebotix and has marketed and sold the "repair" service to customers despite being fully aware that EndoWrists should not be used for more than the prescribed and appropriate number of procedures, and that Intuitive's customers

53

agree in their service contracts that unauthorized parties should not service or modify instruments.

53.     SIS also is aware that Rebotix had not obtained 510(k) clearance from the FDA to market or sell the "repaired" EndoWrists.

54.     SIS has never conducted an EndoWrist "repair" for a customer.  Instead, it only provides EndoWrists to Rebotix and then reaps the premium that it charges its customers.

## V.     SIS's Deceptive Marketing and Conduct

55.     SIS's EndoWrist-related business is supported by a misinformation campaign targeted at Intuitive customers.  The overarching goal of the campaign is to persuade EndoWrist purchasers into believing that the "repairs" SIS coordinated are actually provided by SIS, legitimate, cost-effective, safe and without any downside or risk.  In reality, SIS's (and Rebotix's) service is none of those things.

56.     SIS's campaign of deception spans several different kinds of false and misleading marketing claims.

57.     Much of SIS's efforts at deception concern misrepresenting the nature, efficacy and safety of its service.  As set forth above, the Interceptor process overhauls EndoWrists, forcing them to operate beyond their safe, reliable and FDA-cleared use lives.  Yet SIS falsely markets the service as safe, effective and reliable, and conceals from the public that the service requires breaking into Intuitive instruments to make modifications such as inserting an unauthorized circuit board.

58.     For example, SIS markets the service as a "repair" or "complete evaluation, repair, and test" of EndoWrists, inaccurately conveying to customers that the service is simply a tune up or other routine step to bring the instruments back to their original condition.  *See* Exs. 1,

54

2.

59.      Suggesting that EndoWrists are "repaired" not only mischaracterizes the nature of

SIS's (more accurately, Rebotix's) operations, but further conveys the false message that

instruments that have reached their use limits are broken, defective or otherwise in need of

fixing.  SIS knows, however, that there is nothing broken about an EndoWrist that cannot exceed

its predetermined use limit; to the contrary, that the instrument can no longer be used is a fully

intended—and critically important—safety feature.

60.      SIS furthers the deception about what the "repair" actually entails by falsely

touting that a "repaired" EndoWrist (i) "meet[s] the quality and functional requirements of a new

device" (Ex. 3) and (ii) "has been repaired to original specifications" (Ex. 1).  These fictions are

reiterated even in SIS's Complaint in this litigation.  SIS Compl. ¶ 8 ("SIS's services ensure that

the inspected or repaired EndoWrists meet all original specifications").

61.      These claims deceive customers in at least two ways.  ***First***, it is not true that the

adulterated EndoWrists retain "original specifications" or "meet the quality and functional

requirements of a new device."  SIS and Rebotix do not have the capability to provide customers

with modified EndoWrists equivalent to the quality and functional requirements of new, out-of-

the-box, EndoWrists manufactured by Intuitive.  At its core, the remanufactured product is

qualitatively different from—and does not maintain the original specifications of—an out-of-the-

box EndoWrist (e.g., it incorporates the unauthorized "Interceptor" and exceeds the instrument's

prescribed use limits, which themselves are specifications for the instruments).  ***Second***, SIS

misrepresents that it has taken the steps necessary to sufficiently validate its claim that the

"requirements" of a "new device" have been met—e.g., conducting or relying on reliable

scientific testing and analysis.  SIS plainly had not done so, nor has SIS ever had access to the

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

Intuitive internal files that would specify the "quality and functional requirements" of new EndoWrists.

62. SIS compounds the deceptiveness of the "repair" messaging by falsely conveying to customers that it is **SIS** that actually has developed and performs the "complete evaluation, repair and test" of EndoWrists. Seeking to leverage its reputation and "50-year history of performing repairs," SIS does not disclose that SIS does not perform the EndoWrist "repair" itself or did not perform any of the testing that purportedly supports the safety and reliability of the EndoWrist "repair" process. In fact, SIS has utilized **Rebotix's** deceptive communications and simply re-branded them as SIS's. *Compare* Ex. 2, *with* Ex. 4; *compare* Ex. 3, *with* Ex. 5.

63. Evidence that customers actually have been deceived by the foregoing false messaging already exists on the public record. In a separate federal litigation concerning EndoWrists, a putative class of Intuitive customers have alleged that SIS "has already serviced and repaired EndoWrists." *In re: Da Vinci Surgical Robot Antitrust Litigation*, Case 3:21-cv-03825-VC, ECF No. 52, "Larkin Amended Complaint," at ¶ 124.

64. Certain other deceptive marketing claims by SIS concern the legality and legitimacy of the remanufacturing services.

65. To mollify concerns that customers would have about subjecting surgical instruments to unauthorized "repair" services, and further underscore the false message that the service is safe, effective and reliable, SIS falsely informed customers that the EndoWrist services do not require FDA certification or clearance. *See, e.g.,* Ex. 3. But that is not true. As set forth above, any company that **manufactures** a non-exempt finished device component for sale to an end user or **remanufactures** devices or instruments—including engaging in any "act to a finished device that significantly changes the finished device's performance or safety specifications, *or*

56

*intended use*" (21 C.F.R. § 807.81(a)(3))—must obtain 510(k) clearance.  *See* 21 C.F.R. § 820.3(w) (emphasis added).

66.     Relatedly, SIS falsely informs customers that its "repair" process does not change the intended use, method of use, functionality or performance of EndoWrists.  By inserting the Interceptor to override use limits, SIS changes the intended use of EndoWrists, which requires conformance to the prescribed and FDA-cleared use limits.  SIS's "repair" process was also not adequately tested to ensure safe and effective use beyond FDA-cleared limits.  Accordingly, the "repair" process results in EndoWrists whose functionality and performance have been significantly changed.

67.     Upon information and belief, SIS knew all along that 510(k) clearance was required (but had not been obtained).  At minimum, SIS did not conduct any independent or meaningful investigation to determine whether additional clearance is necessary.

68.     Yet another category of SIS's false advertising is its claims that using the "repair" service would result in substantial cost-savings and financial benefits for Intuitive customers.  For example, SIS has claimed that it can provide an Intuitive customer with significant savings, and the public record indicates that customers did in fact believe similar claims of savings of as much as 55-70% by using SIS rather than purchasing replacement EndoWrists from Intuitive.  *See* Larkin Amended Complaint ¶¶ 7, 155.  This, too, is deceptive because SIS has no legitimate basis or support to make such claims.

69.     SIS's marketing and communications also deceive customers by intentionally obscuring and omitting the negative consequences for customers that retain SIS, including that SIS's unauthorized alterations could void customers' warranties.  SIS fails to inform customers that its unauthorized services could subject customers to contract and warranty ramifications

57

under their SLSAs with Intuitive by virtue of using unauthorized service technicians.

70.     SIS also has leveled false accusations against Intuitive and attacked Intuitive's credibility and trustworthiness.  For example, SIS baselessly asserts that the EndoWrists' use limits are "arbitrary."  *See, e.g.,* Ex. 2.  As detailed above (*supra* at ¶¶ 3, 4, 29), nothing could be further from the truth; the use limits were set after rigorous analysis, are determined pursuant to FDA law and regulations and industry standards and are an essential component of ensuring patient health and safety.

71.     Finally, SIS misleads customers into believing that its service is authorized, approved, or endorsed by Intuitive.  SIS's marketing materials frequently depict Intuitive's trademarks, including marks protected by incontestable federal registrations such as "EndoWrist" (U.S. Reg. No. 2,591,824) and "da Vinci" (U.S. Reg. No. 2,628,871).  In addition, SIS has referred to itself as an "authorized" EndoWrist "service" company.

72.     Even beyond its false advertising, SIS deceives customers by misrepresenting "repaired" instruments as genuine, Intuitive-manufactured EndoWrists.  As detailed above, the Interceptor process fundamentally alters EndoWrists, rendering them qualitatively different from, and inferior to, EndoWrists originally manufactured and sold by Intuitive (and cleared by the FDA).  Yet the "repaired" instruments appear outwardly identical to Intuitive's EndoWrists and still bear Intuitive's trademarks—including trademarks for which Intuitive holds incontestable federal registrations, such as "EndoWrist" (U.S. Reg. No. 2,591,824) and "Intuitive Surgical" (U.S. Reg. No. 2,364,862).  As such, surgeons and other downstream users or recipients of the "repaired" EndoWrists——including anyone who experienced inconsistencies or failures with the adulterated instruments—are likely to confuse the adulterated instruments with Intuitive-manufactured products.

58

73.     SIS's communications furthered this deception by utilizing Intuitive's registered trademarks on its marketing materials and by expressly telling its customers that "[a] repaired EndoWrist® is not an alternative or replacement device," but rather "an original da Vinci® manufactured device that has been repaired to original specifications."  (Ex. 1.)

**VI.     Through its Unfair Business Practices, SIS Has Knowingly Interfered With Intuitive's Business and Contractual Relationships With its Customers.**

74.     As noted above (*supra* at ¶¶ 43-45) Intuitive SLSAs include express acknowledgments by customers that (i) they will not use Intuitive instruments after the maximum use limit is reached; (ii) their licenses to use instruments (such as EndoWrists) expire once maximum use limits are reached; and (iii) they will not use unauthorized components or permit third parties to modify or alter the instruments, and doing so will void Intuitive's warranties and permit Intuitive to terminate the service contracts.

75.     SIS had knowledge of the SLSAs and the terms thereof, including the foregoing provisions.

76.     Notwithstanding such knowledge, SIS has induced Intuitive customers to breach the SLSAs to their detriment and utilize SIS's (and, unbeknownst to the customers, Rebotix's) services, resulting in EndoWrist use beyond their intended, prescribed, and FDA-cleared use limits.

77.     SIS's interference with the relationship between Intuitive and its customers goes beyond facilitating the breach of the SLSA.  For example, SIS has sought to disrupt that relationship by misinforming customers that Intuitive is dishonest and engages in unethical or unlawful practices, such as by setting "arbitrary" EndoWrist use limits.  SIS further sold a service to customers that required 510(k) clearance under FDA rules and regulations, despite not having such clearance.  Thus, SIS's actions are not the reflection of legitimate competition but

59

rather an improper means to induce customers into breaching their contracts with Intuitive.

## VIII.   The Substantial and Irreparable Harm to Intuitive and Its Customers

78.    SIS's deceptive conduct and interference with Intuitive's contractual relationships has harmed Intuitive and its customers in a number of ways, including, but not limited to, the following:

79.    *First*, SIS's unlawful conduct has deprived Intuitive of business.  For example, customers who would have ordered replacement EndoWrists when it is time to do so are instead turning to SIS's so-called "repair" services.

80.    *Second*, Intuitive's reputation and goodwill has been damaged by SIS's direct attacks on Intuitive's honesty and integrity.  By baselessly asserting that the EndoWrist's use limits are "arbitrary" and financially motivated, SIS tells customers that Intuitive should not be trusted, and that its important guidance on proper instrument use need not be followed.

81.    *Third*, to the extent that "repaired" EndoWrists do not function properly during surgery, it jeopardizes the public trust and confidence that Intuitive has inspired among its customers' patients.

82.    *Fourth*, customers themselves have been harmed in numerous ways by SIS's unlawful conduct, including by (i) receiving a qualitatively different and inferior product than that which they had bargained for; (ii) not receiving the cost-savings actually promised by SIS; (iii) having their service contracts and/or warranties with Intuitive voided or otherwise jeopardized; (iv) having their ability to raise concerns about adulterated (and misbranded) devices with the proper parties, including the FDA, inhibited; and (v) not having the ability to look up reports concerning those devices on the FDA's website or other databases.

83.    While certain of the aforementioned categories of harm have injured Intuitive in a

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

way that can be compensated in an amount to be determined at trial, much of it—such as the injury to Intuitive's reputation and customer relationships—is not readily calculable and may not be entirely redressed through monetary damages.  Such irreparable harm can only be fully remedied through injunctive relief.

<u>**COUNT ONE**</u>

**(Unfair Competition and False Advertising – Lanham Act, 15 U.S.C. § 1125)**

84.     Intuitive incorporates by reference the allegations set forth in the previous and subsequent paragraphs of the Counterclaims.

85.     In its marketing materials and communications disseminated to potential and actual customers, SIS has made numerous false and misleading statements, including but not limited to the statements more specifically enumerated above that misrepresent:  (i) the nature, efficacy, and/or safety of the service SIS coordinates (e.g., by referring to those services as mere "repairs" or similar terms); (ii) that "repaired" EndoWrists meet applicable quality and functional requirements; (iii) that devices "serviced" through SIS had been repaired to meet "original specifications" of EndoWrists and are safe to use; (iv) that SIS itself developed, has tested and conducts the "repairs;" (v) that the "repair" and/or resulting instruments do not require clearance by the FDA (and/or that SIS actually engaged in an independent or meaningful analysis of whether such clearance is necessary); (vi) that use of the service will result in substantial cost-savings; (vii) that use of the service does not carry any adverse financial, legal or other consequences (e.g., voiding Intuitive customers' warranties); (viii) that use limits built into EndoWrists are "arbitrary" or Intuitive otherwise is not trustworthy; and (ix) that SIS and/or the "repair" service is authorized, approved, or endorsed by Intuitive.

86.     SIS's deceptive conduct also includes returning qualitatively different and inferior

61

instruments to customers but passing off those products as genuine Intuitive EndoWrists.  In that regard, "repaired" instruments still bear Intuitive's trademarks, including trademarks protected by incontestable federal registrations.  The resulting confusion as to the source or affiliation of the "repaired" instruments is exacerbated by SIS's communications that also leverage Intuitive's trademarks and misinform customers that "a repaired EndoWrist® is not an alternative or replacement device," but rather "an original da Vinci® manufactured device that has been repaired to original specifications."

87.     SIS's deceptive statements and conduct have deceived and confused, and/or have the capacity to deceive and confuse, a substantial segment of Intuitive's current and potential consumers.

88.     SIS's deceptive statements and conduct are material and likely to influence consumer purchasing decisions.

89.      Both Intuitive's EndoWrists and SIS's services (and the "repaired" instruments) are advertised, offered for sale and sold in interstate commerce.

90.     SIS's deceptive statements and conduct are willful and made with the knowledge that they are untruthful and/or unlawful.

91.     Intuitive has suffered substantial harm, both monetary and irreparable, as a result of SIS's actions, and will continue to suffer such substantial harm unless those actions are restrained and enjoined by this Court.

<u>**COUNT TWO**</u>

**(Unfair Competition Law – CA. Stat. § 17200)**

92.     Intuitive incorporates by reference the allegations set forth in the previous and subsequent paragraphs of the Counterclaims.

62

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                         CASE NO.: 3:21-cv-03496-VC

93.     SIS's conduct detailed above constitutes unlawful, unfair and deceptive acts or practices in the conduct of trade or commerce.

94.     SIS willfully used or practiced these acts in violation of California's unfair competition statute, Section 17200, and SIS knew or should have known that its acts were unlawful and would damage Intuitive and injure consumers by its deception

95.     SIS's conduct has resulted in substantial harm to competition.

96.     Intuitive, which has a principal place of business in California, has suffered substantial harm, both monetary and irreparable, as a result of SIS's actions, and will continue to suffer such substantial harm unless those actions are restrained and enjoined by this Court.

## COUNT THREE

### (False Advertising – CA. Stat. § 17500)

97.     Intuitive incorporates by reference the allegations set forth in the previous and subsequent paragraphs of the Counterclaims.

98.     SIS intended for consumers in California to purchase EndoWrist "repairs" from it.

99.     SIS's publicly disseminated marketing and advertising materials include numerous statements detailed above SIS knew or should have known through the exercise of reasonable care were both untrue and misleading.

100.    Intuitive has suffered substantial harm, both monetary and irreparable, as a result of SIS's actions, and will continue to suffer such substantial harm unless those actions are restrained and enjoined by this Court.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

## COUNT FOUR

### (Common Law Unfair Competition)

101.    Intuitive incorporates by reference the allegations set forth in the previous and subsequent paragraphs of the Counterclaims.

102.    SIS is a competitor of Intuitive and has engaged in the above-detailed deceptive and fraudulent conduct with the intent to confuse and deceive the public into using its service and purchasing "repaired" EndoWrists.

103.    SIS's conduct has caused deception and confusion among consumers.

104.    Intuitive has suffered substantial harm, both monetary and irreparable, as a result of SIS's actions, and will continue to suffer such substantial harm unless those actions are restrained and enjoined by this Court.

## COUNT FIVE

### (Tortious Interference With Contract)

105.    Intuitive incorporates by reference the allegations set forth in the previous and subsequent paragraphs of the Counterclaims.

106.    At all relevant times, Intuitive has had contractual relationships with its customers, including through the SLSAs, which contain limitations concerning the modification or alteration of Intuitive EndoWrists.  SIS was at all times aware of these contractual relationships and has undertaken intentional acts to disrupt them and/or induce Intuitive customers to breach them.

107.    SIS's actions have resulted in actual breach or disruption of contractual relationships between Intuitive and its customers.

108.    There is no legal justification for SIS's actions, which have been motivated purely

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

by its own greed and subjected Intuitive patients, Intuitive customers and Intuitive itself to substantial harm.

109.    Intuitive has suffered substantial harm, both monetary and irreparable, as a result of SIS's actions, and will continue to suffer such substantial harm unless those actions are restrained and enjoined by this Court.

## JURY TRIAL

110.    Intuitive requests a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

111.    Intuitive respectfully requests this Court enter judgment in favor of Intuitive and against SIS including an Order granting Intuitive the following relief:

a.  Compensatory damages on all applicable causes of action alleged herein;

b.  Actual costs, expenses and attorneys' fees incurred in this lawsuit;

c.  All exemplary, enhanced and punitive damages;

d.  Pre-judgment and post-judgment interest;

e.  Preliminary and permanent injunctive relief; and

f.  Such other and further relief as the Court shall deem just and proper.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

DATED: December 14, 2021

/s/ Allen Ruby
ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Telephone: (408) 477-9690

KAREN HOFFMAN LENT (*Pro Hac Vice*)
karen.lent@skadden.com
MICHAEL H. MENITOVE (*Pro Hac Vice*)
michael.menitove@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:   (212) 735-3000
Facsimile:    (212) 735-2040

MICHAEL S. BAILEY (*Pro Hac Vice*)
michael.bailey@skadden.com
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone:   (202) 371-7000
Facsimile:    (202) 393-5760

*Attorneys for Defendant*
INTUITIVE SURGICAL, INC.

DEFENDANT'S ANSWER,
AFFIRMATIVE DEFENSE AND COUNTERCLAIMS                    CASE NO.: 3:21-cv-03496-VC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | Case No.  21-cv-03496-VC |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| v. | |
| INTUITIVE SURGICAL, INC., | Re: Dkt. No. 37 |
| Defendant. | |

Intuitive Surgical makes surgical robots, along with the instruments these robots use during surgery. The company has taken a number of steps to prevent other companies from repairing and refurbishing its instruments, effectively requiring customers to buy new instruments whenever the old ones stop working. One of those companies has sued, contending that Intuitive Surgical's conduct violates the antitrust laws because it forecloses competition in the market for repair and refurbishment of the instruments. The lawsuit also alleges that Intuitive Surgical has violated the Lanham Act by making false claims about these companies in an effort to prevent hospitals from doing business with them in this market.

Perhaps there are procompetitive justifications for the alleged conduct that could carry the day at summary judgment or trial. But no such justifications are before the Court at this early stage in the litigation. Nor has Intuitive Surgical argued that the factual allegations in the complaint are implausible. The arguments that Intuitive Surgical does make in support of dismissal are mostly unconvincing. Accordingly, with a minor exception discussed in Section III.B, the case will go forward.

(228 of 239), Page 228 of 239
Case: 25-1372, 10/29/2025, DktEntry: 67.3, Page 228 of 239
Case 3:21-cv-03496-VC Document 70 Filed 11/23/21 Page 2 of 13

## I

Intuitive Surgical manufactures and sells surgical robots.[1] Since it received FDA clearance in 1999, Intuitive Surgical's "da Vinci" robot has achieved near complete market dominance, with a 99% market share in the worldwide and domestic markets for surgical robots used in minimally invasive soft-tissue surgery. One of the reasons for this market dominance is the benefit of performing surgery using a da Vinci robot, rather than by hand. Without a robot, doctors need to hold surgical instruments while operating, or attach them to some sort of physical support. But the da Vinci robot has arms that hold and move surgical instruments under the control of a surgeon who sits at a console. As a result, "[t]he surgeon is not limited by his or her own physical dexterity in manipulating surgical instruments, but can instead make large scale movements at the console that are translated to precision microscopic movements of surgical instruments."

To perform surgery with a da Vinci robot, a hospital needs two things: the robot and the requisite instrument. Da Vinci robots work only with "EndoWrist instruments," which are manufactured and supplied only by Intuitive Surgical. EndoWrist instruments are not as high tech as the robot itself; they are familiar surgical tools attached to an arm that can be controlled by a da Vinci robot. Indeed, Intuitive Surgical has represented to the FDA that EndoWrist instruments are "essentially identical" to their analogue counterparts—scalpels, clamps, forceps, scissors, etc.

Da Vinci robots typically cost over $2 million. But the real money-maker for Intuitive Surgical is its line of instruments. Each EndoWrist instrument is equipped with a use counter. After a certain number of uses—usually ten—the instrument stops working and must be replaced. As a result, customers are effectively charged based on how much they use their robot. The more surgeries a hospital performs, the more instruments it needs to purchase.

---

[1] Unless otherwise noted, the facts described in this section come from the well-pleaded allegations in the complaint. As is required at this early stage, all inferences are drawn in favor of the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Enter Surgical Instrument Service Company (SIS). SIS has refurbished and repaired hospital tools for over 50 years. In 2019, SIS decided to expand its services to refurbish EndoWrist instruments, launching a program in which it would inspect the instruments, perform any necessary repairs (such as sharpening or realigning the instrument tip), confirm that the instruments comport with their original specifications, and then—crucially—reset the use counter. By resetting the use counter, SIS made it possible for hospitals to reuse instruments after hitting the use limit, rather than purchasing new ones. This program had the potential to save hospitals a considerable amount of money, as SIS was offering its refurbishment services for 30–45% less than the cost of replacing an EndoWrist instrument. It therefore proved popular: "[j]ust based on its initial contracts, SIS was prepared to service at least 1,500 EndoWrists a month."

But according to the complaint, Intuitive Surgical took a series of actions that effectively foreclosed SIS from entering the market. The contracts between Intuitive Surgical and its customers expressly forbid customers from working with third parties like SIS: when purchasing a da Vinci robot, a customer must agree that it will not have the instruments repaired or refurbished by a third party. And according to the complaint, this is not an empty threat: "[i]f a customer violates this prohibition, Intuitive [Surgical] has threatened to void the warranties on the da Vinci robotic system, completely terminate the agreement with that customer, refuse to provide further service and support for the robotic system, and even render the surgical robot inoperable." In a series of letters and conversations between Intuitive Surgical and its customers in late 2019 and early 2020, Intuitive Surgical reminded its customers of these contractual commitments, while also noting that refurbishment services may be contrary to FDA approval. As a result, "all of SIS's EndoWrist[] customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating SIS's EndoWrist repair business."

SIS also alleges that Intuitive Surgical redesigned its instruments to thwart SIS's ability to provide refurbishment services. SIS was able to reset the use counter on the original models of EndoWrist instruments—the S and Si generations. But with the more recent Xi generation, Intuitive Surgical redesigned the internal EndoWrist chip, adding encryption and other measures

3

that prevented parties like SIS from resetting the counter. SIS alleges that "there is no technical or safety justification" for these design changes, and that Intuitive Surgical's "sole purpose" in making the changes was "to prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits." SIS further alleges that Intuitive Surgical has taken steps to force customers to move from S and Si generation to Xi generation robots by ceasing to sell S and Si model instruments and by discontinuing technical support for S and Si robots.

SIS claims that Intuitive Surgical's actions violate the antitrust laws. First, SIS asserts that the contractual constraints Intuitive Surgical places on its customers—which together prohibit customers from having their EndoWrist instruments refurbished by third parties—constitute a "restraint of trade" in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1.[2] Second, SIS alleges that Intuitive Surgical violated Section 2 of the Sherman Act through a series of exclusionary tactics, including "tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots," sending cease and desist letters when customers attempted to have their EndoWrist instruments refurbished by third parties, and redesigning its instruments to prevent third-party services from resetting the use counter on its instruments. 15 U.S.C. § 2. Finally, SIS brings an attempted monopolization claim under Section 2 based on this same conduct.

SIS also asserts that Intuitive Surgical violated the Lanham Act by making false and misleading statements to its customers. 15 U.S.C. § 1125. SIS raises two Lanham Act claims based on two sets of Intuitive Surgical's alleged statements: that SIS's services are contrary to FDA approval, and that SIS's services violate Intuitive Surgical's intellectual property rights.

## II

Intuitive Surgical makes two arguments for dismissal of the antitrust claims. First, it contends that all of the antitrust claims must be dismissed because SIS has not adequately alleged the relevant market in which the anticompetitive conduct occurred. Second, Intuitive

---

[2] In its complaint, SIS argues that these constraints are unlawful under two legal theories—"tying" or "exclusive dealing."

Surgical argues that, at a minimum, SIS's monopolization claim must be dismissed to the extent it is based on the company's decision to redesign its EndoWrist instruments, because such allegations amount to a facially deficient refusal-to-deal claim.

## A

To state a claim under the antitrust laws, a plaintiff must identify the relevant market that has been affected by the challenged conduct. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 21 (1984). SIS claims that Intuitive Surgical has harmed competition in the "EndoWrist instrument aftermarket"—i.e., the "worldwide and domestic markets for repair and replacement of instruments for surgical robots [used] for minimally invasive soft tissue surgery."[3] Intuitive Surgical challenges this market definition, contending that SIS has not plausibly alleged that EndoWrist instruments (and their subsequent repair or replacement) occupy a distinct market from the da Vinci robots with which they are used.

In an antitrust case, "whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish*, 466 U.S. at 19.[4] To plead the existence of two products, the plaintiff must allege facts from which the court can plausibly infer that the products exist in separate markets. *See Kentmaster Manufacturing Co. v. Jarvis Products Corp.*, 146 F.3d 691, 695 (9th Cir. 1998). Allegations of consumer choices can satisfy this requirement—separate markets exist in situations where consumers, "when given a choice," opt to purchase the goods from different firms, rather than a single firm. *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir. 2008) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C.

---

[3] SIS describes its services as the "repair" or "refurbishment" of EndoWrist instruments. This ruling follows its lead and uses these two terms interchangeably.
[4] The issue of whether a good occupies one product market or two typically arises in antitrust cases with tying claims, because, to state a tying claim, a plaintiff must allege that "two separate product markets have been linked." *Jefferson Parish*, 466 U.S. at 21. Here, Intuitive Surgical's argument goes beyond SIS's tying claim, challenging all of the antitrust claims. Still, the relevant precedent is primarily antitrust cases with tying claims.

2-SER-437

Cir. 2001)).

The Supreme Court has long recognized that complementary products—however essentially paired—can constitute separate product markets. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 462–63 (1992). This remains true even if demand for one product hinges on demand for another. *Id.* at 463. If complementary products could never occupy distinct product markets, "there [could] never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires." *Id.*

Against this backdrop, SIS has met its pleading-stage burden, plausibly alleging the existence of distinct product markets by virtue of the alleged consumer demand. When SIS sought to provide EndoWrist instrument refurbishment services, it found success, "enter[ing] into service contracts with a number of health care providers" that "would have been worth millions in annual revenue to SIS." These allegations, if true, would constitute evidence of consumer demand for instrument refurbishment services distinct from the market for surgical robots. "[W]hen given a choice," health care providers opted to purchase refurbishment services from SIS, not from Intuitive Surgical. *Rick-Mik Enterprises*, 532 F.3d at 975 (quoting *Microsoft*, 253 F.3d at 86).

Intuitive Surgical counters that these cannot be separate markets because EndoWrist instruments are an "essential component" of the da Vinci surgical robotic system. Essential components, Intuitive Surgical argues, can never be separate products. But this argument runs headlong into *Eastman Kodak*. There, the Court recognized that the market for photocopier replacement parts could be distinct from the market for photocopier servicing—even though there was "no demand for parts separate from service"—because the plaintiffs had presented sufficient evidence of consumer demand for service and parts sold separately *Eastman Kodak*, 504 U.S. at 463.

Intuitive Surgical points to *Kentmaster Manufacturing Co. v. Jarvis Products Corporation*, in which the Ninth Circuit held that slaughterhouse equipment and spare parts constituted a single product because "only an idiot would think of the cost of [the equipment]

6

without taking into account the cost of [spare parts]." 146 F.3d at 694. Intuitive Surgical argues

that the same is true on these facts: no hospital would purchase a da Vinci robot without

factoring in the cost of the instruments it would need to buy in the future. But *Kentmaster* cannot

stand for the proposition that product complements can never make up separate product

markets—such a holding would conflict with controlling Supreme Court precedent. Rather, in

*Kentmaster*, the Ninth Circuit distinguished *Eastman Kodak* on the basis that the complaint had

not alleged any consumer demand for one product apart from the other: "on the face of the

complaint, [the] equipment and spares are described so that they necessarily constitute a single

product." *Id.* at 695. *Kentmaster* is thus an example of a complaint failing to adequately allege

consumer demand for the items as distinct products. The complaint here does not have this

deficiency.

Finally, the various franchise cases cited by Intuitive Surgical are not analogous to the

facts here. *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963 (9th Cir.

2008); *Siva v. American Board of Radiology*, 418 F. Supp. 3d 264, 274 (N.D. Ill. 2019). In the

context of franchise agreements, a franchisee enters into a contract with a franchisor that consists

of a bundle of rights and restrictions. In the ordinary case, the contractual restrictions on a

franchisee do not occupy distinct product markets from the franchise agreement as a whole

because this type of contractual bundle "is consistent with the existence of a competitive market

in which franchises are valued, in part, according to the terms of the proposed franchise

agreement and the availability of alternative franchise opportunities." *Queen City Pizza, Inc. v.

Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997). This reasoning is "grounded . . . in the

fact that the primary market for franchise agreements is a competitive market"—if potential

franchisors do not like the terms of Domino's franchise agreement, they can open a Pizza Hut

instead. *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1046 (9th Cir. 2008). The

constraints on the franchisee's future purchases are therefore not due to the leveraging of market

power, but flow from the "contractual rights that consumers knowingly and voluntarily gave to

the defendant." *Id.* at 1048. Therefore, franchise agreements are characterized as a single

product—not multiple products tied together.

Here, the primary market is not competitive—Intuitive Surgical has a monopoly in the market for surgical robots used in minimally invasive, soft-tissue surgery. According to the allegations in the complaint, Intuitive Surgical's ability to forbid health care providers from purchasing refurbishment services from other suppliers flows not from a voluntary choice by health care providers in a competitive market, but from Intuitive Surgical's monopoly power. Unlike the franchise cases, then, it makes sense (at least at the pleading stage) to conceptualize the market for refurbishment services separately from the market for surgical robots. Intuitive Surgical's motion to dismiss the complaint for failing to allege a relevant market is therefore denied.

## B

As part of its Section 2 monopolization claim, SIS alleges that Intuitive Surgical redesigned its EndoWrist instruments for the sole purpose of preventing the emergence of competitors like SIS. Intuitive Surgical has moved to dismiss "SIS's antitrust claims relating to Xi instruments" because the "allegations regarding Intuitive [Surgical]'s usage counter for Xi instruments constitute a facially deficient 'refusal to deal' theory."

To begin, this appears to be an improper argument for a motion to dismiss; a court dismisses claims, not allegations. The allegations concerning the Xi instruments are one of the exclusionary tactics SIS cites as part of its monopolization claim, not a claim in itself.

But in any event, Intuitive Surgical's argument does not prevail because SIS's allegations fit within the scope of product redesign challenges that are cognizable under the antitrust laws. "[C]hanges in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998 (9th Cir. 2010). To count as unlawful exclusionary conduct, a firm must not have had any "procompetitive justification" for its design change. *Id.* (quoting *Microsoft*, 253 F.3d at 59). SIS has alleged exactly that. According to the complaint, "[t]here is no technical or safety justification" for Intuitive

8

Surgical's redesign of the use counter in its Xi generation EndoWrist instruments; rather, Intuitive Surgical redesigned the use counter for the "sole purpose" of "prevent[ing] competition."[5] SIS alleges that Intuitive Surgical then "t[ook] steps to force customers to switch" from earlier generations of instruments (for which the use counter can be reset) to the new version (for which it cannot be) to prevent the emergence of third-party repair services. SIS has not challenged Intuitive Surgical's decision to design a product with a use counter in the first instance, but the subsequent addition of "encryption and other countermeasures" in the Xi generation that prevent the use counters from being reset by third parties. This is therefore not a refusal-to-deal claim, and SIS need not allege a prior course of dealing between SIS and Intuitive Surgical. On this point, the Court disagrees with *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, 2021 WL 1227593 (M.D. Fl. Mar. 8, 2021).

### III

In addition to its antitrust claims, SIS brings two claims under the Lanham Act, asserting that Intuitive Surgical misleadingly told customers that: (1) SIS's services are contrary to FDA approval; and (2) SIS's services violate Intuitive Surgical's intellectual property rights. Intuitive Surgical has moved to dismiss both claims, arguing that the first is precluded by the Food, Drug, and Cosmetic Act (FDCA) and that the second is insufficiently pled. The motion to dismiss is denied with respect to the first claim but granted with respect to the second.[6]

### A

The Lanham Act creates a private right of action against commercial actors who make any "false or misleading representation of fact . . . in commercial advertising or promotion" that "misrepresents the nature . . . of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1). The statute provides that any person who "is or is likely to be

---

[5] Presumably Intuitive Surgical will offer procompetitive justifications for this design change at summary judgment, but it has not done so in this motion.

[6] The complaint includes both of these claims under the same label, titled "Count V–Unfair Trade Practices–Violation of Lanham Act." But how a plaintiff labels their claims is not what matters. What matters is whether a set of allegations constitutes one claim or several distinct legal claims. In this instance, the two alleged misrepresentations appear distinct.

2-SER-441

damaged by such act" may bring suit. *Id.*

Notwithstanding the text of the Act, Intuitive Surgical argues that SIS's claim is precluded by a separate statute—the FDCA. A Lanham Act suit cannot be brought, Intuitive Surgical contends, when adjudicating the claim would require a court to evaluate the lawfulness of a firm's activity under the FDCA.

That argument is wrong. As the Supreme Court has recognized, the FDCA and the Lanham Act are complementary enforcement schemes. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014). Although both impact the representations a company can make about its medical devices, "the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety." *Id.* at 115. The FDCA does not limit the reach of the Lanham Act; it merely creates another type of enforcement action alongside it.

In Intuitive Surgical's view, this case is controlled by a Ninth Circuit opinion predating the Supreme Court's decision in *POM Wonderful*: *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010). But *PhotoMedex* is no longer good law. In *PhotoMedex*, the Ninth Circuit dismissed the plaintiff's Lanham Act claim, holding that "a private action brought under the Lanham Act may not be pursued when . . . the claim would require litigation of the alleged underlying FDCA violation in a circumstance where the FDA has not itself concluded that there was such a violation." *Id.* at 924. Four years later, the Supreme Court held in *POM Wonderful* that the FDCA did not preclude a Lanham Act claim in a slightly different context—a challenge to an allegedly misleading drink label. 573 U.S. at 106. Although *POM Wonderful* concerns the relationship between the Lanham Act and the provisions of the FDCA dealing with the misbranding of food and drink, its logic applies with equal force to the statutory relationship at issue in *PhotoMedex*: the relationship between the Lanham Act and the sections of the FDCA involving medical-device approval.

First, "neither the Lanham Act nor the FDCA, in express terms, forbids or limits Lanham Act claims challenging" statements about medical devices "that are regulated by the FDCA." *Id.*

at 113. Second, given the fact that the Lanham Act and the FDCA have coexisted for over seventy years, "[i]f Congress had concluded, in light of experience, that Lanham Act suits could interfere with the FDCA, it might well have enacted a provision addressing the issue." *Id.* Finally, as was the case in *PhotoMedex*, Congress has expressly pre-empted state regulations in this area. *See* 21 U.S.C. § 360k. "By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources." *POM Wonderful*, 573 U.S. at 114. The "reasoning [and] theory" of *PhotoMedex* is therefore "clearly irreconcilable with the reasoning [and] theory" of *POM Wonderful*, making *PhotoMedex* "effectively overruled." *See Lair v. Bullock*, 697 F.3d 1200, 1206 (9th Cir. 2012) (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003)).[7]

Even if *PhotoMedex* were not overruled, SIS's Lanham Act claim would not be precluded. *PhotoMedex* concerned a medical device manufacturer that represented that its product was "FDA Approved." 601 F.3d at 923. A competitor brought a lawsuit under the Lanham Act, arguing that the manufacturer "violated the FDCA by misrepresenting that its product had received FDA clearance," even though "the FDA declined to make a finding that there was no valid clearance or to bring an enforcement action itself." *Id.* at 922. This lawsuit presents the inverse scenario. SIS is not seeking to prove that Intuitive Surgical violated the FDCA; rather, it is arguing that Intuitive Surgical's representation that SIS may have violated the FDCA was misleading. The concern in *PhotoMedex* was overlapping authority: the Ninth Circuit found that the plaintiff's Lanham Act claim was precluded because only the FDA had the authority to take action against the defendant for its potential misrepresentation. *See id.* at 925. But here—as Intuitive Surgical acknowledged in the hearing on the motion to dismiss—there is no issue of duplicate enforcement: the FDA does not police statements that market participants make about their competitors, even when those statements concern medical devices. Therefore, even under the now-defunct reasoning of *PhotoMedex*, the Lanham Act claim based on Intuitive

---

[7] "[T]his standard applies not only to three-judge panels but also to district courts within [the Ninth] [C]ircuit." *Id.*

Surgical's statements regarding FDA approval is not precluded by the FDCA.[8]

## B

Finally, Intuitive Surgical argues that SIS has not stated a Lanham Act claim with respect to Intuitive Surgical's alleged statements about its intellectual property rights. On this point, Intuitive Surgical is correct. SIS claims that "Intuitive . . . made misleading statements that use of refurbished EndoWrists would violate [Intuitive Surgical's] intellectual property rights." But the only allegation in support of this claim is that Intuitive Surgical made a "misleading statement . . . by letter" that referred to "unspecified 'intellectual property rights in the da Vinci systems and its instruments' that 'Intuitive believes it has[.]'" This is not enough—setting aside SIS's legal characterization of Intuitive Surgical's statements, the mere fact that Intuitive Surgical referenced its intellectual property in an unspecified letter to its customers is insufficient to plausibly allege that it made a "false or misleading representation of fact" in violation of the Lanham Act. 15 U.S.C. § 1125(a)(1); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This claim is therefore dismissed with leave to amend.[9]

\* \* \*

The motion to dismiss is largely denied. Dismissal of the Lanham Act claim relating to representations about Intuitive Surgical's intellectual property rights is with leave to amend. In the unlikely event that SIS opts to file an amended complaint, it is due within 21 days of this order. Discovery may move forward immediately.[10]

---

[8] Of course, Intuitive Surgical may be correct that evaluating the merits of this Lanham Act claim will require this Court to "decide whether, under the FDCA and its regulations," SIS's services are proper. *PhotoMedex*, 601 F.3d at 928. But this is no concern. Courts regularly evaluate the lawfulness of a party's behavior under federal regulations. That the regulations here come from the FDA make no difference.

[9] Intuitive Surgical's request for judicial notice of its Patent Notice webpage is denied as moot because this claim is insufficient even without considering this webpage. *See* Dkt. No. 38.

[10] SIS's motion for leave to commence discovery, noticed for hearing on January 6, 2022, is denied as moot. *See* Dkt. No. 69.

2-SER-444

**IT IS SO ORDERED.**

Dated: November 23, 2021

_____

VINCE CHHABRIA
United States District Judge