No. 25-1372

# In the United States Court of Appeals for the Ninth Circuit

———————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

*v.*

INTUITIVE SURGICAL, INC.,
DEFENDANT-COUNTER-CLAIMAINT-APPELLEE

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-3496)
(THE HONORABLE ARACELI MARTINEZ-OLGUIN, J.)*

———————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 4 OF 5**

———————

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019*

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA G. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

**From:** Sal Brogna [Sal.Brogna@intusurg.com]
**Sent:** 4/9/2018 2:26:32 PM
**To:** Dave Rosa [Dave.Rosa@intusurg.com]; Myriam Curet [Myriam.Curet@intusurg.com]; Marshall Mohr [Marshall.Mohr@intusurg.com]; Gary Guthart [Gary.Guthart@intusurg.com]
**Subject:** Emailing - 4M Roadmap Background Material - 04-07-18 (003).pdf
**Attachments:** 4M Roadmap Background Material - 04-07-18 (003).pdf



4M Roadmap
Background Mat...

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1389**

Case No.  3:21-cv-03496-AMO
Date Entered _____
By _____
Deputy Clerk

Confidential

**Trial Ex. No. 1389, Pg. 1 of 53**

Intuitive-00767277

**4-SER-693**

(3 of 259), Page 3 of 259

Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 3 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 2 of 53

# 4M PROJECT PACKET
## AS OF 4/6/2018

## <u>Table Of Contents</u>

Page 2 - LRM dV Procedure Base

Page 7 - Market Opportunity Assessment

Page 18 - Roadmap Scenarios & Analytics

Page 35 - Data Appendix

Confidential

Intuitive-00767278

4-SER-694

# dV Procedures
## Today vs. 2022 LRM

<u>Assumptions</u>

- Used 2022 LRM procedure data to map out 2022 dV procedure composition
- Took best available total market sizes from the LRM model and overlaid them to the dV 2022 numbers to assess market penetration

Intuitive-00767279

# CONFIDENTIAL - 2024 MARKET MODELING

### Current LRM - Growth Summary



Trial Ex. No. 1389, Pg. 4 of 53

## 2022 Current Procedure LRM (Based off current LRM)





Confidential

Intuitive-00767281

4-SER-697

## Top 10 dV Procs By Country

| Country | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| US | Inguinal Hernia 264K, 64% | dVH - Benign 156K, 38% | Ventral Hernia 118K, 59% | Colon Resection 112K, 44% | Bariatrics 95K, 53% | dVP 73K, 90% | dVH - Malignant 72K, 90% | Cholecystectomy 49K, 5% | Other Thoracic 28K, 91% | dVL 27K, 99% |
| Germany | Colon Resection 35K, 46% | dVP 19K, 88% | Rectal Resection 14K, 59% | dVL 7K, 43% | dVH - Malignant 6K, 43% | dVPN 4K, 54% | dVH - Benign 4K, 3% | Pyeloplasty 4K, 3% | Other Urology 1K, 5% | dVSC 1K, 2% |
| Japan | Gastrectomy 24K, 43% | dVP 18K, 91% | dVL 12K, 26% | dVH - Malignant 10K, 99% | Rectal Resection 9K, 21% | Other Thoracic 7K, 100% | dVPN 6K, 100% | Colon Resection 2K, 3% | dVC 0K, 5% | dVH - Benign 0K, 0% |
| China | dVP 26K, 51% | dVPN 9K, 28% | dVH - Malignant 9K, 5% | Rectal Resection 6K, 2% | dVL 6K, 2% | dVH - Benign 5K, 3% | Colon Resection 5K, 3% | dVC 4K, 74% | HPB 3K, 1% | dVH 2K, 44% |
| India | dVP 16K, 53% | dVTORS - Malig 14K, 41% | dVH - Malignant 8K, 20% | Rectal Resection 5K, 27% | dVP 4K, 18% | Colon Resection 3K, 14% | dVPN 2K, 2% | Other Urology 1K, 29% | Other Thoracic 1K, 81% | Other Thoracic 0K, 47% |
| South Korea | Cholecystectomy 13K, 18% | dVThyroid 9K, 32% | dVH - Benign 8K, 27% | dVMyo 6K, 21% | dVP 5K, 77% | Rectal Resection 4K, 28% | dVPN 2K, 35% | dVSC 2K, 54% | dVL 1K, 6% | Gastrectomy 1K, 5% |
| France | ... 13K, 69% | Colon Resection 8K, 19% | dVL 6K, 59% | Rectal Resection 4K, 26% | dVH - Malignant 4K, 33% | dVPN 6K, 60% | dVSC 3K, 12% | dVH - Benign 3K, 5% | Bariatrics 1K, 3% | Pyeloplasty 1K, 59% |
| Italy | ... 21K, 96% | Rectal Resection 8K, 100% | Colon Resection 3K, 13% | dVH - Malignant 3K, 45% | dVL 3K, 33% | dVH - Benign 2K, 8% | ... 2K, 63% | Cholecystectomy 1K, 1% | Pyeloplasty 1K, 50% | dVThyroid 0K, 1% |
| Nordics | dVH - Benign 12K, 57% | dVP 9K, 100% | Colon Resection 7K, 57% | Rectal Resection 5K, 97% | dVH - Malignant 5K, 100% | dVL 1K, 62% | Ventral Hernia 1K, 5% | dVPN 1K, 99% | dVTORS - Malig 1K, 43% | dVC 1K, 24% |
| United Kingdom | ... 11K, 100% | dVH - Malignant 5K, 65% | ... 4K, 43% | Rectal Resection 4K, 30% | dVL 3K, 56% | Colon Resection 2K, 13% | ... 2K, 52% | dVH - Benign 2K, 4% | dVPN 1K, 92% | Cholecystectomy 1K, 2% |
| Brazil | dVP 21K, 97% | Rectal Resection 3K, 17% | Colon Resection 3K, 10% | Bariatrics 2K, 7% | Cholecystectomy 1K, 1% | dVH - Malignant 1K, 4% | dVH - Benign 1K, 16% | dVTORS - Malig 1K, 8% | Ventral Hernia 0K, 30% | dVH - Benign 0K, 0% |
| Benelux | dVP 10K, 97% | Rectal Resection 7K, 72% | dVH - Benign 4K, 79% | dVH - Benign 4K, 79% | dVH - Malignant 2K, 80% | Inguinal Hernia 2K, 6% | dVH - Benign 1K, 93% | Colon Resection 1K, 3% | dVSC 0K, 0% | dVH 1K, 14% |
| Other EMEIA Direct | dVP 9K, 92% | dVPN 9K, 88% | Rectal Resection 7K, 73% | dVH - Benign 2K, 18% | Colon Resection 1K, 10% | Bariatrics 1K, 82% | Cholecystectomy 1K, 5% | dVH - Malignant 0K, 3% | Pyeloplasty ... | Other Urology 0K, 24% |
| Australia | dVP 11K, 97% | Cholecystectomy 6K, 12% | dVH - Malignant ... | dVPN 2K, 73% | dVH - Benign ... | Bariatrics 1K, 6% | Colon Resection 1K, 8% | Rectal Resection 1K, 9% | dVSC 0K, 1% | Pyeloplasty 0K, 17% |
| Other EMEIA Indirect | dVP 11K, 97% | dVPN ... | Rectal Resection 1K, 85% | Colon Resection 1K, 75% | Pyeloplasty 1K, 60% | Other Urology 0K, 45% | Bariatrics 0K, 40% | dVH 0K, 40% | dVC 0K, 37% | Other Thoracic 0K, 37% |
| Canada | Colon Resection 9K, 91% | dVP 6K, 65% | dVH - Malignant 4K, 81% | Rectal Resection 2K, 81% | dVPN ... | Other Urology 0K, 12% | dVN 0K, 9% | dVER 0K, 9% | dVL 0K, 1% | Pyeloplasty 0K, 8% |
| Americas | dVP 9K, 94% | dVH - Benign 1K, 84% | dVPN 1K, 62% | Cholecystectomy 0K, 37% | Inguinal Hernia 0K, ... | Other Urology 0K, 16% | dVN 0K, 15% | dVER 0K, 12% | Pyeloplasty 0K, 11% | Foregut 0K, 10% |
| Taiwan | dVH - Benign 3K, 45% | dVP 2K, 97% | dVH - Malignant 2K, 96% | Rectal Resection 1K, 29% | dVMyo 1K, 24% | dVL 1K, 11% | dVPN 1K, 98% | HPB 0K, 13% | Other Urology 0K, 35% | dVMVR 0K, 25% |
| Spain | dVP 9K, 76% | dVH - Malignant 1K, 24% | dVL 1K, 15% | dVPN 0K, 36% | Colon Resection 0K, 1% | Bariatrics 0K, 5% | Rectal Resection 0K, 2% | Pyeloplasty 0K, 10% | Other Thoracic 0K, 8% | dVC 0K, 0% |
| Asia Other | dVP 5K, 95% | Rectal Resection 0K, 37% | dVH - Malignant 0K, 6% | dVH - Benign 0K, 6% | dVPN 0K, 20% | dVL 0K, 11% | Other Thoracic 0K, 11% | Other 0K, 10% | HPB 0K, 10% | Other Urology 0K, 9% |

dV Penetration of Total Market  0% ▬▬▬▬▬▬▬ 100%

Display:
Procedure Subject
dV Procs, dV % Penetration of total market

\* Rank is based on the number of dV procedures being performed in this market in '22

(8 of 259), Page 8 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 8 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 7 of 53

## '22 dV Penetration vs. Total Market Size



# Market Opportunity
## (Total & Remaining Market Opportunities)

### Assumptions

- Look at total market opportunity based on haircuts for emergent procedures. Total market opportunity is a mix of LRM data and data that we have started to vet internally.
- Remaining market opporutnity is the remaining market volume based on where our dV business is projected to land in 2022.
- Remaining opportunity for patient complexity was assessed through HEOR metrics (referenced throughout pages).

Confidential

Intuitive-00767284

**4-SER-700**

## Total Market Opportunity  *1K is default without any 3rd party information

| | US | China | Japan | India | Germany | France | Brazil | Italy | Spain | United Kingdom | Australia | South Korea | Benelux | Nordics | Canada | Other EMEIA Direct | Taiwan | Other EMEIA Indirect | Americas | Asia Other | Grand Total | (+) Brazil/India/China |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cancer** | | | | | | | | | | | | | | | | | | | | | | |
| Colon Resection | 252K | 140K | 30K | 21K | 60K | 44K | 25K | 33K | 32K | 18K | 22K | 14K | 29K | 20K | 10K | 10K | 6K | 1K | 1K | 1K | 838K | 652K |
| Lobectomy | 45K | 365K | 30K | 25K | 18K | 10K | 12K | 10K | 6K | 6K | 4K | 17K | 10K | 3K | 6K | 1K | 6K | 1K | 1K | 1K | 578K | 176K |
| HPB | 10K | 400K | 20K | 1K | 1K | 1K | 1K | 1K | 1K | 6K | 1K | 7K | 14K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 467K | 65K |
| Hysterectomy (Malign... | 80K | 200K | 15K | 38K | 15K | 12K | 22K | 7K | 10K | 8K | 5K | 4K | 6K | 5K | 5K | 10K | 3K | 1K | 1K | 1K | 448K | 187K |
| Prostatectomy | 85K | 50K | 23K | 30K | 23K | 19K | 22K | 22K | 12K | 9K | 8K | 6K | 6K | 9K | 8K | 10K | 3K | 15K | 10K | 5K | 376K | 274K |
| Rectal Resection | 51K | 45K | 32K | 20K | 39K | 18K | 16K | 8K | 16K | 12K | 9K | 15K | 10K | 7K | 3K | 10K | 4K | 1K | 1K | 1K | 316K | 235K |
| Gastrectomy | 23K | 79K | 54K | 1K | 1K | 1K | 1K | 1K | 1K | 2K | 20K | 1K | 1K | 1K | 1K | 1K | 2K | 1K | 1K | 1K | 194K | 113K |
| Partial Nephrectomy | 24K | 33K | 6K | 5K | 9K | 6K | 1K | 13K | 2K | 2K | 2K | 3K | 2K | 1K | 1K | 2K | 1K | 10K | 1K | 1K | 138K | 95K |
| Nephrectomy | 40K | 5K | 14K | 1K | 16K | 9K | 1K | 10K | 6K | 8K | 3K | 5K | 10K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 135K | 128K |
| Oophorectomy | 80K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 3K | 10K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 111K | 108K |
| TORS (Malignant) | 8K | 27K | 4K | 35K | 2K | 2K | 8K | 2K | 1K | 3K | 1K | 1K | 2K | 2K | 1K | 1K | 3K | 1K | 1K | 1K | 106K | 36K |
| Cystectomy | 10K | 5K | 4K | 1K | 10K | 3K | 1K | 4K | 1K | 1K | 5K | 4K | 2K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 60K | 53K |
| **Benign** | | | | | | | | | | | | | | | | | | | | | | |
| Cholecystectomy | 979K | 26K | 275K | 600K | 200K | 115K | 210K | 117K | 91K | 90K | 50K | 73K | 50K | 37K | 65K | 1K | 15K | 1K | 1K | 1K | 2,986K | 2,150K |
| Hysterectomy (Benign) | 430K | 350K | 57K | 152K | 115K | 49K | 90K | 60K | 37K | 42K | 26K | 29K | 22K | 21K | 42K | 10K | 7K | 1K | 1K | 1K | 1,542K | 951K |
| Inguinal Hernia Repair | 475K | 1K | 106K | 1K | 115K | 121K | 1K | 137K | 91K | 50K | 48K | 0K | 32K | 44K | 1K | 1K | 1K | 1K | 1K | 1K | 1,227K | 1,224K |
| Ventral Hernia Repair | 300K | 1K | 10K | 1K | 57K | 48K | 1K | 1K | 46K | 25K | 24K | 0K | 1K | 19K | 1K | 1K | 1K | 1K | 1K | 1K | 539K | 536K |
| Bariatric | 180K | 1K | 0K | 11K | 1K | 55K | 97K | 9K | 4K | 6K | 15K | 0K | 20K | 12K | 7K | 1K | 1K | 1K | 1K | 1K | 424K | 314K |
| Ovarian Cystectomy | 80K | 1K | 91K | 1K | 1K | 1K | 1K | 1K | 1K | 2K | 27K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 215K | 137K |
| Sacrocolpopexy | 50K | 1K | 8K | 1K | 25K | 18K | 40K | 1K | 1K | 3K | 19K | 0K | 1K | 1K | 5K | 1K | 1K | 1K | 1K | 1K | 179K | 139K |
| Myomectomy | 45K | 1K | 26K | 1K | 7K | 6K | 1K | 1K | 3K | 1K | 2K | 28K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 159K | 127K |
| Endometriosis Resecti... | 85K | 1K | 1K | 1K | 1K | 8K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 130K | 212K |
| TOPS (Benign) | 80K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 98K | 95K |
| Other Thoracic | 55K | 5K | 6K | 1K | 10K | 1K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 94K | 87K |
| Foregut | 60K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 80K | 77K |
| Other General Surgery | 30K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 52K | 45K |
| Other Urology | 10K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 32K | 25K |
| Other | 10K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 28K | 25K |
| Other Gynecology | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 28K | 25K |
| Pyeloplasty (Adult & P... | 6K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 27K | 20K |
| | 3,592K | 1,757K | 869K | 956K | 753K | 556K | 582K | 449K | 360K | 314K | 270K | 271K | 222K | 199K | 172K | 92K | 72K | 52K | 38K | 33K | 11,609K | 8,314K |

**Total Market Opp**

| | US | China | Japan | India | Germany | France | Brazil | Italy | Spain | | Australia | South Korea | Benelux | Nordics | Canada | | Taiwan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GDP/HEAD | 66K | 24K | 50K | 11K | 60K | 52K | 18K | 44K | 47K | | 59K | 49K | 60K | 65K | 55K | | 61K | | | |
| Pop/Country | 347m | 1.4B | 124m | 1.3B | 79m | 69m | 223m | 63m | 51m | | 25m | 49m | 30m | 22m | 38m | | 24m | | | |

0K ▬▬▬▬ 150K

*Total Market Opportunity = '22 dV Procedures+ Remaining MIS + Remaining Open

Confidential

## Total Market Opportunity (Exlcuding Emergent Procedures) *1K is default without any 3rd party information

| | | US | China | Japan | India | Germany | France | Brazil | Italy | Spain | United Kingdom | Australia | South Korea | Benelux | Nordics | Canada | Other EMEIA Direct | Taiwan | Other EMEIA Indirect | Americas | Asia Other | Grand Total | (-) Brazil/India/China |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | Colon Resection | 176K | 98K | 56K | 15K | 56K | 31K | 18K | 23K | 22K | 13K | 15K | 10K | 21K | 14K | 7K | 7K | 4K | 1K | 1K | 1K | 587K | 457K |
| | Lobectomy | 45K | 365K | 30K | 25K | 18K | 10K | 12K | 10K | 6K | 6K | 4K | 17K | 10K | 3K | 6K | 1K | 6K | 1K | 1K | 1K | 578K | 176K |
| | HPB | 10K | 400K | 20K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 7K | 14K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 467K | 65K |
| | Hysterectomy (Malign... | 80K | 200K | 15K | 38K | 15K | 12K | 22K | 7K | 10K | 8K | 5K | 4K | 6K | 5K | 10K | 3K | 1K | 1K | 1K | 1K | 448K | 187K |
| | Prostatectomy | 85K | 50K | 23K | 30K | 23K | 19K | 22K | 22K | 12K | 9K | 8K | 6K | 8K | 9K | 8K | 10K | 3K | 15K | 10K | 5K | 376K | 274K |
| | Rectal Resection | 51K | 45K | 32K | 20K | 39K | 18K | 16K | 8K | 16K | 12K | 9K | 15K | 10K | 3K | 10K | 4K | 1K | 1K | 1K | 1K | 316K | 235K |
| | Gastrectomy | 23K | 79K | 54K | 1K | 1K | 1K | 1K | 1K | 2K | 20K | 1K | 1K | 1K | 1K | 1K | 1K | 2K | 1K | 1K | 1K | 194K | 113K |
| | Partial Nephrectomy | 24K | 33K | 6K | 5K | 9K | 6K | 5K | 13K | 2K | 2K | 2K | 3K | 2K | 1K | 2K | 10K | 1K | 10K | 1K | 1K | 138K | 95K |
| | Nephrectomy | 40K | 5K | 14K | 1K | 16K | 9K | 1K | 10K | 6K | 8K | 3K | 5K | 10K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 135K | 128K |
| | Oophorectomy | 90K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 10K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 111K | 108K |
| | TORS (Malignant) | 8K | 27K | 4K | 35K | 2K | 2K | 8K | 2K | 1K | 3K | 1K | 1K | 2K | 2K | 1K | 1K | 3K | 1K | 1K | 1K | 106K | 36K |
| | Cystectomy | 10K | 5K | 4K | 1K | 10K | 3K | 1K | 5K | 3K | 3K | 1K | 1K | 4K | 4K | 1K | 1K | 1K | 1K | 1K | 1K | 60K | 53K |
| Benign | Cholecystectomy | 538K | 14K | 151K | 330K | 110K | 63K | 116K | 64K | 44K | 49K | 27K | 40K | 28K | 20K | 36K | 1K | 8K | 1K | 1K | 1K | 1,642K | 1,183K |
| | Hysterectomy (Benign) | 430K | 350K | 57K | 152K | 115K | 49K | 90K | 60K | 37K | 42K | 26K | 29K | 22K | 21K | 42K | 10K | 7K | 1K | 1K | 1K | 1,542K | 951K |
| | Inguinal Hernia Repair | 475K | 1K | 106K | 1K | 115K | 121K | 1K | 137K | 91K | 50K | 48K | 1K | 32K | 44K | 1K | 1K | 1K | 1K | 1K | 1K | 1,227K | 1,224K |
| | Ventral Hernia Repair | 300K | 1K | 10K | 1K | 57K | 48K | 1K | 1K | 46K | 25K | 24K | 1K | 1K | 19K | 1K | 1K | 1K | 1K | 1K | 1K | 539K | 536K |
| | Bariatric | 180K | 1K | 0K | 11K | 1K | 55K | 97K | 9K | 4K | 6K | 15K | 1K | 20K | 12K | 7K | 1K | 1K | 1K | 1K | 1K | 424K | 314K |
| | Ovarian Cystectomy | 80K | 1K | 91K | 1K | 1K | 1K | 1K | 1K | 2K | 27K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 215K | 137K |
| | Sacrocolpopexy | 50K | 1K | 8K | 1K | 25K | 18K | 40K | 1K | 1K | 3K | 19K | 1K | 1K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 179K | 139K |
| | Myomectomy | 45K | 1K | 26K | 1K | 7K | 6K | 1K | 1K | 3K | 1K | 28K | 1K | 1K | 10K | 3K | 1K | 1K | 1K | 1K | 1K | 159K | 127K |
| | Endometriosis Resecti... | 85K | 1K | 1K | 1K | 1K | 8K | 1K | 1K | 15K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 130K | 212K |
| | TOPS (Benign) | 80K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 98K | 95K |
| | Other Thoracic | 55K | 5K | 6K | 1K | 10K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 94K | 87K |
| | Foregut | 60K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 80K | 77K |
| | Other General Surgery | 30K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 52K | 45K |
| | Other Urology | 10K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 32K | 25K |
| | Other | 10K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 28K | 25K |
| | Other Gynecology | 10K | 1K | 5K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 28K | 25K |
| | Pyeloplasty (Adult & P... | 6K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 1K | 27K | 20K |
| | | 3,076K | 1,703K | 722K | 679K | 639K | 490K | 480K | 387K | 315K | 269K | 241K | 234K | 190K | 176K | 140K | 89K | 64K | 51K | 37K | 32K | 10,014K | 7,151K |

Total Market Opp   0K ▓▓▓▓ 150K

| | US | China | Japan | India | Germany | France | Brazil | Italy | Spain | | Australia | South Korea | Benelux | Nordics | Canada | | Taiwan | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GDP/HEAD | 66K | 24K | 50K | 11K | 60K | 52K | 18K | 44K | 47K | | 59K | 49K | 60K | 65K | 55K | | 61K | |
| Pop/Country | 347m | 1.4B | 124m | 1.3B | 79m | 69m | 223m | 63m | 51m | | 25m | 49m | 30m | 22m | 38m | | 24m | |

*Total Market Opportunity = '22 dV Procedures + Remaining MIS + Remaining Open - Emergent Procedures

Confidential

## Remaining Market Opportunities (In 2022) *1K is default without any 3rd party information

| | US | China | India | Japan | Germany | Brazil | France | Italy | Spain | United Kingdom | Australia | South Korea | Benelux | Nordics | Canada | Other EMEIA Di.. | Taiwan | Asia Other | Americas | Other EMEIA In.. | Grand Total | (-) Brazil/India/China | '22 dV LRM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cancer** | | | | | | | | | | | | | | | | | | | | | | | |
| Lobectomy | 18K | 359K | 20K | 15K | 9K | 12K | 5K | 8K | 1K | 1K | 7K | 12K | 5K | 2K | 6K | 1K | 5K | 1K | 1K | 1K | 495K | 270K | 193K |
| HPB | 6K | 397K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 7K | 12K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 455K | 104K | 77K |
| Colon Resection | 86K | 93K | 12K | 48K | 21K | 15K | 23K | 19K | 22K | 10K | 14K | 9K | 20K | 7K | | 6K | 4K | 1K | 1K | 1K | 390K | 56K | 8K |
| Hysterectomy (Malign.. | 8K | 191K | 30K | 4K | 7K | 22K | 3K | 4K | 10K | 1K | 2K | 2K | | | 1K | 1K | 1K | 1K | 1K | | 303K | 60K | 143K |
| Rectal Resection | 26K | 37K | 15K | 20K | 21K | 13K | 14K | 14K | 8K | 8K | 10K | 3K | 2K | 3K | 3K | 1K | 1K | 1K | 0K | | 201K | 108K | 108K |
| Gastrectomy | 19K | 79K | 1K | 25K | 1K | 1K | 1K | 1K | 1K | 1K | 2K | 16K | 1K | 1K | 1K | 1K | 3K | 1K | 1K | 1K | 156K | 76K | 27K |
| Nephrectomy | 25K | 3K | 1K | 12K | 14K | 1K | 9K | 10K | 6K | 8K | 3K | 4K | 5K | 2K | 2K | 1K | 1K | 1K | | | 111K | 30K | 6K |
| Oophorectomy | 72K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 3K | 1K | 9K | 1K | 1K | 2K | 1K | 1K | 1K | 1K | 1K | 101K | 98K | 17K |
| TORS (Malignant) | 4K | 25K | 21K | 4K | 2K | 7K | 2K | 2K | 1K | 1K | 1K | | 2K | 1K | 1K | | 1K | | | | 81K | 107K | 24K |
| Prostatectomy | 8K | 24K | 14K | 2K | 3K | | 1K | 4K | | 1K | 1K | | 1K | | | | | | | | 69K | 27K | 306K |
| Partial Nephrectomy | 1K | 3K | 3K | | 4K | 4K | 2K | 11K | 1K | 0K | 1K | | 1K | | 0K | 0K | | 0K | | | 60K | 28K | 77K |
| Cystectomy | 5K | 1K | 1K | 2K | 3K | 1K | 2K | 4K | 1K | 1K | 2K | 1K | 1K | | 1K | 1K | | | | | 46K | 42K | 15K |
| **Benign** | | | | | | | | | | | | | | | | | | | | | | | |
| Cholecystectomy | 485K | 13K | 330K | 136K | 98K | 114K | 82K | 44K | 48K | 21K | 27K | 28K | 20K | 36K | 0K | 8K | 1K | 0K | 0K | | 1,536K | 1,079K | 76K |
| Hysterectomy (Benign) | 151K | 344K | 150K | 55K | 100K | | 47K | 59K | 37K | 43K | 25K | 20K | 21K | 9K | 42K | 4K | 1K | 0K | | | 1,197K | 614K | 203K |
| Inguinal Hernia Repair | 182K | 1K | 1K | 303K | | 121K | 137K | 95K | 50K | 46K | | | | 31K | 43K | 1K | 1K | | | | 910K | 907K | 257K |
| Ventral Hernia Repair | 182K | 1K | 1K | 9K | 62K | 1K | 47K | 1K | 45K | 25K | 24K | | 1K | 18K | 1K | 1K | | | | | 412K | 410K | 120K |
| Bariatric | 80K | 1K | 11K | 0K | 1K | 180K | 3K | 9K | 4K | 3K | 14K | | 20K | 12K | 7K | 0K | 1K | | | | 319K | 211K | 105K |
| Ovarian Cystectomy | 72K | 1K | 1K | 102K | 1K | 1K | 1K | 1K | 1K | | 2K | 24K | 1K | | 1K | | | | | | 195K | 102K | 27K |
| Sacrocolpopexy | 23K | 1K | 1K | 8K | 22K | 40K | 15K | 1K | 3K | 19K | | 1K | 5K | 1K | 1K | | | | | | 144K | 114K | 15K |
| Myomectomy | 34K | 1K | 1K | 24K | 6K | 18K | 5K | 1K | 3K | 1K | 20K | | 1K | | 1K | | | | | | 133K | 117K | 5K |
| Endometriosis Resecti.. | 77K | 1K | 1K | 1K | 1K | 1K | 1K | 15K | 7K | | | | 1K | | 1K | | | | | | 120K | 192K | 5K |
| TORS (Benign) | 50K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | 1K | | 1K | | 1K | | | | | | 81K | 78K | 2K |
| Foregut | 45K | 1K | 1K | 1K | | | 1K | 1K | | | 1K | | 1K | | 1K | | | | | | 65K | 62K | 15K |
| Other Thoracic | 22K | 4K | 1K | 9K | 1K | | 1K | 1K | 1K | | | | 1K | | 1K | | | | | | 49K | 44K | 40K |
| Other General Surgery | 17K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | | | 1K | | 1K | | | | | | 37K | 31K | 12K |
| Other | 8K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | | | 1K | | 1K | | | | | | 25K | 22K | 2K |
| Other Urology | 2K | 5K | 1K | 0K | 1K | | 1K | 1K | 1K | | | | 1K | | 1K | | | | | | 19K | 13K | 12K |
| Other Gynecology | 1K | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 1K | | | | 1K | | 1K | | | | | | 18K | 15K | 9K |
| Pyeloplasty (Adult & P.. | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 0K | 1K | | 1K | | 1K | | | | | | 16K | 11K | 11K |
| | 1,708K | 1,620K | 621K | 564K | 490K | 447K | 440K | 340K | 303K | 234K | 216K | 175K | 157K | 132K | 120K | 57K | 51K | 25K | 25K | 23K | 7,745K | 5,057K | 1,913K |

'22 dV LRM

| | US | China | India | Japan | Germany | Brazil | France | Italy | Spain | United Kingdom | Australia | South Korea | Benelux | Nordics | Canada | Other EMEIA Di.. | Taiwan | Asia Other | Americas | Other EMEIA In.. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1,142K | 83K | 93K | 58K | 89K | 50K | 34K | 37K | 30K | 35K | 45K | 47K | 22K | 12K | 45K | 31K | 13K | 7K | 13K | 28K | 1,913K |

Procedures

1K ▨▨▨ 150K *Remaining Market Opportunities = Total Market Opportunity - '22 dV Procedures. **Continues to exclude emergent procedures

Confidential

Intuitive-00767287

**Trial Ex. No. 1389, Pg. 11 of 53**

**4-SER-703**

## Remaining Market Opportunities (Remaining Open) *1K is default without any 3rd party information

| | | China | India | US | France | Brazil | Spain | Japan | Germany | Italy | Australia | United Kingdom | Nordics | Canada | Benelux | Other EMEIA DI.. | South Korea | Taiwan | Americas | Asia Other | Other EMEIA In.. | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | HPB | 317K | 1K | 4K | 1K | 1K | 1K | 14K | 1K | 1K | 5K | 1K | 1K | 1K | 1K | | 9K | 1K | 1K | 1K | 0K | 362K |
| | Gastrectomy | 61K | 1K | 11K | 0K | 1K | 1K | 13K | 1K | 0K | 2K | 1K | 1K | 1K | 1K | | 12K | 2K | 1K | 1K | 0K | 108K |
| | Hysterectomy (Malign.. | 31K | 27K | | 2K | 19K | 9K | 3K | 6K | 1K | | | | 0K | | | 9K | | 1K | 0K | 0K | 108K |
| | Rectal Resection | 3K | 11K | 16K | 10K | 10K | 12K | 10K | 13K | 1K | 6K | 6K | 0K | | 1K | | | 0K | 1K | | | 101K |
| | Lobectomy | 49K | 10K | 0K | 1K | 7K | 3K | 2K | 4K | 3K | 4K | 0K | 0K | 3K | 1K | | 8K | 0K | 0K | 0K | 1K | 99K |
| | Colon Resection | 20K | 4K | | 8K | 6K | 11K | 9K | | 8K | 7K | 4K | | | 9K | 3K | | 0K | 0K | | | 90K |
| | TORS (Malignant) | 5K | 14K | 2K | 2K | 6K | 1K | 1K | 2K | 1K | 1K | 1K | | 2K | 1K | | 0K | 1K | 0K | 1K | 1K | 44K |
| | Nephrectomy | | 0K | 5K | 4K | 0K | 2K | 1K | 6K | | 2K | 1K | 0K | 0K | 2K | | 0K | 0K | 0K | | | 43K |
| | Prostatectomy | | 14K | 7K | 6K | 0K | 4K | | 3K | 0K | | | | 2K | | | | 0K | 0K | | 2K | 39K |
| | Cystectomy | 0K | 1K | 3K | 2K | 1K | 2K | 3K | 6K | 4K | 1K | 2K | 0K | 1K | 2K | | 0K | 0K | 1K | 0K | 0K | 34K |
| | Partial Nephrectomy | | 2K | | 3K | 4K | 1K | 1K | 7K | | | | | | | | 1K | | 0K | 0K | 1K | 17K |
| | Oophorectomy | 0K | 0K | | 0K | 0K | 0K | | 0K | 0K | 0K | 0K | | 0K | | | | 0K | 0K | 0K | 0K | 2K |
| Benign | Inguinal Hernia Repair | 1K | 0K | | 78K | 1K | 59K | 58K | 63K | 89K | 31K | 33K | 28K | | 20K | 1K | | 1K | 1K | 0K | 1K | 466K |
| | Hysterectomy (Benign) | 64K | 96K | | 5K | 58K | | 24K | 11K | 0K | 7K | 16K | 5K | 27K | 1K | | 1K | 5K | | 0K | 0K | 322K |
| | Ventral Hernia Repair | 1K | 1K | 107K | 35K | 0K | 34K | 7K | 37K | 1K | 18K | 19K | 13K | | 1K | 1K | | 1K | 1K | 0K | 1K | 278K |
| | Sacrocolpopexy | 1K | 1K | 8K | 10K | 28K | 1K | 2K | 1K | 1K | 13K | 2K | 2K | 4K | | | 0K | 1K | 1K | 0K | 1K | 72K |
| | Cholecystectomy | 0K | 33K | | 6K | 10K | 4K | | | 5K | | 4K | 2K | 3K | | | | 1K | | | | 72K |
| | Myomectomy | | 1K | 18K | 3K | 11K | | 1K | 5K | 0K | 1K | 1K | 1K | 2K | 6K | | | 1K | | | | 53K |
| | Other General Surgery | 4K | 17K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | 1K | 1K | | | 0K | 0K | | 1K | 37K |
| | Other | 1K | 1K | 8K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | | | | 1K | 0K | 0K | 1K | 25K |
| | Other Urology | 5K | 0K | 2K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 1K | | | 1K | | | 1K | 1K | 0K | 1K | 19K |
| | Bariatric | | 1K | | 4K | 8K | 1K | | 1K | 0K | | | 1K | 1K | 2K | | | 0K | | | | 18K |
| | Other Gynecology | 1K | 0K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | | | 1K | | | 0K | 0K | | 1K | 18K |
| | Other Thoracic | 2K | 0K | | 1K | 1K | | 5K | | 1K | 0K | 1K | | 1K | | | 2K | 0K | 0K | | | 14K |
| | Pyeloplasty (Adult & P.. | 1K | 0K | | 0K | 1K | 1K | 1K | | 0K | 1K | 0K | 0K | 0K | 0K | | | 0K | 0K | | | 6K |
| | Endometriosis Resect.. | 1K | 0K | | 1K | 0K | 0K | | | 0K | 0K | 0K | | | | | | 0K | 0K | | 0K | 3K |
| | TORS (Benign) | 1K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | | 0K | | | | | | | 0K | 0K | 0K | 2K |
| | Ovarian Cystectomy | 0K | 0K | | 0K | 0K | | 0K | | 0K | 0K | 0K | | | | | 0K | | 0K | 0K | 0K | 1K |
| | Foregut | 0K | 0K | | 0K | | | 0K | | | | | | | | | | | 0K | 0K | 0K | 1K |
| | | 566K | 219K | 212K | 183K | 176K | 175K | 151K | 150K | 138K | 111K | 87K | 55K | 53K | 53K | 34K | 34K | 18K | 14K | 12K | 11K | 2,454K |

Procedures


0K  50K  *Remaining Open = Total Market Opportunity - '22 dV Procedures - Remaining MIS Opportunity. **Continues to exclude emergent procedures

Confidential

Intuitive-00767288

4-SER-704

## Remaining Market Opportunities (Remaining MIS) *1K is default without any 3rd party information

| | | US | China | Japan | India | Germany | Brazil | France | Italy | United Kingdom | South Korea | Spain | Australia | Benelux | Nordics | Canada | Taiwan | Other EMEIA Di.. | Asia Other | Other EMEIA In.. | Americas | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | Lobectomy | 18K | 310K | 12K | 10K | 7K | 5K | 4K | 4K | 2K | 7K | 2K | 4K | 4K | 1K | 2K | 2K | 0K | 0K | 0K | 0K | 395K |
| | Colon Resection | 64K | 74K | 39K | 7K | 21K | 9K | 15K | 11K | 6K | 9K | 11K | 8K | 10K | 7K | | 4K | 4K | 0K | | 0K | 300K |
| | Hysterectomy (Malign.. | 8K | 160K | 1K | 4K | 1K | 2K | 5K | 3K | 3K | 2K | 1K | | 2K | | 0K | 1K | 1K | 0K | 0K | 0K | 196K |
| | Rectal Resection | 10K | 34K | 10K | 4K | 8K | 3K | 4K | 2K | 2K | 10K | 3K | 2K | 2K | 1K | 3K | 2K | 1K | 1K | 1K | 0K | 100K |
| | Oophorectomy | 72K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 9K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 99K |
| | HPB | 2K | 80K | 4K | 0K | 0K | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 1K | 1K | 0K | 1K | 0K | 0K | 93K |
| | Nephrectomy | 20K | 3K | 7K | 1K | 8K | 1K | 5K | 5K | 4K | 2K | 3K | 5K | 1K | 1K | 1K | 0K | 1K | 0K | 1K | 1K | 68K |
| | Gastrectomy | 8K | 17K | 12K | 0K | 0K | 0K | 0K | 0K | 0K | 4K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 48K |
| | Partial Nephrectomy | 1K | 24K | | 1K | 3K | 0K | 2K | 4K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 43K |
| | TORS (Malignant) | 2K | 22K | 1K | 7K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 37K |
| | Prostatectomy | 10K | 24K | 2K | 0K | 0K | 0K | 0K | 0K | 0K | 1K | 0K | | | | | 0K | 0K | 0K | 0K | 0K | 30K |
| | Cystectomy | 2K | 1K | 1K | 0K | 2K | 0K | 1K | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 12K |
| Benign | Cholecystectomy | 485K | 13K | 136K | 297K | 99K | 104K | 57K | 58K | 44K | 27K | 40K | 21K | 25K | 18K | 32K | 7K | 1K | 1K | 0K | 1K | 1,465K |
| | Hysterectomy (Benign) | 151K | 280K | 40K | 53K | 98K | 31K | 42K | 51K | 36K | 20K | 13K | 9K | 9K | 9K | 15K | 4K | 4K | 0K | 0K | 0K | 875K |
| | Inguinal Hernia Repair | 181K | 1K | 37K | 0K | 40K | 0K | 42K | 48K | 18K | | 32K | 17K | 11K | 15K | | 0K | 0K | 0K | 0K | 1K | 444K |
| | Bariatric | 85K | 1K | 0K | 10K | 1K | 88K | 49K | 8K | 3K | | 4K | 14K | 18K | 11K | 6K | 1K | 0K | 0K | 0K | 1K | 301K |
| | Ovarian Cystectomy | 72K | 1K | 82K | 1K | 1K | 1K | 1K | 1K | 24K | 1K | 1K | 1K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 194K |
| | Ventral Hernia Repair | 75K | 0K | 3K | 0K | 14K | 0K | 12K | 0K | 6K | | 11K | 6K | 0K | 5K | 0K | 0K | 0K | 0K | 0K | 1K | 135K |
| | Endometriosis Resecti.. | 77K | 1K | 1K | 0K | 1K | 1K | 7K | 1K | 14K | | 1K | 6K | 1K | 1K | 1K | 0K | 0K | 0K | 0K | 0K | 117K |
| | Myomectomy | 16K | 1K | 18K | 0K | 6K | 6K | 1K | 1K | 1K | 20K | 1K | 1K | 1K | 1K | 1K | 2K | 0K | 0K | 0K | 0K | 80K |
| | TORS (Benign) | 64K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 0K | 78K |
| | Sacrocolpopexy | 15K | 1K | 6K | 0K | 21K | 12K | 5K | 0K | 1K | | 6K | 6K | 0K | 1K | | 1K | 1K | 0K | 0K | 0K | 72K |
| | Foregut | 46K | 1K | 1K | 1K | 1K | 0K | 1K | 0K | 1K | | 3K | 3K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 1K | 64K |
| | Other Thoracic | 22K | 1K | | 0K | 4K | 0K | 0K | 0K | 0K | | 2K | 1K | 0K | 1K | 1K | 1K | 0K | 0K | 0K | 0K | 35K |
| | Pyeloplasty (Adult & P.. | 1K | 4K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 10K |
| | | 1,496K | 1,054K | 413K | 402K | 339K | 271K | 258K | 201K | 146K | 141K | 128K | 104K | 104K | 76K | 66K | 32K | 23K | 13K | 12K | 11K | 5,291K |

Procedures 0K — 50K

*Remaining Open = Total Market Opportunity - '22 dV Procedures - Remaining MIS Opportunity. **Continues to exclude emergent procedures

Confidential

## Remaining Market Opportunities (Remaining MIS Adjusted For Complex Patient Population) *1K is default without any 3rd party information

| | | US | China | Japan | Germany | India | France | Brazil | Italy | South Korea | United Kingdom | Spain | Australia | Benelux | Nordics | Canada | Taiwan | Other EMEIA Di.. | Asia Other | Other EMEIA In.. | Americas | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | Lobectomy | 18K | 310K | 12K | 7K | 10K | 4K | 5K | 4K | 7K | 2K | 2K | 2K | 1K | 1K | 2K | 1K | 0K | 0K | 0K | 0K | 395K |
| | Colon Resection | 64K | 74K | 39K | 21K | 7K | 15K | 9K | 11K | 9K | 6K | 11K | 8K | 10K | 7K | | 4K | 4K | 0K | 0K | 0K | 300K |
| | Hysterectomy (Malign.. | 8K | 160K | 1K | 1K | 4K | 5K | 2K | 3K | 2K | 3K | 1K | | 2K | | 0K | 1K | 1K | 0K | 1K | 0K | 196K |
| | Rectal Resection | 10K | 34K | 10K | 8K | 4K | 4K | 3K | 1K | 10K | 2K | 3K | 2K | 1K | 3K | 2K | 1K | 1K | 0K | 1K | 1K | 100K |
| | Oophorectomy | 72K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 9K | 1K | 3K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 1K | 1K | 99K |
| | HPB | 2K | 80K | 4K | 0K | 0K | 0K | 3K | 0K | 0K | 1K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 93K |
| | Nephrectomy | 20K | 34K | 7K | 8K | 1K | 5K | 1K | 4K | 3K | 1K | 5K | 1K | 1K | 1K | 1K | 0K | 1K | 0K | 1K | 0K | 68K |
| | Gastrectomy | 8K | 17K | 12K | 0K | 0K | 0K | 0K | 4K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 48K |
| | Partial Nephrectomy | 1K | 24K | | 3K | 1K | 2K | 0K | 4K | 0K | 1K | 1K | 1K | 0K | 1K | 0K | 0K | 0K | 0K | 2K | 0K | 43K |
| | TOPS (Malignant) | 2K | 22K | 1K | 0K | 7K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 37K |
| | Prostatectomy | 1K | 24K | 2K | 0K | 0K | 0K | 0K | 1K | | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 30K |
| | Cystectomy | 2K | 1K | 1K | 2K | 0K | 0K | 0K | 1K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 12K |
| Benign | Cholecystectomy | 212K | 5K | 56K | 41K | 122K | 23K | 43K | 24K | 11K | 18K | 16K | 9K | 10K | 8K | 13K | 3K | 2K | 0K | 0K | 0K | 614K |
| | Hysterectomy (Benign) | 81K | 140K | 20K | 49K | 27K | 21K | 16K | 26K | 10K | 18K | 6K | 5K | 5K | 5K | 7K | 2K | 2K | 0K | 0K | 0K | 443K |
| | Inguinal Hernia Repair | 138K | 0K | 21K | 22K | 0K | 24K | 0K | 27K | | 10K | 18K | 9K | 9K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 285K |
| | Ovarian Cystectomy | 72K | 1K | 82K | 1K | 1K | 1K | 1K | 24K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 1K | 1K | 194K |
| | Endometriosis Resecti.. | 77K | 1K | 1K | 1K | 1K | 17K | 7K | 1K | 14K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 0K | 0K | 117K |
| | Bariatric | 34K | 0K | 0K | 0K | 4K | 17K | 31K | 3K | | 1K | 5K | 5K | 6K | 4K | 1K | 0K | 0K | 0K | 0K | 0K | 109K |
| | Myomectomy | 16K | 1K | 18K | 6K | 0K | 2K | 6K | 1K | 20K | 1K | 1K | 1K | 2K | 4K | 1K | 1K | 0K | 0K | 0K | 0K | 80K |
| | TORS (Benign) | 64K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 1K | 0K | 0K | 0K | 0K | 78K |
| | Sacrocolpopexy | 15K | 1K | 6K | 21K | 0K | 5K | 12K | 1K | | 0K | 6K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 72K |
| | Foregut | 46K | 1K | 1K | 1K | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 64K |
| | Ventral Hernia Repair | 38K | 0K | 1K | 5K | 0K | 4K | 0K | 0K | | 2K | 4K | 0K | 2K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 59K |
| | Other Thoracic | 22K | 2K | | 0K | 0K | 0K | 0K | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 35K |
| | Pyeloplasty (Adult & P.. | 1K | 4K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 10K |
| | | 1,022K | 906K | 295K | 204K | 193K | 145K | 136K | 115K | 115K | 89K | 74K | 67K | 63K | 44K | 36K | 25K | 21K | 12K | 10K | 9K | 3,582K |

Procedures

0K ▪▪▪▪▪ 50K

Remaining Opportunity = Remaining MIS Opp * Patient Population Complexity (Assumptions):
Chole = 41%; Inguinal = 56%; Ventral = 35%; Bariatric = 35%; Benign Hyst = 50%

**Continues to exclude emergent procedures

Confidential

## Incremental Market Opps To LRM - By Type



**Definitions**

**ASC** = Advisory Board projected rates of total market shift to ASC setting
(Inguinal, Ventral, Hysterectomy, Bariatric)

*ASC assumptions as a % of total market:
  Inguinal = 33%
  Ventral = 17%
  Chole = 10%
  B-Hyst = 5%

## Incremental Market Opps To LRM - By Region



(17 of 259), Page 17 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 17 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 16 of 53

## Incremental Market Opps To LRM - By Type



Benign MIS — 3,528K
Cancer MIS — 1,418K
Benign Open — 1,408K
Cancer Open — 1,046K
US ASC — 345K

Measure
- MIS On Existing Procedures
- Remaining Open On Existing Procedures
- Volume Escaped To The ASCs

### Definitions

ASC = Advisory Board projected rates of total market shift to ASC setting (Inguinal, Ventral, Hysterectomy, Bariatric)

*ASC assumptions as a % of total market:
Inguinal = 38%
Ventral = 17%
Chole = 10%
B-Hyst = 5%

## Incremental Market Opps To LRM - By Region



| Region | Type | Value |
|---|---|---|
| US | Benign MIS | 947K |
| | US ASC | 345K |
| | Cancer MIS | 204K |
| | Benign Open | 163K |
| | Cancer Open | 49K |
| China | Cancer MIS | 750K |
| | Cancer Open | 487K |
| | Benign MIS | 305K |
| | Benign Open | 79K |
| Indirect Other | Benign MIS | 442K |
| | Benign Open | 385K |
| | Cancer Open | 130K |
| | Cancer MIS | 94K |
| India | Benign MIS | 366K |
| | Benign Open | 136K |
| | Cancer Open | 83K |
| | Cancer MIS | 36K |
| EU Direct Other | Benign MIS | 279K |
| | Benign Open | 170K |
| | Cancer MIS | 70K |
| | Cancer Open | 60K |
| Japan | Benign MIS | 324K |
| | Cancer MIS | 89K |
| | Benign Open | 87K |
| | Cancer Open | 63K |
| Germany | Benign MIS | 287K |
| | Benign Open | 111K |
| | Cancer MIS | 52K |
| | Cancer Open | 40K |
| Brazil | Benign MIS | 246K |
| | Benign Open | 122K |
| | Cancer Open | 54K |
| | Cancer MIS | 24K |
| France | Benign MIS | 220K |
| | Benign Open | 146K |
| | Cancer MIS | 38K |
| | Cancer Open | 37K |
| Asia Direct Other | Benign MIS | 112K |
| | Cancer MIS | 62K |
| | Cancer Open | 43K |
| | Benign Open | 9K |

0K   100K   200K   300K   400K   500K   600K   700K   800K   900K   1,000K
Procedures

Confidential

Intuitive-00767292

**4-SER-708**

This view shows remaining MIS opportunity based on patient complexity.

### Incremental Market Opps To LRM - By Type



### Incremental Market Opps To LRM - By Region



This view shows remaining opportunity to focus on MIS patients based on complexity.

Confidential

Intuitive-00767293

4-SER-709

This view shows remaining MIS opportunity based on patient complexity.

### Incremental Market Opps To LRM - By Type



This view shows remaining opportunity to focus on MIS patients based on complexity.

Definitions

**ASC** = Advisory Board projected rates of total market shift to ASC setting (Inguinal, Ventral, Hysterectomy, Bariatric)

*ASC assumptions as a % of total market:
Inguinal = 38%
Ventral = 17%
Chole = 10%
B-Hyst = 5%

### Incremental Market Opps To LRM - By Region



# Roadmap Scenarios & Analytics

## Assumptions

- US/OUS reimbursement rates based on collection from national databases.
- Waterfall calculations are based penetration of remaining market opportunity, as defined in the remaining market opportunity section of this workbook (page 8 - 17).
- Waterfall cont... 'Gap To Fulfill' = the remaining procedure opportunity that is  needed to get to the 4M. A mix of cancer/benign open opportunity in WW indirect markets, along with other opportunities like biopsies, nipple sparing mastectomy, etc.. fulfills this gap
- Tier 1 opportunity assessed from SFDC data, looking at number of procedures at Tier 1 accounts vs. the total market size of accounts (still assessing data and procedure impact)

Intuitive-00767295

**4-SER-711**

## Benign MIS Opportunity In Target Markets - Reimbursement vs. Procs



## Revised Roadmap Waterfall (Reimbursement + Patient Complexity)



(23 of 259), Page 23 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 23 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 22 of 53

## Revised Roadmap Waterfall (Reimbursement + Patient Complexity)



**Type (copy)**
- '22 dV as of '18 LRM
- US
- US Achivement
- France + Germany
- France + Germany Achievement
- Japan
- Japan Achievement
- South Korea

- South Korea Achievement
- IT + ESP + Other EU
- IT + ESP + Other EU Achievement
- China
- WW Indirect
- Other Opportunities
- 4M

<u>Penetration Of Remaining Opportunity</u>
MIS - Complex = 50%
Open - Benign = 60%
MIS - Benign = > $3.2K = Patient Complexity Penetration ; < $3.2K = 50% of PC Penetration
Other Opp = NSM (20%), Lung Biopsies (10%), Emergent Procs (8%)
**Indirect Gap To Fulfill** = Remaining open opportunity need after MIS - Benign

<u>Patient Complexity</u>
<u>Assumptions</u>
Chole = 41%
Inguinal = 56%
Ventral = 35%
Bariatric = 35%
Benign Hyst = 50%

## Roadmap Waterfall (Indirect Contribution)



## 2018 Market Share

| | | US | China | India | Japan | Germany | France | Brazil | Italy | Spain | UK | South Korea | Australia | Benelux | Nordics | Canada | Other EMEIA DI.. | Taiwan | Other EMEIA In.. | Americas | Asia Other | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cancer** | Colon Resection | 24% | 1% | 3% | 0% | 3% | 4% | 1% | 5% | 1% | 3% | 1% | 1% | 3% | 8% | 6% | 6% | 2% | 78% | 11% | 7% | 9% |
| | Lung Biopsies | 0% | 0% | | 0% | 0% | | 0% | 0% | 0% | 0% | | | | | | | | | | | 0% |
| | Lobectomy | 31% | 1% | 0% | 1% | 2% | 14% | 1% | 6% | 2% | 5% | 1% | 0% | 6% | 5% | 3% | 19% | 2% | 19% | 2% | 9% | 4% |
| | HPB | 25% | 1% | 6% | 0% | 10% | 8% | 2% | 21% | 4% | 3% | 2% | 0% | 9% | 3% | 2% | 4% | 12% | 11% | 2% | 8% | 1% |
| | Hysterectomy (Malignant) | 78% | 2% | 4% | 5% | 5% | 12% | 2% | 13% | 2% | 23% | 20% | 22% | 19% | 82% | 19% | 5% | 20% | 53% | 20% | 18% | 19% |
| | Prostatectomy | 84% | 15% | 10% | 73% | 65% | 53% | 18% | 56% | 23% | 100% | 81% | 97% | 90% | 94% | 37% | 74% | 70% | 52% | 37% | 47% | 55% |
| | Rectal Resection | 32% | 5% | 6% | 4% | 3% | 8% | 1% | 15% | 1% | 7% | 9% | 4% | 14% | 38% | 9% | 10% | 13% | 64% | 6% | 21% | 11% |
| | Other Cancer | 12% | 4% | 3% | 1% | 3% | 9% | 1% | 6% | 2% | 13% | 2% | 3% | 9% | 15% | 3% | 3% | 3% | 13% | 2% | 3% | 7% |
| | Nipple Sparing Mastecto.. | 0% | 0% | | | | | | | | | | | | | | | | | | | 0% |
| | Gastrectomy | 6% | 0% | 5% | 3% | 1% | 12% | 4% | 21% | 4% | 0% | 4% | 0% | 0% | 6% | 4% | 1% | 4% | 13% | 4% | 4% | 3% |
| | Partial Nephrectomy | 86% | 14% | 13% | 61% | 34% | 47% | 9% | 13% | 22% | 87% | 48% | 28% | 45% | 73% | 17% | 25% | 85% | 23% | 38% | 32% | 36% |
| | Nephrectomy | 24% | 19% | 40% | 0% | 2% | 3% | 10% | 2% | 1% | 3% | 4% | 3% | 4% | 16% | 7% | 14% | 24% | 28% | 10% | 4% | 10% |
| **Benign** | Cholecystectomy | 8% | 1% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 6% | 0% | 0% | 0% | 0% | 24% | 0% | 21% | 19% | 1% | 3% |
| | Hysterectomy (Benign) | 35% | 0% | 0% | 0% | 1% | 0% | 1% | 0% | 1% | 6% | 0% | 2% | 3% | 12% | 0% | 4% | 12% | 57% | 31% | 18% | 10% |
| | Inguinal Hernia Repair | 22% | 3% | 1% | 0% | 0% | 0% | 5% | 0% | 0% | 0% | 0% | 1% | 1% | 5% | 0% | 0% | 16% | 7% | 0% | 4% | 9% |
| | Ventral Hernia Repair | 21% | 1% | 0% | 0% | 0% | 0% | 7% | 0% | 0% | 0% | 0% | 5% | 2% | 4% | 1% | 0% | 3% | 2% | 1% | | 12% |
| | Bariatric | 12% | 4% | 1% | 0% | 12% | 2% | 0% | 2% | 1% | 0% | 0% | 1% | 0% | 0% | 1% | 23% | 3% | 28% | 14% | 0% | 6% |
| | Other Benign | 29% | 9% | 22% | 3% | 12% | 25% | 6% | 22% | 4% | 8% | 20% | 3% | 18% | 10% | 6% | 12% | 10% | 21% | 6% | 5% | 20% |
| | Ovarian Cystectomy | 4% | 0% | 1% | 0% | 0% | 0% | 0% | 4% | 1% | 0% | 2% | 0% | 0% | 0% | 0% | 15% | 2% | 0% | 0% | | 2% |
| | Sacrocolpopexy | 39% | 0% | 1% | 0% | 2% | 5% | 0% | 17% | 3% | 0% | 0% | 1% | 61% | 6% | 0% | 19% | 3% | 13% | 2% | 1% | 12% |
| | Myomectomy | 14% | 8% | 8% | 0% | 1% | 3% | 0% | 9% | 2% | 0% | 6% | 2% | 6% | 3% | 1% | 0% | 21% | 16% | 4% | 6% | 6% |
| | Endometriosis Resection | 4% | 0% | 0% | 0% | 6% | 2% | 9% | 5% | 1% | 0% | 0% | 2% | 15% | 8% | 4% | 3% | 3% | 2% | | | 3% |
| | TORS (Benign) | 1% | 4% | 15% | 1% | 6% | 8% | 2% | 6% | 1% | 2% | 0% | 6% | 2% | 0% | 3% | 20% | 7% | 1% | 4% | | 2% |
| | **Grand Total** | 21% | 1% | 2% | 4% | 4% | 5% | 1% | 5% | 1% | 5% | 8% | 5% | 9% | 13% | 4% | 16% | 11% | 31% | 16% | 13% | 9% |

*Market Share = dV 2018 LRM / Total Market Share (excluding emergent procedures)

Confidential

## 2022 Market Share

| | | US | China | India | Japan | Germany | France | Brazil | Italy | Spain | UK | South Korea | Australia | Benelux | Nordics | Canada | Other EMEIA Di.. | Taiwan | Other EMEIA In.. | Americas | Asia Other | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | Colon Resection | 64% | 5% | 20% | 3% | 62% | 25% | 15% | 15% | 1% | 18% | 2% | 7% | 4% | 52% | 100% | 14% | 3% | 100% | 3% | 9% | 33% |
| | Lung Biopsies | 0% | 0% | | | 0% | | 0% | 0% | 0% | | | | | | | | | | | | 0% |
| | Lobectomy | 59% | 2% | 18% | 40% | 39% | 55% | 1% | 25% | 16% | 56% | 6% | 0% | 49% | 48% | 1% | 4% | 11% | 5% | 0% | 11% | 13% |
| | HPB | 29% | 1% | 7% | 0% | 12% | 10% | 3% | 24% | 3% | 3% | 2% | 0% | 10% | 4% | 2% | 4% | 13% | 16% | 3% | 10% | 2% |
| | Hysterectomy (Malignant) | 90% | 5% | 20% | 67% | 42% | 34% | 4% | 45% | 6% | 65% | 49% | 100% | 71% | 100% | 81% | 3% | 80% | 13% | 0% | 26% | 32% |
| | Prostatectomy | 86% | 51% | 53% | 86% | 85% | 68% | 97% | 97% | 70% | 100% | 82% | 100% | 100% | 100% | 72% | 92% | 97% | 89% | 94% | 95% | 81% |
| | Rectal Resection | 49% | 18% | 27% | 27% | 36% | 24% | 17% | 91% | 1% | 30% | 28% | 7% | 72% | 75% | 81% | 73% | 29% | 85% | 1% | 37% | 34% |
| | Other Cancer | 14% | 13% | 40% | 1% | 4% | 10% | 7% | 8% | 2% | 36% | 6% | 3% | 9% | 26% | 3% | 3% | 3% | 15% | 2% | 4% | 15% |
| | Nipple Sparing Mastecto.. | 0% | 0% | | | | | | | | | | | | | | | | | | | 0% |
| | Gastrectomy | 7% | 0% | 10% | 44% | 2% | 19% | 4% | 24% | 5% | 0% | 5% | 1% | 0% | 4% | 1% | 5% | 18% | 5% | 4% | | 14% |
| | Partial Nephrectomy | 95% | 28% | 29% | 100% | 44% | 63% | 16% | 14% | 25% | 92% | 60% | 77% | 80% | 74% | 22% | 86% | 98% | 83% | 62% | 20% | 56% |
| | Nephrectomy | 27% | 44% | 45% | 0% | 2% | 3% | 12% | 2% | 1% | 3% | 4% | 3% | 5% | 16% | 8% | 15% | 27% | 40% | 15% | 4% | 13% |
| Benign | Cholecystectomy | 9% | 9% | 0% | 0% | 0% | 0% | 1% | 0% | 0% | 3% | 33% | 23% | 1% | 0% | 0% | 94% | 0% | 31% | 68% | 1% | 5% |
| | Hysterectomy (Benign) | 36% | 2% | 2% | 0% | 3% | 5% | 0% | 4% | 0% | 4% | 27% | 5% | 9% | 57% | 0% | 18% | 45% | 29% | 34% | 26% | 13% |
| | Inguinal Hernia Repair | 54% | 4% | 17% | 0% | 0% | 0% | 5% | 0% | 0% | 0% | | 0% | 3% | 1% | 6% | 0% | 14% | 32% | 0% | 0% | 21% |
| | Ventral Hernia Repair | 39% | 5% | 0% | 0% | 0% | 0% | 30% | 1% | 0% | 0% | | 0% | 1% | 5% | 0% | 1% | 0% | 13% | 0% | 0% | 22% |
| | Bariatric | 53% | 19% | 1% | 0% | 2% | 2% | 2% | 3% | 4% | 58% | | 0% | 0% | 82% | 5% | 40% | 7% | | | | 25% |
| | Other Benign | 40% | 15% | 25% | 61% | 14% | 28% | 7% | 25% | 5% | 8% | 22% | 3% | 21% | 14% | 7% | 13% | 11% | 30% | 9% | 6% | 30% |
| | Ovarian Cystectomy | 5% | 0% | 2% | 0% | 0% | 0% | 5% | 0% | | 3% | 0% | 0% | 0% | 0% | | 16% | 3% | 0% | 2% | | 2% |
| | Sacrocolpopexy | 43% | 0% | 1% | 0% | 2% | 15% | 0% | 19% | 4% | 1% | | | 68% | 6% | 1% | 21% | 3% | 19% | 3% | 1% | 15% |
| | Myomectomy | 16% | 25% | 9% | 0% | 1% | 9% | 0% | 10% | 2% | 0% | 21% | 3% | 7% | 4% | 2% | 0% | 24% | 23% | 6% | 7% | 10% |
| | Endometriosis Resection | 5% | 0% | 0% | 0% | 7% | 3% | 10% | 6% | 1% | 0% | | 0% | 2% | 17% | 9% | 4% | 3% | 5% | 12% | 6% | 4% |
| | TORS (Benign) | 1% | 26% | 17% | 1% | 2% | 9% | 2% | 2% | 1% | 0% | | 7% | 1% | 0% | 3% | 2% | 23% | 0% | 0% | 6% | 2% |
| | Grand Total | 33% | 4% | 9% | 12% | 14% | 9% | 7% | 11% | 4% | 12% | 19% | 12% | 18% | 25% | 16% | 36% | 21% | 55% | 34% | 22% | 17% |

*Market Share = dV 2022 LRM / Total Market Share (excluding emergent procedures)

Confidential

Intuitive-00767301
4-SER-717

## 2024 Market Share Roadmap

| | US | China | India | Japan | Germany | France | Brazil | Italy | Spain | UK | South Korea | Australia | Benelux | Nordics | Canada | Other EMEIA Dir.. | Taiwan | Other EMEIA Ind.. | Americas | Asia Other | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cancer** — Colon Resection | 85% | 10% | 30% | 42% | 85% | 53% | 25% | 43% | 30% | 47% | 50% | 19% | 33% | 79% | 100% | 42% | 8% | 100% | 16% | 12% | 54% |
| Lung Biopsies | 10% | 10% | | | 10% | 10% | | 10% | 10% | 10% | | | | | | | | | | | 10% |
| Lobectomy | 79% | 3% | 27% | 60% | 59% | 75% | 13% | 45% | 36% | 76% | 26% | 12% | 69% | 68% | 13% | 20% | 20% | 16% | 12% | 21% | 21% |
| HPB | 39% | 9% | 22% | 10% | 22% | 20% | 18% | 34% | 15% | 13% | 12% | 16% | 20% | 14% | 18% | 14% | 27% | 29% | 19% | 24% | 10% |
| Hysterectomy (Malignant) | 95% | 6% | 34% | 70% | 47% | 56% | 21% | 67% | 11% | 82% | 74% | 100% | 85% | 100% | 83% | 8% | 80% | 28% | 13% | 27% | 38% |
| Prostatectomy | 86% | 51% | 63% | 85% | 86% | 69% | 97% | 97% | 71% | 100% | 86% | 100% | 100% | 100% | 77% | 92% | 97% | 91% | 95% | 95% | 83% |
| Rectal Resection | 59% | 19% | 38% | 42% | 46% | 34% | 29% | 95% | 11% | 40% | 63% | 22% | 82% | 85% | 31% | 83% | 29% | 85% | 17% | 37% | 44% |
| Other Cancer | 50% | 15% | 47% | 14% | 17% | 26% | 20% | 22% | 19% | 51% | 45% | 10% | 24% | 43% | 14% | 31% | 16% | 23% | 13% | 15% | 36% |
| Nipple Sparing Mastecto.. | 20% | 20% | | | | | | | | | | | | | | | | | | | 20% |
| Gastrectomy | 24% | 8% | 21% | 55% | 19% | 37% | 16% | 41% | 22% | 18% | 16% | 13% | 16% | 25% | 16% | 19% | 20% | 26% | 17% | 19% | 25% |
| Partial Nephrectomy | 97% | 28% | 37% | 100% | 59% | 78% | 27% | 29% | 41% | 96% | 66% | 77% | 90% | 87% | 31% | 94% | 98% | 33% | 34% | 63% | 62% |
| Nephrectomy | 52% | 44% | 46% | 25% | 27% | 28% | 19% | 27% | 27% | 28% | 29% | 12% | 30% | 43% | 16% | 40% | 31% | 42% | 22% | 14% | 35% |
| **Benign** — Cholecystectomy | 50% | 15% | 12% | 25% | 44% | 26% | 13% | 27% | 25% | 23% | 53% | 29% | 26% | 43% | 12% | 100% | 12% | 37% | 24% | 13% | 32% |
| Hysterectomy (Benign) | 54% | 3% | 38% | 35% | 46% | 48% | 37% | 46% | 18% | 46% | 45% | 39% | 51% | 78% | 37% | 27% | 45% | 49% | 34% | 28% | 36% |
| Inguinal Hernia Repair | 58% | 14% | 44% | 10% | 53% | 49% | 39% | 49% | 49% | 10% | | 37% | 13% | 21% | 40% | 10% | 37% | 43% | 51% | 37% | 45% |
| Ventral Hernia Repair | 65% | 12% | 43% | 4% | 48% | 50% | 56% | 54% | 54% | 9% | | 43% | 10% | 13% | 45% | 5% | 43% | 48% | 43% | 43% | 54% |
| Bariatric | 67% | 19% | 6% | 16% | 43% | 18% | 7% | 18% | 20% | 65% | | 9% | 16% | 32% | 6% | 85% | 8% | 40% | 9% | 6% | 36% |
| Other Benign | 54% | 21% | 54% | 64% | 27% | 33% | 47% | 30% | 19% | 14% | 31% | 35% | 25% | 24% | 47% | 19% | 49% | 57% | 47% | 46% | 45% |
| Ovarian Cystectomy | 39% | 1% | 6% | 20% | 36% | 20% | 6% | 25% | 21% | 20% | 22% | 6% | 20% | 36% | 6% | 20% | 16% | 7% | 6% | 7% | 27% |
| Sacrocolpopexy | 55% | 2% | 40% | 15% | 36% | 22% | 40% | 26% | 10% | 7% | | 41% | 75% | 18% | 40% | 28% | 19% | 48% | 41% | 19% | 40% |
| Myomectomy | 28% | 25% | 41% | 15% | 33% | 17% | 37% | 17% | 10% | 8% | 36% | 38% | 14% | 18% | 38% | 8% | 27% | 47% | 40% | 20% | 27% |
| Endometriosis Resection | 39% | 1% | 6% | 20% | 43% | 22% | 10% | 25% | 21% | 20% | | 6% | 22% | 50% | 10% | 24% | 7% | 4% | 12% | 8% | 32% |
| TORS (Benign) | 33% | 26% | 19% | 18% | 34% | 27% | 12% | 20% | 18% | 18% | | 14% | 19% | 32% | 13% | 19% | 23% | 12% | 12% | 14% | 31% |
| **Grand Total** | 53% | 9% | 26% | 32% | 47% | 39% | 25% | 42% | 34% | 31% | 40% | 36% | 38% | 46% | 37% | 45% | 31% | 64% | 49% | 38% | 36% |

*Market Share = Roadmap / Total Market Share (excluding emergent procedures)

# Where Is Growth Coming From And What Is Mix?

This section looks at overall growth by procedure type, and where the growth is coming from (MIS/Open/Other)

**Modality**
- MIS/Other
- Open



## dV Growth By Modality (vs. '18)



### 2024 Growth (vs. '18)



(29 of 259), Page 29 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 29 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 28 of 53



Confidential



Revised Roadmap vs. '18 Growth By Procedure

Roadmap vs. '18 Growth

**US/OUS — Cancer**
- Colon Resection: 236K
- Rectal Resection: 84K
- Lobectomy: 79K
- Nipple Sparing Mastect...: 60K
- Other Cancer: 55K
- Hysterectomy (Maligna...: 52K
- Lung Biopsies: 40K
- Gastrectomy: 36K
- Prostatectomy: 34K
- Nephrectomy: 32K
- Partial Nephrectomy: 20K
- Thyroidectomy: 7K
- HPB: 6K

**US/OUS — Benign**
- Inguinal Hernia Repair: 426K
- Cholecystectomy: 401K
- Hysterectomy (Benign): 266K
- Ventral Hernia Repair: 214K
- Bariatric: 121K
- Other Benign: 61K
- Ovarian Cystectomy: 53K
- Endometriosis Resection: 36K
- TORS (Benign): 28K
- Myomectomy: 24K
- Sacrocolpopexy: 22K

**WW Indirect — Cancer**
- Prostatectomy: 72K
- HPB: 35K
- Hysterectomy (Maligna...: 34K
- Nipple Sparing Mastect...: 30K
- Colon Resection: 30K
- Lung Biopsies: 26K
- Other Cancer: 24K
- Rectal Resection: 21K
- Lobectomy: 19K
- Partial Nephrectomy: 15K
- Gastrectomy: 8K
- Nephrectomy: 2K
- Thyroidectomy: 0K

**WW Indirect — Benign**
- Hysterectomy (Benign): 130K
- Cholecystectomy: 71K
- Sacrocolpopexy: 27K
- Other Benign: 26K
- Inguinal Hernia Repair: 20K
- Ventral Hernia Repair: 13K
- Myomectomy: 9K
- Bariatric: 9K
- TORS (Benign): 1K
- Endometriosis Resection: 1K
- Ovarian Cystectomy: 0K

Proc Type
- Cancer
- Benign

Intuitive-00767305

## Revised Roadmap vs. 18' Growth By Country



## 18' vs. 24' Roadmap Change

| | | US | China | India | Japan | Germany | France | Brazil | Italy | Spain | UK | South Korea | Australia | Benelux | OUS (NSW) | Nordics | Canada | Other EMEIA Di.. | Taiwan | Other EMEIA In.. | Americas | Asia Other | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cancer | Colon Resection | 108K | 9K | 4K | 23K | 46K | 15K | 4K | 9K | 6K | 6K | 5K | 3K | 6K | | 10K | 9K | 3K | 0K | 0K | 0K | 0K | 265K |
| | Lung Biopsies | 22K | 26K | | | 5K | 4K | | 3K | 2K | 4K | | | | | | | | | | | | 66K |
| | Lobectomy | 21K | 9K | 6K | 18K | 10K | 6K | 1K | 4K | 2K | 4K | 4K | 1K | 6K | | 2K | 1K | 0K | 1K | 0K | 0K | 0K | 98K |
| | HPB | 1K | 32K | 0K | 2K | 0K | 0K | 0K | 0K | 0K | 0K | 1K | 1K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 40K |
| | Nipple Sparing Mastect.. | 30K | 30K | | | | | | | | | | | | 30K | | | | | | | | 90K |
| | Hysterectomy (Maligna.. | 14K | 9K | 12K | 10K | 6K | 5K | 4K | 3K | 1K | 5K | 2K | 5K | 0K | | 1K | 3K | 0K | 2K | 0K | 0K | 0K | 86K |
| | Prostatectomy | 2K | 18K | 16K | 3K | 5K | 3K | 18K | 9K | 6K | 2K | 0K | 3K | 2K | | 1K | 3K | 2K | 1K | 6K | 6K | 2K | 106K |
| | Rectal Resection | 14K | 6K | 6K | 12K | 16K | 5K | 4K | 7K | 2K | 4K | 8K | 2K | 7K | | 3K | 2K | 7K | 0K | 0K | 0K | 0K | 106K |
| | Other Cancer | 37K | 4K | 16K | 1K | 2K | 1K | 2K | 1K | 1K | 3K | 5K | 0K | 1K | | 1K | 0K | 1K | 1K | 0K | 0K | 0K | 79K |
| | Gastrectomy | 4K | 6K | 0K | 28K | 0K | 0K | 0K | 0K | 0K | 0K | 2K | 0K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 43K |
| | Partial Nephrectomy | 3K | 5K | 1K | 2K | 2K | 2K | 1K | 2K | 0K | 1K | 1K | 1K | 1K | | 0K | 0K | 7K | 0K | 6K | 0K | 0K | 35K |
| | Nephrectomy | 11K | 1K | 0K | 3K | 4K | 2K | 0K | 3K | 1K | 2K | 1K | 0K | 2K | | 1K | 0K | 0K | 0K | 0K | 0K | 0K | 34K |
| Benign | Cholecystectomy | 222K | 2K | 40K | 38K | 48K | 16K | 15K | 17K | 11K | 14K | 19K | 8K | 7K | | 9K | 4K | 0K | 1K | 0K | 0K | 0K | 472K |
| | Hysterectomy (Benign) | 81K | 11K | 57K | 20K | 52K | 23K | 33K | 27K | 6K | 19K | 11K | 10K | 11K | | 14K | 15K | 2K | 0K | 0K | 1K | 0K | 396K |
| | Inguinal Hernia Repair | 157K | 0K | 0K | 10K | 60K | 59K | 0K | 67K | 44K | 5K | 0K | 18K | 4K | | 9K | 0K | 0K | 0K | 0K | 0K | 0K | 446K |
| | Ventral Hernia Repair | 133K | 0K | 0K | 0K | 27K | 24K | 0K | 1K | 24K | 2K | 0K | 10K | 0K | | 2K | 0K | 0K | 0K | 0K | 0K | 0K | 227K |
| | Bariatric | 98K | 0K | 1K | 0K | 0K | 6K | 9K | 1K | 1K | 4K | 0K | 0K | 3K | | 4K | 0K | 1K | 0K | 0K | 0K | 0K | 130K |
| | Other Benign | 46K | 3K | 2K | 7K | 2K | 1K | 3K | 1K | 0K | 0K | 0K | 3K | 0K | | 1K | 3K | 0K | 2K | 3K | 3K | 0K | 85K |
| | Ovarian Cystectomy | 28K | 0K | 0K | 18K | 0K | 0K | 0K | 0K | 0K | 0K | 5K | 0K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 54K |
| | Sacrocolpopexy | 8K | 0K | 0K | 1K | 8K | 3K | 16K | 0K | 0K | 0K | 0K | 8K | 0K | | 0K | 2K | 0K | 0K | 0K | 0K | 0K | 49K |
| | Myomectomy | 6K | 0K | 0K | 4K | 2K | 1K | 7K | 0K | 0K | 0K | 8K | 0K | 0K | | 0K | 1K | 1K | 0K | 0K | 0K | 0K | 33K |
| | Endometriosis Resection | 30K | 0K | 0K | 0K | 0K | 2K | 0K | 0K | 0K | 3K | 0K | 0K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 37K |
| | TORS (Benign) | 26K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 0K | | 0K | 0K | 0K | 0K | 0K | 0K | 0K | 28K |
| | Grand Total | #### | 172K | 164K | 201K | 298K | 180K | 115K | 156K | 111K | 77K | 75K | 74K | 56K | 30K | 59K | 45K | 26K | 13K | 17K | 12K | 8K | #### |

Tier 1 % of Total Market



0%  106%

## Tier 1 Opp Summary

| | Tier 1 % of Total Market | | | | | | | Total Market Size | | | | | | | Tier 1.. Total | Total.. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Benelux | France | Germany | Japan | Nordics | UK | US | Benelux | France | Germa.. | Japan | Nordics | UK | US | | |
| **Cancer** | | | | | | | | | | | | | | | | |
| Colon Resection | 11% | 22% | 20% | | 23% | 22% | 46% | 29,308 | 44,279 | 79,826 | | 19,777 | 18,074 | 251,500 | 24% | 442,764 |
| Prostatectomy | 22% | 32% | 40% | 35% | 38% | 41% | 47% | 8,100 | 19,200 | 22,548 | 22,977 | 8,887 | 9,000 | 85,000 | 36% | 175,712 |
| Thyroidectomy | 7% | 5% | 11% | | 37% | 28% | | 9,336 | 48,689 | 86,312 | | 8,608 | 16,114 | | 18% | 169,059 |
| Rectal Resection | 11% | 27% | 14% | 22% | 31% | 24% | 54% | 3,816 | 18,349 | 38,500 | 31,986 | 6,835 | 12,022 | 50,600 | 26% | 168,103 |
| Hysterectomy (Maligna.. | 4% | 21% | 13% | 39% | 5% | | 23% | 5,620 | 11,591 | 14,932 | 15,479 | 4,566 | | 80,000 | 18% | 132,188 |
| Lobectomy | 10% | 45% | 57% | 76% | 53% | 52% | 48% | 10,320 | 10,441 | 17,644 | 30,096 | 3,060 | 6,089 | 45,000 | 49% | 122,650 |
| Nephrectomy | 27% | 33% | 33% | 4% | 40% | 35% | 68% | 9,540 | 9,325 | 15,618 | 13,524 | 2,750 | 7,805 | 40,000 | 34% | 98,562 |
| Partial Nephrectomy | 28% | 39% | 32% | 58% | 36% | 51% | 57% | 2,468 | 5,730 | 9,190 | 5,562 | 1,179 | 1,619 | 24,000 | 43% | 49,748 |
| Cystectomy | 15% | 35% | 36% | 20% | 44% | 48% | 129% | 3,748 | 3,335 | 9,687 | 4,162 | 2,130 | 3,136 | 10,000 | 47% | 36,198 |
| HPB | | | | | | | 142% | | | | | | | 10,000 | 142% | 10,000 |
| Total | 15% | 29% | 28% | 36% | 34% | 38% | 68% | 88,256 | 170,939 | 294,257 | 123,781 | 57,792 | 73,859 | 596,100 | 35% | 1,404,984 |
| **Benign** | | | | | | | | | | | | | | | | |
| Cholecystectomy | 25% | 16% | 42% | | 18% | 17% | 35% | 50,361 | 115,426 | 200,000 | | 37,000 | 89,500 | 979,000 | 25% | 1,471,287 |
| Hysterectomy (Benign) | 12% | 16% | 14% | 9% | 40% | 24% | 50% | 22,480 | 49,183 | 115,470 | 56,506 | 21,000 | 42,382 | 430,000 | 24% | 737,021 |
| Inguinal Hernia Repair | | 16% | | | | | 41% | | 121,088 | | | | | 475,000 | 28% | 596,088 |
| Ventral Hernia Repair | | 16% | | | | | 53% | | 47,512 | | | | | 300,000 | 34% | 347,512 |
| Bariatric | 19% | 21% | 21% | | 15% | 8% | 47% | 20,350 | 54,524 | 1,230 | | 12,000 | 6,391 | 180,000 | 22% | 274,495 |
| Other Thoracic | | | | | | | 39% | | | | | | | 55,000 | 39% | 55,000 |
| Sacrocolpopexy | | 20% | 0% | | | 18% | | | 18,000 | 24,634 | | | 2,561 | | 13% | 45,195 |
| Myomectomy | | 22% | 8% | | | 88% | | | 5,808 | 7,236 | | | 2,596 | | 39% | 15,640 |
| Pyeloplasty (Adult & Pe.. | | | | 58% | | | | | | | 1,000 | | | | 58% | 1,000 |
| Total | 19% | 18% | 17% | 34% | 24% | 31% | 44% | 93,191 | 411,541 | 348,570 | 57,506 | 70,000 | 143,430 | 2,419,000 | 27% | 3,543,238 |
| Grand Total | 16% | 24% | 24% | 36% | 32% | 35% | 59% | 181,447 | 582,480 | 642,827 | 181,287 | 127,792 | 217,289 | 3,015,100 | 33% | 4,948,222 |

Tier 1 % of Total Market/dV Penetration of Tier 1 Opportunity



0%             107%   *dV Penetration based on '17 dV volumes

## dV Penetration of Tier 1 Opportunity

| | Tier 1 % of Total Market | | | | | | | dV Penetration of Tier 1 Accounts | | | | | | | Tier 1.. | dV Pen.. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Benelux | France | Germany | Japan | Nordics | UK | US | Benelux | France | Germa.. | Japan | Nordics | UK | US | Total | Total |
| **Cancer** | | | | | | | | | | | | | | | | |
| Colon Resection | 11% | 22% | 20% | | 23% | 22% | 46% | 9% | 2% | 1% | | 2% | 2% | 10% | 24% | 4% |
| Prostatectomy | 22% | 32% | 40% | 35% | 38% | 41% | 47% | 98% | 64% | 50% | | 82% | 100% | 98% | 36% | 82% |
| Thyroidectomy | 7% | 5% | 11% | | 37% | 28% | | 4% | 1% | 0% | | 0% | 0% | | 18% | 1% |
| Rectal Resection | 11% | 27% | 14% | 22% | 31% | 24% | 54% | 26% | 5% | 5% | | 18% | 10% | 29% | 26% | 16% |
| Hysterectomy (Maligna..) | 4% | 21% | 13% | 39% | 5% | | 23% | 100% | 15% | 11% | | 100% | | 100% | 18% | 65% |
| Lobectomy | 10% | 45% | 57% | 76% | 53% | 52% | 48% | 4% | 8% | 1% | | 2% | 3% | 14% | 49% | 5% |
| Nephrectomy | 27% | 33% | 33% | 4% | 40% | 35% | 68% | 4% | 5% | 2% | | 9% | 5% | 19% | 34% | 7% |
| Partial Nephrectomy | 28% | 39% | 32% | 58% | 36% | 51% | 57% | 34% | 61% | 38% | | 72% | 98% | 76% | 43% | 63% |
| Cystectomy | 15% | 35% | 36% | 20% | 44% | 48% | 129% | 30% | 19% | 1% | | 38% | 34% | 16% | 47% | 23% |
| HPB | | | | | | | 142% | | | | | | | 15% | 142% | 15% |
| Total | 15% | 29% | 28% | 36% | 34% | 38% | 68% | 34% | 20% | 12% | | 36% | 32% | 42% | 35% | 29% |
| **Benign** | | | | | | | | | | | | | | | | |
| Cholecystectomy | 25% | 16% | 42% | | 18% | 17% | 35% | 0% | 0% | 0% | | 0% | 0% | 3% | 25% | 1% |
| Hysterectomy (Benign) | 12% | 16% | 14% | 9% | 40% | 24% | 50% | 4% | 3% | 1% | | 4% | 2% | 23% | 24% | 6% |
| Inguinal Hernia Repair | | 16% | | | | | 41% | | 0% | | | | | 10% | 28% | 5% |
| Ventral Hernia Repair | | 16% | | | | | 53% | | 0% | | | | | 9% | 34% | 4% |
| Bariatric | 19% | 21% | 21% | | 15% | 8% | 47% | 0% | 2% | 35% | | 0% | 0% | 9% | 22% | 8% |
| Other Thoracic | | | | | | | 39% | | | | | | | 14% | 39% | 14% |
| Sacrocolpopexy | | 20% | 0% | | 18% | | | | 7% | 31% | | | 0% | | 13% | 29% |
| Myomectomy | | 22% | 8% | | 88% | | | | 5% | 2% | | | 0% | | 39% | 2% |
| Pyeloplasty (Adult & Pe..) | | | | 58% | | | | | | | | | | | 58% | |
| Total | 19% | 18% | 17% | 34% | 24% | 31% | 44% | 1% | 2% | 24% | | 1% | 0% | 11% | 27% | 7% |
| **Grand Total** | 16% | 24% | 24% | 36% | 32% | 35% | 59% | 26% | 12% | 16% | | 27% | 20% | 30% | 33% | 21% |

## Tier 1 Opp + Tier 1 Opp In Current Accounts



(36 of 259), Page 36 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 36 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 35 of 53

## Roadmap Waterfall (Tier 1 Targeting Only)



**Type**
- '22 dV as of '18 LPM
- MIS - Complex
- Baseline + MIS-C
- Open - Benign
- Baseline + M-C + Open-B
- MIS - Benign
- Baseline + M-C + O-B + MIS-Benign
- Gap To Fulfill
- Baseline + M-C + O-B + MIS-B + Makeup

**Penetration Of Remaining Opportunity (Only Targeting Tier 1 Accounts)**
MIS - Complex = 50%
Open - Benign = 60%
MIS - Benign = 40%; 25% US ASC
Indirect/Non-Tier 1 = Remaining need after Tier 1 targeting

Intuitive-00767311
4-SER-727

# Data Appendix

## Procedure Representation List

| Cancer? (group) | Procedure | Asia Direct O... | | Brazil | China | EU Direct Other | | | | France Germ... | | India | Indirect Other | | | | | | | Japan | US |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | South Korea | Taiwan | Brazil | China | United Kingdom | Benelux | Nordics | Other EMEA Di. | France | Germany | India | Italy | Spain | Australia | Canada | Asia Other | Americas | Other EMEA In. | Japan | US |
| Benign | Bariatric | | | | | | | | | | | | | | | | | | | | |
| | Cholecystectomy | | | | | | | | | | | | | | | | | | | | |
| | Endometriosis Resection | | | | | | | | | | | | | | | | | | | | |
| | Foregut | | | | | | | | | | | | | | | | | | | | |
| | Hysterectomy (Benign) | | | | | | | | | | | | | | | | | | | | |
| | Inguinal Hernia Repair | | | | | | | | | | | | | | | | | | | | |
| | Myomectomy | | | | | | | | | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | | | | | | | | | |
| | Other General Surgery | | | | | | | | | | | | | | | | | | | | |
| | Other Gynecology | | | | | | | | | | | | | | | | | | | | |
| | Other Thoracic | | | | | | | | | | | | | | | | | | | | |
| | Other Urology | | | | | | | | | | | | | | | | | | | | |
| | Ovarian Cystectomy | | | | | | | | | | | | | | | | | | | | |
| | Pyeloplasty (Adult & Pediatric) | | | | | | | | | | | | | | | | | | | | |
| | Sacrocolpopexy | | | | | | | | | | | | | | | | | | | | |
| | TORS (Benign) | | | | | | | | | | | | | | | | | | | | |
| | Ventral Hernia Repair | | | | | | | | | | | | | | | | | | | | |
| Cancer | Colon Resection | | | | | | | | | | | | | | | | | | | | |
| | Cystectomy | | | | | | | | | | | | | | | | | | | | |
| | Gastrectomy | | | | | | | | | | | | | | | | | | | | |
| | HPB | | | | | | | | | | | | | | | | | | | | |
| | Hysterectomy (Malignant) | | | | | | | | | | | | | | | | | | | | |
| | Lobectomy | | | | | | | | | | | | | | | | | | | | |
| | Nephrectomy | | | | | | | | | | | | | | | | | | | | |
| | Oopherectomy | | | | | | | | | | | | | | | | | | | | |
| | Partial Nephrectomy | | | | | | | | | | | | | | | | | | | | |
| | Prostatectomy | | | | | | | | | | | | | | | | | | | | |
| | Rectal Resection | | | | | | | | | | | | | | | | | | | | |
| | TORS (Malignant) | | | | | | | | | | | | | | | | | | | | |

Region / Country

Procedure Type
- Sales Force Focused
- Pull Through

Trial Ex. No. 1389, Pg. 37 of 53

Intuitive-00767313

4-SER-729

(39 of 259), Page 39 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 39 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 38 of 53

Procedure Representation List



US - Procedure Specific



## France - Procedure Specific



**Measure**
- MIS On Existing Procedures
- Remaining Open On Existing Procedures

(42 of 259), Page 42 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 42 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 41 of 53

France - Procedure Specific

| Cancer/B.. | Procedure |
|------------|-----------|
| Cancer | Partial Nephrectomy |
| Open | Oophorectomy |

0K
0K

0K  5K  10K  15K  20K  25K  30K  35K  40K  45K  50K  55K  60K  65K  70K  75K  80K  85K

Procedures

**Measure**
▨ MIS On Existing Procedures
▨ Remaining Open On Existing Procedures

Confidential

Intuitive-00767317
4-SER-733

## Germany - Procedure Specific



## EU Direct Other (Non Ger/Fra) - Procedure Specific



**Measure**
- ■ MIS On Existing Procedures
- ▨ Remaining Open On Existing Procedures

(45 of 259), Page 45 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 45 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 44 of 53

## EU Direct Other (Non Ger/Fra) - Procedure Specific

| Cancer/B.. | Procedure |
|---|---|
| Cancer | Lobectomy |
| Open | Prostatectomy |
| | Oophorectomy |

Procedures: 0K 5K 10K 15K 20K 25K 30K 35K 40K 45K 50K 55K 60K 65K 70K 75K 90K 95K 90K 95K

**Measure**
- MIS On Existing Procedures
- Remaining Open On Existing Procedures

(46 of 259), Page 46 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 46 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 45 of 53

## Japan - Procedure Specific



## Asia Direct Other - Procedure Specific



(48 of 259), Page 48 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 48 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 47 of 53

## China - Procedure Specific



Intuitive-00767323
4-SER-739

## India - Procedure Specific



(50 of 259), Page 50 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 50 of 259
Case 3:21-cv-03496-AMO    Document 466-88    Filed 02/07/25    Page 49 of 53

India - Procedure Specific

| Cancer/B.. | Procedure | |
|---|---|---|
| Cancer | Prostatectomy | 0K |
| MIS | Cystectomy | 0K |
| | HPB | 0K |

0K 20K 40K 60K 80K 100K 120K 140K 160K 180K 200K 220K 240K 260K 280K 300K 320K

Procedures

Measure
▨ MIS On Existing Procedures
▨ Remaining Open On Existing Procedures

## Brazil - Procedure Specific



(52 of 259), Page 52 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 52 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 51 of 53

## Brazil - Procedure Specific

| Cancer/B.. | Procedure | | Measure |
|---|---|---|---|
| Cancer | Prostatectomy | 0K | ▨ MIS On Existing Procedures |
| MIS | Cystectomy | 0K | ▨ Remaining Open On Existing Procedures |
| | HPB | 0K | |

0K   10K   20K   30K   40K   50K   60K   70K   80K   90K   100K   110K

Procedures

Confidential

Intuitive-00767327
4-SER-743



Indirect Other - Procedure Specific

(54 of 259), Page 54 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 54 of 259
Case 3:21-cv-03496-AMO   Document 466-88   Filed 02/07/25   Page 53 of 53

Indirect Other - Procedure Specific

| Cancer/B.. | Procedure |
|---|---|
| Cancer | Cystectomy |
| MIS | TORS (Malignant) |
| | Prostatectomy |

3K
2K
1K

0K 10K 20K 30K 40K 50K 60K 70K 80K 90K 100K 110K 120K 130K 140K 150K 160K 170K 180K 190K

Procedures

Measure
▨ MIS On Existing Procedures
▨ Remaining Open On Existing Procedures

Intuitive
1020 Kifer Road
Sunnyvale, CA 94086
T. 408 523 2100
F 408 523 1390
intuitive.com

April 16, 2019

### VIA CERTIFIED MAIL & E-mail

David Mixner
Rebotix Repair LLC
6822 22nd Avenue North, Suite 283
St. Petersburg, FL 33710

**Subject: Tampering with and Reprogramming *da Vinci*® Surgical System Instruments**

Dear Mr. Mixner,

We write on behalf of Intuitive Surgical, Inc. ("Intuitive"), a company that develops and distributes advanced robotic-assisted surgical platforms for minimally-invasive surgery. Our core products include the *da Vinci*® Surgical System (the "System") as well as the *EndoWrist*® instruments that attach to the System.

It has come to our attention that Rebotix Repair LLC ("Rebotix"), either directly or indirectly through its "service centers", is engaging in the unauthorized manufacturing and marketing of a medical device ███████████████████████████████████████████████ ████████  We also have concerns that the devices potentially being distributed are not being manufactured, or re-manufactured as the case may be, under a recognized quality management system applicable to medical devices.  In addition, we believe that Rebotix and its service center representatives engaged in behavior that violates applicable laws and may give rise to civil liability. We write to you on behalf of Intuitive to demand that Rebotix immediately cease and desist from any and all improper behavior with regard to the *EndoWrist*® instruments, including but not limited to your actions described below.

INTUITIVE.



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1441-R**

Case No. __3:21-cv-03496-AMO__
Date Entered_____
By_____
Deputy Clerk

**CONFIDENTIAL**

REBOTIX145274

CONFIDENTIAL

REBOTIX145275

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

## Factual Background

In accordance with its quality system, Intuitive engages in rigorous testing ██████████████ ██████████████████████████████ Generally, and specifically with respect to the *EndoWrist*® instruments, that includes instrument reliability/projected life testing to confirm the maximum number of safe and effective clinical uses of a product prior to disposal. ████████████████████████ ████████████████████████████████ With respect to many of the *EndoWrist*® instruments, Intuitive Surgical determined ████████████████████████ - ten surgical procedures is the maximum number of safe and effective clinical uses prior to disposal. Accordingly, Intuitive placed a memory device inside such instruments that keeps track of the usage count and inhibits the instrument from functioning after ten uses.

We recently have become aware that you are offering Intuitive customers in the United States a service where "[y]our authorized service centers" will "inspect and recondition" *EndoWrist*® instruments to allow the *EndoWrist*® instruments to be used beyond their pre-programmed, cleared number of uses.

## Rebotix's Alleged Activities Violate U.S. Law

We have numerous concerns with the foregoing activities. First, it is unclear whether you or your service technicians have the requisite specifications by which to make the claim that the units are returned to their production equivalent qualification. Even assuming for argument that you have obtained these specifications, or Intuitive' s service manual, any modifications that reset or extend the number of uses of the device ████████████████████ This change impacts the intended use of the device, exceeds the verified and validated testing ████████████████████, and thereby constitutes a major change to the device. This change could significantly affect the safety and effectiveness of the device ████████████████████████████ ████████████████████

CONFIDENTIAL

REBOTIX145276



CONFIDENTIAL

REBOTIX145277

██████████████████████    ██████████████████████████

██████████████████████████████████████████████████

███████████████████████████

Your apparent false and misleading marketing practices and activities also may violate other U.S. federal and state laws and could expose Rebotix and its service centers to significant financial liability. False advertising statements regarding the modified *EndoWrist*® instruments are likely to deceive a substantial segment of your audience with respect to material characteristics of the instruments. The deception caused by such statements – and the attendant potential risk to patient health and safety through the use of modified *EndoWrist*® instruments – threaten to injure or have already injured Intuitive's business and reputation. Such deceptive practices also cause likelihood of confusion or of misunderstanding as to the modified *EndoWrist*® instruments, including but not limited to ████ ██████████, affiliation with or approval by Intuitive, as well as key characteristics such as safety and effectiveness. You also are liable to the extent your activities interfere with our customers' warranties.

Lastly and most critically, Rebotix's modification of the *EndoWrist*® instruments impacts the intended use of the device, exceeds the verified and validated testing performed by Intuitive ██████████████ ██████████████, and therefore raises serious questions about the safety and effectiveness of the clinical use of such modified instruments in surgical procedures. For this reason, you could face significant financial liability from both practitioners and their patients in connection with your untested, unapproved modification of the *EndoWrist*® instruments.

**Demand**

Based on the foregoing apparent violations of U.S. law, Intuitive demands that Rebotix and its service centers (and affiliated entities) immediately cease and desist from:

a. marketing and offering a servicing process in the course of which the use counter of *EndoWrist*® instruments' memory device is manipulated and/or replaced to permit more than ten uses; and

b. █████████████████████████████████████████████████████████████
██████████████████████

CONFIDENTIAL

REBOTIX145278

Please confirm your compliance with these demands no later than April 30, 2019. If you allege that you or your service centers ███████████████████████ ███████ ███████ ████████████████ possess clinical proof that your service process returns the modified instruments to a "production equivalent qualification" and/or that additional use does not affect the safety or performance of the instruments, provide proof of the same no later than April 30, 2019.

We reserve all rights to take all appropriate action against you and to protect Intuitive's rights, products and reputation, including ████████████████████████████████████████ ████████████████████████ pursuing appropriate civil remedies.

Very truly yours,

*Romain Denis signature*
FOR

Romain Denis
VP, EU and US Regulatory Affairs

*Kara Andersen Reiter signature*

Kara Andersen Reiter
SVP, General Counsel & CCO

cc:
R. Reid Haney (Registered Agent), 101 E. Kennedy Boulevard, Suite 3700, Tampa, FL 33602
Rebotix Repair LLC (Street Address), 539 Pasadena Avenue South, St. Petersburg, FL 33707
Benjamin Biomedical (Shared Street Address with Rebotix), 539 Pasadena Avenue South, St. Petersburg, FL 33707

**CONFIDENTIAL**

**REBOTIX145279**

---

Message

| | |
|---|---|
| **From**: | Scott Knight [sknight@sis-usa.com] |
| **Sent**: | 2/7/2020 7:09:08 PM |
| **To**: | thomas.ketter@vizientinc.com |
| **CC**: | Keith Johnson [krjohnson@sis-usa.com] |
| **Subject**: | SIS TMC proposal |
| **Attachments**: | TMC Instrument Repair_RFP_Workbook - SIS proposal.xlsx; TMC MSA Proposal.docx; TMC SOW on-site repair inclusive services proposal.docx; SIS W-9 2020.pdf; SIS Warranty.pdf; SIS Quality Assurance Program.pdf; SIS and TMC Service Implementation Plan.pdf; SIS Beyond Repair Double Check Program.pdf; SIS General Services.pdf; SIS Onsite Services Report - SAMPLE.pdf; SIS Process Excellence Program.pdf; SIS Preventative Maintenance Program.pdf |

Thomas,

Please find the following documents attached in response to the Tucson Medical Center Request for Proposal:

1. TMC Instrument Repair_RFP_Workbook-SIS Proposal
2. TMC MSA proposal
3. TMC SOW on-site repair inclusive services proposal
4. SIS W-9 2020
5. SIS Warranty
6. SIS Quality Assurance Program
7. SIS and TMC Implementation Plan
8. SIS Beyond Repair Double Check Program
9. SIS General Services
10. SIS Onsite Services Report  SAMPLE
11. SIS Process Excellence Program
12. SIS Preventative  Maintenance Program

Please let us know if we can provide any further information.

**Scott Knight** | Director of Field Services
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 206.455.5004
**www.sis-usa.com**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1547**

Case No.  3:21-cv-03496-AMO
Date Entered _____
By_____
Deputy Clerk

CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Our Services

## General Services

Flexible endoscopes

Rigid endoscopes

Specialty endoscopes

Power equipment

Video systems

Stainless instruments

Bipolar forceps

Laparoscopic instruments

Onsite repair services

## Specialty Services

Yellofins® and leg holders

Ultrasound devices

Stryker SILVERGlide™ and other specialty forceps

Phaco handpieces

Harmonic scalpels

Heart paddles

Custom instruments and modifications

Chamber cleaning

## Why SIS?

We maximize the lifespan and effectiveness of medical equipment and instrumentation through:

- Superior repair and refurbishment services

- Comprehensive and targeted educational programs

- Programs focused on optimizing patient safety

- Preventive maintenance programs

- Real-time account information via customer portal

- Cost-reduction programs exclusive to SIS

- An **industry-leading one-year warranty**

## Increase Efficiencies and Patient Safety

With our proprietary educational programs, SIS can evaluate your facility's processes and design customized solutions to help you:

- ✓ Lower medical device repair costs
- ✓ Eliminate inefficiencies in the clinical arena
- ✓ Decrease surgical delays by drastically reducing equipment and instrument failures
- ✓ Ensure adherence to OEM standards regarding the care, handling and reprocessing of devices
- ✓ Improve staff production through equipment and device management programs

## Our Parts and Repair Standards

SIS adheres to stringent OEM specifications for components, processes and device function. All materials and methods used during the repair and rebuild processes are identical or functionally equivalent to the OEM.

## IT'S TIME TO CHALLENGE THE STATUS QUO.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092273

4-SER-753

# PRODUCED IN NATIVE FORMAT

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Tucson Medical Center Instrument Repair RFP - Questionnaire**

| Evaluation Criteria |
| --- |
| The following criteria, in no particular order of importance, will be used to evaluate the responses: |
| 1. Quality resources to meet instrument repair needs: Ability to fulfill requests and repairs in a timely manner with highly qualified individuals based on the proper qualifications, competencies and quality. |
| 2. Competitive financial metrics: ie, rebates, guarantees and penalties |
| 3. Cultural fit |
| 4. Customer service: Based on responsiveness, reliability, ease of use and compatibility |
| 5. Financial stability of company |
| 6. Reporting and monitoring capabilities |
| 7. Savings to TMC |
| 8. Ability to service TMC |
| 9. Support in maintaining regulatory compliance |
| 10. Agreement with TMC terms and conditions |

**\*\*One (1) copy of the following information is to be submitted with each copy of your RFP submittal. \*\***

| Component | Vendor Response |
| --- | --- |
| General Supplier Information | |
| Supplier name | Surgical Instrument Service Company, Inc.  (DBA: SIS) |
| Primary contact information (and preferred method of communication) | Keith Johnson (email) krjohnson@sis-usa.com or (direct) 623-687-5056 and Scott Knight (email) sknight@sis-usa.com or (direct) 206-455-5004 |
| State whether your company is a proprietorship, partnership, or corporation and the state, the date the company was founded, and how long it has been under the present management. | SIS is a privately-held Illinois corporation that was incorporated in 1971 and has never changed ownership. |
| Supplier primary address: provide the name, address, web site, and phone number of the company headquarters | SIS<br>151 N. Brandon Drive<br>Glendale Heights, IL 60139<br>www.sis-usa.com<br>630-221-1988 |
| List your major divisions and subsidiaries, including their principal products and complete addresses. | In addition to the National Service Center corporate headquarters, SIS has an endoscope repair facility located at 8155 N. 24th Avenue, Phoenix, Arizona 85021. SIS is not a subsidiary of any other organization and does not have any additional subsidiaries or alternate service or product offerings beyond surgical device service, maintenance and repair. |
| Give the name and complete address of the parent company if your firm in a subsidiary or a corporate division. | None |
| Provide a completed W9 | Attached |
| Date company was formed | 1971 |
| Description company in terms of size, range and type of services offered and clientele | SIS is a privately-held corporation. SIS provides maintenance, repair, refurbishment and rebuild services for general and specialty handheld medical devices and instruments and other related equipment. Additionally, SIS provides autoclave refurbishment services, rolling stock repair, and refurbishment/repair services for ancillary items. Our clientele range from large hospital systems to smaller surgery centers located across the United States. |
| Year instrument repair services program initiated | SIS began providing traditional instrument repair services in 1971, and on-site instrument maintenance services in 1982. |
| Number of current healthcare clients actively using this program | SIS provides maintenance, repair and services for general and specialty handheld medical devices and instruments for approximately 900 hospitals, surgery centers, medical centers and other medical facilities. |
| What is your company's geographic coverage?  In what states are you providing services such as these? Are there portions of any states where you do not provide services? | SIS provides services throughout the continental United States. There are no regions that are not servicable by SIS. |
| Please indicate which Group Purchasing Organizations (GPOs) you currently have contractual relationships for the services covered in this RFP, if any?  For each GPO with which you currently have a contractual relationship for services covered in this RFP, please list if the award is sole, dual or multi. | SIS has a GPO contract relationship with Vizient that will cover the breadth of this RFP.  This is a multi-source category for Vizient. SIS has an exclusive clause in the GPO contract providing administrative fee bonuses for new business. |
| Are your manufacturing and/or instrument repair facilities ISO approved? If so, provide the name and address of each facility, the date ISO approval was received, and ISO standard number that was assigned for the approval. | SIS has developed, and continues to improve, its own proprietary Quality System. As validation of that system, for Fiscal 2019, SIS maintained a warranty return rate of only 0.02% and a beyond repair rate of only 0.65% across all categories of service. SIS has not completed the ISO certification process. |

| Component | Vendor Response |
|---|---|
| State whether or not your company qualifies as a "Minority Business Enterprise" as defined by the U.S. Government in 41 CFR, Section 1-1.1303.  State basis for qualification | SIS does not qualify as a Minority Business Enterprise. |

| Procurement | |
|---|---|
| If you are currently providing services in this category to Vizient or Provista members, please identify the current tier structure, how many members are on each tier, and the amount of spend allocated to each tier for 2019. | Tier 1, 12 members, $199,070 spend<br>Tier 2, 16 members, $635,441 spend<br>Tier 5, 44 members, $3,223,763 spend |
| Is your company considered a National Service Provider? Please list any states that you DO NOT serve. | SIS is considered a national service provider. |
| Is your company considered a Regional Service Provider?  If yes, please list the states that you DO serve. | No |

| Personnel | |
|---|---|
| List the company officers authorized to act on behalf of your firm, include their name and title. | Greg Posdal, CEO, will be the signatory officer for any final agreement. Keith Johnson, Executive Vice President-Sales and Clinical Programs, can also represent SIS. |
| Provide a detailed Organization Chart of your company's staff showing the officers and principals, including the direct supervision, who would be responsible for the contract for which your company is requesting consideration. | SIS has a local team as well as a corporate account management team based at our NSC,  dedicated to supporting the TMC agreement.<br><br>Local service representatives:<br>Christian Johnson - Associate Sales Representative<br>Danny Singh - Associate Sales Representative<br>Keith R. Johnson - EVP Sales and Clincial Programs<br><br>Local Mobile ICU technician:<br>Name TBD<br><br>NSC Account Management:<br>Karen Zak - Sr. Account Manager<br>Nellie Nichter - Accont Manager<br>Denise Posdal - VP Corporate Operations<br><br>Corporate Clinical Support:<br>Catherine Johnson RN, BSN - Clinical Educator<br>Scott Knight - Director of Field Services<br>Jason Pruet - Director of Field Services<br>Keith Posdal - VP Technical Operations |
| What technical support is offered, both during set up and ongoing? | SIS will provide on-site technicians, local account management and corporate account management for support through the implementation and life of the service agreement as detailed above. |
| What is the protocol for training employees who will use the system, both initially and ongoing? | SIS's customer portal (SISCOMS) is web-based and ongoing training and support will be available as needed by local SIS staff. |
| Please outline your implementation plan, including responsibilities, dates, and estimated time commitment for each step | See attached implemation plan. |

| Business Information | |
|---|---|

Trial Ex. No. 1547, Pg. 5 of 40

| Component | Vendor Response |
|---|---|
| Indicate your company's principal line(s) of business (give a summary of business capabilities). | SIS provides maintenance, repair, refurbishment and rebuild services for general and specialty handheld medical devices and instruments and other related equipment. SIS provides service for the following categories of devices: <br> - General and specialty stainless instrumentation <br> - Fiber optics <br> - Flexible endoscopes <br> - Lap instrumentation <br> - Bipolar forceps <br> - Pneumatic, electric and battery powered equipment <br> - Rigid endoscopes <br> - Semi-rigid and specialty/operating rigid scopes <br> - Video cameras <br> - daVinci robot arms and scopes <br> - Autoclave chamber cleaning <br> - Rolling stock/case cart repair and refurbishment <br> - Video laparoscopes <br> - Ancillary devices |
| Indicate how long your firm has performed each of the services offered. | SIS has been providing service and repairs for surgical instruments and devcies for 49 years. |
| List type of work you normally subcontract to others. | SIS does not sub-contract any services covered by the scope of this RFP. |
| Indicate the extent to which work associated with the service that your company is interested in supplying to TMC is subcontracted. | SIS does not subcontract any services that would be provided through this service proposal to TMC. |
| Provide information including detailed brochures, manuals, catalogs, reports, etc., which fully describe your capabilities and allow an evaluation that will consider the relilability of your company. | Attached |
| Please provide pricing structure, commission rates, product information, equipment resources/ requirements and maintenance, and marketing programs. | Please see agreement proposal for terms and conditions |

| Insurance Information | |
|---|---|
| Give the insurance carrier for personnel who would be performing work, primarily those who woud be providing the service on the premisis of TMC.  Provide the agent, complete address, and telephone number. | Megan Howard <br> Koty-Leavitt Insurance Agency, Inc. <br> 6992 E Broadway Blvd <br> Tucson, AZ 85710 <br> 520-571-1900 |
| Give the type of coverage and the amount. | SIS carries the coverage specified in the Vizient agreement, including : $1,000,000/$3,000,000 general, auto and umbrella liability |
| Indicate if your company has even been denied insurance and if so, explain why. | SIS has never been denied insurance. |
| Describe reporting available to TMC, including both canned reports and customizable reporting options | Please see attached sample onsite service summary sample.  SIS can also provide custom reports for all services rendered by category, device, make, model, serial number, date of service, failure root cause, etc. |

| Financial Data | |
|---|---|
| Give bank references, inclluding contact names and telephone numbers. | See Vizent agreement |
| Provide Annual Reports and audited Financial Statements for the past three (3) years. | See Vizent agreement |
| Provide both above for your parent company if your firm is a corporate division or subsidiary. | SIS does not have a parent company |
| Indicate to what degree your firm provides financial backing to its subsidiaries and, or corporate divisions. | SIS does not have subsidiaries |
| Indicate to what degree your firm is provided financial backing from the parent and send written confirmation. | SIS does not have a parent company |
| Explain any other value-add services offered by your company that will further help TMC meet their  goals. | SIS can provide both onsite and online educational services to hospital staff. Additionally, SIS can provide detailed history by device with failure-trending in order to help identify areas of improvement. |

| Quality | |
|---|---|
| Does your firm have a Quality Assurance/Control Program, and is it documented? | Yes, SIS has a strict, multi-step quality assurance and control process. |
| If it is documented, submit one (1) uncontrolled copy of the latest manual that describes the methods used to control the quality and cost effectiveness of your service(s). | The specific details of our QA program are considered proprietary trade secrets.  Please see attached SIS Quality Assurance Program overview for a summary of the program. |

| Component | Vendor Response |
|---|---|
| If it is not documented, submit a brief summary on your firm's letterhead providing the same type of information. | N/A |
| It is our expectation that all repairs meet or exceed OEM specifications. Please confirm and describe the validation process you utilize to ensure the specifications are met. | All instruments and devices repaired by SIS meet or exceed OEM specifications for design, function and reprocessing compatibility.  Component suppliers maintain testing and validation documentation for components, and SIS utilizes materials and methods that match the composition and make-up of original components. |
| Do you utilize new parts in your repairs?  If yes, please explain where they come from and how you will ensure availability of parts throughout the term of the agreement. | SIS sources parts from the same network of reputable parts manufacturers and suppliers as OEMs and other repair organizations . SIS also maintains a full service machining shop to manufacture components as required to return devices to OEM design specifications. |
| Do you utilize used/refurbished parts in your repairs?  If yes, please list which repairs use refurbished parts and how you ensure product acceptance. | No used parts or components will be utilized in the services covered by this RFP. |
| Does your company perform laser welding in the repair process? If yes, please provide information on the welding process. | SIS provides laser welding as well as other traditional welding services. The specific practices of our technicians, including the laser welding process, is considered proprietary information. |
| Does your company perform instrument laser etching? If yes, please provide information on the etching process. | SIS provides laser and chemical etching. The specific practices of our technicians, including the laser and chemical etching process, is considered proprietary information. |
| Please describe your repair warranty. If the warranty varies depending on the repair, please describe the details of each warranty. | SIS provides a limited one-year warranty against defects in materials and workmanship for all paid repair and maintenance services. Please see attached warranty statement for further detail. |

| Service | |
|---|---|
| It is our expectation that all repairs are completed by the agreed-upon date/time. Please describe all remedies your company offers when commitment deadlines are not met (e.g. complimentary or discounted repairs, rebates). | If a repair takes longer than the agreed upon length of time, and a comparable loaner device is not available, SIS will work directly with the affected department to identify a mutually agreeable solution. For example, an exchange for the same cost as the quoted repair, or a discount on service performed. |
| How many National Repair Centers will you have in service by January 1, 2020? Please list the location for each center (City & State). | Glendale Heights, Illinois and Phoenix, Arizona |
| Please describe any success you have had repairing items that other companies have deemed "unrepairable". | SIS has significant success repairing devices that other organizations have deemed "unrepairable". In fact, SIS has built a program specifically focused on our ability to repair devices that come to us after another vendor has deemed the device unrepairable. Through this program - the Beyond Repair Double Check (BRDC) Program - our success rate is 78%.  In addition to our success in repairing devices other providers cannot, SIS successfully repaired 99.84% of the devices in the categories included in this request last year. All of these repairs were covered by our one-year parts and labor warranty, virtually eliminating the possibility of other vendors repairing devices that are identified as not repairable by SIS. Only 0.16% of devices sent to us were not repairable by SIS. |
| Our expectation is that your repair center will be able to accommodate repairs for TMC at any given time. Please confirm. Additionally, please detail the capacity at which your repair centers are currently operating. | SIS will be able to accommodate repairs from TMC at any given time. In 2012, SIS purchased and moved into our state-of-the-art National Repair Center to accommodate our projected growth. |
| Our expectation is that you will work with our organizations to meet their needs and time tables regarding onsite instrument repair. Please confirm. | Confirmed |
| **Turn time is a key evaluative consideration.** Please indicate your average turn time (in days)  for the products you service. | In 2019, SIS maintained an average turn-time of 2.39 days across all categories of service.  The average turn-time (in business days) by category is listed below:<br>- Bipolar: 4.08<br>- DaVinci: 4.63<br>- Fiber Optic: 4.61<br>- Flexible: 4.17<br>- Lap Instruments: 3.63<br>- Power: 4.36<br>- Rigid: 5.54<br>- Stainless: 1.80<br>- Video: 3.40<br>- Video Lap: 5.75 |
| Define your critical success factors. | Critical success factors for instrument and device maintenance and repair are:<br>- Turn-time<br>- Beyond repair rate<br>- Warranty return rate<br>- OR complaint frequency and content |

| Component | Vendor Response |
|---|---|
| Please list all brands or products you DO NOT repair. | There are no brands of products that SIS does not repair. |

| Operational Efficiency: Loaner Program, Reporting, Technology & Education | |
|---|---|
| **Loaners:** Please provide information about your current loaner program. How many are in your pool, what is the fill rate, etc.? | SIS has a loaner pool of serial numbered devices that are available for use during repair. SIS is able to meet 90+% of all loaner requests. However, there are no devices covered by the scope of this RFP that would generally be eligible for loaner use.  SIS has an inventory of over 500 devices. |
| Loaner availability is a key evaluative consideration. Please indicate your willingness to provide a dedicated pool of loaner equipment strategically located  for use by TMC members with availability based on inventory assessments of members' equipment. | SIS works directly with each department to establish coverage for "mission critical" devices.  Dedicated, in-house, locally stored and general pool loaner options are all available. |
| Additionally, please indicate your willingness to provide onsite loaners to members based on inventory assessments of members' equipment. | SIS works directly with each department to establish coverage for "mission critical" devices.  Dedicated, in-house, locally stored and general pool loaner options are all available. |
| It is our expectation that members would also have access to supplier's general loaner pool. Please confirm. | Confirmed |
| **Reporting:** It is our expectation that your company will provide real-time tracking online to allow customers to see precisely where their repair is in the process. Please confirm. | Confirmed |
| Please describe any software programs in place that allow for collecting the service history of assets, monitoring utilization, and developing preventative maintenance schedules. | SIS's customer portal is available for real time and historical reporting through a web-based interface.  SIS technicians and local support staff will also assist TMC in further implementing and utilizing the maintenance tracking component of Impress. |
| It is our expectation that supplier will provide trend reports utilizing a variety of methods (e.g., live, via webinar, in business review meetings) to enable the management of member assets. Please confirm. | Confirmed |
| It is our expectation that supplier will make recommendations to reduce costs and manage inventory based on collected information and inventory assessments. Please confirm. | Confirmed |
| **Education:** Please describe your customer education program. | SIS offers two types of educational offerings:<br><br>Care and Handling: Competency training and certification for all categories of devices maintained by SIS that includes in-person, hands-on training and individual competency evaluations.  SIS's program follows the guidelines of OEM IFUs and industry best practices.<br><br>Failure Reduction: Educational programs including failure trending, training, consultation and recommendations to reduce the frequency and severity of avoidable failures in any applicable TMC department. |
| **Education is a key evaluative consideration.** It is our expectation that supplier has distinct education programs designed to assist with the handling and maintenance of inventory and competency training; such training will be provided for multiple departments across all levels of staff. | Confirmed |
| It is our expectation that these education programs are accredited and provided at no charge. Please confirm. | Confirmed |
| It is our expectation that supplier will provide a master trainer to TMC who will have a clinical background as well as extensive facility personnel training experience. Such person will be responsible for the full implementation of education and value-added programs. Please confirm your willingness and ability to meet this expectation. | Confirmed |
| It is our expectation that supplier will offer Certification Readiness Training for TMC technicians at no additional cost. Please confirm. | Confirmed |
| Please indicate your willingness to provide initial department evaluations and risk assessments (to identify areas in which best practices are not being met) followed by the creation of a mutually agreed upon targeted education program. | SIS will provide evaluations, assessments and relevant training/education required. |
| It is our expectation that supplier will provide tailored education at each member facility-- in a structured manner and according to a set timeline-- as deemed necessary by TMC. Please confirm. | Confirmed |
| **Technology Platform:** It is our expectation that the supplier will provide a technology platform for the reporting function. At a minimum, the platform should track service history (warranty repairs, repeat repairs, educational opportunities); monitor the preventative maintenance program; and flag/ incorporate underutilized assets. Please confirm your ability to meet this expectation. | Confirmed |

| Cost Reduction & Pricing | |
|---|---|

| Component | Vendor Response |
|---|---|
| It is our expectation that supplier will offer guaranteed savings with options such as: traditional (transaction based, best in class structure); capitated (annual not to exceed); risk allocation (supplier purchases the capital and manages) & gain share (guaranteed target, split savings above target). Please confirm your willingness and ability to meet this expectation. | Confirmed |
| It is our expectation that supplier will offer no charge services (e.g. shipping, loaners, education). Please describe your willingness and ability to meet this expectation. | SIS will include value-add services at no additional cost to TMC. |
| Please describe any programs you offer to assist customers in reducing their repair costs and provide a specific instance where one of these programs was implemented. | The SIS Process Excellence Program (PEP Program) was designed specifically to help hospitals reduce the frequency and severity of device failures. Through this proprietary program of repair trending, root cause analysis, business reviews and in-facility assessments, SIS is able to work with relevant departments to provide educational tools including in-services, documentation and one-on-one validations in order to reduce avoidable failures. We also collaborate with departments to streamline inventory and ensure that the levels are appropriate for the needs of the facility.  SIS implements this process with all full-service customers. |
| It is our expectation that supplier will create a custom TMC pricing tier for members electing a transaction based relationship, as well as create a plan for additional discounts based on TMC volume increases. Please confirm. | Confirmed |
| Describe your cost / price guarantees. | SIS offers several savings programs including fixed spend programs, risk sharing, and pay-per-service. Any contracted savings guarantees will be implemented as agreed upon. |
| Please propose an Administrative Fee (as described in the body of the RFP) for your services. | The Vizient/SIS agreement specifies an administrative fee bonus for new business to SIS. When implemented, the agreement between TMC and SIS would qualify for the administrative fee bonus. |
| Please provide your proposed fixed price for years 1-3. | SIS proposes a full service general instrumentation program that includes all on-site and off-site general instrumentation maintenance and repair. The fixed cost will vary based on the number of service days per month.<br>8.6 days per month (2/week) - $13,900.00<br>13 days per month (3/week) - $19,275.00<br>With 3 or more days per week of service, SIS may place a semi-permanent ICU pod at TMC.  See attached proposal for specific terms. |
| If fixed price is based on the number of claims, providers, users and/or payers, please provide any additional cost once TMC meets or exceeds the number of claims, providers, users or payers. | SIS's proposal is for a fixed spend service that doesn't have a specified cap on the number of claims or services to be performed. |
| If you are not going to offer fixed pricing please explain how you typically price your services. What is included in the price?  Although TMC will review non-fixed pricing proposals TMC is looking for fixed pricing. (Please be specific as to what is included in the cost.) | SIS fixed spend services are an inclusive maintenance and repair offering for general instrument set maintenance and repair. Any non-included services would be charged at Vizient tier 5 discounted rates. |
| Please provide your proposal for the total cost of the implementation process, to include but not limited to: staff expenses (travel, lodging, meals), system changes or interface changes, training of client staff and any other cost associated with your normal implementation. It is important to itemize whenever possible and include all costs and fees associated with your system proposal. | There are no costs to be incurred by TMC for the implementation of a service agreement above the proposed monthly charges. |
| Are there any add-on costs that are not listed and of which TMC should be aware? | There are no add-on costs that would be required for the implementation of a service agreement. |

| Description of Scope and Costs | |
|---|---|
| Please provide a detailed outlined scope for Services that you could provide with a cost, in accordance with terms and conditions. | Please see attached agreeement proposal for  T&C details |

**Tucson Medical Center Instrument Repair - References:**

| References | Supplier Response |
|---|---|
| Provide at least three (3) hospital system references with similar demographics | |
| **Healthcare System/Facility Name:** | **Kaiser Irvine Medical Center** |
| Contact Name: | Daniel Perez |
| Title of Contact: | Department Administrator - SPD |
| Phone #: | 949-379-4457 cell |
| E-mail Address: | daniel.j.perez@kp.org |
| Length of Relationship: | 8 years |
| Annual Instrument Repair Volume: | $350,000 |
| **Healthcare System/Facility Name:** | **Piedmont Healthcare** |
| Contact Name: | Ben Haygood |
| Title of Contact: | Director Supply Chain |
| Phone #: | 470-271-3393 |
| E-mail Address: | ben.haygood@piedmont.org |
| Length of Relationship: | 2 years |
| Annual Instrument Repair Volume: | $2,000,000 |
| **Healthcare System/Facility Name:** | **Legacy Health System** |
| Contact Name: | Brett McClellan |
| Title of Contact: | Regional SPD Manager |
| Phone #: | 360-624-0588 cell |
| E-mail Address: | bmcclell@lhs.org |
| Length of Relationship: | 3 years |
| Annual Instrument Repair Volume: | $1,000,000 |

Trial Ex. No. 1547, Pg. 10 of 40



# Beyond Repair
# Double-Check℠

The SIS Beyond Repair Double-Check℠ Program is guaranteed to reduce unnecessary spending. SIS can help ensure that you are not wasting your limited budget on replacement instruments when your current instruments can be restored to proper function for significantly less.

## 78%

The average percentage of instruments and devices labeled "beyond repair" that SIS can restore.

## RISK FREE

SIS will evaluate your "beyond repair" instruments for free. You will only be invoiced if the repair will restore proper function <u>and</u> save you money.

## CONFLICT FREE

The SIS Beyond Repair Double-Check℠ Program does not conflict with any existing vendor agreements.

## How does the SIS Beyond Repair Double-Check℠ Program work?

- ✓ Instruments that have been slated for disposal or replacement will receive a full evaluation at the SIS National Service Center
- ✓ Quotes will be generated for qualifying instruments and repairs will be made upon approval
- ✓ **All serviced instruments carry an industry-leading one-year warranty covering materials and workmanship**
- ✓ Non-repairable devices and instruments can be disposed of by SIS, or returned to your facility for internal disposal

## Our Repair Standards

SIS adheres to stringent OEM specifications for components, processes and device function. All materials and methods used during the repair and rebuild processes are identical or functionally equivalent to the OEM.

If an instrument cannot be restored to proper function, it will not be repaired. At SIS, patient safety is our number one priority.

## It's time to challenge the status quo

SIS instrument and device management can help you provide the prompt and tailored responses your OR and clinical departments demand.

Call your local SIS representative or our Corporate Office at 800.747.8044.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY



## STATEMENT OF WORK ONE -FIXED COST INSTRUMENT MAINTENANCE

This Statement of Work ("**SOW**") is entered into as of the _____ day of _____, ____ ("**SOW Effective Date**") by the undersigned parties and is subject to the terms and conditions contained in the Master Services Agreement between Surgical Instrument Service Company, an Illinois corporation ("**SIS**") and Tucson Medical Center ("**Customer**") that was effective *(effective date of MSA)* (the "**Agreement**") and is made a part thereof. If the above SOW Effective Date is left blank, this SOW will be effective as of the latest date signed below.

All terms and conditions of the Agreement are expressly incorporated herein by reference. To the extent there are any conflicts or inconsistencies between this SOW and the Agreement, the provisions of the Agreement will govern and control, unless the parties have expressly provided in this SOW that a specific provision in the Agreement is amended, in which case the Agreement will be so amended, but only with respect to this SOW. This SOW expressly supersedes any Contractor proposal. The specific terms and conditions relating to the Services include the following:

### I.    CUSTOMER INFORMATION

CUSTOMER ENTITY NAME: Tucson Medical Center

CUSTOMER COST CENTER:

CUSTOMER EXECUTIVE:

CUSTOMER CONTACT:

Phone:            Fax:            Email:

### II.    PROJECT OVERVIEW; DESCRIPTION OF SERVICES AND DELIVERABLES

    A. This SOW includes the necessary service and repair of handheld general and specialty stainless and on fixed fee basis. Payment for the services in this SOW are due up front on the first day of the month.

### III.    TERM OF SOW; SCHEDULE FOR COMPLETION OF SERVICES

The term of this SOW will be for a period of three years and shall coincide with the term of the Agreement.

A. **FIXED COSTS FOR COVERED SERVICES.** Customer will pay $13,900.00 on the first day of every month for the duration of the Agreement**.**

    i.  Devices excluded from, or not included in, Covered Services will be serviced under the terms of the Agreement.

B. **FIXED COST ADJUSTMENTS.**

    i.  Case Volume Adjustments: As case volumes trend up or down, the Fixed Cost may be adjusted to maintain appropriate charge.

        a)  Case volume will be reported and tracked quarterly.

Statement of Work One

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092276

**4-SER-763**

       b) A ten percent (10%) or greater average monthly case volume increase or decrease (measured quarterly) may result in matching percentage changes in monthly Fixed Cost.

  ii.   Quarterly Review Adjustments: At the conclusion of each quarter, utilization will be reviewed against actual spend. Variances above twenty percent (20%) from actual spend may result in a monthly spend adjustment to bring utilization within twenty percent (20%) of actual spend.

C. **CATEGORIES OF REPAIR (Covered Services).** This SOW includes the necessary maintenance and repair of handheld general and specialty stainless and laparoscopic instrumentation.

  i.   One (1) onsite Instrument Care Unit (ICU) will be provided and staffed for up to two (2) eight (8) hour service days per week for the general maintenance of surgical instrumentation. Additional eight (8) hour days of service are available for $1,250.00 per business day.

  ii.   With 12 days per month of onsite service, SIS can provide a semi-permanent ICU pod for onsite instrument services.

  iii.  Repairs and other complex services for covered devices will be provided at an SIS service center.

  iv.  Only devices owned by, and located in, Customer's facility, within the following departments, are included in Covered Services: (1) Perioperative Services; (2) Sterile Processing; (3) Operating Rooms.

D. **SERVICE PROCESS.**

  i.   **Instrument repairs.** All devices in need of repair will be picked up by a local SIS representative and delivered to one of SIS's Service Centers. As devices are received at SIS they will be inventoried, entered into the tracking system and go through the incoming Quality Inspection process. All damage and defects will be noted, and repairs performed. At completion of the repair the device will go through outgoing Quality Control to verify function against manufacturer's specifications. Devices passing final Quality Control will be packaged and sent to SIS representatives for hand delivery to Customer. SIS will not remove any serial number or manufacturer information during the repair process. In extenuating circumstances, SIS may use professional courier services to deliver or pick-up orders.

  ii.   **ICU maintenance.** Customer will provide trays and instruments to the SIS ICU technician at the beginning of each service day, utilizing the mutually agreed upon processes. Trays returning from the SIS ICU will be ready for decontamination and reprocessing prior to return to service.

E. **EXCLUSIONS FROM COVERED SERVICES:**

  i.   Notwithstanding any other provision of this agreement, this agreement does not cover the following, as determined by SIS in its sole discretion: (1) abnormal wear or damage caused by reckless or intentional misconduct, abuse, neglect or failure to perform normal and routine maintenance as set forth in the manufacturer Instructions for Use, or operating instructions provided with the equipment; (2) accidents, catastrophe, fire, flood or act(s) of God; (3) Damage resulting from faulty maintenance, improper storage, repair, handling or use; (4) service necessary due to the failure of the customer or anyone under its control to comply with written instructions or recommendations; (5) damage caused as a result of the use of the equipment beyond the useful life, if any, specified for such equipment in the user manual; (6) service to the equipment if the equipment or the equipment site is contaminated with blood or other potentially infectious substances; (7) Any otherwise-covered device that failed while under control of any department not listed in section 7 (Categories of Repair); (8) Devices acquired or put into service after agreement date; (9) Laparoscopic instruments requiring repairs beyond those included in Level 5; (10) Specialty silver-tipped bipolar forceps tip replacement; (11) Instrument rebuilds including major component replacement.

---

Statement of Work One

[PAGE ]4

F.   **NON-REPAIRABLE DEVICES.** Any devices not repairable by SIS will be reassembled with original components and returned to Customer for repair or replacement by OEM. Whenever possible, SIS will offer an exchange device at a discounted rate (based on availability).

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

Statement of Work One

[PAGE ]4

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Trial Ex. No. 1547, Pg. 14 of 40

SIS092278

4-SER-765

**IN WITNESS WHEREOF**, the parties hereto have caused this Statement of Work to be executed by their respective authorized representatives to be effective as of the date first above written.

**Surgical Instrument Service Company, Inc**          **Tucson Medical Center**

_____          _____
Signature                          Date          Signature                          Date

Greg Posdal_____          _____
Name                                        Name (please print)

President          _____          _____
Title                                        Title

CONFIDENTIAL - ATTORNEYS' EYES ONLY                          SIS092279

**Trial Ex. No. 1547, Pg. 15 of 40**                          **4-SER-766**



## Preventative Maintenance Program℠

Your physicians demand that their power equipment performs flawlessly during each procedure. Improper care and maintenance of the equipment can put your OR – and your patients – at risk.

By implementing the SIS Preventative Maintenance Program℠, your devices will undergo routine inspections and maintenance in order to maximize their performance, reliability and lifespan.

### Proactive Care Cycle



Inspection and repair → Biannual set maintenance → Improved up-times → No delayed or interrupted procedures

### Why use Preventative Maintenance?

With the Preventative Maintenance Program℠, our goal is to allow you to focus on your patients, not your equipment. Through this program, hospitals will:

- ✓ Receive no-charge preventative maintenance inspections for all covered devices
- ✓ Increase patient safety and surgeon satisfaction
- ✓ Dramatically reduce the severity and frequency of equipment failures
- ✓ Avoid stressful "fire drills" by implementing a proactive care cycle

### It's time to challenge the status quo

SIS instrument and device management can help you provide the prompt and tailored responses your OR and clinical departments demand.

Call your local SIS representative or our Corporate Office at 800.747.8044.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com



## Quality Assurance Process

### Our 3 Step Quality Assurance Process



Repair complete

Initial inspection by lead technician

Secondary inspection by department manager

Final inspection by QC Analyst

Function, feel & aesthetics all equivalent to OEM specifications

### Effectiveness of Process

The effectiveness of our Quality Assurance Process is validated by:

- ✔ 2019 warranty return rate: 1.98 warranty returns per 10,000 repairs
- ✔ 2019 repair rate: 99.979% of all surgical instrumentation sent in for service were repaired successfully

### Our Repair Standards

SIS adheres to stringent OEM specifications for components, processes and device function. All materials and methods used during the repair and rebuild processes are identical or functionally equivalent to the OEM.

At SIS, patient safety is our number one priority.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092281

**4-SER-768**



# MASTER SERVICES AGREEMENT

This Master Services Agreement is made and entered into as of this＿＿ day of ＿＿＿＿＿＿, 20＿ ("**Effective Date**") by and between Surgical Instrument Service Company, an Illinois corporation, with offices located at 151 North Brandon Drive, Glendale Heights, Illinois, 60139, ("**SIS**") and Tucson Medical Center, with offices located at 5301 E Grant Road in Tucson, Arizona 85712 ("**CUSTOMER**").

In consideration of the mutual covenants and promises contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1. STRUCTURE OF AGREEMENT

1.1.    This Agreement contains the terms and conditions that govern the relationship between the parties with respect to Services to be provided by SIS for, or on behalf of, CUSTOMER pursuant to one or more separate Statements of Work (each, a "**SOW**"), as may be entered into by the parties from time to time. Each SOW will be substantially in the form of the sample SOW attached as <u>Exhibit A</u> or any similar form that contains substantially the same information, as applicable, and will be governed by and incorporated into this Agreement by reference. Each SOW must be signed by authorized representatives of both parties to be effective.

1.2.    In the event of a conflict between any provision of this Agreement or any Exhibit to this Agreement and any provision of any SOW, the provision in this Agreement or the Exhibit to this Agreement will control, unless the parties expressly provide in the SOW that the specific provision in this Agreement or Exhibit is amended, in which case this Agreement will be so amended, but only with respect to that SOW. Terms defined in this Agreement and used as defined terms in a SOW (as denoted by their initial capitalization) will have the meanings given for such terms in this Agreement, unless otherwise defined in the SOW.

1.3.    SIS will have no obligation to commence performance of any Services until the parties have executed a SOW documenting the Services.  Likewise, CUSTOMER will have no obligation to compensate SIS for any Services until the parties have executed a SOW documenting the Services.

## 2. SERVICES

2.1.    SIS will provide the Services described in one or more separate SOWs, which Services may include the sale of equipment and the provision of maintenance, repair, testing, inspecting and other professional Services and deliverables, as set forth in the applicable SOW (collectively, the "**Services**").   The Services shall also include, without limitation, all work and Services required such that the equipment and systems meet the minimum performance standards and requirements as set forth in the applicable SOW.

2.2.    Unless otherwise provided in the applicable SOW, SIS shall deliver all equipment, to the CUSTOMER facility identified in the applicable SOW.  SIS warrants that all equipment will be properly classified, described, packed, marked and labeled for shipment, will be in proper condition for transportation in accordance with all applicable laws, rules, regulations, orders, procedures and ordinances, and will include a detailed packing slip with all necessary information. SIS shall make or provide for the payment of all import taxes, duties, charges, assessments, deposits, bonds and security necessary or appropriate to import and deliver any and all equipment to the applicable CUSTOMER facility

2.3.    CUSTOMER shall provide SIS with reasonable access to CUSTOMER facilities as reasonably necessary or appropriate to permit SIS to perform such Services.

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092282

4-SER-769

2.4.     SIS will consult periodically with CUSTOMER at intervals to be determined by SIS, and, in addition, will keep CUSTOMER informed on a current basis with respect to all important aspects of SIS's activities pursuant to this Agreement. SIS will inform CUSTOMER of any event or circumstance of which SIS has knowledge, which event or circumstance would have a material adverse effect on the performance of any of SIS's or CUSTOMER's obligations hereunder.

2.5.     SIS will use best efforts to complete Services in accordance with the schedule agreed upon in the applicable SOW.

2.6.     CUSTOMER will comply with all payment terms detailed in this Master Service Agreement and any applicable SOW.

## 3.  SIS'S REPRESENTATIONS AND WARRANTIES

3.1.     In performing Services under this Agreement, SIS warrants that SIS and all persons providing Services hereunder, whether employees of SIS or contractors of SIS (collectively, "**Personnel**"):

3.1.1.     Will obtain and maintain all licenses, permits, consents and/or certifications required to provide the Services and will provide a copy of such licenses, permits, consents and/or certifications to CUSTOMER upon request.

3.1.2.     Have the education, experience, training and qualifications required to perform the Services.

3.1.3.     Will comply with all of CUSTOMER's reasonable written security procedures concerning systems and data and remote access thereto, building security procedures, and requirements regarding health screening, drug screening, drug free workplace and negative criminal background checks provided they are provided to SIS in the applicable SOW.

3.1.4.     Will comply all applicable federal, state and local statutes, rules and regulations.

3.1.5.     Will comply with any standards or requirements of accrediting or regulatory agencies that in any manner affect or apply to the Services, including but not limited to, those of DNV Healthcare, The Joint Commission, and the Centers for Medicare and Medicaid Services.

3.2.     SIS further represents and warrants to CUSTOMER that:

3.2.1.     The Services will be performed in accordance with, will conform to, and will otherwise meet, all performance requirements set forth in the applicable SOW.

3.2.2.     Title to all Services rendered by SIS under the applicable SOW shall pass to CUSTOMER free and clear of all liens, claims, security interests and encumbrances once Services are fully paid for according to the terms of the applicable SOW. All Work Product and other documents, plans and specifications contemplated or used during the provision of Services will remain the sole intellectual property of SIS.

3.3.     **Limited Warranty. SIS warrants that all fully paid repair services will be free from defects in workmanship or materials under normal use for a period of one (1) year from the date of delivery to CUSTOMER**.

If any device proves to be defective within such warranty period, CUSTOMER must return the device to SIS. CUSTOMER's exclusive remedy, if any, under these warranties is limited, at SIS's election, to any one of (a) refund of SIS's service charge, (b) repair by SIS of any devices found to be defective, or (c) replacement of any such defective devices, provided that SIS determines after inspection and investigation of the device(s) that the alleged defect developed under normal and appropriate use and the device is covered by the terms of this warranty. **CUSTOMER acknowledges that except as specifically set forth**

Page [ PAGE ] of [ NUMPAGES ]

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092283

or referenced in this paragraph 3.3, **THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, IN ADVERTISING MATERIALS, BROCHURES, OR OTHER DESCRIPTIVE LITERATURE) BY SIS OR ANY OTHER PERSON, EXPRESS OR IMPLIED, AS TO THE CONDITION OR PERFORMANCE OF ANY PRODUCTS OR SERVICES, THEIR MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE AND ANY SUCH WARRANTIES ARE SPECIFICALLY DISCLAIMED BY CUSTOMER. SIS ASSUMES NO RESPONSIBILITY OR LIABILITY WHATSOEVER FOR MANUFACTURER'S PRODUCT SPECIFICATIONS OR THE PERFORMANCE OR ADEQUACY OF ANY DESIGN OR SPECIFICATION PROVIDED TO SIS BY OR ON BEHALF OF CUSTOMER.**

**THE REMEDIES SET FORTH IN THIS PARAGRAPH SHALL BE SIS'S SOLE AND EXCLUSIVE LIABILITY AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY. SIS MAKES NO OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, REGARDING THE PRODUCTS OR SERVICES, THEIR FITNESS OR PURPOSE, THEIR MERCHANTABILITY, THEIR NON-INFRINGEMENT, OR OTHERWISE. SIS'S MAXIMUM LIABILITY FOR ANY CLAIMED BREACH OF WARRANTY SHALL BE LIMITED TO THE PURCHASE PRICE OF THE PRODUCT. IN NO EVENT SHALL SIS BE LIABLE FOR THE COST OF PROCUREMENT OR INSTALLATION OF SUBSTITUTE DEVICES BY CUSTOMER OR FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, INDIRECT OR INCIDENTAL DAMAGES OR LOST PROFITS. SUCH LIMITATION UPON SIS'S LIABILITY SHALL SURVIVE EVEN IF ANY OF CUSTOMER'S LIMITED OR EXCLUSIVE REMEDIES ARE DEEMED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.**

Regarding any warranty work, SIS shall not be obligated to perform preventative maintenance, installation, de-installation, relocation, or maintenance. In addition to utilizing new components, SIS reserves the right to use reconditioned, refurbished, and/or serviceable used parts (that meet SIS's quality standards) for warranty or any other repairs. The use of reconditioned, refurbished, or serviceable used parts may include, without limitation, replacing or exchanging major components of the device.

Excluded from this Limited Warranty in section 3.3 and not warranted by SIS in any fashion, either express, implied, or by statute, are the following: (1) Devices and accessories not manufactured or previously serviced by SIS, not bearing a unique serial number or not bearing the SIS logo and a date stamp dated within one (1) year of the CUSTOMER complaint; (2) Any serial numbered device without original invoice that is not registered in SIS's internal order tracking system as having been serviced or repaired for a fee within one (1) year of complaint; (3) Any complimentary repair or service; (4) Any service or device for a CUSTOMER that has any outstanding or late invoices, or is in breach of this Agreement or an SOW with SIS; (5) Any device which has been disassembled, repaired, tampered with, altered, changed, or modified by persons other than SIS authorized service personnel; (6) Any non-conforming repair or modification made at the request of the CUSTOMER; (7) Custom devices; (8) Defects or damage to the device resulting from wear, tear, misuse, abuse, negligence, impact, improper storage, failure to properly clean and sterilize the device or failure to perform any recommended or required maintenance; (9) Failure to comply with all requests and instructions from SIS regarding the use, care or handling, including purchasing appropriate containers and protective devices, to reduce the frequency and severity of device failures, and (10) any devices that come into contact with potentially infectious materials that are not decontaminated in compliance with OSHA blood borne pathogen regulations and any other applicable federal, state and local regulations before being returned to SIS under this Limited Warranty or for any other purpose. .

In compliance with OSHA blood borne pathogen regulations and other applicable federal, state, and local regulations, devices that come into contact with potentially infectious material must be decontaminated before being returned to SIS under this limited warranty or for any other purpose. Representations and warranties made by any person, including but not limited to representatives or agents of SIS, which are inconsistent or in conflict with or in addition to the terms of this Limited Warranty, shall not be binding upon SIS unless in writing and approved by an authorized officer of SIS. This Limited Warranty is the complete and exclusive statement of warranty which SIS agrees to provide with respect to device repairs

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092284

4-SER-771

and service and it shall supersede all prior and contemporaneous oral or written agreements, understandings, proposals, and communications pertaining to the subject matter hereof.

This Limited Warranty is exclusively for the benefit of the original CUSTOMER sand cannot be transferred or assigned.

4. **CORRECTIVE ACTION**

4.1.    CUSTOMER may conduct, at its own expense, such tests as it deems proper or necessary to seek to determine whether the Services (or any portion thereof) meet the Limited Warranty in this Agreement. CUSTOMER shall notify SIS at least three (3) business days in advance of any such tests, and SIS, at its option, shall have the right to have a witness present at such tests.

4.2.    CUSTOMER agrees to comply with all requests and instructions from SIS regarding the use, care or handling, including purchasing appropriate containers and protective devices, to reduce the frequency and severity of device failures.

5. **FEES, EXPENSES AND INVOICING**

5.1.    In exchange for the proper and complete performance of the Services set forth in an SOW, CUSTOMER agrees to pay SIS the fees and other compensation set forth in such SOW as provided in the SOW.  CUSTOMER shall notify SIS of the plan to purchase devices sought to be covered by the SOW and/or the retirement of old devices no longer to be covered by the SOW prior to the actual purchase. Thereafter, the parties will revise the SOW by mutual agreement accordingly. The new monthly fee will be based on the original monthly fee as well as the type and condition of the devices being added or removed. At least annually, CUSTOMER shall permit SIS to audit the CUSTOMER's entire repair history. If SIS determines that any CUSTOMER device not listed in the applicable SOW was repaired by SIS, CUSTOMER shall pay the enterprise discounted rate cost of such repairs. In the alternative, SIS, at its discretion, may adjust the monthly fee to reflect the addition of such device(s) to the applicable SOW. The new monthly fee, to be mutually agreed upon in writing, will be based on the original monthly fee as well as the type and condition of the device(s) being added.

5.2.    No payment to SIS by CUSTOMER shall relieve SIS or CUSTOMER of any of its obligations or liabilities with respect thereto under this Agreement.

5.3.    If Payment terms are not specified in an SOW or Services are provided outside the scope of all SOWs as outlined in Section 12.2, payments are due Net 30.  Payment by check or ACH is preferred. Credit card payments will incur a 3% surcharge. All payments shall be in U.S. Dollars.  CUSTOMER shall make all payments as provided herein without regard to whether CUSTOMER has made or may make any inspection or use of any Products or Services.  No discounts or setoffs shall be made by CUSTOMER against any invoices unless approved in writing in advance by SIS.  Any invoiced amount which is not paid when due shall bear interest at the rate of one and one-half percent (1.5%) per month or the highest rate then permitted by law, whichever is less, until paid in full.

5.4.    For the term of this contract, and for as long as SIS maintains an agreement with Vizient, SIS will pay contractual Administration Fees to Vizient as outlined in the SIS/Vizient agreement.

5.5.    The CUSTOMER will receive SIS Vizient contracted enterprise pricing levels for all Services rendered as outlined in the specific SOW.  Any Services rendered outside of an SOW as outlined in Section 12.2 of this agreement shall also be provided at SIS Vizient contracted enterprise pricing levels.

6. **TERM AND TERMINATION**

6.1.    Unless sooner terminated as set forth herein, the term of this Agreement will be for a period of three (3) years, commencing on the above Effective Date and will automatically renew for two (2) additional, successive terms of one (1) year.  The term of each SOW will be stated in the SOW.

6.2.    This Agreement or any individual SOW may be terminated as follows:

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

6.2.1.    By either party, without cause, with ninety (90) days prior written notice to the other party of such intent to terminate.

6.2.2.    By either party upon written notice to the other party in the event of a breach of any term of this Agreement by the other party that is not cured within thirty (30) days of written notice of such breach to such party.

6.3.    Upon termination of this Agreement, for any reason, each SOW then in effect will terminate as of the effective date of termination of this Agreement.  Termination of any individual SOW(s) will not have the effect of terminating this Agreement, except as to those particular SOW(s).

## 7.   **CONFIDENTIAL INFORMATION AND TRADE SECRETS**

7.1.    The parties acknowledge and agree that during the term of this Agreement, they may become aware of certain information that may constitute trade secrets or confidential information of the other party or its subcontractors that is not commonly known by or available to the general public, including, but not limited to, technical or non-technical data, procedures, processes, client lists, files, reports, protocols, financial data or plans, business practices and information relating to products, Services, pricing, costs, and margins (collectively, "**Confidential Information**").  Confidential Information will not include information that (i) a party can show was in its lawful possession, without any obligation to keep it confidential, prior to receipt of such confidential information from the other party; (ii) is or becomes generally available to the public, through no wrongful act or breach of a duty of confidentiality on the part of a party or any third party; (iii) is later lawfully obtained by a party from a third party under no obligation of confidentiality; or (iv) is independently developed by a party without use of or reference to the other party's Confidential Information.  Each party agrees, and will require its employees, agents and contractors to agree, not to use Confidential Information except as necessary to provide the Services and complete the business detailed in this Agreement and related SOW's and will not to disclose any Confidential Information without the prior written permission of the other party's President/Chief Executive Officer or designee, except as required by law.  Each party shall immediately notify the other party of any unauthorized disclosure or use of any Confidential Information of the other party of which a party becomes aware.  If a party is required by a court of competent jurisdiction to divulge Confidential Information of the other party, then that party shall notify the other party in writing in advance of such disclosure and shall use its best efforts to divulge the minimum amount of Confidential Information as is necessary and to disclose the same on a confidential basis if and to the extent possible.  With respect to any Confidential Information, the foregoing restrictions on use and disclosure will continue in effect after the termination or expiration of this Agreement for so long as such information qualifies as a trade secret.  With respect to Confidential Information that does not qualify as a trade secret, the restrictions on use and disclosure will remain in effect for as long as such information remains confidential.

7.2.    CUSTOMER acknowledges that during the term of this Agreement, SIS and its Personnel will not require access to information pertaining to patients of CUSTOMER and its affiliates ("**Patient Information**") but may have incidental access to such information by virtue of providing Services in CUSTOMER's facilities.  Patient Information includes any and all information relating to individuals who sought or received medical treatment or health care Services or products from or through CUSTOMER or its affiliates.  CUSTOMER acknowledges that Patient Information is subject to various privacy laws, including state and federal regulations.  SIS and the CUSTOMER agrees to strictly abide by all such laws pertaining to the Patient Information, as they are promulgated and applied, currently or in the future.  Without limiting the foregoing, SIS and the CUSTOMER acknowledge and agree that all Patient Information is confidential, and will, and will require their respective Personnel to, maintain all Patient Information in strict confidence and not use or disclose Patient Information except as permitted under this Agreement or as required by law.  SIS agrees that, as between SIS and CUSTOMER, all Patient Information is owned exclusively by CUSTOMER.

7.3.    Upon the termination or expiration of this Agreement, each party will promptly return to the other party all Confidential Information and Patient information in its possession or control (including all copies and documents containing Confidential Information) or will promptly certify to the other party that all

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092286

**Trial Ex. No. 1547, Pg. 22 of 40**

**4-SER-773**

such Confidential Information and Patient Information has been destroyed. If it is not feasible for a party to return or destroy such Confidential Information or Patient Information, that party will notify the other party, in writing, of the reasons that return or destruction is not feasible, and the restrictions in this Section on use and disclosure of such information will continue in effect.

7.4.    This Section will survive the termination or expiration of this Agreement.

## 8. PROPRIETARY RIGHTS

8.1.    "**Work Product**" means all deliverables, procedures, work-flow methods, reports, visual aids, reports, analyses, documentation, drawings, techniques, inventions, processes, and other works and materials developed or created by SIS or its Personnel during the course of performing the Services or specifically designed for the Services and delivered to CUSTOMER under this Agreement. For avoidance of doubt, Work Product does not include SIS Materials (as defined below). Work Product will be deemed the sole property of SIS or its designees.

8.2.    The term "**SIS Materials**" means all methodologies, tools, compilers, specifications, concepts, techniques, software, applications, documentation and data that existed prior to commencement of the Services, together with any and all additions, enhancements, improvements or other modifications thereto (whether or not made during the performance of the Services), that (a) were developed by SIS, its affiliates or by third parties outside of the scope of the Services, or (b) have been purchased by or licensed to SIS. SIS Materials includes all patent, copyright, trade secret and other intellectual property rights related to any of the foregoing. CUSTOMER acknowledges that in providing Services under this Agreement, SIS may utilize aspects of SIS Materials. For avoidance of doubt, SIS Materials do not include any of CUSTOMER's Confidential Information or Patient Information. To the extent the Services (including the proper operation of the equipment and any hardware or software included therein) is based on, or incorporates, or constitutes improvements or derivatives of, or cannot be reasonably made, used, modified, maintained, supported, reproduced and distributed, or otherwise fully exploited, without using SIS Materials or otherwise using or infringing on intellectual property owned or licensed by SIS and not assigned hereunder, SIS hereby grants to CUSTOMER a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully-paid right and license to exploit and exercise all such Contractor Materials and other intellectual property; provided that, in each case, such exploitation and exercise is solely for the use of the Services, including the proper operation of the equipment, hardware, and software associated therewith.

8.3.    Provided that no Confidential Information or Patient Information of CUSTOMER is used or disclosed in connection therewith, nothing in this Agreement will preclude SIS from using any generalized ideas, concepts, know-how, methods, techniques or skills gained or learned during the course of providing any Services performed hereunder to perform similar Services for itself or other CUSTOMERs.

8.4.    All copyrights, patents, trade secrets, and other intellectual property rights associated with any technology, ideas, concepts, techniques, inventions, processes, or works of authorship provided to SIS by or on behalf of CUSTOMER shall be considered "**Preexisting Work**", and all intellectual property rights associated with such Preexisting Work shall remain exclusively with CUSTOMER.

## 9. NO SOLICITATION/NO HIRING OF EMPLOYEES

9.1.    For the term of this Agreement, including any extensions or renewals, and for a period of one (1) year after expiration or termination of this Agreement (regardless of fault or cause of termination), neither party will recruit, hire or attempt to recruit or hire, or solicit, induce, or encourage to leave their employment (either directly or by assisting others): (i) any person employed by the other party and who was employed by the other party at any time during the term (including extensions and renewals) of this Agreement and with whom a party had Material Contact; or (ii) any person who, within six (6) months prior to the date of hire/contract or proposed date of hire/contract by a party, was an employee of the other party and who was employed by the other party at any time during the term (including extensions and renewals) of this Agreement and with whom the party had Material Contact. For purposes of this Section,

Page [ PAGE ] of [ NUMPAGES ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092287

"**Material Contact**" means contact for the purpose of furthering a party's business or performing under this Agreement.

9.2.        It is agreed that establishing and maintaining employee relationships with qualified personnel is valuable to the business of both parties and disruption or attempted disruption of such relationships would cause irreparable harm that cannot be fully compensated by monetary damages. Therefore, the parties agree that in the event of any such breach or threatened breach of this covenant, in addition to any other remedies available at law (including but not limited to monetary damages), the parties shall be entitled to preliminary and permanent injunctive relief to prevent or curtail any breach of this covenant, in which event each party waives the necessity of the posting bond in connection therewith. Nothing in this Agreement shall prohibit a party from seeking or recovering any legal or monetary damages to which it may be entitled if the other party breaches this Agreement.

9.3.  If adherence with this covenant is adjudicated, the prevailing party shall be entitled to recover its attorney's fees and costs, in addition to recovering all other legal and equitable relief potentially available.

9.4.  For purposes of this Section, "party" includes a Party and its affiliates, but this covenant may only be waived in writing by a party.

## 10. **INDEPENDENT CONTRACTOR STATUS**

10.1.        SIS and its Personnel are, at all times, performing Services as independent contractors and not as agents or employees of CUSTOMER. CUSTOMER will neither have nor exercise any control or direction, nor will it have the right to exercise any control or direction, over the methods or manner in which SIS performs the Services required under this Agreement. SIS and its Personnel will not be entitled to employee benefits, such as salary, vacation pay, sick leave, retirement benefits, social security, workers' compensation, disability or unemployment insurance benefits that may be provided to CUSTOMER employees. CUSTOMER will not be responsible for withholding income or other taxes from the payments made to SIS. SIS will be solely responsible for compensating its Personnel and for filing all returns and paying any income, social security or other tax levied upon or determined with respect to the payments made to SIS pursuant to this Agreement. SIS will indemnify CUSTOMER against any claims arising with respect to such payments, withholdings and benefits, if any. This Section will survive the termination or expiration of this Agreement.

10.2.        Inasmuch as SIS is an independent contractor, SIS does not have the authority to bind CUSTOMER to any third person or otherwise to act in any way as the representative of CUSTOMER, unless otherwise expressly agreed to in writing signed by both parties hereto. SIS agrees not to represent itself as the agent for CUSTOMER for any purpose to any party or to allow any of its employees to do so unless specifically required by the terms of a SOW.

## 11. **COMPLIANCE WITH LAW**

11.1.        Equal Employment Opportunity. SIS and all subcontractors shall not discriminate against any employee or applicant for employment because of race, religion, color, sex, national origin, disability or age. SIS shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, religion, color, sex, national origin, disability or age.

11.2.        Employment Eligibility Verification. SIS shall comply with all federal, state, and local labor, immigration, and employment eligibility verification laws, regulations and requirements, including but not limited to, the Immigration and Control Act of 1986 (and all amendments thereto), those of the United States Department of Homeland Security (DHS) and the requirements at FAR 52.222-54, where applicable, regarding all Personnel retained by SIS who will be performing Services, as well as all requirements of Illinois law and any required E-Verify requirements of the federal and state governmental agencies. SIS shall also take appropriate measures to verify that every agent or employee that it assigns

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092288

Trial Ex. No. 1547, Pg. 24 of 40

**4-SER-775**

or directs to perform the Services is legally eligible to work in the United States, will complete, execute and maintain a federal form I-9 of all employees that is assigns or is otherwise involved in the Services, and will not knowingly or intentionally direct or allow any employee or agent to enter onto CUSTOMER's property or to perform the Services who is not legally eligible to work in the United States. SIS shall comply with all federal, state and local labor laws, regulations and orders, including without limitation, those that relate or permit to harassment or discrimination in employment.

## 12. CHANGES

12.1.     If CUSTOMER or SIS desires to change any of the terms of any SOW, CUSTOMER or SIS shall notify the other of such desired change. CUSTOMER and SIS shall not be obligated to accept any proposed change, unless and until SIS and CUSTOMER have agreed in a written amendment to the applicable SOW, which shall include any adjustments in the price or schedule, or other matters deemed necessary or appropriate. Unless and until such amendment is signed by both parties, the original SOW shall remain in effect.

12.2.     From time to time, CUSTOMER may request Services or products from SIS that are not detailed in any current SOW. These costs for these Services will be due and payable according to the terms of this Master Service Agreement. SIS agrees it will not make or seek to make any claims for additional compensation or additional time that was not authorized by a documented approval from CUSTOMER or their designee in advance of commencement of performance of such additional work.

## 13. GENERAL PROVISIONS

13.1.     Governmental Access to Books and Records. From the Effective Date until the expiration of four (4) years after the furnishing of Services under this Agreement, SIS will, to the extent required by Section 952 of the Omnibus Reconciliation Act of 1980 and regulations promulgated thereunder, make available to the Secretary, United States Department of Health and Human Services, the Comptroller General of the United States, and the duly authorized representatives of the foregoing, this Agreement, and all books and records of SIS that are necessary to verify the nature and extent of the costs of Services rendered.

13.2.     Entire Agreement. This Agreement and each SOW, now or hereafter executed, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior negotiations, understandings and agreements of the parties, whether oral or written, which relate to the subject matter of this Agreement.

13.3.     Amendments. This Agreement may be amended or modified only upon mutual agreement of the parties evidenced in writing and signed by authorized representatives of the parties.

13.4.     Assignment. SIS and CUSTOMER shall not assign this Agreement or any of their rights or obligations hereunder without the express prior written consent of the other party, which consent may be granted or withheld in each parties respective and absolute discretion. Notwithstanding anything herein to the contrary, both parties acknowledge and agree that a proposed "change in control" shall be deemed to constitute a proposed assignment of this Agreement, which shall be subject to other party's consent as required herein. For the purposes of this provision, the term "change in control" shall mean: (i) the merger, consolidation or reorganization of a party with or into another entity, (ii) the sale of all or substantially all of the assets of a party, (iii) the sale of a majority of the stock, membership interests or partnership interests of a party, or (iv) a change in the effective voting control of the shareholders, members, partners, directors or managers of a party. Any attempted assignment or transfer of this Agreement by either party without the prior consent of the other party as required herein shall be deemed void, and in such event the other party may, without limiting any of their rights and remedies hereunder or at law, immediately terminate this Agreement upon notice to other party.

13.5.     Binding Agreement. This Agreement will be binding upon, and will inure to the benefit of, the parties and their respective representatives, successors and permitted assigns.

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY
SIS092289

**Trial Ex. No. 1547, Pg. 25 of 40**

**4-SER-776**

13.6.   <u>Notices</u>. Whenever any notice, demand or consent is required or permitted under this Agreement, such notice, demand or consent will be in writing and will be deemed sufficiently given (i) on the day personally delivered, (ii) seven (7) days after deposit in the U.S. Mail if mailed by registered or certified mail, postage prepaid, or (iii) on the day of delivery if sent by recognized courier service to the following addresses:

13.6.1.   If to CUSTOMER:
CUSTOMER NAME:_____
ADRESSEE:_____
TITLE:_____
FULL ADDRESS:_____
_____
_____

13.6.2.   If to SIS:
Surgical Instrument Service Co., Inc.
Greg Posdal
President
151 N. Brandon Drive
Glendale Heights, IL 60139

13.6.3.   Each party may change its address indicated above by giving the other party written notice of the new address in the manner set forth above.

13.7.   <u>Force Majeure</u>. If either party hereto is delayed or prevented from fulfilling any of its obligations under this Agreement, the party so failing will not be liable for such failure, inability or delay to perform hereunder, if such failure, inability or delay is due to any cause beyond the reasonable control of the party ("**Force Majeure**") so failing, and due diligence is used in curing such cause and in resuming performance. Force Majeure will include any cause beyond the reasonable control of a party including, but not limited to, an act of God, an act or omission of civil or military authorities, fire, flood, riot, terrorism or threat of terrorism, war, delay of transportation, disruptions of telecommunications Services, labor disputes or governmental restrictions.

13.8.   <u>Publicity</u>.   SIS shall have right to use any name, trademark, image, logo or trade name of the CUSTOMER or of its affiliates, without prior written approval for marketing purposes and reference purposes. Both parties shall not refer to specific terms of this Agreement or the Services performed hereunder or to any Confidential Information, directly or indirectly, in connection with any product, promotion or publication, and CUSTOMER approves all press releases, publications or public communications describing or concerning Services provided under this Agreement for marketing and reputation building purposes.

13.9.   <u>Waiver</u>. No waiver of any term or provision of this Agreement will be valid unless in writing and signed by the party to be charged with waiver. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No delay in acting with regard to any breach of any provision of this Agreement shall be construed to be a waiver of such breach.

13.10.   <u>Severability</u>. If any provision of this Agreement is rendered illegal, invalid or unenforceable by a court having jurisdiction, under present or future laws effective during the term of this Agreement, the legality, validity and enforceability of the remaining provisions will not be affected thereby.

13.11.   <u>Headings</u>. The headings in this Agreement are for convenience only and shall not be used to define, limit or describe the scope of this Agreement or any of the obligations herein.

13.12.   <u>Counterparts; Execution</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. This Agreement and any SOW, amendment or addendum hereto may be executed electronically or by

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092290

**Trial Ex. No. 1547, Pg. 26 of 40**

4-SER-777

hand, and signed copies may be delivered as hard copies or as electronic copies transmitted by facsimile or electronic mail in Adobe portable document format (.pdf) or similar format. All signatures made by a party and transmitted by such means will be deemed original signatures.

13.13.   Governing Law. This Agreement will be governed by, construed and interpreted in accordance with the laws of the State of Illinois, without giving effect to its conflicts of laws provisions. All legal proceedings arising under this Agreement or in respect of the service and repair work detailed hereunder will be initiated and maintained solely and exclusively in any state court located in DuPage County or federal court located in Cook County, Illinois. The parties hereby irrevocably consent to such jurisdiction and venue.

13.14.   Cumulative Remedies. All rights and remedies provided in this Agreement are cumulative and not exclusive of any other rights or remedies that may be available to the parties, whether provided by law, equity, statute, in any other agreement between the parties or otherwise.

13.15.   Survival. Notwithstanding anything to the contrary in this Agreement, any provision of this Agreement that by its nature or express terms is not susceptible of being fully performed prior to the expiration or termination of this Agreement will survive any such expiration or termination.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                        SIS092291

Trial Ex. No. 1547, Pg. 27 of 40

4-SER-778

**IN WITNESS WHEREOF**, each party has caused this Agreement to be executed as of the day and year written below.

**Surgical Instrument Service Company, Inc**      **Tucson Medical Center**

| | | |
|---|---|---|
| Signature | Date | |

Signature                               Date

Greg Posdal
Name                                    Name (please print)

President
Title                                   Title

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Trial Ex. No. 1547, Pg. 28 of 40

SIS092292
4-SER-779

## EXHIBIT A

## STATEMENT OF WORK - SAMPLE

This Statement of Work ("**SOW**") is entered into as of the ___ day of _____, 20__ ("**SOW Effective Date**") by the undersigned parties and is subject to the terms and conditions contained in the Master Services Agreement between Surgical Instrument Service Company, an Illinois corporation ("**SIS**") and CUSTOMER NAME HERE ("**CUSTOMER**") that was effective _____, 20__ (the "**Agreement**") and is made a part thereof.  If the above SOW Effective Date is left blank, this SOW will be effective as of the latest date signed below.

All terms and conditions of the Agreement are expressly incorporated herein by reference.  To the extent there are any conflicts or inconsistencies between this SOW and the Agreement, the provisions of the Agreement will govern and control, unless the parties have expressly provided in this SOW that a specific provision in the Agreement is amended, in which case the Agreement will be so amended, but only with respect to this SOW.  This SOW expressly supersedes any Contractor proposal.  The specific terms and conditions relating to the Services include the following:

I.  **CUSTOMER INFORMATION**

CUSTOMER ENTITY NAME:_____

CUSTOMER COST CENTER:_____

CUSTOMER EXECUTIVE:_____

CUSTOMER CONTACT:_____

Phone #: _____  Fax #: _____  Email: _____

II.  **PROJECT OVERVIEW; DESCRIPTION OF SERVICES AND DELIVERABLES**
    a.  **ADD DESCRIPTION OF SERVICES**

III.  **TERM OF SOW; SCHEDULE FOR COMPLETION OF SERVICES**

The term of this SOW will be for a period of three years and shall coincide with the term of the Agreement.

a.  **ADD TERMS OF SOW HERE**

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.**

Master Services Agreement [ DATE \@ "M/d/yyyy" ]

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092293

**Trial Ex. No. 1547, Pg. 29 of 40**

**4-SER-780**

**IN WITNESS WHEREOF**, the parties hereto have caused this Statement of Work to be executed by their respective authorized representatives to be effective as of the date first above written.


**Surgical Instrument Service Company, Inc**       **CUSTOMER NAME**


| | | | |
|---|---|---|---|
| _____ | | _____ | |
| Signature | Date | Signature | Date |
| Greg Posdal_____ | | _____ | |
| Name | | Name (please print) | |
| President _____ | | _____ | |
| Title | | Title | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Trial Ex. No. 1547, Pg. 30 of 40

SIS092294

4-SER-781



## Process Excellence Program℠

SIS has found that 60% of the failures in endoscopes, cameras and orthopedic handpieces are preventable. In an effort to provide healthcare facilities with the tools they need to drastically reduce these preventable failures, we have developed the Process Excellence Program℠ featuring:

| | | |
|---|---|---|
| Failure Trending | Clinical Process Assessments | Focused Department Education |
| Process Excellence Inspections | Reprocessing Workshops | Routine Process Reviews |

By implementing the Process Excellence Program℠ into your facility's day-to-day operations, SIS guarantees to **put money back into your budget**.

### Increase efficiencies and patient safety

With the Process Excellence Program℠, SIS will design customized solutions to help you:

- ✓ Lower medical device repair costs
- ✓ Eliminate inefficiencies in the clinical arena
- ✓ Reduce the frequency and severity of device failures in the OR
- ✓ Improve staff productivity through surgical equipment management programs
- ✓ Increase physician and patient satisfaction

### It's time to challenge the status quo

SIS instrument and device management can help you provide the prompt and tailored responses your OR and clinical departments demand.

Call your local SIS representative or our Corporate Office at 800.747.8044.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092295

**4-SER-782**

(92 of 259), Page 92 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 92 of 259
Case 3:21-cv-03496-AMO Document 466-99 Filed 02/07/25 Page 32 of 40



# Surgical Instrument Service Co., Inc. Onsite Services Report

Customer Name

Service Date

Technician Name

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 93 of 259
Case 3:21-cv-03496-AMO    Document 466-99    Filed 02/07/25    Page 33 of 40



# Today's Service Summary

| | |
|---|---|
| Number of trays serviced | 7 |
| Number of instruments repaired | 213 |
| Number of instruments sent to lab | 9 |
| Number of instruments beyond repair | 1 |
| PO: Standing | |

CONFIDENTIAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092297

**4-SER-784**

(94 of 259), Page 94 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 94 of 259
Case 3:21-cv-03496-AMO   Document 466-99   Filed 02/07/25   Page 34 of 40



# Trays Serviced

| Tray Name | Tray Name |
|---|---|
| Cataract/Eye Set - 003 | Cataract/Eye Set - 004 |
| Cataract/Eye Set - 005 | K Storz Diagnostic Laparoscopy - 001 |
| Tracheostomy Tray - 002 | C-Section - 002 |
| Wolf Diagnostic Laparoscopy - 001 | |

CONFIDENTIAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092298
**4-SER-785**



# Items Beyond Repair

| Tray Name | Instrument | Manufacturer | Model # | Qty. | Reason |
|---|---|---|---|---|---|
| Repair Bin | Thumb Forcep | Aesculap | BD512R | 1 | Broken Tip |

CONFIDENTIAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092299

4-SER-786

(96 of 259), Page 96 of 259
Case: 25-1372, 10/29/2025, DktEntry: 67.5, Page 96 of 259
Case 3:21-cv-03496-AMO   Document 466-99   Filed 02/07/25   Page 36 of 40



# Items Sent to Lab

| Tray Name | Instrument | Manufacturer | Model # | Qty. | Reason |
|---|---|---|---|---|---|
| K Storz Diagnostic Laparoscopy - 001 | Lap Grasper, Handle only | Karl Storz | 33151 | 1 | Replace Hinge Pins |
| K Storz Diagnostic Laparoscopy - 001 | Lap Tube | Karl Storz | 33300 | 1 | Reinsulate |
| Wolf Diagnostic Laparoscopy - 001 | Lap Graspers, Handle only | R. Wolf | 8393 | 5 | Broken/Cracked Adjustment knobs |
| Wolf Diagnostic Laparoscopy - 001 | Lap Tubes | R. Wolf | NA | 2 | Broken Attachement Knobs |

CONFIDENTIAL

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092300
4-SER-787

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

**Request for Taxpayer**
**Identification Number and Certification**

Give Form to the
requester. Do not
send to the IRS.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

Surgical Instrument Service Co

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification; check only one of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC
☐ C Corporation
☑ S Corporation
☐ Partnership
☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

Note. For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

(Applies to accounts maintained outside the U.S.)

5 Address (number, street, and apt. or suite no.)
151 N. Brandon Dr

6 City, state, and ZIP code
Glendale Heights, IL 60139

Requester's name and address (optional)

7 List account number(s) here (optional)

**Part I** **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

or

Employer identification number

3 6 – 2 8 9 3 7 9 6

**Part II** **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

Sign Here

Signature of U.S. person ▶

Date ▶ 1/11/20

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at www.irs.gov/fw9.

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See What is FATCA reporting? on page 2 for further information.

Cat. No. 10231X

Form **W-9** (Rev. 12-2014)

 # SIS Limited Warranty

Surgical Instrument Service Company, Inc. (SIS) warrants that all paid repair services will conform to current OEM published specifications, and will be free from defects in workmanship or materials under normal use and service for a period of one (1) year from the date of delivery. If any device proves to be non-conforming or defective within such warranty period, the customer must return the device to SIS. At its sole discretion, SIS will repair or replace the non-conforming or defective device or credit back the initial repair service charges, provided that SIS investigation and technical inspection disclose that (a) such non-conformity or defect developed under normal and proper use and (b) the Product is covered under this limited warranty.

Products shall be at SIS's sole obligation and the customer's exclusive remedy hereunder. SIS shall not be obligated to perform preventive maintenance, installation, de-installation, relocation, or maintenance. In addition to utilizing new components, SIS reserves the right to use reconditioned, refurbished, and/or serviceable used parts (that meet SIS's quality assurance standards) for warranty or any other repairs. The use of reconditioned, refurbished, or serviceable used parts may include, without limitation, replacing or exchanging major components of the device.

Excluded from this limited warranty and not warranted by SIS in any fashion, either express, implied, or by statute, are:

a) Devices and accessories not manufactured or previously serviced by SIS, not bearing a unique serial number, or not bearing the SIS logo and date stamp
b) Any serial numbered device without original invoice that is not registered in SIS's internal order tracking system as having been serviced or repaired within one (1) year of complaint
c) Any complimentary repair or service done
d) Any service or device for a customer that has outstanding or late invoices or is in breach of contract with SIS
e) Any device which has been disassembled, repaired, tampered with, altered, changed, or modified by persons other than SIS's own authorized service personnel
f) Defects or damage to the device resulting from wear, tear, misuse, abuse, negligence, impact, improper storage, non-performance of scheduled operator and maintenance items, or non-approved reprocessing methods

*Except for the limited warranty set forth herein, SIS makes no and disclaims all other representations, guaranties, conditions, and warranties concerning the products, whether direct or indirect, express or implied, or arising under any statute, ordinance, commercial usage or otherwise, including without limitation any warranty or representation as to suitability, durability, design, operation, or condition of the products (or any part thereof), or the merchantability of the products or their fitness for a particular purpose, or relating to the infringement of any patent, copyright, or other proprietary right used or included therein. If any implied warranties apply as a matter of law, they are limited in duration to the length of this limited warranty. Some states may not recognize a disclaimer or limitation of warranties and/or limitation of liability so the above disclaimer and exclusions may not apply. The customer may also have different and/or additional rights and remedies that vary from state to state.*

Continued on reverse side

151 N. Brandon Drive · Glendale Heights, IL 60139 · 800-747-8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092302

4-SER-789



# SIS Limited Warranty

*The customer acknowledges and agrees that SIS shall not be responsible for any damages that the customer may incur from delayed shipment, product failure, product design, selection, or production or from any other cause, whether liability is asserted in contract, tort (including negligence and strict product liability) or otherwise. In no event shall SIS be liable for any indirect, incidental, consequential or special damages of any kind (including without limitation loss of profits or loss of use), whether or not SIS shall be or should be aware of the possibility of such potential loss or damage.*

In compliance with OSHA blood borne pathogen regulations and other applicable federal, state, and local regulations, devices that come into contact with potentially infectious material must be decontaminated before being returned to SIS under this limited warranty or for any other purpose. Devices must also be returned to SIS in adequate packaging materials. Representations and warranties made by any person, including but not limited to representatives, salespersons, or agents of SIS, which are inconsistent or in conflict with or in addition to the terms of this limited warranty, shall not be binding upon SIS unless reduced to writing and approved by an expressly authorized officer of SIS. This limited warranty is the complete and exclusive statement of warranty which SIS agrees to provide with respect to the device repairs and service and it shall supersede all prior and contemporaneous oral or written agreements, understandings, proposals, and communications pertaining to the subject matter hereof.

This limited warranty is exclusively for the benefit of the original customer and cannot be transferred or assigned.

---

151 N. Brandon Drive · Glendale Heights, IL 60139 · 800-747-8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Trial Ex. No. 1547, Pg. 39 of 40**

SIS092303

**4-SER-790**

# SIS and Tucson Medical Center
## Service Implementation Plan

Upon approval, this Tucson Medical Center plan will be implemented.

1. Before implementation date:
   a. SIS will meet with TMC to determine, validate and finalize the onsite service schedule and determine the mobile ICU location or ICU pod location. During this meeting, SIS and TMC will review past and current service programs. Utilizing this data, teams will work together to determine the appropriate service frequency for instrumentation sets.
   b. TMC facilities management contacted to review location and provide access.
   c. Repair pick up and return protocols and schedules determined
   d. Insulated Instrument Assurance program materials delivered and insulation testing in-services scheduled
2. First week of implementation:
   a. On-site maintenance program implemented as scheduled
   b. Regular pickup and delivery of lab services begins
3. First month:
   a. Site assessment performed to establish current baseline and expectations
      i. Assessments provide insights into potential inefficiencies and areas of focus for reducing frequency and severity of instrumentation failures
   b. SIS to work with SPD/OR staff educators to implement educational programs and process assessments.
   c. Failure trend-based instruction and documentation provided to reduce the frequency and severity of failures as determined through failure trend analysis
4. First quarter:
   a. Service evaluated for facility satisfaction
   b. Repair spend for first quarter compared to prior quarter and prior year same quarter for value
   c. Fixed spend vs. time and materials service evaluated for best overall value
5. Quarterly:
   a. Regular service review meeting schedule established and followed
      i. Attended by SIS, SPD and OR leadership, educators and business managers
      ii. SIS to report on identified failure trends and industry updates, etc.
      iii. SPD & OR to report on replacement instrument spends, concerns, needs/wants, etc.
   b. PMIs scheduled as needed to reduce frequency and severity of failures

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092304

Trial Ex. No. 1547, Pg. 40 of 40

4-SER-791

Message

| | |
|---|---|
| **From:** | Daniel Perez [djp281224@gmail.com] |
| **Sent:** | 10/2/2019 11:08:15 PM |
| **To:** | Keith Johnson [krjohnson@sis-usa.com] |
| **Subject:** | Re: Keith J SIS |

That looks good.  Impressive to me. I'll keep an ear out and if I hear about any movement I will let you know.

Sent from my iPhone

On Oct 2, 2019, at 8:43 PM, Keith Johnson <krjohnson@sis-usa.com> wrote:

Just wanted you to see

**Keith Johnson** | **Executive Vice President**
Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
www.sis-usa.com

-------- Original message --------
From: Keith Johnson <krjohnson@sis-usa.com>
Date: 10/2/19 7:46 PM (GMT-07:00)
To: "Donald T. Cabrera" <Donald.T.Cabrera@kp.org>
Cc: "Nestor A. Jarquin" <Nestor.A.Jarquin@kp.org>
Subject: Re: Keith J SIS

```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TRIAL EXHIBIT 1548

Case No. _3:21-cv-03496-AMO_
Date Entered_____
By_____
        Deputy Clerk
```

Thanks for the email, Donald.

We are excited about the opportunity to have an SST agreement.  We are doing some great things with Kaiser facilities in So California and looking forward to growing our relationship across the Kaiser system.

Kaiser facilities are working with us because of the services we provide and the huge cost savings programs we offer.  We have a number of the facilities that have recently started working with us because we provide services that other companies do not provide.  We have documented $1000's of dollars in savings for a number of your facilities. A great example is Fontana.  We recently started working with them servicing their stryker bi-polar forceps.  The only option is to purchase a replacement from Stryker at a cost of up to $1300.  We have full refurbishment capabilities on these instruments.  On average a medical center will save over $36,000 a year on this one item alone.  We have a number of programs like this that are generating huge cost reductions for our customers.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS092890

Is there an opportunity for SIS to present at one of your SPD regional meetings?   We would love to share share the successes we are having in Kaiser facilities through out So Cal and really discuss our service offerings and savings opportunities that are in excess of 30% over our competitors.

Our robotic program launched six months ago.  SIS is the only company providing this service.  We have a patent on the process and have ISO certification to refurbish daVinci endowrists.  This service includes the complete refurbishment and counter reset of your S and Si robot endowrists.  Xi endowrists are currently in R&D.  We hope to launch that service 2020.  Our current program is a reduction of 40% in replacement cost.  This program is saving hospitals on average $400 - $700 per case.  True cost reduction,  not an estimated savings.   As of last week, we have refurbished over 1000 endowrists for facilities around the US.  Some of our customers utilizing this service include, Legacy Health, Banner Health, Piedmont Healthcare, AdvocateAurora Health, Baylor Scott and White.

I have attached some documents about our robotic program.  The robotic surgeons at Fontana are very interested in this program and have requested a trial.

Nestor,  I will be in LA Tuesday and Wednesday next week. If you have a couple minutes can we schedule some time to get together and discuss the opportunity for an SST.

Looking forward to hearing from you.

Keith

**Keith Johnson** | EVP, Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
**www.sis-usa.com**

---

**From:** Donald T. Cabrera <Donald.T.Cabrera@kp.org>
**Sent:** Tuesday, October 1, 2019 1:49 PM
**To:** Keith Johnson <krjohnson@sis-usa.com>
**Cc:** Nestor A. Jarquin <Nestor.A.Jarquin@kp.org>
**Subject:** RE: Keith J SIS

Keith,

I did mention that moving anything forward will need to go through our SST process.
I'm not sure it is up to me to make that happen.
I believe you have heard from Nestor Jarquin as well a couple of months ago regarding your services offered to us.
He is copied on this email.

I am not aware of a robotic project with your team at Fontana or other SPDs looking for service providers.
What information do you have?
Thank you.

Donald Cabrera, CRCST, CHL, CIS, CFER
SCAL Sterilization & Disinfection Lead Consultant
Kaiser Permanente Regional Offices
393 E Walnut Street, 6th Floor, NW
Pasadena, CA 91188

Phone: (626) 405-6645
Tie Line: 335

---

**From:** Keith Johnson <krjohnson@sis-usa.com>
**Sent:** Tuesday, September 24, 2019 5:57 AM
**To:** Donald T. Cabrera <Donald.T.Cabrera@kp.org>
**Subject:** Keith J SIS

**Caution:** This email came from outside Kaiser Permanente. Do not open attachments or click on links if you do not recognize the sender.

---

Good morning sir,  we haven't spoke since the Anaheim convention.

You had mentioned moving forward with an SST agreement.    We are continuing to grow our relationship with Kaiser and are currently working on a robotic project with Fontana.

Let me know when you have a couple minutes to connect or how I can support your efforts and the process.

Looking forward to speaking with you again soon.

Keith

## Keith Johnson | Executive Vice President
Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
www.sis-usa.com
**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents.  If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them.  Thank you.

<da Vinci EndoWrist Process_2019.pdf>
<SIS Summary of Quality Regulatory.pdf>
<EndoWrist FAQs.pdf>
<SIS daVinci EndoWrist Pricing_6_19.pdf>

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Message | |
|---|---|
| **From:** | Megan Klenke [mklenke@sis-usa.com] |
| **Sent:** | 12/7/2021 1:25:39 PM |
| **To:** | Katie Posdal [kdposdal@sis-usa.com] |
| **CC:** | Keith Johnson [krjohnson@sis-usa.com]; Denise Posdal [DePosdal@sis-usa.com]; Greg Posdal [GPosdal@sis-usa.com] |
| **Subject:** | Fw: SIS/Yankee Contract and Pricing |
| **Attachments:** | SIS_Yankee Contract.pdf; SIS_Yankee Enterprise Repair Pricing_2021.pdf; Price File & Products-Template.xls |

Hi All,

Please see the email request below. I am not familiar with this formatting, nor do I have these documents in any format aside from PDF. Is this something we can do?

Thank you,

**Megan Klenke** | Business Development Manager
**Surgical Instrument Service Co., Inc.**

Corp: 800.747.8044 | Cell: 404.695.4708
www.sis-usa.com

---

**From:** Tom Kennedy <TKennedy@yankeealliance.com>
**Sent:** Tuesday, December 7, 2021 2:18 PM
**To:** Megan Klenke <mklenke@sis-usa.com>
**Subject:** FW: SIS/Yankee Contract and Pricing

Hi Megan:

Can you resend these documents?  Please send the contract in word format, using track changes format (we need to review the redlines), and the price file in excel in the attached price file template.

Thank you

Tom


Tom Kennedy
Senior Contracts Administrator
Yankee Alliance
138 River Road
Andover, MA 01810
P. 978.470.2000 ext.71520 F. 978-681-6100
tkennedy@yankeealliance.com
www.yankeealliance.com
Common goals.  Uncommon results.



 *Please consider the environment before printing this email.*

| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br><br>**TRIAL EXHIBIT 1566-R**<br><br>Case No. 3:21-cv-03496-AMO<br>Date Entered _____<br>By _____<br>Deputy Clerk | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY                SIS127048

Case 3:21-cv-03496-AMO    Document 466-102    Filed 02/07/25    Page 2 of 33

**Confidentiality Notice:** This email message may contain legally confidential and privileged information for the sole use of the intended recipient(s) named above. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please contact info@yankeealliance.com or notify the sender and promptly delete this message, its attachments and any copy or printout. Thank you. Yankee Alliance.

**From:** Megan Klenke <mklenke@sis-usa.com>
**Sent:** Friday, December 03, 2021 11:06 AM
**To:** Tom Kennedy <TKennedy@yankeealliance.com>; Todd Senard <tsenard@yankeealliance.com>
**Cc:** Keith Johnson <krjohnson@sis-usa.com>
**Subject:** SIS/Yankee Contract and Pricing

Your attachments have been security checked by Mimecast Attachment Protection. Files where no threat or malware was detected are attached.

Good Morning, Tom and Todd,

I have attached the updated Yankee/SIS agreement and pricing. Once you get a chance to review the documents, could you please have a copy of the signed agreement sent to me? If you have any questions regarding either, feel free to reach out.

We are looking forward to presenting to your team and growing the SIS/Yankee relationship. Let me know when a good time would be to get on your calendar to connect.

Thank you,

**Megan Klenke** | Business Development Manager
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 404.695.4708
**www.sis-usa.com**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127049



# PRODUCED IN NATIVE FORMAT

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127050

**4-SER-797**

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Manufacturer/Distributor Entity Code | Item Number/ NDC Number | Description | UOM/Package | Qty/UOM | Unit Price | Price Effective Date | Price Expiration Date |

Trial Ex. No. 1566-R, Pg. 4 of 33

4-SER-798

Cell: A1
Note: REQUIRED:
    Manufacturer/Distributor Entity Code consistent with the item number in Column C (i.e. if the item number in Column C is a distributor number, then Column B should be the corresponding Distributor Entity Code, and if the item number in Column C is a manufacturer number, then Column B should be the corresponding Manufacturer Entity Code)

Cell: B1
Note: REQUIRED:
    If this is a non-pharmacy contract, enter the manufacturer item number. If this is a Pharmacy contract, enter the National Drug Code for the item.

Cell: C1
Note: REQUIRED:
    Enter the product description for the item denoted in the ItemNumber/NDC Number column
    (255 character maximum).

Cell: D1
Note: REQUIRED:
    Unit of measure of the item.

Cell: E1
Note: REQUIRED:
    The number of individual products in a package. One packet (UOM) may have 10 individual items in it (or pair of items as in gloves).

Cell: F1
Note: REQUIRED:
    The cost of the product as it is purchased (case, bottle, pair).

Cell: G1
Note: REQUIRED: Use the format mm/dd/yyyy

Cell: H1
Note: REQUIRED: Use the format mm/dd/yyyy

Trial Ex. No. 1566-R, Pg. 5 of 33

# Enterprise Pricing Schedule

| Complete Laparoscopic and Bipolar Instrumentation | Repair Price |
|---|---|
| Level 1 – Clean, sharpen, reset, align, straighten | $32/$45 |
| Level 2 – May include Level 1 repairs, plus: replace flush port cap, reinsulate shaft, repair handle insulation | $80 |
| Level 3 - May include Level 1 and 2 repairs, plus: repair/replace cautery post, set/thumb screw, reset inner drive rod | $134 |
| Level 4 - May include Level 1, 2 and 3 repairs, plus: repair/replace springs, flush port, distal/link pins, refile ratchet, repair lock assembly | $179 |
| Level 5 – May include Level 1, 2, 3 and 4 repairs, plus: repair/replace handle, shaft, rotator, ratchet, inner drive rod, drive rod ball, rebuild release button assembly, weld, recoat handles | $257 |
| Level 6 – May include Level 1, 2, 3, 4 and 5 repairs, plus: replace custom handle, custom shaft, custom rotator, tip/jaw assembly, total rebuild | $328 |
| Standard/General Bipolar Rebuild – Clean, repot, replace stopper, reinsulate, realign tips | $195 |
| Specialty Bipolar (Non-stick/Irrigating) – Clean, refurbish/replace tips, repot, replace stopper, reinsulate | $325 |
| Neuro/Specialty Delicate Bipolar (Non-stick) – Clean, refurbish/replace tips, repot, replace stopper, reinsulate | $425 |
| Extra Petite Specialty Bipolar (Stainless/Irrigating) – Clean, refurbish tips, repot, replace stopper, reinsulate | $525 |
| Extra Petite Specialty Bipolar (Non-stick) – Clean, refurbish/replace tips, repot, replace stopper/keyfin, reinsulate | $595 |

| Power Equipment: Battery, Electric and Pneumatic | Repair Price | PM Price |
|---|---|---|
| **Battery and Electric Devices and Attachments** | | |
| Small Bone (Pencil Grip) Micro Electric Handpiece | $236/$397/$572/$857 | $155 |
| Small Bone (Pistol Grip) Electric Driver | $236/$464/$750/$929 | $175 |
| Large Bone (Pistol Grip) Driver* | $240/$465/$895/$1,125 | $175 |
| Attachments | $170/$325/$620 | $155 |
| Specialty Attachments | $322/$397/$464/$550 | $195 |
| Pin and Wire Drivers/Collets | $325/$525/$625 | N/A |
| Shavers | $236/$550/$1,350/$1,475 | $175 |
| Microdebriders | $1,495 - $3,650 | $175 |
| Midas Rex (EM100/200) | $375 - $1,975 | $450 |
| **Pneumatic Devices and Attachments (Anspach, Medtronic, etc.)** | | |
| Small Bone (Pencil Grip) Handpiece | $140/$395/$550 | $155 |
| Large Bone (Pistol Grip) Driver | $264/$397/$550 | $175 |
| Attachments | $170/$325/$620 | $155 |
| Pin and Wire Drivers/Collets | $325/$525/$625 | N/A |
| Air Hose | $56/$145/$214 | N/A |
| **Additional Devices** | | |
| Phaco Handpieces | $1,125 | N/A |
| Harmonic Scalpels | $695 | N/A |
| *\* Does not include replacement of major non-wear components like yolk assemblies and bodies.* | | |

*This document is proprietary and confidential. No part of this document may be disclosed in any manner to a third party without the prior written consent of Surgical Instrument Service Co. Inc.*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127051

4-SER-800

# Enterprise Pricing Schedule

| Video Cameras and Couplers | Repair Price |
|---|---|
| Stryker 1188, 1288, 1488 | $295/$995/$1,570 |
| Stryker 1588 | $295/$1,195/$1,870 |
| Storz Image 1 | $295/$995/$1,570 |
| Olympus OTV-ProH-HD | $695/$2,295 |
| Smith & Nephew Dyonics 560 and earlier, Linvatec IM4120 and earlier | $295/$1,195/$1,870 |
| 4K Cameras | Quote |
| Couplers | $383 |
| Level 1 – May include: Clean, polish and recondition components. Replace tether and/or cap. | |
| Level 2 – May include Level 1 repairs, plus: Disassemble, replace and rewire cable. Replace connectors and seals. Calibrate video output levels, optically center and reassemble. Includes replacing parts for integrated coupler, if applicable | |
| Level 3 – May include Level 1 and 2 repairs, plus: Replace buttons, CCD prism and main board assembly. | |

| Rigid Endoscopes | Repair Price |
|---|---|
| Standard Diagnostic Rigid Endoscope – 4.0mm – 10.0mm | $645 |
| Specialty Diagnostic Rigid Endoscope – 3.9mm and smaller, HD, vein harvesting | $965 |
| Specialty Rigid Endoscopes – Off-set, Operating, Video, Nephroscope – 4.0mm – 10.0mm | $965 |
| Specialty Rigid Endoscopes – Off-set, Operating, Video, Nephroscope – 3.9mm and smaller | $1,265 |
| Semi-rigid Endoscopes and Off-set with Image Guide | $1,935 |
| Specialty Rigid Endoscopes – 4K | Quote |

| Flexible Video Endoscopes (GI: Large Diameter) | Repair Price |
|---|---|
| Level 1 – May include: Angulation adjustment, air/water nozzle service and replacement, bending rubber replacement, channel clearing, dent removal, lens polish and cleaning, light guide lens replacement, light guide prong repair, minor moisture removal, minor alignment | $218 |
| Level 2 – May include: Level 1 repairs, plus: C cover replacement, coil pipe replacement, control knobs, channel replacement (biopsy and light guide), mesh replacement, video switch replacement, rewire electrical connector, repair tensioner | $1,271 |
| Level 3 – May include: Level 1 and 2 repairs, plus: major fluid invasion, electrical connector overhaul, light bundle replacement, light guide tube replacement, objective assembly repair, light guide tube boot replacement, bending section replacement, elevator channel replacement, angulation system overhaul | $2,985 |
| Level 4 – May include: Level 1, 2 and 3 repairs, plus: complete scope refurbishment including insertion tube replacement | $4,725 |
| Level 5 – May include Level 1, 2, 3 and 4 repairs, plus: repair/replace CCD | Quote |

| Flexible Endoscopes (Small Diameter: Non-Video) | Repair Price |
|---|---|
| ACMI ACN, ACN-2 | $630/$2,150/$3,875 |
| Olympus CHF, CYF, ENF-GP/P3/P4, HYF-P/XP/1T, LF-GP/DP/TP, Storz 11272CU1, 11302BD2, 11301BN1 | $630/$1,891/$3,104 |
| ACMI DUR, Storz 11278AU1, 11101RP2, 11301AB1, 11274BCU1, Olympus URF, ENF-XP Stryker CST-4000S | $630/$2,425/$4,554 |
| Olympus BF, Pentax FB, Pentax FI, FNL-7RP3, FNL-10RP3, Welch Allyn RL-150, Storz 11101SK2, OPTIM | $630/$2,425/$4,651 |
| Level 1 – May include: Angulation adjustment, bending rubber replacement, channel clearing, lens micro-polish and cleaning, minor moisture removal, ocular lens cleaning, light guide and image guide cleaning | |
| Level 2 – May include Level 1 repairs, plus: C cover replacement, control knobs, biopsy channel replacement,  light guide tube replacement, bending section replacement, lens replacement | |
| Level 3 – May include Level 1 and 2 repairs, plus: image guide replacement, insertion tube replacement, distal end unit replacement, angulation system overhaul | |

*This document is proprietary and confidential. No part of this document may be disclosed in any manner to a third party without the prior written consent of Surgical Instrument Service Co. Inc.*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127052



# Enterprise Pricing Schedule

| Flexible Endoscopes (Small Diameter: Video) | Repair Price |
|---|---|
| Olympus BF, CYF-V, CYF-V2, ENF-V, Pentax EB | $630/$2,425/$3,950/Quote |
| Olympus LF, MAF-GM, Pentax VLS, VNL | $630/$2,695/$4,175/Quote |
| Storz 11301BNX, 11302BDX | $630/$2,895/$4,395/Quote |
| Level 1 – May include: Angulation adjustment, bending rubber replacement, channel clearing, lens micro-polish and cleaning, minor moisture removal, ocular lens cleaning, light guide cleaning | |
| Level 2 – May include Level 1 repairs, plus: C cover replacement, control knobs, biopsy channel replacement, light guide tube replacement, bending section replacement | |
| Level 3 – May include Level 1 and 2 repairs, plus: insertion tube replacement, distal end unit replacement, angulation system overhaul. | |
| Level 4 – May include Level 1, 2 and 3 repairs, plus: CCD or CMOS repair/replacement. | |

| Flexible Endoscopes (Small Diameter: HD Video) | Repair Price |
|---|---|
| All Storz and Olympus HD Video models | $3,250/$7,250/Quote |
| Level 1 – May include: Angulation adjustment, bending rubber replacement, channel clearing, lens micro-polish and cleaning, minor moisture removal, ocular lens cleaning, light guide cleaning | |
| Level 2 – May include Level 1 repairs, plus: C cover replacement, control knobs, biopsy channel replacement, light guide tube replacement, bending section replacement, insertion tube replacement, lens replacement, bending section replacement, distal end unit replacement, rewire electrical connector, major fluid invasion moisture removal, angulation system overhaul. | |
| Level 3 – May include Level 1, 2 and 3 repairs, plus: CCD or CMOS repair/replacement. | |

| Ultrasound Endoscopes | Repair Price |
|---|---|
| Olympus EUS and EBUS models (other models may be eligible) | $4,500/$9,500/$11,900/$13,900/Quote |
| Level 1 – May include: Angulation adjustment, bending rubber replacement, minor moisture removal, repair/replace: nozzle/control knobs/switches, seal control body, s-cover and connector, repair dents on insertion tube and light guide tube, adjust elevator wire | |
| Level 2 – May include Level 1 repairs, plus: major fluid removal, rewire electrical connector, replace insertion tube, image guide, light guide bundle, light guide tube, bending section mesh, air/water channel, biopsy channel, suction tube, light guide lens, ultrasound balloon, and suction balloon water channel, repair/replace bending section, clean corrosion | |
| Level 3 – May include Level 1 and 2 repairs, plus: replace ultrasound universal cord | |
| Level 4 – May include Level 1, 2 and 3 repairs, plus: replace control body unit | |
| Level 5 – May include Level 1, 2, 3 and 4 repairs, plus: repair/replace CCD, replace probe transducer | |

*This document is proprietary and confidential. No part of this document may be disclosed in any manner to a third party without the prior written consent of Surgical Instrument Service Co. Inc.*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127053

4-SER-802

**YANKEE ALLIANCE, LLC**
*Supply Chain Solutions*

*Common goals. Uncommon results.*

**Yankee Alliance**
**Standard Agreement**
**Contract # - YA-OR-146**

The Standard Group Purchasing Agreement ("Agreement") is by and among Yankee Alliance Supply Chain Solutions, LLC, a Delaware limited liability company ("SCS"), and Yankee Alliance, LLC, a Delaware limited liability company (the "LLC") (SCS and the LLC, collectively, "Yankee Alliance"), and Surgical Instrument Service Company, Inc., a _____ ("Vendor") effective 2/1/2022 (the "Effective Date"). Yankee Alliance and Vendor are referred to throughout each as a "Party" and collectively as "Parties", as the context may require. This Agreement outlines the general terms and conditions under which Vendor will provide products/services to Participants of Yankee Alliance, as defined below.

1. **Applicability:** This Agreement is applicable to products and services provided by Vendor to Participants for use in the Classes of Trade ("COT") listed in <mark>Exhibit A</mark>

2. **Eligible Participants**: All parties participating in Yankee Alliance's group purchasing program (the "GPP"), and all clinics and physician practices that are affiliated with a party participating in the GPP, are eligible to participate under this Agreement. This Agreement shall have two (2) Participant Groups (each a "Participant Group"): Yankee Alliance Supply Chain Solutions, LLC Participants ("SCS Participants"), the initial SCS Participants are listed on <mark>Exhibit B-1</mark> attached hereto, and Yankee Alliance, LLC Participants ("LLC Participants") (SCS Participants and LLC Participants, collectively, the "Participants"), the initial list of LLC Participants are listed on <mark>Exhibit B-2</mark> attached hereto (Exhibits B-1 and B-2, collectively, the "Participant Roster"). Yankee Alliance may add or delete Participants to either Participant Group at any time, at its sole discretion. Yankee Alliance shall make an electronic version of updated Participant Roster available to Vendor on an on-going basis. Vendor shall be responsible for downloading and cross-referencing the current Participant Roster to Vendor's customer records at least monthly. New Participants added to the Participant Roster shall be eligible to participate under this Agreement upon the relevant date set forth in the Participant Roster. Vendor shall stop providing the pricing set forth herein to entities removed from the Participant Roster within thirty (30) days following the applicable date of removal set forth in the Participant Roster.

   Vendor will provide contact information for a price activation point of contact to address price activation issues and questions. The name, phone number, and e-mail information shall be provided to Yankee Alliance in writing on or before the Effective Date. If Vendor and Yankee Alliance agree to amend, modify, restate, extend or renew this Agreement, Vendor will automatically roll all then current Participants to the new or revised agreement without requiring such Participants to complete new participation paperwork; instead each such Participant's Participating Member Designation Form ("PDMF"), substantially in the form attached hereto as Exhibit C, any letter of commitment ("LOC"), and/or any letter of participation ("LOP") executed with respect to this Agreement shall be effective.

3. **Agreement Term:** The term ("Term") of this Agreement shall be effective from the <mark>"Effective Date"</mark> to the 1/31/2025. Either Party may terminate this Agreement prior to the End Date without cause or penalty at any time by giving the other Party 90-days prior written notice of termination. The Parties also have the right to terminate this Agreement as provided in the <mark>"Termination Rights"</mark> clause. Yankee Alliance shall have the sole right to delete an entire Participant Group from this Agreement without cause or penalty at any time by giving the Vendor 60-days prior written notice of deletion.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127054

Trial Ex. No. 1566-R, Pg. 9 of 33

**4-SER-803**

**YANKEE ALLIANCE, LLC**
*Supply Chain Solutions*              *Common goals. Uncommon results.*

4. ~~ORDERING - SHIPPING; DELIVERY: Authorized Distributors~~. All Products purchased pursuant to this Agreement by Participants are ~~not~~ to be purchased directly from Vendor. ~~where applicable, may be purchased from and through authorized distributors of Yankee Alliance ("Yankee Alliance Authorized Distributors") or authorized distributors of Vendor ("Vendor Authorized Distributors") (Yankee Alliance Authorized Distributors and Vendor Authorized Distributors, collectively, "Authorized Distributors"). A list of all current Authorized Distributors is set forth in~~ <mark>Exhibit D</mark>. ~~Vendor warrants that it shall not make any change or take any action with respect to Authorized Distributors which, if implemented, would materially change the ultimate Product and delivery price paid by the Participant. Vendor further warrants that, in the event Products are available through Vendor Authorized Distributors, (i) Vendor shall make such Products available, subject to the terms of this Agreement, through Yankee Alliance Authorized Distributors, (ii) Vendor shall not subject Yankee Alliance Authorized Distributors to different credit or other business terms than that are applied to Vendor Authorized Distributors and (iii) such Vendor Authorized Distributors shall be required by Vendor to trace all sales under this Agreement.~~

5. **Termination of Existing Contracts:** Vendor agrees that, upon receiving notice from a Participant with which Vendor then has an existing contract for services and/or products governed by this Agreement, of such Participant's desire to terminate such contract in order to participate under the GPP and receive products and/or services from Vendor in accordance with the terms and conditions of this Agreement, Vendor shall accept such immediate termination of such other contract upon fulfillment of any outstanding obligation of the Participant under such contract. For avoidance of doubt, Vendor shall not charge any penalty, interest, or bring any action against, or otherwise enforce any right to remedy against such Participant for breach of such contract, regardless of the remedies that are provided therein.

6. **Products/Services Included:** <mark>Exhibit E</mark> attached hereto sets forth the terms and conditions under which Vendor will provide certain designated products/services (collectively, the "Products") to Participants, including the specific pricing for each specific Product to be provided.

7. **Pricing:** Vendor shall not increase any Product pricing throughout the Term of this Agreement without Yankee Alliance's consent in writing. Vendor shall refrain from notifying Authorized Distributors of any price change unless, and until, Vendor notifies Yankee Alliance of such change and Yankee Alliance acknowledges, in writing, that such change is consistent with the terms of this Agreement. If the Parties have communicated to each other an intent to negotiate, in good faith, renewal or extension of this Agreement beyond its Term, both Parties shall continue to perform as set forth in this Agreement on a month-to-month basis until the earlier of (1) the renewal or extension being entered into, at which time the Parties' relationship shall be governed by the subsequent agreement; (2) one (1) months' notice by either party to the other of its desire to terminate the negotiations; or (3) one-hundred twenty (120) days after the end of the Term, at which time the Parties' relationship shall be terminated. For avoidance of doubt, both Parties' rights to terminate this Agreement under <mark>"Agreement Term" and "Termination Rights"</mark> clauses shall remain in effect during this month-to-month period. During this time, Vendor shall not change pricing of Products and shall notify Authorized Distributors of the temporary extension of the Agreement. Changes to pricing made without proper notification shall be deemed a material breach of contract.

Except as required by law, Vendor may not, directly or indirectly, pass through to Participant any taxes that are imposed on Vendor, or otherwise adjust the pricing terms of this Agreement by reason of any such taxes, including without limitation the medical device excise tax set forth in Section 4191 of the Internal Revenue Code; provided, however, that, for any Participant that is not a tax exempt entity and/or that fails to provide Vendor with an applicable tax exemption certificate upon request, Vendor may separately invoice the

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    SIS127055

YANKEE ALLIANCE
*Supply Chain Solutions*

YANKEE ALLIANCE, LLC
*Common goals. Uncommon results.*

Participant for any tax that Vendor is required by law to pass through, or collect from, a purchaser of such Products.

8. **Pricing of New Products:** Pricing for any additional and/or new Products which the Parties mutually agree to add to Exhibit E will be negotiated at prices consistent with the prices of Products already covered by this Agreement. Vendor agrees to inform Yankee Alliance of new Products (branded or generic) that Vendor plans to introduce to the market, where possible, at least sixty (60) days prior to the introduction of such new Products to the market. If Vendor is unable to notify Yankee Alliance sixty (60) days prior to the introduction of new Product(s), then Vendor, if commercially reasonable, shall notify Yankee Alliance at least thirty (30) days prior to the introduction of the new Product(s). ████████████████████████████████████

████████████

9. **Competitive Pricing:** Subject to applicable law, Vendor represents and warrants that the prices, terms and conditions offered by Vendor to Yankee Alliance and Participants through this Agreement shall, at all times, be at least as good as those offered to any other non-government healthcare customer of Vendor that is similar in market segment and class, has similar contract terms, with a similar product mix, and which purchases a comparable volume of Products as Yankee Alliance, this Agreement, and the aggregate purchases of all Participants hereunder. Further, Vendor represents and warrants that the prices, terms, and conditions offered under this Agreement are proportionally better than the prices, terms, and conditions offered to any other non-government customer which purchases a lower volume of Products relative to the volume purchased by Participants. Notwithstanding any other provision of this Agreement, upon obtaining the prior written consent of Yankee Alliance, Vendor may offer special acquisition programs to certain Participants to meet local market conditions, the terms of which shall be mutually agreed upon by Vendor, Yankee Alliance and such Participant. Yankee Alliance reserves the right to request a new price file if market dynamics have changed.

10. **Delivery, Inspection and Rejection/Risk of Loss:** Vendor agrees to promptly deliver products ordered directly by Participants and products ordered by the Authorized Distributors on behalf of Participants to the address provided with FOB destination. Vendor agrees to prepay and absorb charges, if any, for transporting Products to the ordering organization. Vendor acknowledges and agrees that Participants' rights under this Agreement will not be adversely impacted by any agreement between Vendor and an Authorized Distributor. Title to and risk of loss for Products furnished by Vendor shall pass to the Participant after the Participant's inspection and Acceptance of the Product(s) (as defined in the "Ordering and Shipping" clause).Vendor is responsible for maintaining adequate stock of Products so that deliveries may be made to the ordering organization according to the delivery schedules designated to the Product at the time of purchase.

11. **Quality Management System:** Vendor maintains a quality management system utilizing the following compliance standards (please check off those that apply):

| | | |
|---|---|---|
| | None | |
| | ISO 9001 | Model for quality assurance in design, development, production, installation and servicing |
| | ISO 9002 | Model for quality assurance in production, installation and servicing |
| | ISO 9003 | Model for quality assurance in final inspection and test |
| | ISO 13485 | Medical device manufacturer |
| | ISO 14001 | Model for environmental management systems |
| | Other | Please enter other national/international standards or certifications below: |

138 River Road | Andover, MA 01810 - 1083 | 978-470-2000 | 978-681-6100 | www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127056

4-SER-805

**YANKEE ALLIANCE**
*Supply Chain Solutions*

**YANKEE ALLIANCE, LLC**
*Common goals. Uncommon results.*

*For example: Professional associations a member of, i.e. National Association of Manufacturers, Medical Device Manufacturers Association, etc.*

Vendor will notify Yankee Alliance, in writing, of any changes in their quality management system standards.

12. **Replacement Parts:** All replacement parts for the Product(s) will be available for not less than seven (7) years following the earlier of either (a) the date when Vendor ceases to sell the Product(s) or (b) the expiration of the warranty period relating to the Product at the time of purchase.

13. **Billing**: Responsibility for payment for Products remains solely with each Participant. Yankee Alliance shall not be liable for any payments due from Participants.

14. **Recalls**: Notwithstanding anything in this Agreement to the contrary, in the event of a recall which prevents Vendor from supplying any Products for more than thirty (30) consecutive days, the following terms shall apply in addition to any other available remedies: (a) Yankee Alliance may add one or more additional Vendor(s) to the applicable COT upon written notice to Vendor; and/or (b) the Participant, in its sole discretion, may either: (i) purchase any substitute Product(s) from another source or sources and Vendor shall reimburse such Participant for the difference between such Participant's actual F.O.B. destination acquisition cost for such product(s) and the price(s) such Participant would have paid for Vendor's Product(s) under this Agreement; or (ii) terminate without penalty the obligations of such Participant under this Agreement and any other agreement related to the Product(s), including without limitation any purchase order or Participant Agreement, as defined in the "Continuing Obligation to Pay Administrative Fees" clause, and Vendor shall immediately refund to such Participant all funds paid for the undelivered or returned Product(s) and any related materials plus any shipping and other charges incurred by the Participant with respect to the applicable Products, including all costs of testing and inspection of the Products or implementation of any fixes or corrections to ensure the safety or reliability of the Products. Upon the request of any Participant, Vendor will assist any such Participant in finding alternative acceptable sources for any Product(s) which Vendor is unable to deliver in a manner that is reasonably acceptable to the Participant.

In addition, Vendor will supply Yankee Alliance, at least annually, a listing of all ▮▮ recalls issued within the last three (3) years with respect to any Products covered under this Agreement.

15. **Indemnification:** Vendor hereby agrees to hold harmless and indemnify Yankee Alliance and each Participant and their affiliated organizations, directors, officers, employees, contractors, insurers, customers and agents (collectively, the "Indemnitee") from and against any and all losses, judgments, claims, demands, actions, expenses, penalties, fines, and other legal liabilities (including, without limitation, interest, penalties and reasonable experts' and attorneys' fees) and judgments arising out of or substantially related to: a) alleged bodily injury, wrongful death, property damage or any other damage or injury allegedly caused in whole or in part, contributed to by or associated with any of the Products; (b) any alleged direct or contributory infringement of any intellectual property right, including any patent, trademark, copyright, or trade secret right, by (i) any of the Products; (ii) the packaging instructions and other materials supplied with the Products; or (iii) their contemplated uses; and (c) acts or omissions of Vendor and/or its employees, affiliates, directors, officers, contractors, or agents, except to the extent such losses, judgments, claims, expenses, penalties, fines or other legal liabilities are directly caused by the sole negligence or willful misconduct of the person or entity claiming the indemnification.

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127057

**4-SER-806**

YANKEE ALLIANCE, LLC
Supply Chain Solutions
Common goals. Uncommon results.

16. **Insurance**: Throughout the term of this Agreement, Vendor shall maintain comprehensive general liability insurance, product liability insurance and workers' compensation insurance, with commercially reasonable coverage limits and deductibles. Evidence of Vendor insurance will be provided to Yankee Alliance upon the commencement of the term of this Agreement and thereafter upon Yankee Alliance's request. Vendor shall make Yankee Alliance a named additional insured under Vendor's insurance policies described above. Vendor shall provide Yankee Alliance with at least thirty (30) days prior written notice of any cancellation or material modification of such insurance (10 days in case of cancellation for non-payment of premiums).

17. **GPO Status**: Yankee Alliance operates as a group purchasing organization that is structured to comply with the requirements of the "safe harbor" regulations regarding payments to group purchasing organizations ("GPO") set forth in 42 CFR §1001.952(j) (the "Safe Harbor Regulation").

18. **Medicare Notice**: It is the intent of the Parties to establish a business relationship which complies with the Medicare and Medicaid anti-kickback statute, set forth in 42 U.S.C. § 1320a-7b(b). Vendor represents that it does, and will continue to, satisfy any and all applicable requirements imposed by the Safe Harbor Regulation and its sales to Participants shall comply with the Safe Harbor Regulation. Yankee Alliance represents that it does, and will continue to, satisfy any and all requirements imposed on GPOs by the Safe Harbor Regulation.

19. **Medicare Records:** To the extent that the Omnibus Reconciliation Act of 1980 applies to this Agreement, Vendor shall maintain records of all purchases made by each Participant for a period of (4) four years after purchase and shall make the same available for inspection by the Secretary of Health and Human Services or the Comptroller General of the United States, or their duly authorized representatives, upon request.

20. **Corporate Compliance**: Yankee Alliance complies with all federal and state laws and regulations, including the requirement that it not contract with individuals or companies which have been excluded from participating in government reimbursement programs. Vendor represents and warrants that, throughout the Term of this Agreement, and any extension thereof, Vendor and all Products shall be and shall remain in compliance with all applicable Federal, State, and local laws and regulations and with all lawful orders of any court or regulatory or governmental agency, including, without limitation, the Safe Harbor Regulation relating to GPOs and fees, discounts and incentives paid and/or granted to GPOs and any participants therein.

Vendor represents that as of the Effective Date of this Agreement, Vendor has not: (a) been listed by any federal or state agency as excluded, debarred, suspended or otherwise ineligible to participate in federal and/or state programs; or (b) been convicted of any crime relating to any federal and/or state program. Vendor further agrees to immediately notify Yankee Alliance in writing in the event Vendor is listed by a federal or state agency as excluded, debarred, suspended or otherwise ineligible to participate in any federal and/or state programs or if Vendor is convicted of any crime relating to any such program, or if Vendor is being investigated by any federal or state agency in relation to any federal and/or state program.

Vendor represents and warrants that it shall be solely responsible for determining whether any encounters with, interactions with, offers to, or provisions to a Participant result in a reportable payment or transfer of value pursuant to Section 6002 of the Patient Protection and Affordable Care Act, Public Law 111-148 (March 23, 2010) (the "Sunshine Act"). Vendor further represents and warrants that it shall be solely responsible for complying with the Sunshine Act with respect to any reportable payment or transfer of value.

21. **HIPAA Compliance:** Vendor represents and warrants that, to the extent applicable, it shall, with respect to its obligations under this Agreement and interactions with Participants, comply with the requirements of the

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127058

4-SER-807

YANKEE ALLIANCE, LLC

*Supply Chain Solutions*

*Common goals. Uncommon results.*

Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA"), the privacy standards adopted by the U.S. Department of Health and Human Services ("DHHS") as they may be amended from time to time, 45 C.F.R. parts 160 and 164, subparts A and E (the "Privacy Rule"), the security standards adopted by DHHS as they may be amended from time to time, 45 C.F.R. parts 160, 162 and 164, subpart C (the "Security Rule"), and the Privacy provisions (Subtitle D) of the Health Information Technology for Economic and Clinical Health Act, Division A, Title XIII of Pub. L. 111-5, and its implementing regulations (the "HITECH Act"). Vendor further represents and warrants that, in the event Vendor is providing a service or function for or on behalf of a Participant that requires the use and disclosure of "protected health information" (as defined by HIPAA), it shall obtain such access in compliance with HIPAA.

Without limiting the foregoing, if Vendor serves in the capacity of a "business associate" (as defined by HIPAA) in its interactions with a Participant, Vendor shall comply with the terms and conditions set forth in the sample business associate agreement located at the website of the Department of Health and Human Services Office for Civil Rights ("OCR"), unless the applicable Participant and Vendor enter into a business associate agreement on mutually acceptable terms. In the event Vendor is acting as a "health care provider" (as defined by HIPAA), and needs access to protected health information in providing the Product to a Participant, Vendor will abide by the applicable policies established by such Participant when accessing, using and disclosing protected health information.

Vendor and Yankee Alliance agree and acknowledge that by entering into this Agreement they have not established, and do not intend to establish, a "business associate" relationship, as defined under HIPAA. Under no circumstances will either Party request from the other Party, nor will either Party provide to the other Party, any protected health information.

22. **Labor and Employment Laws:** Vendor represents and warrants that it complies and will comply with applicable labor and employment laws and prohibits any form of child labor or other exploitation of children in the manufacturing and delivery of Products, consistent with provisions of the International Labor Organization's Minimum Age Convention of 1973. A child is any person who is less than fourteen (14) years of age or who is younger than the compulsory age to be in school in the country in which Vendor's business is being conducted, if that age is higher than fourteen (14).

23. **Accreditation and Compliance:** Vendor shall promptly cooperate with any Participant's reasonable request for assistance and information in connection with such Participant's efforts to comply with the requirements and standards of The Joint Commission on Accreditation of Healthcare Organizations, NIAHO (DNV Healthcare's National Integrated Accreditation for Healthcare Organizations) or similar accreditation organization.

24. **Administrative Fee:** In consideration of Yankee Alliance's administrative and sales development services, effective as of the Effective Date and during the Term of this Agreement, and any extension thereof, Vendor will pay to Yankee Alliance an administrative fee (the "Administrative Fee") of 3% of the total dollar volume of Products purchased by Participants, which fee shall be paid quarterly within thirty (30) days after the end of each calendar quarter. The Administrative Fee must be an electronic payment through Yankee Alliance's ACH (Automated Clearing House). In addition, simultaneously with paying the Administrative Fee, Vendor shall provide to Yankee Alliance an accompanying electronic sales report ("Sales Report"), in Excel or CSV format, detailing all purchases made by the Participants within such quarter. The electronic sales report fields are outlined in Exhibit F. Simultaneously with the 4th quarter Sales Report for each year, Vendor shall provide an annual Sales Report in compliance with the Safe Harbor Regulation. For information on Yankee's ACH, and to submit this sales report, please contact our Finance Department at cfiorante@yankeealliance.com or 978-470-

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

YANKEE ALLIANCE
Supply Chain Solutions

YANKEE ALLIANCE, LLC
Common goals. Uncommon results.

2000. Upon receipt of Vendor's administrative fee and Sales Report, Yankee Alliance shall process and report administrative fees separately for each LLC Participants and SCS Participants.

Vendor's failure to provide the information and reports as described, as well as in the Exhibit F format, shall be deemed a material breach of this Agreement. Vendor shall pay to Yankee interest on any past due Yankee Administrative Fees not otherwise disputed in good faith, owing Yankee hereunder, including, but not limited to, Yankee Administrative Fees and audit costs pursuant at the lesser of (a) one and one-half percent (1-1/2%) per month or (b) the maximum interest rate legally permitted. For the purpose of determining whether interest is due, Vendor shall not have satisfied the requirements of this Section 24 until all associated reports pursuant have also been received by Yankee.

25. **Continuing Obligation to Pay Administrative Fee**: Notwithstanding any provision of this Agreement to the contrary, Vendor shall continue to pay Administrative Fees to Yankee Alliance under this Agreement with respect to sales of any Products to Participants which occur after the expiration or termination of this Agreement pursuant to a Participant Agreement (as defined below). Vendor's obligation to pay such Administrative Fees shall continue until the expiration or termination of the then-current term of the Participant Agreement. Further, all other provisions relating to Yankee Alliance's Administrative Fee, including without limitation, the obligation to provide Sales Reports shall survive the expiration or termination of this Agreement and remain in effect with respect to Product purchases under Participant Agreements until the expiration or termination of the then-current term of the applicable Participant Agreement.

For purposes of this Agreement, a "Participant Agreement" shall mean any local arrangement, local negotiation and/or direct agreement in effect between a Participant and Vendor pertaining to the sale of Products that is entered into at any time during the term of this Agreement.

Yankee Alliance shall have the right, upon reasonable notice to Vendor, and at Yankee Alliance's expense, to review Vendor's records for the purpose of verifying reported sales to Participants. Vendor shall make its records available to Yankee Alliance and its representatives at the Vendor's business office during normal business hours.

26. **Participant Rebates**: If applicable, Vendor will pay Participant rebates directly to the Participants. In addition, Vendor shall provide Yankee Alliance, as a part of the Sales Report, an accompanying rebate report ("Rebate Report"), in Excel or CSV format, detailing all rebates paid directly to the Participants. The Rebate Report shall be submitted to Yankee Alliance the same month as the Participant rebates are paid. The electronic rebate report fields are outlined in Exhibit G. To submit this rebate report, please contact our Finance Department at cfiorante@yankeealliance.com or 978-470-2000.

27. **Member Requirements: Commitment requirement, LOC, Price Activation process:** Use this section to provide details on any commitment requirements like a Letter of Commitment or other vendor required documents to access this contract. Also describe any Price Activation requirements and/or the process to follow. Participants are required to complete Vendor new customer documentation and Yankee PMDF form and submit to Vendor for price activation. For Participants requesting special consideration, fixed spend services, or committed pricing, a Vendor Master Services Agreement (MSA) and related Statements of Work (SOW) that are substantially similar to the sample in Exhibit J will also need to be completed, and mutually agreed to, by Vendor and Participant.

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127060

4-SER-809

**YANKEE ALLIANCE**
*Supply Chain Solutions*

**YANKEE ALLIANCE, LLC**
*Common goals. Uncommon results.*

28. **Payment Terms**: A Participant will receive an early payment discount off of the pricing set forth in Exhibit E if full payment is made to Vendor within ten (10) days following the later of (a) delivery of Product(s), (b) receipt of invoice, or (c) Acceptance of Product(s) (as defined in the "Ordering and Shipping" clause) by the Participant. In any event, full payment must be made within thirty (30) days following delivery of Product(s), receipt of invoice, or Acceptance of Product(s), whichever date is later, unless earlier returned. Payment terms for Products purchased from an Authorized Distributor will be negotiated between each Participant and the Authorized Distributor. In no event shall Vendor invoice for any Products prior to shipment or completion of services as applicable.

Vendor agrees that a Participant may pay for the Products using electronic fund transfers, purchase cards and credit cards, and that such methods of payment will not increase the cost of Products to a Participant. All purchases made by procurement cards and credit cards will not be eligible for early payment discounts.

29. **Ordering; Shipping Terms**: Orders directly from Vendor shall be placed by telephone, telecopier or through electronic order entry in accordance with the Ordering Instructions set forth on Exhibit H. Except as otherwise provided below, for all shipments of Products directly to Participants or to Authorized Distributors from Vendor, all costs of transportation and insurance shall be paid by Vendor, with the exception of special delivery and/or air shipments requested by a Participant or Authorized Distributor. Such special delivery and/or air shipment charges shall be prepaid by Vendor and invoiced to the requesting Participant for payment pursuant to the payment terms set forth in this Agreement, and such Product(s) pricing shall be reduced as appropriate by the amount of shipping charges that may have already been built into the price of the Product(s). Title and risk of loss shall transfer to P Participants upon delivery to the Participant. Vendor shall mark each shipment, packing slip, bill of lading, invoice, and any and all related documents with Participant's purchase order number ("PO Number").

Participants shall have seven (7) business days from the date of delivery to inspect the Product(s) and to accept or reject such Product(s). "Acceptance" of Products by Participants shall occur if Participant has not notified Vendor of any Product issues within seven (7) days of the receipt of Product. In the event a Participant, after such inspection, rejects the Product(s), the Participant shall have the right to return the rejected Product(s) for, at the Participant option, (a) full credit of purchase price or (ii), if applicable, replacement of the rejected Product(s). Vendor shall pay for all costs of transportation and insurance related to any return of the Product(s) by a Participant due to (a) a rejection pursuant to this Section or (b) Products shipped in error by Vendor. All other returns are subject to the requirements indicated on the Vendor's Returned Goods Policy as provided in Exhibit I. Shipping terms for Products purchased from and shipped by an Authorized Distributor to a Participant will be negotiated between the applicable Participant and Authorized Distributor.

In the event that any shipments of the Products are to be prepaid by Vendor and invoiced to the Participant and the Participant, in its sole discretion, establishes a freight management program, including, without limitation, a program whereby the Participant uses a third party for inbound freight management or services (a "Member Freight Program"), Vendor shall accommodate such Member Freight Program at no additional cost to the Participant.

30. **Minimum Order**: Vendor has a $100.00 minimum purchase order requirement applicable to any and all Participants. For Products purchased from an Authorized Distributor, any minimum order purchase requirement will be negotiated between each Participant and the Authorized Distributor.

138 River Road  │  Andover, MA 01810 - 1083  │  978-470-2000  │  978-681-6100  │  www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127061

**4-SER-810**

YANKEE ALLIANCE, LLC
*Supply Chain Solutions*   *Common goals. Uncommon results.*

31. **Guarantee of Delivery under Emergency Conditions:** In the event of a natural disaster or industry wide shortage of Products ("Emergency Condition"), Vendor will use commercially reasonable efforts to fill orders placed by Participants for Products during the duration of the Emergency Condition. Vendor will use reasonable commercial efforts to maintain an adequate quantity of Products for purchase by Participants for the duration of the Emergency Condition.

32. **Governing Law and Venue; Dispute Resolution:** This Agreement is being delivered and executed in the State of Massachusetts.

In the event that a Party believes in good faith that a dispute or claim exists pursuant to this Agreement, or with respect to the subject matter hereof (in each case, a "Dispute"), such Party will notify the other Party in writing in a timely manner of such Dispute (a "Dispute Notice"). Promptly following a Dispute Notice, each Party shall appoint a representative of the Party (the "Representative") authorized to negotiate and resolve such Dispute in good faith, and such Representatives shall meet in person on at least one occasion. For the avoidance of doubt, this Section 32 is the exclusive means for resolving any Disputes.

If, within thirty (30) days after the Dispute Notice (the "Negotiation Period"), the Parties have not fully resolved such Dispute, then either Party may, by written notice to the other Party (a "Mediation Notice"), demand that the Parties engage in mediation in Andover, Massachusetts, in good faith, with an independent mediator mutually agreed upon by such Parties. If no such agreement is reached by the Parties within ten (10) days after the Mediation Notice, then the Parties shall request that the American Arbitration Association (the "AAA") select a mediator with experience in the subject matter of the Dispute. The Parties will use their reasonable best efforts to engage such mediator as soon as practicable, which mediation shall include at least one in-person meeting with the mediator and the Representatives present.

If, within thirty (30) days after a Mediation Notice is delivered (the "Mediation Period"), the Parties have not fully resolved the subject Dispute, then either Party may, by written notice to the other Party (an "Arbitration Notice"), demand that the Parties submit such Dispute to binding arbitration to be conducted by one arbitrator mutually agreed upon by the Parties. If no such agreement on an arbitrator is reached by the Parties within thirty (30) days after the Arbitration Notice, then either Party may request that the AAA provide a list of names of potential arbitrators, and the Parties shall attempt to agree on an arbitrator from such list. If no such agreement as to the arbitrator is reached by the Parties within fifteen (15) days after the names of potential arbitrators have been proposed by the AAA, then either Party may request that the AAA select an arbitrator having expertise in the subject matter of the Dispute, and such selection by the AAA shall be binding on the Parties. The arbitration shall take place in Andover, Massachusetts, in accordance with the AAA's Commercial Arbitration Rules using the Expedited Procedures thereunder, and judgment upon any award rendered in such arbitration will be binding on such Parties and may be entered in any court having jurisdiction thereof. The arbitrator shall be required to provide in writing to the Parties the basis for the award or order of such arbitrator. In any arbitration hereunder, the Parties shall share the arbitrator's fee and any filing fees equally, but each Party shall pay its own attorney, consultant and expert witness fees and other costs or expenses

In the event of any Dispute arising out of this Agreement brought by or against a Participant, the validity, construction and enforcement of this Agreement shall be governed in all respects by the laws of the State where the Participant is located, and venue shall be proper only in a court of competent jurisdiction located in the county and state in which such Participant is located.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127062

4-SER-811

33. **Termination for Breach**: In the event of a breach of any provision of this Agreement, the non-breaching party shall notify the breaching party in writing of the specific nature of the breach and shall request that it be cured. If the breaching party does not cure the breach within thirty (30) days of such notice, the non-breaching party may immediately terminate this Agreement effective on the date specified in written notice to the breaching party, and such termination shall not preclude the non-breaching party from pursuing any and all remedies available to it at law or in equity. Notwithstanding the foregoing, if one, but not both, of the Yankee Alliance parties is the breaching party and fails to cure, Vendor's decision, as non-breaching party, to terminate this Agreement with the breaching Yankee Alliance party shall in no way effect the rights and obligations under this Agreement as between the non-breaching Yankee Alliance party and Vendor.

████████████████████████████████████████████████, Yankee Alliance shall have the right to immediately terminate the entire Agreement or any part of this Agreement pertaining to affected Products, upon written notice to Vendor. Further, in such event, Participants shall have the right to return any affected Products to Vendor at Vendor's expense and Vendor shall promptly provide such Participants a full refund of all amounts paid for such Products.

34. **Orders Placed Prior to Termination**: Vendor shall fulfill, in accordance with the terms of this Agreement, all orders for Products submitted by Participants and received by Vendor prior to termination or expiration of this Agreement and the orders shall be paid for in accordance with the terms of this Agreement.

35. **Termination Rights**: Either party may terminate this Agreement at any time without cause or penalty upon providing the other Party with ninety (90) days' advance written notice. Except as otherwise specifically provided in this Agreement, either party may delete any Product from this Agreement at any time without cause or penalty upon providing the other party with ninety (90) days' advance written notice.

Notwithstanding any other provision of this Agreement, in the event that any Product or its use is alleged to be part of an infringement of any intellectual property right, including any patent, trademark, copyright or trade secret right, or in the event of reasonable grounds for believing that such an allegation may be made, Yankee Alliance may withdraw such Product from this Agreement upon written notice to Vendor and may notify Participants of the withdrawal and of Yankee Alliance's reasons for the withdrawal. Yankee Alliance may withdraw the Product to avoid the claim or potential claim of infringement, even though there may be substantial defenses to that claim.

36. **CONFIDENTIALITY - Confidential Information:** For the purposes of this Agreement, confidential information ("Confidential Information") shall mean all proprietary, secret or confidential information or data relating to Yankee Alliance, Participants, or Vendor and their respective operations, employees, services, patients or customers, including purchase data and pricing information under this Agreement and Participant Agreements.

**Protection of Confidential Information:** Vendor and Yankee Alliance acknowledge that Vendor, Yankee Alliance, or Participants may disclose Confidential Information to each other in connection with this Agreement. If Vendor or Yankee Alliance receives Confidential Information, it shall: (a) maintain the Confidential Information in strict confidence; (b) use at least the same degree of care in maintaining the secrecy of the Confidential Information as it uses in maintaining the secrecy of its own proprietary, secret, or confidential information, but in no event less than a reasonable degree of care; (c) use Confidential Information only to fulfill its obligations under this Agreement and for internal business purposes; and (d) return or destroy all documents, copies, notes, or other materials containing any portion of the Confidential Information upon request by Yankee Alliance or Vendor. Notwithstanding the foregoing, (i) Yankee Alliance shall have the right

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

YANKEE ALLIANCE
Supply Chain Solutions

YANKEE ALLIANCE, LLC
Common goals. Uncommon results.

to (A) disclose Confidential Information to third parties as necessary for Yankee Alliance to provide support services for Participants in connection with this Agreement, provided any such third parties agree to the same level of confidentiality as described herein and (B) use aggregated non-identifiable data for all purposes, commercial or otherwise, and (ii) Participants shall have the right to disclose Confidential Information from Participant Agreements to Yankee Alliance.

**Agreement Confidentiality:** Except as otherwise permitted by this Agreement, neither Yankee Alliance nor Vendor shall disclose the terms of this Agreement to any other person or entity outside its organization and affiliates other than to a Participant, a prospective Participant, or as required by law. For purposes of this section, an "affiliate" is an entity in which Yankee Alliance or Vendor, as appropriate, maintains an ownership position in or a contractual relationship with, and the disclosure is required so that the disclosing party may fulfill its obligations hereunder. Neither party shall make any public announcement, exclusive of communications to Participants, concerning the terms of this Agreement unless such party receives prior written approval by the other party. Yankee Alliance shall have the right to approve, in advance, any promotional materials that reference Yankee Alliance or Yankee Alliance's GPP.

**Limitation on Obligation:** Vendor and Yankee Alliance shall have no obligation concerning any portion of the Confidential Information which: (a) was known to it before receipt, directly or indirectly, from the disclosing party; (b) is lawfully obtained, directly or indirectly, by it from a non-party to this Agreement which was under no obligation of confidentiality; (c) is or becomes publicly available other than as a result of an act or failure to act by the receiving party; (d) is required to be disclosed by the receiving party by applicable law or legal process; or (e) is developed by the receiving party independent of the Confidential Information disclosed by the disclosing party. The receiving party shall not disclose any portion of the Confidential Information to any person except those of its employees and affiliates and Participants having a need to know such portion to accomplish the purposes contemplated by this Agreement.

37. **Data Ownership:** Vendor acknowledges and agrees that all information and data generated by Participant purchases of Products is proprietary to and owned exclusively by the applicable Participant and/or Yankee Alliance. Vendor shall not sell, market, or commercialize Participant data, create derivative products or applications based on Participant data or otherwise use Participant data in any manner unrelated to the performance of Vendor's obligations under this Agreement.

38. **Nature of Relationship:** Nothing contained in this Agreement or in the relationship between Vendor, Yankee Alliance, and/or any of the Participants shall be deemed to constitute a partnership, joint venture or any other similar relationship among them.

39. **Attachments:** All attachments to this Agreement are incorporated by reference and become part of this Agreement. Any conflicts between the text of this Agreement and the Attachments or between the Attachments shall be construed in favor of this Agreement.

40. **Controlling Document:** In the event of any conflict between the terms and conditions contained in this Agreement and the terms and conditions of any document, instrument or agreement prepared by Vendor (including without limitation, Vendor's warranty documents, price quotations, invoices and any Participant Agreements), the terms of this Agreement shall control. In the event of any conflict between Yankee Alliance Standard Terms and Conditions and any Exhibits, the terms of the Yankee Alliance Standard Terms and Conditions shall control.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127064

**4-SER-813**

41. **Modification and Waiver:** No modification of this Agreement shall be deemed effective unless in writing and signed by each of the Parties hereto. Any waiver of a breach of any provision(s) of this Agreement shall not be deemed effective unless in writing and signed by the Party against whom enforcement of the waiver is sought.

42. **Business Reviews:** Yankee Alliance and Vendor will have monthly review meetings to develop and implement specific sales development plans for increasing Participant awareness of Vendor and Vendor's contracted services. Review meetings will be monthly until a plan is developed, and no less than the complete first quarter of 2022, consisting of meetings in January, February, and March of 2022. Once the plan is developed, review meetings will be quarterly or semi-annually as mutually agreed.

43. **Headings:** The descriptive headings of the sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any provision hereof.

44. **Assignment:** Yankee Alliance shall have the right, on written notice but without Vendor's consent, to assign Yankee Alliance's rights, title and interest under this Agreement to any entity owned or controlled by SCS and/or LLC. Except as set forth in the foregoing sentence, neither Party may assign, subcontract, delegate or otherwise transfer this Agreement or any of its rights or obligations hereunder, nor may it contract with third parties to perform any of its obligations hereunder except as contemplated in this Agreement, without the other Party's prior written consent.

45. **Severability:** If any part of this Agreement shall be determined to be invalid, illegal or unenforceable by any valid Act of Congress or act of any legislature or by any regulation duly promulgated by the United States or a state acting in accordance with the law, or declared null and void by any court of competent jurisdiction, then such part shall be reformed, if possible, to conform to the law and, in any event, the remaining parts of this Agreement shall be fully effective and operative insofar as reasonably possible.

46. **Notices:** Except as otherwise specifically set forth in this Agreement, notice required to be given pursuant to the terms and provisions hereof shall be in writing, postage and delivery charges pre-paid, and shall be sent by telecopier, hand delivery, overnight mail service, first-class mail or certified mail, return receipt requested, or by electronic mail to Yankee Alliance or Vendor at the addresses and/or facsimile numbers set forth on the signature page hereof. Any party may change the address to which notices are to be sent by notice given in accordance with the provisions of this section. Notices hereunder shall be deemed to have been given and shall be effective upon actual receipt by the other party, or, if mailed, upon the earlier of the second (2nd) day after mailing or actual receipt by the other party.

47. **Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

48. **Counterparts:** This Agreement may be signed in counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. For purposes of this Agreement, a facsimile copy of a Party's signature shall be sufficient to bind such party.

(Remainder of page intentionally left blank. Signature page to follow.)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127065

**4-SER-814**

YANKEE ALLIANCE

*Supply Chain Solutions*

YANKEE ALLIANCE, LLC

*Common goals. Uncommon results.*

IN WITNESS WHEREOF, duly authorized officers of Yankee Alliance and Vendor have executed this Agreement effective the date first written above. The Parties' contact information for notices under this Agreement is set forth below.

Yankee Alliance, LLC
138 River Road
Andover, Massachusetts 01810
Tel: 978-470-2000
Contract Administrator:

Surgical Instrument Service Company, Inc.
151 N Brandon Drive
Glendale Heights, IL 60139
Tel: 630-221-1988
Contract Administrator: Greg Posdal

| By: | Amy Campbell | By: | Greg Posdal |
|---|---|---|---|
| Title: | Chief Administrative Officer | Title: | President & CEO |
| Signature: | | Signature: | |
| Date: | | Date: | 12/1/21 |

Yankee Alliance Supply Chain Solutions, LLC
138 River Road
Andover, Massachusetts 01810
Tel: 978-470-2000
Contract Administrator:

| By: | Amy Campbell |
|---|---|
| Title: | Chief Administrative Officer |
| Signature: | |
| Date: | |

(Revised March 2021)

138 River Road | Andover, MA 01810 - 1083 | 978-470-2000 | 978-681-6100 | www.yankeealliance.com

14658907.1

*Supply Chain Solutions*

YANKEE ALLIANCE, LLC

*Common goals. Uncommon results.*

**Exhibits:**

Exhibit A: Classes of Trade
Exhibit B-1: Yankee Alliance Supply Chain Solutions, LLC Participants
Exhibit B-2: Yankee Alliance, LLC Participants
Exhibit C: Participating Member Designation Form (PMDF)
~~Exhibit D: Authorized Distributors~~
Exhibit E: Product and Product Price List
Exhibit F: Required Electronic Sales Reporting Format
Exhibit G: Required Rebate Reporting Format
~~Exhibit H: Ordering Instructions and Additional Warranties~~
Exhibit I: Returned Goods Policy

138 River Road | Andover, MA 01810 - 1083 | 978-470-2000 | 978-681-6100 | www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127067

**4-SER-816**



**Supply Chain Solutions**

YANKEE ALLIANCE, LLC

*Common goals. Uncommon results.*

Exhibit A
Classes of Trade

| | Who the contract is available for: (must check off Class of Trade boxes for those that will have access to this Agreement) | | |
|---|---|---|---|
| | Alternate Markets | | Imaging Centers |
| | Ambulatory Care | | Long Term Care Facilities |
| | Business and Industry | | National Members |
| | Colleges and Universities | | Pharmacy |
| xx | Dentistry | | Physicians |
| | Durable Medical Equipment (DME) | | Physicians/Healthcare Business - Other |
| | First Responders | | Regional Only: Please specify_____ |
| | Freestanding Healthcare Lab | | Schools |
| | Healthcare Business - Other | xx | Surgery Centers |
| | Home Care | xx | Veterinary |
| xx | Hospital | | |

138 River Road | Andover, MA 01810 - 1083 | 978-470-2000 | 978-681-6100 | www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127068

4-SER-817



**Exhibit B-1**

**Yankee Alliance Supply Chain Solutions, LLC Participants**

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127069

**YANKEE ALLIANCE**
*Supply Chain Solutions*

**YANKEE  ALLIANCE, LLC**
*Common goals. Uncommon results.*

**Exhibit B-2**
**Yankee Alliance, LLC Participants**

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127070

**4-SER-819**

YANKEE ALLIANCE

*Supply Chain Solutions*

YANKEE ALLIANCE, LLC

*Common goals.* **Uncommon results.**

Exhibit C
Participating Member designation Form (PMDF)

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127071

Trial Ex. No. 1566-R, Pg. 26 of 33

**4-SER-820**



*Supply Chain Solutions*

Common goals. Uncommon results.

Exhibit D
Authorized Distributors
**VENDOR DOES NOT HAVE ANY AUTHORIZED DISTRIBUTORS**

| Authorized Distributors: (check all that apply and add other you commonly use) | | |
|---|---|---|
| | Cardinal | |
| | Claflin | |
| | Medline | |
| | Mohawk | |
| | Owens & Minor | |
| | Other: Please specify_____ | |
| | Other: Please specify_____ | |
| | Other: Please specify_____ | |
| | Other: Please specify_____ | |
| | | |

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127072

**YANKEE ALLIANCE**
*Supply Chain Solutions*

**YANKEE ALLIANCE, LLC**
*Common goals. Uncommon results.*

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127073

4-SER-822



Exhibit E
Product and Product Price List

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127074

4-SER-823

YANKEE ALLIANCE
Supply Chain Solutions

YANKEE ALLIANCE, LLC
Common goals. Uncommon results.

| Exhibit F | |
|---|---|
| **Required Electronic Sales Reporting Format** | |
| **Vendor Name** | Your Company Name |
| **Facility Yankee or Premier Entity Code** | Please supply one of these unique identifiers: Entity Code, GLN # or DEA # |
| **Facility GLN #** | |
| **Facility DEA #** | |
| **Yankee Alliance Agreement #** | Enter Yankee Alliance contract number (i.e. YA-OR-001) If unknown, please contact your Yankee Alliance Contract Administrator at 978-470-2000 |
| **Period Begin Date** | The first date in the month/quarter for which you are reporting sales (i.e. 20150901) |
| **Period End Date** | The end date for the month/quarter you are reporting (i.e. 20151231) |
| **Facility Name** | Sold to Customer Name |
| **Facility Address 1** | Sold to Customer Address Line 1 |
| **Facility Address 2** | Sold to Customer Address Line 2 |
| **Facility City** | Sold to Customer City |
| **Facility State** | Sold to Customer State |
| **Facility Zip Code** | Sold to Customer Zip Code |
| **Total Sales Dollars** | *NOTE:* No dollar signs or commas; Negative numbers must have minus sign (no parentheses or red) |
| **Administrative Fee Amount** | |

| Exhibit G | |
|---|---|
| **Required Rebate Reporting Format** | |
| **Vendor Name** | Your Company Name |
| **Facility Yankee or Premier Entity Code** | Please supply one of these unique identifiers: Entity Code, GLN # or DEA # |
| **Facility GLN** | |
| **Facility DEA** | |
| **Yankee Alliance Agreement #** | Enter Yankee Alliance contract number (i.e. YA-OR-001) If unknown, please contact your Yankee Alliance Contract Administrator at 978-470-2000 |
| **Period Begin Date** | The first date in the month/quarter for which you are reporting sales (i.e. 20150901) |
| **Period End Date** | The end date for the month/quarter you are reporting (i.e. 20151231) |
| **Facility Name** | Sold to Customer Name |
| **Facility Address 1** | Sold to Customer Address Line 1 |
| **Facility Address 2** | Sold to Customer Address Line 2 |
| **Facility City** | Sold to Customer City |
| **Facility State** | Sold to Customer State |
| **Facility Zip Code** | Sold to Customer Zip Code |
| **Rebate Amount** | *NOTE:* No dollar signs or commas; Negative numbers must have minus sign (no parentheses or red) |

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                          SIS127075

Trial Ex. No. 1566-R, Pg. 30 of 33                    **4-SER-824**

YANKEE ALLIANCE
Supply Chain Solutions

YANKEE ALLIANCE, LLC
*Common goals. Uncommon results.*

**Exhibit H**
**Ordering Instructions and Additional Warranties**

Limited Warranty

Surgical Instrument Service Company, Inc. (SIS) warrants that all repair services will conform to the current OEM published specifications and will be free from defects in workmanship or materials under normal use (the "Warranty") for a period of one (1) year from the date of delivery to CUSTOMER ("Warranty Period").

If any device is non-operable under the OEM specifications within such Warranty Period, CUSTOMER must return the device to SIS. CUSTOMER's remedy under this Section 3.3 at SIS's reasonable election is: (a) refund of SIS's service charge, (b) repair by SIS of any devices found to be defective, or (c) replacement of any such defective devices, provided that SIS determines after technical inspection and investigation of the device(s) that the alleged defect developed under normal and appropriate use and the device is covered by the terms of this Warranty.

EXCEPT AS OTHERWISE PROVIDED IN THE YANKEE ALLIANCE AGREEMENT, CUSTOMER acknowledges that except as specifically set forth in this paragraph 3.3, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, IN ADVERTISING MATERIALS, BROCHURES, OR OTHER DESCRIPTIVE LITERATURE) BY SIS OR ANY OTHER PERSON, EXPRESS OR IMPLIED, AS TO THE CONDITION OR PERFORMANCE OF ANY PRODUCTS OR SERVICES, THEIR MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE AND ANY SUCH WARRANTIES ARE SPECIFICALLY DISCLAIMED BY CUSTOMER. SIS ASSUMES NO RESPONSIBILITY OR LIABILITY WHATSOEVER FOR MANUFACTURER'S PRODUCT SPECIFICATIONS OR THE PERFORMANCE OR ADEQUACY OF ANY DESIGN OR SPECIFICATION PROVIDED TO SIS BY OR ON BEHALF OF CUSTOMER.

EXCEPT FOR ANY THIRD-PARTY CLAIMS UNDER THE INDEMNIFICATION SECTION OF THIS AGREEMENT, THE REMEDIES SET FORTH IN THIS PARAGRAPH SHALL BE SIS'S SOLE AND EXCLUSIVE LIABILITY AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR BREACH OF WARRANTY. THE LIMITATION SET FORTH IN THE PRECEDING SENTENCE WILL NOT APPLY WITH RESPECT TO DAMAGES RESULTING FROM THE NEGLIGENT ACTS, OMISSIONS, BAD FAITH, OR WILLFUL MISCONDUCT OF A PARTY OR ITS PERSONNEL. SIS'S MAXIMUM LIABILITY FOR ANY CLAIMED BREACH OF WARRANTY SHALL BE LIMITED TO THE PURCHASE PRICE OF THE PRODUCT. EXCEPT FOR CLAIMS UNDER INDEMNIFICATION, SIS SHALL NOT OTHERWISE BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, INDIRECT, OR INCIDENTAL DAMAGES OR LOST PROFITS. SUCH LIMITATION UPON SIS'S LIABILITY SHALL SURVIVE EVEN IF ANY OF CUSTOMER'S LIMITED OR EXCLUSIVE REMEDIES ARE DEEMED TO HAVE FAILED OF THEIR ESSENTIAL PURPOSE.

Regarding any warranty work, SIS shall not be obligated to perform preventative maintenance, installation, de-installation, relocation, or maintenance. In addition to utilizing new components, SIS reserves the right to use reconditioned, refurbished, and/or serviceable used parts (that meet OEM's quality standards) for warranty or any other repairs. The use of reconditioned, refurbished, or serviceable used parts may include, without limitation, replacing or exchanging major components of the device.

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com
14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127076

**4-SER-825**

Excluded from this limited warranty and not warranted by SIS in any fashion, either express, implied, or by statute, are:

a) Devices and accessories not manufactured or previously serviced by SIS, not bearing a unique serial number, or not bearing the SIS logo and date stamp

b) Any serial numbered device without original invoice that is not registered in SIS's internal order tracking system as having been serviced or repaired within one (1) year of complaint

c) Any complimentary repair or service done

d) Any service or device for a customer that has outstanding or late invoices or is in breach of contract with SIS

e) Any device which has been disassembled, repaired, tampered with, altered, changed, or modified by persons other than SIS's own authorized service personnel

f) Defects or damage to the device resulting from wear, tear, misuse, abuse, negligence, impact, improper storage, non-performance of scheduled operator and maintenance items, or non-approved reprocessing methods

In compliance with OSHA blood borne pathogen regulations and other applicable federal, state, and local regulations, devices that come into contact with potentially infectious material must be decontaminated before being returned to SIS under this limited warranty or for any other purpose.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127077

**YANKEE ALLIANCE**
*Supply Chain Solutions*

**YANKEE ALLIANCE, LLC**
*Common goals. Uncommon results.*

Exhibit I
Return Goods Policy

All repairs provided under this agreement are guaranteed to meet manufacturer specification for design and function. Should a paid repair fail to meet that standard, SIS will either:

1. Perform additional repairs at no charge to restore proper design or function
2. Refund the repair price
3. Provide an exchange

The choice of solution is at SIS's sole discretion and the only remedy available.

138 River Road │ Andover, MA 01810 - 1083 │ 978-470-2000 │ 978-681-6100 │ www.yankeealliance.com

14658907.1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS127078

**4-SER-827**

```
                AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON APRIL 22, 1998
                                              REGISTRATION NO. 333-
- -------------------------------------------------------------------------------
- -------------------------------------------------------------------------------
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
---------------------

FORM S-1

REGISTRATION STATEMENT

UNDER

THE SECURITIES ACT OF 1933
---------------------

INTUITIVE SURGICAL, INC.

(Exact name of registrant as specified in its charter)

| DELAWARE | 3842 | 77-0416458 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

-------------------

1340 W. MIDDLEFIELD ROAD
MOUNTAIN VIEW, CALIFORNIA 94043
(650) 237-7000

(Address, including zip code, and telephone number, including area code, of
registrant's principal executive offices)
---------------------

LONNIE M. SMITH
PRESIDENT AND CHIEF EXECUTIVE OFFICER
INTUITIVE SURGICAL, INC.
1340 W. MIDDLEFIELD ROAD
MOUNTAIN VIEW, CALIFORNIA 94043
(650) 237-7000

(Name, address, including zip code, and telephone number, including area code,
of agent for service)
---------------------

COPIES TO:

| ALAN C. MENDELSON, ESQ. | JAY K. HACHIGIAN, ESQ. |
|---|---|
| PATRICK A. POHLEN, ESQ. | RENEE F. LANAM, ESQ. |
| Cooley Godward LLP | Gunderson Dettmer Stough |
| Five Palo Alto Square | Villeneuve Franklin & |
| 3000 El Camino Real | Hachigian, LLP |
| Palo Alto, California 94306 | 155 Constitution Drive |
| (650) 843-5000 | Menlo Park, California 94025 |
| | (650) 321-2400 |

-------------------

APPROXIMATE DATE OF PROPOSED SALE TO THE PUBLIC:
As soon as practicable after the effective date of this Registration Statement.
-------------------

If any of the Securities being registered on this Form are to be offered on
a delayed or continuous basis pursuant to Rule 415 under the Securities Act of
1933, check the following box. / /

If this Form is filed to register additional securities for an offering
pursuant to Rule 462(b) under the Securities Act, please check the following box
and list the Securities Act registration statement number of the earlier
effective registration statement for the same offering. / /

If this Form is a post-effective amendment filed pursuant to Rule 462(c)
under the Securities Act, check the following box and list the Securities Act
registration statement number of the earlier effective registration statement
for the same offering. / /

If delivery of the Prospectus is expected to be made pursuant to Rule 434,
please check the following box. / /
---------------------

CALCULATION OF REGISTRATION FEE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1585-R**

Case No.  3:21-cv-03496-AMO
Date Entered_____
By_____
Deputy Clerk

| TITLE OF SECURITIES TO BE REGISTERED | PROPOSED MAXIMUM AGGREGATE OFFERING PRICE(1) | AMOUNT OF REGISTRATION FEE |
|---|---|---|

Common Stock, $.001 par value............................................... $50,000,000          $14,750

(1) Estimated solely for the purpose of computing the amount of the registration
    fee in accordance with Rule 457 under the Securities Act of 1933.
                          -------------------

    THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR
DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL
FILE A FURTHER AMENDMENT THAT SPECIFICALLY STATES THAT THIS REGISTRATION
STATEMENT SHALL THEREAFTER BECOME EFFECTIVE&bbsp;IN ACCORDANCE WITH SECTION 8(A) OF
THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME
EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(A),
MAY DETERMINE.

- --------------------------------------------------------------------------------
- --------------------------------------------------------------------------------

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. A
REGISTRATION STATEMENT RELATING TO THESE SECURITIES HAS BEEN FILED WITH THE
SECURITIES AND EXCHANGE COMMISSION. THESE SECURITIES MAY NOT BE SOLD NOR MAY
OFFERS TO BUY BE ACCEPTED PRIOR TO THE TIME THE REGISTRATION STATEMENT BECOMES
EFFECTIVE. THIS PROSPECTUS SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE
SOLICITATION OF AN OFFER TO BUY NOR SHALL THERE BE ANY SALE OF THESE SECURITIES
IN ANY STATE IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR
TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF ANY SUCH STATE.

PROSPECTUS (SUBJECT TO COMPLETION)

ISSUED            , 1998

                                  SHARES

                             [INTUITIVE LOGO]

                              COMMON STOCK
                             -----------------

ALL OF THE       SHARES OF COMMON STOCK ARE BEING SOLD BY INTUITIVE SURGICAL,
INC. (THE "COMPANY"). PRIOR TO THIS OFFERING, THERE HAS BEEN NO PUBLIC
     MARKET FOR THE COMMON STOCK OF THE COMPANY. IT IS CURRENTLY ESTIMATED
     THAT THE INITIAL PUBLIC OFFERING PRICE PER SHARE WILL BE BETWEEN
       $     AND $     . SEE "UNDERWRITERS" FOR A DISCUSSION OF THE
       FACTORS TO          BE CONSIDERED IN DETERMINING THE
                    INITIAL PUBLIC OFFERING PRICE.
                       -----------------------

       APPLICATION HAS BEEN MADE TO LIST THE COMMON STOCK FOR QUOTATION
         ON THE NASDAQ NATIONAL MARKET UNDER THE SYMBOL "ISRG."
                       -----------------------

       THIS OFFERING INVOLVES A HIGH DEGREE OF RISK. SEE "RISK FACTORS"
               BEGINNING ON PAGE 7 OF THIS PROSPECTUS.
                       -----------------

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND
  EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE
    SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION
      PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY
       REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.
                     -------------------

                        PRICE $  A SHARE
                     -------------------

|                              | PRICE TO<br>PUBLIC | UNDERWRITING<br>DISCOUNTS AND<br>COMMISSIONS(1) | PROCEEDS TO<br>&bbsp;   COMPANY(2) |
|------------------------------|--------------------|-----------------------------------------------|-----------------------------------|
|                              | ------------------ | ---------------------                          | ----------------------            |
| PER SHARE..................  | $                  | $                                             | $                                 |
| TOTAL(3)................      | $                  | $                                             | $                                 |

- ------------
    (1) THE COMPANY HAS AGREED TO INDEMNIFY THE UNDERWRITERS AGAINST CERTAIN
        LIABILITIES, INCLUDING LIABILITIES UNDER THE SECURITIES ACT OF 1933, AS
        AMENDED.
    (2) BEFORE DEDUCTING EXPENSES PAYABLE BY THE COMPANY ESTIMATED AT $    .
    (3) THE COMPANY HAS GRANTED TO THE UNDERWRITERS AN OPTION, EXERCISABLE
        WITHIN 30 DAYS OF THE DATE HEREOF, TO PURCHASE UP TO AN AGGREGATE OF
            ADDITIONAL SHARES AT THE PRICE TO PUBLIC LESS UNDERWRITING
        DISCOUNTS AND COMMISSIONS FOR THE PURPOSE OF COVERING OVER-ALLOTMENTS, IF
        ANY. IF THE UNDERWRITERS EXERCISE SUCH OPTION IN FULL, THE TOTAL PRICE TO
        PUBLIC, UNDERWRITING DISCOUNTS AND COMMISSIONS AND PROCEEDS TO COMPANY
        WILL BE $    , $    AND $    , RESPECTIVELY. SEE "UNDERWRITERS."
                       -----------------------

    THE SHARES ARE OFFERED, SUBJECT TO PRIOR SALE, WHEN, AS AND IF ACCEPTED BY
THE UNDERWRITERS NAMED HEREIN AND SUBJECT TO APPROVAL OF CERTAIN LEGAL MATTERS
BY GUNDERSON DETTMER STOUGH VILLENEUVE FRANKLIN & HACHIGIAN, LLP, COUNSEL FOR
THE UNDERWRITERS. IT IS EXPECTED THAT DELIVERY OF THE SHARES WILL BE MADE ON OR
ABOUT            , 1998 AT THE OFFICE OF MORGAN STANLEY & CO. INCORPORATED, NEW
YORK, N.Y., AGAINST PAYMENT THEREFOR IN IMMEDIATELY AVAILABLE FUNDS.

-------------------

MORGAN STANLEY DEAN WITTER

                    BEAR, STEARNS & CO. INC.

                              BT ALEX. BROWN

        , 1998

                    GENERATIONS OF SURGERY


  OPEN SURGERY    [Photo of
  SIMPLE &           open
  COMPLEX          surgical
  PROCEDURES     instruments]
   - NATURAL
   MOTIONS
   - WIDE
   RANGE OF
   MOTION
   - HANDS
   INSIDE
   PATIENT
   - PRECISE
   TISSUE
  MANIPULATION
   - LARGE
   INCISION

  [Photo of     MINIMALLY
   minimally     INVASIVE
   invasive      SURGERY
   surgical      SIMPLE
  instruments]  PROCEDURES
                 - BACKWARD
                 MOTIONS
                 - LIMITED
                 RANGE OF
                 MOTION
                 - HANDS
                 OUTSIDE
                 PATIENT
                 - IMPRECISE
                 TISSUE
                 MANIPULATION
                 - SMALL
                 INCISION

                   [Photo
  INTUITIVE-TM-   of
   SURGERY        Intuitive's
   SIMPLE &       surgeon
   COMPLEX        console]
   PROCEDURES
   - NATURAL
   MOTIONS
   - WIDE
   RANGE OF
   MOTION
  - MECHANICAL
   WRISTS
   INSIDE
   PATIENT
   - PRECISE
   TISSUE
  MANIPULATION
   - SMALL
   INCISION


CERTAIN PERSONS PARTICIPATING IN THIS OFFERING MAY ENGAGE IN TRANSACTIONS THAT
STABILIZE, MAINTAIN OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK.
SPECIFICALLY, THE UNDERWRITERS MAY OVERALLOT IN CONNECTION WITH THE OFFERING,
AND MAY BID FOR, AND PURCHASE, SHARES OF COMMON STOCK IN THE OPEN MARKET. FOR A
DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITERS."

                    INTUITIVE THIRD GENERATION SURGERY

        [Photo of Intuitive's products in the Company's preclinical procedure room]

With INTUITIVE surgery, surgeons
operate while seated at a console
and viewing a 3-D image of the
surgical field. Their hands rest
below the display holding
instrument handles that resemble
the handles of open surgical
instruments. Natural hand
movements made at the console are
translated into precise
microsurgical movements using
instruments that are
approximately seven millimeters

in diameter and which incorporate real-time natural wrist movements. Intuitive's products are designed to allow surgeons, for the first time, to be able to perform surgical procedures through small incisions using the natural movements and precision of open surgery.
[Photo of Company's instrument]
/ /
ACTUAL SIZE

INTUITIVE'S PRODUCTS IN THE COMPANY'S PRECLINICAL PROCEDURE ROOM

The Company's products are investigational and, except as set forth in this Prospectus,

[INTUITIVE LOGO]

NO PERSON IS AUTHORIZED IN CONNECTION WITH ANY OFFERING MADE HEREBY TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY OR BY ANY UNDERWRITER. THIS PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE SHARES OF COMMON STOCK OFFERED HEREBY, NOR DOES IT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY OF THE SECURITIES OFFERED HEREBY TO ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SOLICITATION TO SUCH PERSON. NEITHER THE DELIVERY OF THIS PROSPECTUS NOR ANY OFFER OR SALE MADE HEREBY SHALL UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE SUBSEQUENT TO THE DATE HEREOF.

-------------------

UNTIL     , 1998 (25 DAYS AFTER THE COMMENCEMENT OF THIS OFFERING), ALL DEALERS EFFECTING TRANSACTIONS IN THE COMMON STOCK, WHETHER OR NOT PARTICIPATING IN THIS DISTRIBUTION, MAY BE REQUIRED TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE OBLIGATION OF DEALERS TO DELIVER A PROSPECTUS WHEN ACTING AS UNDERWRITERS AND WITH RESPECT TO THEIR UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.

-------------------

TABLE OF CONTENTS

| | PAGE |
|---|---|
| | --------- |
| Prospectus Summary | 4 |
| Risk Factors | 7 |
| Use of Proceeds | 19 |
| Dividend Policy | 19 |
| Capitalization | 20 |
| Dilution | 21 |
| Selected Financial Data | 22 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 23 |
| Business | 27 |

| | PAGE |
|---|---|
| | --------- |
| Management | 52 |
| Certain Transactions | 61 |
| Principal Stockholders | 62 |
| Description of Capital Stock | 64 |
| Shares Eligible for Future Sale | 68 |
| Underwriters | 70 |
| Legal Matters | 72 |
| Experts | 72 |
| Additional Information | 72 |
| Index to Financial Statements | F-1 |

-------------------

The Company intends to furnish its stockholders with annual reports containing financial statements
audited by an independent certified public accounting firm and quarterly reports for the first three quarters of each year containing unaudited financial information.

-------------------

INTUITIVE, ENDOWRIST, IMMERSIVE and the Company's logo are trademarks of the Company. This Prospectus also includes trademarks of companies other than the Company.

3

PROSPECTUS SUMMARY

THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE MORE DETAILED INFORMATION, INCLUDING "RISK FACTORS" AND THE FINANCIAL STATEMENTS AND NOTES THERETO, APPEARING ELSEWHERE IN THIS PROSPECTUS. THIS PROSPECTUS CONTAINS FORWARD-LOOKING STATEMENTS WHICH INVOLVE RISKS AND UNCERTAINTIES. THE COMPANY'S ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THESE FORWARD-LOOKING STATEMENTS AS A RESULT OF CERTAIN FACTORS, INCLUDING THOSE SET FORTH UNDER "RISK FACTORS" AND ELSEWHERE IN THIS PROSPECTUS. UNLESS THE CONTEXT OTHERWISE REQUIRES, THE TERMS "INTUITIVE" AND THE "COMPANY" REFER TO INTUITIVE SURGICAL, INC., A DELAWARE CORPORATION. EXCEPT AS OTHERWISE NOTED HEREIN, INFORMATION IN THIS PROSPECTUS (I) ASSUMES NO EXERCISE OF THE UNDERWRITERS' OVER-ALLOTMENT OPTION, (II) GIVES EFFECT TO THE CONVERSION OF ALL OUTSTANDING SHARES OF PREFERRED STOCK OF THE COMPANY INTO SHARES OF COMMON STOCK OF THE COMPANY, WHICH WILL OCCUR UPON THE CLOSING OF THIS OFFERING, (III) GIVES EFFECT TO THE FILING, UPON THE CLOSING OF THIS OFFERING, OF AN AMENDED AND RESTATED CERTIFICATE OF INCORPORATION, AUTHORIZING 10,000,000 SHARES OF UNDESIGNATED PREFERRED STOCK AND 75,000,000 SHARES OF COMMON STOCK, AND (IV) DOES NOT GIVE EFFECT TO A    FOR    REVERSE STOCK SPLIT TO BE EFFECTED PRIOR TO THE CLOSING OF THIS OFFERING.

THE COMPANY

Intuitive designs and manufactures proprietary products which it believes represent a fundamentally new generation of technology for surgery. This new generation of surgery, INTUITIVE surgery, is believed by the Company to represent an advance similar in scope to the previous two generations of surgery--open surgery and minimally invasive ("MIS") surgery. The Company's technology seamlessly translates the surgeon's natural hand movements on instrument handles at a console into corresponding micro-movements of instruments positioned inside the patient through small puncture incisions, or "ports." Intuitive believes that its technology provides the surgeon with the range of motion and fine tissue control possible with open surgery, while simultaneously allowing the surgeon to work through the ports of MIS surgery.

Although open surgery is still commonly performed and is used in almost every area of the body, the large incisions required create significant trauma to the patient, resulting in long hospitalization and recovery times, high hospitalization costs, as well as significant pain and suffering. Over the past several decades, MIS surgery has reduced trauma to the patient by allowing surgery through ports rather than large incisions, resulting in shorter recovery times and reduced hospitalization costs. MIS surgery has been widely adopted in certain surgical procedures, but it has not been widely adopted for complex procedures. The Company believes this slow adoption for complex procedures has occurred because surgeons generally find MIS operative techniques more difficult to learn and perform and less precise than open surgery for fine tissue manipulations such as dissecting and suturing. Factors that make MIS techniques more difficult or less precise include backward instrument movements, restricted range of motion, magnified hand tremors, exaggerated instrument movements and poor visualization.

INTUITIVE surgery overcomes many of the limitations of existing MIS surgery by utilizing a broad technology platform consisting of computer hardware, software, algorithms, mechanics and optics to perform fine tissue manipulation through ports in many parts of the body. Using Intuitive's technology, surgeons perform surgical procedures while seated comfortably at a console viewing a 3-D image of the surgical field. The surgeon's hands grasp the instrument handles below the display in their normal orientation with respect to the surgeon's eyes, and the Company's technology seamlessly translates these movements into precise real-time microsurgical movements of electromechanical arms and instruments inside the patient. The Company's technology is also designed to give surgeons the perception that their hands are inside the patient, directly holding instruments--even though their hands are outside--and to give surgeons the perception that the surgical field is being directly visualized instead of being viewed through an endoscope.

4

An important advantage of the Company's technology is that surgeons can learn to manipulate Intuitive's instruments with only a few minutes of training, allowing surgeons to focus on the clinical procedure. When performing procedures that the surgeon has previously performed only with open surgical techniques, the Company believes that the surgeon will have to learn where to place ports and how to approach the operation but will generally not have to relearn how to perform basic tissue manipulations. The Company believes that tissue manipulations using its products can be as natural to the surgeon as hand movements in open surgery. As a result, the Company believes its products will make a broad range of open surgical procedures suitable for INTUITIVE surgery, with significantly less patient trauma and post-operative pain and shorter recovery times.

The Company's strategy is to focus initially on the cardiac surgery market because (i) there are a large number of procedures concentrated in a small number of hospitals that can be targeted by a focused sales force and field organization, (ii) while approaches to these procedures have been developed that are somewhat less invasive than open surgery, they are difficult and only account for a small minority of cardiac surgery procedures being performed and (iii) no existing technology is able to accomplish a full cardiac procedure through ports. The Company believes that its technology can help surgeons accomplish cardiac surgery procedures more easily, more accurately and with less trauma to the patient than existing approaches. Cardiac surgery procedures are among the most precise and demanding in all of surgery. As such, the Company believes that if its technology is adopted for cardiac surgery, surgeons will gain confidence that Intuitive's technology also can be used for less demanding procedures in general and other surgery.

The Company plans to derive its revenues from the direct sale of two types

4-SER-832

of interlinked proprietary products (i) a surgeon's console and a patient-side cart which holds the electromechanical arms and (ii) a range of "resposable" instruments such as scissors, forceps and electrocautery. The resposable instruments are resterilizable and the number of procedures that each instrument can perform is controlled by a proprietary electronic interlock. This feature will allow the Company to limit the number of uses of each instrument to less than its tested usage so that the instrument's performance meets specifications during each procedure. By defining the number of uses for each instrument, the Company can effectively price its resposable instruments on a per-procedure basis.

Intuitive believes that it is the first mover in third generation surgery. In March 1997, surgeons using Intuitive's technology successfully performed what the Company believes to be the initial third generation surgery on humans. Intuitive believes that its development efforts represent the largest effort devoted to third generation surgery of any company in the world today. Intuitive owns or has licensed 38 issued and 8 allowed patents, including patents from SRI International and IBM, companies which in the late 1980s were early pioneers in the research of third generation surgery.

The Company was incorporated in Delaware in November 1995 as Intuitive Surgical Devices, Inc. and changed its name to Intuitive Surgical, Inc. in January 1997. The Company's executive offices are located at 1340 W. Middlefield Road, Mountain View, California 94043, and its telephone number is (650) 237-7000.

5

THE OFFERING

```
Common Stock offered........................  shares
Common Stock to be outstanding after this
  offering.................................  shares(1)
Use of Proceeds............................  For research and development, clinical
                                             trials, manufacturing scale-up, expansion of
                                             sales and marketing activities, partial
                                             payment of a license fee to IBM, working
                                             capital and general corporate purposes.
Proposed Nasdaq National Market Symbol.......  ISRG
```

SUMMARY FINANCIAL DATA

| | PERIOD FROM INCEPTION (NOVEMBER 9, 1995) TO DECEMBER 31, 1996(2) | YEAR ENDED DECEMBER 31, 1997 | THREE MONTHS ENDED MARCH 31, | | PERIOD FROM INCEPTION (NOVEMBER 9, 1995) TO MARCH 31, 1998 |
|---|---|---|---|---|---|
| | | | 1997 | 1998 | |
| | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| STATEMENTS OF OPERATIONS DATA: | | | | | |
| Operating costs and expenses: | | | | | |
| Research and development.................... | $ 2,934 | $ 14,282 | $ 1,793 | $ 6,764 | $ 23,980 |
| General and administrative.................. | 951 | 4,434 | 686 | 1,627 | 7,012 |
| Technology license......................... | -- | 6,000 | -- | -- | 6,000 |
| Total operating costs and expenses........ | 3,885 | 24,716 | 2,479 | 8,391 | 36,992 |
| Loss from operations........................ | (3,885) | (24,716) | (2,479) | (8,391) | (36,992) |
| Interest income, net........................ | 198 | 1,114 | 70 | 376 | 1,688 |
| Net loss.................................... | $ (3,687) | $ (23,602) | $ (2,409) | $ (8,015) | $ (35,304) |
| Pro forma net loss per share................ | | $ (1.85) | | $ (0.47) | |
| Shares used in computing pro forma net loss per share.................................. | | 12,730 | | 17,207 | |

| | AS OF MARCH 31, 1998 | |
|---|---|---|
| | ACTUAL | AS ADJUSTED(3) |
| | (IN THOUSANDS) | |
| BALANCE SHEET DATA: | | |
| Cash, cash equivalents and short-term investments...................................... | $ 26,303 | |
| Working capital.................................................. | 17,792 | |
| Total assets..................................................... | 30,107 | |
| Capital lease obligations, noncurrent............................ | 1,297 | |
| Deficit accumulated during the development stage......................................... | (35,304) | (35,304) |
| Total stockholders' equity....................................... | 19,982 | |

- ------------

(1) Based on the number of shares outstanding on March 31, 1998. Excludes (i)
977,250 shares of Common Stock issuable upon exercise of options
outstanding, at a weighted average exercise price of $0.99 per share, (ii)
an aggregate of 785,138 shares available for future grants or purchases
pursuant to the Company's 1996 Equity Incentive Plan, and (iii) 11,000
shares issuable upon exercise of a warrant outstanding, at an exercise price
of $5.00 per share. In April 1998, an additional 4,700,000 shares were
reserved for future grants or purchases pursuant to the Company's 1998
Equity Incentive Plan, 1998 Employee Stock Purchase Plan and 1998
Non-Employee Directors' Stock Option Plan. See "Capitalization," and
"Management--Employee Benefit Plans."

(2) The Company's statement of operations data for the period from inception
(November 9, 1995) to December 31, 1995 is not presented separately as the
Company's operations during that period were not material.

(3) As adjusted to give effect to the sale in this offering of        shares
of Common Stock by the Company and the application of the net proceeds
therefrom. See "Use of Proceeds" and "Capitalization."

6

RISK FACTORS

AN INVESTMENT IN THE SHARES OF COMMON STOCK OFFERED HEREBY INVOLVES A HIGH
DEGREE OF RISK. THE FOLLOWING FACTORS, IN ADDITION TO THE OTHER INFORMATION
CONTAINED IN THIS PROSPECTUS, SHOULD BE CAREFULLY CONSIDERED IN EVALUATING THE
COMPANY AND ITS BUSINESS BEFORE PURCHASING THE SHARES OF COMMON STOCK OFFERED
HEREBY. THIS PROSPECTUS CONTAINS FORWARD-LOOKING STATEMENTS. FOR THIS PURPOSE,
ANY STATEMENTS CONTAINED HEREIN THAT ARE NOT STATEMENTS OF HISTORICAL FACTS MAY
BE DEEMED TO BE FORWARD-LOOKING STATEMENTS. WITHOUT LIMITING THE FOREGOING, THE
WORDS "BELIEVES," "ANTICIPATES," "PLANS," "INTENDS" AND SIMILAR EXPRESSIONS ARE
INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THERE ARE A NUMBER OF IMPORTANT
FACTORS THAT COULD CAUSE THE COMPANY'S ACTUAL RESULTS TO DIFFER MATERIALLY FROM
THOSE INDICATED BY SUCH FORWARD-LOOKING STATEMENTS. THESE FACTORS INCLUDE,
WITHOUT LIMITATION, THOSE SET FORTH BELOW AND ELSEWHERE IN THIS PROSPECTUS.

EARLY STAGE OF CLINICAL TESTING; NO ASSURANCE OF SAFETY, EFFICACY OR
COMMERCIALIZATION

The Company was founded in November 1995. To date, the Company has engaged
primarily in researching, developing, testing ███████████████████████████
for its initial product candidate which consists of a surgeon's console and
patient-side cart and certain resposable instruments.



DEVELOPMENT STAGE COMPANY; HISTORY OF LOSSES AND EXPECTATION OF FUTURE LOSSES

As of March 31, 1998, the Company had an accumulated deficit of $35.5
million. The Company has not generated any revenue from product sales. The
Company's future profitability depends, in part, ████████████████████████
████████████████████████████████ its ability to successfully manufacture and market
its products. The Company's headcount was 23, 86 and 100 as of December 31, 1996
and December 31, 1997 and March 31, 1998, respectively. The Company expects to
expend substantial additional funds, increase headcount and continue to incur
significant operating losses for the foreseeable future as it continues to fund
clinical trials ████████████████████████ , expands

7

research and development activities, establishes commercial-scale manufacturing
capabilities and expands sales and marketing activities. Even if the Company is
able to successfully commercialize its products, the Company cannot be certain
that it will achieve significant revenues from either domestic or international
sales. Failure to achieve significant revenues from product sales would have a
material adverse effect on the Company's business, financial condition and
results of operations, and may require the Company to cease operations. See
"Management's Discussion and Analysis of Financial Condition and Results of
Operations."

UNCERTAINTY OF MARKET ACCEPTANCE; TRAINING REQUIREMENTS

    The Company's products represent a fundamentally new way of performing
surgery. The Company's ability to successfully commercialize its products will
depend, in part, on achieving physician and patient acceptance of INTUITIVE
surgery as a preferred method of performing surgery and for a broader array of
surgical procedures. There can be no assurance that the Company's products will
gain any significant degree of market acceptance by physicians, patients and
third-party payors ████████████████ . The
Company believes that physicians' and third-party payors' acceptance of the
benefits of procedures performed using the Company's products will be essential
for acceptance of the Company's products by patients. Physicians will not
recommend that procedures be performed using the Company's products unless the
Company is able to demonstrate similar efficacy and/or reduced trauma as
compared to existing surgical techniques. Even if the Company establishes the
clinical efficacy of procedures using its products, surgeons may elect not to
use the Company's products for any number of other reasons. For example, most
patients with cardiovascular disease first consult with a cardiologist who may
refer the patient to a cardiac surgeon for conventional open-heart surgery
because such surgery has become widely accepted.

    The Company expects that there will be a significant learning process
involved for surgical teams to become proficient in the use of the Company's
products in performing surgeries, such as cardiac surgery, which to date have
been mostly performed with open surgical techniques. Broad use of the system
will require training of surgical teams in performing minimally invasive
procedures, and market acceptance could be delayed by the time required to
complete this training. The Company cannot be certain that it will be able to
rapidly train surgical teams in numbers sufficient to generate adequate demand
for the Company's products. If the Company's products fail to achieve market
acceptance, the Company may not achieve revenues from product sales necessary to
support the Company's business. See "Business-- Intuitive's Products" and "--
Clinical Trials and Experience."



# Board Book

## ── January 17, 2019 ──

### MISSISSIPPI BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1612-R**

Case No.   3:21-cv-03496-AMO
Date Entered _____
By _____
Deputy Clerk

| 3825 Ridgewood Road, Jackson MS 39211 | 601 432 6198 |

# Board Meeting Outline

## MISSISSIPPI BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING

**MEETINGS SCHEDULE**

Health Affairs Committee | January 16, 2019, 2:00p | IHL Board Room
Board Meeting | January 17, 2019, 9:00a | IHL Board Room

**CALL TO ORDER** ............................................................................ Trustee Shane Hooper
**INVOCATION** ...................................................................................... Trustee Hal Parker
**INTRODUCTION OF GUESTS** ...................................................... Trustee Shane Hooper

## MINUTES

December 12, 2018 Regular Board Meeting Minutes ............................................................... 5

## CONSENT AGENDAS  | Trustee Shane Hooper

### FINANCE

1.  MSU – Request for Approval to Enter into a New Agreement with American College Testing/National Research Center for College and University Admissions .....................................18
2.  MSU – Request for Approval to Enter into a New Agreement with Sage Publications, Inc. ............19
3.  MSU – Request for Approval to Modify an Agreement with SirsiDynix.........................................20
4.  UM – Request for Approval to Amend an Agreement with John Wiley and Sons, Inc. ..................22
5.  UMMC – Request for Approval to Enter into an Agreement with Aureus Nursing, LLC ...............23
6.  UMMC – Request for Approval to Enter an Agreement with Compass Clinical Consulting Co...........................................................................................................................25
7.  UMMC – Request for Approval to Enter into a Purchase Agreement with Elekta Inc. ...................28
8.  UMMC – Request for Approval to Amend a Support Agreement with Epic Systems Corporation...................................................................................................................................30
9.  UMMC – Request for Approval to Enter into a Product Agreement with LivaNova USA, Inc. ......35
10. UMMC – Request for Approval to Enter into a Sales and Service Agreement with Medrobotics Corporation ..............................................................................................................36
11. UMMC – Request for Approval to Amend a Product Sale Agreement with Medtronic USA, Inc.......................................................................................................................................38
12. UMMC – Request for Approval to Enter into a Sterile Processing Support and Services Agreement with STERIS Instrument Management Services, Inc. .....................................................39

### REAL ESTATE

Approval of Initiations of Projects/Appointments of Professionals

*Bureau of Building Projects*
1.  DSU – GS 102-266 – HVAC Improvements, Design Professional – Engineering Resource Group, Inc. ......................................................................................................................................44
2.  DSU – GS 102-267 – Campus Roofing, Design Professional – Burris/Wagnon Architects, P.A.......45

Approval of Budget Increases and/or Changes of Scope/Change of Funding Source(s)

*Bureau of Building Projects*
3.  DSU – GS 102-258 – Sillers Coliseum Renovation, Design Professional – Cooke Douglass Farr Lemons Architects & Engineers, P.A. ......................................................................46

*IHL Projects*
4.  ASU – IHL 201-253 – Animal Science Building, Design Professional – Durrell Design Group, PLLC........................................................................................................................................48

Approval of Other Real Estate Requests
5.  ASU – Delete from Inventory and Demolish Building #0128 – Laying Building ..............................49
6.  DSU – Naming of the Aquatics Center as the "Ronald G. Mayers Aquatics Center" .......................50
7.  MSU – Delete from Inventory and Demolish Building #1446 – Prairie Research Unit, Prairie, Mississippi ............................................................................................................................52

**LEGAL**
1.  MSU – Approval to Modify Contract with Ware | Immigration as Outside Counsel ........................53
2.  USM – Approval to Hire Evan Law Group, LLC as Outside Counsel................................................55
3.  UMMC – Request for Approval to Extend Current Affiliation Agreement with Friends of Children's Hospital ...............................................................................................................55

**PERSONNEL**
1.  Employment (MUW, MVSU, UM)....................................................................................................56
2.  Change of Status (MVSU) .................................................................................................................56
3.  Sabbatical (UM)................................................................................................................................56

# REGULAR AGENDAS

**FINANCE** | Trustee Tom Duff
1.  UMMC – Request for Approval to Enter into an Agreement with CHG Companies, Inc. d/b/a CompHealth ..........................................................................................................................57
2.  UMMC – Request for Approval to Enter into a Medical Office Building Lease with Flowood Investors II, LLC.................................................................................................................58
3.  UMMC – Request for Approval to Enter into a Medical Office Building Lease with Highland Plaza, LLC ...............................................................................................................61


**REAL ESTATE** | Trustee Hal Parker
Approval of Initiations of Projects/Appointments of Professionals

*IHL Projects*
1.  USM – GCRL – IHL 210-248 – Invertebrate Growout II, Design Professional – McCarty Architects. ..............................................................................................................................67


**LEGAL** | Trustee Ann Lamar
1.  DSU – Approval to Settle IHL Self-Insured Workers' Compensation Claim No. 55-36579-1 ..........69
2.  MSU – Approval to Settle IHL Self-Insured Workers' Compensation Claim No. 55-37715-1..........69

**Trial Ex. No. 1612-R, Pg. 3 of 378**

**4-SER-838**

## INFORMATION AGENDAS | Commissioner Alfred Rankins, Jr.

### FINANCE

1. UMMC – Mississippi Information Technology Services Amendment #1 to the Master Acute Client Agreement with Allscripts Healthcare, LLC ..................................................70
2. UMMC – Mississippi Information Technology Services Amendment #4 to the Software License and Maintenance Agreement with Haemonetics Corporation.................................70
3. UMMC – Mississippi Information Technology Services Amendment #3 to the Software License and Application Service Agreement with Marsh Clearsight LLC (Formerly CS Stars LLC).................................................................................................................................70
4. UMMC – Mississippi Information Technology Services Amendment #9 to the Master Services and License and Agreement with OptumnInsight, Inc.................................................70
5. UMMC – Mississippi Information Technology Services Supplement to the Master Purchase Agreement with Shi International Corp. ..................................................................................71

### REAL ESTATE

1. SYSTEM – Real Estate Items Approved Subsequent to the December 12, 2018 Board Meeting
Jackson State University .......................................................................................................359
Mississippi State University ................................................................................................359
University of Mississippi ......................................................................................................362
University of Mississippi Medical Center .............................................................................366
University of Southern Mississippi.......................................................................................367

### LEGAL

1. SYSTEM – Report of Payments to Outside Counsel .......................................................369
2. SYSTEM – Emergency Approval of Jones Walker, LLP as Outside Counsel .................376

### ADMINISTRATION/POLICY

1. SYSTEM – Commissioner's Notification of Approval ........................................................377

## ADDITIONAL AGENDA ITEMS IF NECESSARY
## OTHER BUSINESS/ANNOUNCEMENTS
## EXECUTIVE SESSION IF DETERMINED NECESSARY
## ADJOURNMENT

**BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING**
**CONSENT AGENDA**
**FINANCE**
**January 17, 2019**

**Contract Amount:** The total estimated cost of the Agreement is $3,010,854 over the thirty-six (36) month term. UMMC has included an annual price increase of three percent (3%) for potential price increases.

**Funding Source of Contract:** This agreement will be funded by hospital patient revenue.

**Contractor Selection Process:** The LivaNova VNS Therapy System, including generators, leads, tunnelers, accessory packs, programming wands, and patient essential kits, qualify as clinical commodities under Miss Code Ann §31-7-l, which are exempted from procurement requirements under §31-7-13.

**Staff Recommendation:  Based on Board Policy 707.01, *Land, Property and Service Contracts, Board approval is required prior to execution of the contract for all other land, personal property, and service contracts that require an aggregate total expenditure of more than $250,000.* Legal Staff has reviewed the proposed Agreement between the University of Mississippi Medical Center and LivaNova USA, Inc. for compliance with applicable law and find same to be acceptable. Board staff recommends approval of this item.**

10. <u>UMMC-REQUEST APPROVAL TO ENTER INTO A SALES AND SERVICE AGREEMENT WITH MEDROBOTICS CORPORATION</u>

**Agenda Item Request:** The University of Mississippi Medical Center (UMMC) requests approval to enter into a Sales and Service Agreement (Agreement) with **Medrobotics Corporation (Medrobotics)** to provide a Flex® Robotic TA/ENT System (Flex System), including associated accessories, internal software, warranty, and support services. The Flex System provides precise, less invasive surgical procedures than traditional open methods or rigid robotic systems. The Flex System will be used to perform transanal (TA) and ear, nose, and throat (ENT) surgical procedures.

**Contractor's Legal Name: Medrobotics Corporation (Medrobotics)**

**History of Contract:** This is a new contract for the purchase of a new Flex® Robotic TA/ENT System, including associated accessories, internal software, warranty, and support services. The Flex System provides precise, less invasive surgical procedures than traditional open methods or rigid robotic systems. The Flex System will be used to perform TA and ENT surgical procedures.

**Specific Type of Contract:** This is a new sales and service agreement.

**Purpose:** The purpose of this Agreement is to purchase a Flex System, including associated accessories, internal software, warranty, and support services. The Flex System provides precise, less invasive surgical procedures than traditional open methods or rigid robotic systems. The Flex System will be used to perform TA and ENT surgical procedures.

**BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING**
**CONSENT AGENDA**
**FINANCE**
**January 17, 2019**

**Scope of Work:** Under the agreement, Medrobotics will:

- Provide system, including associated accessories, and internal software
- Training
- One year warranty
- Installation
- Support services

**Term of Contract:** The term of the agreement is five (5) years, beginning January 25, 2019, and ending January 24, 2024.

**Termination Options:** Termination options include the following:
- By UMMC if Medrobotics is unable to install the system within thirty 30 days of the delivery date;
- By Medrobotics if UMMC uses the system with any accessory not made or approved by Medrobotics; and
- By Medrobotics if UMMC does not abide by the requirements for system installation and use;
- By Medrobotics upon thirty (30) days written notice if UMMC does one of the following and does not cure within the notice period:
  - o UMMC fails to operate the system in compliance with the agreement;
  - o UMMC fails to make any payment due on a timely basis;
  - o UMMC tampers with or alters the system, software of any accessories;
  - o UMMC prohibits, fails to permit or fails to cooperate in the conduct of any inspection of the System requested by Medrobotics, or
  - o UMMC breaches any material term of this agreement;
- By UMMC upon sixty (60) day written notice to Medrobotics for any or no reason.

**Contract Amount:** The total expected cost of the Agreement over five (5) years is $1,898,000, including the equipment purchase, associated accessories, internal software, warranty, and support services. The total cost of the equipment is $750,000. Support services are $130,000 per year.

**Funding Source of Contract:** This agreement will be funded by hospital patient revenue.

**Contractor Selection Process:** The Flex System and associated accessories qualify as clinical commodities under Miss Code Ann. §31-7-1, which are exempted from procurement requirements under §31-7-13.

**Staff Recommendation:  Based on Board Policy 707.01, *Land, Property and Service Contracts, Board approval is required prior to execution of the contract for all other land, personal property, and service contracts that require an aggregate total expenditure of more than $250,000.* Legal Staff has reviewed the proposed Agreement between the University of Mississippi Medical Center and Medrobotics Corporation**

**BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING**
**CONSENT AGENDA**
**FINANCE**
**January 17, 2019**

for compliance with applicable law and find same to be acceptable. Board staff recommends approval of this item.

11. <u>**UMMC-REQUEST APPROVAL TO AMEND PRODUCT SALE AGREEMENT WITH MEDTRONIC USA, INC.**</u>

**Agenda Item Request:** The University of Mississippi Medical Center (UMMC) requests approval to amend the current Product Sale Agreement with **Medtronic USA, Inc.** to add products to the Agreement. The products to be added are various consumable commodities and equipment for use during the implantation of cardiac rhythm management (CRM) devices, such as pacemakers and defibrillators.

**Contractor's Legal Name: Medtronic USA, Inc. (Medtronic)**

**History of Contract:** On August 16, 2018, the IHL Board approved the Agreement with Medtronic for cardiac rhythm management devices and supplies. The Agreement term extends from September 1, 2018, through August 31, 2020. UMMC also purchases CRM products from Boston Scientific Corporation. Under both agreements with Medtronic and Boston Scientific Corporation, UMMC commits to purchase at least 85% of its total CRM purchases from the dual vendors, with the remaining 15% available for other vendors that may have a different technology benefitting a particular patient.

**Specific Type of Contract:** Amendment 1 to the Product Sale Agreement.

**Purpose:** The purpose of the Agreement is to purchase discounted consumable commodities and equipment used specifically during cardiac rhythm management (CRM) procedures. The purpose of the amendment is to add products to the Agreement.

**Scope of Work:** Under the amended Agreement, Medtronic will:

- sell consumable commodities and equipment used in CRM procedures at discounted prices,
- provide instruction, education, and training on the safe and effective use of its products, as well as other training opportunities, and
- pay UMMC a quarterly rebate on all purchases under the Agreement.

UMMC will:

- commit to purchasing at least 85% of its CRM products from Medtronic and one (1) other vendor, and
- return a compliance form confirming its purchases to Medtronic on a quarterly basis.

Trial Ex. No. 1612-R, Pg. 38 of 378

1

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON MARCH   , 2001.

                                              REGISTRATION NO. 888-[      ]
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------

                                UNITED STATES
                    SECURITIES AND EXCHANGE COMMISSION
                          WASHINGTON, D.C. 20549
                          -----------------------

                                 FORM 10-K
                          -----------------------

    [X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
       SECURITIES EXCHANGE ACT OF 1934

              FOR THE FISCAL YEAR ENDED DECEMBER 31, 2000

                                    OR

    [ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
       SECURITIES EXCHANGE ACT OF 1934

       FOR THE TRANSITION PERIOD FROM _____ TO _____ .

                     COMMISSION FILE NO. 0-26275

                       INTUITIVE SURGICAL, INC.
            (EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)


              DELAWARE                           77-0416458
    (STATE OR OTHER JURISDICTION OF          (I.R.S. EMPLOYER
     INCORPORATION OR ORGANIZATION)          IDENTIFICATION NUMBER)


                       1340 W. MIDDLEFIELD ROAD
                    MOUNTAIN VIEW, CALIFORNIA 94043
                            (650) 237-7000
        (ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING
         AREA CODE, OF THE REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

    SECURITIES REGISTERED UNDER SECTION 12(b) OF THE EXCHANGE ACT: NONE

       SECURITIES REGISTERED UNDER SECTION 12(g) OF THE EXCHANGE ACT:

                     COMMON STOCK, $0.001 PAR VALUE

    Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days:  Yes [X]  No [ ]

    Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of the registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K or any
amendment to this Form 10-K.  [X]

    The aggregate market value of the voting stock held by non-affiliates of
the registrant, based upon the closing price of Common Stock on March 15, 2001,
as reported by Nasdaq, was approximately $202,498,680. Shares of voting stock
held by each officer and director and by each person who owns 5% or more of the
outstanding voting stock have been excluded in that such persons may be deemed
to be affiliates. This assumption regarding affiliate status is not necessarily
a conclusive determination for other purposes.

    The number of outstanding shares of the registrant's common stock on March
15, 2001 was 35,828,944.

                     DOCUMENTS INCORPORATED BY REFERENCE


    Part III -- Portions of the registrant's definitive Proxy Statement to be
issued in conjunction with the Registrant's Annual Meeting of Stockholders to be
held on May 24, 2001 are incorporated by reference into Part III.

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
    2

                        INTUITIVE SURGICAL, INC.

                              FORM 10-K
                  FOR THE YEAR ENDED DECEMBER 31, 2000

                          TABLE OF CONTENTS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1632.001-R**

Case No.  3:21-cv-03496-AMO
Date Entered_____
By_____
          Deputy Clerk

                                                              PAGE
                                                              ----

                              PART I

Item 1.    Business....................................................    1
Item 2.    Properties.................................................   18
████       ████████████████████████████████████████████████████████
Item 4.    Submission of Matters to a Vote of Security Holders.........   19

                              PART II

Item 5.    Market for Registrant's Common Equity and Related
           Stockholder Matters.......................................   20
Item 6.    Selected Financial Data...................................   20
Item 7.    Management's Discussion and Analysis of Financial Condition
           and Results of Operations.................................   21
Item 7A.   Quantitative and Qualitative Disclosures about Market
           Risks.....................................................   34
Item 8.    Financial Statements and Supplemental Data................   35
Item 9.    Changes in and Disagreements With Accountants on Accounting
           and Financial Disclosures.................................   35

                              PART III

Item 10.   Directors and Executive Officers of the Registrant..........   36
Item 11.   Executive Compensation....................................   36
Item 12.   Security Ownership of Certain Beneficial Owners and
           Management................................................   36
Item 13.   Certain Relationships and Related Transactions..............   36

                              PART IV

Item 14.   Exhibits, Financial Statement Schedules and Reports on Form
           8-K.......................................................   37
SIGNATURES...........................................................   38

                              i

      3

PART I

ITEM 1: BUSINESS

FORWARD LOOKING STATEMENTS

     This Annual Report on Form 10-K contains forward-looking statements based
on our current expectations about our company and our industry. You can identify
these forward-looking statements when you see us using words such as "expect,"
"anticipate," "estimate" and other similar expressions. These forward-looking
statements involve risks and uncertainties. Our actual results could differ
materially from those anticipated in these forward-looking statements as a
result of the factors described in the "Risk Factors" section of Management's
Discussion and Analysis of Financial Condition and Results of Operations and
elsewhere in this report. We undertake no obligation to publicly update any
forward-looking statements for any reason, even if new information becomes
available or other events occur in the future.

COMPANY BACKGROUND

     In this report, "Intuitive Surgical," "we," "us," and "our" refer to
Intuitive Surgical, Inc.

     Intuitive(TM)(R), da Vinci(TM), EndoWrist(TM), InSite(TM) and Navigator(TM)
are trademarks of Intuitive Surgical, Inc.

     We design and manufacture the da Vinci Surgical System, an advanced
surgical system that we believe represents a new generation of surgery -- the
third generation. We believe that this new generation of surgery, which we call
Intuitive surgery, is a revolutionary advance similar in scope to the previous
two generations of surgery -- open surgery and minimally invasive surgery, or
MIS. Our da Vinci System consists of a surgeon's console, a patient-side cart, a
high performance vision system and our proprietary instruments. By placing
computer-enhanced technology between the surgeon and patient, we believe that
our system enables surgeons to perform better surgery in a manner never before
experienced. The da Vinci Surgical System seamlessly translates the surgeon's
natural hand movements on instrument controls at a console into corresponding
micro-movements of instruments positioned inside the patient through small
puncture incisions, or ports. Our da Vinci Surgical System is the only
commercially available technology that can provide the surgeon with the
intuitive control, range of motion, fine tissue manipulation capability and 3-D
visualization characteristic of open surgery, while simultaneously allowing the
surgeon to work through the small ports of minimally invasive surgery.

     In March 1997, surgeons using an early prototype of our technology
successfully performed Intuitive surgery on humans. Beginning in May 1998,
surgeons using our technology successfully performed what we believe were the
world's first computer-enhanced closed chest heart surgeries, including mitral
valve repair, dissection of an internal mammary artery and grafting of a
coronary artery. In early 2000, surgeons using our technology successfully
completed what we believe was the world's first beating heart bypass procedure
using only small ports. ████████

██████████████████████████████ the da Vinci Surgical System to
assist in the control of Intuitive Surgical endoscopic instruments including:
rigid endoscopes, blunt and sharp endoscopic dissectors, scissors, scalpels,
forceps/pickups, needle holders, endoscopic retractors, stabilizers,
electrocautery, and accessories during laparoscopic surgical procedures such as
cholecystectomy or Nissen fundoplication. ███████████████████████████████
██████ non-cardiac thoracoscopic surgery ████████████████████████████████
██████. As of December 31, 2000, we have sold 40 of our da Vinci Surgical Systems
and surgeons using our technology have successfully completed over a thousand
surgery procedures of various types.

The first generation of surgery, open surgery, remains the predominant form
of surgery and is still used in almost every area of the body. However, the
large incisions required for open surgery create significant trauma to the
patient, resulting in long hospitalization and recovery times, high
hospitalization costs, as well as significant pain and suffering. Over the past
several decades, the second generation of surgery, MIS surgery, has reduced
trauma to the patient by allowing some surgeries to be performed through small
ports rather than large incisions, resulting in shorter recovery times, fewer
complications and reduced hospitalization costs. MIS

1
4

surgery has been widely adopted for certain surgical procedures, but it has not
been widely adopted for complex procedures. We believe surgeons have been slow
to adopt MIS surgery for complex procedures because they generally find that
fine tissue manipulations, such as dissecting and suturing, using these
techniques are more difficult to learn and perform, and are less precise, than
in open surgery.

Intuitive surgery overcomes many of the shortcomings of both open surgery
and MIS surgery. Surgeons operate while seated comfortably at a console viewing
a bright and sharp 3-D image of the surgical field. This immersive visualization
results in surgeons no longer feeling disconnected from the surgical field and
the instruments, as they do when using an endoscope in MIS surgery. While seated
at the console, the surgeon manipulates instrument controls in a natural manner,
just as he or she has been trained to do in open surgery. Our technology is
designed to provide surgeons with a range of motion in the surgical field
analogous to the motions of a human wrist, while filtering out the tremor
inherent in every surgeon's hand. In designing our products, we have focused on
making our technology as simple as possible to use. In our experience, based on
over a thousand procedures, surgeons can learn to manipulate our instruments
with only a short amount of training and can learn to perform Intuitive surgery
with less training than is required for MIS surgery.

Our products are designed to make a broad range of open surgical and MIS
procedures suitable for Intuitive surgery. The da Vinci Surgical System is
designed to allow surgeons to perform better surgery while providing patients
with the benefits of MIS surgery. We believe that these advantages will enable
us to drive a fundamental change in surgery.

ADDITIONAL BACKGROUND

We believe that there are three generations of surgical techniques: (1)
open surgery, which began its modern era in the 19th century, (2) MIS surgery,
which has developed over the past several decades and (3) Intuitive surgery,
which we have developed. Each generation of surgery has been enabled by the
development of an important technology or set of related technologies.

First Generation: Open Surgery

Modern open surgical technique developed in the second half of the 19th
century because of the combination of two medical breakthroughs: anesthesia and
sterile technique. Using open surgical techniques, a surgeon generally creates
an incision large enough to allow a direct view of the operating field and the
insertion of at least two human hands to manipulate the patient's tissues. Many
different types of hand-held instruments such as the scalpel, forceps, retractor
and clamp have been developed to enable the surgeon to manipulate tissue
precisely in almost every area of the body, and to accomplish complicated
movements such as suturing.

The large incisions generally used in open surgery create very significant
trauma to the patient, resulting in long hospitalization and recovery times,
high hospitalization costs, as well as significant pain and suffering. In most
cases, repairing damaged tissue is much less traumatic than creating the large
incisions necessary to expose that tissue. However, because the human hand has
an extremely wide range of motion and can grip open surgical instruments near
their tips to allow very precise and natural tissue manipulations, open surgical
technique is generally considered the most precise and the easiest technique for
the surgeon to perform. Despite trauma and other drawbacks, open surgery remains
the predominant form of surgical technique.

Second Generation: Minimally Invasive Surgery

Minimally invasive surgical techniques have evolved over the past few
decades, beginning with the development of the endoscope. The objective of MIS
surgery is to substantially reduce trauma to the patient by replacing the large
six- to twelve-inch incision typically required for open surgery with three or
more small puncture incisions, or ports. These ports are each approximately ten
millimeters, or less than one-half inch, in diameter. The ports are created in
the abdominal wall, chest wall, or other areas of the body in locations designed
to provide access to the organs on which the surgeon intends to operate. MIS
surgery generally results in shorter hospitalization and recovery times, reduced
hospitalization costs and substantially less pain and suffering.

5

2

During an MIS procedure, the surgeon inserts an endoscope through a port.
An endoscope makes use of fiber optics or fine glass tubes that allow the
surgeon to view a surgical field through a small incision. The endoscope
transmits an image to a television monitor so the surgeon can see the surgical
site and indirectly observe the operation. The surgeon inserts a variety of
long, hand-held instruments through the ports and manipulates the handles of
these instruments outside the patient's body to perform the operation inside the
patient's body. The instruments typically have tips similar to the corresponding
instrument tips used in open surgery, such as forceps or scissors. These tips
are connected to 15- to 18-inch or 35- to 45-centimeter long tubes, which are
connected to the handles.

Existing Limitations of Minimally Invasive Surgery. We believe that
surgeons generally find MIS surgical techniques more difficult to learn and
perform than open surgery for the following reasons:

- "Backward" Instrument Movements. Existing MIS instruments are essentially
  long rigid levers that rotate around a fulcrum, or pivot point, located
  at the port created in the body wall. As a result, the instrument tip
  moves in the opposite direction from the surgeon's hand. For example, to
  move the tip left, surgeons move the instrument handle to the right; to
  move the tip up, surgeons move the instrument handle down. Surgeons must
  relearn their hand-eye coordination to translate their hand movements in
  this "backward" environment into the required instrument movements.

- Restricted Motions. Existing MIS instruments provide surgeons less
  flexibility, dexterity and range of motion than their own hands provide
  in open surgical procedures. For example, MIS instruments in widespread
  use today do not have joints near their tips to replicate surgeons' hand
  and wrist movements used in open surgery to perform manipulations such as
  reaching behind tissue, suturing and fine dissection.

- Magnified Tremor and Exaggerated Instrument Movements. In open surgery,
  instruments are held near their tips, allowing fine movements of
  surgeons' hands to be directly translated into fine movements of the
  instruments. In MIS surgery, the length of MIS instruments magnifies
  surgeons' hand movements. As a result, the tremor inherent in a surgeon's
  hands is magnified, and the exaggerated motor movements caused by MIS
  instruments make fine tissue manipulation more difficult for the surgeon.
  The difficulty of these movements is analogous to the lack of precision
  one would experience in writing while holding the eraser end of a pencil.

- Poor Visualization. Since the video image from the endoscope is usually
  displayed on a video monitor, surgeons typically must look up and away
  from their hands, the patient and the instruments to see the surgical
  field on the monitor. This can give the MIS surgeon a feeling of being
  disconnected from the surgical field and the instruments. In addition,
  most endoscopes currently available give the surgeon only a
  two-dimensional image. Although three-dimensional endoscopes exist, they
  typically have diminished sharpness and lower brightness than
  two-dimensional endoscopes, making fine detail more difficult for the
  surgeon to see.

- Difficult to Learn. The combination of the inherent difficulties
  mentioned above makes conventional MIS surgical techniques difficult to
  learn. Although most surgeons are now trained in their residency programs
  in basic laparoscopic skills, a significant amount of advanced training
  is required for surgeons to become proficient in most MIS procedures. The
  need for extensive training revolves around the difficulty of learning
  certain laparoscopic skills such as suturing and precise dissection.
  Without the assistance of computer-enhanced techniques, these types of
  advanced laparoscopic skills take months of practice to learn and
  perfect.

Slowing MIS Procedure Conversion Rates. Despite the limitations of existing
MIS techniques, a number of procedures are routinely performed using
laparoscopic procedures. For example, laparoscopic cholecystectomy, removal of
the gall bladder through ports, is learned by most surgeons after a moderate
amount of training, in part because of the anatomical location of the
gallbladder and the relatively gross tissue manipulations required.
Consequently, laparoscopic cholecystectomy grew from a newly-introduced
procedure to the "standard of care" in the United States over approximately
three years, beginning in the late 1980s. In 1997, approximately 85% of
cholecystectomies in the United States were performed using MIS techniques.

3

6

We believe that the adoption rate of laparoscopic cholecystectomy has not
been replicated for most subsequently introduced MIS procedures because such
procedures have been more difficult to learn and perform. In addition, as a
result of these difficulties, many surgical procedures commonly performed using
open surgery have not been adapted to MIS surgical techniques.

The chart below sets forth the percentage of selected procedures that were
performed worldwide in 1997 using MIS surgical techniques:

Graph

Number of Procedures
Performed Using MIS

| | | | | |
|---|---|---|---|---|
| Surgical Techniques: | 1,173,000 | 1,098,000 | 234,000 | 198,000 | 39,000 |
| Total Number of Procedures Performed: | 1,804,000 | 2,540,000 | 1,170,000 | 1,430,000 | 1,065,000 |

-------------------
(1) 85% in United States.
Source: Medical Data International, Inc.

The Intuitive Surgical Solution: Third Generation Surgery

Our technology is designed to return to the surgeon the range of motion, fine tissue control and 3-D vision characteristic of open surgery while simultaneously allowing the surgeon to work through the ports used in MIS surgery. All this is accomplished in an intuitive manner, in the same way that the movements of a surgeon's hands in open surgery are entirely intuitive.

We believe that our technology overcomes many of the limitations of existing MIS surgery in the following ways:

- Natural Instrument Movements. Our technology is designed to directly transform the surgeon's natural hand movements outside the body into corresponding micromovements inside the patient's body. For example, a hand movement to the right outside the body causes the instrument inside the patient to be moved to the right, eliminating the backward nature of existing MIS surgery.

- EndoWrist Instruments Provide Natural Dexterity and Range of Motion. Our technology is designed to provide surgeons with a range of motion in the surgical field analogous to the motions of a human hand and wrist. Our proprietary instruments, which we call EndoWrist instruments, incorporate "wrist" joints that enable surgeons to reach behind tissues and suture with precision, just as they can in open surgery. The surgeon controls the joint's movements from the surgeon's console using natural hand and wrist movements. EndoWrist joints are located near the tips of all of our instruments.

- More Precise Movements and Reduced Tremor. With our technology, the surgeon can also use "motion scaling," a feature that translates, for example, a three millimeter hand movement outside the

4

7

patient's body into a one millimeter instrument movement in the surgical field inside the patient's body. Motion scaling is designed to allow greater precision than is normally achievable in both open and MIS surgery. In addition, our technology is designed to filter out the tremor inherent in every surgeon's hands.

- Immersive 3-D Visualization. Our vision system, which we call the InSite vision system, is designed to give surgeons the perception that their hands are immersed in the surgical field even though they are outside the patient's body. As a result, we believe that surgeons no longer feel disconnected from the surgical field and the instruments, as they currently do with MIS surgery. In addition, we believe that the InSite system provides a much brighter and sharper image than any other 3-D endoscope vision system. The InSite system also incorporates our proprietary Navigator camera control technology that allows the surgeon to easily change, move, zoom and rotate his or her field of vision. The combination of these features offers what we believe is the most advanced surgical vision system available today.

- Easy to Learn and Perform. In designing our products, we have focused on making our technology as simple as possible to use, even though it is inherently complex. We believe that tissue manipulations using our products are as natural as hand movements in open surgery. In our experience, based on feedback from surgeons who have performed hundreds of procedures, surgeons can learn to manipulate our instruments with only a short amount of training. Learning to perform surgical procedures using the da Vinci System will vary depending on the complexity of the procedure and the surgical team's experience with MIS surgery techniques.

- Multi-Specialty Surgical Platform. The da Vinci System is designed to enable surgeons to perform surgery in virtually any part of the body. To date, surgeons have used the da Vinci System to perform over 20 different types of surgical procedures.

We believe that these advantages give the patient the benefits of less traumatic MIS surgery while restoring to the surgeon the range of motion and fine tissue control possible with open surgery, along with further enhancements such as tremor reduction, motion scaling and superior visualization.

We believe that our technology has the potential to change surgical procedures in three basic ways:

- Convert Open Procedures to Intuitive Surgery. We believe our technology will make a number of surgical procedures that currently are performed only with open surgical techniques suitable for Intuitive surgery.

- Facilitate Difficult MIS Operations. We believe surgical procedures that today are performed only rarely using MIS techniques will be performed routinely and with confidence using Intuitive surgery. Some procedures have been adapted for port-based techniques but are extremely difficult and are currently performed by a limited number of highly skilled

surgeons. We believe our da Vinci System will enable more surgeons at more institutions to perform these procedures.

- Simplify Existing, High-Volume MIS Procedures. We believe surgical procedures that today are performed routinely using MIS techniques will be performed more quickly and safely with Intuitive surgery. For example, over the past decade, approximately 85% of gall bladder removals performed in the United States have been converted to MIS surgery. We believe that the da Vinci System will make these procedures easier, faster and more cost effective to perform.

INTUITIVE SURGICAL'S PRODUCTS

Our principal products include the da Vinci Surgical System and a variety of "smart disposable" EndoWrist instruments.

  da Vinci Surgical System

Surgeon's Console. The da Vinci System allows the surgeon to operate while comfortably seated at an ergonomic console viewing a 3-D image of the surgical field. The surgeon's fingers grasp the instrument controls below the display with wrists naturally positioned relative to his or her eyes. Using hardware, software,

5

  8

algorithms, mechanics and optics, our technology is designed to seamlessly translate the surgeon's hand movements into precise and corresponding real-time microsurgical movements of the EndoWrist instruments inside the patient.

Patient-Side Cart. The patient-side cart, which can be easily moved next to the operating table, holds electromechanical arms that manipulate the instruments inside the patient. Three arms attached to the cart can be easily positioned as appropriate, and then locked into place. The first two arms, one representing the left hand and one the right hand of the surgeon, hold our EndoWrist instruments. The third arm positions the endoscope, allowing the surgeon to easily change, move, zoom and rotate his or her field of vision.

3-D Vision System. The vision system includes our InSite high resolution 3-D endoscope with two separate vision channels linked to two high resolution, progressively scanned color monitors. The vision system also incorporates our InSite image processing equipment comprised of high performance video cameras, specialized edge enhancement and noise reduction equipment. The resulting 3-D image has high resolution and contrast and no flicker or cross-fading, which occurs in single monitor systems, and minimizes eye fatigue. Our vision system allows the surgeon to move his or her head in the viewer without affecting image quality.

  EndoWrist Instruments

We manufacture a variety of EndoWrist instruments, each of which incorporates a wrist joint for natural dexterity, with tips customized for various surgical procedures. These EndoWrist instruments are currently approximately seven millimeters in diameter. The instruments mount onto the electromechanical arms that represent the surgeon's left and right hands and provide the mechanical capability necessary for performing complex tissue manipulations through ports. At their tips, the various EndoWrist instruments include forceps, scissors, electrocautery, scalpels and other surgical tools that are readily familiar to the surgeon from open and MIS surgery. Generally, a variety of EndoWrist instruments are selected and used interchangeably during the surgery. Where instrument tips need to incorporate a disposable component, for example, scalpel blades, we sell disposable inserts. We plan to continue to add new types of EndoWrist instruments for additional types of surgical procedures.

The EndoWrist instruments are "smart disposables" because they are resterilizable and reusable for a defined number of procedures or hours of use. A custom computer chip inside each instrument performs several functions that help determine how the system and instruments work together. When an EndoWrist instrument is attached to an arm of the patient-side cart, the chip performs an "electronic handshake" that ensures the instrument was manufactured by us and recognizes the type and function of the instrument and number of past uses or hours. For example, the chip distinguishes between scissors and a scalpel and controls the unique functions of different instruments as appropriate. In addition, the chip will not allow the instrument to be used for more than the prescribed number of procedures or hours so that its performance meets specifications during each procedure. In addition, we can sell the instrument for a fixed number of uses or hours and effectively price our EndoWrist instruments on a per-procedure or per-hour basis.

USING THE DA VINCI SURGICAL SYSTEM

During a procedure, the patient-side cart is positioned next to the operating table with the electromechanical arms arranged to provide access to the initial ports selected by the surgeon. Metal tubes attached to the arms are inserted through the ports, and the EndoWrist instruments are introduced through the tubes into the patient's body. The surgeon then performs the procedure while sitting comfortably at the surgeon's console, manipulating the instrument controls and viewing the operation through our InSite vision system. When a surgeon needs to change an instrument, as is done many times during an operation, the instrument is withdrawn from the surgical field using the controls at the console, in similar fashion to the way a surgeon withdraws instruments from the patient in MIS surgery. A scrub nurse standing near the patient removes the unwanted instrument from the electromechanical arm and replaces it with the new instrument, in a process designed to be rapid enough not to disturb the natural flow of the procedure. As a result, the scrub nurse

plays a role similar to that played in open and MIS surgery. At the conclusion of the operation, the metal tubes are removed from the patient's body and the small incisions are sutured or stapled.

6

9

OUR STRATEGY

Our goal is to establish Intuitive surgery as the standard for complex surgical procedures and many other procedures currently performed using either open or MIS surgery. We intend to accomplish this objective both by pioneering new types of endoscopic surgery and by making existing MIS procedures easier, safer and more cost effective. Over time, our strategy is to broaden the number of procedures performed using the da Vinci Surgical System and to educate surgeons and hospitals as to the benefits of Intuitive surgery. Key elements of this strategy include:

Focus on Key Institutions. Our marketing efforts are focused on large multi-specialty care hospitals where a majority of complex surgical procedures are performed. Following the initial placement at a given hospital, we intend to expand the number of physicians who use the da Vinci Surgical System and work with the hospitals and their surgeons to promote patient education as to the benefits of Intuitive surgery. We believe that these efforts will result in increased usage per system, leading to high volume sales of instruments and sales of additional systems at each hospital. In addition, we believe such efforts will benefit early-adopting hospitals by increasing their market share in the procedures and specialties that benefit from Intuitive surgery. We expect these efforts to increase demand for our products among competitive hospitals, surgeons and referring physicians.

Focus on Leading Surgeons to Drive Rapid and Broad Adoption. We will place significant emphasis on marketing the da Vinci Surgical System to leading surgeons who are considered to be the "thought leaders" in their institutions and fields. These surgeons typically perform complex surgical procedures that are currently not adaptable to MIS techniques. For example, cardiac procedures, of which over one million are currently performed annually worldwide, are among the most difficult to perform using MIS techniques. This strategy puts surgeons at the forefront of procedure development and provides them an opportunity to maintain a competitive edge in their specialty. We believe that early adoption of our products by surgical thought leaders will give many other surgeons the confidence that the da Vinci Surgical System can be used for all types of surgical procedures.

Develop Protocols for New Surgical Procedures. We intend to leverage our relationships with key institutions and surgical thought leaders to develop protocols for new surgical procedures. These protocols would include guidance on patient screening, port placement, interaction of the surgical team and advice on the sequence and selection of tools and maneuvers. We believe that establishing protocols for a given procedure will facilitate the broader adoption of Intuitive surgery for that procedure.

Maintain Market Leadership. We intend to maintain our leadership advantage by continuing to develop and enhance our technology and to communicate the benefits of our da Vinci Surgical System to surgeons, hospitals and patients. We will continue to improve our da Vinci Surgical System through software and hardware enhancements and by developing new surgical instruments. We will also continue to develop our surgical platform to facilitate and support future surgical innovations.

CLINICAL CONTRIBUTIONS

We believe our technology is capable of enhancing or enabling a wide variety of procedures in many surgical specialties. To date, surgeons using our da Vinci Surgical System have performed over a thousand surgery procedures of various types including general and vascular surgery, gynecologic and urologic surgery, and cardiovascular surgery. These applications, as well as potential applications for orthopedic surgery, are described below.

General and Vascular Surgery

Aortic Aneurysms. A common vascular procedure is the repair of aortic aneurysms, which are sacs formed by the dilation of the wall of the main artery in the body. Aneurysms are caused primarily by atherosclerosis, which is characterized by the deposition of fatty substances in large and medium-sized arteries, such as the arteries that lead to the heart and brain. Surgical treatment involves clamping the aorta and making long incisions at multiple sites to resect and replace the aneurysm with a synthetic graft. Once the

7

10

aorta is clamped, time is of the essence, since procedures are typically done without heart/lung bypass machines. Thus, only a narrow window of time for completion is available. Currently, some aneurysms are treated by intravascular stent-grafts. These stent-grafts can be inserted through the main artery in the thigh, called the femoral artery, and do not require an incision. However, the necessity of traversing the femoral artery to gain access to the aorta limits the usage of this technique. We believe that the capability of our technology to deliver to the surgeon enhanced dexterity and the ability to suture grafts, alone or in conjunction with stent-grafts, will help convert this procedure from open surgery to Intuitive surgery.

Aorto-Femoral Bypass. The lower portion of the abdominal aorta is often a location of atherosclerosis. Atherosclerotic blockage of this portion of the aorta restricts blood flow to the lower body. To treat this condition using open

surgery, a synthetic graft is attached above and below the blockage. This procedure currently requires open surgery because of the need to suture the grafts in place. We believe that with our technology, surgeons will be able to perform the required suturing of arteries, called an anastomosis, through ports and avoid the large incision currently required.

Cholecystectomy. Removal of the gallbladder, or cholecystectomy, is the most common procedure performed by general surgeons. The procedure is used to treat cholecystitis, which is an inflammation of the gall bladder. Although a minimally invasive approach, called a laparoscopic cholecystectomy, is now well accepted for routine cases, there is great variability in the level of skill required to accomplish the procedure. The skill level necessary to complete a laparoscopic cholecystectomy is dependent on the disease status the surgeon discovers after the abdomen is entered. For example, acute cholecystitis can result in inflammation and the abnormal union of tissues resulting from the formation of new fibrous tissue in the inflammatory process. As a result, very meticulous surgery to access gallbladder anatomy can be required. Similarly, during the operation, the surgeon may find a condition known as choledocolithiasis, or stones in the common bile duct. The surgeon may choose to incise or cut the common duct to extract stones that are caught between the liver and intestine. Exploration of the common bile duct is an extremely delicate procedure that requires micro-sutures to be placed in the common duct. Most surgeons will not do this procedure laparoscopically because of its difficulty. This usually results in a conversion to open technique or another surgical or delicate gastrointestinal endoscopic procedure to extract the stones. With our technology, we believe that the surgeon will have expanded capability to deal with complicated cholecystectomies and can avoid subjecting the patient to a second procedure.

Nissen Fundoplication. Nissen fundoplication is a general surgical procedure that is performed to correct esophageal reflux. Esophageal reflux disease is a digestive disorder that affects the muscle connecting the esophagus with the stomach. As an elective procedure, Nissen fundoplication is currently performed on only a small fraction of candidates who suffer from this condition because the open surgical procedure is quite invasive. An MIS alternative exists, but there are only a limited number of surgeons skilled in the procedure. We believe that our technology will significantly improve the ease of performing the Nissen procedure through ports. Specifically, our technology will address the two most difficult steps in this procedure, which are made more difficult by existing MIS techniques, esophageal dissection and suturing of the fundus of the stomach. If adoption of our technology becomes widespread for Nissen procedures, we believe that the number of surgeons able to perform a Nissen procedure using port-based techniques will increase. Further, we expect that the widespread availability of a port-based approach may significantly expand the number of surgeries performed.

Colon Resection. Removal of the colon or large bowel is a common general surgical procedure done for both benign and malignant disease. Colon resection is accomplished in a variety of ways by removing all or part of the colon. These procedures are complicated and involve resecting a portion of diseased tissue and then re-anastomosing the two ends of the colon to re-establish continuity of intestinal flow. When using existing MIS techniques, the challenge is to have enough manipulating capability to perform fine dissection of the colon and then to be able to sew or staple the ends of the bowel to accomplish the re-anastomosis. The MIS procedure is currently performed by only a small fraction of general surgeons. By making dissection significantly more precise, we believe that our products will allow port-based colon resection to be performed more widely.

8

11

Hernia Repair. An inguinal hernia is a condition in which tissue protrudes through the wall of the pelvis. It is caused by a defect or weakness in the lining covering the pelvic region. Repair of inguinal hernia is the second most common procedure done in general surgery. There are a variety of hernia procedures available that use both open and MIS techniques. However, the lack of precise dissection capability inhibits adoption of the MIS procedures. Specifically, the delicate dissection of some of the structures and the peritoneal sac, which often adheres to the pelvic anatomy, is very difficult for surgeons to accomplish using MIS techniques. We believe that our technology will encourage surgeons to convert hernia procedures to the port-based approach by removing the training barrier that limits its adoption.

Gynecologic Surgery

General Gynecology. Laparoscopy has been used for several decades in a large number of diagnostic infertility procedures. Although there are a variety of therapeutic infertility procedures that can currently be performed by some gynecologists using existing MIS techniques, these procedures are relatively difficult to perform using existing MIS tools because of the lack of tissue control, inability to perform fine dissection, and limited suturing capability. We believe that our technology will provide gynecologists with the ability to do sophisticated procedures such as tubal re-anastomosis and dissection of ovarian cysts, as well as common procedures such as surgical removal of an ovary or fallopian tube.

Hysterectomy. Removal of the uterus is one of the most commonly performed surgeries in gynecology and it can be done by using open or MIS techniques. Like colon resection, it demands a significant degree of tissue manipulation in the dissection and ligation, or tying, of blood vessels, ligaments and other pelvic structures. Further, laparoscopic techniques used in this procedure increase the risk of injury to the ureters, which are vital structures that provide the conduit for urine between the kidney and bladder. It is often difficult to ensure the identification and prevention of injury to the ureters and bladder with conventional MIS instruments because of the limited angles at which these

4-SER-850

instruments can be positioned. We believe that our products will increase the surgeon's dexterity in this procedure and, as a result, will have a significant impact on safety, operating time, and rate of adoption of port-based techniques in hysterectomy.

Bladder Neck Suspension. Bladder incontinence is a widespread condition affecting middle aged women, which can be treated surgically with a procedure known as bladder neck suspension. This procedure involves elevation of the bladder neck by suspension with sutures, surgically recreating the normal angle of the urethra and re-establishing bladder sphincter control. The procedure works well in open surgery and is the "gold standard" for correction of bladder incontinence. However, because of its long recovery time, many candidates are discouraged from undergoing the procedure using open surgical technique. Instead, they use adult diapers for their incontinence, which is an embarrassment and inconvenience. Bladder neck suspension can currently be done laparoscopically but is difficult to perform because of the need to suture at awkward angles using existing MIS instruments. We believe that our technology may provide a better solution for suturing the bladder neck and would represent an advance in the ease of performing incontinence surgery.

Orthopedic Surgery

Arthroscopy. Many knee surgeries are accomplished by an MIS technique called arthroscopy. This technique is well accepted in the surgical community. However, many of the more sophisticated maneuvers in arthroscopy, such as suturing torn meniscal tissue, are very difficult with existing MIS instruments. The meniscus is a structure located in the knee joint that provides a surface and cushion upon which the bones of the knee joint can move. We believe that our technology and the capabilities of our EndoWrist instruments will increase the ease with which complex arthroscopic procedures such as advanced knee and shoulder arthroscopy can be performed.

Spinal Surgery. Disc removal and spinal fusion are common procedures performed in open spinal surgery. MIS techniques where surgeons approach the spine through the abdomen and use laparoscopic methods to expose the anterior portion of the spine and lumbar disc space are just emerging. This procedure requires both delicate and precise dissection and retraction of tissue, and would benefit greatly from the

9

12

enhanced capabilities offered by the da Vinci Surgical System. We believe that our technology may make this procedure safer, easier, more precise, and allow more surgeons to perform it with confidence.

Cardiothoracic Surgery

Internal Mammary Artery Dissection. In a coronary artery bypass graft procedure used in cardiac surgery, a blocked coronary artery is bypassed with a graft. When available, an artery from the chest called the internal mammary artery is dissected from its natural position and grafted into place to perform the bypass. Because the internal mammary artery is located on the underside of the anterior surface of the chest, dissection of the vessel is challenging using existing surgical instruments through the three- to five-inch incision currently used in a coronary artery bypass graft procedure. Our products have multiple joints that emulate the surgeon's shoulders and elbows, allowing exact positioning of the instruments inside the patient's chest. In addition, the EndoWrist joints permit the surgeon to reach behind the tissues for easier dissection of the internal mammary artery. Thus, we believe that the internal mammary artery can be dissected with greater ease and precision using our technology.

Coronary Anastomosis. Coronary artery bypass graft surgery demands that the surgeon delicately dissect and precisely suture very small structures, which are less than two millimeters in diameter, under significant magnification. These procedures are difficult when performed in open surgery. They are even more difficult when performed using an endoscopic or limited incision approach, and extraordinarily difficult to perform when the heart is beating. As a result, this procedure is typically done as open surgery by stopping the heart and using a heart/lung bypass machine. Our technology is designed to allow surgeons to perform scaled instrument movements that can be even more precise than the movements used in open surgery, thus enabling precise suturing of single and multiple coronary vessels on a stopped or beating heart.

Mitral and Aortic Valve Repair/Replacement. Valve repair and replacement surgeries are challenging even when using open surgical techniques. Significant exposure of the surgical field is essential to the identification and precise manipulation of valves and other structures inside the heart, and is key to successful surgical outcomes with minimal complications. Motion scaling allows a surgeon using our da Vinci Surgical System to maneuver instruments inside the patient even more precisely than is possible in open surgery. Our system has already enabled heart valve repairs to be performed through small ports in a manner that could not have been accomplished with open surgery. Replacement of valves currently requires a small incision, even if the majority of the procedure is eventually performed through ports using our technology, because the replacement valve itself is too large to be inserted into the chest through a port. However, new valve designs that can be delivered through ports are being developed, and the small incisions necessary today to deliver a replacement valve to the heart may eventually not be required, allowing a surgeon using the da Vinci Surgical System to replace a valve entirely using ports.

Thoracoscopy. A number of procedures performed in the thorax, or chest cavity, can be accomplished by minimally invasive methods. These methods are generally referred to as thoracoscopic procedures. They include various types of lung resection, biopsy procedures, node dissections, nerve resections and

esophageal surgery. Conventional thoracoscopic tools have all the limitations of conventional laparoscopic tools, such as "backward" movement and limited range of motion. The capability of our technology to operate dexterously in the often very small and restrictive space of the chest cavity is believed to offer significant clinical value in the performance of advanced thoracoscopic procedures.

MARKETING AND DISTRIBUTION

We market our products through a direct sales force in the United States and most of Europe. We have also entered into agreements with distributors in Italy and Japan. Our marketing and sales strategy in the United States and Europe involves the use of a combination of area sales managers, technical sales representatives and clinical training specialists. As of December 31, 2000, we had 41 employees in sales and marketing. We expect to significantly increase our sales and marketing force as we expand our business.

The role of our technical sales representatives is to educate physicians and surgeons on the advantages of Intuitive surgery and the clinical applications that our technology makes possible. We also train our technical
10

13

sales representatives to educate hospital management on the potential benefits of early adoption of our technology and the potential for increased local market share that may result from Intuitive surgery. Once a hospital has installed a da Vinci Surgical System, our sales force will help introduce the technology to other surgical specialties within the hospital.

Clinical training specialists provide training and support to physicians and other hospital staff. We employ service technicians to install our da Vinci(TM) Surgical Systems and to provide non-clinical technical expertise, upgrades, service and maintenance. We believe that this combination of technical sales representatives, clinical training specialists and service technicians provides an appropriate balance of professional selling skills while maintaining an appropriate level of technical expertise in the field.

Our da Vinci Surgical System has a lengthy sales and purchase order cycle because it is a major capital item and requires the approval of senior management at purchasing institutions. Particularly during the period in which our sales volume is low, this may contribute to fluctuations in our quarterly operating results.

TECHNOLOGY

Using key technologies, we have designed the da Vinci Surgical System to ensure intuitive control and fail-safe operation of the system. The system updates arm and instrument positions over 1000 times per second, thereby ensuring real-time connectivity between the surgeon's hand movements and the movements of the instrument tips. A backup battery is included in the system that can power the system for more than 20 minutes in case of power loss or fluctuation. This 20-minute period is believed to be sufficient either to reestablish the power supply or for the hospital back-up power system to become effective.

Monitoring the operation of the system at all times is a network of approximately 20 micro-controllers that checks for proper system performance. System misuse or system fault can be detected and the system can be transitioned to a safe state in micro-seconds. The system also includes a sensor that detects the presence of the surgeon's head in the viewer. If the surgeon removes his or her head from the viewer, the system automatically disengages and locks the instruments in place to prevent their inadvertent movement.

The instrument controls at the surgeon's console have eight degrees of freedom of motion that allow the surgeon to move each hand through a workspace approximately one cubic foot in volume. These degrees of freedom allow the surgeon to orient his or her hands without limitation. The instrument controls are constructed with very low friction cables and gear transmissions to ensure smooth operation. Furthermore, critical components are constructed of magnesium and titanium to provide high mechanical stiffness and low inertia, ensuring a light and responsive feel to the surgeon.

The electromechanical arms of the patient-side cart are gravitationally counterbalanced to allow for smooth, easy and safe positioning of the instruments in the patient. The arms have seven degrees of freedom, allowing for control of position, orientation, translation and grip of the instrument, all inside the body. Redundant sensors are designed to ensure fail-safe operation of the instrument tips.

Unlike other 3-D systems, our InSite vision system relies on two entirely separate vision channels. Two eyepieces are linked by a precisely designed optical assembly to two high resolution, and high contrast medical grade monitors, which have been specially designed to have a high visual update rate that eliminates flicker and thus, reduces eye fatigue. Our stereo endoscope uses two separate high resolution optical channels to improve image clarity. The stereo images pass through video processing electronics that provide specialized edge enhancement and noise reduction. A foot switch at the surgeon's console operates a focus controller on the endoscope. The endoscope self-regulates the temperature of its tip to eliminate fogging during procedures.

Our EndoWrist instruments use a wrist joint architecture driven by six tiny but very high strength, flexible tungsten cables. Each tungsten cable is a "metal rope" constructed from over 200 fibers that are each less than one thousandth of an inch in diameter. These cables are similar in function to the tendons of a human wrist and are used to drive fluid motions of the wrist joint. The instruments each contain a custom memory chip that records and stores data

each time the instrument is placed on the system. The chip contains encrypted
security codes to protect against use of non-Intuitive Surgical instruments so
that only our instruments will work with the da Vinci Surgical System. The chip
identifies the type of tool being inserted so that different instrument

                                    11

    14

types can be controlled uniquely by the system. The chip also records usage of
the instrument and expires the instrument after its prescribed life.

INTELLECTUAL PROPERTY

     Since our inception in late 1995, we have encountered and solved a number
of technical hurdles. We have patented and continue to pursue patent and other
intellectual property protection for the technology that we have developed to
overcome such hurdles. In addition to developing our own patent portfolio, we
have spent significant resources in acquiring exclusive license rights to
necessary and desirable patents and other intellectual property from SRI
International and IBM, who were early leaders in applying robotics to surgery.
One of the strengths of our portfolio is that the licensed SRI International and
IBM patents have original filing dates as early as January 1992 and June 1991,
respectively. We have also exclusively licensed a patent application from MIT
concerning robotic surgery. In April 2000, we exclusively licensed an extensive
minimally invasive heart surgery patent portfolio from Heartport, Inc. in the
field of robotic surgery. These patents cover many different forms of minimally
invasive robotic surgery, including single- and multi-vessel coronary artery
bypass grafts, heart valve repair and replacement and beating heart
stabilization. As of February 14, 2001, we hold exclusive field-of-use licenses
for 63 United States patents and approximately 40 foreign patents, and own
outright five U.S. patents that expire in 2016. We also own or have licensed
numerous pending United States and foreign patent applications, six of which
were recently allowed. Our patents and patent applications relate to a number of
important aspects of our technology, including our surgeon's console,
electromechanical arms, vision system and our EndoWrist instruments. We intend
to continue to file additional patent applications to seek protection for other
proprietary aspects of our technology.

     Our success will depend in part on our ability to obtain patent and
copyright protection for our products and processes, to preserve our trade
secrets, to operate without infringing or violating valid and enforceable
proprietary rights of third parties, and to prevent others from infringing our
proprietary rights. We intend to take action to protect our intellectual
property rights when we believe doing so is necessary and appropriate. In
addition, our strategy is to actively pursue patent protection in the United
States and in foreign jurisdictions for technology that we believe is
proprietary and that offers a potential competitive advantage, and to license
appropriate technologies when necessary or desirable. We cannot be certain that
we will be able to obtain adequate protection for our technology or licenses on
acceptable terms. Furthermore, if any protection we obtain is reduced or
eliminated, others could use our intellectual property without compensating us,
resulting in harm to our business. In addition, the laws of certain foreign
countries do not protect intellectual property rights to the same extent as do
the laws of the United States. See "Item 7: Management's Discussion and Analysis
of Financial Condition and Results of Operations -- Factors Affecting Operating
Results." Others may assert that our products infringe their intellectual
property rights, which may cause us to engage in costly disputes and, if we are
not successful in defending ourselves, could also cause us to pay substantial
damages and prohibit us from selling our products. In this regard, see "Item 3:
Legal Proceedings" for a description of pending cases and interferences before
the U.S. Patent and Trademark Office regarding our da Vinci Surgical System.

  SRI International License Agreement

     After receiving funding in 1990 from the U.S. Advanced Research Projects
Agency, SRI International conducted research to develop a "telesurgery" system
to allow surgeons to perform surgery on the battlefield from a remote location.
SRI International developed the precise electromechanics, force-feedback
systems, vision systems and surgical instruments needed to build and demonstrate
a prototype system that could accurately reproduce a surgeon's hand motions with
remote surgical instruments. In 1995, John G. Freund, M.D., one of our founders,
acquired an option to license SRI International's telesurgery technology, which
resulted in SRI International granting us a license.

     Under the terms of our license agreement with SRI International, we have an
exclusive, worldwide, royalty-free license to use the SRI International
technology developed before September 12, 1997, including all patents and patent
applications resulting from such work, in the field of manipulating tissues and
medical

                                    12

    15

devices in animal and human medicine, including surgery, laparoscopic surgery
and microsurgery. We also have the right of first negotiation with respect to
any SRI International technology developed in these areas before September 12,
1999 but after September 12, 1997.

     Our license with SRI International will terminate upon the last expiration
of the patents licensed from SRI International or December 31, 2012, whichever
is later. Currently, the last patent expiration date is in 2016, although this
could change. SRI International may terminate this license in the event of a
material, uncured breach of our obligations. In the event SRI International
terminates the license, we cannot assure you that the necessary licenses could
be reacquired from SRI International on satisfactory terms, if at all.

  IBM License Agreement

IBM conducted research on the application of computers and robotics to surgery during the late 1980s and early 1990s. IBM performed some of this work in conjunction with the Johns Hopkins Medical Center. Our license agreement with IBM covers a number of technologies related to the application of computers and robotics to surgery. Under the terms of this agreement, we have an exclusive, worldwide, royalty-free license to a number of IBM patents and patent applications in the field of surgery performed on animals and humans. We also have a non-exclusive license from IBM to practice in the areas of neurology, ophthalmology, orthopedics and biopsies. Under the license, we are obligated to make two future payments tied to revenue milestones, one of which will be made in 2001. The IBM license agreement will terminate upon the last expiration of the licensed patents. Currently, the last patent expiration date is in 2016, although this could change. IBM may terminate the license in the event that we fail to make the required payments. In the event IBM terminates the license agreement, we cannot assure you that necessary licenses could be reacquired from IBM on satisfactory terms, if at all.

### MIT License Agreement

After receiving funding from the U.S. Department of the Army, several researchers at MIT conducted research on various aspects of robotic surgical systems. As a result of that work, several patent applications were filed. Both MIT and the Army waived their rights to all but one of these applications, which the inventors ultimately assigned to us. MIT owns the other application. Under the terms of our license agreement with MIT, we have an exclusive, worldwide, royalty-free license to this patent application in the field of medical devices. The MIT license will terminate upon the last expiration of any patents issuing from the licensed patent application. MIT also has the right to terminate the MIT license in the event of a material, uncured breach of our obligations under the license. In the event MIT terminates the license, we cannot assure you that we would be able to reacquire a license from MIT on satisfactory terms, if at all.

### Heartport, Inc. License Agreement

Since its inception in the early 1990s, Heartport, Inc. has developed an extensive patent portfolio covering systems and methods for performing many different aspects of minimally invasive heart surgery, including single- and multi-vessel coronary artery bypass grafts, heart valve repair and replacement, and beating heart stabilization. In April 2000, we acquired an exclusive, worldwide license in the field of robotic surgery to much of Heartport's portfolio, including 33 issued U.S. patents so far and many still-pending U.S. and foreign applications. The license is royalty-free unless we sell instruments for robotic surgery procedures that are not operated by the robotic surgery system, in which case we pay a small royalty.

Our license will terminate upon the last expiration of the patents licensed from Heartport. Currently, the last patent expiration date is in 2015, although this could change. Heartport may terminate the license in the event of a material, uncured breach of our obligations. In the event Heartport terminates the license, we cannot assure you that the necessary or desirable licenses could be reacquired from Heartport on satisfactory terms, if at all. Intuitive's exclusive license survives Johnson & Johnson's recently announced acquisition of Heartport.

13

16

## RESEARCH AND DEVELOPMENT

Substantially all of our research and development activity is performed internally. Our research and development team is divided into four groups: software engineering, systems analysis, electrical engineering and mechanical engineering. In addition, various members of the research and development team support the design and development of the manufacturing processes used in fabricating our products.

## MANUFACTURING

We have a 13,000 square foot manufacturing facility in Mountain View, California. We have used this facility and our manufacturing personnel to produce the systems and instruments that have been sold to date and used in clinical trials. The manufacture of our products is a complex operation involving a number of separate processes and components. █████████████████
████████████████████████████████████████████████████

We purchase both custom and off-the-shelf components from a large number of certified suppliers and subject them to stringent quality specifications. We periodically conduct quality audits of suppliers and have established a supplier certification program. Some of the components necessary for the assembly of our products are currently provided to us by sole source suppliers or single source suppliers. We purchase components through purchase orders rather than long-term supply agreements and generally do not maintain large volumes of inventory. The disruption or termination of the supply of components could cause a significant increase in the costs of these components, which could affect our profitability. A disruption or termination in the supply of components could also result in our inability to meet demand for our products, which could harm our ability to generate revenues, lead to customer dissatisfaction and damage our reputation.

## COMPETITION

We consider our primary competition to be existing open or MIS surgical techniques. Our success depends in part on convincing hospitals, surgeons and

patients to convert procedures to Intuitive surgery from open or existing MIS surgery.

We also face competition from several companies that are developing new approaches and products for the minimally invasive surgery market, and, in particular, minimally invasive cardiac surgery. Many of these companies have an established presence in the field of MIS, including Boston Scientific Corporation, CardioThoracic Systems, Inc., a division of Guidant Corporation, C.R. Bard, Inc., Guidant Corporation, Heartport, Inc., Ethicon Endo-Surgery, Inc., a division of Johnson & Johnson, Medtronic, Inc., and United States Surgical Corporation, a division of Tyco International Ltd. If we are unable to compete successfully with these companies our revenues will suffer.

In addition, a limited number of companies are using robots and computers in surgery, including Brock Rogers Surgical, Inc., Computer Motion, Inc., Integrated Surgical Systems, Inc., Johns Hopkins University Engineering Research Consortium, Maquet AG, MicroDexterity Systems, Inc., Armstrong Healthcare Ltd., and Ross-Hime Designs, Inc. Our revenues may be reduced or eliminated if our competitors develop and market products that are more effective or less expensive than our products.

We believe that the primary competitive factors in the market we address are capability, safety, efficacy, ease of use, price, quality, reliability, and effective sales, support, training and service. The length of time required for products to be developed and to receive ███████████ reimbursement approval is also an important competitive factor.

14

17





THIRD-PARTY REIMBURSEMENT

In the United States and international markets where we intend to sell our products, the government and health insurance companies together are responsible for hospital and surgeon reimbursement for virtually all surgical procedures. Governments and insurance companies generally reimburse hospitals and physicians for surgery when the procedures are considered non-experimental and non-cosmetic. In the United States, reimbursement for medical procedures under the Medicare and Medicaid programs is administered by the Health Care Financing Administration. Generally speaking, procedure codes are assigned by the American Medical Association using the copyrighted Current Procedural Terminology codes, which are in turn incorporated in the Medicare and Medicaid programs coding system. Applications for new procedure codes may be submitted to the American Medical Association.

Governments and insurance companies carefully review and increasingly challenge the prices charged for medical products and services. Reimbursement rates from private companies vary depending on the procedure performed, the third-party involved, the insurance plan involved, and other factors. Medicare reimburses hospitals a prospectively determined fixed amount for the costs associated with an in-patient hospitalization based on the patient's discharge diagnosis, and reimburses physicians a prospectively determined fixed amount based on the procedure performed. This fixed amount is paid regardless of the actual costs incurred by the hospital or physician in furnishing the care and is unrelated to the specific devices used in that procedure. Thus, any reimbursements that hospitals obtain for performing surgery with our products will generally have to cover any additional costs that hospitals incur in purchasing our products.

Domestic institutions will typically bill the services performed with our products to various third-party payors, such as Medicare, Medicaid and other government programs and private insurance plans. ██████████████████

██████ Medicare reimbursement is available for use of the device in laparoscopic and thoracoscopic procedures and procedures conducted under an approved investigational device exemption application. We believe that the additional procedures we intend to target are generally already reimbursable by government agencies and

17

20

insurance companies. If hospitals do not obtain sufficient reimbursement from third-party payors for procedures performed with our products, or if governmental and private payors' policies do not permit reimbursement for surgical procedures performed using our products, we may not be able to generate the revenues necessary to support our business. In such circumstances, we may have to apply to the American Medical Association for a unique Current Procedural Terminology code covering computer-enhanced surgery. If an application for a unique code is required, reimbursement for any use of our products may be unavailable until an appropriate code is granted. The application process, from filing until adoption of a new code, can take two or more years.

In countries outside the United States, reimbursement is obtained from various sources, including governmental authorities, private health insurance plans, and labor unions. In most foreign countries, private insurance systems may also offer payments for some therapies. Additionally, health maintenance organizations are emerging in certain European countries. To effectively conduct our business, we may need to seek international reimbursement approvals, and we do not know if these required approvals will be obtained in a timely manner or at all.

Any regulatory or legislative developments in domestic or foreign markets that eliminate or reduce reimbursement rates for procedures performed with our products could harm our ability to sell our products or cause downward pressure on the prices of our products, either of which would affect our ability to generate the revenues necessary to support our business.

EMPLOYEES

As of December 31, 2000, we had 183 employees, 40 of whom were engaged

directly in research and development, 68 in manufacturing and service and 75 in
marketing, sales, and administrative activities. None of our employees are
covered by a collective bargaining agreement, and we consider our relationship
with our employees to be good.

ITEM 2: PROPERTIES

     We lease approximately 50,000 square feet in Mountain View, California. The
facility is leased through February 2002, and we have an option to extend the
lease for an additional three-year term. We believe that this facility will be
adequate to meet our needs through 2001.



18

21

ITEM 4: SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

    None.

                                    19
    22

PART II

ITEM 5: MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

PRICE RANGE OF COMMON STOCK

    Our common stock has been traded on The Nasdaq Stock Market under the
symbol "ISRG" since June 13, 2000. The following table sets forth the high and
low sales prices of our Common Stock for the periods indicated and are as
reported by Nasdaq.

| QUARTER | HIGH | LOW |
| ------- | -------- | ------- |
| Second Quarter 2000.................................... | $11.1250 | $7.8750 |
| Third Quarter 2000..................................... | 19.0625 | 9.4375 |
| Fourth Quarter 2000.................................... | 15.0625 | 5.3750 |

    As of December 31, 2000, there were approximately 267 stockholders of
record of our common stock, although we believe that there are a significantly
larger number of beneficial owners of our common stock.

DIVIDEND POLICY

    We have never declared or paid any cash dividends. We currently expect to
retain earnings for use in the operation and expansion of our business, and
therefore do not anticipate paying any cash dividends for at least the next four
years.

USE OF PROCEEDS

    Our initial public offering of common stock was effected through a
Registration Statement on Form S-1 (File No. 333-33016) that was declared
effective by the SEC on June 13, 2000, and pursuant to which we sold 5,750,000
shares of common stock that had been registered.

    Our initial public offering was completed after the shares of common stock
that were registered were sold. The managing underwriters in the offering were
Lehman Brothers Inc., Bear, Stearns & Co., Inc., FleetBoston Robertson Stephens
Inc. and UBS Warburg LLC. The aggregate offering price of the 5,750,000 shares
registered and sold was $51.8 million. Of this amount, $3.6 million was paid in
underwriting discounts and commissions, and an additional $1.4 million of
expense was incurred through December 31, 2000. None of the expenses were paid,
directly or indirectly, to directors, officers or persons owning 10 percent or
more of our common stock, or to our affiliates. As of December 31, 2000, we had
applied the estimated aggregated net proceeds of $46.8 million from our initial
public offering as follows:

    Short-term investments $46.8 million

    The foregoing amounts represent our best estimate of our use of proceeds
for the period indicated. No such payments were made to our directors or
officers or their associates, holders of 10% or more of any class of our equity
securities or to our affiliates, other than payments to officers for salaries in
the ordinary course of business.


ITEM 6: SELECTED CONSOLIDATED FINANCIAL DATA

    The following selected consolidated financial data should be read in
conjunction with the Consolidated Financial Statements and the accompanying
Notes to such Consolidated statements and "Management's Discussion and Analysis
of Financial Condition and Results of Operations" included elsewhere in this
Form 10-K. The selected data in this section is not intended to replace the
consolidated financial statements.

    The consolidated statements of operations data for the years ended December
31, 2000, 1999 and 1998 and the consolidated balance sheet data at December 31,
2000 and 1999, are derived from our consolidated financial statements which have
been audited by Ernst & Young LLP and included elsewhere in this Form 10-K. The
consolidated statement of operations data for the year ended December 31, 1997
and for the period from inception (November 9, 1995) through December 31, 1996
and the consolidated balance sheet

                                    20
    23

data at December 31, 1998, 1997 and 1996 are derived from our audited
consolidated financial statements that are not included in this Form 10-K.
Historical results are not indicative of the results to be expected in the
future.

|  | YEAR ENDED DECEMBER 31, | | | | PERIOD FROM INCEPTION (NOVEMBER 9, 1995) TO DECEMBER 31, |
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
| --- | --- | --- | --- | --- | --- |
|  | (IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | |
| CONSOLIDATED STATEMENTS OF OPERATIONS DATA: |  |  |  |  |  |
| Sales.......................................... | $ 26,624 | $ 10,192 | $ -- | $ -- | $ -- |
| Cost of sales................................. | 18,031 | 9,273 | -- | -- | -- |
| Gross profit................................... | 8,593 | 919 | -- | -- | -- |
| Operating costs and expenses: |  |  |  |  |  |
|   Research and development................... | 11,734 | 11,130 | 23,208 | 14,282 | 2,934 |
|   Selling, general and administrative..... | 19,136 | 9,338 | 7,565 | 4,434 | 951 |
|   Technology license..................... | -- | -- | -- | 6,000 | -- |
|     Total operating expenses........ | 30,870 | 20,468 | 30,773 | 24,716 | 3,885 |
| Loss from operations..................... | (22,277) | (19,549) | (30,773) | (24,716) | (3,885) |
| Interest income (expense), net............. | 3,754 | 1,134 | 1,330 | 1,114 | 198 |
| Net loss................................... | $(18,523) | $(18,415) | $(29,443) | $(23,602) | $(3,687) |
| Basic and diluted net loss per share...... | $ (0.78) | $ (3.81) | $ (8.14) | $ (11.24) | $ (2.86) |
| Shares used in computing basic and diluted net loss per share.................... | 23,796 | 4,837 | 3,619 | 2,100 | 1,287 |

|  | DECEMBER 31, | | | | |
|  | 2000 | 1999 | 1998 | 1997 | 1996 |
| --- | --- | --- | --- | --- | --- |
|  | (IN THOUSANDS) | | | | |
| CONSOLIDATED BALANCE SHEET DATA: |  |  |  |  |  |
| Cash, cash equivalents and short-term investments............................... | $ 89,441 | $ 26,260 | $ 23,220 | $ 32,674 | $ 1,494 |
| Working capital............................... | 83,836 | 22,023 | 19,817 | 25,424 | 1,045 |
| Total assets.................................. | 112,421 | 34,455 | 28,167 | 35,674 | 2,289 |
| Notes payable, less current portion.......... | 1,861 | 2,521 | 2,438 | 897 | -- |
| Deferred compensation........................ | (2,483) | (943) | (1,128) | (1,831) | -- |
| Accumulated deficit........................... | (93,670) | (75,147) | (56,732) | (27,289) | (3,687) |
| Total stockholders' equity................... | 90,730 | 22,211 | 20,596 | 27,331 | 1,770 |

ITEM 7: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
OF OPERATIONS

     The following discussion and analysis should be read in conjunction with
"Selected Consolidated Financial Data" and our consolidated financial statements
and the related notes.

     Except for historical information, the discussion in this report contains
forward-looking statements that involve risks and uncertainties, such as
statements of our plans, objectives, expectations and intentions. The cautionary
statements made in this report should be read as applying to all related
forward-looking statements wherever they appear in this report. Our actual
results could differ materially from those discussed here. Factors that could
cause or contribute to these differences include those discussed in "-- Factors
Affecting Operating Results" below as well as those discussed elsewhere.

OVERVIEW

     We design, manufacture, and market the da Vinci Surgical System, an
advanced surgical system that we believe represents a new generation of surgery.
The da Vinci System consists of a surgeon's console, a patient-

                                   21
    24

side cart, a high performance vision system and proprietary instruments. The da
Vinci System seamlessly translates the surgeon's natural hand movements on
instrument controls at a console into corresponding micro-movements of
instruments positioned inside the patient through small puncture incisions, or
ports. We believe that the da Vinci Surgical System is the only commercially
available technology that can provide the surgeon with the intuitive control,
range of motion, fine tissue manipulation capability and 3-D visualization
characteristic of open surgery, while simultaneously allowing the surgeon to
work through the small ports of minimally invasive surgery or MIS. By placing
computer-enhanced technology between the surgeon and the patient, we believe
that the da Vinci System enables surgeons to perform better surgery while giving

patients the benefits of MIS surgery, including decreased trauma and postoperative pain, reduced surgical complications, shorter hospital stays and lower total treatment costs.



In June and July 2000, we raised net proceeds of approximately $46.8 million through the initial public offering of our common stock.

To date, the majority of our revenues have come from the sales of the da Vinci Surgical System, which are high revenue dollar items. A smaller percentage of revenues have come from sales of EndoWrist instruments and accessories, which are lower revenue dollar items. A small percentage of revenue also comes from ongoing service of installed da Vinci Surgical Systems. Although we expect the majority of our revenues to continue to come from the sale of da Vinci Surgical Systems over the next few years, the percentage of revenue from our EndoWrist instruments and service should continue to increase. Due to the high dollar revenue per system sold, small variations in system unit sales may cause revenue to vary significantly from quarter to quarter. During the useful life of each installed da Vinci Surgical System, we expect to generate recurring revenue through sales of the EndoWrist instruments and accessories and ongoing service.

RESULTS OF OPERATIONS

Sales. Sales for the fiscal year ended December 31, 2000 were $26.6 million, up 161% from $10.2 million for the fiscal year ended December 31, 1999. The sales increase was primarily due to an increase in the number of da Vinci Surgical Systems sold to 28 in 2000 from 12 in 1999. There were no sales recognized in 1998.

Gross Profit. Gross profit for the fiscal year ended December 31, 2000 was $8.6 million, or 32% of sales, compared to $0.9 million, or 9% of sales in the previous fiscal year. The improvement in gross profit compared to the prior year resulted from sales growth and increased manufacturing efficiencies. Fiscal year 2000 gross profit was negatively impacted by a $1 million non-routine royalty charge that became due to IBM when Intuitive Surgical exceeded $25 million in annual revenue. Excluding the impact of this charge, fiscal year 2000 gross profit would have been $9.6 million, or 36% of sales. Another $1 million royalty payment will become due to IBM when Intuitive Surgical exceeds $50 million in annual revenue. Except as noted above, no additional royalty obligations will accrue under our agreement with IBM.

Research and Development Expenses. Research and development expenses in 2000 were $11.7 million, up 5% from $11.1 million in 1999. The increase was due to headcount increases, offset by a decrease caused by classifying manufacturing costs as cost of sales instead of research and development beginning in the second quarter of 1999, as sales were recorded for the first time, and lower fiscal year 2000 prototype materials costs. Fiscal year 1999 research and development expenses decreased $12.1 million, to $11.1 million from $23.2 million in 1998. This decrease was primarily due to higher 1998 expenses for prototype costs of $5.4 million, manufacturing costs prior to revenue recognition of $3.6 million, costs for clinical trials of $2.3 million, and deferred compensation of $0.6 million.

22

25

Research and development expenses include costs associated with the design, development, testing and enhancement of our products. These enhancements represent significant improvements to our products. Research and development expenses also include expenditures for clinical trials and purchases of laboratory supplies. Research and development costs are expensed as incurred. We expect to continue to make substantial investments in research and development and anticipate that research and development expenses will continue to increase in the future.

Selling, General and Administrative Expenses. Selling, general and administrative expenses for the fiscal year ended December 31, 2000 were $19.1 million, up 105% from $9.3 million from fiscal year 1999. The year-over-year increase was due in large part to increases in headcount in the sales and marketing areas to support increased revenue. Selling, general and administrative expenses for the fiscal year ended December 31, 1999 were $1.7 million higher than fiscal 1998 expenses of $7.6 million. This increase was primarily due to headcount increases resulting from intensified sales and marketing efforts as revenue was recognized for the first time in 1999.

Selling, general and administrative expenses include personnel costs for sales, marketing and administrative personnel, tradeshow expenses, legal expenses, regulatory fees and general corporate expenses. Selling, general and administrative expenses are expected to increase in the future to support our expanding business.

Deferred Compensation. We record deferred compensation as the difference between the exercise price of options granted and the fair value of our common stock at the time of grant for financial reporting purposes. Deferred compensation is amortized to research and development expenses and selling, general and administrative expenses. For the years ended December 31, 2000, 1999 and 1998, the Company recorded amortization of deferred stock compensation of $2.5 million, $865,000 and $1.6 million, respectively. Deferred compensation

recorded through December 31, 2000 was $8.9 million with accumulated amortization of $6.4 million. The remaining $2.5 million will be amortized over the remaining vesting periods of the options, generally four years from the date of grant, using a graded-vesting method. Future amortization of deferred compensation at December 31, 2000 is as follows: 2001 -- $1.6 million; 2002 -- $662,000; and 2003 -- $227,000. The amount of deferred compensation expense to be recorded in future periods may decrease if unvested options for which deferred compensation has been recorded are subsequently canceled.

Interest Income. Interest income increased 179% to $4.3 million for the fiscal year ended December 31, 2000 from $1.5 million in both fiscal 1999 and 1998. The increase resulted from higher cash and short-term investment balances, driven by the exercise of warrants to purchase preferred stock in March 2000, yielding approximately $34.8 million in net proceeds, and our initial public offering in June and July 2000, which raised net proceeds of approximately $46.8 million.

LIQUIDITY AND CAPITAL RESOURCES

Prior to our initial public offering, operations were financed primarily through sales of our preferred stock, yielding net proceeds of approximately $127.3 million, and equipment financing arrangements yielding approximately $7.5 million. The equipment arrangements provide financing at specific interest rates for periods of up to 48 months, by which time the principal is repaid to the lessors. As collateral for the equipment financing, we have granted the lessors a security interest in equipment specified under each arrangement. In June and July 2000, we completed the initial public offering of 5,750,000 shares of our common stock and realized net proceeds of approximately $46.8 million.

As of December 31, 2000, we had cash, cash equivalents and short-term investments of $89.4 million, up approximately $63.1 million compared to the 1999 year end balance of $26.3 million. Working capital at December 31, 2000 was $83.8 million, compared to $22.0 million at December 31, 1999. The fiscal year 2000 increase in cash and investments and working capital was primarily attributable to the exercise of warrants to purchase preferred stock in March 2000, yielding approximately $34.8 million in net proceeds, and our initial public offering in June and July 2000, raising net proceeds of approximately $46.8 million, partially offset by cash used in operations.

23

26

Net cash used in operating activities was $12.8 million for the fiscal year ended December 31, 2000, compared to $15.9 million for the fiscal year ended December 31, 1999 and $31.1 for the fiscal year ended December 31, 1998. The decrease in cash used in operations between 2000 and 1999 is primarily due to a lower net loss for 2000, after adjusting for non-cash charges for depreciation and deferred compensation. The decrease in cash used between 1999 and 1998 resulted primarily from higher research and development expenses in 1998 compared to 1999.

Net cash used in investing activities was $50.8 million for the fiscal year ended December 31, 2000, compared to $10.3 million for the fiscal year ended December 31, 1999. The increase in cash used in investing activities between 2000 and 1999 is related to the purchase of short-term investments with the net proceeds from our initial public offering in June and July 2000 and from the exercise of warrants to purchase preferred stock in March 2000. Cash provided by investing activities of $1.0 million during 1998 was due primarily to $2.6 million net sales of short-term investments, offset by capital expenditures of $1.7 million.

Net cash provided by financing activities was $82.2 million for the fiscal year ended December 31, 2000, compared to $20.2 million for 1999 and $23.3 for 1998. The primary reason for the increased cash provided by investing activities in fiscal 2000 compared to 1999 and 1998 relates to our initial public offering in June and July 2000, yielding net proceeds of $46.8 million. Proceeds from the issuance of preferred stock were $34.8 million, $19.3 million, and $20.9 million in 2000, 1999, and 1998, respectively.

Our capital requirements depend on numerous factors, including market acceptance of our products, the resources we devote to developing and supporting our products and other factors. We expect to devote substantial capital resources to continue our research and development efforts, to expand our customer support and product development activities and for other general corporate activities. We believe that our current cash and short-term investment balances, together with revenue to be derived from the sale of our products, will be sufficient to fund our operations at least through 2002. During or after this period, if cash generated by operations is insufficient to satisfy our liquidity requirements, we may need to sell additional equity or debt securities or obtain additional credit arrangements. Additional financing may not be available on terms acceptable to us or at all. The sale of additional equity or convertible debt securities may result in additional dilution to our stockholders.

RECENT ACCOUNTING PRONOUNCEMENTS

In March 2000, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation ("FIN") No. 44, "Accounting for Certain Transactions Involving Stock Compensation -- an Interpretation of APB Opinion No. 25." FIN 44 primarily clarifies (a) the definition of an employee for purposes of applying APB Opinion No. 25, (b) the criteria for determining whether a plan qualifies as a non-compensatory plan, (c) the accounting consequence of various modifications to the terms of previously fixed stock options or awards, and (d) the accounting for an exchange of stock compensation awards in a business combination. FIN 44 was effective July 1, 2000, but certain conclusions in FIN 44 cover specific events that occurred after either December 15, 1998 or January 12, 2000. The

application of FIN 44 has not had a material impact on our financial position or our results of operations.

In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" ("SAB 101"). SAB 101 summarizes some areas of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. The Company believes that its current revenue recognition principles comply with SAB 101.

In June 1998, the FASB issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). The Company is required to adopt SFAS 133 effective January 1, 2001. This statement establishes accounting and reporting standards requiring that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded in the balance sheet as either an asset or liability measured at its fair value. The statement also requires that changes in the derivative's fair value be recognized in earnings unless specific hedge accounting criteria are met. The Company does not currently believe that the adoption of SFAS 133, as amended, will have a significant impact on its financial position or results of operations.

24

27

FACTORS AFFECTING OPERATING RESULTS

OUR FUTURE OPERATING RESULTS MAY BE BELOW SECURITIES ANALYSTS' OR INVESTORS' EXPECTATIONS, WHICH COULD CAUSE OUR STOCK PRICE TO DECLINE.

Because of our limited operating history, we have limited insight into trends that may emerge in our market and affect our business. The revenue and income potential of our market are unproven, and we may be unable to generate significant commercial revenues. In addition, our costs may be higher than we expect. If we fail to generate sufficient revenues or our costs are higher than we expect, our results of operations will suffer, which in turn could cause our stock price to decline. Further, future revenue from sales of our products, if any, will be difficult to forecast because the market for new surgical technologies is still evolving. Our results of operations will depend upon numerous factors, including:

- the progress and results of clinical trials;

- ██████████████████████████

- the extent to which our products gain market acceptance;

- our timing and ability to develop our manufacturing and sales and marketing capabilities;

- demand for our products;

- the progress of surgical training in the use of our products;

- our ability to develop, introduce and market new or enhanced versions of our products on a timely basis;

- product quality problems;

- our ability to protect our proprietary rights;

- our ability to license additional intellectual property rights; and

- third-party payor reimbursement policies.

Our operating results in any particular period will not be a reliable indication of our future performance. It is likely that in some future quarters, our operating results will be below the expectations of securities analysts or investors. If this occurs, the price of our common stock, and the value of your investment, will likely decline.

WE HAVE A LARGE ACCUMULATED DEFICIT, WE EXPECT FUTURE LOSSES, AND WE MAY NOT ACHIEVE OR MAINTAIN PROFITABILITY.

We have incurred substantial losses since inception and we expect to incur substantial additional operating losses for at least the next two years, primarily as a result of expected increases in expenses for our manufacturing and sales and marketing capabilities, research and development activities, clinical trials ██████████████ The extent of our future losses and the timing of profitability are highly uncertain, and we may never achieve profitable operations. If the time required to generate significant revenues and achieve profitability is longer than anticipated, we may not be able to continue our operations. Our net loss for the year ended December 31, 1999 was $18.4 million and was $18.5 million for the fiscal year ended December 31, 2000. As of December 31, 2000, we had an accumulated deficit of $93.7 million.

WE EXPERIENCE LONG AND VARIABLE SALES CYCLES, WHICH COULD HAVE A NEGATIVE IMPACT ON OUR RESULTS OF OPERATIONS FOR ANY GIVEN QUARTER.

Our da Vinci Surgical System has a lengthy sales and purchase order cycle because it is a major capital item and generally requires the approval of senior management at purchasing institutions. We do not plan to maintain an inventory of assembled da Vinci Surgical Systems, but rather plan to manufacture our products only after receiving customer orders. These factors may contribute to substantial fluctuations in our quarterly operating results, particularly during the periods in which our sales volume is low. Because of these fluctuations, it

is likely that in some future quarters, our operating results could fall below
the expectations of securities analysts or investors. If that happens, the
market price of our stock would likely decrease. These

25

28

fluctuations also mean that you will not be able to rely upon our operating
results in any particular period as an indication of future performance.

BECAUSE A SMALL NUMBER OF CUSTOMERS HAVE AND ARE LIKELY TO CONTINUE TO ACCOUNT
FOR A SUBSTANTIAL PORTION OF OUR REVENUES, OUR REVENUES COULD DECLINE DUE TO THE
LOSS OR DELAY OF A SINGLE CUSTOMER ORDER.

     A relatively small number of customers account for a significant portion of
our total revenues. In 1999 and 2000, the majority of our revenues came from the
sales of da Vinci Surgical Systems, which are high revenue dollar items. Due to
the high dollar revenue per system sold, small variations in system unit sales
may cause revenue to vary significantly from quarter to quarter. For the year
ended December 31, 1999, two customers, AB Medica SRL, located in Italy, and
Marubeni America Corporation, located in New York, each accounted for 16% of our
total sales. AB Medica SRL and Marubeni America Corporation are our Italian and
Japanese distributors, respectively. For the year ended December 31, 2000, none
of our customers accounted for 10% or greater of total sales.

     We expect that revenues from a limited number of new customers will account
for a large percentage of total revenues in future quarters. Our ability to
attract new customers will depend on a variety of factors, including the
capability, safety, efficacy, ease of use, price, quality and reliability of our
products and effective sales, support, training and service. The loss or delay
of individual orders could have a significant impact on revenues and operating
results. Our failure to add new customers that make significant purchases of our
products would reduce our future revenues.

IF OUR PRODUCTS DO NOT ACHIEVE MARKET ACCEPTANCE, WE WILL NOT BE ABLE TO
GENERATE THE REVENUE NECESSARY TO SUPPORT OUR BUSINESS.

     Our products represent a fundamentally new way of performing surgery.
Achieving physician, patient and third-party payor acceptance of Intuitive
surgery as a preferred method of performing surgery will be crucial to our
success. If our products fail to achieve market acceptance, hospitals will not
purchase our products and we will not be able to generate the revenue necessary
to support our business. We believe that physicians' and third-party payors'
acceptance of the benefits of procedures performed using our products will be
essential for acceptance of our products by patients. Physicians will not
recommend the use of our products unless we can demonstrate that they produce
results comparable or superior to existing surgical techniques. Even if we can
prove the effectiveness of our products through clinical trials, surgeons may
elect not to use our products for any number of other reasons. For example,
cardiologists may continue to recommend conventional open heart surgery simply
because such surgery is already so widely accepted. In addition, surgeons may be
slow to adopt our products because of the perceived liability risks arising from
the use of new products and the uncertainty of reimbursement from third-party
payors.

     We expect that there will be a learning process involved for surgical teams
to become proficient in the use of our products. Broad use of our products will
require training of surgical teams. Market acceptance could be delayed by the
time required to complete this training. We may not be able to rapidly train
surgical teams in numbers sufficient to generate adequate demand for our
products. Although we are in the process of developing training programs for
surgical teams, we cannot be certain that our training programs will be cost
effective or sufficient to meet our customers' needs.



26

29



27

30

IF INSTITUTIONS OR SURGEONS ARE UNABLE TO OBTAIN REIMBURSEMENT FROM THIRD-PARTY
PAYORS FOR PROCEDURES USING OUR PRODUCTS, OR IF REIMBURSEMENT IS INSUFFICIENT TO
COVER THE COSTS OF PURCHASING OUR PRODUCTS, WE MAY BE UNABLE TO GENERATE
SUFFICIENT SALES TO SUPPORT OUR BUSINESS.

Domestic institutions will typically bill the services performed with our
products to various third-party payors, such as Medicare, Medicaid and other
government programs and private insurance plans. If hospitals do not obtain
sufficient reimbursement from third-party payors for procedures performed with
our products, or if government and private payors' policies do not permit
reimbursement for surgical procedures performed using our products, we may not
be able to generate the revenues necessary to support our business. In such
circumstances, we may have to apply to the American Medical Association for a
unique Current Procedural Terminology code covering computer-enhanced surgery.
If an application for a unique code is required, reimbursement for any use of
our products may be unavailable until an appropriate code is granted. The
application process, from filing until adoption of a new code, can take two or
more years.

Our success in international markets also depends upon the eligibility of our products for reimbursement through government-sponsored health care payment systems and third-party payors. Reimbursement practices vary significantly by country. Many international markets have government-managed healthcare systems that control reimbursement for new products and procedures. Other foreign markets have both private insurance systems and government-managed systems that control reimbursement for new products and procedures. Market acceptance of our products may depend on the availability and level of reimbursement in any country within a particular time. In addition, health care cost containment efforts similar to those we face in the United States are prevalent in many of the other countries in which we intend to sell our products and these efforts are expected to continue. For further information on third-party reimbursement policies, see "Item 1: Business -- Third-Party Reimbursement."



28

31

IF WE ARE UNABLE TO PROTECT THE INTELLECTUAL PROPERTY CONTAINED IN OUR PRODUCTS FROM USE BY THIRD PARTIES, OUR ABILITY TO COMPETE IN THE MARKET WILL BE HARMED.

Our commercial success will depend in part on obtaining patent and other intellectual property protection for the technologies contained in our products, and on successfully defending our patents and other intellectual property against third party challenges.

We will incur substantial costs in obtaining patents and, if necessary, defending our proprietary rights. The patent positions of medical device companies, including ours, can be highly uncertain and involve complex and evolving legal and factual questions. We cannot assure you that we will obtain the patent protection we seek, or that the protection we do obtain will be found valid and enforceable if challenged. We also cannot assure you that we will be able to develop additional patentable proprietary technologies. If we fail

29

32

to obtain adequate protection of our intellectual property, or if any protection we obtain is reduced or eliminated, others could use our intellectual property without compensating us, resulting in harm to our business. We may also determine that it is in our best interests to voluntarily challenge a third party's products or patents in litigation or administrative proceedings, including patent interferences or reexaminations. Given the early priority dates of some of our licensed patents, we believe one or more patent proceedings may be in our best interests. In addition, the laws of certain foreign countries do not protect intellectual property rights to the same extent as do the laws of the United States.

OTHERS MAY ASSERT THAT OUR PRODUCTS INFRINGE THEIR INTELLECTUAL PROPERTY RIGHTS, WHICH MAY CAUSE US TO ENGAGE IN COSTLY DISPUTES AND, IF WE ARE NOT SUCCESSFUL IN DEFENDING OURSELVES, COULD ALSO CAUSE US TO PAY SUBSTANTIAL DAMAGES AND PROHIBIT US FROM SELLING OUR PRODUCTS.

We are aware of both United States and foreign patents issued to third parties that relate to computer-assisted surgery and minimally invasive surgery. Some of these patents on their face appear broad enough to cover one or more aspects of our present technology, and may cover aspects of our future technology. We do not know whether any of these patents, if challenged, would be held valid, enforceable and infringed. From time to time, we receive, and likely will continue to receive, letters from third parties inviting us to license their patents. We may be sued by, or become involved in an administrative proceeding because of one or more of these third parties, regardless of the merits or likely outcome of such suit or proceeding. We cannot assure you that a court or administrative body would agree with any arguments or defenses we have concerning invalidity, unenforceability or noninfringement of any third-party patent. In addition to the issued patents of which we are aware, other parties may have filed, and in the future are likely to file, patent applications covering surgical products that are similar or identical to ours. We cannot assure you that any patents issuing from applications filed by a third party will not cover our products or will not have priority over our patent applications.

The medical device industry has been characterized by extensive litigation and administrative proceedings regarding patents and other intellectual property rights, and companies have employed such actions to gain a competitive advantage. If third parties assert infringement or other intellectual property claims against us as Computer Motion and Brookhill-Wilk 1, LLC have done, our technical and management personnel will experience a significant diversion of time and effort and we will incur large expenses defending ourselves. If third parties in any patent action are successful, our patent portfolio may be damaged, we may have to pay substantial damages, including treble damages, and we may be required to stop selling our products or obtain a license which, if available at all, may require us to pay substantial royalties. We cannot be certain that we will have the financial resources or the substantive arguments to defend our patents from infringement or claims of invalidity or unenforceability, or to defend against allegations of infringement of third-party patents. In addition, any public announcements related to litigation or administrative proceedings initiated by us, or initiated or threatened against us, could cause our stock price to decline.

THE RIGHTS AND MEASURES WE RELY ON TO PROTECT THE INTELLECTUAL PROPERTY UNDERLYING OUR PRODUCTS MAY NOT BE ADEQUATE TO PREVENT THIRD PARTIES FROM USING OUR TECHNOLOGY WHICH COULD HARM OUR ABILITY TO COMPETE IN THE MARKET.

In addition to patents, we typically rely on a combination of trade secret, copyright and trademark laws, nondisclosure agreements and other contractual provisions and technical security measures to protect our intellectual property rights. Nevertheless, these measures may not be adequate to safeguard the technology underlying our products. If they do not protect our rights adequately, third parties could use our technology, and our ability to compete in the market would be reduced. In addition, employees, consultants and others who participate in developing our products may breach their agreements with us regarding our intellectual property, and we may not have adequate remedies for the breach. We also may not be able to effectively protect our intellectual property rights in some foreign countries. For a variety of reasons, we may decide not to file for patent, copyright or trademark protection outside the United States. We also realize that our trade secrets may become known through other means not currently foreseen by us. Notwithstanding our efforts to protect our intellectual property, our competitors may independently develop similar or alternative technologies or products that are equal or superior to our

technology and products without infringing any of our

30

33

intellectual property rights, or may design around our proprietary technologies.
For further information on our intellectual property and the difficulties in
protecting it, see "Item 1: Business -- Intellectual Property."

OUR PRODUCTS RELY ON LICENSES FROM THIRD PARTIES, AND IF WE LOSE ACCESS TO THESE
TECHNOLOGIES, OUR REVENUES COULD DECLINE.

    We rely on technology that we license from others, including technology
that is integral to our products. We have entered into license agreements with
SRI International, IBM, MIT and Heartport. Any of these agreements may be
terminated for breach, including the failure to make required payments under the
IBM license and the failure to commercialize our products under the SRI
International license. If any of these agreements is terminated, we may be
unable to reacquire the necessary license on satisfactory terms, or at all. The
loss or failure to maintain these licenses could prevent or delay further
development or commercialization of our products. See "Item 1:
Business -- Intellectual Property."

BECAUSE OUR MARKETS ARE HIGHLY COMPETITIVE, CUSTOMERS MAY CHOOSE TO PURCHASE OUR
COMPETITORS' PRODUCTS OR MAY NOT ACCEPT INTUITIVE SURGERY, WHICH WOULD RESULT IN
REDUCED REVENUE AND LOSS OF MARKET SHARE.

    Intuitive surgery is a new technology that must compete with established
minimally invasive surgery and open surgery. These procedures are widely
accepted in the medical community and in many cases have a long history of use.
We also face competition from several companies that are developing new
approaches and products for the minimally invasive surgery market. In addition,
we presently face increasing competition from companies who are developing
robotic and computer-assisted surgical systems. Our revenues may be reduced or
eliminated if our competitors develop and market products that are more
effective or less expensive than our products. If we are unable to compete
successfully, our revenues will suffer. We may not be able to maintain or
improve our competitive position against current or potential competitors,
especially those with greater resources.

    In many cases, the medical conditions that can be treated using our
products can also be treated by pharmaceuticals or other medical devices and
procedures. Many of these alternative treatments are also widely accepted in the
medical community and have a long history of use. In addition, technological
advances could make such treatments more effective or less expensive than using
our products, which could render our products obsolete or unmarketable. We
cannot be certain that physicians will use our products to replace or supplement
established treatments or that our products will be competitive with current or
future technologies.

IF SOFTWARE DEFECTS ARE DISCOVERED IN OUR PRODUCTS, WE MAY INCUR ADDITIONAL
UNFORESEEN COSTS, HOSPITALS MAY NOT PURCHASE OUR PRODUCTS AND OUR REPUTATION MAY
SUFFER.

    Our products incorporate sophisticated computer software. Complex software
frequently contains errors or failures, especially when first introduced. In
addition, new products or enhancements may contain undetected errors or
performance problems that, despite testing, are discovered only after commercial
shipment. Because our products are designed to be used to perform complex
surgical procedures, we expect that our customers will have an increased
sensitivity to software defects. We cannot assure you that our software will not
experience errors or performance problems in the future. If we experience
software errors or performance problems, any of the following could occur:

    - delays in product shipments;

    - loss of revenue;

    - delay in market acceptance;

    - diversion of our resources;

    - damage to our reputation;

    - increased service or warranty costs; or

    - product liability claims.

31

34

WE HAVE LIMITED EXPERIENCE IN MANUFACTURING OUR PRODUCTS AND MAY ENCOUNTER
MANUFACTURING PROBLEMS OR DELAYS THAT COULD RESULT IN LOST REVENUE.

    We have manufactured a limited number of our products for prototypes and
sales to customers. We may be unable to establish or maintain reliable,
high-volume manufacturing capacity. Even if this capacity can be established and
maintained, the cost of doing so may increase the cost of our products and
reduce our ability to compete. We may encounter difficulties in scaling up
production of our products, including:

    - problems involving production yields;

    - quality control and assurance;

    - component supply shortages;

- shortages of qualified personnel; and

- compliance with state, federal and foreign regulations.

Manufacturing our products is a complex process. We plan to manufacture products to fill purchase orders rather than to maintain inventories of our assembled products. If demand for our products exceeds our manufacturing capacity, we could develop a substantial backlog of customer orders. If we are unable to establish and maintain larger-scale manufacturing capabilities, our ability to generate revenues will be limited and our reputation in the marketplace would be damaged.



OUR RELIANCE ON SOLE AND SINGLE SOURCE SUPPLIERS COULD HARM OUR ABILITY TO MEET DEMAND FOR OUR PRODUCTS IN A TIMELY MANNER OR WITHIN BUDGET.

Some of the components necessary for the assembly of our products are currently provided to us by sole source suppliers or single source suppliers. We purchase components through purchase orders rather than long-term supply agreements and generally do not maintain large volumes of inventory. The disruption or termination of the supply of components could cause a significant increase in the costs of these components, which could affect our profitability. A disruption or termination in the supply of components could also result in our inability to meet demand for our products, which could harm our ability to generate revenues, lead to customer dissatisfaction and damage our reputation. Furthermore, if we are required to change the manufacturer of a key component of our products, we may be required to verify that the new manufacturer maintains facilities and procedures that comply with quality standards and with all applicable regulations and

32

35

guidelines. The delays associated with the verification of a new manufacturer could delay our ability to manufacture our products in a timely manner or within budget.

THE USE OF OUR PRODUCTS COULD RESULT IN PRODUCT LIABILITY CLAIMS THAT COULD BE EXPENSIVE, DIVERT MANAGEMENT'S ATTENTION AND HARM OUR BUSINESS.

Our business exposes us to significant risks of product liability claims. The medical device industry has historically been litigious, and we face financial exposure to product liability claims if the use of our products were to cause injury or death. There is also the possibility that defects in the design or manufacture of our products might necessitate a product recall. Although we maintain product liability insurance, the coverage limits of these policies may not be adequate to cover future claims. Particularly as sales of our products increase, we may be unable to maintain product liability insurance in the future at satisfactory rates or adequate amounts. A product liability claim, regardless of its merit or eventual outcome, could result in significant legal defense costs. A product liability claim or any product recalls could also harm our reputation or result in a decline in revenues.

OUR GROWTH WILL PLACE A SIGNIFICANT STRAIN ON OUR MANAGEMENT SYSTEMS AND RESOURCES AND, IF WE FAIL TO MANAGE OUR GROWTH, OUR ABILITY TO MARKET, SELL AND DEVELOP OUR PRODUCTS MAY BE HARMED.

In order to complete clinical trials, scale-up manufacturing, expand marketing and distribution capabilities and develop future products, we must expand our operations. We expect that future expansion will occur particularly in the areas of sales and marketing, manufacturing and research and development. This expansion will likely result in new and increased responsibilities for management personnel and place significant strain upon our management, operating and financial systems and resources. We plan to sell our products primarily through direct sales, and we currently have a small sales organization. Our products require a complex marketing and sales effort targeted at several levels within a prospective customer's organization. We will need to expand our sales team significantly over the next 12 months to achieve our sales growth goals. We will face significant challenges and risks in building and managing our sales

team, including managing geographically dispersed sales efforts and adequately training our sales people in the use and benefits of our products. To accommodate our growth and compete effectively, we will be required to improve our information systems, create additional procedures and controls and expand, train, motivate and manage our work force. Our future success will depend in part on the ability of current and future management personnel to operate effectively, both independently and as a group. We cannot be certain that our personnel, systems, procedures and controls will be adequate to support our future operations.

IF WE LOSE OUR KEY PERSONNEL OR ARE UNABLE TO ATTRACT AND RETAIN ADDITIONAL PERSONNEL, OUR ABILITY TO COMPETE WILL BE HARMED.

We are highly dependent on the principal members of our management and scientific staff, in particular Lonnie M. Smith, our President and Chief Executive Officer, Frederic H. Moll, M.D., our Vice President and Medical Director and Robert G. Younge, our Vice President and Chief Technology Officer. In order to pursue our product development, marketing and commercialization plans, we will need to hire additional qualified personnel with expertise in research and development, clinical testing, government regulation, manufacturing, sales and marketing, and finance. Our product development plans depend in part on our ability to attract and retain engineers with experience in mechanics, software and optics. Attracting and retaining qualified personnel will be critical to our success, and competition for qualified personnel is intense, particularly in Silicon Valley. We may not be able to attract and retain personnel on acceptable terms given the competition for such personnel among technology and healthcare companies, and universities. The loss of any of these persons or our inability to attract and retain qualified personnel could harm our business and our ability to compete.

33

36

INTERNATIONAL SALES OF OUR PRODUCTS ACCOUNT FOR A SIGNIFICANT PORTION OF OUR REVENUES, WHICH EXPOSES US TO RISKS INHERENT IN INTERNATIONAL OPERATIONS. OUR GROWTH MAY BE LIMITED IF WE ARE UNABLE TO SUCCESSFULLY MANAGE OUR INTERNATIONAL ACTIVITIES.

Our business currently depends in large part on our activities in Europe, and a component of our growth strategy is to expand our presence into additional foreign markets. Sales to markets outside of the United States accounted for approximately 32% of our sales for the year ended December 31, 2000 and 91% for the year ended December 31, 1999. We will be subject to a number of challenges that specifically relate to our international business activities. These challenges include:

   - failure of local laws to provide the same degree of protection against
     infringement of our intellectual property;

   - protectionist laws and business practices that favor local competitors,
     which could slow our growth in international markets;

   - the risks associated with foreign currency exchange rate fluctuation;

   - the expense of establishing facilities and operations in new foreign
     markets; and

   - building an organization capable of supporting geographically dispersed
     operations.

Currently, a majority of our international sales are denominated in U.S. dollars. As a result, an increase in the value of the U.S. dollar relative to foreign currencies could make our products less competitive in international markets. If we are unable to meet and overcome these challenges, our international operations may not be successful, which would limit the growth of our business.

FAILURE TO RAISE ADDITIONAL CAPITAL OR GENERATE THE SIGNIFICANT CAPITAL NECESSARY TO EXPAND OUR OPERATIONS AND INVEST IN NEW PRODUCTS COULD REDUCE OUR ABILITY TO COMPETE, RESULT IN LOWER REVENUES AND MAY PREVENT US FROM TAKING ADVANTAGE OF MARKET OPPORTUNITIES.

We expect that our existing capital resources and the revenue to be derived from the sale of our products will be sufficient to meet our working capital and capital expenditure needs at least through 2002. After that, we may need to raise additional funds and we cannot be certain that we will be able to obtain additional financing on favorable terms, or at all. If we need additional capital and cannot raise it on acceptable terms, we may not be able to, among other things:

   - develop or enhance our products and services;

   - acquire technologies, products or businesses;

   - expand operations in the United States or internationally;

   - hire, train and retain employees; or

   - respond to competitive pressures or unanticipated capital requirements.

Our failure to do any of these things could result in lower revenues and could harm our business.

ITEM 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

We are not subject to any meaningful market risks related to currency, commodity prices or similar matters. We are sensitive to short-term interest rate fluctuations to the extent that such fluctuations impact the interest income we receive on the investment of the remaining proceeds from our June 2000 initial public offering.

The primary objective of our investment activities is to preserve principal while at the same time maximizing the income we receive from our investments without significantly increasing risk. Some of the securities that we invest in may have market risk. This means that a change in prevailing interest rates may cause the principal amount of the investment to fluctuate. For example, if we hold a security that was issued with a fixed interest rate at the then-prevailing rate and the prevailing interest rate later rises, the principal

34

37

amount of our investment will probably decline. To minimize this risk in the future, we intend to maintain our portfolio of cash equivalents and short-term investments in a variety of securities, including commercial paper, money market funds and government and non-government debt securities. The average duration of all of our investments as of December 2000 was less than one year. Due to the short term nature of these investments, we believe that we have no material exposure to interest rate risk arising from our investments. Therefore, no quantitative tabular disclosure is required.

ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Annual Financial Statements: See Part Four, Item 14(a)(1) of this Form 10-K.

ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURES

None.

35

38

PART III

ITEM 10: DIRECTORS AND EXECUTIVE OFFICER OF THE REGISTRANT

The information regarding directors is incorporated herein by reference from the section entitled "Election of Directors" of the Company's definitive Proxy Statement (the "Proxy Statement") to be filed pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, for registrants' annual meeting of Stockholders to be held on May 24, 2001. The Proxy Statement is anticipated to be filed within 120 days after the registrant's fiscal year end of December 31, 2000.

ITEM 11: EXECUTIVE COMPENSATION

Information regarding executive compensation is incorporated herein by reference from the section titled "Executive Compensation" of the Proxy Statement.

ITEM 12: SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

Information regarding security ownership of certain beneficial owners and management is incorporated herein by reference from the section titled "Security Ownership Of Certain Beneficial Owners and Management" of the Proxy Statement.

ITEM 13: CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Information regarding certain relationships and related party transactions is incorporated herein by reference from the section titled "Certain Transactions" of the Proxy Statement.

36

39

PART IV

ITEM 14: EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a) The following documents are filed as part of this Annual Report on Form 10-K

(1) Financial Statements -- See Index to Consolidated Financial Statements on page F-1 of this Report on Form 10-K.

(2) The following financial statement schedule of Intuitive Surgical, Inc. is filed as part of this Report and should be read in conjunction with the financial statements of Intuitive Surgical:

- Schedule II: Valuation and Qualifying Accounts.

All other schedules have been omitted because they are not applicable, not required under the instructions, or the information requested is set forth in the consolidated financial statements or related notes thereto.

    (3) Exhibits

The exhibits filed as part of this report are listed under "Exhibits" at subsection (C) of this Item 14.

  (b) Reports on Form 8-K

There were no reports on Form 8-K filed for the quarter ended December 31, 2000.

  (c) Exhibits

| NUMBER | DESCRIPTION |
|--------|-------------|
| 3.2(1) | Amended and Restated Certificate of Incorporation of Registrant.(1) |
| 3.3(1) | Bylaws of Registrant. |
| 4.2(1) | Specimen Stock Certificate. |
| 4.3(1) | Warrant to Purchase Shares of Common Stock, dated April 26, 2000. |
| 10.1(1) | Form of Indemnity Agreement. |
| 10.2(1) | 2000 Equity Incentive Plan. |
| 10.3(1) | 2000 Non-Employee Directors' Stock Option Plan. |
| 10.4(1) | 2000 Employee Stock Purchase Plan. |
| 10.5(1) | Amended and Restated Investor Rights Agreement dated March 31, 1999. |
| 10.6(1) | Equipment Financing Agreement (No. 10809), dated April 2, 1997, between the Registrant and Lease Management Services, Inc., and related addendums. |
| 10.7(1) | Security Agreement, dated May 20, 1999, between the Registrant and Heller Financial Leasing, Inc., and related amendments. |
| 10.8(1) | License Agreement, dated December 20, 1995, between the Registrant and SRI International. |
| 10.9(1) | License Agreement, dated December 29, 1997, between the Registrant and International Business Machines Corporation. |
| 10.10(1) | License Agreement, dated April 1, 1999, between the Registrant and Massachusetts Institute of Technology. |
| 10.11(1) | Lease, dated September 9, 1996, between the Registrant and Zappettini Investment Co. |
| 10.12(1) | Lease, dated February 5, 1997, between the Registrant and Zappettini Investment Co. |
| 10.13(1) | Employment Agreement, dated February 28, 1997, between the Registrant and Lonnie M. Smith. |
| 23.1(2) | Consent of Ernst & Young LLP, Independent Auditors. |
| 24.1(2) | Power of Attorney (set forth on signature page). |

---------------
(1) Incorporated by reference to exhibits filed with the Registrant's Registration Statement on Form S-1 (333-33016)

(2) Filed herewith

37

  40

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INTUITIVE SURGICAL, INC.
(Registrant)

By:   /s/ LONNIE M. SMITH
      -----------------------------------
            Lonnie M. Smith
      President and Chief Executive
                  Officer
            March 30, 2001

Date:

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| SIGNATURE | TITLE | DATE |
|-----------|-------|------|
| /s/ LONNIE M. SMITH<br>-----------------------------------<br>Lonnie M. Smith | President, Chief Executive Officer and Director (Principal Executive Officer) | March 30, 2001 |

Trial Ex. No. 1632.001-R, Pg. 30 of 48

| /s/ SUSAN K. BARNES | Chief Financial Officer (Principal Financial and Accounting Officer) | March 30, 2001 |
|---|---|---|
| Susan K. Barnes | | |
| /s/ SCOTT S. HALSTED | Director | March 30, 2001 |
| Scott S. Halsted | | |
| /s/ RUSSELL C. HIRSCH, M.D., PH.D. | Director | March 30, 2001 |
| Russell C. Hirsch, M.D., Ph.D. | | |
| /s/ RICHARD J. KRAMER | Director | March 30, 2001 |
| Richard J. Kramer | | |
| /s/ JAMES A. LAWRENCE | Director | March 30, 2001 |
| James A. Lawrence | | |
| /s/ ALAN J. LEVY, PH.D. | Director | March 30, 2001 |
| Alan J. Levy, Ph.D. | | |
| /s/ FREDERIC H. MOLL, M.D. | Vice President, Medical Director and Director | March 30, 2001 |
| Frederic H. Moll, M.D. | | |

38
41

INTUITIVE SURGICAL, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | PAGE |
|---|---|
| Report of Ernst & Young LLP, Independent Auditors........... | F-2 |
| Consolidated Balance Sheets at December 31, 2000 and 1999... | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2000, 1999 and 1998.......................... | F-4 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2000, 1999 and 1998.............. | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2000, 1999 and 1998.......................... | F-6 |
| Notes to Consolidated Financial Statements................... | F-7 |
| Schedule II -- Valuation and Qualifying Accounts............ | 1 |

F-1
42

REPORT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

Board of Directors and Stockholders
Intuitive Surgical, Inc.

We have audited the accompanying consolidated balance sheets of Intuitive
Surgical, Inc. as of December 31, 2000 and 1999, and the related consolidated
statements of operations, stockholders' equity and cash flows for each of the
three years in the period ended December 31, 2000. Our audits also included the
financial statement schedule listed in the index at Item 14(a). These financial
statements and schedule are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements and
schedule based on our audits.

We conducted our audits in accordance with auditing standards generally
accepted in the United States. Those standards require that we plan and perform
the audit to obtain reasonable assurance about whether the financial statements
are free of material misstatement. An audit includes examining, on a test basis,
evidence supporting the amounts and disclosures in the financial statements. An
audit also includes assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial
statement presentation. We believe that our audits provide a reasonable basis
for our opinion.

In our opinion, the financial statements referred to above present fairly,
in all material respects, the consolidated financial position of Intuitive
Surgical, Inc. at December 31, 2000 and 1999, and the consolidated results of
its operations and its cash flows for each of the three years in the period
ended December 31, 2000, in conformity with accounting principles generally
accepted in the United States. Also, in our opinion, the related financial
statement schedule, when considered in relation to the basic financial
statements taken as a whole, presents fairly in all material respects, the
information set forth therein.

/s/ ERNST & YOUNG LLP

Palo Alto, California
January 26, 2001

F-2

43

INTUITIVE SURGICAL, INC.

CONSOLIDATED BALANCE SHEETS
(IN THOUSANDS, EXCEPT SHARE AND PER SHARE AMOUNTS)

ASSETS

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Current assets: | | |
| Cash and cash equivalents................................... | $ 22,657 | $ 4,106 |
| Short-term investments..................................... | 66,784 | 22,154 |
| Accounts receivable, net of allowance for doubtful accounts of $192 and $55 at December 31, 2000 and 1999, respectively................................................ | 6,444 | 2,044 |
| Inventory, net............................................. | 6,076 | 2,861 |
| Prepaid and other assets................................... | 1,705 | 581 |
| Total current assets............................... | 103,666 | 31,746 |
| Property and equipment, net................................ | 4,669 | 2,709 |
| Intangible and other assets................................ | 4,086 | -- |
| Total assets....................................... | $112,421 | $ 34,455 |

LIABILITIES AND STOCKHOLDERS' EQUITY

|  | 2000 | 1999 |
| --- | --- | --- |
| Current liabilities: | | |
| Accounts payable.......................................... | $ 7,128 | $ 2,722 |
| Accrued compensation and employee benefits................ | 2,609 | 1,325 |
| Warranty accrual.......................................... | 1,494 | 812 |
| Accrued royalty expense................................... | 1,000 | -- |
| Other accrued liabilities................................. | 2,028 | 1,116 |
| Deferred revenue.......................................... | 3,552 | 2,130 |
| Current portion of notes payable.......................... | 2,019 | 1,618 |
| Total current liabilities......................... | 19,830 | 9,723 |
| Long-term notes payable.................................... | 1,861 | 2,521 |
| Stockholders' equity | | |
| Preferred stock, 5,000,000 shares authorized, $0.001 par value, issuable in series; no shares and 19,134,375 shares issued and outstanding as of December 31, 2000 and December 31, 1999, respectively.................... | -- | 19 |
| Common stock, 200,000,000 shares authorized, $0.001 par value, 35,675,822 and 6,681,848 shares issued and outstanding as of December 31, 2000 and December 31, 1999, respectively.................................... | 36 | 7 |
| Additional paid-in capital................................ | 186,713 | 98,508 |
| Deferred compensation..................................... | (2,483) | (943) |
| Accumulated deficit....................................... | (93,670) | (75,147) |
| Accumulated other comprehensive income (loss)............. | 134 | (233) |
| Total stockholders' equity......................... | 90,730 | 22,211 |
| Total liabilities and stockholders' equity........ | $112,421 | $ 34,455 |

See accompanying notes.
F-3

44

INTUITIVE SURGICAL, INC.

CONSOLIDATED STATEMENTS OF OPERATIONS
(IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

|  | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Sales.................................................... | $ 26,624 | $ 10,192 | $ -- |
| Cost of sales............................................ | 18,031 | 9,273 | -- |
| Gross profit...................................... | 8,593 | 919 | -- |
| Operating costs and expenses | | | |
| Research and development................................. | 11,734 | 11,130 | 23,208 |
| Selling, general and administrative...................... | 19,136 | 9,338 | 7,565 |
| Total operating costs and expenses............... | 30,870 | 20,468 | 30,773 |
| Loss from operations.................................... | (22,277) | (19,549) | (30,773) |
| Interest income......................................... | 4,266 | 1,531 | 1,545 |
| Interest expense........................................ | (404) | (406) | (215) |
| Other income/(expense).................................. | (108) | 9 | -- |
| Net loss................................................ | $(18,523) | $(18,415) | $(29,443) |

```
                                              ========   ========   ========
Basic and diluted net loss per common share...............  $  (0.78)  $  (3.81)  $  (8.14)
                                              ========   ========   ========
Shares used in computing basic and diluted net loss per
  common share........................................    23,796     4,837      3,619
                                              ========   ========   ========
```

See accompanying notes.
F-4

45

INTUITIVE SURGICAL, INC.

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(IN THOUSANDS, EXCEPT SHARE AMOUNTS)

| | PREFERRED STOCK | | COMMON STOCK | | ADDITIONAL PAID-IN CAPITAL | DEFERRED COMPENSATION | ACCUMULATED DEFICIT |
|---|---|---|---|---|---|---|---|
| | SHARES | AMOUNT | SHARES | AMOUNT | | | |
| Balances at December 31, 1997.............. | 14,037,500 | $ 14 | 6,594,520 | $ 7 | $ 56,430 | $(1,831) | $(27,289) |
| Issuance of Series E convertible preferred stock, net of issuance costs of $13...... | 2,618,500 | 3 | -- | -- | 20,932 | -- | -- |
| Issuance of common stock................. | -- | -- | 255,060 | -- | 189 | -- | -- |
| Repurchase of common stock............... | -- | -- | (76,086) | -- | (30) | -- | -- |
| Deferred compensation.................... | -- | -- | -- | -- | 865 | (865) | -- |
| Amortization of deferred compensation..... | -- | -- | -- | -- | -- | 1,568 | -- |
| Comprehensive loss: | | | | | | | |
| Other comprehensive income (loss) -- change in unrealized gain (loss) on available-for-sale securities........................... | -- | -- | -- | -- | -- | -- | -- |
| Net loss................................. | -- | -- | -- | -- | -- | -- | (29,443) |
| Comprehensive loss...................... | -- | -- | -- | -- | -- | -- | -- |
| Balances at December 31, 1998.............. | 16,656,000 | 17 | 6,773,494 | 7 | 78,386 | (1,128) | (56,732) |
| Issuance of Series E convertible preferred stock, net of issuance costs of $544..... | 2,478,375 | 2 | -- | -- | 19,281 | -- | -- |
| Issuance of common stock................. | -- | -- | 79,365 | -- | 265 | -- | -- |
| Repurchase of common stock............... | -- | -- | (171,011) | -- | (43) | -- | -- |
| Deferred compensation.................... | -- | -- | -- | -- | 619 | (619) | -- |
| Amortization of deferred compensation..... | -- | -- | -- | -- | -- | 804 | -- |
| Comprehensive loss: | | | | | | | |
| Other comprehensive income (loss) -change in unrealized gain (loss) on available-for-sale securities.......... | -- | -- | -- | -- | -- | -- | -- |
| Net loss................................. | -- | -- | -- | -- | -- | -- | (18,415) |
| Comprehensive loss...................... | -- | -- | -- | -- | -- | -- | -- |
| Balances at December 31, 1999.............. | 19,134,375 | 19 | 6,681,848 | 7 | 98,508 | (943) | (75,147) |
| Issuance of Series F convertible preferred stock, net of issuance costs of $603..... | 3,678,798 | 4 | -- | -- | 34,752 | -- | -- |
| Conversion of preferred stock to common stock upon closing of IPO................ | (22,813,173) | (23) | 22,813,173 | 23 | -- | -- | -- |
| Issuance of common stock upon closing of IPO, net of issuance costs of $4,972..... | -- | -- | 5,750,000 | 6 | 46,778 | -- | -- |
| Issuance of common stock upon exercise of options and warrants.................... | -- | -- | 467,770 | -- | 912 | -- | -- |
| Repurchase of common stock............... | -- | -- | (36,969) | -- | (20) | -- | -- |
| Fair market value of warrants granted..... | -- | -- | -- | -- | 1,720 | -- | -- |
| Deferred compensation.................... | -- | -- | -- | -- | 4,063 | (4,063) | -- |
| Amortization of deferred compensation..... | -- | -- | -- | -- | -- | 2,523 | -- |
| Comprehensive loss: | | | | | | | |
| Other comprehensive income (loss) -- change in unrealized gain (loss) on available-for-sale securities........................... | -- | -- | -- | -- | -- | -- | -- |
| Unrealized gain (loss) on foreign exchange contracts................. | -- | -- | -- | -- | -- | -- | -- |
| Net loss................................. | -- | -- | -- | -- | -- | -- | (18,523) |
| Comprehensive loss...................... | -- | -- | -- | -- | -- | -- | -- |
| Balances at December 31, 2000.............. | -- | $ -- | 35,675,822 | $36 | $186,713 | $(2,483) | $(93,670) |

| | OTHER COMPREHENSIVE INCOME (LOSS) | TOTAL STOCKHOLDERS' EQUITY |
|---|---|---|
| Balances at December 31, 1997.............. | $ -- | $ 27,331 |
| Issuance of Series E convertible preferred stock, net of issuance costs of $13...... | -- | 20,935 |
| Issuance of common stock................. | -- | 189 |
| Repurchase of common stock............... | -- | (30) |
| Deferred compensation.................... | -- | -- |
| Amortization of deferred compensation..... | -- | 1,568 |
| Comprehensive loss: | | |
| Other comprehensive income (loss) -- change in unrealized gain (loss) on available-for-sale | | |

```
  securities............................        46          46
Net loss.................................        --     (29,443)
                                                        --------
Comprehensive loss.......................        --     (29,397)
                                              -----     --------
Balances at December 31, 1998............        46      20,596
Issuance of Series E convertible preferred
  stock, net of issuance costs of $544.....      --      19,283
Issuance of common stock.................        --         265
Repurchase of common stock...............        --         (43)
Deferred compensation....................        --          --
Amortization of deferred compensation....        --         804
Comprehensive loss:
  Other comprehensive income (loss) -change
    in unrealized gain (loss) on
    available-for-sale securities..........    (279)       (279)
  Net loss.................................       --     (18,415)
                                                        --------
Comprehensive loss.......................        --     (18,694)
                                              -----     --------
Balances at December 31, 1999............      (233)     22,211
Issuance of Series F convertible preferred
  stock, net of issuance costs of $603.....      --      34,756
Conversion of preferred stock to common
  stock upon closing of IPO..............        --          --
Issuance of common stock upon closing of
  IPO, net of issuance costs of $4,972.....      --      46,784
Issuance of common stock upon exercise of
  options and warrants...................        --         912
Repurchase of common stock...............        --         (20)
Fair market value of warrants granted.....       --       1,720
Deferred compensation....................        --          --
Amortization of deferred compensation....        --       2,523
Comprehensive loss:
  Other comprehensive income
    (loss) -- change in unrealized gain
    (loss) on available-for-sale
    securities............................      300         300
    Unrealized gain (loss) on foreign
      exchange contracts.................        67          67
  Net loss.................................       --     (18,523)
                                                        --------
Comprehensive loss.......................        --     (18,156)
                                              -----     --------
Balances at December 31, 2000............     $ 134    $ 90,730
```

See accompanying notes.
F-5

46

INTUITIVE SURGICAL, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

| | FOR THE YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| OPERATING ACTIVITIES: | | | |
| Net loss.................................................... | $(18,523) | $(18,415) | $(29,443) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation........................................... | 1,595 | 1,439 | 1,268 |
| Amortization of deferred compensation................... | 2,573 | 804 | 1,568 |
| Amortization of intangible and other assets............. | 584 | -- | -- |
| Issuance of common stock for technology................. | -- | 150 | -- |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable.................................. | (4,400) | (2,044) | -- |
| Prepaid and other assets............................. | (1,124) | (110) | (275) |
| Inventory............................................ | (3,215) | (1,602) | (1,259) |
| Accounts payable..................................... | 4,406 | 466 | 445 |
| Accrued compensation and employee benefits............ | 1,284 | 763 | 327 |
| Warranty accrual..................................... | 682 | 812 | -- |
| Other accrued liabilities............................ | 912 | 445 | (4,471) |
| Accrued royalty expense.............................. | 1,000 | -- | -- |
| Deferred revenue..................................... | 1,422 | 1,365 | 765 |
| | -------- | -------- | -------- |
| Net cash used in operating activities..................... | (12,804) | (15,927) | (31,075) |
| INVESTING ACTIVITIES: | | | |
| Acquisition of property and equipment..................... | (3,555) | (931) | (1,681) |
| Acquisition of patents.................................... | (3,000) | -- | -- |
| Purchase of short-term investments........................ | (70,096) | (38,292) | (47,811) |
| Proceeds from sales of short-term investments............. | 6,900 | 910 | 2,000 |
| Proceeds from maturities of short-term investments......... | 18,933 | 28,000 | 48,446 |
| | -------- | -------- | -------- |
| Net cash provided by (used in) investing activities........ | (50,818) | (10,313) | 954 |
| FINANCING ACTIVITIES: | | | |
| Proceeds from issuance of preferred stock, net............. | 34,756 | 19,283 | 20,935 |
| Proceeds from issuance of common stock, net............... | 47,696 | 115 | 189 |
| Repurchase of common stock................................ | (20) | (43) | (30) |
| Proceeds from notes payable............................... | 1,500 | 2,000 | 2,644 |

```
Repayment of notes payable...............................    (1,759)      (1,178)        (482)
                                                            --------     --------     --------
Net cash provided by financing activities.................    82,173       20,177       23,256
                                                            --------     --------     --------
Net increase (decrease) in cash and cash equivalents.......    18,551      (6,063)      (6,865)
Cash and cash equivalents, beginning of year..............     4,106       10,169       17,034
                                                            --------     --------     --------
Cash and cash equivalents, end of year....................  $ 22,657     $  4,106     $ 10,169
                                                            ========     ========     ========
SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:
  Interest paid...........................................  $    404     $    397     $    190
                                                            ========     ========     ========
  Issuance of warrants for license and services...........  $  1,720     $     --     $     --
                                                            ========     ========     ========
```

See accompanying notes.
F-6

47

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Nature of Operations

Intuitive Surgical, Inc., formerly Intuitive Surgical Devices, Inc. (the "Company") was incorporated in Delaware on November 9, 1995 and is engaged in the development, manufacture and marketing of products designed to provide the flexibility of open surgery while operating through ports. In 1999, the Company began to manufacture, market and sell its products in Europe and the United States. The Company expects to expend substantial additional funds and continue to incur significant operating losses for at least the next two years as it continues to fund clinical trials ████████████████ and expands research and development activities, manufacturing capabilities and sales and marketing activities.

Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

Cash and Cash Equivalents

The Company considers all highly liquid investments with an original maturity from date of purchase of 90 days or less to be cash equivalents for the purpose of balance sheet and statement of cash flows presentation. The carrying value of cash and cash equivalents approximates market value at December 31, 2000 and 1999.

Short-Term Investments

All short-term investments are classified as available-for-sale and therefore carried at fair value. The Company views its available-for-sale portfolio as available for use in its current operations. Accordingly, all investments are classified as short-term, even though the stated maturity date may be one year or more beyond the current balance sheet date. Available-for-sale securities are stated at fair value based upon quoted market prices of the securities. Unrealized gains and losses on such securities, when material, are reported as a separate component of stockholders' equity. Realized gains and losses on available-for-sale securities are included in interest income. The cost of securities sold is based on the specific identification method. Interest and dividends on securities classified as available-for-sale are included in interest income.

Foreign Currency Translation

The functional currency of each foreign subsidiary is its local currency. Foreign assets and liabilities are translated into U.S. dollars at year-end exchange rates when appropriate, while components of the income statement are translated using average exchange rates in effect throughout the year. Gains and losses arising from foreign currency transactions are included in the consolidated statement of operations. Translation adjustments of balance sheet items are included as a component of stockholders' equity.

Concentrations of Risk

Financial instruments which subject the Company to potential risk consists of its cash equivalents, short-term investments, accounts receivable, and foreign exchange contracts. The counterparties to the agreements relating to the Company's investment securities and foreign exchange contracts consist of various major corporations and financial institutions of high credit standing. We believe the financial risks associated with these financial instruments are minimal. For the year ended December 31, 2000, none of our customers accounted for 10% or greater of total sales. For the year ended December 31, 1999, two customers, A and B, each accounted for 16% of total sales. The Company extends reasonably short collection terms but does not

F-7

48

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

require collateral. The Company provides reserves for potential credit losses but has not experienced significant losses to date.

The Company's da Vinci Surgical System, related instruments and accessories and service have accounted for all of the Company's sales for the years ended December 31, 2000 and 1999. Purchases of key parts and components used to manufacture our products are from limited supply sources. The inability of any of these suppliers to fulfill our supply requirements may negatively impact future operating results.

Inventories

Inventories are stated at the lower of cost (determined on a first-in, first-out basis) or market value.

Property and Equipment

Property and equipment are stated at cost, net of accumulated depreciation. Property and equipment are depreciated on a straight-line basis over the estimated useful lives of the assets, generally three to five years. In accordance with Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed of," impairment losses on long-lived assets used in operations would be recorded when events and circumstances indicate that the assets might be impaired and the undiscounted cash flows estimated to be generated by those assets are less than the carrying amounts of those assets.

Intangible and Other Assets

Purchased intangible assets represent patents which are carried at cost less accumulated amortization. Amortization is computed using the straight-line method over the expected useful life of six years. At December 31, 2000 gross intangible assets totaled $4.7 million and related accumulated amortization was $584,000. At December 31, 1999 we held no intangible assets.

Impairment of Long-Lived Assets

In accordance with the Statement of Financial Accounting No. 121 "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," we evaluate long-lived assets, including intangible and other assets, for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable based on expected undiscounted cash flows attributable to that asset. The amount of any impairment is measured as the difference between the carrying value and the fair value of the impaired asset. There were no long-lived assets that were considered to be impaired during the periods presented.

Warranty Accrual

The Company's standard policy is to warrant all shipped systems against defects in design, materials and workmanship by replacing failed parts during the first year of ownership. The warranty accrual is reduced by the cost of the replacement parts and labor over the warranty period. Estimated expenses for warranty obligations are accrued at the time revenue is recognized and are included in cost of sales.

Other Financial Instruments

The Company uses forward foreign exchange contracts that are designated to reduce a portion of its exposure to foreign currency risk from operational and balance sheet exposures resulting from changes in foreign currency exchange rates. Such exposures result from sales denominated in foreign currencies. The

F-8

49

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

forward contracts, which have only nominal intrinsic value at the time of purchase, are denominated in the same foreign currency in which the sales are denominated. Forward contracts are accounted for on a mark-to-market basis with unrealized gains or losses being recorded as a separate component of equity. Realized gains or losses are recognized into income upon settlement of the forward contracts. Discounts or premiums are recognized into income over the life of the contract. Amounts receivable and payable on certain forward foreign exchange contracts are recorded as other current assets or accrued liabilities, respectively.

The Company does not use derivative financial instruments for speculative trading purposes, nor does it hold or issue leveraged derivative financial instruments.

Research and Development

Research and development costs, which include clinical ▮▮▮▮▮▮▮ costs, are expensed to operations as incurred in accordance with Statement of Financial Accounting Standards No. 2, "Accounting for Research and Development Costs."

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles accepted in the United States requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ materially from these estimates.

Stock-Based Compensation

The Company has adopted the provisions of Statement of Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" (SFAS 123"). In accordance with the provisions of SFAS 123, the Company applies APB Opinion 25 ("APB 25"), "Accounting for Stock Issued to Employees" and related interpretations in accounting for its stock option grants to employees and directors with an exercise price equal to or in excess of the fair value of the shares at the date of grant. The Company accounts for stock awards granted to non-employees in accordance with SFAS 123 and related interpretations. (See Note 9, Stockholders' Equity.)

Revenue Recognition

Revenue from system sales is recognized upon installation for direct sales and upon shipment for sales to our distributors. If substantial contractual obligations exist after system installation, revenue is recognized after such obligations are fulfilled. Our distributors do not have price protection rights. Revenue from instruments and accessories is recognized upon shipment. Service revenue is billed in advance and recognized over the service period. Amounts are billed in accordance with the terms of the underlying sales agreement.

We apply the provisions of SAB 101 when recognizing revenue. SAB 101 states that revenue generally is realized or realizable and earned when all of the following criteria are met: a) persuasive evidence of an arrangement exists, b) delivery has occurred or services have been rendered, c) the seller's price to the buyer is fixed or determinable, and d) collectibility is reasonably assured. Accordingly, amounts billed in excess of revenue recognized are included as deferred revenue in the accompanying consolidated balance sheets.

Advertising Costs

Advertising costs are expensed as incurred. Advertising costs for the years ended December 31, 2000, 1999 and 1998 were $1.1 million, $448,000 and $155,000, respectively.

F-9

50

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

Segment Disclosures

The Company operates in one segment, the development and marketing of products designed to provide the flexibility of open surgery while operating through ports. For the year ended December 31, 2000, sales to Europe and the U.S. accounted for 32% and 68% of total sales, respectively. For the year ended December 31, 1999, sales to Europe and the U.S. accounted for 75% and 25% of total sales, respectively. Sales in the U.S. included sales to the Company's Japanese distributor's U.S. subsidiary, which represented 4% and 16% of total sales for the years ended December 31, 2000 and 1999, respectively.

Recent Accounting Pronouncements

In March 2000, the Financial Accounting Standards Board ("FASB") issued FASB Interpretation ("FIN") No. 44, "Accounting for Certain Transactions Involving Stock Compensation -- an Interpretation of APB Opinion No. 25." FIN 44 primarily clarifies (a) the definition of an employee for purposes of applying APB Opinion No. 25, (b) the criteria for determining whether a plan qualifies as a non-compensatory plan, (c) the accounting consequence of various modifications to the terms of previously fixed stock options or awards, and (d) the accounting for an exchange of stock compensation awards in a business combination. FIN 44 was effective July 1, 2000, but certain conclusions in FIN 44 cover specific events that occurred after either December 15, 1998 or January 12, 2000. The application of FIN 44 has not had a material impact on our financial position or our results of operations.

In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" ("SAB 101"). SAB 101 summarizes some areas of the Staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. The Company believes that its current revenue recognition principles comply with SAB 101.

In June 1998, the FASB issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities" (SFAS 133). The Company is required to adopt SFAS 133 effective January 1, 2001. This statement establishes accounting and reporting standards requiring that every derivative instrument, including certain derivative instruments embedded in other contracts, be recorded in the balance sheet as either an asset or liability measured at its fair value. The statement also requires that changes in the derivative's fair value be recognized in earnings unless specific hedge accounting criteria are met. The Company does not currently believe that the adoption of SFAS 133, as amended, will have a significant impact on its financial position or results of operations.

F-10

51

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

2. NET LOSS PER SHARE

The following table presents the computation of basic and diluted net loss
per share (in thousands):

| | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
| | 2000 | 1999 | 1998 |
| Numerator used for basic and diluted net loss per common share................... | $ (18,523) | $ (18,415) | $ (29,443) |
| Denominator used for basic and diluted net loss per common share: | | | |
| Weighted-average shares outstanding....... | 24,686,201 | 6,729,580 | 6,800,736 |
| Less weighted-average shares subject to repurchase........................... | (890,365) | (1,892,115) | (3,181,869) |
| Weighted-average shares used in computing basic and diluted net loss per common share............................... | 23,795,836 | 4,837,465 | 3,618,867 |
| Basic and diluted net loss per common share................................. | $ (0.78) | $ (3.81) | $ (8.14) |
| Potentially dilutive securities excluded from diluted net loss per share computation because they are anti-dilutive........................... | 2,381,449 | 26,940,981 | 20,263,030 |

3. AVAILABLE-FOR-SALE SECURITIES

The following table summarizes available-for-sale securities included in
cash and cash equivalents and short-term investments as of the respective dates
(in thousands):

| | DECEMBER 31, 2000 | | | | DECEMBER 31, 1999 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | UNREALIZED | | | | UNREALIZED | | |
| | AMORTIZED COST | GAINS | LOSSES | FAIR VALUE | AMORTIZED COST | GAINS | LOSSES | FAIR VALUE |
| Time deposits.................... | $ -- | $ -- | $ -- | $ -- | $ 67 | $ -- | $ -- | $ 67 |
| U.S. corporate debt.............. | 27,661 | 116 | (28) | 27,749 | 14,687 | -- | (92) | 14,595 |
| U.S. government debt............. | 7,000 | 19 | (36) | 6,983 | 3,000 | -- | (141) | 2,859 |
| Municipal debt................... | 26,050 | -- | -- | 26,050 | -- | -- | -- | -- |
| Commercial paper................. | 12,794 | -- | (4) | 12,790 | -- | -- | -- | -- |
| Other debt securities............ | 4,041 | -- | -- | 4,041 | 4,700 | -- | -- | 4,700 |
| | $77,546 | $135 | $(68) | $77,613 | $22,454 | $ -- | $(233) | $22,221 |
| Reported as: | | | | | | | | |
| Cash equivalents................. | $10,829 | $ -- | $ -- | $10,829 | $ 67 | $ -- | $ -- | $ 67 |
| Short-term investments........... | 66,717 | 135 | (68) | 66,784 | 22,387 | -- | (233) | 22,154 |
| | $77,546 | $135 | $(68) | $77,613 | $22,454 | $ -- | $(233) | $22,221 |

The Company views its available-for-sale portfolio as available for use in
its current operations. As of December 31, 2000, the average duration of
securities in the portfolio was less than one year.

Realized gains on available-for-sale securities were $112,000 and $210,000
for the years ended December 31, 2000 and 1999, respectively. There were no
realized losses on available-for-sale securities for the years ended December
31, 2000 and 1999. Realized gross gains and losses from the sale of these
securities were not significant for the year ended December 31, 1998.

F-11

52

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

4. INVENTORIES

Inventories consist of the following (in thousands):

| | DECEMBER 31, | |
| --- | --- | --- |
| | 2000 | 1999 |

```
Raw materials..............................................  $2,650   $1,147
Work-in-process............................................   1,130      619
Finished goods.............................................   2,296    1,095
                                                             -------  -------
         Total.............................................  $6,076   $2,861
                                                             =======  =======
```

### 5. PROPERTY AND EQUIPMENT

Property and equipment consists of the following (in thousands):

|  | DECEMBER 31, | |
|---|---|---|
|  | 2000 | 1999 |
| Computer equipment....................................... | $ 2,827 | $ 1,834 |
| Laboratory and manufacturing equipment.................... | 2,717 | 1,425 |
| Office furniture and equipment........................... | 1,041 | 816 |
| Leasehold improvements................................... | 1,407 | 1,220 |
| Software................................................. | 1,858 | 1,000 |
|  | 9,850 | 6,295 |
| Less accumulated depreciation and amortization........... | (5,181) | (3,586) |
| Property and equipment, net.............................. | $ 4,669 | $ 2,709 |

### 6. EMPLOYEE BENEFIT PLAN

Effective May 1, 1996, the Company established a defined contribution
retirement plan (the "Plan"). All U.S. employees who are at least 21 years of
age are eligible to participate. Contributions of up to 15% of compensation may
be made by employees to the Plan through salary withholdings. Employer
contributions are made solely at the Company's discretion. No employer
contributions were made to the Plan for the years ended December 31, 2000, 1999
and 1998.

### 7. COMMITMENTS AND CONTINGENCIES

Operating Leases

Effective March 1997, the Company entered into two operating lease
arrangements for office space in Mountain View, California which expire on
December 31, 2001 and February 28, 2002. Both of these leases include a renewal
option for one additional three-year term.

Future minimum rental commitments under the operating leases as of December
31, 2000 are as follows (in thousands):

```
2001.......................................................  $855
2002.......................................................    65
                                                             ----
         Total.............................................  $920
                                                             ====
```

Rent expense was approximately $884,000, $882,000 and $825,000 for the
years ended December 31, 2000, 1999 and 1998, respectively. Rental income from a
sublease was approximately $175,000, $244,000 and

F-12

53

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

7. COMMITMENTS AND CONTINGENCIES (CONTINUED)

$266,000 for the years ended December 31, 2000, 1999 and 1998, respectively.
This sublease agreement expired in July 2000.





F-13

54

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

F-14

55

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

8. NOTES PAYABLE

Notes payable consists of the following (in thousands):

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Note payable, due in monthly installments through April 1, 2001 |  |  |
|   Interest rate of 13.8% at December 31, 2000.............. | $ 201 | $ 602 |
| Note payable, due in monthly installments through August 1, 2001 |  |  |
|   Interest rate of 12.1% at December 31, 2000.............. | 188 | 355 |
| Note payable, due in monthly installments through June 1, 2002 |  |  |
|   Interest rate of 9.0% at December 31, 2000............... | 502 | 739 |
| Note payable, due in monthly installments through June 1, 2002 |  |  |
|   Interest rate of 9.0% at December 31, 2000............... | 502 | 739 |
| Note payable, due in monthly installments through June 1, 2002 |  |  |
|   Interest rate of 9.9% at December 31, 2000............... | 803 | 1,240 |
| Note payable, due in monthly installments through October 1, 2002 |  |  |
|   Interest rate of 10.2% at December 31, 2000.............. | 323 | 464 |
| Note payable, due in monthly installments through April 1, 2003 |  |  |
|   Interest rate of LIBOR plus 3.75% which is 10.375% at December 31, 2000...................................... | 361 | -- |
| Note payable, due in monthly installments through January 1, 2004 |  |  |
|   Interest rate of 9.0% at December 31, 2000............... | 1,000 | -- |
|  | ------- | ------- |
|  | 3,880 | 4,139 |
| Less current portion....................................... | (2,019) | (1,618) |
|  | ------- | ------- |
|  | $ 1,861 | $ 2,521 |
|  | ======= | ======= |

Notes payable are collateralized by fixed assets specified under each agreement. Assets collateralized under these agreements total $8.0 million and $6.4 million at December 31, 2000 and 1999, respectively. Certain of the notes payable contain covenants pertaining to profitability levels and certain other financial ratios. As of December 31, 2000, the Company is in compliance with all covenants. Principal maturities of notes payable at December 31, 2000 are as follows: 2001 -- $2.0 million; 2002 -- $1.4 million; 2003 -- $418,000; and 2004 -- $32,000.

The fair value of notes payable is estimated based on current interest rates available to the Company for debt instruments with similar terms, degrees of risk and remaining maturities. The carrying values of these obligations approximate their respective fair values as of December 31, 2000 and 1999.

9. STOCKHOLDERS' EQUITY

At December 31, 1999, the Company was authorized to issue up to 30,000,000 shares of convertible preferred stock, issuable in series, with the rights and preferences of each designated series to be determined by the Company's Board of Directors. The outstanding shares of convertible preferred stock automatically convert into common stock upon the closing of an underwritten public offering of common stock under the Securities Act of 1933 in which the Company receives at least $10.0 million in gross proceeds and the price per share is at least $10.00 as adjusted for stock splits, recapitalization and the like, or at the election of the holders of at least 75% of the then outstanding shares of convertible preferred stock.

F-15

56

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. STOCKHOLDERS' EQUITY (CONTINUED)

Convertible Preferred Stock

During the first quarter of the year ended December 31, 2000, the Company issued 3,593,875 shares of Series F convertible preferred stock, upon exercise of warrants at a weighted-average exercise price of $9.84 per share, for net proceeds of $34.8 million.

Each share of Series A, B, C, D, E, and F convertible preferred stock was convertible, at the option of the holder, into common stock on a one-for-one basis, subject to certain adjustments for dilution, if any, resulting from future stock issuances. Concurrent with the closing of the Company's initial public offering, each share of Series A, B, C, D and E convertible preferred

stock was converted on a one-for-one basis into 19,134,375 shares of common
stock. Each share of Series F convertible preferred stock was converted on a
1.02363638 basis into 3,678,798 shares of common stock.

On June 13, 2000, as part of the initial public offering of our common
stock, we issued 5,000,000 shares of our common stock at an offering price of
$9.00 per share and all of Intuitive Surgical's convertible preferred stock
automatically converted into 22,813,173 shares of common stock. On July 13,
2000, the underwriters exercised in full their over-allotment option to purchase
an additional 750,000 shares at $9.00 per share. Cash proceeds from the sale of
the 5,750,000 shares of common stock, net of underwriters' discount and offering
expenses, totaled approximately $46.8 million.

Common Stock

The Company has reserved the following shares of common stock for the
conversion of preferred stock, the exercise of warrants, and the issuance of
options and rights granted under the Company's stock option plan as follows:

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Convertible preferred stock........................ | -- | 19,134,375 |
| Warrants........................................... | 205,081 | 5,107,875 |
| Stock option plan.................................. | 7,030,726 | 1,670,722 |
|  | 7,235,807 | 25,912,972 |

The Company has previously issued shares of common stock, which are subject
to the Company's right to repurchase at the original issuance price upon the
occurrence of certain events as defined in the agreements relating to the sale
of such stock. As of December 31, 2000, 1999, and 1998 shares subject to
repurchase were 409,612, 1,232,006, and 2,559,530 respectively.

Warrants

In April 1997, in connection with one of the notes payable discussed in
Note 8, the Company issued a warrant to purchase 11,000 shares of common stock
at an exercise price of $5.00. In August 2000, this warrant was exercised under
a net exercise provision resulting in the issuance of 7,774 shares of common
stock.

In conjunction with the issuance of the Series E convertible preferred
stock, the Company issued to each purchaser a warrant to purchase shares in
Series F convertible preferred stock at a price initially equal to $8.00 per
preferred share. Warrants to purchase 5,096,875 shares of Series F convertible
preferred stock were issued. The exercise price increased on every subsequent
one-month anniversary of the issuance date by $0.1667 per month up to a maximum
exercise price of $10.00 per preferred share. During the year ended December 31,
2000, warrants to purchase 3,593,875 shares of Series F convertible preferred
stock were exercised at a

F-16

57

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. STOCKHOLDERS' EQUITY (CONTINUED)

weighted-average exercise price of $9.84 per share for net proceeds of $34.8
million. The unexercised warrants expired in March 2000.

In June 2000, the Company issued a warrant to purchase 5,081 shares of
common stock at an exercise price of $9.00 per share to one company. The
warrant, which was fully vested and immediately exercisable, expires in June
2010.

In April 2000, the Company entered into an agreement with Heartport, Inc.
to exclusively license a number of Heartport's patents in exchange for cash of
$3.0 million and a warrant to purchase 200,000 shares of common stock at an
exercise price of $3.00 per share. In accordance with EITF 96-18, "Accounting
for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or
in Conjunction with Selling Goods or Services," the value of the warrant was
estimated using the Black-Scholes option pricing model with the following
assumptions: stock price on the date of grant of $9.90 per share, risk-free
interest rate of 6.5%, contractual life of 5 years, volatility of 0.75 and no
dividend yield, resulting in a value of $1.7 million. As a result of this
agreement, we capitalized approximately $4.7 million as intangible and other
assets, which will be amortized over the estimated useful life of the patents
which is approximately six years. The warrant, which was fully vested and
immediately exercisable, expires in June 2005.

Stock Option Plans

In January 1996, the Board of Directors adopted, and the stockholders
approved, the 1996 Equity Incentive Plan (the "1996 Plan") under which
employees, consultants and directors may be granted Incentive Stock Options
("ISOs") and Nonstatutory Stock Options ("NSOs") to purchase shares of the
company's common stock. The 1996 Plan permits ISOs to be granted at an exercise

price not less than the fair value on the date of grant and NSOs at an exercise price not less than 85% of the fair value on the date of grant. Options granted under the 1996 Plan generally expire 10 years from the date of grant and become exercisable upon grant subject to repurchase rights in favor of the Company until vested. Options generally vest 12.5% upon completion of 6 months service and 1/48 per month thereafter; however, options may be granted with different vesting terms as determined by the Board of Directors. A total of 4,340,000 shares of common stock have been authorized for issuance pursuant to the 1996 Plan as of December 31, 1999. In March 2000, the Company reserved an additional 500,000 shares under the 1996 plan.

In March 2000, the Board of Directors adopted the 2000 Equity Incentive Plan, which took effect upon the closing of the Company's initial public offering. The Company has reserved an additional 5,160,000 shares under this plan. This plan is an amendment and restatement of the 1996 Plan. Also in March 2000, the Board of Directors adopted the 2000 Non-Employee Directors' Stock Option Plan and the 2000 Employee Stock Purchase Plan. The Company has reserved 300,000 and 1,000,000 shares for the issuances under these plans, respectively. These plans were also effective upon the closing of the Company's initial public offering.

F-17

58

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. STOCKHOLDERS' EQUITY (CONTINUED)

Option activity under the 1996 and 2000 Plans was as follows:

|  | 2000 | | 1999 | | 1998 | |
|---|---|---|---|---|---|---|
|  | NUMBER OF SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER OF SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE | NUMBER OF SHARES UNDER OPTION | WEIGHTED AVERAGE EXERCISE PRICE |
| Balance at January 1............ | 1,466,725 | $1.90 | 1,036,500 | $1.21 | 989,409 | $0.07 |
| Options granted............... | 823,600 | $4.94 | 641,050 | $2.33 | 392,750 | $2.33 |
| Options exercised............. | (459,996) | $1.98 | (29,365) | $2.21 | (245,060) | $0.07 |
| Options canceled.............. | (63,573) | $2.69 | (181,460) | $1.82 | (100,599) | $1.71 |
| Balance at December 31.......... | 1,766,756 | $3.27 | 1,466,725 | $1.90 | 1,036,500 | $1.21 |
| Exercisable at December 31...... | 1,517,923 | $2.31 | 1,434,814 | $1.88 | 958,089 | $1.06 |

Additional information concerning options outstanding at December 31, 2000 is as follows:

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| EXERCISE PRICES | NUMBER OF SHARES | WEIGHTED-AVERAGE REMAINING CONTRACTUAL LIFE | WEIGHTED-AVERAGE EXERCISE PRICE | NUMBER OF SHARES | WEIGHTED-AVERAGE EXERCISE PRICE |
| $0.05 - $ 0.50.. | 365,500 | 6.36 | $ 0.50 | 334,249 | $ 0.50 |
| $1.50 - $ 3.00.. | 1,183,656 | 8.59 | $ 2.82 | 1,183,656 | $ 2.82 |
| $7.13 - $16.13.. | 217,600 | 9.47 | $10.36 | 18 | $16.13 |
| $0.05 - $16.13.. | 1,766,756 | 7.90 | $ 3.27 | 1,517,923 | $ 2.31 |

Under the 1996 and 2000 Plans, the Company may also grant rights to purchase restricted stock. Terms and conditions of these rights are determined by the Board of Directors. However, no right shall be granted at an exercise price which is less than 85% of the fair value of the Company's common stock on the date of grant. Exercise of these share purchase rights are made pursuant to restricted stock purchase agreements containing provisions established by the Board of Directors. These provisions give the Company the right to repurchase the shares at the original purchase price of the stock. The right expires at a rate determined by the Board of Directors, generally at a rate of 12.5% after 6 months and 1/48 per month thereafter. For the years ended December 31, 2000, 1999 and 1998, the Company repurchased 36,969, 117,677 and 76,086 shares under the 1996 and 2000 Plans.

As of December 31, 2000, 1999 and 1998, 5,263,970, 203,997 and 823,587 shares were available for future grant under the 1996 and 2000 Plans.

For the years ended December 31, 2000, 1999 and 1998, the Company recorded deferred stock compensation of $4.1 million, $619,000, and $865,000 respectively, representing the difference between the exercise price and the fair value for accounting purposes of the Company's common stock on the date such options were granted. For the years ended December 31, 2000, 1999 and 1998, the Company recorded amortization of deferred stock compensation of $2.5

million, $800,000 and $1.6 million, respectively. As of December 31, 2000 and
1999, the Company had $2.5 million and $943,000 of remaining unamortized
deferred compensation, respectively. Such amount is included as a reduction of
stockholders' equity and is being amortized over the vesting period of the
underlying options using the graded-vesting method. Future amortization of
deferred compensation at December 31, 2000 is as follows: 2001 -- $1.6 million;
2002 -- $662,000; and 2003 -- $227,000.

F-18

59

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

9. STOCKHOLDERS' EQUITY (CONTINUED)

Stock-Based Compensation

    Pro forma information regarding net loss is required by SFAS No. 123, as if
the Company had accounted for its employee stock options under the fair value
method of SFAS 123. Option valuation models require the input of highly
subjective assumptions. Because the Company's employee stock options have
characteristics significantly different from those of traded options, and
because changes in the subjective input assumptions can materially affect the
fair value estimate, in management's opinion, the existing models do not
necessarily provide a reliable measure of the fair value of its employee stock
options.

    The weighted-average estimated fair value of these options during fiscal
2000, 1999 and 1998 was $1.07, $1.37 and $2.53 per share, respectively. The fair
value of these options was estimated at the date of grant using the
Black-Scholes option pricing model using the following weighted-average
assumptions:

|  | YEARS ENDED DECEMBER 31 | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Expected life (in years) | 4.0 | 2.5 | 2.5 |
| Risk-free interest rate | 5.9% | 5.9% | 5.5% |
| Volatility | 0.85 | 0.75 | 0.75 |
| Dividend yield | -- | -- | -- |

    We have elected to follow APB 25 in accounting for our employee stock
options. Under APB 25, we recognize no compensation expense in our financial
statements except in connection with the grant of restricted stock for nominal
consideration and unless the exercise price of our employee stock option is less
than the market price of the underlying stock on the grant date.

    We determined the following pro forma information regarding net income and
earnings per share as if we had accounted for our employee stock options under
the fair value method prescribed by SFAS 123. For purposes of pro forma
disclosures, the estimated fair value of the options is amortized to expense
over the vesting periods. The pro forma information is as follows (in thousands,
except per share amounts):

|  | YEARS ENDED DECEMBER 31 | | |
| --- | --- | --- | --- |
|  | 2000 | 1999 | 1998 |
| Pro forma net loss | $(18,800) | $(18,700) | $(29,700) |
| Pro forma net loss per share: |  |  |  |
| Basic | (0.79) | (3.87) | (8.21) |
| Diluted | (0.79) | (3.87) | (8.21) |

F-19

60

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

10. INCOME TAXES

    Deferred income taxes reflect tax carryforwards and the net tax effects of
temporary differences between the carrying amounts of assets and liabilities for
financial reporting and the amount used for income tax purposes. Significant
components of the Company's deferred tax assets are as follows (in thousands):

|  | AS OF DECEMBER 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| Net operating loss carryforward | $ 20,900 | $ 16,100 |
| Research credits | 3,400 | 2,000 |
| Capitalized research and development | 1,100 | 1,600 |

```
Expenses not currently deductible.....................   2,700     9,400
                                                        --------  --------
Total deferred tax assets.............................   28,100    29,100
Valuation allowance for deferred tax assets...........  (28,100)  (29,100)
                                                        --------  --------
Net deferred tax assets...............................  $   --    $   --
                                                        ========  ========
```

Realization of deferred tax assets is dependent upon future earnings; the timing and amount of which are uncertain. Accordingly, the net deferred tax assets have been fully offset by a valuation allowance. The valuation allowance increased by $6.0 million and $11.7 million during the years ended December 31, 1999 and 1998, respectively. As of December 31, 2000, the Company had net operating loss carryforwards for federal tax purposes of approximately $58.0 million which expire in the years 2010 through 2020. The Company also had net operating loss carryforwards for state income tax purposes of approximately $20.0 million which expire in the years 2003 through 2005. The Company had federal and state research credit carryforwards of approximately $3.4 million. Utilization of the Company's net operating loss may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. The annual limitation may result in the expiration of the net operating loss before utilization.

11. OTHER FINANCIAL INSTRUMENTS

At December 31, the fair value of the Company's other financial instruments is as follows (in thousands):

| | 2000 ASSET (LIABILITY) | | 1999 ASSET (LIABILITY) | |
| | CARRYING AMOUNT | FAIR VALUE | CARRYING AMOUNT | FAIR VALUE |
|---|---|---|---|---|
| Forward foreign exchange contracts................ | $-- | $67 | $-- | $-- |

At December 31, outstanding notional amounts for derivative financial instruments are as follows (in thousands):

| | 2000 | 1999 |
|---|---|---|
| Forward foreign exchange contracts......................... | $781 | $-- |

While the contract or notional amounts provide one measure of the volume of these transactions, they do not represent the amount of the Company's exposure to credit risk. The amounts potentially subject to credit risk (arising from the possible inability of counterparties to meet the terms of their contracts) are generally limited to the amounts, if any, by which the counterparties' obligations exceed the obligations of the Company. The Company controls credit risk through credit approvals, limits, and monitoring procedures. Credit rating criteria for off-balance sheet transactions are similar to those for investments. See additional information at "Other financial instruments" contained in Note 1.

F-20

61

INTUITIVE SURGICAL, INC.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

11. OTHER FINANCIAL INSTRUMENTS (CONTINUED)

At December 31, 2000 the Company had forward foreign exchange contracts of approximately 2 months duration, to exchange euro and Belgian Francs for U.S. dollars in the total gross notional amount of $781,000. This notional amount represents forward contracts to sell foreign currency of $781,000. The Company did not hold any forward exchange contracts at December 31, 1999.

12. OTHER COMPREHENSIVE INCOME (LOSS)

At December 31, the components of Accumulated other comprehensive income (loss), net of related taxes, are comprised of the following (in thousands):

| | 2000 | 1999 |
|---|---|---|
| Unrealized gain (loss) on available-for-sale securities..... | $ 67 | $(233) |
| Unrealized gain on forward exchange contract................ | 67 | -- |
| Accumulated other comprehensive income (loss).............. | $134 | $(233) |

13. SELECTED QUARTERLY DATA (UNAUDITED)

|  | FISCAL 2000 | | | |
|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 |
|  | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | |
| Net sales........................................... | 2,933 | 5,127 | 7,859 | 10,706 |
| Gross profit........................................ | 401 | 1,624 | 3,151 | 3,417 |
| Operating expenses.................................. | 5,769 | 6,798 | 8,567 | 9,736 |
| Operating loss...................................... | (5,368) | (5,174) | (5,416) | (6,319) |
| Other income/(expense).............................. | 336 | 684 | 1,396 | 1,337 |
| Net loss............................................ | (5,032) | (4,490) | (4,020) | (4,982) |
| Net loss per share.................................. | $ (0.90) | $ (0.23) | $ (0.12) | $ (0.14) |
| Shares used in calculation of net loss per share.... | 5,574 | 19,808 | 34,665 | 35,139 |

|  | FISCAL 1999 | | | |
|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 |
|  | (IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | | |
| Net sales........................................... | -- | 3,635 | 3,280 | 3,277 |
| Gross profit........................................ | -- | 393 | 352 | 174 |
| Operating expenses.................................. | 5,750 | 4,036 | 5,020 | 5,662 |
| Operating loss...................................... | (5,750) | (3,643) | (4,668) | (5,488) |
| Other income/(expense).............................. | 190 | 368 | 300 | 276 |
| Net loss............................................ | (5,560) | (3,275) | (4,368) | (5,212) |
| Net loss per share.................................. | $ (1.27) | $ (0.70) | $ (0.87) | $ (0.98) |
| Shares used in calculation of net loss per share.... | 4,369 | 4,649 | 4,997 | 5,335 |

F-21

62

SCHEDULE II

INTUITIVE SURGICAL, INC.

VALUATION AND QUALIFYING ACCOUNTS
(IN THOUSANDS)

|  | BALANCE AT BEGINNING OF YEAR | ADDITIONS CHARGED TO COST AND EXPENSES | DEDUCTIONS | BALANCE AT END OF YEAR |
|---|---|---|---|---|
| Year ended December 31, 2000 |  |  |  |  |
| Deducted from asset accounts: |  |  |  |  |
| Allowance for doubtful accounts and product returns........................ | $ 55 | $ 137 | $ -- | $ 192 |
| Year ended December 31, 1999 |  |  |  |  |
| Deducted from asset accounts: |  |  |  |  |
| Allowance for doubtful accounts and product returns........................ | $ -- | $ 55 | $ -- | $ 55 |

1

63

EXHIBIT INDEX

| NUMBER | DESCRIPTION |
|---|---|
| 3.2(1) | Amended and Restated Certificate of Incorporation of Registrant.(1) |
| 3.3(1) | Bylaws of Registrant. |
| 4.2(1) | Specimen Stock Certificate. |
| 4.3(1) | Warrant to Purchase Shares of Common Stock, dated April 26, 2000. |
| 10.1(1) | Form of Indemnity Agreement. |
| 10.2(1) | 2000 Equity Incentive Plan. |
| 10.3(1) | 2000 Non-Employee Directors' Stock Option Plan. |
| 10.4(1) | 2000 Employee Stock Purchase Plan. |
| 10.5(1) | Amended and Restated Investor Rights Agreement dated March 31, 1999. |
| 10.6(1) | Equipment Financing Agreement (No. 10809), dated April 2, 1997, between the Registrant and Lease Management Services, Inc., and related addendums. |
| 10.7(1) | Security Agreement, dated May 20, 1999, between the Registrant and Heller Financial Leasing, Inc., and related |

```
                 amendments.
  10.8(1)    License Agreement, dated December 20, 1995, between the
             Registrant and SRI International.
  10.9(1)    License Agreement, dated December 29, 1997, between the
             Registrant and International Business Machines Corporation.
  10.10(1)   License Agreement, dated April 1, 1999, between the
             Registrant and Massachusetts Institute of Technology.
  10.11(1)   Lease, dated September 9, 1996, between the Registrant and
             Zappettini Investment Co.
  10.12(1)   Lease, dated February 5, 1997, between the Registrant and
             Zappettini Investment Co.
  10.13(1)   Employment Agreement, dated February 28, 1997, between the
             Registrant and Lonnie M. Smith.
  23.1(2)    Consent of Ernst & Young LLP, Independent Auditors.
  24.1(2)    Power of Attorney (set forth on signature page).


---------------
(1) Incorporated by reference to exhibits filed with the Registrant's
    Registration Statement on Form S-1 (333-33016)

(2) Filed herewith
```

1

EXHIBIT 23.1

CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statements
(Form S-8 No. 333-43558) pertaining to the Intuitive Surgical 2000 Equity
Incentive Plan, 2000 Non-Employee Directors' Stock Option Plan and 2000 Employee
Stock Purchase Plan of our report dated January 26, 2001, with respect to the
consolidated financial statements and schedule included in the Annual Report
(Form 10-K) for the year ended December 31, 2000.

/s/ ERNST & YOUNG LLP

Palo Alto, California
March 26, 2001

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

(MARK ONE)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission file number 000-30713

# INTUITIVE™

# Intuitive Surgical, Inc.
#### (Exact name of Registrant as specified in its Charter)

| Delaware | 77-0416458 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

1020 Kifer Road
**Sunnyvale, California 94086**
(Address of principal executive offices) (Zip Code)

**(408) 523-2100**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | ISRG | The Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or emerging growth company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1632.022-R**

Case No. 3:21-cv-03496-AMO
Date Entered _____
By _____
Deputy Clerk

The aggregate market value of the voting and non-voting common equity held by non-affiliates on June 30, 2021, based upon the closing price of Common Stock on such date as reported on The Nasdaq Global Select Market, was approximately $108.7 billion. Shares of voting stock held by each officer and director have been excluded in that such persons may be deemed to be affiliates. This assumption regarding affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding shares of the registrant's common stock as of January 26, 2022, was 357,744,031.

### DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates information by reference to the definitive proxy statement for the Company's Annual Meeting of Stockholders to be held on or about April 28, 2022, to be filed within 120 days of the registrant's fiscal year ended December 31, 2021.

Table of Contents

## INTUITIVE SURGICAL, INC.

## INDEX

| | | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 6 |
| Item 1A. | Risk Factors | 24 |
| Item 1B. | Unresolved Staff Comments | 50 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| **PART II** | | |
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | [RESERVED] | 54 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 55 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 80 |
| Item 8. | Financial Statements and Supplementary Data | 81 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 119 |
| Item 9A. | Controls and Procedures | 119 |
| Item 9B. | Other Information | 119 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 120 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 121 |
| Item 11. | Executive Compensation | 121 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 121 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 121 |
| Item 14. | Principal Accountant Fees and Services | 121 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 122 |
| Item 16. | Form 10-K Summary | 123 |
| **SIGNATURES** | | 124 |

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This report contains "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Forward-looking statements relate to expectations concerning matters that are not historical facts. Words such as "estimates," "projects," "believes," "anticipates," "plans," "expects," "intends," "may," "will," "could," "should," "would," "targeted," and similar words and expressions are intended to identify forward-looking statements. These forward-looking statements include, but are not limited to, statements related to the expected impacts of the COVID-19 pandemic on our business, financial condition, and results of operations, the potential impact on our procedure volume, our acquisitions, our expected business, our expected new product introductions, the impacts of Extended Use Instruments, procedures and procedure adoption, future results of operations, future financial position, our ability to increase our revenues, the anticipated mix of our revenues between product and service revenues, our financing plans and future capital requirements, anticipated costs of revenue, anticipated expenses, our potential tax assets or liabilities, the effect of recent accounting pronouncements, our investments, anticipated cash flows, our ability to finance operations from cash flows and similar matters, and statements based on current expectations, estimates, forecasts, and projections about the economies and markets in which we operate and our beliefs and assumptions regarding these economies and markets. These forward-looking statements should be considered in light of various important factors, including, but not limited to, the following: the risk that the COVID-19 pandemic could lead to further material delays and cancellations of, or reduced demand for, procedures; curtailed or delayed capital spending by hospitals; disruption to our supply chain, including increased difficulties in obtaining a sufficient supply of materials in the semiconductor and other markets; closures of our facilities; delays in surgeon training; delays in gathering clinical evidence; ███████████████████████████████████ he evaluation of the risks of robotic-assisted surgery in the presence of infectious diseases; diversion of management and other resources to respond to COVID-19 outbreaks; the impact of global and regional economic and credit market conditions on healthcare spending; the risk that the COVID-19 virus disrupts local economies and causes economies in our key markets to enter prolonged recessions; ████ healthcare reform legislation in the U.S. and its impact on hospital spending, reimbursement, and fees levied on certain medical device revenues; changes in hospital admissions and actions by payers to limit or manage surgical procedures; the timing and success of product development and market acceptance of developed products; the results of any collaborations, in-licensing arrangements, joint ventures, strategic alliances, or partnerships, including the joint venture with Shanghai Fosun Pharmaceutical (Group) Co., Ltd.; our completion of and ability to successfully integrate acquisitions, including Orpheus Medical; procedure counts; ██████████████████████████████████████ guidelines and recommendations in the healthcare and patient communities; ████████████████████████; competition in the medical device industry and in the specific markets of surgery in which we operate; risks associated with our operations outside of the United States; unanticipated manufacturing disruptions or the inability to meet demand for products; our reliance on sole and single source suppliers; ████████████ adverse publicity regarding us and the safety of our products and adequacy of training; our ability to expand into foreign markets; the impact of changes to our tax legislation, guidance, and interpretations; changes in tariffs, trade barriers, and regulatory requirements; and other risk factors. Readers are cautioned not to place undue reliance on these forward-looking statements, which are based on current expectations and are subject to risks, uncertainties, and assumptions that are difficult to predict. Our actual results may differ materially and adversely from those expressed in any forward-looking statement, and we undertake no obligation to publicly update or release any revisions to these forward-looking statements, except as required by law. Risks are described throughout this filing, particularly in Part I, "Item 1A. Risk Factors," and include, but are not limited to, those summarized on the following pages.

Table of Contents

## RISKS RELATING TO OUR BUSINESS

• Public health crises or epidemic diseases, or the perception of their effects, have and could continue to materially adversely affect our business and results of operations.

• Our reliance on sole and single source suppliers and our ability to purchase at acceptable prices a sufficient supply of materials, parts, and components could harm our ability to meet demand for our products in a timely manner or within budget.

• Because our markets are highly competitive, customers may choose to purchase our competitors' products or services or may not accept da Vinci robotic-assisted surgery, which would result in reduced revenue and loss of market share.

• The inflationary environment could materially adversely impact our business and results of operations.

• If our products do not achieve and maintain market acceptance, we will not be able to generate the revenue necessary to support our business.

• If institutions or surgeons are unable to obtain coverage and reimbursement from third-party payors for procedures using our products, or if reimbursement is insufficient to cover the costs of purchasing our products, we may be unable to generate sufficient sales to support our business.

• If our products contain defects or encounter performance problems, we may ▮▮▮▮▮▮▮▮▮▮▮▮ incur additional unforeseen costs, and our reputation may suffer.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

• We are subject to significant, uninsured liabilities.

• Negative publicity, whether accurate or inaccurate, concerning our products or our company could reduce market acceptance of our products and could result in decreased product demand and a decline in revenues.

• If we lose key personnel or are unable to attract and retain additional personnel, our ability to compete will be harmed and increases in labor costs could materially adversely impact our business and results of operations.

• We experience long and variable capital sales cycles and seasonality in our business, which may cause fluctuations in our financial results.

• New product developments and introductions may adversely impact our financial results.

• We are subject to a variety of risks due to our operations outside of the U.S.

• Disruption of critical information systems or material breaches in the security of our systems could harm our business, customer relations, and financial condition.

• Our business is subject to complex and evolving laws and regulations regarding privacy, data protection, and other matters relating to information collection.

• If we fail to successfully acquire or integrate new businesses, products, and technology, we may not realize expected benefits or our business may be harmed.

• If we do not successfully manage our collaboration arrangements, licensing arrangements, joint ventures, strategic alliances, or partnerships with third parties, we may not realize the expected benefits from such alliances, which may have a material adverse effect on our business, financial condition, results of operations, or cash flows.

• Our customers may use unauthorized, unapproved, or uncertified instruments and accessories, which would result in reduced revenue and loss of market share.

• We expect gross profit margins to vary over time, and changes in our gross profit margins could adversely affect our financial condition or results of operations.

• We utilize distributors for a portion of our sales and service of our products in certain countries, which subjects us to a number of risks that could harm our business.

• We offer alternative capital acquisition approaches. As a result, we are exposed to the credit risk of some of our customers and the risk of losses of revenue, which could result in material losses.

• We are exposed to credit risk and fluctuations in the market value of our investments.

• We may incur losses associated with currency fluctuations and may not be able to effectively hedge our exposure.

• We may encounter manufacturing problems or delays that could result in lost revenue.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

Table of Contents

•We are subject to risks associated with real estate construction and development.

•Continued consolidation in the healthcare industry could have an adverse effect on our sales and results of operations.

•Economic conditions could have a material adverse effect on our company.

•Natural disasters or other events beyond our control could disrupt our business and result in loss of revenue or higher expenses.

•Changes in our effective tax rate may impact our results of operations.

•We use estimates, make judgments, and apply certain methods in determining our financial results and in measuring the progress of our business. As these estimates, judgments, and methods change, our results of operations and our assessment of the progress of our business could vary.

RISKS RELATING TO OUR REGULATORY ENVIRONMENT

███████████████████████████████████████████████

███████████████████████████████████████████████

•Our products may cause or contribute to adverse medical events or be subject to failures or malfunctions ████████████ that could harm our reputation, business, financial condition, and results of operations.

•If our manufacturing facilities do not continue to meet federal, state, or other manufacturing standards, we may be required to temporarily cease all or part of our manufacturing operations, import/export of our products, and/or recall some products, which would result in significant product delivery delays and lost revenue.

██████████████████████████████████████████████

•Changes in healthcare legislation and policy may have a material adverse effect on our financial condition and results of operations.

•We are subject to federal, state, and foreign laws governing our business practices, which, if violated, could result in substantial penalties. Additionally, challenges to, or investigation into, our practices could cause adverse publicity and be costly to respond to and, thus, could harm our business.

•If hospitals and other surgery facilities do not continue to meet federal, state, or other regulatory standards, they may be required to temporarily cease all or part of their da Vinci utilization.

RISKS RELATING TO OUR INTELLECTUAL PROPERTY

•If we are unable to fully protect and successfully defend our intellectual property from use by third parties, our ability to compete in the market may be harmed.

•Others may be successful in asserting that our products infringe their intellectual property rights, which may cause us to pay substantial damages and/or enjoin us from commercializing our products.

•Our products rely on licenses from third parties, which may not be available to us on commercially reasonable terms or at all. If we lose access to these technologies, our revenues could decline.

GENERAL RISK FACTORS

•Our future operating results may be below securities analysts' or investors' expectations, which could cause our stock price to decline.

•Our stock price has been, and will likely continue to be, volatile.

•Changes to financial accounting standards may affect our reported results of operations.

The summary of material risk factors described above should be read together with the text of the full risk factors below in the section entitled "Item 1A. Risk Factors" and the other information set forth in this Annual Report on Form 10-K, including our consolidated financial statements and the related notes, as well as other documents that we file with the U.S. Securities and Exchange Commission. The risks summarized above or described in full below are not the only risks that we face. Additional risks and uncertainties not precisely known to us or that we currently deem to be immaterial may also materially adversely affect our business, financial condition, results of operations, or cash flows.

Table of Contents

**PART I**

**ITEM 1. BUSINESS**

In this report, "Intuitive Surgical," "Intuitive," the "Company," "we," "us," and "our" refer to Intuitive Surgical, Inc. and its wholly and majority-owned subsidiaries. Intuitive®, Intuitive Surgical®, da Vinci®, da Vinci S®, da Vinci S HD Surgical System®, da Vinci Si®, da Vinci X®, da Vinci Xi®, da Vinci SP®, EndoWrist®, Firefly®, InSite®, SureForm®, Ion®, Iris®, and SynchroSeal® are trademarks or registered trademarks of the Company.

**Company Background**

As part of Intuitive's mission, we believe minimally invasive care is life-enhancing care. Through ingenuity and intelligent technology, we expand the potential of physicians to heal without constraints. We envision a future of care that is less invasive and profoundly better, where diseases are identified earlier and treated quickly so patients can get back to what matters most.

Intuitive is committed to advancing minimally invasive care through a comprehensive ecosystem of products and services. This ecosystem includes systems, instruments and accessories, learning, and services connected by a digital portfolio that enables precision and control, seamless interactions and experiences, and meaningful insights to drive better care.

Intuitive brings nearly three decades of experience and technical innovation to our robotic-assisted surgical solutions. While surgery and acute interventions have improved significantly in the past decades, there remains a significant need for better outcomes and decreased variability of these outcomes across care teams. The current healthcare environment continues to stress critical resources, including the professionals who staff care teams: surgeons, anesthesiologists, nurses, and other staff. At the same time, governments strain to cover the healthcare needs of their populations and demand lower total cost per patient to treat disease. In the face of these challenges, we believe scientific and technological advances in biology, computing, imaging, algorithms, and robotics may offer new methods to solve continued and difficult problems.

We address our customer needs by sharing their goals reflected in the quadruple aim. First, we focus on improving patient outcomes through an ecosystem of advanced robotic systems, instruments and accessories, progressive technology learning pathways, and comprehensive support and program assistance services. Second, we seek to improve the patient experience by minimizing disruption to lives and creating greater predictability for the treatment experience. Third, we seek to improve care team satisfaction by creating products and services that are dependable, smart, and optimized for the care environment in which they are used. Finally, we seek to lower the total cost to treat per patient episode when compared with existing treatment alternatives, providing a return on investment for hospitals and healthcare systems and value for payers.

**Products**

*Systems*

Advanced robotic systems provide precise, powerful systems with high-performance vision extending care team's capabilities to enhance minimally invasive care. These systems include the da Vinci Surgical System, which was designed to enable complex surgery using a minimally invasive approach, and the Ion endoluminal system, which extends our commercial offerings beyond surgery into diagnostic procedures, enabling minimally invasive biopsies in the lung.

*Da Vinci Surgical Systems*

By striving to find less invasive ways to enter the body, provide clearer views of anatomy and more precise tissue interactions, and helping hone surgical skills, Intuitive launched its first da Vinci Surgical System in 1999. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

There are several models of the da Vinci Surgical System: our fourth generation da Vinci X, da Vinci Xi, and da Vinci SP Surgical Systems, our third generation da Vinci Si Surgical System, our second generation da Vinci S Surgical System, and our first generation da Vinci standard Surgical System. The da Vinci surgical systems are designed to enable surgeons to perform a wide range of surgical procedures within our targeted general surgery, urologic, gynecologic, cardiothoracic, and head and neck specialties. To date, surgeons have used the da Vinci Surgical System to perform dozens of different types of surgical procedures. Da Vinci systems offer surgeons three dimensional, high definition ("3DHD") vision, a magnified view, and robotic and computer assistance. They use specialized instrumentation, including a miniaturized surgical camera (endoscope) and wristed instruments (e.g., scissors, scalpels, forceps, etc.) that are designed to help with precise dissection and reconstruction deep inside the body.

Our da Vinci surgical systems are comprised of the following components:

*Surgeon's Console.* The da Vinci Surgical System allows surgeons to operate while comfortably seated at an ergonomic console viewing a 3DHD image of the surgical field. The surgeon's fingers grasp instrument controls below the display with the surgeon's hands naturally positioned relative to his or her eyes. Using electronic hardware, software, algorithms,

6

Table of Contents

and mechanics, our technology translates the surgeon's hand movements into precise and corresponding real-time micro movements of the da Vinci instruments positioned inside the patient. On most of our current systems (da Vinci X, da Vinci Xi, and da Vinci Si), a second surgeon's console may be used in two ways: to provide assistance to the primary surgeon during surgery or to act as an active aid during surgeon-proctor training sessions. With the da Vinci X, da Vinci Xi, and da Vinci Si, a surgeon sitting at a second console can view the same surgery as the primary surgeon and can be passed control of some or all of the da Vinci instruments during the surgery. In addition, surgeons can control 3D virtual pointers to augment the dual-surgeon experience. The da Vinci Surgical System is designed to allow surgeons to operate while seated, which may be clinically advantageous because of reduced surgeon fatigue. The da Vinci Surgical System's design provides natural hand-eye alignment at the surgeon's console. Because the da Vinci Surgical System's robotic arms hold the camera and instruments steady, there is less surgeon and assistant fatigue.

*Patient-Side Cart.* The patient-side cart holds electromechanical arms that manipulate the instruments inside the patient. Up to four arms attached to the cart can be positioned, as appropriate, and then locked into place. At least two arms hold surgical instruments, one representing the surgeon's left hand and one representing the surgeon's right hand. A third arm positions the endoscope, allowing the surgeon to easily move, zoom, and rotate the field of vision. A fourth instrument arm extends surgical capabilities by enabling the surgeon to add a third instrument to perform additional tasks. The fourth instrument arm is a standard, integrated feature on the da Vinci X, da Vinci Xi, and da Vinci Si Surgical Systems. Our da Vinci SP Surgical System includes a single arm with three, multi-jointed, wristed instruments and the first da Vinci fully wristed, 3DHD camera. The instruments and the camera all emerge through a single cannula and are triangulated around the target anatomy to avoid external instrument collisions that can occur in narrow surgical workspaces.

*3DHD Vision System.* Our vision system includes a 3DHD endoscope with two independent vision channels linked to two separate color monitors through sophisticated image processing electronics and software. The resulting 3DHD image has high resolution, high contrast, low flicker, and low cross fading. A digital zoom feature in the 3DHD vision system allows surgeons to magnify the surgical field of view without adjusting the endoscope position and, thereby, reduces interference between the endoscope and instruments. The 3DHD vision system is a standard, integrated feature on the da Vinci X, da Vinci Xi, da Vinci SP, da Vinci Si, and da Vinci S Surgical Systems.

*Firefly Fluorescence Imaging ("Firefly").* Firefly is a standard feature of the da Vinci X and da Vinci Xi Surgical Systems and is available as an upgrade on our da Vinci Si Surgical System. This imaging capability combines an injectable fluorescent dye with a specialized da Vinci camera head, endoscope, and laser-based illuminator to allow surgeons to identify vasculature, tissue perfusion, or biliary ducts in three dimensions beneath tissue surfaces in real-time. Firefly is typically used in the procedure categories of urology, gynecology, and general surgery.

*Da Vinci Xi Integrated Table Motion.* Integrated Table Motion coordinates the movements of the da Vinci robotic arms with an advanced operating room ("OR") table, the TS 7000dV OR Table sold by Hillrom[TM], to enable managing the patient's position in real-time while the da Vinci robotic arms remain docked. This gives OR teams the capability to optimally position the operating table during da Vinci Surgical System procedures. Integrated Table Motion enables surgeons to maximize reach, facilitate access, and choose the angle of approach to target anatomy, as well as reposition the table during the procedure to enhance anesthesiologists' management of the patient.

*Ion Endoluminal System*

In 2019, ▮▮▮▮▮▮ our Ion endoluminal system, which enables minimally invasive biopsies in the lung. Our Ion system is a flexible, robotic-assisted, catheter-based platform that utilizes instruments and accessories, which extends our commercial offering beyond surgery into diagnostic, endoluminal procedures with this first application. The system features an ultra-thin, ultra-maneuverable catheter that can articulate 180 degrees in all directions and allows navigation far into the peripheral lung and provides the stability necessary for precision in biopsy. Many suspicious lesions found in the lung may be small and difficult to access, which can make diagnosis challenging, and Ion helps physicians obtain tissue samples from deep within the lung, which could help enable earlier diagnosis.

**Instruments and Accessories**

We offer a comprehensive suite of stapling, energy, and core instrumentation for our surgical systems. Our technology is designed to transform the surgeon's natural hand movements outside of the body into corresponding micro-movements inside the patient's body and suture with precision, just as they can in open surgery. With our technology, a surgeon can also use "motion scaling," a feature that translates, for example, a three-millimeter hand movement outside the patient's body into a one-millimeter instrument movement in the surgical field inside the patient's body. Motion scaling is designed to allow precision and control for delicate tasks. In addition, our technology filters the tremor inherent in a surgeon's hands.

*Da Vinci Instruments.* We manufacture a variety of instruments, most of which incorporate EndoWrist technology with wristed joints for natural dexterity and tips customized for various surgical procedures. Da Vinci instruments are offered

7

Table of Contents

in a variety of diameters, of which 8mm and 12mm diameter sizes are the most commonly sold. Various da Vinci instrument tips include forceps, scissors, electrocautery tools, scalpels, and other surgical tools that are familiar to the surgeon from open surgery and conventional MIS. A variety of instruments may be selected and used interchangeably during a surgery. Most instruments are sterilizable at the hospital, while others are provided sterile, and most are reusable for a defined number of procedures. A programmed memory chip inside each instrument performs several functions that help determine how the da Vinci system and instruments work together. In addition, the chip will generally not allow the instrument to be used for more than the prescribed number of procedures to help ensure that its performance meets specifications during each procedure.

In 2020, we announced our "Extended Use Program," which consists of select da Vinci Xi and da Vinci X instruments possessing 12 to 18 uses ("Extended Use Instruments"), compared to previously 10 uses. These Extended Use Instruments represent some of our higher volume instruments but exclude stapling, monopolar, and advanced energy instruments. Instruments included in the program are used across a number of da Vinci surgeries. Their increased uses are the result of continuous, significant investments in the design and production capabilities of our instruments, resulting in improved quality and durability. Extended Use Instruments were introduced in the U.S. and Europe in the fourth quarter of 2020 and were launched in most other countries around the world during the first half of 2021, except China ▮▮▮▮▮▮▮ They will continue to be introduced at various times throughout 2022 in other geographies, ▮▮▮▮▮▮

*Da Vinci Stapling.* The EndoWrist Stapler is a wristed, stapling instrument intended for resection, transection, and/or creation of anastomoses. This instrument enables operators to precisely position and fire the stapler. We market five staplers available with the da Vinci X and da Vinci Xi Surgical Systems: the EndoWrist Stapler 30 and 45 and the SureForm Stapler 30, 45, and 60, where the numeric designation indicates the length of the staple line. The EndoWrist Stapler 30 is intended to deliver particular utility with fine tissue interaction in lobectomy and other thoracic procedures. The EndoWrist Stapler 45 is used in general surgery, gynecologic, thoracic, and urologic procedures. The SureForm Staplers 30, 45, and 60 are intended to be used in general surgery, thoracic, gynecologic, urologic, and pediatric surgery procedures. The SureForm Stapler 30 ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ may deliver particular utility in thoracic procedures. The SureForm 45 may deliver particular utility in thoracic and colorectal procedures where maneuverability and visualization are limited. The SureForm Stapler 60 is a single-use, fully wristed, stapling instrument intended to deliver particular utility in bariatric procedures. We market five stapler reloads: gray (2.0 mm), white (2.5 mm), blue (3.5 mm), green (4.3 mm), and black (4.6 mm). Not all reloads are available for use on all staplers. Not all staplers or reloads are available in all countries.

*Da Vinci Energy.* The da Vinci One Vessel Sealer is a wristed, single-use instrument intended for bipolar coagulation and mechanical transection of vessels up to 7mm in diameter and tissue bundles that fit in the jaws of the instrument. This instrument enables surgeons to fully control vessel sealing, while providing the benefits of robotic-assisted surgery. This instrument is designed to enhance surgical efficiency and autonomy in a variety of general surgery and gynecologic procedures. The da Vinci Vessel Sealer Extend is our newest instrument in the Vessel Sealing family of products. The da Vinci Vessel Sealer Extend is a single-use, fully wristed bipolar electrosurgical instrument compatible with our fourth generation multiport systems. It is intended for grasping and blunt dissection of tissue and for bipolar coagulation and mechanical transection of vessels up to 7mm in diameter and tissue bundles that fit in the jaws of the instrument.

The E-100 generator is Intuitive's first generator and is offered as an upgrade to power the da Vinci Vessel Sealer Extend and our SynchroSeal instrument ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SynchroSeal enables a surgeon to perform rapid, one-step sealing and transection with a single pedal press. SynchroSeal uses advanced bipolar energy from its raised cut electrode to transect tissue and then cool down quickly.

*Accessory Products.* We sell various accessory products, which are used in conjunction with the da Vinci Surgical Systems as surgical procedures are performed. Accessory products include sterile drapes used to help ensure a sterile field during surgery, vision products, such as replacement 3D stereo endoscopes, camera heads, and light guides, and other items that facilitate use of the da Vinci Surgical Systems.

### Learning

Intuitive provides progressive learning pathways to support the safe and effective use of our technology. These pathways leverage both learning engagements and learning technologies. Learning engagement touchpoints vary by specific pathway, skill level, and interest, while learning technologies enable and provide training directly to the customer. The portfolio of learning offerings includes role-specific Training Pathways, Learning Engagements, and Learning Technology.

*Training Pathways.* Intuitive Training Pathways are progressive learning journeys that help our customers achieve proficiency using Intuitive technology. There are pathways for surgeons and physicians, residents and fellows, OR care teams, patient side assists, and robotic coordinators, as well as recommendations for executives.

8

Table of Contents

*Learning Engagements.* Intuitive Learning Engagements are touchpoints that support customers throughout their learning journeys. They vary by pathway, skill level, and focus area. Engagements include case observations, online education, in-service training, simulation/skills training, OR care team training, technology training, reprocessing training, proctoring, advanced training, and curriculum development support. Many of these programs take place at established Intuitive training centers and include instruction by expert surgeons and physicians.

*Learning Technology.* Learning Technologies include solutions that provide education and training directly to the customer as well as the enabling technologies that make provision possible. Intuitive's enabling technologies include Telepresence and the Procedure Analytics Platform. Specific technology solutions include Intuitive Learning, SimNow, customized training models, remote case observations, and remote proctoring. Two of the technology solutions most heavily utilized by customers are Intuitive Learning and SimNow.

*Intuitive Learning.* Intuitive Learning provides our customers with access to the technology, procedure, and simulation materials essential to their specific learning journeys. Both assignment of learning materials and tracking of learning progress occur seamlessly within the platform. While Intuitive Learning plans guide learners through each step in their pathways, customers are also able to search the platform independently for additional materials that may be relevant to their area of focus. This platform also provides customers with immediate access to their various training certificates.

*SimNow.* Our cloud-enabled SimNow simulation platform is a practice tool that gives a user the opportunity to practice their skills and gain familiarity with the surgeon console controls and supports the user's progressive learning pathway. SimNow incorporates 3D, physics-based computer simulation technology to immerse the user within a virtual environment and provides training capabilities that have been used extensively by surgeons. The user navigates through the environment and completes exercises by controlling virtual instruments from the surgeon console. Upon completion of a skills exercise, the skills simulator provides a quantitative assessment of user performance based on a variety of task-specific metrics. The SimNow online connection drives real-time simulation performance tracking for surgeons and administrators through an online dashboard and supports remote updates of the VR content and 3DHD videos to drive a more interactive and engaging customer experience. SimNow is intended to augment, not replace, existing training programs for the da Vinci X, da Vinci Xi, and da Vinci SP Surgical Systems.

### Services

We have a network of field service engineers across the U.S., Europe, and Asia and maintain relationships with various distributors around the globe. This infrastructure of service and support specialists offers a full complement of services for our customers, including 24/7 support, installation, repair, and maintenance.

Our comprehensive support and program assistance helps to ensure customers and care teams maximize program performance and protect their investment. Services include readiness support, maintenance support, OR consulting, Customer Hospital Analytics, and market consulting optimization.

*Readiness and Maintenance Support.* Readiness support is operational support to assure smooth onboarding and adoption of new systems and technology. Maintenance support helps to maximize operational efficiency and reduce unplanned equipment downtime. It includes services care plans, support teams, onsite monitoring, software upgrades and updates as well as a maintenance customer portal. The service care plan offers flexible service plans to ensure reliability of the systems and instruments and optimize the robotics program. The support team of expert field service, remote technical support, and customer care technicians resolve and prevent any technology issues and maximize utilization. OnSite Monitoring offers remote service in real-time for pre-operative and intraoperative troubleshooting, as well as proactive monitoring of system performance. Software upgrades and updates enable the latest product innovations and enhancements. The maintenance customer portal is an online tool that delivers on-demand data to set, monitor, and help the operational goals of a robotics program.

*OR Consulting.* OR consulting is a suite of customized solutions to improve a hospital's efficiency and performance with Intuitive technologies. New system integration support is available to streamline the start-up process and expedite increased procedure volumes. Overall program assessments help to support efficiency improvements, cost reductions, and system access optimization.

*Program Analytics.* Our Custom Hospital Analytics program enables the integration of data sources so that individual health institutions can analyze their data in their own environment. Using this data, administrators, chiefs of surgery, and surgeons can gain alignment around their programs based on their KPIs, determine best practices, assess gaps, and take actionable steps to address any gaps.

9

Table of Contents

### Digital Solutions

Integrated digital capabilities provide unified and connected offerings, streamlining performance for hospitals with program-enhancing insights. Secure-by-design, cloud-enabled products analyze and simplify essential data to continuously optimize use of time, tools, and techniques.

*Intuitive Hosted & Managed Services.* The vast majority of our systems are network connected and directly communicate with Intuitive to enable proactive monitoring as well as provide software updates and data insights to Intuitive customers.

*3D Modeling Services.* In February 2019, ▮▮▮▮▮▮▮▮▮ Iris, Intuitive's augmented reality imaging product, for use in kidney procedures. The service extracts CT scans, runs them through machine-learning algorithms and, after technicians' revision and radiologists' review, returns a 3D segmented model of the kidney for use in planning for a procedure and for intraoperative visualization of the area. The tool uses augmented reality to give surgeons an image with details of the kidney anatomy - blood vessels, tumor shape, and size - that they may not be able to see well with other imaging. Intuitive designed this to help with pre-operative planning and intraoperative guidance as well to be shared as a teaching tool for other physicians and patients. It can also be part of the viewing experience inside of the da Vinci surgeon console to enhance information and let surgeons know where critical anatomy sits as they work through a procedure. The service is currently being used in pilot studies. We launched our first pilot site in 2019, continued in 2020 with select sites, and have six pilot sites as of December 31, 2021.

*My Intuitive.* This recently launched mobile application was developed to be the single point for Intuitive customers to access products, services, and personal data insights. The application also offers comparisons of those insights with anonymized national benchmarks to help drive operational efficiencies and decreased costs. The most recent version enables mobile access to Intuitive's Learning platform, case reports generated automatically for the surgeon, and an ability for surgeons to publish their practice information online for patients seeking local physicians.

*Intuitive Hub.* Intuitive Hub captures, transfers, and stores clinical media as part of an OR informatics platform that integrates multiple applications and data sets to help orchestrate procedure workflows. The most recent update connects the da Vinci system to the media management application, automating video bookmarking and editing for physicians aimed at improving workflow efficiencies outside the OR.

### Business Strategy

We align our goals to those of our customers, often called the Quadruple Aim: enabling physicians and hospitals to improve outcomes for their patients, improve their patient's and the care team's experience, and lower the total cost to treat per patient episode. Through the use of smart, connected systems, robotic technologies, advanced imaging, and informatics, our objective is to create value for patients, surgeons, and hospitals as summarized below.

*Patient Value.* We believe that the value of a medical procedure to a patient can be defined: *Patient Value = Procedure Efficacy / Invasiveness*. We define *procedure efficacy* as a measure of the success of the procedure in helping resolve underlying disease and *invasiveness* as a measure of patient pain and disruption of regular activities. When the patient value of procedure using an Intuitive product is greater than that of alternative treatment options, patients may benefit from seeking out surgeons and hospitals that offer those products, which could potentially result in a local market share shift. Adoption of Intuitive technology occurs procedure by procedure and market by market and is driven by the relative patient value and the total treatment costs of da Vinci procedures as compared to alternative treatment options for the same disease state or condition. We believe that most patients will place higher value on procedures that are not only more efficacious but also less invasive than alternative treatments. Our goal is to provide products to surgeons who, in turn, provide patients with procedure options that are both highly effective and less invasive than others.

*Surgeon Value.* We offer physicians and their operating room staff training on the technical use of our products. We provide an ergonomic platform through our da Vinci surgical system for surgeons to perform their procedures. We seek to provide surgeons with reliable and easy-to-use products. For example, the change to cloud-based analytics and routine use of local analytics may help surgeons track their procedures and processes and, with a network-connected smartphone and the My Intuitive app, surgeons can access and explore their procedure data, such as console time and instrument usage, to gain insights into their program.

*Hospital Value.* We assist hospitals in building value by offering patient value using da Vinci products, thereby increasing surgical revenue and reducing costs through lower complication rates and reduced lengths of patient stay. For example, we believe robotic-assisted surgery with the da Vinci Surgical System is a cost-effective approach to many surgeries as compared to alternative treatment options, as recognized in many published studies. We also offer our Custom Hospital Analytics program, which enables the integration of data sources so that individual health institutions can analyze their data in their own environment. Using this data, administrators, chiefs of surgery, and surgeons can gain

10

Table of Contents

alignment around their programs based on their KPIs, determine best practices, assess gaps, and take actionable steps to address any gaps.

**Clinical Applications**

We are the beneficiaries of productive collaborations with leading surgeons in exploring and developing new techniques and applications for robotic-assisted surgery with the da Vinci Surgical System and minimally invasive biopsies with the Ion endoluminal system-an important part of our creative process. We primarily focus our development efforts on those procedures in which we believe our products bring the highest patient value, surgeon value, and hospital value. We currently focus on five surgical specialties: general surgery, urologic surgery, gynecologic surgery, cardiothoracic surgery, and head and neck surgery. Key procedures that we are focused on include hernia repair, colon and rectal procedures, cholecystectomy, bariatric surgery, prostatectomy, partial nephrectomy, hysterectomy, sacrocolpopexy, lobectomy, and transoral robotic surgery. We also focus on minimally invasive biopsies in the lung. Representative surgical applications are described below.

*General Surgery*

*Hernia Repair.* A hernia occurs when an organ or other tissue squeezes through a weak spot in a surrounding muscle or connective tissue. During a hernia repair surgery, the weakened tissue is secured, and defects are repaired. Common types of hernia are ventral and inguinal. Ventral, or abdominal hernia, may occur through a scar after surgery in the abdomen. Inguinal hernia is a bulge in the groin and is more common in men. Hernia repair can be performed using traditional open surgery or MIS. There is a wide-range of complexity in hernia repair surgeries and varying surgeon opinion regarding optimal surgical approach. The benefits of minimally invasive and robotic-assisted hernia repair surgery vary by patient.

*Colorectal Surgery.* These procedures typically involve benign or cancerous conditions of the lower digestive system, in particular the rectum or colon. Common procedures in this area include hemicolectomy, sigmoidectomy, low anterior resection, and abdominoperineal resection. Surgeons have reported that the use of robotic-assisted surgery with a da Vinci Surgical System and our latest technologies, such as the EndoWrist Stapler and da Vinci Energy, have enabled them to offer MIS approaches to a broader range of colorectal surgery patients.

*Cholecystectomy.* Cholecystectomy, or the surgical removal of the gall bladder, is a commonly performed general surgery procedure. Cholecystectomy is the primary method for the treatment of gallstones and other gall bladder diseases. Most cholecystectomies are performed using multi-port MIS techniques, although some surgeons choose to perform cholecystectomy using manual single-port instrumentation. Firefly technology can be used to visualize biliary anatomy in three dimensions beneath the tissue surfaces during multi-port da Vinci cholecystectomies.

*Bariatric Surgery.* A body of literature points to the benefit of surgery to treat patients for morbid obesity and its secondary effects, such as diabetes. Sleeve gastrectomy and Roux-en-Y gastric bypass ("RYGB") are commonly performed surgical procedures for morbid obesity in the U.S. The body habitus of morbidly obese patients can make laparoscopic surgery physically challenging for the surgeon, and certain surgeons have found value in using the da Vinci Surgical System to improve upon the ergonomics when performing MIS in morbidly obese patients. In addition, RYGB can be a technically challenging procedure due to the suturing, stapling, and tissue (bowel) manipulation that is required. Surgeons using the da Vinci Surgical System have reported a reduction in a critical complication (anastomotic leaks) relative to laparoscopic RYGB. Also, we believe SureForm 60 may have particular utility in bariatric procedures.

*Urologic Surgery*

*Prostatectomy.* Radical prostatectomy is the removal of the prostate gland in patients diagnosed with clinically localized prostate cancer. The standard approach to removal of the prostate was via an open surgical procedure. The conventional laparoscopic approach is an option, but it is difficult and poses challenges to even the most skilled urologist. The da Vinci Surgical System has enabled a large number of surgeons to convert from using an open surgical technique to a minimally invasive technique.

*Partial Nephrectomy.* Partial nephrectomy is the removal of a small portion of a kidney (typically, an area of the kidney containing a tumor). Partial nephrectomies are most commonly performed in patients diagnosed with clinically localized renal cancer. Excluding robotic-assisted surgery with a da Vinci Surgical System, there are three common surgical approaches to performing partial nephrectomies: open surgical technique, laparoscopy, and hand-assisted laparoscopy, which is a hybrid of the open and laparoscopic techniques. Surgeons have reported that the da Vinci Surgical System's capabilities may enable a large number of these procedures to be performed through a minimally invasive technique, conferring the benefits of MIS to a broader range of partial nephrectomy patients. Treatment guidelines for patients with localized renal cancer recommend partial nephrectomy due to the benefits that nephron-sparing surgery has in long-term patient outcomes. Published clinical literature has shown that the presence of a da Vinci Surgical System is associated with a higher-proportion of patients receiving a guideline-recommended partial nephrectomy.

11

Table of Contents

### Gynecologic Surgery

*Hysterectomy.* Removal of the uterus is one of the most commonly performed surgeries in gynecology and is performed for a variety of underlying benign and cancerous conditions. Hysterectomies can be performed using open surgery (laparotomy) or MIS techniques, which include vaginal, laparoscopic, and robotic-assisted approaches. Prior to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 2005, the majority of hysterectomies performed were open surgeries. We believe that robotic-assisted surgery with the da Vinci Surgical System provides patients the opportunity to receive a minimally invasive treatment as an alternative to an open hysterectomy.

*Sacrocolpopexy.* The abdominal (open) sacrocolpopexy is one of the operations performed to treat vaginal vault prolapse. Sacrocolpopexy involves suturing a synthetic mesh that connects and supports the vagina to the sacrum (tailbone). A sacrocolpopexy can be performed using a conventional laparoscopic technique; however, it is generally described as difficult and cumbersome to perform. Surgeons have reported that the da Vinci Surgical System's capabilities may enable a larger number of these procedures to be performed through a minimally invasive technique, conferring the benefits of MIS to a broader range of sacrocolpopexy patients.

### Cardiothoracic Surgery

*Thoracic Surgery.* Conventional approaches to surgical procedures in the thorax include both open and video-assisted thoracoscopic approaches. Procedures performed via these methods include pulmonary wedge resection, pulmonary lobectomy, thymectomy, mediastinal mass excision, and esophagectomy. Many thoracic procedures remain open procedures. Surgeons have reported that the use of robotic-assisted surgery with a da Vinci Surgical System in thoracic surgery has enabled them to offer MIS approaches to a broader range of thoracic surgery patients and improved clinical outcomes compared to open and video-assisted thoracic surgery in published single-center, multi-center, and national database clinical studies. Also, we believe the EndoWrist Stapler 30 and the SureForm Stapler 30 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ may have particular utility in thoracic procedures.

### Head and Neck Surgery

*Transoral Surgery.* Head and neck cancers are typically treated by either surgical resection or chemo-radiation, or a combination of both. Surgical resection performed by an open approach may require a "jaw-splitting" mandibulotomy. This procedure, while effective in treating cancer, is potentially traumatic and disfiguring to the patient. MIS approaches via the mouth (transoral surgery) are challenged by line-of-sight limitations dictated by conventional endoscopic tools. Chemo-radiation as a primary therapy does allow patients to avoid traumatic surgical incisions; however, literature suggests that this modality diminishes patients' ability to speak and swallow normally. Surgeons have reported that da Vinci transoral surgery allows them to operate on tumors occurring in the oropharynx (i.e., tonsil and base of tongue) and larynx via the mouth and to overcome some of the line-of-sight limitations of conventional transoral surgery.

### Da Vinci Procedure Mix

Our da Vinci procedure business is broadly split into two categories: (1) cancer procedures and (2) procedures for benign conditions. Cancer and other highly complex procedures tend to be reimbursed at higher rates than less complex procedures for benign conditions. Thus, hospitals are more sensitive to the costs associated with treating less complex, benign conditions. Our strategy is to provide hospitals with attractive clinical and economic solutions across the spectrum of procedure complexity. Our fully featured da Vinci Xi Surgical System with advanced instruments, including the da Vinci Energy and EndoWrist and SureForm Stapler products, and our Integrated Table Motion product, targets the more complex procedure segment. Our da Vinci X Surgical System is targeted towards price sensitive markets and procedures. Our da Vinci SP Surgical System complements the da Vinci Xi and X Surgical Systems by enabling surgeons to access narrow workspaces.

### Clinical Summary

There are approximately 70 representative clinical uses for da Vinci Surgical Systems. We believe that there are numerous additional applications that can be addressed with the da Vinci Surgical System, and we work closely with our surgeon customers to refine and explore new techniques in which a da Vinci Surgical System may bring value. As of December 31, 2021, we had an installed base of 6,730 da Vinci Surgical Systems, including 4,139 in the U.S., 1,199 in Europe, 1,050 in Asia, and 342 in the rest of the world. We estimate that surgeons using our technology completed approximately 1,594,000 surgical procedures of various types in hospitals throughout the world during the year ended December 31, 2021.

Additionally, over time, we believe that there are numerous additional applications that can be addressed with the Ion endoluminal system. As of December 31, 2021, we had an installed base of 129 Ion endoluminal systems, 128 of which are located in the U.S. ▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12

Table of Contents

**Sales and Customer Support**

*Sales Model*

We provide our products through direct sales organizations in the U.S., Europe (excluding Spain, Portugal, Italy, Greece, and most Eastern European countries), China, Japan, South Korea, India, and Taiwan. In January 2019, our Intuitive-Fosun joint venture (referred to herein as the "Joint Venture") with Shanghai Fosun Pharmaceutical (Group) Co., Ltd. ("Fosun Pharma") acquired certain assets related to the distribution business of Chindex Medical Limited and its affiliates ("Chindex"), a subsidiary of Fosun Pharma, which has been our distribution partner for da Vinci Surgical Systems in China since 2011, and began direct operations for da Vinci products and services in China. See "Item 7. Management Discussion and Analysis" for further details on the Joint Venture. In the remainder of our markets outside of the U.S., we provide our products through distributors. During the years ended December 31, 2021, 2020, and 2019, domestic revenue accounted for 67%, 68%, and 70%, respectively, of total revenue, while revenue from our OUS markets accounted for 33%, 32%, and 30%, respectively, of total revenue. As of December 31, 2021, and 2020, 84% and 83% of all long-lived assets were in the U.S., respectively.

Our direct sales organization is composed of a capital sales team, responsible for selling systems, and a clinical sales team, responsible for supporting system use in procedures performed at our hospital accounts. Our hospital accounts include both individual hospitals and healthcare facilities as well as hospitals and healthcare facilities that are part of an integrated delivery network ("IDN groups"). The initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle that can be affected by macroeconomic factors, capital spending prioritization, timing of budgeting cycles, and competitive bidding processes. Capital sales activities include educating surgeons or physicians and hospital staff across multiple specialties on the benefits of robotic-assisted surgery with a da Vinci Surgical System or robotic-assisted bronchoscopy with an Ion endoluminal system, total treatment costs, and the clinical applications that our technology enables. We also train our sales organization to educate hospital management on the potential benefits of adopting our technology, including the clinical benefits of robotic-assisted surgery with a da Vinci Surgical System or robotic-assisted bronchoscopy with an Ion endoluminal system, potential reductions in complications and length of stay, and the resulting potential for increased patient satisfaction, surgeon or physician recruitment, and procedure volume.

Our clinical sales team works on site at hospitals, interacting with surgeons or physicians, operating room staff, and hospital administrators to develop and sustain successful robotic-assisted surgery or bronchoscopy programs. They assist the hospital in identifying surgeons or physicians who have an interest in robotic-assisted surgery or bronchoscopy and the potential benefits provided by the da Vinci Surgical System and the Ion endoluminal system. Our clinical sales team provides current clinical information on robotic-assisted surgery or bronchoscopy practices and new product applications to the hospital teams. Our clinical sales team has grown with the expanded installed bases of da Vinci Surgical Systems and Ion endoluminal systems as well as the total number of procedures performed. We expect this organization to continue to grow as our business expands.

Our customers place orders to replenish their supplies of instruments and accessories on a regular basis. Orders received are typically shipped within one business day. New direct customers who purchase a new system typically place an initial stocking order of instruments and accessories soon after they receive their system.

Our business is subject to seasonal fluctuations. Historically, our sales of da Vinci Surgical Systems have tended to be heavier in the fourth quarter and lighter in the first quarter, as hospital budgets are reset. In addition, we have historically experienced lower procedure volume in the first and third quarters and higher procedure volume in the second and fourth quarters. More than half of da Vinci procedures performed are for benign conditions. These benign procedures and other short-term elective procedures tend to be more seasonal than cancer procedures and surgeries for other life-threatening conditions. In the U.S., volumes for procedures associated with benign conditions are typically seasonally higher in the fourth quarter when more patients have met annual deductibles and lower in the first quarter when deductibles are reset. Seasonality outside the U.S. varies and is more pronounced around local holidays and vacation periods. The timing of procedures and changes in procedure volume impact the timing of instrument and accessory and capital purchases. As a result of factors outlined in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations-COVID-19 Pandemic" below, including the past and potential future recommendations of authorities to defer elective procedures, historical procedure patterns have been and may continue to be disrupted.

*Customer Support*

We have a network of field service engineers across the U.S., Europe, and Asia and maintain relationships with various distributors around the globe. This infrastructure of service and support specialists offers a full complement of services for our customers, including 24/7 support, installation, repair, and maintenance. We generate service revenue by providing these services to our customers through comprehensive service contracts and time and material programs.

13

Table of Contents

### Research and Development

We focus our research and development efforts on innovation and improvement for products and services that align with our mission: We believe that minimally invasive care is life-enhancing care. Through ingenuity and intelligent technology, we believe that we can expand the potential of physicians to heal without constraints. We employ engineering and research and development staff to focus on delivering future innovations and sustaining improvements that advance our mission. In certain instances, we complement our research and development effort through collaborations with other companies, such as Trumpf Medical (a division of Hill-Rom Holdings, Inc.).

### Manufacturing

We manufacture our systems at our facilities in Sunnyvale, California and Durham, North Carolina. We manufacture our instruments at our facilities in Sunnyvale, California and Mexicali, Mexico. We also have manufacturing at multiple sites in Germany.

We purchase both custom and off-the-shelf components from a large number of suppliers and subject them to stringent quality specifications and processes. Some of the components necessary for the assembly of our products are currently provided to us by sole-sourced suppliers (the only recognized supply source available to us) or single-sourced suppliers (the only approved supply source for us among other sources). We purchase the majority of our components and major assemblies through purchase orders rather than long-term supply agreements and generally do not maintain large volumes of finished goods relative to our anticipated demand.

### Competition

We face competition in the forms of existing open surgery, conventional MIS, drug therapies, radiation treatment, and emerging interventional surgical approaches. Our success depends on continued clinical and technical innovation, quality and reliability, as well as educating hospitals, surgeons, and patients on the demonstrated results associated with robotic-assisted surgery using da Vinci Surgical Systems and its value relative to other techniques. We also face competition from several companies that have introduced or are developing new approaches and products for the MIS market. We believe that the entrance or emergence of competition validates MIS and robotic-assisted surgery.

Moreover, as we add new robotically controlled products (e.g., da Vinci Stapling and da Vinci Energy) that compete with product offerings traditionally within the domains of open surgery and/or conventional MIS, we face greater competition from larger and well-established companies, such as Johnson & Johnson and Medtronic plc.

The companies that have introduced products in the field of robotic-assisted surgery or have made explicit statements about their efforts to enter the field, include, but are not limited to, Asensus Surgical, Inc.; avateramedical GmbH; CMR Surgical Ltd.; Johnson & Johnson; Medicaroid, Inc.; Medrobotics Corporation; Medtronic plc; meerecompany Inc.; MicroPort Scientific Corporation; Olympus Corporation; Samsung Group; Shandong Weigao Group Medical Polymer Company Ltd.; and Titan Medical Inc. Other companies with substantial experience in industrial robotics could potentially expand into the field of surgical robotics and become a competitor. In addition, research efforts utilizing computers and robotics in surgery are underway at various companies and research institutions. Our revenues may be adversely impacted as our competitors announce their intent to enter our markets and as our customers anticipate the availability of competing products.

### Intellectual Property

We place considerable importance on obtaining and maintaining patent, copyright, trademark, and trade secret protection for significant new technologies, products, and processes.

We generally rely upon a combination of intellectual property laws, confidentiality procedures, and contractual provisions to protect our proprietary technology. For example, we have trademarks, both registered and unregistered, that provide distinctive identification of our products in the marketplace. We also have exclusive and non-exclusive patent licenses with various third parties to supplement our own robust patent portfolio.

As of December 31, 2021, we held ownership or exclusive field-of-use licenses for more than 4,200 U.S. and foreign patents and have filed more than 2,100 U.S. and foreign patent applications. We intend to continue filing new patent applications in the U.S. and foreign jurisdictions to seek protection for our technology.

Patents are granted for finite terms. Upon expiration, the inventions claimed in a patent enter the public domain.

██████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████

14

Table of Contents



15

Table of Contents



16

Table of Contents



17

4-SER-908

Table of Contents



18

Table of Contents

**Third-Party Coverage and Reimbursement**

Our customers, including physicians, hospitals, and outpatient facilities, typically bill third-party payors for the costs and fees associated with the procedures in which our products are used. In the U.S., in order to receive payment for the procedures performed using our products, our customers must report codes that describe the services or products furnished and determine the medical necessity of the service or whether the service is included in the payors' policy). In the U.S. and most markets globally where we sell our products, reimbursement for medical services and surgical procedures to hospitals, outpatient facilities, and surgeons (collectively "providers") is determined by the government, commercial payors (insurers), or a combination of both.

In the U.S., the Centers for Medicare and Medicaid Services ("CMS") and its fiscal intermediaries (Medicare Administrative Contractors) and state Medicaid programs establish reimbursement policies for medical and surgical services at the state and federal level for the Medicare and Medicaid programs. Third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies but also have their own methods and approval processes. Commercial payors in non-capitated contracts commonly establish payment to providers based on a percentage of the Medicare payment rate.

Physicians and outpatient facilities bill for medical and surgical services by reporting a combination of billing codes. Current Procedural Terminology ("CPT") codes are created by the American Medical Association ("AMA") with input from CMS and commercial payors to describe medical and surgical procedures. CPT codes currently exist for minimally invasive surgical procedures, which may involve the da Vinci surgical system. In general, the majority of payors, including Medicare, consider robotic assistance as a tool used to perform the procedure and do not pay providers more for a surgical procedure that involves robotic assistance using the da Vinci or any other robotic surgical system. Because there is often no separate reimbursement for the use of our products, the additional cost associated with the use of our products can affect the profit margin of the hospital or surgery center where the procedure is performed. If hospitals do not obtain sufficient reimbursement from third-party payors for procedures performed with our products, or if governmental and private payors' policies do not cover surgical procedures performed using our products, we may not be able to generate the revenue necessary to support our business.

Hospitals bill for inpatient services by reporting ICD-10-PCS codes. CMS is primarily responsible for overseeing changes and modifications to ICD-10-PCS codes. Medicare payment to hospitals for services provided during an inpatient stay are based on the Inpatient Prospective Payment System ("IPPS"). Under the IPPS, each patient discharge is categorized into a Medicare Severity Adjusted Diagnosis-Related Group ("MS-DRG" or "DRG"). Each DRG has an assigned payment weight based on the average resources used for Medicare patients in that DRG, taking into account the patient's principal diagnosis, surgical procedures, age, discharge status, and up to 24 additional or secondary diagnoses, among other things. The DRG is a single, bundled payment intended to cover all costs associated with the inpatient admission.

The use of robotic technology does not influence MS-DRG assignment or payment for an inpatient admission related to a surgical procedure. CMS annually updates hospital inpatient and outpatient payments based on hospitals' charge data. Hospital inpatient and outpatient payments are also adjusted based on whether the hospital is a teaching hospital, its geographic location, and any failures to meet certain quality metrics, among other factors.

Commercial payors commonly establish inpatient facility payment for providers using published Medicare DRG rates as a benchmark. Commercial payment to providers varies depending on the procedure performed, geographic location, contractual allowances, and other factors.

Medicare and commercial payor payments to facilities for medical and surgical services may not always fully reimburse providers for all costs associated with furnishing these procedures. If payment is insufficient for procedures involving our technology, hospitals and physicians may decide not to use our products.

In countries outside the U.S., reimbursement for surgical services to physicians and facilities differs considerably and varies by country. In some markets, there is a single public payor who provides a global annual budget to hospitals to provide all care to the population served in a designated geographic area. In other markets, private insurance can be purchased or is provided by employers to supplement public health insurance. In some countries, patients may be permitted to pay directly for surgical services; however, such "co-pay" practices are not common (or allowed) in many countries. Further, in many global markets, access to procedures and technology is governed or heavily influenced by Health Technology Assessment ("HTA") organizations, which conduct periodic and extensive evidence-based reviews of the clinical value and cost effectiveness of a new technology. To effectively conduct our business, we may need to seek OUS reimbursement approvals, and we do not know if these required approvals will be obtained in a timely manner or at all. In addition, in some markets, HTA organizations may publish reports with mixed conclusions about the clinical and economic value of our products to the population. Such reviews could negatively impact hospital adoption of our technology.

Table of Contents

### Healthcare Reform

In the U.S., there have been, and continue to be, a number of legislative initiatives to contain healthcare costs. In March 2010, the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act (collectively, the "ACA"), was enacted. The ACA made changes that have significantly impacted healthcare providers, insurers, and pharmaceutical and medical device manufacturers. The ACA contained a number of provisions designed to generate the revenues necessary to fund health insurance coverage expansion and appropriated funding to research the comparative effectiveness of healthcare treatments and strategies. It remains unclear how this research will influence future Medicare coverage and reimbursement decisions as well as influence other third-party payor coverage and reimbursement policies.

Since its enactment, there have been judicial, executive and Congressional challenges to certain aspects of the ACA. On June 17, 2021, the U.S. Supreme Court dismissed the most recent judicial challenge to the ACA brought by several states without specifically ruling on the constitutionality of the ACA. Thus, the ACA will remain in effect in its current form. Further, prior to the U.S. Supreme Court ruling, President Biden issued an executive order to initiate a special enrollment period from February 15, 2021, through August 15, 2021, for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. These changes included an aggregate reduction in Medicare payments to providers of 2% per fiscal year, which went into effect on April 1, 2013, and will remain in effect through 2030, unless additional Congressional action is taken, with the exception of a temporary suspension from May 1, 2020, through March 31, 2022. On January 2, 2013, the American Taxpayer Relief Act of 2012 was signed into law, which, among other things, further reduced Medicare payments to several types of providers, including hospitals, imaging centers, and cancer treatment centers. The Medicare Access and CHIP Reauthorization Act of 2015, enacted on April 16, 2015 ("MACRA"), repealed the formula by which Medicare made annual payment adjustments to physicians and replaced the former formula with fixed annual updates and a new system of incentive payments that began in 2019 and are based on various performance measures and physicians' participation in alternative payment models, such as accountable care organizations. Individual states in the U.S. have also become increasingly aggressive in passing legislation and implementing regulations designed to control product pricing, including price or patient reimbursement constraints and discounts, and require marketing cost disclosure and transparency measures.

In the U.S. and abroad, reimbursement is dynamic and subject to change annually by public and private payors. National government agencies may also intervene and pass legislation that is intended to reduce healthcare spending, which could impact market access. Such legislative interventions can vacillate significantly based on government leadership. Other federal or state healthcare reform measures that may be adopted in the future could have a material adverse effect on our business. Any regulatory or legislative developments in domestic or foreign markets that eliminate or reduce reimbursement rates for procedures performed with our products could harm our ability to sell our products or cause downward pressure on the prices of our products, either of which would adversely affect our business, financial condition, and results of operations.

### Human Capital

The future success of our company depends on our ability to attract, retain, and further develop top talent. To facilitate talent attraction, retention, and development, we strive to make Intuitive an inclusive, diverse, and safe workplace with opportunities for our employees to grow and develop in their careers, supported by strong compensation, benefits, and health and wellness programs as well as by programs that build connections between our employees and the communities in which they live and work.

As of December 31, 2021, we had approximately 9,793 full-time employees, 1,294 of whom were engaged directly in research and development, 3,682 in manufacturing operations, 3,354 in commercial and service operations, and 1,463 in administrative activities. During 2021, the number of employees increased by approximately 1,712. Our employees are based in 27 different countries around the world. Our global workforce consists of diverse, highly skilled talent at all levels. During 2021, our turnover rate was approximately 10.3%.

*Inclusion and Diversity*

Intuitive's inclusion and diversity (I&D) vision is to empower our employees and customers from every background to fully contribute toward our mission to expand the potential of physicians to heal without constraints. We want to build an environment where every individual can belong and flourish - in our company and the communities we serve.

We believe that everyone should feel included and fairly treated, and we embrace the unique qualities that make people who they are. This includes all genders and gender identities, races, ethnicities, ages, national origins, native languages,

20

Table of Contents

disabilities, sexual orientations, body sizes, military backgrounds, socioeconomic backgrounds, religions, and family structures. We believe in seeking the different to propel innovation and creativity forward.

We have a four-part strategy to guide our I&D progress: building a diverse workforce to fuel innovation and better mirror the patients we serve; ensuring an inclusive experience, where employees from all backgrounds feel welcome, supported, and valued; investing in fair practices by continuously improving our people practices and sharing progress; and strengthening our industry leadership by engaging with the healthcare community, diversity-focused organizations, and shareholders to drive positive change. Employee Resource Groups (ERGs) have been one key area of I&D focus and growth, providing support and community for traditionally marginalized groups, including women, people of color, members of the LGBTQ+ community, military veterans, and employees with disabilities.

From a governance perspective, maintaining a mix of backgrounds and experience in our board composition is essential to understanding and reflecting the needs of our diverse stakeholders. Currently, four of our 11 board members self-identify as women, and three of our 11 board members self-identify as individuals from underrepresented communities (defined as an individual who self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native, or who self-identifies as gay, lesbian, bisexual, or transgender).

*Health, Safety, and Wellness*

The health, safety, and wellness of our employees is a priority in which we continued to invest and expand throughout 2021. We provide our employees and their families with access to a variety of innovative, flexible, and convenient health and wellness programs. Program benefits are intended to provide protection and security, including workplace health and safety best practices integrated into our everyday activities. Additionally, we provide programs that help employees have peace of mind concerning events that may require time away from work or that may impact their family, mental health, or financial well-being.

We continue to implement changes that we determine are in the best interest of our employees, as well as the communities in which we operate, in compliance with government regulations. This includes having employees continue to work from home, where possible, while providing support for strategic, on-site, in-person activities and gatherings with meeting and event protocols in place to help minimize the exposure to COVID-19 and other risks. Each Intuitive location manages overall safety with guidance based on regional, country, and local regulations and best practices.

In 2021, investments in building upgrades and facility safety improvements included improved-efficiency HVAC filters and restrooms equipped with touchless faucets, toilets, towel dispensers, and door kickplates, where possible. We increased cleaning frequency in common areas, while implementing additional safety measures for employees continuing critical on-site work. Employees critical to maintaining our essential engineering, manufacturing, repair, and logistics functions have continued to work from Intuitive locations globally. To protect and support our essential team members, health and safety measures that included maximizing personal workspaces, changing shift schedules, providing personal protective equipment (PPE), and screening and testing resources continue to be provided.

Our future ways of working team helped us explore changes that could strengthen our culture and could appeal to a diverse group of new employees. These included redefining job classifications to include fully remote and hybrid work arrangements, setting new expectations around how we work. An employee survey to inform new ways of working resulted in more outdoor working spaces, self-service information technology equipment procurement, on-demand mental health care and resilience resources, ergonomics review and new furniture choices for those working from home, new scheduling systems for reserving on-site workspaces, and more thoughtful approaches to building cleaning and access to common areas.

Keeping in mind employee health and safety, Intuitive has prepared for a post-pandemic future where employees can return to an Intuitive workspace with peace of mind.

*Compensation and Benefits*

We provide compensation and benefits programs to help meet the needs of our employees. In addition to base compensation, these programs, which vary by country and region, include annual bonuses, stock awards, an Employee Stock Purchase Plan, retirement savings plans, healthcare, income protection benefits, paid time off, family leave, family care resources, and flexible work schedules, among many others.

Ensuring fair and equitable pay is integral to our commitment to our employees. Our executive team and Board of Directors strongly support this commitment. We conduct pay equity reviews annually to help us understand whether our compensation structure is appropriate and to identify what improvements can be made. In addition, we utilize a robust inspection process with an independent consulting firm for gender and ethnicity hiring, promotion, and wage equity to determine whether any statistically significant pay differences exist between women and men and between minorities and non-minorities. If pay disparities are identified, we conduct further evaluation to determine whether remedial adjustments are

21

Table of Contents

appropriate. In addition, employees can raise issues regarding pay equity with their manager, their human resources partner, or confidentially through our anonymous reporting helpline.

### Talent Development

We value our employees and the passion, commitment, and professional depth they provide. To enhance employee retention and job satisfaction, we offer ongoing learning and leadership training opportunities that support growth.

With a commitment to achieving diverse representation within our leadership ranks that reflects the diversity that we see in our overall employee base, we increased our leadership development efforts by reinforcing development around our People Leader Success Model. Leadership development focuses on people-leader effectiveness, cultural continuity, and organizational effectiveness, so that leaders at all levels have the capabilities and knowledge that they and their teams need to succeed.

Our Global Talent Management team transitioned much of our leadership training from in-person sessions to remote learning with the emergence of COVID-19. Our scaled learning platform of on-demand and virtual classroom learning eliminates travel and allows employees worldwide to access development at their convenience.

We have robust annual global performance review processes for reviewing all employees' performance and pay. To support our managers, we train them on conducting effective performance reviews and making compensation recommendations, which take into consideration market pay data and performance, as well as experience in an employee's respective role.

### Community Programs

We believe that building connections between our employees, their families, and our communities creates a more meaningful, fulfilling, and enjoyable workplace. Through our engagement programs, our employees can pursue their interests and hobbies, connect to volunteering and giving opportunities, and enjoy unique recreational experiences with family members.

The Intuitive Foundation is a nonprofit organization established in 2018 and funded by Intuitive. Since its founding, the Intuitive Foundation has been dedicated to promoting health, advancing education, and reducing human suffering. The Foundation supports outreach programs financially while we provide the volunteers and mentors from within our company. Since its inception, we have contributed $85 million to the Intuitive Foundation to fulfill its mission.

One of the Foundation's major programs, the Global Surgical Training Challenge ("GSTC") is inspiring innovation to help expand healthcare access around the world. Launched in 2020, GSTC came together when the Intuitive Foundation worked with MIT Solve and Nesta Challenges to recruit teams and offer a prize pool of up to $5 million for winning concepts that help enable better access to care. In addition, the Intuitive Foundation engages with professional societies and nonprofits to create internships and support leadership development for underrepresented student populations and also continues to support programs that empower young people of all backgrounds to participate in robotics-centered events to inspire their education in science, technology, engineering, and math. Moreover, Intuitive and the Intuitive Foundation, along with many employees, contributed financially to support community programs and other charitable campaigns.

We encourage you to review the "Talent and workplace experience" and "Creating stronger communities" section of our Sustainability Report 2021 (located on our website) for more detailed information regarding our Human Capital programs and initiatives. Nothing on our website, including our Sustainability Report 2021 or sections thereof, shall be deemed incorporated by reference into this Annual Report.

22

Table of Contents

**General**

We make our periodic and current reports, including our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and any amendments to those reports, available free of charge on our website as soon as practicable after such material is electronically filed or furnished with the Securities and Exchange Commission (the "SEC"). Our website address is www.intuitive.com, and the reports are filed under "SEC Filings" on the Company - Investor Relations portion of our website. Periodically, we webcast Company announcements, product launch events, and executive presentations, which can be viewed via our Investor Relations page on our website. In addition, we provide notifications of our material news, including SEC filings, investor events, and press releases as part of our Investor Relations page on our website. The contents of our website are not intended to be incorporated by reference into this report or in any other report or document we file, and any references to our website are intended to be inactive textual references only. The SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at www.sec.gov. The contents of these websites are not incorporated into this filing. Further, references to the URLs for these websites are intended to be inactive textual references only.

We operate our business as one segment, as defined by U.S. generally accepted accounting principles. Our financial results for the years ended December 31, 2021, 2020, and 2019 are discussed in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8. Financial Statements and Supplementary Data" of this Annual Report.

Intuitive Surgical, Inc. was founded in 1995. We are a Delaware corporation with our principal executive offices located at 1020 Kifer Road, Sunnyvale, California 94086. Our telephone number is (408) 523-2100, and our website address is www.intuitive.com.

Table of Contents

## ITEM 1A. RISK FACTORS

You should consider each of the following risk factors, which could materially affect our business, financial position, or future results of operations. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial also may materially adversely affect our business, financial position, or future results of operations. In addition, the global economic climate and additional or unforeseen effects from the COVID-19 pandemic amplify many of these risks.

### RISKS RELATING TO OUR BUSINESS

**PUBLIC HEALTH CRISES OR EPIDEMIC DISEASES, OR THE PERCEPTION OF THEIR EFFECTS, HAVE AND COULD CONTINUE TO MATERIALLY ADVERSELY AFFECT OUR BUSINESS AND RESULTS OF OPERATIONS.**

Our global operations expose us to risks associated with public health crises and outbreaks of epidemic, pandemic, or contagious diseases, such as the current outbreak of a novel strain of coronavirus (COVID-19). To date, COVID-19 has had, and may continue to have, an adverse impact on our operations, our supply chains and distribution systems, and our expenses, including as a result of preventive and precautionary measures that we, other businesses, and governments are taking. In addition, hospitals are also experiencing staffing shortages and supply chain issues that could impact their ability to provide patient care. Due to these impacts and measures, we have experienced and may continue to experience significant and unpredictable reductions in the demand for our products as healthcare customers divert medical resources and priorities towards the treatment of that disease. In addition, our customers have delayed, cancelled, or redirected and, in the future, may delay, cancel, or redirect planned capital expenditures in order to focus resources on COVID-19 or in response to economic disruption related to COVID-19. For example, as a result of the global COVID-19 pandemic, in the first half of 2020, we experienced a significant decline in procedure volume in the U.S. and Western Europe, as healthcare systems diverted resources to meet the increasing demands of managing COVID-19. In addition, U.S. and global public health bodies have, at times, recommended delaying elective surgeries during the COVID-19 pandemic, and surgeons and medical societies are evaluating the risks of minimally invasive surgeries in the presence of infectious diseases, which we expect will continue to negatively impact the usage of our products and the number of da Vinci procedures performed. ████████████████████████████████████████

████████████████████████████████████████████████████████████
█████████

As a result of the COVID-19 outbreak, we have experienced significant business disruptions, including restrictions on our ability to travel as well as distribute and service our products, temporary closures of our facilities and the facilities of our suppliers and their contract manufacturers, and a reduction in access to our customers due to diverted resources and priorities and the business hours of hospitals, as governments institute prolonged shelter-in-place and/or self-quarantine mandates. For example, our corporate headquarters and many of our operations, including certain of our manufacturing facilities, are located in California, which previously instituted risk reduction orders applicable to our employees in that region, significantly impacting the ability of our employees to get to their places of work to produce products and hampering our products from moving through the supply chain. These unprecedented measures to slow the spread of the virus taken by local governments and healthcare authorities globally, including the deferral of elective medical procedures and social distancing measures, have had, and we expect will continue to have, a negative impact on our operations and financial results. Furthermore, our future ways of working changes, including fully remote and hybrid work environments, may present additional risks, uncertainties, and costs that could affect our performance, including increased operational risk, uncertainty regarding office space needs, heightened vulnerability to cyber attacks due to remote work, potential reduced productivity, changes to our company culture, and increased costs to ensure our offices are safe and functional as hybrid offices that enable effective collaboration of both remote and in-person colleagues.

In addition, the COVID-19 pandemic has adversely affected, and may continue to adversely affect, the economies and financial markets of many countries, which may result in a period of regional, national, and global economic slowdown or regional, national, or global recessions that could curtail or delay spending by hospitals and affect demand for our products as well as increased risk of customer defaults or delays in payments. Our customers may terminate or amend their agreements for the purchase, lease, or service of our products due to bankruptcy, lack of liquidity, lack of funding, operational failures, or other reasons. COVID-19 and the current financial, economic, and capital markets environment, and future developments in these and other areas present material uncertainty and risk with respect to our performance, financial condition, volume of business, results of operations, and cash flows.

Outbreaks of other epidemic, pandemic, or contagious diseases, such as, historically, the Ebola virus, Middle East Respiratory Syndrome, Severe Acute Respiratory Syndrome, or the H1N1 virus, could also divert medical resources and priorities towards the treatment of that disease. An outbreak of other contagious diseases could negatively affect hospital admission rates or disrupt our business similar to the impact of the COVID-19 pandemic highlighted above. Any of these

24

Table of Contents

outbreaks could negatively impact the number of procedures performed and have a material adverse effect on our business, financial condition, results of operations, or cash flows.

**OUR RELIANCE ON SOLE AND SINGLE SOURCE SUPPLIERS AND OUR ABILITY TO PURCHASE AT ACCEPTABLE PRICES A SUFFICIENT SUPPLY OF MATERIALS, PARTS, AND COMPONENTS COULD HARM OUR ABILITY TO MEET DEMAND FOR OUR PRODUCTS IN A TIMELY MANNER OR WITHIN BUDGET.**

Some of the components necessary for the assembly of our products are currently provided to us by sole-sourced suppliers or single-sourced suppliers. We generally purchase components through purchase orders rather than long-term supply agreements and generally do not maintain large volumes of inventory. While alternative suppliers exist and could be identified for single-sourced components, the disruption or termination of the supply of components, or inflationary pressure in our supply chain, could cause a significant increase in the costs of these components, which could affect our operating results. A disruption or termination in the supply of components could also result in our inability to meet demand for our products, which could harm our ability to generate revenues, lead to customer dissatisfaction, and damage our reputation and our brand. Furthermore, if we are required to change the manufacturer of a key component of our products, we may be required to verify that the new manufacturer maintains facilities and procedures that comply with quality standards and with all applicable regulations and guidelines. The time and processes associated with the verification of a new manufacturer could delay our ability to manufacture our products on schedule or within budget, which may have a material adverse impact on our business, financial condition, results of operations, or cash flows.

In addition, our ability to meet customers' demands depends, in part, on our ability to timely obtain an adequate delivery of quality materials, parts, and components from our suppliers. An information technology systems interruption, including cybersecurity attacks, could adversely affect the ordering, distribution, and manufacturing processes of our suppliers. Difficulties in obtaining a sufficient supply of semiconductor and other component materials continue to increase, and we expect such difficulties to persist in the foreseeable future. Prices of such materials have also increased, and global supply has become significantly constrained due to the increased demand for materials, including semiconductors, to support expansion of server and cloud networks as a greater proportion of the global population worked remotely, the introduction of 5G, and the continued electrification of vehicles. We engage in activities to seek to mitigate such disruptions by, for example, increasing our communications with our suppliers and modifying our purchase order coverage and inventory levels. However, notwithstanding these activities, the global semiconductor and materials supply shortage is likely to remain a challenge for the foreseeable future. Such global shortages in important components have resulted in, and will continue to cause, inflationary pressure in our supply chain, which would impact our profits and profit margin. If shortages and price increases in important supply-chain materials in the semiconductor or other markets continue, we could also fail to meet product demand, which would adversely impact our business, financial condition, results of operations, or cash flows.

**BECAUSE OUR MARKETS ARE HIGHLY COMPETITIVE, CUSTOMERS MAY CHOOSE TO PURCHASE OUR COMPETITORS' PRODUCTS OR SERVICES OR MAY NOT ACCEPT DA VINCI ROBOTIC-ASSISTED SURGERY, WHICH WOULD RESULT IN REDUCED REVENUE AND LOSS OF MARKET SHARE.**

Robotic-assisted surgery with a da Vinci Surgical System is a technology that competes with established and emerging treatment options in both disease management and reconstructive medical procedures. These competitive treatment options include conventional MIS, open surgery, interventional approaches, and pharmacological regimens. Some of these procedures are widely accepted in the medical community and, in many cases, have a long history of use. Technological advances could make such treatments more effective or less expensive than using our products, which could render our products obsolete or unmarketable. Studies could be published that show that other treatment options are more beneficial and/or cost-effective than robotic-assisted surgery. We cannot be certain that physicians will use our products to replace or supplement established treatments or that our products will continue to be competitive with current or future technologies.

Additionally, we face or expect to face competition from companies that develop or have developed wristed, robotic-assisted, or computer-assisted surgical systems and products. Companies have introduced products in the field of robotic surgery or have made explicit statements about their efforts to enter the field including, but not limited to, the following companies: Asensus Surgical, Inc.; avateramedical GmbH; CMR Surgical Ltd.; Johnson & Johnson; Medicaroid, Inc.; Medrobotics Corporation; Medtronic plc; meerecompany Inc.; MicroPort Scientific Corporation; Olympus Corporation; Samsung Group; Shandong Weigao Group Medical Polymer Company Ltd.; and Titan Medical Inc. Other companies with substantial experience in industrial robotics could potentially expand into the field of surgical robotics and become competitors. Our revenues may be reduced due to pricing pressure or eliminated if our competitors develop and market products that are more effective or less expensive than our products. If we are unable to compete successfully, our revenues will suffer, which could have a material adverse effect on our business, financial condition, result of operations, or cash flows. We may not be able to maintain or improve our competitive position against current or potential competitors, especially those with greater resources.

25

Table of Contents

In addition, third-party service providers that provide services to da Vinci Surgical System operators may emerge and compete with us on price or offerings. To date, substantially all of our customers have sourced services on their da Vinci Surgical Systems from us through service contract commitments or time and materials contracts. Furthermore, there are third-party service providers offering consulting services targeted at analyzing the cost-effectiveness of hospitals' robotic-assisted surgery programs, including procedures performed, placement of systems, and consumption of instruments and accessories. We currently provide similar services and analysis to our customers, but it is difficult to assess the impact that this may have on our business. If we are unable to compete successfully with any third-party service providers, our revenues may suffer.

**THE INFLATIONARY ENVIRONMENT COULD MATERIALLY ADVERSELY IMPACT OUR BUSINESS AND RESULTS OF OPERATIONS.**

Changes in economic conditions and supply chain constraints and steps taken by governments and central banks, particularly in response to the COVID-19 pandemic as well as other stimulus and spending programs, could lead to higher inflation than previously experienced or expected, which could, in turn, lead to an increase in costs. In an inflationary environment, we may be unable to raise the prices of our products sufficiently to keep up with the rate of inflation. Impacts from inflationary pressures could be more pronounced and materially adversely impact aspects of our business with revenue streams and cost commitments linked to contractual agreements that extend further into the future, as we may not be able to quickly or easily adjust pricing, reduce costs, or implement counter measures.

**IF OUR PRODUCTS DO NOT ACHIEVE AND MAINTAIN MARKET ACCEPTANCE, WE WILL NOT BE ABLE TO GENERATE THE REVENUE NECESSARY TO SUPPORT OUR BUSINESS.**

The da Vinci Surgical System and our other products represent a fundamentally new way of performing medical procedures. Achieving and maintaining physician, patient, and third-party payor acceptance of robotic-assisted medical procedures as a preferred method of performing these procedures is crucial to our success. If our products fail to achieve or maintain market acceptance, customers will not purchase our products, and we will not be able to generate the revenue necessary to support our business. We believe that physicians' and third-party payors' acceptance of the benefits of procedures performed using our products will be essential for acceptance of our products by patients. Physicians will not recommend the use of our products unless we can demonstrate that they produce results comparable or superior to existing techniques. Even if we can prove the effectiveness of our products through clinical studies, physicians may elect not to use our products for any number of other reasons. For example, cardiologists may continue to recommend conventional heart surgery simply because such surgery is already widely accepted. In addition, physicians may be slow to adopt our products because of the perceived liability risks arising from the use of new products and the uncertainty of reimbursement from third-party payors, particularly in light of ongoing healthcare reform initiatives and the evolving U.S. healthcare environment.

We expect that there will continue to be a learning process involved for patient care teams to become proficient in the use of our products. Broad use of our products requires training of patient care teams. Market acceptance could be delayed by the time required to complete this training. We may not be able to rapidly train patient care teams in numbers sufficient to generate adequate demand for our products.

**IF INSTITUTIONS OR SURGEONS ARE UNABLE TO OBTAIN COVERAGE AND REIMBURSEMENT FROM THIRD-PARTY PAYORS FOR PROCEDURES USING OUR PRODUCTS, OR IF REIMBURSEMENT IS INSUFFICIENT TO COVER THE COSTS OF PURCHASING OUR PRODUCTS, WE MAY BE UNABLE TO GENERATE SUFFICIENT SALES TO SUPPORT OUR BUSINESS.**

In the U.S., hospitals generally bill for the services performed with our products to various third-party payors, such as Medicare, Medicaid, other government programs, and private insurance plans. If hospitals do not obtain sufficient reimbursement from third-party payors for procedures performed with our products, or if government and private payors' policies do not cover surgical procedures performed using our products, we may not be able to generate the revenues necessary to support our business. In addition, to the extent that there is a shift from an inpatient setting to outpatient settings, we may experience pricing pressure and a reduction in the number of procedures performed. Our success in OUS markets also depends upon the eligibility of our products for coverage and reimbursement through government-sponsored healthcare payment systems and third-party payors. Reimbursement practices vary significantly by country. Many OUS markets have government-managed healthcare systems that control reimbursement for new products and procedures. Other foreign markets have both private insurance systems and government-managed systems that control reimbursement for new products and procedures. Market acceptance of our products may depend on the availability and level of coverage and reimbursement in any country within a particular time. In addition, healthcare cost containment efforts similar to those in the U.S. are prevalent in many of the other countries in which we sell, and intend to sell, our products, and these efforts are expected to continue. Please see our risk factor below titled "Changes in Healthcare Legislation and Policy May Have a Material Adverse Effect on Our Financial Condition and Results of Operations" for additional risks related to the ability of institutions or surgeons to obtain reimbursements.

26

Table of Contents

**IF OUR PRODUCTS CONTAIN DEFECTS OR ENCOUNTER PERFORMANCE PROBLEMS, WE MAY HAVE TO RECALL OUR PRODUCTS, INCUR ADDITIONAL UNFORESEEN COSTS, AND OUR REPUTATION MAY SUFFER.**

Our success depends on the quality and reliability of our products. While we subject components sourced and products manufactured to stringent quality specifications and processes, our products incorporate mechanical parts, electrical components, optical components, and computer software, any of which may contain errors or exhibit failures, especially when products are first introduced. Component failures, manufacturing flaws, design defects or inadequate disclosure of product related risks with respect to our products could result in an unsafe condition or injury to, or death of, the patient. In addition, new products or enhancements may contain undetected errors or performance problems that, despite testing, are discovered only after commercial shipment. Because our products are designed to be used to perform complex surgical procedures, due to the serious and costly consequences of product failure, we and our customers have an increased sensitivity to such defects. In the past, we have voluntarily recalled certain products. Although our products are subject to stringent quality processes and controls, we cannot provide assurance that our products will not experience component aging, errors, or performance problems. If we experience product flaws or performance problems, any or all of the following could occur:

•delays in product shipments;

•loss of revenue;

•delay in market acceptance;

•diversion of our resources;

•damage to our reputation;

•product recalls, which can include, but not be limited to, product withdrawals from the market, labeling changes, design changes, customer notifications, ███████████████████

███████

•increased service or warranty costs; or

•product liability claims.

Costs associated with defects or performance problems of our products could have a material adverse effect on our business, financial condition, results of operations, or cash flows.





UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1635.002-R**

Case No. 3:21-cv-03496-AMO
Date Entered _____
By _____
Deputy Clerk

20095 Hamburg
T +49 40 419 93 0
F +49 40 419 93 200
www.hoganlovells.com

**Via email in advance:**
**admin@Rebotix-Panama.com**

Rebotix-Panama
Plaza Commercial Coronado #5
Playa Coronado
Republic of Panama

**Dr. Tanja Eisenblätter**
LL.M. AU, Washington D.C.
tanja.eisenblaetter@hoganlovells.com

Secretary:
Anne Haselbach
Direct line: -341

Our ref.:
**350 Has 1H6998. 000020**
1010633

21 April 2017

**INTUITIVE SURGICAL INC. ./. REBOTIX-PANAMA**

Dear Sir or Madam,

We write to you on behalf of Intuitive Surgical Inc., 1020 Kifer Road, Sunnyvale, CA 94086-5304, USA. Our client has appointed us to represent its legal interests. In my capacity as a lawyer I hereby confirm that we have been duly authorised. On behalf of our client, we have concerns about activities that are being carried out throughout the EU by Rebotix-Panama and its partners, distributors, affiliated parties (collectively herein, "Rebotix") with regard to our client's *EndoWrist*® products. We write to seek evidence supporting certain claims made by Rebotix and to demand that Rebotix immediately ceases and desists from any and all improper behaviour with regard to *EndoWrist*® products.

████████████████ ██ █████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

Hogan Lovells International LLP is a limited liability partnership registered in England and Wales with registered number OC323639. Registered office and principal place of business: Atlantic House, Holborn Viaduct, London EC1A 2FG.

"Hogan Lovells" is an international legal practice that includes Hogan Lovells International LLP and Hogan Lovells US LLP, with offices in: Alicante Amsterdam Baltimore Beijing Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rio de Janeiro Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Ulaanbaatar Warsaw Washington DC Associated Offices: Budapest Jeddah Riyadh Zagreb.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not hold

The underlying facts of this decision are as follows:

Our client develops and distributes advanced robotic-assisted surgical platforms for minimally-invasive surgery. A central product is the *da Vinci*® system and main components of the *da Vinci*® system are the *EndoWrist*® instruments. The *EndoWrist*® instruments are available in a wide selection of specialized types and specifications to perform all kinds of surgery. For patient safety reasons ██████████████████████████, the usage of these instruments is limited by Intuitive Surgical Inc. A memory device inside the surgical instrument keeps track of the usage count. After consuming all uses, the *EndoWrist*® instruments have to be disposed and replaced by new instruments.

Our client has recently obtained information that you are contacting Intuitive Surgical's customers all over Europe, especially in Denmark, the United Kingdom, Germany and France. Your collaboration with RSS, Win'up surgical and Mr. Gilles Pizot in France and Colin Elke in Germany and Italy has come to our client's attention. You are offering a type of maintenance service for the surgical instruments. Instead of discarding the instruments, you are offering to clean and reset their use count. In this process you are adding a so-called "*Interceptor Board*" to the original devices.

You are contacting hospitals and doctors to advertise your service by using unfair and misleading claims and materials. Our client became aware that you added certificates, issued to companies other than Rebotix-Panama (namely Sibex Inc. and Rebotix LLC, both Florida, USA), to your correspondence in at least one case, giving the impression of being trustworthy and legitimate. Our client even became aware of a case when an *EndoWrist*® Instrument, cleaned and reset by Rebotix-Panama, did not perform properly in surgery.

1.     UNLAWFULNESS OF YOUR SERVICE IN ALL EU MEMBER STATES

Your service in particular and your market activities in general appear to violate several European laws, *inter alia* ████████████████████████████████ European Competition Law, Trademark Law and even criminal law. The latter means that not only your company but also the company's directors could be personally liable for transgressions.

██  ██████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

████████████████████████████████████
████████████████████████████████████

CONFIDENTIAL



## 1.2 Patient Hazard

Furthermore, your business practices appear to constitute ████████████
██████████████████ potential "patient hazards" ████████████
██████████████

In this regard, please provide appropriate evidence that your concept of cleaning the de-vices and making them usable for more than ten times does not pose a danger to pa-tients. In particular, please provide appropriate clinical proof that sufficient sterilization can be achieved with your refurbishment process and that the *"Interceptor Board"* will not affect the safety of the *EndoWrist*[®] instrument. We also request clinical proof that *En-doWrist*[®] instruments can be safely used more than ten times. We assume that you are aware that there have been reports of an incident in France: A device that had been modi-fied by Rebotix-Panama failed during surgery.

It should be noted that any malfunction of the *"Interceptor Board"* can affect the functional-ity of the modified *EndoWrist*[®]-component in surgery. 

It goes without saying that it can lead to substantial financial and even personal criminal charges on your side in case patients suffer damage to their health due to a malfunction of a device that has been manipulated by Rebotix-Panama.

CONFIDENTIAL

REBOTIX140046

1.3   **False Advertising**

Also, your business behaviour fulfils the elements of "*false advertising*" in various ways. This applies to the content of your communication with European surgeons and hospitals as well as to the use of the certificates that were partly attached to it.

The EU Member States have different laws regulating the advertising of medical devices or advertising in general. However, in any case statements made – written or orally – must be true and accurate. In general, misleading advertising is prohibited. This particularly applies to any claims made in connection with the provision of medical device services.

All your services related to the *EndoWrist®* instruments are health-related and thus necessitate particular clarity. Addressees will expect clinical studies verifying the truth of your advertising claims. Absent clinical proof verifying the safety and efficacy of your service in general and the "*Interceptor Board*" in particular, neither the safety nor the efficacy of your service or the "*Interceptor Board*" may be advertised in Europe.

This especially applies with regard to the following subjects:

- Claims that the manipulation of the *EndoWrist®* instruments offered by you does not affect the functionality;

- Claims that the modified instrument would be afterwards functionally identical to the original instruments;

- Claims that the original instruments equipped with the "*Interceptor Board*" still comply with all relevant regulations and safety standards;

- Claims that the manipulation of *EndoWrist®* instruments offered by you "*significantly reduces the unreasonably high costs*" of our client's products;

- Claims that the addition of "extra uses" to the instruments does not compromise the patients' health and safety.

The use of certificates, issued to companies other than Rebotix-Panama, in your communication likewise constitutes "false advertising". Such documents are capable of causing a misconception, since they might give the impression that the safety of your services is verified ███████████████████████████████████████. The surgeons you are addressing will justifiably receive the impression that your service has all necessary qualifications to be sold on the European market and is tested safely, which does not appear to be the case, as set forth above.

CONFIDENTIAL

REBOTIX140047

This behaviour presents not only unfair competition, but can also be prosecutable under the respective national Criminal Law, meaning personal liability of responsible persons.

### 1.4 Trademark Violations

In addition, referring to the trademarks of Intuitive Surgical Inc. in connection with advertising your services constitutes a dishonest use of our client's trademarks.

Dishonest practices are given, according to the European Court of Justice ("ECJ"), if business behaviour entails the discrediting or denigration of the mark (cf. ECJ, 17th March 2005 – *Gillette Company/LA Laboratories*).

Since your business practices appear to be violating numerous European laws, the use of our client's trademarks in connection with these practices is dishonest. ███████████ ████████████████████████████████, you are also endangering patients' lives and wellbeing with an unproven manipulative treatment of the *EndoWrist*® instruments. In addition you are using false and misleading advertising claims. In spite of this you are presenting your product as an additional part of our client's products. Therefore, you are implying that the device modified by you is still having the same quality as the original product. If there will be further malfunctions of instruments manipulated by you, this will disparage our client's trademark.

### 1.5 Criminal Law

Finally, this unfair and misleading market approach can also be prosecutable under the respective national Criminal Law, meaning that also Rebotix-Panama's managers can be personally charged. In several European jurisdictions, including Germany, false and misleading advertising of medical devices constitutes a criminal offence which can even lead to prison sentences.

Also the act of creating a misconception of the safety of your product – especially by attaching certificates, issued to companies other than Rebotix-Panama, to your communication – may also meet the conditions of fraud which is punishable as well.

█ ███████████████████

███████████████████████████
███████████████ █ ███████████████
███████████████████████████
██████████████████████

███████████████████████
███████████████████████

CONFIDENTIAL

REBOTIX140048

CONFIDENTIAL

REBOTIX140049



On behalf of our client, we strongly urge you to provide the proof substantiating your claims or refrain from all market activities related to the products of our client. We reserve all rights to take legal action against any unlawful offering of a refurbishment service concerning the EndoWrist® instruments or any service increasing the use count of the EndoWrist® instruments and we urge you to comply with all European legal requirements and restrictions as set out above.

To avoid further legal action, you must provide clinical proof substantiating your claims by no later than

### Friday, 28th April 2017 (incoming here).

In case you are not able to provide clinical proof substantiating your claims, you must execute and return to us the attached draft of a cease-and-desist declaration

### within the aforementioned period.

We like to point out that only the submission of a declaration containing a sufficient pledge for a contractual penalty has the power to compensate our client's interest in a legal injunction. Since the matter is urgent, an extension of time is not going to be granted. In the event you do not execute and return the declaration to us by Friday, 28th April 2017 our client will take further legal action.

### within the aforementioned period.

CONFIDENTIAL

REBOTIX140050

Case 3:21-cv-03496-AMO    Document 466-111    Filed 02/07/25    Page 8 of 10

Finally, we have to ask you to reimburse the legal expenses of this letter as stipulated in the attached invoice. We expect payment by

**Friday, 5th May 2017.**

We expressly reserve the right to assert further claims, in particular claims for compensation and rights to information.

Yours faithfully

Dr. Tanja Eisenblätter
- Attorney-at-law -

Encl.

CONFIDENTIAL

REBOTIX140051

## Cease-and-Desist Declaration

Rebotix Surgical, Panama hereby undertakes towards Intuitive Surgical Inc., 1020 Kifer Road, Sunnyvale, CA 94086-5304, USA

I.     under penalty of a contract fine imposed for each case of violation according to the reasonably exercised discretion of Intuitive Surgical Inc., in the event of a dispute to be reviewed by the regional court having jurisdiction, to refrain from

      a. marketing and offering a servicing process in the course of which the use counter of *EndoWrist* instruments' memory chip is manipulated and an Interceptor Board is installed;

      b. contacting Intuitive Surgical's customers offering services related to Intuitive Surgical's products;

████████████████████████████████████████

████████████████████████

II.     to compensate Intuitive Surgical Inc. for all the losses incurred and also future losses as a result of the aforementioned actions including the legal expenses incurred through calling in the lawyers Hogan Lovells International LLP.

*Signature and date*

_____

Rebotix Panama

CONFIDENTIAL

REBOTIX140052

**Hogan Lovells**

20095 Hamburg
T  +49 40 419 93 0
F  +49 40 419 93 200
www.hoganlovells.com

Rebotix-Panama
Plaza Commercial Coronado #5
Playa Coronado
Republic of Panama

**Dr. Tanja Eisenblätter**
LL.M. AU, Washington D.C.
tanja.eisenblaetter@hoganlovells.com

Secretary:
Laura Boblan
Direct line: -314

Our ref.:
**350 lab 1H6998.000020**
1024407

21 April 2017

BILL OF CHARGES

IN THE NAME OF INTUITIVE SURGICAL

INTUITIVE SURGICAL INC. ./. REBOTIX-PANAMA
WARNING LETTER DATED 21 APRIL 2017

Amount in dispute: € 500.000,00

| | | |
|---|---|---|
| 1,3 expense charge (Geschäftsgebühr) No. 2300 VV RVG | € | 4,819.50 |
| lump sum for expenses (Auslagenpauschale) No. 7002 VV RVG | € | 20.00 |
| **Total** | **€** | **4,839.50** |



Dr. Tanja Eisenblätter
- Attorney-at-law -

Please transfer into our account:



Hogan Lovells International LLP is a limited liability partnership registered in England and Wales with registered number OC323639. Registered office and principal place of business: Atlantic House, Holborn Viaduct, London EC1A 2FG.

"Hogan Lovells" is an international legal practice that includes Hogan Lovells International LLP and Hogan Lovells US LLP, with offices in: Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated Offices:  Budapest  Jeddah  Riyadh  Zagreb.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing.  Certain individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not hold

CONFIDENTIAL

REBOTIX140053

**4-SER-928**

**Hogan Lovells**

Hogan Lovells International LLP
Alstertor 21
20095 Hamburg
T +49 40 419 93 0
F +49 40 419 93 200
www.hoganlovells.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**TRIAL EXHIBIT 1635.003-R**

Case No.  3:21-cv-03496-AMO
Date Entered _____
By _____
Deputy Clerk

**Via email in advance:**
**admin@Rebotix-Panama.com**

Rebotix-Panama
Plaza Commercial Coronado #5
Playa Coronado
Republic of Panama

Dr. Tanja Eisenblätter
LL.M. AU, Washington D.C.
tanja.eisenblaetter@hoganlovells.com

Secretary:
Anne Haselbach
Direct line: -341

Our ref.:
**350 Has 1H6998. 000020**
1024580

10 May 2017

**INTUITIVE SURGICAL INC. ./. REBOTIX-PANAMA**
**MARKETING ACTIVITIES IN GERMANY**

Dear Sir or Madam,

We write to you on behalf of Intuitive Surgical Inc., 1020 Kifer Road, Sunnyvale, CA 94086-5304, USA. As you already know from our letter dated 21st April 2017, our client has appointed us to represent its legal interests. In my capacity as a lawyer I hereby confirm that we have been duly authorised.

After not having received any response to our earlier letter by the set deadline, we write to you to express our substantial concerns about your marketing activities **in Germany**. As you are aware, our client develops and distributes advanced robotic-assisted surgical platforms for minimally-invasive surgery. A central product is the *da Vinci*® system and main components of the *da Vinci*® system are the *EndoWrist*® instruments. The *EndoWrist*® instruments are available in a wide selection of specialized types and specifications to perform all kinds of surgery. For patient safety reasons ███████████████████, the usage of these instruments is limited by Intuitive Surgical Inc. A memory device inside the surgical instrument keeps track of the usage count. After consuming all uses, the *EndoWrist*® instruments have to be disposed and replaced by new instruments.

Hogan Lovells International LLP is a limited liability partnership registered in England and Wales with registered number OC323639. Registered office and principal place of business: Atlantic House, Holborn Viaduct, London EC1A 2FG.

"Hogan Lovells" is an international legal practice that includes Hogan Lovells International LLP and Hogan Lovells US LLP, with offices in: Alicante Amsterdam Baltimore Beijing Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rio de Janeiro Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Ulaanbaatar Warsaw Washington DC Associated Offices: Budapest Jeddah Riyadh Zagreb.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain individuals, who are described as partners, but who are not members of Hogan Lovells International LLP, do not hold qualifications equivalent to members. A list of the members of Hogan Lovells International LLP is open to inspection at the above address. For more information about Hogan Lovells, the partners and their qualifications, see www.hoganlovells.com.

**CONFIDENTIAL**

**REBOTIX140654**

**4-SER-929**

Rebotix-Panama                                    - 2 -                              10 May 2017

Our client recently obtained information that particularly your representative *Colin Eke* is contacting Intuitive Surgical's customers in Germany (please find attached to this letter an email from Colin Eke to German customers of Intuitive Surgical). You are offering a type of maintenance service for surgical instruments. In this process you are suggesting to clean and reset their use count. Furthermore, you are offering to add a so-called "*Interceptor Board*" that was initially not part of the original devices. You are contacting hospitals and doctors to advertise your unlawful service.

1.   UNLAWFULNESS OF YOUR SERVICE IN GERMANY

Your activities on the German market present a violation of several German laws, ██████████
███████████████████

In detail:

1.1   ███████████



CONFIDENTIAL                                                                    REBOTIX140655

Rebotix-Panama                                      - 3 -                                    10 May 2017

### 1.2    Patient Hazard

Furthermore, your business practices appear to constitute  potential "patient hazards" .

You have not provided any evidence that your concept of cleaning the devices and making them usable for more than ten times does not pose a danger to patients. In particular, you have not provided appropriate clinical proof that sufficient sterilization can be achieved with your refurbishment process and that the *"Interceptor Board"* will not affect the safety of the *EndoWrist*® instrument. Finally, you have not provided clinical proof that *EndoWrist*® instruments can be safely used more than ten times. Taking this into account, we have to assume that you are not in possession of any proof regarding these circumstances.

You are by now most certainly aware that there have been reports of at least one incident in another European country, namely that a modified device failed during surgery. In this regard we would also like to emphasize once again that any malfunction of the *"Interceptor Board"* can affect the functionality of the modified *EndoWrist*®-component in surgery. There is no certainty whatsoever that your *"Interceptor Board"* complies with the standard necessary for an application in surgeries where the lives and the wellbeing of patients are at immediate risk.

It goes without saying that it can lead to substantial financial and even personal criminal charges on your side in case patients suffer damage to their health due to a malfunction of a device that has been manipulated by you.

### 1.3    Trademark Violations

In addition, referring to the trademarks of Intuitive Surgical Inc. in connection with advertising your services constitutes a dishonest use of our client's trademarks:

Dishonest practices are given, according to the European Court of Justice ("ECJ"), if business behaviour entails the discrediting or denigration of the mark (cf. ECJ, 17th March 2005 – *Gillette Company/LA Laboratories*).

Since your business practices appear to be violating numerous German laws, the use of our client's trademarks in connection with these practices in general is dishonest. We have to assume that ████████████████████████████████████ your behaviour puts patients' lives and wellbeing at risk. In spite of this, you are presenting your product as an additional part of our client's products. Therefore, you are implying that the device modified by you is still having the same quality as the original prod-

CONFIDENTIAL                                                                        REBOTIX140656

Rebotix-Panama                                    - 4 -                                    10 May 2017

uct.  If there will be any malfunctions of instruments modified by you, this has the potential
to disparage our client's trademark.

2.   **DECLARATION TO CEASE AND DESIST, RIGHT TO INFORMATION AND CLAIMS FOR DAMAGES**

Against this background, our client is prepared to legally proceed against you in Germany.
On behalf of our client, we strongly urge you to refrain from all market activities related to
the products of our client.  We reserve all rights to take legal action against any unlawful
offering of a refurbishment service concerning the EndoWrist® instruments or any service
increasing the use count of the EndoWrist® instruments and we urge you to comply with
all German legal requirements and restrictions as set out above.

We hereby assert our client's claims for omission.  In addition, we ask you to compensate
our client for any damage that may have occurred to it and which have arisen and will re-
sult from the infringements listed above.  Finally, we ask you to provide information on the
extent of your marketing activities in Germany.

To avoid further legal action, you must execute and return to us the attached draft of a cease-
and-desist declaration by no later than

**Wednesday, 17th May 2017 (incoming here).**

You must further provide all information regarding your marketing activities in Germany and dis-
close names and addresses of recipients of your advertising materials

**within the aforementioned period.**

We like to point out that only the submission of a declaration containing a sufficient pledge for a
contractual penalty has the power to compensate our client's interest in a legal injunction.  Since
the matter is urgent, an extension of time is not going to be granted.  In the event you do not exe-
cute and return the declaration to us by Wednesday, 17th May 2017 our client will take further
legal action.

HAMLIB01/EHMKETIM/1024580.3                                                        Hogan Lovells

**CONFIDENTIAL**

REBOTIX140657

4-SER-932

Rebotix-Panama                          - 5 -                          10 May 2017

Finally, we have to ask you to reimburse the legal expenses of this letter as stipulated in the attached invoice. We expect payment by

**Wednesday, 24th May 2017.**

We expressly reserve the right to assert further claims, in particular claims for compensation and rights to information.

Yours faithfully

Dr. Tanja Eisenblätter
- Attorney-at-law -

Encl.

Hogan Lovells

CONFIDENTIAL

REBOTIX140658

4-SER-933

## Cease-and-Desist Declaration

Rebotix Surgical, Panama hereby undertakes towards Intuitive Surgical Inc., 1020 Kifer Road, Sunnyvale, CA 94086-5304, USA

I.    under penalty of a contract fine imposed for each case of violation according to the reasonably exercised discretion of Intuitive Surgical Inc., in the event of a dispute to be reviewed by the regional court having jurisdiction,

    to refrain from

    a. marketing and offering a servicing process in the course of which the use counter of *EndoWrist* instruments' memory chip is manipulated and an Interceptor Board is installed;

    b. contacting Intuitive Surgical's customers offering services related to Intuitive Surgical's products;

    ███████████████████████████████████

    ████████████████

II.    to compensate Intuitive Surgical Inc. for all the losses incurred and also future losses as a result of the aforementioned actions including the legal expenses incurred through calling in the lawyers Hogan Lovells International LLP.

*Signature and date*

Rebotix Panama

CONFIDENTIAL      REBOTIX140659

**Von:** Colin Eke <colineke@yahoo.co.uk>
**Betreff: Aw: Rebotix. - private and confidential**
**Datum:** 4. Januar 2017 22:42:57 MEZ
**An:** ███████████████████████████████

**Kopie:** colin@rebotix-panama.com, ████████████████████

1.
Typically the customer/distributor provides us with a shipping account number for the
return.  We can also estimate and bill shipping.  Impact of shipping costs are kept manageable
by sending them in groups, so the per-instrument cost is kept low.  Our current processing
margins are very low and we can't absorb unknown shipping costs (since someone could send
them from an expensive shipping location one at a time).
**However** if a customer confirms predicted volume of over 40 instruments per annum which
is quite a low level then we can cover the logistics in total . What I would say is that it would
then need to be done in such a way where a batch of 5 or more should ideally be sent at one
time to keep costs down .

2-
This is unclear - they are only scrapped if there is no possible remaining use, and the failed
inspection can be provided to the customer.  If the customer requires it, they can be returned
(as received) with the next shipment of good instruments. You would then have your 1 life
back , but it is very rare that any are deemed un chippable.

3-
On the Rebotix side, we return them to the invoice address provided.
The instruments are packed professionally and safely in correct packaging and containers ..

4-
We DO sterilize them prior to shipping, but they cannot be considered sterile when they
arrive - they should go through the normal sterilization cycle used between surgeries.

5-
Republic of Panama, near the large Medtronic device processing facility.

I hope this helps and if there is anything further please do not hesitate to ask , and in fact any
questions in terms of Robotics in general please do ask . I presume you have either a Davinci
S or Si ?

Finally this also works on the training instruments too if required and these would be reset
back to 50 as per the original setting ...

CONFIDENTIAL

Kindest regards,

Colin

Sent from my iPhone

CONFIDENTIAL

REBOTIX140661



Hogan Lovells International LLP
Alstertor 21
20095 Hamburg
T +49 40 419 93 0
F +49 40 419 93 200
www.hoganlovells.com

Rebotix-Panama
Plaza Commercial Coronado #5
Playa Coronado
Republic of Panama

**Dr. Tanja Eisenblätter**
LL.M. AU, Washington D.C.
tanja.eisenblaetter@hoganlovells.com

Secretary:
Anne Haselbach
Direct line: -341

Our ref.:
**350 lab 1H6998.000020**
1028767

10 May 2017

BILL OF CHARGES

IN THE NAME OF INTUITIVE SURGICAL

**INTUITIVE SURGICAL INC. ./. REBOTIX-PANAMA**
**WARNING LETTER REGARDING ACTIVITIES IN GERMANY DATED 10 MAY 2017**

Amount in dispute: € 100,000.00

| | | |
|---|---|---|
| 1,3 expense charge (Geschäftsgebühr) No. 2300 VV RVG | € | 1,953.90 |
| lump sum for expenses (Auslagenpauschale) No. 7002 VV RVG | € | 20.00 |
| **Total** | **€** | **1,973.90** |

Dr. Tanja Eisenblätter
- Attorney-at-law -

Please transfer into our account:
Commerzbank AG, Hamburg
IBAN DE97 2004 0000 0622 9595 80
Swift-No.: COBADEFFXXX
stating our reference **1H6998.000020**

Hogan Lovells International LLP is a limited liability partnership registered in England and Wales with registered number OC323639. Registered office and principal place of business: Atlantic House, Holborn Viaduct, London EC1A 2FG.

"Hogan Lovells" is an international legal practice that includes Hogan Lovells International LLP and Hogan Lovells US LLP, with offices in: Alicante Amsterdam Baltimore Beijing Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Moscow Munich New York Northern Virginia Paris Perth Philadelphia Rio de Janeiro Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Ulaanbaatar Warsaw Washington DC Associated Offices: Budapest Jeddah Riyadh Zagreb.

The word "partner" is used to describe a partner or member of Hogan Lovells International LLP, Hogan Lovells US LLP or any of their affiliated entities or any employee or consultant with equivalent standing. Certain individuals, who are designated as partners, but who are not members of Hogan Lovells International LLP, do not hold qualifications equivalent to members. A list of the members of Hogan Lovells International LLP is open to inspection at the above address. For more information about Hogan Lovells, the partners and their qualifications, see www.hoganlovells.com.

# Plomin_1-20-25

Designation List Report

 **Plomin, Paul**                 **2022-11-08**



**ID: PLO**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**COURT EXHIBIT 21**

Case No. _3:21-cv-03496-AMO_
Date Entered _____
By _____
Deputy Clerk

**PLO - Plomin_1-20-25**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 7:21 - 7:23 | **Plomin, Paul 2022-11-08** | 00:00:05 | **PLO.1** |

| | |
|---|---|
| 7:21 | To get us started, would you please state |
| 7:22 | your full name for the record. |
| 7:23 | A. Paul Plomin. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 14:11 - 14:15 | **Plomin, Paul 2022-11-08** | 00:00:11 | **PLO.2** |

| | |
|---|---|
| 14:11 | Q. You are currently employed by Franciscan? |
| 14:12 | A. Yes. |
| 14:13 | Q. What is your role at Franciscan? |
| 14:14 | A. Vice president of finance for Franciscan |
| 14:15 | Alliance. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 15:14 - 15:22 | **Plomin, Paul 2022-11-08** | 00:00:35 | **PLO.3** |

| | |
|---|---|
| 15:14 | Q. What are your responsibilities in your |
| 15:15 | current role? |
| 15:16 | A. My responsibilities are the consolidated |
| 15:17 | financial statements of the health system, the audit |
| 15:18 | budgeting for the health system, reimbursement for |
| 15:19 | the health system, treasury functions, investments |
| 15:20 | and debt.  And as part of budgeting, it's both |
| 15:21 | operational, capital budgeting and nonoperating |
| 15:22 | budgeting. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 31:25 - 32:08 | **Plomin, Paul 2022-11-08** | 00:00:30 | **PLO.4** |

| | |
|---|---|
| 31:25 | Q. If Franciscan is considering purchasing a |
| 32:01 | piece of equipment and part of the acquisition would |
| 32:02 | involve a multiyear service agreement, is that one |
| 32:03 | of the inputs that Franciscan would consider? |
| 32:04 | A. Yes. |
| 32:05 | Q. If the piece of equipment requires |
| 32:06 | particular instrumentation in order to function, |
| 32:07 | would the cost of the instrumentation be included in |
| 32:08 | the assessment of the acquisition? |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 32:12 - 32:12 | **Plomin, Paul 2022-11-08** | 00:00:02 | **PLO.5** |

| | |
|---|---|
| 32:12 | A. Yes. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 33:10 - 34:13 | **Plomin, Paul 2022-11-08** | 00:01:39 | **PLO.6** |

| | |
|---|---|
| 33:10 | Q. So after the facilities submit their |
| 33:11 | ranked proposals, those proposals are -- are routed |
| 33:12 | to the capital allocation committee next; is that |
| 33:13 | right? |
| 33:14 | A. Correct. |
| 33:15 | Q. And then if it's a proposal that involves |

**PLO - Plomin_1-20-25**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

|  | 33:16 | acquisition of equipment, then the proposal's also |  |  |
|  | 33:17 | sent to clinical engineering for their input? |  |  |
|  | 33:18 | A. Yes. |  |  |
|  | 33:19 | Q. Are there any other steps that the |  |  |
|  | 33:20 | proposals go through before the capital allocation |  |  |
|  | 33:21 | committee make its final assessment about whether to |  |  |
|  | 33:22 | approve the request? |  |  |
|  | 33:23 | A. Yes. At the corporate finance level here, |  |  |
|  | 33:24 | myself, the senior VP of finance, Jen Marion, we |  |  |
|  | 33:25 | also review all requests and we sort of come up with |  |  |
|  | 34:01 | our scoring grid of yeses and noes that fit within |  |  |
|  | 34:02 | the capital constraint to try and help the committee |  |  |
|  | 34:03 | make decisions. And we base it, you know, on -- |  |  |
|  | 34:04 | on -- on the factors that we just discussed and |  |  |
|  | 34:05 | who's -- who's done a good job of filling out our |  |  |
|  | 34:06 | capital project as well to give us the detail we |  |  |
|  | 34:07 | need to make the decision. |  |  |
|  | 34:08 | So there is an initial ranking. That |  |  |
|  | 34:09 | ranking is considered by the capital allocation |  |  |
|  | 34:10 | committee. But I will tell you in all the years |  |  |
|  | 34:11 | I've been involved in that committee, that is never |  |  |
|  | 34:12 | the final capital that we approve, but it's just to |  |  |
|  | 34:13 | help guide the conversation. |  |  |

**34:25 - 35:08** | **Plomin, Paul 2022-11-08** | **00:00:32** | **PLO.7**

|  | 34:25 | Who makes up the members of the capital |  |  |
|  | 35:01 | allocation committee? |  |  |
|  | 35:02 | A. So it's the president CEO of the health |  |  |
|  | 35:03 | system. It's the chairperson of the board. It's |  |  |
|  | 35:04 | the treasurer of our board. And it's the hospital |  |  |
|  | 35:05 | facility presidents. It's the senior VP/CFO. And |  |  |
|  | 35:06 | then there are some service line leaders that are |  |  |
|  | 35:07 | voting members as well. And that's it. I -- I -- I |  |  |
|  | 35:08 | am staff to the committee. |  |  |

**35:09 - 35:14** | **Plomin, Paul 2022-11-08** | **00:00:14** | **PLO.8**

|  | 35:09 | Q. When you say "service line leaders," what |  |  |
|  | 35:10 | do you mean by that? |  |  |
|  | 35:11 | A. So we have an accountable care |  |  |
|  | 35:12 | organization. So they lead that service line. |  |  |
|  | 35:13 | They're a member of the capital allocation committee |  |  |
|  | 35:14 | as well. |  |  |

## PLO - Plomin_1-20-25

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 35:15 - 35:21 | **Plomin, Paul 2022-11-08** | 00:00:21 | **PLO.9** |

| | |
|---|---|
| 35:15 | Q. Do any physicians serve on the capital |
| 35:16 | allocation committee? |
| 35:17 | A. Actually, yeah, because our -- our service |
| 35:18 | line leader for the ACO is our chief medical |
| 35:19 | officer. So, yes, he's a physician. And some of |
| 35:20 | our hospital facility pres- -- presidents are |
| 35:21 | physicians as well. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 35:22 - 36:18 | **Plomin, Paul 2022-11-08** | 00:01:04 | **PLO.10** |

| | |
|---|---|
| 35:22 | Q. So just -- I want to make sure I'm -- I'm |
| 35:23 | clear on the -- on the process. |
| 35:24 | So after you and the SVP of finance |
| 35:25 | consider and rank the requests, then they're routed |
| 36:01 | to the capital allocation committee; is that right? |
| 36:02 | A. Yeah, we -- we pull together a summary |
| 36:03 | spreadsheet of all the requests coming to the |
| 36:04 | committee. Obviously, we have the capital forms |
| 36:05 | behind them. But there's a summary spreadsheet that |
| 36:06 | we deliver. We actually deliver all the capital |
| 36:07 | requests by facility, so folks can review them. We |
| 36:08 | put some tags behind them in that summary |
| 36:09 | spreadsheet that says "yes" or "no." And that's |
| 36:10 | what goes to the committee. |
| 36:11 | At the committee meeting, folks are |
| 36:12 | allowed to go through their projects for additional |
| 36:13 | explanations of what they're trying to do with the |
| 36:14 | capital requests. And then throughout that day, |
| 36:15 | that meeting, that's where we work through to say |
| 36:16 | what we're going to allocate within our capital |
| 36:17 | constraint that will be recommended to the board for |
| 36:18 | their approval. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 36:19 - 37:05 | **Plomin, Paul 2022-11-08** | 00:00:30 | **PLO.11** |

| | |
|---|---|
| 36:19 | Q. When you say "folks are allowed to go |
| 36:20 | through their projects," does that mean that |
| 36:21 | individual staff members from the facilities will |
| 36:22 | attempt to explain the -- the goal behind the |
| 36:23 | project or is it someone else who's providing that |
| 36:24 | explanation? |
| 36:25 | A. So the presidents who are part of the |
| 37:01 | committee can go through them. But also as -- as |

PLO - Plomin_1-20-25

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 37:02    staff to the capital allocation committee is all the | | |
| | 37:03    hospital CFOs, so they're involved in that meeting, | | |
| | 37:04    but they're staff. | | |
| | 37:05  Q.  I see. | | |
| 37:06 - 37:12 | **Plomin, Paul 2022-11-08** | 00:00:17 | **PLO.12** |
| | 37:06    And then the capital allocation committee | | |
| | 37:07    makes their final recommendation about which | | |
| | 37:08    projects should be approved; is that right? | | |
| | 37:09  A.  Correct. | | |
| | 37:10  Q.  The recommendation is then routed to the | | |
| | 37:11    board of trustees; is that right? | | |
| | 37:12  A.  Correct. | | |
| 60:05 - 61:01 | **Plomin, Paul 2022-11-08** | 00:01:18 | **PLO.13** |
| | 60:05    Does the capital allocation committee | | |
| | 60:06    consider the potential revenue a Franciscan location | | |
| | 60:07    will receive if a new da Vinci surgical system is | | |
| | 60:08    purchased? | | |
| | 60:09  A.  Yes. | | |
| | 60:10  Q.  How does -- how does the form that you've | | |
| | 60:11    mentioned previously calculate the potential revenue | | |
| | 60:12    from a particular piece of equipment, in particular, | | |
| | 60:13    a da Vinci system? | | |
| | 60:14  A.  So the form includes the volume related to | | |
| | 60:15    that, what we would charge for that procedure, and | | |
| | 60:16    then also an estimate of the payor mix, so you can | | |
| | 60:17    calculate the reimbursement from those procedures | | |
| | 60:18    and then the form also includes all the expenses | | |
| | 60:19    related to doing those procedures to come up with, | | |
| | 60:20    you know, the cash flow related to that to do our | | |
| | 60:21    net present value calculations. | | |
| | 60:22  Q.  So when you say "volume related to that," | | |
| | 60:23    that would be the -- the volume of procedures that | | |
| | 60:24    could be performed in a year with the da Vinci | | |
| | 60:25    surgical system; is that right? | | |
| | 61:01  A.  Correct. | | |
| 61:24 - 62:10 | **Plomin, Paul 2022-11-08** | 00:00:34 | **PLO.14** |
| | 61:24  Q.  You mentioned also part of the calculation | | |
| | 61:25    for potential revenue includes what Franciscan would | | |
| | 62:01    charge for the procedure. | | |
| | 62:02    Do you recall that? | | |

**PLO - Plomin_1-20-25**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 62:03  A.  Yes. | | |
| | 62:04  Q.  So for a piece of equipment like the | | |
| | 62:05      da Vinci where it's not going to be the same charge | | |
| | 62:06      for every procedure that's performed, how is -- how | | |
| | 62:07      is that calculation done? | | |
| | 62:08  A.  Yeah, the -- well, I mean, we should have | | |
| | 62:09      enough detail to break out the type of procedures | | |
| | 62:10      we're doing and the charge for those procedures. | | |
| 63:04 - 63:07 | **Plomin, Paul 2022-11-08** | 00:00:14 | **PLO.15** |
| | 63:04  Q.  You also mentioned all the expenses to | | |
| | 63:05      doing the procedures will go into the calculation. | | |
| | 63:06      Does that include both direct and indirect | | |
| | 63:07      costs? | | |
| 63:08 - 63:08 | **Plomin, Paul 2022-11-08** | 00:00:02 | **PLO.16** |
| | 63:08  A.  Yes. | | |
| 63:14 - 63:16 | **Plomin, Paul 2022-11-08** | 00:00:11 | **PLO.17** |
| | 63:14  Q.  Where does that cost data come from? | | |
| | 63:15  A.  Financial statements and our cost | | |
| | 63:16      accounting system. | | |
| 63:17 - 64:01 | **Plomin, Paul 2022-11-08** | 00:00:34 | **PLO.18** |
| | 63:17  Q.  Does the capital allocation committee | | |
| | 63:18      consider the costs associated with the da Vinci | | |
| | 63:19      surgical system in deciding whether to approve a | | |
| | 63:20      purchase? | | |
| | 63:21  A.  Yes.  That's part of the capital project | | |
| | 63:22      assessment form.  So that's -- that's what gets | | |
| | 63:23      summarized from that form onto that summary sheet of | | |
| | 63:24      all the capital.  So we're reviewing | | |
| | 63:25      apples-and-apples type considerations for the | | |
| | 64:01      projects. | | |
| 64:02 - 64:05 | **Plomin, Paul 2022-11-08** | 00:00:12 | **PLO.19** |
| | 64:02  Q.  And consistent with what we were talking | | |
| | 64:03      about before, that would include not only the system | | |
| | 64:04      itself, but also any service agreement and the | | |
| | 64:05      projected cost of EndoWrist instruments; correct? | | |
| 64:07 - 64:07 | **Plomin, Paul 2022-11-08** | 00:00:02 | **PLO.20** |
| | 64:07      THE WITNESS: Correct. | | |
| 65:10 - 65:23 | **Plomin, Paul 2022-11-08** | 00:00:41 | **PLO.21** |

**PLO - Plomin_1-20-25**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 65:10 | Q. In deciding whether to purchase a da Vinci | | **PLO.21** |
| | 65:11 | surgical system, the capital allocation committee | | |
| | 65:12 | considers procedural volume; correct? | | |
| | 65:13 | A. Correct. | | |
| | 65:14 | Q. In deciding whether to purchase a da Vinci | | |
| | 65:15 | surgical system, the capital allocation committee | | |
| | 65:16 | considers the service lines Franciscan either | | |
| | 65:17 | currently has or is starting? | | |
| | 65:18 | A. Correct. | | |
| | 65:19 | Q. In deciding whether to purchase a da Vinci | | |
| | 65:20 | surgical system, the capital allocation committee | | |
| | 65:21 | considers whether the acquisition is a replacement | | |
| | 65:22 | or a new addition; is that right? | | |
| | 65:23 | A. Correct. | | |

# The Intuitive da Vinci & EndoWrists



1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   SURGICAL INSTRUMENT SERVICE        )
    COMPANY, INC.,                     )
5                                      )
             Plaintiff,                )
6                                      )
             vs.                       ) Case No.
7                                      ) 3:21-CV-03496-VC
    INTUITIVE SURGICAL, INC.,          )
8                                      )
             Defendant.                )
9   _____   )
10
11
12        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
13             DEPOSITION OF GREG POSDAL
14      30(B)(6), SURGICAL INSTRUMENT SERVICE COMPANY
15
16             Tuesday, November 1, 2022
17        Remotely Testifying from Phoenix, Arizona
18
19
20
21
22
23  Stenographically Reported By:
24  Hanna Kim, CLR, CSR No. 13083
25  Job No. 5541334-A

                                       Page 1

```
 1        Q.   Are you referring to the document called

 2   "Summary of Quality and Reliability Measures," or is

 3   there another document that you're thinking of that

 4   contains those testing results?

 5        A.   I'm not certain if that was the name of      09:24:23

 6   it, but it sounds like it probably is.

 7        Q.   Did either -- did -- excuse me.

 8             Did SIS ever perform any testing

 9   specifically regarding the chip that Rebotix

10   installed in the EndoWrists?                           09:24:43

11        A.   No.

12             MR. CHAPUT:  I'd like to introduce what we

13   have previously marked as Exhibit 136.  This is an

14   e-mail SIS 0951 -- 115 through 095118 with a series

15   of attachments.                                        09:25:09

16             THE COURT REPORTER:  Excuse me.  Counsel,

17   is this a dep- -- the Deposition Exhibit 136?

18             MR. CHAPUT:  Defendant's Exhibit 136.

19   We're using sequen- -- sequential exhibit numbering

20   for all of the exhibits.  And we marked this           09:25:36

21   previously at the deposition of Keith Johnson.

22             THE WITNESS:  I have only have 135

23   available to me right now.

24             MR. CHAPUT:  It.  It -- it takes a moment

25   to load because sometimes the -- the exhibits are a    09:25:43
```

Page 26

```
 1    little bit large.

 2            THE WITNESS:  Okay.

 3            (Previously marked Deposition Exhibit 136

 4            was referenced.)

 5    BY MR. CHAPUT:                            09:26:09

 6        Q.   Exhibit 136 should be available to you

 7    now, Mr. Posdal.

 8        A.   Okay.  I've got it.

 9        Q.   And if you would scroll forward, please,

10    to the document with the title "Summary of Quality  09:26:19

11    and Reliability Measures."  It has the page number

12    ending in '126 in the bottom right corner.  It's

13    page 12 out of 25 in the PDF.

14        A.   Okay.

15        Q.   Do you recognize the Summary of Quality  09:26:48

16    and Reliability Measures document?

17        A.   Yes, I do.

18        Q.    Is this the testing results that you were

19    thinking of previously?

20        A.   Yes, they are.                   09:27:06

21        Q.   Did SIS ever have access to testing

22    results that are more detailed than what appears in

23    the Summary of Quality and Reliability Measures?

24        A.   I don't believe so, no.

25        Q.   Did SIS ever request more detailed      09:27:20
```

Page 27

1    documentation?

2         A.   No.

3         Q.   Turn forward, please, to the page ending

4    in '132.  This has a heading at the top, "Risk

5    Management."                                    09:27:45

6         A.   Okay.

7         Q.   This reform -- this states, "Risk

8    management activities per ISO 14971 standard were

9    performed during the development, verification and

10   validation of service processes."               09:27:59

11        Do you see that sentence?

12        A.   Yes.

13        Q.   Who performed those risk management

14   activities?

15        A.   Rebotix.                               09:28:06

16        Q.   Did Rebotix engage any third parties to

17   perform any of those risk management activities?

18        A.   From my recollection, I believe he stated

19   that they did have independent testing done.

20        Q.   Who performed that independent testing?   09:28:24

21        A.   I couldn't answer that without kind of

22   either going through this document, if it's in

23   there, or whether he told me verbally or not.  I

24   don't remember.

25        Q.   Did SIS have any involvement in the risk   09:28:41

Page 28

```
 1    management activities described on page '132?

 2         A.   No.

 3         Q.   The next heading is "Development Process."

 4              Do you see that section?

 5         A.   Yes, I do.                          09:28:57

 6         Q.   This states that "Extensive validation and

 7    safety testing occurred during the development of

 8    the service process."

 9              Did SIS have any involvement in that

10    validation and safety testing?                09:29:09

11         A.   No.

12         Q.   In the third sentence of that same

13    paragraph it refers to "A complete technical file

14    describing qualification activities and independent

15    testing."                                     09:29:22

16              Do you see that reference?

17         A.   I do.

18         Q.   Does SIS have access to the complete

19    technical file?

20         A.   No.                                 09:29:29

21         Q.   Has SIS ever had access to the complete

22    technical file?

23         A.   Not to my knowledge.

24         Q.   Jumping forward a couple pages, please to

25    the page ending '135, heading "Electrical and   09:29:43
```

Page 29