No. 25-1372

# In the United States Court of Appeals for the Ninth Circuit

———————

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
PLAINTIFF-COUNTER-DEFENDANT-APPELLANT

*v.*

INTUITIVE SURGICAL, INC.,
DEFENDANT-COUNTER-CLAIMAINT-APPELLEE

———————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (CIV. NO. 21-3496)
(THE HONORABLE ARACELI MARTINEZ-OLGUIN, J.)*

———————

**SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME 5 OF 5**

———————

WILLIAM B. MICHAEL
JOSHUA HILL, JR.
CRYSTAL L. PARKER
DANIEL A. CRANE
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

KANNON K. SHANMUGAM
KENNETH A. GALLO
PAUL D. BRACHMAN
JAMES DURLING
ANNA G. GOODMAN
JAKE L. KRAMER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

Volume 2

Pages 201 - 433

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE         )
COMPANY, INC., et al.,              )
                                    )
          Plaintiffs,               )
                                    )
   VS.                              )   NO. C 21-03496-AMO
                                    )
INTUITIVE SURGICAL, INC.,           )
                                    )
          Defendant.                )
_____)
AND RELATED COUNTERCLAIMS.          )
_____)
                        San Francisco, California
                        Tuesday, January 7, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
                 BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
                 BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

202

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
 3                            & GARRISON LLP
                              2001 K Street NW
 4                            Washington, D.C. 20006
                      BY:    KENNETH A. GALLO, ATTORNEY AT LAW
 5                           PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
 7                            1285 Avenue of the Americas
                              New York, New York 10019
 8                    BY:    WILLIAM MICHAEL, ATTORNEY AT LAW
                             CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                      BY:    JOSHUA HILL, JR., ATTORNEY AT LAW
12

13   Also Present:          Bobby Cox
                            Ryan Lee
14                          Greg Posdal
                            Dave Rosa
15

16

17

18

19

20

21

22

23

24

25
```

OPENING STATEMENT / McCAULLEY

1     it's in part a function of that's just the rule.

2           So we're not trying to be rude.  We're kind of

3     required to a little bit.  So just -- I may remind you a couple

4     of times that it's just part of what comes with it.  So here we

5     are.

6           So this morning what we'll do is, we talked about, is

7     that both -- both sides will make their opening statements.  I

8     want to just give you a very -- a very brief overview; right?

9           So each side will make their opening statement.  After

10    they've both made their opening statements, we'll start with

11    the presentation of evidence.

12          A quick word about opening statements.  An opening

13    statement is not evidence, and I want you to think of it more

14    of -- more as a roadmap by counsel of what they expect the

15    evidence will show you in this trial.  Its purpose is to assist

16    you in understanding the case as its presented to you.

17          And with that, I will turn the floor over to

18    Mr. McCaulley.

19          **MR. McCAULLEY:**  Thank you, Your Honor.

20                      <u>OPENING STATEMENT</u>

21          **MR. McCAULLEY:**  Well, my suit matches this morning,

22    but I can't get the slides to start.

23          Okay.  Ladies and gentlemen, good morning.

24          We're here today because Intuitive Surgical, which has

25    a monopoly on surgical robotic systems, requires its customers,

OPENING STATEMENT / McCAULLEY

1    the hospitals, to throw away the surgical instruments that are

2    used with that device after they've only been used 10 times.

3          Intuitive prevents independent companies, which are

4    perfectly capable of servicing these instruments and extending

5    those lives, from doing so with restrictive and illegal

6    contractual provisions.  That's the case in a nutshell.  That's

7    what we're here to talk about.

8          I, along with Josh Van Hoven, co-counsel at the end of

9    the table, and Anthony Dowell, who's attending a trial in

10   another part of the country but should be here tomorrow, have

11   the pleasure and honor of representing SIS, Surgical Instrument

12   Service Company.  You'll hear them referred to as SIS

13   throughout the trial.

14         Greg Posdal, the president and CEO of this business,

15   will be at counsel table the entire time.

16         SIS was established in 1971 by Greg's dad.  Greg's dad

17   was an RN in the service and started this business after he

18   came off of active duty.

19         SIS is in the business of repairing surgical

20   instruments.  If you've had surgery in the United States,

21   you've almost surely had a repaired or serviced piece of

22   surgical equipment used during the surgery.  You'll hear

23   Dr. Mahal talk about how common this is in surgery in the

24   United States.

25         Greg's company has been doing this for some 53,

1

2                          <u>**CERTIFICATE OF REPORTER**</u>

3              I certify that the foregoing is a correct transcript

4      from the record of proceedings in the above-entitled matter.

5

6      DATE:    Tuesday, January 7, 25

7

8

9

10     _____

11        Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                 Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 3

Pages 434 - 663

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE     )
COMPANY, INC., et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   NO. C 21-03496-AMO
                                )
INTUITIVE SURGICAL, INC.,       )
                                )
          Defendant.            )
_____)
AND RELATED COUNTERCLAIMS.      )
_____)
                        San Francisco, California
                        Wednesday, January 8, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
               BY:  **RICHARD McCAULLEY JR., ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
               BY:  **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant:
                          PAUL, WEISS, RIFKIND, WHARTON
 3                        & GARRISON LLP
                          2001 K Street NW
 4                        Washington, D.C. 20006
                     BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                        PAUL BRACHMAN, ATTORNEY AT LAW

 6                        PAUL WEISS RIFKIND WHARTON
                          & GARRISON LLP
 7                        1285 Avenue of the Americas
                          New York, New York 10019
 8                   BY:  WILLIAM MICHAEL, ATTORNEY AT LAW

 9                        PAUL, WEISS, RIFKIND, WHARTON
                          & GARRISON LLP
10                        535 Mission Street - 24th Floor
                          San Francisco, California 94105
11                   BY:  JOSHUA HILL, JR., ATTORNEY AT LAW

12

13   Also Present:        Bobby Cox
                          Ryan Lee
14                        Greg Posdal
                          David Rosa
15

16

17

18

19

20

21

22

23

24

25
```

POSDAL - CROSS / GALLO

1  third party modifies it," you don't actually disagree with

2  that?

3  **A.**   That you wouldn't stand behind it?  No, I don't disagree

4  with that.

5  **Q.**   Okay.  So you -- I thought I heard you testify yesterday

6  that those letters, which said, "We're not going to be able to

7  stand behind the product," that you thought those letters were

8  improper?

9  **A.**   That was merely stating that you wouldn't stand behind the

10  repair.

11  **Q.**   So no problem?

12  **A.**   (No audible response.)

13  **Q.**   Let's talk about authorization.  You said you thought if

14  you had called and asked for approval from Intuitive for the

15  product modification you were selling, that Intuitive would not

16  have given it to you?

17  **A.**   That's my assumption, yes.

18  **Q.**   Based on their actions to date, is what you said?

19  **A.**   Yes.

20  **Q.**   And their actions to date were the customer letters I just

21  asked you about 30 seconds ago?

22  **A.**   Yes.

23  **Q.**   Okay.  That are fine?

24  **A.**   That -- that say you're not going to accept

25  responsibility, yes.

POSDAL - CROSS / GALLO

1  Q.   Right.  Which you have no problem with.

2        But even though you now claim this is a $140 million

3  business opportunity, you never picked up the phone and asked

4  Intuitive whether they would approve you?

5  A.   Correct.

6  Q.   Instead, you called Mr. McCaulley in December of 2019?

7  A.   We had discussions after we were effectively out of the

8  business, yes.

9  Q.   No.  You had discussions in December of 2019; right?

10  A.   If that's what the record shows, then, yes.

11  Q.   So the only phone call you placed about your claiming

12  you're being driven out of business was to Mr. McCaulley, not

13  to Intuitive to see if this could be worked out?

14  A.   Historically in our business, no manufacturer has given us

15  authority to perform those --

16  Q.   But you know --

17        **THE COURT:**  Mr. Gallo.

18  **BY MR. GALLO:**

19  Q.   I'm sorry.  I apologize.  I didn't mean to interrupt you.

20  I apologize for that.  Please, go ahead.

21  A.   Our service has been around for 50 years, and we've never

22  received the approval of a manufacturer.

23  Q.   But you know that under Intuitive's policy, Restore has

24  qualified for approval?

25  A.   I'm sorry?

POSDAL - CROSS / GALLO

```
 1   A.    Yes.

 2   Q.    Okay.  And yesterday you said essentially SIS would never

 3   tell a lie to a customer; right?

 4   A.    Yes.

 5   Q.    Can we look at 15 -- Exhibit 1548, which is in --

 6         MR. GALLO:  We need to hand up the binder to the

 7   witness.  Apologies.  I should have done that at the front end.

 8   BY MR. GALLO:

 9   Q.    Tab 11 of your binder.

10                       (Pause in proceedings.)

11         MR. GALLO:  May I approach, Your Honor?

12         THE COURT:  You may.  Thank you.

13                       (Counsel approaches witness.)

14   BY MR. GALLO:

15   Q.    So I'm going to ask you to look at Tab 11.  It's marked

16   Trial Exhibit 1548 and no objections.

17         MR. GALLO:  Okay.  1548.  And, Your Honor, there's no

18   objection and I move it into evidence and ask to be able to

19   publish it to the jury if -- assuming Mr. McCaulley agrees.

20         MR. McCAULLEY:  No objection, Your Honor.

21         THE COURT:  All right.  It's admitted and you may

22   publish it.

23       (Trial Exhibit 1548 received in evidence.)

24         MR. GALLO:  Okay.  Thank you.

25   \\\
```

POSDAL - CROSS / GALLO

BY MR. GALLO:

Q.   And I -- so do you see, in the middle of the very first page there, right next to the "trial exhibit," you recognize this as an e-mail from Mr. Johnson to Mr. Cabrera, and it says "KP," and you recognize that as Kaiser Permanente?

A.   Yes.

Q.   And that's one of the big medical institutions; correct?

A.   It is.

Q.   Okay.  And if you turn the page to page 2, you see the second paragraph refers to "our robot problem" -- "program," rather?

A.   Okay.

Q.   Are you with me?

A.   Yes.

Q.   Okay.  Look at the last sentence of that paragraph.

A.   Okay.

Q.   This is referring to EndoWrist program; right?  This is what it's referring to, the EndoWrist -- what you call the EndoWrist repair program; right?

A.   Okay.

Q.   Is it, sir?  Is it referring to that?

A.   It looks to be, yes.

Q.   Okay.  So look at the last sentence [as read]:

         "Some of the customers using this service include
         Legacy Health" -- let's skip over that --

POSDAL - CROSS / GALLO

```
 1          "Banner Health."
 2              Okay?  Do you see that?
 3   A.    Yes.
 4   Q.    And this document is dated October 2, 2019, right, the
 5   e-mail?
 6   A.    Yes.
 7   Q.    You had not sold anything, any EndoWrist refurbishes,
 8   repairs to Banner Health in October of 2019; correct?
 9   A.    That's correct.
10   Q.    The next one is Piedmont Healthcare.
11   A.    Okay.
12   Q.    Your company had not sold any EndoWrist refurbishments or
13   repair to Piedmont Healthcare in October of 2019?
14   A.    Correct.  Can I elaborate on that?
15   Q.    No.
16   A.    Okay.
17   Q.    Your counsel can ask you the question.
18   A.    Okay.
19   Q.    You had not sold any to Heath [sic], Baylor, Scott, and
20   White as of 2019; isn't that true?
21   A.    Yes.
22   Q.    So what Mr. Johnson said in this e-mail was false, sent to
23   a customer?
24   A.    I would say that's not necessarily true.  It doesn't say
25   "sold to."
```

POSDAL - CROSS / GALLO

1  Q.   Oh, okay.

2        "Some of our customers utilizing this service," what

3  do you take that to mean?

4  A.   Well, that's what I wanted to elaborate on.  Some of

5  these -- and I don't know which ones, that's a Keith Johnson

6  question -- some of these, like Banner and I believe

7  Legacy Health and possibly Piedmont, we had done samples for.

8  We didn't bill or charge them for it.  We did samples so that

9  they could evaluate the service.

10 Q.   You had done samples for Banner Health?

11 A.   I believe we had.

12 Q.   And Piedmont?

13 A.   Yes.  I'm not certain of dates or times on any of this,

14 but I believe those were done.

15 Q.   And Heath -- and Health, Baylor, Scott, and White -- I

16 mean, sorry -- Baylor, Scott, and White?

17 A.   We didn't personally do those.  It's possible he was

18 referring to -- he refers to a thousand EndoWrists, which was

19 part of the Rebotix program.

20 Q.   I just -- I just -- I think I just asked you if you had

21 any knowledge that Rebotix had ever sold to Baylor, Scott, and

22 White, and I think you told me you did not.

23 A.   Rebotix -- I don't have that knowledge, no.

24 Q.   Okay.  So let's look, then, back at tab -- it would be at

25 Tab 18 of your binder.  It's the same document that you've been

POSDAL - CROSS / GALLO

1   questioned about by Mr. McCaulley --

2   A.   Yes.

3   Q.   -- which is the so-called -- all the sales that you -- and

4   services you had provided on EndoWrist modification; right?

5   A.   Yes.

6   Q.   And I understood you to say this listed all of the

7   EndoWrist modifications you had provided in the -- through

8   2019.  Did I misunderstand you?

9   A.   That we had billed for and serviced those hospitals

10  personally.

11  Q.   Okay.  Well, let's look at that.

12       Look at 142, under Tab 18, and look at the -- in the

13  middle of the document, four lines down, across from "Kaiser

14  Permanente," it says, "Sample, Sample, Sample, Sample, Sample."

15  A.   Okay.

16  Q.   Do you see anywhere it says Banner Health got a sample?

17  A.   I don't.

18  Q.   Do you see anywhere it says Piedmont got a sample?

19  A.   I don't.

20  Q.   Do you see anywhere it says whatever the other one was,

21  Blake, Scott, and White [sic] got a sample?

22  A.   No.

23  Q.   Okay.  And so are you telling the jury that you're

24  comfortable with what Mr. Johnson wrote in 1548, at Tab 11,

25  that what he -- you were -- you would be comfortable with him

POSDAL - CROSS / GALLO

1  saying people utilizing this service, that maybe that might

2  create -- you're comfortable that wouldn't create a

3  misimpression with the client, that you had actually sold

4  something to those people?

5  A.   Well, again, it doesn't say "sold," and I'd have to go

6  back in that time period and see if we actually did -- we or

7  our partner, Rebotix, had done anything with those.

8  Mr. Johnson may have knowledge, from working with Rebotix, that

9  those situations did take place.  I don't know.

10  Q.   Okay.  I could have sworn you testified yesterday that

11  Rebotix had no relationship with Piedmont Health -- with

12  Piedmont and you did, and that was part of what you brought to

13  this deal?

14  A.   We had a relationship.  I don't know what happened prior

15  to that.

16  Q.   I -- but isn't the whole premise of this deal that Rebotix

17  didn't have relationships with many hospitals?

18  A.   They were reaching out to us for -- to provide this

19  service to the hospitals, yes.

20  Q.   Okay.  And then let's go up to the top of the page.  The

21  second -- the first line says -- well, it says [as read]:

22       "Our robotic program launched six months ago.

23    SIS is the only company providing this service."

24       Do you see that?

25  A.   I do.

501

POSDAL - CROSS / GALLO

1  Q.   Okay.  So that's not true.  Rebotix was providing the

2  service too; right?

3  A.   They were providing to us.

4  Q.   Well, wait a minute.

5       I'm getting confused because I thought you just said

6  they might have provided it to Banner Health and Piedmont.

7  A.   Okay.

8  Q.   So it's not true that you were the only company providing

9  this service.

10  A.   Okay.

11  Q.   No.  You have to answer.  I ask the questions.

12  A.   That appears true.  That appears true.

13  Q.   Appears.  Let me be clear.  It appears accurate because it

14  is a false statement that you were the only company providing

15  this service?

16  A.   It appears that way.

17  Q.   Yeah.

18       And then it says [as read]:

19       "We have a patent on this process."

20  A.   Okay.

21  Q.   And you don't?

22  A.   In partnership with Rebotix and with their permission.

23  Q.   That's oral permission --

24  A.   Okay.

25  Q.   -- is that right?

POSDAL - CROSS / GALLO

1  A.   Yes.

2  Q.   The patent was never assigned to you?

3  A.   Correct.

4  Q.   And you don't have it in writing anywhere that you were

5  allowed to represent that you owned their patent?

6  A.   Correct.

7  Q.   And let me be -- I really am confused about this because

8  if a -- if a customer knew that you owned the patent, you, SIS,

9  owned the patent, that if they know anything about patents,

10  they would conclude that you -- you had the right to exclude

11  other people from selling this process.  That's what a patent

12  does; right?

13  A.   Sure.

14  Q.   Okay.  But, in fact, Rebotix had the right to exclude

15  other people if they wished to; right?

16  A.   Correct.

17  Q.   Including SIS because SIS didn't have an assignment?

18  A.   That's correct.

19  Q.   So if a hospital thought you had the patent, they might

20  get comfort that this was -- that you were a stable supplier;

21  correct?

22  A.   I imagine they could draw that inference, yes.

23  Q.   But if they concluded that Rebotix had the patent and you

24  didn't have an assignment, they might be worried you were not

25  such a stable supplier; right?

POSDAL - CROSS / GALLO

```
 1   A.   They might.  I don't believe that was a concern of theirs
 2   at all.
 3   Q.   Okay.  But you wanted to be sure it wasn't a concern
 4   because you misrepresented that you had the patent?
 5   A.   Our representative did, yes.
 6   Q.   Yeah.  The guy that you hired back after he had cheated
 7   you.
 8   A.   That's correct.
 9   Q.   And then it says you have ISO certification, but you
10   didn't have ISO certification to refurbish these products.  SIS
11   did not.
12   A.   Correct.  Rebotix did.
13   Q.   Why didn't you just say, "Our supplier has ISO
14   certification"?
15   A.   Because these -- this is a marketing material.
16   Q.   So just say whatever you like?
17   A.   Not whatever you like.
18   Q.   No.  But go right up to the edge?
19   A.   Look, we're providing a safe and effective service.
20   That's what counts to the customer.  We're guaranteeing and
21   warrantying our service.  We're standing behind our service.
22   That's what's important to a customer --
23   Q.   Okay.
24   A.   -- as it has been for 50 years.
25   Q.   We'll come back to that.
```

POSDAL - CROSS / GALLO

1          Did you ever affirmatively misrepresent to a

2     customer -- did you ever actually say, "We do not have a

3     subcontractor on this EndoWrist replacement business"?

4     A.    I don't believe so.

5     Q.    Okay.  Well, we'll see.  Okay?

6     A.    Okay.

7     Q.    We'll see.

8          And when you -- and when Mr. Johnson said, "As of last

9     week, we have refurbished over a thousand EndoWrists for

10    facilities around the U.S.," you're totally comfortable that a

11    client wouldn't be led to believe that SIS had refurbished

12    those products?

13    A.    Well, as a partner with Rebotix, they had and so this

14    service together did do that service --

15    Q.    Okay.

16    A.    -- did provide that service.

17    Q.    And don't you know that customers rely on you, SIS, your

18    reputation for good work?

19    A.    They do, and that's what we provide them.

20    Q.    And you almost never subcontract work?

21    A.    It's infrequent, yes.

22    Q.    And you tell customers -- you tell customers, you market

23    to customers that you do not subcontract the work, don't you?

24    A.    We do.

25    Q.    Yeah.

POSDAL - CROSS / GALLO

1          Okay.  So when it's in your benefit to tell them, "We

2     don't subcontract the work," that's what you tell them; right?

3     A.   We're the face of all the work and we warranty all the

4     work --

5     Q.   Wait a minute.

6     A.   -- and stand behind all the work.

7     Q.   When you're doing the work yourself, you affirmatively

8     represent to the customers, "We do not subcontract this work"?

9     A.   It's possible.  I don't remember the exact statements when

10    or why, but it's possible we say that, yes.

11    Q.   Well, I think I'll be able to help you with that later.

12    A.   Okay.  Thank you.

13    Q.   And when you do subcontract the work, you hide the

14    subcontractor by saying -- by claiming that you do what the

15    subcontractor does?

16    A.   That's a characterization.

17    Q.   How would you characterize what's here?  Let's leave out

18    the word "hide."

19          You do not disclose that you are using a

20    subcontractor?

21    A.   Much like any manufacturer, perhaps yourselves included,

22    parts of work that are included in your systems and your

23    EndoWrists and your instruments are provided by other vendors.

24    Do you disclose all of that to your customers or do you say,

25    "This is an Intuitive Surgical product"?

POSDAL - CROSS / GALLO

1   Q.   So you're suggesting to the jury that it's normal for a

2   distributor to claim it owns the patents that the manufacturer

3   owns?

4   A.   I never said that.

5   Q.   Okay.

6   A.   As a partnership with Rebotix, we shared their -- we were

7   allowed to market their patent as part of this service.

8   Q.   Okay.  Just looking back at Tab 18, 142, I thought I heard

9   you testify yesterday that this -- you were paid for all of the

10  entries that are reflected on Tab 42.  Did I misunderstand you?

11  A.   Oh, I believe that's the case.  It's certainly not the

12  samples; we wouldn't have billed for beyond repairs.

13  Q.   So okay.  So when you said you were paid for all of the

14  entries on Tab 42, that wasn't quite right?

15  A.   I guess -- yes, absolutely.  Samples wouldn't have been

16  charged for.  Beyond repairs wouldn't have been charged for.

17  Q.   So four of the entries are for samples; right?  So you

18  didn't get paid for those --

19  A.   Okay.

20  Q.   -- right?  Correct?

21  A.   Sure.  Yes.

22  Q.   And one, two, three, four, five, six -- six, it looks

23  like, are beyond repair.

24  A.   Okay.

25  Q.   So you didn't get paid for those?

POSDAL - CROSS / GALLO

1    **A.**   I would imagine that's the case.

2    **Q.**   Okay.  And four of the beyond repairs are for Kaiser

3    Fontana; correct?

4    **A.**   Yes.

5    **Q.**   And the five other entries for Kaiser Fontana, don't you

6    know that if you looked at the invoice records of your company,

7    you didn't get paid for those five either?

8    **A.**   I couldn't tell you.

9    **Q.**   You don't know?

10    **A.**   I don't know.

11    **Q.**   But you were comfortable just telling the jury, "Yeah, we

12    got paid for all of these," even though it looks like 10 and

13    maybe 15 of the entries, you didn't get paid for?

14    **A.**   I -- just to clarify, are those my words that we got paid

15    for them?

16    **Q.**   I thought that's what I heard yesterday.

17    **A.**   I could have.  I could have generalized, if these were

18    invoiced, that I don't know of any outstanding bills that were

19    not paid.  So anything that was billed for was likely paid or I

20    would have known about it.  I think that's what I said

21    yesterday.

22    **Q.**   You understand you're under oath; right?

23    **A.**   Yes.

24    **Q.**   Okay.  So you relied on Rebotix for the testing; right?

25    **A.**   Correct.

POSDAL - CROSS / GALLO

1    Q.   And, by the way, you've testified now three or four times

2    about this three-ring binder; right?

3    A.   Yes.

4    Q.   It's not here --

5    A.   Correct.

6    Q.   -- right?

7         It hasn't been moved into evidence?

8    A.   Correct.

9    Q.   You don't have it?

10   A.   Correct.

11   Q.   Okay.  The documents you said were in it, that you just

12   testified, I think it's DX1468 and DX1460 -- TX1469, you just

13   testified -- Mr. McCaulley identified, like, three documents

14   and you said, "Oh, yeah.  Those were all in the three-ring

15   binder"; right?

16   A.   Yes.

17   Q.   They weren't produced; those documents were not produced

18   out of SIS' files in this litigation, were they?

19   A.   Right.

20   Q.   They were produced out of a Rebotix production?

21   A.   Correct.

22   Q.   Of a subpoena to Rebotix?

23   A.   Correct.

24   Q.   So you're not going to show the jury this three-ring

25   binder because you don't have it?

POSDAL - CROSS / GALLO

1    A.    That's correct.

2    Q.    And every document you say you saw, you don't have?

3    A.    That's -- well, no, that's not correct.

4    Q.    I'm sorry.  That's a bad question.  I withdraw the

5    question.

6    A.    All right.

7    Q.    The documents you just testified about that bear Rebotix's

8    production numbers, you don't have them in SIS' files?

9    A.    I believe that's true for most but probably not all.

10   Q.    Okay.  And you didn't do anything to investigate -- I'm

11   distinguishing between you and Rebotix.

12             SIS did not do anything to investigate independently

13   whether the modifications that Rebotix was making to the

14   EndoWrist could hurt patients?

15   A.    Correct.

16   Q.    You relied entirely on Rebotix for that determination?

17   A.    Correct.

18   Q.    Rebotix did all of the testing; correct?

19   A.    Correct.

20   Q.    You did none of the testing?

21   A.    That's correct.

22   Q.    You didn't do anything to test the chip that Rebotix

23   installed?

24   A.    Correct.

25   Q.    You didn't engage any third party to perform testing?

POSDAL - CROSS / GALLO

1   A.   Correct.

2   Q.   You weren't involved in deciding what testing Rebotix

3   would do?

4   A.   That's correct.

5   Q.   You didn't have any input into the design of testing?

6   A.   Correct.

7   Q.   And you went down -- you testified yesterday that you went

8   down to Rebotix and you saw, you used the words, "test data."

9   A.   Okay.

10  Q.   Is that right?

11  A.   Yes.

12  Q.   Isn't that what you said?

13  A.   Yes, I did.

14  Q.   Okay.  But you haven't produced any of that test data out

15  of your files?

16  A.   Some of it's in there, sure.

17  Q.   Okay.

18  A.   The testing that we reviewed earlier this morning, the

19  test of 29 uses, the test of 50 uses, that's all in our files.

20  Q.   Okay.  I think what you're referring to is what's at

21  Tab 39 -- 29 rather?

22  A.   29?

23  Q.   I'm sorry.  I'm sorry.  I misspoke.  That's not correct.

24        It's at Tab 30 and it's Trial Exhibit 147, which

25  you've already been asked questions about.

POSDAL - CROSS / GALLO

1   A.    Yes.

2   Q.    In the third page of that document, which is marked with

3   the Bates Number 1312 and with a PDF number of 3, do you see

4   that, "Rebotix Summary of Quality and Reliability Measures"?

5   A.    I do.

6   Q.    Okay.  You -- if you look back at the first page of that,

7   you e-mailed this document to Keith Johnson on June 11, 2019;

8   right?

9   A.    Yes.

10  Q.    This is the document that you had received from Rebotix;

11  correct?

12  A.    Correct.

13  Q.    And if you -- and this summary of quality and reliability

14  measures, it looks like it's eight pages long.  Do you see

15  that?

16  A.    Yes.

17  Q.    Okay.  And, sir, I want to be really clear about this.

18  The entirety of the summary of the test results appears on

19  pages 318 to 326, Bates numbers.  Would you just look at that?

20  A.    Yes.

21  Q.    Are you with me?

22  A.    Yes.

23  Q.    Would you agree that's the total summary -- the summary of

24  the test results?

25  A.    Of what I have in my possession, yes.

POSDAL - CROSS / GALLO

1  Q.   Well, it's the document your lawyer showed you; right?

2  That's -- the total of this document, summary of test results,

3  that you got from Rebotix --

4  A.   Okay.

5  Q.   -- the summary of the test results appears on eight pages,

6  between page 318 and 326?

7  A.   Okay.

8  Q.   I need you to -- I'm sorry.  I know you're meaning to be

9  helpful, but you have to say "yes" for the record.

10 A.   I'm sorry.  Give me the numbers again.   318?

11 Q.   318 to 326.

12 A.   Okay.  Yes.

13 Q.   Okay.  And this is a -- sort of a narrative summary of the

14 test results; correct?

15 A.   Correct.

16 Q.   There's actually no data here --

17 A.   Okay.

18 Q.   -- correct?

19 A.   It -- in terms of what tests they performed, yes.

20 Q.   There's no actual test data?

21 A.   Correct.

22 Q.   There's no tables, there's no figures, there's no

23 numbers --

24 A.   Okay.

25 Q.   -- correct?

POSDAL - CROSS / GALLO

1  A.   Correct.

2  Q.   There's no laboratory records; right?

3  A.   Correct.

4  Q.   It just purports to summarize what some tests that Rebotix

5  had showed; right?

6  A.   Correct.

7  Q.   And you never asked Rebotix -- you never asked Rebotix for

8  more detailed data of what was contained in those tests than

9  these eight pages?

10 A.   That's correct.

11 Q.   You previously testified under oath that you never had

12 access to any more detailed data than is in these eight pages;

13 right?

14 A.   If that's what it says, yes.

15 Q.   Right.  Well, that's true; isn't it?

16 A.   Well, except for what I observed in the binder that they

17 had with all the rest of the relevant data in it.

18 Q.   When you were asked at your deposition, you didn't mention

19 that three-ring binder, did you?

20 A.   I don't recall.

21 Q.   You said the only access you had was to these eight pages?

22 A.   I don't recall.  It does not seem accurate.  I don't know

23 how the question was phrased at the time, but that --

24 Q.   Go ahead.

25 A.   -- that doesn't seem right.

514

POSDAL - CROSS / GALLO

1    Q.   You never had access to the Rebotix's test -- technical

2    file describing the qualification activities and the testing

3    activities that Rebotix did; correct?

4    A.   Not at my facility.

5    Q.   No, no, no, no, sir.

6         You never had access to it; isn't that true?

7    A.   That was part of what was in that -- in the binder.

8    Q.   Okay.  You were deposed in this case in November of '22;

9    right?

10   A.   Yes.

11   Q.   And you took an oath?

12   A.   Yes.

13   Q.   And you believe you told the truth?

14   A.   I believe I did.

15   Q.   Okay.

16        MR. GALLO:  Can we call up Mr. Posdal's 30(b)(6)

17   deposition at page 29, lines 12 to 23?

18                        (Pause in proceedings.)

19                   (Video played but not reported.)

20   BY MR. GALLO:

21   Q.   That was your truthful testimony; right, sir?

22   A.   Yes.

23   Q.   We're not going to see this three-ring binder, right, in

24   this trial?

25   A.   I don't believe so.

POSDAL - CROSS / GALLO

1  Q.   Oh.  We're not going to see the Rebotix technical file?

2  A.   I don't know.

3  Q.   Yesterday you testified about replacing endoscopes,

4  flexible endoscopes, at some length; right?  Or, I'm sorry, I

5  shouldn't have said "replacing."  Repairing flexible endoscopes

6  at some length?

7  A.   Correct.

8  Q.   And I heard you to say that you were not intimidated about

9  servicing the cables on the EndoWrist because you thought they

10 were similar to the ropes on the flexible endoscopes.  Did I

11 get that right?

12 A.   In part, that's correct.

13 Q.   Were you trying to convey to the jury that you had

14 replaced cables on the endoscope?  "You" meaning SIS.  I mean,

15 on the EndoWrist.  You weren't saying SIS had replaced cables

16 on the EndoWrist; right?

17 A.   I don't believe I ever said that.

18 Q.   No, I don't think you did either.  I just want to be

19 clear.

20 A.   Yes; correct.

21 Q.   And did you -- were you trying to convey to the jury that

22 Rebotix had replaced cables on the EndoWrist when they serviced

23 those devices?

24 A.   No.

25 Q.   Okay.  Because you -- you -- you never replaced the

POSDAL - CROSS / GALLO

1  cables, right, SIS?

2  **A.**   On EndoWrists?

3  **Q.**   Right.

4  **A.**   Correct.

5  **Q.**   And you never had the specifications from Intuitive or

6  anywhere that would instruct somebody how to replace those

7  cables in the EndoWrist; right?

8  **A.**   Correct.  That wasn't part of the process, though.

9  **Q.**   Okay.  You never saw Rebotix replace the cables?

10 **A.**   Correct.

11 **Q.**   And let's look back at Exhibit 147.  It's Tab 30 in your

12 book.  It's already been admitted into evidence.

13         **MR. McCAULLEY:**  I'm sorry, which exhibit?

14         **MR. GALLO:**  147.

15         **THE COURT:**  Mr. Gallo, hold on one second.

16         **A JUROR:**  I'm starting to do the dance over here.

17         **THE COURT:**  Mr. Gallo, is this a good -- I appreciate

18 the notice.

19         Mr. Gallo, how about we take a break here.

20         **MR. GALLO:**  Great.  No, I'm with him.

21         **THE COURT:**  I know that counsel wanted -- hold on.

22 Hold on.  Hold on.

23         I know that counsel wanted to talk about something, so

24 I'm going to go ahead and give you-all a little longer just so

25 we have enough time and you're not stuck in the room.  We'll

POSDAL - CROSS / GALLO

```
 1    come back at 10:20.
 2            All right.  All rise for the jury.
 3                    (Jury exits courtroom.)
 4            (Proceedings were heard out of the presence of the
 5    jury.)
 6            THE COURT:  You may be seated.
 7            THE WITNESS:  Your Honor, may I go to the restroom?
 8    What am I allowed to do or not do?
 9            THE COURT:  My sense is you're welcome to go to the
10    restroom.  I assume your counsel -- excuse me -- unless your
11    counsel would ask you to stay, but you're free to leave the
12    stand and...
13            THE WITNESS:  Thank you.
14            THE COURT:  Counsel, you-all wanted a sidebar earlier,
15    I think, about Restore being authorized.  Is that the point at
16    which I think that came up?
17            MR. McCAULLEY:  I just don't want him to be in the
18    courtroom.
19            THE COURT:  Thank you.  I appreciate that.
20            Can you take your spot?
21            MR. GALLO:  Please.
22            MR. McCAULLEY:  Your Honor, I didn't mean to
23    interject.  I think it raises two important questions.
24            To say that Rebotix is authorized without referencing
25    litigation, I would object and maintain my objection from this
```

POSDAL - CROSS / GALLO

1    morning.  I think it opens the door to the fact that it was
2    done at the point of a bayonet, that it was done as part of
3    settlement of litigation.  I don't see how you can say they
4    were authorized.  They weren't authorized in the relevant time
5    period.
6         And I was worried if you asked this witness that
7    they're authorized, he knows that they did it at the point of a
8    bayonet, and I was -- I didn't think I had to; I hadn't
9    cautioned him.  I was worried that he was about to blurt it
10   out, and that you would think that I had set that up somehow.
11        So I'm concerned about those two things.  I renew my
12   objection from this morning that the door's been opened in
13   talking about Rebotix being authorized to compete.  They
14   weren't authorized in 2019.  They weren't authorized in 2020.
15   They were authorized as part of a settlement of litigation.  So
16   I think that that becomes relevant.
17        And then I don't know how to caution the witness to
18   not answer that way, so I wanted to keep him penned so we could
19   have a civilized off-the-record, outside-the-presence-of-the-
20   jury conversation about that.  I'm just worried that this may
21   come out.
22        THE COURT:  So I appreciate your renewing it and
23   making your record, Mr. McCaulley, but, frankly, I think that
24   Intuitive is allowed -- as we've talked about several times, I
25   think Intuitive is allowed to talk about who -- the competitors

POSDAL - CROSS / GALLO

```
 1    that have been authorized.  I do think that can happen without
 2    invoking the litigation.
 3              And I think to -- in keeping with the motion in limine
 4    ruling, it was -- right? -- from Motion in Limine Number 3,
 5    it's too prejudicial to start bringing up those other
 6    litigations.
 7              So if that requires instructing your witness that he's
 8    not supposed to talk about the other litigation, then that may
 9    be something to do now, before he takes the stand again.
10         MR. GALLO:  I can maybe be helpful by just prefacing
11    the question with, "Please answer this question 'yes' or 'no,'"
12    or the Court could instruct him.  Whichever you guys like, but
13    I think we can handle this.
14         MR. McCAULLEY:  I think, Your Honor, I'd like to give
15    this some thought because I would also like to, on redirect,
16    which I don't think we're going to get to before lunch --
17    correct?
18         MR. GALLO:  Not before lunch, no.  Hopefully before
19    dinner.
20         MR. McCAULLEY:  I think -- may I give some thought
21    to --
22         THE COURT:  One moment.
23              I'm so sorry, Mr. Posdal.  Your counsel had a very
24    good point.  If you could actually stay out of the courtroom
25    for a little while.  Thank you so much.  Apologies for running
```

POSDAL - CROSS / GALLO

```
 1   you off.
 2          MR. McCAULLEY:  Yeah, Your Honor, I'd like to give
 3   some thought and have a few moments of the Court's time before
 4   I go on redirect to make sure that the questions that I'd like
 5   to ask to put this in context don't run afoul.
 6          I'm very sensitive, Your Honor.  I don't want the
 7   jury -- I don't want us to be arguing about the jury shouldn't
 8   have heard something.  So as long as my redirect won't happen
 9   before lunch, may I have a few moments to give some considered
10   thought to how I raise this issue?
11          THE COURT:  Certainly.  And maybe -- so let's -- while
12   we have a moment, let's map out the rest of our day here.
13          Mr. Gallo, you'll have Mr. Posdal, let's say, until
14   about noon?
15          MR. GALLO:  That's fine, Your Honor.
16          THE COURT:  All right.  And then, as you might have
17   noticed, you-all did not get a very long lunch break, but is --
18   to be more candid, neither did the court reporter or my staff.
19   So I want to give them a longer amount of time today to
20   actually take a break.
21          So I'm assuming we won't -- it sounds like you don't
22   need to speak with me about your redirect.  Can we plan to do
23   that during the afternoon break rather than at the lunch hour?
24          MR. GALLO:  Yes.  I think that's fine, Your Honor.  If
25   I'm going to finish, I'll give everybody a heads-up, but I
```

POSDAL - CROSS / GALLO

1   think it's very unlikely that I finish until, well, 2:00, 2:30,

2   you know.  I mean, I -- so I'll give you a heads-up if I'm

3   going to finish materially earlier than that.

4        THE COURT:  Great.  And if you're not, then maybe we

5   even do it at the end of the day.

6        MR. McCAULLEY:  We can do it --

7        THE COURT:  We're getting better.  Just we'll keep

8   working on it.

9        Go ahead, Mr. McCaulley.

10        MR. McCAULLEY:  If Mr. Gallo is -- goes through the

11   end of the day, then we can talk about this at 8:00 o'clock in

12   the morning, and that would actually be preferred so that I can

13   give some thought and actually have some questions laid out.

14   And I just want to do it outside the presence of the jury so we

15   don't get an ugly record.

16        THE COURT:  All right.  Let's -- why don't -- we'll

17   plan for that.  And, Mr. Gallo, you'll let us know if it looks

18   like you'll finish substantially earlier.

19        MR. GALLO:  I will.  I will.  Thank you.

20        THE COURT:  Certainly.

21        MR. McCAULLEY:  Sorry?

22        THE COURT:  I was going to ask if there's anything

23   else before I run away for a few minutes.

24        MR. GALLO:  Only I just wanted to ask if I could have

25   five minutes.  That's what --

POSDAL - CROSS / GALLO

```
 1              THE COURT:  So I instructed the jury -- I wanted to
 2    make sure you-all actually got a few minutes too, so we're
 3    coming back at 10:20.
 4              MR. GALLO:  Oh, thank you.
 5              THE COURT:  So you've all got a little time.
 6              MR. GALLO:  Thank you.  I appreciate it.
 7                    (Recess taken at 10:10 a.m.)
 8                  (Proceedings resumed at 10:23 a.m.)
 9              (Proceedings were heard out of the presence of the
10    jury.)
11              THE CLERK:  This court is now in session.
12              All rise for the jury.
13                    (The jury enters the courtroom.)
14          (Proceedings were heard in the presence of the jury.)
15              THE COURT:  You may be seated.
16              The floor is yours, Mr. Gallo.
17              MR. GALLO:  May I proceed?  Thank you.
18    BY MR. GALLO:
19    Q.   Sir, earlier in my cross-examination, I asked some
20    questions about the fact that you didn't go to Intuitive to
21    seek approval before you filed the lawsuit, and we paused over
22    a couple of questions I didn't get to ask.  I want to come back
23    to those.
24              You know that Restore has qualified as approved under
25    Intuitive's policy?  And I want to ask you to answer "yes" or
```

POSDAL - CROSS / GALLO

1  "no" to that question.

2  **A.**   Was that a question or a statement?

3  **Q.**   The question is:  Isn't it true that you know that Restore

4  was approved by Intuitive under their policy of reviewing and

5  approving third-party vendors?

6  **A.**   And I can only answer "yes" or "no"?

7  **Q.**   Yes, because the Court, I think, would prefer that you

8  only answer "yes" or "no."

9         **THE COURT:**  That's right.

10        **THE WITNESS:**  Yes.

11  BY MR. GALLO:

12  **Q.**   And you know that Rebotix has qualified as approved under

13  the Intuitive policy?

14  **A.**   I'm not sure if I know that, but --

15  **Q.**   Well, if you don't know, just say you don't know.  I

16  mean --

17  **A.**   I'm not sure.

18  **Q.**   Because you have to only tell the truth so --

19  **A.**   I'm not sure.

20  **Q.**   Okay.  So you abandoned the business; right?  That's what

21  your word was; you abandoned it at the end of 2019 or early

22  '20?

23  **A.**   Correct.

24  **Q.**   Without asking to be approved?

25  **A.**   Correct.

POSDAL - CROSS / GALLO

1  Q.   Okay.  Now, when we broke, I had started to ask you some

2  questions about the testimony you gave yesterday that I'll

3  characterize -- and if I get it wrong, you just correct me,

4  please -- where I thought you were sort of comparing repairing

5  endoscope ropes to replacing or repairing cables on the

6  EndoWrist.  You know the testimony I'm referring to?

7  A.   Yes, I do.

8  Q.   Okay.  But -- and I, frankly, don't remember if I asked

9  you before the break -- Rebotix never replaced the cables on

10 the EndoWrist, to your knowledge; right?

11 A.   That's correct.

12 Q.   And if you look at Trial Exhibit 147, which is in your

13 binder, at 30, at page 19, it lists there the pricing for the

14 Rebotix parts, right, that they could supply in connection with

15 the EndoWrist?

16 A.   Correct.

17 Q.   And just by way of example, it lists a bunch of forceps;

18 right?

19 A.   Correct.

20 Q.   And a needle driver?

21 A.   Correct.

22 Q.   And a grasper about two-thirds of the ways down?

23 A.   Correct.

24 Q.   And forceps and scissors all the way down at the bottom?

25 A.   Correct.

POSDAL - CROSS / GALLO

1    Q.    It doesn't list replacing or repairing cables; right?

2    A.    That's correct.

3    Q.    Okay.  And you don't know whether -- when Rebotix modified

4    an EndoWrist, you don't know whether it tested the tension on

5    the internal cables after it extended the use?

6    A.    It's my understanding that the cables, that the tension --

7    I think we're getting into the weeds a little on this, but let

8    me try to answer the way I think you're referring.

9    Q.    Okay.

10   A.    The tension on the cables, as it relates to the deflection

11   of the working end of the instrument, are tensioned properly

12   according to their processes so that that distal tip, the

13   working end of the instrument, behaves as it should.  So

14   there's not loose cables or stretched cables, that those are

15   tensioned properly for the proper articulation of the working

16   end of the instrument.

17   Q.    Okay.

18   A.    As I understand it.

19   Q.    Can you tell me, sir, any test that you saw, any document

20   or something you physically -- any -- let me break it down

21   rather than asking two questions at once.

22          Are you aware of any document that says, when Rebotix

23   modified the EndoWrist, they tested the tension in the cable to

24   be sure it was correct?

25   A.    Again, there's some ambiguity on "testing tension."  There

POSDAL - CROSS / GALLO

1    were tests related to the setting of the cable to make sure

2    that the distal tip was oriented properly.  It sounds to me

3    like that's a test for tensioning of the cable.  It may not

4    qualify for that.

5    **Q.**   You think the fact that the distal tip is oriented

6    properly, you're suggesting, to you, that means the tension in

7    the cable is correct?

8    **A.**   Yes.  As I understand, that's, again, similar to --

9    **Q.**   Sorry.

10   **A.**   That's all right.

11           -- similar to how the repair for flexible endoscopes

12   works.

13   **Q.**   So the fact that it's pointed in the right direction means

14   that the tension is right for all the movements?

15   **A.**   Not simply, no.  There's --

16   **Q.**   Okay.

17   **A.**   There's multiple wires in there.  They all have to be

18   oriented properly.  They all have to be a certain distance so

19   at zero, zero, the instrument is set in the proper orientation

20   and that every action on the cables produces the proper

21   response --

22   **Q.**   Can you show me --

23   **A.**   -- based on the tensioning of the cables.

24   **Q.**   Can you show me a document that you reviewed that says

25   that?

POSDAL - CROSS / GALLO

1   **A.**   I cannot.

2   **Q.**   And you're not an engineer; right?

3   **A.**   (No audible response.)

4   **Q.**   I mean, I'm sorry?  You weren't audible.

5   **A.**   I'm sorry.  No.

6   **Q.**   So you don't know?  You were relying on Rebotix?

7   **A.**   Yes.

8   **Q.**   Okay.

9   **A.**   This is Rebotix's program.

10  **Q.**   Right.  But you can't show me any Rebotix document that

11  says what you just said about the tension?

12  **A.**   I cannot.

13  **Q.**   Okay.  Let's look at, again, Tab 30 and Exhibit 147.  And

14  I'm going to refer you to page 15, where it -- at the top of

15  that page, first sentence says [as read]:

16        "Rebotix service process has been designed in

17        such a way as to have no impact on the exterior

18        specification."

19        Do you see that?

20  **A.**   Yes.

21  **Q.**   So now the cables are on the interior; right?

22  **A.**   Correct.

23  **Q.**   Okay.  And this summary of reliability, as we just

24  indicated, does not say anywhere that the tension on the cables

25  is tested?  In those words, it doesn't refer to such a test?

POSDAL - CROSS / GALLO

1  A.    That's correct.

2  Q.    Okay.  Do you know what value the -- what specific value

3  the cables are -- are assigned by -- by Intuitive when it tests

4  the cables?

5  A.    I do not.

6  Q.    Do you know what force is applied to the cables in surgery

7  when it's -- when the -- let me be clear.

8        When the device is being used by a surgeon and there's

9  force placed on the cables when it's maneuvering, do you know

10 how to measure that force?

11 A.    I personally do not.

12 Q.    Yeah.  Do you know what the force is applied on a rope in

13 a flexible endoscope when it is used?

14 A.    I do not personally know that.

15 Q.    You didn't see a Rebotix document showing the force

16 applied on the cable during whatever testing they did?

17 A.    I do not recall.

18 Q.    Do you know how many times a cable is moved in a typical

19 EndoWrist surgery?

20 A.    I do not.

21 Q.    Do you know how many times a rope in an endo -- in an

22 endoscopic -- flexible endoscope use, how many times the rope

23 is used?

24 A.    Both of those vary greatly.

25 Q.    I asked in an average or typical.

POSDAL - CROSS / GALLO

1   A.   I -- no.  I'm sure we have that somewhere.

2   Q.   Do you know if it's many, many more in an EndoWrist use

3   than an endoscope use?

4   A.   I don't know.

5   Q.   You don't know one way or the other?

6   A.   Correct.

7   Q.   Do you know how an EndoWrist is sterilized?

8   A.   Not specifically.  I've never seen that process, but

9   I believe they use STERRAD.

10  Q.   You believe they do?

11  A.   Do they use STERRAD to re- -- I don't know.

12  Q.   So you don't know whether it's an autoclave process?

13  A.   I don't know specifically.

14  Q.   So you don't know whether the cables are put under

15  pressure to sterilize them?

16  A.   I don't.

17  Q.   You don't know whether they're in heat up to 250 degrees?

18  A.   If they're autoclaved, they are.

19  Q.   But you don't even know whether they're autoclaved?

20  A.   I don't know how the hospital is reprocessing them.

21  Q.   And how about the flexible endoscope?  Do you know how

22  it's sterilized?

23  A.   Yes, we do.

24  Q.   How is it sterilized?

25  A.   That's STERRAD as well.  While the small diameters are

POSDAL - CROSS / GALLO

1    STERRAD, large they have washer sterilizers for.

2    Q.   So the STERRAD sterilization you're referring to with an

3    endoscope is some sort of liquid chemical sterilization?

4    A.   Yes.

5    Q.   It's not hot; right?

6    A.   I believe it's warm.  I don't know the specifics on this.

7    I probably shouldn't answer questions on the specifics of

8    sterilization.

9    Q.   And it's not under pressure; right?

10   A.   Unless it is STERRAD, then there's pressure.

11   Q.   Okay.  And do you know how the autoclave -- the effective

12   degradation it has on the EndoWrist cables compares to the

13   degradation of endoscope ropes when they're done under two

14   different systems?

15   A.   I do not.  That's not in my purview.

16   Q.   Do you have any people at the company whose purview that

17   would be?

18   A.   Well, some of the -- some of the salespeople know those

19   processes; some of the people that have sterile processing

20   experience and background do, and those people are on our

21   staff.

22   Q.   Are they -- they're engineers?

23   A.   No.

24   Q.   No.  They're salespeople?

25   A.   Well, and sterile processing personnel.

POSDAL - CROSS / GALLO

1  Q.   No.   I'm asking, do you have somebody on your staff who

2  would actually understand technically what's going on with the

3  cables in sterilization versus what's going on with an

4  endoscope in sterilization?

5  A.   No.

6  Q.   Okay.  Now, you believe Rebotix would inspect the cables;

7  is that right?

8  A.   So that's what we understand, yes.

9  Q.   And they would be looking at the cables to see if they

10  were visibly broken or frayed?

11  A.   I believe so.

12  Q.   Beyond that, you don't know what they did with the cables?

13  A.   That's correct.

14  Q.   And you don't know whether you can have a breakage even on

15  a cable that isn't vulnerably broken or frayed?

16  A.   Correct.

17  Q.   Are you familiar with the general concept of metal

18  fatigue?

19  A.   I am.

20  Q.   Have you heard about, for example, I don't mean to be

21  morbid, but an airplane crash where there's metal fatigue in

22  the wing and nobody can see and then it breaks?

23  A.   I understand that, yeah.

24  Q.   Yeah.  So what are the cables made of that the EndoWrist

25  is made of?

POSDAL - CROSS / GALLO

1    **A.**    Steel.

2    **Q.**    Actually, tungsten metal, to be more specific?

3    **A.**    Okay.

4    **Q.**    Is that right or do you not know?

5    **A.**    I don't know for certain.

6    **Q.**    You don't know what they're even made of?

7    **A.**    They're made of metal.  I -- this is not my process.  This

8    is Rebotix's process.

9    **Q.**    I know.  But you were totally comfortable that you were

10   going to take over this process.  That's what I heard

11   yesterday.  And when you said that to this jury, you don't even

12   know what the cables are made of?

13   **A.**    If we took over the process, we would have done far more

14   testing on this.  We are not at that position.

15   **Q.**    Possible when you did that, you would have learned you

16   couldn't do it; right?

17   **A.**    It's possible.  I think it's improbable.

18   **Q.**    Yeah.  You have a $140 million damage claim here on the

19   assumption you would do it; right?

20   **A.**    Sure.

21   **Q.**    And you don't even know what the cables are made of?

22   **A.**    I don't suspect at all that it would be a material that we

23   couldn't define accurately.

24   **Q.**    You said it would have been easy to scale up your business

25   because you could get people that would do the modification of

POSDAL - CROSS / GALLO

1   the EndoWrist; right?

2   **A.**   Correct.

3   **Q.**   I assume you meant safely.

4   **A.**   Correct.

5   **Q.**   But you don't know anything about what the cable is made

6   of, but you know you can hire people to fix it?

7   **A.**   Based on Rebotix's program, who we partnered with, and

8   their assertions to me and the ability to do these things

9   safely, which we had complete faith in -- they gave us that

10  information; and with that information, we were confident that

11  we could move forward with this process in a safe and efficient

12  manner.

13  **Q.**   All right.  Let me shift gears.

14       I believe you testified yesterday that you had never

15  received a report or seen a report that said someone was

16  injured as a result of SIS' work on a medical device.  Did you

17  say that?

18  **A.**   I believe I did, yes.

19  **Q.**   So you are unaware of any report in which an SIS repaired

20  medical device injured a patient?  That's your testimony?

21  **A.**   I believe that's accurate, yes.

22  **Q.**   Okay.  Are you aware that the federal government requires

23  certain parties to report problems with medical devices?

24  **A.**   Yes.

25  **Q.**   You're aware that there's a database where you can look up

POSDAL - CROSS / GALLO

1  reports of patient injuries from medical devices?

2  **A.**    I have never done that, but I -- yes.

3  **Q.**    You've never looked to see if SIS is in the federal

4  government database that reports patient injuries?

5  **A.**    No.  I believe I would have known it before it got to a

6  database.

7  **Q.**    So you've just never looked to see if your company has

8  been reported as having been involved in injuring a patient?

9  **A.**    No.

10  **Q.**    Okay.  It's not important enough to check?

11  **A.**    It's important.  How would it get to the database if I had

12  no idea it had happened?

13  **Q.**    You don't know that it's a public database that you can

14  just log right on?

15  **A.**    Wouldn't I know it before it got into a public database?

16  **Q.**    Sir, you're in the medical device safety business, and you

17  are telling the jury you don't know whether there's a public

18  database that you can log on to see --

19  **A.**    I don't.  Sorry.

20  **Q.**    -- if there's been a problem with one of your devices

21  reported?  Is that your testimony?

22  **A.**    I know there's a database.

23  **Q.**    But you've never looked at it?

24  **A.**    No.

25  **Q.**    Okay.  Would you -- if you knew there was -- if there was

POSDAL - CROSS / GALLO

1  such a report in a public database, would you want to know

2  about it?

3  **A.**    Yes.

4  **Q.**    Okay.  Well, would you look at Tab 58, please.

5  **A.**    (Witness examines document.)

6  **Q.**    Sorry.  I don't understand you to read this document out

7  loud, sir.  I've got to follow the rules of evidence here.  So

8  I just want you to read it to yourself.  Just let me know when

9  you've had a chance to read it.

10         It should not be published to the jury.

11         And I'll direct you first, just to help speed things

12  up, to the second-to-last line of the text or third and

13  second-to-last line of the text, there's a reference there I

14  want you to focus on.

15  **A.**    Is this on the first page?

16  **Q.**    Yeah, first page.  Thank you for clarifying that.

17         You know, third line from the bottom, it starts on the

18  right and continues on the next line.  There's a reference

19  there I want you to focus on.

20         And then I want you to focus on the first line of that

21  paragraph about what was reported, the -- under -- in that same

22  paragraph.

23         And then in the first paragraph in the middle, I want

24  you to read about -- the sentence that begins with the word

25  "Further."  That's all I'm going to say.  It's the one, two,

POSDAL - CROSS / GALLO

1  three, fourth line down.

2  **A.**   In the first paragraph?

3  **Q.**   Yeah.  "Further" is on the right.  It's the last word on

4  the right on the fourth line down --

5  **A.**   Okay.

6  **Q.**   -- under the first paragraph.  It continues for the next

7  two lines.

8  **A.**   Okay.  (Witness examines document.)

9  **Q.**   So tell me when you're done.  I don't want to rush you.

10  **A.**   From there till the end of the paragraph?

11  **Q.**   Yeah.  You can just read that sentence.

12  **A.**   Okay.  I got it.

13  **Q.**   Okay.  So does this make you realize that SIS was the

14  subject of a report of an injured patient in January of 2020?

15  **A.**   It appears that way.

16  **Q.**   That was just about the same time you were working with

17  Rebotix; right?

18  **A.**   Sure.

19  **Q.**   And does this make you realize that that report of an

20  injured patient related to a flexible EndoWrist?

21  **A.**   Endoscope.

22  **Q.**   Endoscope.  I'm sorry.  Yeah, it does?

23  **A.**   I don't know what your question was.

24  **Q.**   Does this -- having read this document that I placed in

25  front of you, do you now realize that there was a report in

POSDAL - CROSS / GALLO

1    January of 2020, an injured patient where your company had

2    worked on a flexible endoscope?

3    A.   I realize that from the report, yes.

4    Q.   But even though you told the jury yesterday SIS cares

5    greatly about safety, you never went to this database to check?

6    A.   If there were an injury that was assignable to us, we

7    would have been informed directly about this.

8         Reading this indicates to me that there was an issue

9    not with SIS repair but during a procedure, which the doctor

10   testified yesterday could happen at any time.

11   Q.   Okay.  Well, I didn't want --

12   A.   It doesn't assign blame; and if it did, we would have been

13   alerted to this.

14   Q.   I see.  Okay.  Well, I didn't want to spend more time on

15   this, but now I think we have to because does this -- doesn't

16   this document cause you to realize that the blame that was

17   assigned was that a third-party service organization used parts

18   other than the manufacturer's parts?  Isn't that what it says

19   in the first paragraph?

20   A.   It does say that.

21   Q.   And you realize that it's talking about SIS?

22   A.   Right.  It doesn't assign blame to those parts.

23   Q.   Okay.

24   A.   It says, "During a procedure" --

25   Q.   I want to ask you to read the --

1    MR. McCAULLEY:  Your Honor, he interrupted the
2  witness.
3  BY MR. GALLO:
4  Q.   I'm sorry.  I really am trying.  I don't mean to be rude,
5  but --
6  A.   I am too.  We're doing our jobs.
7  Q.   Okay.  I want to refer you to four sentences from the
8  bottom of the first paragraph, and tell me if it changes your
9  testimony that it doesn't suggest what was to blame.
10  A.   (Witness examines document.)  Again, this seems vague at
11  best to me; and since it wasn't elevated to us as a company, it
12  seems like this was resolved at the hospital level and not
13  assigned to the repair of that flexible endoscope.
14  Q.   Okay.  Before you started working with Rebotix in June of
15  2019, am I correct that SIS had done no robotic surgery work
16  in-house?
17  A.   I believe that's true.  We may have, if this counts, done
18  an endoscope, a da Vinci endoscope, not an EndoWrist, I don't
19  think.
20  Q.   Did you -- do you know if you've done a da Vinci
21  endoscope?
22  A.   I don't think we did it at our facility.  I think that was
23  subcontracted out.
24  Q.   All right.  That's what I meant to ask.  In-house at your
25  facility?

POSDAL - CROSS / GALLO

1  A.  Correct.

2  Q.  Okay.

3       Okay.  Yesterday I heard you say that what this

4  modification of the EndoWrist was -- you characterized it as a

5  repair.  Did I hear that correctly?

6  A.  Again, with clarification, we use "repair" generically --

7  Q.  Okay.

8  A.  -- for service performed on equipment that comes to us.

9  Q.  Because you agree, right, that opening up the endoscope,

10  drilling into it, pulling the circuit board out, you agree

11  that's not a repair?

12  A.  I agree with that, yes.

13  Q.  Okay.  I mean, resetting the chip is not a repair; right?

14  A.  Agreed.

15  Q.  And of the 40 or so EndoWrists that your company sold, you

16  don't know if any of them were really, quote, "broken"; right?

17  A.  Correct.  That's -- that's part of this process, we're

18  taking -- and to use your words yesterday in your opening

19  statement, SIS/Rebotix is taking a perfectly good EndoWrist and

20  breaking it, and -- your words -- it's perfectly good at that

21  point.  We're not breaking anything.

22  Q.  No.  But it's not broken when you -- when Rebotix drills

23  into it and takes the circuit board out, it's not broken?

24  A.  Before or after.

25  Q.  Right.  Okay.

540

POSDAL - CROSS / GALLO

1              But you choose to use the word "repair" for that even

2    though it's not broken?

3    A.   Again, a generic term.  Yes, you're correct.

4    Q.   Are you -- you're not trying to mislead anybody when you

5    use the word "repair"?

6    A.   No.

7    Q.   I think I'm going to do this just very briefly because I

8    think it's clear, but I feel like I want to be sure we have it

9    clearly stated on the record.

10             You understood that what Rebotix did is open the

11   casing of the EndoWrist; right?

12   A.   Yes.

13   Q.   Expose the internal components of the EndoWrist?

14   A.   Correct.

15   Q.   Pulled out the circuit board that was put in there by

16   Intuitive?

17   A.   Yes.

18   Q.   Took the Intuitive chip off of its circuit board and put

19   it on the Rebotix circuit board?

20   A.   Correct.

21   Q.   Which increased the number of uses, doubled the number of

22   uses?

23   A.   Correct.

24   Q.   And you knew that none of those alterations, at least at

25   the time that they were being done, had been approved by

POSDAL - CROSS / GALLO

1    Intuitive?

2    **A.**    Had been -- no.  I knew no knowledge of whether they were

3    approved or not.

4    **Q.**    Boy, I thought you told me you had never known a

5    manufacturer to approve anything earlier.  So didn't you assume

6    they were not approved by Intuitive?

7    **A.**    Yes.

8    **Q.**    Okay.  And that was okay with you?

9    **A.**    Yes.

10    **Q.**    And you said yesterday you had never seen an Intuitive

11    contract; right?

12    **A.**    Until we started preparing for this case.

13    **Q.**    Right.

14          Okay.  So you were embarking on a program for a

15    $140 million business, and you didn't bother to look to see

16    what Intuitive's contract said about whether the device could

17    be modified?

18    **A.**    Correct.

19    **Q.**    Okay.  Even though your own contract voids the warranty if

20    somebody modifies your work?

21    **A.**    That's -- I don't see that as apples to apples.  Ours

22    states that if someone modifies the work that we did, we can't

23    warrant our work, not the instrument itself or any further

24    instruments.  It's that specific individual item.

25    **Q.**    Okay.  Well, from Intuitive's perspective, once you take

POSDAL - CROSS / GALLO

1  this complex medical device and you change the EndoWrist that

2  goes in the human patient, how are you not modifying their

3  work?

4  **A.**    The -- my knowledge, the only modifications done are what

5  the robot reads in terms of how many lives are on that piece of

6  equipment.

7  **Q.**    Boy, oh, boy.  You know they drilled a hole in the device

8  to get the circuit board out.  You don't think that's a

9  modification?

10  **A.**    Not one that affects the performance.

11  **Q.**    How do you know that, sir?  You don't know that.  You

12  assume that because Rebotix, you say, told you that?

13        **MR. McCAULLEY:**  Your Honor, objection.  Argumentative.

14  He's telling the witness what he knows.

15        **MR. GALLO:**  I'll restate it.  It's fine.

16  **BY MR. GALLO:**

17  **Q.**    Sorry to lose my temper but --

18  **A.**    It's okay.

19  **Q.**    -- you don't know that it's not modifying the device.  You

20  are repeating what you believe somebody at Rebotix told you?

21  **A.**    That, along with 50 years of experience and common sense

22  and the fact that that chip doesn't affect the pulleys or the

23  wires or the orientation or any other process in that

24  EndoWrist.

25  **Q.**    But it doubles -- it doubles the uses and then triples the

POSDAL - CROSS / GALLO

```
 1   uses of those wires; right?
 2   A.   I understand that.
 3   Q.   And common sense tells you that's not modifying it?
 4   A.   Not to a detrimental effect.  It's not adding any more
 5   risk to the unit.
 6   Q.   Not because you ever saw a test that showed you that?
 7   A.   Correct.
 8   Q.   Let's look at, please, Tab 36, which is
 9   Trial Exhibit 1566.
10        MR. GALLO:  I believe there are no objections to this
11   document, and I'd like to, assuming Mr. McCaulley agrees with
12   me, move it into evidence.
13        MR. McCAULLEY:  No objection, Your Honor.
14        THE COURT:  It's admitted.
15     (Trial Exhibit 1566 received in evidence.)
16        THE COURT:  And I imagine you'd like to publish?
17        MR. GALLO:  And I'd like to publish it.  Thank you,
18   Your Honor.
19   BY MR. GALLO:
20   Q.   There is -- the document in front of you starts, do you
21   see, on page 1, with an e-mail from SIS -- one employee of
22   SIS U.S.A. to Katie Posdal, who I -- and then you're copied on
23   it.  Do you see that?
24   A.   Yes.
25   Q.   Okay.  Then you received this in the normal course of your
```

POSDAL - CROSS / GALLO

1    business; right?

2    A.    Yes.

3    Q.    And if you look at -- I'd like to refer you -- do you see,

4    at page 54 -- do you recognize this as a standard agreement

5    with Yankee Alliance?

6    A.    What page did you say?

7    Q.    I'm sorry.  It's page 9 of the -- but it's Bates Stamp

8    Number 54.  There are two pages -- two numbers at the bottom.

9    A.    Yes.

10    Q.    This is called standard -- that's an SIS standard

11    agreement?

12    A.    It's a Yankee Alliance standard agreement.

13    Q.    Okay.  And then on page 66, which is -- I'm sorry, yes,

14    yes -- which is also 1566 -- it's page 21, Bates Stamp 66, you

15    see your signature there?

16    A.    Yes.

17    Q.    And if you look at page 76, which is also numbered 31,

18    this is the SIS limited warranty language; right?

19    A.    Yes.

20    Q.    And if you flip the page, 77, the SIS limited warranty

21    language at the first sentence says [as read]:

22            "Excluded from this limited warranty and not

23        warranted by SIS in any fashion, express, implied, or

24        by statute, are, A, devices and accessories not

25        manufactured or previously serviced by SIS."

POSDAL - CROSS / GALLO

```
 1              Do you see that?
 2   A.    Yep, yes.
 3   Q.    And then E [as read]:
 4              "Any device which has been disassembled,
 5        repaired, tampered with, altered, changed, or
 6        modified, by persons other than SIS' own authorized
 7        service personnel."
 8              Do you see that?
 9   A.    Yes.
10   Q.    And then, F [as read]:
11              "Defects or damages to devices resulting from,"
12        and the last phrase is, "non-approved reprocessing
13        methods."
14              Do you see that?
15   A.    Yes.
16   Q.    And that is, in fact, the standard or typical warranty
17   that SIS employs; correct?
18   A.    Correct.
19   Q.    And the reason you do that is because you know that once a
20   third party modifies one of your devices, you don't know
21   whether it would work properly?
22   A.    We can no longer support the work that we did on that
23   piece of equipment.
24   Q.    Right.
25              Okay.  But I'm trying to get at the reason why.
```

POSDAL - CROSS / GALLO

1   Because you don't know it would work properly?

2   **A.**   We don't know how it was modified.

3   **Q.**   All right.  That's fair enough.

4        And you don't know whether it would work properly?

5   **A.**   An extension, okay.

6   **Q.**   Sir, you -- okay -- I know you're not trying to be --

7   **A.**   Yes, I'm not.  I am not.

8   **Q.**   I know you're not, I know; but you have to say "yes"

9   because, otherwise, we have a transcript, we don't know what it

10  means.

11  **A.**   Okay.

12  **Q.**   So the answer is "yes," you don't know what --

13  **A.**   Yes.

14  **Q.**   Okay.  Okay.

15       Let's look at page 18 of the PDF, 63 of the Bates

16  stamp --

17  **A.**   I'm sorry?

18  **Q.**   -- paragraph 35.

19       I'm sorry.  18.

20  **A.**   As listed as the page number?

21  **Q.**   At the bottom of the page, it's 18, and in the Bates stamp

22  corner it's 63.

23  **A.**   Okay.

24  **Q.**   [As read]:

25       "Termination Rights.  Either party may terminate

POSDAL - CROSS / GALLO

1          this agreement at any time without cause or penalty

2          upon providing the other party with 90 days' advance

3          written notice."

4               Right?

5    A.    Yes.

6    Q.    So without cause, you can tell a customer, "I'm not going

7    to service your equipment anymore"?

8    A.    That's correct.  More importantly, it's for the customer

9    to be able to get out of an agreement 90 days if they so

10   choose.

11   Q.    It says "either party" --

12   A.    Right.

13   Q.    -- right?

14   A.    Either party.

15   Q.    So if a customer were doing something to the equipment

16   that you worked on that you thought put your reputation at

17   risk, you had the right to get out in 90 days?

18   A.    To be clear, this is Yankee Alliance's agreement.  These

19   are -- these are their terms.  The termination rights are

20   theirs.

21   Q.    Do you have -- you know what?  That's -- you know, as I

22   was looking at it, I was confused because I thought you had a

23   term that said 60 days.

24   A.    I believe there was changes in our agreements, and it

25   largely depends on whose boilerplate contract this is.  This is

POSDAL - CROSS / GALLO

1   Yankee Alliance's.  This is what they asked for.

2   Q.   Yeah, but I can find it and I'll -- at the lunch break,

3   I'll look for it, so just help me, though.

4        Am I -- isn't it true that your boilerplate has

5   termination for any reason without cause in 60 days?

6   A.   It could.  I'll accept that.

7   Q.   So you believe that to be true?

8   A.   Sure.  Yes.

9   Q.   Okay.  And then yesterday, shifting gears again, you

10  testified about Trial Exhibit 942 and 943, which are the

11  letters from Intuitive to customers saying, "We're concerned

12  about modified EndoWrists."

13       Do you remember testifying about those?

14  A.   I do.

15  Q.   Okay.  And they -- those letters, if you remember what you

16  testified about, referred expressly to unauthorized parties,

17  third parties, performing work on the EndoWrist.  Remember

18  that?

19  A.   I do.

20  Q.   And I believe they were dated, I think, one of them was

21  in, like, January of 2020.  Does that sound right to you?

22  A.   That sounds right, yes.

23  Q.   Yeah.  And I understood you to say that before you got

24  that letter, you had never looked at Intuitive's contracts, so

25  you didn't know that Intuitive took that position?

POSDAL - CROSS / GALLO

1    **A.**    I believe that's accurate.

2    **Q.**    Okay.  So after you got that letter in January of 2020,

3    did you look at the contract?

4    **A.**    I did not have access to the contract.

5    **Q.**    You couldn't get ahold of an Intuitive EndoWrist sales

6    contract?  Did you try?

7    **A.**    I'm not sure if we did.

8    **Q.**    Did you -- you don't know if you tried or not?

9    **A.**    I'm not -- I don't know.

10   **Q.**    Because with all of your customer relationships, I would

11   have thought that wouldn't be that hard.

12   **A.**    It either likely wouldn't be or they either would or

13   wouldn't share it with us.

14   **Q.**    But you never -- even after you got this letter saying

15   that's why Intuitive was objecting to what you were doing, you

16   never even took the time to look at -- find a contract to look

17   at?

18   **A.**    To what purpose?  It was stated in your letter.

19   **Q.**    Well, to see if maybe you didn't have to abandon the

20   business.  Maybe there was a way to work it out.

21   **A.**    Again, in our 50 years, no manufacturer has been likely to

22   work with any independent service organization to authorize any

23   types of repairs.  It was standard in the industry.  We knew

24   what we were up against with every manufacturer, and we

25   performed the repairs and services as needed.

POSDAL - CROSS / GALLO

1  Q.  Even though you just testified that you know Restore and

2  Rebotix qualified for approval?

3  A.  At that time I --

4  Q.  You didn't know it at that time?

5  A.  Right.

6  Q.  Yeah.  Okay.

7      You authorized a filing of this complaint in this case

8  in early 2021; right?

9  A.  I'll take your word on the date.

10 Q.  Do you remember that in that complaint, you alleged that

11 Intuitive's ULSA, user license and sales agreement, prohibits

12 customers from engaging in unauthorized third-party repair,

13 refurbishment, or reconditioning?

14 A.  If that's in there, then, yes.

15 Q.  Okay.  Would you please look at Tab 24, paragraph 4.

16 Please do not read it out loud.  I just want to see if it helps

17 you remember that you, in fact, at least as of April of '21,

18 knew that there was a provision that could authorize third

19 parties.

20 A.  Okay.  Can you redirect me?  I'm on the tab.

21 Q.  Yeah.  Paragraph 4.

22 A.  Of the first -- what page?

23 Q.  I -- let me -- I'll look.  I believe -- I believe it's

24 done just by paragraphs, but let me -- it's -- I'm sure it has

25 page numbers too.  I'll look for the page numbers.

POSDAL - CROSS / GALLO

1          Tab 24.  I mean, it's on page 3 of the document, at

2    line 12.  Now, just read that to yourself so we follow the

3    rules of evidence.

4    **A.**    Okay.

5    **Q.**    Does that refresh your recollection that you knew, as of

6    the filing date of this complaint, May 10, 2021, that the

7    Intuitive contract prevented unauthorized third parties, not

8    all third parties, from modifying devices?

9    **A.**    Yes.

10   **Q.**    It does refresh your recollection?

11   **A.**    It does say that.  I...

12   **Q.**    Okay.  During direct examination, you were asked about a

13   document produced out of the Intuitive files -- and maybe

14   someone can help me with the exhibit number -- which

15   Mr. McCaulley pointed you to that was an internal Intuitive

16   document; right?

17   **A.**    I'm not remembering which one we're referring to.

18   **Q.**    It's Exhibit 463 which -- do we have it in our binder?

19          No.

20          Do you still have the binder that Mr. McCaulley gave

21   you?

22   **A.**    I do not.

23          **MR. GALLO:**  Mr. McCaulley, may I trouble you?  Is

24   there a binder?

25          **MR. McCAULLEY:**  There's no binder.

POSDAL - CROSS / GALLO

```
 1              MR. GALLO:  Oh, you were projecting it.
 2              MR. McCAULLEY:  Do you want me to have Bobby project
 3       it?
 4              MR. GALLO:  Oh, that would -- I appreciate that
 5       courtesy, yes.  Thank you.
 6              463, and it was the language about what Intuitive's
 7       internal document said.
 8                        (Pause in proceedings.)
 9              MR. HILL:  We can publish on our side if the court
10       reporter switches it over.
11                        (Pause in proceedings.)
12       BY MR. GALLO:
13       Q.    While they're doing that, let me just ask the question.
14       We may not need to be --
15       A.    Yeah.
16       Q.    You never saw any Intuitive internal policy statement
17       before you filed the lawsuit in May of 2021; right?
18       A.    Correct.
19       Q.    You saw that document only in preparing for your
20       testimony; correct?
21       A.    Correct.
22       Q.    So you didn't rely on that policy statement to make a
23       decision to file this lawsuit?  You didn't see it --
24       A.    Correct.
25       Q.    -- till much later; correct?
```

POSDAL - CROSS / GALLO

1    A.    That's correct.

2    Q.    When you filed this lawsuit, you knew that authorized

3    third parties were permitted.  You said it right there in your

4    complaint; right?

5    A.    That Intuitive authorized some companies to do work for

6    them, yes.

7    Q.    Yeah.  You knew that, okay.

8    A.    But as you pointed out yesterday, not for EndoWrists.

9    Q.    Sir, I don't -- I mean, I really don't want to keep doing

10   this, but you know, sitting here today, that Restore and

11   Rebotix have been approved for EndoWrist?

12   A.    Currently, yes.

13   Q.    So let's talk about your relationship with Rebotix.

14         I understood you to say you were comfortable relying

15   on Rebotix because you had a longstanding relationship with

16   Rebotix and its parent company, I think, the name of which is

17   escaping me.  Can you help me with that?

18   A.    Benjamin Biomedical.

19   Q.    Yeah.  Isn't that true?  That contributed to your comfort

20   in relying on what Rebotix was doing, the fact that you had a

21   longstanding relationship with them and their parent company?

22   A.    Right.  It did, yes.

23   Q.    Yeah.  And then you took steps that were important to make

24   you comfortable that the Rebotix modification was safe; right?

25   A.    Yes.

POSDAL - CROSS / GALLO

1   Q.   So, for example, you flew down to the Rebotix facility?

2   A.   Yes.

3   Q.   You've testified about that; right?

4   A.   Yes.

5   Q.   And you saw Exhibit 147, which is the eight-page summary

6   of the test results; right?

7   A.   Yes.

8   Q.   And they showed you part of their process on how they

9   reset the devices; right?

10  A.   Yes.

11  Q.   Now, Intuitive, to your knowledge, didn't have a 10-year

12  relationship with Rebotix, did it?

13  A.   I would have no way of knowing.

14  Q.   Do you know if Rebotix and Intuitive had any relationship?

15  A.   I do not, no.

16  Q.   Do you know if Rebotix, in 2019, had showed their reset

17  process to Intuitive?

18  A.   I do not.

19  Q.   Do you know if Rebotix had showed to Intuitive the

20  eight-page summary of test results?

21  A.   I do not.

22  Q.   So you got comfortable through all those things, but you

23  have no basis to believe Intuitive had any chance to get

24  comfortable with Rebotix?

25  A.   I believe that would be accurate.

555

POSDAL - CROSS / GALLO

1  Q.   Rebotix relied on certain third parties to conduct tests;
2  right?  It's reflected in that Exhibit 147?
3  A.   Yes.
4  Q.   So Rebotix didn't do everything.  They in turn replied
5  on -- relied on some third parties?
6  A.   Yes.
7  Q.   And you don't know who those third parties are?
8  A.   Just as they were listed in the documents.
9  Q.   They were listed -- was a third party listed by name?
10 A.   I don't recall.
11 Q.   But, again, Intuitive not only didn't know Rebotix, to
12 your knowledge, but didn't know the third parties Rebotix was
13 relying on, at least to your knowledge?
14 A.   No way of knowing.
15 Q.   Okay.  And do you -- so while all those things -- you
16 wouldn't have done this if you didn't have all those
17 opportunities; right?  If you didn't know Rebotix, if you
18 didn't go down there and talk to them, if you didn't see the
19 process, if they didn't give you that eight-page summary in
20 TX147, you wouldn't have just started selling these things;
21 right?
22 A.   I think that's safe to say.
23 Q.   Yeah.  Do you know that Intuitive asked Rebotix for
24 information and Rebotix never responded?
25 A.   I don't.

POSDAL - CROSS / GALLO

1   Q.   You don't know one way or the other?

2   A.   No.

3   Q.   So Rebotix -- let me get this straight.

4        Do you remember seeing yesterday an April 2019 letter

5   from Intuitive to Rebotix?  It was an exhibit that I think --

6   well, I -- I -- I don't want to -- let me ask you this

7   question:  You're aware, sitting here today, that Intuitive

8   expressed concerns to Rebotix, or are you not aware of that?

9   A.   I'm not sure if we covered that yesterday or not.

10  Q.   Okay.  Let me -- let me ask it this way:  If it were the

11  case that Intuitive had written to Rebotix and expressed

12  concerns about their process and asked for information and

13  Rebotix did not respond, and this all happened before you

14  talked to Rebotix, would it worry you that Rebotix didn't tell

15  you that?

16  A.   I guess I would need more information.

17  Q.   Okay.

18       Okay.  I'd like to go back to TX147, which is Tab 30.

19  A.   30?

20  Q.   Yes, sir.

21       Page -- it's already been admitted.  It's already been

22  published.  So if we could go back to page 1.

23       This is the document that -- where you forwarded

24  testing information you had received from Rebotix, correct, to

25  your colleague, Mr. Johnson?

POSDAL - CROSS / GALLO

1  **A.**   Correct.

2  **Q.**   And it lists four documents there:  Rebotix Summary and

3  Equality and Regulatory, which we've been talking about;

4  Distributor Pricing; Sales Pricing Doc; and Rebotix Repair

5  Facts.  Do you see that?

6  **A.**   I do.

7  **Q.**   Okay.  And this is the material -- when you said you put

8  your name on Rebotix materials and sent them out to customers,

9  it was these four documents you're referring to, right, that

10  were, in whole or in part, sent to customers?

11  **A.**   I believe that's accurate, yes.

12  **Q.**   Yeah.  And you didn't independently vet these materials?

13  You relied on what Rebotix gave you?

14  **A.**   Yes, we did.

15  **Q.**   And then, in your words, you rebranded them by putting

16  your name on them --

17  **A.**   Correct.

18  **Q.**   -- right?

19       And if I refer you to Tab 10, which is

20  Trial Exhibit 136, it's --

21       **MR. GALLO:**  I believe there's no objection.  Don't

22  publish it yet, please.

23       I believe there's no objection, and I would move it

24  into evidence.

25       **MR. McCAULLEY:**  Where are we, Ken?  I'm sorry.

POSDAL - CROSS / GALLO

```
 1          MR. GALLO:  136, tab -- it's 136, Tab 10; my records
 2   reflect no objection, but...
 3          MR. McCAULLEY:  Just one minute, please.
 4          MR. GALLO:  Of course.
 5                    (Pause in proceedings.)
 6          MR. McCAULLEY:  No objection.
 7          MR. GALLO:  Okay.
 8          THE COURT:  It's admitted.
 9       (Trial Exhibit 136 received in evidence.)
10          MR. GALLO:  Thank you very much.
11       We may publish?  Thank you.
12          THE COURT:  You may publish it.
13   BY MR. GALLO:
14   Q.   So at the top of the page on 136, the very first page, you
15   see Keith Johnson sending an e-mail to Timothy Brooks and
16   Kirwan Perry at Banner Health.  Do you see that?
17   A.   I do.
18   Q.   And Banner Health was a prospective customer, correct, for
19   the EndoWrist work?
20   A.   Yes.
21   Q.   And do you see he attaches the same four documents that we
22   just looked at in TX147; correct?
23   A.   Correct.
24   Q.   So these are the documents.  You got them from Rebotix.
25   He turns around and sends a different -- a modified version of
```

POSDAL - CROSS / GALLO

1  them to the customer --

2  **A.**   Correct.

3  **Q.**   -- right?

4      Okay.  And if you look at page 115 of that document --

5  I'm sorry.  I misspoke -- 126 of that document.  126 is the

6  Bates number.  It's page 13 -- it's page 12.

7  **A.**   I see it.

8  **Q.**   Yeah.  So it says [as read]:

9      "Surgical Instrument Service Company Summary of

10      Quality and Reliability Measures."

11      Do you see that?

12  **A.**   Yes.

13  **Q.**   The old version said Rebotix there instead of --

14  **A.**   Yes.

15  **Q.**   Okay.  And that happens in several places throughout this

16  document; right?  I don't want to make the jury sit through 10

17  examples of it.  You agree with me that happened repeatedly?

18  **A.**   I agree.

19  **Q.**   And other than changing the name, they're essentially the

20  same; right?

21  **A.**   Yes.

22  **Q.**   But, for example, at page 127, the top of the page, it

23  says [as read]:

24      "SIS repair is a specialized process for the

25      EndoWrist instruments."

560

POSDAL - CROSS / GALLO

1                   At the very top, first line.

2    **A.**   I see it.

3    **Q.**   That used to say "Rebotix repair"; right?

4    **A.**   Yes.

5    **Q.**   Okay.  And it says [as read]:

6               "SIS services the devices by installing a

7         resettable set counter."

8               Right?

9    **A.**   Yes.

10   **Q.**   Which is not true; right?  It's Rebotix that does that?

11   **A.**   That's right.

12   **Q.**   Right.  [as read]:

13              "While maintaining the ability of the device" --

14        Okay.  And then if you look at page 124, which is a

15        couple of pages back, page 10, it says [as read]:

16              "SIS can now service your da Vinci devices,

17        including repair and use counter reset."

18              Right?

19   **A.**   Correct.

20   **Q.**   And that's not true either.  It's Rebotix that did that?

21   **A.**   That's correct.

22   **Q.**   And then in one, two, three, four bullet points down [as

23        read]:

24              "The repaired device" -- the second sentence

25        says -- "will function identically to the new OEM

POSDAL - CROSS / GALLO

1          EndoWrist."

2              Do you see that?

3    A.   Yes.

4    Q.   And then in the next bullet point, it says, in the second

5    sentence [as read]:

6              "It is an original da Vinci-manufactured device

7          that has been repaired to original specifications."

8              Right?

9    A.   Yes.

10   Q.   So you're telling the customer it functions identically

11   and it's repaired to original specifications, but, in fact,

12   sir, that's not true; right?

13   A.   The specifications outside of the additional lives, yes.

14   Q.   So other than the fact that you've doubled or tripled the

15   licensed lives, you believed it complied with manufacturer

16   specifications?

17   A.   That's what we believed, yes.

18   Q.   But do you really feel comfortable telling a client that,

19   even though the first device was designed and licensed with 10

20   uses, that doubling the uses is functioning identically?

21   That's fair?  That's a fair statement to you?

22   A.   I think it was understood by both parties that the

23   function that we're referring to is that the EndoWrist would

24   behave the same way that the original EndoWrist did.

25   Q.   Okay.  Would you look at page 18 of the document, please,

POSDAL - CROSS / GALLO

```
 1   Bates Number 132?  The second sentence says [as read]:
 2           "Post-production monitoring of devices serviced
 3        by SIS will ensure this service remains free from
 4        safety concerns."
 5           Right?
 6   A.   Yes.
 7   Q.   SIS didn't have any post-production monitoring system, did
 8   it?
 9   A.   That's correct.  That's Rebotix.
10   Q.   And then in the next paragraph down, it refers, in the
11   second sentence, to a complete technical file; right?
12   A.   I'm sorry.  Where are we?
13   Q.   Under developments process, third sentence, a complete
14   technical file --
15   A.   I see it.
16   Q.   -- was created.  That's the technical file you never saw?
17   A.   Yes.  Again, rebranded Rebotix.  These are their words.
18   Q.   And page 136 of the document, it relies on reliability and
19   poor performance test summary.  Do you see that?
20   A.   I do.
21   Q.   Do you know whether Rebotix did those tests or some third
22   party subcontracted by Rebotix did those tests?
23   A.   I wouldn't know.
24   Q.   You don't know.  So you don't even know who did the
25   testing you were relying on?
```

POSDAL - CROSS / GALLO

1   A.   Correct.

2   Q.   Okay.  And at page 124, last question on this document --

3   oh, I'm sorry.  I covered that.

4          Okay.  You said yesterday that you first met with

5   Rebotix about this program at a conference in Cleveland.  You

6   said in the spring, but let me see if I can ask you a couple of

7   questions about that.

8          It was the AAMI conference; right?

9   A.   I believe it was.

10  Q.   And the AAMI conference in 2019 in Cleveland actually

11  occurred between June 7 and June 9; isn't that true?

12  A.   I didn't remember the exact dates.  So if that's a fact,

13  then that's accurate.

14  Q.   So you said April yesterday?

15  A.   But it was my recollection.

16  Q.   But you don't deny that it occurred actually between

17  June 7 and June 9?

18  A.   If those were the dates, then, no, I wouldn't deny that.

19  Q.   Okay.  And then do you remember that it was after June 9

20  that you went down to SIS' facility -- I mean --

21  A.   Rebotix.

22  Q.   -- Rebotix's facility?

23  A.   It would have been after the conference, yes.

24  Q.   It was actually June 17th that you went there; right?

25  A.   If you have that information, I believe it.

POSDAL - CROSS / GALLO

1  Q.   And then if you look back at Exhibit 142, at Tab 18, you

2  sold your first device to legacy on June 28th?

3  A.   Where are we now?

4  Q.   Yeah.  Tab 18, 142.

5  A.   Oh.

6  Q.   First sale there, at the top of it, is dated June 28th on

7  the second line of that document.  The first line appears to be

8  a mistake, as you testified to earlier.  The second line is

9  June 28, which is the first sale?

10  A.   Okay.

11  Q.   Is that right?  Isn't that your first sale?

12  A.   That appears accurate.

13  Q.   So the first time you heard one word about this ability to

14  reset the use counter was June 7 to 9.  Then you went to their

15  facility on June 17.  And nine days later you were selling

16  these devices?

17  A.   That appears to be correct.

18  Q.   So that's the totality of the time you spent trying to

19  figure out, for example, whether they worked and whether they

20  were safe?  Nine days at most?

21  A.   Yes, but we partnered with Rebotix that had years of

22  experience.

23  Q.   So I thought I heard you yesterday say it would take you

24  years to train a good technician on complex medical devices.

25  A.   It could take that long, yes.

POSDAL - CROSS / GALLO

1    MR. GALLO:  Okay.  And it should be pulled up for the

2  jury because it's already been admitted, Your Honor.

3  BY MR. GALLO:

4  Q.   Now, this was the document that was the Rebotix document

5  produced out of Rebotix's file that you said you reviewed as

6  part of the three-ring binder in Florida; right?

7  A.   Yes.

8  Q.   I'd like to refer you to page 19 of that document,

9  paragraph 6.4.13.

10  A.   I can't see any -- oh.

11  Q.   It should be coming up on your screen, and I hope our

12  technician can blow it up for you, that specific paragraph.  It

13  begins "With using the hex screwdriver."

14  A.   I can see that.

15  Q.   You can?

16  A.   Yes.

17  Q.   Okay.  Great.

18       This is discussing working on the cables.  Do you see

19  that from the context?

20  A.   Yes.

21  Q.   And it discusses -- you see this is called the EndoWrist

22  Service Procedure; right?

23  A.   Yes.

24  Q.   And it's giving instructions to technicians as to what

25  they should do with the cables; right?

605

POSDAL - CROSS / GALLO

```
 1   A.   Yes.

 2   Q.   So it says -- first it says [as read]:

 3        "Loosen the screws on the top of the spool."

 4        Right?

 5   A.   Yes.

 6   Q.   Then it says [as read]:

 7        "Verify the cable is wrapped around the spool

 8        correctly fitting defined grooves."

 9        Right?

10   A.   Yes.

11   Q.   So we've got it in the grooves.  [as read]:

12        "Verify the cable runs through the correct

13        pulleys."

14   A.   I see that.

15   Q.   [as read]:

16        "Using a screwdriver, turn the spool to apply

17        tension to the cable.

18        Right?

19   A.   Yes.

20   Q.   [as read]:

21        "Only enough tension to remove slack from the

22        cable."

23        Right?

24   A.   I see that.

25   Q.   [as read]:
```

POSDAL - CROSS / GALLO

1          "Do not overtension the cable as this could

2     create problems."

3          Right?

4     A.   I see that.

5     Q.   So there's no specific tension value that is prescribed

6     here; correct?

7     A.   That's correct.

8     Q.   There's no specific quantification or measurement of what

9     the tension should be?

10    A.   That's correct.

11    Q.   There's no prescription to the technician working on --

12    you'd be doing three of these an hour?  No prescription to that

13    technician as to how to quantify the tension on the cable?

14    A.   That's correct.

15    Q.   So in this medical device, which is being used for

16    precision movements inside human beings, the totality of the

17    instruction is take a screwdriver and make it tight; right?

18    A.   That's correct.

19    Q.   You never saw anything else, right, about that?

20    A.   Correct.

21    Q.   Okay.  I messed up my questioning on this subject that was

22    not clear, so I just want to go back.  I want to make it -- I

23    want to ask you something very simple.

24          When you were dealing with Rebotix in 2019, you

25    personally had no knowledge that Intuitive had informed Rebotix

POSDAL - CROSS / GALLO

1    that it had concerns about the safety of their process;

2    correct?

3    A.    I believe that's accurate.

4    Q.    And you did not know that when you were dealing with

5    Rebotix in 2019, Intuitive had invited Rebotix to submit

6    clinical safety evidence to Intuitive?

7    A.    Correct.

8    Q.    And so when you were being assured by Intuitive that this

9    was -- by Rebotix that this was safe, nobody at Rebotix told

10   you that Intuitive had raised questions about the safety?

11   A.    I believe that's accurate.

12   Q.    Nobody at Rebotix told you that they had been invited to

13   submit clinical safety testing evidence?

14   A.    I believe that's accurate.

15   Q.    And nobody at Rebotix told you that they had not done so?

16   A.    I believe that's accurate.

17   Q.    So the people you were trusting didn't tell you any of

18   those things?

19   A.    I believe that's accurate.

20   Q.    Okay.  Could you look, please, at Tab 20, which is 1574,

21   Trial Exhibit 1574?

22         MR. GALLO:  Can I get some help?  Is this already in

23   evidence?

24         MR. BRACHMAN:  1547 is in evidence.

25         MR. GALLO:  I'm sorry.  I misspoke.  1547 and it is in

POSDAL - CROSS / GALLO

1    evidence, Tab 20.

2    **BY MR. GALLO:**

3    **Q.**    I think you were asked some questions about this earlier.

4         This is the one where we decided to move on to so I

5    would get my act together and do it a little more efficiently.

6         This is the RFP response that you sent to Vizient;

7    right?

8    **A.**    Correct.

9    **Q.**    Dated February 7, 2000?

10   **A.**    Yes.

11   **Q.**    And I want to ask you to look back at page 6 of the RFP

12   response.

13   **A.**    Is this 2274?

14   **Q.**    Sorry.  2274, it's actually page -- okay, now I see the

15   problem.  The copy in my book is all out of order, so I'm

16   looking at the wrong page.

17        Page 6 -- page 1, 22 -- I'm sorry.

18        Page -- yeah, page 6 -- page 6, 2274.

19        On the top of the --

20   **A.**    The one that's -- I'm sorry.

21   **Q.**    Yeah.  On the top right, it says [as read]:

22        "SIS provides maintenance, repair, refurbishment,

23        and rebuild services for generally" -- "for general

24        and specialty handheld medical devices and

25        instruments and other related equipment."

POSDAL - CROSS / GALLO

1          Do you see that?

2  **A.**   Hold on.  My pages are not the same as yours.

3  **Q.**   PDF page 6.

4  **A.**   Page -- the one listed as page 6 of 7?

5  **Q.**   No.  It says page 6 of 40.  I think that's probably the

6  confusion.

7          Page 6 of 40, 2274.  Or you could -- well, I'm happy

8  for you to look at the document.  You could also look at the

9  screen, but...

10  **A.**  I'm going to look at the screen.  I don't have it in my

11  binder.  I have it on the screen.

12  **Q.**  Okay.  You see that this is describing the services you're

13  going to provide under this RFP; correct?

14  **A.**  Yes.

15  **Q.**  And about two-thirds of the way down, of the specific

16  services, it says "da Vinci robot arms"; right?

17  **A.**  Yes.

18  **Q.**  And that's referring to the EndoWrist?

19  **A.**  Yes.

20  **Q.**  Then if you go to the left, there's one, two, three

21  statements down on the left [as read]:

22          "Indicate the extent to which work associated

23      with the service that your company is interested in

24      supplying to TMC is subcontracted."

25          Do you see that?

POSDAL - CROSS / GALLO

```
 1   A.    Yes.

 2   Q.    And the answer from your company is [as read]:

 3             "SIS does not subcontract any" -- "subcontract

 4         any services that would be provided through this

 5         service proposal to TMC."

 6             Do you see that?

 7   A.    I do.

 8   Q.    So not only did your marketing materials fail to identify

 9   Rebotix, but when asked specifically, you denied you were using

10   a subcontractor; right?

11   A.    It appears to be accurate.

12   Q.    Okay.  Let's go to Trial Exhibit 238, which should be at

13   Tab 4.

14             Is this -- yeah, this is already in evidence also,

15   sir.

16             So if you look at the first page, do you recognize

17   this as a supplier and services agreement for instrument repair

18   between Vizient and SIS?

19   A.    Yes.

20   Q.    And you were asked some questions about this contract with

21   Vizient earlier today; right?

22   A.    I don't recall that, but...

23   Q.    Would you look at page -- PDF page 17 of the document?

24   A.    Yes.

25             MR. GALLO:  Paul, may I get some help with this,
```

POSDAL - CROSS / GALLO

1    A.    If the math is right, then, sure.

2    Q.    You just don't recall how much money?

3    A.    Correct.

4    Q.    But you don't deny that it was in the neighborhood of 38-,

5    $35,000?

6    A.    Sounds about right.

7    Q.    I'm sorry.  I didn't hear you.

8    A.    That sounds right.

9    Q.    Okay.  And you agree that you didn't lose any customers in

10   other lines of business; correct?

11   A.    That's correct.

12   Q.    So it didn't, like, hurt the rest of your business?

13   A.    Correct.

14   Q.    Okay.  And your reputation, in your other lines of

15   business, you don't believe was harmed by Intuitive?

16   A.    That's correct.

17   Q.    So you shut down this business in 2019.  Do you recall

18   that Mr. McCaulley started giving you legal advice in December

19   of 2019, without -- I certainly don't want to get into what the

20   advice was, but do you recall that's when it started?

21   A.    I don't remember the exact time frame, but it sounds

22   accurate.

23   Q.    Would you please look at what's at Tab 56 but do not read

24   it into the record.

25   A.    (Witness examines document.)  Okay.

POSDAL - CROSS / GALLO

1  Q.   If you look at the very first page of that document, and
2  the one, two, three, fourth entry, just read it to yourself.
3  A.   (Witness examines document.)
4  Q.   The fifth entry as well.
5  A.   (Witness examines document.)
6  Q.   Okay.  You've read it.
7        Does that refresh your recollection that you began
8  speaking with Mr. McCaulley about a legal opinion and strategy
9  in December of 2020?
10 A.   Yes.
11 Q.   And then you continued to work with him all through 2020,
12 after you had abandoned the business, to develop a legal
13 strategy; right?
14 A.   Correct.
15 Q.   There are many, many entries in this log of you and
16 Mr. McCaulley corresponding about legal strategy?
17 A.   Okay.
18 Q.   Right?
19 A.   Correct.
20 Q.   So after you abandoned the business and did not invest in
21 the business, you moved to the business of a lawsuit and
22 investing in the lawsuit; right?
23 A.   That's correct.
24 Q.   And then you filed this complaint in May of '21?
25 A.   Correct.

POSDAL - REDIRECT / MCCAULLEY

```
1   Q.   Having never bothered to pick up the phone and call
2   Intuitive?
3   A.   That's correct.
4   Q.   Thanks very much.
5        MR. GALLO:  Your Honor, I pass the witness.  Thank
6   you.
7        THE COURT:  Thank you, Mr. Gallo.
8        Mr. McCaulley?
9        THE WITNESS:  Mr. Gallo, do you want your binder?
10       MR. GALLO:  You may want to keep it in case
11  Mr. McCaulley needs to refer to it.
12       THE WITNESS:  Okay.
13                 REDIRECT EXAMINATION
14  BY MR. McCAULLEY:
15  Q.   Mr. Posdal, I just want to start where we just ended up --
16  start where you just ended up with Mr. Gallo, on Tab 56.
17       You and I have known each other for a long time;
18  correct?
19  A.   That's correct.
20  Q.   We consult on a number of different matters; is that
21  correct?
22  A.   That's correct.
23  Q.   We had discussions in early 2020 that related to another
24  specific matter; is that correct?
25  A.   I don't recall which matter that was.
```

POSDAL - REDIRECT / MCCAULLEY

1  A.   Resetting the chip.

2  Q.   So from your perspective, was it clear that that was part

3  of the agreement?

4  A.   Yes.

5  Q.   You talked about -- Mr. Gallo asked you about investments

6  that you made in this opportunity.  Do you remember that?

7  A.   I do.

8  Q.   How much attention for the company was devoted to the

9  EndoWrist business in that six-month period from June until the

10  end of 2019?

11  A.   A great deal of effort and interest.

12  Q.   We also heard testimony that Rebotix and Restore Robotics

13  were authorized by Intuitive?

14  A.   We did.

15  Q.   Were they authorized in the 2019 and 2020 time frame --

16  A.   No.

17  Q.   -- as far as you know?

18  A.   As far as I know, no.

19  Q.   Do you believe, based on the fact that Rebotix and Restore

20  were authorized by Intuitive, that SIS would similarly be

21  authorized?

22  A.   I can make that assumption.

23  Q.   I'd like to go back to Trial Exhibit 1495, which is the

24  draft Rebotix agreement.

25        Just let me see the second page of that.

POSDAL - RECROSS / GALLO

1    incident?

2    A.    Not to my knowledge.

3    Q.    And I just want to clear up one more point.

4          You never had access to the license agreement that

5    Intuitive has with the hospitals; correct?

6    A.    Correct.

7    Q.    And there was much made of the statements contained in the

8    complaint.

9          Did you do anything to obscure your relationship with

10   Rebotix from either the Court or Intuitive in this lawsuit?

11   A.    No.

12   Q.    So at the time you filed the complaint, you were aware

13   that the relationship with Rebotix would become part of the

14   record; correct?

15   A.    Yes.

16         MR. McCAULLEY:  Your Honor, I have nothing further.

17   Thank you.

18         THE COURT:  Thank you, Mr. McCaulley.

19         I see you, Mr. Gallo.  Come on over.

20                     <u>RECROSS-EXAMINATION</u>

21   BY MR. GALLO:

22   Q.    Very briefly, sir.  You're aware your complaint does not

23   use the word "Rebotix"; right?

24   A.    Yes.

25   Q.    Okay.  And you were asked if your contracts restrict

POSDAL - RECROSS / GALLO

1  hospitals from doing anything with their equipment?

2  **A.**   Yes.

3  **Q.**   They're restricted if they want a warranty from you;

4  right?

5  **A.**   I believe I said that, yes.

6  **Q.**   They can't -- if they want a warranty from you, they can't

7  modify the equipment --

8  **A.**   Correct.

9  **Q.**   -- in an unauthorized way; correct?

10 **A.**   Yes.

11 **Q.**   Okay.  Could we look at Exhibit -- Trial Exhibit 861, I

12 think you were just asked about it.

13          **MR. GALLO:**  If we could pull that up.

14          **MR. McCAULLEY:**  What tab is it, Ken?

15          **MR. GALLO:**  It's Trial Exhibit 861.  I believe you

16 used it.  It's the amendment to the Vizient agreement.  Didn't

17 you just show him that?

18          **MR. McCAULLEY:**  I just don't remember what tab it was.

19          **MR. GALLO:**  I don't remember either, I'm afraid.

20          But could we pull it up on the screen, please?  You

21 got it?

22 **BY MR. GALLO:**

23 **Q.**   This is --

24          **MR. GALLO:**  I'm sorry.  Are you okay?

25          **MR. McCAULLEY:**  46.  I thought he might want to know

1

2                    **CERTIFICATE OF REPORTER**

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:   Wednesday, January 8, 2025

7

8

9

10
     _____
11    Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
            Official Reporter, U.S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 4

Pages 664 - 848

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE     )
COMPANY, INC., et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )   NO. C 21-03496-AMO
                                )
INTUITIVE SURGICAL, INC.,       )
                                )
          Defendant.            )
_____ )
AND RELATED COUNTERCLAIMS.      )
_____ )
                          San Francisco, California
                          Thursday, January 9, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
              BY:   **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
                    **ANTHONY E. DOWELL, ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
              BY:   **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

665

1    **APPEARANCES**:  (CONTINUED)

2    For Defendant:

                          PAUL, WEISS, RIFKIND, WHARTON
3                         & GARRISON LLP
                          2001 K Street NW
4                         Washington, D.C. 20006
                  BY:  **KENNETH A. GALLO, ATTORNEY AT LAW**
5                      **PAUL D. BRACHMAN, ATTORNEY AT LAW**

6                         PAUL WEISS RIFKIND WHARTON
                          & GARRISON LLP
7                         1285 Avenue of the Americas
                          New York, New York 10019
8                 BY:  **WILLIAM MICHAEL, ATTORNEY AT LAW**
                       **CRYSTAL L. PARKER, ATTORNEY AT LAW**
9
                          PAUL, WEISS, RIFKIND, WHARTON
10                        & GARRISON LLP
                          535 Mission Street - 24th Floor
11                        San Francisco, California 94105
                  BY:  **JOSHUA HILL, JR., ATTORNEY AT LAW**
12

13
     Also Present:       **Bobby Cox**
14                       **Ryan Lee**
                         **Greg Posdal**
15                       **David Rosa**

16

17

18

19

20

21

22

23

24

25

5-SER-1046

SARGENT - DIRECT / VAN HOVEN

1   hospital systems that are 50 -- 50 different hospitals into a

2   system, that they have their own GPOs.

3   **Q.**   And I guess, of those GPOs you mentioned, what's their

4   relative size and scope?

5   **A.**   So Vizient is going to be the largest, with the largest

6   number of members.  Some hospitals will work with two different

7   GPOs.  They'll have a primary and a secondary; but for the most

8   part, the hospitals work with one GPO, and Vizient is the

9   largest.

10  **Q.**   And approximately how many hospitals are within Vizient?

11  **A.**   About 4,000.

12  **Q.**   Approximately how many hospitals are in the United States?

13  **A.**   6,000.

14  **Q.**   And have you -- we're here with -- this case is against

15  Intuitive Surgical --

16  **A.**   Yes.

17  **Q.**   -- as you're aware?

18  **A.**   Yes.

19  **Q.**   Are you aware of Intuitive Surgical ever having a GPO

20  contract through your years of experience in supply chain and

21  within GPOs?

22  **A.**   No.

23  **Q.**   So we're moving around here -- but, actually, before we do

24  that, I have some hopes that we might have the AV working.

25          You were talking a bit about something called a master

SARGENT - CROSS / PARKER

1    Q.   And based on your experience working in hospitals and in

2    departments that reprocess instruments, if someone had come to

3    you and said they wanted to reprocess an EndoWrist more than

4    the number of prescribed times, you wouldn't have recommended

5    they do that, would you?

6    A.   It depends on the circumstances.

7    Q.   If a hospital came to you and said, "We want to reprocess

8    our EndoWrists more than the number of reprocessing cycles

9    listed in the instructions for use," you would not have

10   recommended they do so, would you?

11   A.   I would recommend -- no.  They not do so.

12   Q.   Ms. Sargent, in talking about your background, you

13   testified a little bit about working at the University of

14   Kentucky; right?

15   A.   Yes.

16   Q.   And when you were at the University of Kentucky, they had

17   a da Vinci robot.  You talked about that with your attorney?

18   A.   Yes.

19   Q.   And I believe your testimony was that when you were at the

20   University the Kentucky, their robot was only used for one

21   particular type of surgery; correct?

22   A.   Yes.

23   Q.   And at the time you were there, do you have any idea of

24   how many other surgeries that robot was allowed to be used on?

25   A.   Nothing.

SARGENT - CROSS / PARKER

1  Q.   I'm sorry.  Let me reask my question.
2          At the time you were there, was the robot capable of
3  doing other surgeries?
4  A.   Yes.
5  Q.   And so Kentucky would use their da Vinci for prostate
6  procedures but not other kinds of procedures it could have
7  performed; right?
8  A.   Correct.
9  Q.   And for those other procedures, Kentucky would opt to do
10 an open or a laparoscopic surgery; right?
11 A.   Correct.
12 Q.   So at least for some of these -- for some of these
13 surgeries, da Vinci was an option but they chose not to use it;
14 correct?
15 A.   Correct.
16 Q.   And when they were making that analysis, at least your
17 understanding was one of the things they considered was cost;
18 right?
19 A.   Correct.
20 Q.   But they had the option to use a da Vinci, a
21 laparoscopic procedure, or an open procedure; correct?
22 A.   Yes.
23 Q.   Okay.  Now, Ms. Sargent, I want to talk a little bit more
24 about your background and relationship with SIS.
25         You testified earlier that you have a consulting

1

2                    **CERTIFICATE OF REPORTER**

3           I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     DATE:   Thursday, January 9, 2025

7

8

9

10    _____

11         Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                  Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 5

Pages 849 - 1059

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. C 21-03496-AMO** |
| INTUITIVE SURGICAL, INC., | ) ) ) |
| Defendant. | ) ) ) |
| AND RELATED COUNTERCLAIMS. | ) ) |

San Francisco, California
Friday, January 10, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        MCCAULLEY LAW GROUP
        180 N. Wabash Avenue - Suite 601
        Chicago, Illinois 60601
      BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
          **ANTHONY E. DOWELL, ATTORNEY AT LAW**

        HALEY GUILIANO LLP
        111 Market Street - Suite 900
        San Jose, California 95113
      BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
            Official Reporter, CSR No. 12219

850

```
 1    APPEARANCES:   (CONTINUED)

 2    For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
 3                            & GARRISON LLP
                              2001 K Street NW
 4                            Washington, D.C. 20006
                         BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                            PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
 7                            1285 Avenue of the Americas
                              New York, New York 10019
 8                       BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                              CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                         BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
      Also Present:          Bobby Cox
14                           Ryan Lee
                             Greg Posdal
15                           David Rosa

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1    harm.

2         THE COURT:  I'll tell you what, Mr. McCaulley, why

3    don't you go get him, and we probably won't bring the jury in

4    until he's up on the witness stand.

5         MR. McCAULLEY:  Okay. I'll just have a word with him.

6         THE COURT:  Sure.  If you could try to be back in five

7    minutes or less.  Thank you.

8         MR. MICHAEL:  Thank you, Your Honor.

9              (Recess taken at 9:07 a.m.)

10             (Proceedings resumed at 9:15 a.m.)

11        (Proceedings were heard out of the presence of the

12   jury.)

13        THE CLERK:  All rise for the jury.

14             (The jury enters the courtroom.)

15      (Proceedings were heard in the presence of the jury.)

16        THE COURT:  You may be seated.

17        Good morning, all.  I thank you all for your patience

18   as we hammered a few things out.

19        We're going to start a little different this morning

20   in that I have some instructions for you before we get started

21   today.

22        Members of the jury, yesterday you heard deposition

23   testimony that referenced the federal Food and Drug

24   Administration.  You will now be instructed as to two matters

25   of fact that you are to accept as established and true.

PROCEEDINGS

1    First, Rebotix applied in 2014 for FDA clearance to

2  market modified EndoWrists.  The FDA did not grant Rebotix

3  clearance at that time.  Rebotix withdrew its application in

4  2015 and Rebotix lacked FDA clearance when plaintiff SIS worked

5  with it.

6    Second, defendant Intuitive Surgical obtained FDA

7  clearance to market the da Vinci and EndoWrists with a

8  limited number of uses.

9    I further instruct you that FDA clearance does not

10  determine as a matter of law that a product is safe.

11    The parties have agreed to certain facts that I will

12  be -- that I will read to you now.  You must treat these facts

13  as having been proved.

14    One, the relevant geographic market for the antitrust

15  claims in this action is the United States.

16    Two, SIS filled -- excuse me -- filed suit against

17  Intuitive on May 1st, 2021.

18    Three, SIS began offering reset S/SI EndoWrists to its

19  customer base in fall of 2019.

20    And, folks, before we -- the final thing, before you

21  start hearing evidence again this morning, is I want to pause

22  and remind you that questions and objections by lawyers are not

23  evidence, that attorneys have a duty to their clients to object

24  when they believe a question is improper under the rules of

25  evidence, that you should not be influenced by the objection or

JOHNSON - DIRECT / McCAULLEY

1  by the Court's ruling.

2          And just a reminder that it is part of the lawyers'

3  role and that it is their job to object if they believe there's

4  a problem with evidence before you hear it.

5          And with that, I know some of you have gotten masks

6  from our courtroom deputy.  By all means, wear them if you'd

7  like.  If anyone wants or needs cough drops, we've got a stash,

8  let me know -- Ms. Solorzano-Rodriguez know.

9          With that, Mr. McCaulley, I turn the floor over to

10  you.

11          MR. McCAULLEY:  Thank you, Your Honor.

12                        KEITH JOHNSON,

13  called as a witness for the Plaintiffs, having been previously

14  duly sworn, testified further as follows:

15              DIRECT EXAMINATION  (resumed)

16  BY MR. McCAULLEY:

17  Q.  Mr. Johnson, you know you're still under oath; correct?

18  A.  Correct.

19  Q.  And I would caution you not to, unless specifically asked,

20  talk about conversations or things that people told you unless

21  I specifically ask for that.  Understood?

22  A.  Understood.

23  Q.  Otherwise Mr. Gallo properly has to object, and he doesn't

24  want to disrupt things.

25          Just to recap a few of the things that we talked about

JOHNSON - CROSS / GALLO

1    you about those.

2           If you look at page 973, in the bottom right-hand

3    corner -- I'm sorry.  I misspoke.  Yeah, there's something

4    wrong with my reproductions, so let me come back to that.

5           Let's look at Tab 10, sir, which is TX1546.

6           **MR. GALLO:**  I believe there are no objections, and

7    I'll ask to move it into evidence.

8           **MR. McCAULLEY:**  No objection, Your Honor.

9           **THE COURT:**  It's admitted.

10          (Trial Exhibit 1546 received in evidence.)

11          **THE COURT:**  And would you like to publish it?

12          **MR. GALLO:**  Yes, please publish it.

13          And I'd ask you, Mr. Lee, to go to the second page.

14   There's an e-mail from Brian Mirsberger dated February --

15   August 23 to Mr. Johnson at 10:46 a.m.

16          Is that up on the screen?

17          Okay.  And if you scroll further down the document,

18   there's an e-mail from Adrienne Ainsworth on August 20, where

19   in the third line of the bullets, she -- she's a -- she's at

20   Aurora, right, Aurora Advocate?

21   **A.**   Yes.

22   **Q.**   Advocate Aurora.

23          And she's asking -- do you see she's asking

24   Brian Mirsberger for background on the supplier, experience

25   with reprocessed equipment, references, et cetera; right?

JOHNSON - CROSS / GALLO

```
 1   A.    Yes.

 2   Q.    And then he flips -- forwards that to you; correct?

 3   A.    Mm-hmm.

 4   Q.    So now you know you're responding to a request for

 5   experience with the equipment that you have and references;

 6   right?

 7   A.    Yes.

 8   Q.    Okay.  And so now if we go to the previous page, we see

 9   your response on Saturday, August 24th.  Let me know if you see

10   that.

11   A.    Yes.

12   Q.    And you respond in the second -- third paragraph in the

13   right [as read]:

14         "We have been in business since 1971."

15         Right?

16   A.    Yes.

17   Q.    And now in response to a request, a question, "What is

18   your experience with the reprocessed equipment," down at the

19   bottom of the page, you say [as read]:

20         "We are installing a new counter and refurbishing

21      the functionality of the instrument back to OEM

22      specifications."

23         Right?

24   A.    Yes.

25   Q.    You don't say "Rebotix is doing it" or "our partner is
```

JOHNSON - CROSS / GALLO

1    doing it" or "a subcontractor is doing it."  You say "we are
2    doing it"; right?
3    A.   Correct.
4    Q.   And you're -- is it your testimony to the jury that you do
5    not believe that would be misleading at all to this customer?
6    A.   In our industry, it is very common practice, and I can
7    share some examples if you'd like to hear them.
8    Q.   You weren't actually doing any refurbishing; right?
9    A.   At that time, no, we were not.
10   Q.   Okay.  And you also -- I won't even -- I won't show the
11   document to try to speed things up because the jury's seen
12   similar references.
13   A.   Yes.
14   Q.   You also told this customer, when you were selling to
15   Advocate Aurora, these -- so these are the people that you
16   succeeded with.  This was what you were telling them; right?
17   Advocate Aurora, you actually sold something to?
18   A.   Correct.
19   Q.   Okay.  And the two documents we just looked at were the
20   representations you made that led to those sales; correct?
21   A.   Correct.
22   Q.   Okay.  And you don't deny that you also told them you had
23   sold more than a thousand instruments?
24   A.   Yes.  I was referring to Rebotix.
25   Q.   Yeah, but that's not what you said; right?  You said SIS;

JOHNSON - CROSS / GALLO

1          You mentioned a moment ago the answer.

2          **"ANSWER:** Not that I recall."

3          Do you see that?

4    **A.**    Yeah.  That is what I said, yes.

5    **Q.**    You didn't do any -- SIS didn't do anything to confirm

6    that the statement by Rebotix that the modified da Vinci was

7    repaired to original specifications -- you didn't confirm that

8    in any way; right?

9    **A.**    I didn't confirm that?

10   **Q.**    Right.

11   **A.**    What I remember seeing were the documents that we've spoke

12   about today that talked about their process and how they do

13   things.  That was a long time ago.

14          I remember seeing technical forms.  And I think in

15   generality during my deposition, I was responding to the fact

16   that I saw a lot of technical documents in that meeting and

17   assumed that one of them -- what I saw was one of those

18   documents that addressed that issue.

19   **Q.**    So you -- so you assumed that they had done something to

20   repair the da Vinci to original manufacturer specifications?

21   You assumed that?

22   **A.**    In our industry, we use the term "performance

23   specifications" meaning it's returned to the way it was

24   originally performed and designed by Intuitive; and by my

25   knowledge, that's what we were doing.

JOHNSON - CROSS / GALLO

1  Q.   Sir, I asked you whether you did anything to confirm the

2  statement that Rebotix made that the modified da Vinci was

3  repaired to original specifications.  Will you answer that

4  "yes" or "no," please?

5  A.   Ask me the question one more time, please.

6  Q.   To your knowledge, did SIS do anything to confirm the

7  statement by Rebotix that the modified da Vinci was repaired to

8  original specifications?

9  A.   I was on the sales side, not the engineering side.  So I

10 know that SIS had a process that stuff was checked, probably

11 overchecked.  So I would assume we were --

12 Q.   Sir --

13 A.   -- doing some form; but the answer is, no, I was not aware

14 of one.

15 Q.   I didn't ask you what you assumed.  I asked you if you

16 knew you did anything.

17       Isn't the answer no?

18 A.   The answer is no.

19 Q.   Okay.  Now, when -- by the way, when -- if and when you

20 collected up these arms from prospective customers and sent

21 them back to your facility, they would have had one use left on

22 them; right?  Isn't that what you were trying to do?

23 A.   For the ones that were due for reset or they wanted to

24 reset, correct, but we were collecting a lot of expired arms as

25 well.

JOHNSON - CROSS / GALLO

1  Q.   Okay.  So you don't know how many had one use left and how

2  many didn't?

3  A.   No.

4  Q.   Okay.  If they had a use left on it, then they did have

5  some value; right?

6  A.   Correct.

7  Q.   Okay.  Now, do you know, sir, after an EndoWrist is reset,

8  let's say it's been used nine times, it goes through the

9  Rebotix process, so now the counter shows one; right?

10  A.   Mm-hmm.

11  Q.   It would display to the surgeon as if it had 9 -- 10 lives

12  left; right?  The surgeon would not know that it was on use 10

13  instead of on use 1; right?

14  A.   No.  It would show how many active lives were on that

15  instrument.

16  Q.   Right.  But it had just been reset, so it was reset to 1;

17  right?

18  A.   It was reset from 1 to 10.

19  Q.   Okay.  I'm sorry.  You're right.  I got it backwards.

20        So it would show 10 active lives; right?

21  A.   Correct.

22  Q.   The surgeon would not know that it had already been used

23  nine times?

24  A.   Unless they knew it was our instrument that had been

25  repaired, no, they would not.

JOHNSON - CROSS / GALLO

1  Q.   Oh, and that's a good point.  You didn't put your name on

2  the instruments that were refurbished; right?

3  A.   No.

4  Q.   And then if it was reset again, it would show 10 and the

5  surgeon would have no way of knowing it had been used 19 times

6  already?

7  A.   Correct.

8  Q.   And Rebotix -- do you know that Rebotix had a contract

9  with Premier Healthcare?

10  A.   Now that you say it, I do remember them saying, at one

11  time, they did have that agreement.

12  Q.   Right.  In 2019 they had such an agreement; right?

13  A.   I don't remember the specific dates and, in fact, I hadn't

14  even remembered that at all; but now that you bring it up, I do

15  remember them saying that they did have a contract with

16  Premier.

17  Q.   So Premier Healthcare is one of the largest group

18  purchasing organizations in the country; right?

19  A.   Correct.

20  Q.   Maybe number two to Vizient?

21  A.   You could probably make that argument.

22  Q.   So when you keep saying that Rebotix didn't have a sales

23  arm, just through their contract with one entity, Premier, they

24  could reach thousands of hospitals; right?

25  A.   Probably a thousand.

PROCEEDINGS

1          MR. GALLO:  Thank you, Your Honor.

2          MR. McCAULLEY:  Thank you, Your Honor.

3          THE COURT:  All right.  I will look forward to your

4    e-mail.  Have a good weekend.

5          You-all feel better, Mr. McCaulley.

6          MR. McCAULLEY:  Thanks.

7               (Proceedings adjourned at 2:54 p.m.)

8                    ---o0o---

9

10                 CERTIFICATE OF REPORTER

11          I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled matter.

13

14    DATE:   Saturday, January 11, 2025

15

16

17

18    _____

19      Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
             Official Reporter, U.S. District Court
20

21

22

23

24

25

Volume 6

Pages 1060 - 1213

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| VS. | ) **NO. C 21-03496-AMO** ) |
| INTUITIVE SURGICAL, INC., | ) ) |
| Defendant. | ) ) |
| AND RELATED COUNTERCLAIMS. | ) ) |

San Francisco, California
Monday, January 13, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

MCCAULLEY LAW GROUP
180 N. Wabash Avenue - Suite 601
Chicago, Illinois 60601
BY: **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
**ANTHONY E. DOWELL, ATTORNEY AT LAW**

HALEY GUILIANO LLP
111 Market Street - Suite 900
San Jose, California 95113
BY: **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official Reporter, CSR No. 12219

1061

```
 1    APPEARANCES:   (CONTINUED)

 2    For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
 3                            & GARRISON LLP
                              2001 K Street NW
 4                            Washington, D.C. 20006
                      BY:   KENNETH A. GALLO, ATTORNEY AT LAW
 5                          PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
 7                            1285 Avenue of the Americas
                              New York, New York 10019
 8                    BY:   WILLIAM MICHAEL, ATTORNEY AT LAW
                            CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                      BY:   JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
      Also Present:        Bobby Cox
14                         Ryan Lee
                           Greg Posdal
15                         David Rosa

16

17

18

19

20

21

22

23

24

25
```

PARNELL - CROSS / PARKER

1  number of uses; right?

2  A.  Yes, that's correct.

3  Q.  And if we look back at the letter, Intuitive went on and

4  wrote (as read):

5          "We recently became aware that you were offering

6      Intuitive customers in the United States a service

7      where your authorized service centers will inspect

8      and recondition EndoWrist instruments to allow the

9      EndoWrist instrument to be used beyond their

10     preprogrammed cleared number of uses."

11     Do you see that, sir?

12  A.  Yes.

13         MS. PARKER:  And, Mr. Lee, if we could now go to

14  page 5 of Exhibit 1441, please.

15         THE COURT:  While Mr. Lee takes you there, I just want

16  to note we're just a touch over 2:30.

17         MS. PARKER:  I just -- may I have two more minutes?

18     Thank you, Your Honor.

19  BY MS. PARKER:

20  Q.  Dr. Parnell, if you look at page 5 of the letter, there's

21  a paragraph that starts with "lastly."  Do you see that?

22  A.  Yes.

23  Q.  And what Intuitive wrote to Rebotix in 2019 (as read):

24         "Lastly, and most critically, Rebotix's

25      modification of EndoWrist instruments impacts the

PARNELL - CROSS / PARKER

1    intended use of the device, extends the verified and

2    validated testing performed by Intuitive, and,

3    therefore, raises serious questions about the safety

4    and effectiveness of the clinical use of such

5    modified instruments in surgical procedures."

6    Do you see that?

7  A.    Yes.

8  Q.    If you turn to the last page of the letter, sir, which is

9  page 6 of 1441, what Intuitive asked Rebotix at the end of this

10  here is (as read):

11        "If you-allege that you and your service centers

12    possess clinical proof that your service process

13    returns modified instruments to a production

14    equivalent specification and/or that additional use

15    does not affect the safety or performance of the

16    instruments, please provide proof of the same no

17    later than April 30, 2019."

18    Did you see that, sir?

19  A.    Yes.

20  Q.    So Intuitive wrote to Rebotix in the spring of 2019 and

21  raised concerns about the safety of what Rebotix was doing;

22  right?  You saw that in the letter?

23  A.    Yes.

24  Q.    And Intuitive specifically asked Rebotix to give it proof

25  that its resetting process didn't affect the safety and

PARNELL - CROSS / PARKER

1    performance of EndoWrists; right?

2    **A.**    Yes.

3    **Q.**    Intuitive was asking Rebotix for the same type of

4    information that you've told the jury you were able to review;

5    correct?

6    **A.**    The type of information that I described as part of the

7    documentation and procedures that were associated with the

8    Rebotix service procedure.

9    **Q.**    That's what Intuitive was asking Rebotix for, right,

10    something to show if it thought its process was safe and

11    effective?

12    **A.**    Yes, along that line, certainly.

13    **Q.**    And you've not seen any evidence in the case that Rebotix

14    ever provided that information to Intuitive, have you?

15    **A.**    No, I have not.

16         **MS. PARKER:**    That's a good place for me to break,

17    Your Honor.  Thank you.

18         **THE COURT:**    Great.  So we're going to recess for the

19    afternoon.

20         And thank our jury.  I want to flag for you-all, for what

21    it's worth, that we will be dark on Friday.  I will remind you

22    of this several times just as a -- just as you have four days

23    this week.  So congratulations on getting through day one of

24    this week.

25         I remind you to please not discuss the case amongst

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:   Monday, January 13, 2025

7

8

9

10
     _____
11      Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
             Official Reporter, U.S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 7

Pages 1214 - 1399

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE      )
COMPANY, INC., et al.,           )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   NO. C 21-03496-AMO
                                 )
INTUITIVE SURGICAL, INC.,        )
                                 )
          Defendant.             )
_____)
AND RELATED COUNTERCLAIMS.       )
_____)
                            San Francisco, California
                            Tuesday, January 14, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
               BY:  **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
                    **ANTHONY E. DOWELL, ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
               BY:  **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

1215

```
1    APPEARANCES:   (CONTINUED)

2    For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
3                             & GARRISON LLP
                              2001 K Street NW
4                             Washington, D.C. 20006
                    BY:  KENNETH A. GALLO, ATTORNEY AT LAW
5                        PAUL D. BRACHMAN, ATTORNEY AT LAW

6                             PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
7                             1285 Avenue of the Americas
                              New York, New York 10019
8                   BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                         CRYSTAL L. PARKER, ATTORNEY AT LAW
9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                    BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

PARNELL - CROSS / PARKER

```
 1    for the jury.
 2                      (The jury enters the courtroom.)
 3         (Proceedings were heard in the presence of the jury.)
 4              THE COURT:  You may be seated.  Good morning,
 5    everyone.
 6         Ms. Parker, you are welcome to continue your examination
 7    of Dr. Parnell.
 8         Good morning, Dr. Parnell.
 9                         TOBY KIM PARNELL,
10    called as a witness for the Plaintiffs, having been previously
11    duly sworn, testified further as follows:
12                      CROSS-EXAMINATION (Resumed)
13    BY MS. PARKER:
14    Q.   Good morning, Dr. Parnell.
15    A.   Good morning.
16    Q.   When we broke for the day yesterday, we were talking about
17    a 2019 letter that Intuitive sent to Rebotix.  Do you recall
18    that?
19    A.   Yes.
20    Q.   And we were discussing how Intuitive asked Rebotix to
21    provide it with documentation about its process; correct?
22    A.   Yes.
23    Q.   And that you've not seen any evidence in the record that
24    Rebotix ever responded to that, have you?
25    A.   That's correct.
```

PARNELL - CROSS / PARKER

1  Q.   And you also didn't show the jury any evidence that SIS

2  ever went to Intuitive and offered to provide them information

3  about the process it was selling, did you?

4  A.   That's also correct.

5  Q.   And you're aware that Mr. Posdal testified last week that

6  SIS never approached Intuitive; correct?

7  A.   I wasn't aware of his testimony.

8  Q.   All right.  But you're not aware of any evidence that SIS

9  ever approached Intuitive to discuss the process with them, are

10 you?

11 A.   No, I'm not.

12 Q.   Dr. Parnell, you talked a little bit, on your direct exam

13 yesterday, about a trip that you took to the Rebotix facility

14 in August of 2021.  Do you recall that?

15 A.   Yes.

16 Q.   And that visit was one of the bases of the opinions that

17 you gave to the jury yesterday about Rebotix's process;

18 correct?

19 A.   Yes.

20 Q.   And your visit was referenced in that summary slide that

21 you put up to the jury as a basis of how you were able to

22 determine that Rebotix's process was thorough and looked

23 reliable; correct?

24 A.   It was one part of it, along with documentation and other

25 materials that I reviewed.

PARNELL - CROSS / PARKER

1  Q.   Right.  And I believe you testified yesterday you were

2  able to spend basically a full business day at the Rebotix

3  facility; correct?

4  A.   Yes, that's correct.

5  Q.   And a gentleman named Greg Fiegel was your tour guide;

6  correct?

7  A.   I'm sorry.  Repeat that?

8  Q.   Sure.  A gentleman named Greg Fiegel was your tour guide?

9  A.   Yes.  Greg Fiegel was my primary contact.  He was director

10 of operations at Rebotix.

11 Q.   And during that visit, you were able to observe the

12 EndoWrist reset process; correct?

13 A.   Yes, that's correct.

14 Q.   And you were able to compare EndoWrists that had been

15 reset by Rebotix with new EndoWrists from Intuitive; correct?

16 A.   Yes, I believe that's correct.  I definitely looked at

17 EndoWrists that had gone through the Rebotix process.

18 Q.   Great.  And you were also able to examine EndoWrists that

19 Rebotix had determined were not suitable to go through its

20 process; right?

21 A.   Yes, that's correct.

22 Q.   And you personally saw each step of the Rebotix reset

23 process being carried out; correct?

24 A.   Yes, that's correct.

25 Q.   So you saw them open up the housing on the back-end of the

PARNELL - CROSS / PARKER

1  EndoWrists; correct?

2  A.    Yes.

3  Q.    And you saw them remove the Intuitive circuit board from

4  the EndoWrist; correct?

5  A.    Yes.

6  Q.    And you watched them use a dental pick to scrape the

7  coating off of that circuit board to free the computer chip on

8  there; right?

9  A.    Yes.  That's one of the steps.

10  Q.    And you also saw the step where they then soldered that

11  computer chip onto a circuit board from Rebotix; right?

12  A.    Yes.  There was a special circuit board that Rebotix had

13  developed.

14  Q.    And that Rebotix circuit board with Intuitive's computer

15  chip was then placed back inside the EndoWrist; correct?

16  A.    Yes, that's correct.

17  Q.    And during your visit, you were able -- I believe you

18  talked about this yesterday -- to interview your tour guide,

19  Mr. Fiegel; right?

20  A.    Yes, we were able to have discussions on process and

21  procedures, questions that I had.

22  Q.    And he answered all of your questions; correct?

23  A.    Yes.

24  Q.    Didn't tell you anything was off limits, did he?

25  A.    I'm sorry.  Say again?

PARNELL - CROSS / PARKER

1  Q.   He didn't tell you that any information was off limits to

2  you, did he?

3  A.   I don't believe so.  I don't -- I don't recall anything to

4  that effect.

5  Q.   And Rebotix and Mr. Fiegel even allowed you to take

6  photographs of the process in their facilities; correct?

7  A.   Yes, that's correct.

8  Q.   You showed some of those to the jury yesterday?

9  A.   Yes.

10  Q.   Now, you'd agree that Rebotix gave you full visibility

11  into their reset process; correct?

12  A.   Yes, I believe that's correct.

13  Q.   They even let you try out and perform some of the steps of

14  the reset process; right?

15  A.   Yes, to -- to be able to see it firsthand and, as I said,

16  to ask questions, get clarification.

17  Q.   And they did all of that so that you could form your

18  opinions and tell the jury that you thought their process was

19  thorough and reliable; right?

20  A.   Yes.  That was a part of my process for reviewing the

21  process steps that they had developed.

22  Q.   Dr. Parnell, you haven't seen any evidence in this case

23  that Rebotix invited Intuitive to come observe its reset

24  process, have you?

25  A.   I'm not aware of any.

LAMB - CROSS / MICHAEL

1  unauthorized third party.  Do you see that?

2  **A.**    I do.

3  **Q.**    And below that it talks about acquiring da Vinci

4  surgical products through unauthorized channels; right?

5  **A.**    I see that, yes, sir.

6  **Q.**    And then below that is the contract section of the letter,

7  and the first bullet point talks about that instrument

8  accessories provision that we just looked at and references

9  repair, refurbishment, or reconditioning not approved by

10  Intuitive; correct?

11  **A.**    I do see that, yes, sir.

12  **Q.**    And now just to be clear, SIS never asked Intuitive to

13  become authorized or approved to offer services relating to

14  EndoWrist instruments; correct?

15  **A.**    That's a very good question.  I'm glad you asked that,

16  because it's something I want to -- as a matter of economics,

17  and the answer to that --

18  **Q.**    Just a second, sir.  It's really a simple question.  It's

19  a yes or no question.

20          **MR. McCAULLEY:**    Objection, Your Honor, to

21  interrupting the witness.  It's his question; it's the

22  witness's answer.

23          **THE WITNESS:**  Would it help if I said no or yes first,

24  Your Honor?

25          **THE COURT:**  I think that would give -- I think that

LAMB - CROSS / MICHAEL

1    would answer Mr. Michael's question, and he can proceed with

2    further questions for you.

3              THE WITNESS:  May I have the indulgence of the Court

4    to explain the no or yes?

5              THE COURT:  I'm not the one questioning you, sir.

6    It's really Mr. Michael's question you need to answer.

7    BY MR. MICHAEL:

8    Q.   Right now I would just like an answer to my question, sir.

9    The question I asked was:  SIS never asked Intuitive to become

10   authorized or approved to offer services relating to EndoWrist

11   instruments; correct?

12   A.   No.  It wouldn't make any sense to do so.

13   Q.   SIS was in the EndoWrist reset business as a reseller of

14   Rebotix's product for about six months in 2019 and early 2020;

15   correct?

16   A.   I can't recall the length of time, but it -- your

17   characterization with respect to reselling Rebotix's services

18   is correct.

19   Q.   And SIS then, to use Mr. Posdal's term, abandoned the

20   EndoWrist business by early 2020 without ever having contacted

21   Intuitive to try to become authorized; correct?

22   A.   I don't remember if that was his words or not, but my

23   understanding is they did leave the refurbishment business;

24   that's correct.

25   Q.   Without asking Intuitive to become authorized or approved;

LAMB - CROSS / MICHAEL

1  right?

2  A.   That -- as I testified, I think, that's correct.   I

3  wouldn't expect them to have asked.

4  Q.   Just so that we're staying in the parameters of the

5  Court's orders, I'm going to please ask you to please answer

6  the following question yes, no, or I don't know only.

7      Some years after SIS had already abandoned the EndoWrist

8  business, Restore and Rebotix each qualified for approval under

9  Intuitive's policy and Intuitive approved them; correct?

10  A.   Well, the answer is yes, but really the answer has to be

11  explained.

12  Q.   Thank you, sir.

13      Your counsel can ask you to explain if he wants to on his

14  examination.

15      Now, you understand that Intuitive has been selling the

16  da Vinci and EndoWrists in the United States for about 25

17  years; right?

18  A.   That sounds like the right time frame, yes.

19  Q.   And EndoWrists were designed, from the very beginning,

20  with a use limit; correct?

21  A.   Yes.

22  Q.   Intuitive obtained FDA clearance to market the da Vinci

23  and EndoWrists with a limited number of uses; right?

24  A.   I can't remember that.  I've seen that fact.  It may have

25  been that they did and it was necessary to, so I just don't

LAMB - CROSS / MICHAEL

```
 1   recall.  But they were selling the EndoWrists instrument;
 2   that's certainly true.
 3   Q.   Okay.  And I'll represent to you that the Court has
 4   actually instructed the jury that that fact has been
 5   established.  You have no reason to doubt it; right?
 6   A.   I don't doubt the Court's orders ever.
 7   Q.   Now, Intuitive never sold EndoWrists in the United States
 8   without a use limit; correct?
 9   A.   I believe the answer to that is correct, counselor, but
10   you said "ever" and I -- I have not surveyed the universe of
11   transactions.  I believe that it's correct, that they came with
12   a counter on them.
13   Q.   Exactly.  From the very beginning, as far as you know,
14   Intuitive designed the EndoWrists with a use counter; right?
15   A.   That's my understanding, yes.
16   Q.   And Intuitive didn't hide that fact from its customers,
17   that the EndoWrists had a use limit or a use counter; correct?
18   A.   I don't have any -- counselor, I don't have any insight
19   into what Intuitive said to any customer during any
20   transaction.  And I think you're asking me about something --
21   I believe it's beyond the scope of my report -- if I looked at
22   my report maybe to refresh my memory.
23        If you represent to me that they never hid it, I will
24   accept that representation, but I don't think I've offered that
25   opinion or cited evidence to that effect.
```

LAMB - CROSS / MICHAEL

1   Q.   As far as you know, there were references to the use limit
2   on the face of the contracts that you've seen; right?
3   A.   I believe -- I've seen contracts that have references to
4   use limits, yes.
5   Q.   And are you aware that Intuitive stated publicly, to the
6   entire marketplace, in its securities disclosures going all the
7   way back to 2000 or even 1998, that EndoWrists have a use limit
8   and a use counter on them?
9   A.   Yes.
10  Q.   Now your opinion is that the provisions of Intuitive's
11  contracts that SIS is complaining about were anticompetitive as
12  of 2019.  That's when you started your analysis and the
13  relevant period that you applied to your opinions in this case;
14  right?
15  A.   Well, yes, but I'm not saying they weren't anticompetitive
16  a day before, at some point before.  That's just the period I
17  was asked to analyze.
18  Q.   And you know that those provisions, like the ones in the
19  contract we looked at earlier, were not added to the contracts
20  in 2019.  They had been there from the very beginning as well;
21  correct?
22  A.   That's my understanding, yes.
23  Q.   From the very beginning, Intuitive had a limited-use
24  license in its contracts; right?
25  A.   That's my understanding, yes.

LAMB - CROSS / MICHAEL

1  Q.   And from the very beginning, Intuitive has had
2  restrictions on the use of unauthorized or unapproved products
3  and services in its contracts; correct?
4  A.   I believe that's correct, yes.
5  Q.   Now, you're not offering an opinion in this case that
6  Intuitive had monopoly power when it entered into contracts
7  with those provisions in 1999 or 2000; correct?
8  A.   I'm sorry.  Maybe I misunderstood your question, but I
9  think you said when they entered into -- '99 and 2000, they did
10 have market power in the surgical robot market.  Was that the
11 question?
12 Q.   That was the question.  So that's a conclusion that you've
13 reached in this case, that Intuitive --
14 A.   I'm going to --
15       THE COURT:  One at a time, please.
16       THE WITNESS:  I'm getting confused about what you're
17 asking me.  Repeat the question you asked.
18 BY MR. MICHAEL:
19 Q.   Let me ask it this way:  Are you offering an opinion that,
20 in 1999 or 2000, when Intuitive first came on the market with
21 the first version of its da Vinci system, that Intuitive had
22 monopoly power?
23 A.   I haven't offered an opinion about that time, first of
24 all.  I'm sorry.  I misheard your question as 2019 and 2020 in
25 my head, which is the time period I analyzed.  I didn't analyze

LAMB - CROSS / MICHAEL

1    the time period '99 or 2000.

2    Q.   That was my question.  And you're not claiming that

3    Intuitive put these provisions in its contracts in 1999 or 2000

4    to stop SIS from competing in a market for EndoWrist repair and

5    replacement; correct?

6    A.   No, I don't believe SIS was trying to compete in that

7    market.

8    Q.   Right.  At the time, SIS was not offering or trying to

9    offer what you have described as EndoWrist repair and

10   replacement services; correct?

11   A.   No, it was not.

12   Q.   That was just about two decades before SIS ever offered or

13   tried to offer those services; right?

14   A.   That's correct, just about two decades.

15   Q.   And, in fact, no third party was offering EndoWrist repair

16   and replacement, as you've termed it, back then; correct?

17   A.   I wouldn't expect them to be, so, no.

18   Q.   You've even said that the market for EndoWrist repair and

19   replacement that you claim existed as of 2019 did not exist

20   back in 1999 or 2000; right?

21   A.   I don't understand your question.  The relevant antitrust

22   market would be the same market, whether there were any

23   competitors attempting to offer repair services or not in that

24   market.  The market would be the same market.  As a -- as a

25   relevant antitrust market, the definition of the market would

LAMB - CROSS / MICHAEL

1  be the same.

2      Whether there was anyone offering the repair services or

3  not -- I haven't analyzed the time period you're referring to,

4  but I want to be clear about -- the construct of a relevant

5  market doesn't change whether one competitor is in the firm or

6  not, unless I'm misunderstanding something about your question.

7  Q.    Can you please turn to Tab 3 in your binder?

8  A.    I don't have a binder that I can see anywhere.  You didn't

9  provide me one.

10  Q.    Sorry about that.  You should have one.

11  A.    Thank you.

12        MR. MICHAEL:  Thank you, Your Honor.

13  BY MR. MICHAEL:

14  Q.    So if you go to Tab 3, do you see that's a transcript of a

15  deposition that you gave on October 19, 2021?

16  A.    I do.

17  Q.    You were under oath at that deposition?

18  A.    I was.  This is in the Rebotix matter.

19  Q.    Excuse me.  Sir, you were under oath at that deposition?

20  A.    I said I was.  This is -- this is the Rebotix --

21  Q.    That's enough, sir.

22        THE COURT:  So, right, he just wants you to answer his

23  question, nothing else.  And as we've talked about a little

24  bit, if what -- you will be given an opportunity possibly to

25  say more thereafter.

1352

LAMB - CROSS / MICHAEL

1          **THE WITNESS:** Okay.

2    **BY MR. MICHAEL:**

3    **Q.** So my question was, you took an oath to tell the truth

4    when you gave this deposition in October of 2021; correct, sir?

5    **A.** I did.

6    **Q.** And did you tell the truth at your deposition?

7    **A.** The best of my recollection, as I sit here today, I always

8    do.

9    **Q.** Let me refer you to page 83, line 3 of your deposition

10   transcript.

11   **A.** Page 83?

12   **Q.** And I'll read from lines 3 to 19 (as read):

13       "**QUESTION:** So, Dr. Lamb, your opinion is that Intuitive's

14       sale of EndoWrist instruments occurs in a relevant market

15       that's different from the market you define for MIST

16       surgical robots in the United States; correct?

17       "**ANSWER:** That's correct, yes. And that's a -- by the

18       way, that's a market that exists during the relevant

19       period that didn't exist, certainly, historically all the

20       way back to the time when Intuitive began selling the

21       da Vinci surgical robot. In other words, the market for

22       EndoWrist repair and replacement developed over time, and

23       the -- in many cases, the Intuitive service agreement

24       that's being discussed here is with respect to many

25       transactions that -- for the da Vinci surgical robot, in

1353

LAMB - CROSS / MICHAEL

1    that market, that occurred before a market in the

2    repair -- in the replacement and repair of EndoWrist

3    instruments had developed."

4    Were you asked that question and did you give that answer

5    under oath, sir?

6  **A.**   I did give that answer under oath.  I stand by that answer

7  and am happy to explain why that answer is truthful.

8  **Q.**   Now, you understand that Intuitive's position, going all

9  the way back to 1999 or 2000, is that the terms in its

10 contracts that SIS is complaining about in this case were

11 necessary due to concerns about patient safety; right?

12         **MR. McCAULLEY:**  Objection, beyond the scope of direct,

13 beyond the scope of his report.

14         **THE WITNESS:**  You're asking me about --

15         **THE COURT:**  Hold on.

16         **THE WITNESS:**  I beg your pardon.

17         **THE COURT:**  It's all right.

18    Lets start with --

19    Mr. Michael, can you -- since the witness is asking for

20 you to restate your question, would you actually either restate

21 is or state it again if you think he has this knowledge.

22 **BY MR. MICHAEL:**

23 **Q.**   Yes.  The question is:  Do you understand, sir, that

24 Intuitive claims that the contract requirements that you talked

25 about in your direct examination were necessary due to patient

**PROCEEDINGS**

1    everything we have today.  We'll just see each other tomorrow

2    morning.  I'll be ready to go at 8:00 with you-all.  And

3    actually, we do have -- as I think about this, we do have at

4    least one issue for the morning, which is to think about -- and

5    after you've spoken, you can chat with me about whatever remedy

6    you may have about the litigation.  All right.

7            MR. MICHAEL:  Thank you, Your Honor.

8            THE COURT:  All right.  Good afternoon, everyone.

9            MR. McCAULLEY:  Thank you.

10           (Proceedings adjourned at 2:43 p.m.)

11                        ---o0o---

12                  **CERTIFICATE OF REPORTER**

13       I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:   Tuesday, January 14, 2025

17

18

19

20   _____

21    Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
           Official Reporter, U.S. District Court

22

23

24

25

Volume 8

Pages 1400 - 1590

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín

SURGICAL INSTRUMENT SERVICE       )
COMPANY, INC., et al.,            )
                                  )
          Plaintiffs,             )
                                  )
  VS.                             )   NO. C 21-03496-AMO
                                  )
INTUITIVE SURGICAL, INC.,         )
                                  )
          Defendant.              )
_____  )
AND RELATED COUNTERCLAIMS.        )
_____  )
                          San Francisco, California
                          Wednesday, January 15, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    MCCAULLEY LAW GROUP
                    180 N. Wabash Avenue - Suite 601
                    Chicago, Illinois 60601
              BY:   **RICHARD McCAULLEY JR., ATTORNEY AT LAW**
                    **ANTHONY E. DOWELL, ATTORNEY AT LAW**

                    HALEY GUILIANO LLP
                    111 Market Street - Suite 900
                    San Jose, California 95113
              BY:   **JOSHUA V. VAN HOVEN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

1401

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:
                              PAUL, WEISS, RIFKIND, WHARTON
 3                            & GARRISON LLP
                              2001 K Street NW
 4                            Washington, D.C. 20006
                         BY:  KENNETH A. GALLO, ATTORNEY AT LAW
 5                            PAUL D. BRACHMAN, ATTORNEY AT LAW

 6                            PAUL WEISS RIFKIND WHARTON
                              & GARRISON LLP
 7                            1285 Avenue of the Americas
                              New York, New York 10019
 8                       BY:  WILLIAM MICHAEL, ATTORNEY AT LAW
                              CRYSTAL L. PARKER, ATTORNEY AT LAW
 9
                              PAUL, WEISS, RIFKIND, WHARTON
10                            & GARRISON LLP
                              535 Mission Street - 24th Floor
11                            San Francisco, California 94105
                         BY:  JOSHUA HILL, JR., ATTORNEY AT LAW
12

13
     Also Present:        Bobby Cox
14                        Ryan Lee
                          Greg Posdal
15                        David Rosa

16

17

18

19

20

21

22

23

24

25
```

5-SER-1089

LAMB - REDIRECT / MCCAULLEY

1   instruments?  It wouldn't make any sense.

2   Q.   I'd like to go back to some questions that you were asked

3   yesterday now.

4        Mr. Michael asked you about whether SIS ever showed

5   Intuitive any clinical proof that the refurbished EndoWrists

6   were safe.  And you said you wouldn't have expected to see such

7   clinical proof provided to Intuitive.  Can you explain what you

8   meant by that?

9   A.   Well, why would they?  Intuitive isn't a regulatory body.

10  It's not -- it's not Intuitive's decision one way or the other.

11  So I wouldn't expect to see that.

12  Q.   You testified during cross exam yesterday that you were

13  asked about testimony you had given about the market for

14  EndoWrist repair and replacement developed over time.  Can you

15  explain what you meant by that?

16  A.   Yeah.  I -- this seemed to be an indication, that somehow

17  I changed my opinion, but I hadn't.

18       The market, as I defined it, was the same relevant

19  market whether there were firms offering the refurbishment

20  services that SIS and Rebotix were offering or not.  That -- it

21  doesn't change the fact that the market is the same.

22       Over time -- and this is kind of important to

23  understand about this product, because we looked at these

24  numbers from 2008 a minute ago.  The robot is introduced and

25  over time the robot surgeries gained in market share.  You saw

1590

BERO - CROSS / MICHAEL

```
 1          THE COURT:  Sure.  Am I right, Mr. Van Hoven, the one
 2    that you-all -- it's not among the ones that you're thinking of
 3    using tomorrow anyhow; is that correct?
 4          MR. VAN HOVEN:  It's not one of three that's resolved,
 5    yes.
 6          THE COURT:  Okay.  Great.  So that's fine.  Let's plan
 7    to pick that up in the morning, then.
 8          Thank you so much.  Have a good evening.
 9          (Proceedings adjourned at 2:34 p.m.)
10                         ---o0o---
11                 CERTIFICATE OF REPORTER
12          I certify that the foregoing is a correct transcript
13    from the record of proceedings in the above-entitled matter.
14
15    DATE:  Wednesday, January 15, 2025
16
17
18
19
20    _____
            Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
21               Official Reporter, U.S. District Court
22
23
24
25
```

Volume 11

Pages 1770 - 1984

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

SURGICAL INSTRUMENT SERVICE )
COMPANY, INC., et al., )
                                    )
        Plaintiffs, )
                                    )
  vs. )  No. C 21-03496 AMO
                                    )
INTUITIVE SURGICAL, INC., ) San Francisco, California
                                    ) Wednesday
        Defendant. ) January 22, 2025
-----------------------------------) 8:00 a.m.
AND RELATED COUNTERCLAIMS. )
_____)

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**           MCCAULLEY LAW GROUP
                           180 N. Wabash Avenue
                           Suite 601
                           Chicago, Illinois 60601
               BY:  **RICHARD McCAULLEY JR., ESQ.**

                           HALEY GUILIANO LLP
                           111 Market Street
                           Suite 900
                           San Jose, California 95113
               BY:  **JOSHUA V. VAN HOVEN, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

1771

**APPEARANCES**:   (CONTINUED)

**For Defendant:**

                          PAUL, WEISS, RIFKIND, WHARTON
                            & GARRISON LLP
                          2001 K Street NW
                          Washington, D.C. 20006
                   **BY:   KENNETH A. GALLO, ESQ.**
                          **PAUL D. BRACHMAN, ESQ.**


                          PAUL WEISS RIFKIND WHARTON
                            & GARRISON LLP
                          1285 Avenue of the Americas
                          New York, New York 10019
                   **BY:   WILLIAM MICHAEL, ESQ.**


                          PAUL, WEISS, RIFKIND, WHARTON
                            & GARRISON LLP
                          535 Mission Street
                          24th Floor
                          San Francisco, California 94105
                   **BY:   JOSHUA HILL, JR., ESQ.**


**Also Present:**              **Bobby Cox**
                          **Ryan Lee**
                          **Greg Posdal**


                          - - -

ROSA - DIRECT / MICHAEL

1  Good morning, members of the jury.  We're getting started

2  again today, and Mr. Michael will continue his examination of

3  Mr. Rosa.

4  MR. MICHAEL:  Thank you, Your Honor.

5  **DAVID ROSA**,

6  called as a witness for the Defendant herein, having been

7  previously sworn, resumed the stand and testified further as

8  follows:

9  **DIRECT EXAMINATION RESUMED**

10  BY MR. MICHAEL:

11  Q.  Good morning, Mr. Rosa.  Welcome back.

12  A.  Thank you.  Good morning.

13  Q.  We were talking yesterday about the progression from the

14  Lenny prototype to the Mona to the da Vinci Standard; is that

15  right?

16  A.  Yes.

17  MR. MICHAEL:  And if I could ask Mr. Lee to please

18  pull up slide number two of Mr. Rosa's demonstratives?

19  (Document displayed.)

20  BY MR. MICHAEL:

21  Q.  We talked about the differences in the wristed instrument

22  between those different models.  I just had a couple of

23  follow-up questions for you, starting with the Lenny.

24  First of all, was the Lenny prototype ever used to perform

25  surgery on humans?

ROSA - DIRECT / MICHAEL

```
 1   A.   No, it was not.

 2   Q.   What did you do with it?

 3   A.   This was used in a laboratory setting to demonstrate some

 4   of the fundamental capabilities that we were trying to design

 5   into the system.

 6   Q.   And were there any shortcomings that you identified

 7   through that process with the Lenny?

 8   A.   There were plenty.  One of them we talked a little bit

 9   about yesterday in terms of that it didn't have an

10   interchangeable instrument.  You couldn't take what was then

11   the EndoWrist in and out of the instrument.

12        The second picture on the top, the one that says "setup

13   joint" is really the device that's supposed to set up the arm

14   relative to the patient.  And that was very, very manual and

15   mechanical, required wrenches, so very difficult to set up.

16        There were others, but there was a long list of

17   shortcomings.

18   Q.   And what did you do to go about addressing those

19   shortcomings?

20   A.   So that's where the next prototype comes in.  And so the

21   way -- we designed some of this knowing those shortcomings.

22        But what we would do is, in the lab when this was set up,

23   the instrument arm -- there were two of them.  One would be the

24   left hand.  One would be the right hand of the surgeon, if you

25   will, being used in the laboratory setting.
```

ROSA - DIRECT / MICHAEL

```
 1        So it's through the use of that over time that we learned
 2   what was working, what wasn't working, and what we have to
 3   redesign as we looked to the next prototype.
 4        MR. MICHAEL:  Mr. Lee, can you go to the next slide
 5   please.
 6        (Document displayed.)
 7   BY MR. MICHAEL:
 8   Q.   So the next prototype was the Mona; correct?
 9   A.   That's right.
10   Q.   And was the Mona system a commercial product that you were
11   able to sell?
12   A.   No.  This was not yet a commercial product.
13   Q.   What was the Mona used for?
14   A.   So this was -- the very first time that -- this was the
15   system that we designed that was actually used to do a number
16   of operations, five of them, in 1997.
17        And so we had started with the Lenny, designed -- made a
18   bunch of design changes, and then took this to the clinical
19   setting and did five surgeries with it.
20   Q.   Were you personally present for any of those initial
21   surgeries done with the Mona?
22   A.   I was.  And so --
23   Q.   And how did that experience affect your thinking about the
24   system that you were designing?
25   A.   So quite a bit, as you might imagine.  And so -- I could
```

ROSA - DIRECT / MICHAEL

1    tell long stories about this.

2         But maybe the two primary things were when we took this

3    system to surgery, we -- we knew, again, that there were some

4    shortcomings.  So this -- there was no user interface per se

5    here.

6         Every command that -- everything we wanted to do with the

7    system, other than when the surgeon operated it, had to be

8    typed into a computer by an engineer.  And so there wasn't kind

9    of a user interface, if you will, with buttons and levers and

10   other things.  And so we knew, again, it was a prototype, but

11   we were really trying to test and understand the basic

12   capabilities of it.  So we learned a lot about that in terms of

13   what was working, what did we need to modify and do better.

14        And this was -- for me, personally, this was the first

15   time that I was able to scrub in to a case.  That's what they

16   called it, where I put on sterile gowns and gloves and was next

17   to the surgical team with that patient.  And I was able -- had

18   an opportunity to meet those patients before and after, and

19   just struck by the trust that the patient has to put in to the

20   whole process.  So they have to trust their surgeon, the care

21   team.

22        And ultimately they are trusting us, the company, the

23   engineers who had designed these components to have done it

24   appropriately, and that stuck with me ever since.

25   Q.   Now, up in the upper left-hand corner, there is a -- on

1797

ROSA - DIRECT / MICHAEL

1    the slide, there is a wooden model.  It says "Instrument Arm
2    Model."  Can you explain what that is?
3    **A.**    Sure.  So this is something that I built, actually, in my
4    dad's woodshop.  But part of what I was responsible for is what
5    you see on the bottom left, it's called the "setup joint."  And
6    this was the mechanism that was used to position the instrument
7    arm relative to the patient.
8        And so that mechanism on the bottom attached to the
9    operating room table and would hold the instrument arm so you
10   could move it around and get it positioned just right on the
11   patient.
12       And what I was trying to do with the wooden models is I
13   built full-size prototypes in order to bring those to our lab,
14   attach them to or assemble them around an operating table just
15   to see how they fit together.
16       So it was just a way to model.  Rather than making it out
17   of metal and actual components, you could make things
18   relatively quickly.
19   **Q.**   So the setup joint for the Mona, was that the same or
20   different than as on the Lenny?
21   **A.**   Quite a bit different.  So on the Lenny it was nuts and --
22   kind of these wrenches and very, very mechanical.
23       Whereas, this one, you pressed a button and were able to
24   move it around in surgery.  And so it was very different
25   between the two.

1798

ROSA - DIRECT / MICHAEL

```
 1   Q.   And what was it that led to that change?
 2   A.   One was needing to have it to be more flexible in surgery.
 3        The other thing that we learned for all the shortcomings,
 4   if you will, in this prototype was that this particular setup
 5   joint was nowhere near ready to be commercialized.  It had,
 6   again, just a lot of shortcomings.
 7        And so when we -- you will see a very, very significant
 8   change again as we look to the next system about how this setup
 9   joint changes between Mona and our next standard system.
10   Q.   What was it that gave you the idea for changing the design
11   from the Lenny to the Mona setup joint?  Is that something you
12   came up with on your own?
13   A.   Well, Lenny to Mona was -- was one that I would say was
14   largely done in-house.  We always had some consultants,
15   surgeons, care teams come in to the company to help out and we
16   would show prototypes to and whatnot.
17        But, you know, in particular, if I think about the journey
18   from Lenny to Mona to the da Vinci system, that's -- I remember
19   in particular some feedback that I had received from a care
20   team.
21        So I had built a number of models and was trying to
22   understand how do I move from the setup joint that you see on
23   this page, the one that's Mona, and then how do I move that
24   into the next setup joint that we think would be a better
25   design overall?
```

ROSA - DIRECT / MICHAEL

1    And I had built a number of prototypes and were showing

2    them to the -- you know, to this nursing team that I had

3    invited in from a local hospital.  And we were assessing them

4    and looking at them and talking about all the differences.  And

5    one of the nurses actually got up and kind of put her arms out

6    and said:  You know, maybe you can make it like this.  Kind of

7    stood up and pretended she was a setup joint.

8        That sort of spawned the idea, if you will, spurred the

9    idea of what you actually see over here.  And it kind of turned

10   into what became the setup joints of the da Vinci system as we

11   look forward.

12       **MR. MICHAEL:**  Mr. Lee, if you could go to the next

13   slide, please.

14       (Document displayed.)

15   **BY MR. MICHAEL:**

16   **Q.**   You already spoke about the instruments on the da Vinci

17   Standard System.  And those were the first EndoWrists per se;

18   is that right?

19   **A.**   That's correct.

20   **Q.**   If you could summarize briefly what the other differences

21   were from the Mona moving to the da Vinci Standard System?

22   **A.**   Sure.  So this is our first commercial system, if you

23   will, one that we believed had the features and the capability

24   to go into a commercial environment.

25       So if you -- the surgeon console was much more refined.

ROSA - DIRECT / MICHAEL

1    We now have a user interface where surgeons can control buttons

2    and mode changes and things themselves.

3         You can see now the patient-side cart looks very different

4    than that little setup joint that you saw before.  So we've now

5    built a cart that's on wheels that can hold three or four arms

6    for the system.  And so that was a very, very big change from

7    what you had seen previously, what we had been thinking about,

8    the EndoWrist's interchange on the system in an easier way than

9    we had designed prior.  And we had upgraded and modified the

10   electronics, if you will, to be more commercial ready.

11           MR. MICHAEL:  Mr. Lee, you can take down the slides

12   for now.

13        (Document removed from display.)

14   BY MR. MICHAEL:

15   Q.   Now, you talked yesterday about how as you moved from the

16   Lenny to the Mona to the first commercial EndoWrist, the

17   diameter and form factor of the instrument got smaller; is that

18   right?

19   A.   It did.

20   Q.   Did that have any benefit for patients in your

21   understanding?

22   A.   It does.  So it will be relatively obvious.  Generally,

23   the smaller the incision for the patient, the better it is for

24   their recovery.  Less pain, less chance of hernias, that sort

25   of thing.  So what we wanted to do was move the diameter down

ROSA - DIRECT / MICHAEL

1  as small as practical and still provide the capability of a

2  wrist and other things.

3  **Q.**   So that was the benefit.  Was there any trade-off to

4  making the wristed instrument smaller in terms of their ability

5  to be reused?

6  **A.**   There is.  One of the key variables in the design of

7  instruments is how -- the diameter.  So the bigger it is, the

8  easier it is, if you will, to design it, to have longer life.

9       The smaller the diameter, the more difficult it becomes.

10  And it becomes a trade-off.  And so how small can you make it

11  to provide the benefits to the patient that we're hoping to get

12  versus the trade-offs you're making on the engineering front

13  with cable tensions and pulley diameters and other parameters

14  that make it difficult to design for multiple lives.

15  **Q.**   Can you explain a little bit more why it is when you make,

16  for example, those cable and pulley diameters smaller or sizes

17  smaller, why it is that that makes it more difficult for an

18  instrument to be reused?

19  **A.**   I will do my best.  Cable design -- in this case we're

20  using cables and pullies -- is a well-understood area of

21  engineering.  There's lots and lots of textbooks and

22  fundamental physics about it.

23       As you reduce the diameter of pulleys, kind of the radius

24  that something is bending over, you can get to the point where

25  the cable itself starts getting into areas where you're

1802

ROSA - DIRECT / MICHAEL

1    stressing the cable beyond sort of the point where you can

2    design it for extended, for many millions of cycles.

3        And you -- the harder you pull on a cable, the smaller the

4    diameter of the pulley.  You're bending it over.  It just puts

5    a lot -- many more constraints on the design.  And it

6    becomes -- you start getting into places where you're no longer

7    following, if you will, the rules of cable design.  You're kind

8    of breaking the rules of cable design in order to fit in this

9    package.  And so that we can provide that benefit to patients.

10   Q.   So with those very first commercial EndoWrists, were you

11   following the engineering rules on cable design that were

12   established in the textbooks or were you breaking those rules?

13   A.   So in the distal end, that front end where the wrist is,

14   that's where we're constrained and really having a difficult

15   time kind of following the rules, if you will.

16       In the back of the instrument, at the proximal end under

17   that housing, there are cables and pulleys as well, and those

18   are more following the rules.

19   Q.   So some of them break the rules; some of them follow them?

20   A.   That's right.

21   Q.   The jury's heard a lot in this case about the use limits

22   on EndoWrists.  Did the EndoWrists that were used with the very

23   first da Vinci Standard Systems have a usage limit?

24   A.   They did.

25   Q.   And can you just explain why EndoWrists have a usage limit

1803

ROSA - DIRECT / MICHAEL

```
 1   in your understanding?
 2   A.   Sure.  Again, it goes right back to the design of
 3   EndoWrists and the constraints that they are under and knowing
 4   that you're kind of, quote, breaking these rules.
 5        And if you look at the -- the cables, these fine wires
 6   that are going over the pulleys, they are getting cycled back
 7   and forth during use.  And we know for a fact over time, those
 8   are going to get under stress and start -- and have a finite
 9   life.  And so the cable designs themselves and the way they are
10   working is one of the reasons we know that there is going to be
11   a finite life.
12        There's also stress put on by cleaning and sterilization
13   cycles that can affect plastics and polymers and engineering
14   materials that we're using that we know will also impact life.
15   So there are several reasons why we knew from day one in trying
16   to engineer this small diameter dextrous instrument that it's
17   going to have a finite life.
18   Q.   When you were working on designing and developing the
19   first da Vinci system and those first EndoWrists, do you recall
20   ever thinking that, from an engineering perspective, the use
21   limit of EndoWrists should be greater than ten?
22   A.   No.  Again, establishing that, you know it's going to have
23   a finite life.  A lot of the early days of the company were
24   just trying to make the EndoWrist last beyond one or two lives.
25        I mean, we were struggling to have the cables last beyond,
```

ROSA - DIRECT / MICHAEL

1  you know, initial uses.  So we did a lot of work on the

2  material of the cables, material fleet angles, all the

3  engineering aspects of pulley design and cable design and the

4  risks that we were working on to try to get the lives up.

5  **Q.**   So from an engineering perspective, was it easy or

6  difficult to get the EndoWrists to a place where they could be

7  safely and reliably reused ten times?

8  **A.**   That was very difficult.

9  **Q.**   Yesterday the jury heard testimony by video from

10 Mr. Harrich of Pullman Regional.  You were here for that

11 testimony?

12 **A.**   I was.

13 **Q.**   And he said in the experience of his hospital, Intuitive

14 EndoWrists with a ten-use limit work just as well on the tenth

15 use as on the first.

16     Does that indicate to you that the use limit Intuitive has

17 set is serving its purpose or not serving its purpose?

18 **A.**   No.  That's -- that's exactly why it's there.  We -- one

19 of our commitments is -- what we want is that the patient

20 experience, the experience of the surgeon treating a patient is

21 the same on the first use as the tenth.

22 **Q.**   And why do you want that?

23 **A.**   Again, the -- the whole -- the foundation of the company

24 is built on providing capability, reliability, safety to

25 surgeons so that they can keep their attention on the patient

ROSA - DIRECT / MICHAEL

1   of an early company and innovator in the minimally invasive

2   surgery market.  They were a company that had developed a

3   number of instruments and other aspects of minimally invasive

4   surgery.  So that -- they were a company that was entrenched in

5   the minimally invasive surgery market.

6        And there's another company called Ethicon -- that's a

7   division of Johnson and Johnson -- that was also developing

8   instruments that was largely in competition with U.S. Surgical.

9        And there were other companies, for sure, but these were

10  the two -- kind of the larger companies that were making up

11  portions, large portions of the minimally invasive, the

12  laparoscopy market at the time.

13  Q.   Were these competitors, U.S. Surgical and Ethicon, bigger

14  or smaller companies than Intuitive?

15  A.   They were both quite a bit larger.

16  Q.   In the discussion in the business plan on Page 17 of both

17  U.S. Surgical and Ethicon, there are references to what are

18  called MIS disposables.  Do you see that?

19  A.   I do.

20  Q.   What did you understand "MIS disposables" to mean?

21  A.   So if you -- again, in this period of time, in the early

22  part of the company, the instruments that were on the market --

23  these are now laparoscopic instruments controlled directly by

24  the surgeon -- were largely single-use instruments.  And so

25  they were made out of plastics and different kinds of

ROSA - DIRECT / MICHAEL

```
 1    materials, sterilized by the company, delivered in -- in
 2    pouches that were opened up in the operating room, used once on
 3    the patient, and then disposed.
 4    Q.   So just to be clear, what is the use limit on a single-use
 5    instrument?
 6    A.   It's basically one.
 7    Q.   And was it common for surgical instruments used in
 8    minimally invasive surgeries around this time to be single use,
 9    in other words, to have a use limit of one?
10    A.   It was.  It was quite common.
11    Q.   So was Intuitive's business model to offer instruments
12    with more uses or fewer uses than its major competitors at the
13    time?
14    A.   So our -- it was to offer more uses than the single-use
15    instruments that were on the market.
16    Q.   Let me ask you to turn back to Page 3 of the document now.
17         (Witness complied.)
18    Q.   Up near the top of the page, the third paragraph reads
19    [as read]:
20              "The company will derive its revenues from
21         high-margin disposable instruments, as well as
22         high-margin reposable instruments, which can be
23         resterilized and reused only for the number of times
24         allowed by the company."
25         Do you see that?
```

ROSA - DIRECT / MICHAEL

```
1    A.    I do.
2    Q.    Mr. McCaulley read that sentence to the jury in his
3    opening statement and said that the revenue plan of the company
4    was built on restricting the number of times that hospitals
5    could use EndoWrists.
6         Is that what you understood the business plan to be
7    saying?
8    A.    No.  No, I don't.  Really, the business plan is about
9    providing high -- you know, different capabilities could really
10   treat patients differently in a safe manner over whatever
11   number of lives that were being designed into the instrument.
12   And so the core of this is to ensure that the outcome that the
13   surgeon is trying to get with the patient is reliable, is safe,
14   it can be repeated.
15        So that's where -- that's what this is about, is ensuring
16   that over the life of that given instrument, instruments, that
17   we can do our very best to ensure that's the case.
18   Q.    Whatever the business plan may have been, what ultimately
19   determine, in your experience, the number of times that an
20   EndoWrist could be safely reused?
21   A.    Yeah.  At the end of the day, it's do our very best to
22   design it in a way that could maximize the number of uses.  So
23   that's really paying attention to all the variables that affect
24   the life of an instrument, cable diameter, fleet angles,
25   pulleys, materials, and on and on.
```

1826

ROSA - DIRECT / MICHAEL

1    And then doing testing to ensure that -- to the very best
2    of our ability, that we are able to ensure the same level of
3    performance and safety on each life that -- as we increased it.
4    Q.    Did this 1995 business plan ultimately underestimate or
5    overestimate the engineering challenges that were involved in
6    designing Intuitive's products in your experience?
7    A.    It underestimated it to a pretty significant degree.
8    Q.    And let me ask you to look at Page 8 of the business plan,
9    please.
10    (Witness complied.)
11    Q.    Do you see near the middle of the page, where it says
12    [as read]:
13        "It will require virtually no software to
14        accomplish movements of the instruments."
15    A.    I do.
16    Q.    First of all, what did you understand that to mean in the
17    business plan?
18    A.    It's a little -- a little bit technical.  But, in essence,
19    what was believed to be able to -- to be able to be
20    accomplished was designing the system to essentially run on
21    hardware and firmware, if you will.
22        So we would have this kinematically similar system where
23    it would require virtually no software to have the surgeon be
24    able to control the patient side of the equipment.
25    Q.    And did that turn out to be accurate?

1827

**ROSA - DIRECT / MICHAEL**

1  A.   Not even close.

2  Q.   How much software is involved today in the da Vinci -- or

3  over time, how much software was involved in the da Vinci

4  system to accomplish movements of the instruments and other

5  functions?

6  A.   There are just a host of ways to measure that and they go

7  from how the robots controlled the safety systems to user

8  interface and more.  But there are millions of lines of code

9  now that are -- underlie the performance of the system.

10 Q.   If I could direct you to Page 9 of the document.  Do you

11 see up in the first third of the page, it says [as read]:

12        "It is currently anticipated that the company's

13        capital equipment will have a cost of goods sold of

14        approximately $50,000 to $65,000 fully burdened,

15        including factory overhead, warranty reserve, and

16        installation."

17        Do you see that?

18 A.   I see that.

19 Q.   And did that estimate turn out to be accurate?

20 A.   No, it did not.

21 Q.   Roughly how far off was it?

22 A.   Probably on the order between eight and ten times more

23 expensive than what's listed here.

24        **MR. MICHAEL:**  Thank you, Mr. Lee.  You can take that

25 document down.

ROSA - DIRECT / MICHAEL

1          (Document removed from display.)

2    BY MR. McCAULLEY:

3    Q.   Now, Mr. Rosa, do EndoWrists -- we have been talking about

4    the use limit.  Do EndoWrists come with a way to track the

5    number of uses or number of times that they are used?

6    A.   They do.  So you've heard this.  There is a chip on the

7    inside of the instrument that, when attached to the system,

8    will track the number of uses.

9    Q.   And that's called the "use counter"?

10   A.   It is.

11   Q.   And how far back in time does that go in terms of the

12   design of EndoWrists?

13   A.   It goes all the way back to, you know, really, the --

14   what's even envisioned in the business plan, but all the way

15   back to our first system.

16   Q.   Does Intuitive inform hospitals about the use limits and

17   use counter on the EndoWrists before or after they acquire a

18   da Vinci system?

19   A.   We inform -- we discuss it with them before they acquire

20   the system.

21   Q.   And is that something you started doing just recently or

22   is that something you've done for a long time?

23   A.   That's been something throughout the history of the

24   company that we have been working with customers on.

25   Q.   Now, we've heard a lot in this trial about Intuitive's

ROSA - DIRECT / MICHAEL

1    contract provisions regarding unauthorized third-party products

2    and services.  Are you familiar with those contract terms?

3    **A.**    I am.

4    **Q.**    Why does Intuitive have a policy that requires third

5    parties to be authorized if their products and services are to

6    be used with the da Vinci?

7    **A.**    So you could imagine the system, its interactions with

8    EndoWrists, you know, taken together -- it's a complex system.

9    And so when third parties -- third-party devices are going to

10   interact with the system, we want to ensure that it's safe,

11   it's effective, that we understand all the interactions that

12   are going to take place so that the experience of, again, the

13   surgeon and care team is top notch.

14   **Q.**    What risk, if any, does Intuitive see the use of

15   unauthorized products and services with the da Vinci posing to

16   patients?

17   **A.**    So it -- you know, it can range.  But depending on the

18   device that's being manufactured by that third party that is

19   compatible with -- that may be compatible with the system, you

20   know, it can range from things like the surgeon wants to hold

21   the clamp with an instrument and our instrument is not strong

22   enough to hold it and so it's not working correctly.  That's a

23   compatibility issue.  All the way up to electrical

24   compatibility, electrical interference, those sorts of things.

25        And so it -- it really can range depending on the type of

1830

ROSA - DIRECT / MICHAEL

```
 1   device that we're working on compatibility with.
 2   Q.   What risk, if any, does Intuitive see the use of
 3   unauthorized third-party products and services with the
 4   da Vinci posing to Intuitive?
 5   A.   So that's -- that's another part.  Again, our commitment
 6   to our customers is that we're going to do our very best to
 7   ensure that that device is safe and effective every time they
 8   turn it on and want to use it in the operating room.
 9        So if -- if a device is used with the system that doesn't
10   deliver that level of safety and performance, that's a -- a
11   reputational -- potential reputational risk as well, and that
12   goes against what we're trying to do for the surgeon and care
13   team.
14   Q.   So when it comes to your policy on unauthorized
15   third-party products and services being used with the da Vinci,
16   do you see Intuitive's business interests as being aligned with
17   patient safety or at odds with patient safety?
18   A.   Oh, it is -- it is 100 percent aligned with patient
19   safety.
20        MR. MICHAEL:  Your Honor, I'm going to introduce
21   another document now.  I'm just mindful of the time.  It's been
22   about an hour.  I'm happy to keep going.
23        THE COURT:  I appreciate that.  I appreciate that,
24   Mr. Michael.  Why don't we go ahead and take just a five-minute
25   break and come on back in five minutes?
```

ROSA - DIRECT / MICHAEL

```
 1        All rise for the jury.
 2        (Jury exits the courtroom at 9:30 a.m.)
 3            THE COURT:  You may be seated, Mr. Rosa.  You're
 4   welcome to take a five-minute break, if you would like to.
 5        (Whereupon there was a recess in the proceedings
 6         from 9:30 a.m. until 9:38 a.m.)
 7            THE COURT:  You may be seated.
 8        Go ahead, Mr. Michael.
 9            MR. MICHAEL:  Thank you, Your Honor.
10   BY MR. MICHAEL:
11   Q.   Mr. Rosa, can I ask you to turn to Tab 13 in your binder,
12   please.
13        (Witness complied.)
14   Q.   And without going into the content of the document, can
15   you please identify what this is?
16   A.   This is our Sales License Service Agreement.
17   Q.   And when is this one from?
18   A.   This is dated February 10, 2000.
19   Q.   Do you recognize this, based on your knowledge and
20   experience at Intuitive, as an Intuitive agreement in its
21   standard form with a hospital customer?
22   A.   I do.
23   Q.   Do the terms of this agreement relate to the da Vinci and
24   EndoWrists?
25   A.   They do.
```

ROSA - DIRECT / MICHAEL

```
 1              MR. MICHAEL:  Your Honor, I offer TX-1633.003-R.

 2              MR. McCAULLEY:  No objection.

 3              THE COURT:  Admitted.

 4         (Trial Exhibit 1633.003-R received in evidence.)

 5              MR. MICHAEL:  May I publish it, Your Honor?

 6              THE COURT:  You may.

 7              MR. MICHAEL:  Thank you.

 8         Mr. Lee, if you could bring that up on the screen.

 9         (Document displayed.)

10    BY MR. MICHAEL:

11    Q.   Okay.  So, Mr. Rosa, do you see this is a contract dated

12    February 10th of 2000?

13    A.   I do.

14    Q.   And was 2000 the year that Intuitive began commercial

15    marketing and sales of the da Vinci in the United States?

16    A.   That's right.  2000 was the right -- was the year.

17    Q.   Okay.  Let me ask you to turn to Page 7 of the document

18    and look at a section that is labeled 3.2(d).

19         Do you see that's titled "Unauthorized Instruments and

20    Accessories"?

21    A.   I do.

22    Q.   It says [as read]:

23              "Purchaser acknowledges that the system is

24         designed for use only with surgical instruments and

25         accessories made or approved by Intuitive."
```

ROSA - DIRECT / MICHAEL

1    Who does "purchaser" refer to there in your understanding?

2    **A.**    This would, generally, be the hospital that is acquiring a

3    da Vinci system.

4    **Q.**    What does "made or approved by Intuitive" mean in your

5    understanding?

6    **A.**    So "made" is that we are making the instrument or

7    accessory, or on the approved side means that we've done

8    generally the work to show that it's compatible with our system

9    and, therefore, approved for use with the system.

10   **Q.**    The contract goes on to say [as read]:

11          "In the event purchaser uses the system with any

12          surgical instrument or accessory which is not made or

13          approved by Intuitive, Intuitive may discontinue any

14          services to be provided hereunder and any warranties

15          applicable to any services provided prior to

16          cancellation of this agreement shall be void."

17   Why did you have a policy that you may discontinue

18   services and void warranties if a customer used unauthorized

19   products or services not approved by Intuitive with the

20   da Vinci system?

21   **A.**    So, really, this goes back to the overall intent of the

22   system and what it's meant to do in the operating room to

23   provide a -- you know, a capable, safe set of products to the

24   surgeon to treat a patient.

25          And so if -- if -- in order to effect that, we want to

ROSA - DIRECT / MICHAEL

1  make sure that anything that is being used on or with the

2  system is compatible, is safe and is highly capable and doesn't

3  disrupt the surgery or do something that may cause a challenge

4  during the case.

5      And so that's why -- why this statement exists, to say if

6  it's not authorized by Intuitive, that it can impact the

7  overall experience of the surgeon.  It may impact the

8  capability of the system.

9      And so, ultimately, it may be impacting the reputation of

10  our company, even if it didn't impact that very case.  And so

11  that's why this exists.

12  **Q.**   Was the purpose of that policy to punish customers?

13  **A.**   No.

14  **Q.**   Was it to force customers to accept Intuitive's products?

15  **A.**   No.

16  **Q.**   Can a da Vinci system be used to perform surgery without

17  an EndoWrist?

18  **A.**    It cannot.

19  **Q.**   Can an EndoWrist be used to perform surgery without the

20  da Vinci system?

21  **A.**   No, it cannot.

22  **Q.**   So if a third party makes changes to the da Vinci system

23  that Intuitive has not approved, are you able to ensure that

24  the EndoWrist is going to do its job properly in surgery?

25  **A.**   No, we can't.

ROSA - DIRECT / MICHAEL

1  Q.   If a third party makes changes to an EndoWrist that

2  Intuitive has not approved, are you able to ensure that the

3  da Vinci is going to do its job properly in surgery?

4  A.   We can't.

5  Q.   Why not?

6  A.   Again, because the -- the system in EndoWrist and

7  accessories, that all the components that make up a system are

8  tested together.  And there are all sorts of verification,

9  validation, and testing that make up the -- the work that is

10 being done.  So we do all that testing to ensure the

11 compatibility and, again, the safe and effective operation.

12       If there are accessories or instruments or other things

13 that are being used that aren't part of that testing, then

14 that's where you go:  I just don't know how to say that we've

15 done the work to ensure safe and effective use.

16 Q.   Let me ask you to turn to Page 4 of the document now.  And

17 do you see down here on the bottom of Page 4, there is a

18 Section 2.6(c) that is labeled "Instruments and Accessories"?

19 A.   I do.

20 Q.   It says [as read]:

21        "Purchaser acknowledges and agrees that all

22        Intuitive Surgical instruments are sold pursuant to a

23        limited license to use those instruments with and

24        prepare those instruments for use with the system.

25        This license expires with the expiration of the

ROSA - DIRECT / MICHAEL

```
 1        instruments' useful life times."
 2        Can you explain, in your own words, what you understood
 3   the customer to be acknowledging and agreeing to there?
 4   A.   Sure.  So that essentially there is a license associated
 5   with the instrument that is aligned and is useful during the
 6   useful number of lives for the instrument.  So if a -- the
 7   license would be in effect for the first, second, up through,
 8   let's say, tenth use.  And then after the tenth use, the
 9   license for that instrument expires.
10   Q.   So under this contract, in your understanding, when the
11   hospital customer is buying an EndoWrist, was it buying the
12   right to use that instrument with the da Vinci in whatever way
13   it wants to or was it buying something more limited than that?
14   A.   So the customer, you know, through this contract and --
15   understands that they are buying an instrument that has a
16   finite life to it.
17   Q.   And is that something that the customer acknowledged and
18   agreed to up front with Intuitive or something that Intuitive
19   imposed on the customer after the fact, after they had already
20   bought the da Vinci system?
21   A.   No.  This is -- this is something that is well understood
22   prior to the acquisition of a system.
23   Q.   The provision we have been looking at goes on to say
24   [as read]:
25        "Any other use of Intuitive's instruments,
```

ROSA - DIRECT / MICHAEL

1      whether before or after instrument expiration,

2      including repair, refurbishment or reconditioning, is

3      prohibited."

4      Do you see that?

5  A.  I do.

6  Q.  Right underneath that, there is a section that deals with

7  warranties and disclaimers.

8      Do you see that?

9  A.  Yes.

10 Q.  That's Section 2.7a; is that right?

11 A.  Yes, that is correct.

12 Q.  Okay.  Do you see where it says [as read]:

13      "This warranty is void with respect to any claims

14      arising from" -- and it goes on to say -- "any repair,

15      modification, disassembly, alteration, addition to,

16      subtraction from, reconfiguration, or misuse of the

17      system by purchaser or any third party without the

18      express written permission of Intuitive."

19      Do you see all that?

20 A.  I do.

21 Q.  Now, when you and the hospital involved here signed this

22 contract back in February of 2000, was Intuitive at that time a

23 profitable company?

24 A.  We were not.

25 Q.  If you look at the cover page of the agreement, it's

ROSA - DIRECT / MICHAEL

1    labeled "Agreement Number 18."  What do you understand that to

2    refer to?

3    **A.**    So, generally, these Sales and Service Agreements are

4    sequentially numbered for the -- for the system that was sold.

5    So this would have been an agreement for the 18th system sold.

6    **Q.**    Did Intuitive force its hospital customer to accept the

7    terms of this agreement?

8    **A.**    No.

9    **Q.**    Did Intuitive, in your experience, have the power to force

10   hospitals to accept these terms?

11   **A.**    No.  This is really early in the company's history.

12   **Q.**    Let me ask you to turn to Tab 14, please.

13        (Witness complied.)

14   **Q.**    Can you identify -- and for the record, this is a document

15   that's marked TX-1634.323.

16        Can you identify what this exhibit is?

17   **A.**    This, again, is a later version of our Sales and License

18   and Service Agreement.

19   **Q.**    Okay.  And does this one date from 2020?

20   **A.**    This is dated April 30th of 2020.

21   **Q.**    And do you recognize this based on its form and based on

22   your experience working at Intuitive, including as head of the

23   Commercial Division of Intuitive?

24   **A.**    I do.

25        **MR. MICHAEL:**  Your Honor, I offer TX-1634.323 into

ROSA - DIRECT / MICHAEL

```
 1    evidence.
 2              MR. McCAULLEY:  No objection.
 3              THE COURT:  It's admitted.
 4         (Trial Exhibit TX-1634.323 received in evidence.)
 5              THE COURT:  Would you like to publish it?
 6              MR. MICHAEL:  Yes, Your Honor.  Thank you.
 7         (Document displayed.)
 8    BY MR. MICHAEL:
 9    Q.   Again, Mr. Rosa, the last agreement we looked at was from
10    2000.  This one is from 20 years later; is that correct?
11    A.   That's correct.
12    Q.   And this is with a hospital called Marin General?
13    A.   Yes.
14    Q.   Let me direct you to Page 3 of the document.
15         And the print is small, so I'll ask Mr. Lee to blow it up.
16         But do you see Section 5.2(e) that's labeled "Unauthorized
17    Instruments and Accessories"?
18    A.   I do.
19    Q.   Do you understand that to set out the same limitation as
20    the 2000 agreement on use of surgical instruments or
21    accessories not made or approved by Intuitive or something
22    different?
23    A.   No, that is laying out the same concept.
24    Q.   Let me ask you to look at Section 8, which is labeled
25    "Instruments and Accessories."
```

ROSA - DIRECT / MICHAEL

1    Does this agreement from 2020 also provide that

2 instruments and accessories will be provided to customers

3 subject to a limited license?

4 **A.**    Correct.

5 **Q.**    Do you see the sentence beginning "any other use" in that

6 provision?

7 **A.**    I do.

8 **Q.**    Do you see it says [as read]:

9         "Any other use is prohibited whether before or

10        after the instrument or accessories' license

11        expiration, including repair, refurbishment, or

12        reconditioning not approved by Intuitive."

13    And it goes on.

14 **A.**    I do see that.

15 **Q.**    And let me ask you now to turn to the next page, Page 4 of

16 the document, and look at a section number ten called "Warranty

17 and Disclaimer."

18    Do you see that either on the paper or up on the screen?

19 **A.**    I do.

20 **Q.**    And I'll direct you to 10.1(c), where it says [as read]:

21        "This warranty is void with respect to any

22        claims:  (1) due to any installation, repair,

23        adjustment, modification, disassembly, alteration,

24        reconfiguration, addition to, subtraction from, or

25        misuse of the System by Customer or any third party

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*

**5-SER-1123**

ROSA - DIRECT / MICHAEL

1    without the express written permission of Intuitive."

2    Do you see all that?

3  **A.**  I do.

4  **Q.**  To your knowledge, was Intuitive's purpose for including

5  the provisions that we just looked at in its contracts the same

6  or different in 2020 as it was in the year 2000?

7  **A.**  These are -- these are largely the same between the two

8  contracts.

9  **Q.**  And did Intuitive, in your experience, have the power to

10  force customers to accept terms in 2020 any more than it did in

11  2000?

12  **A.**  No.  You know, we are -- this is a contract that is

13  negotiated between the two entities, between Intuitive and the

14  purchaser or the hospital.  There's not a forcing of terms

15  here.

16      **MR. MICHAEL:**  You can take that down, Mr. Lee.

17      (Document removed from display.)

18  **BY MR. MICHAEL:**

19  **Q.**  So, Mr. Rosa, we just saw a number of references in

20  Intuitive's contracts to authorization or approval of third

21  parties.  And I now want to ask you:  Has Intuitive, over the

22  years, actually authorized or approved any third-party products

23  to be used with the da Vinci?

24  **A.**  We have, actually.

25  **Q.**  And let me ask you to turn to Tab 3 in your binder,

1842

ROSA - DIRECT / MICHAEL

1   please.

2       (Witness complied.)

3   **Q.**   This is, for the record, a document that has been stamped

4   TX-616-R.  And if I could ask you to identify this document,

5   again generally, without talking yet about its specific

6   contents?

7   **A.**   Sure.  So this -- this is a document that has a listing of

8   third-party devices that have been approved for use with a

9   da Vinci system.

10  **Q.**   And is this a document that Intuitive keeps and maintains

11  in the ordinary course of its business?

12  **A.**   It is.

13  **Q.**   Did you have access to this document in the ordinary

14  course of your business at Intuitive?

15  **A.**   Yes.

16  **Q.**   And is this document, to your knowledge, updated

17  regularly?

18  **A.**   One or one like this.  And so this is specific to IS2000

19  and IS3000, which are S/Si.

20  **Q.**   Do you recognize this as an example from in and around

21  2017?

22  **A.**   I do, yes.

23        **MR. MICHAEL:**  Your Honor, I offer TX-616-R.

24        **MR. McCAULLEY:**  No objection.

25        **THE COURT:**  It's admitted.

ROSA - DIRECT / MICHAEL

1   (Trial Exhibit 616-R received in evidence.)

2        **THE COURT:**  Would you like to publish it?

3        **MR. MICHAEL:**  Yes, please.

4        **THE COURT:**  Go ahead.

5        **MR. MICHAEL:**  Thank you.

6   (Document displayed.)

7   **BY MR. MICHAEL:**

8   **Q.**   So, Mr. Rosa, if you could start by just explaining how is

9   this document used at Intuitive?

10  **A.**   Sure.  So this is -- again, it's a compilation, a record

11  of the devices that have been approved for use with the system.

12  And so this is -- probably not this document, but it would --

13  it would be the foundation of information that's provided to

14  customers about which products are approved for use with the

15  da Vinci system.

16  **Q.**   What kinds of products are included on this list, just

17  generally?

18  **A.**   Just generally, there's a number.  There's -- on the first

19  page, there are a group of products that are called "cannula"

20  that are the ports for -- that go into the body at the

21  beginning of the case for instruments to move in and out of.

22        There's a group of electrosurgical generators that are

23  compatible with the system.

24        There's a section for chemicals that have been approved

25  for use for cleaning da Vinci instruments and accessories, a

ROSA - DIRECT / MICHAEL

1    variety of other cleaning devices, like ultrasonic and washer

2    disinfectors, that sort of thing.  And then there's a group of

3    instrument trays as well.  So it's a variety of accessories.

4    **Q.**    There are a number of columns in the document.

5         Do you see, I think it's the fourth one over, the column

6    that's entitled "Validated Third-Party Device"?

7    **A.**    I do.

8    **Q.**    What does it mean for a third-party device to be validated

9    for use with the da Vinci system?

10   **A.**    So what it means is that the two companies have worked

11   together to ensure that the device that is being -- that wants

12   to be proven compatible have done two things.  That

13   Intuitive -- we've done a lot of the testing that's required to

14   ensure it will work appropriately with our system or

15   instrument, whatever it is that the compatibility is associated

16   with.  So there's a set of testing there that can include

17   mechanical testing, electrical testing, sterilization, and

18   disinfection testing.  It just really depends on the device.

19   So there's -- there's that sort of work that gets done.

20        And then there's also a -- basically an agreement between

21   the companies that helps to lay out a couple of things that

22   include -- one is how the companies will work together to

23   inform each other if a change is made that may impact the

24   compatibility of the third-party device.  So if we make a

25   change that may impact, that we contact that company.  If they

ROSA - DIRECT / MICHAEL

 1   make a change, they contact us.  And so that's in kind of the

 2   normal course of business.

 3       And then, importantly, we also want to make sure that we

 4   know who at that company -- how do the two companies interact

 5   if there's an issue that's reported by the customer or by

 6   somebody else that says, you know, something didn't work.

 7       For example, if on this page, on the very top that's being

 8   shown, it's Ethicon endosurgery.  And let's say that device,

 9   this endopathic cell, something went wrong with it.  Customer

10   contacts us.  We want to make sure Ethicon knew about it.  So

11   we would have a contact and kind of a process laid out by which

12   the two companies would work together.

13   **Q.**   In order to validate a third-party device or approve it

14   for use with the da Vinci system, does Intuitive require any

15   information regarding the safety of that product?

16   **A.**   We do.  So, again, it really depends on the device.  But

17   because there can be complex interactions, we will get

18   specifications and testing and other documentation from that

19   third-party company so that we can inform the validation and

20   the testing that we want to do.  It's just how the two

21   companies work together, and it really depends on what it is

22   we're testing on what kind of data are provided between the

23   companies.

24   **Q.**   Does Intuitive, under the policy and process you have been

25   discussing, approve any third-party products for which

1846

ROSA - DIRECT / MICHAEL

```
 1   Intuitive has not received some form of clinical proof of
 2   safety?
 3   A.    I can't think of any that would be on this list, where we
 4   haven't worked to understand how that third-party device is
 5   going to -- needs to work safely and effectively.  How does
 6   that happen and what kind of data are exchanged?  I don't --
 7   I'd have to look through this carefully, but I can't think of
 8   any examples.
 9   Q.    Now, you said earlier that this particular list refers
10   only to the S and Si da Vinci system; is that correct?
11   A.    That's -- that's what it looks like from kind of the top
12   description here.
13   Q.    Did Intuitive also, to your knowledge, validate
14   third-party products for use with its X and Xi systems?
15   A.    Yes, definitely.
16   Q.    If a third party wants to be validated or approved, in
17   your experience, do you approach them or do they approach you?
18   A.    It can --
19        MR. McCAULLEY:  Objection.  Speculation, Your Honor.
20        THE COURT:  Mr. Rosa, can you answer that in your
21   experience?
22        THE WITNESS:  I can.
23        THE COURT:  Overruled.  You can answer.
24   A.    So in my experience, I have been approached by third-party
25   companies to say:  Hey, we would like our device to potentially
```

ROSA - DIRECT / MICHAEL

1   be used with da Vinci.  What's the process?

2       It's also true that there are times where we may approach

3   a third party to ask some questions and talk about

4   compatibility as well.

5   **BY MR. MICHAEL:**

6   **Q.**   And based on what you've seen and you've experienced

7   through your work at Intuitive, could you estimate, at least

8   roughly, around how many different third-party companies had

9   products validated or approved by Intuitive, say, between 2000

10  and 2020?

11  **A.**   Probably range -- it may be in the dozens number.

12          **MR. MICHAEL:**  Thank you, Mr. Lee.  You can take that

13  document down.

14      (Document removed from display.)

15  **BY MR. MICHAEL:**

16  **Q.**   Now, Mr. Rosa, the third-party validation list we just

17  looked at from 2017, did that include any third-party modified

18  EndoWrists?

19  **A.**   It did not.

20  **Q.**   And at that time had any third party, to your knowledge,

21  applied to become authorized or approved by Intuitive to modify

22  EndoWrists and reset their use counters?

23  **A.**   No.  To my knowledge, no one had approached us and asked.

24  **Q.**   To your knowledge, did SIS ever ask Intuitive to become

25  authorized or approved to perform services on EndoWrists?

ROSA - DIRECT / MICHAEL

1    A.    No, not to my knowledge.

2    Q.    Did SIS, to your knowledge, ever offer to show Intuitive

3    any form of clinical evidence that the service it wanted to

4    offer on EndoWrists was safe and effective?

5    A.    No, they have not.

6    Q.    By 2019 had Intuitive, to your knowledge, become aware

7    that a company called Rebotix was performing services to modify

8    EndoWrists without Intuitive's authorization?

9    A.    We had become aware of that.

10   Q.    And in 2019 or 2020 did Rebotix, to your knowledge, show

11   Intuitive any clinical evidence that the changes it was making

12   to EndoWrists at that time were safe?

13   A.    No, I'm not aware of anything they showed us.

14   Q.    Let me ask you to turn to Tab 10 in your binder, please.

15        (Witness complied.)

16        **MR. MICHAEL:**  And for the record, this is a document

17   that's been stamped TX-1441-R.

18        Mr. Rosa, do you recognize this document based on your

19   work and your experience at Intuitive as being a letter on

20   Intuitive's letterhead?

21   A.    I do.

22   Q.    And do you recognize it as a letter that was sent to

23   Rebotix in April of 2019?

24   A.    I do.

25   Q.    At the time, you were Intuitive's Chief Business Officer

ROSA - DIRECT / MICHAEL

```
 1    or Chief Commercial Officer?

 2    A.   It's hard for me to remember when that -- when that title

 3    changed.  I'm not sure.

 4    Q.   Okay.  Is it fair to say that at this time, April of 2019,

 5    you had responsibility for leading the sales and marketing

 6    organization of Intuitive?

 7    A.   That is fair.

 8    Q.   Okay.

 9         MR. MICHAEL:  So, Your Honor, this is a document

10    that's already in evidence, and I'd ask permission to publish

11    it to the jury.

12         THE COURT:  You may.

13         MR. MICHAEL:  Thank you.

14    (Document displayed.)

15    BY MR. MICHAEL:

16    Q.   Mr. Rosa, if you could turn to the last page of this

17    document.  The jury has already seen this document, but I just

18    want to ask you a question about the last page of it.

19         In this letter to Rebotix, do you see where it says at the

20    top of the last page [as read]:

21              "If you allege that you or your service centers

22         possess clinical proof that your service process

23         returns the modified instruments to a production

24         equivalent qualification and/or that additional use

25         does not affect the safety or performance of the
```

ROSA - DIRECT / MICHAEL

1    instruments, please provide proof of the same no later

2    than April 30, 2019."

3    Do you see that?

4  A.   I do.

5  Q.   And as far as you know, did Rebotix in 2019 or 2020

6  provide the clinical proof that was requested in this letter?

7  A.   No, they did not.

8  Q.   At that time, 2019 or 2020, had any third party offering

9  to modify EndoWrists provided that kind of clinical proof of

10 safety and performance to Intuitive?

11 A.   They had not.

12 Q.   And in 2019 or 2020 had Intuitive approved any third party

13 to modify EndoWrists under its policy?

14 A.   We had not.

15 Q.   To your knowledge, had any third party asked Intuitive to

16 be approved to modify EndoWrists as of 2019 or 2020?

17 A.   No, not to my knowledge.

18 Q.   And had Intuitive, to your knowledge, rejected any

19 application for approval by a third party?

20 A.   No.

21 Q.   Now, some years later, did Rebotix and Restore, to your

22 knowledge, each qualify for approval under Intuitive's policy

23 to offer modified EndoWrists?

24 A.   They did.

25      MR. McCAULLEY:  Objection, Your Honor.

ROSA - DIRECT / MICHAEL

```
 1              THE COURT:  Overruled.
 2         Keep going, Mr. Michael.
 3    BY MR. MICHAEL:
 4    Q.    Your answer, Mr. Rosa?
 5    A.    They did.
 6    Q.    And did Intuitive approve them?
 7    A.    We did.
 8    Q.    For how many different models of EndoWrists, to your
 9    knowledge, did Restore and Rebotix each qualify for approval?
10    A.    They each -- one each.
11    Q.    Has Intuitive rejected any application for approval on any
12    other model?
13    A.    We have not.
14              MR. MICHAEL:  And, Mr. Lee, you can take down that
15    document.
16         (Document removed from display.)
17    BY MR. MICHAEL:
18    Q.    Now, when Intuitive started marketing and selling the
19    da Vinci system in the United States, which I believe you said
20    was around the year 2000, was SIS at that time, to your
21    knowledge, offering any product or service having to do with
22    EndoWrists?
23    A.    No, not to my knowledge.
24    Q.    At that time, was there any third party you knew of
25    offering to reset the use counter on EndoWrists?
```

ROSA - DIRECT / MICHAEL

1  BY MR. MICHAEL:

2  Q.   So Mr. Rosa, now that the jury has this on the screen, can

3  you briefly explain what this summary document is showing and

4  how it's organized?

5  A.   Sure.  So pretty straightforward.  On the left-hand column

6  is the year that we're talking about that was reported in that

7  10-K document.

8       On the right is the summary of R&D expenses.  And these

9  are -- you know, the numbers would read -- are millions of

10 dollars.

11 Q.   So, for example, in the year 2000, how much did Intuitive

12 spend on research and development?

13 A.   So that would have been $11,734,000.

14 Q.   And how much did Intuitive spend on research and

15 development in the year 2020?

16 A.   That would be just over $595 million.

17 Q.   And what was the total amount of Intuitive's investment in

18 research and development from 1995 to 2022?

19 A.   Just over $5 billion.

20      MR. MICHAEL:  Mr. Lee, can you bring up demonstrative

21 slide six, please?

22      (Document displayed.)

23 BY MR. McCAULLEY:

24 Q.   Now, Mr. Rosa, this is referring to the year 2000.  And

25 that was the year that you started marketing the da Vinci

ROSA - DIRECT / MICHAEL

1  commercially in the United States; correct?

2  A.  That is correct.

3  Q.  And the same year as the customer contract we looked at

4  earlier; is that right?

5  A.  That is right.

6  Q.  Okay.  And by the end of the year 2000, how much in total

7  had Intuitive invested in research and development?

8  A.  Just -- just over $63 million.

9  Q.  Okay.  And I think you said this earlier.  Am I correct

10  that as of the year 2000 or the end of that year, Intuitive was

11  not a profitable business?

12  A.  That is correct.

13  Q.  Did the company at that point have any assurance or

14  guarantee that it was going to make back the tens of millions

15  of dollars that it had invested in research and development to

16  that point?

17  A.  No.  There was no guarantee.

18  Q.  What were some of the major risks to its business that

19  Intuitive faced at that point?

20  A.  So you might imagine that as this is a robotics system,

21  new capabilities but not something that surgeons had really

22  interacted with before, there wasn't any -- really any clinical

23  evidence that existed then that the benefits to the patient

24  were repeatable.

25      And so there were, you know, engineering and technical

ROSA - DIRECT / MICHAEL

1    challenges.  There were clinical and outcome challenges.  There
2    were cost-benefit challenges.  And so there were -- there were
3    a host of them that existed at the time.

4    **Q.**    Did Intuitive document those risks anywhere?

5    **A.**    We did.

6    **Q.**    Where?

7    **A.**    Again, it can go back to those same 10-K documents, and
8    there are a series of risks that are outlined.

9    **Q.**    Let me ask you to turn to Tab 11 in your binder, please.

10       (Witness complied.)

11          **MR. MICHAEL:**  And, for the record, this is a document
12   that's been stamped TX-1585-R.

13   **BY MR. MICHAEL:**

14   **Q.**    Can you identify this document Mr. Rosa?

15   **A.**    Sure.  So this is what's known as S-1.  So this is the --
16   in the initial filing with the Securities and Exchange
17   Commission before a company goes public to describe a bunch of
18   parameters that are needed.

19          **MR. MICHAEL:**  Your Honor, I offer TX-1585-R into
20   evidence.

21          **MR. McCAULLEY:**  No objection.

22          **THE COURT:**  It's admitted.

23       (Trial Exhibit TX-1585-R received in evidence.)

24          **MR. MICHAEL:**  May I publish it?

25          **THE COURT:**  You may.

1873

ROSA - DIRECT / MICHAEL

```
 1          MR. MICHAEL:  Thank you.
 2       Mr. Lee, if you can bring up Page 8 of TX-1585-R.
 3       (Document displayed.)
 4          MR. MICHAEL:  This is very small print so I'll ask you
 5    to expand the section that's entitled "Uncertainty of Market
 6    Acceptance."
 7    BY MR. MICHAEL:
 8    Q.   And, Mr. Rosa, do you see the heading Uncertainty of
 9    Market Acceptance on Page 8?
10    A.   I do.
11    Q.   Why was that a risk that Intuitive faced to its business?
12    A.   Again, because it's a new device that really didn't have a
13    precedent in the marketplace, it was difficult to know would
14    surgeons, would care teams and ultimately patients accept the
15    device.  It was complex.
16       It was going to be very different.  It would have to
17    provide a significant benefit in order to be accepted, and that
18    was just unknown at the time.  It was uncertain.
19    Q.   And do you see under that, about three sentences down, it
20    says [as read]:
21           "There can be no assurance that the company's
22           products will gain any significant degree of market
23           acceptance by physicians, patients, and third-party
24           payors."
25    A.   I do.
```

ROSA - DIRECT / MICHAEL

1    Q.   Was that a risk that, in your experience, Intuitive faced

2    to its business in these earlier years?

3    A.   Yes, it was.

4    Q.   Now, SIS in this case is accusing Intuitive of having a

5    monopoly in an alleged market that they call minimally invasive

6    soft tissue surgical robots in the United States.

7         Are you aware of that generally?

8    A.   I am.

9    Q.   Have you, from time to time, seen or heard other people

10   refer to Intuitive's business as a monopoly?

11   A.   I have.

12   Q.   Do you think about Intuitive's business as being a

13   monopoly?

14   A.   I don't.

15   Q.   Why not?

16   A.   You know, for me, we can -- we're in a field of surgery.

17   And the physician, the surgeon, has an option to say what is

18   best for that patient.  That's what they need to do, is say

19   what is best, given my skill set, given what the patient needs.

20        And they have choices.  And so they -- they can choose

21   between open surgery.  They can choose between another

22   minimally invasive approach, like laparoscopy.  And now

23   starting, hopefully, that they can choose a robotic-assisted

24   surgery as an option as well.

25   Q.   In 1998 or 2000, did you think then about Intuitive's

1875

ROSA - DIRECT / MICHAEL

1   business being a monopoly?

2   **A.**    No.

3   **Q.**    Why not?

4   **A.**    Again, the -- all of surgery, before Intuitive came on the

5   market, was performed with open or minimally invasive

6   techniques.  And so patients were being treated surgically with

7   one of those two modalities.

8        And so as we came on the market, we were -- you know, we

9   were just initially starting with da Vinci.  And so the other

10  two modes, the other two options, were there in all of the

11  market as we got started.

12  **Q.**    Did ensuring patient safety and performance in the design

13  of your products have anything to do with their ability to gain

14  market acceptance in your understanding?

15  **A.**    I would say it's table stakes.  Our -- the focus on safety

16  and reliability of the system, it's paramount.  So when a

17  surgeon and care team goes into the operating room and needs to

18  focus on the patient, the last thing they want to worry about

19  is whether or not a device is going to work.  And so that is

20  just -- has to be -- it is unequivocal that those have to be in

21  place in order for physicians, care teams, hospitals, to accept

22  a given product.

23  **Q.**    Were the risks to Intuitive's business that you have just

24  been discussing ones that Intuitive faced when you put in place

25  use limits on EndoWrists?

ROSA - DIRECT / MICHAEL

```
 1   A.    They were.

 2   Q.    Were they also risks that Intuitive faced when you put in

 3   place your policies and contract terms on unauthorized

 4   third-party instruments and accessories?

 5   A.    They were.

 6         MR. MICHAEL:  Let's go back to Demonstrative Slide 6,

 7   please, Mr. Lee.

 8         (Document displayed.)

 9   Q.    Now, in 2000, when you began marketing and selling the

10   da Vinci in the United States, how big or small of a range of

11   EndoWrists was Intuitive offering?

12   A.    It was fairly limited, you know, maybe around ten or so

13   instruments that were part of the portfolio at the time.

14   Q.    And what was it that determined the types of EndoWrists

15   that you offered at that time?

16   A.    There are surgical tasks that almost every surgery uses.

17   And that can be things like grasping and dissecting and

18   cauterizing and using scissors.  So there's a general set of

19   instruments that can be used across a number of procedures that

20   are kind of the basic set, if you will.

21         And then as a procedure, it may be a new procedure, starts

22   getting adopted or we want to refine an existing procedure, we

23   might add an instrument in order to better meet the needs of a

24   surgeon.

25         MR. MICHAEL:  Let's go to the next slide, please.
```

ROSA - DIRECT / MICHAEL

1   Q.   And just generally, how does Intuitive use the kinds of

2   information that are presented in this document?

3   A.   So this document has information about how many

4   procedures, given types of procedures are being done in various

5   markets around the globe.  So it just -- it's a way in which we

6   can look at penetration of a given type of surgery for -- or

7   given modality of surgery -- MIS, open, robotic -- for a given

8   procedure.

9           MR. MICHAEL:  Your Honor, I offer TX-1389 into

10  evidence.

11          MR. McCAULLEY:  No objection.

12          THE COURT:  It's admitted.

13      (Trial Exhibit TX-1389 received in evidence.)

14          MR. MICHAEL:  May I publish it to the jury?

15          THE COURT:  You may.

16      (Document displayed.)

17  BY MR. MICHAEL:

18  Q.   Mr. Rosa, let me ask you to turn to Page 24 of the

19  document, which should be a page entitled "2018 Market Share."

20      (Witness complied.)

21  Q.   And can you explain what this page is showing?

22  A.   I can.  So let's see.  Starting across the top, you'll see

23  geographic -- or geographies around the world.  So first column

24  is the United States, second column is China, and so forth.

25          On the left-hand side are the different kinds of

ROSA - DIRECT / MICHAEL

1  procedures where da Vinci is being used.  And so the top -- the

2  top part, you can see it has "Cancer."  These are generally

3  operations to treat cancer.  The bottom part are operations to

4  treat a benign disease.

5      And then each cell represents the penetration of

6  robotic-assisted surgery, with da Vinci, in that specific

7  procedure and that specific market.

8          MR. MICHAEL:  Mr. Lee, can you blow up the column

9  that's says "U.S.," please.

10  BY MR. MICHAEL:

11  Q.   And, Mr. Rosa, can you explain specifically what this

12  column that's headed "U.S." is showing?

13  A.   Sure.  So if we take one example, the very top row, for

14  example, says "Colon Resection."  And that would say in the

15  U.S. as of 2018, 24 percent of the surgical colon resections

16  that were taking place in the United States, 24 percent were

17  conducted with da Vinci and the balance were conducted with

18  some other type of surgery.

19  Q.   And what could those other types of surgeries include in

20  your understanding?

21  A.   So, for colon resection, here it would either be open

22  surgery or laparoscopy.  Depending on the operation, it might

23  lean one way or the other.  But those would be the other --

24  predominantly the other two modalities.

25  Q.   Now, at the bottom of this column it says "Grand Total."

ROSA - DIRECT / MICHAEL

1    Do you see that?

2    **A.**    I do.

3    **Q.**    Next to that is 21 percent.  Do you see that number?

4    **A.**    I do.

5    **Q.**    What does that represent in your understanding?

6    **A.**    So if you were to take -- it's, basically, the summary of

7    everything you see here.  So you -- you would add up all the

8    surgeries that were happening in these areas.  Take, you know,

9    how many were being completed with da Vinci system and do the

10   weighted average, and you end up with 21 percent out of all of

11   these operations.

12   **Q.**    So SIS last week had one of its witnesses, Dr. Lamb, come

13   here and tell the jury that Intuitive's market share was

14   something like 99.5 percent.

15       Were you here for that testimony?

16   **A.**    I was.

17   **Q.**    Is that consistent or inconsistent with how you understood

18   Intuitive's market share?

19   **A.**    It's inconsistent.

20   **Q.**    As of 2018, what did Intuitive identify its market share

21   in the United States to be?

22   **A.**    It would be about 21 percent.

23   **Q.**    And what did you understand accounted for the other

24   79 percent of the market?

25   **A.**    It would be open surgery or a minimally invasive surgical

ROSA - DIRECT / MICHAEL

```
 1    technique.
 2             MR. MICHAEL:   Thank you, Mr. Lee.   You can take that
 3    document down.
 4         (Document removed from display.)
 5    BY MR. MICHAEL:
 6    Q.   Mr. Rosa, does Intuitive have a sales force?
 7    A.   We do.
 8    Q.   Around in the time period we're talking about, focusing on
 9    you know, 2020, 2021, about how many salespeople did the
10    company employ?
11    A.   It's probably on the order of a thousand.
12    Q.   And how many -- does Intuitive also have a marketing
13    department?
14    A.   We do.
15    Q.   And how many marketing people did Intuitive employ?
16    A.   You know, it's spread across different functions, but
17    certainly over 100, maybe more.
18    Q.   And what did all those sales and marketing people that you
19    employed and that were under your leadership at that time do
20    all day?
21    A.   You know, they had -- there were various roles within
22    those organizations.  And at the end of the day, their job is
23    to present data, present evidence to show customers that by
24    investing in the da Vinci program and da Vinci products, that
25    it can be -- bring benefit to the hospital, to their program,
```

**ROSA - DIRECT / MICHAEL**

```
 1    to their patients.  And so that's a -- that's an every-day

 2    occurrence for those teams.

 3    Q.   Why did you feel that you needed a sales and marketing

 4    department to do that?

 5    A.   The saying goes it doesn't sell itself.  And so every day

 6    we're competing with other forms of therapy for these patients.

 7    And so the sales and marketing teams are generating evidence to

 8    summarize the clinical literature that are available to show

 9    our customers.  They are generating data about how a given

10    customer's program is performing and making sure that that

11    customer knows what's going on.

12         And so it's -- it is just a huge amount of work to

13    continue to generate the evidence and for our customers to

14    train new surgeons who want to start their da Vinci surgery

15    career and more.

16    Q.   Let me ask you to turn to Tab 1 of your binder.

17         (Witness complied.)

18    Q.   Tab 1 is a document that's marked TX-464.  It's in

19    evidence.

20         Mr. Rosa, do you recognize this document, from your

21    experience at Intuitive, as typical of the kind of presentation

22    or a kind of presentation that Intuitive makes to hospital

23    customers?

24    A.   I do.

25              MR. MICHAEL:  Your Honor, may I publish TX-464.
```

ROSA - DIRECT / MICHAEL

```
1              MR. McCAULLEY:  No objection.

2              THE COURT:  Go ahead.

3        (Document displayed.)

4    BY MR. MICHAEL:

5    Q.   Let me ask you to turn to Page 21, please, Mr. Rosa.

6              MR. MICHAEL:  And I'll ask Mr. Lee to make that a

7    little more visible on the screen.

8    BY MR. MICHAEL:

9    Q.   Can you describe what's being shown on this page of the

10   document?

11   A.   Sure.  So let's see.  What we're doing here is comparing

12   the three modalities of surgery that we have been talking

13   about.  You can see on the upper left of the document it has

14   three circles.  It talks about open surgery, kind of in the

15   light gray, I guess.  Laparoscopy, in sort of the darker

16   grayish color.  And then da Vinci.

17        And then it looks across, for this hospital, comparison of

18   a couple of different outcomes, including length of stay,

19   conversions, complications, and how much time is in the

20   operating room for the surgery.

21   Q.   And what do the numbers represent, both at the sort of

22   bottom of the graphs there are some dollar numbers and then

23   down in the bottom left-hand corner?

24   A.   Sure.  So what those numbers represent is if -- for a

25   given type of procedure, that what we're going to do is compare
```

ROSA - DIRECT / MICHAEL

1    the overall cost of that procedure between these three

2    modalities, taking into account what we call the total cost to

3    treat a patient.

4         And so as you look across everything that's spent

5    performing the surgery and then what might be saved because the

6    patient gets out of the hospital more -- earlier, it may

7    prevent conversion, for example.  Just for -- just to be

8    specific, a conversion here means that a laparoscopic case or a

9    robotic case, for whatever reason, wasn't progressing and so

10   they had to convert to it to an open surgery.  So that's what

11   that column means.

12        Once you put all that together, the bottom numbers then

13   say what are the potential cost savings of using the robotic

14   system, in performing a robotic procedure, as compared to open

15   surgery or laparoscopy on a per-case basis are the first two

16   numbers.

17        And then if you look at for a given hospital, how many

18   procedures might they perform in a year, then it's just added

19   up and would result in those estimated savings there at the

20   bottom.

21   Q.   And why does Intuitive present these kinds of cost

22   comparisons to its hospital customers?

23   A.   At the end of the day, we -- we want them to be -- be able

24   to make informed decisions about the best way to treat

25   patients.  And so by helping -- and by having data from a

**ROSA - DIRECT / MICHAEL**

1   hospital, this is now their own data, typically, they can

2   understand how is their open surgery program performing, how is

3   their laparoscopic performing, how is their robotic program

4   performing.  And showing all those together so that,

5   ultimately, they understand the value that they are getting,

6   the clinical value and the economic value both.

7   **Q.**   In your experience, when you do these kinds of cost

8   comparisons, do hospitals typically just take Intuitive's word

9   for it or do they evaluate costs on their own?

10  **A.**   Yeah -- no.  These are generally -- they don't take our

11  word for it.  Oftentimes, hospitals will perform their own

12  analysis.  They have folks who can do this.  We have experts on

13  our side that can help.  Sometimes getting the numbers out of

14  the electronic medical records can be complex.  And so the --

15  the hospital team and our teams can work together to perform

16  these kind of analyses.

17  **Q.**   We have been talking about hospitals sort of in general.

18  Just to give a flavor, can you identify some examples of

19  Intuitive's hospital customers with names that might be

20  recognizable to people?

21  **A.**   Sure.  From around here, the U.C. Health Systems, UCSF,

22  U.C. Davis, up and down California.  Stanford.  If you were to

23  look outside of California systems, you may have heard of,

24  like, the Mayo Clinic in Rochester, Minnesota; the Cleveland

25  Clinic, many major academic institutions around the states

ROSA - DIRECT / MICHAEL

```
 1   would have programs.
 2   Q.   Are any of those hospitals repeat customers of Intuitive?
 3   A.   I think all of the ones I mentioned, but many, many more
 4   than that are repeat customers.
 5   Q.   In your experience and based on your observations, what
 6   kinds of professionals at these hospitals get involved in
 7   dealing with Intuitive as part of the purchasing process?
 8   A.   So it can be a long list of folks.  But it typically
 9   starts with the clinical foundation and working with surgeons
10   to ensure that they believe in the value that can be realized
11   through da Vinci.  And so that's a -- a clinical foundation.
12        And from there, it can involve a whole host of departments
13   and executives from the institution, including C-Suite
14   executives, CEO, COO, directors of surgery, directors of
15   surgical supply, lawyers, and others.
16            MR. MICHAEL:  Mr. Lee, can I ask you to pull up Page 2
17   of the document?
18        (Document displayed.)
19   BY MR. MICHAEL:
20   Q.   And, Mr. Rosa, I will ask you to turn to Page 2.
21        (Witness complied.)
22   Q.   At the bottom of kind of the left-hand side of this
23   slide -- it's a little hard to see, so I'll ask that we blow it
24   up -- do you see a sentence that starts "When considering"?
25   A.   I do.
```

ROSA - DIRECT / MICHAEL

```
 1   Q.   Okay.  And it says [as read]:
 2            "When considering cost effectiveness of an
 3        advanced technology like the da Vinci system, we
 4        recommend that hospitals perform a full cost-benefit
 5        analysis, considering not just the operating room
 6        costs but the costs associated with hospital stays,
 7        procedure-related complications, and hospital
 8        readmissions."
 9        Do you see that?
10   A.   I do.
11   Q.   And what, if any, kinds of information does Intuitive make
12   available to hospitals to help them perform their cost benefit
13   analysis?
14   A.   Let's say this is a new customer who doesn't yet have an
15   existing robotic program.  Then we can provide the cost side to
16   them.  So how much does a system cost, how much do instruments
17   cost, service, those kinds of considerations.
18        And then we could use data that are available kind of
19   directionally, more averages, to help them understand what
20   hospital stays they might see, what are some of the
21   complications they might see, what are the readmissions they
22   might see.
23        And so those are used together for the analysis, the
24   cost-benefit analysis that the hospital will undertake.
25        If it's an existing customer, and let's say they are
```

ROSA - DIRECT / MICHAEL

1  buying an incremental system, then most of the time they will

2  use their own data for the complications and other things, if

3  they already have experience in those procedures.

4  Q.   On the cost side of things, does the information that

5  Intuitive provides to customers relate just to up-front costs

6  or do you provide hospitals with information they can use to

7  evaluate the lifetime costs of a da Vinci system?

8  A.   So when hospitals do analyses of expenditures like this,

9  oftentimes they have a time frame that may be five or seven

10  years where they want to evaluate, sort of, the cost of

11  something like da Vinci or maybe another investment they are

12  making.  And so we'll provide the cost over whatever period

13  that they want to analyze the program.

14  Q.   And does that include or not include information on the

15  cost of EndoWrists that may be used over that period?

16  A.   It would include the cost of EndoWrists.

17  Q.   Let me ask you to turn to Tab 6 of your binder, please.

18       (Witness complied.)

19  Q.   This as a document marked TX-1323.

20       And, Mr. Rosa, do you recognize the presentation at Tab 6

21  as being a standard form of presentation that Intuitive makes

22  to hospital customers in your experience?

23  A.   Yes, I recognize it.

24       **MR. MICHAEL:**  Your Honor, I offer TX-1323 into

25  evidence.

ROSA - DIRECT / MICHAEL

```
 1              MR. McCAULLEY:  Based on the representation this is an
 2   Intuitive document, no objection, Your Honor.
 3              THE COURT:  It's admitted.
 4         (Trial Exhibit TX-1323 received in evidence.)
 5              MR. MICHAEL:  And if I may publish this document to
 6   the jury?
 7              THE COURT:  You may.
 8         (Document displayed.)
 9   BY MR. MICHAEL:
10   Q.    Let me direct you to Page 15 of the presentation that's in
11   this document.
12         And first, let me ask you just generally:  Is this another
13   example of a business alignment meeting presentation that
14   Intuitive makes to a customer like the one we looked at just
15   now?
16   A.    It is.  This is an example of exactly that.
17   Q.    Okay.  And the one we looked at just now, a moment ago,
18   was sort of a form or template presentation; is that correct?
19   A.    That is right.
20   Q.    Was this one, in your understanding, actually done for a
21   particular hospital customer?
22   A.    Yes.  This is a specific presentation for a customer.
23   Q.    What do you understand Page 15 to be showing?
24   A.    So it's going to be -- it's what we looked at before from
25   a kind of a template point of view, but now this is done for a
```

ROSA - DIRECT / MICHAEL

1  procedure called benign hysterectomy, when the uterus is

2  removed for a benign condition.  And it looks at -- we're now

3  adding another -- another outcome.  But we're looking at OR

4  time, complications, conversions, readmissions, and length of

5  stay.

6  **Q.**  And now let me ask you to turn to Tab 5 in your binder,

7  please.

8       (Witness complied.)

9  **Q.**  Tab 5 is a document marked as TX-1314.  Do you recognize

10  this as an Intuitive document?

11  **A.**  I do.

12  **Q.**  Do you recognize this, based on your knowledge and

13  experience, as typical of the kinds of financial information

14  that Intuitive presents to its hospital customers?

15  **A.**  I do.

16  **Q.**  This --

17       **MR. MICHAEL:**  Let me offer TX-1314 into evidence.

18       **MR. McCAULLEY:**  No objection.

19       **THE COURT:**  It's admitted.

20       (Trial Exhibit TX-1314 received in evidence.)

21       **MR. MICHAEL:**  Okay.  And if I could publish it to the

22  jury, please, Your Honor.

23       **THE COURT:**  You may.

24       **MR. MICHAEL:**  So, Mr. Lee, can you pull up Page 11 of

25  the document?

ROSA - DIRECT / MICHAEL

1           (Document displayed.)

2    BY MR. MICHAEL:

3    Q.    And let me ask you to go to Page 11, Mr. Rosa.  Can you

4    describe what's being shown on Page 11?

5    A.    Sure.  So this is a payback analysis, a return on

6    investment for a system.  And this one happens to be over a

7    five-year period.  And what it's showing is -- maybe the best

8    place to look is the graph in the middle, where it says

9    "Investment Payback Analysis."

10          And in here are a lot of variables that are being

11   considered as part of this analysis.  And so -- but at the end

12   of the analysis, what they are looking at is it a cost, a given

13   amount to acquire this system.  Then they start using the

14   system and generating revenue and cost offsets.

15          They have to pay along the way for EndoWrists, but you

16   start seeing all of that put together into this payback

17   analysis, where they -- you can see where their break-even line

18   is, if you will, that kind of reverse-engineered dotted line.

19   But how long it will take them to both kind of break even and

20   what it looks like over the five-year period.

21   Q.    Now, this document is a printout of a spreadsheet.  Have

22   you had an opportunity to review the whole document?

23   A.    I have.

24   Q.    And it's got a number of tabs and backup data included in

25   it; is that correct?

1920

ROSA - DIRECT / MICHAEL

1    **A.**    It does.

2    **Q.**    What we're looking at here, is this sort of a summary

3    analysis that's being shown to the customer?

4    **A.**    It does.    It takes a lot of inputs and a lot of the other

5    information on multiple tabs and puts it into the summary.

6    **Q.**    And in your understanding, does the analysis that's being

7    shown, does it incorporate and account for costs of EndoWrists,

8    as well as other costs associated with the da Vinci?

9    **A.**    It does.    It does.    On subsequent tabs in here, it has the

10    costs and many other variables, but the EndoWrist costs are

11    captured.

12    **Q.**    Again, just to be clear, is that showing costs as of a

13    particular moment in time or over a period of multiple years?

14    **A.**    No.    In this case, we're showing -- the analysis take into

15    account the fact that -- what kind of procedures are being

16    done, what are the associated EndoWrists required for that

17    procedure in every year of the analysis?

18    **Q.**    Does Intuitive have a process called QTI that you're

19    familiar with?

20    **A.**    We have something we call QTI, and it stands for quantify

21    the impact.

22    **Q.**    What is QTI or quantify the impact?

23    **A.**    It's our own nomenclature that we use, but it's really,

24    again, to underscore -- this is all driven and we sort of

25    really are invested into data so that customers understand

ROSA - DIRECT / MICHAEL

1    their data.  And that's what quantifying the impact is, is what

2    kind of clinical data are associated with robotic surgery, what

3    kind of economic data, and quantifying those in a way that the

4    customer can make informed decisions.

5    **Q.**    Let me ask you to turn to Tab 7 of your binder.

6         (Witness complied.)

7    **Q.**    This is a document marked TX-1325.

8         Can you identify this based on your experience at

9    Intuitive as a type of QTI presentation that Intuitive makes to

10   hospitals?

11   **A.**    I can, yes.

12        **MR. MICHAEL:**  Your Honor, I offer TX-1325.

13        **MR. McCAULLEY:**  No objection.

14        **THE COURT:**  Admitted.

15        (Trial Exhibit TX-1325 received in evidence.)

16        **MR. MICHAEL:**  May I publish it?

17        **THE COURT:**  You may.

18        (Document displayed.)

19   **BY MR. MICHAEL:**

20   **Q.**    Mr. Rosa, is the presentation that's contained in TX1325 a

21   presentation done for an actual hospital in July of 2019?

22   **A.**    That is correct.

23   **Q.**    Let me ask you to go to Page 10 of the document.  And

24   what's being shown on Page 10?

25   **A.**    So it's -- it's not very different from what we were

ROSA - DIRECT / MICHAEL

1    looking at prior.  It's just formatted a little bit

2    differently.

3    **A.**    But here, once again, what we're showing are comparisons

4    between open surgery, laparoscopy, and robotic-assisted surgery

5    with da Vinci.

6        And you'll see for -- it's highlighted now.  Those are the

7    boxes and the corresponding columns on the graphs in the

8    middle, and how many in that you saw were how many are in each

9    of the datasets.  And we are looking at length of stay, how

10   much time in the operating room, conversions once again.

11       And in this case now we're looking at how many narcotics

12   are used post surgery by the patient.

13   **Q.**    Once Intuitive sells or leases a da Vinci system to a

14   hospital, does that guarantee that that system is going to be

15   used?

16   **A.**    No, it does not.  It does not.

17   **Q.**    Does it guarantee that you're going to be able to sell any

18   particular volume of EndoWrists to that hospital?

19   **A.**    It doesn't.

20   **Q.**    Does it matter to Intuitive whether or not a hospital

21   actually uses its da Vinci system after buying or leasing it?

22   **A.**    It -- it's critical to Intuitive.

23   **Q.**    Why is it critical?

24   **A.**    You know, first is the way in which we fulfill the

25   mission.  If a system is not being used, that means all the

ROSA - DIRECT / MICHAEL

```
 1    work that we've done over decades isn't impacting a patient.
 2    And so we're not being effective in what we have been trying to
 3    do.
 4        Second is, it's not producing revenue for the company
 5    that's required to keep the company in business.
 6        And, thirdly, it -- it is, you know, hospitals will talk
 7    to each other about their programs.  And if it's not being
 8    used, that can have an impact on customers who have called that
 9    hospital to say:  Tell me about your program.  And can
10    negatively impact other customers.
11  Q.  Over the years that you have been with Intuitive, have you
12    sometimes gotten complaints from hospital customers about
13    Intuitive's pricing?
14  A.  I have.
15  Q.  What, if any, steps has Intuitive taken to respond to
16    those kinds of complaints, in your experience?
17  A.  So we've done several things over the years.  And that
18    includes never -- if you look at how -- you know, I was talking
19    about how do customers look at their costs.  And it's usually
20    on a per-procedure basis.  And if you look across this period
21    of time, we never raised our price on that per-procedure basis
22    for the EndoWrist and accessories that they are purchasing.
23        We also work with customers to give discounts, just
24    straight discounts off of list prices within the portfolio.
25        We have a team that -- we call them Genesis, but there's a
```

ROSA - DIRECT / MICHAEL

 1    team of people in the field that we employ whose primary
 2    responsibility is to work with customers to help them and their
 3    programs become more efficient.  And so to help manage
 4    inventory, to help reduce and streamline the number of
 5    instruments that are used in surgery, to help central
 6    processing when they're handling the instruments and
 7    accessories to perhaps do a better job, handle them more
 8    carefully so they don't break instruments and have to replace
 9    them.
10         We've talked a little bit about some of the innovation
11    work that we've done over the years to combine functionality of
12    instruments, to help lower the cost for customers.
13         We've engaged -- we've talked a little bit about this
14    Extended Use Program where we have worked hard to put in place
15    engineering changes that were able to lead to extended uses,
16    and we also lowered the price across a variety of instruments
17    as a result of those extended uses.
18         We've also put in place a program to help customers
19    acquire a system without using their capital expenditure, if
20    you will, their bank account.  We call it AMP and it stands for
21    accelerating their minimally invasive program.
22         And what that does is on a -- rather than having a
23    customer, say, buy it upfront and spending their money on a
24    da Vinci system, instead we install the system.  We build and
25    manufacture the system, install it, support it.  And the

ROSA - DIRECT / MICHAEL

customer pays every time they use it.

And so this puts the risk onto Intuitive.  And they don't have to use it.  But the only way that we earn revenue in that scenario is by utilization of the system so that the customer, when they use it, are purchasing EndoWrists and accessories and also paying for the system.

All -- off the top of my head, those -- those, taken together, are multiple ways to address the price and the cost of the system.

And then as you might imagine, that's complex.  There's a lot of variables.  It's hard to measure all those things continuously.  So we have an app that's on a phone and some web portals that customers can log into that helps them understand all that together and how do all those things work together?  What are their actual costs?

We can actually do comparisons between hospitals who, say, are very efficient in how they use a robotic program.  And we can put that as a data point into some of these portals.

And then the customer who's interested can compare their costs and their performance to other hospital averages that are out there and see, am I doing better?  Or perhaps I'm doing worse, if you will, on a cost basis.  And if so, what can I do about it?  Can I work with Intuitive?  Can I work with my team to improve the cost-effectiveness?

Q.    In your experience, has taking all those steps that you

**ROSA - DIRECT / MICHAEL**

1  just described made your products more or less price

2  competitive with other forms of surgery, including open and

3  lap?

4  **A.**   They are being made more price competitive.

5  **Q.**   You mentioned the AMP program, A-M-P; is that correct?

6  **A.**   AMP.

7  **Q.**   After the AMP program, who actually owns the da Vinci?  Is

8  it Intuitive or the hospital?

9  **A.**   It is Intuitive.

10  **Q.**   And does Intuitive also offer leases on a da Vinci system

11  as opposed to outright purchases?

12  **A.**   We do.

13  **Q.**   And under a lease arrangement, does Intuitive also own the

14  da Vinci system?

15  **A.**   It does.

16  **Q.**   Over time, in the period that we have been discussing, did

17  more of your business move from hospitals buying da Vinci

18  systems outright to leasing them or using a per-procedure

19  model, such as AMP?

20  **A.**   Over this period of time, more and more customers have

21  been taking advantage of the leasing and AMP models.

22  **Q.**   As of 2022, to your knowledge, did more hospitals buy

23  da Vinci systems outright or use lease arrangements, including

24  AMP?

25  **A.**   More customers were using lease and AMP arrangements in

ROSA - DIRECT / MICHAEL

```
 1              MR. MICHAEL:  Thank you, Your Honor.
 2         Mr. Lee, can you bring up Mr. Rosa's Slide 15, please.
 3         (Document displayed.)
 4    BY MR. MICHAEL:
 5    Q.   Mr. Rosa, you testified earlier that from the founding of
 6    the company through 2022 Intuitive invested more than
 7    $5 billion in research and development; is that correct?
 8    A.   Yes, that is true.
 9    Q.   Can you summarize for the jury what those R&D investments
10    ended up resulting in?
11    A.   Sure.  So you've seen the story, I think, throughout, but
12    what -- part of what that investment went towards was the
13    multiple generations of the system itself, da Vinci, that you
14    see starting with Lenny in the very first prototype, working
15    through four generations of the multi-port system, the
16    Standard, the S, the Si and X/Xi taken together, and, also,
17    with a single-port system that we talked about.
18              MR. MICHAEL:  Mr. Lee, can you go to the next slide,
19    please.
20         (Document displayed.)
21    BY MR. MICHAEL:
22    Q.   What else did Intuitive's investments in research and
23    development result in over the years?
24    A.   So this -- you can look at the ecosystem that we were
25    talking about, which is instruments and accessories that
```

ROSA - DIRECT / MICHAEL

1   surround the system.  And this is an example, a list of many of

2   the instruments that were developed over those years for both

3   the da Vinci systems, the EndoWrist instruments, as well as

4   some for the SP system as well.

5          **MR. MICHAEL:**  Go to the next slide, please, Mr. Lee.

6       (Document displayed.)

7   **BY MR. MICHAEL:**

8   **Q.**   How about in terms of the ways in which your systems can

9   be used?  Was there any result there or impact of the

10  investment that you made in research and development?

11  **A.**   So, again, over the years the changes in the system, its

12  capabilities, the evidence that's being generated has resulted

13  in surgeons being able to use the system across a variety of

14  specialties.  You see here listed general and colorectal

15  surgery, urology, head and neck, cardiac, gynecology, thoracic,

16  to name a few.

17      And these are areas where the system is being used to

18  convert an open surgery, if you will, to a minimally invasive

19  approach or could be laparoscopy, to convert those kinds of

20  procedures to robotic approach.

21  **Q.**   Do you believe that these innovations by Intuitive over

22  the years have benefited patients?

23  **A.**   I do.

24  **Q.**   Do you believe that Intuitive's innovations have benefited

25  doctors?

1937

ROSA - CROSS / MCCAULLEY

```
 1   A.    I do.
 2           MR. MICHAEL:  Mr. Lee, can you go back to slide 15,
 3   please.
 4        (Document displayed.)
 5   BY MR. MICHAEL:
 6   Q.    In 1996 when you were designing and building the Lenny
 7   prototype, was SIS doing anything to contribute that work?
 8   A.    They were not.
 9   Q.    Did SIS do anything to assist Intuitive in the development
10   of any of the subsequent da Vinci systems?
11   A.    They have not.
12   Q.    Did Intuitive invest $5 billion in research and
13   development over 25 years because of competition from SIS or
14   other unauthorized third parties?
15   A.    No.
16   Q.    And in your experience, has SIS contributed anything at
17   all to Intuitive's investments and innovations over the years?
18   A.    They have not.
19   Q.    Thank you, Mr. Rosa.  That's all the questions I have at
20   this time.
21           THE COURT:  Thank you, Mr. Michael.
22                       CROSS-EXAMINATION
23   BY MR. McCAULLEY:
24   Q.    Good afternoon, Mr. Rosa.
25   A.    Good afternoon.
```

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 22, 2025

Volume 12

Pages 1985 - 2191

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

```
SURGICAL INSTRUMENT SERVICE      )
COMPANY, INC., et al.,           )
                                 )
          Plaintiffs,            )
                                 )
  vs.                            )  No. C 21-03496 AMO
                                 )
INTUITIVE SURGICAL, INC.,        ) San Francisco, California
                                 ) Thursday
          Defendant.             ) January 23, 2025
---------------------------------) 8:00 a.m.
AND RELATED COUNTERCLAIMS.       )
_____)
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**              MCCAULLEY LAW GROUP
                                 180 N. Wabash Avenue
                                 Suite 601
                                 Chicago, Illinois 60601
                            **BY:  RICHARD McCAULLEY JR., ESQ.**


                                 HALEY GUILIANO LLP
                                 111 Market Street
                                 Suite 900
                                 San Jose, California 95113
                            **BY:  JOSHUA V. VAN HOVEN, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

**APPEARANCES**:   (CONTINUED)

For Defendant:                    PAUL, WEISS, RIFKIND, WHARTON
                                     & GARRISON LLP
                                  2001 K Street NW
                                  Washington, D.C. 20006
                            BY:   **KENNETH A. GALLO, ESQ.**
                                  **PAUL D. BRACHMAN, ESQ.**


                                  PAUL WEISS RIFKIND WHARTON
                                     & GARRISON LLP
                                  1285 Avenue of the Americas
                                  New York, New York 10019
                            BY:   **WILLIAM MICHAEL, ATTORNEY AT LAW**
                                  **CRYSTAL PARKER, ESQ.**
                                  **ROBERT O'LOUGHLIN, ESQ.**


                                  PAUL, WEISS, RIFKIND, WHARTON
                                     & GARRISON LLP
                                  535 Mission Street
                                  24th Floor
                                  San Francisco, California 94105
                            BY:   **JOSHUA HILL, JR., ESQ.**



Also Present:                     **David Rosa**
                                  **Bobby Cox**
                                  **Ryan Lee**
                                  **Greg Posdal**
                                     - - -

ROSA - REDIRECT / MICHAEL

1  **Q.**  Are those all companies that are large medical device

2  companies?

3  **A.**  Medtronic is the parent company of those devices -- of

4  those -- kind of the ones in the parentheses, Covidien,

5  AutoSuture, and U.S. Surgical.  It is a very large medical

6  device company.

7  **Q.**  Got it.  And Medtronic and Ethicon, are those competitors

8  or potentially competitors to Intuitive?

9  **A.**  They -- those companies produce today, produce

10  laparoscopic instruments and all sorts of instruments that are

11  used in laparoscopy, which we are competing with.

12  **Q.**  Do you know what an NDA is or Nondisclosure Agreement?

13  **A.**  I do.

14  **Q.**  Does Intuitive sometimes enter into NDAs with third

15  parties, including third parties who are competitors, so that

16  you can share information between each other to ensure safety

17  and compatibility of your systems?

18  **A.**  I actually -- I don't know the form of agreement.  I know

19  NDAs are signed between companies.  I don't know which ones.

20  **Q.**  Understood.  But I guess I'll just ask more generally:  Is

21  it your understanding that Intuitive would sometimes enter into

22  agreements with third parties to protect confidentiality of

23  information so that information can be shared between them to

24  ensure safety and compatibility?

25  **A.**  Yes.

ROSA - REDIRECT / MICHAEL

1   Q.   And did Rebotix or Restore, to your knowledge, ever

2   propose an NDA or similar confidentiality agreement to

3   Intuitive at any time between, let's say, 2017 and 2020?

4   A.   Not to my knowledge.

5   Q.   Did SIS ever propose to enter into any such agreement with

6   Intuitive so that they could share information about safety or

7   compatibility?

8   A.   No.

9   Q.   Let me ask you to turn now to TX-1441-R, which is a

10  document that you were asked about yesterday and today.  I

11  believe it's Tab 10 in your binder.

12       (Witness complied.)

13  Q.   And this was the letter that Intuitive sent to Rebotix in

14  April of 2019; correct?

15  A.   Correct.

16  Q.   And this was the letter where, in April of 2019, Intuitive

17  had asked Rebotix to provide clinical proof that its service

18  process returned the modified EndoWrist to a production

19  equivalent qualification and/or that additional use does not

20  affect the safety or performance of the instruments; correct?

21  A.   Correct.

22  Q.   And did Rebotix in this time period provide such proof to

23  Intuitive?

24  A.   No.

25  Q.   Did Rebotix, to your knowledge, ever ask Intuitive to

ROSA - REDIRECT / MICHAEL

1  enter into a confidentiality agreement so that it could provide

2  such proof without it becoming public?

3  **A.**   No.

4  **Q.**   Is the kind of clinical proof that you asked for in this

5  letter regarding production equivalent qualifications and that

6  the service process being proposed does not affect the safety

7  or performance of instruments, is that consistent or

8  inconsistent with the type of clinical proof that Intuitive

9  generally requires from third parties in order to validate or

10  approve their devices?

11         **MR. MCCAULLEY:**  Objection, Your Honor.

12         **THE COURT:**  I can't hear you, Mr. McCaulley.

13         **MR. MCCAULLEY:**  Oh, I just objected as to the scope of

14  the question.

15         **THE COURT:**  Mr. Rosa, can you answer that?

16         **THE WITNESS:**  Yes.

17         **THE COURT:**  Go ahead.  Overruled.

18  **A.**   So the -- we're looking for proof of clinical safety and

19  effectiveness.  And it is -- depending on the kind of device,

20  it's going to be generally similar.  And so I wouldn't --

21  there's nothing here that would be different in concept from

22  other third-party devices.

23  **BY MR. MICHAEL:**

24  **Q.**   Mr. McCaulley asked you some questions today about how

25  Intuitive became aware in or around 2017 of Rebotix modifying

ROSA - REDIRECT / MICHAEL

```
 1    EndoWrists and resetting the use counter without Intuitive's
 2    authorization; correct?
 3    A.    Yes.
 4    Q.    Let me -- if I could, I want to ask you about -- sorry.
 5    Here it is.
 6              MR. MICHAEL:   Your Honor, I wanted to introduce a new
 7    exhibit.   If I may approach the witness to hand up a hard copy,
 8    and I have one for the Court and counsel as well.
 9              THE COURT:   Before you give it to the witness, could
10    you actually share it with Mr. McCaulley, please.
11              MR. MICHAEL:   Sure.   It's actually a series of
12    exhibits:   TX-1635.002, TX-1635.003, TX-1635.012, and
13    TX-1635.014.   And those should all be dash R.
14         May I approach to hand a copy up to the Court?
15              THE COURT:   Please.
16         (Whereupon document was tendered to the Court.)
17              THE COURT:   Thank you.
18         Any objections, Mr. McCaulley?
19              MR. MCCAULLEY:   I'm not all the way through it.
20    Sorry, Your Honor.
21              THE COURT:   We're about at the one-hour mark, so
22    let's -- let's give you all a ten-minute break.   Don't talk to
23    yourselves.   Don't talk about the case.   No research.   Don't do
24    all the things.
25         All rise for the jury.
```

ROSA - REDIRECT / MICHAEL

```
 1        (Whereupon there was a recess in the proceedings
 2         from 11:13 a.m. until 11:24 a.m.)
 3        THE COURT:  You may proceed, Mr. Michael.  I think you
 4   were seeking to introduce some exhibits.
 5        MR. MICHAEL:  Yes, Your Honor.  1635.002-R.
 6        THE COURT:  Mr. McCaulley?
 7        MR. MCCAULLEY:  No objection.
 8        THE COURT:  They are admitted.
 9        (Trial Exhibits 1635.002-R, TX-1635.003-R,
10         TX-1635.012-R, and TX-1635.014-R were received in
11         evidence).
12        THE COURT:  Would you like to publish them?
13        MR. MICHAEL:  Thank you, Your Honor.
14   If I could approach the witness to hand up the hard
15   copies, and then I would like to publish them.
16   Would you like me to go ahead and offer these four
17   documents all at once or do them one by one?
18        THE COURT:  However you prefer.  I think we've --
19   we've admitted them.
20   Why don't you go ahead and hand them to Mr. Rosa so you
21   don't have to get your steps today walking back and forth from
22   there.
23        MR. MICHAEL:  Just for the record, the four exhibits,
24   then, are TX-1635.002-R, 1635.003-R, 1635.012-R, and
25   1635.014-R.
```

ROSA - REDIRECT / MICHAEL

1          MR. MCCAULLEY:  Your Honor, actually I jumped too

2    quickly.  May we have a sidebar?

3          (Proceedings held at sidebar.)

4          MR. MCCAULLEY:  Your Honor, there are all kinds of

5    references to litigation in these documents.

6          MR. MICHAEL:  Your Honor, first of all, I don't plan

7    to get into any of that, but these are redacted versions of

8    these documents that Mr. McCaulley's team sent to us last

9    night.  They said they wanted to use them.

10         We agreed on the objections.  There is not any reference

11   to litigation that we believe is the subject of the Court's

12   orders.  But in any event, I don't plan to ask Mr. Rosa about

13   any of that or publish any of that to the jury.

14         And TX-1635.002-R, the only thing I plan to ask him about

15   was the paragraph under 1.2, "Patient Hazard" that begins

16   "Furthermore" and the next paragraph that begins "In this

17   regard, please provide appropriate evidence."

18         MR. MCCAULLEY:  Your Honor, I just note on Page 5 of

19   10 of 1635.002-R, notwithstanding if we missed it on a

20   redaction, we haven't shown it to the jury, yet there is a

21   reference to preliminary injunction in Denmark.

22         MR. MICHAEL:  And, again, I don't believe that to be

23   the subject of the Court's order; but I am not asking to

24   publish that portion of the document to the jury at this time.

25         THE COURT:  I agree.  I don't think this is the

ROSA - REDIRECT / MICHAEL

1    subject of the order, because then it's not complete.  I was

2    going to suggest maybe just the first two pages.  It's four

3    pages.

4            **MR. MICHAEL:**  If Your Honor does think actions are

5    necessary for any of that, we would be happy to substitute in a

6    redacted version after the fact.

7        Again, I will only put up on the screen the portion on

8    Page 3 that I referred to.

9            **MR. MCCAULLEY:**  I think -- I'm sure we can work

10   something out on that, Your Honor.  I'm sorry.  I caught this,

11   and if we're going to talk about some litigation, you know, it

12   seems -- I just don't --

13           **MR. MICHAEL:**  I'm not planning to ask about that.

14           **THE COURT:**  Let's -- as long as we stay within the --

15   within the letter of the order, which it sounds like

16   Mr. Michael intends to.  Let me know if you -- well, let me

17   know and let Mr. Michael know if you want them to trade out the

18   exhibit.

19           **MR. MCCAULLEY:**  We will work on that tonight.  I

20   appreciate it.

21       I'm not trying to be paranoid.  We saw it and what -- but

22   I'm sure we can -- before anything goes back to the jury in

23   toto, we can have it redacted.  Absolutely.

24       (Proceedings held in open court.)

25           **THE COURT:**  Go ahead, Mr. Michael.

ROSA - REDIRECT / MICHAEL

1          **MR. MICHAEL:**  Thank you, Your Honor.

2       May I approach the witness?

3          **THE COURT:**  You may.

4       (Whereupon document was tendered to the witness.)

5   **BY MR. MICHAEL:**

6   **Q.**   So, Mr. Rosa, just to reorient, you testified that

7   Intuitive first became aware of Rebotix resetting EndoWrists

8   without Intuitive's authorization in or around 2017; is that

9   correct?

10  **A.**   Yes.

11  **Q.**   Okay.  And do you have in front of you what has been

12  marked as TX-1635-002-R?

13  **A.**   I do.

14         **MR. MICHAEL:**  Your Honor, sorry.  I just wanted to

15  clarify, has that been admitted into evidence?

16         **THE COURT:**  It has been admitted.  And would you like

17  to publish it?

18         **MR. MICHAEL:**  I would, Your Honor.  Thank you.

19      Mr. Lee, if you could pull up just the header on the first

20  page of that document showing the addressee and the date,

21  please.

22      (Document displayed.)

23  **BY MR. MICHAEL:**

24  **Q.**   Mr. Rosa, do you recognize TX-1635.002-R as a letter sent

25  on behalf of Intuitive Surgical to Rebotix Panama dated

ROSA - REDIRECT / MICHAEL

```
 1  April 21, 2017?

 2  A.   I do.

 3  Q.   And so this letter was just almost exactly two years

 4  before the April 2019 letter that Intuitive sent to Rebotix

 5  that we looked at just a couple of minutes ago; is that

 6  correct?

 7  A.   That is correct.

 8  Q.   And that April 2019 letter was TX-1441, for the record.

 9       So if I could direct you, Mr. Rosa, to Page 3 of this

10  document.

11       MR. MICHAEL:   And, Mr. Lee, if I could ask you to pull

12  up just the first two paragraphs under Section 1.2 labeled

13  "Patient Hazard."

14       (Document displayed.)

15  BY MR. MICHAEL:

16  Q.   Mr. Rosa, do you see that under the heading "Patient

17  Hazard" in this letter from Intuitive to Rebotix Panama, it

18  says [as read]:

19           "Furthermore your business practices appear to

20       constitute potential patient hazards?"

21  A.   I do see that.

22  Q.   And then underneath that, it says [as read]:

23           "In this regard, please provide appropriate

24       evidence that your concept of cleaning the devices and

25       making them usable for more than ten times does not
```

ROSA - REDIRECT / MICHAEL

1      pose a danger to patients.  In particular, please

2      provide appropriate clinical proof that sufficient

3      sterilization can be achieved with your refurbishment

4      process and that the Interceptor Board will not affect

5      the safety of the EndoWrist instrument.  We also

6      request clinical proof that EndoWrist instruments can

7      be safely used more than ten times.  We assume that

8      you are aware that there have been reports of an

9      incident in France:  A device that has been modified

10     by Rebotix Panama failed during surgery."

11     Do you see all that?

12  A.   I do.

13  Q.   So did Intuitive -- this was two years before the

14  April 2019 letter that we looked at; correct?

15  A.   Correct.

16  Q.   And did Intuitive, to your knowledge, receive in response

17  to this 2017 letter any of the clinical proof of safety and

18  effectiveness and performance that it asked for from Rebotix?

19  A.   To my knowledge, we never received any of that

20  information.

21  Q.   And let me ask you to turn to the next document,

22  TX-1635.003-R.

23       MR. MICHAEL:  And, Your Honor I would offer this one

24  into evidence as well.

25       THE COURT:  I think we already heard from

ROSA - REDIRECT / MICHAEL

1    Mr. McCaulley.  He has no objection.

2        Is that right, Mr. McCaulley?

3            **MR. MCCAULLEY:**  No objection, Your Honor, but same

4    concern that we raised earlier.

5            **THE COURT:**  Understood.  With that, it's admitted.

6        (Trial Exhibit TX-1635.003-R received in evidence)

7            **THE COURT:**  What would you like to do with this,

8    Mr. Michael?

9            **MR. MICHAEL:**  So, Your Honor, I'd just like to

10   publish, first of all, the header on the document, on the first

11   page, showing the addressee and the date.

12       (Document displayed.)

13   **BY MR. MICHAEL:**

14   **Q.**   So, Mr. Rosa, do you see that TX-1635.003-R is another

15   letter sent on behalf of Intuitive to Rebotix Panama?  This one

16   is about three weeks after the last letter we looked at.  So

17   dated May 10 of 2017; is that correct?

18   **A.**   It is.

19   **Q.**   Okay.  And if I could now direct you to Page 3 of the

20   document, and ask Mr. Lee to pull up on the screen just the

21   first two paragraphs under Section 1.2 "Patient Hazard".

22       (Document displayed.)

23   **Q.**   And, Mr. Rosa, do you see that, again, in May of 2017

24   Intuitive wrote to Rebotix that Intuitive believed Rebotix's

25   business practices at that time appeared to constitute

ROSA - REDIRECT / MICHAEL

1    potential patient hazards?

2    **A.**    I see that.

3    **Q.**    And is that consistent with your understanding of what

4    Intuitive's view was at the time?

5    **A.**    It is.

6    **Q.**    And it goes on to say [as read]:

7            "You, Rebotix, have not provided any evidence

8         that your concept of cleaning the devices and making

9         them usable for more than ten times does not pose a

10        danger to patients.  In particular, you have not

11        provided appropriate clinical proof that sufficient

12        sterilization can be achieved with your refurbishment

13        process and that the Interceptor Board will not affect

14        the safety of the EndoWrist instrument.  Finally, you

15        have not provided clinical proof that EndoWrist

16        instruments can be safely used more than ten times.

17        Taking this into account, we have to assume that you

18        are not in possession of any proof regarding these

19        circumstances."

20        Is this all material that I just read that Intuitive sent

21    to Rebotix in 2017?

22    **A.**    Yes.

23    **Q.**    To this point, had Rebotix responded to Intuitive's

24    requests by providing any clinical proof of safety?

25    **A.**    No, not to my knowledge.

ROSA - REDIRECT / MICHAEL

1   Q.   And did Rebotix, to your knowledge, in this 2017 time

2   frame provide any proof to Intuitive to demonstrate that its

3   products were not causing a hazard for patients?

4   A.   No, not to my knowledge.

5   Q.   Now, let me ask you to look at TX-1635.018-R, which should

6   be the next document in your stack.

7        Mr. Rosa, do you recognize -- oh, I'm sorry.  I got it

8   wrong.  Let me withdraw that.

9        So the next document in your stack, Mr. Rosa, should be

10  TX-1635.012-R.  Do you have that?

11  A.   Yes.

12  Q.   Okay.  And do you recognize this as a letter that

13  Intuitive sent to Restore Robotics in November of 2018?

14  A.   I do.

15       MR. MICHAEL:  Your Honor, I offer TX-1635.012-R into

16  evidence.

17       MR. MCCAULLEY:  No objection.

18       THE COURT:  Thank you, Mr. McCaulley.  It's admitted.

19       (Trial Exhibit TX-1635.012-R received in evidence)

20       MR. MICHAEL:  May I publish it?

21       THE COURT:  You may.

22       (Document displayed.)

23  BY MR. MICHAEL:

24  Q.   Mr. Rosa, let me ask you to turn to the last page of this

25  letter, which is Page 6.  And do you see at the top of the page

ROSA - REDIRECT / MICHAEL

1    that in November of 2018, Intuitive wrote to Restore Robotics

2    [as read]:

3              "If you allege that you possess clinical proof

4         that your service process returns the modified

5         instruments to a production equivalent qualification

6         and/or that additional use does not affect the safety

7         or performance of the instruments, please provide

8         proof of the same no later than December 14, 2018."

9    A.   I see that.

10   Q.   Did Restore Robotics, to your knowledge, provide Intuitive

11   any such proof of safety or performance of its processes in the

12   2018 or 2019 time period?

13   A.   Not to my knowledge.

14   Q.   And now, finally, if I could ask you to look at

15   TX-1635.014-R, which should be the next document in your stack.

16   A.   Yes, I have that.

17   Q.   And do you recognize this as a letter that Intuitive sent

18   to Restore Robotics in February of 2019?  So about three or

19   four months after the last letter we looked at.

20   A.   Yes, that's -- yep.

21        MR. MICHAEL:  Your Honor, I offer TX-1635.014-R.

22        MR. MCCAULLEY:  No objection.

23        THE COURT:  It's admitted.

24        (Trial Exhibit TX-1635.014-R received in evidence)

25        MR. MICHAEL:  May I publish it?

ROSA - REDIRECT / MICHAEL

```
 1            THE COURT:  You may.
 2   BY MR. MICHAEL:
 3   Q.   And let me ask you to turn to Page 7 of 8 in this
 4   document, Mr. Rosa.
 5        And do you see how -- where it says [as read]:
 6            "If you allege that you possess clinical proof
 7        that your service process returns the modified
 8        instruments to a production equivalent qualification
 9        and/or that additional use does not affect the safety
10        or performance of the instruments, please provide
11        proof of the same no later than February 28, 2019."
12        Do you see all that?
13   A.   I do.
14   Q.   So is it correct that Intuitive asked Restore Robotics
15   again for proof of safety and effectiveness about three months
16   after the November 2018 letter that we looked at?
17   A.   Yeah.  Yes, that is correct.
18   Q.   And, to your knowledge, was there still no response to
19   that request from Restore in the 2019 or 2020 time period?
20   A.   To my knowledge, there was no response.
21   Q.   So, Mr. Rosa, you were asked some questions about a letter
22   that Intuitive sent to Marin General Hospital in November of
23   2019.  That was TX-942-R, for the record.  Do you remember that
24   letter?
25   A.   I do.
```

ROSA - REDIRECT / MICHAEL

1    Q.    Is it fair to say that by the time that Intuitive sent

2    that letter to Marin in November of 2019 expressing its

3    concerns about patient safety with the use of modified

4    EndoWrists, Intuitive had for more than two years been asking

5    Rebotix and Restore to provide it with clinical proof that its

6    processes were safe?

7    A.    Yes.

8    Q.    And Intuitive, for more than two years at that point, had

9    not received any such proof from Restore or Rebotix?

10   A.    That is correct.

11   Q.    Now, you were asked some questions and gave some testimony

12   about the fact that some years after the time period 2019 and

13   2020, Intuitive did approve under its policy one model each of

14   modified EndoWrists for Restore and Rebotix; correct?

15   A.    Correct.

16   Q.    And just to be clear, did either of those third parties

17   apply to Intuitive, to your knowledge, for approval on any

18   other model of EndoWrist?

19   A.    Not to my knowledge, they did not.

20   Q.    Did either of those third parties provide to Intuitive

21   clinical evidence of safety and efficacy to modify any other

22   model of EndoWrist?

23   A.    No, not to my knowledge.

24   Q.    And has Intuitive rejected any application for approval by

25   any third party for any other model of EndoWrist?

ROSA - REDIRECT / MICHAEL

```
 1    A.   We have not.

 2    Q.   Thank you, Mr. Rosa.  That's all the questions I have

 3    right now.

 4         THE COURT:  Thank you, Mr. Michael.

 5      Mr. McCaulley, anything further?

 6         MR. MCCAULLEY:  We're done.  We don't have anything

 7    further.

 8         THE COURT:  All right, Mr. Rosa.  Thank you so much.

 9    You're excused, and thank you.

10      (Witness excused.)

11         THE COURT:  Mr. Michael or Mr. Gallo or Mr. Hill, call

12    your next witness.

13      Mr. Hill, do you need a small break at this point?

14         MR. HILL:  I do not.  I do not.

15      Intuitive calls Dr. Max Meng.

16         THE COURT:  Come forward, Dr. Meng.

17                      MAXWELL MENG,

18    called as a witness for the defendant, having been duly sworn,

19    testified as follows:

20         THE WITNESS:  Yes, I do.

21         THE CLERK:  Thank you.

22      Please be seated and state and spell your full name for

23    the record.

24         THE WITNESS:  First name is Maxwell, M-A-X-W-E-L-L,

25    last name is Meng, M-E-N-G.
```

MENG - DIRECT / HILL

1    surgeon is holding it.  You can see those holes in there.  You

2    can open and close it, which results in opening and closing of

3    the end that's on the inside of the -- inside of the body down

4    here where I'm pointing at (indicating).  So that's sort of the

5    effect or the tip of the instrument doing the work inside.

6    Q.    And the vision cart on the left side, is that similar to

7    the vision cart that might be used in a da Vinci procedure?

8    A.    Similar.

9    Q.    Now, your two most common procedures that you described

10   for the jury are prostate removal and kidney removal; is that

11   right?

12   A.    Yes.

13   Q.    Can you perform those procedures using open -- an open

14   technique?

15   A.    Yes.

16   Q.    Can you perform these procedures laparoscopically?

17   A.    Yes.

18   Q.    And can you perform those procedures robotically?

19   A.    Yes.

20   Q.    Are there any surgical procedures that can be performed

21   laparoscopically but not robotically?

22   A.    No.

23   Q.    Are there any -- same question, just the reverse, okay?

24   Are there any surgical procedures that can be performed

25   robotically, but they cannot be performed using traditional

**MENG - DIRECT / HILL**

1   laparoscopic means?

2   **A.**    No.

3   **Q.**    About how many da Vinci systems does UCSF have as of 2022,

4   if you know?

5   **A.**    As of 2022, probably six across four different sites where

6   we operate.

7   **Q.**    And how many of those are owned by UCSF?

8   **A.**    Two or three.

9   **Q.**    And then what is the status of the others?

10  **A.**    We probably had them through the AMP program, which I

11  think was mentioned earlier today that I heard.

12  **Q.**    Now, Dr. Meng, you've done thousands of da Vinci

13  surgeries, so you're -- you're familiar with the EndoWrist; is

14  that right?

15  **A.**    Yes.

16  **Q.**    Are you also familiar with standard laparoscopic tools?

17  **A.**    Yes.

18  **Q.**    So if you had to compare the EndoWrist to the standard

19  laparoscopic tools or the open tools you might use, how would

20  you compare the EndoWrist?

21  **A.**    Well, I -- I think it's very hard to compare.  I think

22  they are so different in the fact that -- in my mind, I think

23  the robotic system and the EndoWrists are just more complex

24  than a simple laparoscopic instrument.

25  **Q.**    And staying with the EndoWrist, how -- you know, how do

2121

**MENG - DIRECT / HILL**

1    and using the robot in an EndoWrist outside of the guidelines

2    and instructions for use.

3    **Q.**   Now, have you heard of single-use medical devices?

4    **A.**   Yes.

5    **Q.**   What is a single-use device?

6    **A.**   It's a device that's intended and designed to be used once

7    and then discarded.

8    **Q.**   And are those -- those types of devices, are they commonly

9    used in your practice?

10   **A.**   Yes.

11   **Q.**   Would you be comfortable using a refurbished single-use

12   device that's been modified to be used more than once?

13   **A.**   No.

14   **Q.**   Why not?

15   **A.**   Because, again, I would say that's not their design or

16   intended use, and not within the guidelines and instructions.

17   **Q.**   Are you aware that some traditional laparoscopic

18   instruments can be serviced?

19   **A.**   Yes.

20   **Q.**   And what does that mean to you?

21   **A.**   So we use those, and I think in my mind it's -- let's say,

22   scissors that seems dull or the screw in the middle is a little

23   loose.  If I notice that, that gets taken off, sent for repair,

24   and then comes back and we can use those.

25   **Q.**   In your mind, is that comparable to resetting the use

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, January 23, 2025

Volume 13

Pages 2192 - 2428

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) No. C 21-03496 AMO ) |
| INTUITIVE SURGICAL, INC., | ) San Francisco, California ) Friday |
| Defendant. | ) January 24, 2025 |
| ----------------------------------) | ) 8:00 a.m. |
| AND RELATED COUNTERCLAIMS. | ) ) |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**            MCCAULLEY LAW GROUP
                              180 N. Wabash Avenue
                              Suite 601
                              Chicago, Illinois 60601
                      BY:   **RICHARD McCAULLEY JR., ESQ.**


                              HALEY GUILIANO LLP
                              111 Market Street
                              Suite 900
                              San Jose, California 95113
                      BY:   **JOSHUA V. VAN HOVEN, ESQ.**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
            Official Reporter - US District Court
            Computerized Transcription By Eclipse

2193

<u>**APPEARANCES**</u>:  **(CONTINUED)**

**For Defendant:**                   PAUL, WEISS, RIFKIND, WHARTON
                                     & GARRISON LLP
                           2001 K Street NW
                           Washington, D.C. 20006
             BY:  **KENNETH A. GALLO, ESQ.**
                     **PAUL D. BRACHMAN, ESQ.**

                   PAUL WEISS RIFKIND WHARTON
                        & GARRISON LLP
                   1285 Avenue of the Americas
                   New York, New York 10019
             BY:  **WILLIAM MICHAEL, ESQ.**
                     **CRYSTAL PARKER, ESQ.**
                     **ROBERT O'LOUGHLIN, ESQ.**

                   PAUL, WEISS, RIFKIND, WHARTON
                        & GARRISON LLP
                   535 Mission Street
                   24th Floor
                   San Francisco, California 94105
             BY:  **JOSHUA HILL, JR., ESQ.**

**Also Present:**              **David Rosa**
                   **Bobby Cox**
                   **Ryan Lee**
                   **Greg Posdal**
                   - - -

DUQUE - DIRECT/ PARKER

1   themselves in order to manage the sutures and tie knots.

2   **Q.**   And can you explain to us what we're looking at here in

3   the construction of this EndoWrist?

4   **A.**   Sure.  I'll start at the top.  I knew these were -- this

5   is a large needle driver because the grips have kind of a

6   carbide pad which allows for it to hold the needle properly.

7        The grips have a feature that is kind of shown labeled the

8   "yaw" and "grip pulley" that forms a pulley feature that the

9   drive cables are routed around.  So the cables are routed along

10  this feature, this pulley section of the grips.  As the cables

11  are pulled, it rotates that pulley, which causes motion of the

12  grips.

13       The cables, which are shown in red, they -- they route

14  through a series of pulleys that we call idler pulleys.  The

15  ones that are attached to the grips themself have to route

16  through a set of distal idler pulleys and then another set of

17  what we call proximal idler pulleys.  Essentially they are

18  going through one bend and another bend until it eventually

19  gets routed through some holes in the proximal clevis

20  component, which is shown down at the bottom in that dark gray.

21       I'll call out the one component in the middle, which we

22  call the distal clevis, in light gray, that's really the

23  structure of the wrist where all of the pulleys and the grips

24  are mounted to using pins.

25  **Q.**   And what, if any, design challenges exist in providing a

DUQUE - DIRECT/ PARKER

1    surgical product that uses cables and pulleys like this?

2    **A.**   Sure.  So as I mentioned, the cable has to route -- the

3    distal most cables that route to the grips, in order for them

4    to stay on their cable path and in order for us to have -- to

5    preserve motion, we need to preserve the cable length of that

6    cable path.  And so when the instrument wrist is articulated,

7    we need to make sure that the cables stay on their respective

8    paths.

9          The instrument is small in diameter, so we have limited

10    real estate.  We have to route the cables through the -- a

11    distal joint and then a middle joint.  And so it has to go

12    through a series of pulleys, bending it in one direction around

13    the distal-most idlers shown in the middle and then through a

14    reverse bend through another set of idler pulleys.  It has to

15    be done in compact fashion.  Those pulleys themselves are

16    fairly small.

17    **Q.**   And based on your work designing EndoWrists what, if any,

18    weak points or potential points of failure have you observed in

19    the distal end of EndoWrists?

20    **A.**   Yes.  The -- essentially, the cables.  So the cables do

21    fail.  If the cables are articulating and traveling through

22    these pulleys as we're moving the wrist around and as they are

23    traveling, they are bending through these small diameter

24    pulleys, first in one direction and then in the other

25    direction.

DUQUE - DIRECT/ PARKER

1    We have multiple joints, and so the cables need to be able

2    to bend along one pin direction and then also bend along a

3    different axis, which is orthogonal, so now bending a different

4    direction.  That puts a lot of stress on the cables.

5    And because the cables have to go bend in one direction

6    and then the other, it's putting a great deal amount of stress

7    on the cables.  All through this, the cables are under tension

8    as well.

9    **Q.**   If it's so challenging to get these cables to go back and

10   forth in this tiny real estate, why use pulleys and cables to

11   control the distal end of the EndoWrist?

12   **A.**   We are trying to keep the instrument as compact as

13   possible.  We want small entry points, so 8 millimeter diameter

14   tools.

15   We are trying to mimic the dexterity of the human hand.

16   And the human hand has motions in one direction and also the

17   other direction.

18   They are applying tension.  We can't apply tension using

19   straight rods because they have to bend in a direction.

20   You might be able to achieve a single bend with things

21   such as a flat sheet or shim stock or flat metal bends.  But in

22   order to bend it in one direction and now the other direction,

23   you can only do that with cables.

24        **MS. PARKER:**  Mr. Lee, if we could go to Slide 5.9,

25   please.

DUQUE - DIRECT/ PARKER

```
 1          (Document displayed.)
 2   BY MS. PARKER:
 3   Q.    Mr. Duque, we have heard a lot about cables, and we won't,
 4   you know, go over this in a lot of detail today.  But can you
 5   explain to us, when we hear about cables and EndoWrists, what
 6   are we really talking about?
 7   A.    So this is a closeup view of our -- our cable.  The
 8   diameter of this cable -- this is a zoomed-in view.  The
 9   diameter of this cable is less than 20 thousandths, so it's
10   quite small.  This is a zoomed-in view.
11          The cable is made up of over 200 individual filaments,
12   wire, labeled wire.  That wire filament is one thou normally in
13   diameter.  That's the third of the thickness of a human hair,
14   so it's tiny.
15          The wires, wire filaments are wound into subcomponents
16   which we call the strands, and then those strands are wound
17   into a larger cable construction to make up the overall cable.
18          MS. PARKER:  You can take that down, Mr. Lee.  Thank
19   you.
20          (Document removed from display.)
21   BY MS. PARKER:
22   Q.    Mr. Duque, you told us yesterday when you joined
23   Intuitive, significant portions of the manufacturing process
24   were being done manually.
25          Do you recall that?
```

DUQUE - DIRECT/ PARKER

1   A.   I do.

2   Q.   And has that changed at all in the 24 years you have been

3   at Intuitive?

4   A.   Oh, absolutely.

5   Q.   And how so?

6   A.   There's a lot more automation.  We have had to scale.  We

7   have had to improve our quality.  We have had to improve our --

8   our repeatability.  So there's a lot more automation.

9        I mentioned before, when we first came in, everything was

10  done manually component by component.  Some of those components

11  now come in as subassemblies, coming from feeder lines or

12  coming from suppliers at some level of subassembly.

13       And then there's a lot of operations that had been done

14  manually in the past that are done with some level of

15  automation, semi-automation on the line today.

16  Q.   Mr. Duque, are you familiar with the term "calibration" as

17  it relates to EndoWrists?

18  A.   I am.

19  Q.   And how, if at all, is calibration relevant when

20  manufacturing EndoWrists?

21  A.   Sure.  So when you have the completed instrument assembly,

22  the cables are routed through the distal end effector end,

23  routed through the entire instrument and through the instrument

24  back-end.  So the assembly portion of it is mostly done, but

25  the cables are -- they still need to be tensioned and that

DUQUE - DIRECT/ PARKER

1    tensioning is a calibration.

2         The technicians need to set the appropriate amount of

3    tension on each cable, and they do that to each cable pair.  So

4    it's done on one side of the cable pair and then on the other

5    side of the cable pair.

6         And then after that's done the -- the instrument moves to

7    a different fixture where they measure, you know, how much

8    tension is applied.  And then also takes the measurements to

9    compare the tension from one side of each joint to the other

10   side.  That needs to be balanced to -- within a certain

11   threshold so that we're ensuring that the offset of the end

12   effector is within a certain threshold of what we call the true

13   zero position.

14   Q.   And, Mr. Duque, I want to talk for just a minute about

15   that calibration process in a little more detail.

16        Starting with the older generation S and Si EndoWrists,

17   were those devices calibrated using a manual or an automated

18   process?

19   A.   For S/Si it was manual.

20   Q.   Mr. Duque, can you please turn in your binder to what's

21   been marked as Exhibit TX-622.

22        (Witness complied.)

23   A.   I'm here.

24   Q.   And do you recognize that document, sir?

25   A.   I do.

2230

DUQUE - DIRECT/ PARKER

1   Q.   And what is it?

2   A.   So this is an example of a manufacturing processing

3   instruction or MPI.  It is one of several documents that we use

4   to define the manufacturing or assembly process involved to

5   build an EndoWrist instrument.  We also use it to train

6   assembly technicians.

7           MS. PARKER:  Your Honor, I would seek to admit

8   Exhibit 622 and publish it to the jury.  I understand there are

9   no objections.

10          MR. VAN HOVEN:  No objection.

11          THE COURT:  It's admitted and you may publish it.

12      (Trial Exhibit 622 received in evidence)

13      (Document displayed.)

14  BY MS. PARKER:

15  Q.   Mr. Duque, you mentioned these were manufacturing process

16  instructions.

17      Which generation of EndoWrists do these apply to?

18  A.   These are for IS1200, IS2000 and, IS3000 instruments.

19  Q.   Is there another name that the jury might recognize those

20  numbers by?

21  A.   Sure.  S/Si.

22  Q.   Mr. Duque, if we could go look at the first step of these

23  manufacturing process instructions.  It reads [as read]:

24          "Install the unit on an input nest with the

25          appropriate wrist nest."

2231

DUQUE - DIRECT/ PARKER

1      Do you see that?

2  **A.**   I do.

3  **Q.**   What is an input nest?

4  **A.**   So an input nest is a fixture that adapts to the

5  instrument back-end.  It holds the input disks at their nominal

6  zero position.

7  **Q.**   What about a wrist nest, what is that?

8  **A.**   So the wrist nest is another fixture to install over the

9  instrument end effector and it holds the grip and wrist at its

10 nominal zero position.

11 **Q.**   And are the same input nests and wrist nests used in

12 calibrating every S and Si EndoWrist?

13 **A.**   No, they are different for each type of instrument.

14 **Q.**   Can someone go out and just buy one of those input nests

15 or wrist nests and use it to tension the cables on their

16 EndoWrists at home?

17 **A.**   No.  These are custom to our EndoWrists.

18 **Q.**   Mr. Duque, if we can look down on the page to step six of

19 the manufacturing process instructions.  It reads [as read]:

20        "Insert the cable tensioning tool into the

21     tensioning hole on a clamping pulley."

22     Do you see that?

23 **A.**   I do.

24 **Q.**   And what is a cable tensioning tool?

25 **A.**   So a cable tensioning tool is another fixture.  It's

DUQUE - DIRECT/ PARKER

1    essentially a miniature torque driver, very much like the

2    torque driver that you would use to set the torque on the lug

3    nuts of your car wheel; but this is one that's been specially

4    designed to apply the correct amount of tension to our

5    EndoWrist instruments.

6    **Q.**   And if we look to step seven, the first sentence reads

7    [as read]:

8            "Move the tensioning tool towards the crimp until

9         the correct tension is reached (indicated by the marks

10        on the tensioning tool)."

11        Do you see that, sir?

12   **A.**   I do.

13   **Q.**   What's being instructed here for the technician to do?

14   **A.**   Sure.  So the tensioning tool is installed onto holes or

15   receiving receptacles on each of the clamping pulleys.  They

16   are rotating it.  And as they are rotating it, there is an

17   indicator on the tensioning tool that the operator or the

18   technician is looking at.

19       When that indicator aligns with certain markings on that

20   tension tool, it's applying -- we know that that's applying a

21   certain threshold of tension to the cable.

22   **Q.**   And does every EndoWrist get tension to the same

23   indications or markings on the tensioning tool?

24   **A.**   No.  The tension is different for various instruments.

25   It's even different for each of the inputs.

DUQUE - DIRECT/ PARKER

1   Q.   Is that micro-tensioning tool with those markings that

2   your technicians use to tension the cables, is that something

3   that someone can go out and buy?  You mentioned it was similar

4   to what you used to adjust tension your tires.  Can I buy one

5   of those in a store?

6   A.   No.  It's custom to our manufacturing process.

7   Q.   If one of your technicians didn't have their

8   micro-tensioning tool one day, could they just tension the

9   cables in the S and Si EndoWrists by feel?

10  A.   No, they couldn't.  It's difficult.  It's hard to identify

11  how much tension is actually being applied to the cables

12  without the tensioning tool.  It can't be done by hand.

13  Q.   And what happens in the process briefly once -- once a

14  technician tensions the cables to the indicated markings, what

15  happens then to finish the tensioning process?

16  A.   Sure.  So they set an initial tension, as per the process

17  we described.  First they did one side of the cable pair and

18  then the other.  They will go through the series of the other

19  input disks to complete the tensioning on each of them.

20       Then the instrument gets installed onto another fixture

21  that we call the instrument performance tester and it will go

22  through a series of motions.  With the wrist nest on, holding

23  the end effector at its true zero position, this fixture will

24  drive a known amount of torque through each of the input disks

25  to measure how much translation there is.  Essentially how much

DUQUE - DIRECT/ PARKER

```
 1  travel there is, how much stretch there is in the cable.
 2  That's what we call slack.
 3      So it's measuring the slack, kind of a measurement of how
 4  much tension is applied for each direction.  It will turn in
 5  one direction and then -- for taking a measurement in one of
 6  the cables, and then turn in the opposite direction to measure
 7  the tension on the other side of the cable.  So it's ensuring
 8  it's within a certain threshold.  And then it's comparing the
 9  tension from one side to the other to make sure that it's
10  balanced.
11  Q.   And does that happen for every EndoWrist that comes --
12  every S and Si EndoWrist that comes off the line?
13  A.   That's correct, for every joint.
14        MS. PARKER:  Mr. Lee, we can take that down for now.
15  Thank you.
16      (Document removed from display.)
17  BY MS. PARKER:
18  Q.   Mr. Duque, we have talked about the process for tensioning
19  S and Si EndoWrists.  What, if any, differences are there in
20  how Intuitive calibrates X and Xi EndoWrists?
21  A.   So for X/Xi, that tensioning process is automated.  When I
22  was describing the S/Si, the technician is applying tension.
23  You put it on a fixture that measures the tension and then
24  measures the balance between tension.  If it's not within a
25  certain threshold, they have to take it off and then re-tension
```

DUQUE - DIRECT/ PARKER

1    include or account for all of the preliminary testing that was

2    done, the feasibility testing that was done, the bench-top

3    testing that we talked about before, as well as any dry run

4    testing we may have done to get confidence going into formal

5    V&V.

6        It also doesn't account for any times that we've run the

7    formal V&V and we failed.  What we are looking at is the

8    successful result.

9    **Q.**   Mr. Duque, based on your experience working at Intuitive,

10   how would you describe the time and resources that Intuitive

11   puts into testing its EndoWrist products?

12   **A.**   It's significant.

13        **MS. PARKER:**  Mr. Lee, we can take that down.  Thank

14   you very much.

15        (Document removed from display.)

16   **BY MS. PARKER:**

17   **Q.**   Mr. Duque, you mentioned yesterday that when you joined

18   Intuitive in 2001, there were seven EndoWrists that were

19   already on the market; is that right?

20   **A.**   That's correct.

21   **Q.**   And were those EndoWrists being sold with a use limit?

22   **A.**   Yes, they were.

23   **Q.**   What was that limit?

24   **A.**   It was ten for all of them.

25   **Q.**   And what was your impression of that ten-use limit on

DUQUE - DIRECT/ PARKER

```
 1   EndoWrists when you joined in 2001?
 2   A.   When I first joined, the company was still very spartan
 3   and those devices were very new.  It was a -- it was a high
 4   bar.  We weren't achieving that through -- put even at life
 5   zero.  We were failing instruments coming off the manufacturing
 6   line, so it was a pretty high bar.
 7   Q.   And based on the work that you've done over the years at
 8   Intuitive, if it were suggested to you that the use limits on
 9   EndoWrists were a marketing ploy or a way to sell more
10   EndoWrists, what would your reaction to that be?
11   A.   I disagree.
12   Q.   Why is that?
13   A.   Like I said, it was -- it was difficult to achieve ten.
14   We had to redesign, optimize -- redesign the components,
15   redesign the processes, retest.  It took a while for us to get
16   to ten.  There was a time when we didn't achieve ten for some
17   of those instruments.
18   Q.   And based on your experience at Intuitive, if it were
19   suggested that the way that you should be setting use limits is
20   to test some EndoWrists until they fail and then pick a number
21   one under that, why isn't that a process you used to set use
22   limits?
23   A.   Well, we talked about the Weibull analysis.  When you're
24   running life tests, the data is not clean.  You'll run tests --
25   even if you had a target to, say, ten, some of those test
```

DUQUE - REDIRECT / PARKER

1  have to rotate it past the indicators.  And then slowly come

2  back down to the demarcations on the tension tool.  And that's

3  done purposefully, because you want to tension higher and then

4  reduce the tension to the calibration target.

5        If you did it the other way, there's some constructional

6  stretch in the cables that wouldn't be taken out.

7        We described the cables.  It's a makeup of over 200

8  individual filaments.  There's interstitial space in there, and

9  that interstitial space, that's causing stretch.

10       And so the reason why we tension higher and then come back

11  down is to kind of take out all of that space so that we can

12  tension it in a reliable and repeatable fashion.

13       Sorry.  That was a long example.

14  **Q.**   No, I appreciate it.  Thank you, sir.

15       Counsel asked you a few questions about a -- whether you

16  had seen any EndoWrists that had been hacked by third parties.

17       Do you recall that?

18  **A.**   I do.

19  **Q.**   And you mentioned, I believe, that you saw a device in

20  person as well as photographs; is that correct?

21  **A.**   That's correct.

22  **Q.**   And did you make any observations from the device that you

23  saw?

24  **A.**   Yes.

25  **Q.**   And what was your reaction when you saw that device?

DUQUE - REDIRECT / PARKER

1    A.    Well, immediately I can see that the RTI board had been

2    modified.  There was a couple wires that were soldered onto it

3    and then an additional printed circuit board that was installed

4    onto it.

5         And the way it was installed in the example that I saw, it

6    was right in the middle of a couple of the input disks, right

7    in the area where some cables were traveling back and forth.

8         So one of my immediate observations was that there's an

9    electrical safety risk.  There's a requirement that any

10   electrical component that could take a charge be a certain

11   distance away from anything that can extend down to the tip of

12   the instrument to ensure that we don't inadvertently shock

13   either the patient or the user.

14        So I knew already that we were encroaching on some

15   electrical safety requirements.

16        MS. PARKER:  Your Honor, I would seek to admit and

17   publish to the jury Exhibit 836.

18        Counsel, I don't have a hard copy.  It's a video.  It's

19   not objected to.

20        MR. VAN HOVEN:  What foundation does he have for this?

21        MS. PARKER:  Your Honor, the witness was asked

22   questions about whether he observed and tested certain returned

23   devices.  This is a video of the procedure that was used to

24   hack those devices.

25        It's not an objected-to video, and I'd like to ask the

DUQUE - REDIRECT / PARKER

1    witness whether what he sees in that video is consistent with

2    the concerns he just raised about the device he inspected.

3            MR. VAN HOVEN:  This witness has no basis whatsoever

4    to -- no background.  He has never -- yeah.

5            THE COURT:  Overruled.  You can use the video.

6            MS. PARKER:  Mr. Lee, if we could please pull up 836.

7        (Videotape played in open court.)

8    BY MS. PARKER:

9    Q.   Mr. Duque, I will represent to you this was a video

10   produced in the case from Rebotix.  Can you please tell the

11   jury what you just observed in that video?

12   A.   Okay, yeah.  It looks like they removed the housing

13   forcibly.

14   Q.   And you talked to us a little earlier today about the

15   housing.  What's your reaction to what you just saw there?

16   A.   I mean, that's not supposed to happen.  The housings are

17   there to protect the inside of the instrument, protect those

18   cables.

19        Yeah, that's -- not happy about it.

20   Q.   Fair enough, sir.

21           MS. PARKER:  Mr. Lee, can we please play the next clip

22   from the video?

23   BY MS. PARKER:

24   Q.   And, Mr. Duque, if you could please watch your screen.

25        (Videotape played in open court.)

DUQUE - REDIRECT / PARKER

1  Q.    Mr. Duque, I'll represent to you that that's a drill being

2  used to drill a hole into the S and Si EndoWrists.

3       Can you tell us what your reaction is to seeing that part

4  of the video?

5  A.    Umm, yeah.  It's -- these instruments are near and dear to

6  me.  That -- that's pretty abusive to the instrument.

7  Q.    What do you mean by that?

8  A.    I mean, you're drilling into the housing or the chassis

9  top with a drill.  There's particulate that's being generated.

10  That particulate is getting all over the pulleys and cables.

11       Yeah, it looks like an engineering workbench.

12          MS. PARKER:  Mr. Lee, if we could please play the next

13  clip.

14       (Videotape played in open court.)

15  BY MS. PARKER:

16  Q.    Mr. Duque, I know it's a little hard to see in the video,

17  but do you recognize that green device there has the circuit

18  board for the S and Si EndoWrist?

19  A.    Yes, that's the RTI board.

20  Q.    And what you can observe in the video is that a dental

21  pick is being used to scrape the covering off that RTI board?

22  A.    I see that, yes.

23  Q.    What's your reaction to that?

24  A.    It's pretty aggressive.  Just the RTI board is in a vice

25  clamp.  It looks like they are vice clamping on the pogo pins,

DUQUE - REDIRECT / PARKER

```
 1   which are moving components.  They are scraping away the
 2   pyrroline coating, which is intended to encapsulate the PCA
 3   board to help it withstand the autoclave steam sterilization
 4   cycle.
 5        Yeah.  I mean, when we're prototyping instruments and
 6   doing things on an engineering workbench, we might do things
 7   like this, but totally informal.
 8   Q.   And, Mr. Duque, you were asked some questions on your
 9   examination on whether you conducted testing on the devices
10   that were returned to Intuitive through the RMA process, the
11   hacked devices.
12        Do you recall that?
13   A.   I do.
14   Q.   And you said that you didn't do testing on those.  Can you
15   explain why not?
16   A.   Well, first of all, the instruments were already broken,
17   which is why they were coming through the RMA loop.  I don't
18   know if they were non-functional because of the cables being
19   broken or something else, but they came through the RMA loop
20   for a reason.
21        But, I mean, you asked me do I -- I don't know why I would
22   test this -- these instruments.  They had been adulterated.  I
23   don't know what the history is.  I don't know what was done to
24   them.  To me, it was just adulterated product.
25   Q.   And why would you need to know the history of an
```

2326

SMITH - DIRECT / MICHAEL

```
 1   an Intuitive surgical system requires.
 2           MR. MICHAEL:  And just for the record, the document
 3   that's being shown here has been marked TX-1325.  It's in
 4   evidence.
 5   BY MR. MICHAEL:
 6   Q.   Is it your understanding that this is an Intuitive
 7   document?
 8   A.   It is.  It's a -- I don't know if I've seen precisely this
 9   document, but I have seen documents -- I think I have seen this
10   document.
11   Q.   Okay.
12           MR. MICHAEL:  Let's go to the next slide, please.
13       (Document displayed.)
14   BY MR. MICHAEL:
15   Q.   Now, Dr. Smith, did you also analyze Intuitive's actual
16   prices for the da Vinci system over time?
17   A.   Again, yes.  Just in an effort to determine whether it
18   looks like they've been -- as they have gained sales and
19   arguably -- or the plaintiffs have accused them of gaining
20   monopoly power over time, has that been demonstrated by an
21   increase in their pricing?
22   Q.   And what did you find when you looked at da Vinci prices
23   over time?
24   A.   Well, these are the -- this is for the platforms, the
25   consoles.  And they have stayed relatively flat.
```

SMITH - DIRECT / MICHAEL

1    In real terms the dotted line there, that's adjusting for

2    inflation.  They have actually gone down a little bit since

3    2014.

4    Q.   Just to be clear about the terminology, when you say "real

5    terms," you mean prices adjusted for inflation; is that

6    correct?

7    A.   Yeah.  So the top line there is just like nominal, like

8    what is charged on the day it is charged, 2016, 2017, 2018.

9        The dotted line is effectively comparing everything in

10   2014 dollars, so it's adjusting everything down to account for

11   inflation.

12       MR. MICHAEL:  Let's look at the next slide, please.

13       (Document displayed.)

14   BY MR. MICHAEL:

15   Q.   So we just talked about prices for the da Vinci.

16       Did you also look at prices for EndoWrists specifically

17   over time?

18   A.   Yeah.  So these are actually going down in real and

19   nominal terms.  So this is price-per-procedure.

20       And you can see that over time, the prices of EndoWrist

21   instruments on a per-instrument basis is not really changing.

22   But as the hospitals, the doctors get more efficient with

23   operating the -- the da Vinci surgical systems, also as the

24   da Vinci surgical system continues to compete with lap and open

25   and do additional procedures that require different sets of

1   instruments, the price-per -- per-procedure are actually going

2   down for instruments.

3   **Q.**   In a market where competition is being harmed, do you

4   generally expect to see prices going up or going down?

5   **A.**   I would expect that they are over time gaining an

6   entrenching market power. I would expect prices to be rising,

7   not falling.

8   **Q.**   And when you see prices staying flat or going down, is

9   that, generally, a pro-competitive outcome or an

10   anticompetitive outcome?

11   **A.**   It's consistent with their ongoing competition with lap

12   and open and their efforts to penetrate deeper into the

13   surgeries that traditionally have been occupied by those

14   methods.

15   **Q.**   So you just talked about some of the economic evidence of

16   outcomes that you saw with respect to innovation, quality, and

17   price.

18       Does the economic significance of any of that evidence

19   depend in this case on how you define the relevant market for

20   Intuitive's products, or is it independent of that?

21   **A.**   It's independent of it completely. I mean, it's -- so

22   relevant -- to be clear, what relevant markets are in an

23   antitrust case like this one, they are indirect indicators of

24   market power, monopoly power. These are -- this is just in a

25   direct assessment. It doesn't depend on how the market is

SMITH - DIRECT / MICHAEL

1    whether other companies in the marketplace have similar

2    contract terms or policies to Intuitive?

3    **A.**    Yeah.  I mean, for similar reasons to looking at what

4    Intuitive was doing way back at the beginning, before they

5    arguably had any market power, it's interesting to know whether

6    other firms that don't have a significant presence in the

7    marketplace have similar contractual provisions.  It suggests

8    that those contractual provisions have purposes that are

9    unrelated to any anticompetitive action.

10   **Q.**    Let me ask you to turn to Tab 5 in your binder, which is a

11   document marked TX-1612-R, and to look specifically at Page 37

12   of that document.

13        (Witness complied.)

14   **Q.**    Dr. Smith, can you tell me whether this was a document

15   relating to contract terms of a company called Medrobotics that

16   you considered in forming your opinion?

17   **A.**    Yes.  Medrobotics was a -- another company that had a

18   device.  I think it's no longer present in the market.

19            **MR. MICHAEL:**  Your Honor, I offer TX-1612-R.

20            **MR. McCAULLEY:**  No objection.

21            **THE COURT:**  Thank you, Mr. McCaulley.  It's admitted.

22        (Trial Exhibit 1612-R received in evidence).

23            **MR. MICHAEL:**  Thank you.

24        May I publish an excerpt from Page 37 of the document?

25            **THE COURT:**  You may.

SMITH - DIRECT / MICHAEL

1    **MR. MICHAEL:**  Mr. Lee, if you could go to Slide 20,

2    please.

3        (Document displayed.)

4    **BY MR. MICHAEL:**

5    **Q.**   What did you find, Dr. Smith, with respect to whether

6    Rebotix had any similar contract terms to Intuitive?

7    **A.**   Yeah.  So a very similar term to what we read earlier

8    about accessories made or approved by Intuitive.  Medrobotics,

9    in their contracts, doesn't want their customers using

10   instruments that are not made or approved by Medrobotics.

11   **Q.**   And what did that piece of economic evidence tell you

12   about whether Intuitive's contract term were pro-competitive or

13   anticompetitive?

14   **A.**   It's just consistent with their having a motivation that's

15   not anticompetitive, certainly.  And, you know, for efficiency

16   reasons, you would expect that -- to have a term like this, you

17   know, it's not motivated by anticompetitive motivations, then

18   it's probably motivated by something pro-competitive.

19   **Q.**   Did you also look at the policies of a company called CMR?

20   **A.**   I have seen some of CMR's provisions.

21   **Q.**   Okay.  And if you look at Tab 1 in your binder, did you

22   consider the terms -- I'll wait until you're there.  Sorry.

23       (Witness complied.)

24   **Q.**   My question was with regard to Tab 1, which is a document

25   marked TX-1309-R.  Did you consider the terms set out in this

SMITH - DIRECT / MICHAEL

```
 1    document in conducting your economic analysis this case?
 2    A.   Yes, I've seen this document before.
 3         MR. MICHAEL:  Your Honor, I offer TX-1309-R into
 4    evidence.
 5         MR. McCAULLEY:  No objection.
 6         THE COURT:  It's admitted.
 7    (Trial Exhibit 1309-R received in evidence)
 8         MR. MICHAEL:  And this one, Your Honor, is under seal
 9    by a third party.  So I have hard copies to hand out to the
10    jury.
11         May I do that now?
12         THE COURT:  You may.
13         MR. MICHAEL:  Thank you.
14    (Whereupon Exhibit 1309-R was tendered to the jury.)
15         THE COURT:  Dr. Smith, do you have a copy?
16         THE WITNESS:  I do.  I do have a copy.  Thank you.
17    (Brief pause.)
18    BY MR. MICHAEL:
19    Q.   Dr. Smith, I'll direct you to Page 23 of TX-1309.
20    A.   Yes, I see it.
21    Q.   And I'm not going to ask you to read out loud any
22    significant parts of this, but do you see there's a heading
23    titled "Safety Features"?
24    A.   I do.
25    Q.   And below that there is some discussion of safety features
```

SMITH - DIRECT / MICHAEL

```
 1   associated with the CMR system?
 2   A.   Yes.
 3   Q.   Apologies if I asked you this before, but could you just
 4   remind us what you understand CMR to be?
 5   A.   CMR is a -- they make a minimally invasive surgical
 6   platform.  It's not been sold in the United States.  It's
 7   sold in -- I think there's some in the UK and...
 8   Q.   Sorry to interrupt.  Were you done?
 9   A.   Yes, sir.
10   Q.   Okay.  And then if you look at the next page, Page 24, do
11   you see the second bullet up from the bottom of the page that
12   starts "The subject device"?
13   A.   Yes.
14   Q.   And I'll just ask you to read that to yourself.
15        (Witness complied.)
16   A.   Okay.
17   Q.   Dr. Smith, did you find that CMR had some similar policies
18   with respect to surgical instruments used with its system as
19   Intuitive did in this case?
20   A.   Yeah.  Similar policy, similar product design.
21   Q.   And what did that tell you about whether Intuitive's
22   policies were pro-competitive or anticompetitive?
23   A.   Well, this is a company, again, that is nascent.  So it
24   doesn't have any significant market power.
25        And this is under "Safety Features," so it tells me that,
```

SMITH - DIRECT / MICHAEL

1  you know, it's consistent with Intuitive's policies being

2  motivated by safety and quality.

3          **MR. MICHAEL:**  Your Honor, we're done with that

4  document.  Would you like it to be collected from the jury or

5  should --

6          **THE COURT:**  Yes, please.

7          **MR. MICHAEL:**  Okay.

8      (Exhibit 1309-R collected from the jury.)

9  **BY MR. MICHAEL:**

10 **Q.**   Now, Dr. Smith, if we could go to your next slides, Slide

11 21, I want to --

12         **MR. MICHAEL:**  And do we have that on the screen,

13 Mr. Lee?

14     (Document displayed.)

15 **BY MR. MICHAEL:**

16 **Q.**   I want to talk about your next conclusion, which was that

17 Intuitive did not exclude SIS from competing; is that right?

18 **A.**   That's right.

19         **MR. MICHAEL:**  Let's go to Slide 22, please.

20     (Document displayed)

21 **BY MR. MICHAEL:**

22 **Q.**   And can you explain to the jury what you are depicting on

23 this slide and how it relates to your conclusion?

24 **A.**   Yeah.  So as to whether SIS's ability to compete has been

25 harmed, you might look at what they have been doing since the

2347

SMITH - DIRECT / MICHAEL

1    Traditional methods, lap and open, are declining sort of

2  in parallel with one another.  It indicates that some of the

3  surgeries that Intuitive is now doing come at the expense of

4  open and some come at the expense of laparoscopy.

5        **MR. MICHAEL:**  Let's go to the next slide, please.

6    (Document displayed.)

7  **BY MR. MICHAEL:**

8  **Q.**  Now, Dr. Lamb, in his testimony, talked about Intuitive

9  having a high market share, market share about 90 percent I

10  think is what he said.

11    Do you agree that Intuitive's market share was about

12  90 percent?

13  **A.**  No.  I think that's because I disagree that the market

14  he's defined is a relevant market.  So when we're talking about

15  the contract provisions that Intuitive has, you want to look at

16  the -- what they are focused on in competing and why those

17  terms are there.

18    They are offering a surgical solution to the marketplace,

19  and that's in competition with lap and open.  So I -- I just --

20  he and I just disagree about what the relevant market is here.

21  **Q.**  So can you explain what you did to look at shares and what

22  the data is that you're showing on Slide 25?

23  **A.**  Yeah.  So these are just some examples of surgeries that

24  are performed using different modalities.

25    Prostatectomy is one of the first procedures that were

**SMITH - DIRECT / MICHAEL**

1  done using an Intuitive surgical system, and they perform a

2  relatively high proportion of those.

3      Cholecystectomy is something that's more often done

4  laparoscopically.

5      And then a colon surgery is more often done using open

6  methods.

7      So these are just three examples of surgeries that can be

8  performed using a da Vinci surgical system and their relative

9  share of the surgeries that are performed using it.

10 **Q.**   So for prostatectomy, what was the da Vinci's relative

11 share as compared to open and lap that you observed in 2021?

12 **A.**   So that's the -- the most prevalent da Vinci surgery, and

13 they have a -- more than half of procedures are done doing --

14 using an Intuitive Surgical system.

15 **Q.**   And that's the 61 percent that you identify for a

16 prostatectomy?

17 **A.**   Yes.

18 **Q.**   And how about for cholecystectomy, removing the

19 gallbladder, what was da Vinci's share in 2021 for that

20 procedure?

21 **A.**   So there their share is much smaller.  I don't have a

22 number by the line there, but it looks like it's on the order

23 of maybe 12 percent.

24 **Q.**   And just to be clear, do you see the fourth column over?

25 The da Vinci share?

SMITH - DIRECT / MICHAEL

| | |
|---|---|
| 1 | **A.**   Oh, 14 percent.  So I was close. |
| 2 | **Q.**   So I just wanted to make sure I understood your chart |
| 3 | here. |
| 4 | Is that what you're showing as da Vinci's share relative |
| 5 | to open and lap? |
| 6 | **A.**   Yes. |
| 7 | **Q.**   And how about for colon? |
| 8 | **A.**   It's 23 percent there. |
| 9 | **Q.**   Got it. |
| 10 | **MR. MICHAEL:**  Let's go to the next slide, please. |
| 11 | (Document displayed.) |
| 12 | **BY MR. MICHAEL:** |
| 13 | **Q.**   Now, was there any category or procedure type in which you |
| 14 | found that da Vinci surgery was the only surgical option and |
| 15 | did not compete with either open or lap? |
| 16 | **A.**   Not among surgeries that can be performed using the |
| 17 | da Vinci surgical systems.  All of them can be done using |
| 18 | laparoscopy and/or open methods. |
| 19 | **Q.**   And in most of those surgical categories, did da Vinci |
| 20 | surgery account for more than half or less than half of the |
| 21 | procedures? |
| 22 | **A.**   Only prostatectomy does it account for more than half. |
| 23 | **Q.**   Now, do the numbers that you're showing on Slide 26, do |
| 24 | those include all hospitals that do these procedures or only a |
| 25 | subset? |

SMITH - DIRECT / MICHAEL

1  A.   This is across all hospitals.

2  Q.   So would some of these be hospitals that don't even have a

3  da Vinci?

4  A.   Yes.

5  Q.   And why did you believe it was relevant to look across all

6  hospitals, as opposed to only those that have a da Vinci in

7  assessing shares?

8  A.   There are two margins on which Intuitive is competing for

9  surgeries.

10      One is to convince a hospital that they should buy the

11  capital to have a da Vinci surgical system in the hospital so

12  that they can perform the surgery.

13      And then even for hospitals that have them, there's a

14  second margin on which they are competing, which is to have

15  that be used to perform the surgery.

16  Q.   So did you also consider what the share numbers show if

17  you look only at hospitals that already have a da Vinci system

18  or did as of 2021?

19  A.   Right.  So, I mean, it would ignore the first dimension of

20  competition I just talked about.

21      But, yes, if you focus only on hospitals that have

22  performed at least one da Vinci surgery, those shares are shown

23  on the next slide, I believe.

24      MR. MICHAEL:   So let's take a look that, Slide 27,

25  please.

SMITH - DIRECT / MICHAEL

1          (Document displayed.)

2   BY MR. MICHAEL:

3   Q.   And explain what you found or summarize what you found,

4   please, when you looked at share of procedures only at

5   hospitals that have a da Vinci system?

6   A.   So they average a little more, you know, a little higher

7   share for the da Vinci surgical system.  And there are now two

8   procedures where they have more than half, on average.

9   Q.   And that's prostatectomy and hysterectomy?

10  A.   Yes.

11  Q.   And prostatectomy, the share here at hospitals that have a

12  da Vinci system is 76 percent as of 2021; is that right?

13  A.   Yes.

14  Q.   And for cholecystectomy, the other procedure we talked

15  about earlier, the share is 29 percent; is that right?

16  A.   Yes.

17          MR. MICHAEL:  Let's go to Slide 29, please, Mr. Lee.

18         (Document displayed.)

19  BY MR. MICHAEL:

20  Q.   Now, this is a document that we already looked at earlier

21  when you were talking about market outcomes, TX-1325.

22         I just want to ask you, and return to it now to ask you,

23  what does this comparison in Intuitive's document between

24  da Vinci surgery and open and lap tell you about the market in

25  which Intuitive competes?

SMITH - DIRECT / MICHAEL

1  **A.**    Yeah, so this is their focus.  They are -- their principal

2  focus is not competition with other robotic systems.  It's open

3  and laparoscopy and procedures.  And so they are going out to

4  hospitals trying to convince them to use the da Vinci surgical

5  system more often for procedures by explaining the quality

6  benefits that this system brings to the hospital.  So lower

7  length of stay, less narcotics, back to normal activity faster

8  so the patient experiences less pain in recovery.  And those

9  can lead to cost avoidance on a per-case basis that the

10 hospital then can consider in whether they want to add the

11 capital equipment or do more da Vinci surgical procedures.

12 **Q.**    So does this kind of comparison tell you anything as an

13 economist about whether Intuitive's prices are being

14 constrained by competition from open and lap surgeries?

15 **A.**    This is the margin on which they are competing.  So this

16 is where -- this is what is affecting their pricing.

17        **MR. MICHAEL:**  Let's go to the next slide, please.

18      (Document displayed.)

19 **BY MR. MICHAEL:**

20 **Q.**    You said that Intuitive faces competition and its prices

21 are constrained by competition from open and lap surgeries.

22      If that's correct, how do you explain the profit margins

23 that Intuitive earns on the da Vinci and EndoWrists?

24 **A.**    I think it's important to understand that as a matter of

25 economics, no level of margin indicates monopoly power.

SMITH - REDIRECT / MICHAEL

1    competing with them, and that's how I infer that they are in

2    the same product market in this case.

3    **Q.**   And just to be clear, did you consider in this case

4    Intuitive's products in lap and open products to be

5    differentiated products?

6    **A.**   They are differentiated products, yes.

7    **Q.**   Do you consider those products to be all part of one

8    market in which they compete against one another?

9    **A.**   They are in -- in a -- in the same relevant market here.

10   **Q.**   And so you talked about these differentiated products

11   competing against one another in terms of their quality and

12   advantages and disadvantages; is that correct?

13   **A.**   Yes.

14   **Q.**   Okay.  And let me ask if, if we could --

15          **MR. MICHAEL:**  Sorry, Your Honor.  I'll just need to

16   grab this document.  It's TX-464, which is already in evidence.

17   I do have some hard copies to hand out, if that's helpful.

18          **THE COURT:**  Yes, Mr. Michael.

19          **MR. MICHAEL:**  May I approach the witness, Your Honor?

20          **THE COURT:**  You may.

21          **MR. MICHAEL:**  Your Honor if I could publish Page 38 of

22   this document on the screen, please.

23          (Whereupon document was tendered to the witness.)

24          **THE COURT:**  You may.  I think you said it's already --

25   Mr. Michael, it's in evidence?

2417

SMITH - REDIRECT / MICHAEL

```
 1              MR. MICHAEL:  It is in evidence, Your Honor.

 2              THE COURT:  Go ahead.

 3              MR. MICHAEL:  Thank you.

 4         (Document displayed.)

 5              MR. MICHAEL:  Thank you, Mr. Lee.

 6    BY MR. MICHAEL:

 7    Q.   So, Dr. Smith, my question is, we were talking about

 8    Intuitive marketing its products in competition with open and

 9    laparoscopy based on their clinical advantages and

10    disadvantages.

11         Here do you see an example of Intuitive also competing

12    against laparoscopic surgery by marketing a direct price

13    comparison?

14    A.   Yeah, that appears to be what they are doing here in this

15    document.

16    Q.   So in this case, have you seen evidence that Intuitive

17    competed with open and laparoscopy both on price and on

18    quality?

19    A.   Yeah.

20    Q.   Thank you.  That's all the questions I have.

21              THE COURT:  Thank you, Mr. Michael.

22         Thank you, Dr. Smith.

23         Mr. McCaulley, do you have -- I thanked you too soon.  Do

24    you have anything else, Mr. McCaulley?

25              MR. McCAULLEY:  No.  Thank you, Your Honor.
```

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, January 24, 2025

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco, California*