No. 25-1372

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

**SURGICAL INSTRUMENT SERVICE COMPANY, INC.,**
*Plaintiff/Appellant,*

v.

**INTUITIVE SURGICAL, INC.,**
*Defendant/Appellee.*

◆

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-03496 (Hon. Araceli Martinez-Olguin)

◆

**BRIEF OF *AMICUS CURIAE* THE AMERICAN ASSOCIATION OF GYNECOLOGIC LAPAROSCOPISTS IN SUPPORT OF DEFENDANT-APPELLEE**

◆

F.M. Haston, III
Stanley E. Blackmon
J. Turner Collins
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
thaston@bradley.com
sblackmon@bradley.com
tcollins@bradley.com

*Attorneys for the American Association
of Gynecologic Laparoscopists*

## DISCLOSURE STATEMENT

*Amicus curiae* the American Association of Gynecologic Laparoscopists is a nonprofit organization. It has no parent corporations and does not issue stock.

Dated: November 5, 2025

/s/ F.M. Haston, III
F.M. Haston, III
BRADLEY ARANT BOULT
  CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
thaston@bradley.com

*Counsel for American Association of Gynecologic Laparoscopists*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT....................................................................i

STATEMENT OF INTEREST .................................................................1

INTRODUCTION...................................................................................3

ARGUMENT .........................................................................................4

I.    Instruments that are manipulated through unapproved methods raise patient safety concerns, including risks of mechanical failure or compromised performance...........................4

II.   Accepting SIS's position would endanger patient safety and put surgeons at risk of liability for their use of compromised devices. ................................................................................6

CONCLUSION.....................................................................................11

CERTIFICATE OF COMPLIANCE.....................................................13

CERTIFICATE OF SERVICE..............................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

*Reprocessing of Reusable Medical Devices*, FDA,
   https://www.fda.gov/medical-devices/products-and-
   medical-procedures/reprocessing-reusable-medical-devices
   (last visited Nov. 5, 2025) ..................................................................5

# STATEMENT OF INTEREST

*Amicus curiae* the American Association of Gynecologic Laparoscopists ("AAGL") respectfully submits this brief in support of Defendant-Appellee Intuitive Surgical, Inc. ("Intuitive").[1]

AAGL is the world's leading professional medical association focused on improving women's healthcare through the advancement of minimally invasive endoscopic surgery in gynecology.  Founded in 1971 as an American organization, AAGL has grown to become a global leader in medicine with surgeons in over 110 countries.  Among other important activities, AAGL sponsors educational seminars, publishes the *Journal of Minimally Invasive Gynecology*, and hosts an annual Global Congress.  AAGL also has played an essential role in establishing standards for minimally invasive gynecologic surgery.  Essentials in Minimally Invasive Gynecologic Surgery ("EMIGS") is a comprehensive program

---

[1] All parties consented to the filing of this brief, and AAGL thus may file the brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), AAGL states that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting this brief; and no person, other than amici, its members or counsel, contributed money intended to fund preparing or submitting this brief.

designed by experts in the field for the standardized education and assessment of minimally invasive gynecologic surgery knowledge and skills. The American Board of Obstetrics & Gynecology, the leading board-certification body for obstetric and gynecologic surgery, has approved AAGL's EMIGS program to fulfill the surgical-skills program requirement for board certification.

AAGL has a special interest in this litigation as well as familiarity with and knowledge of the surgical instruments at issue. AAGL members routinely operate with Intuitive's limited-use instruments including its EndoWrist devices ("EndoWrists"). They depend on the safe, effective, and predictable use of such instruments. And they are concerned about the implications on a decision that might embolden companies to alter, hack, or manipulate original manufacturers' instruments in a manner that exceeds their intended and regulatorily-approved uses. AAGL thus has a substantial interest in supporting outcomes that would protect public health, generally, and the health of AAGL patients' specifically.

## INTRODUCTION

The safety of patients and the integrity of the medical system depend on adherence to the regulatory framework established by Congress and enforced by the U.S. Food and Drug Administration. That framework assigns responsibility for a device's safety and effectiveness to its manufacturer, subject to rigorous testing, documentation, and FDA review. Physicians rely on those approvals to ensure that the devices they use perform as intended.

When, as here, third parties seek to manipulate or "hack" FDA-approved devices without the manufacturer's authorization or the governing regulatory agency's clearance, that reliance is undermined. Such modifications create products that have never been evaluated for safety or efficacy and that pose unknowable risks to the doctors and patients involved. Intuitive thus allows its customers to purchase third-party products and services which it has independently credentialed and approved. That approval is reasonable and necessary to ensure that Intuitive's devices, as designed and manufactured, meet the standards necessary to protect patients.

This Court should affirm the District Court's judgment.

3

# ARGUMENT

As Intuitive has explained (Intuitive Br. 50–61), Intuitive allows its customers to make certain purchases from "approved" third-party suppliers. Intuitive's third-party approval process is reasonable and necessary to promote patient safety and protect public health.

## I. Instruments that are manipulated through unapproved methods raise patient safety concerns, including risks of mechanical failure or compromised performance.

AAGL's surgeon members depend on access to safe, effective, and predictable medical instruments to protect their patients during internal surgeries. These instruments have the potential to cause severe injury—or even death—as they are routinely used near multiple internal organs and are designed to facilitate a surgeon's ability to cut, cauterize, grasp, tear and remove target organs and tissue.

The operating room is no place for experimentation with instruments that have been altered, hacked or manipulated in a manner divergent from their original manufacture and intended use. This is particularly so for instruments operating outside of their approved use by governing regulatory agencies, like FDA, which require instrument manufacturers to establish the safe and effective use of such instruments

4

before their clearance. AAGL members depend on such clearance as a measure of confidence in the instruments placed into their hands in the operating room before inserting those instruments inside the bodies of their patients.

Often, the instruments AAGL members use are approved for limited uses before they must be discarded and replaced with new instruments. This is true for all manner of instruments be they traditional surgical scissors, forceps, scalpels or more sophisticated robotic instrumentation such as monopolar curved scissors, surgical staplers or forceps. For those instruments that are approved for more than one use, they are subjected to intense chemical or heated sterilization processes before being put back into the operating room. *See Reprocessing of Reusable Medical Devices*, FDA, https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices (last visited Nov. 5, 2025).

Reprocessing these instruments can cause material degradation, corrosion, and wear that is not always visible to the naked eye. For instance, repeated heat exposure beyond approved limited uses from

intended use or sterilization can dull blades, weaken joints, or alter the mechanical properties of an instrument. *See* 5-SER-1104–05. An altered instrument that has become weakened or dull is more likely to fail during a critical moment in surgery, leading to unintended tissue damage, increased trauma, or other severe surgical complications. At trial, SIS's own surgeon expert—who had "never used" a modified EndoWrist—described these risks as "terrifying." *See* 2-ER-227–28, 2-ER-232. Fundamentally, surgeons rely on instruments to perform exactly as intended and approved, and using them beyond their approved limit removes this assurance of quality and precision.

## II. Accepting SIS's position would endanger patient safety and put surgeons at risk of liability for their use of compromised devices.

The context of this case emphasizes why Intuitive's third-party approval is necessary to maintain quality control.

The EndoWrist devices use a complex set of cables and pulleys to allow surgeons to operate with them. 5-SER-1102–04, 5-SER-1192–93. During their normal and approved usages, these cables and pulleys are routinely subjected to hours and hours of use for a limited number of surgeries. *See* 5-SER-1104, 5-SER-1193–94. Over time, the cables and

6

pulleys come under increasing stress that raise the risk of failure of the devices. *See id.* Knowing about this failure risk that would increase with excessive uses, Intuitive designed EndoWrists to have a finite life and has established a safety profile with limited uses. *See* 5-SER-1104–06. These critical cables and pulleys are not being replaced, repaired, recalibrated or reconditioned by SIS as part of their alteration of Intuitive's EndoWrists; they are effectively simply cracking the EndoWrists' "odometer" and rolling it back to zero without any assurance or commitment to ensure the EndoWrist delivers its intended function safely, effectively and predictably. *See* 5-SER-1006, 5-SER-1205–08.[2]

Reusing surgical instruments beyond their approved limited or single use poses significant risks to patient safety and can compromise the integrity of surgical procedures. Manufacturers designate instruments for limited or single-use for specific reasons, including the challenges of effective resterilization and material degradation. Ignoring these limitations undermines the original validation and regulatory

---

[2] Concerning this practice, the District Court observed that "[i]n significant part, Rebotix developed a computer chip called the 'Interceptor' that could be inserted inside the S/Si EndoWrists to 'intercept' the data in the EndoWrist's memory and fool the system into accepting a new use count starting at zero." 2-SER-349.

approval of the device, putting patient lives at risk as well as creating potential liability for healthcare providers.

Intuitive sought FDA approval, supported by "thousands of pages of reports detailing Intuitive's testing of its products," before marketing its devices. 1-SER-39–40. The FDA granted Intuitive clearance to market EndoWrists instruments *with a use limit. Id.*[3]

If instruments are to be repurposed for use beyond their approved use life, the safety of such repurposing must be supported by robust data. The FDA required Intuitive to secure a new clearance when it sought to expand use limits on later-model EndoWrists, requiring additional data on extended use life. 1-SER-39–40, 1-SER-74–75 (noting that "new testing should be performed with representative instruments stressed to the maximum use life"). With patient safety and provider standards in mind, Intuitive has approved all "instruments that have been remanufactured by a third party pursuant to and in compliance with a

---

[3] AAGL's understanding is that the District Court excluded evidence related to the FDA and its regulatory clearance processes. AAGL views such evidence as essential context and ultimately relevant to understanding the actions of surgical instrument manufacturers, like Intuitive. AAGL members depend on surgical instrument manufacturers' compliance with such regulatory clearance processes to protect their patients' safety.

510(k) clearance or equivalent granted by the FDA." *See* 1-SER-47, 1-SER-120. And third parties have obtained FDA clearance to market modified EndoWrists. 1-SER-47; Intuitive Br. 14.

But SIS never requested Intuitive's approval to provide any such service or action concerning the EndoWrists and never obtained FDA clearance to do so. Indeed, Rebotix, the company SIS hired to alter and, in the District Court's words, "fool the system into accepting a new use count starting at zero," applied for FDA approval in December 2014 but FDA representatives rejected the application, warning the company that it could not place remanufactured instruments into commercial distribution unless and until it received FDA clearance. 2-SER-349–51.[4] The FDA again informed this same company in February 2020 that it must have FDA licensure under a 501(k) before continuing its operations. 2-SER-352. In 2022, an FDA representative informed Rebotix that:

> The instruments in question no longer maintain
> the same safety and effectiveness profile as cleared

---

[4] As the District Court observed, following an inquiry to the FDA from a distributor of the software that fooled the Intuitive EndoWrist to reset its count to zero, FDA stated that Section 510(k) clearance was required because "'if the use-life counter is reset or extended past the number of available use lives, then the device specifications are changed,' which would constitute 'remanufactur[ing].'" 2-SER-352 (alteration in original).

> with the original manufacturer's own submission.
> During premarket review, FDA reviews test data
> to the labeled number of reuse cycles. This
> includes, but is not limited to, items such as
> electrical safety, reprocessing, software, and
> general performance testing. By extending the
> number of uses and modifying the instrument with
> a new chip, the prior information is no longer valid
> and requires additional review to the new labeled
> usage limit in order to establish safety and
> effectiveness. This is therefore different than
> returning the device to its original condition.

2-SER-353. While admittedly this statement did not represent an official regulatory evaluation or formal position of the agency,[5] it aligns with what AAGL would expect of a regulatory authority's reaction to the conduct at issue. Ultimately, Rebotix—after it no longer worked with SIS—obtained FDA clearance for modified EndoWrists. 1-SER-47–49. SIS never obtained such clearance.

\*     \*     \*

AAGL members depend on medical device companies like Intuitive to ensure that internal surgical instruments that reach the operating room have safe, effective and predictable profiles supported by regulatory review and authorization. Such rigorous review ensures that patients

---

[5] 2-SER-353.

receive high quality and dependable care. Allowing companies like SIS to alter, hack, manipulate or—as the District Court put it—"fool" medical devices presents real, meaningful patient risk by placing these altered devices into surgeons' hands. When considering whether SIS established that Intuitive's third-party approval process was "illusory," we would urge this Court to consider and appreciate the end-users' perspective and concerns. Namely that AAGL members rely on surgical instrument manufacturers to ensure their products provide safe, effective and predictable profiles that meet FDA approval standards. Third-party approval provisions, such as Intuitive's, are a prudent means of preventing risks to patient safety.

## CONCLUSION

This Court should affirm the District Court's judgment.

Respectfully submitted,


/s/ *F.M. Haston, III*
F.M. Haston, III
Stanely E. Blackmon
J. Turner Collins
Bradley Arant Boult Cummings
   LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
thaston@bradley.com
sblackmon@bradley.com
tcollins@bradley.com

*Attorneys for the American
Association of Gynecologic
Laparoscopists*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**      25-1372

I am the attorney or self-represented party.

**This brief contains**      1,977      **words,** including      0      words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   /s/ F.M. Haston, III                    **Date**   November 5, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

13

## CERTIFICATE OF SERVICE

I certify that, on November 5, 2025, the foregoing was filed using the CM/ECF system, which will serve notice on all counsel of record.


/s/ *F.M. Haston, III*
Of Counsel
