No. 25-1372

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,
*Plaintiff-Counter-Defendant-Appellant*,

v.

INTUITIVE SURGICAL, INC.
*Defendant-Counter-Claimant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California,
No. 3:21-cv-3496 (Hon. Araceli Martinez-Olguín)

_____

## BRIEF OF *AMICUS CURIAE* ADVANCED MEDICAL TECHNOLOGY
## ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLEE

_____

Michael F. Qian
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, Texas 75201
(214) 651-5041
*Michael.Qian@haynesboone.com*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the Advanced Medical Technology Association states that it does not have a parent corporation, nor does any publicly-held corporation own 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES .......................................................................... iii

INTEREST OF *AMICUS CURIAE* ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 2

ARGUMENT..................................................................................................3

I.      It is common industry practice for manufacturers to require
        authorized servicing..................................................................................3

II.     That common practice serves vital public interests, because
        unauthorized servicing poses serious risks ...................................................5

        A.      Third-party servicers are not FDA regulated .....................................5

        B.      Unauthorized third-party servicers lack crucial capabilities
                .......................................................................................................... 11

        C.      Improper servicing risks serious harm...............................................15

III.    Inhibiting manufacturers from ensuring authorized servicing
        would threaten patient safety and innovation ............................................19

CONCLUSION................................................................................................. 22

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................... 7

**Statutes and Regulations**

21 U.S.C. §321 ................................................................................... 9

21 U.S.C. §352 ................................................................................... 9

21 U.S.C. §360 ................................................................................... 9

21 U.S.C. §360c ................................................................................. 7

21 C.F.R. §801.1 ............................................................................... 7

21 C.F.R. §§803.1 *et seq.* ............................................................... 8

21 C.F.R. §803.10 ............................................................................. 6

21 C.F.R. §806.2 ............................................................................... 8

21 C.F.R. §806.10 ............................................................................. 8

21 C.F.R. §§807.3 *et seq.* ............................................................... 7

21 C.F.R. §820.1 *et seq.* ................................................................. 8

21 C.F.R. §820.3 ............................................................................... 5

21 C.F.R. §820.25 ............................................................................. 8

21 C.F.R. §820.86 ............................................................................. 8

21 C.F.R. §820.200 ...................................................................... 8, 13

21 C.F.R. §860.3 ............................................................................... 7

## Other Authorities

89 Fed. Reg. 7496 (Feb. 2, 2024) ............................................................ 6

89 Fed. Reg. 40490 (May 10, 2024) ......................................................... 5

Advanced Medical Tech. Ass'n, Comment Letter on FDA Report on the Quality, Safety and Effectiveness of Servicing of Medical Devices (Nov. 12, 2018), *available at* https://downloads.regulations.gov/FDA-2018-N-1794-0010/attachment_1.pdf ................................................................ 17

Advanced Medical Tech. Ass'n, Comment Letter on Petition for Rulemaking FTC-2023-0077 (Feb. 2, 2024), *available at* https://downloads.regulations.gov/FTC-2023-0077-1646/attachment_1.pdf ............................................................*passim*

AdvaMed Medical Imaging Division, Comment Letter on Petition for Rulemaking FTC-2023-0077 (Feb. 2, 2024), *available at* https://downloads.regulations.gov/FTC-2023-0077-1657/attachment_2.pdf ............................................... 4, 5, 20

Advanced Medical Tech. Ass'n, Comment Letter on Medical Device Servicing and Remanufacturing Activities (Feb. 25, 2019), *available at* https://downloads.regulations.gov/FDA-2018-N-3741-0034/attachment_1.pdf ...................................................... 9, 12, 13

Advanced Medical Tech. Ass'n, Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices (June 2, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0141/attachment_1.pdf ............................................................*passim*

Baxter Healthcare Corp., Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices (June 3, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0166/attachment_1.pdf ............................................................16, 17

FDA, Remanufacturing of Medical Devices (May 10, 2024), *available at* https://www.fda.gov/media/150141/download ................................. 5, 6, 8, 9

iv

FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (2018), *available at* https://www.fda.gov/media/113431/download ........................................................................*passim*

FDA, Transcript of Presentation on Final Guidance: Remanufacturing of Medical Devices (Sept. 10, 2024), *available at* https://www.fda.gov/media/181931/download?attachment ..............................6

Hitachi Medical Systems America, Comment Letter on Refurbishing, Recondition, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices (June 2, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0173/attachment_1.pdf ............................................................................ 11

Medical Imaging & Technology Alliance, Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices (June 3, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0130/attachment_1.pdf ...................................................*passim*

Olympus Corp., Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices (May 26, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0103/attachment_1.pdf ........................................................ 14, 17, 21

Pat Baird, *The Risks of: Aftermarket Parts*, Biomedical Instrumentation & Tech., Nov/Dec 2011 .................................................................... 15

v

## INTEREST OF *AMICUS CURIAE* [1]

The Advanced Medical Technology Association ("AdvaMed"), is the world's largest medical technology association, with approximately 300 member companies that develop medical devices, diagnostic tools, and health information systems. Its members span every field of medical science and range from cutting-edge startups to multinational manufacturers, all dedicated to advancing clinician and patient access to safe, effective medical technologies in accordance with the highest ethical standards. The innovations created by AdvaMed's members advance efficiency in health care through earlier disease detection and more effective treatments which, in turn, reduce the economic burden of disease and allow people to live longer, healthier, and more productive lives.

This case addresses a common business practice for servicing medical devices: an agreement between the device's manufacturer and customer that servicing will be performed by manufacturer-authorized providers. AdvaMed's members manufacture, research, produce, and sell medical devices whose servicing is at issue in this case. AdvaMed writes to explain why the practice at issue here is common and beneficial.

---

[1] No counsel for any party authored this brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission. The parties consented to the filing of this brief.

1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Imagine a patient on the operating table has a choice. On the doctor's tool tray lie two scopes. One was repaired by personnel regulated by the FDA and vetted, trained, and equipped by the original manufacturer. The second was refurbished by an unregulated third party without manufacturer guidance.

Any patient would choose the first. So would the manufacturer. The manufacturer's name is on the device and its reputation rides on the device's performance. The manufacturer wants to see the device repaired and maintained to the highest standards so that it performs as intended.

In practice, patients have no say in who serviced the instrument. Manufacturers do. They can agree with customers (who are usually hospitals), in their sales contracts, that only vetted, qualified providers will perform repairs and maintenance.

As this brief explains, that is a common arrangement with immense public benefits. It protects patients from unqualified servicers who operate outside FDA oversight, lack the training, information, and materials needed to properly service a device, and jeopardize patients' safety.

SIS's arguments here would turn that common, beneficial practice into an antitrust problem. Lowering the bar for plaintiffs to establish antitrust liability based

2

on authorized-servicing provisions would make it harder for manufacturers to ensure quality servicing. Today, manufacturers' incentives align with patient safety. But if SIS prevails, manufacturers would be pressed to trade away servicing quality to mitigate antitrust risk.

The stakes are especially high when it comes to medical devices—patient safety is on the line. The scenario above was hypothetical, but the dangers are real. In one reported incident, a scope improperly repaired by a third party shed its insulation, which lodged in a patient's kidney. FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices, at 13 (2018), *available at* https://www.fda.gov/media/113431/download ("FDA Servicing Report"). A manufacturer should not be deterred from preventing that outcome.

## ARGUMENT

### I.    It is common industry practice for manufacturers to require authorized servicing

Medical devices of all kinds require regular maintenance and repairs. This servicing occurs after the devices leave the manufacturer's hands. That puts manufacturers in a difficult position. The devices now belong to customers, yet the manufacturer wants to ensure the devices perform well. After all, patient safety is on the line—and the devices bear the manufacturer's name and affect the manufacturer's reputation. So a responsible manufacturer must find some way to

ensure proper servicing.

A common solution is to agree with the buyer that servicing will be performed only by an entity vetted and authorized by the manufacturer. Advanced Medical Tech. Ass'n, Comment Letter on Petition for Rulemaking FTC-2023-0077, Attachment 1, at 3, 5-6 (Feb. 2, 2024), *available at* https://downloads. regulations.gov/FTC-2023-0077-1646/attachment_1.pdf ("AdvaMed FTC Submission"); AdvaMed Medical Imaging Division, Comment Letter on Petition for Rulemaking FTC-2023-0077, at 3 (Feb. 2, 2024), *available at* https://downloads.regulations.gov/FTC-2023-0077-1657/attachment_2.pdf ("AdvaMed Imaging FTC Submission"). Authorized servicers could include the manufacturer itself, the buyer's own in-house repair team, or third parties that the manufacturer has vetted. Manufacturers frequently train those authorized servicers and equip them with bespoke parts and tools.

To implement this solution, many manufacturers use—as Intuitive did here—clauses in their customer agreements providing that customers should use only manufacturer-authorized servicers and accessories. AdvaMed FTC Submission, Attachment 1, at 3, 5; *see* 6-ER-1303-05. Those agreements typically void warranties if the buyer uses unauthorized servicers. *Id.* And manufacturers often agree in those contracts to assist with authorized servicing, including by providing materials and

parts. AdvaMed Imaging FTC Submission 3-5.

## II.    That common practice serves vital public interests, because unauthorized servicing poses serious risks

Third-party medical-device servicers are unregulated, often unqualified, and can pose serious dangers to patients. To be sure, not all third-party servicers are unqualified—but that is why it is important to separate the wheat from the chaff. When manufacturers limit servicing to trusted providers, they benefit patients and the public.

### A.    Third-party servicers are not FDA regulated

Unlike medical-device manufacturers, third-party servicers are not regulated by the FDA. This allows unqualified servicers to escape accountability and put cost savings above safety. Without FDA oversight, someone else must step in and ensure quality servicing—which manufacturers do when they limit servicing to authorized providers.

1. The "FDA generally has not enforced [Food, Drug, and Cosmetic] Act requirements with respect to servicing activities." FDA Servicing Report 4. The FDA distinguishes "servicing" (unregulated) from "manufacturing" and "remanufacturing" (regulated). 89 Fed. Reg. 40490, 40491 (May 10, 2024); FDA, Remanufacturing of Medical Devices, at 3 (May 10, 2024) ("FDA Remanufacturing Guidance"), *available at* https://www.fda.gov/media/150141/download; 21 C.F.R.

§820.3(o), (w) (defining "Manufacturer" and "Remanufacturer"). "Servicing" is "repair and/or preventive or routine maintenance" of a medical device "for purposes of *returning it to [original] safety and performance specifications.*" FDA Remanufacturing Guidance 3 (emphasis added). "Remanufacturing," in contrast, makes alterations that "*significantly change[]* the finished device's performance or safety specifications, or intended use." *Id.* (emphasis added).

This means third-party servicers escape a litany of common obligations in the medical-device industry. For example, "servicers are not required to register and list with the [FDA] for medical devices." FDA, Transcript of Presentation on Final Guidance: Remanufacturing of Medical Devices, at 12 (Sept. 10, 2024), *available at* https://www.fda.gov/media/181931/download?attachment. They face no obligations when it comes to training, recordkeeping, or labeling. Just last year, the FDA again declined "to include third-party servicers and refurbishers" in quality-management-system requirements. 89 Fed. Reg. 7496, 7501 (Feb. 2, 2024). And servicers need not report when a device they serviced malfunctions or even causes serious injury or death. FDA Servicing Report 7; *see* 21 C.F.R. §803.10(c). In short, the FDA does not monitor third-party servicers or ensure that they return devices to safe and effective condition.

Manufacturers, by contrast, operate under rigorous, comprehensive FDA

scrutiny—including as to servicing. To bring a device to market, manufacturers must obtain FDA authorization. The more complex and risky the device, the greater the obligations. All devices must satisfy "general controls," which include prohibitions on adulteration and misbranding. *See* 21 U.S.C. §360c(a)(1)(A). More complicated devices classified as higher risk also face additional "special controls," which can include requirements for clinical data, bench testing, satisfaction of certain standards, use of specific materials, patient registries, FDA recommendations and guidelines, and post-market surveillance. *See id.* §360c(a)(1)(B)-(C); 21 C.F.R. §860.3. The devices at issue in this case are subject to such special controls. *See* 1-SER-60. And "[r]egardless of which category FDA chooses, there must be a 'reasonable assurance of the safety and effectiveness of the device'" before the device is authorized for sale. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 134 (2000).

FDA regulation also goes far beyond just approving new devices. Manufacturers must also share information with the FDA and the public to enable constant FDA oversight. Manufacturers must register annually with the FDA and list their devices. *See* 21 C.F.R. §§807.3 *et seq.* They must comply with FDA labeling requirements. *See id.* §§801.1 *et seq.* And they must report adverse events—when their device may have caused or contributed to a death or serious injury, and when

their device has malfunctioned and would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. *See id.* §§803.1 *et seq.* The FDA imposes detailed obligations on when and how manufacturers must report those events. *Id.*

And the FDA regulates manufacturers specifically when it comes to servicing. The FDA requires manufacturers to establish and maintain quality controls in virtually every aspect of their activities: "design, manufacture, packaging, labeling, storage, installation, and servicing." 21 C.F.R. §820.1(a)(1); *see id.* §§820.1 *et seq.* This governs the "procedures for performing and verifying" that "servicing" meets quality standards. *Id.* §820.200(a). Manufacturers must implement controls to ensure products maintain their quality throughout their lifecycle, including "servicing of the product." *Id.* §820.86. Manufacturers' personnel must be properly trained on servicing. *Id.* §820.25. Manufacturers must keep servicing records. *Id.* §820.200(d). And manufacturers must report to the FDA when they repair a device to "reduce a risk to health posed by the device." 21 C.F.R. §§806.2(d), 806.10(a)(1).

2. Unlike third-party servicers generally, two specific kinds of repair-related entities *are* FDA-regulated. *First*, as noted above, the FDA distinguishes between "servicing" and "remanufacturing" and regulates the latter, which entails changes to the "device's performance or safety specifications, or intended use." FDA

Remanufacturing Guidance 3. Some third-party servicers' activities are better characterized as remanufacturing, and *amicus* AdvaMed has urged the FDA to regulate third-party servicing entities more rigorously. *E.g.*, Advanced Medical Tech. Ass'n, Comment Letter on Medical Device Servicing and Remanufacturing Activities, at 5 (Feb. 25, 2019), *available at* https://downloads.regulations.gov/ FDA-2018-N-3741-0034/attachment_1.pdf ("AdvaMed 2019 FDA Submission"). But currently, "servicing" escapes regulation. And by SIS's own description, this case involves unregulated servicing: SIS claims its activities were not subject to FDA regulation. 3-ER-562; Pl.'s Mot. Partial Summ. J. 5, *Surgical Instrument Service Co. v. Intuitive Surgical, Inc.*, No. 3:21-cv-03496, Dkt. No. 127 (filed Mar. 23, 2023).[2]

*Second*, the *amicus* brief by the Association of Medical Device Reprocessors notes (at 7-8) that the FDA regulates "reprocess[ing]" of "single-use devices"— which are both statutorily defined terms. 21 U.S.C. §321(*ll*). A reticulated statutory scheme governs that narrow context. *E.g.*, *id.* §§352(u), 352(v), 360(o), 360e(c)(2). But—as the *amicus* brief does not deny—this case does not concern "reprocess[ing]" of "single-use devices," and that FDA supervision does not apply to third-party servicing of medical devices generally.

---

[2] But despite SIS's characterization, modifications to EndoWrists that change their specifications or intended use constitute remanufacturing and require compliance with FDA regulations. *See* FDA Remanufacturing Guidance 3.

3. Because of the gulf in FDA supervision between manufacturers and third-party servicers, manufacturer-approved servicing has significant public benefits. The FDA holds manufacturers to high, comprehensive standards—and third-party servicers to none. And when servicing occurs with the manufacturer's involvement, crucial information flows to the manufacturer and the FDA. As just described, manufacturers must collect service history, device performance, repair needs, and malfunctions, and must report to the FDA. Manufacturers and regulators can then use that information to improve the product and protect public safety. But when unknown third parties perform service, the manufacturer is left in the dark—and so are the FDA, patients, and the public.

This asymmetry creates divergent incentives. Manufacturers, accountable to the FDA, are incentivized to maximize servicing safety and quality. By contrast, unauthorized third parties—with no oversight from the FDA or manufacturers—are incentivized to minimize costs and turnaround time. They need not report anything to manufacturers (let alone end users like patients, doctors, and nurses). And when a device malfunctions, it is often difficult to pinpoint whether the cause is poor servicing. FDA Servicing Report 22. So unauthorized third parties can escape accountability for poor servicing, and they can focus on more visible priorities, like cost and speed.

10

**B.    Unauthorized third-party servicers lack crucial capabilities**

Even aside from regulatory oversight, servicing is often done best by providers who work with the original manufacturer. Unauthorized third-party providers frequently lack what it takes to service complex medical devices properly—in training and experience, up-to-date information, and materials.

***Training and experience***. Medical devices are complex. *See* Medical Imaging & Technology Alliance, Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices, at 32-33 (June 3, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0130/attachment_1.pdf ("MITA FDA Submission"); Hitachi Medical Systems America, Comment Letter on Refurbishing, Recondition, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices, at 10 (June 2, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0173/attachment_1.pdf. And devices are unique even within the same general category— under the hood, one defibrillator may be materially different from another. Because devices' designs are unique, so are their service needs and repair methods.

Understanding how to service a particular device thus requires extensive training and device-specific experience. Manufacturers train service personnel (including both their own employees and authorized third parties). AdvaMed FTC

11

Submission, Attachment 2, at 2. To properly train someone to service a device takes days—sometimes years—and thousands of dollars. *Id.*; AdvaMed 2019 FDA Submission 4. Manufacturer-trained personnel learn directly from the best possible source: the engineers who designed the product. Advanced Medical Tech. Ass'n, Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices, at 12-13 (June 2, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0141/ attachment_1.pdf ("AdvaMed 2016 FDA Submission"). And authorized technicians who specialize in a manufacturer's devices build up valuable experience. *Id.*

Third parties without manufacturer-provided training, in contrast, are critically underinformed. A servicer needs to understand the product's technical details "to ensure that the work being performed returns the device to its proper state." FDA Servicing Report 13. This includes device designs, product manuals, protocols for testing whether a device can be returned to operation, and other details. But these details are often proprietary and not widely published (partly to safeguard manufacturers' intellectual property). *Id.*; AdvaMed FTC Submission, Attachment 2, at 6. Unauthorized third parties must try to reverse engineer devices—which, as the FDA has observed, is often impracticable. FDA Servicing Report 13. Third-party

servicers untrained by the manufacturer must therefore grasp in the dark at key technical details of the complex devices they attempt to service.

*Product updates*. Unauthorized third parties also lack the ongoing updates that manufacturers share about their products. Manufacturers are constantly studying and improving their products. They gather new data from the field, make product changes, update software, engineer new ways to repair or maintain devices, and issue warnings and advisories. AdvaMed 2016 FDA Submission 12-13. Manufacturers have processes to alert buyers and authorized servicers—but not unknown third parties—with crucial updates. AdvaMed 2019 FDA Submission 4.

Manufacturer-authorized servicers also have access to key information about a particular device's history. Manufacturers collect service history. 21 C.F.R. §820.200(d); *supra* at 8. So manufacturers know, for example, whether and when parts have been replaced or what mechanical issues have occurred. And they can share that information with a servicer working with the manufacturer, but not an unknown third party.

A similar dynamic also plays out in reverse: unauthorized third-party servicing prevents information from flowing back to manufacturers, which inhibits further product improvements. When authorized servicers share service history with manufacturers, manufacturers can track significant events, investigate root causes,

13

and update their products. But unauthorized servicers, operating out of manufacturers' view, do not transmit this valuable information. MITA FDA Submission 7, 34. Indeed, some unauthorized servicers affirmatively obstruct recordkeeping by altering device identifiers—for example, one manufacturer discovered that after third-party servicing, three of its colonoscopes bore the same serial number. Olympus Corp., Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices, at 2 (May 26, 2016), *available at* https://downloads.regulations.gov/FDA-2016-N-0436-0103/ attachment_1.pdf ("Olympus FDA Submission").

*Tools and parts*. Servicing complex medical devices often requires device-specific equipment, which third parties may lack. FDA Servicing Report 13. Servicing a specialized handpiece, for example, may require more than 90 custom-made tools and a custom programmer. AdvaMed 2016 FDA Submission 12. And after servicing, many devices need to be tested and calibrated. This often requires specialized instruments—like custom retest fixtures, safety analyzers, and high potential electrical safety testing equipment. *Id.*; FDA Servicing Report 13. Manufacturer-authorized servicers use custom servicing equipment designed or approved by the engineers who created the product—not jerry-rigged by a third party. *Id.*

Likewise, manufacturer-authorized servicers use manufacturer-designed or approved replacement parts. Third parties without access to those parts resort to scavenging components from another product or using independently made parts. AdvaMed 2016 FDA Submission 11, 13. But independent parts manufacturers lack the necessary knowledge—of product design and specifications—to properly design, qualify and test components. *Id.* at 12-13. It is impossible to properly engineer one part without understanding the entire device system. *Id.* Moreover, devices are designed and validated to perform throughout their lifecycle using original-manufacturer parts. *Id.* Inserting unapproved components risks unknown disruption to delicate, complex systems. *Id.*; *see* Pat Baird, *The Risks of: Aftermarket Parts*, Biomedical Instrumentation & Tech., Nov/Dec 2011, at 458-463.

## C.    Improper servicing risks serious harm

The stakes could not be higher. When unqualified servicers botch repairs, patients suffer. This can be a matter of life and death.

As the FDA has recognized, "proper servicing is critical" to device safety and effectiveness. FDA Servicing Report 4. "[P]oor quality servicing" risks "malfunction" and "adverse events." *Id.* Quantifying those risks is difficult because third-party servicers need not report service history or adverse events. *Id.* at 22; MITA FDA Submission 7; *see supra* at 6. Even so, the FDA has documented over

4,000 reports of adverse events involving repairs by third-party servicers—including 40 deaths and 294 serious injuries. FDA Servicing Report 22. Moreover, between 2012 and 2017, just six manufacturers identified over 280 adverse events associated with third-party servicing—with some incidents exposing up to 38,500 patients and device operators to potential harm. AdvaMed FTC Submission, Attachment 1, at 6. And one manufacturer identified 87 instances in a single year in which third-party servicers used "unapproved components," "swapped" parts "between different machines without required testing," or performed other unapproved service operations. Baxter Healthcare Corp., Comment Letter on Refurbishing, Reconditioning, Rebuilding, Remarketing, Remanufacturing, and Servicing of Medical Devices, at 2 (June 3, 2016), *available at* https://downloads.regulations.gov /FDA-2016-N-0436-0166/attachment_1.pdf ("Baxter FDA Submission").

Examples of patient harm from third-party servicing include:

- "During an invasive urology procedure, the insulation sleeve from a flexible ureteroscope separated from the device and lodged in the patient's kidney. A resulting investigation revealed that the scope had been repaired by a third party entity using non-[original-manufacturer] materials." FDA Servicing Report 13.

- A ventilator malfunctioned and two people died. *Id.* "[A]fter undergoing

16

servicing by a third party entity, the main compressor inlet filter was missing, multiple components were replaced with non-[original manufacturer] parts, and the device was improperly assembled." *Id.*

- An infusion pump delivered an 18-hour opioid infusion in less than 3 hours. The pump had been incorrectly repaired by an unqualified servicer. AdvaMed 2016 FDA Submission 7-8; *see also* Baxter FDA Submission 2 (reporting instances of devices delivering "uncontrolled flow or over-infusion" of drugs due to modifications by third-party servicers "not authorized or trained by" the manufacturer).

- A screwdriver tip lodged in a patient after the device was improperly serviced. Advanced Medical Tech. Ass'n, Comment Letter on FDA Report on the Quality, Safety and Effectiveness of Servicing of Medical Devices, at 5 (Nov. 12, 2018), *available at* https://downloads.regulations.gov/FDA-2018-N-1794-0010/attachment_1.pdf.

- Bronchoscopes were contaminated by bacteria, and patients were infected, after the bronchoscopes were "subject[ed] to extensive third party repair" that replaced the manufacturer's insertion tube with one that was too short. Olympus FDA Submission 3.

- Endoscopes "separated and came apart during endoscopy procedures,"

17

caused "perforations," and resulted in "mucosal trauma" after a third-party repair that used replacement parts not made by the original manufacturer. *Id.* at 4.

- An x-ray film developer caught fire after a third-party servicer improperly wired the thermal safety fuse to bypass the device's safety feature. FDA Servicing Report 13.

- Parts of a refurbished laparoscopic ultrasonic device handpiece "shear[ed] off during a surgical procedure." AdvaMed 2016 FDA Submission 9.

- A nuclear medicine camera produced distorted images—"meaning a heart defect could go undetected"—and its cooling system was compromised after a third-party provider serviced the instrument improperly. MITA FDA Submission 14-16.

- An ultrasound probe delivered a degraded signal—risking misdiagnosis— after a third-party servicer used a non-original-manufacturer part with different material and measurements than the original. *Id.* at 22.

- Non-standard greases have been found inside devices after third-party repairs. Such greases can result in device overheating (potentially during use on a patient) and may not be biocompatible. AdvaMed 2016 FDA Submission 8-9.

- A device improperly repaired with a third-party motor controller can leak

18

exhaust during a sterile surgical procedure. *Id.* at 8.

Beyond physical harm, improper third-party servicing also jeopardizes the security of patients' private health data. Many modern medical devices, like MRI machines, store and transmit patient data electronically. These devices are not just complex mechanically; they also involve sophisticated cybersecurity protections. Servicers often need "privileged access to perform the necessary diagnostic, maintenance and repair functions." FDA Servicing Report 25. Unauthorized servicers—unfamiliar with the device's cybersecurity design, and possibly forced to jailbreak a device in lieu of manufacturer-provided access—may leave the device's data vulnerable.

## III. Inhibiting manufacturers from ensuring authorized servicing would threaten patient safety and innovation

Manufacturers' incentives today align with patient safety. Forcing manufacturers to allow unvetted third-party servicing would disrupt those incentives and harm the public. Yet that is what SIS's antitrust theory would do.

Currently, manufacturers have strong business incentives to put safety first. If a device malfunctions, blame will fall on the manufacturer—even if poor third-party servicing is the root cause. The manufacturer's name is on the device, and the identity of the servicer may be unknown, especially because unregulated servicers need not keep records. AdvaMed 2016 FDA Submission 3. Nor is it easy to pinpoint

whether servicing caused a malfunction. FDA Servicing Report 22. So to protect its reputation and brand—and to guard against liability—a manufacturer must work to prevent malfunctions by ensuring quality repairs and maintenance.

Protecting intellectual property reinforces that incentive. Manufacturers develop sophisticated, cutting-edge protocols and tools for repairing and maintaining their devices. *Supra* at 11-12, 14. Intellectual-property protections for those innovations help incentivize their development. And training and equipping someone to service a complex medical device requires sharing proprietary information—such as technical specifications, product schematics, servicing protocols and tools, and software—protected by trade-secret and copyright law. AdvaMed Imaging FTC Submission 5-6; AdvaMed FTC Submission 6. Undiscerning dissemination would defeat intellectual-property protections and enable copying and tampering. So manufacturers are incentivized to vet servicers carefully.

Threatening manufacturers with antitrust liability for agreeing with customers to use authorized servicers would distort those incentives and harm the public. Manufacturers' incentives would fall out of step with patient safety: fear of antitrust liability would cut against the existing incentives to ensure high-quality, vetted servicing.

20

Innovation would also suffer. For a medical device to achieve commercial success, it needs a sterling safety record. But if the manufacturer cannot ensure that only qualified providers perform repairs and maintenance, the gauntlet becomes even more impassable—deterring would-be innovators. Additionally, compelling manufacturers to share confidential design specifications or software access with third-party servicers would chill investment in cutting-edge improvements. Indeed, those third-party servicers could be rival manufacturers with a servicing business; forcing one device manufacturer to turn over confidential design specifications or software access to a rival would be disastrous for competition and innovation.

Finally, a manufacturer's incentive to ensure proper servicing is particularly important because patients, doctors, and nurses often cannot. Improper servicing is difficult to detect—until something goes wrong. AdvaMed 2016 FDA Submission 3. And because there are no labeling or marking requirements for third-party-serviced devices, patients, doctors, and nurses might not know that the device has been serviced by an unauthorized third party at all. *Id.* at 14-15; MITA FDA Submission 7; Olympus FDA Submission 2. Manufacturers are in prime position to safeguard patient and provider interests by requiring that servicing be performed by vetted, qualified providers. This Court should reject a rule that would turn that public benefit into a source of antitrust liability.

## CONCLUSION

Authorized-servicing provisions are a common, prudent response to the FDA's regulatory asymmetry and the technical realities of medical devices. This practice promotes patient safety and innovation. The Court should preserve manufacturers' ability to ensure authorized servicing and reject SIS's attempt to make it easier for plaintiffs to recast that common practice as an antitrust problem. The Court should affirm.

Respectfully Submitted,

*/s/ Michael F. Qian*
Michael F. Qian
HAYNES AND BOONE, LLP
2801 N. Harwood St., Suite 2300
Dallas, TX 75201
(214) 651-5375
*Michael.Qian@haynesboone.com*

**Counsel for *Amicus Curiae***
**Advanced Medical Technology**
**Association**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1372

I am the attorney or self-represented party.

**This brief contains** | 4,104 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [        ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Michael Qian | **Date** | November 5, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*