**No. 25–1372**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

PLAINTIFF-COUNTER-DEFENDANT-APPELLANT,

V.

INTUITIVE SURGICAL, INC.

DEFENDANT-COUNTER-CLAIMANT-APPELLEE

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA,
CASE NO. 3:21-CV-3496
HON. ARACELI MARTINEZ-OLGUIN

---

**AMICUS CURIAE BRIEF OF MEDICAL DEVICE MANUFACTURERS
ASSOCIATION IN SUPPORT OF APPELLEE**

---

Ryan M. Sandrock
Kevin P. Burke (application pending)
SHOOK HARDY & BACON L.L.P.
555 Mission Street
San Francisco, CA 94105
(415) 544-1900
rsandrock@shb.com
kpburke@shb.com

*Counsel for Amicus Curiae Medical Device Manufacturers Association*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Medical Device Manufacturers Association states that it is a non-profit organization and, as such, no entity has any ownership interest in it.

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF AMICUS CURIAE ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................. 3

I.    FDA'S REGULATORY REGIME PROMOTES SAFETY AND EFFECTIVENESS AND SHAPES MEDICAL DEVICE MARKETS.................................................................... 3

    A.    FDA Classifies Medical Devices Based on Risk. ............... 5

    B.    The Section 510(k) Review Process Assesses Safety and Effectiveness........................................................ 8

    C.    FDA Regulations Address Repair and Remanufacture. . 11

II.    FDA-BASED MARKET FACTS CAN BE RELEVANT TO THE ANTITRUST ANALYSIS IN MEDICAL DEVICE CASES........ 13

CONCLUSION ............................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Epic Games, Inc. v. Apple, Inc.,*
  67 F.4th 946 (2023) ...................................................................................3

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ...................................................................................6

*Ohio* v. *American Express Co.,*
  585 U.S. 529 (2018) .................................................................................13

**Statutes**

21 U.S.C. § 360c ..................................................................................... 5-10

21 U.S.C. § 360(k) ........................................................................................8

**Other Authorities**

21 C.F.R. § 807.81 .......................................................................................5

21 C.F.R. § 807.87 .......................................................................................9

21 C.F.R. § 807.92 .................................................................................... 8-9

21 C.F.R. § 807.93 .......................................................................................9

21 C.F.R. § 807.100 ...................................................................................10

21 C.F.R. § 820.3 ..................................................................................... 5, 12

21 C.F.R. § 860.3 .........................................................................................7

FDA, *FDA Guidance, The 510(k) Program: Evaluating Substantial
  Equivalence in Premarket Notifications [510(k)]* (July 28, 2014),
  *available at* https://www.fda.gov/media/82395/download ...................10

ii

FDA, *FDA Continues to Take Steps to Strengthen the Premarket Notification [510(k)] Program – Program Updates* (May 29, 2024), *available at* https://www.fda.gov/medical-devices/510k-clearances/fda-continues-take-steps-strengthen-premarket-notification-510k-program-program-updates ...........................................................................................10

FDA, *Remanufacturing of Medical Devices: Guidance for Industry, Entities That Perform Servicing or Remanufacturing, and FDA Staff* (May 10, 2024), *available at* https://www.fda.gov/regulatory-information/search-fda-guidance-documents/remanufacturing-medical-devices................... 11-12

## INTEREST OF AMICUS CURIAE

Amicus Curiae is the Medical Device Manufacturers Association (MDMA). MDMA, established in 1992, is a national trade association that provides educational and advocacy assistance to approximately 300 innovative and entrepreneurial medical technology companies. MDMA's mission is to promote public health and improve patient care through the advocacy of innovative, research-driven medical device technology.[1] In so doing, it seeks to promote medical technology innovation and shape policies that impact and improve the ecosystem for patients and innovators.

## INTRODUCTION AND SUMMARY OF ARGUMENT

MDMA and its members recognize the importance of competition free of artificial, unnecessary constraints. Competition drives the innovation that brings life-saving and life-enhancing technologies to the marketplace. So too does patient safety and product quality, which are of paramount importance, from both ethical and competitive standpoints. For competition

---

[1] All parties have consented to the filing of this amicus curiae brief. No counsel for a named party in this case has authored this amicus curiae brief in whole or in part, and no party, party's counsel, or any other person—other than this amicus curiae or their counsel—has contributed money that was intended to fund preparing or submitting this amicus curiae brief.

to be effective, medical devices must be trusted by physicians, patients and the public. These safety and quality considerations are also driven by the legal environment, including FDA regulations and the risk of liability for defective products. For these reasons, manufacturers have a strong and legitimate interest in how their products are marketed, stored, and used. For capital equipment and reusable accessories, this interest extends to how products are maintained, reprocessed, and repaired.

In instances where contractual restrictions relate to modifications to medical devices that implicate product safety or quality, the manufacturer's conduct should be considered in light of these factors, including the applicable regulatory regime. These contextual facts are particularly important in antitrust cases because the regulatory regime may be relevant to deciding whether restrictions are unreasonable or harm competition.

However, the district court excluded all evidence relating to FDA's Section 510(k) required review and determination process for reasonable assurance of safety and effectiveness. While MDMA does not ordinarily intervene in disputes between private parties, MDMA does so here because this aspect of the ruling potentially distorts the reality of medical device markets and in some cases could undermine patient safety. Therefore, while

2

MDMA does not challenge the outcome in the court below, it urges this Court to instruct courts hearing antitrust and other cases involving medical device markets to consider the FDA's regulatory framework for product safety and efficacy.[2]

## ARGUMENT

### I.  FDA'S REGULATORY REGIME PROMOTES SAFETY AND EFFECTIVENESS AND SHAPES MEDICAL DEVICE MARKETS.

FDA regulates medical devices to ensure their safety and effectiveness. When presented with a new medical device, FDA's level of review for safety and efficacy depends on several factors. If the device or anything similar has never been marketed, is being marketed for a new intended use, or is of a new technology that raises different questions of safety and effectiveness, the device is generally subject to a de novo petition premarket ("de novo") process or an independent premarket approval ("PMA") process. These processes can be time-consuming and expensive.

---

[2] Amicus submits this brief to emphasize the importance of the FDA's regulatory framework in medical device antitrust cases. Amicus does not take a position with respect to the requirements from *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (2023) and does not dispute Intuitive's position that this court can affirm the decision below without unsettling the motion in limine ruling or considering additional FDA evidence.

A different review process—the Section 510(k) premarket review process—is available for medical devices and FDA is required to make a determination regarding whether the device is "substantially equivalent" to a legally marketed predicate device. FDA makes this determination by comparing the device to the predicate. This review is generally faster and less expensive than de novo or PMA because the safety and effectiveness of the medical devices is based on a predicate device that has been in the market and for which reasonable assurance of safety and effectiveness have already been established. Under this regime, the manufacturer is required to show that its newer product is *at least* as safe and effective as this predicate device.

Additionally, for multiple-use medical devices, proper servicing is critical to the safe and effective use of the devices over their useful lifetime. Therefore, FDA's regulatory regime carefully delineates between repairing and remanufacturing medical devices. As explained below, because remanufacturing carries more potential risk, the FDA imposes additional responsibilities on entities performing these activities.

## A.    FDA Classifies Medical Devices Based on Risk.

The Federal Food, Drug, and Cosmetic Act (FDCA) established, and FDA has implemented, a multi-tiered, risk based comprehensive regulatory regime for reviewing and making marketing determinations regarding medical devices in order to provide the public with "reasonable assurance of the safety and effectiveness of devices intended for human use." *See* 21 U.S.C. § 360c(a)(1). In addition to original part manufacturers, remanufacturers are also subject to these requirements when selling medical devices and aftermarket medical device parts to end users. 21 C.F.R. § 820.3(w) (defining "remanufacturer"); 21 C.F.R. § 820.3(o) (defining manufacturer to include remanufacturers); 21 C.F.R. § 807.81(a)(3)(i) (requiring 510(k) clearance for any "change or modification in the device that could significantly affect the safety or effectiveness of the device").

Under the Medical Device Amendments to the FDCA, the FDA assigns each medical device type to a specific class and that classification determines the level and type of review and controls needed for that type device: Class I (lowest risk); Class II (intermediate risk and identify special controls); and Class III (higher risk where special controls cannot be identified). *See* 21 U.S.C. § 360c(a)(1). As the U.S. Supreme Court has stated, "[r]egardless of

which category FDA chooses, there must be a reasonable assurance of the safety and effectiveness of the device." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 134 (2000) (internal quotation omitted).

Class I medical devices are simple devices that present low risk and are well understood, such as scalpels, bandages, tongue depressors, and medical gloves. These devices may be marketed if they satisfy certain "general controls," which include registration, listing, good manufacturing practices, proper labeling, compliance with quality system regulations, and post-market reporting. *See* 21 U.S.C. § 360c(a)(1)(A). Class I devices, by definition, are those devices for which these general controls are "sufficient to provide reasonable assurance of [] safety and effectiveness." *Id*.[3] Manufacturers do not need FDA premarket 510(k) submission and review and a determination by FDA to market most Class I type devices. *Id.*

---

[3] Class I devices exempt from Section 510(k) include those devices which are not for "a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health" and do not "present a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(a)(1)(A).

Class II medical devices are devices for which these general controls alone are not sufficient to provide reasonable assurance of safety and effectiveness. Devices are designated Class II types when FDA has sufficient information based on studies and other materials to establish the necessary "special controls to provide such assurance." 21 U.S.C. § 360c(a)(1)(B). Special controls can include requirements such as for clinical data, bench testing, satisfaction of certain standards, use of specific materials, patient registries, FDA recommendations and guidelines, and post-market surveillance in the 510(k) submission for review. *See* 21 U.S.C. § 360c(a)(1)(B); 21 C.F.R. § 860.3(c)(2). Generally, Class II devices are subject to FDA's 510(k) review process and must receive such authorization before they can be marketed in the United States. Examples of Class II device types include ultrasonic diagnostic equipment, x-ray machines, syringes, sutures, insulin pumps, and some prostheses.

Class III devices are higher-risk device types for which general controls alone are inadequate to provide reasonable assurance of device safety and effectiveness and there is insufficient information to establish special controls to provide such reasonable assurance of safety and

effectiveness. *See* 21 U.S.C. § 360c(a)(1)(C). These devices always require FDA marketing authorization through the PMA process.[4]

EndoWrists have been classified by FDA review as Class II type medical devices and, therefore, FDA 510(k) review and clearance is required prior to marketing. 21 U.S.C. §§ 360(k), 360c(a)(1)(B).

**B.    The Section 510(k) Review Process Assesses Safety and Effectiveness.**

The Section 510(k) review process is a rigorous safety and effectiveness process that was designed to give FDA flexibility in determining how to give the public access to Class I and II medical device types that are based on existing legally marketed devices. Rather than require each new iteration of a device to go through an extensive PMA process, Congress decided it would be better for public health if FDA could review and make determinations on a device for use if it can be determined to be "substantially equivalent" to an earlier, or predicate, device. *See* 21 C.F.R. § 807.92(a)(3). Congress enacted the Safe Medical Devices Act in 1990 to make

---

[4] All devices are in Class III until otherwise classified by FDA. De novo petitions start in Class III and if general controls alone are sufficient or if general controls in addition to special controls can be established, FDA will put the device into Class I or II.

8

clear that this substantial equivalence "standard" includes a determination that the new device is at least "as safe and effective" as the predicate.

The Section 510(k) review process has become a rigorous, substantial undertaking on safety and effectiveness. For example, FDA requires submissions to include:

- a statement of the device's intended use and an explanation on any difference(s) in intended use from the predicate device;

- a description of the device, including its technological characteristics such as its materials, design, energy source, and other features, and a comparison of those characteristics to the predicate device;

- the proposed labeling for the device;

- "an adequate summary for the public of any information respecting safety and effectiveness," including "detailed information regarding data concerning adverse health effects" or a 510(k) statement that a copy of the 510(k) can be provided to a requestor; and

- any performance data, including clinical or scientific data necessary to support a substantial equivalence finding.

21 U.S.C. § 360c(i)(1); 21 C.F.R. § 807.87; 21 C.F.R. §§ 807.92-93.

For example, additional scientific data, *i.e.*, non-clinical data, can include: bench testing on mechanical, electrical, and biological engineering performance, such as fatigue, wear, tensile strength, compression, flowrate, and burst pressure; electromagnetic compatibility; sterility; stability/shelf life; and software validation, as well as non-clinical animal and/or

9

biocompatibility studies. *See* FDA, *FDA Guidance, The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]* (July 28, 2014) at 22.[5]

FDA has many tools for evaluating 510(k) submissions so that it can make a determination of reasonable assurance of safety and effectiveness and of substantial equivalence to a predicate. It can request clinical data to determine that the new device is at least as safe and as effective as the predicate, seek team or advisory panel reviews, and ask for additional information to clarify or strengthen review determinations. *See* 21 U.S.C. § 360c(i)(1)(A); 21 C.F.R. § 807.100(b). FDA often finds additional information is necessary and rejects applications if it finds the application inadequate for its rigorous review process. *See* FDA, *FDA Continues to Take Steps to Strengthen the Premarket Notification [510(k)] Program – Program Updates* (May 29, 2024).[6]

---

[5] Available at https://www.fda.gov/media/82395/download.

[6] Available at https://www.fda.gov/medical-devices/510k-clearances/fda-continues-take-steps-strengthen-premarket-notification-510k-program-program-updates.

*C.*    **FDA Regulations Address Repair and Remanufacture.**

FDA recognizes that many medical devices "are reusable and need preventive maintenance and repair during their useful life." *See* FDA, *Remanufacturing of Medical Devices: Guidance for Industry, Entities That Perform Servicing or Remanufacturing, and FDA Staff* (May 10, 2024) ("FDA Remanufacturing Guidance") at 1.[7] Because "proper servicing is critical" to the "continued safe and effective use" of medical devices during their useful life, the FDA distinguishes between "servicing" and "remanufacturing" of a device. *Id*. Critically, FDA imposes more regulatory responsibilities on entities that remanufacture medical devices. *Id*.

To this end, FDA defines servicing as "the repair and/or preventive or routine maintenance of one or more parts in a finished device, after distribution, for purposes of returning it to the safety and performance specifications established by the OEM and to meet its original intended use." *See* FDA Remanufacturing Guidance at 3. Conversely, FDA defines remanufacturing as "the processing, conditioning, renovating, repackaging, restoring, or any other act done to a finished device that significantly

---

[7] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/remanufacturing-medical-devices.

changes the finished device's performance or safety specifications, or intended use." *Id*.[8] Entities that remanufacture a device, "are generally subject to the same regulatory requirements" as the original manufacturer of the device, including the applicable premarket review, notification, and/or authorization processes and corresponding control requirements. *Id*. at 17.

FDA focuses on the specific activities an entity performs to distinguish "servicing" from "remanufacturing." *See* FDA Remanufacturing Guidance at 3. FDA considers the addition or removal of components or parts from a legally marketed device to be remanufacturing when the addition or removal significantly changes the devices performance or safety specifications. *Id*. at 11-12.

Intuitive argues these FDA requirements are relevant to the antitrust analysis of post-market contractual restrictions. Br. at 9 n.1. Amicus agrees, as set forth below, the FDA regulatory framework is relevant to medical

---

[8] A finished device is "any device or accessory to any device that is suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized," 21 C.F.R. § 820.3 (l), but only when sold to the end user is any premarket review required for a device type that is not otherwise exempt.

device antitrust cases. The FDA facts might favor the manufacturer or the remanufacturer, but in each case they will generally be relevant.

## II.  FDA-BASED MARKET FACTS CAN BE RELEVANT TO THE ANTITRUST ANALYSIS IN MEDICAL DEVICE CASES.[9]

Antitrust cases depend on market facts. There is no antitrust violation in a rule of reason case without a properly defined antitrust market. *Ohio* v. *American Express Co.*, 585 U.S. 529, 541 (2018). And there is no antitrust violation if the challenged conduct is reasonable based on its procompetitive effects. *Id.* at 541-42. The regulatory framework for review of medical devices is critical to this assessment. FDA regulation regarding patient safety and effectiveness shapes competition in medical device markets. For example, manufacturers commonly negotiate customer contracts in anticipation of competitive products being cleared by FDA, and hospital and other customer purchasing decisions are often influenced by the availability of "substantially equivalent" medical devices.

---

[9] Again, MDMA does not dispute Intuitive's position that the court can affirm the decision below without considering any FDA-related evidence. MDMA makes the points in this section to suggest that, in some medical device antitrust cases, evidence related to FDA and its review process will be necessary to the antitrust analysis.

Contrary to these facts, the district court excluded all evidence relating to FDA's Section 510(k) review process. This ruling has the potential to distort competition by ignoring market forces in medical device markets. Here, Intuitive cites to evidence that some hospitals used significantly modified EndoWrists because the hospitals incorrectly believed that these modified devices had received FDA review and clearance. Br. at 12-13. Similarly, Intuitive cites evidence that it approved of the use of third-party FDA cleared EndoWrist devices with its da Vinci systems. *Id*. at 14. These assertions should be considered when evaluating whether there was an unreasonable exclusion that caused harm to competition.

Again, amicus takes no position on the outcome of this case, except to say that these safety and effectiveness FDA issues would be relevant in case of a retrial. Courts assessing a manufacturer's approval processes under the antitrust laws should be able to consider whether the manufacturer is promoting patient safety and competition.

## CONCLUSION

Amicus supports consideration of market facts—including the 510(k) regulatory process, product quality, and patient safety—in medical device antitrust cases.

Respectfully submitted,

/s/ Ryan M. Sandrock
Ryan M. Sandrock
SHOOK HARDY & BACON L.L.P.
555 Mission Street
San Francisco, CA 94105
(415) 544-1900
rsandrock@shb.com

Dated: November 5, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25–1372

1.  I am the attorney or self-represented party.

2.  **This brief contains 2658 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

3.  I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   [ ] it is a joint brief submitted by separately represented parties;

   [ ] a party or parties are filing a single brief in response to multiple briefs; or

   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

16

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**\_\_\_\_/s/Ryan M. Sandrock_____     **Date** November 5, 2025\_

**CERTIFICATE OF SERVICE**

I certify that on November 5, 2025, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

/s/ Ryan M. Sandrock