No. 25–1372

# In the United States Court of Appeals for the Ninth Circuit

———————————————————

SURGICAL INSTRUMENT SERVICE COMPANY,

*Plaintiff-Appellant,*

*v.*

INTUITIVE SURGICAL, INC.,

*Defendant-Appellee.*

———————————————————

On Appeal from the United States District Court for the
Northern District of California, Case No. 21-cv-03496-AMO
Hon. Araceli Martinez-Olguin, Judge

———————————————————

**BRIEF OF *AMICUS CURIAE* FOOD AND DRUG ADMINISTRATION
FORMER ASSOCIATE COMMISSIONER IN SUPPORT OF
APPELLEE'S ANSWERING BRIEF AND AFFIRMANCE**

———————————————————

KEKER, VAN NEST & PETERS LLP
CODY S. HARRIS, #255302
IAN KANIG, #295623
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400

*Attorneys for Amicus Curiae Food and Drug Administration
Former Associate Commissioner Peter Pitts*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ...................................................................1

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT............................................................................................5

I.    APPELLANT ILLEGALLY SOLD A REMANUFACTURED VERSION OF APPELLEE'S MEDICAL DEVICE BECAUSE IT FAILED TO SECURE CLEARANCE FROM THE FDA...........5

    A.    The FDA subjects medical devices to increased levels of regulatory scrutiny where patient safety requires. .............5

    B.    The FDA classifies appellee's da Vinci Surgical System and its EndoWrists as Class II medical devices that require special controls to ensure patient safety...................10

    C.    Remanufacturers of medical devices are also required to seek FDA clearance through appropriate processes..........14

    D.    The record in this case establishes that appellant was a Class II medical-device remanufacturer that failed to secure the requisite clearance from the FDA. .....................17

II.    MEDICAL-DEVICE MANUFACTURERS SHOULD NOT BE PRECLUDED FROM RESTRICTING PURCHASERS FROM USING ILLEGALLY REMANUFACTURED DEVICES. .............23

    A.    Medical-device manufacturers' prohibition on the use of non-FDA-cleared remanufactured versions of their devices benefits both consumers and competition.................25

    B.    The district court provided remanufacturers with a roadmap for selling illegal medical devices without any FDA regulation or manufacturer oversight. ...................31

CONCLUSION .......................................................................................36

FORM 17. STATEMENT OF RELATED CASES PURSUANT TO
    CIRCUIT RULE 28-2.6.................................................................37

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS..............38

CERTIFICATE OF SERVICE.................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ...............................................................34

*Rebotix Repair, LLC v. Intuitive Surgical, Inc.,*
  No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538 (M.D.
  Fla. Aug. 10, 2022) ...............................................................35

**Federal Statutes**

21 U.S.C. § 360c.................................................................. *passim*

**Rules**

Fed. R. App. P. 29(a)..........................................................2, 3

**Regulations**

21 C.F.R. § 10.115 ..................................................................6

21 C.F.R. § 807.3 ...................................................................8

21 C.F.R. § 807.81 ................................................................16

21 C.F.R. § 820.3 .................................................................15

21 C.F.R. § 860 .....................................................................8

62 Fed. Reg. 8961 (Feb. 27, 1997) ........................................6

63 Fed. Reg. 67076 (Dec. 4, 1998) ..................................16, 17

**Other Authorities**

FDA, "The 510(k) Program: Evaluating Substantial
  Equivalence in Premarket Notifications" (July 28, 2014) ...............9

FDA, "Classify Your Medical Device" (Feb. 7, 2020)...............9

FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device" (Oct. 25, 2017) ........................................... 9

FDA, "Remanufacturing of Medical Devices, Guidance for Industry, Entities That Perform Serving or Remanufacturing, and FDA Staff" (May 10, 2024) ........................... 15

FDA, "Report on Quality, Safety, and Effectiveness of Servicing Medical Devices" (May 2018) ............................. 27

Intuitive Surgical, da Vinci Surgical System Procedures ..................... 11

Intuitive Surgical, Intuitive Da Vinci X/Xi System Instrument and Accessory Catalog (Dec. 2023) ................................ 11

Thorin Klosowski, "What You Should Know About the Right to Repair," N.Y. Times (Jul. 15, 2021) ................................. 25

U.S. Government Accountability Office, "Medical Devices, FDA Has Begun Building an Active Postmarket Surveillance System" (Jul. 2024) ...................................... 28

## STATEMENT OF INTEREST

Amicus curiae Peter Pitts is a former Associate Commissioner of the United States Food and Drug Administration (the "FDA"). In that role, Mr. Pitts served as the senior communications and policy advisor to the FDA Commissioner. He supervised the FDA's Office of Public Affairs, Office of the Ombudsman, Office of Special Health Issues, Office of Executive Secretariat, and Advisory Committee on Oversight and Management. He also served on the FDA's counterfeit drug taskforce.

Mr. Pitts is currently the President and Co-Founder of the Center for Medicine in the Public Interest, a nonprofit, nonpartisan research and educational organization that seeks to advance the discussion and development of patient-centered health care. He is also a Visiting Professor at the University of Paris School of Medicine and a member of the Council for International Organizations of Medical Sciences Expert Working Group. Because of his expertise, Mr. Pitts regularly comments on health care policy issues, including in the New York Times, the Los Angeles Times, the Washington Post, and the Wall Street Journal.

This appeal ostensibly presents a question of antitrust law. But it also concerns an issue that significantly affects medical patient safety.

Namely, whether medical-device manufacturers can restrict purchasers from replacing FDA-approved component devices with remanufactured versions that lack the requisite FDA clearance. From a patient safety perspective, the answer is clearly yes. That is why the FDA prohibits the sale of remanufactured medical devices without clearing them first.

But the district court held that whether appellant remanufactured and resold appellee's FDA-approved medical devices without FDA clearance—and were illegal—was irrelevant to the antitrust analysis. That sends a clear signal to the market that third-party medical-device remanufacturers can refuse to secure the required FDA clearance, sell illegal devices, and then use antitrust law to reap profits and punish manufacturers for protecting patients. That would create a regulatory and enforcement loophole likely to flood the market with unsafe and ineffective medical devices. As a former Associate Commissioner of the FDA and patient-focused health care advocate, Mr. Pitts submits this amicus brief to highlight these issues for this Court's consideration.

All parties have consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel has authored this amicus brief in whole or in part, and no party, no party's counsel, and no other

person or association has contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## SUMMARY OF ARGUMENT

This case asks whether a medical-device manufacturer lawfully restricted purchasers from using unregulated aftermarket components that unauthorized third parties "remanufactured"—or, more accurately, hacked—to operate beyond their FDA-approved lifespan. Ans. Br. at 2. Beyond certain questions of antitrust law, appellant raises fundamental issues about medical-device safety: (1) whether third parties may resell expired and adulterated medical devices without FDA approval and (2) whether manufacturers may require purchasers to use authorized and FDA-approved components to ensure patient safety and device efficacy.

The record here shows that appellant changed appellee's medical device by doubling its FDA-limited use life. That is remanufacturing under FDA regulations and, for that reason, appellant was required to secure FDA approval before reselling its device for use on patients. The record also shows that appellee was acting with the best interest of patients in mind by requiring remanufacturers like appellant to seek approval before reselling their medical device for use on patients. But

3

the district court refused to decide whether appellant's device was illegal and kept all evidence about the FDA from the jury, leaving the factfinder in the dark about the truth of appellant's dangerous business.

Remanufacturers cannot be allowed to create a loophole in critical FDA safety regulations on medical devices by wielding antitrust claims against medical-device manufacturers like appellant attempted here. The alternative—permitting unlicensed third-party remanufacturers to resell medical devices without ***any*** FDA involvement—presents an existential threat to patient safety and device efficacy.  Whatever one believes about a general "right to repair" durable consumer goods, an unregulated right to repair cannot exist for FDA-approved medical devices.  Unregulated, remanufactured medical devices pose a high risk to consumer safety that most other consumer goods do not.

This Court should affirm the district court's judgment in full.  In the alternative, if this Court were to reverse the judgment, it should clarify that FDA regulations are key to the disposition of the case.  The jury should know that appellee's purchaser contracts benefitted consumers and competition by ensuring its FDA-regulated medical devices remained safe and effective for use in surgical procedures.

4

## ARGUMENT

## I.    APPELLANT ILLEGALLY SOLD A REMANUFACTURED VERSION OF APPELLEE'S MEDICAL DEVICE BECAUSE IT FAILED TO SECURE CLEARANCE FROM THE FDA.

As this Court considers appellant's antitrust claims, it should bear in mind that appellant was selling an illegal medical device.  Based on the regulatory record below, there is no real question that appellant was required to—but did not—obtain FDA clearance before reselling a remanufactured version of appellee's medical device in the United States.  Appellee's medical device is classified as a "Class II" medical device that requires special regulatory controls to ensure patient safety and device efficacy.  For that reason, Class II-device remanufacturers such as appellant are required to demonstrate to the FDA that those devices are safe and effective, most often through a "510(k)" application.  Without FDA clearance, any third party could put any Class II medical device on the market without *any* regulatory oversight whatsoever.  That is extraordinarily dangerous, which is why the FDA prohibits it.

### A.    The FDA subjects medical devices to increased levels of regulatory scrutiny where patient safety requires.

Since 1976, the FDA has regulated medical devices intended for human use in the United States under the Federal Food, Drug, and

5

Cosmetic Act.  21 U.S.C. § 321 , *et seq.* ("FD&C Act").  The FDA's device

standards are set forth in the FD&C Act, its formal regulations, and in

informal "good guidance documents" that espouse its views on the law.

*Id.* § 321(h)(1) (defining medical devices); *id.* §§ 351–362n-2 (statutory

provisions governing medical devices); 21 C.F.R. § 10.115 (setting out

the FDA's good guidance document practices and procedures).[1]

Pursuant to the FD&C Act and its formal regulations, the FDA

classifies each medical device as a Class I, Class II, or Class III device

depending on the strength of FDA regulation required to ensure the

health and safety of patients upon which it is used.  21 U.S.C. § 360c(a).

Medical devices are classified as Class I when they are not "for a

use in supporting or sustaining human life or for a use which is of

substantial importance in preventing impairment of human health" and

"do[] not present a potential unreasonable risk of illness or injury."  *Id.*

§ 360c(a)(1)(ii).  Medical devices can also be classified as Class I where

"general controls" such as accurate product labeling and manufacturer

---

[1] While the FDA's good guidance documents are not technically binding, "FDA's decision-makers will take steps to ensure that their staff do not deviate from the guidance document without appropriate justification and appropriate supervisory concurrence."  62 Fed. Reg. 8961, at 8967 (Feb. 27, 1997).  In short, these documents are the FDA's best practices.

6

registration are sufficient to protect patient safety. *Id.* § 360c(a)(1)(ii).
Class I devices include, for example, canes, crutches, and exam gloves.

Medical devices are classified as Class II when they are used to
support or sustain human life or prevent the impairment of human
health and "general controls by themselves are insufficient to provide
reasonable assurance of the safety and effectiveness of the device," but
where "there is sufficient information to establish special controls to
provide such assurance[.]" *Id.* § 360c(a)(1)(B). Class II devices include,
for example, MRI machines and surgical devices. "Special controls"
used to ensure the safe and effective operation of such devices may
include "the promulgation of performance standards, postmarket
surveillance, patient registries, development and dissemination of
guidelines [], recommendations, and other appropriate actions as the
[FDA] Secretary deems necessary to provide such assurance." *Id.*

Medical devices are classified as Class III—requiring the most
stringent level of regulation—when there is insufficient information to
determine whether general and special controls are sufficient to provide
reasonable assurance of their safety and effectiveness. *Id.* § 360c(a)(C).
These devices require more demanding premarket approval. *Id.* § 360e.

7

Any device that is not grandfathered into regulatory approval (because it was introduced before the FD&C Act was implemented in 1976), is not "substantially equivalent to another device within such type," or is not classified as Class I or II, is classified as Class III. *Id.* § 360c(f)(1).

Because of the serious risks to patient safety posed by Class II medical devices, manufacturers must secure FDA clearance to sell them. The type of clearance that a manufacturer must acquire depends on the novelty of the device. If a device is novel, meaning that it is not "substantially equivalent" to a "predicate device" already approved by the FDA, then it must seek "de novo" classification and clearance. 21 C.F.R. § 860, *et seq.* In de novo applications, manufacturers must submit detailed data about their proposed medical device, including the "benefits and risks of device use" and actual "performance data to demonstrate reasonable assurance of safety and effectiveness." *Id.*

If their device is not novel (*i.e.,* the FDA has already approved a predicate device for commercial use), a manufacturer may seek "510(k)" premarket clearance. 21 C.F.R. § 807.3, *et seq.* (setting out the 510(k) process). A 510(k) application must include, among many things, device specifications, proposed product labeling, and a statement indicating

8

that the device is substantially equivalent to a predicate device already in commercial distribution. *Id.* § 807.87. The FDA has issued detailed good guidance practices about securing 510(k) premarket clearance, including when manufacturers must show substantial equivalence[2] to a predicate device and how to demonstrate substantial equivalence.[3]

Once a device is submitted for FDA approval, a "classification panel" composed of experts qualified in developing, manufacturing, and using similar devices review the application. 21 U.S.C. § 360c(b), (c). The FDA has created approximately 1,700 different generic types of medical devices that are divided amongst 16 different expert panels.[4]

During the review process, the FDA may provide informal and preliminary evaluations of the proposed medical device, including by sending the applicant a deficiency letter demanding more information.

---

[2] FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device" (Oct. 25, 2017) (originally issued Jan. 10, 1997), available at: https://www.fda.gov/media/99812/download.

[3] FDA, "The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications" (July 28, 2014), available at: https://www.fda.gov/media/82395/download.

[4] FDA, "Classify Your Medical Device" (Feb. 7, 2020), available at: https://www.fda.gov/medical-devices/overview-device-regulation/classify-your-medical-device.

9

Though non-final, such a communication is highly significant: it reflects the FDA's view with respect to current law and regulation. In response, an applicant can cure the deficiencies or withdraw its application.

If the review moves forward, the classification panel then submits its conclusions and recommendations about how to classify the medical device and whether to approve the device for sale to the FDA Secretary. 21 U.S.C. § 360c(b)(7), (d). The Secretary then makes the final decision on device classification and approval and notifies the applicant. *Id.*

Class II or Class III medical devices that are not FDA-approved or exempted are considered "adulterated." *Id.* § 360c(f)(2)(B); *see also id.* § 351(f)(1)(B) (classifying unapproved medical devices as adulterated). Selling adulterated devices is a *strict liability criminal offense* that is punishable on a first offense by up to one year of imprisonment. *Id.* §§ 331(a), 333(a)(1) (criminal penalties for selling adulterated devices).

### B. The FDA classifies appellee's da Vinci Surgical System and its EndoWrists as Class II medical devices that require special controls to ensure patient safety.

Appellee's da Vinci Surgical System is classified as a Class II medical device that is FDA-approved for use in soft tissue surgery. Dkt.

No. 137–13 ¶¶ 145–46.[5] This surgical device allows surgeons to operate with increased precision and mobility during procedures, which include gallbladder removals, hysterectomies, and lung biopsies.[6]  It was first FDA-approved in July 2000, and each of the five further generations of the system have since been approved by the FDA.  *Id.* ¶¶ 76, 91–93, 99.

A core component of appellee's surgical device is its "EndoWrist"— its name for the interchangeable devices that attach to the system and are used by surgeons to perform the particular medical procedure.  Dkt. No. 137–2 ¶¶ 8–9.  Types of EndoWrists include endoscopes, scissors, scalpels, forceps, needle holders, endoscopic retractors, and accessories for electrocautery of tissue.[7]  EndoWrists are separately classified and cleared by the FDA as Class II medical devices because they are used in "supporting or sustaining human life."  Dkt. No. 137–13 ¶¶ 16, 37, 44; 21 U.S.C § 360c(a)(1)(B).  For that reason, EndoWrists, like the da Vinci

---

[5] Throughout this brief, "Dkt. No." refers to the district court docket.

[6] Intuitive Surgical, da Vinci Surgical System Procedures, available at: https://www.intuitive.com/en-us/patients/procedures.

[7] Intuitive Surgical, Intuitive Da Vinci X/Xi System Instrument and Accessory Catalog (Dec. 2023), available at: https://www.intuitive.com/en-us/-/media/ISI/Intuitive/Pdf/da-vinci-x-xi-instruments-accessories-catalog.pdf.

system, are subject to special regulatory controls. *Id.*

Perhaps most critically, the FDA has approved each EndoWrist medical device for a limited number of uses only. Dkt. No. 137–13 ¶¶ 78–82. That is because these surgical devices rely on an intricate cable and pulley system engineered into its "wristed" design that is subject to wear and tear from use or from chemical sterilization processes. Dkt. No. 137–2 ¶¶ 24–27. As a result, if the device is used in procedures after its labeled number of uses, the device can fail because of metal fatigue in the wire cables or friction in the pulley system. *Id.* ¶¶ 26–27 Accordingly, in its original application to the FDA, appellee provided detailed testing data to establish that the instruments will properly perform for the labeled number of uses. Dkt. No, 137–13 ¶¶ 78–82.

To ensure that each EndoWrist device is not used beyond its FDA-approved limited number of uses, the device incorporates "Tool ID electronics [that] provide electronic recognition of the tool, and store number of uses remaining in memory." *Id.* ¶ 81. Through these Tool ID computer chips, the "[i]nstruments are programmed to 'expire' and not be useable after a predetermined amount of usage in order to assure

reliable operation and the absence of 'wear out.'" *Id.* ¶ 84. The FDA thus approved the initial set of EndoWrists in July 2000. *Id.* ¶ 85.

Since the FDA first approved appellee's EndoWrists for use in its da Vinci Surgical System, the FDA has required appellee to seek 510(k) clearance for any additional uses and any increased number of uses. For example, in October 2001, appellee submitted a 510(k) application for new EndoWrists that included endoscopic forceps, graspers, needle drivers, and scissors. *Id.* ¶ 86. These devices "provided for a limited number of uses to ensure reliability and consistent performance" and then expire. *Id.* Appellee submitted patient testing data to demonstrate the efficacy of its use limitations, again with respect to its "wristed" design. *Id.* ¶ 87. In December 2001, the FDA sent appellee a "deficiency letter" regarding these new EndoWrists that required it to "specify the number of uses" and provide "data to support the claim." *Id.* ¶ 88. Appellee provided this additional information and data, and the FDA cleared the new EndoWrists in January 2002. *Id.* ¶¶ 89–90. In 2013, appellee secured 510(k) approval for the next generation of the da Vinci Surgical System and EndoWrist instruments. *Id.* ¶¶ 91–93.

In August 2022, the FDA approved appellee's 510(k) application for EndoWrists that could be used beyond its previously approved use life. *Id.* ¶ 101; Dkt. No. 137–2 ¶ 11.  The FDA reaffirmed to appellee that "changes to the reprocessing of your device require a 510(k)," which is "needed to ensure that the system . . . can be used safely and effectively for the number of uses proposed[.]"  Dkt. No. 137–13 ¶ 263.

This regulatory record makes clear that appellee's EndoWrists are Class II medical devices that require FDA clearance before they can be sold for use in the United States.  This record also makes clear that any significant changes to the device—including increasing its permitted number of uses—required appellee to seek additional FDA clearance.  This is exactly consistent with how the FDA regulates Class II medical devices, which helps ensure that such devices are safe and effective.  Without FDA clearance, the sale of these medical devices is illegal.

## C. Remanufacturers of medical devices are also required to seek FDA clearance through appropriate processes.

Just like manufacturers of medical devices, "remanufacturers" must secure FDA clearance to market such devices for use on patients.  FDA regulations define a medical-device remanufacturer as "any person who processes, conditions, renovates, repackages, restores, or does any

14

other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use." 21 C.F.R. § 820.3(w). "[A] significant change to device performance or safety specifications [is] one that, based on verification and validation testing and/or a risk-based assessment, results in a finished device that is outside the [manufacturer's] performance or safety specifications or introduces new risks or significantly modifies existing risks."[8] In turn, the FDA also defines a medical-device "manufacturer" to include "any person" who is engaged in device "remanufacturing." 21 C.F.R. § 820.3(o). For that simple reason, medical-device remanufacturers are subject to the **exact same** FDA regulatory requirements to which manufacturers are subject. Dkt. No. 137–13 ¶¶ 68–74; *accord* Amicus Curiae Br. of the Assoc. of Med. Device Reprocessors (Aug. 4, 2025) at 7 & n.4 (agreeing FDA regulations identically bind remanufacturers).

This means that remanufacturers must secure FDA approval to market medical devices by submitting a 510(k) or de novo application.

---

[8] FDA, "Remanufacturing of Medical Devices, Guidance for Industry, Entities That Perform Serving or Remanufacturing, and FDA Staff" (May 10, 2024), available at: https://www.fda.gov/media/150141/download.

In practice, this usually means that remanufacturers must demonstrate that their device is "substantially equivalent" to the original, predicate device that secured FDA approval. If it is not, then remanufacturers would need to secure de novo clearance of their medical device. It also means that remanufacturers must secure separate and additional FDA clearance whenever they make a "change or modification in the device that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, . . . or manufacturing process." 21 C.F.R. § 807.81(a)(3). And it means that remanufacturers must register and list themselves with the FDA to ensure that adverse patient events are reported. *Id.* § 807.20.

A remanufacturer cannot escape this FDA regulatory review by dividing ownership of the device from the remanufacturing and sale of the device among entities. 63 Fed. Reg. 67076, at 67077 (Dec. 4, 1998) ("FDA no longer believes that the processing, remarketing, or servicing of used devices should be characterized in terms of whether or not the processor acquires ownership of the device for purposes of resale or remarketing."). What matters to the FDA is "whether or not significant changes occur, or are made, in the performance or safety specifications

16

or intended use of the finished device, as a result of the processing" that has occurred. *Id.* Thus, a remanufacturer cannot avoid FDA review by dividing up its ownership, remanufacturing, and distribution among multiple entities. The FDA does not countenance such shell games.

### D. The record in this case establishes that appellant was a Class II medical-device remanufacturer that failed to secure the requisite clearance from the FDA.

Based on the record in this case, it appears that appellant was a participant in precisely such a scheme to divide up ownership, remanufacturing, and distribution in an effort to sell appellee's medical device without FDA regulation or manufacturer oversight. Although appellant acted only as a distributor, it still served as a medical-device remanufacturer that needed—but failed to obtain—FDA clearance to market its remanufactured EndoWrists for sale and use. By selling remanufactured EndoWrists without any FDA approval, appellant was selling an adulterated and thus illegal Class II medical device.

The record shows that sometime around 2014, a company called Rebotix began hacking into EndoWrist medical devices to extend their uses beyond the FDA-approved limit. Dkt. No. 230–7 at 6. By inserting a computer chip it called the "Interceptor" into the EndoWrist, Rebotix

17

could fool appellee's Tool ID electronics inside to accept a new use count starting at zero. *Id.* Rebotix advertised that it could "reset" the device multiple times in this manner to extend an EndoWrist's FDA-approved lifespan without limit. *Id.* Thus, Rebotix—without securing any FDA clearance—began selling appellee's EndoWrists for ***indefinite*** use.

Apparently, the FDA quickly caught wind of this scheme. Instead of seeking FDA clearance to remanufacture EndoWrist devices, Rebotix moved its operations to Panama and began reselling EndoWrist devices outside of the United States and FDA jurisdiction. *Id.* at 7. After those operations were enjoined abroad, Rebotix created a new business model in 2018 that involved hospitals retaining ownership of the devices and merely hiring Rebotix to modify the devices for extended use. *Id.* The remanufacturing process that Rebotix used was identical to the process that it had previously used on EndoWrists, but Rebotix simply told its customers that there was a loophole in the law that allowed it to skip FDA clearance if legal title to the used instruments did not change. *Id.*

To put even more distance between itself and these sales, Rebotix then contracted with another third party, Restore Robotics. *Id.* Restore would market the Rebotix "remanufacturing" process to hospitals, buy

18

Interceptor chips from Rebotix, and modify the EndoWrist devices. *Id.* That way, the thinking likely went, Rebotix neither held title to the EndoWrist devices involved nor performed the remanufacturing.

This is where appellant got involved. Rebotix contracted with appellant to also act as a marketer of its remanufactured EndoWrists. *Id.* at 9. But appellant did not handle the remanufacturing of the EndoWrists, let alone conduct safety testing to determine whether the devices it was reselling to hospitals would harm patients. *Id.* All that appellant did was resell the devices that Rebotix supplied. *Id.* This relationship was never even formalized in a written contract. *Id.* And it sold the devices under ***appellee's*** brand name. 5–SER–1061–62.

In May 2018, potential customers expressed concern to the FDA about Rebotix's lack of FDA clearance to engage in remanufacturing. *Id.* The FDA again expressly told Rebotix that 510(k) clearance was required to remanufacture and market extended-use EndoWrists. *Id.* Rebotix terminated its relationship with Restore in late 2019. *Id.* In February 2020, the FDA again contacted Rebotix and again confirmed that "a 510(k) is needed before [Rebotix] continue[s] [its] operation." *Id.*

19

Undeterred, Rebotix continued its operation. Then, on November 16, 2021, the FDA issued an "It Has Come to Our Attention" Letter to Rebotix demanding that it provide its "FDA clearance or approval number for the remanufactured" EndoWrist medical devices. Dkt. No. 432–30 at 1–2. The FDA explained that these devices "were cleared for a set number of uses. By extending the number of uses, your activities may be altering the intended use of the subject device." *Id.*

Then, on April 8, 2022, the FDA unambiguously wrote to Rebotix that its activities constituted improper remanufacturing and that it must stop selling hacked EndoWrists to hospitals for use in surgery.

> "The Agency believes that the activities of Rebotix constitute remanufacturing and would require FDA review and clearance (e.g. 510(k) / de Novo). We therefore request that Rebotix stop engaging in the current activities until an application is reviewed and cleared/granted. The instruments in question no longer maintain the same safety and effectiveness profile as cleared with the original manufacturer's own submission. During premarket review, FDA reviews test data to the labeled number of reuse cycles. This includes, but is not limited to, items such as electrical safety, reprocessing, software, and general performance testing. By extending the number of uses and modifying the instrument with a new chip, the prior information is no longer valid and requires additional review to the new labeled usage limit in order to establish safety and effectiveness. This is therefore different than returning the device to its original condition."

20

*In re Da Vinci Surgical Robot Antitrust Litig.*, No. 3:21-cv-03496 (N.D. Cal.), Dkt. No. 260–4 at 3.[9]  In response, Rebotix sought to confirm with the FDA that it would have to secure formal FDA clearance.  *Id.*

On April 22, 2022, the FDA issued a "summary recommendation" to Rebotix in response to its request for clearance to remanufacture the EndoWrist devices.  The FDA "determined that the firm's activities would indeed require premarket notification.  Had the OEM . . . decided to increase the number of uses in their own instruments, a 510(k) would have also been expected.  In addition, another firm seeking clearance for similar remanufacturing activities provided a 510k for review."  *Id.*

Another remanufacturer of the EndoWrist viewed the FDA's regulations the same way.  On September 30, 2022, Iconocare applied for and received 510(k) clearance from the FDA to resell the device. Dkt. No. 137–13 ¶¶ 152–53.  After an exhaustive 19-month review that required Iconocare to perform additional testing and make adjustments to its remanufacturing process, the FDA approved its remanufactured device.  Dkt. No. 230–7 at 14.  Because Iconocare received FDA

---

[9] This citation is from a related case before the same district court.

21

approval, appellee did not restrict purchasers from using its remanufactured devices. *Id.*

This regulatory record is unambiguous. Because appellees' EndoWrist medical devices are classified as Class II medical devices, any remanufacturing of those devices requires FDA clearance. What Rebotix did—hack into those devices to reset their internal controls that cause them to expire after their FDA-approved limited number of uses—unquestionably qualifies as remanufacturing. Rebotix caused significant changes to that device both by (1) extending the use of the device and (2) hacking into the devices to insert its Interceptor chip. Because Rebotix was remanufacturing EndoWrists without any FDA clearance, and then contracting with appellant to resell those devices, appellant was selling an adulterated medical device in violation of the FD&C Act that could have resulted in strict liability criminal charges.

Seeking to muddy the regulatory waters, appellant has pointed to an email from the FDA that, in response to Rebotix's request to "appeal" the FDA's decision, clarified that the FDA's correspondence was a "preliminary informal assessment" rather than an appealable "official regulatory evaluation." *In re da Vinci Surgical Robot Antitrust Litig.,*

22

Dkt. 260–4 at 2. But the fact that the FDA disapproved Rebotix's remanufacturing of EndoWrists in a summary assessment in no way diminishes its conclusion. The FDA instructed Rebotix that it needed to seek appropriate Class II device clearance in order to remanufacture and sell EndoWrists. But Rebotix—and by proxy, appellant, as its distributor—did not secure the FDA's clearance. Accordingly, its remanufactured product was adulterated and illegal.

## II. MEDICAL-DEVICE MANUFACTURERS SHOULD NOT BE PRECLUDED FROM RESTRICTING PURCHASERS FROM USING ILLEGALLY REMANUFACTURED DEVICES.

Instead of securing FDA clearance to remanufacture EndoWrists, appellant brought this lawsuit to open an unregulated backdoor into a heavily regulated market. By arguing that the antitrust laws bind device manufacturers' hands and forbid them from setting sensible aftermarket standards for using remanufactured devices, appellant places the entire burden on the FDA to monitor the market to ensure patient safety and device efficacy, allowing adulterated medical devices to flood the market in the meantime, in the name of competition.

That is a recipe for disaster. Medical-device manufacturers must be able to require purchasers to use only authorized remanufactured

devices.  Otherwise, the only way for the FDA to enforce its regulations on medical devices would be through *post hoc* enforcement actions.  By removing manufacturer aftermarket restrictions as a prophylactic remedy, remanufactured devices that lack the requisite FDA-approval will more frequently enter the stream of interstate commerce.  As a result, remanufactured medical devices are likely to fail more often, patients will likely be harmed more often, and device ***manufacturers*** will likely be sued more often for allegedly causing those injuries.

That Kafkaesque result should not be the outcome of this appeal. Allowing illegal remanufacturers of medical devices to weaponize the antitrust laws to prohibit manufacturers from implementing safety restrictions endangers patient safety, undermines device efficacy, and undercuts the regulatory framework that ensures both.  At minimum, appellee should have been allowed to tell the jury that appellant was selling remanufactured medical devices without FDA approval.  If this Court remands the case to the district court for further proceedings, it should clarify that such evidence is material to the analysis.  The alternative would empower and incentivize possibly unscrupulous—and certainly unregulated—actors.

### A. Medical-device manufacturers' prohibition on the use of non-FDA-cleared remanufactured versions of their devices benefits both consumers and competition.

In appellant's view, the antitrust laws constrain medical-device manufacturers from restricting purchasers from using remanufactured medical devices that lack the requisite FDA approval. This necessarily implies that only the FDA can enforce its remanufacturing regulations to prevent adulterated devices from entering the stream of commerce. It is no coincidence that appellant takes this position. Its adoption would allow third parties like appellant to market remanufactured devices without informing the FDA and without manufacturer constraints. Appellant frames this issue as one involving the "right to repair," but any such right cannot trump FDA regulatory requirements.

In recent years, the "right to repair" movement—which seeks to enshrine legal protections for consumers to hire third parties to repair electronics and appliances instead of manufacturers—has sprawled.[10] But whatever the merits of a right to repair durable consumer goods

---

[10] Thorin Klosowski, "What You Should Know About the Right to Repair," N.Y. Times (Jul. 15, 2021), available at: https://www.nytimes.com/wirecutter/blog/what-is-right-to-repair/.

are, medical devices must be carved out of any such legal protections, whether as a function of right to repair statutes or antitrust law.

Medical devices are nothing like retail consumer electronics. Those are markets where it may make policy sense to insist that aftermarket remanufacturers can repair or refurbish those devices without regulatory approval or manufacturer oversight. An aftermarket remanufacturer that replaces a smartphone screen poses no serious threat of harm to its users' health and safety. Put simply, no one is likely to die from using a refurbished iPhone or copy machine. Not so with Class II medical devices. Even a minor change, mistake, or malfunction can result in catastrophic results—including the death of a patient. A patient would reasonably feel uncomfortable having an inexperienced and unregulated third party refurbish a ventilator or a surgical robotics system. Such concerns would only grow when applied to medical devices like EndoWrists, which literally enter the patient's body and manipulate, cut, and cauterize internal tissues and organs. But in appellant's view, no one—not the FDA and not the manufacturer—should ensure that remanufacturers have the experience, training, and know-how to fix and recalibrate a highly

specialized piece of equipment, and that sound data supports the safety and efficacy of the remanufacturing process and remanufactured device. That kind of unregulated and unsupervised marketplace is dangerous.[11]

These concerns about medical-device remanufacturers are in no way hypothetical. In 2018, the FDA released a report showing that, for the 4,301 documents instances in which medical devices were serviced by third parties, there were 40 deaths, 294 serious injuries, and over 3,700 cases of device malfunction.[12] Indeed, the "majority of comments, complaints, and adverse event reports . . . pertain to 'remanufacturing.'" *Id.* at i, 22–23. In one instance, "a remanufactured imaging system that lacked FDA clearance or approval" malfunctioned and its "camera fell on and killed a patient." *Id.* at 22. While this is just one example, it

---

[11] The Federal Trade Commission's amicus curiae brief, which explains that it is "committed to vigorously enforcing the law to combat repair restrictions that violate antitrust or consumer protection laws," fails to discuss how its views on a general "right to repair" would function in the context of medical devices as opposed to other consumer goods. *See* Amicus Curiae Br. of the Fed. Trade Comm. (Aug. 6, 2025) at 2–3.

[12] FDA, "Report on Quality, Safety, and Effectiveness of Servicing Medical Devices" (May 2018) at 22, available at: https://www.fda.gov/files/about%20fda/published/FDARA-Section-710-Report-on-the-Quality--Safety--and-Effectiveness-of-Servicing-of-Medical-Devices.pdf.

effectively illustrates how remanufacturing can have a significant impact on the safety and effectiveness of a medical device and why FDA has interpreted regulatory requirements to apply to remanufacturers and has actively regulated them as manufacturers. *See generally id.*

Beyond FDA clearance of medical-device remanufacturers, another critical component for maintaining device safety comes from manufacturer aftermarket surveillance of its medical devices.[13]  The FDA lacks the resources to conduct independent investigations of every remanufactured product that has entered the marketplace. *Id.* It therefore relies on manufacturers to engage in aftermarket surveillance of their own devices to ensure they continue to function safely and effectively. *Id.* Unsurprisingly, appellant would prefer that antitrust law proscribed these kinds of manufacturer safety restrictions.  They have reframed the issue as an improper exercise of a manufacturer's market power.  Whatever antitrust law may say about how to evaluate such claims, this Court should know that, from a medical-device safety

---

[13] U.S. Government Accountability Office, "Medical Devices, FDA Has Begun Building an Active Postmarket Surveillance System" (Jul. 2024) at 1–2, available at: https://www.gao.gov/assets/gao-24-106699.pdf.

and regulatory perspective, a manufacturer's aftermarket restrictions are not properly characterized as simple anticompetitive restraints.

As an analogy, imagine that a third-party entity collects expired prescription medication and rebottles it for retail resale without FDA clearance. The third party uses the manufacturer's bottle and label, changes only the expiration date, and sells it without seeking FDA approval. The pharmaceutical manufacturer contractually restricts pharmacies from reselling this expired medication on the grounds that the FDA has set limits on the shelf life of these drugs to ensure patient safety. But the reseller claims that the pharmaceutical company that manufactures the medication cannot prevent those aftermarket sales because it would constitute an improper tying arrangement. That is ***exactly*** what appellant is asking this Court to bless in this case. Using antitrust law, appellant wants to prevent manufacturers from stopping the sale of expired medical devices without any regulatory oversight. That is obviously dangerous, and this Court should decline to sign off.

Further, if medical-device manufacturers are stripped of their ability to supervise aftermarkets, it is the manufacturer that would likely take the blame for an adverse event caused by a remanufacturer.

A patient who suffered injury at the hands of a malfunctioning device would look first to the manufacturer, focusing on whether the device was properly designed, made, and maintained. The manufacturer would then face scrutiny—and potentially liability—not only for how it designed and manufactured the device, but also potentially for failing to properly supervise how its purchasers used its device. This would place manufacturers in an untenable Catch-22: they could protect patients by restricting unregulated aftermarket remanufacturing and face antitrust claims, or instead leave patients unprotected and face tort claims.

Allowing medical-device manufacturers to restrict purchasers to FDA-approved remanufactured devices also protects fair competition. If unscrupulous remanufacturers can use antitrust law to invalidate these restrictions, it gives them a competitive advantage over other lawful remanufacturers who spend the time and money to get FDA clearance. It could also spur a race to the bottom, where the cheapest, fastest, and perhaps most unsafe remanufacturing processes offer the lowest prices in an unregulated market for remanufactured medical devices. The ultimate consumers—here, patients undergoing surgeries—are hardly served by a competitive landscape with this incentive structure.

30

For all of these reasons, medical-device manufacturers should be allowed to require purchasers to use only remanufactured versions of their devices that have received the requisite FDA approval. Antitrust law should not create a loophole for unscrupulous remanufacturers to sell unregulated medical devices and then punish manufacturers who try to restrain them. The FDA regulatory regime relies on these private enforcement mechanisms to ensure patient safety and device efficacy. Prohibiting these private enforcement mechanisms would not only undermine enforcement of FDA regulations, but it would likely also cause device manufacturers to face lawsuits when things go wrong.

### B. The district court provided remanufacturers with a roadmap for selling illegal medical devices without any FDA regulation or manufacturer oversight.

At minimum, medical-device manufacturers should be permitted to show that restricting purchasers from using remanufactured devices that lack FDA approval helps ensure patient safety, device efficacy, and fair competition in the aftermarket for remanufactured medical devices. The district court, however, prevented appellee even from discussing FDA regulations on remanufacturers, including appellant's failure to secure FDA-clearance to remanufacture EndoWrists, at trial. That

31

ruling—and the district court's further claim that 510(k) clearance is irrelevant to safety—further incentivizes unlawful remanufacturers to use antitrust law as a weapon for forcing their way into the market.

First, the district court rejected appellee's argument, presented in its cross-motion for summary judgment, that it could not have harmed appellant because appellant was selling an illegal medical device. Dkt. No. 204 at 15–16. The district court believed that deciding whether appellant's remanufactured devices required FDA approval was beyond its purview, despite the expert testimony in the record. *Id.* at 11–13. Namely, appellee's expert witness concluded, as this brief does, that the FDA unambiguously required Rebotix (and thus appellant) to secure FDA approval for its remanufactured devices before marketing them.[14]

Then, the district court excluded all evidence regarding the FDA's regulation of medical-device remanufacturers and whether appellant was acting as an unlawful remanufacturer from the trial. Dkt. No. 330 at 2–3 (granting appellant's motion *in limine* to exclude "all testimony,

---

[14] The district court's deference to the FDA is particularly confusing given that there are apparently no ongoing regulatory proceedings that relate to appellant's remanufactured versions of appellee's devices. As a result, there seems to be no way for the FDA to ever make that ruling. The apparent result is that appellant got a "get out of jail free" card.

documentary evidence, and argument related to (1) the FDA's Section 510(k) regulatory framework and procedures for clearance of medical devices for commercial marketing, (2) the meaning, scope and application of the regulatory term 'remanufacturing,' and (3) whether [appellee] or other third parties' EndoWrist activities constitute 'remanufacturing' or require 510(k) approval."). The court believed that any discussion of these issues would prejudice the jury. *Id.* at 4.[15]

The district court went further still, holding that even if appellant had failed to receive FDA clearance, that is ***irrelevant*** to whether a remanufactured device is safe. Dkt. No. 330 at 2–3 (claiming "Section 510(k) clearance does not address issues of safety" and "Section 510(k) simply is not oriented towards ensuring safety of medical devices").

I am not an expert on the federal rules of evidence. But I am an expert on FDA regulations, what they mean, and their purpose. The FDA would certainly disagree with the district court's ruling, which

---

[15] Appellant then violated this order by introducing evidence about the FDA, which required the district court to issue a curative instruction. Dkt. No. 452 at 882–84. While this instruction informed the jury that "Rebotix lacked FDA clearance when [appellant] worked with it," appellee was not allowed to explain the implications. *Id.* The court then instructed the jury, also without explanation, that "FDA clearance does not determine as a matter of law that a product is safe." *Id.*

appears based on a misreading of the regulatory record discussed in the Supreme Court's decision in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996). *Medtronic* concerned whether a medical-device manufacturer sued for negligent design could rely on its 510(k) clearance to preempt those safety claims. *Id.* at 483. The Supreme Court correctly disagreed, explaining that the FDA's 510(k) certification process does not prove device safety, it proves equivalence with a safe device. *Id.* at 486–87.

In this case, no party disputes that appellee's medical device is safe. What appellee sought to do was present evidence that appellant's ***lack*** of 510(k) clearance shows that its remanufactured product was not cleared by the FDA as the equivalent of a safe product. That is the basis for appellee's restriction on its aftermarket sales. This is the FDA's position, too: remanufactured device equivalence is evidence of safety, because the original device was deemed safe. That is the whole point of the 510(k) process. The district court got this wrong.

These district court rulings may have far-reaching and dangerous effects on patient safety. As explained in Section I above, the FDA's regulations make clear that appellant's products are "remanufactured" Class II medical devices that require FDA approval under the 510(k)

pathway. *Supra* at 18–24. But even if the district court was unwilling to reach that conclusion as a matter of law, it should have allowed appellee to present evidence to the jury discussing the FDA regulations at issue and appellant's failure to comply with them. Another district court confronting these same questions about Rebotix's unregulated remanufacturing ruled that such crucial information was admissible. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3272538, at *7 (M.D. Fla. Aug. 10, 2022).

Forcing this case to proceed without due discussion of the relevant FDA regulatory framework could have serious unintended consequences for medical device safety and efficacy. If appellant's status as a remanufacturer and its concomitant need to obtain FDA approval are irrelevant, then an antitrust victory for the remanufacturer—which would prevent the device manufacturer from ensuring that its products are used safely and effectively in accordance with FDA approval—would implicitly bless the sale and use of unregulated remanufactured Class II medical devices in the United States. Relying on antitrust principles, a remanufacturer could demand entry into the market for its adulterated devices, thereby evading any regulatory or manufacturer oversight.

As a former Associate Commissioner of the FDA, I believe that this endangers patient safety and device efficacy and undermines the FDA regulatory framework that meticulously seeks to ensure just that.

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated: November 5, 2025         Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

*/s/Cody S. Harris*
CODY S. HARRIS
IAN KANIG

*Attorneys for Amicus Curiae Former*
*Food and Drug Administration*
*Associate Commissioner Peter Pitts*

36

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 25-1372

The undersigned attorney or self-represented party states the following:

☒ I am unaware of any related cases currently pending in this court.

☐ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated: November 5, 2025         Respectfully submitted,

                                KEKER, VAN NEST & PETERS LLP

                                */s/ Cody S. Harris*
                                CODY S. HARRIS
                                IAN KANIG

                                *Attorneys for Amicus Curiae Former
                                Food and Drug Administration
                                Associate Commissioner Peter Pitts*

37

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-1372

I am the attorney or self-represented party.

This brief contains 7,000 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☒ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ☐ it is a joint brief submitted by separately represented parties;

    ☐ a party or parties are filing a single brief in response to multiple briefs; or

    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Signature */s/ Cody S. Harris*      Date November 5, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

38

## CERTIFICATE OF SERVICE

I, SAMANTHA ROMERO-BOTHI, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 5, 2025.

**BRIEF OF *AMICI CURIAE* FORMER FOOD AND DRUG ADMINISTRATION OFFICIAL PETER PITTS IN SUPPORT OF APPELLEE'S ANSWERING BRIEF AND AFFIRMANCE**

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Executed November 5, 2025, at San Francisco, California.

*/s/ Samantha Romero-Bothi*
SAMANTHA ROMERO-BOTHI