**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

*Plaintiff-ctr-defendant - Appellant*,

v.

INTUITIVE SURGICAL, INC.,

*Defendant-ctr-claimant - Appellee*.

No. 25-1372

D.C. No. 3:21-cv-03496-AMO

OPINION

Appeal from the United States District Court
for the Northern District of California
Araceli Martinez-Olguin, District Judge, Presiding

Argued and Submitted June 25, 2026
San Francisco, California

Filed August 13, 2026

Before: Mary H. Murguia, Chief Judge, and Lucy H. Koh and Holly A. Thomas, Circuit Judges.

Opinion by Judge Koh

## SUMMARY*

### Antitrust

The panel held that the district court erred in requiring Plaintiff Surgical Instrument Service Co., Inc. (“SIS”) to prove certain factors known as the “*Kodak*/*Epic* factors” in order to prove its antitrust claims against Defendant Intuitive Surgical, Inc. (“Intuitive”). At trial, SIS introduced evidence that Intuitive possesses more than 99% market share in the market for surgical robots used in minimally invasive soft-tissue (“MIST”) surgery—the “foremarket”—and 100% market share in the robot attachment instruments used in such surgeries—the “aftermarket.” The district court decided to instruct the jury that, in order to establish that SIS’s proposed aftermarket is a valid antitrust market, SIS needed to prove the *Kodak*/*Epic* factors.

The panel held that the district court’s jury instruction was erroneous. The panel explained that the *Kodak*/*Epic* factors apply only in cases where the plaintiff cannot show that the defendant possesses market power in the competitive foremarket and instead seeks to bring a “*Kodak*-style” antitrust claim alleging abuse of market power in a downstream, single-brand aftermarket. Here, however, SIS presented evidence at trial demonstrating that Intuitive leveraged its near-100% market share in the foremarket for MIST surgical robots to obtain and maintain 100% market share in the aftermarket for robot attachment instruments. SIS thus brought a standard foremarket/aftermarket tying

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claim for which proof of the *Kodak*/*Epic* factors was not required.

The panel rejected Intuitive's alternative argument that it was entitled to judgment as a matter of law based on the insufficiency of the evidence presented at trial. The panel concluded that Intuitive waived the argument that the evidence at trial was insufficient to establish that Intuitive possessed market power prior to SIS's entry in the market in 2019, and that even if Intuitive had not waived the argument, the evidence at trial was sufficient for a reasonable jury to conclude that Intuitive possessed market power prior to 2019. The panel also concluded that the evidence at trial was sufficient for a reasonable jury to find that Intuitive's process for approving third party products and services was illusory.

Accordingly, the panel reversed the judgment below and remanded for further proceedings.

## COUNSEL

Eric F. Citron (argued) and Kathleen Foley, Zimmer Citron & Clarke LLP, Washington, D.C.; Edwina B. Clarke and David J. Zimmer, Zimmer Citron & Clarke LLP, Cambridge, Massachusetts; Richard T. McCaulley, McCaulley Law Group, Chicago, Illinois; Joshua V. Van Hoven, Van Hoven PC, San Ramon, California; for Plaintiff-Counter-Defendant-Appellant.

Kannon K. Shanmugam (argued), Kenneth A. Gallo, Paul D. Brachman, James Durling, Anna J. Goodman, Anna J. Lucardi, and Jake L. Kramer, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C.; William B. Michael, Joshua Hill Jr., Daniel A. Crane, and Crystal L. Parker, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; Sonya D. Winner, Cortlin H. Lannin, and Isaac D. Chaput, Covington & Burling LLP, San Francisco, California; Kathryn Cahoy, Covington & Burling LLP, Palo Alto, California; for Defendant-Counter-Claimant–Appellee.

Mariel Goetz (argued), Geoffrey M. Green, Joseph Conrad, Joseph R. Baker, and Alok Narahari, Attorneys; H. Thomas Byron III, Deputy General Counsel; Lucas Croslow, General Counsel; Federal Trade Commission, Washington, D.C., for Amicus Curiae Federal Trade Commission.

Sandeep Vaheesan and Tara Pincock, Open Markets Institute, Washington, D.C., for Amicus Curiae Open Markets Institute.

Joshua P. Davis and Matthew I. Summers, Berger Montague PC, San Francisco, California, for Amici Curiae Antitrust Law Professors.

Kathleen W. Bradish, American Antitrust Institute, Washington, D.C., for Amicus Curiae American Antitrust Institute.

Jennifer Gross and Michael R. Goodman, Olsson Frank Weeda Terman Matz PC, Washington, D.C., for Amicus Curiae Association of Medical Device Reprocessors.

F.M. Haston III, Stanley E. Blackmon, and J. Turner Collins, Bradley Arant Boult Cummings LLP, Birmingham, Alabama, for Amicus Curiae American Association of Gynecologic Laparoscopists.

Michael Qian, Haynes & Boone LLP, Dallas, Texas, for Amicus Curiae Advanced Medical Technology Association.

Ryan M. Sandrock and Kevin P. Burke, Shook Hardy & Bacon LLP, San Francisco, California, for Amicus Curiae Medical Device Manufacturers Association.

Cody S. Harris and Ian Kanig, Keker Van Nest & Peters LLP, San Francisco, California, for Amicus Curiae Food and Drug Administration Former Associate Commissioner Peter Pitts.

Zac Morgan and Cory L. Andrews, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Amir C. Tayrani, Gibson Dunn & Crutcher LLP, Washington, D.C.; Julian Kleinbrodt and Sarah H. Roberts, Gibson Dunn & Crutcher LLP, San Francisco, California; Theodore J. Boutrous Jr., Gibson Dunn & Crutcher LLP, Los Angeles, California; for Amici Curiae International Center for Law & Economics and Scholars of Law and Economics.

## OPINION

KOH, Circuit Judge:

The primary question presented in this appeal is whether the district court erred in requiring Plaintiff Surgical Instrument Service Company, Inc. ("SIS") to prove certain factors known as the "*Kodak*/*Epic*" factors in order to prove its antitrust claims. At trial, SIS introduced evidence that Defendant Intuitive Surgical, Inc. ("Intuitive") possesses more than 99% market share in the market for surgical robots used in minimally invasive soft-tissue ("MIST") surgery—the "foremarket"—and 100% market share in the robot attachment instruments used in such surgeries—the "aftermarket." SIS's theory of liability was that Intuitive leveraged its market power in the foremarket to harm competition in the aftermarket. At the conclusion of trial, the district court ultimately decided to instruct the jury that SIS needed to prove the *Kodak*/*Epic* factors in order to establish that SIS's proposed aftermarket is a valid antitrust market. SIS conceded that the evidence was insufficient to prove the *Kodak*/*Epic* factors and stipulated to judgment in Intuitive's favor. SIS now appeals the judgment below on the ground that the district court's jury instruction was erroneous. In the alternative, Intuitive argues that it is entitled to judgment as a matter of law based on the insufficiency of the evidence produced at trial. For the reasons explained below, we hold that the district court's jury instruction was erroneous and reject Intuitive's challenge to the sufficiency of the evidence produced at trial. Accordingly, we reverse.

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. Factual Background

### i. The da Vinci Robot

Intuitive manufactures and sells the da Vinci, a surgical robot used to perform MIST surgery. Before the da Vinci was introduced to the market in the late 1990s, there were only two available surgical modalities: open and laparoscopic. Open surgery is performed through large incisions in the body that enable surgeons to directly visualize and expose tissue for manipulation and excision. The advantage of open surgery is that it allows surgeons to control surgical instruments using natural, intuitive hand movements. However, large incisions can cause major trauma and result in long and expensive recovery times for patients. The alternative to open surgery, laparoscopic surgery, is performed by inserting a camera and long, rigid instruments into the patient through a small incision. Although laparoscopic procedures "decrease[] patient trauma and length of stay in the hospital," surgeons generally found the "operative technique more difficult to learn and perform than conventional surgery," in part because laparoscopic instruments are "non-intuitive" and offer "limited degrees of freedom" and "poor sensory feedback."

In response to the limitations of these existing surgical modalities, Intuitive created the da Vinci, a robot-assisted surgical system that combines the minimally invasive nature of laparoscopic surgery with the intuitive motions of open surgery. As compared to open or laparoscopic procedures, patients who undergo surgery using the da Vinci report less bleeding, less pain, less scarring, shorter hospital stays, and quicker recovery times.

To perform an operation using the da Vinci robot, the surgeon sits at a viewing console, which displays a three-dimensional, high-definition image of the surgical field inside the patient's body. Mounted to the viewing console are hand controls that control robot arms located on a cart next to the operating table. The hand controls instantaneously translate the surgeon's hand movements to manipulate surgical instruments attached to the end of robot arms, which are inserted into the patient's body through small incisions. These instruments, known as EndoWrists, are also developed by Intuitive. EndoWrists mimic the human wrist but provide a greater degree of precision, dexterity, and range of motion. There are many types of EndoWrists, including traditional instruments such as forceps, scalpels, and scissors.

Intuitive installs in every EndoWrist a use counter that is pre-set to a specific number of "lives"—typically ten. The counter decreases the number of remaining lives each time the EndoWrist is activated, regardless of the length, intensity, or purpose of the use. Once the counter hits zero, the EndoWrist stops functioning and is no longer usable. Intuitive maintains that the use counter was put in place because of engineering limitations and patient safety considerations. According to one of Intuitive's founding business plan documents, however, the company envisioned "a business model based on recurring revenue rather than revenue from sale of capital equipment." Intuitive thus sought to derive its revenue not from selling the MIST surgical robots themselves, but from selling the "high margin 'resposable' instruments which can be resterilized and reused only for the number of times allowed by the company."

Intuitive introduced the first iteration of the da Vinci to the market in 1998, at which point it was the only MIST surgical robot available in the United States. Since then, the da Vinci has become the primary method of surgery for many types of procedures, including certain cancer procedures that cannot be performed laparoscopically. Surgeons are trained in medical schools on how to use the da Vinci robot, and hospitals "need[] to be able to offer the MIST surgical robot" to recruit surgeons.

Although a few minor competitors have entered the market for MIST surgical robots over the past few decades, the vast majority of robots installed in the United States are da Vincis. Intuitive has an installed base of over 5,000 da Vinci robots, as compared to only a few dozen made by Intuitive's competitors. SIS's expert testified at trial that Intuitive possesses over a 99% share of the market for MIST surgical robots in the United States.

**ii. Intuitive's Alleged Anticompetitive Conduct Against SIS**

Plaintiff SIS is a family-run surgical instrument repair business that provides services to hospitals and surgery centers. The services offered by SIS include repairing, refurbishing, sharpening, and cleaning the instruments used during surgery, such as scissors, graspers, and endoscopes. In the spring of 2019, SIS learned that another company, Rebotix, had developed the ability to modify the circuit board on the EndoWrist and reset the device's use counter. These modifications allowed the EndoWrist to be used more times than had been validated by Intuitive. Intuitive's marketing department set the target number of uses (again, typically ten), and Intuitive performed tests to validate safety only up to that number. Rebotix, however, performed

independent testing showing that the EndoWrist performed safely with additional uses. Specifically, Rebotix tested a representative sample of EndoWrists through 29 uses and found that they performed without any "degradation in performance or condition." Rebotix also tested a smaller sample of instruments through over 50 uses and again observed "no indications of material degradation."

SIS and Rebotix devised a plan to market Rebotix's ability to reset the EndoWrist counter. Under their arrangement, SIS would use its existing relationships with hospitals to market the service, Rebotix would reset the counter, and SIS would otherwise service the instrument (for example, by inspecting, refurbishing, and cleaning the tool). SIS sold its repair services for 40% below the price of buying a new EndoWrist from Intuitive. Beginning in June 2019, SIS serviced EndoWrists for about six different hospitals for about six months. The refreshed EndoWrists performed as expected without evidence of harm to patients.

When Intuitive discovered that hospitals were using SIS's services, Intuitive sent letters to the hospitals "strongly discourag[ing]" them from using SIS's unauthorized services and warning that the use of EndoWrists "beyond the programmed number of uses [constituted] a material breach" of the hospitals' agreements with Intuitive. Specifically, Intuitive's sales agreement for the da Vinci prohibits purchasers from using the da Vinci without an EndoWrist "made or approved by Intuitive." Similarly, Intuitive's Use, License & Service Agreement ("ULSA") provides that the sale of EndoWrists is "subject to a limited license," which expires once the EndoWrist is "used up to its maximum number of uses." The ULSA also prohibits any unapproved "repair, refurbishment, or reconditioning" of EndoWrists. In its letters to the hospitals, Intuitive stated that because the

hospitals had used EndoWrists "refurbished by an unauthorized third party, Intuitive may no longer accept [the hospitals'] service calls for" the da Vinci. After receiving these letters, every one of SIS's clients ceased using SIS's EndoWrist repair services.

### B. Procedural History

SIS filed suit against Intuitive in the Northern District of California on May 10, 2021. In its complaint, SIS alleged that Intuitive has "a 99%+ market share" in the market for surgical robots used in MIST surgeries, and that "Intuitive has leveraged its monopoly power . . . to prevent any repair services from existing and competing within the EndoWrist instrument aftermarket." SIS asserted four antitrust claims against Intuitive: (1) tying under Section 1 of the Sherman Act, for using Intuitive's dominant power in the market for MIST surgical robots to "coerce its customers into buying EndoWrists from Intuitive"; (2) exclusive dealing under Section 1 of the Sherman Act, for requiring "customers to replace their EndoWrist instruments on an exclusive basis with new Intuitive EndoWrists"; and (3) monopolization and (4) attempted monopolization under Section 2 of the Sherman Act, for willfully obtaining or attempting to obtain monopoly power in the market for repair and replacement of MIST surgical robot instruments through the use of illegal ties and exclusive deals.[1] These claims eventually went to trial in January 2025.

Prior to trial, the parties submitted competing jury instructions. At issue in this appeal is "Disputed Instruction No.7 Re Relevant Product Markets" ("Instruction No. 7"),

---

[1] Intuitive also asserted counterclaims against SIS, which are not relevant to this appeal.

offered by Intuitive. Instruction No. 7 largely incorporated language from the American Bar Association Antitrust Section's model jury instructions on defining a relevant market and explained first that "[f]or each of SIS's antitrust claims, SIS must prove by a preponderance of the evidence that the relevant markets it alleges are valid antitrust markets." The instruction then discussed a number of considerations relevant to the jury's determination as to whether SIS had met its burden of demonstrating a relevant product market. In addition to incorporating this model language, Intuitive also proposed including the following language in Instruction No. 7:

> To establish a valid single-brand aftermarket, SIS must prove each of the following four factors by a preponderance of the evidence:
>
> (1) the challenged aftermarket restrictions (which, here, are the alleged restrictions that Intuitive places in its contracts on the use with the da Vinci system of unauthorized instruments or instruments that have been modified by unauthorized third parties) are not generally known when hospitals make their "foremarket" purchase of the da Vinci system;
>
> (2) significant information costs prevent hospitals from forecasting life-cycle pricing accurately at the time they purchase their da Vinci surgical systems;
>
> (3) significant monetary or non-monetary switching costs exist; and

> (4) general market-definition principles regarding cross-elasticity of demand, like those on which I have instructed you, do not undermine SIS's proposed single-brand market.

These four factors, which the parties in this case refer to as the "*Kodak*/*Epic* factors," are derived from the Ninth Circuit's decision in *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023), which in turn interpreted the U.S. Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). SIS objected to Instruction No. 7 in its entirety as unnecessary.

Trial commenced on January 6, 2025, and lasted three weeks. SIS presented evidence that there were two relevant markets: one for MIST surgical robots, in which Intuitive had a 99% market share, and one for EndoWrists, in which Intuitive had a 100% market share. SIS did not present any proof of the *Kodak/Epic* factors. Following the conclusion of SIS's case in chief, Intuitive sought judgment as a matter of law under Federal Rule of Civil Procedure 50(a) based on, among other reasons, SIS's failure to present evidence of the *Kodak/Epic* factors. The district court denied the motion.

As the end of trial approached, however, the district court issued several conflicting rulings on whether to include the *Kodak/Epic* factors in the final jury instructions. First, the district court issued tentative jury instructions that adopted Intuitive's proposal to include the *Kodak/Epic* factors, with some minor modifications. Then, following the close of evidence, Intuitive renewed its motion for judgment as a matter of law, including on the ground that SIS had not presented evidence of the *Kodak/Epic* factors. The district

court again denied the motion, but also stated that it would "leave in Instruction Number 7."

The same day as that ruling, however, the district court issued a written order finding that "the proposed jury instruction requiring SIS to prove the [*Kodak/Epic*] factors [is] unnecessary." The district court also issued an accompanying "Final Jury Charge" that omitted Instruction No. 7. After Intuitive filed an objection, the district court issued another order tentatively sustaining the objection and indicating its intention to include Instruction No. 7.

The parties presented additional argument on the issue the following morning, after which the district court ruled finally that Instruction No. 7 would be given. SIS acknowledged that it had presented no evidence at trial to establish the *Kodak/Epic* factors and therefore stipulated to judgment in Intuitive's favor on SIS's antitrust claims. The district court entered judgment in favor of Intuitive. This appeal followed.

## II. JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. "We review a district court's formulation of civil jury instructions for an abuse of discretion, but we consider *de novo* whether the challenged instruction correctly states the law." *Wilkerson v. Wheeler*, 772 F.3d 834, 838 (9th Cir. 2014). "We review *de novo* a district court's grant of judgment as a matter of law. In so doing, we 'view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor.'" *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (citations omitted).

## III. DISCUSSION

We first address SIS's challenge to the district court's jury instruction requiring SIS to prove the *Kodak*/*Epic* factors. We next address Intuitive's challenge to the sufficiency of the evidence.

### A. SIS's Challenge to the District Court's Jury Instruction

The primary question presented in this appeal is whether the district court's decision to instruct the jury that SIS needed to prove the *Kodak*/*Epic* factors was erroneous. We hold that it was. We begin by discussing applicable antitrust law, including the related concepts of market power and market definition. We then discuss how those principles are applied in cases involving ties between foremarkets and aftermarkets. Next, we discuss the Supreme Court's decision in *Kodak* and our case law addressing "*Kodak*-style" antitrust claims. Finally, we explain why this case does not involve a *Kodak*-style antitrust claim, and thus why the district court's jury instruction requiring proof of the *Kodak*/*Epic* factors was erroneous.

#### i. Applicable Law

The general goal of antitrust law is to protect competition and to prevent monopoly power. *See Standard Oil Co. v. Fed. Trade Comm'n*, 340 U.S. 231, 249 (1951). The Sherman Act achieves this goal through two principal prohibitions. Section 1 of the Sherman Act prohibits *concerted* action by making unlawful "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Section 2, on the other hand, targets *independent* action by making it unlawful to "monopolize, or attempt to monopolize, or

combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." *Id.* § 2.

The parties in this case agree that the Rule of Reason applies to each of SIS's antitrust claims. The Rule of Reason is "a multi-step, burden-shifting framework that 'requires courts to conduct a fact-specific assessment' to determine a restraint's 'actual effect' on competition." *Epic*, 67 F.4th at 974 (quoting *Ohio v. Am. Express Co.* ("*Amex*"), 585 U.S. 529, 541 (2018)). Under the Rule of Reason, each of SIS's claims presents "the same question: does the challenged conduct have a substantial anticompetitive effect that harms consumers in the relevant market?" *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1066 (9th Cir. 2025) (citation modified); *see also Epic*, 67 F.4th at 998-99 (analyzing Section 1 and Section 2 claims together).

To answer whether the challenged conduct has a substantial anticompetitive effect that harms consumers in the relevant market, "a 'threshold step' is defining the relevant market in which the alleged restraint occurs." *Epic*, 67 F.4th at 974 (quoting *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020)). A relevant market for antitrust purposes is defined as "'the area of effective competition'—*i.e.*, 'the arena within which significant substitution in consumption or production occurs.'" *Id.* at 975 (quoting *Amex*, 585 U.S. at 543). To determine which products should be included in a single market, courts look to whether the products "have a reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Id.* (citation modified). The test for assessing a proposed market asks whether a hypothetical

monopolist controlling the proposed market "could profitably raise prices above a competitive level." *Id.*[2]

In most antitrust cases, the plaintiff must first define the relevant market because it enables the plaintiff to demonstrate circumstantially that the defendant possesses market power within that market. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *see also Kodak*, 504 U.S. at 469 n.15 (noting that because market power is often inferred from the defendant's share in the relevant market, "market definition generally determines the result of the case"). Market power, in turn, is "the power 'to force a purchaser to do something that he would not do in a competitive market.'" *Kodak*, 504 U.S. at 464 (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). Showing the defendant's possession of market power is a required element for many antitrust claims, and even when not strictly required, "is relevant and often critical." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1378 (9th Cir. 1989) (discussing attempted monopolization claims).

In this case, for example, SIS alleged that Intuitive engaged in illegal tying by using its market power in the market for MIST surgical robots to require hospitals to purchase EndoWrists exclusively from Intuitive. In a tying arrangement, the defendant uses its "market power in one product market to extend its market power to a distinct

---

[2] This inquiry often involves an empirical assessment of "past consumer-demand data and/or consumer-survey responses to determine whether a hypothetical monopolist could profitably impose a Small, Significant, Non-transitory Increase in Price above a competitive level." *Epic*, 67 F.4th at 975 (emphasis omitted).

product market. To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (citations omitted). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.* Accordingly, demonstrating that the defendant "possesses appreciable economic power in the tying product market" is an essential element of a tying claim. *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (stating three-factor test for tying claims).

SIS also asserted a claim for exclusive dealing premised on a similar theory—that Intuitive contractually required its da Vinci customers to purchase EndoWrists exclusively from Intuitive. Exclusive dealing occurs when an "'agreement between a vendor and a buyer . . . prevents the buyer from purchasing a given good from any other vendor,' and forecloses competition." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1180 (9th Cir. 2016) (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 & n.1 (9th Cir. 2010)). Similar to a tying claim, an antitrust plaintiff can show that the challenged agreements foreclose competition by demonstrating that the "agreements cover a market in which the defendant" occupies a dominant position. *CoStar Grp.*, 150 F.4th at 1067.

Lastly, SIS asserted claims for willful and attempted monopolization under Section 2 based on allegations that Intuitive engaged in anticompetitive conduct through its illegal tying arrangement and exclusive deals. The

defendant's "possession of monopoly power in the relevant market" is an element of a willful monopolization claim. *See Epic*, 67 F.4th at 998 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)). As for attempted monopolization claims, "[a]lthough proof of a defendant's power in the relevant market is not listed as an essential element . . . , such proof is relevant and often critical." *Thurman Indus.*, 875 F.2d at 1378.

**ii. Foremarket and Aftermarkets**

SIS's proposed market definitions involved two specific types of markets: foremarkets and aftermarkets. A "foremarket" is the primary market for a durable good (*e.g.*, a car), whereas an "aftermarket" is a "derivative market consisting of consumable goods or replacement components that must be used for the proper functioning of [the] primary good" (*e.g.*, brake pads). PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 564B (2026 Cumulative Supp. 2018-2023); *see also Epic*, 67 F.4th at 976 (providing similar definitions).

Claims involving foremarkets and aftermarkets are not new. For example, in *International Business Machines Corp. v. United States* ("*IBM*"), 298 U.S. 131 (1936), the U.S. Supreme Court addressed a foremarket/aftermarket tie similar to the tie at issue here. The defendant in that case, IBM, produced a type of computing machine, which operated by using cards to record data for tabulation or computation. *Id.* at 133. The foremarket for computing machines had only two competitors, and IBM was the larger of the two. *Id.* at 133, 136. IBM used its market power in the foremarket to condition the lease of its machines upon the lessee using cards manufactured only by IBM. *Id.* at 134-35.

The Supreme Court found that this tying arrangement was illegal because it "operated to prevent competition and to create a monopoly in the production and sale of tabulating cards suitable for [IBM's] machines." *Id.* at 135-36.

As cases like *IBM* illustrate, claims involving foremarket/aftermarket ties are assessed according to the standard antitrust market definition principles discussed above, without any need for proving the additional *Kodak*/*Epic* factors. Indeed, citing *IBM* and other Supreme Court precedent dating back to 1922, the Supreme Court in *Kodak* emphasized that cases involving foremarket/aftermarket ties do not involve "any exception to the usual antitrust analysis" and that aftermarkets are treated the same as "every other separate market." *Kodak*, 504 U.S. at 479 n.29.

**iii. *Kodak*-Style Antitrust Claims**

In contrast to a standard foremarket/aftermarket tying claim, an antitrust plaintiff may instead assert an alternative theory of antitrust liability first discussed by the Supreme Court in *Kodak*. In a "*Kodak*-style" antitrust claim, the plaintiff does not attempt to show that the defendant possesses market power in the foremarket. Instead, the plaintiff seeks to establish the defendant's antitrust liability based on the defendant's market power in a *downstream aftermarket* for the defendant's own goods—a so-called "single-brand aftermarket."

In *Kodak*, the plaintiffs were a group of companies known as independent service organizations ("ISOs") that repaired Kodak photocopiers. *Id.* at 455. The ISOs sued Kodak for illegal tying based on Kodak's adoption of policies that made it "more difficult for [ISOs] to compete with Kodak in servicing Kodak equipment." *Id.* However,

because Kodak faced competition from other companies in the foremarket for the sale of photocopiers, the ISOs could not establish the requisite market power needed to maintain a standard foremarket/aftermarket tying claim. *See id.* (discussing Kodak's "lack of market power in the primary equipment [fore]market"). Instead, the ISOs claimed that Kodak illegally tied the sale of Kodak *parts*—an aftermarket in which Kodak undisputedly had monopoly power—to the aftermarket for service of Kodak copiers. *Id.* at 459. In other words, rather than allege a foremarket/aftermarket tie like the one in *IBM*, the ISOs alleged that Kodak engaged in illegal tying between *two aftermarkets*.

Kodak moved for summary judgment, arguing that the ISOs' tying claim was not cognizable as a matter of law. *Id.* at 466. Kodak did not present any evidence to rebut the ISOs' showing of Kodak's market power in the parts and services aftermarkets. *Id.* Instead, Kodak made a simple legal argument: that the existence of competition in the foremarket for photocopier equipment categorically "preclude[d] any finding of monopoly power in derivative aftermarkets." *Id.* Kodak's reasoning was that, if Kodak were to raise prices above competitive levels in the aftermarkets, "potential customers would simply stop buying Kodak equipment" in the foremarket, *id.* at 470, which would lead to "a disastrous drop in equipment sales" for Kodak, *id.* at 472. Thus, Kodak contended, "competition in the equipment [fore]market cannot coexist with market power in the aftermarkets." *Id.* at 471.

The Supreme Court rejected this argument. Rather than adopt Kodak's bright-line rule that foremarket competition would necessarily "discipline" Kodak's ability to raise prices in the aftermarkets, *id.* at 486, the Supreme Court recognized that Kodak might still be able to exercise its

aftermarket power for several reasons, including: (1) consumers might be unable to acquire the information needed to accurately assess the total cost of maintaining a Kodak product over the course of its lifecycle; (2) consumers might lack the ability to engage in such "lifecycle pricing"; and (3) even if consumers could engage in lifecycle pricing, consumers might be "locked in" due to the high cost of switching to another company's product. *See id.* at 473-77.

By permitting the plaintiffs to proceed with their tying claim, the *Kodak* decision represented an *expansion* of antitrust liability. *See id.* at 489 (Scalia, J., dissenting) (arguing that the majority's opinion "threatens to release a torrent of litigation"). That is, the Supreme Court acknowledged that *even though Kodak lacked market power in the foremarket*—a fact that the dissenters in *Kodak* thought should have been dispositive, *see id.* at 493 (Scalia, J., dissenting)—the plaintiffs could *still* bring an antitrust claim based on Kodak's market power in the aftermarket for Kodak's own goods by showing the existence of "locked-in customers," *id.* at 476-77 (majority opinion).

Importantly, the Supreme Court's reasoning in *Kodak* was explicitly limited to circumstances in which the defendant lacked market power in a competitive foremarket. *See id.* at 454-55 ("The principal issue here is whether a defendant's *lack of market power in the primary equipment* [*fore*]*market* precludes—as a matter of law—the possibility of market power in derivative aftermarkets." (emphasis added)).

Indeed, the *Kodak* Court expressly declined to address the situation presented here. When the plaintiffs belatedly attempted to argue that Kodak possessed market power in

the foremarket, the Supreme Court refused to consider the argument. *See id.* at 465 n.10 (noting that the plaintiffs had failed to contest the Court of Appeals' presumption "that competition exists in the equipment [fore]market").

Our Circuit has continued the logic of *Kodak* in several subsequent decisions. Like *Kodak*, each of these cases involved situations where the plaintiff *could not* demonstrate the defendant's market power in the competitive foremarket and instead sought to pursue an antitrust claim alleging that the defendant possessed market power in an aftermarket downstream from a competitive foremarket.

The leading case in the Ninth Circuit applying *Kodak* is *Epic*. The plaintiff in that case, Epic, was a videogame developer that brought tying, monopolization, and other claims against Apple related to Apple's practices on the App Store. *See Epic*, 67 F.4th at 966-69. Because Apple possessed only "about a 15% market share in the global smartphone market," Epic did not attempt to base its tying claim on Apple's market power in the equipment foremarket. *Id.* at 966-67.[3] Instead, Epic attempted to define "two single-brand markets: the aftermarkets for iOS app distribution and iOS in-app payment solutions, derived from a foremarket for smartphone operating systems." *Id.* at 970 (emphasis omitted). Among other claims, Epic alleged that Apple engaged in unlawful tying between these two aftermarkets by tying app distribution to the use of Apple's

[3] Intuitive contends that the relevant foremarket in *Epic* was not the global smartphone market, but rather the market for mobile operating systems. That distinction is ultimately immaterial, however, because iOS is used exclusively on Apple devices, *see id.* at 980, and thus Apple's market share in the mobile operating systems market is necessarily the same as its market share in the smartphone equipment market.

in-app payment processor. *See id.* at 994. In other words, just like in *Kodak*, Epic brought a tying claim alleging that, even though there was a competitive foremarket, Apple used its market power in *one* aftermarket for Apple products to harm competition in *another* aftermarket for Apple products.

Before addressing Epic's specific claims, we first considered Epic's proposed market definition and considered whether Epic had met its burden of establishing a "*Kodak*-style market." *Id.* at 978. Specifically, we noted that "where a plaintiff asserts a *Kodak*-style single-brand aftermarket, it bears the burden of rebutting the economic presumption that consumers make a knowing choice to restrict their aftermarket options *when they decide in the initial (competitive) market to enter a contract*." *Id.* (citation modified). Drawing on *Kodak*, we outlined four requirements a plaintiff must satisfy to rebut this presumption:

> (1) the challenged aftermarket restrictions are "not generally known" when consumers make their foremarket purchase; (2) "significant" information costs prevent accurate life-cycle pricing; (3) "significant" monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market.

*Id.* at 977. Although worded slightly differently, these are the same concepts as those discussed in *Kodak*. We refer to these requirements as the *Kodak*/*Epic* factors. In *Epic*, we required proof of the *Kodak*/*Epic* factors to prove a single-

brand market, a threshold issue for all of Epic's antitrust claims.

Six months later in *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948 (9th Cir. 2023), we considered essentially the same market definition issue against the same defendant, Apple, this time in the context of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Like in *Epic*, the plaintiffs in *Coronavirus Reporter* were a group of app developers who sued Apple based on Apple's operation of the App Store. *Id.* at 953.[4] The crux of our decision was that the plaintiffs' "scattergun" complaint, which alleged "at least fifteen" different antitrust markets, failed to state a claim because the plaintiffs had "made no effort at all to define the markets or to distinguish them from one another." *Id.* at 956. In the course of rejecting the plaintiffs' various proposed market definitions, we noted that the plaintiffs appeared to bring "an allegation of a single-brand market" like the one in *Epic*. *Id.* We summarily rejected that market definition for the same reasons discussed in *Epic*. *Id.* Our reliance on the *Epic* decision's reasoning implicitly incorporated *Epic*'s determination that Apple lacked market power in the competitive foremarket for smartphones. *See id.* at 956 & n.3 (discussing consumers' foremarket purchasing decisions when "buying an iPhone" and noting the plaintiffs' allegations regarding a "broader market for smartphones"). Because we held that the plaintiffs failed to "meet the threshold step of defining a relevant market," we

[4] Specifically, the plaintiffs challenged "Apple's policy requiring that any apps related to COVID-19 be submitted by a recognized health entity such as a government organization or medical institution." *Coronavirus Reporter*, 85 F.4th at 953.

rejected their antitrust claims without further analysis. *Id.* at 957.

We engaged in the same type of analysis at the motion to dismiss stage in *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), a case decided before both *Epic* and *Coronavirus Reporter*. In our discussion of *Kodak*, we began by emphasizing that the *Kodak* plaintiffs "did not allege that Kodak held power in the general [fore]market" and instead "alleged market power only in a submarket consisting of those customers that had already purchased Kodak-brand equipment." *Newcal*, 513 F.3d at 1048. We then noted that the plaintiff, Newcal, like the plaintiffs in *Kodak*, did not allege that the defendant, IKON, "holds power in the primary market." *Id.* at 1050. Nevertheless, we allowed Newcal to proceed on its claims because, "[j]ust as the plaintiffs had in *Eastman Kodak,* Newcal offers factual allegations to rebut the economic presumption that IKON consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter an IKON contract." *Id.* In other words, engaging in an analysis similar to the *Kodak*/*Epic* factors, we held that the plaintiffs sufficiently alleged that "[c]ompetition in the initial market . . . does not necessarily suffice to discipline anticompetitive practices in the aftermarket." *Id.*

#### iv. Application of the *Kodak*/*Epic* Factors in This Case

As *Kodak* and our decisions interpreting it make clear, the *Kodak*/*Epic* factors apply only in cases where the plaintiff cannot show that the defendant possesses market power in the competitive foremarket and instead seeks to bring an antitrust claim alleging abuse of market power in a

downstream, single-brand aftermarket. That is because the *Kodak/Epic* factors clarify whether the competition and information available in the foremarket is sufficient to discipline anticompetitive conduct in the aftermarket. Here, however, there was no competition in the foremarket. Rather, SIS alleged, and then presented evidence at trial demonstrating, that Intuitive leveraged its near-100% market share in the foremarket for MIST surgical robots to obtain and maintain 100% market share in the aftermarket for EndoWrists. Thus, the district court erred when it concluded that SIS needed to prove the *Kodak*/*Epic* factors.[5]

In deciding to issue the disputed jury instruction, the district court misconstrued our case law as requiring proof of the *Kodak*/*Epic* factors *anytime* an antitrust plaintiff seeks to define a single-brand aftermarket. But that reasoning is not supported by either *Kodak* or our decisions applying it. The Supreme Court's decision in *Kodak* was expressly limited to situations in which the "defendant[] *lack*[*s*] . . . *market power in the primary equipment [fore]market*," 504 U.S. at 454-55 (emphasis added), and the Supreme Court declined to consider the situation where, as here, the defendant possesses market power in the foremarket, *see id.* at 465 n.10. Our decisions in *Newcal*, *Epic*, and *Coronavirus Reporter* merely confirmed *Kodak*'s reasoning and applied that reasoning in analogous factual circumstances. As in *Kodak*, the defendants in *Newcal*, *Epic*, and *Coronavirus Reporter* lacked market power in the competitive foremarket and the plaintiffs alleged that the

---

[5] We reject Intuitive's contention that SIS forfeited certain arguments regarding precisely when the *Kodak*/*Epic* factors should or should not apply. SIS preserved its argument that the *Kodak*/*Epic* factors do not apply on the facts of this case and that the district court's jury instruction was inappropriate.

defendants used their market power in a downstream aftermarket to harm competition in another downstream aftermarket.

Here, by contrast, SIS's theory was that Intuitive used its near-100% market power in the foremarket for MIST surgical robots to obtain and maintain a 100% market share in the aftermarket for EndoWrists by forcing MIST surgical robot consumers to purchase EndoWrists exclusively from Intuitive. In other words, SIS brought a standard foremarket/aftermarket tying claim like the claim in *IBM*. As the *Kodak* Court made clear, cases like *IBM* involving "tying in derivative aftermarkets" do not require "any exception to the usual antitrust analysis" and that aftermarkets are treated the same as "every other separate market." *Id.* at 479 n.29. Even Justice Scalia's dissent agreed on this point, stating that "manufacturer ties of *foremarket* equipment to aftermarket derivatives" violate the antitrust laws when the manufacturer has "monopoly power in the equipment" foremarket. *Id.* at 499 (Scalia, J., dissenting).[6]

As a practical matter, moreover, requiring proof of the *Kodak*/*Epic* factors makes little sense where the defendant possesses market power in the foremarket. This case provides a good illustration as to why. Consider the first three *Kodak*/*Epic* factors in turn. The first factor requires the plaintiff to show that "the challenged aftermarket restrictions are 'not generally known' when consumers make their

[6] For this reason, we are not persuaded by Intuitive's repeated assertion that single-brand aftermarkets are "disfavored" because they "risk making every company a monopolist in its own brand." Even the dissent in *Kodak* acknowledged that this concern is not present where, as here, the defendant possesses market power in the foremarket and uses that market power to require purchases in the aftermarket. 504 U.S. at 498-99 (Scalia, J., dissenting).

foremarket purchase." *Epic*, 67 F.4th at 977. Whether aftermarket restrictions are generally known, however, only matters if the knowledge of such information would impact consumers' purchasing decisions in the foremarket, thereby constraining the defendant's ability to raise prices in the aftermarket. Where, as here, there are no meaningful alternatives in the foremarket, whether or not consumers possess such information makes no difference.

The second factor likewise requires the plaintiff to show that "'significant' information costs prevent accurate life-cycle pricing." *Id.* Again, consumers' ability to engage in lifecycle pricing matters only if there are alternative products to which consumers can switch in the first place. Here, even if consumers possessed perfect information about the cost of maintaining the da Vinci robot over the lifetime of the product, that information would not allow them to make any different purchasing decisions in the foremarket given Intuitive's 99% market share in the foremarket.

Finally, the third factor requires the plaintiff to show that "'significant' monetary or non-monetary switching costs exist." *Id.* Requiring proof of this factor is logically incoherent when there *are no* alternatives to which consumers can switch.

In sum, the *Kodak*/*Epic* factors apply only in situations where the defendant lacks market power in a competitive foremarket and the plaintiff instead alleges a "*Kodak*-style" antitrust claim based on the defendant's market power in a single-brand aftermarket. Stated differently, a plaintiff seeking to pursue an antitrust claim based on the defendant's possession of market power in a single-brand aftermarket has two options: (1) show that the defendant has market power in the foremarket, or (2) if the plaintiff cannot show

that the defendant possesses market power in the foremarket, satisfy the *Kodak*/*Epic* factors.[7] SIS pursued the first option. Thus, SIS was not required to prove the *Kodak*/*Epic* factors for any of its antitrust claims, and the district court's jury instruction was erroneous.

### B. Intuitive's Challenge to the Sufficiency of the Evidence

Having concluded that the district court's jury instruction was erroneous, we now turn to Intuitive's alternative argument that the judgment below should be affirmed based on the insufficiency of the evidence presented at trial. Intuitive makes two arguments: first, that SIS failed to demonstrate that Intuitive possessed market power prior to 2019, and second, that SIS failed to prove that Intuitive's process for approving third party products and services was illusory.

#### i. Evidence of Intuitive's Pre-2019 Market Power

Intuitive first argues that the evidence presented at trial was insufficient to establish that Intuitive possessed market power prior to 2019. Intuitive argues that SIS was required to demonstrate that Intuitive possessed market power "at the time" its customers made their relevant purchases or entered into the relevant agreements. Intuitive began selling the da Vinci in 1998, and SIS did not enter the market until 2019. Thus, according to Intuitive, SIS was required to show that

[7] In reaching this conclusion, we need not, and do not, attempt to define any precise quantity of "market share" or "market power" needed to demonstrate a lack of competition in the foremarket. Intuitive's possession of over 99% market share in the market for MIST surgical robots would clearly meet any threshold.

Intuitive possessed market power during this time period—1998 to 2019—but failed to do so.

Intuitive's argument fails for two reasons. First, Intuitive's initial and renewed motions for judgment as a matter of law under Rule 50(a) did not assert that SIS failed to prove Intuitive's pre-2019 market power. Accordingly, Intuitive has waived the argument. *See OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1016 (9th Cir. 2018) (arguments "not raise[d] in [a party's] pre-verdict Rule 50(a) motion" are "waived for purposes of appeal" (citation modified)).

Second, even if Intuitive had not waived the argument, the evidence presented at trial provided a "legally sufficient evidentiary basis" for a reasonable jury to conclude that Intuitive had market power prior to SIS's entry in the market in 2019. Fed. R. Civ. P. 50(a)(1). Intuitive's own expert confirmed that "[f]rom 1999 through 2018, approximately, Intuitive was the only firm selling MIST surgical robots in the United States." Similarly, Intuitive's president confirmed that Intuitive was the only firm selling MIST surgical robots until at least 2009. The jury also heard testimony regarding the barriers to entry into the MIST surgical robot market, including Intuitive's high research and development costs from 1995 through 2022. This evidence was sufficient for a reasonable jury to conclude that Intuitive had market power prior to 2019.

**ii. Evidence that Intuitive's Third Party Approval Process Was Illusory**

Intuitive next argues that SIS failed to prove that Intuitive's process for approving third party products and services was illusory. The parties dispute which party bears the burden of proof on this point, but regardless of which

party bears the burden, the evidence was sufficient to support a reasonable jury finding that Intuitive had no process for approving third party services for EndoWrists and that any prospect of approval was illusory.

In support of its argument, Intuitive relies on evidence that Intuitive had approved "dozens" of third party services and products for use with the da Vinci prior to 2020; that Intuitive approved Rebotix and another third party to sell modified EndoWrists; that no third party sought Intuitive's approval to modify EndoWrists until after SIS ceased its business efforts; and that neither SIS nor Rebotix responded to Intuitive's request that Rebotix provide clinical proof of the safety and efficacy of its services. In response, SIS points to testimony from Intuitive's president indicating that Intuitive had no established process for approving third party EndoWrist repair services prior to November 2022. SIS further contends that none of the "dozens" of third party products approved prior to 2020 included EndoWrists and instead included products such as detergents and instrument trays. Finally, SIS contends that Intuitive's two approvals of the third party EndoWrists occurred years after 2019, and only as part of settlement agreements after those third parties sued Intuitive for antitrust violations.[8]

Viewing the evidence in the light most favorable to SIS and drawing all inferences in SIS's favor, the evidence presented at trial was sufficient for a reasonable jury to find that Intuitive's third party approval process was illusory. *See Krechman*, 723 F.3d at 1109. "[T]he reasonableness of a restrictive practice is a paradigm fact question." *Betaseed, Inc. v. U and I Inc.*, 681 F.2d 1203, 1228 (9th Cir. 1982); *see*

[8] The district court excluded evidence of these prior lawsuits from the jury.

*also id.* at 1230 (finding that a genuine dispute of fact precluded the grant of summary judgment in favor of antitrust defendant on a contractual tying claim). Although the evidence relied upon by Intuitive could have persuaded a jury that Intuitive's third party approval process was not illusory, the contrary evidence—including that Intuitive did not approve any third party EndoWrists until years after 2019 and had no established process for doing so—was also sufficient to support the opposite conclusion. Accordingly, Intuitive is not entitled to judgment as a matter of law on this basis.[9]

## IV. CONCLUSION

For the reasons discussed above, we **REVERSE** the judgment below and **REMAND** for further proceedings consistent with this opinion.

[9] We note that several amicus briefs filed in support of Intuitive focus on the issue of whether Intuitive's controls over the EndoWrist attachments were in the best interests of patient safety and whether the district court erred in making various pre-trial rulings that limited Intuitive's ability to introduce evidence of the FDA approval process. We express no views on these issues, which have not been raised by either party to this appeal and are not properly before us.